**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
E-mail: jpafiti@pomlaw.com

*Attorney for Plaintiff*

*[Additional Counsel on Signature Page]*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER L. SAYCE, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> FORESCOUT TECHNOLOGIES, INC., MICHAEL DECESARE, and CHRISTOPHER HARMS, <br><br> Defendants. | Case No. <br><br> <u>CLASS ACTION</u> <br><br> COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS <br><br> <u>DEMAND FOR JURY TRIAL</u> |

1

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiff Christopher L. Sayce ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Forescout Technologies, Inc. ("Forescout" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities, other than Defendants, who purchased or otherwise acquired Forescout securities between February 7, 2019, and October 9, 2019, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Forescout was founded in 2000 and is headquartered in San Jose, California.  The Company provides network security products in the Americas, Europe, the Middle East, Africa, the Asia Pacific, and Japan, selling its products and services through distributors and resellers.

3.      Forescout's profitability depends on, *inter alia*, the number of deals and licenses the Company can secure within a given fiscal period, as well as the relative size and geographic location of those deals.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

4.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Forescout was experiencing significant volatility with respect to large deals and issues related to the timing and execution of deals in the Company's pipeline, especially in Europe, the Middle East, and Africa ("EMEA"); (ii) the foregoing was reasonably likely to have a material negative impact on the Company's financial results; and (iii) as a result, the Company's public statements were materially false and misleading at all relevant times.

5.     On October 10, 2019, during pre-market hours, Forescout issued a press release announcing preliminary third quarter 2019 ("3Q19") financial results.  That press release lowered 3Q19 revenue guidance to $90.6 million to $91.6 million, compared to prior revenue guidance of $98.8 million to $101.8 million, and market consensus of $100.52 million.  In explaining these results, Defendants cited "extended approval cycles which pushed several deals out of the third quarter," which "was most pronounced in EMEA."

6.     On this news, Forescout's stock price fell $14.63 per share, or 37.32%, to close at $24.57 per share on October 10, 2019.

7.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

8.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

10.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Forescout is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions took place within this Judicial District.

11.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

12.     Plaintiff, as set forth in the attached Certification, acquired Forescout securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

13.     Forescout is a Delaware corporation with principal executive offices located at 190 West Tasman Drive, San Jose, California 95134.  The Company's common stock trades on the NASDAQ Global Market ("NASDAQ") under the ticker symbol "FSCT."

14.     Defendant Michael DeCesare ("DeCesare") has served as Forescout's Chief Executive Officer at all relevant times.  Defendant DeCesare sold 230,272 shares of Forescout common stock during the Class Period.

15.     Defendant Christopher Harms ("Harms") has served as Forescout's Chief Financial Officer at all relevant times.  Defendant Harms sold 82,761 shares of Forescout common stock during the Class Period.

16.     Defendants DeCesare and Harms are sometimes referred to herein as the "Individual Defendants."

17.     The Individual Defendants possessed the power and authority to control the contents of Forescout's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of Forescout's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Forescout, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

18.     Forescout was founded in 2000 and is headquartered in San Jose, California.  The Company provides network security products in the Americas, Europe, the Middle East, Africa, the Asia Pacific, and Japan, selling its products and services through distributors and resellers.

19.     Forescout's profitability depends on, *inter alia*, how many deals and licenses the Company can secure within a given fiscal period, as well as the relative size and geographic location of those deals.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**Materially False and Misleading Statements Issued During the Class Period[1]**

20.     The Class Period begins on February 7, 2019, when Forescout issued a press release announcing its fourth quarter and fiscal full year 2018 ("4Q/FY18") financial results (the "4Q/FY18 Press Release").  That press release provided fiscal full year 2019 ("FY19") revenue guidance of $363.1 million to $373.1 million, representing year-over-year growth of 24% at the midpoint.

21.     The 4Q/FY18 Press Release also quoted Defendant DeCesare, who touted that "[t]he quarter was marked by a ***record number of new customer additions***, some marquee customer wins across a diverse mix of industry verticals, ***strong international growth***, and ***large expansion deals with notable existing customers***."

22.     Additionally, the 4Q/FY18 Press Release quoted Defendant Harms, who represented that Defendants "were very pleased with the revenue growth that we achieved in the fourth quarter and full year 2018, which exceeded our expectations as a result of ***strong execution, successful deal conversion, and healthy market demand for our products***."  Defendant Harms also assured investors that these results were the consequence of "consistent revenue outperformance, improving gross margins from an increasing mix of software products," and "demonstra[ble] operating expense leverage with [the Company's] maturing sales organization."

23.     Later that day, on an earnings call with analysts and investors to discuss the 4Q/FY18 financial results, Defendant Harms touted the profitability and growth of its EMEA market, asserting that Defendants "saw strong execution across all geographies throughout the year," including EMEA, which represented 17% of total revenue for 2018, compared to 16% the year prior.

---

[1] All emphases added unless noted otherwise.

24.     Additionally, in response to a question from UBS analyst Fatima Boolani ("Boolani") as to how to reconcile Defendants' representations concerning increasing deal volume and deal sizes while average deal size came down year-on-year, Defendant Harms represented that "the average annual deal size was impacted by the success we had in [*inter alia*] EMEA in getting some net new logos that had smaller initial deal sizes," which was "[j]ust the volume of new customers and transactions we brought to the market," but that "the million dollars is really focused at the high end Global 2000 March healthcare and the government where the quantity of those deals stay consistent with the aggregate value of those deals increased year-over-year."

25.     On May 9, 2019, Forescout issued a press release announcing its first quarter 2019 ("1Q19") results, as well as raised FY19 revenue guidance of $365.3 million to $375.3 million, representing year-over-year growth of 24% at the midpoint.

26.     Later that day, on an earnings call to discuss Forescout's 1Q19 financial results, Defendant Harms touted that EMEA revenue for the quarter "was 15% . . . compared to 14%" in the year-ago quarter.  Defendant Harms also disclosed that "a handful of deals that we initially expected to close in the second quarter are now expected to close in the latter part of the year."  In response, multiple analysts pressed Defendants on any "deal slippage" the Company was facing. Boolani specifically posed the following question to Defendant Harms**:**

> Chris, I'd like to start with you on the second quarter guidance. Just with regards to your comments around deal slippage, I wanted to unpack that a little bit and wanted to understand outside of typical enterprise procurement delays and things like that. Are there any other factors that caused this degree of slippage into the back half, just trying to diagnose if it's really sort of intrinsic or extrinsic?

Before Defendant Harms could answer, however, Defendant DeCesare interjected and represented the following:

> When we started – we feel really good about the pipeline, ***big deals are a part of our business and we've been tracking them very closely. When we started the year off, we had expectations on a handful of deals that we thought at least some of those would naturally materialize for the second quarter. And as we look out***

7

*across kind of what's happened in the year so far for different reasons, just a number of those deals now appear to be more naturally on track for the back half of the year.* To try to give you a little bit more color on that. There's -- that they may be a mix of both land and expand. They would cover both international and U.S. There's not a single trend inside of those.

27.    Defendant Harms also assured those on the call that "*[i]n terms of the overall outlook on our path towards profitability, when we share to the analyst there is no meaningful changes to communicate, we are still on track*."

28.    Other analysts had questions similar to Boolani's, including JPMorgan analyst Sterling Auty ("Auty"), who requested more insight on the nature of the delayed deals.  Defendant DeCesare responded by asserting that "every one of those deals is still in pipeline, it's just our – we had an expectation that a couple of them would have been far enough along to be in guidance by this point," and that "*[w]e have a high degree of confidence they close for the year, we had originally thought they would be more naturally suited for Q2 and they've just slipped a little bit*."

29.    Unsatisfied with this response, other analysts on the call continued to press Defendants on the "slipped" deals.  For example, Morgan Stanley analyst Melissa Franchi ("Franchi") had the following question for Defendant Harms regarding large deal volatility, while expressing worry that deals could be pushed back even further: "Just to clarify, were there any large deals that got pulled forward for Q2 into Q1? And then what's your level of confidence in the deals that got flipped from Q2 into Q3 or Q4, what's the level of confidence in those deals actually closing in the second half of the year? Is there risk that they could potentially slip into FY2020?"  Defendant Harms responded by assuring investors that there was "plenty of pipeline" for Defendants to meet their projections:

Yes. So no major pull in a deal to get to Q1. So let's address that directly. As it relates to the second half of the year, kind of reiterating some of the points Mike hit upon. *Those deals are ones where we've already got the tech win. There are*

8

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*kind of each nuanced elements to why we still feel we're going to close those deals in 2019, we just weren't prepared to put them into our guidance for Q2.*

So inclusive of that, as we're looking at that second half of the year, we feel like *we've got plenty of pipeline for the coverage of what we need to do*. Those deals are part of the portfolio that we look at. Those, we still have a very high degree as we're assessing the deals that are taking shape of the cross-expansion and land – and land is getting larger, we feel like *there's plenty of pipeline to deliver upon the guidance we've given you for the full year*.

30.     Bank of America analyst Tal Liani also pressed Defendants about the aggressive guidance they were providing in initiating the below exchange:

I'm asking almost the same question that someone else asked, but I want to ask it differently. You missed 2Q guidance but you're raising, you're not keeping, you're not only you're not keeping the guidance for the year, you're raising the guidance for the year. So that means you have some kind of confidence on dematerialization of the contract in the second half.

Can you share with us what is – what kind of arrangements you have for these contracts? Why are you increasing the guidance for the year? And what's the risk that it doesn't materialize? I just want to understand on what basis you are increasing the guidance?

Defendant DeCesare took the lead in explaining away Defendants' questionable projections, while simultaneously minimizing issues related to deal execution and timing:

This is Mike. I'll take that. I think as we said, in the second quarter, this is the deal timing issue for us, right. *When we started off the year ahead of are substantial pipeline, we had a number of larger deal that we thought at that point were much more naturally going to close in the second quarter and we're now realizing that they need a little bit more time in the oven before they're going to be done. As I mentioned, we have tech win in those accounts, I mean that they've chosen us.* So it's not common for a customer to award a technology win to a vendor and then not buy their product for an extended period of time.

*So that gives us a high degree of confidence. We've also got 50% of our sales organization, as we mentioned at the end of 2018 as ramped, which means they've been in their territory for more than a couple of years. So many of these deals are into accounts. We've had the same account manager on the same accounts for a longer period of time, which gives us more visibility.*

*So obviously we would not raise 2019 if we did not have a very high degree of confidence.* The building of pipeline, the maturation of our reps, the success we're seeing in some of the international territories that were kind of later hires for us from a cohort perspective where all giving us that confidence.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

31.     Needham analyst Alex Henderson ("Henderson") also questioned Defendants on Forescout's delayed deal execution and timing, particularly with respect to whether Defendants had adequately accounted for the foreseeable negative impacts such delays had on the Company's growth, including "the impact that it has on [the Company's] sales team's ability to do the secondary deals or third deals" in the face of such timing, as well as whether "deal size [is] increasing enough to offset the impact of them spending more time closing deals that were expected in the first half [of the year]." Defendant DeCesare refused to acknowledge those issues as an ongoing problem for the Company, stating, in relevant part:

> *So I would caution not to read too much into the handful of deals that's in the second quarter. There are new customers in that, so certainly, those customers haven't bought our products yet.* But there's expand opportunities inside of that as well. We have a very good pipeline. We've been working this for many years to build pipeline.

> *So we are not dependent on those deals in the second half for us to be able to be successful.* We're just pointing out to you that we had maybe a sense that they were going to close a little bit earlier, and now we've got to a high degree of confidence that they're going to close in the back half of the year.

> *So it doesn't have a material impact on kind of the overall productivity.* We've got hundreds of sales reps. We feel good about those transactions in the second half of the year.

32.     Henderson also specifically asked whether the deals were "large enough that they would absorb any capacity issues." Defendant DeCesare responded in the affirmative and confirmed that Forescout's "*pipeline is large enough where we can still achieve our capacity expectations without those deals closing in the second quarter*."

33.     On August 7, 2019, Forescout issued a press release reporting its second quarter 2019 ("2Q19") financial results, providing 3Q19 revenue guidance of $98.8 million to $101.8 million, and reaffirming its prior FY19 revenue guidance.   That press release quoted Defendant Harms, who boasted that Defendants were "pleased with our second quarter results, highlighted

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

by total revenue of $78.3 million, which was an increase of 16% year-over-year"; that, "***[i]n the quarter, we saw meaningfully higher than expected customer adoption of term-based licenses which increased the percentage of recurring revenue within our business***"; and that, "[a]t the same time, we continue to make progress on our path to sustainable profitability, benefiting from operational efficiencies."

34.     Later that day, on an earnings conference call to discuss Forescout's 2Q19 results, Defendant DeCesare acknowledged that the second quarter "was impacted by some pent up demand," citing the recent introduction of "term-based license in April," while also touting that Defendants "are continuing to benefit from operational efficiencies in our go-to-market engine and strong gross margins which remain the primary drivers towards the near and long term profitability targets."

35.     Defendant Harms also weighed in, assuring investors that "as we shape our Q3 of fiscal year 2019 guidance, we are applying the insights that we gained in the first half of 2019 and the indicators that are taking further shape as it pertains to the second half of 2019."  Defendant Harms further represented that "[o]ur guidance continues to reflect our confident outlook and takes into consideration the potential for some continued mix shift in the second half of 2019," thereby assuring investors that Defendants had already accounted for any "slipped" deals in the 3Q19 guidance.  Defendant Harms represented that, "[a]ccordingly, we are maintaining our full year revenue and operating lots guidance," and further stated that "[w]ith regards to the loss per share guidance, we are slightly improving the top end of our guidance range, primarily reflecting our updated outlook on interest income."  Defendant Harms then provided the following 3Q19 guidance on the call:

> For the third quarter 2019, we expect total revenue to be in the range of $98.8 million to $101.8 million, representing year-over-year growth of 17% at the midpoint. We expect operating income in the range of $2.6 million to $3.6 million, and income per share to be in the range of $0.4 to $0.6, based on approximately

$46.4 million weighted shares outstanding. For the full year, we expect total revenue to be in the range of $365.3 million to $375.3 million, representing year-over-year growth of 24% at the midpoint. Operating loss in the range of $15.6 million to $11.6 million and loss per share in the range of 41 cents to 33 cents, based on approximately $45.8 million weighted shares outstanding.

36.    During the Q&A session of the August 7, 2019 earnings call, Auty asked about "acceleration in the core business," and Defendant Harms stated that "[w]e definitely saw acceleration in close rates this quarter; we had some deals that were in the pipeline that we're still thinking about when they were going to close."  Defendant Harms also advised that Defendants "were able to get some of those orders in kind of earlier for us," and thus "*the close rates remained very strong here*."

37.    In the same Q&A session, Boolani questioned Defendant Harms about "deal slippage dynamics" and for "an update on how those transactions shook out and how you're thinking about large deal dynamics in the back half of this year."  Defendant Harms responded that Defendants "still have high confidence that all to most of those will contribute to our Q4 revenue"; that "[a]ll of our pipeline analytics, all of the probing that [Defendant DeCesare] and I are doing about how those deals are taking shape across new logos and expansion, also give us great confidence about the contributions of big deals in the Q4 timeframe"; and that Defendants "are definitely spending time with the field," had "taken the insights that we've garnered . . . been doing the analysis, [and] all of that is baked into how we are guiding for the full year," confirming that "clearly that's what's implicit for Q4."

38.    The statements referenced in ¶¶ 20-37 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Forescout was experiencing significant volatility with respect to large deals and issues related to the timing

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

and execution of deals in the Company's pipeline, especially in EMEA; (ii) the foregoing was reasonably likely to have a material negative impact on the Company's financial results; and (iii) as a result, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Begins to Emerge

39.    On October 10, 2019, during pre-market hours, Forescout issued a press release announcing preliminary 3Q19 financial results.   That press release lowered 3Q19 revenue guidance to $90.6 million to $91.6 million, compared to prior revenue guidance of $98.8 million to $101.8 million, and market consensus of $100.52 million.   In explaining these results, Defendants cited "extended approval cycles which pushed several deals out of the third quarter," which "was most pronounced in EMEA."

40.    On this news, Forescout's stock price fell $14.63 per share, or 37.32%, to close at $24.57 per share on October 10, 2019.

41.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

### Post-Class Period Disclosures

42.    On October 16, 2019, Forescout received a target price cut at UBS from $50.00 to $33.00 as a result of its lowered 3Q19 revenue guidance.   According to UBS analyst Boolani, "[e]xecution credibility has been undermined" and has created "a likely frustrating valuation overhang," which will require several quarters to "rebuild investor confidence."

43.    Then, on November 6, 2019, during intraday trading, Forescout reported its 3Q19 financial results and, to further investor dismay, downgraded FY19 financial guidance significantly.   Specifically, Defendants now expected revenue of $339 million to $342 million for

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

FY19, representing year-over-year growth of 14% at the midpoint, compared to prior guidance of $365.3 million to $375.3 million, which would have represented year-over-year growth of 24% at the midpoint.

44.     Later that day, Forescout held an earnings conference call to discuss these results, in which Defendant DeCesare explained that "several seven digit deals did not close as expected." Defendant DeCesare also cited "[t]he large deal nature of our business," which could "have a more pronounced impact on our results depending on the size and timing of these deals, because of our historical perpetual license model."  Defendant DeCesare also disclosed that Defendants were "taking a number of steps within our business to work on areas we can control, such as strengthening our sales execution and shaping our revenue model for better predictability."

45.     Addressing Forescout's suddenly downgraded financial outlook, Defendant Harms finally acknowledged that large deal volatility and delayed deals were an ongoing issue for the Company.  Specifically, Defendant Harms disclosed that, "[s]ince our [initial public offering], we have attempted to appropriately balance the large deal volatility of our business into our guidance," and that "[c]ustomers invest[ing] in Forescout with large strategic transactions" had "present[ed] a challenge as it manifests itself in our financial results in less predictable patterns."  Notably, Defendant Harms admitted that while "[i]n both 2017 and 2018, we closed three or more 8 digit strategic deals, which comprised a meaningful portion of our revenue," Defendants had "only closed one 8 digit deal so far this year."  Defendant Harms also disclosed that Defendants' "[fourth quarter] forecast previously included some 8 digit deals that though they continue to be in our pipeline are no longer expected to close during the fourth quarter, due to customer environmental dynamics, that elongated deal cycles and internal forecasting that we just recently learned was too aggressive."

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

46.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Forescout securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

47.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Forescout securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Forescout or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

48.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

49.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

50.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Forescout;

- whether the Individual Defendants caused Forescout to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Forescout securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

51.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

52.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Forescout  securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Forescout securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

53.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

54.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

55.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

56.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

57.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under

which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Forescout securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Forescout securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

58.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Forescout securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Forescout's finances and business prospects.

59.    By virtue of their positions at Forescout, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

60.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Forescout, the Individual Defendants had knowledge of the details of Forescout's internal affairs.

61.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Forescout.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Forescout's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Forescout securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Forescout's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Forescout securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

62.     During the Class Period, Forescout securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Forescout securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that

were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Forescout securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Forescout securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

63.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

64.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

65.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

66.     During the Class Period, the Individual Defendants participated in the operation and management of Forescout, and conducted and participated, directly and indirectly, in the conduct of Forescout's business affairs.  Because of their senior positions, they knew the adverse non-public information about Forescout's misstatement of income and expenses and false financial statements.

67.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Forescout's

financial condition and results of operations, and to correct promptly any public statements issued by Forescout which had become materially false or misleading.

68.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Forescout disseminated in the marketplace during the Class Period concerning Forescout's results of operations.   Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Forescout to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Forescout within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Forescout securities.

69.     Each of the Individual Defendants, therefore, acted as a controlling person of Forescout.  By reason of their senior management positions and/or being directors of Forescout, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Forescout to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Forescout and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

70.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Forescout.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  January 2, 2020

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jennifer Pafiti*
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
E-mail: jpafiti@pomlaw.com

**POMERANTZ LLP**
Jeremy A. Lieberman
(*pro hac vice* application forthcoming)
J. Alexander Hood II
(*pro hac vice* application forthcoming)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email: jalieberman@pomlaw.com
Email: ahood@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
(*pro hac vice* application forthcoming)
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**HOLZER & HOLZER, LLC**
Corey D. Holzer
(*pro hac vice* application forthcoming)
1200 Ashwood Parkway
Suite 410
Atlanta, Georgia 30338
Telephone: (770) 392-0090
Facsimile: (770) 392-0029
Email: cholzer@holzerlaw.com

***Attorneys for Plaintiff***

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

### CERTIFICATION OF NAMED PLAINTIFF
### <u>PURSUANT TO FEDERAL SECURITIES LAWS</u>

The undersigned declares, as to the claims asserted under the federal securities laws, that:

      Plaintiff has reviewed the initial complaint filed in this action.

      Plaintiff did not purchase and/or acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action under the federal securities laws.

      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary. I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

      Plaintiff's transactions in the security that is the subject of this action during the Class Period are as follows **- List additional transactions on Schedule A, if necessary**:

Purchases:

| Ticker of Company | Date(s) Purchased | # Shares Purchased | Cost/Share |
|---|---|---|---|
| FSCT | 19 September 2019 | 728 | 37.35 |
| | 27th September 2019 | 357 | 38.07 |

Sales:

| Ticker of Company | Date(s) Sold | # Shares Sold | Proceeds/Share |
|---|---|---|---|
| FSCT | 24th September 2019 | 364 | 36.08 |
| | 10th October 2019 | 721 | 25.51 |

      During the three (3) years prior to the date of this certification, Plaintiff has not sought to serve or served as a class representative in an action filed under the federal securities laws except for the following (if any):

NO

Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ____ 22 ____ day of __October__, 2019 in ____REDACTED____, ____REDACTED____.
                                                          City              State

(Signature) X_____ _Christopher Sayce_
                         DocuSigned by:
                         40C428901D9A467...

(Print Name)_____Christopher L Sayce_____
                  First              Last

SCHEDULE A

Purchases:

| Ticker of Company | Date(s) Purchased | # Shares Purchased | Cost/Share |
|---|---|---|---|
| FSCT | | | |

Sales:

| Ticker of Company | Date(s) Sold | # Shares Sold | Proceeds/Share |
|---|---|---|---|
| FSCT | | | |