1    **POMERANTZ LLP**

2
     Jennifer Pafiti (SBN 282790)
3    1100 Glendon Avenue, 15th Floor
     Los Angeles, California 90024
4    Telephone: (310) 405-7190
     E-mail: jpafiti@pomlaw.com
5

6    *Lead Counsel for Lead Plaintiff Meitav Tachlit Mutual Funds Ltd.*

7    *[Additional Counsel on Signature Page]*

8
                     UNITED STATES DISTRICT COURT
9                  NORTHERN DISTRICT OF CALIFORNIA
                        SAN FRANCISCO DIVISION
10
     CHRISTOPHER L. SAYCE, Individually and on    )    CASE NO.: 20-CV-00076-SI
11   Behalf of All Others Similarly Situated,     )
                                                  )    **CLASS ACTION**
12                        Plaintiff,              )
                                                  )    Hon. SUSAN ILLSTON
13           v.                                   )
                                                  )
14   FORESCOUT TECHNOLOGIES, INC.,                )
     MICHAEL DECESARE, and CHRISTOPHER            )    **AMENDED COMPLAINT FOR**
15   HARMS,                                       )    **VIOLATIONS OF THE**
                                                  )    **SECURITIES LAWS**
16                        Defendants.             )
                                                  )
17                                                )    **JURY TRIAL DEMANDED**
                                                  )
18                                                )
                                                  )
19                                                )
                                                  )
20   _____  )

21

22

23

24

25

26

27

28

Lead Plaintiff Meitav Tachlit Mutual Funds Ltd. ("Lead Plaintiff"), individually and on behalf of all other persons similarly situated, by its undersigned attorneys, for its Amended Complaint against Defendants (defined below), alleges the following based upon personal knowledge as to those allegations concerning Lead Plaintiff and, as to all other matters, the investigation conducted by and through its attorneys, which included, among other things, a review of the Defendants' public statements, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by, and regarding, Forescout Technologies Inc. ("Forescout" or the "Company"), analysts' reports and advisories about the Company, information obtained from interviews with knowledgeable former employees of the Company, and other information readily obtainable on the Internet.  Lead Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action on behalf of persons or entities, who purchased or otherwise acquired the common stock of Forescout between February 7, 2019 and May 15, 2020, both dates inclusive (the "Class Period"), seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").

2.      Forescout is a cybersecurity company, based in San Jose, California, that purports to assist businesses and government agencies in monitoring devices that seek to connect to their networks in an effort to prevent a cyber attack, limit access and control to the networks or otherwise mitigate the risks of a security breach.  During the Class Period, Defendant Michael DeCesare ("DeCesare") was the Company's Chief Executive Officer ("CEO"), and Defendant Christopher Harms ("Harms") was the Chief Financial Officer ("CFO") of the Company.

3.      On February 7, 2019, the Defendants released an extraordinarily bullish guidance for the full fiscal year 2019 that touted revenues within the range of $363.1 million to $373.1 million, which represented year-over-year growth of 24%.  To support and reaffirm this unrealistic guidance, Defendants repeatedly failed to disclose the truth about the Company's sales force and its sales pipeline, and made false and/or misleading statements of current or past facts concerning the actual state of the Company's sales force and its sales pipeline.  In the beginning of the Class

Period, Defendant Harms told investors that the Company would never publicly disclose its guidance unless the Company was "completely confident in our ability to over-exceed upon it," even though he knew or recklessly disregarded that the productivity of sales representatives as well as the number and dollar amount of committed deals in the sales pipeline began to rapidly deteriorate in the beginning of 2019.  Indeed, neither Harms, DeCesare, or anyone else representing the Company disclosed the truth about the number or actual amount of deals in the sales pipeline when offering guidance to analysts and the market during the Class Period.

4.     Throughout the Class Period, Defendants repeatedly claimed that the Company's sale force had ramped and matured because 50% of the Company's sales representatives had purportedly been with Forescout for more than two years.  Defendants constantly touted this productivity metric as the reason the Company would "land and expand" deals, and as the basis for "visibility" into the sales pipeline that "drove momentum in [Forescout's] business."

5.     Defendants failed to disclose that Forescout had dramatically cut the number of employees throughout the Company in the beginning of 2019, particularly within the sales department, and a significant number of sales representatives also left the Company on their own initiative directly due to declining sales attributed to intense competition and the lack of customer interest in Forescout's products.

6.     Indeed, on February 28, 2020, Defendants corroborated the accounts of the Confidential Witnesses ("CW") cited in this Amended Complaint when Forescout's Annual Report filed on Form 10-K disclosed that, as of December 31, 2019, only 38% of Forescout's sales representatives had been at the Company for more than two years, down from 50% as of December 31, 2018.

7.     Instead of disclosing the truth about lowered sales and deteriorating productivity, Defendants claimed that the Company was "hiring like crazy," falsely assured analysts probing for specifics on headcount that "nothing had changed," and continued to tout the Company's high productivity metrics.  Unbeknownst to investors, and corroborated by numerous CWs, the Company failed to disclose that a mass exodus of experienced sales representatives had occurred

by then, a significant number of employees in key divisions were let go or left on their own due to a lack of work, and an entire group within the sales department had been eliminated.

8.  On May 9, 2019, Forescout announced that revenues for the second quarter of 2019 would be within the range of $75.3 million to $78.3 million due to "slipped deals" that Defendants claimed would be completed in the second half of the year.

9.  On this partial disclosure or the materialization of the risks thereof, Forescout's share price declined by $7.02 or over 16% from its previous day closing price of $43.30 per share, to close at $36.28 per share on May 10, 2019.

10.  Nevertheless, to counter the expected stock price decline, Defendants boldly increased the full year guidance for 2019 from their previous estimate in the beginning of the year, and touted that the Company would easily finish the fiscal year with revenues in the range of $365.3 million to $375.3 million, once again representing year-over-year growth of 24% at the midpoint.

11.  On an earnings conference call held on May 9, 2019, analysts probed for specifics about committed deals in the pipeline, and asked Defendants to substantiate the source and basis for their bullish guidance.  In response, Defendants misled the analysts and the market by touting the purported size and strength of Forescout's sales pipeline and the purported productivity of its sales force (even though both were in decline), and misrepresented potential deals as "technology wins where we've already been awarded the business."

12.  Similarly, on an earnings conference call and other events held in August 2019, the Defendants falsely assured investors that the rate of closing deals remained "very strong" and "very healthy."

13.  The above-mentioned statements were false and/or misleading, and Defendants further failed to disclose that the Company included potential deals worth millions of dollars into its quarterly forecasts even though Defendants knew or recklessly disregarded that those deals would not close before the end of the quarter.  Moreover, the CWs further assert that the Company pressured them to list artificial closing dates for potential deals in a desperate attempt to support the forecasts that Defendants had misrepresented to analysts and the market.

14.     Defendants were aware of, or recklessly disregarded, all the facts, which they failed to disclose, that contradicted their false and/or misleading statements to analysts and the market because the Defendants had real-time access to, and knowledge of, the Company's sales pipeline and the state of its sales force.  Specific details of all significant deals were compiled on the Salesforce platform and delivered to key high-level executives, including Defendant DeCesare. Multiple CWs assert that Defendant DeCesare monitored key information about high dollar deals, and directly asked specific questions that were relayed down to the CWs regarding the technology fit, timeline for closing, and competitive pressure.  Indeed, during the Class Period, Defendants repeatedly admitted that they had access to, and knowledge of, all pertinent information concerning the status of potential deals.

15.     Instead of fulfilling their duty to disclose all information or refrain from trading during the Class Period, Defendants DeCesare and Harms took advantage of Forescout's artificially-inflated stock price to reap nearly $12 million in stock sales during the Class Period. These stock sales were nearly four and a half times the dollar amount that Defendant DeCesare reaped from open market sales before the Class Period, and nearly two and a half times the dollar amount that Defendant Harms reaped from open market sales before the Class Period.

16.     In or around October 2019, the Company began to explore strategic options, including a possible sale.  Shortly thereafter, Bloomberg News reported that, according to anonymous insiders at the Company, the Individual Defendants were working with a financial adviser to sell the Company.

17.     On October 10, 2019,  Forescout announced that total revenue for the third quarter was expected to be within the range of $90.6 million to $91.6 million compared to the Company's prior guidance of $98.8 million to $101.8 million.  Defendant DeCesare blamed the disappointing results on "extended approval cycles which pushed several deals out of the third quarter" due to deteriorating macroeconomic conditions in Europe, Middle East and Africa ("EMEA"), even though the relative size of Forescout's business in the EMEA region did not support the shortfall and was not the true reason for the shortfall.

18.     On this partial disclosure or the materialization of the risks thereof, the price of Forescout's common stock fell by over 37% from its closing price of $39.20 on the previous day, to close at $24.565 per share on October 10, 2019, on heavy trading volume.

19.     Nevertheless, Defendants stated that the larger, slipped deals would still close in the second half of 2019 and Forescout would eventually catch up.  The Defendants continued the charade because, by this time, they had to prop up the price of the common stock to maximize their return on the planned sale of the Company.

20.     On February 6, 2020—the same day that the Company announced poor financial results for the fourth quarter of 2019—Defendants blunted the impact of the bad news by disclosing that the Company had entered into a definitive agreement to be acquired by the affiliates of Advent International ("Advent") for $33 per share in an all cash transaction valued at approximately $1.9 billion.  Defendants DeCesare and Harms collectively stood to gain over $42 million from the sale.

21.     Defendants' attempt to buffer the impact of yet another negative earnings release worked.  The price of Forescout's common stock rose to $33.28 per share on February 6, 2020 from its previous day closing price of $27.98 per share on February 5, 2020.

22.     Subsequent events revealed that Defendants created an internal "Illustrative Guidance" in January 2020 that projected that Forescout's revenue for the first quarter of 2020 would be $62 million.  On March 23, 2020, the Illustrative Guidance was included in a definitive proxy statement filed with the SEC that sought shareholder approval of the sale to Advent.

23.     On May 11, 2020, Defendants disclosed the Company's revenues in the Company's Form 10-Q for the first quarter of 2020 filed with the SEC.  Reported revenues for the first quarter of 2020 were $57 million, or $5 million less than the figures disseminated to the shareholders and the market in the definitive proxy statement filed in March 2020.

24.     On this partial disclosure or the materialization of the risks thereof, the price of Forescout's common stock fell by nearly 5% from its closing price of $32.09 on the previous day, to close at $30.50 per share on May 12, 2020, on heavy trading volume.

25.     On May 18, 2020, Forescout issued a press release which revealed that on May 15, 2019, Advent notified the Company that it would not proceed with the acquisition as scheduled.

26.     On this partial disclosure or the materialization of the risks thereof, the price of Forescout's common stock plunged by nearly 24% from its closing price of $29.52 on the previous day, to close at $22.57 on May 18, 2020, on extremely heavy trading volume.

27.     The price of Forescout's common stock continued to decline to close at $20.93 on May 19, 2020 and $19.84 on May 20, 2020.

28.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Forescout's securities resulting from the partial disclosures or materialization of the risks thereof, Lead Plaintiff and other members of the Class have suffered significant damages.

## JURISDICTION AND VENUE

29.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

30.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

31.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) given that a significant portion of the Defendants' misconduct, and the subsequent damages, took place within this District.  Forescout is a corporation incorporated in Delaware with its principal place of business in San Jose, California, and the Defendants reside in or around the San Francisco Bay Area.

32.     In connection with the acts, conduct and other wrongs alleged in this Amended Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of a national securities exchange.

**PARTIES**

33.     Lead Plaintiff purchased Forescout common stock during the Class Period, and suffered damages as a result of the federal securities laws violations alleged herein.

34.     Defendant Forescout is a Delaware corporation with its principal executive offices located at 190 West Tasman Drive, San Jose, CA 95134.   Forescout's shares trade on the NASDAQ Global Select Market under the ticker symbol "FSCT."

35.     Defendant DeCesare is, and was at all relevant times, Forescout's President, CEO and a member of the Company's Board of Directors.

36.     Defendant Harms is, and was at all relevant times, Forescout's CFO with responsibilities to lead the Company's finances, administration and supply chain management.

37.     Defendants DeCesare and Harms are sometimes referred to in this Amended Complaint as the "Individual Defendants."

**SUBSTANTIVE ALLEGATIONS**

**Background**

38.     Defendant Forescout is a cybersecurity company that purports to provide device visibility and control solutions to businesses and government agencies in an attempt to reduce cyber and operational risks.   The Company was founded in Israel in 2000, but its principal place of business is located in San Jose, California.   In October 2017, the Company raised $116 million in an Initial Public Offering, and listed 5.28 million shares on the NASDAQ Global Select Market at $22 per share.

39.     The Company offers products for visibility and control capabilities as well as for orchestration capabilities.   Products for visibility and control capabilities consist of eyeSight, eyeControl and SilentDefense.   These products use "agentless" technology to discover, classify and assess devices that seek to connect to a customer's network.   After a potential device that attempts to connect to a customer's network is classified by its type and ownership, Forescout's visibility and control solutions examine the security threat posed by the device, and hence allow customers to create rules of access for the device while it is connected to their respective networks.

40.     Through the eyeExtend family of products, the Company offers orchestration capabilities such as advanced threat detection, client management tools, endpoint protection, detection and response, Information Technology Systems Management, next-generation firewall, enterprise mobility management, privileged access management, security information and event management and vulnerability assessment.  The Company also offers supplementary maintenance, support and professional services.

41.     Forescout claims to deploy a "direct touch channel fulfilled strategy" with a field sales team and another team focused on managing relationships with the Company's channel partners, and working with those partners to support customers.  During the Class Period, the Company informed investors that its sales representatives' productivity is directly tied to the duration of their tenure with productivity in their second full year at the Company twice as high as the productivity in the first year, and productivity in the third year 50% higher than the productivity in the second year.

42.     Throughout the Class Period, the Company touted that as of December 31, 2018, 50% of its sales representatives had been with the Company for more than two years compared to 35% as of December 31, 2017.  While directly tying the sales representatives' productivity levels to the Company's ability to close deals, Defendants failed to disclose that both voluntary and involuntary departures throughout the Class Period caused a precipitous decline in the number of productive employees through the end of 2019.  In fact, on February 28, 2020, Defendants admitted in an Annual Report filed on Form 10-K that, as of December 31, 2019, only 38% of its sales representatives had been at the Company for more than two years, down from 50% reported by the Company for December 31, 2018.

**Forescout Encountered a Dramatic Exodus of its Sales Force and a Decline in Sales Productivity Throughout 2019**

43.     CW1 is a former Senior Sales Development Representative ("SDR") who worked at Forescout from June 2018 to May 2019.  As a former SDR, CW1 was responsible for reaching out to new or existing customers to inquire about the customers' interest in purchasing Forescout's products, and CW1 also set up meetings between the customers and a Forescout Named Account

Manager ("NAM").  According to CW1, in the beginning of 2019, SDRs had serious difficulty in meeting their quotas for potential pipeline opportunities because of intense competition and a lack of customer interest in Forescout's products.

44.     CW1 recalled that most SDRs were able to only meet 50% of their targets in the beginning of 2019, which caused more than a dozen SDRs to leave the Company.  CW1 confirms that the entire inside sales team was, in fact, dissolved in the spring of 2019, and a steady stream of sales employees from the division began to resign as a result.  CW1 stated that at least twenty-five sales employees located in San Jose left the Company within the first few months of 2019.  CW1 stated that the Company's turn-over rate was higher than average for the industry.  CW1 explained that there was a lot more movement than any other company CW1 had served at, and that sales employees left after working at Forescout for only a few months.

45.     CW2, a former SDR at Forescout from June 2016 to June 2019, corroborates CW1's account.  CW2 confirms that the Company was unable to close deals in 2019 and, as a result, a significant number of sales employees began to depart the Company in the first half of 2019.  According to CW2, it was difficult to sell and, at some point, sales employees had to move on.  CW2 asserts that employees at all levels from SDRs to NAMs to Regional Managers began to depart in the first half of 2019.

46.     CW3, Forescout's former Director of Americas – Business Values & Strategic Sales between July 2018 and February 2020, confirms that the Company struggled to sell its products in 2019 because the software was highly complex and customers encountered difficulties with understanding its value.   CW3 also corroborated CW1's statement that Forescout was outcompeted by larger cybersecurity firms, which offered similar products at a lower price.

47.     Similarly, CW4, a Forescout SDR from January 2018 to January 2019 and a Forescout Inside Sales Representative from January 2019 to March 2019, corroborated both CW1's and CW3's statements that customers preferred larger and well-established vendors like Cisco Systems, Inc. over Forescout.

48.     The significant reduction in Forescout's headcount went well beyond its sales force.  CW5, the Interim Director of International Accounting and Business Operations at Forescout from

April 2018 to July 2019, stated that a large number of employees left the Company's accounting department in the second quarter of 2019, and these employees were not replaced. CW5 attributed the reduction in headcount to an attempt to manage the Company's cash flow and reduce costs due to declining sales.

49.     According to CW6, the Company's former Director of Accounting from February 2019 to September 2019, Forescout instituted a hiring freeze due to poor financial results in the third quarter of 2019 in an attempt to increase its cash flow.

50.     CW7 was a NAM at Forescout between June 2018 and September 2019. CW7 worked in the State, Local and Educational ("SLED") section of the Public Sector division with responsibility for the upper Midwest region. CW7 asserts that the Company laid off a significant number of sales representatives in the Commercial division of the Company in the February 2019. CW7 further states that the entire SLED section was eliminated in the third quarter of 2019, including high level executives like Todd Favakeh, the Regional Director of SLED.

51.     CW8 was a NAM in Forescout's Commercial division between February 2016 and October 2019. According to CW8, Forescout laid off a significant number of sales representatives dedicated to the healthcare and financial services industry in August 2019. CW8 also stated that Forescout eliminated a number of employees who assisted with sales and marketing at that time.

**Forescout Pressured NAMs to Manufacture "Committed" Deals That the Company Knew Were Illusory**

52.     Defendant DeCesare identified NAMs as the key individuals who had visibility into whether a deal would close. For example, on the May 5, 2019, earnings conference call to announce the Company's financial results for the first quarter of 2019, Defendant DeCesare touted the amount of time a NAM had been with Forescout as a measure of strong cross-sell opportunities. At the same event, Defendant DeCesare also tied the longevity of a NAM to the visibility of the Company's pipeline in an effort to mislead investors.

53.     CW9 was a NAM at Forescout from 2014 to February 2019. CW9 identified specific accounts, created selling plans for those accounts, forecasted when a certain deal would close, and supported outside sales representatives. CW9 explained that Forescout categorized

deals into three key areas: (1) committed deals expected to close during a certain quarter, (2) upside deals that had a 50-50 chance of closing in a particular quarter, and (3) pipeline deals where the Company had simply engaged in a discussion with a customer without any kind of commitment.  CW9 stated that there was constant pressure from upper management to move deals from the upside category to the committed category.  CW9 described this tactic as a juggling act whereby Forescout placed uncertain deals into the committed category to support the Company's misleading forecasts.

54.     CW9 stated that CW9's immediate boss, Steve Rog, the Vice President of Sales for the Central Region, instructed CW9 to move a $1 million deal from the upside category to the committed category, so that the Salesforce platform would show a $1 million increase in revenue for the quarter even though a customer had not committed to the deal.  The increasing use of this abusive practice was a significant reason why CW9 left the Company in the beginning of 2019.

55.     CW10 was a NAM at Forescout between January 2017 to July 2019.  CW10 managed a list of potential customers in the high-tech industry in the San Francisco Bay Area, and also serviced existing accounts.  CW10 described $1 million of deals that CW10 inherited as "mostly BS."  Forescout expected these deals to close, but when CW10 directly spoke to the customers, they told CW10 that they were not interested in acquiring any of Forescout's products.  CW10 estimated that only $100,000 of CW10's $1 million quota actually closed.  CW10 corroborated other CWs' statements that Forescout's products sold poorly due to low demand.  In CW10's experience, most Forescout customers expressed a lack of interest in an expensive security tool that was complex and difficult to implement.  CW10 closed only 10% of the deals in CW10's pipeline during CW10's two year stint at the Company, and closed only one large deal for $500,000.

56.     CW7, a NAM in the SLED section of the Public Sector division with responsibility for the upper Midwest region, stated that in the second and third quarter of 2019, CW7 was personally pressured by upper management at Forescout to report that a $2 million deal would close by September 2019, even though the Company knew that the deal would not close by that time.  In early 2019, CW7 worked on a $2 million deal for the University of Wisconsin – Madison

("UWM").  On or about May 2019, the UWM informed CW7 that its Information Technology department was reviewing different proposals and a final decision had been postponed.

57.     In July 2019, CW7, a Forescout engineer who worked on the UWM project and Niels Jensen, Forescout's Senior Vice President of Sales for the Americas, participated in a conference call with the procurement officer for UWM.  On this conference call, Jensen told the procurement officer that if UWM wanted Forescout's products to be operational by December 31, 2019, then UWM would need to place a purchase order before the end of September 2019.  According to CW7, UWM's procurement officer flatly informed Jensen that Jensen's proposed timeline could not be met.  Right after this conference call with the UWM, Favakeh, Forescout's Regional Director of SLED sales, called CW7 and told CW7 that Jensen wanted CW7 to list the close date for the UWM project on or before the end of September 2019.  CW7 followed Jensen's instructions and listed the project to close in September 2019 on the Company's Salesforce platform.  CW7 states that the UWM project never materialized.

58.     According to CW7, Carl Woodward, a NAM in the public sector division in Texas was also pressured to report that two deals in Dallas, Texas worth $2 million would close before the end of the third quarter of 2019.  Woodward told CW7 that the close dates selected were unrealistic, but that he was told to accelerate the closing date by Shawn Rodriguez, the head of SLED at Forescout.  Woodward told CW7 that the two deals in Dallas, Texas did not close before the end of the third quarter of 2019.  Woodward also told CW7 that Favakeh and Rodriguez were under intense pressure from higher level managers to place deals into the committed category for specific quarters despite lack of interest or outright refusal from customers.

59.     When CW7 left the Company in September 2019, the SLED division was on track to achieve only 35% of its $18 million quota for 2019.  Most NAMs in the SLED division were at or below 10% of their quotas at the time CW7 left Forescout.  CW7 stated that other NAMs said that the Commercial sales division at Forescout also was not on track to meet its quota for 2019.

60.     CW8, a NAM in Forescout's Commercial division between February 2016 and October 2019, states that sales began to substantially decrease in 2019, and the rate of closed deals dramatically shrunk because customers believed that Forescout's competitors offered a better

product than Forescout at a lower price.  Due to the decreased sales, CW8 was able to hit only 25% of CW8's $3 million quota for the year before CW8 left the Company in October 2019.

61.     CW11 was a NAM at Forescout's Enterprise division between December 2018 and September 2019.  CW10 stated that superiors forced CW10 to report higher dollar values for potential deals shortly before each quarter closed.  For example, on one occasion, CW11 assessed after direct communications with a customer that a deal was worth $100,000, but CW11's manager told CW11 to identify the deal as worth $250,000.  During CW11's entire career in the sales industry, CW11 does not recall that a manager at any other company instructed CW11 to report a larger value than CW11 believed was an accurate forecast for a potential opportunity.

62.     In addition, CW11 was also forced to report closing dates that were sooner than CW11 had forecast for deals that CW11 worked on.  According to CW11, the total value of these illusory deals that CW11 initially worked on was $1.2 million, and CW11 learned from other colleagues after leaving the Company that at least one of these deals did not close before the end of the third quarter of 2019.

**FORESCOUT AND THE INDIVIDUAL DEFENDANTS MADE FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD**

63.     The Class Period begins on February 7, 2019 when Forescout issued a press release that announced its financial results for the fourth quarter of 2018, and for the full fiscal year that ended on December 31, 2018.  This press release touted that Forescout would generate revenues within the range of $363.1 million to $373.1 million for the full fiscal year 2019, which represented year-over-year growth of 24% at the midpoint.

64.     The full fiscal year 2019 revenue guidance was materially false and/or misleading because it lacked any objective basis and, in fact, was inconsistent with Forescout's actual business performance, which was known to the Individual Defendants, at the time this guidance was disclosed.

65.     On February 7, 2019, the Individual Defendants also participated in a conference call, in which Defendant DeCesare made the following materially misleading statements:

*The momentum we're having on both the land and expand side would not be possible without the investments you made to grow our sales force, which is maturing and ramping nicely.* As we previously shared, at the end of 2016, only

14% of our sales reps have been with Forescout for more than two years. This number increased to approximately 35% at the end of 2017 and to approximately 50% at the end of 2018. ***From a productivity perspective, our 2018, 2017 and 2016 cohorts are producing at or better than we expected, which is helping to drive momentum in our business.***

. . . .

**<Q - Alex Henderson>**: And one last thing and then I'll cede the floor. Could you just go over the metric you said on the sales productivity number? I just didn't catch it when you gave it earlier.

**<A - Michael P. DeCesare>**: What I said was that at the end of 2016, what we are declaring as tenured is a sales rep that has been with Forescout for more than two years and in their territory so that we know that they kind of had the time to build things up. That number was 14% at the end of 2016, 35% at the end of 2017 and over 50% at the end of 2018. ***So we believe that's trending in the right direction.***

66.     The statements identified in Paragraph 65 were materially false and/or misleading when made and failed to disclose that (a) dramatic cuts to the number of employees began in early 2019 throughout the Company, particularly within the sales department; (b) a significant number of sales employees left the Company on their own initiative due to declining sales and; (c) the productivity of the Company's sales representatives seriously declined throughout 2019 given that only 38% of Forescout's sales representatives had served at the Company for more than two years as of December 31, 2019, down from 50% as of December 31, 2018.

67.     On March 4, 2019, Forescout hosted an investor day in San Francisco, California to present the Company's vision, strategy and plan for growth.  At this event, Defendant DeCesare continued to mislead investors regarding Forescout's sales organization's then-current trajectory towards being "ramp[ed]" and "matur[ed]."   In particular, Defendant DeCesare falsely claimed that the Company was "hiring like crazy," and made the following additional misleading statements that tied the so-called robust tenure of the Company's sales force to the strength and visibility of its sales pipeline:

> ***So, it's given us increased visibility which is you'd expect as reps are longer and the marketing team is getting going, we get kind of better visibility into pipeline. This is something that we certainly track on a very, very, very consistent basis***.

68.     The statements identified in Paragraphs 67 were materially false and/or misleading when made and failed to disclose that (a) dramatic cuts to the number of employees began in early

2019 throughout the Company, particularly within the sales department; (b) a significant number of sales employees left the Company on their own initiative due to declining sales; (c) the productivity of the Company's sales representatives seriously declined throughout 2019 given that only 38% of its sales representatives had served at the Company for more than two years as of December 31, 2019, down from 50% as of December 31, 2018; and as a result (d) the Company did not experience "better visibility into the pipeline."

69. At the investor day hosted on March 4, 2019, Defendant Harms falsely told an analyst that the Company would not have issued the full fiscal year 2019 revenue guidance unless the Company over-exceeded its own expectations:

> **<Q - Rob Owens>**: Hi, Rob Owens from KeyBanc. Criss, another question you won't answer, but relative to that 24% guidance and the puts and takes around subscription, how do you think about how 2019 might play out, because that could be a headwind should your customers choose OpEx versus CapEx?
>
> **<A - Christopher Harms>**: *You quoted the 24%, is that – oh, in terms of the year-over-year guidance, yeah.*
>
> **<Q - Rob Owens>**: Your [ph] bullish (02:51:08) guidance. That's what I'm looking for.
>
> **<A - Christopher Harms>**: Yeah. I'm sorry. I started thinking Extended Modules and it put me in the – I couldn't connect to it. But yes. Look, we have weaved that into our expectations of kind of a range of how subscription could play out for us. As Mike alluded to, we want to get it out of the marketplace, we obviously have tested with customers about their receptiveness to it and how they would buy in a one-year or a three-year structure.
>
> We'd like to get a little bit more of that under our belt. *We obviously would have not put the 24% out there if we weren't completely confident in our ability to over-exceed upon it, given variability of how the subscription could play out. Yeah, I think that's the color I can add.*

70. The statements identified in Paragraph 69 were materially false and/or misleading when made and failed to disclose that (a) potential deals worth millions of dollars were included in the Company's quarterly forecasts even though Defendants knew or recklessly disregarded that those deals would not close before the end of the quarter; and (b) artificial closing dates for potential deals were listed in the Salesforce platform in an attempt to support the Company's forecasts.  Indeed, there was no basis in fact for Defendant Harms to state, *inter alia*, that the Company would "over-exceed upon" its full year revenue guidance for 2019.

71.    On May 9, 2019, Forescout issued a press release that announced the Company's financial results for its first quarter that ended on March 31, 2019.  In this press release, Forescout stated that revenues for the second quarter of 2019 would be within the range of $75.3 million to $78.3 million, now representing year-over-year growth of 14% at the midpoint.

72.    On this partial disclosure or the materialization of the risks thereof, the price of Forescout's common stock declined by $7.02 or over 16% from its previous day closing price of $43.30 per share, to close at $36.28 per share on May 10, 2019, on heavy trading volume.

73.    To lessen the expected decrease in Forescout's share price from the realization that revenues in the second quarter of 2019 would be disappointing, Defendants increased the full year guidance for 2019 in the press release from their previous estimate and touted that the Company would finish the fiscal year with revenues between $365.3 to $375.3 million, again representing year-over-year growth of 24% at the midpoint.

74.    The full fiscal year 2019 increased revenue guidance was materially false and/or misleading because it lacked any objective basis and, in fact, was inconsistent with Forescout's actual business performance, which was known to the Individual Defendants, at the time this guidance was disclosed.

75.    On May 9, 2019, Forescout also held an earnings conference call in which Defendant Harms explained that the Company raised its full year revenue guidance, in part, because "we feel very good about the pipeline, market and our competitive positioning."   In response, analysts requested further information regarding the slipped deals and deals that Defendants said would close in the back half of the year:

**Fatima Boolani, Analyst**

Criss, I'd like to start with you on the second quarter guidance. Just with regards to your comments around deal slippage. I wanted to unpack that a little bit and wanted to understand outside of typical enterprise procurement delays and things like that, are there any other factors that caused this degree of slippage into the back half? Just trying to diagnose if it's really sort for intrinsic or extrinsic, and then a follow-up, if I can.

**Michael DeCesare, Chief Executive Officer and President**

Yeah. This is Mike, I'll take that one if you don't mind.

**Fatima Boolani, Analyst**

Sure.

**Michael DeCesare, Chief Executive Officer and President**

*When we started -- we feel really good about the pipeline, big deals are a part of our business and we've been tracking them very closely. When we started the year-off, we had expectations on a handful of deals that we thought at least some of those would naturally materialize for the second quarter. And as we look out across the -- kind of what's happened in the year so far, for different reasons, just a number of those deals now appear to be more naturally on track for the back half of the year.* Try to give you a little bit more color on that, there will be a mix of both land and expand. They would cover both international and U.S, there is not a single trend inside of those.

76.     The statements identified in Paragraph 75 were materially false and/or misleading when made and failed to disclose that (a) potential deals worth millions of dollars were included in the Company's quarterly forecasts even though the Defendants knew or recklessly disregarded that those deals would not close before the end of the quarter; and (b) artificial closing dates for potential deals were listed in the Salesforce platform in an attempt to support the Company's forecasts.

77.     Boolani also questioned both Individual Defendants regarding the Company's sales capacity, and both DeCesare and Harms made the following materially misleading statements in response:

**Fatima Boolani, Analyst**

If I can just sneak in a follow-up. In terms of sales capacity, do you have comfort in the current levels of capacity that you have? Or should we anticipate there should be sort of a ramp in rep hiring, in capacity hiring as we progress through the year?

**Michael DeCesare, Chief Executive Officer and President**

*Yeah, no, consistent with the theme I just hit upon, look, we feel like we are tracking very well against our sales productivity, the investment levels that we have been making and plan to make through the rest of the year, follow the -- that path to profitability and investing at levels below where our top line is growing. Nothing has changed at those levels.* There was another facet I wanted to hit on. Perhaps as Mike's adding to it, I'll remember what it was.

**Christopher Harms, Chief Financial Officer**

*No. I'm good. He nailed it.*

78.     The statements identified in Paragraph 77 were materially false and/or misleading when made and failed to disclose that (a) dramatic cuts to the number of employees began in early

2019 throughout the Company, particularly within the sales department; (b) a significant number of sales employees left the Company in the beginning of 2019 on their own initiative due to declining sales; and (c) the productivity of the Company's sales representatives seriously declined throughout 2019 given that only 38% of its sales representatives had served at the Company for more than two years as of December 31, 2019, down from 50% as of December 31, 2018.  Indeed, contrary to Defendant DeCesare's false statement, quite a lot "had change[d]" at this time with respect to the Company's sales capacity.

79.     Other analysts also requested more specificity, and Defendants continued to mislead them:

**Sterling Auty, Analyst**

Yeah. Thanks. Hi guys. So I'm sure a bunch of folks are going to pile on the deals moving later in the year. You mentioned just not materializing until later. Well, can you just give us a little bit more insight, choose one or two of them and just kind of walk through why. Is it they need more signatures, the project timeline has shifted, there is other technology priorities? Why do you think they're materializing later in the year?

**Michael DeCesare, Chief Executive Officer and President**

***Sure. So first, understand that every one of those deals is still in pipeline.*** It's just our -- we had an expectation that a couple of them would have been far enough along to be in guidance by this point, that's the major issue for us, right?

We have high degree of confidence they close for the year. We had originally thought they would be more naturally suited for Q2 and they just slipped a little bit. So I said earlier kind of there is not really a single flavor to them in the sense that they span different industries and different figures for us and things like that. There is not really anything there that you could be thrilled into. I guess the one that I would share with you, Sterling, is I'll just give you one example. ***As you know we had one very large account -- by the way, it's also worth pointing out, in every one of those deals, we have the technology win already. We've already been awarded the business.***

***The question now is what I would call the business win, which is when we actually get the money and the commitment towards timing. So that's why we have a fairly high degree of confidence that they will materialize in the back half of the year.***

80.     The statements identified in Paragraph 79 were materially false and/or misleading when made and failed to disclose that (a) deals were included in Forescout's forecasts even though the Company had not been awarded the business at that time; (b) potential deals worth millions of dollars were included in quarterly forecasts even though the Defendants knew or recklessly

disregarded that those deals would not close before the end of the quarter; and (c) artificial closing dates for potential deals were listed in the Salesforce platform in an attempt to support the Company's forecasts.

81.     Similarly, an analyst from Morgan Stanley questioned Defendant Harms regarding why the deals that had failed to close in the second quarter of 2019 could not potentially slip even further into fiscal year 2020:

**Melissa Franchi, Analyst**

Perfect. Thanks. And then just a follow-up for Criss on the large deal volatility. Just to clarify, were there any large deals that got pulled forward for Q2 into Q1? And then what's your level of confidence in the deals that got flipped from Q2 into Q3 or Q4, what's the level of confidence in those deals actually closing in the second half of the year? Is there risk that they could potentially slip into FY '20?

**Christopher Harms, Chief Financial Officer**

Yeah. So no major pull in a deal to get to Q1. So let's address that directly. ***As it relates to the second half of the year, kind of reiterating some of the points Mike hit upon. Those deals are ones where we've already got the tech win.*** There are kind of each nuanced elements to why we still feel we're going to close those deals in 2019, we just weren't prepared to put them into our guidance for Q2. ***So inclusive in that, as we're looking at that second half of the year, we feel like we've got plenty of pipeline for the coverage of what we need to do. Those deals are part of the portfolio that we look at. Those, we still have a very high degree as we're assessing the deals that are taking shape of the cross-expansion and land -- and land is getting larger, we feel like there is plenty of pipeline to deliver upon the guidance we've given you for the full year.***

82.     The statements identified in Paragraph 81 were materially false and/or misleading when made and failed to disclose that (a) deals in the pipeline for the second half of the year were not "tech wins" as defined by DeCesare because the Company had not been awarded the business at that time; (b) potential deals worth millions of dollars were included in quarterly forecasts even though the Defendants knew or recklessly disregarded that those deals would not close before the end of the quarter; and (c) artificial closing dates for potential deals were listed in the Salesforce platform in an attempt to support the Company's forecasts.

83.     An analyst from Bank of America pointedly asked the Defendants about their decision to pre-announce poor results for the second quarter of 2019 while raising the full year revenue guidance for 2019 even higher than the previous estimate:

**Tal Liani, Analyst**

Hi, guys. I'm asking almost the same question that someone else asked, but I want to ask it differently. You missed 2Q guidance, but you are raising. You're not keeping -- you're not only -- you're not keeping the guidance for the year you're raising the guidance for the year. So that means you have some kind of confidence on the materialization of the contracts in the second half. Can you share with us what is -- what kind of arrangement you have for these contracts?  Why are you increasing the guidance for the year? And what's the risks that it doesn't materialize? I just want to understand on what basis you're increasing the guidance? Thanks.

**Michael DeCesare, Chief Executive Officer and President**

This is Mike. I'll take that. I think, as we said, in the second quarter, this is a deal timing issue for us right? When we started off the year, we had more of substantial pipeline, we had a number of larger deals that we thought at that point were much more naturally going to close in the second quarter, and we're now realizing that they need a little bit more time in the oven before they're going to be done. *As I've mentioned, we have tech win in those accounts, meaning that they've chosen us. So it's very, -- it's not common for a customer to award a technology win to a vendor and then not buy their product for an extended period of time. So that gives us a high degree of confidence.*

We've also got 50% of our sales organization, as we mentioned, at the end of 2018 is ramped, which means they've been in their territory for more than a couple of years. *So many of these deals are into accounts that we've had the same account manager on the same accounts for a longer period of time, which gives us more visibility. So obviously, we would not raise 2019 if we did not have a very high degree of confidence. The building of pipeline, the maturation of our reps, the success we're seeing in some of the international territories that were kind of later high risk for us from a cohort perspective are all giving us that confidence.*

84.     The statements identified in Paragraph 83 were materially false and/or misleading when made and failed to disclose that (a) deals in the pipeline for the second half of the year were not "tech wins" as the Company had not been awarded the business at that time; (b) potential deals worth millions of dollars were included in quarterly forecasts even though the Defendants knew or recklessly disregarded that those deals would not close before the end of the quarter; and (c) artificial closing dates for potential deals were listed in the Salesforce platform in an attempt to support the Company's forecasts.  The statements identified in Paragraph 83 were also materially false and misleading when made because of the same reasons identified in Paragraphs 68 and 78.

85.     Towards the end of the conference call, Defendant DeCesare went even further than the above-mentioned misrepresentations, and told an analyst that the Company's sales pipeline

1 | was so large and robust that the Company would easily meet its revenue guidance for the full year

2 | even if the slipped deals from Q2 2019 never materialized:

3 | **Alex Henderson, Analyst**

Thank you. I wanted to go back to the issue associated with the timing of the closure of these deals into the back half. It's pretty easy to come to the conclusion that those transactions will in fact close. But the other side of the coin, when these deals get pushed out, it notoriously causes some diminishment of growth because it requires sales capacity to push them to close and push them to the revenues. Have you adequately thought through the impact that it has on your sales team's ability to do the secondary deals or third deals as a result of their timeline here? Or alternatively, is the deal size increasing enough to offset the impact of them spending more time closing deals that were expected in the first half?

**Michael DeCesare, Chief Executive Officer and President**

So I would caution not to read too much into the handful of deals that's in the second quarter. There are new customers in that, so certainly, those customers haven't bought our products yet. But there is expand opportunities inside of that as well. ***We have a very large pipeline. We've been working this for many years to build pipeline. So we are not dependent on those deals in the second half for us to be able to be successful.*** We're just pointing out to you that we had maybe a sense that they were going to close a little bit earlier, and now we've got a high degree of confidence that they're going to close in the back half of the year. ***So it doesn't have a material impact on kind of the overall productivity, we've got hundreds of sales reps. We feel good about those transactions in the second half of the year.***

**Alex Henderson, Analyst**

So that would be, you feel like you -- the deals are large enough that they would absorb any capacity issues?

**Michael DeCesare, Chief Executive Officer and President**

***I feel our pipeline is large enough where we can still achieve our capacity expectations without those deals closing in the second quarter.***

86.     The statements identified in Paragraph 85 were materially false and/or misleading when made and failed to disclose that (a) potential deals worth millions of dollars were included in quarterly forecasts even though the Defendants knew or recklessly disregarded that those deals would not close before the end of the quarter; and (b) artificial closing dates for potential deals were listed in the Salesforce platform in an attempt to support the Company's forecasts. The statements identified in Paragraph 85 were also materially false and misleading when made because of the same reasons identified in Paragraph 68 and 78.

87.     On August 7, 2019, Forescout issued a press release that announced the Company's financial results for its second quarter that ended on June 30, 2019.  In this press release, Forescout stated that revenues for the third quarter of 2019 would fall within the range of $98.8 million and $101.8 million.  On the same day, the Company also held a conference call, in which Defendant DeCesare falsely claimed that Forescout's rate of closing deals "remain very strong" and "very healthy," misleadingly blamed a poor performance in the second quarter to "pent-up demand," and said the Company was "very comfortable in our pipeline, rolling in both the third and the fourth quarter, but we think we've kind of measured those two things appropriately in our guidance."  On the August 7, 2019 conference call, Defendant Harms misrepresented that "the pipeline is absolutely taking shape very effectively."

88.     The third quarter 2019 revenue guidance was materially false and/or misleading because it lacked any objective basis and, in fact, was inconsistent with Forescout's actual business performance, which was known to the Individual Defendants, at the time this guidance was disclosed.

89.     The statements identified in Paragraph 87 were also materially false and/or misleading when made and failed to disclose that (a) potential deals worth millions of dollars were included in quarterly forecasts even though the Defendants knew or recklessly disregarded that those deals would not close before the end of the quarter; and (b) artificial closing dates for potential deals were listed in the Salesforce platform in an attempt to support the Company's forecasts.

90.     At the August 7, 2019 conference call, Defendant DeCesare also made the following materially false and/or misleading statements regarding the maturity of Forescout's sales force and the then-current strength of the Company's sales pipeline:

> And just to remind you, that our definition of ramped is they've been with Forescout for more than two years and they're in the territory for more than two years. *That was 50% at the end of 2018 up from 35% a year prior, and although it's tracking very well for us, we're going to hold-off on disclosing what that percentage is until we finish 2019. With that said, you're kind of looking at like softer data points that are underneath that, we're quite happy with the level of pipeline we're building, the percentage of our sales reps that have been hired in the more recent cohorts like Asia-Pacific that did very well this quarter for us, there's a lot of indicators for us inside the business that are pointed in the right direction.* You can always do

better here, and until you're at a place where every single sales rep is making their numbers and producing results.

91.     The statements identified in Paragraph 90 were materially false and/or misleading when made and failed to disclose that (a) dramatic cuts to the number of employees began in early 2019 throughout the Company, particularly within the sales department; (b) a significant number of  sales representatives were cut in the Commercial division and the SLED division at the time this statement was made; (c) a significant number of sales employees left the Company on their own initiative due to declining sales throughout 2019; and (d) the productivity of the Company's sales representatives seriously declined throughout 2019 given that only 38% of its sales representatives had served at the Company for more than two years as of December 31, 2019, down from 50% as of December 31, 2018.

92.     On August 12, 2019, Defendant Harms participated in the KeyBanc Capital Markets Technology Leadership Forum.  At this event, Defendant Harms stated that Forescout raised its full year guidance for revenues in the second quarter of 2019 because "we still had great visibility into the rest of the year and still the confidence we have about how deals were taking shape." Defendant Harms also claimed that Defendant DeCesare and he had "spent a lot of our July time frame really diving into the field to shape how Q3 was taking shape, how Q4 was taking shape, so that we could reflect that additional insight and give you an appropriate level of guidance, which the Q3 was still very solid, consistent with how I guided at the beginning of the year."

93.     The statements identified in Paragraph 92 were materially false and/or misleading when made and failed to disclose that (a) potential deals worth millions of dollars were included in quarterly forecasts even though the Defendants knew or recklessly disregarded that those deals would not close before the end of the quarter; and (b) artificial closing dates for potential deals were listed in the Salesforce platform in an attempt to support the Company's forecasts.

94.     In or around October 2019, the Company began to explore strategic options, including a possible sale.  Bloomberg News reported that, according to anonymous insiders at the Company, the Individual Defendants were working with a financial adviser to sell the Company.

95.     On October 10, 2019, Forescout issued a press release that announced preliminary financial results for the third quarter that ended on September 30, 2019.  Based upon a purported preliminary review of financial information, Forescout announced that total revenue for the third quarter was expected to be in the range of $90.6 million to $91.6 million compared to the Company's prior guidance of $98.8 million to $101.8 million.  In the press release, to address the materialization that revenues would fall short of the earlier guidance, Defendant DeCesare blamed the disappointing results on "extended approval cycles which pushed several deals out of the third quarter" due to deteriorating macroeconomic conditions in the EMEA region.

96.     On this partial disclosure or the materialization of the risks thereof, the price of Forescout's common stock declined by over 37% from its closing price of $39.20 on the previous day, to close at $24.565 per share on October 10, 2019, on heavy trading volume.

97.     Nevertheless, the statements identified in Paragraph 95 were materially false and/or misleading when made and failed to disclose that (a) potential deals worth millions of dollars were included in quarterly forecasts even though the Defendants knew or recklessly disregarded that those deals would not close before the end of the quarter; and (b) artificial closing dates for potential deals were listed in the Salesforce platform in an attempt to support the Company's forecasts.

98.     On November 6, 2019, Forescout issued a press release that announced financial results for the third quarter of 2019.  Total revenue was $91.6 million, missing guidance by at least $7.2 million on the low end, or approximately 7% for the quarter.  Defendant DeCesare again shifted blame from the U.S. market to "extended sales cycles" in the EMEA region for the revenue miss.  The November 6, 2019 press release also stated that revenues would fall within the range of $93.5 million to $96.5 million for the fourth quarter of 2019.

99.     The fourth quarter 2019 revenue guidance was materially false and/or misleading because it lacked any objective basis and, in fact, was inconsistent with Forescout's actual business performance, which was known to the Individual Defendants, at the time this guidance was disclosed.

100.     The statements identified in Paragraph 98 were materially false and/or misleading when made and failed to disclose that (a) potential deals worth millions of dollars were included in quarterly forecasts even though the Defendants knew or recklessly disregarded that those deals would not close before the end of the quarter; (b) artificial closing dates for potential deals were listed in the Salesforce platform in an attempt to support the Company's forecasts; and (c) DeCesare and Harms propped up the price of the common stock to maximize their return on the planned sale of the Company.

101.     On February 6, 2020, Defendants issued a press release that announced poor financial results for the fourth quarter of 2019. Total revenue for the fourth quarter of 2019 was $91.3 million, missing analyst estimates as well as the Company's earlier guidance. Defendant DeCesare again blamed the EMEA region for the poor results.  To blunt the impact of the missed revenues on the stock price, Defendants announced that Forescout had entered into a definitive agreement to be acquired by Advent for $33 per share in an all-cash transaction valued at approximately $1.9 billion.

102.     The statement that blamed the revenue miss on the EMEA region in Paragraph 101 was materially false and/or misleading when made and failed to disclose that (a) potential deals worth millions of dollars in the United States were included in quarterly forecasts even though the Defendants knew or recklessly disregarded that those deals would not close before the end of the quarter; (b) artificial closing dates for potential deals were listed in the Salesforce platform in an attempt to support the Company's forecasts; and (c) DeCesare and Harms propped up the price of the common stock to maximize their return on the planned sale of the Company.

103.     In reaction to the news, the price of Forescout common stock rose to $33.28 per share on February 6, 2020 from its previous day closing price of $27.98 per share on February 5, 2020.

104.     On March 23, 2020, the Company issued a definitive proxy statement that included an "Illustrative Guidance."  According to the "Illustrative Guidance," revenues for the first quarter of 2020 would be $62 million.

105.    The "Illustrative Guidance" for the first quarter of 2020 was materially false and/or misleading because it lacked any objective basis and, in fact, was inconsistent with Forescout's actual business performance, which was known to the Individual Defendants, at the time this guidance was disclosed.

106.    On May 11, 2020, the Company filed its Form 10-Q for the first quarter of 2020 with the SEC that reported revenues of $57.2 million, missing the Illustrative Guidance by nearly $5 million.

107.    On this partial disclosure or the materialization of the risks thereof, the price of Forescout's common stock fell by nearly 5% from its closing price of $32.09 on the previous day, to close at $30.50 per share on May 12, 2020, on heavy trading volume.

108.    The Form 10-Q further revealed negative net cash flow of $14.463 million from operating activities, and admitted that Forescout borrowed $16 million under a revolving credit facility to seek liquidity.  The Company conveniently blamed the global pandemic for its woes, but the World Health Organization did not declare that COVID-19 was a global pandemic until March 11, 2020, and the shelter-in-place order in the Bay Area was issued on March 16, 2020.

109.    Indeed, Defendants' COVID-19 related excuses are severely undermined by the financial results of their peers for the first quarter of 2020:

| Peer Group | Ticker | Q1 Revenue Guidance (Midpoint) | Implied Growth | Q1 Revenue, Actual | Beat/Miss |
|---|---|---|---|---|---|
| Cyberbark Software | CYBR | $108.0 | 12.6% | $106.8 | -1.1% |
| FireEye | FEYE | $224.0 | 6.4% | $224.7 | +0.3% |
| Fortinet | FTNT | $560.0 | 18.5% | $576.9 | +3.0% |
| Qualys | QLYS | $86.1 | 14.3% | $86.3 | +0.2% |
| Rapid7 | RPD | $92.4 | 26.3% | $94.3 | +2.1% |
| SailPoint Technologies | SAIL | $71.5 | 18.0% | $75.8 | +5.5% |
| Tenable Holdings | TENB | $100.5 | 25.2% | $102.6 | +2.1% |
| **Forescout Technologies** | **FSCT** | **$62.0** | **-18.0%** | **$57.2** | **-7.7%** |

110.    On May 18, 2020, Forescout issued a press release to announce that, on May 15, 2019, Advent notified the Company that it would not proceed with the acquisition as scheduled.

111.   On this partial disclosure or the materialization of the risks thereof, the price of Forescout's common stock plunged by nearly 24% from its closing price of $29.52 on the previous day, to close at $22.57 on May 18, 2020, on extremely heavy trading volume.

112.   The price of Forescout common stock has continued to decline since the materialization of the risk that the acquisition would not occur because of Defendants' failure to disclose the true state of affairs of Forescout's business and financials during the Class Period.  As a result, the price of the Company's common stock has continued to fall, closing at $20.93 on May 19, 2020, and closing at $19.84 on May 20, 2020.

113.   A letter dated May 15, 2020, from Advent's General Counsel to Forescout, identified material adverse effects to justify Advent's refusal to close its deal with Forescout, which further corroborate the allegations supported by the CWs in this Amended Complaint:

> *. . . Specifically, the Company has already suffered a dramatic decline in earnings potential and financial performance year-over-year from Q1 2019 to Q1 2020 and is on pace to suffer a dramatic decline in earnings potential and financial performance year-over-year from Q2 2019 to Q2 2020, and from Q3 2019 to Q3 2020. In addition, based on the Company's actual recent financial performance, information received from the Company regarding the Company's expected future financial performance (including sales and customer pipeline data), and Parent's projections of future financial performance for the fiscal year 2020 and beyond, it is clear that the Company's decline in earnings potential and financial performance will last for a durationally significant period of time. To the extent that the Company has attributed its downturn in financial prospects to the COVID-19 outbreak or any other general economic condition, there has been a materially disproportionate effect on the Company's business relative to other companies of similar size operating in the industries in which the Company and its subsidiaries conduct business*. See Merger Agreement, Section 1.1(t)(i), (vi). *In fact, the financial performance and earnings of the Company's peers have actually improved in this economic environment, while the Company's financial performance and earnings have dramatically declined*.

> \*\*\*\*\*

**DeCesare and Harms had Real-Time Access to, and Knowledge of, the Sales Pipeline**

114.   CW10 had weekly one-on-one meetings with CW10's immediate manager to discuss the status of the sales pipeline and account management for existing customers, and monthly meetings to discuss the same subjects with Rob Duncan, the Vice President of Sales for America West and Latin America.  CW10 stated that sales pipeline reports generated on the

Salesforce platform were compiled regularly, and delivered to Duncan as well as the Company's Chief Revenue Officer, Steve Redman.  Redman states on his Linkedin profile that he personally "run[s] sales and marketing for one of the most exciting companies on the planet - Forescout," and Defendant DeCesare identified Redman as the key high-level executive with responsibility over sales and revenues during the Class Period.

115.    CW10 further explained that Brian Gumbel, Forescout's then Senior Vice President of Worldwide Sales, received automatic alerts regarding the details of any potential deal worth $1 million or more that was entered as a potential opportunity in the Salesforce platform.

116.    According to CW7, Favakeh and Rodriguez stated that they informed Jensen, Forescout's former Senior Vice President of Sales for the Americas, regarding every aspect of the UWM project.  Favakeh and Rodriguez also told CW7 that the purpose of updating the status of major opportunities in the pipeline on the Salesforce platform was because Gumbel *and* Defendant DeCesare both reviewed the data on the Salesforce platform, and then asked CW7 specific questions about specific deals.

117.    CW8 states that CW8 participated in monthly conference calls with Jensen and Redman to discuss the details of the Company's sales pipeline, including forecasts and the status of specific deals.  CW8's immediate supervisor told CW8 that Jensen monitored all deals over $500,000, and frequently asked questions about those high dollar deals.  CW8's immediate supervisor, the Regional Sales Director of the Commercial Division, relayed questions from Defendant DeCesare regarding large deals in CW8's sales pipeline.  CW8 stated that DeCesare specifically inquired about the technology fit, budget, timeline, and competitive pressure regarding all deals that were over a $1 million.  CW8 said that this was par for the course as DeCesare was an extreme micromanager.

118.    Defendants admitted that they had access to, and knowledge of, all pertinent information regarding the sales pipeline and the status of potential deals.  On the May 9, 2019 earnings conference call, Defendant DeCesare told an analyst from Berenberg that "sales execution is certainly – or sales ramping and productivity is always one of those areas that both [Harms] and I spend a lot of time on."  On the August 7, 2019 earnings conference call, Defendant

Harms told a UBS analyst that DeCesare and he analyzed and "probe[d]" the sales pipeline, spent time in the field "asking the additional question as it relates to customers['] buying preferences," and "all of that is baked into how we are guiding for the full year."

**Individual Defendants' Insider Sales Create a Powerful Inference of Scienter**

119.    During the Class Period, Defendants DeCesare and Harms took advantage of Forescout's artificially inflated stock price and collectively earned nearly $12 million from sales of Forescout common stock on the open market:

**Class Period**

**DeCesare's Stock Sales:[1]**

| Date of Sale | Shares Disposed | Price | Proceeds |
|---|---|---|---|
| 2/20/2019 | 11,864 | $38.6670 | $458,745 |
| 3/11/2019 | 11,104 | $42.4460 | $471,320 |
| 4/11/2019 | 10,198 | $41.3790 | $421,983 |
| 5/15/2019 | 1,073 | $35.0000 | $37,555 |
| 5/16/2019 | 14,154 | $35.0960 | $496,749 |
| 7/2/2019 | 24,989 | $35.0270 | $875,290 |
| 7/15/2019 | 30,000 | $37.8970 | $1,136,910 |
| 8/29/2019 | 25,000 | $35.0770 | $876,925 |
| 9/16/2019 | 25,000 | $31.9433 | $798,583 |
| 11/19/2019 | 50,000 | $35.0900 | $1,754,500 |
| 12/16/2019 | 25,000 | $35.1150 | $877,875 |
| **Total** | **228,382** | | **$8,206,435** |

**Harms's Stock Sales:**

| Date of Sale | Shares Disposed | Price | Proceeds |
|---|---|---|---|
| 2/20/2019 | 5,182 | $38.6460 | $200,264 |
| 3/11/2019 | 5,182 | $42.4480 | $219,966 |
| 4/11/2019 | 6,239 | $41.4110 | $258,363 |
| 5/16/2019 | 4,898 | $35.4811 | $173,786 |
| 6/13/2019 | 4,898 | $32.5480 | $159,420 |
| 7/15/2019 | 8,945 | $37.8920 | $338,944 |
| 8/16/2019 | 7,676 | $36.3520 | $279,038 |
| 9/13/2019 | 9,815 | $36.1590 | $354,901 |
| 10/15/2019 | 9,815 | $25.8481 | $253,699 |
| 11/15/2019 | 9,815 | $33.5561 | $329,353 |
| 12/13/2019 | 9,815 | $34.5759 | $339,362 |

---

[1] Excluded from these charts are proceeds from shares withheld by Forescout in order to cover tax withholding obligations as well as shares sold to the underwriters in connection with Forescout's follow-on public offering in March 2018, which was conducted before the lockup period expired on April 25, 2018.

| 1/15/2020 | 9,815 | $33.8007 | $331,754 |
| 2/18/2020 | 6,451 | $32.9830 | $212,773 |
| 3/16/2020 | 5,859 | $27.1868 | $159,287 |
| 4/15/2020 | 5,460 | $32.0190 | $174,824 |
| **Total** | **109,865** | | **$3,785,734** |

120.    These sales were dramatically out of line with their stock sales before the Class Period in terms of both the total number of shares sold and the amount of proceeds reaped from the sales of Forescout's artificially inflated stock price:

**Pre-Class Period**

**DeCesare's Stock Sales:**

| Date of Sale | Shares Disposed | Price | Proceeds |
| --- | --- | --- | --- |
| 8/13/2018 | 10,198 | $34.7972 | $354,861 |
| 9/11/2018 | 9,930 | $37.1933 | $369,330 |
| 10/11/2018 | 10,212 | $30.1420 | $307,810 |
| 11/12/2018 | 10,139 | $27.0534 | $274,295 |
| 12/11/2018 | 10,011 | $26.2990 | $263,280 |
| 1/11/2019 | 10,131 | $26.3190 | $266,638 |
| **Total** | **60,621** | | **$1,836,214** |

**Harms's Stock Sales:**

| Date of Sale | Shares Disposed | Price | Proceeds |
| --- | --- | --- | --- |
| 7/5/2018 | 16,023 | $4.9400 | $79,154 |
| 8/20/2018 | 20,047 | $32.5080 | $651,688 |
| 9/11/2018 | 1,920 | $37.0070 | $71,053 |
| 9/11/2018 | 2,107 | $37.3500 | $78,696 |
| 10/11/2018 | 4,027 | $30.1130 | $121,265 |
| 11/9/2018 | 2,620 | $27.9820 | $73,313 |
| 11/9/2018 | 1,550 | $28.9220 | $44,829 |
| 11/9/2018 | 400 | $29.8000 | $11,920 |
| 11/9/2018 | 200 | $31.3230 | $6,265 |
| 12/11/2018 | 7,757 | $26.2790 | $203,846 |
| 12/11/2018 | 200 | $27.0800 | $5,416 |
| 1/11/2019 | 7,957 | $26.3550 | $209,707 |
| **Total** | **64,808** | | **$1,557,152** |

121.    In addition, according to an amended Annual Report filed on Form 10-K on April 29, 2020, Defendant DeCesare was granted 6,392,741 Restricted Stock Units ("RSU") in 2019,

1    and Defendant Harms was granted 2,663,679 RSUs in 2019.  In contrast, Defendant DeCesare

2    was granted 5,804,241 RSUs in 2018 and 2,431,334 RSUs in 2017.  Similarly, Defendant Harms

3    was granted 2,224,941 RSUs in 2018 and 1,620,902 RSUs in 2017.

4        122.    Defendants DeCesare and Harms also received bonuses of $453,500 and $246,591

5    respectively for the fiscal year 2019 that were specifically tied to increasing the sales pipeline,

6    execution of product roadmap, revenues, employee recruitment and retention, and adding

7    headcount to assist with larger transaction volumes.

8    **Forescout's Planned Sale Created an Incentive to Mislead the Market**

9        123.    As a result of their holdings, Defendants DeCesare and Harms stood to gain over

10   $42 million from the sale of Forescout to Advent.  Even in the event of termination at the effective

11   time of the sale, the merger agreement's golden parachute provision would allow Defendants

12   DeCesare and Harms to collectively walk away with over $16 million.  These enormous amounts

13   of money dwarfed Defendants' annual salaries for 2019.  For fiscal year 2019, Defendant

14   DeCesare was paid an annual salary of $500,000, and Defendant Harms was paid an annual salary

15   of $453,125.

16                          **LEAD PLAINTIFF'S CLASS ACTION ALLEGATIONS**

17       124.    Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

18   Procedure 23(a) and (b)(3) on behalf of all persons or entities that purchased or otherwise acquired

19   Forescout common stock between February 7, 2019 and May 15, 2020, both dates inclusive,

20   seeking to pursue remedies under §§10(b) and 20(a) of the Exchange Act.  Excluded are Defendants

21   herein, the officers and directors of the Company, at all relevant times, members of their immediate

22   families and their legal representatives, heirs, successors or assigns and any entity in which

23   Defendants have or had a controlling interest.

24       125.    Class members are so numerous that joinder of all members is impracticable.

25   Throughout the Class Period, Forescout common stock was actively traded on the NASDAQ

26   Global Select Market under the ticker symbol "FSCT."  Because the overwhelming majority of

27   owners hold shares in street name, Lead Plaintiff believes that there are hundreds or thousands of

28   members in the proposed Class.  Potential Class members may be identified from records

1    maintained by Forescout, its transfer agents, and brokers and banks that hold shares beneficially

2    for investors in street name, and may be notified of the pendency of this action by mail, using the

3    form of notice similar to that customarily used in securities class actions.

4         126.    Lead Plaintiff's claims are typical of the claims of those of the Class, as all Class

5    members were similarly affected by Defendants' wrongful conduct in violation of federal law

6    complained of herein.

7         127.    Lead Plaintiff will fairly and adequately protect the interests of the members of the

8    Class and has retained counsel competent and experienced in class action and securities litigation.

9         128.    Common questions of law and fact exist as to all Class members and predominate

10   over any questions solely affecting individual Class members.  Among the questions of law and

11   fact common to the Class are:

- whether the Individual Defendants are control persons of Forescout for purposes of Section 20(a) of the Exchange Act;

- whether Forescout and the Individual Defendants made false statements or failed to disclose material information that rendered their Class Period statements as misleading;

- whether Forescout and the Individual Defendants made the misrepresentations or omissions with scienter;

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether the prices of Forescout's securities during the Class Period were artificially inflated because of the Defendants' misconduct complained of herein; and

- whether the Class has sustained damages with respect to its Exchange Act claims and, if so, what is the proper measure of damages.

24        129.    A class action is superior to all other available methods for the fair and efficient

25   adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the

26   damages suffered by individual Class members may be relatively small, the expense and burden of

27   individual litigation make it impossible for Class members to individually redress the wrongs done

28   to them.  There will be no difficulty in the management of this action as a class action.

130.     With respect to the Exchange Act claims, Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Forescout's common stock traded in an efficient market;

- the Company's common stock was liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ Global Select Market, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

- Lead Plaintiff and other Class members purchased and/or otherwise acquired Forescout common stock between the time that the Defendants failed to disclose or misrepresented material facts, and the time that the true facts were disclosed or materialized, without knowledge of the omitted or misrepresented facts.

131.     Based upon the foregoing, Lead Plaintiff and other Class members are entitled to a presumption of reliance upon the integrity of the market.

132.     Alternatively, Lead Plaintiff and the Class members are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in violation of a duty to disclose such information, as detailed above.

## <u>COUNT I</u>

**(Against the Defendants for Violations of Section 10(b) and Rule 10b-5)**

133.     Lead Plaintiff repeats and reallege the allegations contained in Paragraphs 1 to 132 above as if fully set forth herein.

134.     This Count is asserted against Forescout and each of the Individual Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

135.    During the Class Period, the Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon the Lead Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including the Lead Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Forescout common stock; and (iii) cause Lead Plaintiff and other members of the Class to purchase or otherwise acquire Forescout common stock at artificially inflated prices.

136.    Specifically, Forescout and the Individual Defendants made material misrepresentations and omitted to disclose material information that rendered their statements misleading as particularized in Paragraphs 63 to 105.

137.    The Individual Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive the Lead Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Forescout and the Individual Defendants.  In addition to the facts alleged herein demonstrating a strong inference of scienter, certain information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within these Defendants' knowledge and control.  As the senior managers of Forescout, the Individual Defendants had knowledge of the details of Forescout's internal affairs that were inconsistent with their public statements.

138.    As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information regarding Forescout's business, operations, and finances.  As a result of the dissemination of the aforementioned false and misleading statements, the market price of Forescout common stock was artificially inflated

throughout the Class Period.  As sellers of Forescout common stock during the Class Period, the Individual Defendants had a duty to disclose or refrain from trading on Forescout's artificially inflated stock price.

139.    In ignorance of the adverse facts concerning Forescout's business, operations and finances, which were concealed by the misrepresentations and omissions alleged herein, Lead Plaintiff and the other members of the Class purchased or otherwise acquired Forescout common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

140.    During the Class Period, Forescout's common stock was traded on an active and efficient market.  Lead Plaintiff and the other members of the Class, directly relying on the materially false and misleading statements described herein, and/or relying upon the integrity of the market, purchased or otherwise acquired shares of Forescout at prices artificially inflated by Defendants' wrongful conduct.  Had Lead Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired it at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Lead Plaintiff and the Class, the true value of Forescout's common stock was substantially lower than the prices paid by Lead Plaintiff and the other members of the Class. The market price of Forescout's common stock declined sharply upon public disclosure of the facts or materialization of the risks alleged herein to the injury of Lead Plaintiff and other Class members.

141.    By reason of the conduct alleged herein, Forescout and the Individual Defendants knowingly or recklessly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

142.    As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and the other Class members suffered damages in connection with their respective purchases of the Company's common stock during the Class Period when the risk of Defendants' wrongdoing materialized or upon the disclosure thereof causing the price of Forescout common

stock to decline.  Forescout and the Individual Defendants are liable for damages in connection with these losses under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

143.    Lead Plaintiff repeats and realleges the allegations contained in Paragraphs 1 to 142 above, as if fully set forth herein.

144.    During the Class Period, the Individual Defendants participated in the operation and management of Forescout, and conducted and participated, directly and indirectly, in the conduct of Forescout's business affairs.  Because of their senior positions, they knew the adverse non-public information that rendered Forescout's public statements false and misleading.

145.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Forescout's financial information and results of operations, and to correct promptly any public statements issued by Forescout, which had become materially false or misleading.

146.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the Company's statements, which Forescout disseminated in the marketplace during the Class Period concerning Forescout's financial information and business.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Forescout to engage in the wrongful acts complained of herein.  The Individual Defendants therefore, were "controlling persons" of Forescout within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Forescout common stock.

147.    Each of the Individual Defendants, therefore, acted as a controlling person of Forescout.  By reason of their senior management positions and/or being directors of Forescout, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Forescout to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Forescout and possessed

the power to control the specific activities, which comprise the primary violations about which Lead Plaintiff, and the other members of the Class complain.

148.    As control persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the primary violations of the Exchange Act committed by Forescout.

## PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiff as the Class Representative;

B.    Requiring Defendants to pay damages sustained by the Lead Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Lead Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Lead Plaintiff hereby demands a trial by jury.

Dated:  May 22, 2020                    **POMERANTZ LLP**

                                        By:  _/s/ Omar Jafri_

                                        Patrick V. Dahlstrom
                                        Omar Jafri
                                        Ten South La Salle Street, Suite 3505
                                        Chicago, Illinois 60603
                                        Telephone: (312) 377-1181
                                        Facsimile:  (312) 377-1184
                                        E-mail: pdahlstrom@pomlaw.com
                                             ojafri@pomlaw.com

Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile:  (212) 661-8665
Email: jalieberman@pomlaw.com
Email: ahood@pomlaw.com


*Attorneys for Lead Plaintiff Meitav Tachlit Mutual Funds Ltd.*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<div align="center">

**CERTIFICATE OF SERVICE**

</div>

I hereby certify that on May 22, 2020, a copy of the foregoing was filed electronically via the Court's CM/ECF system.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's CM/ECF System.

Dated:  May 22, 2020

**POMERANTZ LLP**

By:  */s/ Omar Jafri*

Omar Jafri

*Attorney for Lead Plaintiff Meitav Tachlit Mutual Funds Ltd.*