MARC M. SELTZER (54534)
mseltzer@susmangodfrey.com
KRYSTA KAUBLE PACHMAN (280951)
kpachman@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150

P. RYAN BURNINGHAM (*Pro Hac Vice*)
rburningham@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1201 Third Ave., Suite 3800
Seattle, WA 98101
Telephone: (206) 516-3800
Facsimile: (206) 516-3883

ANDREW J. ENTWISTLE (*Pro Hac Vice*)
aentwistle@entwistle-law.com
ENTWISTLE & CAPPUCCI LLP
401 Congress Avenue, Suite 1170
Austin, TX 78701
Telephone: (512) 710-5960
Facsimile: (212) 894-7272

VINCENT R. CAPPUCCI (*Pro Hac Vice*)
vcappucci@entwistle-law.com
BRENDAN J. BRODEUR (*Pro Hac Vice*)
bbrodeur@entwistle-law.com
ANDREW M. SHER (*Pro Hac Vice*)
asher@entwistle-law.com
ENTWISTLE & CAPPUCCI LLP
299 Park Avenue, 20th Floor
New York, NY 10171
Telephone: (212) 894-7200
Facsimile: (212) 894-7272

CHRISTOPHER J. KELLER
(*Pro Hac Vice* forthcoming)
ckeller@labaton.com
FRANCIS P. McCONVILLE
(*Pro Hac Vice* forthcoming)
fmcconville@labaton.com
LABATON SUCHAROW LLP
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

*Attorneys for the Arbitrage Plaintiffs and Proposed Lead Counsel*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| CHRISTOPHER L. SAYCE, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> FORESCOUT TECHNOLOGIES, INC., MICHAEL DECESARE, AND CHRISTOPHER HARMS, <br><br> Defendants. | Case No. 3:20-CV-00076-SI <br><br> **THE ARBITRAGE PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR APPOINTMENT OF LEAD PLAINTIFFS AND IN OPPOSITION TO COMPETING MOTIONS** <br><br> DATE: Friday, November 6, 2020 <br> TIME: 10:00 a.m. <br> Courtroom 1, 17th Floor |

## **TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................................................ 1

II.     PROCEDURAL HISTORY ......................................................................................... 2

III.    FACTUAL BACKGROUND ...................................................................................... 3

      A.     A Transaction At Grave Risk ........................................................................... 3

      B.     The Spruce Point Report .................................................................................. 4

      C.     The Glazer Funds' Continued Investment ........................................................ 5

      D.     The Merger Is Cancelled .................................................................................. 6

IV.     LEGAL STANDARD .................................................................................................. 6

V.      ARGUMENT ............................................................................................................... 7

      A.     The Glazer Funds Are Neither Typical Nor Adequate Representatives ................. 7

      B.     The Arbitrage Plaintiffs Suffered the Most Substantial Losses Based Upon
           Purchases Before the Spruce Point Report Was Issued ....................................... 12

      C.     The Arbitrage Plaintiffs Are Typical and Adequate Representatives ................... 13

VI.     CONCLUSION ........................................................................................................... 14

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Berwecky v. Bear, Stearns & Co.*,
197 F.R.D. 65 (S.D.N.Y. 2000) ........................................................................................ 9

*Curry v. Hansen Med., Inc.*,
No. 5:09-cv-05094-JF (HRL), 2010 WL 702432 (N.D. Cal. Feb. 25, 2010) ...................... 14

*Epstein v. American Reserve Corp.*,
1988 WL 40500 (N.D. Ill. Apr. 21, 1988) ........................................................................ 11

*Ferrari v. Gisch*,
225 F.R.D. 599 (C.D. Cal. 2004) ..................................................................................... 14

*Folsom v. Indymac Bancorp Inc.*,
No. CV 08-03812-GW (C.D. Cal. Sept. 12, 2008) ............................................................ 9

*Hanon v. Dataproducts Corp.*,
976 F.2d 497 (9th Cir. 1992)..................................................................................... 8, 9, 13

*In re Cardinal Health, Inc., Securities Litigation*,
226 F.R.D. 298 (S.D. Ohio 2005) .................................................................................... 10

*In re Cavanaugh*,
306 F.3d 726 (9th Cir. 2002)............................................................................................. 7

*In re Enron Corp. Securities Litigation*,
206 F.R.D. 427 (S.D. Tex. 2002).................................................................................. 10, 11

*In re Harcourt Brace Jovanovich, Inc.*,
838 F. Supp. 109 (S.D.N.Y. 1993).................................................................................... 10

*In re Safeguard Scientifics*,
216 F.R.D. 577 (E.D. Pa. 2003) ....................................................................................... 10

*In re Valence Technology Securities Litigation*,
1996 WL 119468 (N.D. Cal. 1996).................................................................................. 8, 9

*In re World Access, Inc. Securities Litigation*,
310 F. Supp. 2d 1281 (N.D. Ga. 2004) ............................................................................ 10

*Kovaleff v. Piano*,
142 F.R.D. 406 (S.D.N.Y. 1992) ...................................................................................... 11

*Rocco v. Nam TaiElectronics, Inc.*
245 F.R.D. 131 (S.D.N.Y. 2007) ........................................................................................ 9

*Rolex Employees Retirement Trust v. Mentor Graphics Corp.*,
   136 F.R.D. 658 (D. Or. 1991) ................................................................................................ 9, 10

**STATUTES**

15 U.S.C. §§ 78u-4(a)(1) and (a)(3)(B) .................................................................................... 6

15 U.S.C. § 78u-4(a)(3)(B)(iii)(I) ........................................................................................... 6

15 U.S.C. § 78u-4(a)(3)(B)(iii)(II) ...................................................................................... 6, 7

Private Securities Litigation Reform Act.............................................................................. 4, 6

Securities Exchange Act of 1934 Sections 10(b) and 20(a)................................................. 2, 3

**RULES**

Fed. R. Civ. P. 23 ..................................................................................................... 1, 6, 7, 13

Fed. R. Civ. P. 23(a)(3) ......................................................................................................... 10

## I.      INTRODUCTION

The Arbitrage Plaintiffs[1] respectfully submit this memorandum of law in further support of their motion for appointment as lead plaintiffs and for approval of their selection of lead counsel, and in opposition to the competing motions by the Glazer Funds, Donald Levin and Meitav Tachlit Mutual Funds.

Although the Glazer Funds purport to have the largest losses, they are neither adequate nor typical plaintiffs. Specifically, the Glazer Funds continued to purchase a significant amount of Forescout shares following the April 30, 2020 release of a public report by Spruce Point Capital Management ("Spruce Point"), which revealed substantial facts undermining Forescout's prior representations regarding its financial performance. Indeed, the Glazer Funds purchased nearly **half** of their Forescout shares **after** the Spruce Point report was released to the public, and the **majority** of the Glazer Funds' losses incurred during the class period were derived from shares purchased after that release.[2]

Federal courts routinely reject as atypical and inadequate movants who made significant stock purchases after curative disclosures undermining the defendants' earlier statements and omissions were released to the public because such movants are subject to unique defenses. Consequently, the Glazer Funds do not satisfy the typicality or adequacy requirements of Rule 23, and the Court must turn to the applicant with the next largest loss.

---

[1] The Arbitrage Plaintiffs are: The Arbitrage Fund; Water Island LevArb Fund, LP; Water Island Diversified Event-Driven Fund; Water Island Merger Arbitrage Institutional Comingled Master Fund, LP; AltShares Merger Arbitrage ETF (the "Water Island Funds"); together with S. Muoio & Co. LLC and Amethyst Arbitrage International Master Fund.

[2] The Glazer Funds purchased 643,697 total shares during the class period. *See* Seltzer Decl., Ex. 1.  Of those, 292,200 (or 45%) were purchased after the report was issued on April 30, 2020. *See* Seltzer Decl.*,* Ex. 3. Likewise, the Glazer Funds expended $20,561,112.53 in funds purchasing Forescout stock during the class period. *See* Seltzer Decl., Ex. 1. Of that amount, the Glazer Funds expended $9,126,853.00 (or 44%) after the report was issued. *See* Seltzer Decl., Ex. 3. And Glazer Funds incurred approximately $5.27 million in actual losses. *See* Seltzer Decl., Ex. 1. Of that amount, approximately $2.7 million (or 51%) corresponds to shares Glazer Funds purchased after the report was issued. *See* Seltzer Decl., Ex. 3.

The Arbitrage Plaintiffs suffered the next largest loss. In fact, when losses derived from purchases made after the release of the Spruce Point report are excluded, the Arbitrage Plaintiffs' losses surpass those of the Glazer Funds: The Arbitrage Plaintiffs' total losses amount to approximately $3.2 million, and their *Dura* losses total approximately $2.6 million, while the Glazer Funds' actual and *Dura* losses are approximately $3.1 million and $2 million, respectively. Compared to Donald Levin or Meitav Tachlit, the Arbitrage Plaintiffs suffered significantly greater losses by any measure, as demonstrated below:

**Losses By Movant**
**(Excluding Losses from Purchases After the April 30, 2020 Spruce Point Report)[3]**

| Movant | Actual Losses (FIFO) | Actual Losses (LIFO) | *Dura* Losses (FIFO/LIFO) |
|---|---|---|---|
| Arbitrage Plaintiffs | $3,237,202.04 | $3,227,337.26 | $2,603,066.00 / $2,610,052.77 |
| Glazer Funds | $2,576,227.10 | $3,135,151.29 | $1,782,675.00 / $2,048,978.15 |
| Donald R. Levin | $1,850,931.39 | $1,850,931.39 | $1,039,720.00 / $1,039,720.00 |
| Meitav Tachlit | $283,356.67 | $210,543.05 | $56,567.09 / $44,917.85 |

The Arbitrage Plaintiffs are also extremely qualified to serve as lead plaintiffs. They are institutional investors with extensive experience serving as lead plaintiffs in securities class actions. Furthermore, the Water Island Funds filed a detailed complaint against the defendants and successfully litigated Meitav Tachlit's motion to vacate the notice and lead plaintiff deadline following the filing of the Water Island Funds' complaint. The Arbitrage Plaintiffs have already demonstrated their commitment to the class and easily satisfy the typicality and adequacy requirements.

## II.    PROCEDURAL HISTORY

On January 2, 2020, plaintiff Christopher Sayce filed a complaint against Forescout Technologies, Inc., Michael DeCesare and Christopher Harms for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934. *See* ECF No. 1. On March 23, 2020, the Court granted Meitav Tachlit's unopposed motion for appointment as lead plaintiff. *See* ECF No. 27. Two months

---

[3] *See* Seltzer Decl., Ex. 2.

after that appointment – on May 22, 2020 – Meitav Tachlit filed an amended complaint that expanded the proposed class (the "Class") to include persons or entities who purchased or otherwise acquired the common stock of Forescout between February 7, 2019 and May 15, 2020, both dates inclusive (the "Class Period"). *See* ECF No. 31.

On June 10, 2020, the Water Island Funds filed a separate complaint against the same defendants, also for violations of the Exchange Act. *See* Case No. 3:20-cv-03819-SI ("Water Island Action"), ECF No. 1. The complaint was brought on behalf of investors who purchased or otherwise acquired the common stock of Forescout during the period from February 6, 2020 through May 15, 2020, inclusive, and were damaged thereby. *Id.* The next day, counsel for the Water Island Funds published notice of that lawsuit.

On June 15, 2020, Meitav Tachlit moved for an order to consolidate the Water Island Action with this action and to vacate the notice and lead plaintiff deadline in the Water Island Action. *See* ECF No. 35. The Water Island Funds responded on June 29, 2020, successfully arguing that the Court should order publication of a new notice and order a new lead plaintiff selection process. *See* ECF No. 41 (Water Island Funds' Opp. Mem.); ECF No. 55 at 10 (consolidating and ordering republication and a new lead plaintiff selection process). Meitav Tachlit republished notice for the class on July 29, 2020. *See* ECF No. 65-3.

On September 28, 2020, four groups filed motions to be appointed lead plaintiff(s): the Glazer Funds (ECF No. 63), the Arbitrage Plaintiffs (ECF No. 64), Donald Levin (ECF No. 76) and Meitav Tachlit (ECF No. 81).

## III.     FACTUAL BACKGROUND

### A.     A Transaction At Grave Risk

This case relates to a failed merger between Forescout and Advent. Forescout announced the merger agreement with Advent on February 6, 2020. Water Island Action, ECF No. 1 ¶ 1. Forescout knew that the consummation of the transaction was unlikely at the time it announced the merger because its business had suffered a dramatic (and undisclosed) downturn, including in the fast-growing Asia Pacific and Japan region that was impacted by COVID-19 starting in January 2020. *Id.* ¶ 3. Forescout was also aware that its fourth quarter 2019 revenues were inflated through

3

an abnormal transaction with a large resale customer, which a whistleblower alleged to Advent was the result of a "channel stuffing scheme" in the fourth quarter of 2019. *Id.*

Forescout never amended its proxy statement to disclose to investors Advent's growing concerns regarding the likelihood that the transaction would not close. *Id.* ¶ 52. The transaction was approved by a shareholder vote at a special meeting on April 23, 2020. *Id.* Shareholders were deprived of a full and fair opportunity to vote because they lacked information regarding Advent's concerns relating to COVID-19 and Advent's intent not to proceed with the transaction. *Id.* Furthermore, because the class is now broader by virtue of consolidation and this Court's orders regarding the PSLRA notice, it now encompasses prior misleading statements and omissions by Forescout.

### B.    The Spruce Point Report

On April 30, 2020, Spruce Point issued a public letter to management at Advent recommending that Advent critically reexamine its agreement to purchase Forescout, explaining that Advent "should consider revising its offer lower or abandoning the transaction outright." Seltzer Decl., Ex. 4 at 13; *see also* Water Island Action, ECF No. 1 ¶ 53. This letter attached a report (titled "Why Advent Should Cut Its Purchase Price or Abandon The Forescout Deal") supporting Spruce Point's view that the merger price could be revised lower by up to 35 to 50% if the deal were not called off entirely. *See id.* at 15-55.

Spruce Point explained that Forescout "may not have given complete, timely, or realistic access to information with respect to its financial projections, thus leading to an inflated $33 per share purchase price." *Id.* at 13. Spruce Point cautioned:

> Upon reading the proxy, it appears that Forescout was eager to complete a transaction prior to its Q4 2019 earnings call. At that time, Forescout was set to issue 2020 "Illustrative Guidance" that would have exposed a serious decline in financial expectations, resetting annual revenue guidance from $386m to $355m, or 8% below plan. Surely, this information would have been a blow to its share price. For context, in Q3 FY19, revised sales guidance resulted in a 37% price drop.

*Id.* Spruce Point further warned that "Advent should consider revising its offer lower or abandoning the transaction outright," largely because the COVID-19 pandemic meant that "Forescout's financial projections would be even materially worse." *Id.* In the report that accompanied the letter,

Spruce Point gave a detailed analysis of the financial information that Forescout had failed to disclose to prospective buyers. *See id.* at 17-33.

The Water Island Funds identified this significant disclosure in their complaint. *See* "Water Island Action, ECF No. 1 ¶ 53.

### C.   The Glazer Funds' Continued Investment

Following the issuance of the Spruce Point report, the Glazer Funds (unlike the Arbitrage Plaintiffs and other competing movants) made substantial additional investments in Forescout stock. Indeed, 292,200 (or 45%) of the Glazer Funds' 643,697 total Forescout shares purchased during the Class Period were acquired following the issuance of the Spruce Point report. By contrast, the Arbitrage Plaintiffs purchased only 29,756 (or 1%) of their 2,508,595 total shares after the Spruce Point report was issued. And following the Spruce Point report, the Arbitrage Plaintiffs sold approximately 1.4 million more shares than they purchased.

| Movant | Shares Purchased After Spruce Point Report | Net Shares Purchased After Spruce Point Report[4] |
|---|---|---|
| Glazer Funds | 292,200 | 201,203 |
| Arbitrage Plaintiffs | 29,756 | (1,419,011) |
| Donald Levin | 0 | 0 |
| Meitav Tachlit | 221 | 183 |

Moreover, of the Glazer Funds' $20,561,112.53 expended purchasing Forescout stock during the Class Period, $9,126,853 (or 44%) of that came after the facts undermining Forescout's misleading statements and omissions were disclosed:

| Funds Expended By Glazer Funds | |
|---|---|
| Total Funds Expended | $20,561,112.53[5] |
| Funds Expended Before Spruce Point Report | $11,434,259.53[6] |
| Funds Expended After Spruce Point Report | $9,126,853.00[7] |

[4] *See* Seltzer Decl., Ex. 3.
[5] *See* Seltzer Decl., Ex. 1.
[6] *See* Seltzer Decl., Ex. 2.
[7] *See* Seltzer Decl., Ex. 3.

Likewise, of the Glazer Funds' claimed $5,273,193.63 in losses, $2,696,966.53 (or 51%) are attributable to purchases that occurred after the Spruce Point report was issued:

| Glazer Funds Losses | |
|---|---|
| Total Claimed Losses | $5,273,193.63[8] |
| FIFO Losses Before Spruce Point Report | $2,576,227.10[9] |
| FIFO Losses After Spruce Point Report | $2,696,966.53[10] |

### D.   The Merger Is Cancelled

On May 18, 2020, Forescout announced that it had received notice on May 15, 2020 from Advent that Advent "would not be proceeding to consummate the acquisition of Forescout." Water Island Action, ECF No. 1, ¶ 1.

## IV.   LEGAL STANDARD

The Private Securities Litigation Reform Act ("PSLRA") governs the appointment of lead plaintiffs in this action. *See* 15 U.S.C. §§ 78u-4(a)(1) and (a)(3)(B). In appointing lead plaintiffs, the Court is tasked with identifying the class member or members "most capable of adequately representing the interests of class members." *Id.* Under the PSLRA, the most adequate plaintiff is presumed to be the "person or groups of persons" that:

> (a)   has either filed the complaint or made a motion in response to a notice . . . ;

> (b)   in the determination of the court, has the largest financial interest in the relief sought by the class; and

> (c)   otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). However, the presumption is rebuttable by proof from a class member that the presumptive most adequate plaintiff "will not fairly and adequately protect the interests of the class" or "***is subject to unique defenses that render such plaintiff incapable of adequately representing the class.***" 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II) (emphasis added).

---

[8] *See* Seltzer Decl., Ex. 1.
[9] *See* Seltzer Decl., Ex. 2.
[10] *See* Seltzer Decl., Ex. 3.

## V.    ARGUMENT

The Glazer Funds are neither typical nor adequate class representatives. Because they purchased substantial amounts of Forescout stock after the Spruce Point report disclosed significant facts undermining Forescout's representations, the Glazer Funds are subject to unique defenses that are atypical of the Class and render them incapable of adequately representing the Class. By contrast, the Arbitrage Plaintiffs followed a typical trading pattern and suffered losses typical of the Class. Moreover, the Arbitrage Plaintiffs plainly satisfy the Rule 23 requirements. Consequently, the Arbitrage Plaintiffs are the Class members most capable of adequately representing the interests of other Class members.

### A.    The Glazer Funds Are Neither Typical Nor Adequate Representatives

At this stage in the PSLRA's sequential process for determining lead plaintiffs, the Court must "consider the losses allegedly suffered by the various plaintiffs" and select as the "presumptively most adequate plaintiff . . . the one who has the largest financial interest in the relief sought by the class and [who] otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." *In re Cavanaugh*, 306 F.3d 726, 729–30 (9th Cir. 2002) (internal citations omitted). The Glazer Funds purport to have the greatest financial interest and claim to be the presumptive most adequate plaintiffs. However, the Court must "give other plaintiffs an opportunity to rebut the presumptive lead plaintiff's showing that it satisfies Rule 23's typicality and adequacy requirements." *Id.* at 730. Here, that presumption is rebutted.

Because of their significant purchases after the Spruce Point report was issued, the Glazer Funds are "subject to unique defenses that render [them] incapable of adequately representing the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II). Federal courts have routinely held that such a pattern of purchases of the defendant company's stock after full or partial disclosure of materially false statements and omissions of material fact, either during the class period or after the close of the class period, may disqualify a plaintiff from serving as a lead plaintiff or class representative.

This is especially true where, as here, the later purchases in question are substantial. That is because the fraud-on-the-market theory is a rebuttable presumption which can be vitiated by showing that the plaintiff would have made the purchase regardless of material misstatements or

omissions. Consequently, where investors increase their holdings even after public disclosure of the alleged fraud, courts have concluded that the investors purchased stock regardless of the material misstatements or omissions.

The Ninth Circuit has noted that "[s]everal courts have held that class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (quotation omitted). And the court agrees "that a named plaintiff's motion for class certification should not be granted if there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." *Id.* (quotation omitted). Accordingly, courts in this circuit have repeatedly rejected proposed lead plaintiffs that purchased significant numbers of a company's shares after facts undermining that company's representations come to light.

For example, in *In re Valence Technology Securities Litigation*, 1996 WL 119468 (N.D. Cal. 1996), on a motion for class certification, the district court rejected two plaintiffs as class representatives where they continued to purchase shares of the defendant company after learning of alleged misrepresentations. One plaintiff increased his holdings a day after the end of the disclosure, and the other plaintiff tripled his holdings two months later. The court found that their purchases made them atypical and unable to represent members of the class who had purchased their shares before the disclosure because their purchases could subject them to unique defenses regarding their claim of reliance on the integrity of the market. The court explained:

> The fact that [plaintiff] continued to trade in the stock [of defendants] after he learned of the alleged misrepresentations of defendants severs the link between the alleged misrepresentations of defendants and the stock purchases made by [plaintiff] and acts to rebut the presumption that [plaintiff] relied on the alleged misrepresentations in making his purchases.

*Id.* at *4. The court explained further:

> Accordingly, these plaintiffs' positions are far removed from those of the pre-May 1994 purchasers and thus these plaintiffs are not typical of the class. Berry and Bergelson's interest in the materiality of the May 3, 1994 adverse disclosure is in conflict with the interests of pre-May 1994-only purchasers.

*Valence*, 1996 WL 119468, at *5. With respect to the plaintiff who tripled his holdings after the fraud was disclosed, the *Valence* court found him atypical, stating:

> Berry did not merely retain his Valence shares after an adverse disclosure. He filed a fraud suit immediately after the first adverse disclosure, and then, after a second adverse disclosure, tripled his Valence holdings. These factors are sufficient to place Berry in a unique situation as compared to the pre-May 1994 purchase class members, thus making Berry atypical of the class.

*Id.* at *6.

Likewise, in *Rolex Employees Retirement Trust v. Mentor Graphics Corp.*, 136 F.R.D. 658, 663 (D. Or. 1991), the court denied a motion for class certification where Rolex (the proposed class representative) "continued to trade in the stock in Mentor Graphics on behalf of Rolex after he learned of the alleged misrepresentations of defendants." The court found that there was "a substantial likelihood that if Rolex is named as the representative of the proposed class, defenses unique to Rolex could become the focus of the litigation to the detriment of the class." *Id.* (cited with approval by *Hanon*, 976 F.2d at 508).

More recently, in *Folsom v. Indymac Bancorp Inc.*, No. CV 08-03812-GW (C.D. Cal. Sept. 12, 2008), the court appointed the movant with the second-greatest financial interest as lead plaintiff where the movant with the greatest interest had purchased substantial stock after information regarding the misleading nature of defendant's statements and omissions came to light. *See id.* at Dkt. 39.

Such reasoning is not unique to courts in this circuit. On the contrary, case law from other jurisdictions abundantly supports the conclusion that the Glazer Funds should not be appointed as the lead plaintiffs.

For example, in *Rocco v. Nam TaiElectronics, Inc.* 245 F.R.D. 131, 136 (S.D.N.Y. 2007), the court explained that, "[a]lthough there is no per se rule to this effect, this Court has consistently held that 'a person that increases his holdings in a security after revelation of an alleged fraud involving that security is subject to a unique defense that precludes him from serving as a class representative.'") (quoting *Berwecky v. Bear, Stearns & Co.*, 197 F.R.D. 65, 69 (S.D.N.Y. 2000)). The court also recognized that a "named plaintiff who is subject to an arguable defense of non-reliance on the market has been held subject to a unique defense, and therefore, atypical of the class

under Rule 23(a)(3)." *Id.* (quoting *In re Harcourt Brace Jovanovich, Inc.*, 838 F. Supp. 109, 113 (S.D.N.Y. 1993)). Because the proposed class representative had purchased stock despite having information concerning the company's allegedly manipulated finances, the court concluded he was not an adequate class representative. *Id.*

Likewise, in *In re Cardinal Health, Inc., Securities Litigation*, 226 F.R.D. 298, 310 (S.D. Ohio 2005), the court declined to appoint as lead plaintiff an institutional investor who purchased a significant number of shares after the disclosure of a significant earnings shortfall, the existence of an SEC subpoena concerning revenue accounting methods, and an investigation by the U.S. Attorney's Office, stating:

> The timing of New Jersey's purchases undermines any causal nexus between the Defendants' alleged misrepresentation and the resulting injury. It will be difficult to argue that the presumptive Lead Plaintiff incurred the vast bulk of its injury after Cardinal acknowledged that its accounting methodologies were under investigation. ***New Jersey's trading patterns will make it susceptible to claims that New Jersey did not rely on the Defendants' alleged misrepresentations when purchasing Cardinal stock. Thus, the Court finds the presumption of typicality and adequacy rebutted.***

*Id.* at 310 (emphasis added).

In *In re World Access, Inc. Securities Litigation*, 310 F. Supp. 2d 1281, 1300 (N.D. Ga. 2004), the presumption that the plaintiff relied on the integrity of the market was rebutted by evidence that he continued to purchase the defendant's stock after he learned of the alleged misrepresentations. The court explained: "Due to the timing of his purchases, the only thing that [plaintiff] appears to have relied upon is that [defendant's] stock would eventually go back up." *Id.* (citing *Rolex*, 136 F.R.D. at 663).

In *In re Safeguard Scientifics*, 216 F.R.D. 577, 582-583 (E.D. Pa. 2003), the named plaintiff in a securities class action had increased his holdings in the defendant corporation's stock "even after public disclosure of the alleged fraud… raise[d] serious doubts as to the materiality of the alleged fraud disclosures." This subjected him to the unique defenses of lack of reliance and lack of materiality, rendering him inadequate as class representative. *Id.*

In *In re Enron Corp. Securities Litigation*, 206 F.R.D. 427, 455 (S.D. Tex. 2002), the court rejected as "atypical of and antagonistic" to the class a public pension fund movant for lead plaintiff

that had the larger loss because the fund purchased Enron stock "after the initial public disclosure regarding Enron's overstatement of its assets and partnership liabilities" and "after the SEC announced that it was investigating Enron." These post-disclosure purchases "create[d] a conflict of interest with those who purchased stock before the disclosure." *Id.* Without the ability to aggregate that fund's losses, the other fund's losses were insufficient to support its appointment as lead plaintiff. *Id.*

In *Kovaleff v. Piano*, 142 F.R.D. 406, 408 (S.D.N.Y. 1992), the court denied a motion for class certification because the plaintiffs increased their holdings of the company's stocks after disclosure of alleged fraud and thus were subject to unique defenses that made their claims atypical.

In *Epstein v. American Reserve Corp.*, 1988 WL 40500, at *3 (N.D. Ill. Apr. 21, 1988), the court rejected two movants who made significant purchases after fraudulent information had become known. The court explained: "purchases of ARC securities were made in both the Epstein and Wenger accounts after the alleged fraudulent information had become known." *Id.* And the court concluded that neither the Epsteins nor the Wegners were appropriate class representatives because they were "subject to unique defenses which may well consume the merits of this case and which cause their claims to be atypical of the claims of the class." *Id.*

Because the Glazer Funds purchased nearly half of their Forescout shares ***after*** the Spruce Point report revealed substantial facts undermining Forescout's prior representations regarding its financial performance, the defendants can be expected to argue that the Glazer Funds did not rely on defendants' alleged misrepresentations in buying Forescout common stock. Thus, there is a real and palpable possibility that the Glazer Funds will be found to be inadequate as class representatives. This unique defense is likely to become the focus of the litigation and will distract the Glazer Funds from vigorously and effectively prosecuting this action to the detriment of the other class members.

**B.      The Arbitrage Plaintiffs Suffered the Most Substantial Losses Based Upon Purchases Before the Spruce Point Report Was Issued**

Accounting for losses throughout the Class Period, the Arbitrage Plaintiffs suffered substantial losses at $3.39 million – more than Donald Levin and Meitav Tachlit combined. *See* Seltzer Decl., Ex. 1. The movants' losses during the Class Period are reflected in the chart below:

**Losses by Movant (Class Period)[11]**

| Movant | Actual Losses (FIFO) | Actual Losses (LIFO) | *Dura* Losses (FIFO/LIFO) |
|---|---|---|---|
| Glazer Funds | $5,273,193.63 | $5,273,193.63 | $3,813,207.52 / $3,804,152.15 |
| Arbitrage Plaintiffs | $3,394,626.17 | $3,370,882.06 | $2,750,619.08 / $2,756,931.59 |
| Donald R. Levin | $1,850,931.39 | $1,850,931.39 | $1,039,720.00 / $1,039,720.00 |
| Meitav Tachlit | $285,312.22 | $212,522.78 | $58,103.04 / $46,453.80 |

Additionally, the Arbitrage Plaintiffs purchased far more shares and expended far more actual funds during the Class Period than any other proposed lead plaintiff, and the Arbitrage Plaintiffs purchased more net shares, expended more net funds, and suffered more losses than Donald Levin and Meitav Tachlit combined. *See id*.

**Additional *Lax* Factors by Movant (Class Period)[12]**

| Movant | Shares Purchased During Class Period | Net Shares Purchased During Class Period | Funds Expended During Class Period | Net Funds Expended During Class Period |
|---|---|---|---|---|
| Arbitrage Plaintiffs | 2,508,595 | 403,781 | $80,363,407.69 | $13,466,354.21 |
| Glazer Funds | 643,697 | 548,700 | $20,561,112.53 | $17,530,760.10 |
| Donald R. Levin | 150,000 | 150,000 | $5,286,291.39 | $5,286,291.39 |
| Meitav Tachlit | 44,305 | (32,533) | $1,603,877.03 | $(975,753.59) |

---

[11] *See* Seltzer Decl., Ex. 1.
[12] *See Id.*

Accounting for losses typical to the Class, the Arbitrage Plaintiffs' losses outweigh those of Glazer Funds. The movants' losses corresponding to stock purchases made before substantial facts undermining the truth of Forescout's prior representations were disclosed to the public are reflected in the chart below:

**Losses By Movant**
**(Excluding Losses Corresponding to Purchases After Spruce Point Report)[13]**

| Movant | Actual Losses (FIFO) | Actual Losses (LIFO) | *Dura* Losses (FIFO/LIFO) |
|---|---|---|---|
| Arbitrage Plaintiffs | $3,237,202.04 | $3,227,337.26 | $2,603,066.00 / $2,610,052.77 |
| Glazer Funds | $2,576,227.10 | $3,135,151.29 | $1,782,675.00 / $2,048,978.15 |
| Donald R. Levin | $1,850,931.39 | $1,850,931.39 | $1,039,720.00 / $1,039,720.00 |
| Meitav Tachlit | $283,356.67 | $210,543.05 | $56,567.09 / $44,917.85 |

### C.    The Arbitrage Plaintiffs Are Typical and Adequate Representatives

The Arbitrage Plaintiffs satisfy the requirements of Rule 23 and are well equipped to serve as class representatives. *See* ECF No. 64 at 9–11.

#### 1.    Typicality

"The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (quotation omitted). Just like other Class members, the Arbitrage Plaintiffs (1) acquired Forescout common stock during the Class Period, (2) at prices artificially inflated by defendants' false and misleading statements and omissions and (3) suffered damage as a result. By contrast to the Glazer Funds, the Arbitrage Plaintiffs did not continue to purchase Forescout stock in significant quantities after defendants' material misstatements and omissions were made known.

---

[13] *See* Seltzer Decl., Ex. 2.

### 2.    Adequacy

A class representative is adequate when the representatives' interests are not antagonistic to the interests of absent class members, it is unlikely that the action is collusive and counsel for the class is qualified and competent. *Curry v. Hansen Med., Inc.*, No. 5:09-cv-05094-JF (HRL), 2010 WL 702432, at *2 (N.D. Cal. Feb. 25, 2010). "In addition, the class representative must have a sufficient interest in the outcome of the case to ensure vigorous advocacy." *Ferrari v. Gisch*, 225 F.R.D. 599, 607 (C.D. Cal. 2004). As set forth in their motion, the Arbitrage Plaintiffs meet these requirements.

*First*, the Arbitrage Plaintiffs suffered substantial losses from defendants' wrongdoing during the Class Period. Such substantial losses ensure that the Arbitrage Plaintiffs are highly invested in the case's outcome and that their interests are aligned with the interests of other Class members. *See Ferrari*, 225 F.R.D. at 607 (suffering the greatest financial loss provides an incentive to prosecute the case vigorously). *Second*, there is no evidence of collusive action. *Third*, the Arbitrage Plaintiffs' counsel are qualified and competent. The firms (Susman Godfrey, Entwistle & Cappucci and Labaton Sucharow) are highly experienced in prosecuting securities class actions and highly successful in those prosecutions. For these reasons, the Arbitrage Plaintiffs are adequate class representatives.

Notably, certain of the Arbitrage Plaintiffs (the Water Island Funds) have already demonstrated their adequacy by filing a detailed complaint against defendants and by successfully moving the Court to order a new lead plaintiff selection process. *See* ECF Nos. 41, 55.

## VI.    CONCLUSION

The Glazer Funds are neither adequate nor typical representatives because their losses are predominately derived from stock purchases made after substantial facts undermining Forescout's misleading statements and omissions were disclosed to the public. Excluding purchases after the issuance of the Spruce Point report, the Arbitrage Plaintiffs have the greatest financial interest in this litigation, and they are adequate and typical representatives. The Arbitrage Plaintiffs should, therefore, be appointed lead plaintiffs, and their choice of lead counsel should be approved.

Dated:  October 13, 2020                Respectfully submitted,

                                        Marc M. Seltzer
                                        Krysta Kauble Pachman
                                        P. Ryan Burningham
                                        SUSMAN GODFREY L.L.P.

                                        Andrew J. Entwistle
                                        Vincent R. Cappucci
                                        Brendan J. Brodeur
                                        Andrew M. Sher
                                        ENTWISTLE & CAPPUCCI LLP

                                        Christopher J. Keller
                                        Francis P. McConville
                                        LABATON SUCHAROW LLP


                                        By:    */s/ Marc M. Seltzer*
                                               Marc M. Seltzer

                                        *Attorneys for the Arbitrage Plaintiffs and Proposed Lead Counsel*