# Exhibit 3

Translated
from the
Hebrew original

# MEITAV DASH INVESTMENTS LTD.

## CONSOLIDATED FINANCIAL STATEMENTS

## AS OF DECEMBER 31, 2019

## INDEX

| | Page |
|---|---|
| Auditors' Report - Internal Control over Financial Reporting | 2 - 3 |
| Auditors' Report | 4 |
| Consolidated Statements of Financial Position | 5 - 6 |
| Consolidated Statements of Profit or Loss and Other Comprehensive Income | 7 |
| Consolidated Statements of Changes in Equity | 8 |
| Consolidated Statements of Cash Flows | 9 - 13 |
| Notes to Consolidated Financial Statements | 14 - 141 |
| Appendix to Consolidated Financial Statements - List of Investees | 142 - 144 |

- - - - - - - - - - - - -



**Kost Forer Gabbay & Kasierer**
144A Menachem Begin Road
Tel-Aviv 6492102, Israel

Tel: +972-3-6232525
Fax: +972-3-5622555
ey.com

# AUDITORS' REPORT

## To the Shareholders of

## MEITAV DASH INVESTMENTS LTD.

### Regarding the Audit of Components of Internal Control over Financial Reporting

### Pursuant to Section 9b(c) to the Israeli Securities Regulations (Periodic and Immediate Reports), 1970

We have audited the components of internal control over financial reporting of Meitav Dash Investments Ltd. as of December 31, 2019. Control components were determined as explained in the following paragraph. The Company's board of directors and management are responsible for maintaining effective internal control over financial reporting, and for their assessment of the effectiveness of the components of internal control over financial reporting included in the accompanying periodic report for said date. Our responsibility is to express an opinion on the Company's components of internal control over financial reporting based on our audit.

The components of internal control over financial reporting audited by us were determined in conformity with Auditing Standard (Israel) 911 of the Institute of Certified Public Accountants in Israel, "Audit of Components of Internal Control over Financial Reporting" ("Auditing Standard (Israel) 911"). These components consist of: (1) entity level controls, including financial reporting preparation and close process controls and information technology general controls; (2) controls over the supplier payment process; (3) controls over the commission payment process relating to independent and internal resellers of mutual funds; (4) controls over the bank distribution commission payment processes relating to mutual, provident and pension funds; (5) controls over the bank charge process relating to provident funds; (6) controls over the revenue process relating to provident and pension funds; (7) controls over the revenue process relating to mutual funds (including ETFs); (8) controls over the process of recording finance income from non-bank credit in Peninsula Group Ltd.; and (9) controls over the payroll process (collectively, "the audited control components").



EY
Building a better
working world

- 3 -

We conducted our audit in accordance with Auditing Standard (Israel) 911. That Standard requires that we plan and perform the audit to identify the audited control components and obtain reasonable assurance about whether these control components have been effectively maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, identifying the audited control components, assessing the risk that a material weakness exists regarding the audited control components and testing and evaluating the design and operating effectiveness of the audited control components based on the assessed risk. Our audit of these control components also included performing such other procedures as we considered necessary in the circumstances. Our audit only addressed the audited control components, as opposed to internal control over all the material processes in connection with financial reporting and, therefore, our opinion addresses solely the audited control components. Moreover, our audit did not address any reciprocal effects between the audited control components and unaudited ones and, accordingly, our opinion does not take into account any such possible effects. We believe that our audit provides a reasonable basis for our opinion within the context described above.

Because of its inherent limitations, internal control over financial reporting as a whole, and specifically the components therein, may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, the Company effectively maintained, in all material respects, the audited control components as of December 31, 2019.

We have also audited, in accordance with generally accepted auditing standards in Israel, the consolidated financial statements of the Company as of December 31, 2019 and 2018 and for each of the three years in the period ended December 31, 2019 and our report dated March 18, 2020 expressed an unqualified opinion thereon.

Tel-Aviv, Israel                                          KOST FORER GABBAY & KASIERER
March 18, 2020                                          A Member of Ernst & Young Global



**Kost Forer Gabbay & Kasierer**
144A Menachem Begin Road
Tel-Aviv 6492102, Israel

Tel: +972-3-6232525
Fax: +972-3-5622555
ey.com

## AUDITORS' REPORT

### To the Shareholders of

### MEITAV DASH INVESTMENTS LTD.

We have audited the accompanying consolidated statements of financial position of Meitav Dash Investments Ltd. ("the Company") as of December 31, 2019 and 2018 and the related consolidated statements of profit or loss and other comprehensive income, changes in equity and cash flows for each of the three years in the period ended December 31, 2019. These financial statements are the responsibility of the Company's board of directors and management. Our responsibility is to express an opinion on these financial statements based on our audits.

We did not audit the financial statements of certain subsidiaries, whose assets included in consolidation constitute approximately 33.81% and approximately 26.69% of total consolidated assets as of December 31, 2019 and 2018, respectively, and whose revenues included in consolidation constitute approximately 11.93%, approximately 9.71% and approximately 9.74% of total consolidated revenues for the years ended December 31, 2019, 2018 and 2017, respectively. The financial statements of those companies were audited by other auditors, whose reports have been furnished to us, and our opinion, insofar as it relates to amounts included for those companies, is based on the reports of the other auditors.

We conducted our audits in accordance with generally accepted auditing standards in Israel, including those prescribed by the Auditors' Regulations (Auditor's Mode of Performance), 1973. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by the board of directors and management, as well as evaluating the overall financial statement presentation. We believe that our audits and the reports of other auditors provide a reasonable basis for our opinion.

In our opinion, based on our audits and the reports of other auditors, the financial statements referred to above present fairly, in all material respects, the financial position of the Company and its subsidiaries as of December 31, 2019 and 2018 and their results of operations, changes in equity and their cash flows for each of the three years in the period ended December 31, 2019, in conformity with International Financial Reporting Standards (IFRS) and with the provisions of the Israeli Securities Regulations (Annual Financial Statements), 2010.

We have also audited, in accordance with Auditing Standard (Israel) 911 of the Institute of Certified Public Accountants in Israel, "Audit of Components of Internal Control over Financial Reporting", as amended, the Company's components of internal control over financial reporting as of December 31, 2019 and our report dated March 18, 2020 expressed an unqualified opinion on the effective existence of those components.

Tel-Aviv, Israel
March 18, 2020

KOST FORER GABBAY & KASIERER
A Member of Ernst & Young Global

**MEITAV DASH INVESTMENTS LTD.**

**CONSOLIDATED STATEMENTS OF FINANCIAL POSITION**

|  | Note | December 31, | |
|---|---|---|---|
|  |  | **2019** | **2018** |
|  |  | **NIS in millions** | |
| ASSETS |  |  |  |
|  |  |  |  |
| CURRENT ASSETS: |  |  |  |
| Cash and cash equivalents |  | 287 | 278 |
| Short-term investments | 5 | 290 | 182 |
| Loans to customers | 6 | 894 | 768 |
| Trade receivables | 7 | 59 | 32 |
| Other accounts receivable | 8 | 26 | 164 |
| Current taxes receivable |  | 9 | 9 |
|  |  | 1,565 | 1,433 |
|  |  |  |  |
| NON-CURRENT ASSETS: |  |  |  |
| Investments of provident fund members | 19c(8) | 96 | 96 |
| Investments, loans and receivables | 9 | 179 | 80 |
| Investments in associates | 10 | 36 | 24 |
| Property, plant and equipment | 11 | 194 | 37 |
| Deferred taxes | 26b | 19 | 20 |
| Intangible assets | 12 | 1,159 | 1,174 |
|  |  | 1,683 | 1,431 |
|  |  | 3,248 | 2,864 |

The accompanying notes are an integral part of the consolidated financial statements.

**MEITAV DASH INVESTMENTS LTD.**

## CONSOLIDATED STATEMENTS OF FINANCIAL POSITION

|  | Note | December 31, | |
|---|---|---|---|
|  |  | **2019** | **2018** |
|  |  | **NIS in millions** | |
| LIABILITIES AND EQUITY |  |  |  |
|  |  |  |  |
| CURRENT LIABILITIES: |  |  |  |
| Credit from banks and current maturities of debentures | 13 | 667 | 573 |
| Liabilities for short sale of securities | 14 | 55 | 10 |
| Trade payables |  | 66 | 69 |
| Other accounts payable | 15 | 209 | 305 |
| Current taxes payable |  | 14 | 15 |
|  |  | 1,011 | 972 |
|  |  |  |  |
| NON-CURRENT LIABILITIES: |  |  |  |
| Loans from banks | 16 | 12 | 97 |
| Debentures | 16 | 897 | 669 |
| Liabilities to provident fund members | 19c(8) | 98 | 98 |
| Lease liabilities | 19a(2) | 154 | 13 |
| Liabilities for purchase of shares |  | 4 | 11 |
| Other accounts payable | 4a | 16 | - |
| Employee benefit liabilities | 18 | 8 | 8 |
| Deferred taxes | 26b | 46 | 46 |
|  |  | 1,235 | 942 |
|  |  |  |  |
| Total liabilities |  | 2,246 | 1,914 |
|  |  |  |  |
| EQUITY: | 20 |  |  |
| Share capital |  | 65 | 64 |
| Share premium |  | 518 | 513 |
| Capital reserve for share-based payment transactions |  | 10 | 14 |
| Retained earnings |  | 228 | 200 |
| Other reserves |  | 35 | 34 |
|  |  |  |  |
| Equity attributable to equity holders of the Company |  | 856 | 825 |
| Non-controlling interests |  | 146 | 125 |
|  |  |  |  |
| Total equity |  | 1,002 | 950 |
|  |  |  |  |
|  |  | 3,248 | 2,864 |

The accompanying notes are an integral part of the consolidated financial statements.

March 18, 2020

| Date of approval of the financial statements | Eli Barkat Chairman of the Board | Ilan Raviv CEO | Einat Rom Chief Accountant |
|---|---|---|---|

**MEITAV DASH INVESTMENTS LTD.**

## CONSOLIDATED STATEMENTS OF PROFIT OR LOSS AND OTHER COMPREHENSIVE INCOME

| | Note | Year ended December 31, | | |
| --- | --- | --- | --- | --- |
| | | 2019 | 2018 | 2017 |
| | | NIS in millions (except per share data) | | |
| Revenue from management fees, commissions and other, net | 22 | 844 | 829 | 818 |
| Finance income from non-bank loans | | 81 | 61 | 56 |
| Total revenues | | 925 | 890 | 874 |
| Marketing, operating, general and administrative expenses | 23 | 718 | 688 | 666 |
| Operating income | | 207 | 202 | 208 |
| Gain (loss) from securities held for Nostro portfolio investments, net | | 9 | (3) | 4 |
| Finance income | 24a | 1 | 1 | 2 |
| Finance expenses | 24b | (33) | (37) | (32) |
| Other expenses, net | 25 | (44) | (33) | (17) |
| Company's share of earnings of companies accounted for at equity, net | 10 | 6 | 3 | 5 |
| Income before taxes on income | | 146 | 133 | 170 |
| Taxes on income | 26c | 50 | 56 | 64 |
| Net income for the year | | 96 | 77 | 106 |
| Other comprehensive income (loss) (net of tax effect): | | | | |
| Actuarial gain on defined benefit plans | | - | - | 1 |
| Gain on cash flow hedges | | - | 2 | - |
| Loss on financial assets at fair value through other comprehensive income | | - | - | (1) |
| Foreign currency translation adjustments of foreign operations | | (2) | - | - |
| Total other comprehensive income (loss) | | (2) | 2 | - |
| Total comprehensive income | | 94 | 79 | 106 |
| Net income attributable to: | | | | |
| Equity holders of the Company | | 78 | 67 | 95 |
| Non-controlling interests | | 18 | 10 | 11 |
| | | 96 | 77 | 106 |
| Comprehensive income attributable to: | | | | |
| Equity holders of the Company | | 78 | 69 | 95 |
| Non-controlling interests | | 16 | 10 | 11 |
| | | 94 | 79 | 106 |
| Earnings per share attributable to equity holders of the Company (in NIS): | 28 | | | |
| Basic earnings | | 1.19 | 1.03 | 1.47 |
| Diluted earnings | | 1.17 | 1.02 | 1.43 |

The accompanying notes are an integral part of the consolidated financial statements

**MEITAV DASH INVESTMENTS LTD.**

## CONSOLIDATED STATEMENTS OF CHANGES IN EQUITY

| | Attributable to equity holders of the Company | | | | | | | Non-controlling interests | Total equity |
|---|---|---|---|---|---|---|---|---|---|
| | Share capital | Share premium | Treasury shares | Capital reserve from share-based payment transactions | Retained earnings | Other reserves | Total | | |
| | | | | | NIS in millions | | | | |
| Balance as of January 1, 2017 | 63 | 559 | (54) | 15 | 134 | (18) | 699 | 68 | 767 |
| Net income for the year | - | - | - | - | 95 | - | 95 | 11 | 106 |
| Other comprehensive loss, net | - | - | - | - | - | - | - | - | - |
| Total comprehensive income | - | - | - | - | 95 | - | 95 | 11 | 106 |
| Dividend declared and paid | - | - | 2 | - | (50) | - | (48) | - | (48) |
| Dividend to non-controlling interests | - | - | - | - | - | - | - | (8) | (8) |
| Company's share-based payment | - | - | - | 2 | - | - | 2 | - | 2 |
| Net purchases of non-controlling interests | - | - | - | - | - | (9) | (9) | (6) | (15) |
| Issuance of capital to non-controlling interests | - | 1 | - | - | - | 63 | 64 | 62 | 126 |
| Exercise of employee options | 1 | 2 | - | (3) | - | - | - | - | - |
| Derecognition of non-controlling interests due to sale of subsidiary | - | - | - | - | - | - | - | (1) | (1) |
| Net sales of Company shares by subsidiaries | - | (1) | - | - | - | - | (1) | - | (1) |
| Balance at December 31, 2017 | 64 | 561 | (52) | 14 | 179 | 36 | 802 | 126 | 928 |
| Cumulative effect of initial adoption of IFRS 9 as of January 1, 2018 | - | - | - | - | (1) | - | (1) | - | (1) |
| Balance as of January 1, 2018 (after initial adoption of IFRS 9) | 64 | 561 | (52) | 14 | 178 | 36 | 801 | 126 | 927 |
| Net income for the year | - | - | - | - | 67 | - | 67 | 10 | 77 |
| Other comprehensive income, net | - | - | - | - | - | 2 | 2 | - | 2 |
| Total comprehensive income | - | - | - | - | 67 | 2 | 69 | 10 | 79 |
| Dividend declared and paid | - | - | 2 | - | (45) | - | (43) | - | (43) |
| Dividend to non-controlling interests | - | - | - | - | - | - | - | (8) | (8) |
| Company's share-based payment | - | - | - | 2 | - | - | 2 | - | 2 |
| Net purchases of non-controlling interests | - | - | - | - | - | (4) | (4) | (4) | (8) |
| Exercise of employee options | - | - | - | - | - | - | - | 1 | 1 |
| Issuance of capital to non-controlling interests | *) - | 2 | - | (2) | - | - | - | - | - |
| Receipt of treasury shares as dividend in kind | - | (50) | 50 | - | - | - | - | - | - |
| Balance at December 31, 2018 | 64 | 513 | - | 14 | 200 | 34 | 825 | 125 | 950 |
| Net income for the year | - | - | - | - | 78 | - | 78 | 18 | 96 |
| Other comprehensive income, net | - | - | - | - | - | - | - | (2) | (2) |
| Total comprehensive income | - | - | - | - | 78 | - | 78 | 16 | 94 |
| Dividend declared and paid | - | - | - | - | (50) | - | (50) | - | (50) |
| Dividend to non-controlling interests | - | - | - | - | - | - | - | (15) | (15) |
| Company's share-based payment | - | - | - | 2 | - | - | 2 | - | 2 |
| Investment in partnership's capital by non-controlling interests | - | - | - | - | - | (4) | (4) | 61 | 57 |
| Issuance of capital to non-controlling interests | - | - | - | - | - | 5 | 5 | 27 | 32 |
| Non-controlling interests created in newly consolidated company | - | - | - | - | - | - | - | (5) | (5) |
| Exercise of employee options | 1 | 5 | - | (6) | - | - | - | - | - |
| Derecognition of non-controlling interests due to loss of control in partnership | - | - | - | - | - | - | - | (63) | (63) |
| Balance at December 31, 2019 | 65 | 518 | - | 10 | 228 | 35 | 856 | 146 | 1,002 |

*)    Less than NIS 1 million.

The accompanying notes are an integral part of the consolidated financial statements.

**MEITAV DASH INVESTMENTS LTD.**

## CONSOLIDATED STATEMENTS OF CASH FLOWS

| | Year ended December 31, | | |
|---|---|---|---|
| | **2019** | **2018** | **2017** |
| | NIS in millions | | |
| Cash flows from operating activities: | | | |
| Net income for the year | 96 | 77 | 106 |
| Adjustments to reconcile net income to net cash provided by (used in) operating activities: | | | |
| Adjustments to the profit or loss items: | | | |
| Depreciation of property, plant and equipment | 27 | 7 | 7 |
| Amortization of intangible assets | 69 | 56 | 49 |
| Impairment loss of goodwill | - | - | 3 |
| Gain from sale of investment in associate | - | - | (1) |
| Capital loss from sale of investment in subsidiary | - | 1 | - |
| Amortization of deferred acquisition costs | 9 | 9 | 9 |
| Revaluation of investments to provident fund members | - | (1) | (2) |
| Revaluation of liabilities to provident fund members | - | 2 | 2 |
| Change in liabilities for purchase of operations | 1 | - | (1) |
| Revaluation of loans from banks | - | - | (1) |
| Gain from sale of available-for-sale financial asset | - | - | (2) |
| Gain from change in TASE equity rights | - | - | (22) |
| Company's share of earnings of companies accounted for at equity, net | (2) | (3) | (1) |
| Deferred taxes, net | 1 | (6) | 11 |
| Revaluation of debentures | (3) | 6 | (2) |
| Loss (gain) from securities measured at fair value through profit or loss, net | (15) | 2 | (1) |
| Share-based payment | 2 | 2 | 2 |
| Revaluation of liabilities due to put options to non-controlling interests | - | - | 1 |
| | 89 | 75 | 51 |
| Changes in asset and liability items attributable to ETNs operation: | | | |
| Revaluation of current investments of special purpose subsidiaries | - | (94) | (2,079) |
| Revaluation of ETNs and CDs | - | 483 | 2,469 |
| Change in assets, net | - | 4,444 | 1,713 |
| Change in liabilities, net | - | (308) | 148 |
| Change in ETNs, CDs and liability, net | - | (4,550) | (2,243) |
| Change in securities, net | - | 32 | 12 |
| Change in liabilities for short sale of securities | - | (20) | (22) |
| | - | (13) | (2) |
| Changes in asset and liability items: | | | |
| Loans to customers, trade receivables and other accounts receivable | (169) | (347) | (99) |
| Short-term credit from giving non-bank loans *) | 53 | 103 | (165) |
| Trade payables and other accounts payable | (129) | 179 | (12) |
| | (245) | (65) | (276) |
| Net cash provided by (used in) operating activities | (60) | 74 | (121) |

*)    See Note 16e.

The accompanying notes are an integral part of the consolidated financial statements.

**MEITAV DASH INVESTMENTS LTD.**

## CONSOLIDATED STATEMENTS OF CASH FLOWS

| | Year ended December 31, | | |
|---|---|---|---|
| | **2019** | **2018** | **2017** |
| | **NIS in millions** | | |
| Cash flows from investing activities: | | | |
| Sale (purchase) of short-term investments measured at fair value through profit or loss, net | (65) | (28) | 13 |
| Purchase of property, plant and equipment | (3) | (4) | (5) |
| Purchase of intangible assets | (30) | (52) | (27) |
| Purchase of loans to customers | - | (4) | - |
| Proceeds from sale of assets held for sale | - | - | 12 |
| Repayment of liabilities in respect of business combination | (9) | (10) | (10) |
| Grant of long-term loan | (11) | (13) | (3) |
| Change in restricted deposits, net | (16) | (11) | (9) |
| Investment in companies accounted for at equity | (1) | - | (1) |
| Repayment of loan to company accounted for at equity | - | - | 2 |
| Merger of operation against issuance of capital to non-controlling interests (b) | - | - | 6 |
| Sale of previously consolidated ETN companies (e) | - | 173 | - |
| Acquisition of newly consolidated company (c) | (14) | - | - |
| Proceeds from sale of TASE shares | - | 27 | 1 |
| Net cash provided by (used in) investing activities | (149) | 78 | (21) |
| Cash flows from financing activities: | | | |
| Issuance of Company debentures (net of issuance expenses) | 268 | 95 | 141 |
| Issuance of subsidiary's debentures (net of issuance expenses) | 207 | 98 | 222 |
| Repayment of Company debentures | (87) | (87) | (75) |
| Repayment of subsidiary's debentures | (114) | (86) | - |
| Change in treasury shareholdings | - | 1 | - |
| Dividend paid to equity holders of the Company | (50) | (43) | (48) |
| Dividend paid to non-controlling interests | (15) | (8) | (8) |
| Repayment of lease liabilities | (27) | (2) | (2) |
| Exercise of options in subsidiary | 8 | - | (4) |
| Grant of partnership rights to non-controlling interests | 59 | - | - |
| Purchase of non-controlling interests | - | (8) | (11) |
| Repayment of long-term loans from banks | (85) | (11) | (20) |
| Issuance of capital to non-controlling interests | 20 | 1 | 13 |
| Receipt of convertible loan | 5 | - | - |
| Proceeds from short sale of securities | 30 | - | - |
| Short-term credit from banks, net | (3) | 16 | (17) |
| Net cash provided by (used in) financing activities | 216 | (34) | 191 |
| Exchange rate differences on cash and cash equivalents | 2 | - | - |
| Increase in cash and cash equivalents | 9 | 118 | 49 |
| Cash and cash equivalents at the beginning of the year | 278 | 160 | 111 |
| Cash and cash equivalents at the end of the year | 287 | 278 | 160 |

The accompanying notes are an integral part of the consolidated financial statements.

**MEITAV DASH INVESTMENTS LTD.**

## CONSOLIDATED STATEMENTS OF CASH FLOWS

| | Year ended December 31, | | |
|---|---|---|---|
| | **2019** | **2018** | **2017** |
| | **NIS in millions** | | |
| (a) Additional information on cash flows from operating activities: | | | |
| Group operations, excluding ETN operation: | | | |
| Cash paid during the year for: | | | |
| Interest | 51 | 48 | 43 |
| Taxes on income | 43 | 44 | 32 |
| Cash received during the year for: | | | |
| Interest | 113 | 83 | 68 |
| Taxes on income | 9 | 7 | 5 |
| ETN operation: | | | |
| Cash paid during the year in ETN operation for: | | | |
| Interest | - | 9 | 7 |
| Dividend | - | 21 | 20 |
| Cash received during the year in ETN operation for: | | | |
| Interest | - | 218 | 279 |
| Dividend | - | 148 | 234 |

The accompanying notes are an integral part of the consolidated financial statements.

**MEITAV DASH INVESTMENTS LTD.**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | | Year ended December 31, | | |
|---|---|---|---|---|
| | | **2019** | **2018** | **2017** |
| | | **NIS in millions** | | |
| (b) | Merger of operation against issuance of capital note to non-controlling interests | | | |
| | Working capital (excluding cash and cash equivalents) | - | - | 14 |
| | Intangible assets attributable to operations | - | - | (62) |
| | Goodwill | - | - | (48) |
| | Deferred taxes | - | - | (9) |
| | Non-controlling interests | - | - | 50 |
| | Total *) | - | - | (55) |
| | *) Total for merger | - | - | (55) |
| | Total against allocation of shares to non-controlling interests | - | - | 61 |
| | Total cash provided by the merger | - | - | 6 |
| (c) | Acquisition of newly consolidated company: | | | |
| | The subsidiary's assets and liabilities on date of acquisition: | | | |
| | Working capital (excluding cash and cash equivalents) | 2 | - | - |
| | Intangible assets attributable to operations | (26) | - | - |
| | Long-term liabilities | 15 | - | - |
| | Non-controlling interests | (5) | - | - |
| | Total acquisition of newly consolidated subsidiary | (14) | - | - |

The accompanying notes are an integral part of the consolidated financial statements.

**MEITAV DASH INVESTMENTS LTD.**

## CONSOLIDATED STATEMENTS OF CASH FLOWS

|  | | Year ended December 31, | |
| --- | --- | --- | --- |
|  | 2019 | 2018 | 2017 |
|  | | NIS in millions | |
| (d) Sale of investment in previously consolidated subsidiary: | | | |
| Working capital (excluding cash and cash equivalents) | - | 4 | - |
| Non-controlling interests | - | - | - |
| Total assets and liabilities of the subsidiary on date of sale | - | 4 | - |
| Total assets and liabilities on date of sale | - | 4 | - |
| Non-cash consideration | - | (4) | - |
|  | - | - | - |
| (e) Sale of previously consolidated ETN companies: | | | |
| Current investments of special purpose ETN companies | - | 24,796 | - |
| Liabilities of special purpose ETN companies | - | (320) | - |
| Liabilities in respect of ETNs and CDs | - | (24,303) | - |
| Total assets and liabilities of the special purpose ETN companies on date of sale | - | 173 | - |
| (f) Loss of control in previously consolidated partnership: | | | |
| Working capital (excluding cash and cash equivalents) | (72) | - | - |
| Non-controlling interests | 62 | - | - |
| Total assets and liabilities of the partnership on date of sale | (10) | - | - |
| Total assets and liabilities on date of sale | (10) | - | - |
| Investment in the partnership on date of deconsolidation | 10 | - | - |
|  | - | - | - |

The accompanying notes are an integral part of the consolidated financial statements.

**MEITAV DASH INVESTMENTS LTD.**

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 1:-   GENERAL**

a.   Company description:

1.   Meitav Dash Investments Ltd. ("the Company") was founded and began its operations in 1992. The Company operates, by itself and through its investees, in the capital market in the fields of financial asset management, including study funds, provident funds, pension funds, exchange-traded funds ("ETFs"), money market funds, mutual funds and investment portfolios. In addition, the Group operates in other segments such as Stock Exchange membership and brokerage, insurance agencies, non-bank loans and distribution of foreign funds.

2.   The Company is a public company whose shares and issued debentures (series C and series D) are traded on the Tel-Aviv Stock Exchange ("the TASE"). See Note 16 regarding debenture issuances and debenture expansions.

3.   ETF reform:

On August 3, 2017, the Joint Investment Trust Law (Amendment No. 28) (Exchange-traded Funds), 2017 ("Amendment 28") was published in the official government records according to which all exchange-traded notes were converted into exchange-traded funds and money market funds effective from October 4, 2018. The conversion was achieved in several steps, each of which consisting of products of similar classification categories. The conversion was completed on December 20, 2018. According to the principal objective of Amendment 28, the segment of investments in ETFs, which regarding ETNs was regulated by the Israeli Securities Law and supervised by it mainly at the disclosure level, is regulated and supervised as of the financial statement date in the context of the Joint Investment Trust Law. Amendment 28 laid the legislative foundations for converting the financial instrument issued as an ETN, which constituted a liability product, into an ETF, which is a financial instrument based on managing joint investments designed to achieve the tracking asset's yield according to the investment policies and legal provisions applicable to ETFs by virtue of Amendment 28. As a financial instrument, an ETF is essentially similar to a tracker fund, a closed-end traded fund whose aim is to achieve results by tracking changes in commodity indices, and which is essentially similar to exchange traded funds used in the U.S., except for two material adjustments:

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 1:-  GENERAL (Cont.)**

a.  Company description (Cont.):

3.  ETF reform (Cont.):

a)  The ETFs will be traded on an ongoing basis similarly to the current activity of ETNs and will be offered to the public by the market maker, subject to the regulations governing tracker funds, the structural separation guidelines and the TASE's articles of association whereby their main activity will be ETF related market making.

b)  The ETFs include a variable management fee mechanism - additional compensation payable to the fund manager in the form of excess return on the one hand and supplementation of short return on the other at the rate determined in the ETF's prospectus.

In addition, the currency based ETNs and CDs previously issued by special purpose ETN companies were converted on the date of adoption of the final step (December 20, 2018) into open-end mutual funds.

b.  Definitions:

In these financial statements:

| | |
|---|---|
| The Company | - Meitav Dash Investments Ltd. |
| The Group | - The Company and its investees. |
| Subsidiaries | - Companies in which the Company exercises control (as this term is defined in IFRS 10) and whose accounts are consolidated with those of the Company. |
| Associates | - Companies in which the Company has significant influence and that are not subsidiaries. The Company's investment therein is accounted for in the consolidated financial statements of the Company using the equity method. |
| Investees | - Subsidiaries or associates. |
| Interested parties and controlling shareholder | - As defined in the Israeli Securities Regulations (Annual Financial Statements), 2010. |
| Related parties | - As defined in IAS 24 (2009). |

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 1:-   GENERAL (Cont.)**

c.      Dividend distribution policy:

According to the Company's dividend distribution policy, the Company may distribute to its shareholders a dividend accounting for at least 50% of net income according to the Company's consolidated financial statements.

The distribution is subject to the existence of distributable profits, as defined in the Israeli Companies Law, 1999 ("the Companies Law"), as well as to the provisions of other applicable laws and provided that such distribution does not impair the Company's business and/or operations. This decision does not derogate from the Company's Board's authority to amend the Company's dividend distribution policy as it considers appropriate from time to time or decide on additional dividend distributions within the legally allowed limits and provided that the Company's Board reports such decision as required by law.

**NOTE 2:-   SIGNIFICANT ACCOUNTING POLICIES**

The following accounting policies have been applied consistently in the financial statements for all periods presented, unless otherwise stated.

a.      Basis of presentation of the financial statements:

These financial statements have been prepared in accordance with International Financial Reporting Standards ("IFRS"). Furthermore, the financial statements have been prepared in conformity with the provisions of the Israeli Securities Regulations (Annual Financial Statements), 2010.

The Company's financial statements have been prepared on a cost basis, except for the following items:

- Derivatives and certain other financial instruments that are measured at fair value;
- Deferred tax assets and liabilities;
- Employee benefit assets and liabilities;
- Investments accounted for at equity;
- Provisions;
- Liability in respect of cash-settled share-based payment transaction;

The Company has elected to present the profit or loss items using the function of expense method.

b.      The operating cycle:

The Company's operating cycle is one year.

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### NOTE 2:- SIGNIFICANT ACCOUNTING POLICIES (Cont.)

c.   Consolidated financial statements:

The consolidated financial statements comprise the financial statements of companies that are controlled by the Company (subsidiaries). Control is achieved when the Company is exposed, or has rights, to variable returns from its involvement with the investee and has the ability to affect those returns through its power over the investee. Potential voting rights are considered when assessing whether an entity has control. The consolidation of the financial statements commences on the date on which control is obtained and ends when such control ceases.

The financial statements of the Company and of the subsidiaries are prepared as of the same dates and periods. The consolidated financial statements are prepared using uniform accounting policies by all companies in the Group. Significant intragroup balances and transactions and gains or losses resulting from intragroup transactions are eliminated in full in the consolidated financial statements.

Non-controlling interests in subsidiaries represent the equity in subsidiaries not attributable, directly or indirectly, to a parent. Non-controlling interests are presented in equity separately from the equity attributable to the equity holders of the Company. Profit or loss and components of other comprehensive income are attributed to the Company and to non-controlling interests. Losses are attributed to non-controlling interests even if they result in a negative balance of non-controlling interests in the consolidated statement of financial position.

A change in the ownership interest of a subsidiary, without a loss of control, is accounted for as a change in equity by adjusting the carrying amount of the non-controlling interests with a corresponding adjustment of the equity attributable to equity holders of the Company less / plus the consideration paid or received.

After loss of control, the Group derecognizes the subsidiary's assets and liabilities, any non-controlling interests and other components of equity that are attributable to the subsidiary. The difference between the proceeds and the derecognized balances is recognized in profit or loss in the item other income or expenses.

In analyzing control for the purpose of consolidation of the financial statements of partnerships that operate as investment funds managed and controlled by the Group, the Group examines the percentage of its exposure to variable returns in the investment funds (consisting of the entire income and profits produced by the Group from the funds managed by it) in relation to the exposure of the investors in the investment funds that are not controlled by the Group.

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### NOTE 2:-    SIGNIFICANT ACCOUNTING POLICIES (Cont.)

    d.    Business combinations and goodwill:

Business combinations are accounted for by applying the acquisition method. The cost of the acquisition is measured at the fair value of the consideration transferred on the acquisition date with the addition of non-controlling interests in the acquiree. In each business combination, the Company chooses whether to measure the non-controlling interests in the acquiree based on their fair value on the acquisition date or at their proportionate share in the fair value of the acquiree's net identifiable assets.

Direct acquisition costs are carried to the statement of profit or loss as incurred.

In a business combination achieved in stages, equity interests in the acquiree that had been held by the acquirer prior to obtaining control are measured at the acquisition date fair value while recognizing a gain or loss resulting from the revaluation of the prior investment on the date of achieving control.

Contingent consideration is recognized at fair value on the acquisition date and classified as a financial asset or liability in accordance with IFRS 9. Subsequent changes in the fair value of the contingent consideration are recognized in profit or loss. If the contingent consideration is classified as an equity instrument, it is measured at fair value on the acquisition date without subsequent remeasurement.

Goodwill is initially measured at cost which represents the excess of the acquisition consideration and the amount of non-controlling interests over the net identifiable assets acquired and liabilities assumed. If the resulting amount is negative, the acquirer recognizes the resulting gain on the acquisition date.

    e.    Investments in associates:

Associates are companies in which the Group has significant influence over the financial and operating policies without having control. The investment in an associate is accounted for using the equity method.

Under the equity method, the investment in the associate is presented at cost with the addition of post-acquisition changes in the Group's share of net assets, including other comprehensive income of the associate. Gains and losses resulting from transactions between the Group and the associate are eliminated to the extent of the interest in the associate.

Goodwill relating to the acquisition of an associate is presented as part of the investment in the associate, measured at cost and not systematically amortized. Goodwill is evaluated for impairment as part of the investment in the associate as a whole.

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 2:-   SIGNIFICANT ACCOUNTING POLICIES (Cont.)**

    e.    Investments in associates: (Cont.)

The financial statements of the Company and of the associate are prepared as of the same dates and periods. The accounting policies applied in the financial statements of the associate are uniform and consistent with the policies applied in the financial statements of the Group.

The equity method is applied until the loss of significant influence in the associate or classification as investment held for sale.

On the date of loss of significant influence or joint control, the Group measures the remaining investment in the associate or the joint venture at fair value and recognizes in profit or loss the difference between the fair value of any remaining investment plus any proceeds from the sale of the investment in the associate or the joint venture and the carrying amount of the investment on that date.

    f.    Functional currency, presentation currency and foreign currency:

        1.    Functional currency and presentation currency:

The presentation currency of the financial statements is the NIS.

Assets and liabilities of investees which represent foreign operations, including created surplus costs, are translated at the closing rate at each reporting date. Profit or loss items are translated at average exchange rates for all periods presented. The resulting translation differences are recognized in other comprehensive income (loss).

Intragroup loans for which settlement is neither planned nor likely to occur in the foreseeable future are, in substance, a part of the investment in the foreign operation and, accordingly, the exchange rate differences from these loans (net of the tax effect) are recorded in other comprehensive income (loss).

Upon the full or partial disposal of a foreign operation resulting in loss of control in the foreign operation, the cumulative gain (loss) from the foreign operation which had been recognized in other comprehensive income is carried to profit or loss. Upon the partial disposal of a foreign operation which results in the retention of control in the subsidiary, the relative portion of the amount recognized in other comprehensive income is reattributed to non-controlling interests.

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### NOTE 2:-  SIGNIFICANT ACCOUNTING POLICIES (Cont.)

f.    Functional currency, presentation currency and foreign currency: (Cont.)

2.    Transactions, assets and liabilities in foreign currency:

Transactions denominated in foreign currency are recorded upon initial recognition at the exchange rate at the date of the transaction. After initial recognition, monetary assets and liabilities denominated in foreign currency are translated at each reporting date into the functional currency at the exchange rate at that date. Exchange rate differences, other than those capitalized to qualifying assets or accounted for as hedging transactions in equity, are recognized in profit or loss. Non-monetary assets and liabilities denominated in foreign currency and measured at cost are translated at the exchange rate at the date of the transaction. Non-monetary assets and liabilities denominated in foreign currency and measured at fair value are translated into the functional currency using the exchange rate prevailing at the date when the fair value was determined.

3.    Index-linked monetary items:

Monetary assets and liabilities linked to the changes in the Israeli Consumer Price Index ("CPI") are adjusted at the relevant index at each reporting date according to the terms of the agreement.

g.    Cash equivalents:

Cash equivalents are considered as highly liquid investments, including unrestricted short-term bank deposits with an original maturity of three months or less from the date of investment or with a maturity of more than three months, but which are redeemable on demand without penalty and which form part of the Group's cash management.

h.    Short-term investments:

Short-term bank deposits are deposits with an original maturity of more than three months from the date of investment and which do not meet the definition of cash equivalents. The deposits are presented according to their terms of deposit.

i.    Allowance for doubtful accounts (accounting policy applied until December 31, 2017):

The allowance for doubtful accounts is determined in respect of specific debts whose collection, in the opinion of the Company's management, is doubtful. Impaired debts are derecognized when they are assessed as uncollectible. The Group did not recognize an allowance in respect of groups of customers that are collectively assessed for impairment since it did not identify any groups of customers which bear similar credit risks.

As for determining the allowance for doubtful accounts in subsidiaries that are engaged in lending non-bank loans, see Note 3j.

**MEITAV DASH INVESTMENTS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**NOTE 2:-  SIGNIFICANT ACCOUNTING POLICIES (Cont.)**

    j.    Revenue recognition:

The accounting policy for revenue recognition applied from January 1, 2018

Revenue from contracts with customers is recognized when the control over the goods or services is transferred to the customer. The transaction price is the amount of the consideration that is expected to be received based on the contract terms, excluding amounts collected on behalf of third parties (such as taxes). The Group elected to adopt the provisions of IFRS 15, "Revenue from Contracts with Customers" using the modified retrospective method with the application of certain practical expedients and without restatement of comparative data. As for specific revenue recognition criteria, see below.

The accounting policy for revenue recognition applied in periods before January 1, 2018

Revenues are recognized in the statement of profit or loss when the revenues can be measured reliably, it is probable that the economic benefits associated with the transaction will flow to the Company and the costs incurred or to be incurred in respect of the transaction can be measured reliably. When the Company acts as a principal and is exposed to the risks associated with the transaction, revenues are presented on a gross basis. When the Company acts as an agent and is not exposed to the risks and rewards associated with the transaction, revenues are presented on a net basis. Revenues are measured at the fair value of the consideration less any trade discounts.

Following are the specific revenue recognition criteria which must be met before revenue is recognized:

1.    Revenues from consulting services, management services and insurance commissions are carried to profit or loss over the service period.

2.    a)    Revenues from commissions relating to customer portfolios and other security brokerage services are recognized when the service is rendered and presented on a net basis in profit or loss since the Company acts as an agent and is not exposed to any of the risks or rewards associated with the transaction.

        b)    Revenues from asset management services are recognized over the service period on an accrual basis.

3.    A subsidiary carries a provision for reimbursement of management fees to members in keeping with its obligations pursuant to agreements and according to estimates based on past experience.

4.    Interest income:

Interest income is recognized on an accrual basis using the effective interest method. Finance income on trade transactions in deferred deliverables are recognized using the effective interest method. The interest is computed according to this method for the relative portion that has accrued from the date of the trade transaction in deferred deliverables to the end of the reporting year.

5.    Revenues from dividends:

Revenues from dividends from investments in shares classified as available-for-sale financial assets are recognized when the right to receive the dividends is established.

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### NOTE 2:- SIGNIFICANT ACCOUNTING POLICIES (Cont.)

k.   Taxes on income:

Current or deferred taxes are recognized in profit or loss, except to the extent that they relate to items which are recognized in other comprehensive income or equity.

1.   Current taxes:

The current tax liability is measured using the tax rates and tax laws that have been enacted or substantively enacted by the reporting date as well as adjustments required in connection with the tax liability in respect of previous years plus gain tax as defined in the VAT Law for those subsidiaries that are financial institutions.

2.   Deferred taxes:

Deferred taxes are computed in respect of temporary differences between the carrying amounts in the financial statements and the amounts attributed for tax purposes.

Deferred taxes are measured at the tax rate that is expected to apply when the asset is realized or the liability is settled, based on tax laws that have been enacted or substantively enacted by the reporting date.

Deferred tax assets are reviewed at each reporting date and reduced to the extent that it is not probable that they will be utilized. Temporary differences for which deferred tax assets had not been recognized are reviewed at each reporting date and a respective deferred tax asset is recognized to the extent that their utilization is probable.

Taxes that would apply in the event of the disposal of investments in investees have not been taken into account in computing deferred taxes, as long as the disposal of the investments in investees is not probable in the foreseeable future. Also, deferred taxes that would apply in the event of distribution of earnings by investees as dividends have not been taken into account in computing deferred taxes, since the distribution of dividends does not involve an additional tax liability or since it is the Company's policy not to initiate distribution of dividends from a subsidiary that would trigger an additional tax liability.

Deferred taxes are offset if there is a legally enforceable right to offset a current tax asset against a current tax liability and the deferred taxes relate to the same taxpayer and the same taxation authority.

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 2:-   SIGNIFICANT ACCOUNTING POLICIES (Cont.)**

l.    Leases:

The Group applies IFRS 16, "Leases" ("the Standard") from January 1, 2019 (see paragraph z(1) below).

The accounting policy for leases applied from January 1, 2019

The Company accounts for a contract as a lease when the contract terms convey the right to control the use of an identified asset for a period of time in exchange for consideration.

The Company recognizes on the commencement date of the lease a right-of-use asset and a lease liability, excluding leases whose term is up to 12 months and leases for which the underlying asset is of low value. For these excluded leases, the Company has elected to recognize the lease payments as an expense in profit or loss on a straight-line basis over the lease term. In measuring the lease liability, the Company has elected to apply the practical expedient in the Standard and does not separate the lease components from the non-lease components (such as management and maintenance services, etc.) included in a single contract.

Leases which entitle employees to a company car as part of their employment terms are accounted for as employee benefits in accordance with the provisions of IAS 19 and not as subleases.

On the commencement date, the lease liability includes all unpaid lease payments discounted at the interest rate implicit in the lease, if that rate can be readily determined, or otherwise using the Company's incremental borrowing rate. After the commencement date, the Company measures the lease liability using the effective interest rate method.

On the commencement date, the right-of-use asset is recognized in an amount equal to the lease liability plus lease payments already made on or before the commencement date and initial direct costs incurred. The right-of-use asset is measured applying the cost model and depreciated over the shorter of its useful life and the lease term.

Following are the amortization periods of the right-of-use assets by class of underlying asset:

|  | **Years** | **Mainly** |
|---|---|---|
| Land | 3 – 19 | 19 |
| Motor vehicles | 3 | |

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**NOTE 2:- SIGNIFICANT ACCOUNTING POLICIES (Cont.)**

l.    Leases: (Cont.)

For leases in which the Company is the lessee, the aggregate changes in future lease payments resulting from a change in the index are discounted (without a change in the discount rate applicable to the lease liability) and recorded as an adjustment of the lease liability and the right-of-use asset, only when there is a change in the cash flows resulting from the change in the index.

A non-cancelable lease term includes both the periods covered by an option to extend the lease when it is reasonably certain that the extension option will be exercised and the periods covered by a lease termination option when it is reasonably certain that the termination option will not be exercised. In the event of any change in the expected exercise of the lease extension option or in the expected non-exercise of the lease termination option, the Company remeasures the lease liability based on the revised lease term using a revised discount rate as of the date of the change in expectations. The total change is recognized in the carrying amount of the right-of-use asset until it is reduced to zero, and any further reductions are recognized in profit or loss.

If a lease modification does not reduce the scope of the lease and does not result in a separate lease, the Company remeasures the lease liability based on the modified lease terms using a revised discount rate as of the modification date and records the change in the lease liability as an adjustment to the right-of-use asset.

If a lease modification reduces the scope of the lease, the Company recognizes a gain or loss arising from the partial or full reduction of the carrying amount of the right-of-use asset and the lease liability. The Company subsequently remeasures the carrying amount of the lease liability according to the revised lease terms, at the revised discount rate as of the modification date and records the change in the lease liability as an adjustment to the right-of-use asset.

The accounting policy for leases applied in periods before January 1, 2019

The criteria for classifying leases as finance or operating leases depend on the substance of the agreements and are made at the inception of the lease in accordance with the following principles as set out in IAS 17. Leases in which substantially all the risks and rewards of ownership of the leased asset are not transferred to the Group are classified as operating leases. Lease payments are recognized as an expense in profit or loss on a straight-line basis over the lease term.

A lease that transfers substantially all the risks and rewards incidental to ownership of the leased asset to the Group is classified as a finance lease. At the commencement of the lease term, the leased asset is measured at the lower of the fair value of the leased asset or the present value of the minimum lease payments.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**NOTE 2:-  SIGNIFICANT ACCOUNTING POLICIES (Cont.)**

m.  Property, plant and equipment:

Property, plant and equipment are measured at cost, including directly attributable costs, less accumulated depreciation and less accumulated impairment losses and excluding day-to-day servicing expenses.

Depreciation of assets is calculated on a straight-line basis to reduce their cost or their estimated value to residual value over their estimated useful lives as follows:

|  | % | Mainly % |
|---|---|---|
| Computers and peripheral equipment | 25 - 33 | |
| Office furniture and equipment | 6 - 15 | 6 |
| Leasehold improvements | see below | |

Leasehold improvements are depreciated on a straight-line basis over the shorter of the lease term (including the extension option held by the Group and intended to be exercised) and the expected life of the improvement.

The useful life, depreciation method and residual value of an asset are reviewed at least each year-end and any changes are accounted for prospectively as a change in accounting estimate. Depreciation of an asset ceases at the earlier of the date that the asset is classified as held for sale and the date that the asset is derecognized.

n.  Intangible assets:

Separately acquired intangible assets are measured on initial recognition at cost including direct acquisition costs. Intangible assets acquired in a business combination are measured at fair value at the acquisition date.

Intangible assets with a finite useful life are amortized over their useful life and reviewed for impairment whenever there is an indication that the asset may be impaired. The amortization period and the amortization method for an intangible asset are reviewed at least at each year end.

Intangible assets with indefinite useful lives are not systematically amortized and are tested for impairment annually or whenever there is an indication that the intangible asset may be impaired. The useful life of these assets is reviewed annually to determine whether their indefinite life assessment continues to be supportable. If the events and circumstances do not continue to support the assessment, the change in the useful life assessment from indefinite to finite is accounted for prospectively as a change in accounting estimate and on that date the asset is tested for impairment. Commencing from that date, the asset is amortized systematically over its useful life.

**MEITAV DASH INVESTMENTS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**NOTE 2:-   SIGNIFICANT ACCOUNTING POLICIES (Cont.)**

n.   Intangible assets: (Cont.)

Amortization expenses in respect of intangible assets with a finite useful life are carried to profit or loss on a straight-line basis or over the declining sum of the years' digits method as follows:

| | Straight-line method | Declining sum of the years' digits method |
|---|---|---|
| Customer relations | 4 - 15 | 1.5 - 13 |
| Excess cost attributable to provident and pension fund management | 12 - 15 | 13 |
| Excess cost attributable to portfolio and mutual fund management | 7 | 1 - 5 (mainly 1) |
| Excess cost attributable to TASE member customer base | | 7 |
| Excess cost attributable to brokerage operation customer base | | 2 |
| Excess cost attributable to other operations' customer base | | 4 - 6 |
| Excess costs attributable to Tachlit trademark | 0.5 - 10 | |
| Brand name | 13 - 15 | |
| Non-competition | 1 - 3 | |
| Other | 5 - 7 | |
| Software | 3 - 4 | |
| Deferred issuance costs | 8 | |

*Software:*

The Group's assets include computer systems comprising hardware and software. Software forming an integral part of the hardware to the extent that the hardware cannot function without the programs installed on it is classified as property, plant and equipment. In contrast, stand-alone software that adds functionality to the hardware is classified as an intangible asset.

An intangible asset arising from a development project or from the development phase of an internal project is recognized if the Company can demonstrate the technical feasibility of completing the intangible asset so that it will be available for use or sale; the Company's intention to complete the intangible asset and use or sell it; the ability to use or sell the intangible asset; how the intangible asset will generate future economic benefits; the availability of adequate technical, financial and other resources to complete the intangible asset; and the ability to measure reliably the respective expenditure asset during its development.

**MEITAV DASH INVESTMENTS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**NOTE 2:-   SIGNIFICANT ACCOUNTING POLICIES (Cont.)**

o.   Impairment of non-financial assets:

The Company evaluates the need to record an impairment of non-financial assets whenever events or changes in circumstances indicate that the carrying amount is not recoverable. If the carrying amount of non-financial assets exceeds their recoverable amount, the assets are reduced to their recoverable amount. The recoverable amount is the higher of fair value less costs of sale and value in use. In measuring value in use, the expected cash flows are discounted using a pre-tax discount rate that reflects the risks specific to the asset. The recoverable amount of an asset that does not generate independent cash flows is determined for the cash-generating unit to which the asset belongs. Impairment losses are recognized in profit or loss.

An impairment loss of an asset, other than goodwill, is reversed only if there have been changes in the estimates used to determine the asset's recoverable amount since the last impairment loss was recognized. Reversal of an impairment loss, as above, shall not be increased above the lower of the carrying amount that would have been determined (net of depreciation or amortization) had no impairment loss been recognized for the asset in prior years and its recoverable amount. The reversal of impairment loss of an asset presented at cost is recognized in profit or loss.

The following unique criteria are applied in assessing impairment of these specific assets:

1.   Goodwill in respect of subsidiaries:

For the purpose of impairment testing, goodwill acquired in a business combination is allocated on the date of acquisition to each of the Group's cash-generating units that are expected to benefit from the business combination.

The Company reviews goodwill for impairment once a year, on December 31, or more frequently if events or changes in circumstances indicate that there is an impairment.

Goodwill is tested for impairment by assessing the recoverable amount of the cash-generating unit (or group of cash-generating units) to which the goodwill has been allocated. An impairment loss is recognized if the recoverable amount of the cash-generating unit (or group of cash-generating units) to which goodwill has been allocated is less than the carrying amount of the cash-generating unit (or group of cash-generating units). Any impairment loss is allocated first to goodwill. Impairment losses recognized for goodwill cannot be reversed in subsequent periods.

**MEITAV DASH INVESTMENTS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**NOTE 2:- SIGNIFICANT ACCOUNTING POLICIES (Cont.)**

    o.    Impairment of non-financial assets: (Cont.)

        2.    Investment in associate:

            After application of the equity method, the Company determines whether it is necessary to recognize any additional impairment loss with respect to the investment in associates. The Company determines at each reporting date whether there is objective evidence that the carrying amount of the investment in the associate is impaired. The test of impairment is carried out with reference to the entire investment, including the goodwill attributed to the associate.

    p.    Financial instruments:

        On January 1, 2018, the Company initially adopted IFRS 9, "Financial Instruments" ("the Standard"). The Company elected to apply the provisions of the Standard retrospectively without restatement of comparative data.

        The accounting policy for financial instruments applied from January 1, 2018

        1.    Financial assets:

            Financial assets are measured upon initial recognition at fair value plus transaction costs that are directly attributable to the acquisition of the financial assets, except for financial assets measured at fair value through profit or loss in respect of which transaction costs are recorded in profit or loss. The Company classifies and measures debt instruments in the financial statements based on: (a) the Company's business model for managing financial assets; and (b) the contractual cash flow terms of the financial asset.

            Debt instruments are measured at amortized cost when the Company's business model is to hold the financial assets in order to collect their contractual cash flows, and the contractual terms of the financial assets give rise on specified dates to cash flows that are solely payments of principal and interest on the principal amount outstanding. After initial recognition, the instruments in this category are measured according to their terms at amortized cost using the effective interest rate method, less any provision for impairment.

            Other financial assets held for trading are measured at fair value through profit or loss unless they are designated as effective hedging instruments. Dividend income from investments in equity instruments is recognized in profit or loss when the right to receive the dividends is established.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

## NOTE 2:-  SIGNIFICANT ACCOUNTING POLICIES (Cont.)

p.    Financial instruments: (Cont.)

2.    Derecognition of financial assets:

A financial asset is derecognized only when:

(a)    The contractual rights to the cash flows from the financial asset has expired; or

(b)    The Company has transferred substantially all the risks and rewards deriving from the contractual rights to receive cash flows from the financial asset or has neither transferred nor retained substantially all the risks and rewards of the asset, but has transferred control of the asset; or

(c)    The Company has retained its contractual rights to receive cash flows from the financial asset but has assumed a contractual obligation to pay the cash flows in full without material delay to a third party.

3.    Impairment of financial assets:

The Company evaluates at the end of each reporting period the loss allowance for financial debt instruments which are not measured at fair value through profit or loss. The Company distinguishes between two types of loss allowances:

a)    Debt instruments whose credit risk has not increased significantly since initial recognition, or whose credit risk is low - the loss allowance recognized in respect of this debt instrument is measured at an amount equal to the expected credit losses within 12 months from the reporting date (12-month ECLs); or

b)    Debt instruments whose credit risk has increased significantly since initial recognition, and whose credit risk is not low - the loss allowance recognized is measured at an amount equal to the expected credit losses over the instrument's remaining term (lifetime ECLs).

The Company applies the low credit risk simplification in the Standard, according to which the Company assumes the debt instrument's credit risk has not increased significantly since initial recognition if on the reporting date it is determined that the instrument has a low credit risk, for example when the instrument has an external rating of "investment grade".

An impairment loss on debt instruments measured at amortized cost is recognized in profit or loss with a corresponding loss allowance that is offset from the carrying amount of the financial asset, whereas the impairment loss on debt instruments measured at fair value through other comprehensive income is recognized in profit or loss with a corresponding loss allowance that is recorded in other comprehensive income and not as a reduction of the carrying amount of the financial asset in the statement of financial position.

The Company has short-term financial assets such as trade receivables in respect of which the Company applies a simplified approach and measures the loss allowance in an amount equal to the lifetime expected credit losses.

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### NOTE 2:- SIGNIFICANT ACCOUNTING POLICIES (Cont.)

p. Financial instruments: (Cont.)

4. Financial liabilities:

a) Financial liabilities measured at amortized cost:

Financial liabilities are initially recognized at fair value less transaction costs that are directly attributable to the issue of the financial liability. After initial recognition, the Company measures all financial liabilities at amortized cost using the effective interest rate method. The amortization of the effective interest is carried to profit or loss in financing.

b) Financial liabilities measured at fair value through profit or loss:

At initial recognition, the Company measures financial liabilities that are not measured at amortized cost at fair value. Transaction costs are recognized in profit or loss.

5. Derecognition of financial liabilities:

A financial liability is derecognized only when it is extinguished, that is when the obligation specified in the contract is discharged or cancelled or expires. A financial liability is extinguished when the debtor discharges the liability by paying in cash, other financial assets, goods or services; or is legally released from the liability.

6. Offsetting financial instruments:

Financial assets and financial liabilities are offset and the net amount is presented in the statement of financial position if there is a legally enforceable right to set off the recognized amounts and there is an intention either to settle on a net basis or to realize the asset and settle the liability simultaneously.

The right of set-off must be legally enforceable not only during the ordinary course of business of the parties to the contract but also in the event of bankruptcy or insolvency of one of the parties. In order for the right of set-off to be currently available, it must not be contingent on a future event, there may not be periods during which the right is not available, or there may not be any events that will cause the right to expire.

The Company elected to apply the provisions of IFRS 9, "Financial Instruments", retrospectively without restatement of comparative data while adjusting the balance of retained earnings as of January 1, 2018. As a result, the balance of retained earnings decreased by approximately NIS 1 million simultaneously with a decrease in the balance of loans to customers by same amount.

**MEITAV DASH INVESTMENTS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**NOTE 2:- SIGNIFICANT ACCOUNTING POLICIES (Cont.)**

p.   Financial instruments: (Cont.)

7.   Hedge accounting:

The Company elected to apply the practical expedient allowed by IFRS 9 whereby it will continue applying the provisions of IAS 39 regarding hedge accounting.

Accounting policy regarding financial instruments applied in periods before January 1, 2018

1.   Financial assets:

Financial assets within the scope of IAS 39 are initially recognized at fair value plus direct transaction costs, except for financial assets measured at fair value through profit or loss in respect of which transaction costs are recorded in profit or loss.

After initial recognition, the accounting treatment of financial assets is based on their classification as follows:

a)   Financial assets at fair value through profit or loss:

This category includes financial assets held for trading and financial assets designated upon initial recognition as at fair value through profit or loss.

The Group assesses the existence of an embedded derivative and whether it is required to be separated from a host contract when the Group first becomes party to the contract. Reassessment of the need to separate an embedded derivative only occurs if there is a change in the terms of the contract that significantly modifies the cash flows that would otherwise be required.

Derivatives, including embedded derivatives separated from the host contract, are classified as held for trading unless they are designated as effective hedging instruments.

In the event of a financial instrument that contains one or more embedded derivatives, the entire combined instrument is designated as a financial asset at fair value through profit or loss only upon initial recognition.

b)   Loans and receivables:

Loans and receivables are investments with fixed or determinable payments that are not quoted in an active market. After initial recognition, loans are measured based on their terms at amortized cost plus direct transaction costs using the effective interest method and less any impairment losses. Short-term borrowings are measured based on their terms, normally at face value.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**NOTE 2:-   SIGNIFICANT ACCOUNTING POLICIES (Cont.)**

        p.     Financial instruments: (Cont.)

            1.     Financial assets: (Cont.)

                c)     Available-for-sale financial assets:

Available-for-sale financial assets are (non-derivative) financial assets that are designated as available for sale or are not classified in any of the preceding categories. After initial recognition, available-for-sale financial assets are measured at fair value. Gains or losses from fair value adjustments, except for interest, exchange rate differences that relate to debt instruments and dividends from an equity instrument, are recognized in other comprehensive income. When the investment is disposed of or in case of impairment, the other comprehensive income (loss) is transferred to profit or loss.

            2.     Financial liabilities:

Financial liabilities are initially recognized at fair value. Loans and other liabilities measured at amortized cost are presented less direct transaction costs.

After initial recognition, the accounting treatment of financial liabilities is based on their classification as follows:

                a)     Financial liabilities at amortized cost:

After initial recognition, loans and other liabilities are measured based on their terms at amortized cost less direct transaction costs using the effective interest method. The amortization of effective interest is carried to profit or loss under financing.

                b)     Financial liabilities at fair value through profit or loss:

Financial liabilities at fair value through profit or loss, including short sale of securities, include financial liabilities classified as held for trading and financial liabilities designated upon initial recognition as at fair value through profit or loss.

Financial liabilities are classified as held for trading if they are acquired for the purpose of sale in the near term. Gains or losses on liabilities held for trading are recognized in profit or loss.

Derivatives, including separated embedded derivatives, are classified as held for trading unless they are designated as effective hedging instruments.

The Group assesses the existence of an embedded derivative and whether it is required to be separated from a host contract when the Group first becomes party to the contract. Reassessment of the need to separate an embedded derivative only occurs if there is a change in the terms of the contract that significantly modifies the cash flows that would otherwise be required.

A liability may be designated upon initial recognition at fair value through profit or loss, subject to the provisions of IAS 39.

- 32 -

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**NOTE 2:-  SIGNIFICANT ACCOUNTING POLICIES (Cont.)**

    p.    Financial instruments: (Cont.)

        3.    Fair value:

            a)    Financial instruments traded in an active market:

                The fair value of these instruments is determined based on market prices as of the reporting date.

            b)    Financial instruments with no active market:

                The fair value of these instruments is determined using valuation techniques. These techniques include reliance on recent arm's length transactions, reference to the current market value of similar instruments, discounted cash flows or other valuation methods.

        4.    Offsetting financial instruments:

        Financial assets and financial liabilities are offset and the net amount is presented in the statement of financial position if there is a legally enforceable right to set off the recognized amounts and there is an intention either to settle on a net basis or to realize the asset and settle the liability simultaneously.

        The right of set-off must be legally enforceable not only during the ordinary course of business of the parties to the contract but also in the event of bankruptcy or insolvency of one of the parties. In order for the right of set-off to be currently available, it must not be contingent on a future event, there may not be periods during which the right is not available, or there may not be any events that will cause the right to expire.

        5.    Derecognition of financial instruments:

            a)    Financial assets:

                A financial asset is derecognized when the contractual rights to the cash flows from the financial asset expire or the Company has transferred its contractual rights to receive cash flows from the financial asset or assumes an obligation to pay the cash flows in full without material delay to a third party and has transferred substantially all the risks and rewards of the asset, or has neither transferred nor retained substantially all the risks and rewards of the asset, but has transferred control of the asset.

                If the Company transfers its rights to receive cash flows from an asset and neither transfers nor retains substantially all the risks and rewards of the asset nor transfers control of the asset, a new asset is recognized to the extent of the Company's continuing involvement in the asset. When continuing involvement takes the form of guaranteeing the transferred asset, the extent of the continuing involvement is the lower of the original carrying amount of the asset and the maximum amount of consideration received that the Company could be required to repay.

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 2:-  SIGNIFICANT ACCOUNTING POLICIES (Cont.)**

p.   Financial instruments: (Cont.)

5.   Derecognition of financial instruments: (Cont.)

b)   Financial liabilities:

A financial liability is derecognized when it is extinguished, that is when the obligation is discharged or cancelled or expires. A financial liability is extinguished when the debtor (the Group) discharges the liability by paying in cash, other financial assets, goods or services; or is legally released from the liability.

6.   Liability for ETNs and CDs:

The liabilities for ETNs and CDs are initially recognized at their liability value representing adjusted cost and less issuance expenses. These liabilities are presented in each reporting period at their liability value which is calculated based on their issuance terms less the outstanding unamortized issuance expenses. Gains and losses are measured through profit or loss. Liabilities in respect of ETNs and CDs represent a compound financial instrument which consists of a host contract and an embedded derivative. According to IAS 39, separate accounting treatment and measurement must be exercised for the host contract (ETNs which constitute zero-coupon loan and CDs which constitute a loan) and for the embedded derivative (which constitutes a forward transaction on the index to which the ETNs are linked and CDs and the currency to which they are linked). According to IAS 39, the host contract relating to the ETNs and CDs does not require separate presentation of each of the compound instrument's components. The Company believes that presenting the components of the ETNs and the CDs collectively best reflects the economic substance of the liability in respect of the ETNs and certificates.

According to IAS 39, embedded derivatives included in compound financial instruments are presented at fair value. Changes in fair value are carried over the life of the ETNs and CDs in profit or loss. The fair value of the embedded derivatives on the date of issuance of the ETNs and CDs is deemed as zero. Accordingly, the issuance expenses of ETNs and CDs are proportionately allocated between the embedded derivatives and the host contracts. Since the value of the embedded derivatives is negligible, the majority of issuance expenses were allocated to the host contract (zero coupon loan).

Moreover, costs of issuance of ETNs and CDs are amortized on a straight-line basis over the life of the ETNs and CDs. Liabilities in respect of ETNs and CDs are initially recognized at liability value.

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 2:-  SIGNIFICANT ACCOUNTING POLICIES (Cont.)**

    p.    Financial instruments: (Cont.)

        7.    Impairment of financial assets:

The Group assesses at the end of each reporting period whether there is any objective evidence of impairment of a financial asset or group of financial assets as follows:

a)    Financial assets carried at amortized cost:

Objective evidence of impairment exists when one or more events that have occurred after initial recognition of the asset have a negative impact on the estimated future cash flows. The amount of the loss recorded in profit or loss is measured as the difference between the asset's carrying amount and the present value of estimated future cash flows (excluding future credit losses that have not yet been incurred) discounted at the financial asset's original effective interest rate. If the financial asset has a variable interest rate, the discount rate is the current effective interest rate. In a subsequent period, the amount of the impairment loss is reversed if the recovery of the asset can be related objectively to an event occurring after the impairment was recognized. The amount of the reversal, up to the amount of any previous impairment, is recorded in profit or loss.

b)    Available-for-sale financial assets:

For equity instruments classified as available-for-sale financial assets, evidence of impairment includes a significant or prolonged decline in the fair value of the asset below its cost and evaluation of changes in the technological, economic or legal environment or in the market in which the issuer of the instrument operates. The determination of a significant or prolonged impairment depends on the circumstances at each reporting date. In making such a determination, historical volatility in fair value is considered, as well as a decline in fair value of 20% or more, or a decline in fair value whose duration is six months or more. Where there is evidence of impairment, the cumulative loss recorded in other comprehensive income is reclassified to profit or loss. In subsequent periods, any reversal of the impairment loss is recognized in other comprehensive income.

For debt instruments classified as available-for-sale financial assets, evidence of impairment includes one or more events that have occurred after the date of the investment in the asset and which have a negative impact on the estimated future cash flows. Where there is evidence of impairment, the cumulative loss recorded in other comprehensive income is recognized as an impairment loss in profit or loss. In a subsequent period, the amount of the impairment loss is reversed if the increase in fair value can be related objectively to an event occurring after the impairment was recognized. The amount of the reversal, up to the amount of any previous impairment, is recorded in profit or loss.

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### NOTE 2:- SIGNIFICANT ACCOUNTING POLICIES (Cont.)

q.   Derivative financial instruments designated as hedges:

The Group enters into contracts for derivative financial instruments such as forward currency contracts and interest rate swaps to hedge risks associated with foreign exchange rate and interest rate fluctuations.

Any gains or losses arising from changes in the fair values of derivatives that do not qualify for hedge accounting are recorded immediately in profit or loss.

Hedges qualify for hedge accounting, among others, when at inception of the hedging relationship there is a formal designation and documentation of the hedging relationship and of the Group's risk management objective and strategy for undertaking the hedge. Hedges are assessed on an ongoing basis to determine whether they are highly effective during the reporting period for which the hedge is designated.

Cash flow hedges which meet the criteria for hedge accounting are accounted for as follows:

Derivatives used as cash flow hedges are presented in the financial statements at fair value.

Changes in the fair value which effectively protect the cash flow hedges are recognized as follows:

Amounts in respect of the hedging instrument are recognized in profit or loss in the reporting period in which the expenses in respect of the hedged instrument are recognized.

Changes in the fair value of the hedging instrument which effectively hedge unrecognized cash flows are carried to equity and included in comprehensive income.

Changes in fair value which do not constitute an effective hedge are carried immediately to profit or loss.

r.   Treasury shares:

Company shares held by the Company and/or subsidiaries are recognized at cost of purchase and presented as a deduction from equity. Any gain or loss arising from a purchase, sale, issue or cancellation of treasury shares is recognized directly in equity.

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### NOTE 2:- SIGNIFICANT ACCOUNTING POLICIES (Cont.)

s.    Provisions:

A provision in accordance with IAS 37 is recognized when the Group has a present obligation (legal or constructive) as a result of a past event, it is probable that an outflow of resources embodying economic benefits will be required to settle the obligation and a reliable estimate can be made of the amount of the obligation. When the Group expects part or all of the expense to be reimbursed, for example under an insurance contract, a third party indemnification liability and etc., the reimbursement is recognized as a separate asset but only when the reimbursement is virtually certain. The expense is recognized in the statement of profit or loss net of any reimbursement.

Following are the types of provisions included in the financial statements:

*Legal and contingent claims:*

A provision for legal and contingent claims is recognized when the Group has a present legal or constructive obligation as a result of a past event, it is more likely than not that an outflow of resources embodying economic benefits will be required by the Group to settle the obligation and a reliable estimate can be made of the amount of the obligation.

*Onerous contracts:*

A provision for onerous contracts is recognized when the unavoidable costs of meeting the obligations under the contract exceed the economic benefits expected to be received by the Group from the contract. The provision is measured at the lower of the present value of the anticipated cost of exiting from the contract and the present value of the net anticipated cost of fulfilling it.

*Levies:*

Levies imposed on the Company by government entities through legislation, are accounted for pursuant to IFRIC 21 according to which the liability for the levy is recognized only when the activity that triggers payment occurs.

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 2:-  SIGNIFICANT ACCOUNTING POLICIES (Cont.)**

t.    Employee benefit liabilities:

The Group has several employee benefit plans:

1.    Short-term employee benefits:

Short-term employee benefits are benefits that are expected to be settled wholly before twelve months after the end of the annual reporting period in which the employees render the related services. These benefits include salaries, paid annual leave, paid sick leave, recreation and social security contributions and are recognized as expenses as the services are rendered. A liability in respect of a cash bonus or a profit-sharing plan is recognized when the Group has a legal or constructive obligation to make such payment as a result of past service rendered by an employee and a reliable estimate of the amount can be made.

2.    Post-employment benefits:

The plans are normally financed by contributions to insurance companies and classified as defined contribution plans or as defined benefit plans.

The Group has defined contribution plans pursuant to section 14 to the Severance Pay Law under which the Group pays fixed contributions and will have no legal or constructive obligation to pay further contributions if the fund does not hold sufficient amounts to pay all employee benefits relating to employee service in the current and prior periods.

Contributions to the defined contribution plan in respect of severance or retirement pay are recognized as an expense when contributed concurrently with performance of the employee's services.

The Group also operates a defined benefit plan in respect of severance pay pursuant to the Severance Pay Law. According to the Law, employees are entitled to severance pay upon dismissal or retirement. The liability for termination of employment is measured using the projected unit credit method. The actuarial assumptions include expected salary increases and rates of employee turnover based on the estimated timing of payment. The amounts are presented based on discounted expected future cash flows using a discount rate determined by reference to market yields at the reporting date on high quality corporate bonds in NIS with a term that is consistent with the estimated term of the severance pay obligation. The computation is done by a qualified actuary.

In respect of its severance pay obligation to certain of its employees, the Company makes current deposits in pension funds and insurance companies ("the plan assets"). Plan assets comprise assets held by a long-term employee benefit fund or qualifying insurance policies. Plan assets are not available to the Group's own creditors and cannot be returned directly to the Group.

The liability for employee benefits shown in the statement of financial position reflects the present value of the defined benefit obligation less the fair value of the plan assets.

Remeasurements of the net liability are recognized in other comprehensive income in the period in which they occur.

- 38 -

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 2:-  SIGNIFICANT ACCOUNTING POLICIES (Cont.)**

u.    Share-based payment transactions:

The Group's employees/other service providers are entitled to remuneration in the form of the Company's and/or subsidiaries' equity-settled share-based payment transactions.

The cost of equity-settled transactions with employees is measured at the fair value of the equity instruments granted at grant date. The fair value is determined using an acceptable option pricing model. As for other service providers, the cost of the transactions is measured at the fair value of the goods or services received as consideration for equity instruments granted. If the fair value of the services received in return for equity instruments cannot be measured, it is measured at the fair value of the equity instruments granted.

The cost of equity-settled transactions is recognized in profit or loss together with a corresponding increase in equity during the period which the performance and/or service conditions are to be satisfied ending on the date on which the relevant employees become entitled to the award ("the vesting period"). The cumulative expense recognized for equity-settled transactions at the end of each reporting period until the vesting date reflects the extent to which the vesting period has expired and the Group's best estimate of the number of equity instruments that will ultimately vest.

No expense is recognized for awards that do not ultimately vest, except for awards where vesting is conditional upon a market condition, which are treated as vesting irrespective of whether the market condition is satisfied, provided that all other vesting conditions (service) are satisfied.

v.    IFRS 8, "Operating Segments" ("IFRS 8"):

According to IFRS 8, when reporting the financial performances of the operating segments, the Company applies the management approach. Segment information is the information used by management internally for evaluating segment performances and for making decisions on allocating resources to the operating segments.

An operating segment is a Group component which meets the following three conditions:

1.    It is engaged in business activities which yield revenues and incur expenses, including revenues and expenses attributable to intercompany transactions in the Group;

2.    Its operating results are regularly reviewed by the Group's chief operating decision maker ("CODM") in making decisions regarding resource allocation and performance evaluation;

3.    There is available separate financial information regarding the segment.

**MEITAV DASH INVESTMENTS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**NOTE 2:- SIGNIFICANT ACCOUNTING POLICIES (Cont.)**

    w.    Earnings per share:

Earnings per share are calculated by dividing the net income attributable to equity holders of the Company by the weighted number of Ordinary shares outstanding during the period.

Potential Ordinary shares are included in the computation of diluted earnings per share when their conversion decreases earnings per share from continuing operations. Potential Ordinary shares that are converted during the period are included in diluted earnings per share only until the conversion date and from that date in basic earnings per share. The Company's share of earnings of investees is included based on its share of earnings per share of the investees multiplied by the number of shares held by the Company.

    x.    Investments of provident fund members and liabilities to provident fund members:

A subsidiary, Meitav Dash Provident and Pension Ltd. ("Meitav Dash Provident"), has undertaken towards its members to supplement the yield determined in the articles of association of Meitav Dash Security Fund under yield-guaranteed tracks (4.5% and 5.5% real yield).

According to an agreement signed with the Ministry of Finance, the yield-guaranteed fund deposited amounts that are linked to the CPI and bear annual interest of 4.95% and 5.95%, respectively. It was also agreed that at all times, the amounts of the deposits in the State Treasury will not exceed 85% of the balance of the yield-guaranteed fund's assets and/or of the balance of the fund's liabilities, whichever is lower, in respect of the members whose yield has been guaranteed. If the amounts of the deposits exceed the above rate, the fund will repay the surplus yield to the State Treasury, as defined in the agreement.

    y.    Reclassification:

The Company reclassified certain comparative figures in immaterial amounts in the consolidated statements of financial position in order to adapt them to the current period's presentation. The reclassification has no effect on the income for the year.

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 2:-   SIGNIFICANT ACCOUNTING POLICIES (Cont.)**

z.   Changes in accounting policies - initial application of new financial reporting and accounting standards and amendments to existing financial reporting and accounting standards:

1.   Initial application of IFRS 16, "Leases":

In January 2016, the IASB issued IFRS 16, "Leases" ("the Standard"), which provides guidance on the recognition, measurement, presentation and disclosure of leases and supersedes IAS 17, "Leases" ("the old Standard"), IFRIC 4, "Determining Whether an Arrangement Contains a Lease", and SIC-15, "Operating Leases - Incentives". According to the Standard, a lease is a contract, or part of a contract, that conveys the right to use an asset for a period of time in exchange for consideration.

The Standard has been applied for the first time in these financial statements. As permitted by the Standard, the Company elected to apply the provisions of the Standard using the modified retrospective method. The Company recognized lease liabilities on the initial application date of the Standard in respect of leases previously classified as operating leases according to IAS 17. The amount of the liability as of the date of initial application of the Standard was measured using the Company's incremental borrowing rate of interest on the date of initial application of the Standard.

The carrying amount of the right-of-use assets was identical to the carrying amount of the lease liability.

For details of the accounting policy applied from the date of initial application of the Standard, see paragraph l above.

Following are data relating to the initial application of the Standard as of January 1, 2019, in respect of leases existing as of that date:

a)   Effects of the initial application of the Standard on the Company's financial statements as of January 1, 2019:

| | As previously reported | The change | As presented according to IFRS 16 |
|---|---|---|---|
| | | NIS in thousands | |
| **As of January 1, 2019:** | | | |
| Non-current assets: | | | |
| Property, plant and equipment | 37 | 177 | 214 |
| Current liabilities: | | | |
| Other payables | 294 | 18 | 312 |
| Non-current liabilities: | | | |
| Lease liabilities | 13 | 159 | 172 |
| Retained earnings | 200 | - | 200 |

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 2:- SIGNIFICANT ACCOUNTING POLICIES (Cont.)**

    z.    Changes in accounting policies - initial application of new financial reporting and accounting standards and amendments to existing financial reporting and accounting standards: (Cont.)

        1.    Initial application of IFRS 16, "Leases": (Cont.)

            b)    The Group was assisted by an external valuation expert in determining the appropriate nominal interest rate for discounting its leases based on the companies' financing risk, the weighted average term of the leases and other economic variables. The range of nominal discount rates used on the date of initial application of the Standard for measuring the lease liability was between 1.48% and 4.84%. This range is affected by differences in lease term, differences in the various asset categories, differences between the discount rates of the Group companies etc.

        2.    IFRIC 23, "Uncertainty over Income Tax Treatments":

        In June 2017, the IASB issued IFRIC 23, "Uncertainty over Income Tax Treatments" ("the Interpretation"). The Interpretation clarifies the accounting for recognition and measurement of assets or liabilities in accordance with the provisions of IAS 12, "Income Taxes", in situations of uncertainty involving income taxes. The Interpretation provides guidance on considering whether some tax treatments should be considered collectively, examination by the tax authorities, measurement of the effects of uncertainty involving income taxes on the financial statements and accounting for changes in facts and circumstances in respect of the uncertainty.

        The Interpretation has been applied by the Company from January 1, 2019. The application of the Interpretation did not have a material effect on the Company's financial statements.

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### NOTE 2:- SIGNIFICANT ACCOUNTING POLICIES (Cont.)

    aa.    Disclosure of new IFRSs in the period prior to their adoption:

        1.    IFRS 3, "Business Combinations":

In October 2018, the IASB issued an amendment to the definition of a "business" in IFRS 3, "Business Combinations" ("the Amendment"). The Amendment is intended to assist entities in determining whether a transaction should be accounted for as a business combination or as an acquisition of an asset.

The Amendment consists of the following:

a)    Clarification that to meet the definition of a business, an integrated set of activities and assets must include, as a minimum, an input and a substantive process that together significantly contribute to the ability to create output.

b)    Removal of the reference to the assessment whether market participants are capable of acquiring the business and continuing to operate it and produce outputs by integrating the business with their own inputs and processes.

c)    Introduction of additional guidance and examples to assist entities in assessing whether the acquired processes are substantive.

d)    Narrowing the definitions of "outputs" and "business" by focusing on goods and services provided to customers.

e)    Introducing an optional concentration test that permits a simplified assessment of whether an acquired set of activities and assets is not a business.

The Amendment is to be applied prospectively to all business combinations and asset acquisitions for which the acquisition date is on or after the beginning of the first annual reporting period beginning on or after January 1, 2020, with earlier application permitted.

        2.    In September 2019, the IASB issued amendments to IFRS 9, "Financial Instruments", IFRS 7, "Financial Instruments: Disclosures", and IAS 39, "Financial Instruments: Recognition and Measurement".

The amendments provide practical expedients regarding tests of effectiveness and hedge accounting in the period of the transition from IBORs to RFRs. The amendments are to be applied retrospectively from annual periods beginning on or after January 1, 2020. Early application is permitted. The Company estimates that the amendments will not have a material effect on the Company's financial statements.

**MEITAV DASH INVESTMENTS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**NOTE 2:-  SIGNIFICANT ACCOUNTING POLICIES (Cont.)**

bb.   Fair value measurement:

Fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date.

Fair value measurement is based on the assumption that the transaction will take place in the asset's or the liability's principal market, or in the absence of a principal market, in the most advantageous market.

The fair value of an asset or a liability is measured using the assumptions that market participants would use when pricing the asset or liability, assuming that market participants act in their economic best interest.

Fair value measurement of a non-financial asset takes into account a market participant's ability to generate economic benefits by using the asset in its highest and best use or by selling it to another market participant that would use the asset in its highest and best use.

The Group uses valuation techniques that are appropriate in the circumstances and for which sufficient data are available to measure fair value, maximizing the use of relevant observable inputs and minimizing the use of unobservable inputs.

All assets and liabilities measured at fair value or for which fair value is disclosed are categorized into levels within the fair value hierarchy based on the lowest level input that is significant to the entire fair value measurement:

Level 1      -  quoted prices (unadjusted) in active markets for identical assets or liabilities.

Level 2      -  inputs other than quoted prices included within Level 1 that are observable directly or indirectly.

Level 3      -  inputs that are not based on observable market data (valuation techniques which use inputs that are not based on observable market data).

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 3:-    SIGNIFICANT ACCOUNTING JUDGMENTS, ESTIMATES AND ASSUMPTIONS USED IN THE PREPARATION OF THE FINANCIAL STATEMENTS**

In the process of applying the significant accounting policies, the Group has made judgments which have the most significant effect on the amounts recognized in the financial statements. The preparation of the financial statements requires management to make estimates and assumptions that have an effect on the application of the accounting policies and on the reported amounts of assets, liabilities, revenues and expenses. Changes in accounting estimates are reported in the period of the change in estimate.

The key assumptions made in the financial statements concerning uncertainties at the reporting date and the critical estimates computed by the Group that may result in a material adjustment to the carrying amounts of assets and liabilities within the next financial year are discussed below.

a.    Legal claims:

In estimating the likelihood of outcome of legal claims filed against investees, the companies rely on the opinion of their legal counsel. These estimates are based on the legal counsel's best professional judgment, taking into account the stage of proceedings and legal precedents in respect of the different issues. Since the outcome of the claims will be determined in courts and/or in arbitration and/or in settlement agreements, the results could differ from these estimates.

The investee's management examines the potential of settling claims whose chances cannot be assessed and which are directly handled by the Group's legal advisors before the legal proceedings are concluded and records a provision in respect thereof if a reliable estimate can be made. If the subsidiary's management decides that it has no intention to settle the legal claims before the court and/or arbitration proceedings are concluded, no provision is included until an evaluation of the chances of the claims are obtained from the legal advisors that directly handle the claims.

When the chances of the claims handled directly by the Group's legal advisors can be evaluated and it is more likely than not that the investee has a present legal or constructive obligation in respect thereof, a provision is recorded if it is expected that the investee will be required to expense financial resources to settle the obligation which can be measured reliably. When the time value effect is material, the provision is measured at its present value.

b.    Impairment of goodwill:

The Group reviews goodwill for impairment at least once a year. This requires management to make an estimate of the projected future cash flows from the continuing use of the cash-generating unit (or a group of cash-generating units) to which the goodwill is allocated and also to choose a suitable discount rate for those cash flows.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**NOTE 3:-** **SIGNIFICANT ACCOUNTING JUDGMENTS, ESTIMATES AND ASSUMPTIONS USED IN THE PREPARATION OF THE FINANCIAL STATEMENTS (Cont.)**

    c.    Deferred acquisition costs:

Commissions paid to agents and acquisition supervisors for the acquisition of pension and provident fund asset management contracts are recorded as deferred acquisition costs ("DAC") if they can be separately identified and reliably measured and it their recovery is expected through management fees. The DAC are amortized over the estimated period of generating revenues from management fees.

According to the Company's estimate, the DAC amortization period is six years for provident contracts and 10 years for pension contracts.

The Group reviews the recoverability of DAC every reporting period based on the entire pension and provident contract portfolio. If the related DAC cannot be recovered, the accelerated amortization of DAC may be required or even the derecognition of DAC.

    d.    Deferred tax assets:

Deferred tax assets are recognized for unused carryforward tax losses and deductible temporary differences to the extent that it is probable that taxable profit will be available against which the losses can be utilized. Significant management judgment is required to determine the amount of deferred tax assets that can be recognized, based upon the timing and amount of future taxable income. See additional information in Note 26b below.

    e.    Pension and other post-employment benefits:

The liability in respect of post-employment defined benefit plans is determined using actuarial valuations. The valuation involves making assumptions about, among others, the discount rate, rate of salary increase and employee turnover rate. The carrying amount of the liability may be significantly affected by changes in these estimates.

    f.    Determining the fair value of an unquoted financial instrument:

The fair value of unquoted financial instruments classified at Level 3 in the fair value hierarchy is determined as follows: for loans and debentures - using future cash flows discounted at current rates applicable for items with similar terms and risk characteristics; for warrants - based on a customary valuation model. Changes in estimated future cash flows and estimated discount rates, after consideration of risks such as liquidity risk, credit risk, volatility and applicable standard deviation, are liable to affect the fair value of these assets.

    g.    Determining the fair value of share-based payment transactions:

The fair value of share-based payment transactions is determined upon initial recognition by an acceptable option pricing model. The inputs to the model include share price and exercise price and assumptions regarding expected volatility, expected life of share option and expected dividend yield.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**NOTE 3:- SIGNIFICANT ACCOUNTING JUDGMENTS, ESTIMATES AND ASSUMPTIONS USED IN THE PREPARATION OF THE FINANCIAL STATEMENTS (Cont.)**

h.   Provision for onerous contracts:

The provision for onerous contracts has been calculated based on the Company's estimate of the expected gap between the income from subleases and the Company's liability according to existing contracts. The gap is affected by the expected date of subleasing the offices and the rental income that will be received.

i.   Provision for reimbursement of management fees:

The provision for the reimbursement of management fees to members of provident funds were calculated based on the Company's estimate which relies, among others, on past experience and the directives of the Ministry of Finance's circulars.

j.   Allowance for doubtful accounts and expected credit losses:

The allowance for doubtful accounts is assessed at each reporting date and until the date of the approval of the financial statements and is recognized when there is objective evidence of risk that the Company will not be able to collect the amounts to which it is entitled. In each case of objective evidence or an indication of non-compliance with the deliverable, a discussion is held for each specific amount at risk, in which the receivable is examined, the borrower of the deliverable and its financial condition, the collaterals and the history of agreements, if any.

According to the Company's policy, besides the examination of other loss events, the Company examines on the above dates all the debts on an individual basis, with respect to debts over 90 days past due but not collected close to the date of the approval of the financial statements and contemplates to create an allowance for doubtful accounts and creates an allowance accordingly. In addition, the group of financial assets for which there is no objective evidence of impairment is examined separately close to the date of publication of the financial statements. Part of this group that was not repaid as of the date of the additional examination is collectively assessed for impairment based on the Company's experience.

If such objective evidence exists, the Company accounts as follows:

The amount of the loss is the difference between the carrying amount of the asset and the present value of the estimated future cash flows from the asset discounted at the original effective interest rate of the financial asset (i.e., the effective interest rate calculated on initial recognition in the financial statements). When estimating the future cash flows from the asset, the Company does not take into account any future credit losses that have not yet been incurred or indemnifications expected to be received from the insurance company. The amount of the loss is reported in profit or loss.

Evaluation of expected credit losses - in the testing of impairment of financial assets, the Group evaluates whether the credit risk associated with the financial asset has significantly increased since the initial recognition date and also uses forecasts for measuring expected credit losses.

**MEITAV DASH INVESTMENTS LTD.**

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 3:- SIGNIFICANT ACCOUNTING JUDGMENTS, ESTIMATES AND ASSUMPTIONS USED IN THE PREPARATION OF THE FINANCIAL STATEMENTS (Cont.)**

    k.    Contingent liability for business combinations:

The Company measures the fair value of contingent liabilities for business combinations based on the evaluation of the total outstanding payments as determined in the acquisition agreement, discounted at the original effective interest rate on the business combination date. Changes in fair value are carried to profit or loss.

    l.    Effective control:

The Company evaluates whether it controls a company in which it holds less than the majority of the voting rights by, among others, reference to the size of its share of voting rights relative to the size and dispersion of voting rights held by the other shareholders, and by voting patterns at previous shareholders' meetings.

    m.    Discount rate for a lease liability:

When the Company is unable to readily determine the discount rate implicit in a lease in order to measure the lease liability, the Company uses an incremental borrowing rate. That rate represents the rate of interest that the Company would have to pay to borrow over a similar term and with similar security, the funds necessary to obtain an asset of similar value to the right-of-use asset in a similar economic environment. When there are no financing transactions that can serve as a basis, the Company determines the incremental borrowing rate based on its credit risk, the lease term and other economic variables deriving from the lease contract's conditions and restrictions. In certain situations, the Company is assisted by an external valuation expert in determining the incremental borrowing rate.

    n.    Lease extension and termination options:

In evaluating whether it is reasonably certain that the Company will exercise an option to extend a lease or not exercise an option to terminate a lease, the Company considers all relevant facts and circumstances that create an economic incentive for the Company to exercise the option to extend or not exercise the option to terminate such as: significant amounts invested in leasehold improvements, the significance of the underlying asset to the Company's operation and whether it is a specialized asset, the Company's past experience with similar leases, etc.

After the commencement date, the Company reassesses the term of the lease upon the occurrence of a significant event or a significant change in circumstances that affects whether the Company is reasonably certain to exercise an option or not exercise an option previously included in the determination of the lease term, such as significant leasehold improvements that had not been anticipated on the lease commencement date, sublease of the underlying asset for a period that exceeds the end of the previously determined lease period, etc.

**MEITAV DASH INVESTMENTS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**NOTE 4:-  SUBSIDIARIES**

        a.      Business combinations:

        1.      Bank of Jerusalem Ltd.:

On October 16, 2017, Meitav Dash Trade Ltd. ("Meitav Dash Trade") and Meitav Dash Brokerage Ltd. ("Meitav Dash Brokerage") entered into agreements for the purchase of the operation of Bank of Jerusalem Ltd. ("the Bank") for providing securities trading services to independent and institutional customers, respectively, for a total consideration of approximately NIS 21 million to be paid on the completion date. As of the closing date of the agreements, the scope of assets managed in the purchased operation approximates NIS 5 billion.

Among others, the purchase agreements consist of various presentations as customary in this type of transactions as well as the Bank's liability for compensation for any violation of the presentations and past liabilities in connection with the purchased operation, subject to a time limit and maximum compensation limit of 100% of the consideration. Moreover, the purchase agreements consist of certain non-compete restrictions that apply to the Bank for a period of up to four years from the transaction completion date.

Completion of the transaction is contingent on obtaining the approval of the Director General of the Israel Antitrust Authority and the Court's approval for the arrangement pursuant to Article 350 to the Israeli Companies Law and the assignment of agreements with customers.

In addition to the transaction consideration, on the date of completion of the transaction, Meitav Dash Trade will pay the Bank the monetary credit that had been extended by the Bank to its customers up to the maximum amount determined in the purchase agreement and will assume the Bank's position for the credit.

On January 25, 2018, after the suspending conditions had been met, the transaction for the sale of the institutional customer operation to Meitav Dash Brokerage in consideration of NIS 6.5 million was completed. Meitav Dash Brokerage also entered into an agreement with the Bank according to which the Bank will continue providing Meitav Dash Brokerage TASE member and operating services in connection with the sold operation until June 30, 2018. In the PPA study underlying the above transaction, Meitav Dash Brokerage allocated an amount of approximately NIS 6.1 million to customer relations and the balance of approximately NIS 0.4 million to goodwill.

On February 15, 2018, following the fulfillment of the suspending conditions, the transaction for the sale of the independent customer portfolio to Meitav Dash Trade was consummated. Accordingly, the overall price of the operation amounted to approximately NIS 18.2 million, of which NIS 14.5 million was paid to the Bank for the purchase of the operation and approximately NIS 3.7 million was allocated to the Bank's customer credit portfolio which was transferred to Meitav Dash Trade. It should be noted that the purchased credit portfolio is secured by the customers' securities portfolios acquired in the context of the transaction. Meitav Dash Trade is also required to hold variable liquid assets in respect of the acquired operation as per the TASE's regulations. In the PPA study underlying the above transaction, Meitav Dash Trade allocated an amount of approximately NIS 14.3 million to customer relations and the balance of approximately NIS 0.2 million to goodwill.

**MEITAV DASH INVESTMENTS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

## NOTE 4:- SUBSIDIARIES (Cont.)

    a.    Business combinations: (Cont.)

        2.    Liquidity Capital M.C. Ltd.:

On March 15, 2018, the Company entered into an investment agreement and a shareholders' agreement with Liquidity Capital M.C. Ltd. (formerly: Liquidity Capital General Partner Ltd., "Liquidity") and Liquidity's founders. Liquidity purchases SaaS based portfolios of international and local tech companies for third parties through Liquidity Capital II, L.P., whose indirect general partner is Liquidity Capital G.P. G.P. Ltd. ("the Fund" and "the GP", respectively) whereby Liquidity grants the Fund management services. In the context of the transaction, the Company invested $ 540 thousand in Liquidity against the allocation of shares to the Company, following which the Company holds 54% of the share capital of Liquidity on a fully diluted basis.

After obtaining the approval of the Company's Audit Committee and Board, the Company's CEO, Mr. Ilan Raviv, invested in Liquidity a total of approximately $ 60 thousand in return for shares in Liquidity accounting for 6% of its share capital on a fully diluted basis.

The Company committed to make an initial investment in the Fund (by itself and/or through other investors) in the amount of $ 3.4 million. The profits from the investments are distributed between the Company and Liquidity based on a profit sharing mechanism. Once the Fund began operating, the above investments were assigned based on the above profit sharing mechanism pro rata to the Company's priority in the return of the investment. According to the transaction, an agreement was signed between the shareholders in Liquidity, Mr. Yaron Sela and Mr. Ron Daniel, which settles the parties' interests in Liquidity. Mr. Sela and Mr. Daniel also serve as officers in Liquidity. On November 28, 2018, the Company's Board approved the grant of a loan to Liquidity for making the initial investments in the Fund in a maximum total of $ 3.6 million and an unlinked loan in a maximum amount of $ 1 million bearing annual interest of 5% for financing Liquidity's operating activities.

The Company has a capital commitment of $ 7 million in the Fund, half of which has been invested in practice.

**MEITAV DASH INVESTMENTS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**NOTE 4:-  SUBSIDIARIES (Cont.)**

   a.   Business combinations: (Cont.)

      2.   Liquidity Capital M.C. Ltd.: (Cont.)

On April 1, 2019, the Fund completed an initial capital raising round of approximately $ 30 million. As of the date of the financial statements, the Fund holds investor commitments totaling approximately $ 49 million. Accordingly, the Company no longer has control of the Fund and has ceased consolidating the Fund's financial statements from said date.

After the financial statement date, the Fund completed additional capital raising rounds and consequently, as of the financial statement approval date, the total investment commitments in the Fund approximate $ 71 million.

On May 27, 2019, the Company's Board approved the Company's participation in a convertible loan agreement ("CLA") with other investors according to which Liquidity will be granted a convertible loan of up to $ 1 million. On October 22, 2019, Liquidity completed the first CLA closing. According to the transaction, in the first capital raising round, Liquidity raised approximately $ 2.5 million ("the amount raised"), of which the Company invested an amount of $ 1 million. The amount raised and any additional amounts that will be raised, if any, will be convertible into Liquidity shares based on the methods, rates and dates determined in the agreement. The transaction also includes MUFG Innovation Partners No. 1 Investment Partnership ("MUIP") of the MUFG Mitsubishi UFJ Financial Group, one of the world's largest and leading financial and banking groups.

Based on the mechanism determined in the agreement, after Liquidity has raised additional capital, MUIP will increase its share of the transaction to a cumulative amount of $ 4 million whereby its relative share as determined on the first closing date will be retained after said capital raising. The purpose of the capital raising is mainly to accelerate the development of Liquidity's technology which is based on a series of unique algorithms which are being developed by Liquidity for forecasting future corporate revenues and cash flows and which is used by the Fund for managing its investments.

On February 25, 2020, Liquidity completed the second CLA closing and raised approximately $ 2 million.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**NOTE 4:-  SUBSIDIARIES (Cont.)**

a.  Business combinations: (Cont.)

3.  Lotus Investment Management Limited:

On October 10, 2019, the Company entered into an acquisition agreement whereby upon signing, the Company and two additional buyers ("the additional buyers" and collectively with the Company – "the buyers") acquired 85% of the issued share capital of Lotus Investment Management Limited ("Lotus"), an Irish company controlled by Mr. David Green, in consideration of a total of € 10.35 million (the Company's share is € 5.4 million), subject to certain adjustments. Following the acquisition, the Company will have control over Lotus with 45% of Lotus' issued share capital, another 40% will be held by the additional buyers and the remaining 15% will be held by Lotus' executives, including Mr. Green.

On the acquisition date, the Company paid € 4.05 million and the balance will be paid subject to meeting certain milestones as determined in the agreement. After the financial statement date, another amount of approximately € 1.1 million was paid. The sellers are also entitled to an earnout of € 2.4 million once certain conditions as determined in the agreement are met. The Company also granted one of the additional buyers a loan of up to € 2.4 million for financing the latter's share of the transaction (as of the financial statement date, the total loan amounts to approximately € 2.2 million), in return for recording a lien on the additional buyer's shares in Lotus. The transaction costs were in an immaterial amount and were carried to the statement of profit or loss.

Lotus is an Irish founded and based company that manages Small & Medium Enterprise (SME) loan portfolios for real estate developers and investors. As of the acquisition date, Lotus manages asset-backed loan portfolios totaling some € 115 million for various investors. Its loan portfolios are mostly comprised of loans to developers for financing real estate construction and a small portion is dedicated to bridge loans for financing constructed real estate properties for average periods ranging between 12 and 24 months.

The Company has undertaken, by itself or through third parties, to invest in Lotus' managed loan portfolios an amount of € 16.8 million after 30 days have elapsed from the signing date.

According to the terms of the acquisition agreement, Lotus may purchase the loan portfolios managed by it, in which case the investments in the portfolios (as defined above) will be converted into mezzanine loans bearing annual interest of 11% ("the mezzanine loans"). The mezzanine loans are designed to finance Lotus' acquisition of the loan portfolios from the investors. The repayment of the mezzanine loans is superior to the distribution of any dividends by Lotus but inferior to the payment of the earnout, to the repayment of any senior debt and to any other payments to the sellers as determined in the agreement.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**NOTE 4:-   SUBSIDIARIES (Cont.)**

a.   Business combinations: (Cont.)

3.   Lotus Investment Management Limited: (Cont.)

The parties to the acquisition agreement also signed a shareholders' agreement for settling their rights as shareholders in Lotus, including the Company's right to appoint half of the directors in Lotus, one of whom will serve as Chairman of the Board and have a deciding vote, other than in certain decisions which require a special majority.

The financial statements include liabilities for the share purchase totaling approximately NIS 6 million and a long-term liability of approximately NIS 9 million recorded in the reporting period.

The PPA has not been accounted for as of the reporting date and therefore the Company allocated the purchase price to goodwill temporarily. The contribution of Lotus' financial results from the date of initial consolidation through December 31, 2019 is not material to the Company's consolidated financial statements.

On February 27, 2020, the Company completed the acquisition of another 13.5% of Lotus' issued and outstanding share capital from a corporation controlled by Mr. David Green for a total of approximately € 2 million.

4.   Peninsula Group Ltd.:

On June 10, 2019, Peninsula Group Ltd. ("Peninsula") issued a shelf offering report by virtue of which it issued 13,230,000 ordinary shares, 3,969,000 warrants (series 2) that are exercisable into ordinary shares of Peninsula and 3,969,000 warrants (series 3) that are exercisable into ordinary shares of Peninsula for immediate (gross) proceeds of approximately NIS 30.6 million. In the context of the share and warrant issue, the Company purchased 2,553,000 ordinary shares, 765,900 warrants (series 2) and 765,900 warrants (series 3) of Peninsula. See Note 31a regarding the issue of shares after the reporting date.

Through December 31, 2019, 3,963,940 marketable warrants were exercised into 3,963,940 shares of Peninsula in return for NIS 9.9 million.

On January 22, 2020, Peninsula issued a shelf offering report by virtue of which it issued 69,976,000 ordinary shares for immediate gross proceeds of approximately NIS 251.9 million. In the share issue, the Company purchased 32,000,000 ordinary shares of Peninsula for a total of approximately NIS 115 million. As of the date of approval of the financial statements, the Company holds about 50.33% of Peninsula's issued share capital.

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 4:-  SUBSIDIARIES (Cont.)**

    b.    Merger of Meitav Dash Mutual Funds Ltd. and Tachlit Indices Mutual Fund Management Ltd.:

On November 28, 2018, following the approval of the boards of Meitav Dash Mutual Funds Ltd. ("Meitav Dash Mutual Funds") and Tachlit Indices Mutual Fund Management Ltd. (formerly: Tachlit Indices Ltd., "Meitav Tachlit"), the Company's Board approved the merger of Meitav Dash Mutual Funds into Meitav Tachlit with the former's legal dissolution. The objectives of the merger include consolidating the holding structure, minimizing operating costs, benefiting from economies of scale and improving operations.

On March 24, 2019, the Company received the ITA's pre-ruling regarding the merger of Meitav Dash Mutual Funds with and into Meitav Tachlit in accordance with the provisions of Section 103B to the Income Tax Ordinance. The merger was subject to the fulfillment of certain suspending conditions which were met on March 28, 2019, and on April 4, 2019, the merger certificate was received and the merger between Meitav Tachlit and Meitav Dash Mutual Funds was completed. On April 28, 2019, the merged company's name was changed to Meitav Tachlit Mutual Funds Ltd.

**MEITAV DASH INVESTMENTS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

## NOTE 4:- SUBSIDIARIES (Cont.)

c.   Non-controlling interests in subsidiaries:

The table below consolidates information regarding the Group's subsidiaries which operate in Israel, including fair value adjustments made on the date of acquisition, other than goodwill, with material non-controlling interests (before elimination of intragroup transactions).

| | December 31, 2019 | | | | | | | Year ended December 31, 2019 | | | | | | |
| | Ownership interests held by non-controlling interests % | Current assets | Non-current assets | Current liabilities | Non-current liabilities | Total net assets | Carrying amount of non-controlling interests | Revenues | Total comprehensive income (loss) | Income attributable to non-controlling interests | Cash flows from operating activities | Cash flows from investing activities | Cash flows from financing activities excluding dividend to non-controlling interests | Dividend paid to non-controlling interests | Total change in cash and cash equivalents |
| | | | | | | | NIS in millions | | | | | | | | |
| Peninsula Meitav Dash | 51% | 830 | 122 | 555 | 194 | 203 | 100 | 81 | 32 | 15 | (113) | (1) | 91 | 13 | (10) |
| Provident | 20% | 110 | 466 | 172 | 106 | 298 | 48 | 318 | (3) | (1) | 1 | (3) | - | - | (2) |
| | | 940 | 588 | 727 | 300 | 501 | 148 | 399 | 29 | 14 | (112) | (4) | 91 | 13 | (12) |

| | December 31, 2018 | | | | | | | Year ended December 31, 2018 | | | | | | |
| | Ownership interests held by non-controlling interests % | Current assets | Non-current assets | Current liabilities | Non-current liabilities | Total net assets | Carrying amount of non-controlling interests | Revenues | Total comprehensive income | Income attributable to non-controlling interests | Cash flows from operating activities | Cash flows from investing activities | Cash flows from financing activities excluding dividend to non-controlling interests | Dividend paid to non-controlling interests | Total change in cash and cash equivalents |
| | | | | | | | NIS in millions | | | | | | | | |
| Peninsula Meitav Dash | 45% | 711 | 41 | 468 | 126 | 158 | 72 | 61 | 23 | 10 | (47) | (1) | (12) | 6 | (48) |
| Provident | 20% | 106 | 482 | 181 | 106 | 302 | 48 | 320 | 1 | - | 17 | 2 | (11) | - | 8 |
| | | 817 | 523 | 649 | 232 | 460 | 120 | 381 | 24 | 10 | (30) | 1 | (23) | 6 | (40) |

**MEITAV DASH INVESTMENTS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**NOTE 4:-   SUBSIDIARIES (Cont.)**

c.   Non-controlling interests in subsidiaries: (Cont.)

|  | **Year ended December 31, 2017** | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Ownership interests held by non-controlling interests** | **Revenues** | **Total comprehensive income (loss)** | **Income attributable to non-controlling interests** | **Cash flows from operating activities** | **Cash flows from investing activities** | **Cash flows from financing activities excluding dividend to non-controlling interests** | **Dividend paid to non-controlling interests** | **Total change in cash and cash equivalents** |
| **%** | | | | **NIS in millions** | | | | |
| Peninsula 48% | 56 | 19 | 10 | (216) | (1) | 233 | 5 | 21 |
| Meitav Dash Provident 20% | 338 | (12) | (2) | 10 | 13 | (19) | - | 4 |
| | 394 | 7 | 8 | (206) | 12 | 214 | 5 | 25 |

**NOTE 5:-   SHORT-TERM INVESTMENTS**

| | | **December 31,** | |
|---|---|---|---|
| | | **2019** | **2018** |
| | | **NIS in millions** | |
| a. | Financial assets measured at fair value with changes therein carried to profit or loss: | | |
| | Investment funds | 23 | 11 |
| | Short-term Government loans (MAKAM) (1) | 32 | 2 |
| | Shares and warrants (2) | 36 | 24 |
| | Corporate debentures | 44 | 26 |
| | Collateralized loan obligations (CLOs) | 14 | 21 |
| | Government bonds | 25 | 31 |
| | Mutual funds (2) | 16 | 14 |
| | | 190 | 129 |
| b. | Cash and deposits in banks (2) (4) | 54 | 22 |
| c. | Restricted deposits in respect of the TASE Clearing House (3) | 46 | 31 |
| | | 290 | 182 |

As for information regarding the Group's exposure to credit and currency risks, see Note 17.

As for liens and guarantees, see Note 19c.

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### NOTE 5:-  SHORT-TERM INVESTMENTS (Cont.)

|  |  | December 31, | |
|---|---|---|---|
|  |  | **2019** | **2018** |
|  |  | **NIS in millions** | |
| (1) | Including deposits used in trust according to Article 6 to the Securities Regulations (Underwriting), 2007 | 2 | 2 |
| (2) | Including financial assets pledged to banks: | | |
|  | Shares | - | 13 |
|  | Mutual funds | - | 4 |
|  | Cash and deposits in banks | 24 | 6 |
|  |  | 24 | 23 |

(3)     See Note 19c(7).

(4)     Includes NIS 29.7 million (December 31, 2018 - NIS 16.3 million) that Meitav Dash Trade provided as a collateral to a bank which is a member of the MAOF Clearing House to secure its operation in the MAOF market.

### NOTE 6:-  LOANS TO CUSTOMERS

|  | December 31, | |
|---|---|---|
| | **2019** | **2018** |
| | **NIS in millions** | |
| Open debts and checks receivable | 923 | 791 |
| Less - expected credit losses | (18) | (13) |
| Less - deferred revenues | (11) | (10) |
| Total short-term loans to customers | 894 | 768 |
| Long-term loans to customers | 166 | 56 |
|  | 1,060 | 824 |

Net loans to customers are mostly in unlinked NIS.

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### NOTE 6:- LOANS TO CUSTOMERS (Cont.)

a.  In the ordinary course of business, Meitav Dash Trade, a subsidiary, extends credit to its customers at arm's length for financing their stock trading activity. Meitav Dash Trade's customers' securities portfolio serves as a safety cushion for this credit. See also Note 17a(2)(b).

b.  The movement in the allowance for expected credit losses recorded by the Group is as follows:

|  | Year ended December 31, | |
|---|---|---|
|  | **2019** | **2018** |
|  | **NIS in millions** | |
| Balance at beginning of year | 13 | 9 |
| Effect of initial adoption of IFRS 9 carried to retained earnings as of January 1, 2018 | - | 1 |
| Amounts provided in the year against profit or loss: | | |
| Measured in an amount equivalent to expected credit losses in the reporting period | 1 | - |
| Adjustment of specific allowances | 5 | 3 |
| Uncollected trade receivables written off in the year | (1) | - |
| Balance at end of year | 18 | 13 |

| | December 31, 2019 | | | | |
|---|---|---|---|---|---|
| | **Loans to customers for which a specific allowance was recorded** | **Credit provided as loans** | **Loans collateralized by third party endorsed checks** | **Loans to customers collateralized by immobile collaterals** | **Total** |
| Expected credit loss ratio | | 0.30%-1.89% | 0.10% | 0.15% | |
| Gross carrying amount (NIS in millions) | 92 | 130 | 672 | 184 | 1,078 |
| Total allowance for ECLs (NIS in millions) | 17 | - | 1 | - | 18 |

- 58 -

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 6:-  LOANS TO CUSTOMERS (Cont.)**

b. The movement in the allowance for expected credit losses recorded by the Group is as follows: (Cont.)

|  | December 31, 2018 | | | | |
|---|---|---|---|---|---|
|  | Loans to customers for which a specific allowance was recorded | Credit provided as loans | Loans collateralized by third party endorsed checks | Loans to customers collateralized by immobile collaterals | Total |
| Expected credit loss ratio |  | 0.20%-1.24% | 0.13% | 0%-0.1% |  |
| Gross carrying amount (NIS in millions) | 82 | 132 | 559 | 64 | 837 |
| Total allowance for ECLs (NIS in millions) | 12 | - | 1 | - | 13 |

c. Deferred revenues represent the relative portion of discount fees in respect of deferred instrument transactions which have not yet been recognized as revenue in the statement of comprehensive income. The relative portion of income accrued from the date of the deferred instrument transaction through the end of the reporting period is carried as revenues in the statement of comprehensive income. The discount fees are calculated using the effective interest method on the relative portion of the revenue accrued from the date of the deferred instrument transaction through the end of the reporting period.

**NOTE 7:-  TRADE RECEIVABLES**

|  | December 31, | |
|---|---|---|
|  | 2019 | 2018 |
|  | NIS in millions | |
| Open debts *) | 59 | 32 |

*) Mainly management fees receivable from provident funds and managed investment portfolios and variable management fees, collected on a monthly basis.

As of December 31, 2019 and 2018, there are no material open debts in arrears.

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### NOTE 8:-   OTHER ACCOUNTS RECEIVABLE

|  | December 31, | |
|---|---|---|
|  | **2019** | **2018** |
|  | **NIS in millions** | |
| Government authorities | 1 | 1 |
| TASE Clearing House | - | 5 |
| Short-term loan | 5 | 1 |
| Current balance with company accounted for at equity | 1 | - |
| Prepaid expenses | 7 | 7 |
| Receivables for TASE clearing services | 7 | 47 |
| Custodian customers | - | 93 |
| Other | 5 | 10 |
|  | 26 | 164 |

### NOTE 9:-   LONG-TERM INVESTMENTS, LOANS AND RECEIVABLES

|  | December 31, | |
|---|---|---|
|  | **2019** | **2018** |
|  | **NIS in millions** | |
| Investment in financial assets at fair value through other comprehensive income (FVTOCI) (1) | 6 | 5 |
| Loan to related party | - | 13 |
| Long-term loan (2) | 7 | 6 |
| Long-term loans to customers | 166 | 56 |
|  | 179 | 80 |

(1)     On July 21, 2019, the Company signed an investment agreement with Reigo Investments Ltd. ("Reigo") along with other investors, including the Company's CEO and the Company's VP of Alternative Investments. According to the agreement, the Company, the CEO and the VP of Alternative Investments were granted a right to receive minority shares in Reigo based on fulfillment of the conditions stipulated in the agreement. Concurrently with the investment agreement, the Company signed an option agreement for increasing its stake in Reigo to about 21% on a fully diluted basis ("the option transaction"), subject to meeting certain suspending conditions. There is currently no certainty that the suspending conditions underlying the closing of the option transaction will be met or that the option transaction will be completed. Concurrently with the signing of the investment agreement and the option transaction as above, the Company, the Company's CEO and the VP of Alternative Investments entered into a shareholders' agreement with Reigo for founding a new company and settling their rights in the new company. The new company is expected to serve as the general partner of an investment fund that will be founded by the new company. Reigo currently offers a platform for real estate investments focused on lending hard money to first-charge senior loans in the US market. The company employs big data science to improve performance, reduce defaults, increase diversification, and reduce underwriting time.

(2)     As of December 31, 2019 includes the balance of a loan to one of the buyers in the Lotus transaction, see Note 4a(3) above.

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### NOTE 10:- INVESTMENTS IN ASSOCIATES

a.  Composition:

|  | December 31, | |
|---|---|---|
|  | **2019** | **2018** |
|  | **NIS in millions** | |
| Cost of shares | 27 | 16 |
| Post-acquisition earnings, net | 9 | 8 |
|  | 36 | 24 |

b.  Additional information regarding interests in associates:

1.  Apex Issuances Ltd.:

    The Company (indirectly) holds 19.99% of the share capital of Apex Issuances Ltd. which is engaged in the management of underwriting, distribution and consulting for offerings.

2.  Apex Capital Markets Ltd.:

    The Company (indirectly) holds 19.99% of the share capital of Apex Capital Markets Ltd. which is engaged in the management of underwriting, distribution and consulting for offerings.

3.  Value Base Ltd.:

    The Company holds 19.95% of the share capital of Value Base Ltd. which is engaged in investment banking, deal brokerage, M&A, underwriting, hedge fund management and investments and corporate and stock investments.

4.  Peninsula Fund Management Ltd.:

    In January 2016, Peninsula and a third party established a private company that will serve as the general partner in Peninsula Growth Fund for Medium Size Business - Limited Partnership. Peninsula holds 19.99% in the general partner.

5.  Liquidity Capital II, L.P. ("Liquidity"):

    In keeping with Note 4a(2) above, on December 31, 2019, the Company no longer has controlling interests in Liquidity and currently holds 14.28% of the partners' capital.

c.  Movement in investments:

|  | December 31, | |
|---|---|---|
|  | **2019** | **2018** |
|  | **NIS in millions** | |
| Balance at beginning of year | 24 | 21 |
| Company's share of earnings of associates, net | 2 | 3 |
| Investment in associated partnership as of the deconsolidation date | 10 | - |
| Balance at end of year | 36 | 24 |

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### NOTE 11:- PROPERTY, PLANT AND EQUIPMENT

| | Computers and peripheral equipment | Office furniture and equipment | Leasehold improvements | Right-of-use assets *) | Total |
|---|---|---|---|---|---|
| | | | NIS in millions | | |
| Cost: | | | | | |
| Balance at January 1, 2019 | 58 | 16 | 55 | - | 129 |
| Initial adoption of IFRS 16 | - | - | (24) | 201 | 177 |
| Additions during the year | 3 | - | - | 9 | 12 |
| Disposals during the year | - | - | - | (6) | (6) |
| Balance at December 31, 2019 | 61 | 16 | 31 | 204 | 312 |
| Accumulated depreciation: | | | | | |
| Balance at January 1, 2019 | 50 | 11 | 31 | - | 92 |
| Initial adoption of IFRS 16 | - | - | (7) | 7 | - |
| Additions during the year | 3 | 1 | 1 | 22 | 27 |
| Disposals during the year | - | - | - | (1) | (1) |
| Balance at December 31, 2019 | 53 | 12 | 25 | 28 | 118 |
| Depreciated cost at December 31, 2019 | 8 | 4 | 6 | 176 | 194 |

| | Computers and peripheral equipment | Office furniture and equipment | Leasehold improvements | Total |
|---|---|---|---|---|
| | | | NIS in millions | |
| Cost: | | | | |
| Balance at January 1, 2018 | 54 | 16 | 55 | 125 |
| Additions during the year | 4 | - | - | 4 |
| Balance at December 31, 2018 | 58 | 16 | 55 | 129 |
| Accumulated depreciation: | | | | |
| Balance at January 1, 2018 | 46 | 10 | 29 | 85 |
| Additions during the year | 4 | 1 | 3 | 7 |
| Balance at December 31, 2018 | 50 | 11 | 32 | 92 |
| Depreciated cost at December 31, 2018 | 8 | 5 | 23 | 37 |

*)    See Note 2z(1) above regarding the initial adoption of IFRS 16.

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### NOTE 12:- INTANGIBLE ASSETS, NET

    a.    Composition and movement:

| | Excess cost *) | Non-compete | Goodwill | Computer software | Deferred issuance costs | DAC | Total |
|---|---|---|---|---|---|---|---|
| | | | | NIS in millions | | | |
| **Cost:** | | | | | | | |
| Balance at January 1, 2019 | 345 | 5 | 943 | 141 | 32 | 65 | 1,531 |
| Newly consolidated companies | - | - | 26 | - | - | - | 26 |
| Additions during the year | - | - | - | 30 | - | 7 | 37 |
| Balance at December 31, 2019 | 345 | 5 | 969 | 171 | 32 | 72 | 1,594 |
| **Accumulated amortization:** | | | | | | | |
| Balance at January 1, 2019 | 201 | 4 | 30 | 86 | - | 36 | 357 |
| Additions during the year | 33 | 1 | - | 26 | 9 | 9 | 78 |
| Balance at December 31, 2019 | 234 | 5 | 30 | 112 | 9 | 45 | 435 |
| Amortized cost at December 31, 2019 | 111 | - | 939 | 59 | 23 | 27 | 1,159 |

| | Excess cost *) | Non-compete | Goodwill | Computer software | Deferred issuance costs | DAC | Total |
|---|---|---|---|---|---|---|---|
| | | | | NIS in millions | | | |
| **Cost:** | | | | | | | |
| Balance at January 1, 2018 | 323 | 5 | 942 | 113 | - | 59 | 1,442 |
| Reclassification of deferred issuance costs to ETF segment **) | - | - | - | - | 31 | - | 31 |
| Additions during the year | 22 | - | 1 | 28 | 1 | 6 | 58 |
| Balance at December 31, 2018 | 345 | 5 | 943 | 141 | 32 | 65 | 1,531 |
| **Accumulated amortization:** | | | | | | | |
| Balance at January 1, 2018 | 167 | 3 | 30 | 65 | - | 27 | 292 |
| Additions during the year | 34 | 1 | - | 21 | - | 9 | 65 |
| Balance at December 31, 2018 | 201 | 4 | 30 | 86 | - | 36 | 357 |
| Amortized cost at December 31, 2018 | 144 | 1 | 913 | 55 | 32 | 29 | 1,174 |

    *)    Excess cost mainly allocated to customer relations in respect of management of provident funds, mutual fund and portfolios, non-bank loans, securities trading services for private customers and insurance agencies totaling approximately NIS 102 million and brand name totaling approximately NIS 9 million (December 31, 2019 - NIS 133 million and NIS 11 million, respectively).

    **)    See Note 1a(3) above regarding Amendment 28.

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### NOTE 12:- INTANGIBLE ASSETS, NET (Cont.)

b.    Amortization expenses:

Amortization expenses of intangible assets are classified in profit or loss as follows:

|  | Year ended December 31, | | |
| --- | --- | --- | --- |
|  | **2019** | **2018** | **2017** |
|  | **NIS in millions** | | |
| Marketing, operating, general and administrative expenses | 35 | 30 | 24 |
| Other expenses | 43 | 35 | 37 |
| Total | 78 | 65 | 61 |

c.    Testing the impairment of cash-generating units including goodwill:

In order to test the impairment of goodwill, the goodwill was allocated to cash-generating units as follows:

1.    Managing current savings.
2.    Managing provident funds and pension funds.
3.    Brokerage.
4.    Managing insurance agency - Rimonim.
5.    Managing insurance agencies - Y.K.V and Kariv.
6.    Managing insurance agency - Sela.
7.    Non-bank loans - Peninsula Group.

As of December 31, 2019 and 2018, the carrying amount of goodwill allocated to each cash-generating unit of the above intangible assets is as follows:

| | Managing current savings | Managing provident and pension funds | Brokerage | Managing insurance agencies (see below) | Non-bank credit | Other | Unallocated temporary goodwill (1) | Total allocated to cash-generating units |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | **December 31, 2019** | | | | |
| | | | | **NIS in millions** | | | | |
| Goodwill | 449 | 368 | 10 | 39 | 46 | 1 | 26 | 913 |

(1)    The goodwill will be allocated after completing the PPA.

| | Sela | Y.K.V and Kariv | Rimonim | Total allocated to managing insurance agencies |
| --- | --- | --- | --- | --- |
| | | **December 31, 2019** | | |
| | | **NIS in millions** | | |
| Goodwill | 8 | 23 | 8 | 39 |

**MEITAV DASH INVESTMENTS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

## NOTE 12:- INTANGIBLE ASSETS, NET (Cont.)

c.  Testing the impairment of cash-generating units including goodwill: (Cont.)

| | Managing current savings | Managing provident and pension funds | Brokerage | Managing insurance agencies (see below) | Non-bank credit | Other | Total allocated to cash-generating units |
|---|---|---|---|---|---|---|---|
| | | | | December 31, 2018 | | | |
| | | | | NIS in millions | | | |
| Goodwill | 449 | 368 | 10 | 39 | 46 | 1 | 913 |

| | Sela | Y.K.V and Kariv | Rimonim | Total allocated to managing insurance agencies |
|---|---|---|---|---|
| | | December 31, 2018 | | |
| | | NIS in millions | | |
| Goodwill | 8 | 23 | 8 | 39 |

As of the reporting date, management believes that no changes have occurred in the following underlying assumptions that are liable to cause the carrying amount of intangible assets to exceed their recoverable amount.

1.  Managing current savings:

    a)  Managing ETFs:

    The Company conducted the annual test of impairment of goodwill on June 30, 2019 in respect of the cash-generating unit of ETF management. The recoverable amount of assets allocated to managing ETFs is determined based on the fair value which is derived from the discounted cash flows ("DCF") method. For the calculation of the fair value, the Company used forecasts regarding future income derived from the scope of managed assets as of June 30, 2019 based on its profits for the period ended June 30, 2019, its expected future profits, evaluations of a future growth rate of 2.5% and a discount rate of about 10.5%. The recoverable amount exceeds the unit's carrying amount and, accordingly, no provision for impairment is required.

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 12:- INTANGIBLE ASSETS, NET (Cont.)**

    c.    Testing the impairment of cash-generating units including goodwill: (Cont.)

        1.    Managing current savings: (Cont.)

            b)    Managing portfolios and mutual funds:

                The Company conducted the annual test of impairment of goodwill on June 30, 2019 in respect of the cash-generating unit of portfolio and mutual fund management. The recoverable amount of assets allocated to portfolio and mutual fund management is determined based on the value in use which is derived from the DCF method. For the calculation of the pre-tax value in use using the DCF method, the Company used forecasts regarding future income derived from the scope of managed assets as of June 30, 2019 based on its profits for the period ended June 30, 2019, its expected future profits, evaluations of a future growth rate of 2.5% and a pre-tax discount rate of about 10.3%. The recoverable amount exceeds the unit's carrying amount and, accordingly, no provision for impairment is required.

        2.    Managing provident funds and pension funds:

            The Company conducted the annual test of impairment of goodwill on September 30, 2019 in respect of the cash-generating unit of provident and pension fund management. The recoverable amount of assets allocated to provident and pension fund management is determined based on fair value and using the DCF method. For the calculation of the fair value using the DCF method, the Company used forecasts regarding future income derived from the scope of managed assets as of September 30, 2019 based on its profits for the period ended September 30, 2019, its expected future profits, evaluations of a future growth rate of 2.5% and a discount rate of about 10.1%. The recoverable amount exceeds the unit's carrying amount and, accordingly, no provision for impairment is required.

        3.    Brokerage:

            The Company conducted the annual test of impairment of goodwill on September 30, 2019 in respect of the cash-generating unit of brokerage. The recoverable amount of assets allocated to the cash-generating unit of brokerage is determined based on the value in use, derived from using the DCF method. For the calculation of the pre-tax value in use using the DCF method, the Company used forecasts regarding future income derived from the profits of Meitav Dash Brokerage Ltd. in the period ended September 30, 2019, its expected future profits, evaluations of a future growth rate of 2% and a pre-tax discount rate of about 17.6%. The recoverable amount exceeds the unit's carrying amount and, accordingly, no provision for impairment is required.

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### NOTE 12:- INTANGIBLE ASSETS, NET (Cont.)

    c.    Testing the impairment of cash-generating units including goodwill: (Cont.)

        4.    Insurance activity - Y.K.V and Kariv:

The Company conducted the annual test of impairment of goodwill on September 30, 2019 in respect of the cash-generating unit of the insurance activity of Y.K.V Insurance Agencies Ltd. ("Y.K.V") and Kariv Insurance Agencies Ltd. ("Kariv"). The recoverable amount of assets allocated to the insurance activity cash-generating unit is determined based on the value in use which is derived from the DCF method. For the calculation of the pre-tax value in use using the DCF method, the Company used forecasts regarding future income derived from the profits from the insurance activity for the period ended on September 30, 2019, evaluations of a future growth rate of 2% and a pre-tax discount rate of about 17.7%. The recoverable amount exceeds the unit's carrying amount and, accordingly, no provision for impairment is required.

        5.    Insurance agency management - Rimonim:

The recoverable amount of assets allocated to the Rimonim insurance agency cash-generating unit is determined based on the value in use which is derived from the DCF method. For the calculation of the pre-tax value in use using the DCF method, the Company used forecasts regarding future income derived from Rimonim's profits for the period ended December 31, 2019, its expected future profits, evaluations of a future growth rate of 0.5% and a pre-tax discount rate of about 12.3%. The recoverable amount exceeds the unit's carrying amount and, accordingly, no provision for impairment is required. The Rimonim insurance agency management unit consists of the probability of changes in the key assumptions used in calculating the fair value of the unit which are likely to cause the carrying amount of the unit to significantly exceed its recoverable amount.

        6.    Insurance agency management - Sela:

The recoverable amount of assets allocated to the Sela insurance agency cash-generating unit is determined based on the value in use which is derived from the DCF method. For the calculation of the pre-tax value in use using the DCF method, the Company used forecasts regarding future income derived from Rimonim's profits for the period ended December 31, 2019, its expected future profits, evaluations of a future growth rate of 2% and a pre-tax discount rate of about 16.4%. The recoverable amount exceeds the unit's carrying amount and, accordingly, no provision for impairment is required.

        7.    Non-bank loans - Peninsula Group:

The quoted market price of the shares of Peninsula Group on the TASE as of December 31, 2019 exceeded their carrying amount. Therefore, the recoverable amount exceeds the unit's carrying amount and, accordingly, no provision for impairment is required.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

### NOTE 13:- CREDIT FROM BANKS AND CURRENT MATURITIES OF DEBENTURES

| | Interest rate 2019 % | December 31, 2019 | | | | December 31, 2018 | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Unlinked | Linked to foreign currency | CPI-linked | Total | Unlinked | CPI-linked | Total |
| | | | | | NIS in millions | | | |
| Short-term credit | (1) (2) | 4 | 13 | - | 17 | 21 | - | 21 |
| Credit to finance non-bank loans | (1) (3) | 396 | - | - | 396 | 344 | - | 344 |
| Current maturities of long-term loans | (4) | 9 | - | - | 9 | 9 | - | 9 |
| Current maturities of debentures | (4) | 14 | - | 87 | 101 | - | 87 | 87 |
| Current maturities of subsidiary's debentures | (4) | 144 | - | - | 144 | 112 | - | 112 |
| | | 567 | 13 | 87 | 667 | 486 | 87 | 573 |

(1)    As of December 31, 2019, the Prime interest rate is 1.75%.

(2)    An amount of NIS 12 million is linked to the Euro and bears interest of Libor+1.1%. As of December 31, 2019, the Libor interest rate is (0.26%). A NIS bank deposit bearing annual interest of 0.5% has been pledged to secure this loan.

(3)    An amount of NIS 271 million is linked to the Prime interest rate less 0.3% and an amount of NIS 125 million is linked to the BOI interest rate plus a margin of 0.85%.

(4)    See Note 16 below.

Credit - Peninsula Group

On November 28, 2018, Peninsula Group issued commercial paper (CP) totaling NIS 125 million which are short-term securities that can be repaid within seven business days. The balance of the commercial paper bears annual interest at the BOI interest rate plus a margin of 0.85%, is repayable in a lump sum at the end of the first anniversary from the date of issue. The term of the commercial paper can be extended with the parties' consent (each of the investors individually and Peninsula Group) by additional one-year periods each up to a maximum five years.

The BOI interest rate as of December 31, 2019 is 0.25%.

Near the date of publication of the financial statements, Peninsula nearly completed the full repayment of the commercial paper series issued to classified investors which on the issue date amounted to NIS 125 million.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
_____

**NOTE 13:- CREDIT FROM BANKS AND CURRENT MATURITIES OF DEBENTURES (Cont.)**

Credit - Peninsula Group (Cont.)

Liens and financial covenants

To secure the above liabilities and guarantees, Peninsula recorded current charges on its property, assets and insurance rights therefrom, fixed charges on its share capital, goodwill, its right to tax exemption and/or relief and/or discount and on its securities, documents and notes. Peninsula also recorded a floating charge on its entire assets, funds, property and rights of any type that are or will be owned by it in the future, including all deposits in NIS and in foreign currency and the rights therefrom that are placed in the banks.

To the best of Peninsula's knowledge, the banks that finance its operations have signed an interbank agreement according to which to secure Peninsula's liabilities to the banks that have signed the interbank agreement, Peninsula must record in favor of these banks a general current charge that is equal in degree and rights (pari passu) to the charges recorded in favor of other lending banks.

The lending banks may place the loans provided to Peninsula to immediate repayment if: (1) Peninsula decides or intends to execute a restructuring process without obtaining the lenders' advance written consent; (2) a restructuring process has been executed without the lenders' advance written consent; or (3) the lenders consider, at their exclusive discretion, that a change in ownership or control of Peninsula has occurred.

The terms of Peninsula's engagements with the banks impose a general current charge on Peninsula's entire assets as well as various restrictions, including the requirement to meet certain financial covenants.

Peninsula is required to maintain the following leverage ratios, as demanded by the credit providing banks:

1. Towards bank A:

   - Peninsula has undertaken that the entire credit facilities received from the bank will be used to finance its customers at a rate of up to 85% of the advance for each invoice paid to customers. The balance of the invoice (15%) will be financed using Peninsula's own capital.
   - Peninsula has undertaken that the ratio of its equity to total balance sheet will not be lower than the higher of (a) 15% of the balance sheet; or (b) NIS 27 million. In order to calculate the ratio, the total amount of deposits and cash will be subtracted from the total amount of credit up to an amount of NIS 60 million.
   - Peninsula has undertaken that an individual debtor's debt will not exceed the lower of (1) 10% of the total debt in its balance sheet; or (2) 25% of its equity.
   - The aggregate (net) debt of Peninsula's ten largest debtors will not exceed 120% of its equity.
   - Peninsula has undertaken to hold a credit insurance policy according to which the compulsory insurance of Peninsula's entire transactions will not be lower than the higher of: (1) 16% of its total net factoring transactions; or (2) $ 18 million.
   - Peninsula has undertaken to obtain at least an A rating from an insurance company based on international ratings.
   - Peninsula has undertaken to deposit an overall amount of deferred deliverables at a rate of at least 90% of Peninsula's outstanding bank debt.

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 13:-  CREDIT FROM BANKS AND CURRENT MATURITIES OF DEBENTURES (Cont.)**

Credit - Peninsula Group (Cont.)

Liens and financial covenants (Cont.)

2.    Towards bank B:

- Peninsula has undertaken not to extend any loans to its interested parties and not to repay ant existing or future loans to its interested parties in an amount that exceeds NIS 200 thousand per annum, excluding the remuneration paid to its officers and shareholders, as customary in other companies that are similar in nature to Peninsula, without the bank's advance written consent.

- Peninsula has undertaken to maintain a cross default provision – if it violates any undertaking and/or agreement and/or document towards a bank or another lender in connection with loans provided by the former and/or if any of Peninsula's creditors become entitled to demand early or immediate repayment of Peninsula's debts thereto which exceed NIS 100 thousand, the default will represent grounds for the bank to place the credit and debt for immediate repayment.

- Peninsula has undertaken to maintain a ratio of tangible equity to balance sheet assets less financial assets of at least 15%.

- Peninsula has undertaken that the ratio of overall credit received/receivable by it from all banks and/or other financial institutions (net of cash, cash equivalents and bank deposits that are not restricted by a fixed lien) will not exceed 85% of its total invoices and deliverables which Peninsula finances in the ordinary course of business.

- Peninsula has undertaken that the overall amount of invoices and checks of an individual debtor: (a) will not exceed 10% of total credit extended by it in factoring and check discounting transactions; (b) will not exceed 33% of its total equity; and (c) in any event will not exceed NIS 10 million of the insured amount.

- Peninsula will not record a net loss during four consecutive quarters from the first quarter of 2013.

- Peninsula has undertaken not to perform any factoring and check discounting transactions without valid credit insurance unless with the bank's advance written consent.

- According to the insurance policy which Peninsula has undertaken to hold, Peninsula's debtors' insurance will not be lower than $ 25 million. Peninsula's deductible will not exceed 10% of the insured amount.

- Every calendar year, Peninsula will be entitled to pay management fees provided that its annual income (according to its annual financial statements) is at least NIS 2.5 million and provided that no default event has occurred, and will also be entitled to distribute every calendar year a dividend (as this term is defined in the Companies Law) in an amount that is equivalent to its annual net income less NIS 2.5 million, provided that no default event has occurred.

- Peninsula has undertaken that in any event that any other collateral of any type is created, recorded and/or granted by it to any of the other banks and/or to another third party, it will create, record and/or grant the bank identical or equivalent collateral.

- Peninsula has undertaken to deposit an overall amount of deferred deliverables at a rate of at least 100% of its outstanding bank debt (net of the deposits).

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 13:- CREDIT FROM BANKS AND CURRENT MATURITIES OF DEBENTURES (Cont.)**

Credit - Peninsula Group (Cont.)

Liens and financial covenants (Cont.)

3.    Towards bank C:

- Peninsula has undertaken that the ratio of its outstanding liabilities to financial and other lending institutions net of cash deposited in financial institutions, as presented in the financial statements, to its equity will not exceed 6 at all times.
- Peninsula has undertaken that the debt of an individual debtor towards it will not exceed 5% of its total debtors, unless with the bank's advance written consent.
- The scope of Peninsula's debtors' credit insurance will not be lower than $ 35 million at all times.
- Peninsula has undertaken to deposit deferred deliverables which are and/or whose rights are pledged in favor of the bank based on the principles agreed upon with the bank in an overall amount that will not be lower than 100% of its total debts and liabilities to the bank.
- Peninsula has undertaken that the total deferred deliverables deposited by it in the bank's accounts and withdrawn by the same entity will not exceed at tall times the lower of: (i) 4% of total deferred deliverables; or (ii) NIS 20 million.
- Peninsula has undertaken that its tangible equity (the equity presented in the financial statements with the addition of outstanding shareholders' loan principals for which the bank, Peninsula and its shareholders signed subordinated loan agreements, and less: (a) intangible assets such as: goodwill, patents, trademarks, tradenames, copyright etc.; (b) Peninsula's receivables which consist of interested parties and/or subsidiaries and/or related companies; (c) guarantees provided by Peninsula to secure the debts of interested parties and/or subsidiaries and/or related companies; (d) investments in investees/subsidiaries/related companies; (e) non-controlling interests (formerly: minority interests) presented in equity (in consolidated financial statements); (f) revaluation reserve in respect of property, plant and equipment created as a result of the adoption of a revaluation model in the period after drafting the financial covenants; (g) deferred tax asset; (h) its deferred charges will not be lower than an amount equivalent to 15% of Peninsula's subsidiary's total balance sheet (less cash).
- Peninsula will not incur a net loss in four consecutive quarters.

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 13:- CREDIT FROM BANKS AND CURRENT MATURITIES OF DEBENTURES (Cont.)**

Credit - Peninsula Group (Cont.)

Liens and financial covenants (Cont.)

4.      Towards bank D:

- Peninsula has undertaken that its equity will not be lower than NIS 27 million or that the ratio of its equity to balance sheet (less cash and deposits in its account) will not be lower than 15%, whichever is higher.
- Peninsula has undertaken that its total net financial credit (less cash and deposits in its account) will not exceed 85% of total debtors' portfolio at all times.
- Peninsula has undertaken that an individual debtor's debt will not exceed the lower of (1) 7.5% of the total debt in its balance sheet or (2) 25% of its equity.
- The aggregate (net) debt of Peninsula's ten largest debtors will not exceed 120% of its equity.
- Peninsula has undertaken to deposit an overall amount of deferred deliverables at a rate of at least 90% of total actually utilized credit in its account.
- Peninsula will not record a net loss during four consecutive quarters.
- Peninsula will be insured by a credit insurance company so that the scope of its debtors' credit insurance will not be lower than $ 40 million at all times.

As of the reporting date, Peninsula is meeting the restrictions and financial covenants imposed by virtue of the various loans received from banks in Israel.

**NOTE 14:- LIABILITIES FOR SHORT SALE OF SECURITIES**

|  | December 31, | |
|---|---|---|
|  | **2019** | **2018** |
|  | **NIS in millions** | |
| Shares (1) | 4 | 4 |
| Short-term Government loans | 30 | - |
| Derivatives | 6 | 4 |
| Corporate debentures | 15 | 2 |
|  | 55 | 10 |

(1)     Liabilities in respect of securities arise from short sale of borrowed marketable securities.

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### NOTE 15:- OTHER ACCOUNTS PAYABLE

|  | December 31, | |
|---|---|---|
|  | **2019** | **2018** |
|  | **NIS in millions** | |
| Employees and payroll accruals | 65 | 58 |
| Government authorities | 14 | 7 |
| Payables for acquisition of shares *) | 13 | 10 |
| Refund of management fees to institutional entities | 9 | 11 |
| Accrued expenses | 27 | 17 |
| TASE Clearing House | 3 | - |
| Current maturities of lease liabilities | 19 | 3 |
| Payables for clearing services | 6 | 40 |
| Custodian customers | 12 | 116 |
| Liability to subsidiary's shareholders | 31 | 29 |
| Other payables | 10 | 14 |
|  | 209 | 305 |

### NOTE 16:- NON-CURRENT LIABILITIES

a.    Composition:

**December 31, 2019**

|  | Principal amount NIS in millions | Stated interest rate % | Effective interest rate % | Balance | Balance less current maturities |
|---|---|---|---|---|---|
|  |  |  |  | **NIS in millions** | |
| Loans from banks (1) | 21 | 3.03 | 3.03 | 21 | 12 |
| Debentures (series C) (2) (3) | 521 | 3.95 | 1.08-4.27 | 539 | 452 |
| Debentures (series D) | 270 | 2.11 | 2.26 | 268 | 254 |
| Subsidiary's debentures | 335 | 1.4-1.5 | 1.9-2.3 | 335 | 191 |
|  | 1,147 |  |  | 1,162 | 909 |

**December 31, 2018**

|  | Principal amount NIS in millions | Stated interest rate % | Effective interest rate % | Balance | Balance less current maturities |
|---|---|---|---|---|---|
|  |  |  |  | **NIS in millions** | |
| Loans from banks (1) | 106 | 2.8-3.03 | 2.8-3.03 | 106 | 97 |
| Debentures (series C) (2) (3) | 606 | 3.95 | 1.08-4.27 | 630 | 543 |
| Subsidiary's debentures | 238 | 1.4-1.5 | 1.9-2.3 | 238 | 126 |
|  | 950 |  |  | 974 | 766 |

(1)    The loans are not designed for specific use.
(2)    The principal and interest are linked to the CPI.
(3)    As for a hedge transaction, see c(3) below.

**MEITAV DASH INVESTMENTS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**NOTE 16:- NON-CURRENT LIABILITIES (Cont.)**

b.    Maturity dates after the statement of financial position date as of December 31, 2019:

| | First year | Second year | Third year | Fourth year | Fifth year | Sixth year and onwards*) | Total |
|---|---|---|---|---|---|---|---|
| | | | | NIS in millions | | | |
| Loans from banks | 9 | 9 | 3 | - | - | - | 21 |
| Debentures (series C) | 87 | 87 | 87 | 87 | 87 | 104 | 539 |
| Debentures (series D) | 14 | 14 | 14 | 14 | 14 | 198 | 268 |
| Subsidiary's debentures | 144 | 144 | 47 | - | - | - | 335 |
| | 254 | 254 | 151 | 101 | 101 | 302 | 1,163 |

*)    Final maturity in 2029.

c.    The Company's debentures (series C):

1.    On November 28, 2010, the Company issued a shelf prospectus (which was amended on December 7, 2010). On December 21, 2010, in the context of a shelf offering report issued according to the prospectus, the Company raised approximately NIS 296 million (less issuance expenses) in debentures (series C). According to the offering report, the Company offered to the public NIS 300 million par value of debentures (series C). The annual effective interest rate of the debentures is 4.12%.

The debentures (series C) are repayable in 14 equal installments on December 10 in each of the years 2012 through 2025, bearing annual interest of 3.95% and linked (principal and interest) to the CPI. Moreover, the interest will be paid semiannually from June 10, 2011 through December 10, 2025. As for financial covenants, see d below.

In 2012-2018, the Company expanded the series of debentures (series C) and issued approximately NIS 697.34 million par value each for total proceeds of approximately NIS 744.6 million less issuance expenses at CPI linked effective interest rates ranging between 1.08% and 4.27%.

As of the financial statement date, the Company has NIS 489 million par value of debentures (series C).

- 74 -

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

## NOTE 16:- NON-CURRENT LIABILITIES (Cont.)

    c.    The Company's debentures (series C): (Cont.)

        2.    Adjustment of interest rate on the debentures (series C) due to lowered rating:

In the event that the rating of debentures (series C) by a rating agency is updated during any interest period to one or more levels lower than A1 ("the downgraded rating" and "the original rating", respectively), the annual interest rate borne by the unsettled principal balance of the debentures (series C) will be annually raised by 0.25% above an interest rate of 3.95% for each level below the original rating up to a rating of Baa2 ("the additional interest rate"). The additional interest rate will be paid for the period beginning on the date of announcement of the downgraded rating until the full repayment of the unsettled principal balance of the debentures (series C) or until the upgrading of the rating of the debentures (series C) by one or more levels upon which for each upgrading of the rating of the debentures (series C) by one level, the additional interest rate will be lowered by 0.25% in such a manner that in any event, the interest rate will not be lower than 3.95%.

It is clarified that increasing the interest rate as described above will only be done up to a rating of Baa2 whereby even if a rating that is lower than Baa2 is assigned to the debentures (series C), the interest rate will not be further increased.

On June 23, 2019, Midroog reaffirmed the rating of the debentures (series C) at A1.il with a stable outlook.

        3.    Hedges:

On October 30, 2013, the Company's Board approved entering into hedges for part of the debentures (series C) in a maximum amount of NIS 300 million through interest rate swap ("IRS") transactions with Israeli banks to hedge against the exposure to the CPI by swapping the CPI-linked coupon (principal and interest) with a fixed coupon. On November 14, 2013, the Company and a bank entered into a hedge on a balance of debentures in the amount of approximately NIS 50 million with the addition of stated interest of 6.46% on said balance. On July 2, 2014, the Company and another bank entered into another hedge on a balance of debentures in the amount of approximately NIS 50 million with the addition of stated interest of 6.35% on said balance. The Company occasionally considers entering into additional hedges based on market terms.

The hedges are accounted for in the financial statements as effective hedges on the expected cash flows from the balance of the hedged debentures. As of the financial statement date, the hedged par value amounted to approximately NIS 48 million and the fair value of the hedges amounted to approximately NIS 2 million, recognized in short-term and long-term payables.

**MEITAV DASH INVESTMENTS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

## NOTE 16:- NON-CURRENT LIABILITIES (Cont.)

d.    The Company's debentures (series D):

1.    On February 27, 2019, the Company issued a shelf prospectus by virtue of which it may issue different types of securities as allowed by applicable law. The securities included in the shelf prospectus will be offered in shelf offering reports which will consist of all the details pertaining to each specific offering such as the composition of the offered units and other terms and method of allocation of the offered securities as they will be on the offering date.

On October 30, 2019, the Company's Board made a master decision to authorize the Company's management to act for raising debt by issuing a new series of debentures (series D) to the public through a shelf offering report based on the Company's shelf prospectus of February 28, 2019.

On November 27, 2019, Midroog rated the debentures (series D) at A1.il with a stable outlook for raising up to approximately NIS 270 million.

On November 28, 2019, based on the shelf offering report issued according to the shelf prospectus as above, the Company raised approximately NIS 270 million par value of debentures (series D) in consideration of approximately NIS 267.6 million (less issuance expenses). The annual effective interest rate of the debentures (series D) is 2.26%.

The debentures (series D) are repayable in 10 unequal installments as follows: (1) six equal installments payable on December 10 of each of the years 2020 through 2025 whereby each installment will account for 5% of the overall principal of the debentures (series D); (2) four equal installments payable on December 10 of each of the years 2026 through 2029 whereby each installment will account for 17.5% of the overall principal of the debentures (series D). The debentures (series D) bear annual nominal interest of 2.11%. In addition, the interest will be paid semiannually from June 10, 2020 to December 10, 2029. See paragraph e below for the financial covenants underlying the debentures (series D).

As of the financial statement date, the Company has NIS 270 million par value of debentures (series D).

**MEITAV DASH INVESTMENTS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**NOTE 16:- NON-CURRENT LIABILITIES (Cont.)**

    d.    The Company's debentures (series D): (Cont.)

        2.    Adjustment of interest rate on the debentures (series D) due to lowered rating:

In the event that the rating of the debentures (series D) by a rating agency is downgraded during any interest period to two levels lower than A1.il ("the downgraded rating") based on the rating of Midroog (or lower than a rating of A+ by S&P Global Ratings Maalot Ltd. or a corresponding rating) ("the original rating"), the annual interest rate borne by the unsettled principal balance of the debentures (series D) will be annually raised by 0.5% above the interest rate on the balance ("the original interest" and "the additional interest", respectively) for the period beginning on the date of announcement of the downgraded rating until the full repayment of the unsettled principal balance of the debentures (series D) or alternatively until the upgrading of the rating of the debentures (series D) back to one level below the original rating or a higher rating, whichever is sooner. The interest rate borne by the debentures (series D) will also be updated in the event of additional lowering/s of the rating below the downgraded rating in a manner that: (a) if the rating determined is lower by one level than the downgraded rating ("the second downgraded rating"), the annual interest rate borne by the unsettled principal balance of the debentures (series D) will be raised by another 0.25% above the additional interest to be equal to the original interest plus 0.75% ("the second additional interest"); (b) in any event that the rating determined is lower than the second downgraded rating, the annual interest rate borne by the unsettled principal balance of the debentures (series D) will not exceed the second additional interest, all until the full repayment of the unsettled principal balance of the debentures (series D) or alternatively until the raising of the downgraded rating back to one level above the second downgraded rating as applicable, whichever is sooner.

It is clarified that insofar as an interest rate adjustment is required for both the mechanism described above and the mechanism described in paragraph f(2) below due to noncompliance with the financial covenants underlying the debentures (series D), then in any event the maximum cumulative annual interest rate borne by the unsettled principal balance of the debentures (series D) will be the original interest plus 1%.

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### NOTE 16:- NON-CURRENT LIABILITIES (Cont.)

  e.  Investee's debentures:

    1.  On April 9, 2017, Peninsula issued the results of the issuance of debentures (series A) based on a shelf offering report of April 5, 2017, which was based on a shelf prospectus issued by Peninsula on January 27, 2017. The debentures were rated by S&P Maalot on April 5, 2017 at Ail.

      The debentures (series A) bear fixed annual interest at a rate of 1.4% and are not linked (principal or interest) to any index. The total immediate proceeds from the public offering less issuance expenses amounted to approximately NIS 222.4 million.

      The debenture principal is repayable in eight equal quarterly consecutive installments, each accounting for 12.5% of the overall value of the debentures, from April 1, 2018. The interest on the unsettled balance of the debentures will be paid in 11 quarterly installments from July 1, 2017.

      On January 1, 2020, Peninsula made a full and final repayment of the debentures (series A) in keeping with the series' maturity dates.

    2.  On April 23, 2018, Peninsula issued a shelf offering report according to which it offered to the public 100,188 thousand debentures (series B) of NIS 1 par value each.

      The debentures bear fixed annual interest of 1.5% and are not linked (principal or interest) to any index. The immediate proceeds from the public offering less issue expenses amounted to approximately NIS 97.9 million.

      The debenture principal is repayable in eight equal consecutive quarterly installments of 12.5% each of the overall principal from April 1, 2020. The interest on the unsettled principal balance of the debentures is payable in 15 quarterly installments from July 1, 2018.

      On July 16, 2019, Peninsula completed the issue of NIS 207,971 thousand par value of debentures (series B) of NIS 1 par value each by way of series expansion. The debentures bear fixed annual interest of 1.5% and are (principal and interest) linkage free. Total immediate proceeds of the public offering less issue expenses amounted to approximately NIS 207.4 million. The debenture principal is repayable in eight consecutive quarterly installments from April 1, 2020.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

## NOTE 16:- NON-CURRENT LIABILITIES (Cont.)

f. Financial covenants:

1. Debentures (series C):

The Company undertook that as long as the debentures (series C) are outstanding, it will meet the following financial covenants. If the Company fails to meet any of these covenants at each reporting date of five consecutive quarters, this will constitute grounds for placing the debentures for immediate repayment.

The shelf offering report of the debentures (series C) which is based on the consolidated financial statements establishes the following financial covenants:

a) Debt coverage ratio (net financial debt to NOI):

"Net financial debt" is defined as current liabilities, consisting of credit from banks and others, with the addition of non-current liabilities, consisting of loans from banks and debentures, less current assets, consisting of cash and cash equivalents, short-term investments and loans to customers, and less non-current assets, consisting of investments, loans and receivables. It should be clarified that the components of net financial debt do not include assets that are (fully or proportionately) consolidated in the Company's financial statements in respect of financial instruments of SPCs that have been and/or will be issued and/or have been and/or will be purchased by the Company.

"Net operating income" (NOI) is defined as the Company's consolidated accounting operating income in the quarter less expenses for share-based payment (as defined in IFRS 2, "Share-based Payment"). If the Company issues pro forma financial statements (as defined in Regulation 9a to the Israel Securities Regulations (Periodic and Immediate Reports), 1970), then for each quarter of issuing pro forma financial statements, the interim NOI will be extracted from the pro forma statements.

The Company has undertaken that its cumulative debt coverage ratio at the end of each quarter in the last calendar quarters will not exceed 6.

b) Minimum equity:

"Equity" is defined as the equity attributable to equity holders of the Company according to the consolidated financial statements (excluding non-controlling interests).

The Company has undertaken that as long as its debentures (series C) are outstanding, the Company's equity will not be lower than NIS 100 million.

As of the date of the financial statements, the Company is meeting the financial covenants in respect of the debentures (series C) as described above.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**NOTE 16:- NON-CURRENT LIABILITIES (Cont.)**

    f.    Financial covenants: (Cont.)

        1.    Debentures (series C): (Cont.)

Following are the results of the Company's compliance with the financial covenants as of the relevant cutoff dates:

| Date | Debt coverage ratio | Minimum equity |
|------|---------------------|----------------|
| | | **NIS in millions** |
| March 31, 2019 | (0.16) | 839 |
| June 30, 2019 | (0.20) | 848 |
| September 30, 2019 | (0.59) | 858 |
| December 31, 2019 | (0.35) | 856 |

        2.    Debentures (series D):

        a)    Interest rate adjustment mechanism in the event of noncompliance with financial covenants:

The interest rate borne by the debentures (series D) will be adjusted for noncompliance with any of the following financial covenants:

(1)    The Company's equity in its latest audited or reviewed standalone financial statements, as applicable, will not be lower than NIS 450 million.

(2)    The ratio of net financial debt to operating income (as defined below) will not exceed 5.

(3)    The ratio of net financial debt to net CAP (as defined below) will not exceed 65%.

In this context:

"Net financial debt" is defined as the Company's total liabilities in respect of issued debentures, loans from banks and from financing corporations, less cash and short-term investments as disclosed in the Company's latest audited or reviewed consolidated financial statements, as applicable, with the exclusion of consolidated corporations that are engaged in providing credit, factoring, purchasing debt or trade receivables or extending loans, as they will be from time to time.

**MEITAV DASH INVESTMENTS LTD.**

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 16:- NON-CURRENT LIABILITIES (Cont.)**

      f.     Financial covenants: (Cont.)

           2.     Debentures (series D): (Cont.)

               a)     Interest rate adjustment mechanism in the event of noncompliance with financial covenants: (Cont.)

"Operating income" is defined as the Company's consolidated operating income as disclosed in the Company's audited or reviewed consolidated financial statements, as applicable, for the last four quarters less the operating profit or loss arising from consolidated corporations that are engaged in providing credit, factoring, purchasing debt or trade receivables or extending loans, as they will be from time to time.

"Net CAP" is defined as net financial debt with the addition of the Company's total consolidated equity (including non-controlling interests), all as disclosed in the Company's latest audited or reviewed consolidated financial statements, as applicable, less the above values deriving from consolidated corporations that are engaged in providing credit, factoring, purchasing debt or trade receivables or extending loans, as they will be from time to time.

The additional interest rate is defined as an interest increment of 0.25% per annum for noncompliance with any of the above financial covenants for the purpose of changing the interest up to a maximum of 0.5% and in any event it is clarified that insofar as the interest rate will need to be adjusted for the above mechanism and for the mechanism described in paragraph d(2) above due to the change in the rating of the debentures (series D), the maximum cumulative interest rate of the annual interest borne by the unsettled principal balance of the debentures (series D) will be the original interest with the addition of 1%.

               b)     Distribution commitment:

The Company has committed that unless the above mentioned conditions are met, it will not make any type of distribution (as defined in the Israeli Companies Law) and will not declare, pay or distribute any dividend until the date of the full, final and exact settlement of the debt according to the terms of the debentures (series D) and the fulfillment of all of the Company's other liabilities to the holders of the debentures (series D):

     (1)     The Company's equity in its latest audited or reviewed standalone financial statements, as applicable, before the approval of any distribution will not be lower than NIS 450 million.

     (2)     The ratio of net financial debt to operating income (as defined above) before the approval of any distribution will not exceed 4.5.

     (3)     The ratio of net financial debt to net CAP (as defined above) before the approval of any distribution will not exceed 60%.

**MEITAV DASH INVESTMENTS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**NOTE 16:- NON-CURRENT LIABILITIES (Cont.)**

    f.    Financial covenants: (Cont.)

        2.    Debentures (series D): (Cont.)

            c)    Placement for immediate repayment:

The trustee or the holders of the debentures (series D) will be entitled to place the unsettled balance of the debentures (series D) for immediate repayment upon the occurrence of one or more of the following events:

(1)    The Company's equity in its latest audited or reviewed standalone financial statements, as applicable, falls below NIS 400 million.

(2)    The ratio of net financial debt to operating income (as defined above) exceeds 5.5.

(3)    The ratio of net financial debt to net CAP (as defined above) exceeds 65%.

(4)    The rating of the debentures (series D) by Midroog is lowered below Baa3 (exclusive) or to a corresponding rating by another rating company.

In addition, the deed of trust of the debentures (Series D) stipulates additional conditions for the placement of the debentures for immediate repayment in the event of insolvency, liquidation of the Company, registration of a going concern warning and sale of the majority of the Company's assets.

As of the financial statement date, the Company is in compliance with the above financial covenants underlying the debentures (Series D).

Following are the results of the Company's compliance with the above financial covenants as of December 31, 2019:

(1)    The equity attributable to equity holders of the Company was NIS 856 million.

(2)    The ratio of net financial debt to operating income was NIS 1.7 million.

(3)    The ratio of net financial debt to net CAP is 24%.

**MEITAV DASH INVESTMENTS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**NOTE 16:- NON-CURRENT LIABILITIES (Cont.)**

     f.     Financial covenants: (Cont.)

          3.     Investee's debentures:

Following are the financial covenants which Peninsula has undertaken to meet in connection with the issuance of debentures (series A):

     a)     Equity of at least NIS 80 million.

     b)     Equity to total balance sheet ratio of at least 15%;

     c)     The rate of checks withdrawn by the same legal entity will not exceed 10% of total gross customer credit portfolio.

Following are the financial covenants which Peninsula is required to meet in connection with debentures (series B):

     a)     Equity of at least NIS 84 million.

     b)     Equity to total balance sheet ratio of at least 14.5%;

     c)     The rate of checks withdrawn by the same legal entity will not exceed 10% of total gross customer credit portfolio.

As of the date of the financial statements, Peninsula is meeting the financial covenants in respect of the debentures (series A and B) as described above.

          4.     Banks:

In the context of the restructuring of the debts of the Company and the Group companies to banks, in August 2013, the Company signed an agreement with a bank according to which Meitav Dash Securities and Investments Ltd. ("Dash") assigned to the Company its bank debts in an aggregate of NIS 30 million (as of December 31, 2018), by virtue of past financing agreements signed by Meitav (which merged with and into Dash) ("the assigned liabilities"). In the context of the assignment of the liabilities as above, the causes for placement of the assigned liabilities for immediate repayment by the bank were updated.

In order to secure the full repayment of the liabilities to the bank, Dash pledged shares of Tachlit held by it in favor of the bank, including the revenues therefrom and yields thereon, its rights in the bank account, including funds and deposits therein and its rights to receive funds from Tachlit as management fees and on account of shareholders' loans granted by the Company.

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 16:- NON-CURRENT LIABILITIES (Cont.)**

      f.    Financial covenants: (Cont.)

            4.    Banks: (Cont.)

Among others, the Company also undertook that until the full repayment of the bank credit, the Company and its material subsidiaries (as defined in the letter of liability) will continue to engage in their principal business operations (as defined in the letter of liability) and will not alter the nature of their businesses without the bank's advance written consent. Moreover, the letter of liability establishes grounds for placing the credit for immediate repayment.

The Company also undertook that it and Tachlit, as applicable, will meet the following financial covenants:

Total EBITDA will not be lower than NIS 160 million.
Tachlit's total managed assets will not lower than NIS 13 billion.

The Company signed agreements with two banks for receiving credit facilities of up to NIS 50 million from each, a total of NIS 100 million, until the end of 2018 and subsequently the credit facility will be renewed for 12-month periods each. The amended letter of liability between the Company and one of the banks contains an additional financial covenant according to which the ratio of net financial debt in each quarter to the Company's cumulative operating income in the four latest calendar quarters ended in the relevant quarter will not exceed 6 (this covenant is identical to the covenant underlying the debentures (series C)).

As of the financial statement date, the Company meets the above financial covenants.

      g.    Liens and collaterals:

See Note 19c.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**NOTE 17:- FINANCIAL INSTRUMENTS**

a.     Financial risk factors:

The Group's activities expose it to various financial risks such as market risks (foreign currency risk, CPI risk, interest risk and price risk), credit risk and liquidity risk.

Market risks affect the fair value of the Group's assets, mainly the Group's securities portfolio which is held for Nostro investments ("the Group's assets") and the Group's income component which is derived from the value of the Group's managed assets (provident and pension fund assets, mutual fund assets, investment portfolio assets, ETF assets etc.) ("the Group's managed assets").

Risk management is an integral part of the Group's daily investment activities. The Group has established limitations on investments in shares and debentures of the Group's assets and uses tests performed by the Group's analysts in managing the investments of the Group's assets and the Group's managed assets.

1.     Market risks:

a)     Currency risk:

Currency risks relating to the Group's assets and the Group's managed assets are indirectly inherent in other price risks, as explained below, since some of the Company's short-term investments consist of bonds and securities that are traded in foreign stock markets.

The net financial assets which are linked to foreign currency in respect of which the Group is exposed to currency fluctuations amount to approximately NIS 65 million as of December 31, 2019 (December 31, 2018 - approximately NIS 74 million).

|  | **Sensitivity test to changes in foreign currency exchange rates** | |
|  | **Profit (loss) from change** | |
|  | **5% increase in exchange rate** | **5% decrease in exchange rate** |
|  | **NIS in millions** | |
| 2019 | 3.3 | (3.3) |
| 2018 | 3.9 | (3.9) |

The selected changes were determined based on management's evaluations regarding reasonable potential changes in these risk variables.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**NOTE 17:- FINANCIAL INSTRUMENTS (Cont.)**

    a.    Financial risk factors: (Cont.)

        1.    Market risks: (Cont.)

            b)    CPI risk:

The Group has investments in short-term securities, lease liabilities and issued debentures which are linked to changes in the CPI. The net financial liabilities which are linked to the CPI in respect of which the Group is exposed to CPI changes amount to approximately NIS 620 million as of December 31, 2019 (December 31, 2018 - approximately NIS 554 million).

The Company issued marketable debentures (series C) which bear fixed interest and are linked to the CPI. Therefore, the fair value of these debentures is exposed to market and CPI risks. As for hedges entered into in respect of some of the debentures (series C), see Note 16c(3).

The Group has leases of buildings and vehicles which are mostly linked to the CPI and are therefore exposed to market and index risks.

The Company's policy is to occasionally hedge some of the effects of the CPI, based on the Board's decisions.

| | Sensitivity test to changes in CPI | |
| | Profit (loss) from change | |
| | 2.5% increase in CPI | 2.5% decrease in CPI |
| | NIS in millions | |
|---|---|---|
| 2019 | (15) | 15 |
| 2018 | (14) | 14 |

The selected changes were determined based on management's evaluations regarding reasonable potential changes in these risk variables.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**NOTE 17:- FINANCIAL INSTRUMENTS (Cont.)**

    a.    Financial risk factors: (Cont.)

        1.    Market risks: (Cont.)

            c)    Interest risk:

                The Group has balances of cash and deposits that bear interest and therefore the Company is exposed to changes in interest rates.

                <u>In the non-bank loans segment</u>

                The principal market risk to which Peninsula is exposed is interest risk. Interest risk is the risk of impairment of Peninsula's profits and equity as a result of changes in interest rates. Peninsula adjusts the interest and commission received from its customers in order to prevent erosion of its operating margins. Lowering the BOI interest rate increases the margin whereas raising the BOI interest rate reduces the margin in existing transactions which do not allow raising the interest rate. Peninsula estimates that owing to the short-term loans and the general adjustment of the interest rate to the customer as a result of changes in market interest, its exposure to this type of situations is immaterial.

            d)    Price risk:

                The Group has investments in marketable financial instruments. The Group is exposed to the risk of changes in fair value which is determined based on quoted market prices in respect of its shares, debentures and warrants which are classified as financial assets and measured at fair value through profit or loss.

                The Group has investments in non-marketable financial instruments (mainly warrants and derivatives) whose base asset is traded on the TASE and investments in debentures whose quoted market price is derived from risk-free interest rate quotes and risk premiums for the revaluation of unquoted assets ("Fair Spread"), which is indirectly affected by changes in the quoted market price of marketable debentures (financial instruments classified at Level 2 in the fair value hierarchy (see paragraph d below)). Shares, debentures, warrants, derivatives and investment funds are classified as financial assets and measured at fair value through profit or loss in respect of which the Group is exposed to the risk of changes in fair value which is determined based on quoted market prices.

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### NOTE 17:- FINANCIAL INSTRUMENTS (Cont.)

a.   Financial risk factors: (Cont.)

2.   Credit risk:

a)   The Group has cash, cash equivalents, short-term deposits and marketable securities which are placed in banks and Israeli and foreign stock exchange members. Accordingly, the Group is exposed to fluctuations in the banking system and in the local and foreign stock exchange members and to the collapse of a bank or a stock exchange member in which the Group's funds are deposited.

b)   A subsidiary which is a TASE member extends credit to its customers for the purchase of securities pursuant to the TASE's articles of association and receives from its customers the managed securities portfolios as collaterals. The subsidiary's exposure to credit risk arises from overnight (T+1-5) credit terms granted to customers in respect of short-term bank trading and clearing services (custodian customers) in the amount of the difference between the transaction price and the position closing price only in the event of credit card chargebacks. The exposure to credit risk in respect of loans to customers is limited by the number of customers to which credit is extended and by the amount of the credit extended in relation to collaterals.

c)   The Group has credit risks (the risk that the counterparty to a financial instrument will fail to meet its obligation and cause the Group losses) arising from holding debentures (mainly corporate debentures) both in respect of the Group's assets and in respect of the Group's managed assets.

d)   In the non-bank loans segment:

Credit risk is the risk that one party to the financial instrument will cause the counterparty to sustain a financial loss due to default. Peninsula's credit risk mainly arises from the risk that its customers will fail to meet their commitments towards it. The amount that best represents Peninsula's maximum exposure to credit risk, regardless of any collateral held by it, is the carrying amount of the financial assets.

Credit risk is managed by Peninsula. Peninsula is responsible for managing and analyzing the specific credit risk of each new customer before offering it standard payment terms. Credit risk arises from cash and cash equivalents, financial instruments and bank deposits. Peninsula enters into engagements with leasing and most prominent banks in Israel.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**NOTE 17:- FINANCIAL INSTRUMENTS (Cont.)**

a.    Financial risk factors: (Cont.)

2.    Credit risk: (Cont.)

d)    In the non-bank loans segment: (Cont.)

In the process of deciding whether to enter into engagements with customers, Peninsula's management reviews the customer's credit quality while considering its financial position, the past experience with the customer and other factors. Peninsula takes steps to minimize credit risk by dispersing the transactions and obtaining collaterals such as personal guarantees, postdated checks, deposits, real estate liens, equipment liens etc., excluding immaterial amounts and engagements with government owned entities (authorities, government companies etc.), is insured by a credit insurance policy. The policy provides insurance coverage against debtors' insolvency and bankruptcy. The policy terms provide for a liability limit of about $ 55 million in Israel. In this context it should be noted that the policy does not prevent Peninsula from entering into uninsured engagements.

The model for measuring impairment of financial assets applied by Peninsula from January 1, 2018 as per IFRS 9 is as follows:

Since substantially all of Peninsula's financial assets consist of credit to customers which mature within the next 12 months, Peninsula assessed the weighed expected credit losses with the probability of occurrence within the next 12 months based on past experience and on the probability of occurrence of future events. The test is performed based on categories of customers depending on the structure of collaterals provided for each transaction. The collaterals are divided into three categories as follows:

(a)    Credit provided as loans ("category A customers").
(b)    Loans collateralized by third party endorsed checks ("category B customers").
(c)    Loans to customers collateralized by immobile collaterals ("category C customers"). These collaterals are mainly provided for financial assets whose maturity date is more than 12 months.

When calculating the allowance for expected credit losses, Peninsula first examines whether any customers require a specific allowance due to a default event that requires a specific customer analysis. Among others, default events include borrower's debt repayment in arrears of more than 90 days, initializing a liquidation or receivership process and any other discovered indication of a customer's deteriorated credit risk.

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 17:- FINANCIAL INSTRUMENTS (Cont.)**

    a.    Financial risk factors: (Cont.)

        2.    Credit risk: (Cont.)

           d)    In the non-bank loans segment: (Cont.)

As a second stage, in respect of the remaining customers for which no specific allowance was recorded, Peninsula calculates the ratio of expenses arising from expected credit losses to the average balance of the loans in each quarter during the 12 quarters preceding the statement of financial position date. This calculation is performed for credit granted to category A customers and category B customers separately.

As above, the calculation is performed on a quarterly basis whereby the weight accorded to each quarter in the calculation of the weighted allowance rate is different so that the nearer the quarter to the calculation date, the larger its weight in the calculation since Peninsula assumes that the information is more updated and better reflects the situation prevailing as of the calculation date.

Moreover, assuming that the information held by Peninsula is updated and is based on its current underwriting activities in respect of new loans, if the interest rates inherent in the new loans indicate that the allowance for expected credit losses needs updating, Peninsula modifies the rate of allowance for ECLs according to such information.

With respect to long-term loans to customers collateralized by immobile collaterals (category C customers), Peninsula analyzes whether there was a major increase in the customers' credit risk since the initial recognition date. If no specific customer whose credit risk has increased significantly is identified, Peninsula uses for category C customers an allowance rate that represents half of the allowance rate calculated for loans collateralized by self endorsed checks (category A customers) since Peninsula's management believes that these credit transactions are essentially similar to this category but with a significantly lower credit risk arising from the type of collaterals. See details of the allowance for ECLs as of December 31, 2019 and 2018 in Note 6b above.

        3.    Liquidity risk:

The Company has a working capital ratio of 1.55 as of December 31, 2019 (December 31, 2018 - 1.47). The Company does not foresee any liquidity risk relating to meeting any type of liability.

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### NOTE 17:- FINANCIAL INSTRUMENTS (Cont.)

b. Concentration of liquidity risk:

The following table presents the maturity dates of the Group's financial liabilities based on contractual terms in undiscounted amounts:

**December 31, 2019**

| | Less than one year | 1-2 years | 2-3 years | 3-4 years | 4-5 years | < 5 years *) | Total |
|---|---|---|---|---|---|---|---|
| | | | | NIS in millions | | | |
| Credit from banks | 413 | - | - | - | - | - | 413 |
| Liabilities for short sale of securities | 55 | - | - | - | - | - | 55 |
| Trade payables | 66 | - | - | - | - | - | 66 |
| Other accounts payable | 177 | - | - | - | - | - | 177 |
| Loans from banks | 9 | 9 | 3 | - | - | - | 21 |
| Lease liabilities | 19 | 19 | 19 | 19 | 19 | 78 | 173 |
| Debentures | 245 | 242 | 151 | 101 | 101 | 301 | 1,141 |
| Liabilities for shares | 14 | 4 | - | - | - | - | 18 |
| Other payables | - | 5 | 9 | - | - | 2 | 16 |
| | 998 | 279 | 182 | 120 | 120 | 381 | 2,080 |

*) Until 2032.

**December 31, 2018**

| | Less than one year | 1-2 years | 2-3 years | 3-4 years | 4-5 years | < 5 years *) | Total |
|---|---|---|---|---|---|---|---|
| | | | | NIS in millions | | | |
| Credit from banks | 365 | - | - | - | - | - | 365 |
| Liabilities for short sale of securities | 10 | - | - | - | - | - | 10 |
| Trade payables | 69 | - | - | - | - | - | 69 |
| Other accounts payable | 293 | - | - | - | - | - | 293 |
| Loans from banks | 9 | 9 | 85 | 3 | - | - | 106 |
| Debentures | 199 | 151 | 149 | 87 | 87 | 195 | 868 |
| Liabilities for shares | 10 | 7 | 4 | - | - | - | 21 |
| Other payables | 2 | 2 | 3 | 3 | 3 | 2 | 15 |
| | 957 | 169 | 241 | 93 | 90 | 197 | 1,747 |

*) Until 2025.

The expected maturity dates of short-term investments are up to one year.

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## NOTE 17:- FINANCIAL INSTRUMENTS (Cont.)

    c.    Fair value:

The following table presents the carrying amount and fair value of the groups of financial instruments that are presented in the financial statements not at fair value:

|  | Carrying amount | | Fair value | |
|  | December 31, | | December 31, | |
|  | 2019 | 2018 | 2019 | 2018 |
|---|---|---|---|---|
|  | NIS in millions | | | |
| Financial liabilities: | | | | |
| Loans from banks (1) (2) | 21 | 106 | 21 | 106 |
| Subsidiary's debentures (2) (3) | 336 | 239 | 337 | 240 |
| Debentures (series C) (1) (2) | 540 | 632 | 586 | 669 |
| Debentures (series D) (1) (2) | 268 | - | 324 | - |
|  | 1,165 | 977 | 1,268 | 1,015 |

    (1)    The Company's debentures (series C and series D) are traded on the TASE.

    (2)    Including current maturities and accrued interest.

    (3)    The debentures of Peninsula Group Ltd. are traded on the TASE with a fair value based on quoted market prices.

The carrying amount of cash and cash equivalents, short-term investments, customer credit, trade receivables, other accounts receivable, long-term loans and receivables, short-term credit from banks, trade payables, other accounts payable and liabilities for shares approximate their fair value.

    d.    Classification of financial instruments by fair value hierarchy:

The financial instruments presented in the financial statements at fair value are grouped into classes with similar characteristics using the following fair value hierarchy which is determined based on the source of input used in measuring fair value:

Level 1    -  quoted prices (unadjusted) in active markets for identical assets or liabilities.

Level 2    -  inputs other than quoted prices included within Level 1 that are observable directly or indirectly.

Level 3    -  inputs that are not based on observable market data (valuation techniques which use inputs that are not based on observable market data).

**MEITAV DASH INVESTMENTS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

## NOTE 17:- FINANCIAL INSTRUMENTS (Cont.)

d.  Classification of financial instruments by fair value hierarchy: (Cont.)

Financial instruments measured at fair value:

**December 31, 2019**

|  | Level 1 | Level 2 | Level 3 |
|---|---|---|---|
|  | NIS in millions | | |
| Financial assets at fair value through profit or loss: | | | |
| Shares, options and debentures | 150 | 3 | 37 |
| Financial assets at fair value through other comprehensive income: | | | |
| Shares | - | - | 6 |
|  | 150 | 3 | 43 |
|  | | | |
| Financial liabilities: | | | |
| Shares, debentures and marketable options | 55 | - | - |
| Index forwards used for hedging | - | 2 | - |
| Liability for shares | - | - | 17 |
|  | 55 | 2 | 17 |

**December 31, 2018**

|  | Level 1 | Level 2 | Level 3 |
|---|---|---|---|
|  | NIS in millions | | |
| Financial assets at fair value through profit or loss: | | | |
| Shares, options and debentures | 93 | 4 | 32 |
| Financial assets at fair value through other comprehensive income: | | | |
| Shares | - | - | 4 |
|  | 93 | 4 | 36 |
|  | | | |
| Financial liabilities: | | | |
| Shares, debentures and marketable options | 6 | - | - |
| Index forwards used for hedging | - | 2 | - |
| Forwards and swaps | - | 3 | - |
| Liability for shares | - | - | 21 |
|  | 6 | 5 | 21 |

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## NOTE 17:- FINANCIAL INSTRUMENTS (Cont.)

d.    Classification of financial instruments by fair value hierarchy: (Cont.)

Movement in financial assets and liabilities classified at Level 3:

| | Financial assets at fair value through profit or loss | Financial assets at fair value through other compre-hensive income | Liability for shares | Total |
|---|---|---|---|---|
| | NIS in millions | | | |
| Balance at January 1, 2019 | 32 | 4 | (21) | 15 |
| Total loss recognized in profit or loss | (8) | - | (1) | (9) |
| Purchases | 30 | 2 | - | 32 |
| Newly consolidated companies | - | - | (6) | (6) |
| Disposals | (17) | - | - | (17) |
| Repayment of liabilities | - | - | 11 | 11 |
| Balance at December 31, 2019 | 37 | 6 | (17) | 26 |

| | Financial assets at fair value through profit or loss | Financial assets at fair value through other compre-hensive income | Liability for shares | Total |
|---|---|---|---|---|
| | NIS in millions | | | |
| Balance at January 1, 2018 | 33 | 4 | (33) | 4 |
| Total income (loss) recognized in profit or loss | 3 | - | (1) | 2 |
| Purchases | 23 | - | - | 23 |
| Disposals | (27) | - | - | (27) |
| Repayment of liabilities | - | - | 13 | 13 |
| Balance at December 31, 2018 | 32 | 4 | (21) | 15 |

**MEITAV DASH INVESTMENTS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

## NOTE 17:- FINANCIAL INSTRUMENTS (Cont.)

e. Additional information regarding material investments in financial assets:

There are no material investments in groups of financial assets pursuant to IFRS 9.

f. Linkage terms of financial assets by groups of financial instruments pursuant to IFRS 9:

**December 31, 2019**

| | In or linked to foreign currency | | | Linked to CPI | Unlinked | Linked to various indices | Yield-guaranteed funds linked to various indices | Total |
|---|---|---|---|---|---|---|---|---|
| | USD | Euro | Other | | | | | |
| | | | | NIS in millions | | | | |
| Cash and cash equivalents | 40 | 2 | 1 | - | 244 | - | - | 287 |
| Financial assets at fair value through profit or loss | 34 | 12 | 2 | 34 | 178 | 30 | - | 290 |
| Financial assets at fair value through other comprehensive income | - | - | - | - | 6 | - | - | 6 |
| Yield-guaranteed funds (1) | - | - | - | - | - | - | 96 | 96 |
| Loans and receivables *) | - | 9 | 1 | - | 3 | - | - | 13 |
| | 74 | 23 | 4 | 34 | 431 | 30 | 96 | 692 |

**December 31, 2018**

| | In or linked to foreign currency | | Linked to CPI | Unlinked | Yield-guaranteed funds linked to various indices | Total |
|---|---|---|---|---|---|---|
| | USD | Other | | | | |
| | | | NIS in millions | | | |
| Cash and cash equivalents | 27 | - | - | 251 | - | 278 |
| Financial assets at fair value through profit or loss | 37 | 10 | 26 | 109 | - | 182 |
| Available-for-sale financial assets | - | - | - | 5 | - | 5 |
| Yield-guaranteed funds (1) | - | - | - | - | 96 | 96 |
| Loans and receivables *) | 15 | - | - | 163 | - | 178 |
| | 79 | 10 | 26 | 528 | 96 | 739 |

*) Excluding trade receivables and loans to customers.

- 95 -

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### NOTE 17:- FINANCIAL INSTRUMENTS (Cont.)

f.   Linkage terms of financial assets by groups of financial instruments pursuant to IFRS 9: (Cont.)

(1)   Composition of yield-guaranteed funds:

|  | December 31, | |
|---|---|---|
|  | **2019** | **2018** |
|  | **NIS in millions** | |
| Quoted debt assets | 11 | 8 |
| Treasury deposits | 82 | 82 |
| Loans and receivables, including bank deposits | 2 | 4 |
| Other financial investments | 1 | 2 |
|  | 96 | 96 |

g.   Linkage terms of financial liabilities by groups of financial instruments pursuant to IFRS 9:

**December 31, 2019**

|  | **Linked to CPI** | **Unlinked** | **Linked to foreign currency** | **Total** |
|---|---|---|---|---|
|  | **NIS in millions** | | | |
| Financial liabilities measured at amortized cost *) | 706 | 1,043 | 33 | 1,782 |

**December 31, 2018**

|  | **Linked to CPI** | **Unlinked** | **Linked to foreign currency** | **Total** |
|---|---|---|---|---|
|  | **NIS in millions** | | | |
| Financial liabilities measured at amortized cost *) | 643 | 728 | 3 | 1,374 |

*)   Excluding trade payables.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**NOTE 18:- EMPLOYEE BENEFIT ASSETS AND LIABILITIES**

Employee benefits consist of short-term benefits, post-employment benefits, other long-term benefits and termination benefits.

a.    Post-employment benefits:

According to the labor laws and Severance Pay Law in Israel, the Company is required to pay compensation to an employee upon dismissal or retirement or to make current contributions in defined contribution plans pursuant to Section 14 to the Severance Pay Law, as specified below. The Company's liability is accounted for as a post-employment benefit. The computation of the Company's employee benefit liability is made in accordance with a valid employment contract based on the employee's salary and employment term which establish the entitlement to receive the compensation.

The post-employment employee benefits are normally financed by contributions classified as defined benefit plans or as defined contribution plans, as detailed below.

1.    Defined contribution plans:

Section 14 to the Severance Pay Law, 1963 applies to part of the compensation payments, pursuant to which the fixed contributions paid by the Group into pension funds and/or policies of insurance companies release the Group from any additional liability to employees for whom said contributions were made. These contributions and contributions for compensation represent defined contribution plans.

| | Year ended December 31, | | |
| --- | --- | --- | --- |
| | **2019** | **2018** | **2017** |
| | **NIS in millions** | | |
| Expenses in respect of defined contribution plans | 12 | 11 | 10 |

2.    Defined benefit plans:

The Group accounts for that part of the payment of compensation that is not covered by contributions in defined contribution plans, as above, as a defined benefit plan for which an employee benefit liability is recognized and for which the Group deposits amounts in central severance pay funds and in qualifying insurance policies.

**MEITAV DASH INVESTMENTS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

## NOTE 18:- EMPLOYEE BENEFIT ASSETS AND LIABILITIES (Cont.)

a.    Post-employment benefits: (Cont.)

2.    Defined benefit plans: (Cont.)

a)    Changes in the defined benefit obligation and fair value of plan assets:

**2019**

| | Balance at January 1, 2019 | Current service cost | Net interest expense | Past service cost and effect of settlements | Total expense recognized in profit or loss for the period | Payments from the plan | Return on plan assets (excluding amounts included in net interest expenses) | Actuarial gain (loss) arising from changes in demographic assumptions | Actuarial gain (loss) arising from changes in financial assumptions | Actuarial gain (loss) arising from experience adjustments | Total effect on other comprehensive income for the period | Contributions by employer | Balance at December 31, 2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | **Expenses recognized in profit or loss** | | | | | **Gain (loss) from remeasurement in other comprehensive income** | | | | | | |
| | | | | | | | NIS in millions | | | | | | |
| Defined benefit obligation | 29 | 1 | 1 | - | 2 | 3 | - | - | 1 | - | 1 | - | 29 |
| Fair value of plan assets | 21 | - | - | - | - | 1 | 1 | - | - | - | 1 | - | 21 |
| Net defined benefit liability (asset) | 8 | 1 | 1 | - | 2 | 2 | (1) | - | 1 | - | - | - | 8 |

**2018**

| | Balance at January 1, 2018 | Current service cost | Net interest expense | Past service cost and effect of settlements | Total expense recognized in profit or loss for the period | Payments from the plan | Return on plan assets (excluding amounts included in net interest expenses) | Actuarial gain (loss) arising from changes in demographic assumptions | Actuarial gain (loss) arising from changes in financial assumptions | Actuarial gain (loss) arising from experience adjustments | Total effect on other comprehensive income for the period | Contributions by employer | Balance at December 31, 2018 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | **Expenses recognized in profit or loss** | | | | | **Gain (loss) from remeasurement in other comprehensive income** | | | | | | |
| | | | | | | | NIS in millions | | | | | | |
| Defined benefit obligation | 29 | 2 | 1 | - | 3 | 3 | - | - | - | - | - | - | 29 |
| Fair value of plan assets | 22 | - | 1 | - | 1 | 2 | (1) | - | - | - | (1) | 1 | 21 |
| Net defined benefit liability (asset) | 7 | 2 | - | - | 2 | 1 | 1 | - | - | - | 1 | (1) | 8 |

**MEITAV DASH INVESTMENTS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**NOTE 18:- EMPLOYEE BENEFIT ASSETS AND LIABILITIES (Cont.)**

a.   Post-employment benefits: (Cont.)

2.   Defined benefit plans: (Cont.)

b)   Disaggregation of the fair value of the plan assets:

|  | December 31, | |
|---|---|---|
|  | **2019** | **2018** |
|  | **NIS in millions** | |
| Cash and cash equivalents | 1 | 2 |
| Equity instruments | 5 | 4 |
| Debt instruments | 13 | 13 |
| Other | 3 | 2 |
|  | 22 | 21 |

c)   The principal assumptions underlying the defined benefit plan:

|  | **2019** | **2018** |
|---|---|---|
|  | **%** | |
| Discount rate | 1.5-2.45 | 2.72-3.39 |
| Average rate of expected salary increase | 3.8 | 3.5 |

The discount rates as of December 31, 2019 and 2018 were determined based on the yield curve as of the reporting date on high-quality corporate debentures in Israel.

- 99 -

**MEITAV DASH INVESTMENTS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**NOTE 18:- EMPLOYEE BENEFIT ASSETS AND LIABILITIES (Cont.)**

    a.    Post-employment benefits: (Cont.)

        2.    Defined benefit plans: (Cont.)

            d)    Amount, timing and uncertainty of future cash flows:

Below are reasonably possible changes at the end of the reporting period in each actuarial assumption assuming that all other actuarial assumptions are constant:

| | Change in defined benefit obligation |
| --- | --- |
| | **NIS in millions** |
| Sensitivity test for changes in the rate of expected salary increase: | |
| The change as a result of: | |
| Salary increase of 4.8% (instead of 3.8%) | 0.5 |
| Sensitivity test for changes in the discount rate of the plan assets and liability: | |
| The change as a result of: | |
| Increase of 1% in discount rate | (0.5) |
| Decrease of 1% in discount rate | 0.5 |

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 19:-  COMMITMENTS, CONTINGENT LIABILITIES, GUARANTEES AND LIENS**

    a.    Commitments:

        1.    The Company's engagement in management agreements with controlling shareholders and officers:

            a)    Mr. Zvi Stepak (a controlling shareholder in the Company until December 31, 2019, "Zvi") and Mr. Avner Stepak (a controlling shareholder in the Company from December 31, 2019, "Avner"):

                *Management services provided through companies controlled by Zvi and Avner:*

                On May 26, 2019, the Company's general meeting approved the extension of the Company's engagement in management service agreements with companies controlled by Zvi and Avner.

                Zvi provides the Company services as a full-time active director through a management company controlled by him. Subject to Zvi's consent and the approval of the relevant organs, he also serves as director and/or member of committees of Group companies. In return for the management services, the Company pays the management company a monthly fee of NIS 115 thousand, with the addition of VAT, linked to the increase in the CPI (for April 2012).

                Avner (Zvi's son) provides the Company services as the full-time Vice Chairman of the Board through a management company controlled by him. Subject to Avner's consent and the approval of the relevant organs, he also serves as director and/or member of committees of Group companies. In return for the management services, the Company pays the management company a monthly fee of NIS 97.5 thousand, with the addition of VAT, linked to the increase in the CPI (for April 2012).

                *Annual bonus:*

                After the approval of the financial statements for the former calendar year, the Company pays each of the management companies of Zvi and Avner an annual bonus with the addition of VAT as required by law, subject to the high-water mark mechanism.

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 19:- COMMITMENTS, CONTINGENT LIABILITIES, GUARANTEES AND LIENS (Cont.)**

    a.    Commitments: (Cont.)

        1.    The Company's engagement in management agreements with controlling shareholders and officers: (Cont.)

            a)    Mr. Zvi Stepak (a controlling shareholder in the Company until December 31, 2019, "Zvi") and Mr. Avner Stepak (a controlling shareholder in the Company from December 31, 2019, "Avner"): (Cont.)

            *Annual bonus:* (Cont.)

            According to this mechanism, a net present value ("NPV") is defined as the net income attributable to equity holders of the Company in the calendar year based on the audited annual financial statements for any calendar year with the following adjustments: (a) less profits and with the addition of non-recurring net capital losses (after tax); (b) with the addition of the annual bonus to the management companies of Zvi and Avner, if and to the extent paid, and less corporate tax in their respect; (c) with the addition of tax expenses and less tax income against deferred taxes; (d) with the addition of 100% of amortization of other assets and depreciation of property, plant and equipment; and (e) with the addition of expenses or losses recorded in the Company's statements of profit or loss for which a demand for compensation was submitted to the Company and less income and/or gains recorded in the Company's statements of profit or loss as a result of compensation paid to the Company - both on a net basis - after taxes and only in connection with the merger agreement between the Company and the shareholders of Meitav Investment House Ltd..

            Every year, the NPV will be calculated with the addition of the NPV of each of the years before the relevant year from the year of commencement of the management services (namely from 2019) divided by the number of years included in said calculation ("the cumulative NPV underlying the annual bonus"). If the cumulative NPV underlying the annual bonus in the relevant year is above NIS 98 million ("the minimum amount"), the Company will pay each of the management companies the annual bonus based on the following brackets and rates:

            -    If the cumulative NPV underlying the annual bonus in the relevant year is between the minimum amount (NIS 98 million) and NIS 131 million, the difference between the minimum amount and the lower of the actual cumulative NPV underlying the annual bonus and NIS 131 million ("the difference for calculating the first bonus bracket"), the Company will pay the management companies of Zvi and Avner an annual bonus of 1.75% and 2.25% of the difference for calculating the first bonus bracket, respectively ("the first bonus bracket").

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**NOTE 19:- COMMITMENTS, CONTINGENT LIABILITIES, GUARANTEES AND LIENS (Cont.)**

    a.    Commitments: (Cont.)

        1.    The Company's engagement in management agreements with controlling shareholders and officers: (Cont.)

            a)    Mr. Zvi Stepak (a controlling shareholder in the Company until December 31, 2019, "Zvi") and Mr. Avner Stepak (a controlling shareholder in the Company from December 31, 2019, "Avner"): (Cont.)

*Annual bonus:* (Cont.)

-    If the cumulative NPV underlying the annual bonus in the relevant year is between NIS 131 million and NIS 163 million, the difference between NIS 131 million and the lower of the actual cumulative NPV underlying the annual bonus and NIS 163 million ("the difference for calculating the second bonus bracket"), the Company will pay the management companies of Zvi and Avner, in addition to the first bonus bracket, an annual bonus of 2.25% and 3.25% of the difference for calculating the second bonus bracket, respectively ("the second bonus bracket").

-    If the cumulative NPV underlying the annual bonus in the relevant year is above NIS 163 million, the difference between NIS 163 million and the actual cumulative NPV underlying the annual bonus ("the difference for calculating the third bonus bracket"), the Company will pay the management companies of Zvi and Avner, in addition to the first and second bonus brackets, an annual bonus of 3% and 4.25% of the difference for calculating the third bonus bracket, respectively ("the third bonus bracket").

In any case, the total annual cost to the Company for the remuneration of either Zvi or Avner in a given calendar year (including management fees, reimbursement of expenses and annual bonus) shall not exceed the lower of (a) NIS 2.5 million, linked to the CPI of April 2012, (b) a ceiling which is the result of multiplying the average cost to the employer in each calendar year of the bottom percentile of the Group's employees and individuals employed in the Group through management agreements by 30 and (c) another binding cogent ceiling for remuneration of officers which applies to the Company by law and this in effect from the date on which the ceiling will apply, as above, in respect of agreements with officers which were binding before the above ceiling became effective.

Zvi and Avner are both entitled to quittance, indemnification and insurance as customary in the Company. The total cost of employment of Zvi and Avner in 2019 amounted to approximately NIS 2.2 million and NIS 2.2 million, respectively (2018 and 2017 - approximately NIS 1.9 million and NIS 1.8 million in each year).

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### NOTE 19:- COMMITMENTS, CONTINGENT LIABILITIES, GUARANTEES AND LIENS (Cont.)

a.   Commitments: (Cont.)

1.   The Company's engagement in management agreements with controlling shareholders and officers: (Cont.)

a)   Mr. Zvi Stepak (a controlling shareholder in the Company until December 31, 2019, "Zvi") and Mr. Avner Stepak (a controlling shareholder in the Company from December 31, 2019, "Avner"): (Cont.)

*The engagement period:*

The Company's engagement in management agreements with Zvi and Avner is for a period of three years effective from March 20, 2019. During the engagement period, each party may terminate the engagement at any time by providing an advance notice of six months. During the early notice period, all the provisions of the management agreements will continue to apply but the Company will be entitled to waive the actual performance of the management services provided that the full fee is paid pursuant to the management agreements.

b)   Mr. Eli Barkat:

On May 26, 2019, the Company's general meeting approved the extension of the Company's engagement in a management service agreement with a company controlled by Mr. Eli Barkat, the Chairman of the Company's Board ("Mr. Barkat") for a period of three years effective from March 20, 2019.

Mr. Barkat provides the Company management services consisting of all the functions of an active chairman of the board of a company of the Company's size and nature, under a position at a scope of at least 40%, in return for an overall monthly fee of NIS 64 thousand with the addition of VAT.

Mr. Barkat is entitled to quittance, indemnification and insurance, as customary in the Company. The total cost of employment of Mr. Barkat in a given calendar year (including management fees and reimbursement of expenses) shall not exceed another binding cogent ceiling for remuneration of officers which applies to the Company by law and this in effect from the date on which the ceiling will apply, as above, in respect of agreements with officers which were binding before the above ceiling became effective.

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### NOTE 19:-  COMMITMENTS, CONTINGENT LIABILITIES, GUARANTEES AND LIENS (Cont.)

a.    Commitments: (Cont.)

1.    The Company's engagement in management agreements with controlling shareholders and officers: (Cont.)

b)    Mr. Eli Barkat: (Cont.)

Each party may terminate the management agreement by providing an advance notice of three months during which time all the provisions of the management agreement will continue to apply. According to a trust agreement signed between Mr. Barkat and his brother, Mr. Nir Barkat, Mr. Nir Barkat transferred his entire shares in Nir Barkat Ltd., a company through which Mr. Nir Barkat holds shares of BRM Finance Ltd., to Mr. Eli Barkat to be held in trust ("the trust agreement"). As a result, the Company considers Mr. Barkat a controlling shareholder in BRM Finance Ltd., and consequently a controlling shareholder in the Company.

The total cost of employment of Mr. Barkat in 2019 amounted to approximately NIS 0.8 million (2018 and 2017 - approximately NIS 0.8 million in each year).

c)    The Company's CEO:

On March 14, 2017, the Company's general meeting approved and reaffirmed the extension and terms of the engagement with Mr. Ilan Raviv ("Mr. Raviv") as the Company's CEO.

On January 19, 2020, following the approval of the Remuneration Committee, the Company's Board approved the extension of the Company's engagement with Mr. Raviv for his continued service and tenure with no change in terms in accordance with Regulation 1B2(b) to the Israeli Companies Regulations (Reliefs in Interested Party Transactions), 2000 ("the Relief Regulations") ("the engagement extension agreement").

Mr. Raviv serves as the Company's CEO as a full-time position and under an employer-employee relationship with the Company. It should be noted that Mr. Raviv also serves as director in the Company's subsidiaries without receiving any additional remuneration.

*Base salary:*

In return for his services, Mr. Raviv is entitled to a gross base salary of NIS 125 thousand a month, linked to the known Israeli CPI as of January 1, 2017. He is also entitled to related benefits and reimbursement of expenses (including company car and social benefits). Mr. Raviv is entitled to quittance, indemnification and insurance, as customary in the Company.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**NOTE 19:- COMMITMENTS, CONTINGENT LIABILITIES, GUARANTEES AND LIENS (Cont.)**

    a.    Commitments: (Cont.)

        1.    The Company's engagement in management agreements with controlling shareholders and officers: (Cont.)

            c)    The Company's CEO: (Cont.)

            *Fixed bonus:*

Mr. Raviv is entitled to a fixed gross annual bonus of NIS 780 thousand (or a relative portion thereof if the agreement is in effect for part of the calendar year and subject to the Company's remuneration policy). Mr. Raviv is entitled to advances on account of said bonus in the form of 12 equal gross monthly payments of NIS 65 thousand ("the fixed bonus component" and "the monthly payment for the fixed bonus"). Notwithstanding the aforementioned: (a) if the Company fails to meet 70% of the annual EBITDA target imposed on it by the Board for a certain year, Mr. Raviv will not be entitled to the fixed bonus for that year; (b) if the Company meets 70%-85% of the annual EBITDA target imposed on it by the Board for a certain year, Mr. Raviv will be entitled to a fixed gross bonus in the amount of NIS 384 thousand for that year; (c) if the Company meets 85% or more of the annual EBITDA target imposed on it by the Board for a certain year, Mr. Raviv will be entitled to the full fixed bonus component. The (full/partial) offsetting of the fixed bonus will be done in the following year by reducing the monthly payment for the fixed bonus accordingly.

*Annual bonus based on measurable targets:*

The Company will pay Mr. Raviv an annual bonus of up to five salaries based on meeting an annual measurable targets plan as annually determined by the Company's Board at the latter's discretion.

*Discretionary bonus:*

The remuneration committee and Board may decide to grant Mr. Raviv an annual bonus, based on their discretion, in an amount that does not exceed three times his base salary.

*Maximum remuneration:*

The Company's expected cost of the entire components of Mr. Raviv's remuneration will not exceed 35 times the lowest remuneration, based on a full-time position cost paid by the Company to any of its employees in the year before the engagement date.

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### NOTE 19:- COMMITMENTS, CONTINGENT LIABILITIES, GUARANTEES AND LIENS (Cont.)

   a.   Commitments: (Cont.)

      1.   The Company's engagement in management agreements with controlling shareholders and officers: (Cont.)

         c)   The Company's CEO: (Cont.)

*The engagement term:*

The engagement extension agreement is effective from January 1, 2020 for a period of three years until January 1, 2023. Each party may terminate the engagement at any time by providing an advance written notice of six months. During the early notice period, all the provisions of the engagement will continue to apply but the Company will be entitled to waive Mr. Raviv's actual services.

The total cost of Mr. Raviv's employment in 2019 amounted to approximately NIS 3.2 million (2018 and 2017 - approximately NIS 3 million in each year).

      2.   Leases:

The Group has leases that consist of buildings and vehicles used for sustaining the Group's operating activities.

The leases of buildings range between 3 and 15 years while leases of vehicles are for a period of 3 years.

Some of the Company's leases include lease extension and/or termination options.

On August 4, 2013, the Group entered into a lease agreement for six office floors in an overall gross area of some 9,703 sq. m. consisting of office, storage and parking spaces in Champion Tower. The lease period is 10 years from January 1, 2014 with three extension options of three years each. The annual lease fees payable by the Group approximate NIS 14.5 million, with the addition of linkage differences and VAT. The fees are for the lease of the office, storage and parking spaces, management fees, municipal taxes and participation in cost of maintenance. The Company guaranteed the fulfillment of the lease obligations of Meitav Dash Securities and Investments Ltd. according to the lease agreement. In recent years, the Company expanded the leased office spaces. In addition, insurance agencies controlled by the Company lease various offices in different locations in Israel.

         a)   Information of leases:

|  | NIS in millions |
|---|---:|
| Interest expenses on lease liability | 6 |
| Total negative cash flows in respect of leases | 27 |

         b)   See Note 17b above for an analysis of the maturity dates of lease liabilities.

         c)   See Note 11 above for details of right-of-use assets.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**NOTE 19:- COMMITMENTS, CONTINGENT LIABILITIES, GUARANTEES AND LIENS (Cont.)**

a.    Commitments: (Cont.)

3.    The Group has agreements with executives in subsidiaries according to which the executives will receive a base salary and bonuses based on compliance with predetermined targets. The remuneration paid to officers in the Company is subject to the Company's remuneration policy. Moreover, executives in subsidiaries occasionally receive shares and/or share options in their respective companies.

4.    As of the date of the financial statements, Mizrahi Tefahot Bank Ltd. and Malam Provident Operation Ltd. serve as the operators of the provident and pension funds managed by the Group ("the operators"). The operators grant Meitav Dash operating and back office services as well management of members' accounts consisting, among others, of issuing reports to the members and the authorities, transfer payments and computing services.

5.    A subsidiary, Meitav Dash Provident, entered into agreements with various resellers for marketing the provident funds managed by it in return for commissions. In the majority of agreements, the entitlement to a commission also applies if the agreement is cancelled and as long as the funds of the customers recruited by the resellers are managed by Meitav Dash Provident, subject to the terms of each specific agreement. Meitav Dash Provident's customers include entities which are related and interested parties the engagement with which is at standard engagement terms.

6.    Meitav Dash Provident signed distribution agreements with the majority of Israeli banks, including the top five banks in Israel, for the distribution of the funds managed by it. Meitav Dash Provident entered into engagements with other pension consultants for distributing its products and intends to enter into engagements with additional pension consultants.

7.    Meitav Tachlit, a subsidiary which manages mutual funds, entered into distribution agreements with the majority of commercial banks in Israel. According to the distribution agreements, the banks distribute the participation units of the mutual funds managed by the subsidiary. In return, the subsidiary pays the banks distribution commissions at the maximum rates prescribed in the Joint Investments in Trust Regulations (Distribution Commissions), 2006 ("distribution commissions").

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### NOTE 19:- COMMITMENTS, CONTINGENT LIABILITIES, GUARANTEES AND LIENS (Cont.)

    a.    Commitments: (Cont.)

        8.    Some of the mutual funds managed by Meitav Tachlit are hosted mutual funds whose investments are managed by external investment managers ("hosting"). Under the hosting format, the subsidiary is fully responsible for the funds, including the management and operation of the mutual funds, whereas the external investment managers provide investment management services that consist, among others, of daily management of fund assets under the governance of the subsidiary's investment committee and board and the trustees and based on the provisions of the relevant fund agreement, the fund's prospectus and applicable legal provisions. In return for the investment management services, each external investment manager is entitled to a monthly fee which is normally derived from management fees and an additional percentage which is collected upon the sale of the fund's units, less direct expenses and including distribution commissions, origination fees, statutory publications and the ISA's and TASE's fees. The parties are entitled to cancel the engagement by providing an advance notice on the dates specified in the relevant agreement. After the reporting date, on February 2, 2020, Meitav Tachlit issued a report according to which it decided to minimize the grant of hosting services to external investment managers and accordingly notified the external investment managers that it intends to terminate its engagement with them based on the dates stipulated in the specific agreements signed by it with each external investment manager. As of the financial statement publication date, Meitav Tachlit terminated its engagement with the majority of external investment managers and by the end of March 2020 is expected to maintain a single engagement with one external investment manager.

        9.    On August 13, 2018, the Company's Board approved the Company's engagement in a collective agreement with the National Labor Federation in Eretz-Israel (NLF) and the Company's Workers' Union. The collective agreement defines certain major principles regarding the work relations in the Company, including hiring new employees and relocating existing employees, termination of employment, salary increase budget, various social benefits and dispute resolution mechanisms. See details of the establishment of a committee whose objective is to discuss the issue of employee eligibility for payment for the period before the agreement signing date, see paragraph b(3) below.

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 19:- COMMITMENTS, CONTINGENT LIABILITIES, GUARANTEES AND LIENS (Cont.)**

   b.   Contingent liabilities:

   Owing to their business occupations, in the ordinary course of business, the Group companies receive requests from customers or suppliers involving various arguments. Some of these requests are liable to result in litigation. The Group companies might be required to pay various amounts in respect of differences and errors involving their activities. When the liabilities in respect of the aforementioned are immaterial and/or cannot be reasonably estimated, no provision is recorded in the financial statements.

   1.   Claims filed against underwriting companies:

   On March 23, 2009, a claim and motion for approval of the claim as a class action were filed with the Central District Court by Mrs. Ruth Hillel Safroni and Dr. Barak Shenhav against 26 defendants (among which are the underwriters in the issuance including M.D. Treasury Ltd.) in a total of at least NIS 50 million alleging the existence of misleading details in the prospectus of Pacifica Holdings Ltd. ("Pacifica").

   On September 14, 2017, a claim and motion to approve the claim as a derivative action were filed with the Tel-Aviv District Court among others against the underwriters, including M.D. Treasury Ltd. and other defendants according to which the petitioners argue that the actions taken by the respondents in the period from March 2006 to June 2007 left Pacifica without free cash flows and with debts in excess of NIS 50 million. Both the above proceedings pertain to similar actions relating to Pacifica's prospectus from 2007.

   There are also additional proceedings concluded and pending against Pacifica (which do not involve the Group), including criminal proceedings.

   In court hearings held on March 14, 2018 and March 21, 2018 in another case against Pacifica, intensive negotiations were held between the parties as a result of which the Court proposed a potential settlement which, if signed and approved, will conclude all the pending proceedings in Pacifica's case.

   On April 1, 2018, the Court validated the proposed settlement as a court decision and ordered the parties to reach a settlement. During the reporting period, procedural proceedings were held in various cases relevant to Pacifica, which were mainly intended to give the parties additional time to formulate a settlement agreement and the various proceedings were consolidated.

   On June 27, 2019, the Court rendered its decision whereby it ordered the group members to prepare a binding settlement version. It was also decided that assuming that no objections have been filed by the date of filing objections, guidelines will be provided on submitting the parties' arguments for the distribution of the settlement amount and the payment of legal and professional fees to the plaintiffs' representatives and attorneys. During the period for filing objections and withdrawing from the motion, several notices were submitted by various parties. On November 14, 2019, the Attorney General submitted his position on the settlement agreement to the Court.

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### NOTE 19:- COMMITMENTS, CONTINGENT LIABILITIES, GUARANTEES AND LIENS (Cont.)

b.  Contingent liabilities: (Cont.)

1.  Claims filed against underwriting companies: (Cont.)

On January 30, 2020, the Court approved the settlement agreement after having heard the objections submitted and having dismissed the motions for withdrawal submitted. The Court also ruled that the distribution of the settlement amount and the determination of the attorneys' fees and remuneration will be decided in the next stage of the hearing after all the parties entitled to submit their arguments have done so, and ordered submitting all the positions on the distribution of the settlement amount and the determination of the attorneys' fees and remuneration within 30 days.

The Company recorded a provision in its financial statements which it believes reflects the assessment of the amount which it may be required to pay in the settlement agreement.

2.  Litigation and claims - Meitav Dash Provident and Pension:

a)  On December 23, 2012, a claim and motion for approval of the claim as a class action were filed with the Tel-Aviv District Court pursuant to the Class Action Law, 2006 ("the claim") in a nominal amount of approximately NIS 195 million against Meitav Dash Provident. The plaintiff argues that Meitav Dash Provident should have collected zero management fees on the accumulated balance of assets from the members of the compensation provident fund ("the fund") who joined before June 30, 2007. The plaintiff also argues that Meitav Dash Provident should have collected 1% of the contributions although the legal provisions forbade companies that manage provident funds to collect management fees on the contributions (until January 1, 2013). The claim is based on a document of 1969 which according to the articles of association, agreements and documents produced to Meitav Dash Provident was no longer in effect in 2007, the date of purchase of the fund by Meitav Dash Provident and therefore is obviously not effective today. The fund was purchased after obtaining the approval of the Ministry of Finance and the collection of the management fees was executed in conformity with the fund's articles of association and applicable laws.

In addition, on September 1, 2014, a claim and motion for approval of the claim as a class action were filed with the Tel-Aviv District Court pursuant to the Class Action Law, 2006 in a nominal amount of approximately NIS 251 million against Meitav Dash Provident. The plaintiff argues that Meitav Dash Provident illegally increased the management fees paid by the plaintiff and the group of members of a compensation fund. The plaintiff also argues that the management fees should be zero and that charging management fees is in contrast to signed agreements. Both cases were consolidated and are discussed together.

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### NOTE 19:- COMMITMENTS, CONTINGENT LIABILITIES, GUARANTEES AND LIENS (Cont.)

    b.    Contingent liabilities: (Cont.)

        2.    Litigation and claims - Meitav Dash Provident and Pension: (Cont.)

            a)    (Cont.)

On August 30, 2015, the District Court decided to dismiss the motion for approval of a class action against Meitav Dash Provident regarding alleged illegal collection of management fees from provident fund members who are employees of Bank Hapoalim and accept the motion for approval of a class action with respect to the other groups of plaintiffs in both motions.

On November 22, 2017, a joint file was submitted which includes the documents on which the parties were asked to rely. On January 31, 2018, the plaintiffs submitted their depositions and an opinion on their behalf. On June 5, 2018, the depositions of Meitav Dash Provident and an opinion on its behalf were submitted to the Court.

Proof hearings in the case were held in September 2019. On February 4, 2020, the principal arguments were submitted by the plaintiffs. The defendants are required to submit their principal arguments by May 4, 2020. A verbal hearing of the summations has been scheduled for May 14, 2020.

The attorneys handling the case believe that Meitav Dash Provident has good defense arguments against the motion and that it is more likely than not that Meitav Dash Provident's position will accepted once the legal proceedings have been exhausted. Accordingly, no provision was included in the financial statements.

            b)    On October 15, 2013, a claim and motion for approval of the claim as a class action were filed with the Tel-Aviv District Court pursuant to the Class Action Law, 2006 ("the claim") in an amount of approximately NIS 50 million against Meitav Dash Provident. The plaintiff argues that Meitav Dash Provident increased the plaintiff's management fees without providing advance notice.

Several interim petitions and responses thereto were submitted in the case, a pretrial hearing was held and a proof hearing was held (cross examination for depositions). By February 2018, the summations were filed by the parties to the claim and the parties are awaiting the Court's verdict.

The attorneys representing Meitav Dash Provident believe that it is more likely than not that Meitav Dash Provident's defense arguments will be accepted and that the motion will be dismissed. If the claim is approved as a class action, however, at this early stage it is difficult to assess its chances or Meitav Dash Provident's monetary exposure in its respect.

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### NOTE 19:- COMMITMENTS, CONTINGENT LIABILITIES, GUARANTEES AND LIENS (Cont.)

   b.   Contingent liabilities: (Cont.)

      2.   Litigation and claims - Meitav Dash Provident and Pension: (Cont.)

         c)   On July 10, 2016, a claim and motion for approval of the claim as a class action were filed with the Tel-Aviv District Court against Meitav Dash Provident.

According to the petitioners' arguments, members of Meitav Dash Comprehensive Provident Fund (formerly: Yuvalim Comprehensive Pension Fund for Hired and Self Employed Employees), managed by Meitav Dash Provident, who had made excess contributions to the pension fund (above the maximum amount prescribed by law) are not and will not be entitled in the future to receive any pension annuities in respect of the excess amounts contributed by them and are also not entitled to a recovery of said contributions which are retained by Meitav Dash Provident and for which the latter even charges management fees without providing details thereon. It is also argued that Meitav Dash Provident was negligent in failing to inform its members of the Fund's articles of association according to which there is no legal option of making excess contributions above the maximum rate stipulated by law and had even notified one of the petitioners that the "insured annuity" includes the entire contributions made. The petitioners also argue that Meitav Dash Provident was negligent in failing to provide timely information to members that they will not be entitled to any annuity for the excess contributions made by them.

On January 11, 2017, the District Court rendered its decision according to which the petition filed by Meitav Dash Provident to dismiss the above motion in limine due to absence of subject-matter jurisdiction was partly accepted and ruled that the subject-matter jurisdiction underlying the above motion pertaining to non-torts lies with the Labor Court. Accordingly, on February 1, 2017, the petitioners filed an amended motion with the District Court which excludes all the grounds in the original motion except for the grounds of theft and negligence.

On May 7, 2017, Meitav Dash Provident submitted its response to the petitioners' amended motion. A proof hearing was held on July 1, 2019 which consisted of the interrogation of the petitioners. Additional proof hearings were held on January 23 and 26, 2020 for the interrogation of a declarant on behalf of the petitioners and of declarants on behalf of Meitav Dash Provident. The petitioners are required to submit their summations by April 1, 2020 and Meitav Dash Provident is required to submit its summations by June 1, 2020.

The attorneys representing Meitav Dash Provident believe that after Meitav Dash Provident has finalized applying to its members who are part of the group of plaintiffs and after the members' position on the funds deposited in excess of the monthly contribution ceiling has been accepted, it is more likely than not (less than 50%) that the claim in its present format will not be approved as a class action.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**NOTE 19:- COMMITMENTS, CONTINGENT LIABILITIES, GUARANTEES AND LIENS (Cont.)**

    b.    Contingent liabilities: (Cont.)

        2.    Litigation and claims - Meitav Dash Provident and Pension: (Cont.)

            d)    In October, November and December 2016, three claims and motions for approval of the claims as a class actions were filed with the Jerusalem Regional Labor Court and the Central District Court against Meitav Dash Provident and Ayalon Pension and Provident Ltd. (which was merged into Meitav Dash Provident on January 1, 2017, "Ayalon").

                    According to the above motions, Meitav Dash Provident/Ayalon were not entitled to deduct from the members' assets direct expenses for conducting transactions in the relevant provident fund and advanced study fund assets. The sought remedy is recovery of the direct expenses charged from the fund for transactions in its assets. The total damage to the group in the above three claims is estimated by the plaintiffs at approximately NIS 110.6 million, approximately NIS 67.4 million and an amount which cannot be quantified.

                    On May 13, 2018, the Commissioner of Capital Markets, Insurance and Savings at the Ministry of Finance submitted her position on the collection of direct expenses. Among others, the position states that institutional entities may charge expenses directly from members or policyholders even if it is not explicitly prescribed in the institutional entity's articles of association, provided that it is done in conformity with the Regulations.

                    From this date until the date of approval of the financial statements, the following developments occurred in these proceedings:

                    (1)    In respect of two claims and motions to approve the claims as class actions, on June 26, 2019, a petition was filed for suspending the proceeding which was dismissed on August 20, 2019. Meitav Dash Provident submitted its summations on December 11, 2019.

                    (2)    In respect of another claim and motion to approve the claim as a class action which was filed by a registered association, on September 9, 2019, a proof hearing was held in the issue of the petitioner's eligibility as a class action plaintiff. On September 19, 2019, another petition was filed for ordering the petitioner to place a guarantee as a prerequisite for continuing the proceeding and the parties are currently awaiting the Court's decision on this petition.

                    The attorneys handling the claims believe that in view of the early stage of the motions, before a hearing of the actual motions has commenced, and based on information delivered to them to date, Meitav Dash Provident has good defense arguments and that it is more likely than not (less than 50%) that the Court will dismiss the motions.

**MEITAV DASH INVESTMENTS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**NOTE 19:- COMMITMENTS, CONTINGENT LIABILITIES, GUARANTEES AND LIENS (Cont.)**

    b.    Contingent liabilities: (Cont.)

        2.    Litigation and claims - Meitav Dash Provident and Pension: (Cont.)

            e)    On February 26, 2017, a claim and motion for approval of a claim as a class action pursuant to the Class Action Law, 2006 were filed with the Tel-Aviv-Jaffa District Court by Financial Justice, R.A. ("the motion" and "the plaintiff", respectively) against Ayalon Pension and Provident (which was merged with and into Meitav Dash Provident on January 1, 2017, "the defendant") et al.

According to the plaintiff, the defendant illegally collected loan origination and/or management fees from its members. The group which the plaintiff seeks to represent is any individual or entity that had received a loan and/or credit from the defendant and was charged for loan origination and/or management fees.

On December 17, 2017, a petition for consolidating all the claims that had been filed for the same issue under a single beneficiary was granted. It was also agreed in the hearing that the parties will be first assigned to mediation.

In early 2019, the parties reached understandings regarding a settlement agreement based on the mediator's recommendation for concluding the case. On January 29, 2020, a petition was filed with the Court for approving a settlement agreement reached between the parties. On February 18, 2020, the Court ordered allowing the submission of the Attorney General's response and objections to the settlement agreement and making the settlement agreement public.

According to the Company's attorneys handling the motion, due to the early stage of the claim, it is difficult to assess the chances of the claim and/or the motion to be accepted.

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 19:- COMMITMENTS, CONTINGENT LIABILITIES, GUARANTEES AND LIENS (Cont.)**

      b.      Contingent liabilities: (Cont.)

            2.      Litigation and claims - Meitav Dash Provident and Pension: (Cont.)

                  f)      On July 10, 2017, a claim and motion to approve the claim as a class action were filed against Meitav Dash Provident with the Tel-Aviv District Court ("the motion"). The main arguments raised in the motion involve a criminal proceeding held against a former investment manager ("the defendant") in Apex Provident Fund Management Ltd. (which had been merged into Meitav Dash Provident several years before, "Apex Provident"). On May 25, 2017, the defendant was convicted in a plea bargain, among others, of several criminal offenses such as securities fraud, fraudulent receipt, theft by authorized person, deceit, breach of trust in a corporation and money laundering. The conviction mainly relies on planned transactions committed by the defendant himself.

Among others, it is argued in the motion that Apex Provident is responsible for the losses which the plaintiff argues had been caused to its then members by the defendant's actions and for the damages caused to the members' funds, among others due to Apex Provident's negligence in safekeeping the members' funds.

On April 17, 2018, a hearing of the case was held at the Court. As agreed upon between the parties, the hearing was assigned to the Labor Court and it was decided to allow the petitioner to file a revised motion for approval to the Labor Court.

On September 13, 2019, the petitioner filed a claim and revised class action certification motion against Meitav Dash Provident ("the revised class action certification motion") in which similar arguments as in the initial motion are raised. The amount of the revised class action certification motion in respect of the entire group of plaintiffs is approximately NIS 16.7 million (based on an expert opinion attached to the revised class action certification motion).

On January 14, 2020, Meitav Dash Provident filed a motion for dismissal of the revised class action certification motion on the grounds of statute of limitation and alternatively on the grounds of delayed submission ("the motion for dismissal"). Simultaneously with the motion for dismissal, the respondent filed a motion for deferral of the date for submitting its response to the revised class action certification motion until a decision is rendered in the motion for dismissal. On February 19, 2020, the petitioner submitted its response to the motion for dismissal. On March 15, 2020, Meitav Dash Provident submitted its response to the petitioner's response. The case is scheduled for a pretrial hearing on May 21, 2020 and for a proof hearing on September 17, 2020.

In the opinion of the attorneys handling the claim and motion, at this early stage since Meitav Dash Provident has yet to submit its response to the revised class action certification motion (and since no response has been submitted to the motion for dismissal which remains undecided), they are unable to assess the chances of the claim and motion.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**NOTE 19:- COMMITMENTS, CONTINGENT LIABILITIES, GUARANTEES AND LIENS (Cont.)**

   b.    Contingent liabilities: (Cont.)

   2.    Litigation and claims - Meitav Dash Provident and Pension: (Cont.)

   g)    On March 20, 2018, a claim and motion to approve the claim as a class action were filed with the Tel-Aviv Regional Labor Court against Meitav Dash Provident and five other managing companies (jointly with Meitav Dash Provident - "the defendants") by members of pension funds managed by the defendants.

   The claim alleges that survivors' insurance fees were charged from members with no survivors. The group which the plaintiffs wish to represent includes anyone who joined or was added to a pension fund managed by any of the defendants who has no survivors but was charged for survivors' insurance fees nonetheless. In their claim, the plaintiffs state that they are unable to assess the overall damage caused to the group members. On October 24, 2018, Meitav Dash Provident submitted its response to the motion for approval.

   On December 23, 2018, the petitioners submitted their response to the defendants' response. Various preliminary proceedings have been held in the course of the year.

   On June 13, 2019, a pretrial hearing was held at the Court and on July 29, 2019, the Court rendered a decision on a petition for disclosure of documents which dismissed the petition in full. An interrogation hearing is scheduled for June 25, 2020.

   The attorneys handling the motion believe that it is more likely than not (less than 50%) that Meitav Dash Provident's arguments will be accepted and the motion for approval of a class action will be dismissed.

   3.    In keeping with the collective agreement, a committee was founded whose objective is to discuss the issue of the eligibility of employees to payment for the period preceding the date of signing the agreement ("past debts") by weighting benefits previously granted by the Company to its employees in excess of mandatory legal requirements. Insofar as the committee reaches understandings on the existence of past debts, and as needed, the committee will determine their settlement for both existing employees and terminated employees. If the committee fails to reach understandings, the parties will apply to the dispute resolution mechanism stipulated in the agreement.

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 19:- COMMITMENTS, CONTINGENT LIABILITIES, GUARANTEES AND LIENS (Cont.)**

     b.    Contingent liabilities: (Cont.)

          4.    On September 26, 2019, a claim and class action certification motion filed with the Tel-Aviv District Court against Meitav Dash Loans Ltd. (a wholly owned subsidiary, "Meitav Dash Loans") for total cumulative damages of approximately NIS 7 million. The plaintiff argues that Meitav Dash Loans violated its fiduciary duty and duty of good faith towards the public of lenders using the loan platform operated by Meitav Dash Loans by deceiving them and offering the public of prospective lenders projected insolvency rates that were unclear and misleading.

               The members of the group which the plaintiff seeks to represent are anyone who in the seven years prior to the date of filing the motion had used Meitav Dash Loans' social lending platform as a lender whose rate of defaulted loans, defined by Meitav Dash Loans as "loans in arrears", exceeded the projected insolvency rates used by Meitav Dash Loans on its website.

               The plaintiff argues that Meitav Dash Loans had violated its legislative duty and the provisions of several laws including the Financial Service Control Law, the Consumer Protection Law and the Contract Law and also alleges deception, mala fide, malpractice, exploitation of standard form contracts and unjust enrichment. Meitav Dash Loans is required to submit its response to the motion by March 31, 2020. A pretrial hearing has been scheduled for June 24, 2020.

               The attorneys handling this case believe that at this early stage before the necessary examinations have been performed and before a response to the motion has been submitted, the chances of the claim and motion cannot be assessed.

     c.    Guarantees and liens:

          1.    Meitav Dash Securities and Investments Ltd. pledged in favor of Bank Hapoalim shares of Meitav Tachlit held by it, including the revenues therefrom and yields thereon, its rights in the bank account, including the funds and assets thereof, and its rights to receive funds from Meitav Tachlit as management fees and on account of shareholders' loans.

          2.    In the context of lease agreements, the Company and subsidiaries provided CPI-linked guarantees to owners of assets as collateral for the fulfillment of liabilities pursuant to lease agreements. As of the financial statement date, these guarantees amounted to approximately NIS 0.4 million.

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 19:- COMMITMENTS, CONTINGENT LIABILITIES, GUARANTEES AND LIENS (Cont.)**

    c.    Guarantees and liens: (Cont.)

        3.    A subsidiary, Meitav Dash Trade, manages its operations in the derivative (MAOF) market and clears all the securities traded by it according to an agreement with a bank which is a member of the TASE Derivatives (MAOF) Clearing House ("the TASE Derivatives Clearing House"). Meitav Dash Trade is committed to adhere to all the guidelines of the TASE and the TASE Derivatives Clearing House pertaining to derivative transactions as if it were itself a member of the TASE Derivatives Clearing House.

            According to the guidelines of the TASE Derivatives Clearing House, the generation of future rights for TASE members or for customers requires the TASE Derivatives Clearing House member to fulfill the obligations underlying the future rights. To secure these liabilities, Meitav Dash Trade might be required to provide the lending member collaterals at the monetary scope that is required from time to time.

            As of December 31, 2019, Meitav Dash Trade provided collaterals in respect of this liability totaling approximately NIS 29.7 million (December 31, 2018 - approximately NIS 16.3 million).

        4.    In the context of security and foreign currency transactions conducted by a subsidiary with banks and to secure credit extended to it, the subsidiary pledged the specific funds, deposits and securities in its bank accounts.

        5.    Meitav Dash Trade provided the TASE Clearing House a bank deposit in the amount of approximately NIS 46.3 million that is included in short-term investments. The deposit is pledged in favor of the TASE Clearing House under a first degree fixed lien. In October 2019, the TASE Clearing House ruled that Meitav Dash Trade's share of the TASE's risk fund as of the date of the financial statements will not be lower than NIS 46.3 million. Meitav Dash Trade is meeting this covenant.

        6.    Before the capital market reform in which ETNs were converted into ETFs, Tachlit companies recorded liens on ETN assets in favor of the trustees as part of their current operations. Once Amendment 28 became effective, an ETF trustee is entitled to pledge part of the ETF's assets in favor of banks.

            In the context of the transition to ETFs, the Company provided a guarantee of NIS 45 million to secure bank guarantees provided by the bank to the trustees in respect of "variable management fees" (as defined in the Tracking Fund Regulations). The Company also provided guarantees in an aggregate of approximately NIS 17 million to banks as a collateral requirement for its money market operation.

        7.    On March 5, 2020, the Company provided a guarantee in an unlimited amount to a bank in the context of receiving a credit line for SPC Loans Limited Partnership.

**MEITAV DASH INVESTMENTS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**NOTE 19:- COMMITMENTS, CONTINGENT LIABILITIES, GUARANTEES AND LIENS (Cont.)**

    c.    Guarantees and liens: (Cont.)

        8.    Investments of members of provident funds and liabilities to members of provident funds:

            Meitav Dash Provident has several guarantees towards some of its members as defined in the provident funds' articles of association.

            As of the financial statement date, Mizrahi Tefahot Bank Ltd. has guaranteed the undertakings defined in the relevant provident funds' articles of association. The guarantee will be in effect for a period of two years from the signing date (June 2017) and will be automatically renewed at the end of the period for an additional 24-month period unless the Bank notifies Meitav Dash Provident in writing six months in advance of its decision not to renew the guarantee. The guarantee is limited to an amount of NIS 30 million. If the Bank is required to pay any amount pursuant to the guarantee, it will have a right to receive a refund from Meitav Dash Provident and the Company.

        9.    In 2015-2016, the Company provided several guarantees to several investors in the context of their investment in Meitav Dash Loans' loan platform. The aggregate amount of the guarantees provided by the Company approximates NIS 2.4 million.

        10.    A subsidiary recorded a fixed charge on its entire rights to bank deposits, including the entire yields and income that derive and will derive from these deposits and all the yields, income, rights and franchises arising from pledged assets or related thereto, including the mortgagers' entire rights to compensation and indemnification and any right to exemption, discount, relief, refund and rights to exercise and/or offset losses in connection with the pledged assets and/or secured amounts, in a total of approximately NIS 0.6 million.

**NOTE 20:- EQUITY**

    a.    Composition of share capital:

| | December 31, 2019 and 2018 | December 31, | |
| --- | --- | --- | --- |
| | | 2019 | 2018 |
| | Authorized | Authorized | Issued and outstanding |
| | | Number of shares | |
| Ordinary shares of NIS 1 par value each | 100,000,000 | 69,123,390 | 68,155,935 |

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 20:- EQUITY (Cont.)**

b.  Movement in share capital:

Issued and outstanding share capital:

|  | Number of shares |
|---|---|
| Balance at January 1, 2019 (1) | 68,155,935 |
| Exercise of employee options into shares | 392,455 |
| Issue of RSUs (2) | 575,000 |
| Balance at December 31, 2019 | 69,123,390 |

(1)  Including 2,985,159 dormant shares held by the Company, see paragraph c below.

(2)  On May 27, 2019, following the approval of the Company's Remuneration Committee, the Company's Board approved the allocation of 575,000 RSUs of the Company (accounting for about 0.87% of its issued capital) to 16 Company officers and employees (of whom six officers and senior officers). Half of the RSUs will vest at the third anniversary from the date of approval of the allocation by the Board and the other half will vest at the fifth anniversary from said date. On June 4, 2019, the approval for the listing of the RSUs for trade on the TASE was obtained and the RSUs were listed for trade. The fair value on the grant date amounted to approximately NIS 6.9 million.

c.  Company's shares held by subsidiaries - treasury shares:

On December 20, 2018, DS Apex Technologies Ltd. and M.D. Treasury Ltd., wholly owned subsidiaries of the Company, transferred to the Company their entire interests in the Company's shares through a distribution of a dividend in kind, after having obtained the approval of the ITA and of the Tel-Aviv-Jaffa District Court. These shares are held by the Company as dormant shares which do not confer any equity or voting rights. Effective from said date, the number of issued shares that confer equity rights is identical to the number of issued shares that confer voting rights and the share capital registered for trade has been reduced accordingly.

d.  Capital management in the Group:

1.  The Company's equity is used in the development of the Company's business and in maintaining its financial stability.

2.  The Group companies operate by virtue of laws and regulations that govern their activities. By virtue of these laws and regulations, some of the Group companies are required to meet minimum capital requirements. As of December 31, 2019, all the Group companies are meeting these minimum capital and solvency requirements.

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### NOTE 20:- EQUITY (Cont.)

e. Dividend policy:

As for the dividend policy adopted by the Company, see Note 1c above.

f. As for the Company's obligation to meet financial covenants, see Note 16d above.

g. Dividend distributions:

In 2019, cumulative dividends were declared and paid in an amount of NIS 0.76 per share and a net total of approximately NIS 50 million (less dividends to subsidiaries that hold Company shares).

In 2018, cumulative dividends were declared and paid in an amount of NIS 0.65 per share and a net total of approximately NIS 43 million (less dividends to subsidiaries that hold Company shares).

In 2017, cumulative dividends were declared and paid in an amount of NIS 0.74 per share and a net total of approximately NIS 48 million (less dividends to subsidiaries that held Company shares).

h. Other capital reserves:

| | Put options to non-controlling interests | Hedges | Transactions with non-controlling interests | Other | Total |
|---|---|---|---|---|---|
| | | | NIS in millions | | |
| Balance at January 1, 2017 | (5) | (3) | (8) | (2) | (18) |
| Exercise of put options to non-controlling interests | 5 | - | (8) | - | (3) |
| Issuance of capital to non-controlling interests | - | - | 63 | - | 63 |
| Loss on available-for-sale financial assets | - | - | - | (1) | (1) |
| Actuarial gain on defined benefit plans | - | - | - | 1 | 1 |
| Purchases of non-controlling interests | - | - | (6) | - | (6) |
| Balance at December 31, 2017 | - | (3) | 41 | (2) | 36 |
| Purchases of non-controlling interests | - | - | (4) | - | (4) |
| Gain on cash flow hedges | - | 2 | - | - | 2 |
| Balance at December 31, 2018 | - | (1) | 37 | (2) | 34 |
| Investment in partnership's capital by non-controlling interests | - | - | (4) | - | (4) |
| Issuance of capital to non-controlling interests | - | - | 5 | - | 5 |
| Balance at December 31, 2019 | - | (1) | 38 | (2) | 35 |

**MEITAV DASH INVESTMENTS LTD.**

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 21:- BALANCES AND TRANSACTIONS WITH INTERESTED AND RELATED PARTIES**

    a.    Balances with interested and related parties:

**December 31, 2019**

| | Interested party and related parties |
|---|---:|
| | **NIS in millions** |
| Other accounts payable | (4) |

**December 31, 2018**

| | Interested party and related parties |
|---|---:|
| | **NIS in millions** |
| Other accounts payable | (3) |

    b.    Benefits to interested parties:

| | Year ended December 31, | | |
|---|:---:|:---:|:---:|
| | **2019** | **2018** | **2017** |
| | **NIS in millions** | | |
| Salaries and related expenses to those employed by or on behalf of the Company | 8 | 8 | 7 |
| Fees of directors not employed by or on behalf of the Company | 1 | 1 | 1 |
| Number of people to whom the salaries and benefits relate: | | | |
| Interested parties employed by or on behalf of the Company | 4 | 4 | 4 |
| Directors not employed by the Company | 8 | 7 | 7 |
| | 12 | 11 | 11 |

**MEITAV DASH INVESTMENTS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**NOTE 21:- BALANCES AND TRANSACTIONS WITH INTERESTED AND RELATED PARTIES (Cont.)**

c.    Benefits to key management personnel:

| | Year ended December 31, | | |
| --- | --- | --- | --- |
| | **2019** | **2018** | **2017** |
| | **NIS in millions** | | |
| Short-term benefits | 9 | 8 | 8 |
| Number of people to whom the benefits relate | 4 | 4 | 4 |

d.    Transactions with interested and related parties:

| | Year ended December 31, | | |
| --- | --- | --- | --- |
| | **2019** | **2018** | **2017** |
| | **NIS in millions** | | |
| Salaries and payroll accruals | 10 | 10 | 10 |

e.    Terms of transactions with related parties:

Transactions with related parties are conducted at arm's length and consist, among others, of brokerage services, portfolio management, provident funds, pension funds and mutual funds managed for related parties at market prices and not included above.

f.    The Company's policy on immaterial transactions:

Following the approval and recommendation of the Company's Audit Committee, on March 30, 2014, the Company's Board approved the adoption of guidelines and rules for classifying transactions with controlling shareholders as immaterial transactions. These rules will also serve for examining the scope of disclosure of transactions with controlling shareholders or transactions in whose approval controlling shareholders have a personal interest, as stipulated in Regulation 22 to the Israeli Securities Regulations (Periodic and Immediate Reports), 1970 and in Regulation 54 to the Israeli Securities Regulations (Details of Prospectus and Prospectus Draft - Structure and Format), 1969.

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 21:- BALANCES AND TRANSACTIONS WITH INTERESTED AND RELATED PARTIES (Cont.)**

f. The Company's policy on immaterial transactions: (Cont.)

In this context, the Company's Board ruled that a controlling shareholder transaction will be viewed as an immaterial transaction provided that it meets all the following conditions:

1. The transaction is not extraordinary (as this term is defined in the Israeli Companies Law); and

2. The transaction is inherent in the Company's operations, is of the type of transaction which the Company enters into in its ordinary course of business and the underlying engagement is not extraordinary and does not require making extraordinary management decisions; and based on the entirety of the circumstances it does not appear that the transaction has a significant impact on the Company or that it requires immediate disclosure to the public.

3. Regarding transactions for the provision of services by the Group to a controlling shareholder or in which a controlling shareholder has a personal interest:

    3.1 Long-term saving transactions - if conducted under the same rules of benefits granted to the Group's employees.

    3.2 Non long-term saving transactions - if the ratio of the Group's forecasted annual income from the provision of the services to the Group's total consolidated income in the latest calendar year does not exceed 0.5%, and provided that the ratio of the Group's forecasted annual income from the provision of the services to the Group's total consolidated income from the provision of the services in the latest calendar year does not exceed 10%; and

    The price (including commissions, management fees etc.) for the controlling shareholder will not be lower than the average price for a customer with a similar scope of activity in connection with the same services by more than 1%.

4. Regarding transactions for the receipt of services/produces by the Company from a controlling shareholder or in which a controlling shareholder has a personal interest:

    4.1 If the (annual) cost of the service/product to the Group does not exceed NIS 5 million (as adjusted to the rate of increase in the CPI in relation to the CPI published in January 2014); and

    4.2 The ratio of the Group's forecasted annual transaction related expenses to the Group's total expenses in the latest calendar year does not exceed 0.5%.

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 21:- BALANCES AND TRANSACTIONS WITH INTERESTED AND RELATED PARTIES (Cont.)**

      f.      The Company's policy on immaterial transactions: (Cont.)

            5.      Regarding investment transactions in which the Group and controlling shareholders are involved:

                5.1      If the ratio of the Company's investment to the Company's total long-term investments on a consolidated basis on the date of making the investment decision does not exceed 0.5%; and

                5.2      If the ratio of the Company's investment to the Company's consolidated equity according to its latest financial statements does not exceed 1%.

                5.3      It is hereby clarified that provided that the transaction is not an extraordinary transaction, investments in public companies in which the controlling shareholder holds less than 5% of the share capital will be classified as immaterial transactions.

It should be clarified that transactions in which the Company's controlling shareholders have excess interest will not be viewed as transactions that create material excess interest for the controlling shareholders and accordingly will not be viewed as transactions in which the controlling shareholders have a personal interest if the aggregate amount of all the transactions of the same type in which the Company's controlling shareholders have excess interest in annual terms does not exceed NIS 200,000 with respect to each controlling shareholder.

In cases in which the abovementioned benchmarks are not applicable to the examination of the transaction's immateriality, the transaction will be viewed as immaterial if it meets another applicable benchmark determined by the Audit Committee, provided that the scope of the transaction according to the applicable benchmark does not exceed 1% of the predetermined applicable benchmark and NIS 5 million (as adjusted to the rate of increase in the CPI in relation to the CPI published in January 2014).

The immateriality of interdependent or contingent transactions in the context of the same engagement will be examined on an aggregation basis. The immateriality of a multiannual transaction will be examined annually as long as it is in effect based on the transaction's scope in the relevant year in relation to its overall scope.

Moreover, the Company's Audit Committee decided that transactions that meet the conditions stipulated in paragraphs 2-5 above will not be viewed as extraordinary transactions. The Audit Committee will annually approve in advance that a transaction that meets the conditions stipulated in paragraphs 2-5 above is not extraordinary and if necessary the relevant parameters will be updated. This policy is reexamined annually by the Audit Committee.

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### NOTE 22:- REVENUES FROM MANAGEMENT FEES, COMMISSIONS AND OTHER

| | Year ended December 31, | | |
|---|---|---|---|
| | **2019** | **2018** | **2017** |
| | **NIS in millions** | | |
| Management of provident and pension funds | 318 | 320 | 338 |
| Management of mutual funds and ETNs/ETFs (1) | 315 | 310 | 305 |
| Management of security portfolios | 27 | 26 | 26 |
| TASE member and institutional brokerage | 104 | 105 | 77 |
| Revenues from insurance commission | 54 | 52 | 58 |
| Consulting, management fees and other | 26 | 16 | 14 |
| | 844 | 829 | 818 |

(1)     From the first quarter of 2019, following the merger between Meitav Dash Mutual Funds Ltd. and Meitav Tachlit Mutual Fund Management Ltd., the revenues from managing mutual funds also include revenues from managing ETFs. The comparative figures have been restated to allow a proper comparison.

### NOTE 23:  MARKETING, OPERATING, GENERAL AND ADMINISTRATIVE EXPENSES AND FINANCE EXPENSES FROM NON-BANK LOANS

| | Year ended December 31, | | |
|---|---|---|---|
| | **2019** | **2018** | **2017** |
| | **NIS in millions** | | |
| Salaries and related expenses (1) (2) (3) | 298 | 286 | 280 |
| Reseller commissions | 166 | 158 | 161 |
| Professional fees | 37 | 36 | 38 |
| Advertising | 20 | 20 | 20 |
| Rent and maintenance | 5 | 22 | 20 |
| Levies | 18 | 14 | 12 |
| Office and communication expenses | 9 | 9 | 11 |
| Operating and computing commissions | 69 | 64 | 54 |
| Depreciation and amortization | 58 | 31 | 24 |
| Vehicle maintenance and parking fees | 4 | 15 | 15 |
| Share-based payment | 2 | 2 | 2 |
| Donations | 2 | 2 | 2 |
| Compensation of customers | 3 | 1 | 1 |
| Finance expenses from non-bank loans | 21 | 15 | 15 |
| Other | 6 | 13 | 11 |
| | 718 | 688 | 666 |

(1)     Includes payroll tax for salaries and related expenses of subsidiaries which are financial institutions pursuant to the VAT Law.

(2)     Includes management fees to companies owned by executives in the Group.

(3)     Includes nonrecurring expenses of approximately NIS 5 million arising from corporate efficiency measures adopted in 2019.

- 127 -

**MEITAV DASH INVESTMENTS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

### NOTE 24:- FINANCE INCOME (EXPENSES)

| | | Year ended December 31, | | |
| --- | --- | --- | --- | --- |
| | | **2019** | **2018** | **2017** |
| | | NIS in millions | | |
| a. | Finance income: | | | |
| | Finance income from interest and linkage difference in respect of income tax | 1 | 1 | 1 |
| | Other | - | - | 1 |
| | | 1 | 1 | 2 |
| b. | Finance expenses: | | | |
| | Finance expenses from long-term liabilities | 3 | 3 | 4 |
| | Finance expenses from debentures | 20 | 29 | 23 |
| | Ineffective portion of change in fair value of cash flow hedge | 2 | 1 | 1 |
| | Finance expenses from lease liability | 6 | - | - |
| | Other | 2 | 4 | 4 |
| | | 33 | 37 | 32 |

### NOTE 25:- OTHER EXPENSES, NET

| | Year ended December 31, | | |
| --- | --- | --- | --- |
| | **2019** | **2018** | **2017** |
| | NIS in millions | | |
| Amortization of intangible assets | 43 | 35 | 34 |
| Impairment of goodwill in subsidiary | - | - | 3 |
| Capital loss from sale of investment in investee | - | 1 | - |
| Capital gain from sale of investment in associate | - | - | (1) |
| Loss from change in liability for purchase of operations | 1 | - | 2 |
| Gain from change in share of TASE equity rights | - | - | (22) |
| Gain from sale of TASE shares | - | (5) | - |
| Other, net | - | 2 | 1 |
| | 44 | 33 | 17 |

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### NOTE 26:- TAXES ON INCOME

a. Details of the tax environment in which the Group operates:

1. Corporate tax rate:

The Israeli corporate tax rate was 24% in 2017 and 23% in 2018 and 2019. A company is taxable on its real capital gains at the corporate tax rate in the year of sale.

On December 22, 2016, the "Knesset" plenum approved the Economic Efficiency Law (Legislative Amendments for Achieving the Economic Targets for the 2017 and 2018 Budget Years), 2016 which prescribes, among others, a reduction of the corporate tax rate from 25% to 23% in two stages; the first to the rate of 24% is effective from January 1, 2017 and the second to the rate of 23% is effective from January 1, 2018 onward.

2. Profit tax:

Some of the Group companies are financial institutions, as this term is defined in the Value Added Tax Law. According to this law, in addition to corporate tax (23%), financial institutions are also subject to profit tax.

On October 12, 2015, the Israeli Parliament's Plenum approved the Value Added Tax Decree (Tax Rate applicable to Non-profit Organizations and Financial Institutions) (Revised), 2015 according to which the profit rate applicable to financial institutions will be lowered from 18% to 17% effective from October 1, 2015.

The profit tax for 2017, 2018 and 2019 is 17% and the statutory tax rate applicable to financial institutions is 35.04%, 34.19% and 34.19%, respectively.

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### NOTE 26:- TAXES ON INCOME (Cont.)

b.    Deferred taxes:

| | Carry-forward losses | Intangible assets | Employee benefits | Deferred issuance costs | Other | Total |
|---|---|---|---|---|---|---|
| | | | NIS in millions | | | |
| Deferred tax assets (liabilities), net: | | | | | | |
| Balance at January 1, 2017 | 19 | (64) | 4 | 7 | 5 | (29) |
| Changes reported in profit or loss | (5) | (3) | - | (1) | (2) | (11) |
| Business combination | 9 | - | - | - | - | 9 |
| Balance at December 31, 2017 | 23 | (67) | 4 | 6 | 3 | (31) |
| Changes reported in profit or loss | 3 | (1) | - | 1 | 3 | 6 |
| Changes reported in other comprehensive income | - | - | - | - | (1) | (1) |
| Balance at December 31, 2018 | 26 | (68) | 4 | 7 | 5 | (26) |
| Changes reported in profit or loss | - | - | - | - | (1) | (1) |
| Balance at December 31, 2019 | 26 | (68) | 4 | 7 | 4 | (27) |

The deferred taxes are presented in the statement of financial position as follows:

| | December 31, | |
|---|---|---|
| | 2019 | 2018 |
| | NIS in millions | |
| Non-current assets | 19 | 20 |
| Non-current liabilities | (46) | (46) |
| | (27) | (26) |

The deferred tax balances are computed at the tax rates that are expected to apply upon realization.

**MEITAV DASH INVESTMENTS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**NOTE 26:- TAXES ON INCOME (Cont.)**

c.     Taxes on income included in the statements of profit or loss:

|  | Year ended December 31, | | |
|---|---|---|---|
|  | **2019** | **2018** | **2017** |
|  | **NIS in millions** | | |
| Current taxes | 33 | 49 | 34 |
| Deferred taxes | 1 | (6) | 11 |
| Taxes in respect of previous years | - | - | (1) |
| VAT on intragroup management fees | 16 | 13 | 19 |
| Adjustment of deferred tax balances following change in tax rate | - | - | 1 |
|  | 50 | 56 | 64 |

d.     Tax assessments:

The Company and some of the Group companies received final tax assessments and assessments that are considered final through the 2014 tax year. The Company and a subsidiary were issued tax assessments to the best of judgment for the 2014-2017 tax years according to which they are required to pay additional taxes amounting to approximately NIS 1.1 million (in nominal NIS for the years in question).

On December 3, 2018, the Company received withholding tax assessment orders for the 2011-2012 tax years and on January 6, 2020, the Company received withholding tax assessment orders for the 2013-2015 tax years, all pursuant to Section 152(b) to the Income Tax Ordinance. According to the orders, the tax assessing officer argues that the Company should have paid withholding tax on payments made to certain service companies in keeping with the Income Tax and Employer's Tax Regulations (Deduction from Wages and Salaries and Payment of Employer's Tax), 1993. The total tax charged from the Company (in nominal NIS for the years in question) approximates NIS 15.3 million. The Company disputes the grounds and amount of the tax charge and with its legal counsel has filed an appeal to the tax assessment orders with the Tel-Aviv District Court. In response to the appeal, the tax assessing officer submitted to the Court a document specifying the grounds for the tax assessments for 2011-2012, which was delivered to the Company on January 31, 2019. As for the notice of appeal on the tax assessments for 2013-2014, the Court granted the tax assessing officer's request for an extension for submitting the tax assessment grounds until April 18, 2019.

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 26:- TAXES ON INCOME (Cont.)**

    d.    Tax assessments: (Cont.)

On October 29, 2019, two subsidiaries received tax assessment orders for the 2013-2014 tax years pursuant to Section 152(b) to the Income Tax Ordinance. According to the orders, the tax assessing officer argues that the subsidiaries should have paid withholding tax on payments made to certain service companies in keeping with the Income Tax and Employer's Tax Regulations (Deduction from Wages and Salaries and Payment of Employer's Tax), 1993. The total tax charged from the subsidiaries (in nominal NIS for the years in question) approximates NIS 1.1 million. The subsidiaries dispute the grounds and amount of the tax charge and with their legal counsel filed appeals to the tax assessment orders with the Tel-Aviv District Court.

The Company and the ITA have initiated negotiations for settling their disputes regarding the appealed tax years (through the 2015 tax year, inclusive) and the disputed tax assessments of the subsidiaries off-court. A provision was recorded in the financial statements in the amount of the settlement proposed in the context of the negotiations.

In the opinion of the Company, based on its legal counsel, the Company has good defense arguments and therefore it is more likely than not that they will be accepted. However, the Court's ruling cannot be predicted at this stage.

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### NOTE 26:- TAXES ON INCOME (Cont.)

e. Theoretical tax:

The reconciliation between the tax amount that would have applied, assuming that all the income and expenses, gains and losses in the statement of comprehensive income were taxed at the statutory tax rate, and the taxes on income recorded in the statement of comprehensive income as follows:

| | Year ended December 31, | | |
|---|---|---|---|
| | **2019** | **2018** | **2017** |
| | **NIS in millions** | | |
| Income before taxes on income (excluding the Company's share of earnings of associates and associated partnerships, net) | 140 | 130 | 165 |
| Statutory tax rate *) | 23% | 23% | 24% |
| Tax computed at the statutory tax rate | 32 | 29 | 39 |
| Permanent differences in recognition of income and expenses, net | - | 2 | 1 |
| Share-based payment | - | - | 1 |
| Utilization of timing differences, carryforward losses and temporary differences from previous years for which deferred taxes were not recorded in the past | (3) | - | (1) |
| Losses and timing differences for which deferred taxes were not created | 4 | 1 | 8 |
| Losses from previous year for which deferred taxes were created | (3) | - | (2) |
| Deferred and current taxes in respect of previous years | - | - | (1) |
| Differences in respect of different tax rate applicable to Group companies (financial institutions) | 20 | 20 | 22 |
| Adjustment due to change in tax rates, net | - | - | 1 |
| Other | - | 4 | (4) |
| Taxes on income | 50 | 56 | 64 |

*) The tax rate applicable to the Company and subsidiaries in the Group that are not financial institutions.

**MEITAV DASH INVESTMENTS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**NOTE 26:- TAXES ON INCOME (Cont.)**

    f.    Carryforward tax losses:

Based on the Company's evaluation, the Company and subsidiaries have business losses, capital losses and real losses from marketable securities for tax purposes that are carried forward to future years totaling approximately NIS 448 million as of December 31, 2019 (December 31, 2018 - approximately NIS 419 million). As of December 31, 2019, the Company and the subsidiaries did not create deferred taxes relating to said carryforward losses of approximately NIS 316 million (December 31, 2018 - approximately NIS 303 million). Some of the losses are subject to limitations due to the tax-exempt business restructuring in the Company.

**NOTE 27:- OPERATING SEGMENTS**

    a.    General:

        1.    The Group operates in five reportable operating segments:

| | |
|---|---|
| Long and medium-term savings management segment | - Marketing and managing compensation and severance pay funds, study funds, central severance pay funds, pension funds and funds earmarked for other purposes. |
| Current savings management segment | - From the second quarter of 2019 and following the merger discussed in Note 4c above, the current savings management segment consists of marketing and managing security investment portfolios for private and institutional customers, managing mutual funds and managing ETFs. |
| TASE member and institutional brokerage segment | - Providing TASE member and institutional brokerage services that consist, among others, of security custodian services and security transactions for a wide variety of customers. |
| Non-bank loans | - Providing non-bank loans to small and medium sized corporations in Israel through Peninsula Group Ltd. |

The other activities in the Group are included in the "other" segment and mainly consist of insurance agencies (other than an insurance agency that is wholly owned by the Company and is included in the long-term and medium-term savings segment), distribution of foreign funds and the Capital Markets College, which was sold in July 2018.

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### NOTE 27:- OPERATING SEGMENTS (Cont.)

a.    General: (Cont.)

2.    Management separately monitors the operating results of its business units for the purpose of making decisions of resource allocation and performance evaluation. Segment performances are evaluated based on the operating income or loss which in certain cases is measured differently from the operating income or loss in the consolidated financial statements.

The finance expenses, finance income and taxes on income are managed on a group basis and not allocated to operating segments. Other expenses, which mainly consist of amortization of intangible assets, are not allocated to operating segments since they are not part of the CODM's decision-making process. Moreover, expenses that are not allocated to segments mainly include headquarter expenses.

3.    The Group accounts for inter-segment revenues as if the revenues are derived from third parties and therefore recognizes them at current market prices.

4.    In 2018, in the context of liabilities for ETNs in the consolidated statement of financial position, the Company's share is included in several indices which are tracked by the ETNs. Against those liabilities, the special purpose subsidiaries of the ETNs hold Company shares as part of the assets backing the liabilities. These shares are presented in the Company's consolidated financial statements as treasury shares and accordingly, the gains or losses from revaluation and exercise of these shares are not recognized in profit or loss. For the purpose of making decisions, the CODM takes into account the gains and losses arising from the liabilities for the Company's shares.

As a result of the above, in 2017, the Company's consolidated revenues in the statement of comprehensive income differ from the total consolidated revenues of the segments.

5.    As discussed in Note 2l above, effective from January 1, 2019, the Company applies IFRS 16. Accordingly, right-of-use asset depreciation expenses ore not allocated to the different segments since they are not used by management for making operating decisions.

6.    As discussed above, from the second quarter of 2019, the current savings management segment includes mutual fund management, ETF management and securities investment portfolio marketing and management for private and institutional customers. The presentation is governed by the policy adopted by the Company's CODM who, from the second quarter of 2019 and as a result of the merger, as described in Note 4b above, views these operations as a reportable segment. Accordingly, the Group restated the segment under the necessary changes.

**MEITAV DASH INVESTMENTS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

## NOTE 27:- OPERATING SEGMENTS (Cont.)

b.    Information regarding operating segments:

| | Long and medium-term savings management | Current savings management | TASE member and institutional brokerage | Non-bank loans | Other | Adjustments | Total |
|---|---|---|---|---|---|---|---|
| | | | | Year ended December 31, 2019 | | | |
| | | | NIS in millions | | | | |
| Revenues: | | | | | | | |
| Revenues from external entities | 318 | 342 | 104 | 81 | 80 | - | 925 |
| Inter-segment revenues | - | - | - | - | 5 | (5) | - |
| Total revenues | 318 | 342 | 104 | 81 | 85 | (5) | 925 |
| Company's share of earnings of companies accounted for at equity, net | - | - | - | - | 6 | - | 6 |
| Segment income | 44 | 117 | 35 | 42 | 32 | - | 270 |
| Expenses not allocated to segments | | | | | | | (57) |
| Gain from securities held for Nostro portfolio investments, net | | | | | | | 9 |
| Finance expenses, net | | | | | | | (32) |
| Other expenses, net | | | | | | | (44) |
| Income before taxes on income | | | | | | | 146 |

**MEITAV DASH INVESTMENTS LTD.**

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 27:- OPERATING SEGMENTS (Cont.)**

b.    Information regarding operating segments: (Cont.)

| | Year ended December 31, 2018 | | | | | | |
|---|---|---|---|---|---|---|---|
| | Long and medium-term savings management | Current savings management * | TASE member and institutional brokerage | Non-bank loans | Other | Adjustments | Total |
| | NIS in millions | | | | | | |
| Revenues: | | | | | | | |
| Revenues from external entities | 320 | 336 | 105 | 61 | 68 | - | 890 |
| Inter-segment revenues | - | - | - | - | 5 | (5) | - |
| Total revenues | 320 | 336 | 105 | 61 | 73 | (5) | 890 |
| Company's share of earnings of companies accounted for at equity, net | - | - | - | - | 3 | - | 3 |
| Segment income | 42 | 117 | 33 | 30 | 16 | - | 238 |
| Expenses not allocated to segments | | | | | | | (33) |
| Loss from securities held for Nostro portfolio investments, net | | | | | | | (3) |
| Finance expenses, net | | | | | | | (36) |
| Other expenses, net | | | | | | | (33) |
| Income before taxes on income | | | | | | | 133 |

*)    From the second quarter of 2019, the current savings management segment includes mutual fund management, ETF management and securities investment portfolio marketing and management for private and institutional customers. The presentation is governed by the policy adopted by the Company's CODM who, from the second quarter of 2019 and as a result of the merger, as described in Note 4b above, views these operations as a reportable segment. Accordingly, the Group restated the segment under the necessary changes.

**MEITAV DASH INVESTMENTS LTD.**

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## NOTE 27:- OPERATING SEGMENTS (Cont.)

b.   Information regarding operating segments: (Cont.)

| | Year ended December 31, 2017 | | | | | | |
|---|---|---|---|---|---|---|---|
| | Long and medium- term savings management | Current savings management * | TASE member and institutional brokerage | Non-bank loans | Other | Adjustments | Total |
| | | | NIS in millions | | | | |
| Revenues: | | | | | | | |
| Revenues from external entities | 338 | 330 | 77 | 56 | 72 | - | 873 |
| Inter-segment revenues | - | - | - | - | 6 | (6) | - |
| Total revenues | 338 | 330 | 77 | 56 | 78 | (6) | 873 |
| Company's share of earnings of companies accounted for at equity, net | - | - | - | - | 5 | - | 5 |
| Segment income | 48 | 126 | 21 | 26 | 27 | (2) | 246 |
| Expenses not allocated to segments | | | | | | | (35) |
| Gain from liability in respect of treasury shares | | | | | | | 1 |
| Gain from securities held for Nostro portfolio investments, net | | | | | | | 4 |
| Finance expenses, net | | | | | | | (30) |
| Other expenses, net | | | | | | | (16) |
| Income before taxes on income | | | | | | | 170 |

*)   From the second quarter of 2019, the current savings management segment includes mutual fund management, ETF management and securities investment portfolio marketing and management for private and institutional customers. The presentation is governed by the policy adopted by the Company's CODM who, from the second quarter of 2019 and as a result of the merger, as described in Note 4b above, views these operations as a reportable segment. Accordingly, the Group restated the segment under the necessary changes.

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 27:- OPERATING SEGMENTS (Cont.)**

    c.    Major service providers:

        Subsidiaries use FMR's software for their account management and trading service system. The subsidiaries and other TASE members are dependent on the services of this service provider.

**NOTE 28:- EARNINGS PER SHARE**

        Details of the number of shares and income used in the computation of earnings per share:

| | Year ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | **2019** | | **2018** | | **2017** | |
| | **Weighted number of shares** | **Income** | **Weighted number of shares** | **Income** | **Weighted number of shares** | **Income** |
| | **In thousands** | **NIS in millions** | **In thousands** | **NIS in millions** | **In thousands** | **NIS in millions** |
| For the computation of basic earnings per share | 65,652 | 78 | 65,067 | 67 | 64,727 | 95 |
| For the computation of diluted earnings per share | 66,384 | 78 | 65,959 | 67 | 66,557 | 95 |

**NOTE 29:- SHARE-BASED PAYMENT TRANSACTIONS CONSISTING OF COMPANY SHARES**

    a.    Option plan for the Company's officers and employees:

        According to the Company's remuneration policy approved on September 12, 2013 by the Company's general meeting, from time to time, the Company's Remuneration Committee and Board are entitled to allocate options to officers in the Company (who are not controlling shareholders therein).

        On December 25, 2013 and January 26, 2014, the Company's Board approved the allocation of options to the Company's CEO and to officers and employees of the Company and of companies controlled by it, at no consideration, in an aggregate number of up to non-marketable registered 5,932,000 options ("the allocation package") that are exercisable into up to 5,932,000 Ordinary shares of the Company of NIS 1 par value each, assuming full exercise and subject to adjustments.

        On November 15, 2017, the Company's Board approved the allocation to seven directors of 245,000 non-marketable options that are exercisable into up to 245,000 shares of the Company, assuming full exercise. The allocation was approved by the Company's general meeting and was executed on January 22, 2018.

        On August 13, 2019, the Company's Board approved the allocation of 35,000 non-marketable options that are exercisable into up to 35,000 shares of the Company, assuming full exercise, to a director. The allocation was approved by the Company's general meeting and was executed on October 24, 2019.

**MEITAV DASH INVESTMENTS LTD.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**NOTE 29:- SHARE-BASED PAYMENT TRANSACTIONS CONSISTING OF COMPANY SHARES (Cont.)**

a.   Option plan for the Company's officers and employees: (Cont.)

The movement in options issued and their weighted average exercise price:

|  | Number of options | | Weighted average exercise price (NIS) | |
|---|---|---|---|---|
|  | **2019** | **2018** | **2019** | **2018** |
| Balance at January 1, | 3,139,378 | 3,884,259 | 12.23 | 11.85 |
| Granted during the year | 35,000 | 245,000 | 13.24 | 14.43 |
| Exercised during the year | (1,704,700) | (711,240) | 12.13 | 12.06 |
| Expired during the year | (166,927) | (278,641) | 12.37 | 11.61 |
| Balance at December 31, | 1,302,751 | 3,139,378 | 12.37 | 12.23 |

The parameters used in fair value measurement on the date of approval of the grant of the options:

|  | **2019** |
|---|---|
|  | **Directors** |
| Fair value at grant date (NIS in millions) | 0.9 |
| Share price on grant date (NIS) | 13.23 |
| Expected volatility (%) | 21.8 |
| Risk-free interest rate (%) | 0.28-1.05 |
| Expected life of the options (years) | 3-6 |
| Dividend yield on share (%) | - |

b.   Allocation of RSUs:

As for the allocation of RSUs, see Note 20b(2) above.

**MEITAV DASH INVESTMENTS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**NOTE 30:- EVENT AFTER THE REPORTING DATE**

After the reporting period and beginning in February 2020, the Coronavirus outbreak has been adversely affecting both local and global financial markets due to the major slowdown in global economic activity. The main impact on the Company is reflected in an anticipated decrease in revenues and income as a result of the impairment of assets managed by it. The scope of the impact depends on the duration of the crisis and the prolongation of the increased volatility in the stock and corporate bond markets.

From the beginning of 2020 through March 15, 2020, the mutual fund assets managed by the Group (including ETFs) decreased by approximately NIS 11.8 billion, the managed portfolio assets decreased by approximately NIS 1.8 billion and the provident and pension fund assets managed by the Group decreased by approximately NIS 5.5 billion. The decrease in the scope of managed assets results both from impairment and from redemptions by customers and directly led to a decline in the Group's revenues.

The marketable securities in the Group's Nostro portfolio recorded net impairment losses of approximately NIS 12 million from the beginning of 2020. The Group's securities portfolio, which is principally used as part of the equity required according to regulatory requirements for various Group companies, is mostly invested in deposits, government bonds and liquid assets.

The Company is closely monitoring the rapid developments in the markets and has already taken steps to adjust its expenses to the expected decline in revenues. Due to the nature of the Group's operations, about one third of the decline in revenues is automatically offset against a decrease in direct expenses such as distribution commissions, operating costs and other expenses arising from the scope of the assets. In addition, various steps are being considered and taken to minimize the Company's payroll costs, including requiring certain employees to take unpaid leave of absence, minimizing marketing and advertising budgets, reducing procurement and supplier expenses, suspending new IT system projects and ceasing investments in new ventures.

In view of all of the aforesaid, the Company estimates that the prolongation of the crisis will have a material adverse effect on its business operations, including on its revenues and profits. At this stage it is impossible to quantify the extent of the negative impact on the Company's business results as it depends, among others, on the duration of the crisis.

**MEITAV DASH INVESTMENTS LTD.**

## APPENDIX TO CONSOLIDATED FINANCIAL STATEMENTS

### LIST OF INVESTEES

| | Ownership rate | |
| --- | --- | --- |
| | December 31, | |
| | 2019 | 2018 |
| | % | |
| Meitav Dash Securities and Investments Ltd. | 100 | 100 |
| M.D. Treasury Ltd. | 100 | 100 |
| DS Apex Mergers and Acquisitions Ltd. | 100 | 100 |
| DS Apex Technologies Ltd. | 100 | 100 |
| Peninsula Group Ltd. | 51.24 | 54.77 |
| Meitav Dash Loans Ltd. | 100 | 100 |
| Meitav Dash Insurance Agency Ltd. | 88 | 88 |
| Meitav Dash Brokerage Ltd. | 88.13 | 85.4 |
| Meitav Dash Trade Ltd. | 100 | 100 |
| Meitav Dash Mortgage Advisors Ltd. (1) | 60.01 | 60.01 |
| Meitav Dash Global Markets Ltd. | 70.01 | 70.01 |
| Sela Insurance Agency Ltd. | 60 | 60 |
| Naroy Financial Technologies Ltd. | - | 42 |
| Meitav Dash Pension Insurance Agency Ltd. | 100 | 100 |
| Value Base Ltd. | 19.95 | 19.95 |
| Y.K.V Insurance Agencies Ltd. | 100 | 100 |
| Mikadu Hedge Funds Ltd. | 70 | 70 |
| MDP Loan Funds Ltd. | 75 | 75 |
| Knox Wealth Management Ltd. | 59.3 | 59.3 |
| Liquidity Capital M.C. Ltd. | 60 | 60 |
| Meitav Dash Hazavim Investment Management Ltd. | 100 | 60 |
| Eshelim Capital Markets Ltd. | 87 | 87 |
| Liquidity Capital G.P.G.P. Ltd. | 60 | 60 |
| Liquidity Capital II, L.P. | 14.18 | - |
| Lotus Investment Management Limited (4) | 45 | - |
| | | |
| ***Companies held by Meitav Dash Trade Ltd.:*** | | |
| Gaon Finance Investments (2000) Ltd. (1) | 100 | 100 |
| Gaon Financial Investments (MBLL) Ltd. (1) | 100 | 100 |
| M.G.B.H. Holdings Ltd. (1) | 100 | 100 |
| | | |
| ***Companies held by Peninsula Group Ltd.:*** | | |
| Peninsula Fund Management Ltd. | 19.99 | 19.99 |
| Peninsula Commercial Credit Ltd. | 100 | 100 |
| Peninsula Ltd. | 100 | 100 |

**MEITAV DASH INVESTMENTS LTD.**

**APPENDIX TO CONSOLIDATED FINANCIAL STATEMENTS**

**LIST OF INVESTEES (Cont.)**

| | Ownership rate | |
|---|---|---|
| | December 31, | |
| | **2019** | **2018** |
| | **%** | |
| ***Company held by Lotus Investment Management Limited:*** | | |
| Lotus Investments IG Limited | 100 | 100 |
| | | |
| ***Companies held by M.D. Treasury Ltd.:*** | | |
| Apex Issuances Ltd. | 19.99 | 19.99 |
| Apex Capital Markets Ltd. | 19.99 | 19.99 |
| | | |
| ***Company held by Y.K.V Insurance Agencies Ltd.:*** | | |
| Kariv Insurance Agencies Ltd. | 100 | 100 |
| | | |
| ***Company held by Meitav Dash Insurance Agency Ltd.*** | | |
| Rimonim Insurance Agency Ltd. | 88 | 88 |
| | | |
| ***Companies held by Meitav Dash Securities and Investments Ltd.:*** | | |
| Meitav Dash Provident and Pension Ltd. | 80 | 80 |
| Meitav Tachlit Mutual Fund Management Ltd. (formerly: Tachlit Trackers Mutual Fund Management Ltd.) | 100 | 100 |
| Tachlit Composite Structures Ltd. | 100 | 100 |
| Meitav Dash Mutual Funds Ltd. (5) | - | 100 |
| Meitav Dash Portfolio Management Ltd. | 100 | 100 |
| Meitav Dash Properties Ltd. (3) | 100 | 100 |
| Dovrat Shrem Enterprises (1) | 100 | 100 |
| Meitav Issuing and Finance Ltd. (3) | 100 | 100 |
| Meitav Dash Financial Markets Ltd. | 100 | 100 |
| | | |
| ***Company held by Meitav Issuing and Finance Ltd.*** | | |
| Direct Investment House (Underwriting) Ltd. (3) | 100 | 100 |
| | | |
| ***Company and limited partnership held by Meitav Dash Loans Ltd.:*** | | |
| e-Loan GP Ltd. (2) | 100 | 100 |
| SPC Loans Limited Partnership (2) | 99 | 99 |
| | | |
| ***Limited partnership held by Eshelim Capital Markets Ltd.:*** | | |
| M.D. Eshelim Capital Markets, L.P. | 87 | 87 |
| | | |
| ***Companies held by Rimonim Insurance Agency Ltd.:*** | | |
| Rimonim North Insurance Agency (2018) Ltd. | 51 | 51 |
| Peles Insurance Agency (2018) Ltd. | 51 | 51 |

**MEITAV DASH INVESTMENTS LTD.**

**APPENDIX TO CONSOLIDATED FINANCIAL STATEMENTS**

## LIST OF INVESTEES (Cont.)

| | Ownership rate | |
| --- | --- | --- |
| | December 31, | |
| | **2019** | **2018** |
| | **%** | |
| ***Company held by Tachlit Composite Structures Ltd.:*** | | |
| Synergetica Underwriting Ltd. | 100 | 100 |
| | | |
| ***Companies held by Synergetica Undersriting Ltd.:*** | | |
| Tachlit Financial Structures Ltd. | 100 | 100 |
| Tachlit Deposits Ltd. (3) | - | 80 |
| Reserve and Trade (Deposits) Ltd. (3) | - | 80 |
| Tachlit Trackers Ltd. (3) | - | 95.5 |
| Reserve and Trade (Index) Ltd. (3) | - | 95.5 |
| Tachlit Global Ltd. (3) | - | 100 |
| Global Reserve and Trade Ltd. (3) | - | 100 |
| Tachlit Composites Ltd. (3) | - | 100 |
| Composites Reserve and Trade Ltd. (3) | - | 100 |
| | | |
| ***Companies held by Meitav Tachlit Mutual Fund Management Ltd.*** ***(formerly: Tachlit Trackers Mutual Fund Management Ltd.)*** ***(some indirectly):*** | | |
| Index Trackers Ltd. (3) | - | 100 |
| Tachlit Trackers Ltd. (3) | - | 4.5 |
| Reserve and Trade (Index) Ltd. (3) | - | 4.5 |
| Tachlit Deposits Ltd. (3) | - | 20 |
| Reserve and Trade (Deposits) Ltd. (3) | - | 20 |
| Tachlit Currencies Ltd. (3) | - | 100 |
| Reserve and Trade (Currencies) Ltd. (3) | - | 100 |
| Tachlit Global Dollar Ltd. (3) | - | 100 |
| Reserve and Trade (Dollar) Ltd. (3) | - | 100 |
| Tachlit Index Foreign Currency Ltd. (3) | - | 100 |
| Tachlit Index Machsanit Foreign Currency Ltd. (3) | - | 100 |

(1)    Inactive company.

(2)    eLoan GP Ltd. is the general partner which holds 1% of SPC Loans Limited Partnership.

(3)    In voluntary liquidation process (some liquidated after the reporting date).

(4)    After the financial statement date, the Company holds 58.5% of the issued and outstanding share capital.

(5)    Merged into Meitav Tachlit.

- - - - - - - - - - - - - -