UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER L. SAYCE, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>FORESCOUT TECHNOLOGIES, INC., et al.,<br><br>Defendants. | Case No. 20-cv-00076-SI<br><br>**ORDER APPOINTING CO-LEAD PLAINTIFFS GLAZER FUNDS AND MEITAV; APPROVING SELECTION OF CO-LEAD COUNSEL**<br><br>Re: Dkt. Nos. 63, 64, 76, 81 |

Now before the Court in this securities action are three competing motions to appoint lead plaintiff and for approval of their selection of lead counsel. Dkt. Nos. 63, 64, 81. This matter came on for videoconference hearing on November 6, 2020.

For the following reasons and for good cause shown, the Court GRANTS the motions for appointment of lead plaintiff by the Glazer Funds and Meitav. *See* Dkt. Nos. 63, 81. The Court APPOINTS the Glazer Funds and Meitav as co-lead plaintiffs in this case and APPROVES their selection of co-lead counsel, Abraham, Fruchter & Twersky, LLP and Pomerantz LLP.

**BACKGROUND**

**I.    Factual Background**

Defendant Forescout Technologies ("Forescout") is a San Jose, California-based cybersecurity company "that purports to provide device visibility and control solutions to businesses and government agencies in an attempt to reduce cyber and operational risks." Dkt. No. 31 ¶¶ 2, 38 ("Amended Complaint"). The company was founded in Israel in 2000 and had its initial public offering in October 2017. *Id.* ¶ 38. On January 2, 2020, plaintiff Christopher Sayce filed this

securities class action's original complaint (the "Sayce Action") against Forescout Technologies, Inc., Michael DeCesare, and Christopher Harms (collectively, "defendants") for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder. Dkt. No. 1 at 2. The complaint alleged that "[t]hroughout the Class Period [then described as 2/7/19 – 10/9/19], Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Forescout was experiencing significant volatility with respect to large deals and issues related to the timing and execution of deals in the Company's pipeline, especially in Europe, the Middle East, and Africa ('EMEA'); (ii) the foregoing was reasonably likely to have a material negative impact on the Company's financial results; and (iii) as a result, the Company's public statements were materially false and misleading at all relevant times." *Id.* ¶ 4.

According to the amended complaint, the alleged misleading statements contained two partial disclosures. First, on May 9, 2019, Forescout announced its second quarter revenues for 2019 would be between $75.3 million and $78.3 million as a result of "slipped deals." Dkt. No. 31 ¶ 8 (Amended Complaint). Share prices dropped by $7.02 from its last closing price of $43.30 per share, closing at $36.28 per share on May 10, 2019. *Id.* ¶ 9. Forescout increased its full year guidance, however, despite these "slipped deals" and claimed expected end-of-year revenues between $365.3 million and $375.3 million. *Id.* ¶ 10. Forescout further assured analysts by "touting" the size and strength of its sales pipeline and productivity at an earnings conference call that same day, despite a decline in both. *Id.* ¶ 11. Second, on October 10, 2019, Forescout announced that its expected third quarter revenue would be lower ($90.6 million-$91.6 million) than that previously provided in its guidance ($98.8 million-$101.8 million). *Id.* ¶ 17. Share prices dropped once again by more than 37%, closing at $24.565 per share on October 10, 2019. *Id.* ¶ 18. Forescout attributed its lacking revenue to "'extended approval cycles which pushed several deals out of the third quarter' due to deteriorating macroeconomic conditions in Europe, Middle East and Africa . . . , even though the relative size of Forescout's business in the . . . region did not support the shortfall." *Id.* ¶ 17. Forescout also continued to assure the public that the "slipped deals" would

2

close in the second half of the year and allow it to "catch up." *Id.* ¶ 19.

On February 6, 2020, Forescout announced that it "had entered into a definitive agreement to be acquired by the affiliates of Advent International ('Advent') for $33 per share in an all cash transaction valued at approximately $1.9 billion." Dkt. No. 31 ¶ 20 (Amended Complaint). On the day of the announcement, the price of Forescout common stock increased from a closing price of $27.98 on February 5, 2020, to $33.28 on February 6. *Id.* ¶ 21. "On May 18, 2020, Forescout issued a press release which revealed that on May 15, 2019 [sic], Advent notified the Company that it would not proceed with the acquisition as scheduled." *Id.* ¶ 25.[1] Stock prices declined to a closing price of $22.57 per share on May 18, 2020, from $29.52 per share at the close of trading on May 15, 2020. *Id.* ¶ 26.

## II.     Procedural Background

On January 2, 2020, Pomerantz LLP, counsel for Sayce, published its first notice of the filing of this lawsuit "on behalf of a class consisting of investors who purchased or otherwise acquired Forescout securities between February 7, 2019, and October 9, 2019, both dates inclusive . . . ." Dkt. No. 18-2 (Pafiti Decl., Ex. B); *see also* Dkt. No. 1 ¶¶ 1, 46. The notice informed shareholders that they had until March 2, 2020, to ask the Court to be appointed as lead plaintiff for the class. *Id.* On March 23, 2020, this Court granted the unopposed motion by Meitav Tachlit Mutual Funds Ltd. ("Meitav") for appointment as lead plaintiff and approved Meitav's selection of Pomerantz LLP as lead counsel. Dkt. No. 27 at 3 (Vacated Order per Dkt. No. 55 (Order to Consolidate Cases and Republish PSLRA Notice)).

On May 22, 2020, Meitav filed an Amended Complaint that expanded the class to include "persons or entities, who purchased or otherwise acquired the common stock of Forescout between February 7, 2019 and May 15, 2020, both dates inclusive[,]" thereby encompassing the period just before Forescout's announcement that it would not be acquired by Advent. *See* Dkt. No. 31 ¶ 1

---

[1] As of July 15, 2020, the merger agreement was amended and Advent International did acquire Forescout such that it is now a wholly owned subsidiary of Advent International. Dkt. No. 63 at 5 (Motion by Glazer Funds).

3

(Amended Complaint).

On June 10, 2020, a different set of plaintiffs[2] filed a securities class action complaint (the "Arbitrage Action") against the same defendants identified in the Sayce Action for violations of Sections 10(b) and 20(a) of the Exchange Act. *See The Arbitrage Fund v. Forescout Techs., Inc.*, Case No. 3:20-cv-03819-SI, Dkt. No. 1 at 3. The complaint in the Arbitrage Action alleged that Forescout made misstatements and omissions about the prospects of the failed Advent acquisition and defined the proposed class as those "persons or entities who purchased or otherwise acquired the common stock of defendant Forescout Technologies, Inc. . . . during the period from February 6, 2020 through May 15, 2020, inclusive . . and were damaged thereby . . . ." *Id.* On June 11, 2020, Entwistle & Cappucci LLP, counsel for plaintiffs in the Arbitrage Action, published notice of the filing of the lawsuit, with an August 10, 2020, deadline for potential lead plaintiffs to file a motion with the Court. Dkt. No. 42 (Seltzer Decl., Ex. C).

In the Sayce Action, on June 15, 2020, Meitav brought a Motion to Consolidate Cases and Vacate Notice and Lead Plaintiff Deadline, seeking to consolidate the Sayce Action and the Arbitrage Action. Dkt. No. 35 (Motion to Consolidate). On July 22, 2020, the Court granted the motion in part, ordered the two cases consolidated, vacated its previous order appointing Meitav as lead plaintiff, and ordered a new lead plaintiff notice process. Dkt. No. 55 at 10. Meitav republished notice of the action, specifying the expanded class period identified in the Amended Complaint, with a lead plaintiff motion deadline of September 28, 2020. Dkt. No. 63 at 9 (Motion by Glazer Funds).

Three movants now seek appointment as lead plaintiff: the "Glazer Funds,"[3] the "Arbitrage

---

[2] These plaintiffs were: the Arbitrage Fund, Water Island LevArb Fund, LP, Water Island Diversified Event-Driven Fund, Water Island Merger Arbitrage Institutional Comingled Master Fund LP, and Altshares Merger Arbitrage ETF. These plaintiffs, joined by several other entities, and calling themselves the "Arbitrage Plaintiffs," now move for appointment of lead plaintiff in this action.

[3] The Glazer Funds consist of: Glazer Capital Management, L.P.; Glazer Enhanced Fund L.P.; Glazer Enhanced Offshore Fund, Ltd.; Glazer Offshore Fund, Ltd.; and Highmark Multi-Strategy 2.

4

Plaintiffs,"[4] and Meitav. *See generally* Dkt. No. 63 (Motion by Glazer Funds); Dkt. No. 64 (Motion by Arbitrage Plaintiffs); Dkt. No. 81 (Motion by Meitav).[5]

**LEGAL STANDARD**

Section 21D of the Private Securities Litigation Reform Act of 1995 ("PSLRA") is "intended to encourage the most capable representatives of the plaintiff class to participate in class action litigation and to exercise supervision and control of the lawyers for the class." Joint Explanatory Statement of the Committee of Conf., Conference Report on Sec. Litig. Reform, H.R. Conf. Rep. No. 104-39 at 32 (1995); *see generally In re Microstrategy Inc. Sec. Litig.*, 110 F. Supp. 2d 427, 432-36 (E.D. Va. 2000). Under the procedures set out in the PSLRA, all proposed lead plaintiffs must submit a sworn certification setting forth certain facts designed to assure the Court that the plaintiff (i) has suffered more than a nominal loss, (ii) is not a professional litigant, and (iii) is otherwise interested and able to serve as a class representative. 15 U.S.C. § 78u-4(a)(2)(A). The plaintiff in the first lawsuit to be filed must additionally publish notice of the complaint in a widely circulated business publication within twenty days of filing the complaint. *Id.* at § 78u-4(a)(3)(A)(I). The notice must include a description of the claim and notify prospective class members that they may move within 60 days of the notice to be named lead plaintiff.

Once applications for lead plaintiff status are closed, the district court must determine who among the movants is the "most adequate plaintiff." *Id.* at § 78u-4(a)(3)(B)(I). The PSLRA directs courts to "appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members . . . ." *Id.* In the Ninth Circuit, *In re Cavanaugh*, 306 F.3d 726 (9th Cir. 2002), governs lead plaintiff selection and establishes a three-step process. First, as discussed above, timely and complete notice

---

[4] The Arbitrage Plaintiffs consist of: the Arbitrage Fund; Water Island LevArb Fund, LP; Water Island Diversified Event-Driven Fund; Water Island Merger Arbitrage Institutional Comingled Master Fund, LP; Altshares Merger Arbitrage ETF; S. Muoio & Co. LLC; and Amethyst Arbitrage International Master Fund.

[5] Donald R. Levin also moved for appointment as lead plaintiff, Dkt. No. 76, but subsequently filed a Notice of Non-Opposition after acknowledging that the Glazer Funds had the larger financial interest. *See generally* Dkt. No. 93 (Notice by Levin).

of the action must be published. *Cavanaugh*, 306 F.3d at 729. Second, the district court considers the losses suffered by potential lead plaintiffs and selects "the one who 'has the largest financial interest in the relief sought by the class' and 'otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.'" *Id.* at 730 (citing 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)). Finally, the court focuses on that plaintiff to ensure that the proposed lead plaintiff "satisfies the requirements of Rule 23(a), in particular those of 'typicality' and 'adequacy.'" *Id.* A plaintiff who satisfies the first two steps becomes the "presumptively most adequate plaintiff." *Id.* In step three, other plaintiffs have the opportunity to rebut the presumptive lead plaintiff's showing of typicality and adequacy. *Id.* (citing 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)).

Once the court has designated a lead plaintiff, the lead plaintiff "shall, subject to the approval of the court, select and retain counsel to represent the class." 15 U.S.C. § 78u-4(a)(3)(B)(v).

## DISCUSSION

Here, none of the three competing groups dispute the timeliness of the others' motions to appoint lead plaintiff. They also agree that the largest purported financial loss, and therefore interest, in the case is that of the Glazer Funds. *See* Dkt. No. 97 at 2 (Opp'n by Arbitrage Pls.) (admitting that the Arbitrage Plaintiffs' financial loss is second to the Glazer Funds') ("The Arbitrage Plaintiffs suffered the next largest loss."); Dkt. No. 96 at 7 (Opp'n by Meitav) (arguing only that the Glazer Funds and the Arbitrage Plaintiffs fail to satisfy Rule 23) ("While the other competing movants have alleged larger losses than Meitav . . . ."). The Glazer Funds claims losses of approximately $5.3 million; the Arbitrage Plaintiffs claim losses of approximately $3.4 million; and Meitav claims losses of approximately $200,000. Dkt. No. 96 at 7 (Opp'n by Meitav). The Court therefore begins its analysis by considering the typicality and adequacy of the Glazer Funds to determine whether is satisfies Rule 23.

I.  **The Glazer Funds**

   A.  **Typicality**

"The purpose of the typicality requirement is to assure that the interest of the named

representative aligns with the interests of the class . . . . [C]lass certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (holding that proposed representative's claims were not typical because his "reliance on the integrity of the market would be subject to serious dispute as a result of his extensive experience in prior securities litigation, his relationship with his lawyers, his practice of buying a minimal number [of] shares of stock in various companies, and his uneconomical purchase of only ten shares of stock" in defendant company) (citations omitted).

Here, Meitav and the Arbitrage Plaintiffs argue, in summary, that the Glazer Funds is not typical of the entire class because (1) it purchased a large portion of its relevant shares after the release of a third party report, the Spruce Point report, which identified some of the misrepresentations alleged in this case; (2) it purchased all relevant shares after the announcement of the planned (but then-failed) merger of Forescout and affiliates of Advent International; and (3) according to Meitav, Glazer based its purchases on an investment strategy markedly different from that of a majority of the members of the class.

### 1. Purchases Post-Spruce Point Report

The Arbitrage Plaintiffs argue that the Glazer Funds is not typical of the entire class because it purchased the majority of its relevant shares after the release of the Spruce Point report, a report released by a third-party short-seller that purportedly identified some of the alleged misrepresentations in this case. *See* Dkt. No. 97 at 7 (Opp'n by Arbitrage Pls.).

On April 30, 2020, Spruce Point Capital Management ("Spruce Point"), a New York based investment management company, published a letter that advised Advent International to either terminate the merger agreement with Forescout or significantly lower the offered price per share.[6]

---

[6] The Glazer Funds disputes that the report was published on April 30, 2020. It says instead that Spruce Point issued a press release and tweeted about the report but that the report did not actually issue until May 12, 2020. The Court does not find this dispute relevant to the outcome of this Order.

7

Dkt. No. 97 at 4 (Opp'n by Arbitrage Pls.). This report included Spruce Point's conclusions that Forescout failed to disclose significant information to its potential acquirers. *See id.* at 4-5. The report stated, for instance, "Failure to disclose such devastating, yet realistic projections certainly calls management's credibility into question and gives Advent a basis for reevalution of the transaction price and conditions." Dkt. No. 98-4 at 6 (Spruce Point report).[7] The report also stated, "We remain concerned that Forescout executives may have been aware of the emergence of dramatic, Company-altering headwinds which it never divulged to prospective acquirers." *Id.* The report stated that the opinions presented were "based upon publicly available information" (*id.* at 3), and that Spruce Point "hold[s] a short position in Forescout [stocks] and stand[s] to benefit in the event its share price declines" (*id.* at 7). The Glazer Funds purportedly purchased approximately 45% of its shares after the report's release, while the Arbitrage Plaintiffs apparently purchased only 1% of their shares after that date. Dkt. No. 97 at 5 (Opp'n by Arbitrage Pls.).

The Arbitrage Plaintiffs argue that the Spruce Point report constitutes a "full or partial disclosure of materially false statements and omissions of material fact" and, therefore, subjects the Glazer Funds to the unique defense that it did not, in fact, rely on misinformation or misrepresentations when purchasing shares after the report's release. *See id.* at 7. The Glazer Funds counterargues that "the Spruce Point report was authored by a short-seller with clear financial incentives to precipitate a sell-off of Forescout common stock through publication of a report that also disclaimed the accuracy of the representations made therein," and therefore cannot constitute a corrective disclosure. Dkt. No. 101 at 7 (Reply by Glazer Funds).

At this early stage of litigation, the Court need not and will not decide the issue of whether the Spruce Point report constitutes a corrective disclosure. Even if the Court assumes, arguendo, that the report was a corrective disclosure, this Court has previously found that a "plaintiff's post-disclosure purchases do not automatically defeat typicality." *See in re Connetics Corp. Securities Litigation*, 257 F.R.D. 572, 577 (N.D. Cal. 2009) (Illston, J.). Other courts have similarly "ruled that purchases of stock by the class representatives after negative announcements during the class

---

[7] Page numbers for this Exhibit refer to the ECF branded numbers. All other page numbers in this Order refer to the original pagination when available.

period or even after the close of the class period do not destroy typicality." *Hufnagle v. Rino Int'l Corp.*, No. CV 10-8695-VBF(VBKx), 2011 U.S. Dist. LEXIS 19771, at *22 (C.D. Cal. Feb. 14, 2011) (Fairbank J.) (quoting *Lehocky v. Tidal Techs., Inc.*, 220 F.R.D. 491, 501-02 (S.D. Tex. 2004)).[8]

The fact that Glazer Funds bought shares after the Spruce Point report's release does not automatically defeat the plaintiff's typicality. *See In re Connetics*, 257 F.R.D. at 577. Moreover, the Court finds it significant that the Spruce Point report did not contain any previously unavailable information that would clearly distinguish Glazer Funds from the other plaintiffs in the class who may have bought shares only prior to its release.

Furthermore, the Arbitrage Plaintiffs' claim that litigating such an issue would be a waste of litigation costs resources for the rest of the class has no merit. Under the Amended Complaint, the class period includes time after the report's release, from April 30, 2020, to May 15, 2020. If, as the Arbitrage Plaintiffs predict, defendants argue that the report constitutes disclosure of some kind and seek to exclude the period after its release, it would potentially affect *all* members of the class, not just the Glazer Funds. *See Eichenholtz v. Verifone Holdings, Inc.*, No. C 07-06140 MHP, 2008 WL 3925289, at *3 (N.D. Cal. Aug. 22, 2008) (noting that it was "inimical" to the interests of the class for a proposed lead plaintiff to argue for a shorter class period, and ruling, "at this early stage in the litigation, the court declines the invitation to artificially shorten the class period when

---

[8] The parties also cite *In re BofI Holding, Inc. Securities Litigation*, 977 F.3d 781, No. 18-55415, 2020 U.S. App. LEXIS 31938 (9th Cir. 2020). There, the Ninth Circuit found that anonymous third-party blog posts did not constitute corrective disclosures under the circumstances presented because "[t]he posts were authored by anonymous short-sellers who had a financial incentive to convince others to sell, and the posts included disclaimers from the authors stating that they made 'no representation as to the accuracy or completeness of the information set forth in this article.'" *Id.*, 2020 U.S. App. LEXIS 31938, at *33-34.

For two reasons, the Court declines the Glazer Funds's invitation to find that case shows the Spruce Point report was not a corrective disclosure. First, the *In re BofI* court rejected the defendant's request to adopt a bright line rule that disclosures based on publicly available information can never constitute corrective disclosures, finding instead that a "flexible" approach was the better course. *Id.*, 2020 U.S. App. LEXIS 31938, at *27. Second, that decision resolved a motion to dismiss, not a motion to appoint lead plaintiff. *See generally*, 2020 U.S. App. LEXIS 31938.

9

1   determining the plaintiff with the greatest financial interest in this litigation."). Therefore, the
2   potential defense the Arbitrage Plaintiffs identify is not necessarily unique to the Glazer Funds, and
3   the Arbitrage Plaintiffs' arguments regarding the Spruce Point report does not destroy the Glazer
4   Funds's typicality at this stage.

### 2. Purchases Post-Merger Announcement

Forescout announced the merger, for Advent International to acquire Forescout in its entirety, on February 6, 2020, almost one year past the start of the class period (i.e., February 7, 2019). Dkt. No. 63 at 3 (Motion by Glazer Funds). Meitav argues that, since the Glazer Funds did not purchase any shares during that one year "sub-period" prior to the merger announcement, the Glazer Funds is subject to the unique defense of lack of standing should post-merger-announcement events later be found non-actionable. Dkt. No. 96 at 12 (Opp'n by Meitav).

Meitav's argument suggests that a lead plaintiff must have purchased shares after each alleged count of misinformation by defendants, which could undermine the purpose of appointing a lead plaintiff in such class actions. *See Police & Fire Ret. Sys. Of City of Detroit v. IndyMac MBS, Inc.*, 721 F.3d 95, 112 (2d Cir. 2013) ("Nothing in the PSLRA indicates that district courts must choose a Lead Plaintiff with standing to sue on every available cause of action . . . ."). Moreover, the cases on which Meitav relies are distinguishable. *See* Dkt. No. 96 at 12-13 (Opp'n by Meitav) (citing *Kanefsky v. Honeywell Int'l, Inc.*, No. 18-cv-15536, 2020 U.S. Dist. LEXIS 87108, at *7 n.4 (D.N.J. May 18, 2020); *Erickson v. Snap, Inc.*, No. 2:17-cv-03679-SVW-AGR, 2017 U.S. Dist. LEXIS 221050, at *8-9 (C.D. Cal. Sept. 18, 2017)). The court in *Kanefsky* did not actually rule on the issue at hand. *See Kanefsky*, 2020 U.S. Dist. LEXIS 87108, at *7 n.4 (ordering that parties meet and confer because the court foresaw "problems" due to purchase dates). And in *Erikson*, the presumptive lead plaintiff purchased more than 60% of his shares "*after the exact revelation of fraud that [he] pled in his own complaint.*" *Erikson*, 2017 U.S. Dist. LEXIS 221050, at *7 (emphasis added).

Here, however, the Glazer Funds's alleged moment of "revelation" is May 18, 2020. Nothing in the record shows that the Glazer Funds significantly increased its holding of Forescout

1  stock after this date, nor has Meitav argued that the Glazer Funds did so. *See* Dkt. No. 101 at 12
2  (Reply by Glazer Funds). The Glazer Funds purchased shares based on alleged misrepresentations
3  made within the specified class period. This argument therefore does not destroy typicality.

4        Still, the Court finds it prudent, as discussed further below and as discussed with counsel at
5  the hearing, to appoint both the Glazer Funds and Meitav as co-lead plaintiffs to ensure that the
6  entire class is best represented. The Court's ultimate obligation is to "appoint as lead plaintiff the
7  member or members of the purported plaintiff class that the court determines to be most capable of
8  adequately representing the interests of class members." 15 U.S.C. § 78u-4(a)(3)(B)(i); *see also In*
9  *re Baan Co. Sec. Litig.*, 186 F.R.D. 214, 215 (D.D.C. 1999) ("Congress envisioned that courts still
10 would play an independent, gatekeeping role to implement the PSLRA."). Although the Court will
11 not go so far as to find the timing of the Glazer Funds's purchases render it atypical, given that the
12 Glazer Funds purchased Forescout stock roughly one year after the start of the class period, and
13 after several of the partial disclosures alleged in the Amended Complaint, the Court agrees with
14 Meitav's underlying premise that the class would be best represented by lead plaintiffs who also
15 purchased securities during the earlier portion of the class period.

### 3.  Investment Strategy

Meitav also raises concerns regarding the Glazer Funds's alleged event-based investment strategies and the possibility that such a strategy would lead defendants to successfully rebut the *Basic* presumption, which states that "it is reasonable to presume that most investors—knowing that they have little hope of outperforming the market in the long run based solely on their analysis of publicly available information—will rely on the security's market price as an unbiased assessment of the security's value in light of all public information." *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 273 (2014) (quoting *Amgen Inc. v. Connecticut Retirement Plans & Trust Funds*, 568 U.S. 455, 462 (2013)). The Supreme Court, however, noted that "to indirectly rely on a misstatement in the sense relevant for the *Basic* presumption, [the investor] need only trade stock based on the belief that the market price will incorporate public information within a reasonable period." *Halliburton*, 573 U.S. at 274. This is because such an investor "also presumably tries to

11

1   estimate *how* undervalued or overvalued a particular stock is, and such estimates can be skewed by

2   a market price tainted by fraud." *Id.* (emphasis original).  Therefore, Meitav's assertions that the

3   Glazer Funds purchased shares based on event-driven strategies designed to "take advantage of

4   market miscalculations" (Dkt. No. 96 at 14 (Opp'n by Meitav)) as opposed to only stock prices,

5   does not constitute proof at this stage of the case that the Glazer Funds's claims are not typical of

6   the class as a whole.

7   In addition, the central question of the case will be whether defendants made

8   misrepresentations that artificially inflated the company's stock price.  The key concern is the

9   defendants' behavior rather than the plaintiffs' (*see Deutschman v. Beneficial Corp.*, 132 F.R.D.

10   359, 373 (D. Del. 1990)), and there is nothing to suggest that defendants treated the Glazer Funds

11   any differently from those like the Arbitrage Plaintiffs or Meitav.  Finally, any concerns regarding

12   the Glazer Funds's investment strategy will be mitigated by the appointment of Meitav as co-lead

13   plaintiff.

14   For the above reasons, at this stage of the case, the Court finds the Glazer Funds sufficiently

15   meets the Rule 23 typicality requirement to be appointed as a lead plaintiff.

### B.   Adequacy

18   The relevant inquiry when determining adequacy under Rule 23 is whether "the

19   representative plaintiffs and their counsel have any conflicts of interest with other class members"

20   and whether "the representative plaintiffs and their counsel [will] prosecute the action vigorously

21   on behalf of the class." *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003) (internal citations

22   omitted).

23   The competing plaintiffs do not raise any separate issues regarding the adequacy of the

24   Glazer Funds to act as lead plaintiff apart from those already discussed with respect to typicality.

25   The Court finds that, given its significantly larger financial interest in this case and through their

26   selection of counsel experienced in securities class action litigation (*See* Dkt. No. 63 at 13 (Motion

27   by Glazer Funds)), the Glazer Funds has sufficiently demonstrated its alignment of interest with the

28   rest of the class as well as its intent and willingness to act as vigorous advocates on behalf of the

12

1  entire class. Therefore, the Glazer Funds meets the adequacy requirement to be appointed as a lead
2  plaintiff at this stage of the case.

## II. Meitav as Co-Lead Plaintiff

Meitav requests, in the alternative, that it be appointed co-lead plaintiff should the Court find another plaintiff qualified to be lead plaintiff. Dkt. No. 96 at 19-20 (Opp'n by Meitav).

A review of the case law shows that the term "co-lead plaintiffs" more commonly refer to plaintiffs that make up a single group of plaintiffs like the Glazer Funds rather than a combination of two moving groups of plaintiffs like the Glazer Funds and Meitav. *See, e.g.*, *In re Enron Corp. Securities Litig.*, 206 F.R.D. 427, 454 n.32 (S.D. Texas 2002) ("The Court agrees with counsel . . . that Alabama's losses should not be counted as part of the State Retirement Systems Group's because it is not applying as a co-Lead Plaintiff."). However, the statutory language, which states, "the court . . . shall appoint as lead plaintiff the member *or members* of the purported plaintiff class that the court determines to be most capable . . ." allows for this possibility. *See* 15 U.S.C. § 78u-4(a)(3)(B)(i) (emphasis added). If the court appoints a group to act as co-lead plaintiffs, the group should be a "*small* group of manageable size that is capable of joint decisionmaking regarding the litigation." *See Takeda v. Turbodyne Techs., Inc.*, 67 F. Supp. 2d 1129, 1136 (C.D. Cal. 1999) (citing *In re Advanced Tissue Sciences Sec. Litig.*, 184 F.R.D. 346 (S.D. Cal. 1998) (narrowing the lead plaintiff group to six plaintiffs as opposed to 250)); *Yousefi v. Lockheed Martin Corp.*, 70 F. Supp. 2d 1061, 1070 (C.D. Cal. 1999) (rejecting unopposed motion by group of 137 plaintiffs and selecting two from among members of the class to serve as lead plaintiffs).

Here, the Glazer Funds and Meitav together would be a group within the meaning of "small."[9] *See In re Advanced Tissue Sciences*, 184 F.R.D. 346 (S.D. Cal. 1998); *see also* Memorandum of the Securities and Exchange Commission, Amicus Curiae, Introduction and Summary of the Commission's Position, at 1, attached to *In re Baan*, 186 F.R.D. at 224 ("Construing

---

[9] It appears that the Glazer Funds, although comprised of several different funds, have Glazer Capital LLC, managed by Paul J. Glazer, as their investment manager. *See* Dkt. No. 66-3, Berg Decl., Ex. C (Certification).

the term 'groups of person' in light of the language and purposes of the Act, a court generally should apply approve a group small enough to be capable of effectively managing the litigation and the lawyers. The Commission believes that ordinarily this should be no more than three to five persons, a number that will facilitate joint decision-making and also help to assure that each group member has a sufficiently large stake in the litigation.").

As noted above, given the differences in the timing of when the Glazer Funds and Meitav purchased their stock (for the Glazer Funds, after the merger announcement; for Meitav, before and after the merger announcement), the Court finds it appropriate to appoint the Glazer Funds and Meitav as co-lead plaintiffs in this case. Although the Court does not find any typicality problems with the Glazer Funds at this stage, adding Meitav as co-lead counsel will best protect the interests of the class should issues later arise specific to the year-long class period before the merger announcement, when only Meitav had stock purchases. Moreover, none of the parties dispute that Meitav meets the Rule 23 requirements. Appointing these two movants as co-lead plaintiffs will, therefore, provide the Court with the best representation of the entire class.[10] [11]

### III.   Co-Lead Counsel

The Ninth Circuit has explained that "the district court does not select class counsel at all." *Cavanaugh*, 306 F.3d at 732. Instead, the district court generally approves the lead plaintiff's selection of counsel. Glazer Funds has selected and retained Abraham, Fruchter & Twersky, LLP

---

[10] The Court does not consider the Arbitrage Plaintiffs as a co-lead plaintiff, although they have the next largest financial stake after the Glazer Funds, for two reasons: (1) like the Glazer Funds, they too had no Forescout securities purchases before the announcement of the proposed merger, and so are vulnerable to the same challenges as the Glazer Funds; and (2) one of their members was previously found in breach of fiduciary duty by another court, and thus risks triggering unique defenses that would distract from the focus of the litigation. *See* Dkt. No. 104 at 6 (Reply by Meitav).

[11] The Court also does not consider Mr. Levin, who also filed a motion for appointment but then filed a Notice of Non-Opposition. *See generally* Dkt. No. 93. That notice states that Mr. Levin remains willing and able to serve as lead plaintiff if the Court finds the Glazer Funds to be inadequate, which the Court does not. The Court also notes that although Mr. Levin's stock purchases fell within the class period prior to the announced merger, that is, the class period identified in the original complaint in this case, Mr. Levin did not seek appointment as lead plaintiff when notice of this action was first published.

to serve as lead counsel pursuant to statute. Dkt. No. 63 at 13 (Motion by Glazer Funds). Meitav has selected and retained Pomerantz LLP to serve as lead or co-lead counsel. Dkt. No. 81 at 18 (Motion by Meitav). Both firms have presented their credentials, including years of experience successfully litigating large securities class action suits such as this one. At the hearing, the firms indicated a willingness to work together and noted they have successfully litigated securities cases together in the past. Accordingly, the Court approves the Glazer Funds's and Meitav's selection of counsel and appoints Abraham, Fruchter & Twersky, LLP and Pomerantz LLP as co-lead counsel.

As discussed at the hearing, this Court is committed to ensuring that junior lawyers (five or fewer years out of law school) and lawyers from groups that have been historically underrepresented in the legal profession have meaningful opportunities to participate in litigation. The Court notes the apparent lack of diversity, including by female lawyers, among the group that argued at the November 6 hearing. The Court strongly urges all parties to this case to make meaningful litigation opportunities available to junior and underrepresented lawyers throughout the pendency of this action.

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby GRANTS the motions for appointment of lead plaintiff by the Glazer Funds and Meitav. *See* Dkt. Nos. 63, 81. The Court APPOINTS the Glazer Funds and Meitav as co-lead plaintiffs and APPROVES their selection of co-lead counsel, Abraham, Fruchter & Twersky, LLP and Pomerantz LLP. The competing motions by the Arbitrage Plaintiffs and Donald Levin are DENIED. *See* Dkt. Nos. 64, 76.

**The newly-appointed co-lead plaintiffs shall file an amended consolidated complaint on or before December 18, 2020.**

**IT IS SO ORDERED**.

Dated: November 19, 2020

SUSAN ILLSTON
United States District Judge