Pages 1 - 30

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE SUSAN ILLSTON

CHRISTOPHER L. SAYCE, individually )
and on behalf of all others         )
similarly situated,                 )
                                    )
            Plaintiffs,             )
    vs.                             ) No. C 20-0076 SI
                                    )
FORESCOUT TECHNOLOGIES, INC.,       )
MICHAEL DECESARE and CHRISTOPHER    )
HARMS,                              )
                                    )  San Francisco, California
            Defendants.             )  Friday
                                    )  November 6, 2020
_____)  10:00 a.m.

**TRANSCRIPT OF ZOOM VIDEO CONFERENCE PROCEEDINGS**

**APPEARANCES**:

**For Plaintiffs Meitav Tachlit Mutual Funds and
Christopher Sayce:**
                        POMERANTZ LLP
                        600 Third Avenue
                        20th Floor
                        New York, New York 10016
                BY:  **JEREMY A. LIEBERMAN, ESQ.**

**For Movant Donald R. Levin:**
                        ROBBINS GELLER RUDMAN & DOWD LLP
                        Post Montgomery Center
                        One Montgomery Street
                        Suite 1800
                        San Francisco, California 94104
                BY:  **SHAWN A. WILLIAMS**

        **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By:    *Debra L. Pas, CSR 11916, RPR, RMR, CRR*
                *Official Reporter - US District Court*
                *Computerized Transcription By Eclipse*

**APPEARANCES:   (CONTINUED)**

**For Movants The Arbitrage Fund, et al:**
                         SUSMAN GODFREY LLP
                         1900 Avenue of the Stars
                         Suite 1400
                         Los Angeles, California 90067
                    BY:  **MARC M. SELTZER, ESQ.**
                         **KRYSTA KAUBLE PACHMAN, ESQ.**


                         ENTWISTLE & CAPPUCCI LLP
                         401 Congress Avenue
                         Suite 1170
                         Austin, Texas 78701
                    BY:  **ANDREW J. ENTWISTLE, ESQ.**


                         LABATON SUCHAROW
                         140 Broadway
                         New York, New York 10005
                    BY:  **FRANCIS P. MCCONVILLE, ESQ.**


**For Movants Glazer Capital Management, et al:**
                         ABRAHAM FRUCHTER AND TWERSKY LLP
                         One Penn Plaza
                         Suite 2805
                         New York, New York 10119
                    BY:  **JEFFREY S. ABRAHAM, ESQ.**


**For Defendants:**      WILSON SONSINI GOODRICH & ROSATI
                         650 Page Mill Road
                         Palo Alto, California 94304
                    BY:  **IGNACIO EVARISTO SALCEDA, ESQ.**
                         **DIANE MARIE WALTERS, ESQ.**

                              —  —  —

**Friday - November 6, 2020**                              **9:59 a..m.**

**P R O C E E D I N G S**

**---000---**

THE CLERK:  Now calling Case No. 20-CV-076; Sayce versus Forescout Technologies, Incorporated.

Counsel, please state your appearances for the record, starting with plaintiffs.

MR. SELTZER:  Good morning, Your Honor.  Marc Seltzer of Susman Godfrey on behalf of the plaintiffs in the -- the Arbitrage plaintiffs.

THE COURT:  Good morning.

MR. LIEBERMAN:  Good morning, Your Honor.  Jeremy Lieberman from Pomerantz, LLP on behalf of movant Meitav Tachlit and on behalf of the Sayce plaintiff.

THE COURT:  Good morning.

MR. ABRAHAM:  Good morning, Your Honor.  Jeffrey Abraham on behalf of the Glazer Fund movants.

THE COURT:  Good morning.

MR. ENTWISTLE:  Good morning, Your Honor.  Andrew Entwistle on behalf of the Arbitrage Fund movants, and Krysta Pachman is also here from the Susman Godfrey firm on behalf of those movants with Mr. Seltzer.

THE COURT:  Good morning.

MR. McCONVILLE:  Good morning, Your Honor.  Francis P. McConville from Labaton Sucharow also on behalf of the

Arbitrage plaintiffs.

THE COURT:  Good morning.

MR. WILLIAMS:  Good morning, Your Honor.  Shawn Williams, Robbins Geller Rudman and Dowd, on behalf of Mr. Donald Levin.

THE COURT:  Good morning.

MR. SALCEDA:  Good morning, Your Honor.  This is Ignacio Salceda of Wilson Sonsini on behalf of defendants.

THE COURT:  Is that everybody?

MS. WALTERS:  One more.  Good morning, Your Honor. Diane Walters of Wilson Sonsini Goodrich and Rosati for defendants.

THE COURT:  Good morning.

MS. WALTERS:  Good morning.

THE COURT:  So first let me ask Ms. Walters and Mr. Salceda, do you have anything to say about the pending motions?

MR. SALCEDA:  I think we sit by and watch the proceedings.  I think this is between the various plaintiffs and the Court.

THE COURT:  Okay.  Thank you.  That's what I thought.

MR. SALCEDA:  At the appropriate time, class certification and the like, we'll deal with some of these issues; but as of now, I think we're bystanders.

THE COURT:  Okay.

So this is an unusual case in that the Sayce case was filed first and was really by itself for some time, and then the merger happened, and then the other cases happened, and then the Sayce case was expanded.  So we have a slightly enlarged class period from what we started off with in these related cases.  And these are the various motions by various interested plaintiffs and their lawyers to be appointed lead plaintiff.

To cut to the chase, I'll tell you my plan and then I will be glad to hear from everybody.

The parties agree that -- or at least it's not disputed that the Glazer Funds have the largest financial loss asserted, but that their trades were entirely post merger.

The Meitav -- is that how I say it?  Meitav?

**MR. LIEBERMAN:**  Meitav.

**THE COURT:**  Meitav.  The Meitav plaintiffs do have the earlier purchases on account of they were part of this earlier set of claims.

So my current plan would be to appoint them co-lead plaintiffs in order that there be sufficient coverage of the issues and not be questions downstream about standing or such issues.

So that would be my plan, but I need to find out from those two people, two entities, sets of entities if they are willing to work together as co-lead plaintiffs; and if not, why

not.

And I will be happy to hear from the Arbitrage plaintiffs, although I will note that they have a less -- a smaller financial loss.  And then there are separate issues concerning the Spruce Point report.

So that's where I'm starting, and I will be happy to hear from whoever wants to talk to me.

MR. ABRAHAM:  I'll Jeremy go first.

MR. LIEBERMAN:  Thank you, Mr. Abraham.

Your Honor, I think, you know, quite frankly, that's a very sensible approach.  We certainly -- I know Mr. Abraham quite well, and we've worked with his firm in a number of matters as co-lead plaintiffs.  So I hope he would feel the same, but we certainly would be happy to serve as co-lead plaintiff with him.

If I could, you know, just, you know, shortly summarize why we think it's sensible.  There are -- Glazer Funds clearly have the larger financial interest.  There are issues with -- you know, both funds do have a certain very specific strategy as to why they became invested in the stock.  Had there not been a merger or the acquisition, certainly neither of the competing funds would have invested in the shares of Forescout. That gives clearly a different perspective and potentially different interests.

So there is a pre-acquisition period, and then there is an

acquisition period.  And so it's -- make sure that there is a -- make sure that there is proper coverage for both periods, which Meitav has, and clearly Glazer has for the post acquisition period.

We think it definitely makes sense.  It makes sense from the perspective of our firm is really -- you know, started this action.  We represent the -- you know, with the Sayce action.  Nobody was interested in the case when Meitav filed for lead plaintiff.  It was an uncontested motion.

Our firm has done all the work and brought the case to bear to date.  And currently, you know, Meitav filed the operative Complaint.  It would be an odd posture by all means if for some reason someone else who didn't rep those allegations are now all of a sudden asked to defend those allegations.

Clearly, as Your Honor noted in her order reopening the lead plaintiff structure, that our complaint was broader.  It had a broader perspective.  Looked at sales issues.  Looked at issues regarding the staffing for their sales staff and forecasting, which simply weren't appearing in the Arbitrage Complaints, and it's not apparent that anybody else showed an interest in pursuing those claims.

So we certainly think that it makes sense to keep the plaintiff that filed that operative complaint involved.  We also think it makes sense to have both pre-and post acquisition

periods covered, and so we think Your Honor has split the baby quite well and quite intelligently.

**THE COURT:**  I don't split babies.

**MR. LIEBERMAN:**  Okay.  Well, at least hasn't thrown out the baby with the bath water here.

**THE COURT:**  All right.

**MR. LIEBERMAN:**  As long as we're dealing with the baby, I think we're fine.

But if Mr. Abraham is inclined, we certainly welcome the opportunity to work with him on the case and think it's the best way and most intelligent way to proceed in this case.

And I'll leave to it Mr. Abraham.

**MR. ABRAHAM:**  Yes, Your Honor.

It is true that Mr. Lieberman is a friend of mine, and we've worked together in other cases.

But in this case my client has a very substantial financial interest, maybe 20 times the amount of Lieberman's client.

To the extent the Court is concerned about whether we'll adequately litigate the earlier part of the class period, it could simply add Meitav as an additional class representative. And I guess this also implicates the issue of whether Meitav is the largest plaintiff in the earlier part of the class period.

Those are my thoughts, Your Honor.  I think it's better if there is a single lead plaintiff entity.

**THE COURT:** Why? Why?

**MR. ABRAHAM:** To the extent it reduces the possibility for disagreements, Your Honor, amongst potential lead plaintiffs. It's why there's nine justices on the Supreme Court, not eight or ten.

But I think that Lieberman's client, Meitav, their interests are adequately served with an additional class representative.

I will let other firms speak to -- I'm not sure that Lieberman's client is the client with the largest financial interest in the earlier part of the class period, but I'll let others speak to that, Your Honor.

**MR. LIEBERMAN:** If I can respond.

First of all, as far as other class members, it's true there was a Mr. Levin, who filed a lead plaintiff motion. He's not opposed or contested and -- Meitav's application.

For some reason it decided not to pursue its -- plaintiff application any further. Now it sees -- potentially sees an opportunity, then -- then it may try to now open the door again.

But there is a reason why. We had -- we had certainly a lot to say about Mr. Levin's application. If the Court was -- and it had -- there were a lot of issues. They purchased all their shares on one day in the pre-acquisition period, as opposed to Meitav, who purchased throughout the pre and post

acquisition period.

There's a lot of issues regarding -- we think with Mr. Levin's business and things like that, which if the Court wants to open that up, we can brief it.  But we think there are clearly issues.

And so -- and the bottom line is is that while, you know, I'm sorry to hear that Mr. Abraham is not so excited to have a marriage in this case, as opposed to other cases, the bottom line is the operative Complaint was filed by Meitav, but drafted by our firm, researched by our firm, and it makes little sense to have somebody that -- to have this case continue without our firm being involved.

It's not clear if Mr. Abraham could go it alone.  Would he defend the allegations in our Complaint?  How would he do so if he didn't do the research for it?  How would he do so if he didn't have the -- a confidential informant?

So, again, I appreciate Mr. Abraham's offer to add us as an additional part of it.  There's clear reasons why it makes very much sense to have Meitav, the only movant, including Mr. Levin, that purchased both in pre and post acquisition periods.  I think that's the precise way to proceed, and I think Your Honor is -- has a good option.

As far as the other plaintiffs, Arbitrage Funds and others can argue.  I would just note, they have three different law firms here represented.  They couldn't even -- it doesn't

appear that they even agreed as to who will speak for the Funds.  Three different firms have found it necessary to appear and argue, when they were asked as to who would argue for the Arbitrage Funds.  It doesn't -- obviously if there would be any problems with coordinating, it would come from having such a large and unwieldy group.

So having pre and post acquisition covered clearly makes sense.  Having our firm, who drafted, filed and understands the operative Complaint, clearly makes sense.  And so, you know, we would certainly look forward to working with Mr. Abraham as a co-lead plaintiff.

**THE COURT:**  I had understood, and perhaps I'm wrong, that the question I was to decide today was among Glazer, Arbitrage and Meitav; is that not correct?  Is there -- is Mr. Levin seeking lead counsel status?

**MR. WILLIAMS:**  Good morning, Your Honor.  Shawn Williams here on behalf of Mr. Levin.  And thank you, I will be brief.

It's true that Mr. Levin filed a motion seeking lead plaintiff status.  Once the motions were submitted and he and we evaluated the losses that were presented both by the Glazer Funds and the Arbitrage Funds, it was clear to us that Mr. Levin simply didn't have the largest financial interest.  His financial interest was approximately $1.8 million in losses.  That clearly dwarfs the Meitav proposed lead

plaintiff.

So for us, had we anticipated that Your Honor might consider a co-lead arrangement, so to speak, that would include a movant with the smallest losses of the initial movants, we would have likely briefed up the remainder of the issues throughout the sort of lead plaintiff process.

But we plainly recognize that Mr. Levin simply didn't have the largest financial interest and, I think, appropriately withdrew, but acknowledged that we were prepared and willing to go forward as the lead plaintiff if Your Honor found that the two other movants with the larger financial interest were inadequate for one reason or another.

**MR. SELTZER:**  Mark Seltzer on behalf of the Arbitrage plaintiffs.

First of all, let me say that we would be more than happy to work with the Meitav plaintiff and Mr. Lieberman and his firm.  We've worked together successfully over the years in many cases together.  And I --

**THE COURT:**  Everybody has done that, so you can all say that about one another.  It's -- I understand that.

**MR. SELTZER:**  Right.  But let me make two fast points, if I may.

First of all, as Your Honor noted at the outset, we've raised, we think, a very substantial issue regarding potential defensive non-reliance that would apply to the Glazer Fund that

is not applicable either to our plaintiffs or to Meitav for that matter concerning purchases that were made after the Spruce Point report was issued.  If the shares --

THE COURT:  Is it -- by the way, Mr. Seltzer, is it correct that Spruce Point is a short seller and was shorting Forescout?

MR. SELTZER:  Yes.  That's what it said in its report.  By the way, very detailed report that was based on a very extensive investigation as described in that report.  I would like to go into some details of that report, if I may.

But the point is is that if you were to exclude the shares purchased after that report or the disclosures were made initially by Spruce Point from the calculation of shares for purposes of the lead plaintiff motion, then in that circumstance the Arbitrage plaintiffs do have the largest losses.  I think that's unquestionable.  This is laid out in an Exhibit 2 to my declaration, which does the computations by the various methodologies where it's used.

Second, and I think this is perhaps even more significant. If you have the Glazer Funds as one of the co-lead plaintiffs in this case, they are going to be subjected to this potential defense, which would not lie against the Arbitrage plaintiffs, who are also very, very large investors, who lost, you know, millions of dollars on their investment.  They would not be subjected to that defense, and I think together with Meitav

they would be -- provide comprehensive coverage for the entire class with respect to all the claims that had been asserted in the case, and you would have a cleaner representation, if you will, of the class with those two plaintiffs being married together.

As I say, we have no problem having the Meitav plaintiff be a co-lead plaintiff and also working at co-lead counsel together with the Pomerantz firm in the case.

If I may with respect to Spruce Point, the Spruce Point report really goes to the heart of the allegations we made in our case before the cases got joined together having to do with the unlikelihood and the undisclosed risk of unlikelihood that the merger would ever be consummated.

That report and its -- and the record in the report are included in the record attached to my declaration, as well as the declaration of Mr. Abraham.  It was based upon an analysis of the merger proxy statement.  Prior statements made by Forescout.  An interview with a former employee of a company who was identified as a cyber security expert.  A comparison of the results of business of several of Forescout's competitors. They are Cyber Ark, Fire Ark, Fortinet and others.  Industry reports regarding Forescout and its competitors.  And a comparison of a recent comparable -- comparable acquisition of another cyber security company called Avira.  And a much lower financial multiplier and projected revenue that was used to

price that deal and that used to price the Forescout deal.

And although Forescout was the -- the subject of this extensive investigation and extremely lengthy and detailed report by Spruce Point.  This is not some idle, anonymous blogger who was just, you know, guessing about things or maybe picking up one fact out of the public record.  This was a comprehensive study.

And the principal points that Spruce Point made were that prior to the deal being announced on February 6th of 2020, Advent had prepared in late January -- this is prior to the deal being made -- financial projections that showed that Forescout expected first quarter revenue for 2020 to decline by 18 percent, to 62 million, over the revenue reported for the first quarter of 2019, and the final revenue would decline by 8 percent, to 355 million from 386 million.

Those projections would then be disclosed on an earnings call on February 6th, but the call was canceled and the merger agreement at $33 a share was announced instead.

If the merger hadn't been announced and the projections revealed instead, it stands to reason that the stock price would have plummeted as it did in the third quarter of 2019 when an earnings miss of smaller proportions was revealed and the stock dropped nearly 40 percent.

Now, that information in these internal projections, they apparently, according to the proxy statement, were supplied to

Morgan Stanley, not to Advent.  At least there is no indication that they were provided to Advent.

Now, if Advent learned afterwards about these projections, which would have been the subject of disclosures in the merger proxy statement after the deal was made in February -- in -- in April of 2020, that would have given rise to, I think, a very powerful argument by Advent that it can withdraw from the merger.

And there were other undisclosed facts as well, that was not even picked up by investors, that Spruce Point pointed out.

It analyzed, for example, you know, information from the former Forescout employee, who revealed how and why Forescout was being left behind as a cyber security firm, because its competitors were shifting to the cloud.  Whereas, Forescout was based upon, you know, hardware in-house, on the premises of companies.  And it was being left in the dust by its competitors.

There are other things as well.  For example, there was kind of a surprising unexplained drawdown on a revolving credit line that Forescout had never drawn down on before, of many millions of dollars, even though it said at the end of 2019 it had almost $100 million of cash in the bank.

There are other events as well which Spruce Point pointed out could give rise to a claim by Advent that there had been a material adverse event that would give it ground to withdraw

from the merger, or that it had -- there had been representations made to it that were incorrect, or violations, or in addition to that violations of the forbearance covenants in the merger agreement.  For example, this drawdown of the revolving credit line, or a surprising restructuring plan that Forescout announced, which left 90 employees out of work; salespeople, engineers, a variety of employees.  All of that would be a change in the company's business.

All of this is happening and revealed by Spruce Point. It's true based on all the sources I talked about.  But Spruce Point was putting together this information in a form that would not have been readily accessible to the -- certainly to the average investor.

And the Ninth Circuit made very clear in prior rulings, but also in a decision just a few weeks ago in the -- and I'm sure I'm mispronounced it.  It's the *B-O-F-I Holding*, *Inc.* securities case, which was decided in October 8th.  Made very clear that corrective disclosures such that -- that would give rise to a claim really of demonstrating loss causation can come from any source.  It doesn't have to come from the company.  It doesn't have to be an admission that a prior statement was false and misleading.  And it can come from knowledgeable third parties, such as whistleblowers, analysts or investigative reporters.

Spruce Point is an analyst.  They analyze companies to see

whether or not they are being forthcoming about their financial condition and their prospects. And here the report was about the prospects of this merger actually taking place, and Spruce Point was telling Advent, saying, look, fiduciary to all the people that you are investing money on behalf of, including government pension plan and employees of those plans, you better think twice before you go forward with this deal because these are all these adverse events that are taking place.

And it's also true that corrective disclosure doesn't have to reveal the true scope of what was false and misleading about prior statements.

So here we have these statements about the merger being made by Spruce Point. And what does the Glazer Funds do? They buy more than half of their shares after the Spruce Point report comes out and suffer nearly half of their losses after the report comes out.

The merger itself -- the report is April 30th and there is some follow-on reports as well -- craters two weeks later with Advent saying that it's not willing to go forward with the transaction because of this, the adverse developments concerning Forescout. And then what happens, consistently what Spruce Point was saying should happen, you can renegotiate at a lower price, and that's what happened. They renegotiated for a lower price. I think August was the time the deal was made.

Now, this litigation goes forward. I'm the defendant, and

please understand I'm not advocating for the defense.  I'm just saying what the risk is --

**THE COURT:**  Well, I get your point.  And then you say, you say now you will be advocating for the defense.  So consider that.

**MR. SELTZER:**  Right.  And it's -- these are all arguments that could be made.  There are counter arguments, of course, but arguments that could be made that could be the focus of litigation against the Glazer Funds if they were selected as the lead plaintiff.

In terms of extending the point of view from plaintiffs, the issue for the Court is deciding whether or not those facts give rise to a potential defense of non-reliance.  You don't have to decide there actually is non-reliance.  It's whether can the focus of the litigation such that it will distract the lead plaintiff from representing the class as a whole, as opposed to dealing with the issues that are unique to that plaintiff.  That's the test that the Courts have followed in these cases.

So I think the advantage that the class would have if the Arbitrage plaintiffs were selected as lead plaintiffs in this case and co-lead plaintiffs with Meitav, as I said we're happy to do that, so you have coverage for the class, is you eliminate that issue entirely from the case.

**THE COURT:**  All right.  Thank you.

Mr. Abraham.  What about that?

**MR. ABRAHAM:**  Well, let me address that.

If you look at the Complaint that the Arbitrage fund plaintiffs filed, the introduction in Paragraphs 1 through 12 doesn't even mention April 30th.

There is a single allegation in Paragraph 53 that mentions the Spruce Point, whatever they were, Tweets or report, from April 30th without even alleging either partial disclosure or any loss causation.

Their Complaint goes on to allege, as does this -- as does Meitav's Complaint, a May 11 statement that's materially false and misleading, which is part of the class and, therefore, the class ends at the end of trading on May 15th.

Now, the facts are that on April 30th it wasn't actually a report.  It was a Tweet storm.  And the report itself was issued on May 12, after the May 11th announcement.  But more importantly, there was no market movement or no appreciable market movement in response to this Tweet storm.  And we set that forth in Exhibit C and D of my affidavit on reply, where the price of the stock went from 31.83 to 31.76 on April 30th, and then rebounded to 31.92 the next day.

With respect to *BofI*, we address that case on Pages 6 and 7 of our reply brief.  And *BofI* actually held in the context of that case, with the short seller's report that more detailed and uncovered more non-public information, that it did not

constitute a partial disclosure of any sort sufficient to support loss causation, but it's really the same analysis going forward in this matter as well.

And finally, or maybe it's perhaps the first point, this Court has held in the *Kinetics* case and another court in this district in the *eSport* case that a partial disclosure makes no difference on the issue of typicality on class certification and certainly not with respect to the issue on lead plaintiff motion.

My client is committed to litigating the entire case. This is not a unique defense.  I don't even consider it a significant defense, Your Honor, in light of the lack of market movement, the fact that it's a short seller report, and that everybody has alleged an additional misrepresentation on May 11th, Your Honor, after the short seller report came out. And that's when you get the market movement, when they actually missed their quarter results, and then finally the deal blows up at the end of May 15th, May 18th, Your Honor.

**THE COURT:**  All right.  Thank you.

And I want to ask -- I'm ultimately going to submit this and I'll get you a ruling, but assume for a moment that somebody is appointed and potentially -- because I -- I'm pretty committed to this, assuming that there are co-lead defendants.  Will you --

**MR. ABRAHAM:**  Co-lead plaintiffs, Your Honor?

**THE COURT:** I'm sorry. Plaintiffs.

Will you want to file an Amended Complaint?

**MR. ABRAHAM:** I would like to file an Amended Complaint. And I have certain things in mind, Your Honor, with respect to the existing Meitav Complaint that I would like to add.

**THE COURT:** Okay.

**MR. ABRAHAM:** And I will discuss that with Mr. Lieberman if we become co-lead plaintiffs.

**THE COURT:** Right. And, Mr. Seltzer, do you agree you would also want to do that?

**MR. SELTZER:** Yes, Your Honor.

**THE COURT:** Okay.

**MR. SELTZER:** And may I respond briefly to what Mr. Abraham had to say?

**THE COURT:** Sure.

**MR. SELTZER:** First, with respect to the issue that there was no market movement on the day of the Tweets -- and the Tweets weren't just Tweets. They attached every page of this extensive, I think it's a 56-page report that was sent by Spruce Point to Advent and then disclosed publicly the same day by Spruce Point. In other words, you've got page after page of detailed financial analysis that are part of these Tweets. And, again, those are all in the record as part of the declarations of both myself and Mr. Abraham.

Second, with respect to the issue the market didn't move, therefore, it's irrelevant.  That's exactly the issue that this circuit, the Ninth Circuit, dealt with in *Gilead Sciences*, where in that case there was an FTA letter warning Gilead that it was using drugs, marketing drugs for off label purposes illegally or improperly.  And that report -- and that letter -- in fact, that letter was released publicly.  It wasn't until three months later that the effects of that report were felt, effects of that letter from the FDA were felt when there was a downturn, an earnings miss that was suffered three months later.  That was sufficient to establish loss causation.

Here only two weeks later the precise risk that Spruce Point is talking about is realized when Advent pulls the plug on the merger.  All of the allegations, all of the information that was supplied to the market by Spruce Point related to the risk that the merger wouldn't take place, and that's precisely what happened.

It's the same thing of realizing a risk that causes harm after the fact.  That's enough to establish loss causation for purposes of a plaintiff.  So it's no red herring at all.

And as far as the case that Mr. Abraham talked about, *the BofI* case, if I'm pronouncing it correctly, that case distinguished a situation where you had anonymous bloggers on a website making comments from a kind of a detailed study and report made by a very serious investment advising company,

which laid out in great detail why this deal was not a good idea for Advent and why Advent could and should withdraw from the deal because it was contrary to the representations that were made to Advent and disclosures made to Advent about what was happening to the company, what was happening to Forescout. That's why this is a very serious question that can be raised.

**THE COURT:** All right. Thank you.

**MR. LIEBERMAN:** Your Honor, just to address a few quick points.

As far as the Amended Complaint, we're fine certainly if Mr. Abraham is designated as co-lead plaintiff to amend the Complaint with him.

I think both co-lead counsel should be standing by the allegations and have performed sufficient investigation to stand by their allegations. So that certainly makes sense to do an Amended Complaint.

We do want to just hammer home a few points regarding Mr. Levin, who seems to now be trying to, you know, reengage himself in the lead plaintiff process.

We have serious -- first of all, Mister -- when it came to -- Mr. Levin purchased during the pre-acquisition period in the Complaint when -- in the class period of prior -- and Mister -- the Sayce case and Meitav initially didn't appoint a lead plaintiff. They were interested in those allegations.

If they felt there was any credibility to the case or they

had any interest in being class representative, why didn't they file their motion at that time?

The only reason why now they came in to file the motion is we had been prone to lead plaintiff.  We came up with very credible Complaints, which clearly has spurred the interest of a number of law firms, and after he saw the allegation in the Complaint, it filed a -- it raised its hand and said:  Oh, sure.  This sounds like an interesting case to pursue.

We don't think that's the type lead plaintiff that should be appointed in this action.

We additionally had -- they also -- Mr. Levin only purchased -- had one day of purchase, one purchase of Forescout's stock during the pre-acquisition period, not like -- unlike Meitav, who purchased during all, both pre and post periods, throughout the entire class period.  It clearly renders adequacy issues.

And if there is any inclination to appoint Mr. Levin, we certainly -- there was a number of issues we had seen in our research regarding Mr. Levin, regarding his adequacy and regarding his business dealings, and we would want to raise them with the Court.

And we just want to emphasize kind of the spat that we saw, if you can call it that, between Mr. Seltzer and Mr. Abraham regarding the Spruce Point report I think just hammers home the reason of having someone who purchased during

all periods as a lead plaintiff here, which only -- Meitav is the only one that did purchase during all periods.

There's clearly issues that come out during the acquisition period.  Whether those issues are defeating or not, that's for defendants to argue and this Court to decide.  But clearly there are unique issues in the acquisition period and as that period goes on.

The only way this Court could defend from that and defend -- and make sure there is proper coverage during all periods is if Meitav is appointed as a co-lead plaintiff.

So we think Your Honor's initial instinct is the correct one and I'll -- that's the finale of our remarks.

**THE COURT:**  All right.  Thank you.

I see Mr. Salceda's face there, so did you want to add something?

**MR. SALCEDA:**  Very briefly, Your Honor, on behalf of defendants.

You've heard a lot of statements, particularly from Mr. Seltzer, regarding the merits and allegations.  This isn't the place for us to address them.  We're happy to, but I think that the motion before the Court is who the Court will appoint as the lead plaintiff or lead plaintiffs, and we're off to the side on that.

We certainly have lots to say about the merits, but -- and we're prepared to do that now and certainly prepared to do that

at the appropriate time in responding to any operative Complaint.

And you have also heard a lot about reliance and something about typicality and adequacy.  Defendant, again, will deal with those issues at the appropriate time, if and when they arise, for example, in class certification and otherwise.

But I'm just sitting here and smiling because it's not really my role to tell the Court what it should do with respect to whom the Court will appoint as the lead plaintiff.  But we certainly have a lot to say.

Unless the Court wants us to address these issues, and we're happy to, we will just hold them for the moment and raise them at the appropriate time.

**THE COURT:**  All right.  Thank you.

Mr. Williams?

**MR. WILLIAMS:**  Very quickly, Your Honor.  A couple quick points.

I want to just clarify what I said earlier when I said that Mr. Levin withdrew.  He did file a non-opposition, which I guess is materially different, and that's at docket No. 33.

Again, you know, if it wasn't obvious that the Glazer Funds and the Arbitrage Funds had the largest financial interest and the only competing interest would have been the Meitav plaintiffs, clearly the difference between $1.8 million and a maximum of -- a possible maximum of $300,000 of

Mr. Meitav would have resulted in Mr. Levin having the largest financial interest and being appointed.

The -- the fact that Mister -- that Meitav had been appointed earlier is really of no consequence. The Court vacated that ruling and new notice went out and opened the lead plaintiff process again.

With respect to the developing the allegations, this Court has seen these motions for -- many, many of these motions over a lengthy period of time. And the fact is that whether or not the first filed case initially -- whether or not a plaintiff filed a first filed case has really no bearing on the PSLRA process. And the development of the allegations once a plaintiff is appointed has regularly grown once that investigation and sort of deeper development has occurred. So I take some issue with Mr. Lieberman's point there.

But we stand ready, willing and able to participate at whatever -- in whatever role the Court finds is appropriate. I just wanted to make those points clear.

THE COURT: All right. Thank you.

MR. ABRAHAM: Your Honor?

THE COURT: Yes. Who is that?

MR. ABRAHAM: Mr. Abraham.

THE COURT: Oh, Mr. Abraham. Yes.

MR. ABRAHAM: I just want to point out, and I think Your Honor alluded to it, that a short seller with a clear

financial incentive is different than just an analyst's report, and that's clearly what Spruce Point was here.

And we still stand by the lack of market movement as demonstrating that people did not take it quite so seriously. People say all sorts of things as short sellers because they try to get a stock to move and other people don't always listen to them. And that was clearly the case in this context, but even if it wasn't clearly, it hasn't been established to the contrary on this motion.

But, you know, even though our initial position is that we could be solely, to the extent that Meitav is appointed as co-lead plaintiff, that would obviously blunt the issue.

**THE COURT:** Okay. Thank you all. The matter will be submitted. You'll hear from me shortly.

One thing that I will say in the order -- and I'll tell you now just to be thinking it through -- I see Ms. Walters there, and it's nice to see your face. She's the only -- only female person I see here. Oh, there is another. Ms. Pachman, okay.

One thing that we are -- we, the judiciary, has been -- has become concerned about is that there is a lack of diversity, racial, gender, all kinds of diversity among the law firms who are directing some of the most important and lucrative litigations in the country. And we are concerned and we desire very much to make sure that younger folks and female

folks and folks of color have plenty of opportunity to develop their skills in cases like this where the Court is providing a route for people to litigate cases.

So I mention that because one thing the order will say is that the Court will anticipate that the -- any firms appointed to do any of these things will actively undertake to make sure that previously underrepresented folks have an opportunity to participate in and learn from the matter.

So that's just an advisory of what will be coming.

**MR. SELTZER:**  Your Honor, if I may.

My partner Krysta Pachman and I are the only partners in our firm on the case.  And if we were appointed as one of the co-lead counsel, she would be front and center of this case.

**THE COURT:**  Good.  Well, I see you popping up now, now that we're talking about it.

I'm glad to know that and I'm glad to see you Ms. Pachman, but that will be one of the things that the Court will be concerned about.

**THE COURT:**  Thank you all.  Something else?

**MR. LIEBERMAN:**  Your Honor, Pomerantz has no problem complying with the order.

**THE COURT:**  Thank you.  The matter will be submitted.

(Proceedings adjourned.)

**CERTIFICATE OF OFFICIAL REPORTER**


I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Friday, February 5, 2021