**ABRAHAM, FRUCHTER**
  **& TWERSKY, LLP**
Takeo A. Kellar (SBN 234470)
11622 El Camino Real, Suite 100
San Diego, CA 92130
Telephone: (858) 764-2580
Email: TKellar@aftlaw.com

**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
Email: jpafiti@pomlaw.com

*Lead Counsel for Plaintiffs*

*[Additional Counsel on Signature Page]*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| CHRISTOPHER L. SAYCE, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> FORESCOUT TECHNOLOGIES, INC., MICHAEL DECESARE, and CHRISTOPHER HARMS, <br><br> Defendants. | CASE NO.: 3:20-cv-00076-SI <br><br> CLASS ACTION <br><br> **LEAD PLAINTIFFS' CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS** <br><br> Date:  March 19, 2021 <br> Time:  10:00 a.m. <br> Dept.:  Courtroom 1, 17th Floor <br><br> Before:  Hon. Susan Illston |

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
CASE NO. 3:20-cv-00076-SI

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................... iii

STATEMENT OF ISSUES TO BE DECIDED ...................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES .......................................................1

I.      INTRODUCTION ....................................................................................................1

II.     STATEMENT OF RELEVANT FACTS ..................................................................3

        A.      The Company and the Individual Defendants .............................................3

        B.      Defendants Carefully Monitored the Company's
                Sales Pipeline and Sales Productivity ........................................................3

        C.      Defendants Made False Representations of Current
                Fact Regarding the Company's Sales Pipeline and
                Sales Productivity ......................................................................................4

        D.      The Truth Concerning Forescout's Pipeline and
                Sales Force Deterioration ............................................................................6

        E.      The Merger Is Announced and Defendants Continue
                Their Deception ..........................................................................................7

        F.      Advent Seeks to Terminate the Merger Followed by
                the Delaware Proceeding .............................................................................9

        G.      The Individual Defendants Profited from the
                Company's Deception ................................................................................10

III.    ARGUMENT...........................................................................................................10

        A.      LEGAL STANDARD.................................................................................10

        B.      THE COMPLAINT ADEQUATELY ALLEGES
                FALSE AND MISLEADING STATEMENTS............................................11

                1.      Defendants Made Materially False or
                        Misleading Statements About the
                        Company's Present Business Conditions
                        Throughout the Class Period........................................................12

                2.      Confidential Witness Accounts Support
                        Falsity...........................................................................................16

                3.      Plaintiffs Adequately Allege Facts
                        Supporting the Existence of a Channel
                        Stuffing Scheme...........................................................................22

4.    The Acquisition Closing at a Lower Price
Does Not Defeat Plaintiffs' Claims of
Deception with Respect to the Merger
Related Statements ...................................................................24

5.    The PSLRA's Safe Harbor Does Not
Insulate Defendants from Liability ..........................................25

C.    THE COMPLAINT ALLEGES FACTS RAISING
A STRONG INFERENCE OF SCIENTER ...........................................27

1.    The CW Allegations and Defendants' Own
Statements Support a Strong Inference of
Scienter ....................................................................................28

2.    Factual Allegations Made by the Company
in the Delaware Proceeding Support a
Strong Inference of Scienter .....................................................34

3.    The Temporal Proximity of the May 11,
2020 Statement to the Disclosure of Adverse
Facts Supports a Strong Inference of
Scienter ....................................................................................36

4.    Defendants' Financial Motives Further
Support a Strong Inference of Scienter......................................36

a.    Defendants' 2019 Stock Sales Were Suspicious in
Timing and Amount.........................................................37

b.    The Individual Defendants' Desire to Monetize
Their Forescout Holdings Demonstrates a Motive
from October 2019 Going Forward .................................41

c.    The Desire to Enable a Controlling Shareholder to
Favorably Monetize His Forescout Holdings
Provides an Additional Motive .......................................42

D.    THE COMPLAINT SUFFICIENTLY ALLEGES
LOSS CAUSATION....................................................................43

E.    THE COMPLAINT ADEQUATELY ALLEGES
SECTION 20(a) CLAIMS ...........................................................45

IV.    CONCLUSION.................................................................................45

# **TABLE OF AUTHORITIES**

Page

Cases

*Backe v. Novatel Wireless, Inc.*,
    607 F. Supp. 2d 1145 (S.D. Cal. 2009)..................................................................... 38

*Berson v. Applied Signal Tech., Inc.*,
    527 F.3d 982 (9th Cir. 2008) ..................................................................... 11, 28, 30, 43

*Bielousov v. GoPro, Inc.*,
    No. 16-cv-06654, 2017 WL 3168522 (N.D. Cal. July 26, 2017) ..................................... 16

*Brodsky v. Yahoo! Inc.*,
    630 F. Supp. 2d 1104 (N.D. Cal. 2009) ..................................................................... 34

*Camp v. Qualcomm, Inc.*, Case No. 18-cv-1208, 2020 WL 1157192 (S.D. Cal. Mar. 10,
    2020) ................................................................................................................ 26, 44

*Christine Asia Co. v. Yun Ma*,
    718 F. App'x 20, 23 (2d Cir. Dec. 5, 2017)................................................................. 33

City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.,
    856 F.3d 605 (9th Cir. 2017) ................................................................................ 15, 30

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
    880 F. Supp. 2d 1045 (N.D. Cal. 2012) ..................................................................... 34

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
    No. 5:11-CV-04003-LHK, 2013 WL 2156358 (N.D. Cal. May 17, 2013) ..................... 42

*Condus v. Howard Sav. Bank*,
    781 F. Supp. 1052 (D.N.J. 1992) .............................................................................. 36

*Craig Frazier Design, Inc. v. Zimmerman Agency LLC*,
    No. C 10-1094 SBA,, 2010 WL 3790656 (N.D. Cal. Sep. 27, 2010)............................. 10

*Eisenstadt v. Centel Corp.*,
    113 F.3d 738 (7th Cir. 1997) ................................................................................... 24

*Eminence Capital, LLC v. Aspeon, Inc.,*
    316 F.3d 1048 (9th Cir. 2003) .................................................................................. 45

*ESG Capital Partners, LP v. Stratos*,
    828 F.3d 1023 (9th Cir. 2016) .................................................................................. 28

*Freudenberg v. E*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y 2010)..................................................................... 29, 41

*Friedman v. Rayovac Corp.*,
    295 F. Supp. 2d 957 (W.D. Wis. 2003) ..................................................................... 23

*Hatamian v. Advanced Micro Devices, Inc.*,
    87 F. Supp. 3d 1149 (N.D. Cal. 2015) .................................................................. 29, 32

*Hodges v. Akeena Solar, Inc.*,
    No. C 09-02147 JW, 2010 WL 3705345 (N.D. Cal. May 20, 2010)...............................38

*Howard v. Everex Sys., Inc.*,
    228 F.3d 1057 (9th Cir. 2000) ........................................................................................45

*Hsingching Hsu v. Puma Biotechnology, Inc.*,
    No. SACV 15-00865 AG (JCGx), 2017 WL 3205774 (C.D. Cal. July 25, 2017) ...........16

*In re Allied Nev. Gold Corp. Sec. Litig.*,
    743 F. App'x 887 (9th Cir. 2018) ..............................................................................15, 32

*In re Atossa Genetics Inc. Sec. Litig.*,
    868 F.3d 784 (9th Cir. 2017) .....................................................................................10, 11

*In re BofI Holding, Inc. Sec. Litig.*,
    977 F.3d 781 (9th Cir. 2020) ..........................................................................................43

*In re BofI Holding, Inc. Sec. Litig.*,
    No. 3:15-CV-02324-GPC-KSC, 2017 WL 2257980 (S.D. Cal. May 23, 2017) ..............17

*In re Bridgepoint Educ., Inc. Sec. Litig.*,
    No. 3:12-CV-1737 JM (WMC), 2013 WL 5206216 (S.D. Cal. Sept. 13, 2013)........16, 38

*In re Century Aluminum Co. Sec. Litig.*,
    No. C 09-1001 SI, 2011 WL 830174 (N.D. Cal. Mar. 3, 2011) .......................................45

*In re ComUnity Lending, Inc.*,
    No. C 08-00201 JW, 2009 WL 10699633 (N.D. Cal. Apr. 24, 2009)...............................35

*In re Connetics Corp. Sec. Litig.*,
    No. C 07-02940 SI, 2008 WL 3842938 (N.D. Cal. Aug. 14, 2008)................................23

*In re CV Scis., Inc.*,
    No. 2:18-cv-01602-JAD-BNW, 2019 WL 6718086 (D. Nev. Dec. 10, 2019).................45

*In re CV Therapeutics, Inc. Sec. Litig.*,
    No. C 03-03709 SI, 2004 WL 1753251 (N.D. Cal. Aug. 2004)......................................26

*In re Daou Sys., Inc.*,
    411 F.3d 1006 (9th Cir. 2005) ............................................................................17, 23, 28

*In re Extreme Networks, Inc.*,
    Case No. 15-cv-04833-BLF, 2018 WL 1411129 (N.D. Cal. March 21, 2018).........17, 29

*In re Illumina, Inc.*,
    No. 3:16-cv-3044-L-KSC, 2018 WL 500990 (S.D. Cal. Jan. 22, 2018) .........................27

*In re Imperial Credit Indus., Inc.*,
    No. CV 98-8842 SVW, 2000 WL 1049320 (C.D. Cal. Feb. 22, 2000)...........................41

*In re InterMune, Inc. Sec. Litig.*,
    No. C 03-2954 SI, 2004 WL 1737264 (N.D. Cal. July 30, 2004) ...................................27

*In re Intuitive Surgical Sec. Litig.*,
    No. 5:13-CV-01920-EJD, 2017 WL 4355072 (N.D. Cal. Sept. 29, 2017)......................15

*In re Juno Therapeutics Inc.*,
Case No. C16-1069RSM, 2017 WL 2574009 (W.D. Wash. June 14, 2017) .................. 23

*In re Maxwell Techs., Inc. Sec. Litig.*,
18 F. Supp. 3d 1023 (S.D. Cal. 2014)................................................................. 39

*In re Mylan N.V. Sec. Litig.*,
379 F. Supp. 3d 198 (S.D.N.Y. 2019)................................................................. 44

*In re Quality Sys.*,
865 F.3d 1130 (9th Cir. 2017) ..................................................................... *passim*

*In re Quality Systems Inc. Sec. Litig.*,
13-cv-01818-CJC-JPR, ECF No. 26 (C.D. Cal. Apr. 7, 2014)......................................... 18

*In re Questcor Inc. Sec. Litig.*,
No. SA CV 12-01623 DMG (FMOx), 2013 WL 5486762 (C.D. Cal. Oct. 1, 2013) ................................................................................................... 37

*In re Secure Computing Corp.*,
184 F. Supp. 2d 980 (N.D. Cal. 2001) ................................................................ 40

*In re SeeBeyond Techs. Corp. Sec. Litig.*,
266 F. Supp. 2d 1150 (C.D. Cal. 2003) ....................................................... 37, 39

*In re Silicon Graphics Inc. Sec. Litig.* ("*SGI*"),
183 F.3d 970 (9th Cir. 1999) ........................................................................ 40

*In re Sprint Corp. Sec. Litig.*,
232 F. Supp. 2d 1193 (D. Kan. 2002)................................................................. 24

*In re St. Jude Med. Inc. Sec. Litig.*,
836 F. Supp. 2d 878 (D. Minn. 2011)................................................................. 23

*In re UTStarcom, Inc.*,
617 F. Supp. 2d 964 (N.D. Cal. 2009) ................................................. 24, 27, 38

*In re Vivendi Universal, S.A., Sec. Litig.*,
605 F. Supp. 2d 586 (S.D.N.Y. 2009)................................................................. 43

*In re White Elec. Designs Corp. Sec. Litig.*,
416 F. Supp. 2d 754 (D. Ariz. 2006) ................................................................ 34

*In re Zillow Grp., Inc. Sec. Litig.*,
Case No. C17-1387-JCC, 2019 WL 1755293 (W.D. Wash. Apr. 19, 2019).................... 29

*In re Zynga Inc. Sec. Litig.*,
No. C 12-04007 JSW, 2015 WL 1382217 (N.D. Cal. Mar. 25, 2015) ............................ 17

*Johnson v. Aljian*,
394 F. Supp. 2d 1184 (C.D. Cal. 2004) ............................................................. 37

*Johnson v. Knapp*,
No. CV 02-9262-DSF (PJW), 2009 WL 764521 (C.D. Cal. Mar. 16, 2009) .................. 10

*Karinski v. Stamps.com, Inc.*,
        Case No. CV 19-1828, 2020 WL 281716 (C.D. Cal. Jan. 17, 2020)......................... 32, 42

*Kelly v. Elec. Arts., Inc.*,
        71 F. Supp. 3d 1061 (N.D. Cal. 2014) ........................................................................ 44

*Khoja v. Orexigen Therapeutics, Inc.*,
        899 F.3d 988 (9th Cir. 2018) ............................................................................... 10, 19

*Lloyd v. CVB Fin. Corp.*,
        811 F.3d 1200 (9th Cir. 2016) .................................................................................... 32

*Malin v. XL Cap. Ltd.*,
        499 F. Supp. 2d 117 (D. Conn. 2007)......................................................................... 38

*Matrixx Initiatives, Inc. v. Siracusano*,
        563 U.S. 27 (2011)...................................................................................................... 11

*McCasland v. FormFactor, Inc.*,
        No. C-07-5545-SI, 2009 WL 2086168 (N.D. Cal. July 14, 2009).................................. 34

*McGovney v. Aerohive Networks, Inc.*,
        No. 18-CV-00435-LHK, 2019 WL 8137143 (N.D. Cal. Aug. 7, 2019)......................... 33

*Meyer v. Concordia Int'l Corp.*,
        16 Civ. 6467 (RMB), 2017 WL 4083603 (S.D.N.Y. July 28, 2017).............................. 41

*Miller v. Thane, Int'l Inc.*,
        519 F.3d 879 (9th Cir. 2007) ...................................................................................... 11

*Mineworkers' Pension Scheme v. First Solar Inc.*,
        881 F.3d 750, 753-54 (9th Cir. 2018) ......................................................................... 43

*Monachelli v. Hortonworks, Inc.*,
        225 F.3d 1045 (N.D. Cal. 2016) ................................................................................. 34

*Mulderrig v. Amyris, Inc.*,
        Case No. 19-CV-1765 YGR, 2020 WL 5903844 (N.D. Cal. Oct. 5, 2020) ............... 14, 25

*Mulligan v. Impax Labs, Inc.*,
        36 F. Supp. 3d 942 (N.D. Cal. 2014) ........................................................ 14, 16, 17, 18

*Murphy v. Precision Castparts Corp.*,
        No. 3:16-cv-00521-SB, 2017 WL 3084274 (D. Or. June 27, 2017) .............................. 21

*Murphy v. Precision Castparts Corp.*,
        No. 3:16-cv-00521-SB, 2020 WL 4040827 (D. Or. July 17, 2020) ............................... 14

*N.Y. Hotel Trades Council v. Impax Labs., Inc.*,
        No. 19-16744, 2021 WL 81719 (9th Cir. Jan. 11, 2021).................................................. 27

*Nathanson v. Polycom, Inc.*,
        87 F. Supp. 3d 966 (N.D. Cal. 2015) .......................................................................... 44

*NECA-IBEW Pension Tr. Fund v. Precision Castparts Corp.*,
        No. 3:16-cv-01756-YY, 2017 WL 4453561 (D. Or. Oct. 3, 2017) ................................ 25

*No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
320 F.3d 920 (9th Cir. 2003) ........................................................................................... 40

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
380 F.3d 1226 (9th Cir. 2004). ........................................................................................ 37

*ODS Capital LLC v. JA Solar Holdings Co.*,
18-CV-12083 (ALC), 2020 WL 7028639 (S.D.N.Y. Nov. 30, 2020) ........................ 41, 42

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
575 U.S. 175, 135 S. Ct. 1318 (2015) ............................................................................. 15

*Pirani v. Slack Techs., Inc.*,
445 F. Supp. 3d 367 (N.D. Cal. 2020) ........................................................................ 11, 45

*Provenz v. Miller*,
102 F.3d 1478 (9th Cir. 1996) ......................................................................................... 40

Reese v. Malone,
747 F.3d 557 (9th Cir. 2014) ............................................................................... 30, 35, 36

*Robb v. Fitbit*,
216 F. Supp. 3d 1017 (2016) ..................................................................................... 31, 33

*Robb v. Fitbit, Inc.*,
Case No. 16-cv-00151-SI, 2017 WL 219673 (N.D. Cal. Jan. 19, 2017) ......................... 33

*Roberts v. Zuora, Inc.*,
Case No. 19-cv-03422-SI, 2020 WL 2042244 (N.D. Cal. Apr. 28, 2020) ............... *passim*

*Rodriguez v. Gigamon Inc.*,
325 F. Supp. 3d 1041 (N.D. Cal. 2018) ........................................................................... 14

*S. Ferry LP, No. 2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008) ........................................................................................... 30

*Scheller v. Nutanix, Inc.*,
Case No. 19-cv-01651-WHO, 2020 WL 5500422 (N.D. Cal. Sep. 11, 2020) ..... 14, 19, 29

*Schueneman v. Arena Pharm., Inc.*,
840 F.3d 698 (9th Cir. 2016) ............................................................................... 11, 19, 21

*SEB Inv. Mgmt. AB v. Align Tech., Inc.*,
Case No. 18-cv-06720-LHK, 2020 WL 5408056 (N.D. Cal. Sep. 9, 2020) .............. 22, 30

*SEC v. Todd*,
642 F.3d 1207 (9th Cir. 2011) ......................................................................................... 11

*Shenwick v. Twitter, Inc.*,
282 F. Supp. 3d 1115 (N.D. Cal. 2017) ................................................................ 17, 20, 36

*Spitzberg v. Houston Am. Energy Corp.*,
758 F.3d 676 (5th Cir. 2014) ........................................................................................... 33

*Stocke v. Shuffle Master, Inc.*,
615 F. Supp. 2d 1180 (D. Nev. 2009) .............................................................................. 38

*Tellabs Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) .......................................................................................... 28, 31, 36

*Turocy v. El Pollo Loco Holdings, Inc.*,
    No. SACV 15-1343-DOC (KESx), 2017 WL 3328543 (C.D. Cal. Aug. 4, 2017)........... 21

*Washtenaw Cty. Empl. Ret. Sys. v. Celera Corp.*,
    No. 5:10-cv-02604 EJD, 2012 WL 3835078 (N.D. Cal. Sep. 4, 2012) ........................... 17

*Wochos v. Tesla, Inc.*,
    No. 19-15672, 2021 WL 246210 (9th Cir. Jan. 26, 2021) ......................................... 14, 32

*Wozniak v. Align Tech., Inc.*,
    No. C-09-3671 MMC, 2011 WL 2269418 (N.D. Cal. June 8, 2011) ............................... 42

*Yaron v. Intersect ENT, Inc.*,
    No. 19-CV-02647-JSW, 2020 WL 6750568 (N.D. Cal. June 19, 2020) ......................... 24

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ...................................................................................... 16

Statutes, Rules and Regulations

15 U.S.C. §78u-4(b)(2) ....................................................................................................... 28

15 U.S.C. §78u-5(c)(1) ....................................................................................................... 25

17 C.F.R. §240.10b-5(b) ..................................................................................................... 11

17 C.F.R. §240.10b5-1 ....................................................................................................... 38

Del. Ch. Ct. R. 11............................................................................................................... 35

Fed. R. Civ. P. 11............................................................................................................... 35

Fed. R. Civ. P. 12(b)(6)...................................................................................................... 10

Fed. R. Civ. P. 9(b) ............................................................................................................ 43

Other Authorities

U.S. Securities and Exchange Commission, Division of Corporation Finance:
    Manual of Publicly Available Telephone Interpretations, Fourth Supplement
    (2001)......................................................................................................................... 36

Lead Plaintiffs Glazer Capital Management, L.P., Glazer Enhanced Fund L.P., Glazer Enhanced Offshore Fund, Ltd., Glazer Offshore Fund, Ltd. and Highmark Limited, in respect of its Segregated Account Highmark Multi-Strategy 2 (collectively, the "Glazer Funds") and Meitav Tachlit Mutual Funds Ltd. ("Meitav," and together with the Glazer Funds, "Lead Plaintiffs" or "Plaintiffs") respectfully submit this Opposition to the Motions to Dismiss filed by Defendants Forescout Technologies, Inc. ("Forescout" or the "Company"), ECF No. 127 ("F. MTD") and Michael DeCesare ("DeCesare") and Christopher Harms ("Harms") (the "Individual Defendants," and together with Forescout, "Defendants"), ECF No. 129 ("I.D. MTD").[1]

## STATEMENT OF ISSUES TO BE DECIDED (Civil L.R. 7-4(a)(3))

(1) Whether Plaintiffs sufficiently alleged actionable misrepresentations or omissions;

(2) Whether Plaintiffs alleged a strong inference of scienter;

(3) Whether Plaintiffs sufficiently alleged loss causation; and

(4) Whether Plaintiffs pleaded a claim for control person liability.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Defendants repeatedly made false statements of past or current fact about Forescout's sales pipeline and the productivity of its sales force, tying those rising and robust metrics to objectively false revenue guidance figures. Defendants knew or, at the very least exhibited a high degree of recklessness in not knowing, that their statements concerning the sales pipeline and the productivity of the sales force employed by Forescout as well as their statements relating to the proposed acquisition (the "Merger" or "Acquisition") of Forescout by Advent International, Inc. ("Advent") were materially false or misleading. Fifteen confidential witnesses ("CWs") in positions at Forescout to know the true situation at the Company, the accounts of which are corroborated by a whistleblower and subsequent factual statements made by Forescout and Advent, raise a strong inference of scienter with respect to the misleading statements concerning the Company's sales pipeline and the productivity of its sales force. In addition, factual statements

---

[1] All citations of "¶_" and "¶¶_" refer to the Consolidated Amended Complaint For Violations Of The Securities Laws filed on December 18, 2020 (ECF No. 116) (the "Complaint" or the "CAC").

made by Forescout in subsequent litigation with Advent concerning the Acquisition in the Delaware Chancery Court (the "Delaware Proceeding") raise a strong inference of scienter with respect to the statements made following the announcement of the Acquisition. These scienter allegations are further supported by the Individual Defendants' motive of selling nearly $12 million during the Class Period at suspicious times and amounts, inconsistent with their prior trading history and often within days of making false statements. In addition, the Individual Defendants stood to monetize their holdings in Forescout, much of which was held in Restricted Stock Units ("RSUs") for over $42 million through the Acquisition.

Defendants, in an effort to avoid liability, among other things, distort both the reliability of the CWs and the relevant principles of law for determining the reliability of their accounts. Defendants' chosen standard, *i.e.*, that a securities fraud complaint cannot survive unless a high-level executive with accounting expertise prepares a fraudulent forecast and recounts a conversation with a defendant where the defendant provides a gift-wrapped admission of guilt, is inconsistent with the decisions of this Court, the Ninth Circuit, and the Supreme Court on the very issue.

For reasons fully discussed below, none of Defendants' arguments about falsity and scienter has any merit. Defendants distort the analysis for determining whether the statements are sufficiently material to be actionable and whether the safe harbor afforded by Section 21E of the Securities Exchange Act of 1934 (the "Exchange Act") to certain forward-looking statements applies to insulate Defendants from liability. Virtually all the statements pled in the Complaint are statements of current or past fact or untruthful statements of belief which are not subject to the safe harbor. Indeed, even the unadorned revenue guidance figures are not protected by the safe harbor because Defendants failed to provide meaningful cautionary language and had actual knowledge of their objectively false nature.

In a final effort to obtain dismissal, Defendants advance arguments on the issue of loss causation which assume facts not in evidence and which are contrary to the current record before the Court. However, those arguments are also inherently flawed because, at the pleadings stage, Plaintiffs are not required to rule out alternative causes of stock price declines, account for whether

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS                                      -2-
Case No. 3:20-cv-00076-SI

hypothetical individual class members relied on false statements or were damaged thereby, or produce evidence to rebut the speculative opinions of counsel that contradict the well-pled allegations of the Complaint.

Therefore, and as discussed below in greater detail, Defendants' Motions to Dismiss should be denied in their entirety and, instead, this Action should proceed through discovery towards trial.

## II.    STATEMENT OF RELEVANT FACTS

### A.    The Company and the Individual Defendants

Forescout is a cybersecurity company selling products and services to limit cyber-attacks and mitigate the risk of security breaches across computer networks and connected devices.  ¶¶2, 45.  Defendant DeCesare was Forescout's President, CEO and a member of the Company's Board of Directors (the "Board").  ¶42.  Defendant Harms was Forescout's CFO, having responsibility for leading the Company's finances and supply chain management.  ¶43.

### B.    Defendants Carefully Monitored the Company's Sales Pipeline and Sales Productivity

Forescout sells its products directly and through resellers, deploys a field sales team and has another team managing relationships with its channel partners and working with those partners to support customers.  ¶¶22, 48.  Forescout's Named Account Managers ("NAMs") had direct responsibility for closing deals and developing Forescout's sales pipeline during a given quarter.  ¶¶13, 61.  DeCesare told investors that NAMs were the key individuals who had visibility into whether a deal would close and explicitly tied the number of years a NAM had been with the Company as a metric that provided both "visibility" into the sales pipeline as well as a basis for why the Company would not just meet but over exceed upon its guidance even if some large deals in a given quarter never closed.  ¶60, 125.

According to a NAM cited in the Complaint, potential deals at Forescout were divided into three categories: (1) "committed" deals that were expected to close before a quarter; (2) "up-side deals" with a 50% chance of closing in the current quarter, and (3) deals that involved only discussions with a customer without a firm commitment.  ¶61.

The Individual Defendants and other high-level executives at Forescout had real-time access to specific details about Forescout's sales pipeline.  ¶¶160-64.  Pipeline reports generated

on the Salesforce platform were regularly delivered to the Company's Chief Revenue Officer ("CRO"), Steve Redman ("Redman"). ¶160. The Worldwide Sales head at the Company received all details about any potential deal worth $1 million or more that was entered as a potential opportunity in the Salesforce platform. ¶161. According to a CW, DeCesare reviewed data on the Salesforce platform and asked specific questions about specific deals based on his review. ¶162. DeCesare, a micromanager, specifically inquired about granular details related to all deals over $1 million, according to another CW. ¶163.

The Individual Defendants also publicly acknowledged and referred to the information learned from the Salesforce platform and their internal discussions with NAMs as the basis for their public statements concerning the state of the Company's operations and their revenue forecasts. *E.g.*, ¶¶14, 115, 119, 121. Defendants also admitted in their public statements to looking at the pipeline and knowing how "the deals were taking shape." ¶¶121, 164. Thus, for example, on May 9, 2019, Defendants affirmed that "big deals are a part of our business and we've been tracking them very closely." ¶115. Similarly, on August 12, 2019, Defendant Harms publicly stated that he and DeCesare "spent a lot of our July time frame really diving into the field" to look at specific details about the Company's sales pipeline. ¶132.

### C.     Defendants Made False Representations of Current Fact Regarding the Company's Sales Pipeline and Sales Productivity

The Class Period begins on February 7, 2019, when Defendants issued an objectively false guidance for fiscal year 2019, calling for 24% year-over-year growth in revenues (in the range of $363.1-$373.1 million). ¶¶3, 103. Defendants represented that these projections were based upon, and attributable to, Forescout's rising sales productivity over the last few years, including a substantial increase in the number and percentage of NAMs **with 2+ years of experience** at the Company. ¶105. Defendants told investors that this objectively false guidance could be easily achieved because NAMs at the Company with 2+ years of experience grew from 35% year-end 2017 to 50% year-end 2018, increasing both "visibility" in the sales pipeline in the near-term and the long-term and providing assurances about the ability to close deals. ¶¶50, 109. On March 4, 2019, DeCesare falsely claimed that the Company "was hiring like crazy" at that time, and the sales force was "ramping" and "maturing." ¶107.

On May 9, 2019, Forescout announced disappointing earnings results for Q1 2019, due to "slipped deals" in the pipeline (*i.e.*, deals that were expected to close that quarter but did not); however, Defendants simultaneously reassured investors by *increasing* their guidance for the full-year 2019 and falsely claimed that "slipped deals" were on course to definitively close in the second half of 2019. ¶¶8, 10, 111, 113, 115, 123. To support these false claims, both DeCesare and Harms falsely stated that "every one of the deals is still in the pipeline," because Forescout had "tech wins," *i.e.*, the Company had "already been awarded the business," and repeatedly touted the Company's "large pipeline," and referred to the then-existing pipeline "as plenty of pipeline to deliver upon the guidance." ¶¶119, 121.

On the May 9, 2019 earnings call, DeCesare again made objectively false statements about the then-current "maturation of our reps," and falsely told analysts and the market that "nothing had changed" with respect to the Company's sales productivity. ¶¶117, 119, 123, 125. In fact, DeCesare went even further to claim that the sales pipeline was already so large and robust, and sales productivity so accretive, that the Company would easily meet its full year revenue guidance even if the "slipped deals" never materialized. ¶125.

On August 7, 2019, Forescout announced disappointing results for Q2 2019, based on "pent-up demand," while reassuring investors that "the pipeline is absolutely taking shape effectively." ¶127. Annual guidance was unchanged despite disappointing results. ¶¶127, 132. DeCesare once again reassured investors that the percentage of "ramped" sales representatives who have "been with Forescout for more than two years and they're in the territory for more than two years" is "tracking very well for us" and Defendants were "happy with the level of pipeline we're building" based on the "percentage of our sales reps that have been hired in the more recent cohorts like Asia-Pacific that did very well for us this quarter." ¶130.

On October 10, 2019, November 6, 2019, and February 6, 2020, Forescout announced disappointing financial results for each respective quarter, which Defendants blamed on "extended approval cycles," and Defendants also incorrectly blamed the "EMEA" region [Europe, Middle East and Africa] as being responsible for those poor results even though that region accounted for

an insignificant amount of Forescout's overall business and could not account for the earnings downfall. ¶¶135, 138, 141.

When Forescout filed its Annual Report for fiscal year 2019 on February 28, 2020, it disclosed that its sales force had lost a significant number of "ramped" or "matured" sales representatives with 2+ years of experience with the Company, dropping from 50% year-end 2018 to 38% year-end 2019. ¶23. In the 2020 10-K, a note from the Company's auditors stated that auditing for the Company's "revenue recognition" was "challenging." ¶146.

### D.     The Truth Concerning Forescout's Pipeline and Sales Force Deterioration

In truth and in fact, coinciding with Defendants' objectively false guidance figures and false statements of current facts concerning sales productivity, its sales force was being reduced by terminations and resignations due to declining sales and a lack of interest in Forescout's products, as confirmed by confidential witnesses (CW2, CW3, CW4, and CW10). ¶¶5, 7, 51, 52, 54, 55, 63. In Q1 2019, Sales Development Representatives ("SDR") were meeting only 50% of their sales targets, due to competition and the lack of interest in Forescout's products, as confirmed by confidential witnesses (CW1, CW2, and CW3). ¶¶51-54. By Q4 2019, Forescout's State, Local and Education ("SLED") division was on track for only 35% of its $18 million annual sales quota, and further below its 2019 goal of $26 million, according to confidential witnesses (CW7 and CW14). ¶¶67, 74. Forescout's Commercial sales division was only at 25% of its quota for 2019 heading into Q4 2019, as confirmed by a confidential witness (CW8). ¶68. The continued inability to close deals led to the departure of sales personnel at all levels through the second half of 2019, including SDRs, NAMs and Regional Managers, according to a confidential witness (CW2). ¶53. In addition to voluntary departures, Forescout enacted widespread sales force layoffs across multiple divisions, eliminated an entire department, and instituted a firmwide hiring freeze in the third quarter of 2019 due to strains on cashflow and rapidly declining sales. ¶¶53-59.

Defendants also pressured NAMs, the members of the sales department with direct responsibility for closing deals, to list unsubstantiated and baseless expected closing dates for potential deals to create the appearance of a stronger pipeline than existed, as confirmed by confidential witnesses (CW7, CW9, CW10, CW11, CW13, CW14). ¶¶13, 61-66, 70, 73, 74.

Other personnel at Forescout also recognized that committed deals reflected in the pipeline never materialized (CW7, CW12, CW15).  ¶¶62, 66, 71, 75.  In addition to changing expected deal closing dates, NAMs were asked to inflate the value of the potential deals expected to close in Q1, Q2 and Q3 2019, to enhance the appearance of the pipeline supporting the Company's guidance, as confirmed by a confidential witness (CW11).  ¶69.

### E.    The Merger Is Announced and Defendants Continue Their Deception

In October 2019, Defendants began to explore strategic options for Forescout, including the possible sale of the Company.  ¶¶18, 134.  On February 6, 2020, the same day that Forescout announced its disappointing Q4 2019 results (making it clear that the Company would not catch up on slipped deals and meet its 2019 guidance), Defendants announced the Acquisition of Forescout by Advent for $1.9 billion (or $33 per share)—with Defendants DeCesare and Harms standing to collect over $42 million from the deal.  ¶¶20, 21, 88.

The Acquisition, however, was fraught with difficulty from the very time of its announcement as Forescout had only been able to achieve its reported Q4 2019 results through a large transaction with one of Forescout's largest resellers, Merlin International Inc. ("Merlin"), which a whistleblower identified as being part of a "channel stuffing scheme."  ¶81.  The whistleblower's account was corroborated by a confidential witness (CW15) confirming that Merlin had a regular practice to accept high-value deals at the end of a quarter from Forescout without an expected closing date to resell the product.  ¶83.  Doing so caused the Company to inflate revenue in violation of Generally Accepted Accounting Principles ("GAAP") and Forescout's own publicly stated revenue recognition policies.  ¶¶86, 87.

The Company also experienced adverse developments in its operations after the Merger's announcement.  Two multinational professional service companies that had been substantial business partners of Forescout terminated their relationships with the Company due to the conflicts created by auditing relationships with Advent's portfolio companies.  ¶¶25, 148.  A third major partner informed the Company that it could no longer be a go-to market partner for Forescout for similar reasons which, standing alone, caused tens of millions of dollars of the Company's pipeline to be deregistered.  *Id.*

By the end of February 2020, it had become obvious internally at Forescout that the Company's business was falling off a cliff. ¶92. On March 20, 2020, Forescout provided Advent with a disappointing preview of expected results even for the more immediate time period of Q1 2020 ending on March 31, 2020. ¶¶90, 166.

Nonetheless, on March 23, 2020, Forescout issued a definitive Proxy Statement disclosing the history of the negotiations leading up to the Merger and presenting an internal "Illustrative Guidance" prepared in January 2020 projecting, among other things, that Forescout's revenue would be $62 million for Q1 2020. ¶¶24, 147. The Proxy Statement, however, failed to disclose that *by that very time* Defendants knew—based upon developments in the Company's business and the March 20, 2020 preview provided to Advent as well as the adverse developments with key customers and distribution partners—that the Illustrative Guidance for Q1 2020 would not be achieved. ¶¶25, 148-49.

On March 24, 2020, Advent received additional information from Forescout showing the Company's worsening financial condition. ¶91. On March 27, 2020 and April 6, 2020, Forescout provided Advent with analysis showing that the Company's financial performance "dropped off a cliff" compared to Forescout's year-over-year results from Q1 2019 *and* compared to Forescout's competitors despite "severely unnatural (and detrimental) actions taken by Forescout to pull additional bookings into the quarter" (*i.e.*, channel stuffing), according to Advent. ¶92.

On April 29, 2020, in an SEC filing, Forescout stated that it was cancelling its annual shareholder meeting because it "expected the proposed acquisition of Forescout by entities affiliated with Advent . . . to close in the second quarter of 2020." ¶150. However, in making that statement, Defendants failed to disclose the facts known to them about the ongoing deterioration in the Company's business of key customers abandoning Forescout following the Merger and the failure to achieve the Q1 2020 Illustrative Guidance—a fact unquestionably also known at that time based upon the close of the fiscal quarter on March 31, 2020—and that, based upon those facts and other related developments, Advent had expressed concerns about proceeding with the Merger. ¶151.

On May 11, 2020, Forescout disclosed its Q1 2020 financial results including revenues of $57.2 million for the quarter, well below the $62 million identified in the Illustrative Guidance. ¶¶27, 151. The Q1 2020 10-Q also disclosed that to even achieve those results, the Company had deeply discounted two large hardware deals resulting in a negative gross margin of 8% for hardware sales for the fiscal quarter. ¶152.

At the same time on May 11, 2020, Forescout issued a press release quoting DeCesare as stating that "we look forward to completing our pending transaction with Advent." ¶155. This was a rather remarkable statement given that only three days earlier, as subsequently disclosed by Advent in litigation, on May 8, 2020, it informed DeCesare that it was considering not closing the Merger based upon, among other things, the Company's inability to achieve its projections, *i.e.*, the Illustrative Guidance, as well as Advent's inability to finance the Acquisition given the deterioration in Forescout's operations and future business prospects. ¶¶29, 98, 156. The press release issued on May 11, 2020 further falsely blamed the global pandemic for yet another revenue miss, but the Company's financial performance was drastically worse than its peers (whose performance had actually improved during the pandemic), and Advent, which had access to internal financial information of the Company, attributed the poor performance to an inadequate sales force and a "dramatic" decline in the Company's financial performance since the first quarter of 2019 or the beginning of the Class Period in this Action. ¶¶157-59.

**F.    Advent Seeks to Terminate the Merger Followed by the Delaware Proceeding**

On May 18, 2020, Forescout announced that Advent informed the Company in writing (the "Termination Letter") on May 15, 2020, that based on Forescout's poor financial results and Advent's due diligence concerning the Company's financial condition and projections, Advent would not proceed with the Merger as scheduled. ¶¶30, 31, 102, 158, 159. The Company brought the Delaware Proceeding in an effort to enforce the Merger agreement and during the course of that case, Forescout and Advent made factual allegations in their pleadings demonstrating Defendants' contemporaneous knowledge of adverse facts inconsistent with their March 23, April 29 and May 8, 2020 statements concerning the Merger. ¶¶25, 26, 29, 91, 96, 148, 156, 166.

G. **The Individual Defendants Profited from the Company's Deception**

The Individual Defendants received cash bonuses and restricted stock units ("RSUs") tied to the Company's sales pipeline, employee recruitment and retention and revenue increases. ¶¶169-70. In addition, Defendants DeCesare and Harms reaped nearly $12 million in proceeds from selling stock at inflated prices during the Class Period, which was uncharacteristic of prior insider sales. ¶¶34, 167, 168. DeCesare and Harms also stood to collectively receive $42 million from monetizing their Forescout holdings in the Merger, including shares held as RSUs, if it closed at the initially agreed upon price of $33.00 per share and to enable key investors to monetize their positions in Forescout at similarly elevated prices. ¶¶20, 21, 88; RJN, Ex. 16 (ECF No. 128-16) at 68.

III. **ARGUMENT**

A. **LEGAL STANDARD**

On a 12(b)(6) motion, the court "accept[s] the Plaintiffs' allegations as true and construe[s] them in the light most favorable to Plaintiffs." *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 793 (9th Cir. 2017) (quotation marks and citations omitted). "[T]he purpose of a 12(b)(6) motion to dismiss is to test the sufficiency of the complaint, not to decide its merits[.]" *Craig Frazier Design, Inc. v. Zimmerman Agency LLC*, No. C 101094 SBA, 2010 WL 3790656, at *6 (N.D. Cal. Sep. 27, 2010) (citations omitted). Defendants cannot insert their own version of the facts in place of the Complaint's particularized allegations. *See Johnson v. Knapp*, No. CV 02-9262-DSF (PJW), 2009 WL 764521, at *4 (C.D. Cal. Mar. 16, 2009) ("[T]he Court ignores Defendants' version of the facts and relies, instead, on Plaintiff's version contained in the Complaint and any inferences that can be drawn from it."). At the pleading stage, the Court's analysis is confined to the Complaint and any materials that are the proper subject of judicial notice or incorporation by reference. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). Judicial notice, however, does not extend to the truth of disputed facts asserted in SEC filings or conference calls transcripts. *Id.*

Section 10(b) of the Exchange Act makes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in

the light of the circumstances under which they were made, not misleading." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011) (quoting 17 C.F.R. §240.10b-5(b)).  The elements of a claim are: (1) a misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.  *See In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d at 793.  Here, Defendants challenge whether the Complaint adequately pleads falsity, scienter and loss causation and, as demonstrated below, Plaintiffs have properly alleged each one of those elements of a Section 10(b) claim.

### B.  THE COMPLAINT ADEQUATELY ALLEGES FALSE AND MISLEADING STATEMENTS

A statement is materially misleading if it gives a reasonable investor the "impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (internal quotation marks and citations omitted) (quoted in *Roberts v. Zuora, Inc.*, No. 19-cv-03422-SI, 2020 WL 2042244, at *9 (N.D. Cal. Apr. 28, 2020)); *see also Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 889 (9th Cir. 2008) (a statement is materially misleading if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.").  Of critical importance, "'once defendants cho[o]se to tout' positive information to the market, 'they [are] bound to do so in a manner that wouldn't mislead investors,' including disclosing adverse information that cuts against the positive information." *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016).

"Generally, whether a public statement is misleading, or whether adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact." *Pirani v. Slack Techs., Inc.*, 445 F. Supp. 3d 367, 385 (N.D. Cal. 2020) (internal quotation marks and citations omitted). "Accordingly, resolving an issue as a matter of law is only appropriate when the adequacy of the disclosure is so obvious that reasonable minds [could] not differ." *Id.* at 1220.

**1.    Defendants Made Materially False or Misleading Statements About the Company's Present Business Conditions Throughout the Class Period**

Defendants made materially misleading statements of current or past fact regarding the Company's sales pipeline and sales productivity throughout the Class Period.  Defendants "did not just describe the pipeline [and the state of the sales force] in subjective or emotive terms. Rather, they provided a concrete description of the past and present state of the pipeline [as well as the sales force]." *In re Quality Sys.*, 865 F.3d 1130, 1143-44 (9th Cir. 2017).

On February 7, 2019, DeCesare told investors that the momentum gained in landing and expanding deals was due to the Company's sales force "maturing and ramping nicely."  ¶105. DeCesare then relied on the rise in productivity from 14% to 50% to tout that productivity was "trending in the right direction." *Id.*  On March 4, 2019, DeCesare again misled investors about the then-existing "ramping" and "maturing" of the sales force, falsely claimed that the Company was "hiring like crazy," and that the increased number of experienced sales representatives provided the Company with "increased visibility" into the sales pipeline.  ¶107.

On May 9, 2019, Defendants preannounced disappointing revenues for the second quarter of 2019, but simultaneously raised the full year guidance despite the intermittent shortfall to align exactly with the full year guidance given in the beginning of the year.  Incredulous analysts repeatedly questioned Defendants concerning the basis for these conflicting messages, and Defendants repeatedly made false statements of present fact in response.  ¶¶115-26.  DeCesare justified the bullish guidance despite the impending shortfall in the second quarter of 2019 because "big deals" were "on track" to close "for the back half of the year," falsely stated that "nothing ha[d] changed" with respect to the Company's sales force, and that "every one of those large deals is still in the pipeline."  ¶¶117, 119.  Harms agreed and claimed that DeCesare "nailed it" with these false representations.  ¶117.

During the May 9, 2019, earnings conference call, DeCesare and Harms made their most concrete and brazen misrepresentations.  Both of them repeatedly told investors that big deals would materialize in the back half of the year because Forescout already had the technology win, *i.e.*, that the Company "had been awarded the business," and all that was left to accomplish was a transfer of money and a commitment on timing.  ¶119; *see also* ¶121 ("Those deals are ones where

we've already got the tech win."), ¶123 ("we have tech wins in those accounts, meaning that they've chosen us…it is not common for a customer to award a technology win to a vendor and not buy their product."). Both Defendants similarly made false representations concerning a "large pipeline" at that time and "plenty of pipeline to deliver upon the guidance we've given you for the full year[.]" ¶¶121, 125. DeCesare again made references to the then-current "building of the pipeline," and the "maturation of our reps" as verifiable metrics that provided visibility into the closing of deals and he went even further by falsely stating that even if some of the big deals did not close, Forescout would still meet its full year revenue guidance because the Company had already built "a very large pipeline" over "many years" and "had hundreds of sales reps." ¶¶123, 125. Hence, according to DeCesare, the pipeline was already "large enough" to achieve the Company's revenue guidance even if other "big deals" did not close in the Q2 2019. ¶125.

In August 2019, DeCesare and Harms participated in conference calls and other investor events and made similar false statements. During an earnings conference call held on August 2019, DeCesare again misrepresented that the rate of closing deals "remain[s] very strong," misleadingly blamed the poor performance in the second quarter on "pent-up demand," incorrectly asserted that the current sales pipeline was "measured appropriately into the guidance," and again falsely claimed that sales productivity and the "level of pipeline" "are pointed in the right direction." ¶¶127, 130.

On three separate occasions—October 10, 2019, November 6, 2019, and February 6, 2020—the Defendants falsely told investors that the Company repeatedly missed its revenue guidance by tens of millions of dollars because of "extended approval cycles" due to deteriorating macroeconomic conditions in the EMEA region. ¶¶135, 138, 141. And on May 11, 2020, the Company falsely blamed COVID-19 for yet another revenue miss even though its financial performance was drastically worse than all of its peers, and Advent, which had inside access to Forescout's sales pipeline and revenue projections, attributed the poor performance, and Forescout's dramatic decline in earnings and financial performance throughout the Class Period, to an inadequate sales force. ¶¶157, 159.

Virtually identical statements about a company's sales pipeline have been held by the Ninth Circuit as actionable false statements. Thus, in *In re Quality Sys.*, the Ninth Circuit held that statements such as "the pipeline has grown every quarter," "our pipeline continues to build to record levels," "our pipeline keeps growing," "our pipeline is deep," and "we haven't seen any fundamental change to any of the dynamics" were all plausibly false statements of current fact to which the safe harbor did not apply. 865 F.3d at 1143. In *Mulderrig v. Amyris, Inc.*, another court in this District recently applied *Quality Sys.* to rule that similar statements to those pled by Plaintiffs here, including "we have very good visibility on continuing at this rate" in the future, and "we expect a very strong second half to build on the momentum of the first half" were plausibly false statements of current fact. Case No. 19-CV-1765 YGR, 2020 WL 5903844, at *12-15 (N.D. Cal. Oct. 5, 2020); *see also Scheller v. Nutanix, Inc.*, Case No. 19-cv-01651-WHO, 2020 WL 5500422, at *7-8 (N.D. Cal. Sep. 11, 2020) (ruling that statements such as sales productivity was "ramping up" and hiring plans had been executed "flawlessly" were plausibly false when made because defendants experienced high levels of attrition); *Rodriguez v. Gigamon Inc.*, 325 F. Supp. 3d 1041, 1050-51 (N.D. Cal. 2018) (applying *Quality Sys.* to conclude that touting a "large deferred service," "healthy product backlog," and "consistent quarterly linearity" as metrics that provided "visibility" into the fourth quarter revenue guidance were false statements of present business conditions); *Mulligan v. Impax Labs, Inc.*, 36 F. Supp. 3d 942, 964 (N.D. Cal. 2014) (ruling that statement suggesting that the company was "on track" was a misrepresentation of present fact concerning the company's response to the FDA).[2]

Defendants' February 6, 2020 statement unquestionably contains no forward-looking elements because it reported on the Company's financial results for Q4 2019 and the existence of

---

[2] *Wochos v. Tesla, Inc.*, No. 19-15672, 2021 WL 246210, at *7 (9th Cir. Jan. 26, 2021), upon which Defendants rely, is not on point because *Wochos* held that a mixed statement of current fact combined with a forward-looking statement can be materially false or misleading if the defendants, as they did here, simultaneously represent that the statement is based upon objective facts. *Wochos*, 2021 WL 246210, at *8. Indeed, whether a statement that a company is "on track" is actionable depends on the context in which it is made. *See Murphy v. Precision Castparts Corp.*, No. 3:16-cv-00521-SB, 2020 WL 4040827, at *11-12 (D. Or. July 17, 2020) (discussing split in authority and distinguishing cases similar to *Wochos* to conclude that defendants' statements misled investors).

the Merger agreement. ¶¶20, 22, 141-42. Statements made by Defendants after the February 6, 2020, announcement of the Merger are similarly actionable because they refer to material facts rather than broad statements of corporate optimism. The April 29, 2020 statements refer to the cancellation of the upcoming shareholders' annual meeting and, through its context, falsely reassured investors concerning the likelihood that the Acquisition would proceed as planned given the Company's failure to meet the Q1 2020 Illustrative Guidance issued on March 23, 2020 and the decline in the state of the Company's operations which was serving as a material potential impediment to completing the Acquisition. ¶¶147-51. *See, e.g.*, *In re Allied Nevada Gold Corp. Sec. Litig.*, 743 F. App'x 887, 888 (9th Cir. 2018) (finding "plaintiff adequately alleged that defendants possessed knowledge during the class period that left them with no basis for their optimistic statements regarding production, finances, and the company's expansion plans" and rejecting defendants' argument that "they were unaware of the nature and extent of the issues that rendered their statements overly optimistic in hindsight" because the complaint gave rise to a holistic inference of scienter that was "cogent and at least as compelling as any opposing inference.").

However, even the May 11, 2020 statement, which admittedly is one of opinion, and the April 29, 2020 statements, to the extent those are considered pure statements of opinion, are actionable because the known, undisclosed facts were sufficiently material to make those statements materially misleading. *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615-16 (9th Cir. 2017) (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 194 (2015)). Statements of opinion are, indeed, actionable when the failure to include a material fact renders a statement misleading. *Omnicare*, 575 U.S. at 194; s*ee also In re Intuitive Surgical Sec. Litig.*, No. 5:13-CV-01920-EJD, 2017 WL 4355072, at *3 (N.D. Cal. Sept. 29, 2017) (finding that "it is plausible that a reasonable investor would find that the omitted information regarding [disclosed opinions about certain matters] rendered the statements of opinion misleading.").

Defendants' attempt to cast the false statements of belief made in April 2020 and May 2020 regarding the completion of the transaction that contradicted known information in their

possession as "forward-looking" is without merit.  Instead, those statements are clearly ones of current opinion. *See Bielousov v. GoPro, Inc.*, No. 16-cv-06654, 2017 WL 3168522, at *4-5 (N.D. Cal. July 26, 2017) (ruling that the inclusion of the phrase "we believe" regarding expectations about meeting a revenue guidance transformed the statements into present opinions unprotected by the Private Securities Litigation Reform Act of 1995's (the "PSLRA") safe harbor); *see also Hsingching Hsu v. Puma Biotechnology, Inc.*, No. SACV 15-00865 AG (JCGx), 2017 WL 3205774, at *3 (C.D. Cal. July 25, 2017) (concluding that defendants could not invoke the safe harbor "by simply saying they 'anticipated' success when, in fact, they had a reasonable belief that defeat was just around the corner.").

The Court should also disregard Defendants' conclusory claim that the Complaint pleads inactionable statements of corporate optimism or puffery.  F. MTD at 15 n.8, 17 n.9.  "When determining whether statements amount[] only to puffery, the [C]ourt must analyze the context in which the statements were made." *Mulligan*, 36 F. Supp. 3d at 966 (quoting *In re Bridgepoint Educ., Inc. Sec. Litig.*, No. 3:12-CV-1737 JM (WMC), 2013 WL 5206216, at *17 (S.D. Cal. Sept. 13, 2013)).  Defendants pluck certain words and phrases out of their false statements robbing them of the very context that the Court should consider.  F. MTD at 15 n.8, 17 n.9.  Regardless, general statements of optimism give rise to a claim "when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly." *In re Quality Sys.*, 865 F.3d at 1143.  That is the case here where, as discussed above, Defendants repeatedly made misleading statements, but failed to disclose material, known adverse information that was inconsistent with their positive public statements.

### 2.    Confidential Witness Accounts Support Falsity

Reliable confidential witness statements may support falsity if the CWs are described with sufficient particularity to establish their reliability and personal knowledge about the facts that they allege. *Zuora*, 2020 WL 2042244, at *10 (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009)).  "The Ninth Circuit has held that numbering the confidential witnesses and describing the witnesses' job description and responsibilities constitutes a 'large

degree of specificity,' especially where the witnesses' exact title is used." *See Mulligan*, 36 F. Supp. 3d at 962 (citing *In re Daou Sys., Inc.*, 411 F.3d 1006, 1016 (9th Cir. 2005)).

CW accounts that contradict or undermine a defendant's public statements are sufficient to plead falsity. *See In re Quality Sys.*, 865 F.3d at 1144 (crediting CW accounts about a saturated market, declining sales, missed quotas and a reduction in compensation for sales employees to conclude that defendants made false statements about the company's sales pipeline); *Mulligan*, 36 F. Supp. 3d at 962-63 (inferring falsity of defendants' statements regarding remediation efforts when CW accounts showed pervasive and systemic problems at the company); *In re Extreme Networks, Inc.*, Case No. 15-cv-04833-BLF, 2018 WL 1411129, at *17-18 (N.D. Cal. March 21, 2018) (finding that defendants' statements that integration was "on track" was false when CWs were told that the "dust had not yet settled from the integration."); *In re Zynga Inc. Sec. Litig.*, No. C 12-04007 JSW, 2015 WL 1382217, at *4-5 (N.D. Cal. Mar. 25, 2015) (ruling that defendants made false statements about "strong" "bookings" when CWs alleged that bookings were declining during the class period); *In re BofI Holding, Inc. Sec. Litig.*, No. 3:15-CV-02324-GPC-KSC, 2017 WL 2257980, at *9 (S.D. Cal. May 23, 2017) (crediting accounts of lower level underwrites "pressured" to approve risky loans to conclude that defendants made false statements about the bank's loan and credit quality).

Whether a CW's account supports that a defendant made false statements is not the same as whether a CW's statements are indicative of scienter. *See Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1146 (N.D. Cal. 2017) (ruling that CW accounts reliably bolstered the conclusion that defendants made false and misleading statements even if they were not independently sufficient to show scienter); *Washtenaw Cty. Empl. Ret. Sys. v. Celera Corp.*, No. 5:10-cv-02604 EJD, 2012 WL 3835078, at *3 (N.D. Cal. Sep. 4, 2012) (ruling that statements attributable to defendants were "very useful" to demonstrate the company's problems even if they did not directly show that defendants knew their statements were false). Defendants repeatedly disregard this reality by conflating arguments about falsity and scienter. *See* F. MTD 13 (urging the Court to ignore the CWs because they did not have "direct contact" with DeCesare or Harms); *id.* at 14

(arguing that the CW accounts are "insufficient for the same reasons they fail to raise a strong inference of scienter.").

There is no question that the CWs here are reliable and have personal knowledge of Forescout's sales pipeline and sales productivity. *Twelve* of them worked in the sales department, and *five* were NAMs—the very same individuals DeCesare identified as the key individuals who had visibility into whether a deal would close, and whose "matured" and "ramped" sales experience he repeatedly touted as a basis for knowing that the Company would exceed upon its revenue guidance. ¶¶60, 123, 125, 130. Even CWs with much more limited sales experience were credited by the Ninth Circuit in *In re Quality Sys. Compare* ¶¶51-75 *with In re Quality Systems Inc. Sec. Litig.*, 13-cv-01818-CJC-JPR, ECF No. 26 at ¶¶49-56 (C.D. Cal. Apr. 7, 2014).

Here, Plaintiffs have more than adequately described the CWs' job responsibilities with sufficient particularity. ¶¶51, 53-59, 61, 63-64, 69, 71-72, 74-75. In fact, Defendants' voluminous motions do not contest that the Complaint provides a large degree of specificity about what each CW did at Forescout to assure the Court that the CWs are described with particularity. *See Mulligan*, 36 F. Supp. 3d at 942 (noting that providing job titles and describing job responsibilities constitutes a large degree of specificity).

CW1 states that most SDRs were only able to meet 50% of their quotas and confirms that the entire inside sales team was dissolved in the spring of 2019. ¶52. CW2 similarly states that the Company was unable to close deals in the beginning of 2019 and, as a result, a significant number of sales employees left. ¶53. CW7 asserts that a significant number of sales employees in the Commercial Division were laid off in February 2019, and that an entire department, the SLED section of the Public Sector division, including high level executives such as the Regional Director of SLED, was eliminated in Q3 2019. ¶58. According to CW8, a significant number of sales representatives dedicated to the health and services industry were let go in August 2019, and Forescout eliminated employees who assisted in sales and marketing at that time as well. ¶59. The cuts in 2019 were so widespread that, according to CW5, even a large number of employees in the Company's accounting department left in Q2 of 2019 and these employees were not

replaced. ¶56.[3] CW5, the Interim Director of International Accounting and Business Operations, explained that the reduction in headcount was caused by a need to manage cashflow due to declining sales. *Id.* CW6 states that Forescout ultimately instituted a hiring freeze in Q3 2019 in an attempt to increase cash and stem the negative impact of poor financial results. ¶57. Numerous CWs attribute the departure to lackluster sales, a general lack of interest in the Company's products and competition from more established organizations. ¶¶53-55. These so-called "anecdotes" (*e.g.*, F. MTD. at 11) are backed by hard evidence. On February 28, 2020, Defendants admitted in the Company's Annual Report that only 38% of sales representatives had been at the Company for more than two years, down from 50% at the end of 2018. ¶50.

Once Defendants began to tout the Company's "maturing and ramping" sales force that was "trending in the right direction," and repeatedly referred to increased sales productivity in the past as a measure that provided "visibility" into the pipeline, they were bound to disclose adverse facts that cut against this positive information, including all of the facts above. *Schueneman*, 840 F.3d at 705-06. Not only did Defendants fail to disclose these adverse facts, but DeCesare made objectively false statements, including that the Company was "hiring like crazy"; that "nothing had changed" in terms of the Company's sales force; and that "hundreds of sales reps" employed at the Company meant that Forescout would easily exceed upon its objectively false revenue guidance. These facts are more than enough to plead falsity under the Exchange Act. *See Nutanix Inc.*, 2020 WL 5500422, at *8 (finding that complaint pled falsity when defendants claimed that sales productivity was "ramping up" when sales force was actually "experiencing high levels of attrition.").

---

[3] Contrary to Defendants' conclusory claims, this allegation is not "completely irrelevant" to Plaintiffs' claims. F. MTD at 16. It shows the widespread nature of the reductions throughout the Class Period due to declining sales, a strain on cashflow, and poor financial results. Indeed, a hiring freeze was instituted in Q3 2019. Defendants' arguments are also internally inconsistent. Defendants fault Plaintiffs for discussing cuts made in other departments, but then reach outside the pleadings to claim that Forescout's overall headcount increased by 101 employees at the end of 2019 compared to the total in 2018. *Id.* Putting aside the fact that the Court cannot assume the truth of this self-serving and unsubstantiated assertion at the pleading stage, *see Khoja*, 899 F.3d at 1000-08 (reversing dismissal based on an improper application of judicial notice and the incorporation by reference doctrine where the district court repeatedly assumed the truth of disputed facts contained in defendants' SEC filings), the total number of employees at the end of 2019 is irrelevant when Defendants admitted that sales productivity of NAMs at the end of that year dramatically declined compared to 2018.

Defendants urge the Court to draw a pleading inference in their favor by pointing to DeCesare's refusal to provide interim percentages of the number of "ramped" sales representatives, but they fail to realize that DeCesare's refusal to provide specific data "strongly impl[ies] that he had access to the disputed information," *Twitter, Inc.*, 282 F. Supp. 3d at 1147, but failed to disclose it because the data would severely undermine his misleading statements. *See also* ¶130 ("we're going to hold-off on disclosing what that percentage is until we finish 2019.")

The adverse facts concealed from investors regarding the Company's deteriorating sales pipeline and the amount and nature of illusory deals in that pipeline are even worse. Defendants ignore that, according to CW9, a NAM, "committed deals" were deals that Forescout expected to close in a certain quarter. ¶61. F. MTD at 17 (incorrectly arguing that "no CW claims to know whether these particular deals were included in Forescout's public forecasts."). It is illogical to assume, based on the baseless assertions of Defendants' counsel, that Forescout—a company that repeatedly missed its revenue guidance time and time again—would not include "committed deals" into its public forecasts even though it expected to close those deals and derive revenue from them before the end of the quarter.

CW9, a NAM, was instructed by superiors to move a $1 million deal from the upside category to the committed category even though a customer had not committed to the deal and there was no "tech win." ¶62. CW7, another NAM, provides vivid details about how a $2 million deal for the University of Wisconsin – Madison ("UWM") was listed to close before the end of September 2019 even though the customer had informed senior executives at Forescout that the proposed timeline was not acceptable, and the deal ultimately failed. ¶64. CW7 states that a high-level executive, Niels Jensen ("Jensen"), Forescout's Senior Vice President of Sales for the Americas, knew that this deal was illusory but instructed the Regional Director of SLED to list the deal as closed before the end of September 2019. ¶65. According to CW7, another NAM in Texas was also pressured to report that other deals worth $2 million would close before the end of Q3 2019. ¶66. CW14, the Regional Director of SLED, agrees with CW7's allegations and confirms that several deals listed as "committed" in the SLED section were known to be illusory. ¶74.

CW11, another NAM, was also forced to report that deals worth $1.2 million would close sooner than CW11 had forecast. ¶70.  None of these deals ultimately materialized.

CW12 corroborates that the "committed" deals did not just fall through but "evaporated." ¶71.  CW13 explains that sales employees at SecurityMatters, a company acquired by Forescout, were pressured by senior managers to list deals as "committed" even though sales employees knew that there was no actual commitment from buyers. ¶73.  According to CW13, the head of sales at SecurityMatters left the Company because he was fed up with Forescout's direction to fudge the numbers and count uncommitted deals as committed. *Id.*  CW15 explains that Forescout utilized an internal "forecast file" that identified committed deals for each quarter, and deals lingered in this file for months or even years without coming to fruition. ¶75.  Numerous CWs further confirm that they were grossly below their sales quotas. ¶¶63, 67, 74.

The interlocking nature of these allegations bolsters their reliability and exposes the falsity of Defendants' statements. *See Turocy v. El Pollo Loco Holdings, Inc.*, No. SACV 15-1343-DOC (KESx), 2017 WL 3328543, at *16-17 (C.D. Cal. Aug. 4, 2017) (reconsidering dismissal and sustaining the complaint in light of *Quality Sys.* because the interlocking nature of CWs' statements bolstered their reliability).  Collectively, the CWs provide highly specific information about deals worth at least $7.2 million that were illusory in 2019.  Multiple NAMs assert that this was a systemic problem at Forescout.  Their collective accounts contradict Defendants' false claims that the Company had already "been awarded the business," and that Forescout's current pipeline was so large and plentiful that it would exceed upon its revenue guidance even if some big deals fell through in the Class Period.  ¶¶117, 119, 121, 123, 125, 127, 130.  It was also misleading for Defendants to tout the nature of Forescout's existing sales pipeline when Defendants withheld the diametrically opposed internal state of affairs at the Company.  *See Schueneman*, 840 F.3d at 705-06 (reversing dismissal because defendants had a duty to disclose adverse facts that cut against their positive spin about clinical trial results).  Far less specific information from CWs has been credited to conclude that a complaint pleads falsity under the PSLRA.  *See Murphy v. Precision Castparts Corp.*, No. 3:16-cv-00521-SB, 2017 WL 3084274, at *13-14 (D. Or. June 27, 2017) (relying on CW accounts of aggressive sales strategies to

conclude that defendants' statements about organic growth, inventory reduction and ability to meet earnings targets were false when made).

It was also misleading for Defendants to attribute the earnings misses on poor performance in the EMEA region and alleged disruptions caused by the global pandemic—a false excuse that appeared to have no impact on Forescout's competitors—when they concealed from investors the high level of attrition and the illusory nature of "big deals" worth millions of dollars in the United States that drastically reduced "visibility" into the Company's future earnings notwithstanding Defendants' false statements to the contrary.  That Advent noted a "***dramatic decline in earnings potential and financial performance year-over-year from Q1 2019 to Q1 2020***," and called out Forescout for falsely blaming COVID-19 for its downturn in its Termination Letter, strengthens the CWs' allegations.  *See* ¶159 (emphasis added).  The Court should ignore Defendants' mischaracterizations of the contents of the letter, and their attempt to have their own alternative interpretation imposed on it.  F. MTD at 12 n.5.  Courts do not consider a defendant's "alternative facts" or after the fact interpretations of statements at the pleading stage.  *See SEB Inv. Mgmt. AB v. Align Tech., Inc.*, Case No. 18-cv-06720-LHK, 2020 WL 5408056, at *11-13 (N.D. Cal. Sep. 9, 2020) (adopting plaintiff's interpretation of defendant's false statement at the pleading stage to avoid resolving factual disputes about the meaning of statements).

### 3. Plaintiffs Adequately Allege Facts Supporting the Existence of a Channel Stuffing Scheme

In Q4 2019, Defendants blunted the impact of an even more severe decline by engaging in a channel-stuffing scheme.  On February 6, 2020, Forescout announced that total revenue for Q4 2019 was $91.3 million, yet again missing analyst estimates and the Company's earlier guidance.  ¶141.  On May 11, 2020, the Company announced abysmal revenues of $57.2 million for the first quarter of 2020, missing the Illustrative Guidance contained in the Proxy Statement by nearly $5 million.  ¶152.  Still, these revenue figures were inaccurate and inflated by an abnormal transaction with Merlin.  ¶81.  On May 5, 2020, Advent received a letter from a whistleblower at Forescout, who alleged that Forescout had stuffed the channel in connection with a large transaction with Merlin.  *Id.*  The whistleblower's allegations were serious enough that Forescout's new counsel in this Action, who also represented Advent before the parties reconciled, served a subpoena on

Merlin in the Delaware Proceeding that sought additional information about the scheme. ¶82. The Complaint pleads additional circumstantial evidence of the scheme's existence. CW15, who participated in meetings with Merlin, states that Merlin agreed to resell Forescout's products for high value deals even though Merlin could not close the deal before the end of the quarter. ¶83. CW15 also confirms that certain large deals facilitated by Merlin never closed. *Id.* In addition, in Q1 2020, the average margin on hardware sales declined to ***negative*** 8% from a high of 25% in Q2 2019 because Forescout deeply discounted two large deals. ¶85. Heightened discounts and concessions are a tell-tale sign of channel stuffing. *Id.*

Recognition of revenue in earlier periods through a channel stuffing scheme violated GAAP and the Company's own revenue recognition policies. ¶¶86-87. Recognition of revenue in violation of GAAP states a claim for securities fraud because "revenue must be earned before it can be recognized." *In re Daou Sys.*, 411 F.3d at 1016. The Court has ruled that a complaint does not need to plead specific transactions, shipments, customers, times or dollar amounts if the complaint otherwise provides sufficient information to plead the existence of a channel stuffing scheme. *See In re Connetics Corp. Sec. Litig.*, No. C 07-02940 SI, 2008 WL 3842938, at *9-11 (N.D. Cal. Aug. 14, 2008) (crediting CW accounts of excessive inventory and defendants' need to increase forecasts to internally justify selling more products to conclude that channel stuffing was sufficiently alleged); *see also Friedman v. Rayovac Corp.*, 295 F. Supp. 2d 957, 987 (W.D. Wis. 2003) (ruling that general allegations by CWs of a channel stuffing scheme combined with defendants' financial difficulties in the first quarter were sufficient to state a claim); *In re St. Jude Med. Inc. Sec. Litig.*, 836 F. Supp. 2d 878, 890-91 (D. Minn. 2011) (rejecting demand that a channel stuffing scheme be pleaded with hyper specificity because the "PSLRA has not converted a motion to dismiss into a motion for summary judgment, much less a trial on the merits.").

Defendants contend that Forescout's current counsel's subpoena served on Merlin in the Delaware Proceeding "does not establish the accusation's truth," F. MTD at 19, but "Plaintiffs do not need to prove their case to survive" dismissal under the PSLRA. *In re Juno Therapeutics Inc.*, Case No. C16-1069RSM, 2017 WL 2574009, at *5 (W.D. Wash. June 14, 2017). Nor are Plaintiffs required to disprove that customers changed their mind or found better offers or otherwise produce

evidence that Forescout did not discount purchases to land two large contracts. Defendants will have the opportunity to test these allegations during discovery. *See In re UTStarcom, Inc.*, 617 F. Supp. 2d 964, 972 n.12 (N.D. Cal. 2009) (denying motion to dismiss because factual disputes cannot be resolved at the pleading stage, and noting that defendants may attempt to prove that a false guidance was not issued during discovery); *see also Yaron v. Intersect ENT, Inc.*, No. 19-CV-02647-JSW, 2020 WL 6750568, at *6 (N.D. Cal. June 19, 2020) ("even legitimate types of channel stuffing may be part of a fraudulent scheme when used to hide poor business fundamentals.").

### 4. The Acquisition Closing at a Lower Price Does Not Defeat Plaintiffs' Claims of Deception with Respect to the Merger Related Statements

Defendants advance a type of innocence by hindsight claim based on the Acquisition's closing in August 2020—***three months after the end of the Class Period***. I.D. MTD at 9. However, that conveniently ignores that the Company voluntarily agreed to a reduction in the Acquisition price to $29 per share, or $4 below the original $33 per share price while the Delaware Proceeding created great uncertainty as to whether the Acquisition would proceed at all. *E.g.,* ¶¶90, 94-98, 141, 156. Indeed, if anything, Advent's ability to negotiate a $230 million lower price further supports the truth of the facts upon which Plaintiffs' claims are based.

*Eisenstadt v. Centel Corp.*, 113 F.3d 738, 746 (7th Cir. 1997), upon which Defendants seek to rely as well as other decisions referenced by Defendants, are inapposite to the case at Bar. This case does not involve a duty to "speculate" about Advent's positions or its intentions to close the deal. F. MTD. at 20. Advent's positions and intentions were well known to Defendants, yet they concealed adverse facts, and repeatedly misled investors to believe that closing was imminent and there were no significant obstacles down the road. This is more than sufficient to state a claim for securities fraud. *See, e.g., In re Sprint Corp. Sec. Litig.*, 232 F. Supp. 2d 1193, 1207, 1220-21 (D. Kan. 2002) (finding a press release stating "[w]e look forward to completing the merger later this year" was potentially actionable because at the time that statement was made it was alleged that "the Sprint defendants were in possession of information, which, if released, would have altered the 'total mix' of available information" about the merger's chance of closing) (footnote omitted).

**5.      The PSLRA's Safe Harbor Does Not Insulate Defendants from Liability**

The PSLRA's safe harbor only applies where a statement is "identified as a forward-looking statement, and is accompanied by ***meaningful*** cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement[.]"  15 U.S.C. §78u-5(c)(1) (emphasis added); *see also In re Quality Sys.*, 865 F.3d at 1141.  The statements at issue in this Action are unprotected by the safe harbor.

The PSLRA's safe harbor does not apply to statements about present or historical fact or even mixed statements containing both projections and statements of historical facts or optimistic statements of opinion that conflict with known, adverse information.  *See, e.g.*, *In re Quality Sys.*, 865 F.3d at 1148 (holding that "[b]ecause Defendants made materially false or misleading non-forward-looking statements about the state of QSI's sales pipeline, virtually no cautionary language short of an outright admission that the non-forward-looking statements were materially false or misleading would have been adequate.").  Here, as demonstrated, almost all of Defendants' statements involve the failure to disclose existing or historical facts.  *See* Point III.B.1, *supra; see also, e.g.*, ¶¶148-49, 151.  Even assuming that any part of Defendants' false statements about the Company's sales pipeline or sales productivity were forward-looking, Defendants cannot invoke the safe harbor because they did not admit to making false statements about those subjects.  *See Amyris, Inc.*, 2020 WL 5903844, at *16 (applying *Quality Sys.* to conclude that defendants failed to provide meaningful cautionary language because they did not admit that revenue was improperly recognized); *NECA-IBEW Pension Tr. Fund v. Precision Castparts Corp.*, No. 3:16-cv-01756-YY, 2017 WL 4453561, at *12 (D. Or. Oct. 3, 2017) (rejecting proposed language as meaningfully cautionary because "there were no statements sufficiently warning or admitting that the present statements at issue were or might be untrue.").  The actual quarterly guidance numbers disclosed on February 7, 2019, May 10, 2019, and the Illustrative Guidance contained in the Proxy Statement are the only forward-looking statements that Defendants made during the Class Period because these figures were unaccompanied by other false statements of current or past fact.  ¶¶103-04, 112-14, 147-48; *see In re Quality Sys.*, 865 F.3d at 1148-1149 (holding that the quantitative figures given to investors for the range of future earnings per share were forward looking because

they were not accompanied by any other non-forward-looking statement alleged to be false). Because the guidance figures disclosed in press releases issued on August 7, 2019, October 10, 2019, and November 6, 2019 were accompanied by other false statements of past or current fact, the safe harbor does not apply to them at all. *Id.* at 1141, 1148-49.

Still, Defendants cannot invoke the safe harbor for even the handful of forward-looking statements alleged in the Complaint because the risks purportedly disclosed had either materially heightened risk of occurring or had come to pass. In *In re CV Therapeutics, Inc. Sec. Litig.*, the Court ruled that the use of the words "may" and "could" to purportedly warn of the delay of approval or the risk of non-approval of a drug was misleading when defendants knew that the FDA harbored serious doubts about the drug candidate. No. C 03-03709 SI, 2004 WL 1753251, at *11 (N.D. Cal. Aug. 2004). It was misleading for Defendants to assert that the timing of sales "***may*** vary substantially from period to period" or that the Company "***may*** be unable to hire or retain" qualified personnel or that revenue ***could*** be "delayed for any reason" or that revenue "***could*** 'fall below [Company] expectations'" when they knew that each one of these risks would materialize due to the known erosion in sales productivity and the illusory nature of deals. F. MTD at 9-10.

Forescout's purported disclosure of vague risks that "***might*** impact the transaction" are also wholly insufficient to obtain dismissal of Plaintiffs' claims when those risks had already increased if not transpired. F. MTD at 10 (emphasis added). *See, e.g.*, *Camp v. Qualcomm, Inc.*, Case No. 18-cv-1208, 2020 WL 1157192, at *5 (S.D. Cal. Mar. 10, 2020) (rejecting attempt to escape liability based on disclosure of potential risk of non-approval from a regulator because undisclosed discussions with the regulator while the merger was pending elevated the risk that the regulator might block the transaction). Moreover, Defendants may wish that Plaintiffs do not plead "why the pandemic related excuse was false," F. MTD at 20 n.10, but Plaintiffs allege that the organization that acquired Forescout and had access to undisclosed granular data made it known that the Company's financial performance "***dropped off a cliff***" compared to its peers, none of whom were impacted by the global pandemic. ¶92.

Defendants also seek to rely on other purported warnings which are too general and vague to invoke the safe harbor. Thus, that Forescout has "limited operating history" or that its growth

strategy is dependent on large organizations tells investors nothing about its rapidly deteriorating sales pipeline and high attrition level or its objectively false guidance figures during the Class Period. *See, e.g.*, *In re InterMune, Inc. Sec. Litig.*, No. C 03-2954 SI, 2004 WL 1737264, at *4-5 (N.D. Cal. July 30, 2004) (concluding that forward looking statements that are not based on the most accurate information available to defendants are not protected by the safe harbor).

The safe harbor also does not immunize Defendants' misleading statements because they made them with actual knowledge. Defendants knew throughout 2019, that sales productivity was rapidly declining, and included illusory deals with no commitments from buyers worth millions of dollars in Forescout's quarterly forecasts. Defendants ***already knew*** of Advent's unwillingness to proceed with the Merger as originally agreed upon before the Company's March 23, 2020, Illustrative Guidance was included in the Proxy Statement, that the Company's actual business performance in Q1 2020 had cratered in the last week of February 2020 and that multiple customers and joint service providers cancelled their contracts with Forescout. *See infra* Section III.C; *see also* ¶¶23, 25, 26, 148(a), 148(c), 148(d), 149(b), 150(b), 151(d), 151(f). Defendant' failure to disclose existing adverse facts makes the safe harbor inapplicable to the claims at issue. *See, e.g.*, *N.Y. Hotel Trades Council v. Impax Labs., Inc.*, No. 19-16744, 2021 WL 81719, at *2 (9th Cir. Jan. 11, 2021) (reversing dismissal because revenue guidance figures were given with actual knowledge of facts that rendered the figures false); *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d at 971 n.11 (denying motion to dismiss false guidance figures as protected by the safe harbor); *In re Illumina, Inc.*, No. 3:16-cv-3044-L-KSC, 2018 WL 500990, at *5 (S.D. Cal. Jan. 22, 2018) (denying motion to dismiss because there was a factual question about whether defendants knew their guidance figures were false when made); *see also Zuora*, 2020 WL 2042244, at *10 (holding that forward looking statements were actionable where the "plaintiff allege[d] that defendants did not have a reasonable basis to believe [their statements were true]").

C.    **THE COMPLAINT ALLEGES FACTS RAISING A STRONG INFERENCE OF SCIENTER**

"To establish scienter at the pleading stage, a complaint must state with particularity facts giving rise to a strong inference that the defendant made false or misleading statements either intentionally or with deliberate recklessness." *Zuora*, 2020 WL 2042244, at *10 (citing 15 U.S.C.

§78u-4(b)(2); *In re Daou Sys.*, 411 F.3d at 1015). The inference that the defendant acted with scienter must be cogent and compelling but "need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences." *Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007); *see also ESG Capital Partners, LP v. Stratos*, 828 F.3d 1023, 1035 (9th Cir. 2016) (Plaintiffs need only "provide a narrative of fraud—facts which, if true, substantiate an explanation at least as plausible as a nonfraudulent alternative."). In evaluating scienter, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Tellabs*, 551 U.S. at 326; *see also In re Quality Sys.,* 865 F.3d at 1144 (complaint allegations must be "taken collectively" in scienter analysis); *Zuora*, 2020 WL 2042244, at *10.

Allegations that the maker of a false statement was "in possession of contemporaneous, contradictory information when they made the false and misleading statements [gives] rise to a strong inference of scienter." *Zuora*, 2020 WL 2042244, at *11; *see also Berson*, 527 F.3d at 989 (Plaintiffs' showing that Defendants' had "*contemporaneous* knowledge" that the alleged misstatements were false when made is sufficient to plead scienter under the PSLRA) (emphasis in original). Here, Plaintiffs have alleged precisely such facts based upon: (i) statements made by CWs and a corporate whistleblower; (ii) Defendants' public statements made acknowledging that they had access to and reviewed relevant internal corporate information; (iii) factual allegations made by the Company or Advent in the Delaware Proceeding; and (iv) the financial motives of the Individual Defendants to misrepresent material facts during the Class Period.[4]

### 1. The CW Allegations and Defendants' Own Statements Support a Strong Inference of Scienter

Reliable CW statements serve as a sufficient basis for alleging contemporaneous knowledge of adverse facts sufficient to support a strong inference of scienter. *See, e.g.*, *Zuora*, 2020 WL 2042244, at *10-11. The interlocking CW statements and Defendants' admissions that they tracked the pipeline (see ¶¶107, 115, 132) "plausibly allege[s] that [Defendants were] regularly kept apprised of [Forescout]'s pipeline, whether through Salesforce.com or otherwise,

---

[4] Defendants do not dispute that scienter is properly alleged against a corporation where it is properly alleged against at least one corporate officer. *See* F. MTD at 22.

such that [they were] at least deliberately reckless as to the fact that the pipeline was declining and the statements made regarding customer growth misleading" "support a strong inference that [Defendants] knew, or at least [were] reckless as to the fact that [Forescout's sales productivity and] pipeline was declining substantially." *Nutanix*, 2020 WL 5500422, at *9. As the Court in *Nutanix* recognized, "[a]n opposing inference—that the individual defendants were ignorant of the declining pipeline even as they discussed this pipeline with investors—is implausible in light of the allegations from multiple CWs, including several that met with the defendants, that throughout the company that the pipeline was 'in trouble' or 'drying up.'" *Id.* In the case of Defendants' materially false or misleading statements concerning the experience and efficiency of the Company's sales force, four CWs (CW2, CW3, CW4, and CW10) confirm that Forescout's sales force was being reduced by terminations and resignations due to declining sales and demand, while Defendants' bullish guidance and continual reassurances based upon Forescout's ramped sales force were made. ¶¶5, 7, 51, 52, 54, 55, 63. Three other CWs (CW6, CW7 and CW8) further confirm sales force layoffs and hiring freezes. ¶¶57-59. The veracity of these statements is confirmed by a February 28, 2020, disclosure by the Company that as of December 31, 2019, only 38% of Forescout's sales representatives had been at the Company for more than two years, down from 50% as of December 31, 2018. ¶¶23, 50.

The individual reliability of each CW's account of the relevant contemporaneous facts is further bolstered by so many current and former employees providing the same or similar testimony, further bolstering the strong inference of scienter here. *See, e.g.*, *In re Extreme Networks, Inc. Sec. Litig.*, 2018 WL 1411129, at *27 (finding CWs' accounts indicative of scienter as "the CWs corroborate each other with respect to what was going on internally at [the company], which further supports the reliability of their statements") (citing *Hatamian v. Advanced Micro Devices, Inc.*, 87 F. Supp. 3d 1149, 1163 (N.D. Cal. 2015)); *In re Zillow Grp., Inc. Sec. Litig.*, Case No. C17-1387-JCC, 2019 WL 1755293, at *5 (W.D. Wash. Apr. 19, 2019) (ruling that the "consistent and interlocking nature of [CW] testimony bolsters the evidence's reliability and credibility"); *see also Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 197 (S.D.N.Y 2010) ("The fact that this case involves corroboration from multiple [CW] sources also supports

an inference of a scienter."). Similarly, that the CWs were employed in various departments throughout the Company corroborate Defendants' contemporaneous knowledge contradicted their public statements. *See, e.g., Berson*, 527 F.3d at 985 ("any number of company employees would be in a position" to know or reasonably deduce that the company was suffering setbacks; and disputes over witnesses' accounts "must at least await discovery").

Defendants' knowledge of these material adverse undisclosed facts is confirmed by testimony from CW8 that DeCesare was a micromanager. ¶163. Defendants' public statements, in fact, confirm the veracity of CW8's account that Defendants closely monitored the sales pipeline when they told the market that the pipeline was "something that *we certainly track on a very, very, very consistent basis*." ¶107 (emphasis added); *see also* ¶115 ("big deals are a part of our business and we've been *tracking them very closely*.") (emphasis added); ¶132 ("we spent a lot of our July time frame really diving into the field to shape how Q3 was taking shape, how Q4 was taking shape, so that we could reflect that additional insight and give you an appropriate level of guidance, which the Q3 was still very solid, consistent with how I guided at the beginning of the year."); ¶164 ("sales execution is certainly – or sales ramping and productivity is always one of those areas that both [Harms] and I spend a lot of time on."); *In re Quality Sys.*, 865 F.3d at 1130 (holding that executives' statements concerning the maintenance of Salesforce databases to report the sales pipeline and support revenue forecasts was a sufficient admission of knowledge at the pleading stage). The Court should ignore Defendants' after-the-fact spin and alternative interpretations of these statements at this stage. *See Align Tech., Inc.*, Case No. 18-cv-06720-LHK, 2020 WL 5408056, at *11-13 (refusing to credit claim that plaintiffs took statements "out of context" as an improper factual attack at the pleading stage).

Indeed, even absent these direct admissions of knowledge, scienter is alleged because "the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *Reese v. Malone*, 747 F.3d 557, 576 (9th Cir. 2014), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017); *accord S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 786 (9th Cir. 2008).

In addition, several CWs interacted directly with Forescout's upper management. *See, e.g.,* ¶64 (CW7 was personally pressured by "Forescout's upper management"); ¶65 (Forescout's Senior Vice President of Sales for the Americas was aware a deal would not close by a date listed in the Company's records, but nevertheless pressured a NAM to list it as closing before September 2019); ¶66 (the head of Forescout's SLED division knew closing dates for deals were unrealistic under pressure from higher level managers); ¶69 (superiors pressured CW11 in Forescout's Enterprise division to inflate deal values); ¶73 (senior management at Forescout directed the head of sales at SecurityMatters to fudge numbers); ¶74 (Forescout's CRO pressured CW14 to identify uncommitted deals as committed); ¶75 (senior management pressured CW15 and the Deal Desk to identify deals with no prospect of closing during a quarter as committed). The consistent pressure, across divisions and locations, from upper management is indicative of scienter. *See Robb v. Fitbit*, 216 F. Supp. 3d 1017, 1032 (2016) (holding that where CWs reported directly to Fitbit's chief operating officer, who was not himself a defendant, that was "indicat[ive of] scienter by Fitbit executives" and "suffice[d] to plead scienter."). According to CW10, sales pipeline reports were provided to Redman, the CRO, and Brian Gumbel, the head of Worldwide sales, received automatic alerts with details of all deals worth $1 million or more. ¶¶160-61. CW7 states that DeCesare reviewed data on the Salesforce platform and asked specific questions about deals, and CW8 states that Jensen, the head of sales for the Americas, monitored all deals over $500,000. ¶162. CW8 also states that DeCesare specifically asked questions at a granular level about all deals over a $1 million. ¶163; *see also In re Quality Sys.*, 865 F.3d at 1145 (crediting CW accounts that sales reports were "automatically delivered to the management team" and forecasts were available on the Salesforce platform to conclude that scienter was adequately pled).

In Defendants' view, a securities fraud complaint cannot be sustained unless a high-level CW with experience in preparing a fraudulent revenue forecast at issue recounts a conversation with a defendant, in which the defendant provides a gift-wrapped admission of guilt. F. MTD at 13-18; I.D. MTD at 10-16. This imaginary standard disregards Supreme Court and Ninth Circuit precedent. In *Tellabs Inc.*, the Supreme Court emphasized that a plaintiff is not required to plead "smoking-gun" evidence at the pleading stage. 551 U.S. at 324. In *Quality Sys.*, the Ninth Circuit

credited the accounts of numerous lower-level sales representatives who had no experience in creating forecasts, provided less specific details than the CWs here, and had no contact with the individual defendants. 865 F.3d at 1144.

It is not "notable" at all that only one CW was present for the entire Class Period. I.D. MTD at 10 n.2. The Court has already rejected the same argument. *See Zuora, Inc.*, 2020 WL 2042244, at *11 (finding that a CW does not need to be employed at the company for the entire class period to be credible). Nor are vague cries of "hearsay" enough to disregard a CW's account. *See Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1208-09 (9th Cir. 2016) (reversing dismissal because the district court discounted credible allegations from a CW as hearsay to dismiss the complaint). After all, hearsay is admissible in a trial under the Federal Rules of Evidence pursuant to a multitude of exceptions. Even though the CW allegations pled in the Complaint are concrete and particularized, Plaintiffs note that even "vague" allegations have been credited by other courts in this District depending on the circumstances. *See Hatamian*, 87 F. Supp. 3d at 1159 (crediting allegation that everyone at the company was "flipping out" over the yield problems to sustain falsity allegations).

Nor are the CWs here in "apparent" disagreement with management. F. MTD at 14, 18. The Court should clearly reject this dangerous proposition. Defendants' reliance on *Wochos* to support this claim is completely inappropriate. In *Wochos*, two CWs told the defendant that production goals could not be met, and the defendant fired the CWs in response because he disagreed with their views. 2021 WL 246210, at *9. There was an apparent disagreement in *Wochos* on the face of the pleadings. *Id.* Here, there are no allegations in the Complaint that can be read to infer any such disagreement. The speculative opinions of Defendants' counsel about a presumed disagreement with no basis in fact is plainly inadequate, and Defendants cannot offer after the fact opinions to refute Plaintiffs' well-pleaded allegations. *See Karinski v. Stamps.com, Inc.*, Case No. CV 19-1828, 2020 WL 281716, at *18 (C.D. Cal. Jan. 17, 2020) (rejecting a similarly conclusory claim that CWs merely disagreed with higher management as an improper factual attack at the pleading stage); *see also In re Allied Nev. Gold Corp. Sec. Litig.*, 743 F. App'x at 887-88 (reversing dismissal where district court minimized allegations as nothing but a "shared

opinion" amongst CWs); *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676 (5th Cir. 2014) (overruling conclusion that CW accounts were a mere disagreement with management because the CWs spoke in factual terms).

Most importantly, the gaping hole in Defendants' strategy is their conspicuous refusal to acknowledge the Court's previous decisions that severely undercut their contentions. CW14 implicates Jensen, the head of sales for the Americas, and Redman, the CRO at Forescout identified by DeCesare, as the key high-level executive with global responsibility for sales and revenue at the Company. CW14 asserts that the pressure campaign was instigated by Jensen and Redman, and CW7 confirms that CW14 told CW7 that Jensen instructed that the illusory two-million-dollar project involving UWM should be listed to close on or before September 2019. ¶¶65, 74. Redman's and Jensen's direct involvement in the pressure campaign and knowledge of illusory deals is more than enough to plead scienter. *In Robb v. Fitbit*, the Court found that the complaint pled scienter because the CWs reported to a higher-level non-defendant executive, which indicated the individual defendants' scienter. 216 F. Supp. 3d at 1032. When defendants in *Robb* moved for reconsideration, the Court again explained that reports given to the higher-level non-defendant executive "would also have been known to the individual defendants." *Robb v. Fitbit, Inc.*, Case No. 16-cv-00151-SI, 2017 WL 219673, at *6 (N.D. Cal. Jan. 19, 2017). The Court's decisions in *Robb* are consistent with the general state of the law. *See e.g.*, *Christine Asia Co. v. Yun Ma*, 718 F. App'x 20, 23 (2d Cir. Dec. 5, 2017) (holding that "it is virtually inconceivable" that senior managers at the company would not relay material information to the individual defendants). High-level executives' direct involvement in the fraud here is more than sufficient to bridge any gaps and plead scienter.

Defendants rely on several lower court opinions pre-dating the Ninth Circuit's decision in *Quality Sys.* which is a case with starkly similar facts that numerous other courts in this District have applied to sustain securities fraud claims. F. MTD at 12-18. In any event, Defendants' authorities are factually distinguishable. In *McGovney v. Aerohive Networks, Inc.*, No. 18-CV-00435-LHK, 2019 WL 8137143, at *11 (N.D. Cal. Aug. 7, 2019), the defendants "actually disclosed sales personnel issues." *Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1114-15 (N.D.

Cal. 2009), is similarly inapposite to the case at Bar, because it was unclear whether the CW's observations were either contemporaneous with or in any way contradicted the relevant public statements. In *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1064-65 (N.D. Cal. 2012), the CWs' allegations lacked specificity because they did not even allege a failure to meet sales goals or any specifics about "slumping sales." *In re White Elec. Designs Corp. Sec. Litig.*, 416 F. Supp. 2d 754, 772-73 (D. Ariz. 2006), is inapposite because there the allegations about an "inflated backlog" were conclusory and originated with a single CW who provided no other details to assess the nature of the claim. In *Monachelli v. Hortonworks*, *Inc.,* 225 F.3d 1045, 1057-58 (N.D. Cal. 2016), the gravamen of the complaint involved the failure to disclose an impending capital raise, where the defendants, in fact, disclosed that they would conduct an offering in the future. *McCasland v. FormFactor, Inc.*, No. C-07-5545-SI, 2009 WL 2086168, at *6-9 (N.D. Cal. July 14, 2009), does not even reference CWs in evaluating scienter and, instead, was based upon the company's financial restatements undercutting scienter. Other cases that Defendants rely upon are even further removed from the facts of this case or *Quality Sys.* or the cases that faithfully apply *Quality Sys*.

Equally meritless is Defendants' argument that the channel stuffing or front loading of sale by the Company through improper incentives offered to distributors such as Merlin "merely" relies upon one alleged whistleblower. I.D. MTD at 17. That is not correct because the whistleblower's charges were corroborated by CW15, a manager on the Deal Desk at Forescout from June 2016 to June 2020. ¶75. In addition, Advent, after having access to the Company's documents following its entry into the Merger agreement, asserted that there were "several highly unnatural (and detrimental) actions taken by Forescout to pull additional bookings into the" first quarter of 2020 to make the Company look better in advance of the Merger. ¶¶83, 92. And the allegation that DeCesare specifically inquired about the details of all deals that were over a $1 million (¶163) demonstrates his awareness of the "abnormal," large transaction with Merlin. ¶¶83, 163.

**2.　　Factual Allegations Made by the Company in the Delaware Proceeding Support a Strong Inference of Scienter**

The allegations of falsity for the statements made after March 2020 are based upon factual allegations primarily made by the Company in the Delaware Proceeding. ¶¶25, 26, 91, 96, 148(c),

---

148(d). Those statements were made pursuant to Rule 11 of the Delaware Court of Chancery Rules which is identical in form to Rule 11 of the Federal Rules of Civil Procedure and requires factual allegations to have some factual basis. *See* Del. Ch. Ct. R. 11(b)(3); Fed. R. Civ. P. 11(b)(3). These statements have never been publicly disclaimed or disavowed by the Company and, therefore, they are presumptively true. *See, e.g.*, *In re ComUnity Lending, Inc.*, No. C 08-00201 JW, 2009 WL 10699633, at *2 (N.D. Cal. Apr. 24, 2009) ("since counsel are subject to Fed. R. Civ. P. Rule 11 sanctions, the Court presumes as true the information presented in Plaintiffs' Motion").

Similarly, certain of those factual allegations are based upon allegations made by Advent in the Delaware Proceeding. ¶¶96, 156, 166. Advent was also bound by the pleading obligations of Rule 11(b)(3). Advent also was able to achieve a $4.00 per share reduction from the originally agreed upon price of $33.00 per share, equating to approximately $230 million, strongly suggesting that its allegations in the Delaware Proceeding had merit.

Defendants contend that Advent's Termination Letter as well as the allegations Advent made in the Delaware Proceeding cannot serve as the basis for a strong inference of scienter because they were made after any challenged statement. *See* I.D. MTD at 9. However, the relevant factual statements spoke directly to what took place contemporaneously with Defendants' statements regarding the Merger and why those statements were false or misleading for failing to disclose material adverse facts which is the very essence of scienter. *See, e.g.*, *Reese*, 747 F.3d at 574 (the "[t]emporal proximity of an allegedly fraudulent statement or omission and a later disclosure can be circumstantial evidence of scienter.").

Equally lacking in merit is the counter-inference Defendants seek to gain by having brought the Delaware Proceeding. *See* I.D. MTD at 9. Suing to enforce the Merger Agreement does not necessarily mean that the Company was confident of victory, but only that Forescout considered suing to be its best course of action and one far better than simply allowing Advent to abandon the Merger. In any event, this case does not, in any way, depend upon whether the Company breached the Merger Agreement but, instead, in the post February 6, 2020 statements, whether Defendants misrepresented or failed to disclose material facts relevant to Plaintiffs and

other investors assessing the value of the Company and facts relevant to understanding whether Advent would choose to proceed with the Merger.[5]

### 3. The Temporal Proximity of the May 11, 2020 Statement to the Disclosure of Adverse Facts Supports a Strong Inference of Scienter

DeCesare's May 11, 2020, statement that "we look forward to completing our pending transaction with Advent" three days after Advent had informed DeCesare that it was considering not closing the Acquisition (¶29) was extremely reckless if not knowingly false. The temporal proximity of Advent's May 8, 2020, conversation with DeCesare and the May 15, 2020, receipt of the Termination Letter, suggest that DeCesare was advised on May 8, 2020, that Advent did not anticipate closing the Acquisition. *See, e.g.*, *Reese*, 747 F.3d at 574 (temporal proximity can be indicative of scienter). Courts in this District have recently inferred scienter based on a much larger gap between false statements and corrective disclosures. *See Twitter, Inc.*, 282 F. Supp. 3d at 1148 (ruling that five-month gap between misleading statements and corrective disclosure created inference of scienter). Here, the statements and contradictory disclosures were separated by ***only three days*** in between, and the mere week that passed between the conversation that DeCesare had with Advent's representative and the receipt of the Termination Letter suggests that DeCesare had no reasonable basis to believe Advent would close its acquisition of Forescout.

### 4. Defendants' Financial Motives Further Support a Strong Inference of Scienter

In *Tellabs*, the Supreme Court instructed that while pecuniary gain is not necessary to plead scienter, financial motives and personal gain "weigh heavily in favor of a scienter inference," under a holistic determination of scienter. 551 U.S. at 325. Here, Plaintiffs allege the following

---

[5] Harms sold 11,319 shares of Forescout stock in March and April of 2020, after the Merger Agreement was executed, for an average price of $29.52. ¶167. Those sales, which were at more than a 10% discount to the Merger consideration, cannot be explained by the existence of a 10b5-1 plan. *See* U.S. Securities and Exchange Commission, Division of Corporation Finance: Manual of Publicly Available Telephone Interpretations, Fourth Supplement, at ¶15 (2001), *available at* www.sec.gov/interps/telephone/phonesupplement4.htm ("terminating a [10b5-1] plan while aware of material nonpublic information [cannot] result in liability[.]"); *accord Condus v. Howard Sav. Bank*, 781 F. Supp. 1052, 1056 (D.N.J. 1992) (insider trading requires a purchase or sale of a security). The sign-close period sales thus undercut any supposed confidence that Forescout had a binding agreement with Advent. *See* I.D. MTD at 9.

---

financial motives: (i) personally profiting through the open market sale of the Company's stock and the receipt of RSUs; (ii) the prospect of personally profiting from the Merger; and (iii) enabling a key shareholder having a representative serving as the Vice Chairman of the Board to sell the Company's stock on a profitable basis. Each of these personal financial motives independently, or alternatively as part of a holistic approach when combined with other allegations, supports a strong inference of scienter.

### a. Defendants' 2019 Stock Sales Were Suspicious in Timing and Amount

Defendants' insider stock sales can be particularly cogent evidence of scienter when those sales are suspicious in terms of: "(1) the amount and percentage of shares sold; (2) timing of the sales; and (3) consistency with prior trading history." *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004). However, none of these factors are dispositive on their own or required. *Id.* In this case, all three factors demonstrate that the Individual Defendants' stock sales during the Class Period were suspicious and contribute to an inference of scienter. Although Defendants erroneously contend that DeCesare's sale of "approximately 22% of his holdings" and Harms's sale of "approximately 47.5%" were not "unusually high" (I.D. MTD at 19), these percentages amply support an inference of scienter. *See Oracle*, 380 F.3d at 1232 (holding that suspicious insider sales supported an inference of scienter even if defendant sold only 2.1% of his holdings); *Johnson v. Aljian*, 394 F. Supp. 2d 1184, 1199 (C.D. Cal. 2004) (class period sales of 18% of holdings "significant"); *In re SeeBeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1169 (C.D. Cal. 2003) (sale of "only 7.6% of [defendant's] personal holdings" supported inference of scienter).

Defendants also contend that their insider sales must be discounted because they were made pursuant to Rule 10b5-1 trading plans. I.D. MTD at 18; F. MTD at 23. However, Defendants are incorrect that the mere presence of a 10b5-1 trading plan insulates their highly suspicious stock trades for purposes of a motion to dismiss. *See In re Questcor Inc. Sec. Litig.*, No. SA CV 12-01623 DMG (FMOx), 2013 WL 5486762, at *16 (C.D. Cal. Oct. 1, 2013) (finding defendant's "trading plan alone does not negate the suspicious nature of the sales as a whole"). Moreover, this argument is inappropriate on a motion to dismiss, as "the existence of a Rule 10–b5–1 trading plan

is an affirmative defense that must be pled and proved." *Malin v. XL Cap. Ltd.*, 499 F. Supp. 2d 117, 156 (D. Conn. 2007) (citing 17 C.F.R. §240.10b5-1(c)(1)(i)); *see In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d at 976 n.16 ("although evidence of the nondiscretionary nature of Defendants' sales may ultimately provide the basis of an affirmative defense at a later stage of the litigation, it suffices that, at the pleading stage, Plaintiffs have alleged significant and suspiciously timed securities sales").[6]

SEC regulations require that 10b5-1 trading plans be entered in good faith, not as vehicles to trade on material, non-public information. *See Stocke v. Shuffle Master, Inc.*, 615 F. Supp. 2d 1180, 1193 (D. Nev. 2009). Courts in this Circuit have repeatedly declined to entertain an affirmative defense based on trading plans because whether a trading plan was entered in good faith is a factual question that cannot be resolved at the pleading stage. *Id.* Here, Defendants do not even attempt to establish that the trading plan was executed in good faith. Indeed, Defendants cannot invoke the affirmative defense because the pattern of DeCesare's sales are inconsistent with a valid trading plan since he sold stock "in varying amounts and on varying dates" to capitalize on his misconduct, and failed to sell any stock after December 2019 when the Company's performance "fell off a cliff." ¶¶167-68; *see Backe v. Novatel Wireless, Inc.*, 607 F. Supp. 2d 1145, 1162 (S.D. Cal. 2009) (finding that pattern of trading activity was inconsistent with a 10b5-1 trading plan because defendants did not sell stock on the first of every month in consistent amounts).

Equally unpersuasive is Defendants' assertion that the Individual Defendants' stock sales are not dramatically out of line with their prior trading history. I.D. MTD at 19. As alleged, DeCesare's $8.2 million in proceeds and Harms's $3.7 million in proceeds from stock sales at artificially inflated prices during the Class Period were quite significant, especially when compared to their annual salaries for 2019 of $500,000 and $453,125, respectively, and their pre-

---

[6] *Accord Hodges v. Akeena Solar, Inc.*, No. C 09-02147 JW, 2010 WL 3705345, at *6 (N.D. Cal. May 20, 2010) ("the factual question of whether [the officer defendant] sold his stock pursuant to such [10b-5 trading plan] is an issue appropriately resolved on summary judgment"); *In re Bridgepoint Educ., Inc.* Sec. *Litig.*,, 2013 WL 5206216, at *27 ("Defendants may not use trading plans at the pleading stage to defeat an inference of scienter.").

Class Period stock sales. ¶¶167, 168, 172.[7] *See In re Quality Sys.*, 865 F.3d at 1146 (insider trading enhanced scienter where defendant sold stock that was seven times his annual salary). When viewed with the Complaint's particularized allegations that the Individual Defendants knowingly, or deliberately recklessly, made false and misleading statements during the Class Period, courts have found that such "significant" stock sale earnings raise a strong inference of scienter, even if there is dispute as to whether the sales were out of line with prior trading history. *See SeeBeyond*, 266 F. Supp. 2d at 1168-69 (finding insider sales raised a strong inference of scienter even if they were not out of line with prior trading history because the income generated from the sales was "significant" and defendants acted with deliberate recklessness). Nevertheless, prior to the Class Period, DeCesare sold 60,621 shares or *an average of 10,103.5 shares per month* with an average price per share of $30.29; but, during the Class Period, he sold 228,382 shares or *an average of 20,762 shares per month* and an average price per share of $35.93. ¶¶167-68.[8]

In addition to being dramatically out of line with their prior trading activity, DeCesare and Harms dumped stock within days after false statements were made during the Class Period and DeCesare sold nothing and Harms sold relatively small amounts of stock after the end of 2019. Defendants effectively concede the suspicious nature of these sales by disregarding the suspicious

---

[7] Defendants also seek to discount the allegations of the Individual Defendants' performance bonuses (¶170) that were specially tied to Forescout's financial condition resulting from the misrepresented sales pipeline during the Class Period. I.D. MTD at 20. But, contrary to Defendants' assertions, such allegations of performance-based compensation, especially in light of the alleged misrepresentations in the Complaint, contribute to a finding of a strong inference of scienter. *See In re Maxwell Techs., Inc. Sec. Litig.*, 18 F. Supp. 3d 1023, 1044 (S.D. Cal. 2014) ("The existence of performance-based compensation provides motive for the individual defendants to order or ignore misconduct that would increase revenues. The Court considers this in its holistic review.").

[8] Similarly, with respect to Harms, while not as dramatic as DeCesare's stock sales and earnings, prior to the Class Period (between July 2018 and January 2019), Harms sold 64,808 shares or an average of 9,258.3 shares per month and an average price per share of $24.03; but, during the Class Period (between February 2019 and April 2020), he sold 109,865 shares, or an average of 7,847.5 shares per month, but for an average price per share *of $34.46, while the stock traded at artificially inflated prices* due to the alleged fraud. ¶¶167-68. The decrease of shares sold is a function of Harms selling nearly half of his holdings, as Defendants admit (I.D. MTD at 19), while, nevertheless, making a significant profit of over $3.7 million, all prior to Advent requesting that Forescout provide realistic sales data for the first quarter of 2020 on April 19, 2020, and Advent terminating the deal on May 15, 2020. ¶¶95, 102, 167.

times or the lack of substantial sales after the business had completely cratered by the beginning of 2020.  ¶¶167-68; *see also No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 939 (9th Cir. 2003) (absence of insider sales for four months after the class period raised an inference of scienter); *Provenz v. Miller*, 102 F.3d 1478, 1491 (9th Cir. 1996) (sale of 20% of total holdings raised inference of scienter because it occurred between the misleading statements and the corrective disclosures).  The coordinated nature of their sales during the Class Period and absence of substantial sales after the Class Period heightens suspicion. *See In re Secure Computing Corp.*, 184 F. Supp. 2d 980, 989-90 (N.D. Cal. 2001).

Defendants contend that because Forescout "only went public in October 2017" there is an insufficient trading history from which "to assess comparable periods and patterns."  I.D. MTD at 18.  This argument ignores Ninth Circuit law.  A 15-month Class Period is alleged, and the Court's analysis to assess patterns is restricted to only 15 months before the Class Period or to November 2017. *See Am. W. Holding Corp.*, 320 F.3d at 941 (holding that if the class period consists of ten months, the court's review is limited to only ten months before the class period).  The limited look back period alleged here is not only appropriate but required. *Id.*  Both Defendants had plenty of opportunity to sell stock to their heart's desire after the lock-up period expired in April 2018, but DeCesare's sales never exceeded $369,330 on any given day before the Class Period.  In contrast, DeCesare dumped $1.75 million on a single day during the Class Period within days of making knowingly or recklessly false statements.  ¶¶167-68.  Defendants not only ignore these facts, but their authorities have no application here.  In *In re Silicon Graphics Inc. Sec. Litig.* ("*SGI*"), 183 F.3d 970, 987 (9th Cir. 1999), the court found that trading history was of limited value for a defendant who "had only been with SGI for a year and had no significant trading history for purposes of comparison." *Id.* at 987.  Harms, by contrast, served as the Company's CFO before its IPO. *See* RJN, Ex. 16 (ECF No. 128-16) at 70-72.  Even with the blackout periods that Defendants reference, that is several times longer than the trading history found insufficient in *SGI*.  Defendants' arguments also ignore that the Defendants' stock sales proceeds in the fifteen-month Class Period were significantly large, and as discussed above, contribute to an inference of scienter, when viewed with the other scienter allegations.

As Judge Sweet explained in *Freudenberg*, "[t]he fact that there might be an innocent explanation for the timing of [defendants'] sale[s] is not enough to defeat the inference of scienter that arises from plaintiffs' well-pleaded allegations – which, as defendants keep forgetting, [the Court] must accept as true for purposes of this motion to dismiss." 712 F. Supp. 2d. at 201. These allegations, particularly in combination with other allegations of the Complaint and inferences drawn therefrom, are sufficient to create an additional inference of scienter.

> **b.      The Individual Defendants' Desire to Monetize Their Forescout Holdings Demonstrates a Motive from October 2019 Going Forward**

After Defendants decided to put Forescout up for sale in October 2019, they had a clear incentive to make it look as attractive to potential buyers as possible. This serves as a clear motive for the Company to mislead investors about its sales pipeline and sales force and engage in a channel stuffing scheme towards the end of the Class Period as Defendants became even more desperate. DeCesare and Harms expected to receive $42 million proceeds from the Merger if it closed at the initially agreed upon price of $33.00 per share. ¶¶20, 88. For this reason, Defendants continued to mislead investors in the beginning of 2020 even though the business had "cratered" and fallen "off a cliff" by then based on any objective standard.

Indeed, Defendants were able to conceal Forescout's true financial and operating condition long enough to attract Advent as a buyer. Courts have routinely recognized similar allegations as supporting a strong inference of scienter. *See*, *e.g.*, *In re Imperial Credit Indus., Inc.*, No. CV 98-8842 SVW, 2000 WL 1049320, at *3 (C.D. Cal. Feb. 22, 2000) (inference of scienter additionally supported where defendants "had a strong incentive to inflate [the company's] financial status because they were shopping [the company] for a buyer and sought to attract a large bid."); *Meyer v. Concordia Int'l Corp.*, 16 Civ. 6467 (RMB), 2017 WL 4083603, at *6 (S.D.N.Y. July 28, 2017) (allegations of "motive and opportunity" was "premised upon the fact that . . . the Company was seeking bids for a potential buyout"); *ODS Capital LLC v. JA Solar Holdings Co.*, 18-CV-12083 (ALC), 2020 WL 7028639, at *12 (S.D.N.Y. Nov. 30, 2020) (finding "motive to commit fraud" where defendant misrepresented the financial position of the company to benefit from a favorable merger price). Indeed, as alleged, Defendants "stood to gain in a concrete and personal way by

materially misrepresenting the financial position of the Company that resulted in approval of the Merger at a price favorable to [Defendants]." *Id.* at *12.

### c. The Desire to Enable a Controlling Shareholder to Favorably Monetize His Forescout Holdings Provides an Additional Motive

Plaintiffs allege how Defendants' fraud enabled other insiders to sell stock at inflated prices, including Kalish, the Vice Chairman of the Board, who sold 756,078 shares of the Company's common stock in February 2019 for a series of venture capital funds with which he is affiliated for total proceeds of more than $29 million. ¶¶16, 171. These profitable sales enabled DeCesare and Harms to further entrench and endear themselves to a key director and shareholder and an active venture capitalist when Defendants' jobs and compensation were at risk from activist investors agitating for corporate change at Forescout because of poor financial performance. ¶¶171-72. Kalish and his affiliated entities also stood to gain almost $95 million from the Merger. ¶173. Currying favor with Mr. Kalish almost certainly enabled the Individual Defendants to receive RSUs and performance bonuses. ¶¶169-71.

Defendants contend that sales by non-defendants are irrelevant, (I.D. MTD at 19) but courts in this Circuit have recently considered sales by other insiders as a proper consideration for a holistic review of scienter. *See Stamps.com, Inc.*, 2020 WL 281716, at *15 (rejecting argument that a non-defendant's sales were "irrelevant" as an improper request to consider factual questions). Defendants' authorities reject the concept of a *quid pro quo* supporting scienter by showing a symbiotic relationship with a powerful director. *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, No. 5:11-CV-04003-LHK, 2013 WL 2156358, at *9 (N.D. Cal. May 17, 2013), and *Wozniak v. Align Tech., Inc.*, No. C-09-3671 MMC, 2011 WL 2269418, at *14 (N.D. Cal. June 8, 2011), upon which Defendants rely, merely found that allegations of increased stock sales by anonymous insiders during a period of alleged artificial inflation was not indicative of scienter of a defendant. These decisions have no relevance here where Defendants themselves traded on material information at suspicious times and in suspicious amounts in violation of their duties, and while they misled the market about the Company's financial condition.

### D.   THE COMPLAINT SUFFICIENTLY ALLEGES LOSS CAUSATION

The Ninth Circuit has recently held that the particularity requirements of Rule 9(b) are not meaningful in the context of a plaintiff's burden in alleging loss causation with Plaintiffs only required to give notice to a defendant of their loss causation theory and "provide the court some assurance that the theory has a basis in fact." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 793-94 (9th Cir. 2020).  The Complaint easily passes this test both because it alleges corrective disclosures and because risks that Defendants concealed materialized with each partial disclosure. A plaintiff can "prove loss causation by showing that the stock price fell upon the revelation of an earnings miss, even if the market was unaware at the time that fraud had concealed the miss." *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753-54 (9th Cir. 2018).  Here, except when offset by the announcement of the Merger, the price of Forescout's stock dropped significantly each time Defendants failed to meet their false revenue guidance (¶¶112, 136, 145, 153), revealing both that the guidance itself was false as well as that the repeated misses were caused by partial disclosures of the deteriorating state of internal affairs at the Company.  That is more than enough to provide Defendants with notice and plead loss causation at this stage, a fact-intensive inquiry in any event.  *See Berson*, 527 F.3d at 989-90 (holding that loss causation was sufficiently pled when plaintiffs alleged that a stop work order caused an earnings miss, which ultimately caused the price of the company's stock to significantly decline).   Under the materialization of the risk theory, a plaintiff only needs to show that part of the truth was previously concealed by the fraud.  *See In re Vivendi Universal, S.A., Sec. Litig.*, 605 F. Supp. 2d 586, 598 (S.D.N.Y. 2009).  The repeated failure to meet revenue guidance despite false assurances that Defendants would "over exceed" upon it shows that Defendants concealed the risks associated with their deteriorating sales pipeline and declining sales productivity.

Similarly, Advent's Termination Letter revealed that Defendants concealed massive deterioration in the Company's financial performance from investors, which caused Advent to terminate the agreement, and led the price of Forescout's stock to plunge for days.  ¶¶158-59.  This is all the law requires to plead loss causation.

Notwithstanding Defendants' arguments to the contrary, Plaintiffs are not required to rule out alternative causes at the pleading stage to defeat a motion to dismiss. *See Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 966, 984 (N.D. Cal. 2015) (noting that whether there are alternative causes for the decline in price is not an appropriate consideration at the pleading stage). The pandemic had little to do with Forescout's shambolic performance during the Class Period—a fact that Advent agreed with in its Termination Letter. For these reasons, Defendants' reliance on *Qualcomm*, 2020 WL 1157192, at *7, is grossly inappropriate because their purported "intervening events"—events that Plaintiffs do not need to disprove at the pleading stage—have no basis in fact and inappropriately contradict the well-pled allegations of the Complaint.

Defendants also attempt to gin up a "loss causation" argument based on a hypothetical set of investors who sold before the end of the Class Period. *See* F. MTD at 25. That argument, however, is entirely speculative and, in fact, does not apply to Plaintiffs with Meitav *not* having sold out its shares after the February 6, 2020 announcement and Glazer not having made any purchases prior to February 6, 2020. *See* ECF No. 66-4 (loss chart for the Glazer Funds); ECF No. 86-1 (loss chart for Meitav). As fully explained above, the press release issued on February 6, 2020 was also false when made and did not reveal the fraud entirely. Defendants' speculative claims are baseless at any stage of the proceedings.

Defendants further confuse issues of standing with loss causation. *See Kelly v. Elec. Arts., Inc.*, 71 F. Supp. 3d 1061, 1069 (N.D. Cal. 2014) (ruling that appointed lead plaintiff did not have standing to pursue claims for post-purchase statements). There is no question that the Lead Plaintiffs in this Action have standing to assert all claims since they both bought shares after the Acquisition was announced. Whether any other hypothetical individual class member relied on Defendants' false statements or suffered a loss or can recover damages are matters that are dealt with at a later stage of the proceedings, perhaps even during a distribution of money damages collected in this Action when a Plan of Allocation will determine who is entitled to damages and who is not. They certainly are not appropriate on a motion to dismiss. *See e.g.*, *In re Mylan N.V. Sec. Litig.*, 379 F. Supp. 3d 198, 210-11 (S.D.N.Y. 2019) (refusing to entertain similar arguments because courts do not examine an individual class member's economic loss on a motion to dismiss

when other class members are presumed to have suffered losses); *see also In re CV Scis., Inc.*, No. 2:18-cv-01602-JAD-BNW, 2019 WL 6718086, at *6 (D. Nev. Dec. 10, 2019) (noting that there is no authority applying the 90 day lookback limitation to a loss causation analysis on a motion to dismiss).

### E.    THE COMPLAINT ADEQUATELY ALLEGES SECTION 20(a) CLAIMS

Having sufficiently plead a primary violation of Section 10(b), and because Defendants do not dispute "control," Plaintiffs' Section 20(a) control person claims should also be sustained.  *See Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000).

## IV.    CONCLUSION

Therefore, for all the reasons stated above, Defendants' Motions to Dismiss should be denied in their entirety.  In an abundance of caution, should the Court find the Complaint wanting in any respect, Plaintiffs respectfully request leave to amend the pleadings in order to cure any such deficiencies.  *See Eminence Capital, LLC v. Aspeon, Inc.,* 316 F.3d 1048, 1051-52 (9th Cir. 2003) (leave to amend should be granted "with extreme liberality," especially in securities fraud cases); *see also Slack Techs, Inc.*, 445 F. Supp. 3d at 367 (noting that leave to amend should be granted even without a formal request if there is any possibility to cure a pleading defect); *cf. In re Century Aluminum Co. Sec. Litig.*, No. C 09-1001 SI, 2011 WL 830174, at *10 (N.D. Cal. Mar. 3, 2011) (dismissing claim only after repeatedly allowing opportunities to amend).

Dated:  February 19, 2021                    Respectfully submitted,


                                             **POMERANTZ LLP**


                                             By:  /s/ *Omar Jafri*
                                             Patrick V. Dahlstrom
                                             Omar Jafri
                                             Ten South La Salle Street, Suite 3505
                                             Chicago, Illinois 60603
                                             Telephone: (312) 377-1181
                                             Facsimile: (312) 377-1184
                                             E-mail: pdahlstrom@pomlaw.com
                                                     ojafri@pomlaw.com

                                             -and-

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
E-mail: jpafiti@pomlaw.com

-and-

Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
E-mail: jalieberman@pomlaw.com
          ahood@pomlaw.com

**ABRAHAM, FRUCHTER
   & TWERSKY, LLP**

By:  /s/ *Jeffrey S. Abraham*
Jeffrey S. Abraham
(admitted *Pro Hac Vice*)
Michael J. Klein
(admitted *Pro Hac Vice*)
One Penn Plaza, Suite 2805
New York, NY 10119
Telephone: (212) 279-5050
Facsimile: (212) 279-3655
E-mail: JAbraham@aftlaw.com
          MKlein@aftlaw.com

-and-

Takeo A. Kellar (SBN 234470)
11622 El Camino Real, Suite 100
San Diego, CA 92130
Telephone: (858) 764-2580
Facsimile: (858) 764-2582
E-mail: TKellar@aftlaw.com

*Co-Lead Counsel*