Anne Johnson Palmer (CSB #302235)
ROPES & GRAY LLP
Three Embarcadero Center
San Francisco, CA 94111-4006
Tel: (415) 315-6300
Fax: (415) 315-6350
Anne.JohnsonPalmer@ropesgray.com

Charles D. Zagnoli (admitted *pro hac vice*)
ROPES & GRAY LLP
191 N. Wacker Dr., 32nd Floor
Chicago, IL 60606
Tel: (312) 845-1200
Fax: (312) 845-5522
Charles.Zagnoli@ropesgray.com

Peter L. Welsh (admitted *pro hac vice*)
C. Thomas Brown (admitted *pro hac vice*)
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199-3600
Tel: (617) 951-7000
Fax: (617) 951-7050
Peter.Welsh@ropesgray.com
Thomas.Brown@ropesgray.com

*Attorneys for Defendant*
*Forescout Technologies, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| CHRISTOPHER L. SAYCE, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>FORESCOUT TECHNOLOGIES, INC., MICHAEL DECESARE, and CHRISTOPHER HARMS,<br><br>Defendants. | CASE NO.: 3:20-cv-00076-SI<br><br>CLASS ACTION<br><br>**DEFENDANT FORESCOUT'S REPLY BRIEF IN SUPPORT OF ITS MOTION TO DISMISS**<br><br>Date:  March 19, 2021<br>Time: 10:00 A.M.<br>Dept.: Courtroom 1, 17th Floor<br><br>Before: Hon. Susan Illston |

## TABLE OF CONTENTS

**Page**

SUMMARY OF ARGUMENT ............................................................................................1

ARGUMENT .....................................................................................................................1

I.    PLAINTIFFS' OPERATIONS-RELATED FRAUD THEORIES REST ON NO
      ACTIONABLE MISSTATEMENTS AND DEFICIENT SCIENTER ALLEGATIONS ......1

      A.    Plaintiffs Cannot Dodge the Safe Harbor for Forward-Looking Statements..............1

      B.    The Complaint's Vague Allegations of Alleged Pipeline
            or  Sales Force Issues Are Insufficient to Plead Falsity................................................6

      C.    Plaintiffs' Channel-Stuffing Allegations Are Inadequate.......................................10

      D.    Plaintiffs Cannot Cover Over the Deficiencies in Their Scienter
            Allegations with Inapplicable, Rarely Justified Pleading Inferences .......................11

II.   THE OPPOSITION CONFIRMS THAT THE COMPLAINT'S MERGER
      ALLEGATIONS ARE DEFICIENT AS TO FALSITY AND SCIENTER.........................12

III.  PLAINTIFFS IDENTIFY NO VIABLE LOSS CAUSATION THEORY............................14

IV.   CONCLUSION ......................................................................................................15

DEFENDANT FORESCOUT'S REPLY BRIEF
ISO ITS MOTION TO DISMISS                                    CASE NO. 3:20-CV-00076-SI

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Eisenstadt v. Centel Corp.*,
113 F.3d 738 (7th Cir. 1997) ............................................................................................. 13

*Friedman v. Rayovac*,
295 F. Supp. 2d 957 (W.D. Wis. 2003) ............................................................................. 10

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051 (9th Cir. 2014) .................... 12

*Mulderrig v. Amyris, Inc.*,
No. 19-CV-1765, 2020 WL 5903844 (N.D. Cal. Oct. 5, 2020) ........................................... 4

*Mulligan v. Impax Labs, Inc.*, 36 F. Supp. 3d 942 (N.D. Cal. 2014) ........................................... 7

*In re Connetics Corp. Sec. Litig.*,
No. C 07–02940, 2008 WL 3842938 (N.D. Cal. Aug. 14, 2008) ......................................... 10

*In re CV Therapeutics, Inc. Sec. Litig.*,
No. C 03-03709, 2004 WL 1753251 (N.D. Cal. Aug. 5, 2004) ............................................. 5

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017) ..................................................................................*passim*

*Reese v. Malone*,
747 F. 3d 557 (9th Cir. 2014) ........................................................................................... 14

*In re Rigel Pharms., Inc. Sec. Litig.*,
697 F.3d 869 (9th Cir. 2012) ........................................................................................... 13

*Robb v. Fitbit Inc.*,
No. 16-cv-00151, 2017 WL 219673 (N.D. Cal. Jan. 19, 2017) ........................................... 12

*Roberts v. Zuora, Inc.*,
No. 19-cv-03422, 2020 WL 2042244 (N.D. Cal. Apr. 28, 2020) .......................................... 5

*Schueneman v. Arena Pharm.*,
840 F.3d 698 (9th Cir. 2016) ........................................................................................... 10

*Shenwick v. Twitter, Inc.*,
282 F. Supp. 3d 1115 (N.D. Cal. 2017) ............................................................................ 14

*Wochos v. Tesla, Inc.*,
985 F.3d 1180 (9th Cir. 2021) ..................................................................................*passim*

-ii-

DEFENDANT FORESCOUT'S REPLY BRIEF
ISO ITS MOTION TO DISMISS                                    CASE NO. 3:20-CV-00076-SI

**STATUTES**

15 U.S.C. § 78u–5(i)(1)(A) ................................................................................................... 6

15 U.S.C. § 78u–5(c)(1)(B) ................................................................................................... 5

**RULES**

Rule 10b–5 ........................................................................................................................... 13

Rule 12 ................................................................................................................................. 11

**OTHER**

Merriam-Webster, https://www.merriam-webster.com/dictionary/year-over-year ........................... 9

-iii-

DEFENDANT FORESCOUT'S REPLY BRIEF
ISO ITS MOTION TO DISMISS                    CASE NO. 3:20-CV-00076-SI

**SUMMARY OF ARGUMENT**

Plaintiffs' opposition brief, Dkt. 134 ("Opposition" or "Opp."), cannot circumvent the fatal defects in the Complaint as identified in Defendants' Motions to Dismiss. To distract from their inadequate falsity allegations regarding revenue guidance and the sales function, Plaintiffs attempt to convert forward-looking statements into actionable fact statements, lower the PSLRA's high pleading bar, and inflate the limited personal knowledge of the alleged Confidential Witnesses ("CWs") by exaggerating the witnesses' supposed roles in relevant events. As to their Merger-related misstatement allegations, Plaintiffs attempt to dodge applicable case law, effectively asking the Court to impose a non-existent duty to update about the surmised intentions of third parties. Among other problems, this approach side-steps Plaintiffs' duty to plead what Defendants actually knew or believed about Advent's intentions for the deal's closing. Finally, as to their barebones loss causation allegations, Plaintiffs simply emphasize how forgiving the pleading standards supposedly are and ask that the Court wait to dismiss claims tied to a facially defective four-month period when supposed "bad news" was met with an increasing stock price. For these reasons, and as set forth below and in the Individual Defendants' briefs, the Complaint should be dismissed with prejudice.[1]

**ARGUMENT**

**I.  PLAINTIFFS' OPERATIONS-RELATED FRAUD THEORIES REST ON NO ACTIONABLE MISSTATEMENTS AND DEFICIENT SCIENTER ALLEGATIONS**

**A.  Plaintiffs Cannot Dodge the Safe Harbor for Forward-Looking Statements**

The most telling part of Plaintiffs' Opposition is its sidestepping of the PSLRA's safe harbor for forward-looking statements. *See* Opp. at 14–16; 25–27. The Complaint centers on allegations that Forescout's senior executives somehow knew that revenue guidance was unachievable, in particular based on the sales force's supposed inability to perform adequately. *See* F-MTD at 14, *citing* ¶¶ 5–7, 50, 106. Indeed, Plaintiffs allege that stock drops during the Class Period were prompted by the gap between guidance and actual results. ¶¶ 112, 136, 153. Predictions about performance, including revenue guidance, are classic forward-looking statements. *See* F-MTD at 8–9 (collecting authorities). Thus the PSLRA's safe harbor presents an enormous roadblock to

---

[1] Capitalized terms not defined in this Reply have the meanings given to them in Defendant Forescout's Motion to Dismiss Consolidated Amended Complaint, Dkt. 127 ("F-MTD").

Plaintiffs' case, immunizing the challenged forward-looking statements unless Plaintiffs can allege defects in the accompanying cautionary language *and* actual knowledge of falsity.  *See id.*

Plaintiffs do not even attempt to argue that revenue guidance is not forward looking.[2]  Instead, they claim that Forescout's guidance fell outside the safe harbor because while discussing the guidance, Defendants supposedly made false statements of past or present fact in the same press release or on the same conference call.  And then in an attempt to turn even the guidance disclosures that Plaintiffs admit are purely forward-looking into actionable statements, Plaintiffs also mistakenly claim that Defendants gave inadequate cautionary warnings and actually knew their forward-looking statements were false when made.  Plaintiffs are wrong, for at least four reasons.

*First*, Plaintiffs point to almost no actual statements of past or present fact in the disputed statements.  *See* Opp. at 12–16.  For example, they challenge expressions of confidence in Forescout's "ability to over-exceed upon" projections, ¶ 109, the view that "there is plenty of pipeline to deliver upon the guidance we've given," ¶ 121, and the statement that "the Company raised its full year revenue guidance, in part, because 'we feel very good about the pipeline, market and our competitive positioning,'" ¶ 115; *see also* ¶ 123.[3]  Other challenged statements express the plan and objective of closing the Merger:  "[W]e look forward to completing our pending transaction with Advent."  ¶ 155; *see also* ¶ 150.  These statements were all made as part of a broader discussion of Forescout's revenue guidance or the Merger's future closing.  *See, e.g.*, Exs. 4, 8, 17.  And most importantly, these statements all concern plans and objectives for the future, Forescout's future economic performance, or the assumptions underlying those views.  All of these categories of statements are explicitly protected by the safe harbor.  *See* F-MTD at 8–11.

The Ninth Circuit's recent decision in *Wochos v. Tesla, Inc.*—which Plaintiffs neglect to address in their safe harbor argument—demonstrates that these statements are forward-looking and

_____

[2] Indeed, Plaintiffs admit, as they must, that the revenue projections disclosed on February 7, 2019; on May 9, 2019; and in the Illustrative Guidance are forward looking and unaccompanied by any statements of past or present fact.  Opp. at 25–26; *see* ¶¶ 103, 111–13, 147.  Plaintiffs refer to the "May 10, 2019" press release, Opp. at 25, but the release was issued on May 9, *see* ¶ 111.

[3] *See also, e.g.*, ¶ 115 ("deals now appear to be more naturally on track for the back half of the year"); ¶ 117 ("[W]e feel like we are tracking very well against our sales productivity the investment levels that we have been making and *plan to make* through the rest of the year . . . .  Nothing has changed at those levels."); ¶ 130 (indicators are "pointed in the right direction"); ¶¶ 119, 123, 125, 127.

-2-

thus subject to the safe harbor. 985 F.3d 1180 (9th Cir. 2021). In *Wochos*, the court held that the safe harbor protected management's statements of confidence in Tesla's ability to achieve its goals and statements that certain factors would support achieving those goals. *Id.* at 1190–92, 1196, *citing In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1144 (9th Cir. 2017). Statements specifically held to be protected included that Tesla aimed to produce 5,000 vehicles per week; that it was ***presently*** "on track" to achieve that production goal; that there were ***presently*** "no issues" that would prevent it from achieving the goal; and that "[b]ased on our preparedness ***at this time***, we ***are*** confident we can . . . achieve a run rate of 5,000 vehicles per week by the end of 2017," among others. *Id.* at 1190–93, 1195 (emphasis added). Statements about management's then-expected timelines to achieve the production goal were similarly "assumptions" underlying the declared objective. *Id.* at 1192. Notably, the *Wochos* court applied the safe harbor despite allegations that employees and suppliers had told management that the production goal was unachievable, *id.* at 1194, an allegation absent here. And as in *Wochos*, the statements here—to the extent they are not forward-looking on their face, *see infra* 5–6—describe the factors that management thought would allow Forescout to achieve its projections, goals, and objectives; or the assumptions underlying those projections, goals, or objectives. Applying *Wochos*, the safe harbor controls.

To avoid *Wochos*, Plaintiffs lean heavily on *Quality Systems*, overlooking its distinguishable facts. A statement falls outside the safe harbor only if it contains ***concrete, specific*** assertions of past or present fact. *Wochos*, 985 F.3d at 1192; *Quality Sys.*, 865 F.3d at 1142–44. Contrary to Plaintiffs' suggestion that *Quality Systems* involved "[v]irtually identical statements about a company's sales pipeline," Opp. at 14, the complete statements there—read in context and not as selectively quoted by Plaintiffs—contained specific and concrete factual representations absent here. Indeed, the *Quality Systems* executives repeatedly disclosed specific data; drew explicit comparisons between the pipeline's current state and its historical performance in specifically identified periods; and represented that nothing had changed about the pipeline since specific past periods: for example, "more than half the large practice market, more than 75% of the midsize practice market is still fair game for new system sales," and "[the] pipeline has grown every quarter since the announcement of the stimulus bill back in February of 2009." 865 F.3d at 1143. Plaintiffs incorrectly claim that the

-3-

court deemed statements to be non-forward-looking based on phrases such as "[o]ur pipeline is deep." Opp. at 14. But in reality, those phrases were part of a much longer statement that made concrete representations comparing specific parts of the current pipeline to certain historical periods. *Quality Sys.*, 865 F.3d at 1143. These are a far cry from expressions of confidence here in "our ability to over-exceed upon" guidance, ¶ 109, or statements that "there is plenty of pipeline to deliver upon the guidance," ¶ 121. *See infra* at 6–7; F-MTD at 15, 17; *cf. Mulderrig v. Amyris, Inc.*, No. 19-CV-1765, 2020 WL 5903844 (N.D. Cal. Oct. 5, 2020) (distinguishable on same grounds).

***Second***, Plaintiffs inaccurately suggest that Defendants' cautionary statements were inadequate because they described risks as possibilities when the risks had supposedly started (or were highly likely) to occur.[4] Opp. at 25–27. To the contrary, Forescout warned investors about the risks to the sales pipeline, sales force productivity, and other operations challenged by Plaintiffs in the February 7, 2019, press release, Ex. 1—***before*** the period when, according to the Complaint, sales force turnover and pipeline issues began in earnest, *see* F-MTD at 13, 16, *citing* ¶¶ 51–53, 55, 61–62; ¶¶ 64–74; *see also* Ex. 3 at 14–15, 17, 23 (issuing similar warnings in the 2018 Form 10-K filed on March 1, 2019); F-MTD at 9–10. When, according to the Complaint, the risks allegedly did start to materialize in a significant way, Defendants promptly informed the market by revising their guidance downward, disclosing slipped deals and other challenges, acknowledging that results were disappointing, and reporting revenue results below earlier guidance. *See, e.g.*, Ex. 8 & ¶ 123; Ex. 12 & ¶ 135; Ex. 13 & ¶ 138; Ex. 14 & ¶ 141. Defendants simultaneously cautioned the market that the alleged issues might reoccur or continue in the future. *See, e.g.*, Ex. 7 (May 9, 2019, press release listing risks and uncertainties); Ex. 12 (same on Oct. 10, 2019); Ex. 13 (same on Nov. 6, 2019); Ex. 14 (same on Feb. 6, 2020). Likewise, Defendants cautioned investors about the risks to the Merger in the February 6, 2020, press release that announced the deal, *see* F-MTD at 10, Ex. 14—weeks before Advent allegedly first expressed misgivings, *e.g.*, ¶ 151(a). For this reason, Plaintiffs

---

[4] Plaintiffs also suggest that Defendants' cautionary language was inadequate because it "did not admit to making false statements." Opp. at 25. But the language in *Quality Systems* on which Plaintiffs rely addressed only forward-looking statements accompanied by a concrete, specific statement of past or present fact that was false or misleading. *Quality Sys.*, 865 F.3d at 1146–48; *see also Mulderrig*, 2020 WL 5903844, at *15–16. Plaintiffs allege no such fact statements. *See supra* at 2–4; *infra* at 6–11, 13–15; *see also* MTD at 8–11 (forward-looking statements), 11-21 (falsity).

-4-

DEFENDANT FORESCOUT'S REPLY BRIEF
ISO ITS MOTION TO DISMISS                                    CASE NO. 3:20-CV-00076-SI

mistakenly rely on *In re CV Therapeutics, Inc. Securities Litigation*.  There, the issuer *already knew* that certain specific, concrete risks had materialized when it issued its cautionary warnings.  No. C 03-03709, 2004 WL 1753251, at *11 (N.D. Cal. Aug. 5, 2004).  The safe harbor's first prong thus protects the statements *regardless* of the speakers' mental states or actual knowledge.  F-MTD at 8.

*Third*, even if the cautionary language had been deficient, the safe harbor's second prong would still apply, because (contrary to Plaintiffs' claim, Opp. at 27) the Complaint fails to sufficiently plead that any Individual Defendant had actual knowledge of the statements' alleged falsity.  *See* 15 U.S.C. § 78u–5(c)(1)(B); *Wochos*, 985 F.3d at 1190; *Quality Sys.*, 865 F.3d at 1149; *see also infra* at 11–14; F-MTD at 10–11, 21–24; Individual Defs.' Mot. to Dismiss Consolidated Am. Compl., Dkt. 129 ("I.D.-MTD") at 5–21; Reply Memo. in Supp. of Individual Defs.' Mot. to Dismiss Consolidated Am. Compl. ("I.D. Reply") at 2–15.  Plaintiffs do not adequately allege that the Individual Defendants knew about profound operational issues that would have made their forward-looking statements false or misleading when made, and no facts suggest that Defendants knew Advent would not proceed with the Merger until it sent its Termination Letter on May 15, 2020.  *See* F-MTD at 21–24; I.D. MTD at 5–21; *infra* at 6–15; *cf., e.g.*, *Roberts v. Zuora, Inc.*, No. 19-cv-03422, 2020 WL 2042244, at *3–6, 10 (N.D. Cal. Apr. 28, 2020) (cited by Opp. at 27) (no reasonable basis for statements when highly *specific* CW accounts suggested defendants knew specific, contradictory facts from particularly alleged meetings of which CWs had personal knowledge).

*Fourth*, Plaintiffs adopt the mistaken premise that so long as a disclosure providing revenue guidance also includes an allegedly false representation of past or present fact, the entire disclosure (including its forward-looking guidance) falls beyond the safe harbor's protection.  Opp. at 14 n.2, 26 (claiming that "the safe harbor does not apply . . . at all" to guidance figures accompanied by allegedly false statements of past or current fact).  The Ninth Circuit has held otherwise: "In the context of such 'mixed' statements, only the forward-looking aspects could be immunized from liability," while the non-forward-looking parts (but only those non-forward-looking parts) would not be immunized.  *Wochos*, 985 F.3d at 1190, *citing Quality Sys.*, 865 F.3d at 1141–42.  Thus, at the very least, the safe harbor would immunize the many statements plainly forward-looking on their face even if the statements had been accompanied by false, concrete, and specific statements of past

-5-

or present fact (they were not, as explained above); for example, many challenged statements contain revenue projections, *see, e.g.*, ¶¶ 127, 135, 138—quintessential forward-looking statements, 15 U.S.C. § 78u–5(i)(1)(A); *see also, e.g.*, ¶ 115 (projecting that deals are "on track for the back half of the year"); ¶¶ 150, 155 (predicting the Merger's closing).[5]

### B.    The Complaint's Vague Allegations of Alleged Pipeline or Sales Force Issues Are Insufficient to Plead Falsity

Even setting aside the safe harbor, the Opposition still fails to excuse the Complaint's inadequate falsity allegations. *See* F-MTD 11–19.  Plaintiffs attempt to distract from the issue by misconstruing Defendants' falsity argument to be that Plaintiffs can plead fraud only with an admission from a high-level executive with direct responsibility for public forecasting. *Cf.* Opp. at 2.  That is not the standard, and Defendants never claimed that it is.  Rather, the law requires Plaintiffs to allege particularized facts indicating how alleged operational problems affected the public forecasts that they assert were false when made, or how those problems rendered public statements of fact false or misleading.  F-MTD at 11–21.  They have not done so.

To begin, aside from certain one-off disclosures not alleged to be false, *see, e.g.*, ¶ 130 (historical tenured sales rep percentages), Defendants' pipeline and sales force statements are not only protected by the safe harbor, but also general statements of corporate optimism that are too vague to be actionable under Ninth Circuit precedent.  F-MTD at 15, 17 (citing cases).  Plaintiffs argue that "general statements of optimism give rise to a claim 'when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly.'"  Opp. at 16, *citing Quality Sys.*, 865 F.3d at 1143.  But as explained below, Plaintiffs' allegations rely on narrow and localized anecdotes from CWs about a few potential deals, all scattered over various quarters and geographies, and that the CWs themselves value only in the low millions.  This is plainly insufficient to allege that the Individual Defendants in fact knew the Company's *global* pipeline or sales force tenure trends contradicted general expressions of optimism.  *See* F-MTD at 21–24; I.D.-MTD at 9–15; I.D. Reply at 3–8; *infra* at 12.  Moreover, Defendants did not express optimism in a

---

[5] Even if some statements were deemed mixed statements containing concrete, specific present or past facts, nothing in the Complaint actually suggests that those particular facts were false when the statements were made. *See infra* at 6–11, 13–15; F-MTD at 11–21; *Wochos*, 985 F.3d at 1193.

-6-

vacuum: Forescout repeatedly revised its guidance downward as the year progressed and actual operations unfolded, and Defendants offered explanations for those misses that included slipped deals. *Supra* at 4, *citing* Ex. 8, ¶ 123; Ex. 12, ¶ 135; Ex. 13, ¶ 138; Ex. 14, ¶ 141.[6]

Plaintiffs also argue that "CW accounts that contradict or undermine a defendant's public statements are sufficient to plead falsity." Opp. at 7. But Plaintiffs understate the level of specificity required: under the PSLRA and case law, CW accounts must be based on personal knowledge of facts that specifically pertain to the alleged fraud. F-MTD at 12–13. The statements challenged here are about the global pipeline, company-wide sales force trends, and external revenue guidance. F-MTD at 12–13. Critically, the CW allegations lack the sort of facts—and the CWs themselves lack the personal knowledge—that would suggest that the alleged operational issues would have necessarily had a dramatic and substantial impact on the Company *as a whole*, such that the Individual Defendants' statements about pipeline, sales force, or projections would be false or even misleading or the projections unachievable. *See* F-MTD at 11–18. The CW allegations in the cases cited by Plaintiffs were far more detailed and particularized than those here and far more directly refuted the defendants' public statements based on the CWs' personal knowledge of the relevant conflicting facts and personal interactions with the speaking officers.[7]

Here, no CW is alleged to have personal knowledge of forecasting (global or otherwise) or of company-wide hiring or pipeline trends, and none occupied a role that would have given them insight into those subjects. While a few CWs interacted with senior sales officers, none alleged conversations with those officers about forecasting or company-wide trends, and none interacted

---

[6] Plaintiffs accuse Forescout of cherry-picking quotes to support its puffery argument, but Plaintiffs never actually identify a quote that they think Forescout unfairly excerpted—let alone explain why any statement's supposedly omitted context makes the statement actionable. Opp. at 16. In any event, the accusation is meritless: Defendants provided the statements' entire context in the uncontested exhibits filed with Forescout's Motion.

[7] *See, e.g.*, *Quality Sys.*, 865 F.3d at 1144 (CEO's statement denying market saturation was false or misleading when CW had heard CEO explain on multiple internal conference calls that the market "had become saturated," and statements that pipeline continued to grow were false or misleading when Board-member CW alleged pipeline was declining); *Mulligan*, 36 F. Supp. 3d at 960–61 (statements of company's commitment to remedying problems were false when CWs alleged that company routinely adopted "'temporary' changes / improvements to pass an FDA inspection only to undo the changes shortly after the inspection concluded"; finding personal knowledge where a CW described conversations defendant had with other officers about alleged issues).

-7-

DEFENDANT FORESCOUT'S REPLY BRIEF
ISO ITS MOTION TO DISMISS                                    CASE NO. 3:20-CV-00076-SI

with the Individual Defendants or could speak to, say, what data they consulted or what other steps they may have taken.  To distract from this defect, the Opposition exaggerates the CWs' roles—particularly those who were NAMs.  For example, the Opposition claims the Individual Defendants "publicly acknowledged and referred to" Salesforce data and "their internal discussions with NAMs as the basis for their public statements" about Company operations and revenue forecasts.  Opp. at 4, *citing* ¶¶ 14, 115, 119, 121.  But the cited Complaint paragraphs say no such thing.  *See* ¶¶ 14, 115, 119, 121; *compare also, e.g.*, Opp. at 4, *citing* ¶¶ 50, 109 (claiming that Defendants based their confidence in projections on a growing percentage of tenured "NAMs"), *with* ¶¶ 50, 109 (mentioning only trends in the percentage of tenured sales reps generally, without referring to NAMs).

Plaintiffs also have not shown that the sales force statements were false or misleading when made, let alone that alleged sales force issues rendered any projections unachievable.  F-MTD at 14–16.  While CWs claim that personnel left Forescout, they do not allege (especially with any particularized facts) that the Company had inadequate salespeople to meet its projections or that the Individual Defendants could not have felt confident about sales productivity or hiring trends despite the alleged turnover.  Mr. DeCesare's statement that he believed the percentage was "trending in the right direction" plainly referred to the undisputed fact that the percentage had increased each year from 2016 to 2018.  ¶ 105; *see also* ¶ 130.[8]  That Mr. DeCesare declined to give an interim update to a *yearly* statistic is not false or misleading, *see* Opp. at 20, but rather consistent with Company practice.  F-MTD at 15.  Similarly, Plaintiffs have pled no facts to show why a statement that Forescout had "hundreds of sales reps," ¶ 125, was false or misleading when made in May 2019.

As to statements about Forescout's sales pipeline, Plaintiffs point to vague allegations about incorrectly categorized deals and argue that it is "illogical to assume [ ] that Forescout [ ] would not include 'committed deals' into its public forecasts."  Opp. at 20; *see* F-MTD 16–18.  Plaintiffs miss the point:  nothing in the Complaint indicates how pipeline classifications *translate* to public forecasts—if they even translate at all (a suggestion the Complaint does not plead).  The fact that the Company had a deal classification process does not mean that company-wide, external financial projections automatically projected revenue based solely on those classifications, without

---

[8] Plaintiffs wrongly assert that this percentage referred to "productivity."  Opp. at 12, *citing* ¶ 105.  The Complaint itself alleges that this percentage referred to tenured sales representatives.  *See* ¶ 105.

DEFENDANT FORESCOUT'S REPLY BRIEF
ISO ITS MOTION TO DISMISS                                    CASE NO. 3:20-CV-00076-SI

considering, for example, the possibility that not all "committed" deals would close on the expected timeline. The CWs allege no insight into the forecasting process for the company's guidance or into how a few deals would impact global pipeline or revenue guidance, much less in what ways management views on sales force makeup and performance influenced the preparation of guidance given to investors. Thus, for example, the CWs' assertion that $7.2 million of deals in Forescout's entire FY2019 global pipeline were supposedly "illusory" in certain sales employees' eyes, Opp. at 21, reveals nothing about whether or how the guidance accounted for those deals, or even which quarters' results were allegedly affected by the deals. And no facts pair any of the supposedly illusory deals with the slipped deals or "tech wins" referenced by the Individual Defendants' public statements. F-MTD at 17. Perhaps recognizing the weaknesses in the CWs' allegations, Plaintiffs continually exaggerate and mischaracterize those allegations in their Opposition. *See, e.g.*, Opp. at 6 (claiming that CW8 alleged quota misses by "Commercial sales division"), *citing* ¶ 68 (alleging only a miss of CW8's *personal* quota); Opp. at 31 (claiming CW15 felt pressured to aggressively classify deals), *citing* ¶ 75 (omitting any allegation by CW15 that she or he felt pressure).[9]

Plaintiffs also misconstrue Advent's May 15, 2020, Termination Letter in the hotly contested Delaware Merger litigation to buttress their sales force and pipeline claims. Opp. at 22. Advent's letter noted a "dramatic decline in earnings potential and financial performance *year-over-year* from Q1 2019 to Q1 2020." Opp. at 22, *citing* ¶ 159. Plaintiffs misread that sentence as some sort of commentary on Forescout's performance across 2019. On its face, the letter can only be read to compare Forescout's positive 1Q2019 performance to its performance in 1Q2020—the plain, customary meaning of the phrase "year-over-year." *See* "year-over-year" definition, Merriam-Webster, https://www.merriam-webster.com/dictionary/year-over-year ("comparing or based on comparing the same time period in successive years"); F-MTD at 12 n.5. In fact, Advent never sought to excuse its closing obligation on account of Forescout's 2019 performance—performance on which it had conducted significant pre-signing diligence, F-MTD at 23, *citing* Ex. 19. The

---

[9] *Compare also* Opp. at 21 (claiming that "[n]one" of the deals CW11 was allegedly pressured to aggressively classify "ultimately materialized"), *with* ¶ 70 (alleging that CW11 said "*at least one* of these deals did not close *before the end of the third quarter*") (emphasis added); *see also* Opp. at 6, 19, 29 (claiming that CW3 and CW4 blamed sales force departures on declining sales, weak customer interest, and competition), *citing* ¶¶ 54–55 (omitting any such allegation).

DEFENDANT FORESCOUT'S REPLY BRIEF
ISO ITS MOTION TO DISMISS                                          CASE NO. 3:20-CV-00076-SI

Material Adverse Event ("MAE") clause on which Advent's Delaware claims were premised explicitly applied only to MAEs that "occurred after the date of th[e] Agreement." *See* Ex. 16, Annex A at A-73 (§ 7.2(d)); *see also id.* at A-5 (excluding earnings misses "for any period" as a basis to terminate). The Merger litigation merely addressed Advent's concern that Forescout's business, on a forward-looking basis, had suffered an MAE due to the sales force's inability, ***after the Merger's signing***, to adapt to the new pandemic-disrupted market. ¶ 159; Ex. 19 (noting that parties to Delaware litigation disputed occurrence of MAE). "Where, as here, a plaintiff claims that the words used in a statement have some special or nuanced meaning that differs from what the literal words suggest, the plaintiff must plead facts that will support this crucial premise in order to satisfy the PSLRA's requirement that a private securities plaintiff adequately plead 'the reason or reasons why [a] statement is misleading.'" *Wochos*, 985 F.3d at 1193. Plaintiffs fail to do so.

Plaintiffs also argue that once Defendants touted positive information about their sales operations to the market, they were bound to disclose adverse information that cuts against the positive information. *See* Opp. at 19, 21, *citing Schueneman v. Arena Pharm.*, 840 F.3d 698, 706 (9th Cir. 2016). But, unlike in *Schueneman*, Plaintiffs fail to plead particularized facts actually suggesting that alleged operational issues meaningfully cut against any disclosed positive information. *See supra* at 6–10. Moreover, Forescout ***did*** disclose real-time adverse information repeatedly during the class period—for example, by revising guidance, *see supra* at 4. The executives' continued optimism does not amount to fraud.

### C.    Plaintiffs' Channel-Stuffing Allegations Are Inadequate

Plaintiffs claim that their barebones channel-stuffing allegations suffice at the pleading stage, Opp. at 23, without even referencing the cases in this Circuit holding otherwise, *see* F-MTD at 19–20.[10] Channel-stuffing is challenging to plead, requiring specific facts about specific transactions.

---

[10] Even Plaintiffs' *own* cases suggest otherwise. *See* Opp. at 23, *citing, e.g.*, *In re Connetics Corp. Sec. Litig.*, 2008 WL 3842938, at *10 (N.D. Cal. Aug. 14, 2008) (where the parties disputed ***only scienter***, noting authority that for channel-stuffing claim "to be pled with sufficient particularity, it must allege specific transactions, specific shipments, specific customers, specific times, or specific dollar amounts") (quotation omitted); *Friedman v. Rayovac*, 295 F. Supp. 2d 957, 986–87 (W.D. Wis. 2003) (claim "managed to scrape by, if only barely," when several CWs described "endemic" channel-stuffing practices, detailing payment terms, advertising credits, discounts, and transaction amounts, and that company closed 60% of its sales in the quarter's "last 2 or 3 weeks").

-10-

*See* F-MTD at 19–20.  Not only do Plaintiffs fail to plead such specific transactions; they fail to plead even enough facts to satisfy general Rule 12 pleading standards.  *See id.*

Plaintiffs base their channel-stuffing theory on a supposed "whistleblower" whose claims were allegedly "corroborated by [CW15] confirming that Merlin had a regular practice to accept high-value deals at the end of a quarter from Forescout without an expected closing date to resell the product."  Opp. at 7.  Beyond the lack of any specific information about the whistleblower, CW15 does not actually allege that Merlin had a "regular practice" of accepting high-value deals "at the end of a quarter."  *Compare* Opp. at 7, *with* ¶ 83.  Moreover, CW15 does not allege that Forescout recognized Merlin-assigned deals as revenue before those deals closed, let alone in the same quarter when Merlin agreed to resell the products—a critical omission in a channel-stuffing claim.  Indeed, the Complaint makes only a generic allegation that the Company followed a particular GAAP rule in recognizing revenue.  ¶ 86.  The Complaint does not even allege a single fact about how Forescout applied this alleged policy in practice—let alone how it applied the policy to resellers' deals.[11]

In addition, the fact that Advent's counsel investigated the whistleblower accusation in discovery during the deal litigation does not even support an inference that the accusation was true; Plaintiffs notably do not (and cannot) allege that Advent asserted channel-stuffing claims in the Delaware suit.  *See* Opp. at 22–23; F-MTD at 19.  Advent's passing allegation—in contested merger litigation—that Forescout tried to "pull additional bookings into the quarter" neither specifies transactions nor any particular sales practice, failing to meet applicable pleading standards.  Nor can Plaintiffs properly base their claims on a third party's untested and untried allegations in some other litigation.  *See* I.D.-MTD at 8–9.

**D.  Plaintiffs Cannot Cover Over the Deficiencies in Their Scienter Allegations with Inapplicable, Rarely Justified Pleading Inferences**

The Individual Defendants' Reply, which Forescout joins and incorporates by reference, discusses in detail Plaintiffs' failure to raise a strong scienter inference.  I.D. Reply at 2–15.  Together

---

[11] Plaintiffs' theory is even internally inconsistent.  Plaintiffs claim 1Q2020 revenues were "inflated by an abnormal transaction with Merlin," Opp. at 22, *citing* ¶ 81.  But ¶ 81 alleges that channel stuffing occurred in "the fourth quarter of 2019."  In Plaintiffs' own words, channel stuffing "inflates revenues in the period in which the channel stuffing occurs, and lowers revenues in subsequent periods." ¶ 84.

-11-

with the Individual Defendants, Forescout also emphasizes the problematic reliance on the core operations theory, which Plaintiffs use to dodge their failure to plead any facts about Mr. DeCesare's or Mr. Harms' *own* knowledge, as the law requires, *see* F-MTD at 22.[12]  Specifically, Plaintiffs claim that the Individuals Defendants must have known their statements were false or misleading because other executives supposedly knew about alleged pressure campaigns, because the Individual Defendants supposedly had access to unspecified data, and because (in Plaintiffs' unsubstantiated view) the problems were supposedly so significant that the Court should infer the Individual Defendant's knowledge of their statements' alleged falsity.  Opp. at 28–34; *see Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014) ("Proof under [the core operations] theory is not easy.").  But Plaintiffs still offer no specifics about the reports or data the Individual Defendants supposedly reviewed, and nothing in the Complaint supports the idea that the supposed operational issues were so catastrophic for the *global* Company that the Individual Defendants could not have justifiably felt the confidence or believed the representations that they conveyed to the market.  *See* F-MTD at 11–20; *Intuitive Surgical*, 759 F.3d at 1061–64; *cf. Robb v. Fitbit Inc.*, No. 16-cv-00151, 2017 WL 219673, at *3–6 (N.D. Cal. Jan. 19, 2017) (cited by Opp. at 31, 33) (inferring scienter when CWs primarily responsible for tracking product failures delivered their own reports showing critical design defects in a device that accounted for 80% of company's revenue).[13]  Plaintiffs' desperate reliance on a rarely available doctrine only underscores the glaring absence of adequate scienter allegations.

## II.     THE OPPOSITION CONFIRMS THAT THE COMPLAINT'S MERGER ALLEGATIONS ARE DEFICIENT AS TO FALSITY AND SCIENTER

In their Merger-related claims, Plaintiffs argue that Defendants should have predicted (and disclosed) that Advent eventually would not close on the Merger's original schedule, based on

---

[12] Plaintiffs oddly suggest that "Defendants do not dispute that scienter is properly alleged against a corporation where it is properly alleged against at least one corporate officer."  Opp. at 28 n.4.  As Forescout explained in its opening brief, Plaintiffs must adequately plead scienter as to the Individual Defendants before it can successfully plead scienter as to Forescout.  F-MTD at 22.

[13] Plaintiffs exaggerate the CWs' interactions with upper management. *See* Opp. at 31 (claiming that management pressured CW14 and CW15 "to identify deals with no prospect of closing during a quarter as committed"), *citing* ¶¶ 74, 75 (neither CW alleges that management pressured him or her).

-12-

DEFENDANT FORESCOUT'S REPLY BRIEF
ISO ITS MOTION TO DISMISS                                                      CASE NO. 3:20-CV-00076-SI

financial and operational difficulties in early 2020—*i.e.*, as the pandemic hit the economy with full force—and on Advent's eventual expressions of concern with the deal. *See* Opp. at 15. This is a demand for speculation and prognostication about others' thoughts and actions. Until Advent told Defendants that it would no longer close, Defendants had no basis on which to predict with certainty how Advent would respond to the Company's 1Q2020 performance, or whether Advent would close on schedule or attempt to terminate the deal. The securities laws do not obligate Defendants to guess. *See* F-MTD at 20–21, *citing, e.g.*, *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 880 n.8 (9th Cir. 2012) ("[S]ection 10(b)(5) and Rule 10b–5 do not create an affirmative duty to disclose any and all material information[.]"); *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 746 (7th Cir. 1997) (no duty to disclose difficulties in corporate auction, including that potential bidders had bowed out).[14]

Plaintiffs claim that "Advent's positions and intentions were well known to Defendants," Opp. at 24. But that is not what the Complaint alleges: namely, that until Advent's May 15 termination letter, Defendants knew only that Advent expressed "concern" about proceeding with the deal on April 14, 2020, and said on May 8 that it was "considering not closing the Acquisition," ¶¶ 151, 156; *see also* ¶¶ 88–102. Even the April 14 date appears to be a scrivener's error: in their account of the Merger parties' alleged discussions, Plaintiffs say nothing about an expression of concern on April 14. *See* ¶¶ 94–98; Opp. at 36. Plaintiffs further mischaracterize their own pleading in asserting that "Defendants already knew of Advent's unwillingness to proceed with the Merger" before March 23, 2020. Opp. at 27. In any event, "concerns" and "considerations" about the Merger are a far cry from specific allegations of Defendants' knowledge or belief that Advent would in fact not close the deal as scheduled. There are no allegations in the Complaint about what the Individual Defendants (or any other Forescout personnel) thought about Advent's expression of "concern"— let alone allegations suggesting that any Defendant did not actually expect the Merger to close when they told the market that they did. *See Wochos*, 985 F.3d at 1188–89, 1196. There are no allegations suggesting whether Defendants viewed Advent's statements as serious, or bluffing, something in

---

[14] Plaintiffs claim that Defendants' cases to this effect are "inapposite" but never actually explain why. Opp. at 24. Each case confirms that companies have no duty to disclose difficulties or potential setbacks (even known ones) in a corporate transaction—the very disclosures that Plaintiffs fault Forescout for not giving here. *See* MTD at 20–21.

-13-

DEFENDANT FORESCOUT'S REPLY BRIEF
ISO ITS MOTION TO DISMISS                                           CASE NO. 3:20-CV-00076-SI

between, or something else entirely.  Nor are "concerns" or "considerations" sufficient to plead actual knowledge that forward-looking statements about the Merger—such as "we look forward to completing our pending transaction with Advent," ¶ 155; *see also, e.g.*, ¶ 150—were false.  *Supra* at 4.  For the same reasons, these Merger statements would not support a claim even if construed as opinions, *see* Opp. at 15–16:  no allegations suggest Defendants did not actually hold the opinions or knew any information that directly contradicted their view.  *Wochos*, 985 F.3d at 1188–89, 1196 (saying "'great progress' was being made . . . would potentially be an actionable false statement only if . . . Tesla had been 'making no progress at all'").  This is simply not enough to allege falsity under any measure, much less with the particularity required by the PSLRA.  Despite their protestations, Opp. at 24, Plaintiffs' Merger-related claims in fact embrace a guilt-by-hindsight theory:  because Advent eventually announced that it did not intend to close as scheduled, Plaintiffs claim that Defendants should have known all along that the Merger would take that turn.  Defendants had no duty to speculate on the Merger's fate.  F-MTD at 20–21.

As to scienter for Merger-related claims, Forescout again joins and incorporates the Individual Defendants' Reply, *see* I.D. Reply at 2–15.  Forescout also emphasizes the lack of allegations suggesting any coherent motive for Defendants to mislead shareholders about the Merger's prospects.  The notion that executives would lie to the market because they (or other investors) stood to earn payouts *if the deal closed* is illogical:  the market's understanding of the Merger's likelihood of closing would not increase that likelihood—a reality that Plaintiffs continue to ignore.  F-MTD at 23.  Without any further indication of scienter, Plaintiffs' mere appeal to the "temporal proximity" of the May 8 call and the May 15 letter is insufficient.  *See* Opp. at 36, *citing Reese v. Malone*, 747 F. 3d 557, 577 (9th Cir. 2014) (scienter *not* pled as to CEO, partly because time gap was *too short*), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017), *and Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1148 (N.D. Cal. 2017) ("timing" is one of several "additional facts that support scienter").  The allegations here simply cannot withstand the *Tellabs* competing inferences test.

### III.    PLAINTIFFS IDENTIFY NO VIABLE LOSS CAUSATION THEORY

The Opposition articulates an illogical loss causation theory found nowhere in Plaintiffs'

-14-

Complaint. Plaintiffs strangely suggest that the fact that guidance misses caused stock drops "reveal[ed] [ ] that the guidance itself was false" and "that the repeated misses were caused by partial disclosures of the deteriorating state of internal affairs at the Company." Opp. 43. But the claim—not pled in the Complaint—that guidance was false because the Company missed it (and because the market reacted to the miss) is both circular logic and classic "fraud by hindsight." *See* F-MTD at 19, 24. Moreover, Plaintiffs make no effort to explain how a disclosure could cause a guidance miss—or, for that matter, how disclosures could affect company performance at all. Regardless, the Complaint alleges none of the defective loss causation theories now offered in the Opposition, let alone with particularity. F-MTD at 24–25.

Plaintiffs miss the point with respect to those putative class members who purchased shares between October 10, 2019 and February 6, 2020. The problem is not that the ***named*** Plaintiffs lack standing or did not purchase their shares at the right times; rather, the named Plaintiffs purport to assert claims on behalf of a class that would include purchasers who bought shares during that window—and yet the Complaint has failed to allege any viable loss causation theory as to those putative class members. F-MTD at 25. All Plaintiffs can muster in response is that those putative class members' claims should be dismissed at a later stage of the case. But Plaintiffs cannot proceed with claims that are defectively pled on the Complaint's face. Unlike the 90-day lookback rule at issue in the cases Plaintiffs cite, *see* Opp. at 44-45, these defects in the Complaint require no expert testimony about complex damages calculations and turn on no fact-intensive inquiries into the details of specific purchasers' stock transactions; the defects are apparent from the Complaint's face, and these putative class members' claims thus should be dismissed now.

## IV.    CONCLUSION

The Complaint should be dismissed with prejudice.

Date:  March 5, 2021                    Respectfully submitted,

**ROPES & GRAY LLP**

 */s/ Anne Johnson Palmer*
Anne Johnson Palmer (CSB #302235)

*Attorneys for Defendant Forescout Technologies, Inc.*

-15-

DEFENDANT FORESCOUT'S REPLY BRIEF
ISO ITS MOTION TO DISMISS                        CASE NO. 3:20-CV-00076-SI