UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER L. SAYCE, et al.,<br><br>             Plaintiffs,<br><br>      v.<br><br>FORESCOUT TECHNOLOGIES, INC., et al.,<br><br>             Defendants. | Case No.  20-cv-00076-SI<br><br>**ORDER GRANTING DEFENDANTS'<br>MOTIONS TO DISMISS**<br><br>Re: Dkt. Nos. 127, 129 |

Before the Court are motions to dismiss, filed by defendant Forescout Technologies Inc. ("Forescout") and individual defendants Michael DeCesare and Christopher Harms (collectively "individual defendants").  Dkt. No. 127; 129.  For the reasons set forth below, the Court **GRANTS** Forescout's motion to dismiss and **GRANTS** individual defendants' motion to dismiss.  The Court **GRANTS** plaintiffs Christopher Sayce, Meitav Tachlit Mutual Funds Ltd., The Arbitrage Fund, Water Island merger Arbitrage Institutional Comingled Master Fund LP, Water Island LevArb Fund, LP, Water island Diversified Event-Driven Fund (collectively "plaintiffs") leave to amend.

**BACKGROUND**

**I.      Factual Background**

The following allegations are taken from the Consolidated Amended Complaint ("CAC"), which the Court must treat as true for purposes of this motion.

Forescout provides cybersecurity services and technology to businesses and government agencies. Dkt. No. 116, CAC ¶ 45. Defendant Michael DeCesare is Forescout's Chief Executive Officer. *Id*. ¶ 6. Defendant Christopher Harms is Forescout's Chief Financial Officer. *Id*. at ¶ 3. During the Class Period, from February 7, 2019 to May 15, 2020, Forescout and individual

defendants allegedly made material misrepresentations about Forescout's sales productivity and pipeline, product deals, Advent International's ("Advent") acquisition ("Advent Acquisition") of Forescout, and revenue projections.

## II.      Current Matter

On January 1, 2020, plaintiff Christopher Sayce, individually and on behalf of others similarly situated, filed this securities class action lawsuit against defendants. Dkt. No. 1. On May 22, 2020, plaintiffs Christopher Sayce, Meitav Tachlit Mutual Funds Ltd., The Arbitrage Fund, Water Island merger Arbitrage Institutional Comingled Master Fund LP, Water Island LevArb Fund, LP, Water Island Diversified Event-Driven Fund filed an amended complaint against defendants. Dkt. No. 31.  On December 18, 2020, plaintiffs filed a consolidated amended complaint ("CAC") against defendants.  Dkt. No. 116.

Plaintiffs allege violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the Securities Exchange Commission. CAC ¶¶ 183-198.  Plaintiffs allege defendants knowingly made false and misleading statements and failed to disclose (1) dramatic layoffs and departures of Forescout employees beginning in early 2019, particularly from the sales department; (2) declined productivity of Forescout's sales representatives; (3) lack of "better visibility into the pipeline"; (4) deals with Forescout that did not close; (5) deals in Forescout's pipeline for the second quarter were not "tech wins"; (6) artificial closing dates listed in Forescout's Salesforce platform; (7) an objective basis for Forescout's increased revenue projections; (8) Forescout's channel stuffing scheme; and (9) conditions of funding.  *Id*. at ¶¶ 108, 110, 114, 116, 118, 120, 122, 124, 126, 128-130, 131, 137, 139-140, 143, 148-49.  Plaintiffs allege individual defendants are liable under 20(a) of the Exchange Act as Forescout's senior officers in positions of control and authority.  *Id*. at 193-98.

On January 29, 2021, Defendant Forescout filed a motion to dismiss, Dkt. No. 127, and individual defendants filed a motion to dismiss, Dkt. No. 129.[1] On February 19, 2021, plaintiffs

---

[1] Defendants also filed a Notice of Incorporation by Reference & Request for Judicial Notice supporting the two motions to dismiss.  Dkt. No. 130.  Plaintiffs did not file an opposition. Defendants

United States District Court
Northern District of California

filed an opposition.  Dkt. No. 134. On March 5, 2021, defendants filed replies. Dkt. Nos. 135, 136. On March 19, 2021, the Court heard oral arguments on defendants' motions to dismiss.  Dkt. No. 138.

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "facial plausibility" standard requires the plaintiff to allege facts that add up to "more than a sheer possibility that a Defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570. "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id*. (quoting *Twombly*, 550 U.S. at 557). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id*. at 679.

In deciding whether a plaintiff has stated a claim upon which relief can be granted, the court must assume that the plaintiff's allegations are true and must draw all reasonable inferences in the plaintiff's favor. *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that contradict exhibits attached to the Complaint or matters properly subject to judicial notice, or allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Daniels–Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).

If the court dismisses a complaint, it must then decide whether to grant leave to amend. The Ninth Circuit has "repeatedly held that a district court should grant leave to amend even if no request

---

request the Court take notice of documents incorporated throughout the CAC and of 26 exhibits that include Forescout's press releases, transcripts of earnings calls, Form 10-Qs and 10-Ks. Dkt. No 130 at 1-5. The Court **GRANTS** defendants' requests for incorporation by reference and judicial notice. *See Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010) ("On a motion to dismiss, [the Court] may consider . . . matters of public record); *Dreiling v. Am. Exp. Co.*, 458 F.3d 942, 946 n.2 (9th Cir.2006) (SEC filings subject to judicial notice).

1   to amend the pleading was made, unless it determines that the pleading could not possibly be cured

2   by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (citations and

3   internal quotation marks omitted).

4

5                                   **DISCUSSION**

6          Defendants collectively move to dismiss plaintiffs' Section 10(b) claim for failure to

7   adequately plead actionable misstatements, causation, and scienter.  Dkt. Nos. 127 at 7-24; 129 at

8   5-22.  Individual defendants move to dismiss plaintiffs' Section 20(a) claim for failure to plead an

9   independent violation of the Exchange Act.  Dkt. No. 129 at 22.

10

11  **I.     Section 10(b) of the Exchange Act**

12         Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with

13  the purchase or sale of any security...any manipulative or deceptive device or contrivance in

14  contravention of such rules and regulations as the [SEC] may prescribe as necessary." 15 U.S.C.

15  § 78j(b). A plaintiff asserting a claim under Section 10(b) must adequately allege  "(1) a material

16  misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the

17  misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the

18  misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re NVIDIA Corp. Sec.*

19  *Litig.*, 768 F.3d 1046, 1052 (9th Cir. 2014) (citations omitted).

20         Defendants argue the CAC fails to adequately plead actionable misstatements, causation,

21  and a strong inference of scienter.  Dkt. Nos. 127 at 7-24; 129 at 5-22.

22

23  **A.     Actionable Misstatements**

24         **1.     Forward Looking Statements**

25         The Private Securities Litigation Reform Act's ("PSRLA") safe harbor "is designed to

26  protect companies and their officials when optimistic projections of growth in revenues and earnings

27  are not borne out by events."  *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir.

28  2017). The safe harbor holds that "a defendant will not be liable for a false or misleading statement

United States District Court
Northern District of California

4

1   if it is forward-looking *and* either is accompanied by cautionary language *or* is made without actual

2   knowledge that it is false or misleading." *Id.* at 1141 (emphasis added).

3        Defendants argue that statements involving revenue projections, sales pipeline, and sales

4   productivity are forward looking statements protected by the safe harbor provision. Dkt. No 127 at

5   8-11. Plaintiffs argue the statements are based on present or historical facts. Dkt. No. 134 at 25.

6   Plaintiffs assert the statements were made with actual knowledge and lacked adequate cautionary

7   language. *Id.* at 25-27.

8        A forward-looking statement is "a statement containing a projection of revenues, income

9   (including income loss), earnings (including earnings loss) per share, capital expenditures,

10   dividends, capital structure, or other financial items." 15 U.S.C. § 78u–5(i)(1)(A). Forward looking

11   statements include statements of plans and objectives of management for future operations and

12   statements of the assumptions underlying or relating to those plans and objectives. *Wochos v. Tesla*

13   *Inc.,* 985 F.3d 1180, 1191 (9th Cir. 2021). Unlike statements indicating that a company is "on track"

14   to meet a particular goal, "concrete factual assertions about a specific present or past circumstances

15   [that go beyond] the assertion of a future goal, and . . . desbrib[e] concrete circumstances that have

16   already occurred . . . [are] not forward-looking." *Id.* at 1192.

17        Defendants statements regarding Forescout's sales productivity, pipeline, and deals contain

18   concrete factual assertions about Forescout's operations. *Compare In re Quality Systems*, 856 F.3d

19   at 1146-47 (finding defendant's revenue projections were forward-looking statements that were

20   accompanied by non-forward looking statements such as "pipeline [is] 'growing,'"; "there's nothing

21   out of character in the pipeline that we're reporting today versus what we have seen in the past

22   couple of years"; and "confidence in the prediction to the state of the current sales pipeline.") *with*

23   CAC ¶ 115 ("[W]e feel really good about the pipeline, big deals are part of our business . . . [deals]

24   on track for the back half of the year.") *and* CAC ¶ 117 ("[W]e feel like we are tracking very well

25   against our sales productivity, the investment levels that we have been making . . . [follow] that path

26   to profitability and investing at levels below where our top line is growing."); *and* CAC ¶ 121

27   ("Those deals are ones where we've already got the tech win."). Defendants' statements contain

28   reasons why Forescout will meet revenue projections. *See Wochos*, 985 F.3d at 1192 ("[O]ne can

United States District Court
Northern District of California

readily announce an objective *without* stating, for example, that the reason why it is achievable . . . If such factual assertions are made and are false, then they are outside the safe harbor and potentially actionable"). Accordingly, the Court finds that defendants' statements contain non-forward looking statements to the extent the statements involved concrete assertions about defendants' sales productivity, pipeline, and deals.

To the extent that defendants' statements are forward-looking statements, as discussed below, the Court finds that the statements were not made with actual knowledge of falsity and are protected by the PSLRA's safe harbor provision.

### 2.   Falsity

Defendants argue that the CAC fails to adequately plead how defendants' alleged misstatements were false. Dkt. No. 127 at 11-21.

To establish falsity, a complaint must state with particularity each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and all facts on which that belief is formed. 15 U.S.C. § 78u–4(b)(1). Furthermore, a statement or omission "must be misleading; in other words it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosp. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).

### a.   Alleged Misstatements about Sales Productivity Hiring

Plaintiff argues that DeCesare's February 7, 2019 statement that Forescout's sales force was "maturing and ramping nicely . . . trending in the right direction" and March 4, 2019 statement that Forescout was "hiring like crazy" and had "increased visibility" into the sales pipeline were actionable misstatements. Dkt. No. 134 at 12. Plaintiffs assert falsity is established by statements by confidential witnesses ("CW") 1, 2, 5, 6, 7, and 8, which collectively demonstrate Forescout's sales department struggled to meet sales quotas, a significant number of sales representatives left Forescout, and Forescout experienced a hiring freeze. *Id.* at 16-19.

However, the statements by CW1, CW2, CW5, CW6, CW7, and CW8 are too vague to establish falsity. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 996 (9th Cir. 2009)

United States District Court
Northern District of California

(requiring complaints to "provide the requisite particularity to establish that certain statements . . . [by] confidential witnesses are based on the witnesses' personal knowledge."). The CWs do not claim that defendants DeCesare and Harms had knowledge of any employee departures or hiring freezes. *See In re Quality Systems,* 865 F.3d at 1144 (finding CW statement supporting falsity because CW "recounted that [defendant] explained in internal QSI conference calls . . . that the market for new systems 'had become saturated, and that any sales . . . were largely to replace existing [electronic health record] systems.'"); *In re Pivotal Sec. Lit*., 19-cv-3589, 2020 WL 4193384 at \*7 (N.D. Cal. July 21, 2020) ("General optimistic statements . . .[may be actionable if] statements 'address specific aspects of a company's operation that the speaker knows to be performing poorly'") (internal citations omitted).

DeCesare's February 7, 2019 statement that Forescout's sales force was "maturing and ramping nicely . . . [and productivity] trending in the right direction" is vague and non-actionable puffery. The CAC fails to plead facts showing that defendants would have known any of their statements were false. *Compare Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014) (holding statements of "repeated assurances that FDA approval was 'imminent'" as not puffery because "'the company, whose financial success depended on FDA approval . . . knew that [approval] was not [imminent].") *with In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir.2010) (finding statement "[n]one of our employees is represented by a labor union, and we believe our employee relations are good" to be puffery) and *Scheller v. Nutanix*, 450 F.Supp.3d 1024, 1036 (N.D. Cal. Mar. 9, 2020) ("'we are big on hiring' and 'a lot of hiring [is going on]' are puffery").

Moreover, CW reports about hiring freezes lack requisite details to show that defendants' statements were false. *See Scheller,* 450 F.Supp.3d at 1035-36 (holding CW's report that defendant "implemented hiring freezes of all sales personnel during the Class Period" as inadequate to establish falsity because the CW "failed to provide any details about these hiring freezes, such as how many there were, how long they lasted, how often they were instituted, how many employees they affected, or what locations they covered" or "how each CW would have personal knowledge of [defendant's] hiring").

### b.      Alleged Misstatements about Deals and the Sales Pipeline

Plaintiffs argue that defendants falsely told investors that Forescout had "technology win[s]," Forescout's rate of closing deals "remain very strong," and the pipeline "are pointed in the right direction." Dkt. No. 134 at 12-13.   Plaintiffs argue statements by CW7, CW9, CW12, CW13, and CW14 demonstrate that Forescout's sales pipeline and deals were deteriorating.  *Id*. at 20-21.

The CAC fails to adequately plead how defendants' statements about Forescout's deals and pipeline are false.  Defendants' statements that the rate of closing deals "remain[s] strong" and the pipeline is "pointed in the right direction" are defendants' subjective assessments and do not guarantee the closure of every deal on the pipeline.  *See In re Quality Sys.,* 865 F.3d at 1143-44 (finding statements about a pipeline actionable because "[defendants] did not just describe the pipeline in subjective or emotive terms. Rather, they provided a concrete description of the past and present state of the pipeline. They repeatedly reassured investors during the class period that the number and type of prospective sales in the pipeline was unchanged, or even growing, compared to previous quarters.").  Notably, defendants disclosed that deals on the pipeline could change.  *See* Dkt. No. 128-8 (May 9, 2019 earnings call) (showing DeCesare told investors that "large deals are a component of [Forescout's] business, and timing and composition of these deals can shift and cause quarter-to-quarter fluctuations" and Harms stated a "decent pipeline review indicated that a handful of deals that we initially expected to close in the second quarter are now expected to close in the latter part of the year.")

Moreover, plaintiffs' CWs do not establish falsity of defendants' statements.  CW7, CW9, CW13 reported that senior management pressured sales representatives to list certain deals as "closed" or "committed" on the pipeline before the deals closed.  CAC ¶ 62, 65, 73, 74.   Even though CW13 stated "the pressure to fudge the sales numbers came directly from DeCesare," CW13's statement is directly contradicted by CW14's statement, "the pressure campaign was instigated by both Jensen, the Senior Vice President of Sales for the Americas, and Steve Redman [], the Company's Chief Revenue Officer."  *Id*. ¶ 73.  Therefore, there is no reliable CW statement that the pressure to artificially list deals as "closed" or "committed" came from individual defendants.  *See Applestein v. Medivation, Inc.*, 861 F.Supp.2d 1030, 1038 (N.D. Cal. Mar. 22, 2012)

United States District Court
Northern District of California

(finding CW statements unreliable indicators of falsity where the statements "contradict statements made by the same group of witnesses").

Plaintiffs rely on CW12's statement that Forescout had a high number of deals listed as "committed" on the timeline that did not ultimately close.   ¶ 71. However, CW12's statement is vague and does not specify which deals were improperly listed or when the deals ultimately did not close. *Cf. Scheller*, 450 F.Supp.3d at 1036 ("[P]laintiffs fail to provide any details about these hiring freezes, such as how many there were, how long they lasted, how often they were instituted, how many employees they affected, or what locations they covered"). Without more, CW12's statement does establish falsity of statements about "technology wins".

Plaintiffs also assert Forescout's Form 10-k amendment,[2] filed on April 29, 2020, "through its context, falsely reassured investors concerning the likelihood that the [Advent] Acquisition would proceed as planned given . . . the decline in [Forescout's] operations." Dkt. No. 134 at 15. As the Court discussed previously, the CAC and plaintiffs' CWs fail to provide sufficient facts regarding Forescout's actual sales or hiring operations during the class period.  Plaintiffs also fail to explain how Forescout's expectation of completing the Advent acquisition was false.  During oral argument, the Court was told that Forescout and Advent ultimately completed an acquisition deal and that Forescout was acquired by Advent.

### c.   Alleged Misstatements about Revenue Projections

Plaintiffs argue that defendants' statements on October 10, 2019, November 6, 2019, and February 6, 2020, stating that Forescout missed revenue projections because of deteriorating macroeconomic conditions in the EMEA, were materially false because (1) artificial deals were included in Forescout's salesforce platform and forecasts and (2) individual defendants "propped up" stock prices to maximize returns from the Advent Acquisition.  CAC ¶¶ 137, 140, 142; Dkt. No. 134 at 13.  However, as previously discussed, the CAC and plaintiffs' CWs fail to specify which

---

[2] The 10-k amendment stated, in relevant part, "Forescout expects the proposed acquisition of Forescout by entities affiliated with Advent . . . to close in the second quarter of 2020." CAC ¶150.

1    deals were artificially listed as "closed" or "committed" and when, during the class period, the deals

2    were artificially closed.  Moreover, the CAC fails to adequately plead how the inclusion of such

3    deals would render Forescout's forecasts false—the CAC lacks details of how defendants develop

4    their revenue projections.

5        Plaintiffs argue that, on May 11, 2020, Forescout falsely blamed COVID-19 for missed

6    revenue projections.  Dkt. No. 134 at 13.  However, plaintiffs fail to demonstrate how Forescout's

7    statements were false.  As stated in the CAC, the World Health Organization declared COVID-19

8    was a global pandemic on March 11, 2020—a declaration made before Forescout's May 11, 2020

9    statement.  CAC ¶ 157.  Plaintiffs also fail to demonstrate how declines in Forescout's earnings or

10   financial performance were not caused by the COVID-19 pandemic.

11

### d.    Channel Stuffing

13       Finally, plaintiffs argue defendants engaged in a channel stuffing scheme by artificially

14   closing deals. Dkt. No. 134 at 22-23.  Plaintiffs assert an anonymous Forescout whistleblower sent

15   Advent a letter alleging Forescout stuffed channels in connection with the Advent Acquisition.  *Id.*

16       "Channel stuffing is the oversupply of distributors in one quarter to artificially inflate sales,

17   which will then drop in the next quarter as the distributors no longer make orders, while they deplete

18   their excess supply."  *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1298 (9th Cir. 1998).  The

19   Ninth Circuit views channel stuffing claims with skepticism because such claims are often

20   "speculation made in hindsight."  *Id.*

21       Plaintiffs fail to establish a channel stuffing claim. Defendants did not admit to artificially

22   listing deals as closed on the pipeline.  *See Yaron v. Intersect ENT, Inc.,* 19-cv-02647-JSW, 2020

23   WL 6750568 at *7 (N.D. Cal. June 19, 2020) (finding channel stuffing claim where defendant

24   "admitted that discounted bulk sales took place over six quarters and that it resulted in inventory

25   build-up worth 2% to 3% of annual sales.").  Moreover, plaintiffs' vague accusations about

26   Forescouts' practices and reference to an anonymous whistleblower fail to establish defendants'

27   alleged method of channel stuffing.  *See City of Dearborn Heights Act 345 Police & Fire Retire.*

28   *System v. Align Tech. Inc., et al.*, 856 F.3d 605, 617-19 (9th Cir. 2017) (finding failure to plead

United States District Court
Northern District of California

channel stuffing claim where there are "no facts establishing that Defendants used the inflated 2010 revenues that resulted from Cadent's channel stuffing to conduct its goodwill impairment testing at the end of 2011, and [failure to plead] the exact assumptions that Defendants used.")

## B.    Loss Causation

Forescout argues the CAC fails to adequately plead loss causation. Dkt. No. 127 at 24. Forescout asserts there was no traceable harm from any alleged misstatement between October 10, 2019 and February 6, 2020. Dkt. No. 127 at 25.   Plaintiffs argue the CAC adequately pleads causation because the CAC includes instances when Forescout's stock price dropped after defendants disclosed a failure to meet revenue projections. Dkt. No. 134 at 43.

"To prove loss causation, [a plaintiff] must demonstrate a causal connection between the deceptive acts that form the basis for the claim of securities fraud and the injury suffered by the [Plaintiffs]." *Ambassador Hotel Co., Ltd. v. Wei–Chuan Inv.*, 189 F.3d 1017, 1027 (9th Cir.1999). At the pleading stage, the plaintiff's task is to allege with particularity facts plausibly suggesting that both showings can be made.  *See Oregon Pub. Emps. Ret. Fund v. Apollo Group, Inc.*, 774 F.3d 598, 605 (9th Cir. 2014) (requiring allegations of loss causation to satisfy Federal Rule of Civil Procedure 9(b)'s heightened "particularity" requirement). However, "when applied to allegations of loss causation . . . Rule 9(b)'s particularity requirement usually adds little to the plaintiff's burden." *In re Bofl Holding, Inc. Sec. Litig.*, 977 F.3d 781, 794 (9th Cir. 2020). "[T]he relevant question for loss causation purposes is whether the market reasonably *perceived* [a defendant's statements] as true and acted upon them accordingly."  *Id.* at 792.

The CAC adequately pleads facts showing that the market acted on defendants' statements. On August 7, 2019, Forescout issued a press release announcing total revenue projections for the 2019 third quarter ranging between $ 98.8 million and $101.87 million.[3]  CAC ¶ 127. On October, 10, 2019, Forescout issued another press release announcing revenue projections for the 2019 third quarter ranging between $ 90.6 million and 91.6 million because of "extended approval cycles which

---

[3] On November 6, 2019, Forescout announced that the total revenue for the third quarter of 2019 was 91.6 million.

United States District Court
Northern District of California

pushed several deals out of the third quarter . . . most pronounced in the EMEA against the backdrop of a challenging macro-economic environment." Dkt. No. 128-12. Forescout's stock declined approximately 37% on heavy trading volume by the end of October 10, 2019. CAC ¶ 137. Similarly, on May 18, 2020, Forescout announced that Forescout's acquisition deal with Advent International was terminated. CAC ¶ 158. After the Advent termination announcement, Forescout's stock dropped approximately 24%. *Id.* The Court finds these subsequent stock drops after Forescout's disclosures of adverse facts to be adequate to plead loss causation. *See In re Bofl Holding*, 977 F.3d at 794 (finding sufficient loss causation where disclosure resulted in stock drop of more than 30% on extremely high trading volume); *Iron Workers Local 580 Joint Funds v. Nvidia Corporation*, 18-cv-7669-HSG, 2020 WL 1244936 at *13 (N.D. Cal. Mar. 16, 2020) (finding sufficient loss causation where partial disclosure resulted in a 4.9% stock drop and later 28%).

### C.    Strong Inference of Scienter

"To adequately plead scienter, the complaint must. . . 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Zucco,* 552 F.3d at 991 (citing 15 U.S.C. § 78u–4(b)(2)). "[T]he inference of scienter must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 324 (2007). The scienter inquiry "is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322–23. In *Zucco*, the Ninth Circuit explained that the scienter inquiry requires "a dual inquiry: first, we will determine whether any of the plaintiff's allegations, standing alone, are sufficient to create a strong inference of scienter; second, if no individual allegations are sufficient, we will conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *Zucco*, 552 F.3d at 992.

Plaintiffs argue that a strong inference of scienter is established by fifteen confidential witnesses ("CW"), defendants' statements, defendant' stock sales, defendants' motives, and a

United States District Court
Northern District of California

temporal proximity between defendants' statements and adverse facts.  Dkt. No. 134 at 27-42.

For the reasons stated below, plaintiffs' allegations, neither individually nor holistically, plead a strong inference of scienter.

### 1. CWs

Court may rely on statements from a CW if (1) the CW is described with sufficient particularity to establish reliability and personal knowledge of the information alleged; and (2) the statements themselves are indicative of scienter.  *Zucco,* 552 F.3d at 995.

Plaintiffs rely on statements from fifteen CWs.  All CWs are former employees of Forescout and worked at Forescout during various times during the Class Period. CAC ¶ 51-75.  The CAC provides the CWs' job titles, including named account managers, regional directors, and senior sales development representatives.  *Id*.

However, individually and collectively, the CWs' statements lack detail to establish either the reliability of CWs' statements or that the statements themselves are indicative of scienter. The CWs' statements reference general time frames, such as "in the beginning of 2019" or "in August 2019," and do not provide specifics or dates of reported activity.  *See Zucco*, 552 F.3d 981 at 997 ("The lack of detail in [CW's] allegations (he claims only that sometime in 2003, 'some expenses not directly related to a program were charged to that program' and that '[employee] time was being changed,' and fails to provide specifics or dates for these activities) further support the conclusion that [CW's] allegations are not reliable enough to support [] allegations of scienter.").

Moreover, as discussed in Section (I)(A)(2), the CWs' statements do not reliably indicate that individual defendants had knowledge of any of the details regarding deals, the pipeline, or sales productivity that the CWs allege.  *See In re Quality Systems,* 865 F.3d at 1145 (finding CWs reliable where their "statements establish the existence of 'funnel reports' and sales forecasts through the Salesforce software that were . . . automatically delivered to the management team" and defendants had "actual access to the disputed information").  None of the CWs reported to individual defendants about their experiences with sales and hiring or personally heard individual defendants speak about sales productivity, the pipeline, or Forescout's deals.  *See Zucco*, 552 F.3d at 996 (finding CWs

13

1    unreliable and lacking personal knowledge where CWs were "simply not positioned to know the

2    information alleged, many report only unreliable hearsay, and others allege conclusory assertions

3    of scienter."); *Robb v. Fitbit,* 216 F.Supp.3d 1017, 1032 (N.D. Cal. 2016) (finding CW statements

4    sufficient to establish scienter where CWs complaints and failures to company's Chief Operations

5    Officer).

6

7                            **2.      Defendants' Statements**

8          Plaintiffs argue defendants' admissions that defendants tracked "the pipeline" and "big

9    deals" support a strong inference of scienter. Dkt. No. 134 at 28; CAC ¶¶ 107, 115.

10         Scienter is "a mental state embracing intent to deceive, manipulate, or defraud" *Matrixx*

11   *Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48 (2011) (citations omitted). As discussed previously,

12   plaintiffs failed to adequately allege how the CWs' reports contradict defendants' statements.

13   Therefore, without additional corroboration showing defendants' statements about the pipeline or

14   big deals were false, defendants' admissions to monitoring the pipeline and big deals are insufficient

15   to plead a strong inference of scienter. *See In re Quality Systems,* 865 F.3d at 1145-46 (finding

16   statements comparable those where "'top executives admit[ted] to having monitored [a] database'

17   of sales data, and 'Plaintiffs ... [made] specific allegations . . . [of] sales data that contradict' those

18   same executives' public statements" as evidence of strong inference of scienter).

19

20                           **3.      Defendants' Stock Sales**

21         Plaintiffs argue defendants' stock sales were suspicious during the class period. *Id*. at 37-41.

22   However, all of defendants' stock sales during the class period were made pursuant to Rule 10b5-1

23   trading plans.  *See Metzler Inv. GMBH v. Corinthian Colleges*, 540 F.3d 1049, 1067 n.11 (9th Cir.

24   2008) ("Sales according to pre-determined plans may rebut [ ] an inference of scienter.'") (internal

25   citations omitted).  Moreover, the CAC fails to adequately plead how defendants' stock sales were

26   "dramatically out of line with prior trading practices at times calculated to maximize the personal

27   benefit from undisclosed inside information." *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001).

28   Defendants' stock sales before and during the class period share similar sales prices and proceeds.

1    CAC ¶¶ 167-68.

2

3                    **4.      Financial Motives**

4          Plaintiffs assert defendants' decision to pursue the Advent Acquisition financially motivated

5    defendants to mislead the public about Forescout's sales pipeline and productivity.  Dkt. No. 134 at

6    36-42.  However, financial motives arising from the potential acquisition are insufficient to establish

7    a strong inference. *Glazer Cap. Mgmt., LP. v. Magistri*, 549 F.3d 736, 748 (9th Cir. 2008) ("We join

8    our sister circuits and hold that evidence of a personal profit motive on the part of officers and

9    directors contemplating a merger is insufficient to raise a strong inference of scienter.")

10

11                   **5.      Temporal Proximity**

12         Plaintiffs argue that the temporal proximity between Advent's May 8, 2020 statement that

13   that Advent was considering terminating the Advent acquisition and defendants' May 11, 2020

14   statement that Forescout looked forward to completing the Advent Acquisition support a strong

15   inference of scienter.  Dkt. No. 134 at 36.  However, the CAC fails to provide sufficient facts

16   showing that Advent gave a statement on May 8, 2020.[4]  Moreover, disclosures alone do not

17   establish a strong inference of scienter. *Yourish v. Cal. Amplifier*, 191 F.3d 983, 997 (9th Cir. 1999)

18   (explaining that "temporal proximity of an allegedly fraudulent statement or omission and a later

19   disclosure" is insufficient on its own to establish scienter and can only "bolster" an inference based

20   on other allegations).

21         Accordingly, when considering plaintiffs' scienter factors individually and holistically, the

22   Court finds that the CAC fails to adequately plead a strong inference of scienter.  The CAC fails to

23   adequately plead that defendants had actual knowledge of falsity in their alleged misstatements at

24   the time when the alleged misstatements were made during the class period.  For this additional

25

26         [4] The CAC states that Advent gave this statement during a "Delaware Proceeding."  CAC
27   ¶ 156.  When describing the Delaware Proceeding, the CAC simply mentions "filings made in
     *Forescout Technologies, Inc. v. Ferrari Holdings, L.P.*, C.A. No. 2020-0385-SG (Del. Ch.)" CAC at 1.
     Notably, plaintiffs failed to provide the relevant filings to the Court and the CAC fails to state which
28   filings are relevant to plaintiffs' claims and the actual contents of those filings.

United States District Court
Northern District of California

reason, the Court **GRANTS** defendants' motion to dismiss, with leave to amend.

**II.     Section 20a of the Exchange Act   Any ae**

Individual defendants move to dismiss plaintiffs' claims under Section 20(a) of the Securities Exchange Act because the CAC failed to adequately plead a violation of Section 10(b) of the Securities Exchange Act.  Dkt. No. 129 at 22.

For the reasons stated above, the Court finds plaintiffs failed to adequately plead a violation of 10(b) of the Securities Exchange Act. For this additional reason, the Court **GRANTS** defendants' motion to dismiss, with leave to amend.

## CONCLUSION

Accordingly, the Court **GRANTS** defendant Forescout's and individual defendants' motions to dismiss and **GRANTS** plaintiffs with leave to amend.

**IT IS SO ORDERED**.

Dated: March 25, 2021

_____
SUSAN ILLSTON
United States District Judge

United States District Court
Northern District of California