1

**ABRAHAM, FRUCHTER**
2      **& TWERSKY, LLP**
Takeo A. Kellar (SBN 234470)
3    11622 El Camino Real, Suite 100
San Diego, CA 92130
4    Telephone: (858) 764-2580
Email: TKellar@aftlaw.com
5
**POMERANTZ LLP**
6    Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
7    Los Angeles, California 90024
Telephone: (310) 405-7190
8    E-mail: jpafiti@pomlaw.com
9
*Lead Counsel for Plaintiffs*
10
*[Additional Counsel on Signature Page]*
11

12                          **UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
13                            **SAN FRANCISCO DIVISION**

14  | CHRISTOPHER L. SAYCE, Individually and on ) | CASE NO.: 20-CV-00076-SI |
15  | Behalf of All Others Similarly Situated, ) | |
|                                             ) | **CLASS ACTION** |
16  |                        Plaintiff,           ) | |
|                                             ) | Hon. SUSAN ILLSTON |
17  |           v.                                ) | |
|                                             ) | **SECOND CONSOLIDATED** |
18  | FORESCOUT TECHNOLOGIES, INC., *et. al.*    ) | **AMENDED COMPLAINT FOR** |
|                                             ) | **VIOLATIONS OF THE** |
19  |                        Defendants.          ) | **SECURITIES LAWS** |
|                                             ) | |
20  |_____) | **JURY TRIAL DEMANDED** |

21

22

23

24

25

26

27

28

1

# **<u>TABLE OF CONTENTS</u>**

2

INTRODUCTION.............................................................................................................1

3

JURISDICTION AND VENUE........................................................................................6

4

PARTIES...........................................................................................................................7

5

SUBSTANTIVE ALLEGATIONS ...................................................................................8

6

    A.    The Company and its Product Offerings ...............................................8

7

    B.    Defendants Knew That the Market Was Shifting with Forescout Being Left

8

        Behind .....................................................................................................9

9

    C.    Defendants Know that the Revenue Guidance Provided to Investors Is
Based on Faulty Assumptions ...............................................................18

10

    D.    Defendants Act to Sell the Company Before Revenue Comparisons Turn
Negative ................................................................................................22

11

12

    E.    Advent Agrees to Acquire Forescout for $33.00 Per Share Which Promises
to Enrich DeCesare and Harms .............................................................23

13

    F.    Advent Expresses Concern About Proceeding With, and Then Refuses to
Close on, the Original Merger Agreement .............................................24

14

    G.    Facts Revealed in SEC Filings and the Delaware Litigation Establish the
Falsity of Defendants' Earlier Statements .............................................26

15

16

    H.    Materially False or Misleading Statements ...........................................28

17

        1.    The February 7, 2019 Press Release and Form 8-K....................29

18

        2.    March 4, 2019 Investor Day...................................................31

19

        3.    May 9, 2019 Press Release and Earnings Conference Call........33

20

        4.    The August 7, 2019 Press Release and Earnings Conference Call
and the Related Investor Conference ........................................42

21

        5.    The October 10, 2019 Press Release .........................................43

22

        6.    The November 6, 2019 Press Release and Earnings Conference Call......44

23

        7.    The February 6, 2020 Form 8-K ...............................................46

24

        8.    The 2019 Form 10-K Filed on February 28, 2020 ...................49

25

        9.    The Proxy Statement Filed on March 24, 2020 .......................50

26

        10.    The April 23, 2020 Extraordinary Shareholders' Meeting.......53

27

        11.    The April 23, 2020 Press Release .............................................54

28

        12.    The Form 10-K/A Filed April 29, 2020 ...................................54

13.     The May 11, 2020 Press Release ...........................................................55

LEAD PLAINTIFFS' CLASS ACTION ALLEGATIONS ........................................................57

COUNT I: (AGAINST DEFENDANTS FORESCOUT, DECESARE AND HARMS FOR
        VIOLATIONS OF SECTION 10(B) AND RULE 10B-5)................................................59

COUNT II: (AGAINST DEFENDANTS DECESARE AND HARMS FOR VIOLATIONS
        OF SECTION 20(A) OF THE EXCHANGE ACT) ........................................................61

PRAYER FOR RELIEF..........................................................................................................62

DEMAND FOR TRIAL BY JURY .........................................................................................63

Lead Plaintiffs Glazer Capital Management, L.P., Glazer Enhanced Fund L.P., Glazer Enhanced Offshore Fund, Ltd., Glazer Offshore Fund, Ltd. and Highmark Limited, in respect of its Segregated Account Highmark Multi-Strategy 2 (hereinafter collectively referred to as the "Glazer Funds") and Meitav Tachlit Mutual Funds Ltd. ("Meitav" and together with the Glazer Funds referred to herein as "Lead Plaintiffs" or "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their Second Consolidated Amended Complaint (the "Complaint") against Defendants (defined below), allege the following based upon personal knowledge as to those allegations concerning Lead Plaintiffs and, as to all other matters, the investigation conducted by and through their attorneys, including, among other things, a review of Defendants' public statements and filings made with the U.S. Securities and Exchange Commission (the "SEC"), filings made in *Forescout Technologies, Inc. v. Ferrari Holdings, L.P.*, C.A. No. 2020-0385-SG (Del. Ch.) (the "Delaware Litigation"), wire and press releases either issued by or regarding Forescout Technologies Inc. ("Forescout" or the "Company"), analysts' reports, information obtained from interviews with knowledgeable former employees of the Company and an expert on the cybersecurity industry and cloud computing, and other information obtainable on the Internet.  Lead Plaintiffs believe that substantial evidentiary support exists for the allegations set forth herein after a reasonable opportunity for discovery.

## **INTRODUCTION**

1.      Forescout specializes in providing network security from malware and potential infiltrators for large computer networks.  The Company became publicly traded through an initial public offering ("IPO" or the "Offering") in October 2017 reporting growth averaging more than 30% a year in revenues for the fiscal years prior to the Offering.  This steady growth continued in fiscal year ("FY") 2018 with a reported 32% increase in reported revenues.

2.      However, as the Company entered 2019, it was encountering increased competition from other industry players especially because Forescout's products were not as well suited to providing security for the increasing trends towards cloud delivered cybersecurity solutions and remote working.  Nonetheless, Defendants provided revenue guidance to investors of 24% annual growth in revenue for FY 2019.

3.     This was the first public guidance issued by Forescout since its IPO but was untethered to the Company's prospects as demonstrated by input received in 2018 from Force Management LLC ("Force Management"), a consulting firm Forescout retained to add structure and discipline to Forescout's sales process.  The related analysis of that information in early 2019 by a highly placed employee at Forescout who is serving as a confidential witness ("CW"),[1] states that a majority of Forescout's deals in the sales pipeline had only a 50% chance of closing yet Forescout identified the deals as "committed" in its sales pipeline.  Forescout considered implementing the model proposed by Force Management in early 2019, but quickly abandoned that model before revenue guidance for FY 2019 was given.

4.     On May 9, 2019, Defendants then preannounced a lowered guidance range for the second quarter ("Q2") of FY 2019 with revenues of $75.3 million and $78.3 million, representing year-over-year growth of 14% at the midpoint, but conditioned investors for a soft landing about the impending deterioration in Forescout's business.  Defendants claimed that the Company would still meet its revenue guidance for FY 2019 because the Company had already been awarded business despite some deals simply having "slipped" to close later in the year.  Analysts, as surrogates for the market, repeatedly questioned Defendants about the basis for increasing the guidance despite the "slipped" deals, and Defendants repeatedly made concrete and material misrepresentations in response to analysts' inquiries by stating that Forescout had "tech wins" with firm commitments from customers and a "ramped up" sales force with two or more years of experience that generated far more deals and revenue than inexperienced employees, both of which provided early "visibility" into the sales pipeline for the rest of the year.

5.     The reality was far grimmer as, in truth and in fact, the Company did *not* have "tech wins," something which was recognized internally by Forescout soon after beginning the first in a series of exoduses and layoffs of sales representatives in the beginning of 2019, who were critical to driving the Company's growth in revenues.  Ultimately, the Company admitted in an Annual

---

[1] CWs are identified with unique numbers taking the form "CW#" herein.

SECOND CONSOLIDATED AMENDED
COMPLAINT
CASE NO.: 20-CV-00076-SI

-2-

Report filed on Form 10-K for FY 2019 that sales productivity declined from 50% to 38% in 2019, wiping out all the gains from 2018.

6.      In an effort to avoid disclosing these adverse facts, beginning in February 2019, senior executives, including DeCesare and Forescout Chief Revenue Officer Steve Redman ("Redman") pressured sales representative to categorize deals as "committed" even though buyers had, in fact, not yet made any such commitment to make a purchase.  Multiple CWs with personal knowledge about the deals confirm the existence of this widespread pressure campaign to miscategorize seven figure deals that even spread to a new company acquired by Forescout formerly known as SecurityMatters.  Towards the end of the Class Period (defined below in ¶158), CW19 states that he heard the Vice President of Americas at Forescout instruct sales representatives to report deals as "committed" based only on a single, preliminary conversation with a senior executive of the customer, again showing the pressure campaign was not restricted to immaterial one-offs but was, in fact, a companywide policy.

7.      DeCesare, according to CW20, was provided with updates on a granular level about the status of all deals over $500,000 on a weekly basis as the quarter progressed, including the status of negotiations with customers and the remaining steps required to close deals.  In addition, multiple CWs also confirm that DeCesare, Redman and other senior executives used Clari, a software that provides information about the status of sales representatives, the sales pipeline, and forecasts with real-time accuracy to monitor deals and sales representatives during the Class Period.  CW18 further confirms that DeCesare himself acted as the chief sales representative for large transactions, and thus DeCesare knew that Forescout had not been awarded the business for numerous seven figure deals.

8.      On October 10, 2019, Forescout yet again announced poor financial results for the third fiscal quarter ("Q3") of 2019 that missed even the low end of the revenue guidance by over $7 million.  Still, Defendants again failed to come clean with investors, and falsely claimed that the sales pipeline "continued to grow," and deals had merely slipped again because of extended approval cycles due to poor economic conditions outside the United States.  However, in making those misrepresentations, Defendants again failed to disclose the rapid deterioration in sales productivity

1   at the time caused by terminations and voluntary departures of sales representatives or the failure to

2   secure "tech wins" given CW18's statement that one out of every three seven figure deals in

3   Forescout's global sales pipeline was illusory.

4           9.      In October 2019, the Company decided to put itself up for sale by hiring Morgan

5   Stanley & Co. LLC ("Morgan Stanley") to shop it to both strategic and financial purchasers.  The

6   storyline put forward by the Company for deciding to put itself up for sale was that the shift from

7   the sale of product licenses to subscription-based services was causing some disruption in reported

8   revenues, making it more suitable for the Company to be privately held as it had been for more than

9   15 years prior to the IPO.

10          10.     However, there were certain revenue goals the Company needed to meet to make it

11  an attractive acquisition candidate including a relatively soft landing in terms of revenue growth

12  before Forescout's new subscription-based revenue model started generating a new period of steady

13  growth.  The Company produced these by showing moderately lower growth in revenue from prior

14  year results for the fourth fiscal quarter ("Q4") of FY 2019 and providing projections to potential

15  acquirers reflecting 14% growth in revenue for FY 2020 with steady annual revenue growth of

16  approximately 15% after that time.

17          11.     Once again, the reality was far worse as Forescout had, in fact, front-loaded millions

18  of dollars of sales into Q4 2019 results through millions of dollars of sales to Merlin International,

19  Inc. ("Merlin"), one of its key third-party partners, to cover up even worse results.  In addition, the

20  FY 2020 revenue projections Forescout provided to potential acquirers lacked any reasonable basis

21  and were materially higher than internal guidance prepared as part of illustrative guidance (the

22  "Illustrative Guidance") it was planning to provide to public investors if an acquisition had not

23  materialized.

24          12.     On February 6, 2020, the same day that Forescout released its Q4 2019 results, it also

25  announced that Advent International, Inc. ("Advent"), a private equity firm, had entered into a

26  merger agreement (the "Original Merger Agreement") to acquire Forescout for $33.00 per share

27  (the "Planned Acquisition").

28

13.     However, Advent soon learned through the Company's SEC proxy disclosures that the FY 2020 revenue projections it had been provided with were inconsistent and materially higher than the Illustrative Guidance and that the Company had been laying off and otherwise losing experienced sales representatives necessary to drive Forescout's revenue growth.  The Company, after stonewalling Advent's request for additional information, failed to meet even the lower revenue projection of $62 million in revenue for Q1 2020, instead reporting $57.2 million in revenue representing a 24% *decline* from Q1 2019 revenue, an amount which it only received through selling millions of dollars of hardware below cost, *i.e.*, *at a loss*, in a desperate effort to even come close to the Q1 2020 Illustrative Guidance.  Advent then learned from a corporate whistleblower that the Company had front-loaded millions of dollars of sales in Q4 2019 through Merlin, with the whistleblower's version of events confirmed by other unusual facts reported by the Company, including an implosion in Q1 2020 revenue and Forescout's auditor openly questioning the Company's revenue recognition practices during 2019.

14.     Defendants persisted in deceiving Plaintiffs and other investors concerning key facts relating to the Company's operations and whether Advent would close on the Original Merger Agreement in May 2020, despite internally acknowledging that Advent would not voluntarily do so especially after direct communication from Advent both on April 20, 2020 and May 8, 2020 reflecting that it was unlikely that Advent would voluntarily proceed with the Planned Acquisition. This was part of what Advent characterized as Defendants' litigation strategy to act as if everything was perfectly normal in order to prevent Advent from being able to back out of the Original Merger Agreement and to enforce the Original Merger Agreement through litigation.  At the very same time, however, a strategic committee (the "Strategic Committee") of the Company's Board of Directors (the "Board") met regularly to discuss, among other things, Forescout's options should Advent not proceed with consummating the Planned Acquisition as correspondence between Defendants and Advent became increasingly contentious.

15.     On May 15, 2020, Advent put Defendants' strategy of forcing through the Original Merger Agreement to a test when Advent sent a letter (the "Termination Letter") elaborating on and reiterating a prior oral conversation occurring no later than May 8, 2020 and explaining why it was

refusing to proceed with the Planned Acquisition.  On Monday, May 18, 2020, Forescout's stock price imploded, declining to under $20.00 per share over the next three trading days, when it was forced to disclose these facts.

16.     Defendants, consistent with their prior strategy, filed a sixty page Verified Complaint (the "Delaware Complaint") on May 19, 2020 in the Delaware Court of Chancery seeking, among other things, injunctive relief requiring Advent to proceed with the Planned Acquisition.  This was followed by Advent answering the Delaware Complaint and asserting a counterclaim (the "Answer and Counterclaim") which was followed by Forescout answering Advent's counterclaim (the "Counterclaim Answer"), and then two months of expedited litigation.

17.     The Delaware Litigation was ultimately resolved by Forescout and Advent, on July 15, 2020, entering into an Amended and Restated Agreement and Plan of Merger (the "Amended Merger Agreement") providing for Advent saving $300 million by acquiring Forescout for $29.00 per share through a tender offer made on July 20, 2020 on Schedule TO and a concurrent Solicitation/Recommendation Statement made on Schedule 14D-9 (the "Tender Offer Recommendation").

## JURISDICTION AND VENUE

18.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

19.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

20.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) given that a significant portion of the Defendants' misconduct took place within this District.  Forescout is a corporation with its principal place of business in San Jose, California, and the Individual Defendants reside in or around the San Francisco Bay Area.

21.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

including but not limited to, the United States mail, interstate telephone communications and the facilities of a national securities exchange.

**PARTIES**

22.     Lead Plaintiffs purchased Forescout common stock during the Class Period and suffered damages as a result of the federal securities laws violations alleged herein.

23.     Defendant Forescout is a Delaware corporation with its principal executive offices located at 190 West Tasman Drive, San Jose, CA 95134.  Forescout's shares traded on the NASDAQ Global Select Market under the ticker symbol "FSCT" until the Acquisition was completed.

24.     Defendant Michael DeCesare ("DeCesare") was, at all relevant times, Forescout's President, CEO and a member of the Company's Board of Directors.  In connection with the Planned Acquisition, DeCesare stood to receive $33.5 million for restricted stock units ("RSUs") and performance-based restricted stock units ("PSUs"), and a golden parachute worth $10.8 million.  The $44.3 million DeCesare stood to gain from the Planned Acquisition was over six times his 2019 total compensation of $7,361,857.  *See* 2019 Form 10K/A at p. 25.  In addition, DeCesare received over $8.2 million from selling 228,382 shares of Forescout common stock during the Class Period compared to only $1.836 million from 60,621 shares disposed in the fifteen months prior to the Class Period, excluding shares sold to cover taxes and 200,000 shares sold at $29.00 in Forescout's March 2018 secondary public offering (the "SPO").

25.     Defendant Christopher Harms ("Harms") was, at all relevant times, Forescout's CFO with responsibilities to lead the Company's finances, administration and supply chain management.  In connection with the Planned Acquisition, Harms stood to receive $8.95 million for RSUs and PSUs and a golden parachute worth $5.185 million. The $14.135 million Harms stood to gain from the Planned Acquisition was over four times his 2019 total compensation of $3,378,044 for 2019.  *See id.*  Further, Harms received nearly $3.8 million from selling 109,865 shares during the Class Period compared to only $1.557 million from 64,808 shares disposed in the fifteen months prior to the Class Period, excluding shares sold to cover taxes and 46,169 shares sold for $29.00 per share in the SPO.

26.     Defendants DeCesare and Harms are sometimes referred to in this Complaint as the "Individual Defendants" and together with Forescout as "Defendants."

**SUBSTANTIVE ALLEGATIONS**

**A.     The Company and its Product Offerings**

27.     Forescout developed proprietary agentless technology that discovers and classifies IP-based devices in real time as they connect to a customer's physical network and then continuously monitors and assesses the security posture of such IP-based devices.  The Company historically generated revenue from sales of its products and associated maintenance and professional services including: ForeScout CounterACT, ForeScout Enterprise Manager, and ForeScout Extended Modules.  Forescout's CounterACT and Enterprise Manager products were generally sold as physical hardware appliances with its software pre-installed.

28.     In 2017, the Company also started offering, in limited quantities to a small number of large enterprises, CounterACT and Enterprise Manager together as a software-only license.  The Company's Extended Modules were sold as software add-ons to the CounterACT and Enterprise Manager products.  All of Forescout's products were sold with a perpetual license.  End-customers typically purchased maintenance and professional services contracts with a one-year or three-year term when they purchased Forescout's products.

29.     Although the Company's software solutions had been available for many years, sales began to rapidly accelerate in 2017 because an increasing number and variety of IP-based devices, which are not manageable by IT departments, began entering and connecting to enterprise networks every day.  Specifically, corporate-managed devices became a smaller percentage of the total device population as bring your own device to work ("BYOD") and the Internet of Things ("IoT") became a larger percentage of the total device population connecting to networks.  As a result, the agent-based approach to device discovery no longer provided adequate security for many companies as IT departments were unable to force users to install agents on BYOD devices and many IoT devices did not have the ability to install agents.

30.     The lack of security from BYOD and IoT devices created vulnerabilities and caused more cyberattacks to enter organizations by leveraging gaps in network visibility and vendor silos

as the significant increase in undetected and unmanaged devices on a network increased the surface area of attack for enterprises with cybercriminals targeting less secure devices with the same access levels as enterprise-managed devices (*i.e.*, desktops and corporate laptops).

31.     The security innovation of Forescout's product offerings led to rapid revenue growth with sales growing from a reported $71,113,000 in FY 2014, to $125,959,000, or by more than 77% in FY 2015 and to $166,841,000, or by more than 32% in FY 2016.  The Company became publicly traded in an October 2017 IPO.  For FY 2017, the Company reported that revenue had grown by more than another 32% to $220,871,000.  The Company continued its strong growth in FY 2018 reporting that revenue once again had increased by more than 32% to $297,651,000.

**B.     Defendants Knew That the Market Was Shifting with Forescout Being Left Behind**

32.     Plaintiffs consulted with David Linthicum, an internationally recognized expert on cloud computing, edge computing, application integration, enterprise architecture, service-oriented architecture, electronic commerce, and business-to-business systems.  Mr. Linthicum was named one of the top nine Cloud Pioneers in Information Week, the #1 cloud influencer by Apollo Research, and is typically listed as a top ten cloud influencer, podcaster and blogger by various publications.  He has previously served as the Chief Technology Officer of numerous public and private companies, published more than 7,000 articles and has been quoted in major publications, including *Forbes*, *Business Week*, *The Wall Street Journal* and the *LA Times*.

33.     Mr. Linthicum agrees that the cybersecurity market began to shift dramatically towards the cloud between 2018 and 2020, but, based on his research and examination of Forescout's suite of product offerings during the Class Period, concludes that Forescout focused on enterprise security based on devices connected to local networks that did not provide value for the emerging cloud computing marketplace, which is dependent on processes and management of data outside the corporate firewall on public clouds.

34.     Mr. Linthicum notes further that Forescout's products were not positioned for private clouds.  Given the dramatic shift from enterprise-based information technology to public clouds hosted by Amazon, Google and Microsoft between 2018 and 2020, Mr. Linthicum states that the market increasingly sought cloud-based cybersecurity products that Forescout could not provide.

While most technology platforms began to dramatically shift from the enterprise to the public clouds and Forescout's competitors quickly adjusted to cloud-based cybersecurity solutions, Mr. Linthicum observes that Forescout continued to offer legacy technology between 2018 and 2020 that was not competitive with the offerings of its peers.

35.     This is evidenced by DeCesare telling investors on November 6, 2019, that the Company did not expect to launch its core cloud-based product until late 2020.  Instead, Forescout only launched a secondary cloud offering with cloud enabled features known as eyeSegment on November 6, 2019, but revenue from this product was immaterial in its financial statements with cloud-based sales of only $22,000 in 2019, $122,000 in the first quarter of 2020, and $167,000 in the second quarter of 2020.

36.     Mr. Linthicum's analysis of the state of the Company's business as it entered 2019 is confirmed by CW8, a Named Account Manager ("NAM") in Forescout's Commercial division between February 2016 and October 2019, who states that sales began to substantially decrease in 2019, and the rate of closed deals dramatically shrunk because customers believed that Forescout's competitors offered a better product than Forescout at a lower price.  Due to the decreased sales, CW8 was able to hit only 25% of CW8's $3 million quota for the year before CW8 left the Company in October 2019.  The Company's product offerings are ideally suited for situations when the employees are all in one location and connecting to a physical network in that fashion but Forescout's products were substantially less effective for use in cloud computing or remote working situations.  Several former Forescout employees identified this specific problem, including:

A.     CW1, a former Senior Sales Development Representative ("SDR") who worked at Forescout from June 2018 to May 2019, who was responsible for reaching out to new or existing customers to inquire about the customers' interest in purchasing Forescout's products, and also set up meetings between the customers and a Forescout NAM, stated that in the beginning of 2019, SDRs had serious difficulty in meeting their quotas for potential pipeline opportunities because of intense competition and a lack of customer interest in Forescout's products.  CW1 recalled that most SDRs were able to only meet 50% of their targets in the beginning of 2019.

B.     CW2, a former SDR at Forescout from June 2016 to June 2019, corroborates CW1's account.  According to CW2, Forescout's products had become difficult to sell, causing experienced sales employees to resign from Forescout.

C.     CW3, Forescout's former Director of Americas – Business Values & Strategic Sales between July 2018 and February 2020, confirms that the Company struggled to sell its products in 2019 because customers encountered difficulties with understanding their value. CW3 also corroborated CW1's statement that Forescout was outcompeted by larger cybersecurity firms, which offered similar products at a lower price.

D.     CW4, a Forescout SDR from January 2018 to January 2019 and a Forescout Inside Sales Representative from January 2019 to March 2019, corroborated both CW1's and CW3's statements that customers preferred larger and well-established vendors like Cisco Systems, Inc., over Forescout.

E.     CW17, a Strategic Account Manager ("SAM") at Forescout from April 2019 to February 2021, who sold Forescout's products to large enterprises in Houston, Austin and San Antonio, confirms the accounts of numerous other CWs and states that some sales employees voluntarily left the Company because Forescout's products were outdated, making sales to new customers he encountered extremely difficult with the close rate for new logos being no more than 10%.

37.     These operating problems did not immediately manifest themselves in the Company's reported operating results because of Forescout's relatively lengthy sales cycle and because existing customers were largely committed to Forescout's product platform.  According to the Company's public filings made with the SEC, Forescout had a sales cycle of between nine and twenty-four months for sales to new customers and between three and twelve months for sales to existing customers.  Thus, even though the Company started reporting sales shortfalls in May 2019, the underlying problems in the sales process manifested themselves months earlier.

38.     Thus, according to CW12, a former Senior Business Operations Manager at Forescout from the beginning of 2018 through the beginning of 2020, deals previously identified as "committed" in the sales pipeline began evaporating in 2019.  This caused many experienced sales

personnel to leave the Company voluntarily.  Several former Forescout employees identified this specific problem, including:

        A.    CW1 recalled that, as a result of competition in early 2019, more than a dozen SDRs left the Company in the beginning of 2019.  CW1 confirms that the entire inside sales team was, in fact, dissolved in the spring of 2019, and a steady stream of sales employees from the division began to resign as a result.  CW1 stated that at least twenty-five sales employees located in San Jose left the Company within the first few months of 2019.

        B.    CW2 confirms that the Company was unable to close deals in 2019 and, as a result, a significant number of sales employees began to depart the Company in the first half of 2019.  CW2 asserts that employees at all levels from SDRs to NAMs to Regional Managers began to depart in the first half of 2019.

39.    In addition, the Company began eliminating sales representatives, which was particularly important because the Company informed investors that its sales representatives' productivity is directly tied to the duration of their tenure, with a 100% increase in productivity after the second year at Forescout, and 50% higher than second-year productivity in the third year at Forescout.  Indeed, the Company reported that, as of December 31, 2018, 50% of its sales representatives had been with the Company for more than two years, compared to 35% as of December 31, 2017. *See, e.g.*, 2018 Form 10-K at p. 11.

40.    These voluntary and involuntary departures throughout 2019 caused a precipitous decline in the number of productive employees through the end of 2019 demonstrating and exacerbating the Company's inability to successfully sell its relatively outdated product offerings to larger government entities and financial companies.  Several former Forescout employees identified this specific problem:

        A.    CW6, the Company's former Director of Accounting from February 2019 to September 2019, stated that Forescout instituted a hiring freeze in the third quarter of 2019 in an attempt to increase its cash flow and blunt the impact of poor financial results.

        B.    CW7, a NAM at Forescout between June 2018 and September 2019 who worked in the State, Local and Educational ("SLED") section of the Public Sector division with

responsibility for the upper Midwest region, asserts that the Company laid off a significant number of sales representatives in its Commercial division in February 2019.  CW7 further states that the entire SLED section was eliminated in the third quarter of 2019, including high level executives like the Regional Director of SLED.

C.      CW19, a former Strategic Enterprise Account Executive ("SEAE") at Forescout from September 2019 to June 2020, confirms that the entire SLED section of the Public Sector division was eliminated in September 2019.  CW19 further confirms that Forescout conducted layoffs in waves with cuts made in September 2019 and further cuts made in 2020, including in June 2020.

D.      CW8 states that Forescout laid off a significant number of sales representatives dedicated to the healthcare and financial services industry in August 2019.  CW8 also stated that Forescout eliminated several employees who assisted with sales and marketing at that time.

E.      CW16, a Channel Account Manager ("CAM") at Forescout from December 2015 to February 2020, who provided support for sales efforts in New England, New York City and Canada, recalls that there were numerous hiring freezes at the Company during CW16's tenure, and a significant hiring freeze in 2019.  According to CW16, Forescout initiated major layoffs in the summer of 2019 in an attempt to "get leaner" in anticipation of a planned sale of the Company, demonstrating that Forescout formed the intent to seek buyers and go private long before it hired financial advisors in anticipation of the Merger in October 2019.

F.      CW17 confirms that Forescout conducted five rounds of layoffs between April 2019 and February 2021 and that major cuts in the sales force took place in the summer of 2019.  CW17 further states that another significant round of layoffs took place in January 2020, and the layoffs occurred at a quicker pace in anticipation of a planned acquisition of the Company.

G.      CW18, a former senior executive at Forescout who served as the Global Talent and Enablement Manager ("GTEM") at the Company from June 2018 to December 2020 and trained and supervised NAMs and other sales representatives, stated that, in June 2018, Forescout had 400 employees in its sales organization, including 200 sales representatives.  By the end of 2019

and the beginning of 2020, CW18 stated that the total sales force had shrunk to 300 employees. According to CW18, Forescout's long sales cycle required sales representatives to spend years working at the Company to be able to close deals.  However, between 2019 and 2020, CW18 recalls that Forescout replaced 100 experienced sales representatives with inexperienced ones who were unable to close deals given the lengthy sales cycle.  In 2019 alone, CW18 states that Forescout fired or otherwise lost through voluntary departures between twenty-five and thirty "ramped up" NAMs. According to CW18, the NAMs were let go or left on their own as soon as they had been "ramped up," and replaced with NAMs who did not have two years of experience.  CW18 asserts further that in late 2019 or early 2020, Forescout laid off another 30% of its sales force or about one hundred sales representatives, including the entire team of sixty SDRs and Business Development Representatives ("BDRs").  At a sales kick off meeting held a week or so after these additional cuts, CW18 heard DeCesare state that Forescout reduced its sales force in 2019 and additional cuts needed to be made in early 2020 because the Company had failed to grow revenues in 2019.

H.      CW17 also identified similar layoffs having taken place during the summer in 2019, a fact which is confirmed by CW16, a former CAM at Forescout.  CW8, a NAM in Forescout's Commercial Division, fixes that date as being in August 2019.  This appears to include, according to CW19, a former SEAE, the Company's elimination of the entire SLED sales team in or about September 2019.  The elimination of the entire SLED team is confirmed by CW7, who worked for the SLED team.

41.      These reductions in experienced sales staff were material and demonstrated the Company's lack of success in attracting new customers because, as Forescout recognized in its public filings, experienced sales representatives were a key driver of growth at the Company.  2018 Form 10-K at pp. 7 and 11.  Similarly, DeCesare, on a May 2019 earnings conference call, publicly tied the amount of time a NAM had been at Forescout to the visibility of the Company's pipeline (*i.e.*, the longer a sales representative was at Forescout, the greater the likelihood that the sales representative would generate more deals and greater revenue).

42.      The existence of these 2019 sales representative layoffs was not separately disclosed by the Company.  However, a careful reading of the Company's Form 10-K for FY 2019, filed with

the SEC on February 28, 2020, reflects an otherwise unexplained decline in the Company's experienced salesforce with only 38% of sales representatives having been with the Company for more than two years, down from 50% the prior year.  *See* Form 2019 Form 10-K at p. 11.

43.     DeCesare, Redman and other C-suite executives used a Salesforce revenue operations platform add-on called Clari, which utilized artificial intelligence and machine learning algorithms to find patterns, identify risks and make forward-looking predictions.   These tools provided DeCesare, Redman and other C-suite executives with "surface predictive insights so [the Company] ***always knows what's going on with [its] reps, deals, pipeline and forecast in purpose-built applications.***"   *See* https://www.clari.com/why-change/ (emphasis added).   These machine learning tools further provided DeCesare, Redman and other C-suite executives with: "a company-wide forecasting workflow that continuously rolls up across teams, product lines, geographies and market segments.  ***Your forecast is always up-to the-minute and accurate—whether you have five sales reps or 5,000.***"  *Id.* (emphasis added).  DeCesare, Redman and other C-suite executives further used Clari to "know when [they] were short on pipeline, see which deals are at risk, predict outcome early in the quarter, spot churn risk before its too late, track sales and buyer activities, and manage forecast calls, 1:1 and QBRs."  *Id.*

44.     Defendants admitted that they had made use of all the available internal reporting tools at Forescout regarding the sales pipeline and the status of potential deals.  Thus, on Forescout's May 9, 2019, earnings conference call, Defendant DeCesare told an analyst from Berenberg that "sales execution is certainly – or sales ramping and productivity is always one of those areas that both [Harms] and I spend a lot of time on."  Similarly, on Forescout's August 7, 2019 earnings conference call, Defendant Harms told a UBS analyst that he and DeCesare analyzed and "probe[d]" the sales pipeline, spent time in the field "asking the additional question as it relates to customers['] buying preferences," and "all of that is baked into how we are guiding for the full year."

45.     Several former employees of the Company confirm that DeCesare and Harms had real-time access to, and knowledge of, the deteriorating sales pipeline and the rapid decline in sales productivity:

A.    CW10, a NAM at Forescout from January 2017 to July 2019, stated that sales pipeline reports generated on the Salesforce platform were compiled regularly and delivered to Redman, who DeCesare identified as the key high-level executive with responsibility over global sales and revenues during the Class Period.   CW10 further explained that Brian Gumbel ("Gumbel"), Forescout's head of worldwide sales, received automatic alerts regarding the details of any potential deal worth $1 million or more that was entered as a potential opportunity in the Salesforce platform.

B.    CW7 was told by CW14, the Regional Director of the SLED section until December 2019, and other senior managers that the purpose of updating the status of major opportunities in the pipeline on the Salesforce platform was because Gumbel *and* DeCesare both reviewed the data on the Salesforce platform, and then asked CW7 specific questions about specific deals.

C.    CW8 states that CW8 participated in monthly conference calls with Niels Jensen ("Jensen"), Forescout's Senior Vice President of Sales for the Americas, and Redman to discuss the details of the Company's sales pipeline, including forecasts and the status of specific deals.   CW8's immediate supervisor, the Regional Sales Director of the Commercial Division, relayed questions from Defendant DeCesare regarding large deals in CW8's sales pipeline.   CW8 stated that DeCesare specifically inquired about the technology fit, budget, timeline, and competitive pressure regarding all deals that were over a $1 million.   CW8 said that this was par for the course as DeCesare was an extreme micromanager.

D.    CW16 states that Defendant DeCesare held quarterly internal business review calls where he provided updates on the sales pipeline, including "tech wins."   During these quarterly review calls, which were attended by the Company's sales employees, including CW16, DeCesare discussed "tech wins" as cases that could be utilized to pitch other deals to customers.

E.    According to CW17, Forescout's most senior executives, including DeCesare and Redman, used Clari to monitor sales deals and the Company's forecasts.   CW17 states that Clari provided a more visual and easy-to-read view of sales data.   This testimony is confirmed by the

1   reference to a sales pipeline predictor tool in the Delaware Litigation.  *See* Counterclaim Answer

2   ¶26.

3      F. CW18 states that DeCesare was heavily involved in managing larger clients

4   and acted as the sales representative himself for any multi-million-dollar deal.  According to CW18,

5   it was common knowledge at the Company that DeCesare would get together with clients in face-

6   to-face meetings, pitch Forescout's products to them and participate in all calls in an effort to

7   micromanage the process.  According to CW18, "the rep would still be there, but Mike would lead

8   the show because Mike started his career as a salesperson, and he liked being part of deals."

9      G. CW18 corroborates the account of CW17 that DeCesare, Redman and other

10  senior executives viewed sales pipeline data on Clari, which provided them with knowledge of

11  where a particular deal stood in the process towards a commitment or closing.

12     H. CW20 was a Senior Deal Desk Manager at Forescout from August 2018 to

13  April 2020, who worked directly with sales representatives on the East Coast to structure deals and

14  make proposals to customers.  CW20 reported directly to the Director of the Global Deal Desk,

15  Mick Roberts ("Roberts"), who reported to the Senior Vice President of Revenue Operations, Aaron

16  Martin ("Martin"), who in turn reported directly to DeCesare.  CW20 reports that DeCesare held

17  weekly forecasting calls with Martin, who provided DeCesare with updates on all deals valued at or

18  above $500,000.  CW20 states that, during these weekly calls, DeCesare and Martin extensively

19  discussed the sales pipeline, including deals that were expected to close or not expected to close,

20  and whether any other steps were required to help facilitate closing such as legal review of customer

21  contracts.  CW20 knows this because, in preparation for these weekly calls between DeCesare and

22  Martin, CW20 prepared updates that Martin provided to DeCesare regarding deals valued at

23  $500,000 or more by utilizing Smartsheet, a software program that gathered all pertinent information

24  from Salesforce data concerning the specific status of deals.  CW20 was told by Roberts that updates

25  on Smartsheet were required to be prepared because Martin presented the information contained in

26  them to DeCesare in weekly meetings.

27     I. CW20 also inputted granular data in Smartsheet about the status of deals

28  worth $500,000 or more, including the status of negotiations with the customer, the steps needed to

SECOND CONSOLIDATED AMENDED
COMPLAINT
CASE NO.: 20-CV-00076-SI

-17-

be taken to close the deal, and the expected dollar amount for each customer contract. According to CW20, Martin also had access to Smartsheet and supervised CW20's and other employees' work in connection with updates he would regularly provide to DeCesare.

J.      During the beginning of each quarter, Martin asked CW20 and other members of the Deal Desk team to provide updates every two weeks about the status of all deals valued at or above $500,000. CW20 recalled that information was updated on Smartsheet on, at least, a weekly basis after a month into any quarter of the year. In an effort to incorporate accurate and timely information about the status of deals, CW20 regularly communicated with NAMs and other sales employees.

K.      CW20 also attended quarterly "all-hands" conference calls where DeCesare discussed the Company's performance in any given quarter, including its revenue forecasts, bookings and the status of potential "tech wins." CW20 heard DeCesare discuss the Company's lack of progress in meeting sales goals for acquiring "net new logos." According to CW20, the Company failed to meet its target for "net new logos" in 2019.

L.      Corroborating the accounts of numerous other CWs, CW20 states that DeCesare and other senior executives utilized Clari to regularly monitor deals, and by using Clari, Forescout's C-suite executives, including DeCesare and Redman, saw all the deals included in the Company's forecasts, including notes from the sales team on the status of negotiations and the steps remaining to close a deal. CW20 confirms that deals at Forescout were regularly forecasted improperly because all the steps required to close the deal had not even taken place. CW20 further confirms that deals without a proof of concept or a "tech win," which CW20 explained was a deal that was actually awarded to Forescout, were forecasted to close three weeks before the end of the quarter even though Forescout's sales cycle was significantly longer than that short amount of time, and deals would then naturally and eventually "slip" into the next quarter as a result.

## C.      Defendants Know that the Revenue Guidance Provided to Investors Is Based on Faulty Assumptions

46.     The Company's reported quarterly results during 2019 fell below FY 2018's reported growth in revenues and were consistently and materially below the full year revenue guidance,

which the Company started providing on February 7, 2019.  Thus, in Q1 2019, Forescout reported that total revenue growth had slowed from the 42% year over year growth reported in Q1 2018 to 27% year over year growth in Q1 2019.  *See* Q1 2019 Form 10-Q at p. 19.  The reported decline in growth rates worsened in Q2 2019 with the Company reporting year over year revenue growth of 16% compared to 35% for Q2 2018.  *See* Q2 2019 Form 10-Q at p. 20.  By Q3 2019, the decline had accelerated with the Company reporting year over year revenue growth of 7% compared to reported revenue growth of 23% for Q3 2018.  *See* Q3 2019 Form 10-Q at p. 21.  In addition, the disclosure in the Q3 2019 Form 10-Q was notable because, unlike the prior periods' Form 10-Qs, it failed to break out revenue growth and the related decline in the rate of revenue growth by the specific categories of license revenues, subscription revenues and professional services revenue. *Compare* Q1 and Q2 2019 Form 10-Qs *with* Q3 2019 Form 10-Q.

47.  Defendants publicly attributed this decline in sales growth to a series of non-recurring delays, *i.e.*, one-offs, such as bureaucratic delays in customers finalizing orders, a shift to a subscription revenue model and finally, in Q3 2019, deteriorating macroeconomic conditions in the EMEA region, which region accounted for 16.1% of the Company's revenues in 2019, 17.5% of the Company's revenues in 2018, and 16.3% of the Company's revenues in 2017.  *See* 2019 Form 10-K at p. 110.  In other words, sales were delayed but would materialize because the Company still had the "technology win" based upon its product offerings.

48.  However, in truth and in fact, Defendants knew that the culprit for missed revenue guidance was basically two-fold: the shift in customer demand to products which were better suited to the increasing trend towards cloud computing and remote work (*see* ¶¶33-34, *supra*); and an inadequate internal system for projecting future revenue.

49.  The Company included sales designated as "committed" in creating projections according to CW18 and CW19.  Defendants, however, knew that the resulting revenue projections were inflated and, because of that, according to CW18, beginning in June 2018 with the help of Force Management, a consulting firm that helps companies build sales teams and improve revenues, instituted a new system, designed to provide greater structure and more certainty to the method for projecting future revenue known as the "Customer Engagement Process" ("CEP").

50.     CEP was developed in the middle of 2018 in consultation with Force Management. CW18 states that Force Management told senior executives at Forescout in 2018, including CW18, that implementation of the CEP model would result in a majority of deals categorized as "committed" by the Company as not actually locked down as "committed" deals.  CW18 stated that the CEP model had seven rigorous steps, each linked to a percentage of likelihood that a given deal would close: Prospect (0%), Qualify (10%), Present (30%), Prove (50%), Purpose (70%), Negotiate (90%) and Closed-Won (100%).  CW18 explained that each one of these steps was associated with specific tasks that needed to be completed before a deal could move on to the next step.  CW18 estimates that a majority of Forescout's forecasts for "committed" deals were, in fact, generated based on the "Prove" category where deals had only a 50% chance of closing and hence could not constitute "tech wins."

51.     CEP was scheduled to be fully implemented in the beginning of 2019 and reflected that a very large number of sales recorded as "committed" by sales representatives were, in fact, highly unlikely to be made.  However, rather than acknowledge reality, Defendants simply refused to implement CEP and continued to project revenues based upon the prior faulty system that categorized deals as "committed" when they had only a 50% chance of success.

52.     Compounding this failure was that starting at least by the beginning of 2019, Defendants engaged in a pressure campaign by forcing NAMs and other sales representatives to miscategorize deals as "committed" in order for the Company to be able to project continued rapid increases in sales even though, in fact, there were no actual commitments from buyers:

A.     CW9 was a NAM at Forescout from 2014 to February 2019.  CW9 stated that CW9's immediate boss instructed CW9 to move a $1 million deal from the upside category to the committed category, so that the Salesforce platform would show a $1 million increase in revenue for the quarter even though a customer had not committed to the deal.

B.     CW10 described $1 million worth of deals that CW10 inherited as "mostly BS."  Forescout expected these deals to close, but when CW10 directly spoke to the customers, they told CW10 that they were not interested in acquiring any of Forescout's products.

C.      In July 2019, CW7, another NAM in the public sector division worked on a deal for the University of Wisconsin – Madison ("UWM").  CW7 participated in a conference call with Jensen and a procurement officer for UWM.  According to CW7, UWM's procurement officer flatly informed Jensen that UWM would not place a purchase order before September 2019 as Jensen requested.  Right after this conference call with UWM, CW14 called CW7 and told CW7 that Jensen wanted CW7 to list the close date for the UWM project on or before the end of September 2019.  CW7 states that the UWM project never materialized.

D.      CW11 was a NAM at Forescout's Enterprise division between December 2018 and September 2019.  CW11 was forced to report closing dates that were sooner than CW11 had forecast for deals worth $1.2 million.  CW11 learned from other colleagues after leaving the Company that at least one of these deals did not close before the end of the third quarter of 2019.

E.      According to CW12, in the middle of 2019, NAMs at Forescout became concerned that deals listed as "committed" in the sales pipeline would not materialize as they did not just fall through, but "evaporated."

F.      CW13 was a Senior Administrative Assistant and Office Manager at Forescout between November 2018 and March 2020.  CW13 joined Forescout in November 2018 when Forescout acquired SecurityMatters, an information technology company based in the Netherlands with its U.S. operations in New Hampshire, which specialized in providing security solutions for industrial threats and flaws.  According to CW13, SecurityMatters sales employees were pressured by Forescout's senior managers to list deals as "committed" even though SecurityMatters' sales employees knew that there was no actual commitment from buyers.  CW13 further stated that Jim Crowley, the head of sales at SecurityMatters, left Forescout in January 2020 because he was fed up with Forescout's pressure campaign.  CW13 further stated that the pressure to fudge the sales numbers at SecurityMatters came directly from DeCesare.

G.      CW14 corroborated CW7's allegations, and states that the pressure campaign to include illusory deals in the sales pipeline was instigated by both Jensen and Redman.

**D.      Defendants Act to Sell the Company Before Revenue Comparisons Turn Negative**

53.      The Company put itself up for sale in October 2019.  The explanation offered was that even though the Company's product offerings were in heavy demand, short-term dislocation caused by, among other things, the transition to subscription fee arrangements, would be better managed in a non-public reporting company setting.

54.      Key to Defendants' effort to obtain a premium price for the Company was to portray Forescout as still being a growth company with a steadily increasing revenue flow that had been sidelined by a series of one-offs during 2019.  In order to do so, the Company would need to avoid reporting a further decline in revenue growth for Q4 2019 and project a resumption in growth more in line with Forescout's historical results.

55.      The Company reported Q4 2019 revenue of $91.3 million, representing 8% year-over-year growth from Q4 2018, which was disappointing but still not a continued decline in growth from the 7% reported in Q3 2019.  In addition, in connection with a sales process in which the Company hired Morgan Stanley to shop itself to potential acquirers, it prepared two alternative forecasts projecting 2020 revenue of $389 million and $386 million, reflecting anticipated 30.6% growth in reported revenue from 2019.  In other words, Defendants' revenue model continued to assume that sales had simply "slipped" from 2019 into 2020.

56.      As Defendants knew, the true situation at the Company was substantially more dire with internal Illustrative Guidance prepared in January 2020 reflecting projected 2020 revenue of $355 million – a full 10% below the projections provided to potential acquirers – with projected Q1 2020 revenue of $62 million, reflecting an 18% expected *decline* from Q1 2019 reported revenues. Defendants later acknowledged that at least by January 2020 a fundamental shift had taken place in Forescout's business operations causing the reduced revenue projections contained in the Illustrative Guidance.  *See* Preliminary Proxy Statement dated March 3, 2020 (the "Preliminary Proxy Statement") at pp. 42-44; and Proxy Statement dated March 24, 2020 (the "Proxy Statement") at pp. 42-44.  However, as demonstrated above, that fundamental shift had, in fact, taken place much earlier in 2019.  *See* ¶¶32-36, *supra*.

57.     However, the more realistic and dire projections offered by the Illustrative Guidance were not tied to reality.  CW19, a SEAE who worked at Forescout from September 2019 to June 2020 recalls an in-person meeting at the "sales kickoff" event in January 2020 where, during a breakout session, the Vice President of the Americas for Forescout, Matt Hartley ("Hartley"), who oversaw all American sales at Forescout towards the end of the Class Period, instructed sales representatives to list deals as "committed" into the Salesforce platform only on the basis of a single conversation with a potential customer's C-suite executives or employees in the procurement group.

58.     Therefore, it was unsurprising to Defendants when Q1 2020 reported revenue came in at $57.2 million, more than 10% below the $62 million in the Illustrative Guidance, representing a 24% *decline* in revenue from Q1 2019 revenues, and that decline was only achieved through a multi-million-dollar discounted sale of hardware at a loss.  As Advent explained in the Delaware Litigation, "even with several highly unnatural (and detrimental) actions taken by Forescout to pull additional bookings into the quarter," Forescout's financial performance "*dropped off a cliff*, compared to its actual Q1 2019 performance, and importantly, *compared to its peers*." Answer and Counterclaim ¶32 (footnote omitted, emphasis added).

59.     Similarly, Q2 2020 results, although not reflecting a decline in year over year review, came in at $79.9 million, representing only a 2% increase in revenue from Q2 2019.  Eventually, in July 2020, Defendants provided updated projections reflecting 2020 revenue of $321 million, a 10.5% decline from even the Illustrative Guidance and a more substantial decline from the projections provided to potential acquirers with a similar decline in expected FY 2021 from $417 million in guidance provided to potential acquirers in February to $317 million.

**E.     Advent Agrees to Acquire Forescout for $33.00 Per Share Which Promises to Enrich DeCesare and Harms**

60.     Defendants' deception bore fruit when on February 6, 2020, Advent, a well-respected private equity firm, acting though Ferrari Group Holdings, L.P and Ferrari Merger Sub, Inc. (collectively "Ferrari"), entered into the Original Merger Agreement pursuant to which it agreed to purchase Forescout for $33.00 per share in the Planned Acquisition.

61.     The Planned Acquisition promised to substantially enrich both DeCesare and Harms, as they were set to receive $33.5 million and $8.95 million for their Forescout RSUs and PSUs, respectively.  In addition, DeCesare and Harms stood to receive golden parachutes valued at $10.8 million and $5.185 million, respectively.  In contrast, had the Company not entered into the Merger Agreement, both DeCesare and Harms were threatened with the loss of their jobs by an activist investor (*see* Proxy Statement at 37-38), the stock they owned would have traded for much lower values (*see* Form 10K/A at page 31 (showing DeCesare and Harms beneficially owned 898,623 and 174,034 shares of common stock as of December 31, 2019, respectively)), and many, if not all, of their PSUs would have been underwater without the Original Merger Agreement.

**F.     Advent Expresses Concern About Proceeding With, and Then Refuses to Close on, the Original Merger Agreement**

62.     The Company's required disclosures in connection with soliciting shareholder approval through the Preliminary Proxy Statement filed on March 3, 2020 and the Proxy Statement, revealed that by the time Advent had signed the Original Merger Agreement, Forescout no longer believed in the veracity of its previously provided projections upon which the Planned Acquisition had been premised because of an acknowledged shift in the Company's business and that the Illustrative Guidance it was planning to provide to investors reflected substantially lower projected revenues.

63.     As a result, the Company's relationship with Advent started to sour after the March 3, 2020 filing of the Preliminary Proxy Statement.  This situation worsened by March 24, 2020—the same day the Company issued the Proxy Statement—by which point it had become clear that Forescout would not even achieve the $62 million Q1 2020 revenue target in the Illustrative Guidance.

64.     As these adverse facts were disclosed regarding the Company's operations and future business prospects, Advent was pressing for updated forecasts, which Forescout refused to fully provide, that were needed to obtain funding to close on the Original Merger Agreement.  Thus, on March 27, 2020 and April 6, 2020, Forescout prepared updated forecasts which Advent considered to be of low quality because they contained troubling analysis.

65.     On April 20, 2020, Advent informed Defendants that it was unsure whether it could proceed with the terms of the Original Merger Agreement.  The Tender Offer Recommendation explains (at p. 32) that Advent stated that it "was reviewing Forescout's business, operations, future prospects and financial condition in order to assess whether the conditions to closing provided in the Original Merger Agreement would be met."  Defendants, recognizing the distinct and real risk that Advent would seek to back out of the Original Merger Agreement, began internally discussing the Company's options should Advent act in that manner.

66.     Nonetheless, Defendants began framing all their discussions with Advent and public disclosures to investors as based upon a certainty that the Planned Acquisition would close as planned on May 18, 2020 for $33.00 per share as purportedly required by the Original Merger Agreement.

67.     On May 5, 2020, Advent learned from a whistleblower email that Forescout had been manipulating its results, including in Q4 2019, by selling products to Merlin in order to improperly accelerate revenue recognition.

68.     On May 8, 2020, a representative of Advent told DeCesare that Advent could not "make the numbers work" for the Planned Acquisition and expressed concerns regarding whether conditions precedent to the Planned Acquisition would be met.  Answer and Counterclaim ¶8.

69.     On May 11, 2020, Forescout disclosed its results for Q1 2020.  In reaction to this disclosure, the price of Forescout's common stock declined by nearly 5% from its closing price of $32.09 on the previous day, to close at $30.50 per share on May 12, 2020, on heavy trading volume.

70.     On May 18, 2020, Forescout shocked investors by disclosing that Advent was refusing to proceed with the Planned Acquisition of the Company for $33.00 per share.  Instead, Advent had sent the Termination Letter to Forescout on May 15, 2020, identifying its bases for refusing to proceed with the Planned Acquisition, including that:

A.     "[B]ased on the Company's actual recent financial performance, information received from the Company regarding the Company's expected future financial performance for the fiscal year 2020 and beyond, it is clear that the Company's decline in earnings potential and financial performance will last for a durationally significant period of time";

B.    Forescout "is continuing to provide non-standard discounts and payment terms on its products to a significant number of customers [which] are material and substantially adversely affect the near- and long-term prospects of the Company"; and,

C.    If the Acquisition were to be consummated, "the Company would not be solvent ... under any relevant test of solvency" because, among other things, "the Company's debts will likely exceed its estimated enterprise value."

71.    In reaction to the Company's disclosure of Advent's refusal to proceed with the Acquisition and the statements contained in the Termination Letter, which the Company publicly disclosed at that time, Forescout's stock plummeted by nearly 24% from its closing price of $29.52 on the previous day to close at $22.57 per share on May 18, 2020, $20.93 on May 19, 2020, and $19.84 per share on May 20, 2020.

72.    This price implosion followed a previous decline in the price of the Company's stock on May 11, 2020, when Forescout reported revenues of $57.2 million for Q1 2020, well below the $62 million the Company had provided as its Illustrative Guidance for Q1 2020 and the $355 million then projected for 2020, and further below the projected Alternate Plan provided to Advent on January 27, 2020, which projected revenue of $386 million for 2020.  The Company's disastrous results were only able to be achieved by receiving revenue of $4.787 million by selling hardware at approximately 8% *below* cost, compared with margins from the year-prior of 24%, in transactions described as "one offs."  *See* Q1 2020 Form 10-Q at 26.

**G.    Facts Revealed in SEC Filings and the Delaware Litigation Establish the Falsity of Defendants' Earlier Statements**

73.    On May 19, 2020, Forescout filed a Verified Complaint in Delaware Chancery Court seeking, among other things, an Order requiring Advent – or more precisely Ferrari – to proceed with the Acquisition on the terms described in the Merger Agreement, *i.e.*, for $33.00 per share.  *See* Forescout Complaint and Prayer for Relief ¶C.  Advent answered the Complaint and asserted a counterclaim with respect to which Forescout filed an answer.

74.    On July 15, 2020, Advent and Forescout ultimately settled the Delaware Litigation with Advent entering into a revised merger agreement pursuant to which Ferrari would make a

tender offer for Forescout's stock at $29.00 per share pursuant to a revised acquisition agreement (the "Revised Acquisition"), representing an approximately $300 million discount from the Proposed Acquisition as provided for in the Original Merger Agreement.

75.     On July 20, 2020, the Company filed the Tender Offer Recommendation with the SEC, recommending that Forescout shareholders tender their stock to Ferrari for $29.00 per share.

76.     On August 14, 2020, the tender offer closed and Advent completed its acquisition of Forescout for $29.00 per share.

77.     The pleadings in the Delaware Litigation and the Tender Offer Recommendation disclosed the following material adverse facts which Plaintiffs and other public investors had not previously known:

A.     On April 20, 2020, Advent sent a letter to the Company stating that it "was reviewing Forescout's business, operations, future prospects and financial condition in order to assess whether the conditions to closing provided in the Original Merger Agreement would be met." Tender Offer Recommendation at 32;

B.     On May 8, 2020, "**Advent Signal[ed] its Intention to Renege on the Merger Agreement**" (Delaware Complaint at p. 38 (emphasis in original));

C.     Two multinational professional services companies that were substantial business partners as well as a third major business partner of Forescout terminated their relationships with the Company and the Company lost several customers after the Acquisition was announced (Delaware Complaint ¶93);

D.     Advent was sufficiently skeptical of the guidance previously provided by Forescout in connection with negotiating the terms of the Planned Acquisition and other due diligence that it received that, by April 14, 2020, it had prepared its own forecasts of the Company's expected results for 2020 and 2021 (Delaware Complaint ¶70, Answer and Counterclaim ¶37);

E.     Forescout had routinely engaged in end-of-quarter discounting of products for sale which appeared to be designed to meet public projections (Delaware Complaint ¶94).

F.     In response to the Termination Letter, Forescout initially engaged "in an effort to find a resolution that would result in Advent consummating an acquisition of Forescout" (Tender Offer Recommendation at 32);

G.     A July 2020 forecast (the "July Case") serving as the basis for the fairness opinion provided by Morgan Stanley in connection with the Tender Offer Recommendation reflected 2020 revenues of $321 million, materially lower than the $386 million to $389 million range originally provided to Advent and also below the 2020 projection of $355 million contained in the Illustrative Guidance (Tender Offer Recommendation at 45; Proxy Statement at 61, 63-65); and,

H.     The July Case reflected that, contrary to the projections originally provided to Advent of 15% growth in revenue for FY 2021, revenues were expected to be flat with those of 2020 (Tender Offer Recommendation at 44-45).

78.     In addition, other SEC filings made by Forescout after the Acquisition's announcement on February 6, 2020 revealed the following additional facts demonstrating that the Company's prior public statements were materially false or misleading at the times they were made:

A.     Auditing the timing of the Company's revenue recognition was "challenging" and that "certain arrangements required judgment to determine the distinct performance obligations and the appropriate timing of revenue recognition" (2019 Form 10-K at 73);

B.     The level of Forescout's sales force experience had declined from 50% to 38% having been with the Company for more than two years during 2019 (2019 Form 10-K at 11); and,

C.     Forescout, during Q1 2020, had restructured its sales force, eliminating approximately 90 employees within the sales, marketing, and engineering functions (Q1 2020 Form 10-Q at 17).

**H.     Materially False or Misleading Statements**

79.     These material facts caused a series of statements made between February 7, 2019 and May 11, 2020 to be materially false or misleading.  These facts were, as alleged above and as

alleged below with respect to each particular statement, at all relevant times known to or recklessly disregarded by Defendants:

        **1.**       **The February 7, 2019 Press Release and Form 8-K**

80.       On February 7, 2019, Forescout issued a press release announcing its financial results for the fourth quarter of 2018, and for the full fiscal year that ended on December 31, 2018. This press release also provided revenue guidance within the range of $363.1 million to $373.1 million for FY 2019, representing year-over-year growth of 24% at the midpoint.

81.       Forescout's revenue guidance was materially false or misleading because it lacked any objective basis and, in fact, was inconsistent with Forescout's actual performance, which was known to Defendants, at the time this guidance was disclosed. The objectively false nature of this guidance is evidenced by: (a) the shift in the market for cybersecurity products towards the cloud in 2018, well before the Class Period, resulted in significant pricing pressure from Forescout's competitors who offered cloud delivered services when Forescout could not launch its core cloud-based security software until late 2019 (*see* ¶¶33-37, *supra*); (b) the Company already having experienced the loss of experienced sales representatives necessary to help drive sales growth (*see* ¶¶38-41, *supra*); (c) DeCesare and Harms receiving regular analytical reports regarding Forescout's sales pipeline and their involvement in the sales process (*see* ¶¶44-45, *supra*); and (d) the February 7th guidance facilitating the sale of over $29 million worth of common stock by the Pitango Group of venture capital funds in which Rami Kalish, the Vice Chairman of the Board, was a partner.

82.       Defendants knew, as of February 7, 2019, that most deals in Forescout's pipeline barely had a 50% chance of success because, CW18, Forescout's former GTEM, together with Redman and Gumbel, developed a new sales tracking methodology known as the CEP which was scheduled to be implemented by the Company in early 2019 which Defendants then refused to fully implement. *See* ¶¶49-51, *supra*.

83.       CW18 explains further that the CEP model was never implemented at Forescout because implementing its structured methodology would have forced the Company to recognize that a large proportion of deals identified as "committed" would, in fact, not close because of the failure to obtain consent from the "economic buyers," such as clients' CFOs, to proceed forward with large

transactions.  Thus, CW18 states that he was able to recognize based upon the CEP model that ***the Company would miss its sales targets for the next three or four quarters consecutively*** just as Force Management had already warned senior executives at Forescout before the Class Period.

84.     There is additional corroboration that Forescout had a Company-wide policy of identifying deals as "committed" even when deals were only in the negotiations stage.  CW19, a SEAE who worked at Forescout from September 2019 to June 2020, recalls an in-person meeting at the "sales kickoff" event in January 2020 where, during a breakout session, the Vice President of the Americas for Forescout, Matt Hartley ("Hartley"), instructed sales representatives to list deals as "committed" into the Salesforce platform only on the basis of a single conversation with a potential customer's C-suite executives or employees in the procurement group.  Hartley oversaw all American sales at Forescout towards the end of the Class Period.

85.     According to CW19, at this breakout session in January 2020, where CW19 was present, CW19 heard Hartley tell sales personnel that deals should be identified as "committed" in the Salesforce platform "once the negotiations started" even though there was never a real commitment from potential customers such as a purchase order or other indicia of a real commitment.

86.     Rather than implementing CEP, CW9 explained that Forescout categorized deals into three key areas: (1) committed deals expected to close during a certain quarter, (2) upside deals that had a 50-50 chance of closing in a particular quarter, and (3) pipeline deals where the Company had simply engaged in a discussion with a customer without any commitment.  CW9 described constant pressure from upper management to list deals as "committed" as a juggling act whereby Forescout placed uncertain deals into the committed category to support its misleading forecasts.  Indeed, CW9 had been pressured to identify a seven figure deal as committed no later than February 2019 even though there was no commitment from a buyer given that CW9 was no longer employed at Forescout in February 2019.  Hence, given that Forescout resorted to its past practice of including a majority of deals with only a 50% chance of success in its forecasts and chose to abandon the CEP despite knowing what its implementation would entail, Defendants knew before the FY 2019

guidance was given that the underlying deals that the guidance was based upon barely had a 50% chance of success.

### 2. March 4, 2019 Investor Day

87. On March 4, 2019, Forescout hosted an investor day in San Francisco, California. At this event, Defendant DeCesare made the following materially false and misleading statements:

> So there'll be no questions today around go-to-market, so I'll try to give you a little bit of this, and then Brian can dig into the detail if you guys have questions towards the end. First is we've shared this with you is at the end of 2016, 14% of our sales organization was what we call tenured. That is a arbitrary definition for us. We have chosen that to be two years in your territory. We think it's about two years when a reps in the same territory, not just for the company but in their territories, that's when they start to really get kind of the pipeline, everything else that we need flowing. That rose to 35% at the end of 2017 and 50% at the end of 2018. I don't ever expect this to get to 100%.

> **We're obviously hiring like crazy and not everybody works out.** So there's going to be a good kind of critical mass that we get to, but we still think there is upside above and beyond the 50% for sure. The new step we want to share with you is where we are on pipeline. So this shows you what the total pipeline would be as a multiple of our internal bookings plan which is, no, we are not disclosing to you. But it gives you a sense of how big that multiple could be at the start of the year. So, that was 3.8% start of 2016; 3.4% at the end of 2017; and then $4.2 million as we go into 2019.

> **So, it's given us increased visibility which is you'd expect as reps are longer and the marketing team is getting going, we get kind of better visibility into pipeline.** This is something that we certainly track on a very, very, very consistent basis. (emphasis added).

88. The statements identified in Paragraph 87 were materially false or misleading when made because DeCesare omitted to disclose that:

A. Any new hiring the Company was doing was necessitated by the departure of experienced sales representatives necessary to continue driving the Company's revenue growth. In fact, as per CW7, Forescout had already fired a significant number of employees in the Commercial division in February 2019. CW1 states that 25 to 30 BDRs/SDRs were terminated or left the Company in the first few months of 2019. This was a significant reduction given CW18's statement that the entire team of SDRs and BDRs at the end of 2019 consisted of only 60 individuals.

B. According to CW18, the Company began to eliminate or otherwise lose through voluntary departures "ramped up" NAMs, ultimately replacing 25 to 30 NAMs in 2019 with

SECOND CONSOLIDATED AMENDED COMPLAINT
CASE NO.: 20-CV-00076-SI

-31-

inexperienced employees.  Per CW19, each NAM had a quota of deals worth $2.5 million per year.  CW18 states that the elimination or voluntary departure of the "ramped up" NAMs due to poor sales prevented Forescout from closing deals and securing "tech wins."

C.    As a result, the Company's "visibility" into the sales pipeline was diminishing, not increasing as DeCesare misleadingly stated, at the time this statement was made because Forescout had already started to eliminate or otherwise lose a significant number of sales representatives across multiple divisions.

D.    DeCesare also failed to disclose that, as CW18 states, Force Management had already told senior executives at Forescout in 2018 that a majority of the Company's deals in the sales pipeline were miscategorized as "committed" because the Company did not have "tech wins" or agreement from senior executives with authority to sign contracts or issue purchase orders on behalf of customers.  CW18 states that Forescout considered initiating the CEP model's steps in early 2019, but never implemented it and continued to include a significant number of deals with only a 50% chance of success into its forecasts.

E.    DeCesare made the misleading statements identified in Paragraph 87 with actual knowledge or reckless disregard for the truth because:

i.    DeCesare told investors that "sales ramping and productivity is always one of those areas that both [Harms] and I spend a lot of time on."

ii.    CW18 heard DeCesare state that, at least with respect to the Company's own terminations, Forescout reduced its sales force in 2019 and additional cuts needed to be made in early 2020 because the Company had failed to grow revenues in 2019, demonstrating that DeCesare knew about the terminations and departures and why they occurred.

iii.    According to CW18, DeCesare also knew that the Company had considered implementing the CEP model before this false statement was made but failed to implement it because DeCesare acted as the chief sales representative himself for large deals and knew that the steps of the CEP model had not been applied for deals that he pitched to clients himself.  CW18 worked with Gumbel and Redman to initiate the CEP model in the beginning of 2019 even though it was quickly abandoned.  CW17 states that Redman and Gumbel both answered

1    DeCesare's pointed questions and shared information with DeCesare about the sales pipeline.

2    DeCesare thus knew when he made this statement that misidentifying as "committed" deals with a

3    50% chance of success, as CW18 explained was normal practice, reduced "visibility" into the sales

4    pipeline.

5          **3.**      **May 9, 2019 Press Release and Earnings Conference Call**

6          89.      On May 9, 2019, Forescout issued a press release that announced the Company's

7    financial results for its first quarter ("Q1") that ended on March 31, 2019. In this press release,

8    Forescout conditioned the market for a soft landing about the impending deterioration in its business

9    due to the shift to the cloud, and the Company stated that revenues for the second quarter of 2019

10   would be within the range of $75.3 million to $78.3 million, now representing year-over-year growth

11   of 14% at the midpoint.

12         90.      On this partial disclosure or the materialization of the risks thereof, the price of

13   Forescout's common stock declined by $7.02, or over 16% from its previous day closing price of

14   $43.30 per share, to close at $36.28 per share on May 10, 2019, on heavy trading volume.

15         91.      To hasten Defendants' expectation of a decrease in Forescout's share price due to

16   declining revenues resulting from the Company's illusory pipeline of deals and loss of its seasoned

17   sales force in the second quarter of 2019, Defendants increased the full year guidance for 2019 and

18   touted that the Company would still finish the fiscal year with revenues between $365.3 and $375.3

19   million, again representing year-over-year growth of 24% at the midpoint.

20         92.      The full fiscal year 2019 increased revenue guidance was materially false or

21   misleading because it lacked any objective basis and, in fact, was inconsistent with Forescout's

22   actual business performance, which was known to Defendants at the time this guidance was

23   disclosed for the same reasons identified in Paragraphs 81-86 and 88.

24         93.      On May 9, 2019, Forescout also held an earnings conference call to announce Q1

25   results. At this conference call, analysts requested further information regarding the slipped deals

26   and deals that Defendants said would close in the back half of the year. For example, Fatima Boolani

27   questioned both Individual Defendants regarding the Company's sales capacity, and both DeCesare

28   and Harms provided the following materially misleading response:

      -33-

**Fatima Boolani, Analyst**

If I can just sneak in a follow-up. In terms of sales capacity, do you have comfort in the current levels of capacity that you have? Or should we anticipate there should be sort of a ramp in rep hiring, in capacity hiring as we progress through the year?

**Michael DeCesare, Chief Executive Officer and President**

***Yeah, no, consistent with the theme I just hit upon, look, we feel like we are tracking very well against our sales productivity, the investment levels that we have been making and plan to make through the rest of the year, follow the -- that path to profitability and investing at levels below where our top line is growing. Nothing has changed at those levels.*** There was another facet I wanted to hit on. Perhaps as Mike's adding to it, I'll remember what it was.

**Christopher Harms, Chief Financial Officer**

***No. I'm good. He nailed it.*** (emphasis added).

94.     The statements identified in Paragraph 93 were material because analysts, as surrogates for the market, pointedly questioned Defendants about the sales force, and DeCesare and Harms assured them that the Company would meet its objectively false guidance because ***nothing had changed*** about the sales capacity or productivity from its high of 50% at the end of 2018.

95.     These statements were materially misleading when made because contrary to Defendant DeCesare's false statement, quite a lot "had change[d]" at this time with respect to the Company's sales capacity and productivity, including the following:

        A.      Contrary to DeCesare's statement, the sales capacity and productivity level of sales representatives had not only changed but ***declined*** because CW7 states that significant cuts were made in the Commercial division in February 2019, and CW1 states that an entire sales team was gutted in the spring of 2019 and 25 to 30 BDRs/SDRs were terminated or left the Company in the first few months of 2019.  This was a significant reduction given CW18's statement that the entire team of SDRs and BDRs at the end of 2019 consisted of only 60 individuals.

        B.      CW16 and CW17 confirm that layoffs occurred in waves with five rounds of layoffs in 2019 and 2020, and the most significant cuts were made in 2019.  On or about when this false statement was made, according to CW16 and CW17, Forescout planned to initiate another round of cuts in the summer of 2019 to become leaner in anticipation of a planned acquisition.

C.      According to CW18, Forescout also terminated or otherwise lost 25 to 30 "ramped up" NAMs in 2019, losing tens of millions of dollars in potential business.

96.      DeCesare's false statement that "nothing had changed" about the Company's sales capacity and productivity, and Harm's false affirmation of that statement were made with actual knowledge or extreme disregard for the truth.  At this same earnings conference call held on May 9, 2019, DeCesare himself told investors that "sales ramping and productivity is always one of those areas that both [Harms] and I spend a lot of time on," so he knew about the waves of layoffs and cuts.  CW18 also heard DeCesare state at a "sales kick off" event in the beginning of 2020 that Forescout reduced its sales force in 2019 and additional cuts needed to be made in early 2020 because the Company had failed to grow revenues in 2019, demonstrating DeCesare's knowledge of the massive turnover in 2019 and the reasons for the reduced level of productivity.

97.      Other analysts also requested more specificity about the preannounced poor quarter and the raised full year guidance, and Defendants continued to mislead investors:

**Sterling Auty, Analyst**

Yeah. Thanks. Hi guys. So I'm sure a bunch of folks are going to pile on the deals moving later in the year. You mentioned just not materializing until later. Well, can you just give us a little bit more insight, choose one or two of them and just kind of walk through why. *Is it they need more signatures, the project timeline has shifted, there is other technology priorities? Why do you think they're materializing later in the year?*

**Michael DeCesare, Chief Executive Officer and President**

*Sure. So first, understand that every one of those deals is still in pipeline.* It's just our – we had an expectation that a couple of them would have been far enough along to be in guidance by this point, that's the major issue for us, right?

We have high degree of confidence they close for the year. We had originally thought they would be more naturally suited for Q2 and they just slipped a little bit. So I said earlier kind of there is not really a single flavor to them in the sense that they span different industries and different figures for us and things like that. There is not really anything there that you could be thrilled into. I guess the one that I would share with you, Sterling, is I'll just give you one example. *As you know we had one very large account – by the way, it's also worth pointing out, in every one of those deals, we have the technology win already. We've already been awarded the business.*

*The question now is what I would call the business win, which is when we actually get the money and the commitment towards timing. So that's why we have a fairly high degree of confidence that they will materialize in the back half of the year.* (emphasis added).

98.     The statements identified in Paragraph 97 were material because analysts, as surrogates for the market, specifically asked Defendants the reason why the deals had slipped, including whether authority from an economic buyer was missing, as CW18 states was usually the case with the illusory deals, or if the project timeline had shifted, as CW7 explains occurred with the UWM deal.

99.     The statements identified in Paragraph 97 were materially false or misleading when made because Defendants failed to disclose that:

A.      Forescout could not, and did not, "have the technology win already," was not "awarded the business" and "every one of those deals" was not still in the pipeline.  This fact is confirmed by the rapid shift to cloud computing in 2018 and Forescout's inability to adjust to the changing dynamics of the market that rendered its products obsolete.  CW1, CW2, CW3, CW4, CW8, CW10 and CW17 also corroborate that Forescout's declining revenue in 2019 was directly caused by pricing pressure and superior cloud delivered solutions offered by competitors.

B.      In 2018, Force Management told senior management at Forescout, including CW18, that implementation of the CEP model would result in a majority of deals miscategorized as "committed" because Forescout identified deals with only a 50% chance of success as "committed." CW18 states that the Company's decision to abandon the steps of the CEP model in early 2019, including securing "tech wins" from representatives of buyers with economic decision-making authority, resulted in Forescout's failure to meet its sales targets for the next three to four quarters.

C.      Before this false statement was made, CW17 states that Forescout lost every single customer in CW17's territory in southern Texas by April 2019.  CW17 also states that Forescout lost the largest customer in Texas, AMD, with millions in potential business, by May 2019.

D.      CW18 further states that an $80 million potential deal with Booz Hamilton repeatedly slipped in 2019, and further estimates that 1 out of 5 deals in the global sales pipeline was miscategorized as "committed," and 1 out of every 3 seven or eight figure deals was miscategorized as "committed."

E.      CW7, CW9, CW10, CW11 and CW14 state that each one of them as well as other sales representatives were pressured by senior executives such as Redman to identify numerous seven figure deals as "committed" even though buyers had no interest.  This pressure campaign was so widespread that it extended to SecurityMatters, a new acquisition of the Company's at the end of 2018.  According to CW13, the head of sales at SecurityMatters left that organization because he was fed up with Defendants' pressure campaign to fudge the numbers.  CW13 states that DeCesare applied the pressure on SecurityMatters.  CW12 confirms that "committed" deals "evaporated" in the middle of 2019.  CW15, a manager on the Deal Desk at Forescout from June 2016 to June 2020, states that "committed" deals listed in the forecast file lingered for months or years with no prospects of closing. CW19 affirmatively states that "committed" deals were included in the Company's forecasts.  CW20 confirms that despite the length of Forescout's sales cycle, deals were forecasted to close within weeks of a quarter, and inevitably slipped into the next quarter as a result.

F.      That this was Company policy is confirmed by CW19 who attended a breakout session at a sales kickoff event in early 2020 where Hartley, the head of Americas for Forescout, in the presence of CW19, instructed sales representatives to identify deals as "committed" in the Salesforce platform based only on a single conversation with a senior executive of the customer in the negotiations stage when there was no purchase order or any kind of actual commitment.  Indeed, CW9 was pressured to identify a $1 million deal with only a 50% chance of success as "committed" even though the buyer had no interest in the product before February 2019.

100.    DeCesare's knowledge or extreme recklessness in making this false statement is evidenced by, at least, the following specific facts pertinent to this false statement:

A.      The Company's statements in its Annual Reports that the sales cycle was between 9 and 24 months for new customers, and 3 to 12 months for existing customers, demonstrating that Defendants had substantial lead time to understand and know that the Company could not meet its sales targets or secure "tech wins" or that the deals would continue to "slip."

1
2
3
   B.  CW8 and CW18 state that DeCesare was a micromanager, and CW18 further states that DeCesare acted as the sale representative himself for the larger deals, meeting clients face-to-face and participating in conference calls.

4
5
6
7
8
9
10
11
12
   C.  CW17, CW18 and CW20 state that DeCesare, Redman and other senior executives at Forescout used Clari, an add-on-revenue operation platform to track sales, monitor sales representatives, deals and forecasts.  DeCesare and Redman used Clari's real time information to learn when the Company was short on its pipeline, identify deals that were at risk, predict outcomes early in the quarter, and spot churn risk of failure.  This tool gave DeCesare information on the Company's forecasts and sales pipeline on a company-wide level with real time accuracy.  It is thus implausible that DeCesare would not know about the pressure campaign, the illusory deals or that a majority of Forescout's deals identified as "committed" had only a 50% chance of success as CW18 explained.

13
14
15
16
17
18
   D.  With information provided on Smartsheet by CW20 after gathering information from sales representatives, Martin, the Senior Vice President of Revenue Operations at Forescout, provided to DeCesare information about all deals over $500,000 in weekly meetings as the quarter progressed.  According to CW20, Martin's weekly updates to DeCesare included information about the status of negotiations, the steps remaining to close a deal, and the expected dollar amount for each deal.

19
20
21
22
   E.  CW20 also attended "all hands" conference calls where CW20 heard DeCesare discuss revenue forecasts, current bookings, "tech wins," and the Company's inability to generate new business in 2019.  CW16 similarly recounts that DeCesare held quarterly internal review calls where he discussed the status of "tech wins."

23
24
25
26
27
   F.  Information provided to other senior executives was rolled up into updates provided to DeCesare.  CW10 states that Redman reviewed sales pipeline reports on Salesforce, and Gumbel received automatic alerts about all deals over $1 million.  CW17 states that Redman and Gumbel then answered DeCesare's pointed questions and provided him with updates on the status of deals and the sales pipeline.

28

1         G.      According to CW7 and CW14, Redman pressured sales representatives to

2  identify illusory deals as committed.  According to CW13, DeCesare also instigated the pressure

3  campaign on the head of sales at SecurityMatters.

4         H.      On the August 7, 2019 earnings conference call, Harms told investors that he

5  and DeCesare analyzed and "probed" the sales pipeline, spent time in the field asking about

6  customers' buying preferences, and both of those pieces of information were "baked into" the full

7  year guidance.

8      101.    Similarly, an analyst from Morgan Stanley questioned Defendant Harms regarding

9  why the deals that had failed to close in the second quarter of 2019 could not potentially slip even

10 further into fiscal year 2020:

11 **Melissa Franchi, Analyst**

12 Perfect. Thanks. And then just a follow-up for Criss on the large deal volatility. Just
to clarify, were there any large deals that got pulled forward for Q2 into Q1? And

13 then what's your level of confidence in the deals that got flipped from Q2 into Q3 or
Q4, what's the level of confidence in those deals actually closing in the second half

14 of the year? Is there risk that they could potentially slip into FY '20?

15 **Christopher Harms, Chief Financial Officer**

16 Yeah. So no major pull in a deal to get to Q1. So let's address that directly. ***As it
relates to the second half of the year, kind of reiterating some of the points Mike***

17 ***hit upon. Those deals are ones where we've already got the tech win.*** There are kind
of each nuanced elements to why we still feel we're going to close those deals in

18 2019, we just weren't prepared to put them into our guidance for Q2. ***So inclusive in
that, as we're looking at that second half of the year, we feel like we've got plenty***

19 ***of pipeline for the coverage of what we need to do. Those deals are part of the
portfolio that we look at. Those, we still have a very high degree as we're assessing***

20 ***the deals that are taking shape of the cross-expansion and land -- and land is
getting larger, we feel like there is plenty of pipeline to deliver upon the guidance***

21 ***we've given you for the full year.***  (emphasis added).

22     102.    Analysts, as surrogates for the market, again focused on asking about the slipped

23 deals and whether Defendants had a basis for stating that there was no risk of further slippage into

24 the next fiscal year, again demonstrating that Defendants' false statements in response were

25 material.

26     103.    The statements identified in Paragraph 101 were materially false or misleading when

27 made for the same reasons described in Paragraphs 99-100.

28

SECOND CONSOLIDATED AMENDED       -39-
COMPLAINT
Case No.: 20-CV-00076-SI

104.     In addition, evidence that Harms made the misleading statements identified in Paragraph 101 with actual knowledge or reckless disregard for the truth is evidenced by the fact that Harms himself told investors during the Class Period that he and DeCesare analyzed and "probed" the sales pipeline, spent time in the field asking about customers' buying preferences, and both of those pieces of information were "baked into" the full year guidance.

105.     Another analyst from Bank of America pointedly asked Defendants about their decision to pre-announce poor results for the second quarter of 2019 while raising the full year revenue guidance for 2019 even higher than the previous estimate:

**Tal Liani, Analyst**

Hi, guys. I'm asking almost the same question that someone else asked, but I want to ask it differently. You missed 2Q guidance, but you are raising. You're not keeping -- you're not only -- you're not keeping the guidance for the year you're raising the guidance for the year. So that means you have some kind of confidence on the materialization of the contracts in the second half. Can you share with us what is -- what kind of arrangement you have for these contracts?  Why are you increasing the guidance for the year? And what's the risks that it doesn't materialize? I just want to understand on what basis you're increasing the guidance? Thanks.

**Michael DeCesare, Chief Executive Officer and President**

This is Mike. I'll take that. I think, as we said, in the second quarter, this is a deal timing issue for us right? When we started off the year, we had more of substantial pipeline, we had a number of larger deals that we thought at that point were much more naturally going to close in the second quarter, and we're now realizing that they need a little bit more time in the oven before they're going to be done. *As I've mentioned, we have tech win in those accounts, meaning that they've chosen us. So it's very, -- it's not common for a customer to award a technology win to a vendor and then not buy their product for an extended period of time. So that gives us a high degree of confidence.*

We've also got 50% of our sales organization, as we mentioned, at the end of 2018 is ramped, which means they've been in their territory for more than a couple of years. *So many of these deals are into accounts that we've had the same account manager on the same accounts for a longer period of time, which gives us more visibility. So obviously, we would not raise 2019 if we did not have a very high degree of confidence. The building of pipeline, the maturation of our reps, the success we're seeing in some of the international territories that were kind of later high risk for us from a cohort perspective are all giving us that confidence.* (emphasis added).

106.     The statements identified in Paragraph 105 were materially false or misleading when made for the same reasons identified in Paragraphs 88, 95-96, and 99-100.  These statements were further false and misleading because, according to CW6 and CW16, there were numerous hiring

freezes in 2019.  DeCesare also failed to disclose to investors that major cuts were instituted in the summer of 2019 in anticipation of finding an acquirer as CW16 explained.

107.     DeCesare made these false statements with actual knowledge or reckless disregard for the truth for the same reasons explained in Paragraphs 96 and 100.

108.     Towards the end of the conference call, Defendant DeCesare went even further than the above-mentioned misrepresentations, and told an analyst that the Company's sales pipeline was so large and robust that the Company would easily meet its revenue guidance for the full year even if the slipped deals from Q2 2019 never materialized:

**Alex Henderson, Analyst**

Thank you. I wanted to go back to the issue associated with the timing of the closure of these deals into the back half.  It's pretty easy to come to the conclusion that those transactions will in fact close. But the other side of the coin, when these deals get pushed out, it notoriously causes some diminishment of growth because it requires sales capacity to push them to close and push them to the revenues.  Have you adequately thought through the impact that it has on your sales team's ability to do the secondary deals or third deals as a result of their timeline here? Or alternatively, is the deal size increasing enough to offset the impact of them spending more time closing deals that were expected in the first half?

**Michael DeCesare, Chief Executive Officer and President**

So I would caution not to read too much into the handful of deals that's in the second quarter. There are new customers in that, so certainly, those customers haven't bought our products yet. But there is expand opportunities inside of that as well. ***We have a very large pipeline. We've been working this for many years to build pipeline. So we are not dependent on those deals in the second half for us to be able to be successful.*** We're just pointing out to you that we had maybe a sense that they were going to close a little bit earlier, and now we've got a high degree of confidence that they're going to close in the back half of the year. ***So it doesn't have a material impact on kind of the overall productivity, we've got hundreds of sales reps. We feel good about those transactions in the second half of the year.***

**Alex Henderson, Analyst**

So that would be, you feel like you -- the deals are large enough that they would absorb any capacity issues?

**Michael DeCesare, Chief Executive Officer and President**

***I feel our pipeline is large enough where we can still achieve our capacity expectations without those deals closing in the second quarter.***  (emphasis added).

109.     The statements identified in Paragraph 108 were materially false or misleading when made for the same reasons identified in Paragraphs 95-96 and Paragraphs 99-100.

SECOND CONSOLIDATED AMENDED
COMPLAINT
CASE NO.: 20-CV-00076-SI

-41-

1

2

        **4.**       **The August 7, 2019 Press Release and Earnings Conference Call and the Related Investor Conference**

3

4

5

6

7

8

9

10

11

12

     110.     On August 7, 2019, Forescout issued a press release that announced the Company's financial results for its second quarter that ended on June 30, 2019. In this press release, Forescout stated that revenues for the third quarter of 2019 would fall within the range of $98.8 million and $101.8 million. On the same day, the Company also held a conference call, in which Defendant DeCesare falsely claimed that Forescout's rate of closing deals "remain[s] very strong" and "very healthy," misleadingly blamed a poor performance in the second quarter to "pent-up demand," and said the Company was "very comfortable in our pipeline, rolling in both the third and the fourth quarter, but we think we've kind of measured those two things appropriately in our guidance." On the August 7, 2019 conference call, Defendant Harms misrepresented that "the pipeline is absolutely taking shape very effectively."

13

14

15

16

     111.     The third quarter 2019 revenue guidance was materially false or misleading because it lacked any objective basis and, in fact, was inconsistent with Forescout's actual business performance, which was known to Defendants at the time it was issued, as fully explained in Paragraphs 95-96 and Paragraphs 99-100.

17

18

19

20

21

22

23

24

25

26

27

28

     112.     The statements identified in Paragraph 110 were also materially false or misleading for the reasons identified in Paragraphs 95-96 and Paragraphs 99-100. Furthermore, these statements were also knowingly or recklessly false when made because, according to numerous CWs, significant cuts had already been made across divisions, including cuts in the healthcare and financial services division in August 2019 as CW8 confirms, and the entire SLED section of the Public Sector was on course to be eliminated in September 2019 per CW7 and CW19. In addition, before this statement was made, Jensen and Redman pressured CW7 and CW14 to report that the $2 million deal with UWM would close before September 2019 even though UWM had told Jensen in a conference call with CW7 that it could not meet Forescout's chosen timeline to close the deal. According to CW7, this deal ultimately failed to materialize into a "tech win." It is inconceivable that Redman, or Gumbel did not inform DeCesare about the status of negotiations with UWM given the channels of communication to DeCesare through senior executives, updates prepared on

1  Smartsheet, Salesforce data or that DeCesare did not know himself based on his own use of Clari to

2  monitor and track the sales pipeline with real time accuracy.

3      113.    At the August 7, 2019 conference call, Defendant DeCesare also made the following

4  materially false or misleading statements regarding the maturity of Forescout's sales force and the

5  then-current strength of the Company's sales pipeline:

> And just to remind you, that our definition of ramped is they've been with Forescout for more than two years and they're in the territory for more than two years. ***That was 50% at the end of 2018 up from 35% a year prior, and although it's tracking very well for us, we're going to hold-off on disclosing what that percentage is until we finish 2019. With that said, you're kind of looking at like softer data points that are underneath that, we're quite happy with the level of pipeline we're building, the percentage of our sales reps that have been hired in the more recent cohorts like Asia-Pacific that did very well this quarter for us, there's a lot of indicators for us inside the business that are pointed in the right direction.*** You can always do better here, and until you're at a place where every single sales rep is making their numbers and producing results.  (emphasis added).

12      114.    The statements identified in Paragraph 113 were materially false or misleading when

13  made for the same reasons identified in Paragraphs 95-96 and 99-100.

14      115.    On August 12, 2019, Defendant Harms participated in the KeyBanc Capital Markets

15  Technology Leadership Forum.  At this event, Defendant Harms stated that Forescout raised its full

16  year guidance for revenues in the second quarter of 2019 because "we still had great visibility into

17  the rest of the year and still the confidence we have about how deals were taking shape."  Defendant

18  Harms also claimed that Defendant DeCesare and he had "spent a lot of our July time frame really

19  diving into the field to shape how Q3 was taking shape, how Q4 was taking shape, so that we could

20  reflect that additional insight and give you an appropriate level of guidance, which the Q3 was still

21  very solid, consistent with how I guided at the beginning of the year."

22      116.    The statements identified in Paragraph 115 were materially false or misleading when

23  made for the same reasons identified in Paragraphs 95-96 and Paragraphs 99-100.

24      **5.    The October 10, 2019 Press Release**

25      117.    On October 10, 2019, Forescout issued a press release that announced preliminary

26  financial results for the third quarter that ended on September 30, 2019.  Based upon a purported

27  preliminary review of financial information, Forescout announced that total revenue for the third

28  quarter was expected to be in the range of $90.6 million to $91.6 million, compared to the

Company's prior guidance of $98.8 million to $101.8 million.  In the press release, to address the materialization that revenues would fall short of the earlier guidance, Defendant DeCesare blamed the disappointing results on "extended approval cycles which pushed several deals out of the third quarter" due to deteriorating macroeconomic conditions in the EMEA region.  DeCesare was further quoted in the press release as falsely stating that the fundamentals of the business had not changed and the sales pipeline "continued to grow."

118.    On this partial disclosure or the materialization of the risks thereof, the price of Forescout's common stock declined by over 37% from its closing price of $39.20 on the previous day, to close at $24.565 per share on October 10, 2019, on heavy trading volume.

119.    Nevertheless, the statements identified in Paragraph 117 were materially false or misleading when made because the fundamentals of Forescout had changed substantially and its sales pipeline did not continue to grow but had already substantially deteriorated as fully explained in Paragraphs 95-96 and Paragraphs 99-100.

**6.    The November 6, 2019 Press Release and Earnings Conference Call**

120.    On November 6, 2019, Forescout issued a press release that announced financial results for the third quarter of 2019.  Total revenue was $91.6 million, missing guidance by at least $7.2 million on the low end, or approximately 7% for the quarter.  Defendant DeCesare again shifted blame from the U.S. market to "extended sales cycles" in the EMEA region for the revenue miss. The November 6, 2019 press release also stated that revenues would fall within the range of $93.5 million to $96.5 million for the fourth quarter of 2019.

121.    The fourth quarter 2019 revenue guidance was materially false or misleading because it lacked any objective basis and, in fact, was inconsistent with Forescout's actual business performance, which was known to Defendants, at the time it was issued for the same reasons identified in Paragraphs 95-96 and Paragraphs 99-100.

122.    The statements identified in Paragraph 120 were also materially false or misleading when made because by this time:

A.    According to CW6 and CW16, there were numerous hiring freezes in 2019, and CW6 states that another hiring freeze was instituted in September 2019 to increase cashflow

and blunt the impact of poor financial results. CW5, the Interim Director of International Accounting and Business Operations at Forescout from April 2018 to July 2019, and CW8, who both left the Company before these false statements were made confirm that the cuts to the sales force were widespread across divisions and departments and encompassed secondary roles in marketing and accounting. CW7 further confirms that the entire SLED section of the public sector division was eliminated in September 2019.

          B.      As CW18 confirms, by this point, Forescout had nearly eliminated the entire team of 60 SDRs and BDRs at the Company, fired or otherwise lost almost 25 to 30 NAMs with two or more years of experience, was on course to replace nearly 100 "ramped up" employees with inexperienced representatives who could not generate deals and revenue, all of which caused a loss of tens of millions in potential business. As a result, given that so many CWs confirm that the reduction of the sales force was a process that began as early as February 2019, by November 2019, Forescout was very close to wiping out all the gains in sales productivity from 2018 that Defendants misleadingly touted throughout 2019, and which declined from 50% to 38% no later than December 31, 2019.

          C.      Numerous NAMs, including CW7, CW10, CW11 and CW14 had already been forced to report illusory deals with no commitment as "committed" in the Company's sales pipeline platforms. The accounts of CW7, CW13 and CW14 show that the pressure was instigated by *both* DeCesare and Redman. In fact, CW19 confirms that he heard Hartley, the head of Americas for Forescout, state that deals should be listed as "committed" in the Salesforce platform based only on a single conversation with a senior executive during the negotiations stage although there was no purchase order or any kind of actual commitment.

     123.     The statements identified in Paragraph 120 were also knowingly or recklessly false when made for, at least, the following additional reasons:

          A.      Within two months of these false statements, CW18 heard DeCesare state at a sales kickoff event that Forescout reduced its sales force in 2019 and additional cuts needed to be made in early 2020 because the Company had failed to grow revenues in 2019, demonstrating his knowledge about the massive turnover in 2019 as well as the reasons for that turnover.

B.      On the August 7, 2019 earnings conference call, DeCesare refused to disclose the percentage of productive sales representatives who worked at the Company for more than 2 years "until we finish 2019," demonstrating that, at least, by November 2019, he was aware of the massive decline in sales productivity that did not occur overnight.

C.      DeCesare acted as the chief sales representative himself for large deals, was informed by Martin about the status of all deals over $500,000, viewed data on Clari to learn when the Company was short on its pipeline, identify deals that were at risk, and there were many at risk by this point, predict outcomes early in the quarter, and spot churn the risk of failure before time ran out.  DeCesare also received real-time information about deals through various other channels of communications as explained in Paragraph 100.

**7.      The February 6, 2020 Form 8-K**

124.      On February 6, 2020, the Company issued a press release, which was also attached as Exhibit 99.1 to a Form 8-K filed that same day with the SEC, announcing its results for Q4 2019. The first line of the press release reported "*Fourth Quarter Revenue of $91.3 million, compared to $84.7 million in fourth quarter of 2018.  Full Year Revenue of $336.8 million, compared to $297.7 million in the full year 2019.*"  (emphasis in original).  Elsewhere, the press release under a title "**Fourth Quarter 2019 Financial Highlights**" stated that: "[t]otal revenue was $91.3 million, an increase of 8% over the fourth quarter of 2019" and that "[l]icense revenue was $48.4 million, an increase of 2% over the fourth quarter of 2018."

125.      These statements made in the February 6, 2020, press release were materially false or misleading because they failed to disclose that Q4 2019 revenues, particularly license revenues, had been distorted and inflated through the frontloading of sales to Merlin, one of Forescout's largest resellers.  This front loading of sales resulted in both the total amount of revenues as well as license revenues being overstated, as well as the reported year-over-year rate of growth in those revenues from Q4 2018.

126.      The front loading of sales to Merlin and related distortion of the Company's reported revenue growth is evidenced by the following facts:

A. A whistleblower identifying Merlin as a business partner through which Forescout frontloaded sales in Q4 2019, according to a June 5, 2020, Subpoena Duces Tecum and Ad Testificandum Directed to Merlin in the Delaware Litigation defines "Whistleblower Email" as "the email sent from forescout.whistleblower@protonmail.com to Advent on May 5, 2020, alleging that Forescout involved Merlin in a channel stuffing scheme for Q4 2019."

B. CW15 asserted that Merlin agreed to resell Forescout's products for high value deals even though Merlin could not close the deals with the customers before the end of each quarter.

C. Forescout suffering an otherwise unexplained implosion of ***more than 60%*** in reported licensing revenue from $37,680,000 in Q1 2019 to $14,799,000 in Q1 2020. *See* Q1 2020 Form 10-Q at 7. This was followed by Q2 2020 in which total licensing revenue showed a less than 2% decline in reported total licensing revenue from $31,865,000 reported in Q2 2019 to $31,334,000 reported in Q2 2020, notwithstanding the economy suffering the same level of disruption from COVID-19 in Q2 2020 as in Q1 2020 (*see* Q2 2020 Form 10-Q at 14) and Forescout's peers not having suffered a similar decline in revenues. *See* Answer and Counterclaim ¶¶2-3 (characterizing Forescout's Q1 2020 results as "disastrous" and comparing them to Forescout's peers which "were almost uniformly reporting significant first quarter earnings and revenue gains"). The Company's Q1 2020 results are particularly telling because they came after the signing of the Original Merger Agreement giving Advent contractual right to monitor Forescout's internal reporting and operations allowing Advent to review the integrity of the revenues being reported by the Company and prevent similar frontloading of revenues in Q1 2020.

D. Forescout also suffered an otherwise unexplained deviation in total revenue from the $62 million Illustrative Guidance for Q1 2020 formulated in late January 2020 as disclosed in the Proxy Statement, representing a 24% decline from reported Q1 2019 revenue. *See* Proxy Statement at 61. The Company's actual results for Q1 2020 were $57.2 million, representing a 7.7% negative deviation in a relatively short period of time and that deviation would have been greater than 15% had Forescout not acted to sell $4.787 million in hardware ***at a loss***. *See* Q1 2020 Form 10-Q at 14, 26. The Company, in response to Advent's allegation that these Q1 2020 sales were

"highly unnatural (and detrimental) actions … to pull additional bookings into the quarter" "in a failed attempt to maintain at least some of its Q1 revenues, albeit at the expense of long-term value." *See* Answer and Counterclaim ¶¶32, 41.

E.     Forescout's independent auditor in the 2019 Form 10-K, filed with the SEC on February 28, 2020, openly questioned the Company's revenue recognition policies by including the following statement on "Critical Audit Matters" ***which had not been made with respect to Forescout's prior year financial statement*** contained in the 2018 Form 10-K filed with the SEC on March 1, 2019, by stating that:

> Auditing the Company's revenue recognition was challenging, specifically related to the identification and determination of the distinct performance obligations and the timing of revenue recognition.  For example, certain arrangements required judgment to determine the distinct performance obligations and the appropriate timing of revenue recognition.

F.     The Company acknowledging in the Delaware Litigation that it routinely provided end of quarter discounts in order to promote sales.  *See* Delaware Complaint ¶94 ("[a]ny discounts Forescout gave were consistent with the way Forescout has operated in the past.").

127.     Defendants' knowledge or extreme recklessness in making the materially false or misleading statements of February 6, 2020 is evidenced by at least the following facts:

A.     Forescout refused to provide Advent with a satisfactory explanation for the sudden dramatic implosion in the Company's revenue.  *See* Answer and Counterclaim ¶33.

B.     DeCesare was a micromanager who paid close attention to the Company's operations and sales through the Company's comprehensive system for internal reporting.  *See* ¶¶44-45, *supra.*

C.     The amount of licensing revenue earned by the Company is a material fact which had been separately reported upon by the Company (except in the Q3 2019 Form 10-Q) and discussed in the Management Discussion and Analysis section of the Company's SEC filings required by Item 303 of Regulation S-K, including the 2019 Form 10-K which was signed by both Defendants DeCesare and Harms.

D.     Forescout's Q4 2019 results had a direct impact on the price which Advent was negotiating to pay for the Company and were sufficiently material to potential acquirers that

SECOND CONSOLIDATED AMENDED COMPLAINT
CASE NO.: 20-CV-00076-SI

-48-

one such potential bidder refused to make an offer until it saw the Company's Q4 2019 results and their effect on its stock price. *See* Proxy Statement at 43-44. That price, in turn, had a material and substantial impact on the Forescout RSUs and stock owned by DeCesare and Harms. *See* ¶¶24-25, 61 *supra*.

**8.     The 2019 Form 10-K Filed on February 28, 2020**

128.     On February 28, 2020, Forescout filed its 2019 Form 10-K which represented, under a title "**Our Growth Strategy**[,]" that one of the primary drivers of the Company's growth was to:

> ***Expand our presence in the market by leveraging our ecosystem of channel partners***. We will continue to broaden and invest in our value added and system integrator channel partner relationships to increase distribution of our products. We are focused on educating existing partners and investing in sales enablement to expand our market reach through our channel partner network, particularly into mid-market enterprises.

129.     The 2019 Form 10-K also purported to disclose certain "risks and uncertainties" relating to Forescout's condition and prospect, including that "[t]he announcement and pendency of our agreement to be acquired by Advent could adversely affect our business."

130.     These statements made in the 2019 Form 10-K were materially false or misleading because, by that very time, two multinational professional services companies that were substantial business partners of Forescout had ***terminated*** their relationships with the Company and a third major partner had said that it could no longer be a go-to market partner for Forescout. *See* Delaware Complaint ¶93. The disruption in those relationships "caused tens of millions of dollars of Forescout's pipeline to be deregistered." *Id.*

131.     The terminations and downgrading of these business relationships, according to Forescout, were the direct outgrowth of the Company entering into the Original Merger Agreement. *Id.* In addition, "[o]ther customers ... simply expressed their unwillingness to work with a private equity buyer post-closing." *Id.* These issues manifested themselves through Forescout's sales pipeline and sales pipeline predictor tool during the last week of February 2020 and before the 2019 Form 10-K was filed with the SEC. *See* Counterclaim Answer ¶26.

132.     Defendants' knowledge or reckless disregard of these facts is evidenced by the materiality of those business relationships to Forescout, the Company monitoring those business

relationships through its sales pipeline predictor tool, Defendant Harms being actively involved in the Company's financial forecasting, and the ongoing communications between, DeCesare and Harms, on the ones hand, and senior executives of Advent, on the other hand, regarding the Planned Acquisition and the Company's ongoing business operations.  *See* Answer and Counterclaim ¶26 ("A few short weeks after the parties signed the Merger Agreement, Forescout's business cratered. Initially, during the last week of February 2020, [redacted] indicated that Forescout was on track to [redacted.]"); Counterclaim Answer ¶26 ("Forescout ... admits that Advent purports to characterize indications derived from Forescout's sales pipeline predictor tool during the last week of February 2020 regarding booking targets").

**9.      The Proxy Statement Filed on March 24, 2020**

133.      On March 24, 2020, Forescout issued and filed with the SEC its Proxy Statement in connection with the Planned Acquisition with respect to a special meeting of the Company's shareholders to be held on April 23, 2020 to consider and vote on a proposal to approve the Planned Acquisition.  The Proxy Statement identified the following risk factor with respect to the Planned Acquisition: "the effect of the announcement of pendency of the merger on our business relationships, customers, operating results and business generally...."

134.      That risk factor discussion contained in the Proxy Statement was materially false or misleading because, by that time, the Company had already actually suffered adverse consequences from announcing the Planned Acquisition since, according to Forescout's allegations later made in the Delaware Litigation, the announcement of the Planned Acquisition caused two multinational professional services companies that were substantial business partners of Forescout to *terminate* their relationships with the Company and a third major partner had said that it could no longer be a go-to market partner for Forescout.  *See* Delaware Complaint ¶93.  The disruption in those relationships "caused tens of millions of dollars of Forescout's pipeline to be deregistered."  *Id.*

135.      The Proxy Statement also incorporated by reference, *inter alia*, the 2019 Form 10-K and the Form 8-K filed with the SEC on February 6, 2020.  *See* Proxy Statement at 121.  As a result, the Proxy Statement was materially false or misleading for the same reasons as the statements made in those SEC filings.  *See* ¶¶125-27, 130-32, *supra*.

136.     The Proxy Statement also stated that the Company had prepared Illustrative Guidance in late January 2020 of $62 million and $355 million in revenue for the first quarter and all of 2020 and had prepared various financial models forecasting Forescout's future results, all of which showed steady increases in revenues from 2020 through FY 2029.  *See* Proxy Statement at 61, 64-65.  Defendants stated that Illustrative Guidance as well as the other financial forecasts contained in the Proxy Statement were forward looking statements which management believed were reasonable at the time they were made subject to the following generalized risk factors: "(1) general economic conditions; (2) the accuracy of certain accounting assumptions; (3) changes in actual or projected cash flows; (4) competitive pressures; and (5) changes in tax laws." Proxy Statement at 62.  In addition, the Proxy Statement generically stated that: "[a]dditional factors that may impact Forescout and its business can be found in the various risk factors included in Forescout's periodic filings with the SEC.  All of these factors are difficult to predict, and many of them are outside of Forescout's control."  *Id.*

137.     The five current risk factors disclosed in connection with presenting the Illustrative Guidance and the other forecasts contained in the Proxy Statement were not meaningful because they related to either generic economic events or risks the Company previously encountered rather than current risks affecting the viability and reasonableness of the financial forecasts contained in the Proxy Statement.  Indeed, the risk factors themselves were materially false or misleading because, by the time the Proxy Statement was filed with the SEC on March 24, 2020, Defendants knew that the Illustrative Guidance as it related to Q1 2020, as well as the periods going forward, could not possibly be achieved as on that very date Forescout's management reported sharply worsening financial conditions to Advent (Answer and Counterclaim ¶¶28-29) and Defendants knew of the ***already existing facts*** material impairment of the Company's business through the loss of key customer relationships.  *See* ¶¶77.C, 130, 134, *supra* (citing Delaware Complaint ¶93).

138.     Additionally, Defendants knew that the projections provided to potential acquirers, including the Illustrative Guidance, were generated from a defective system for reporting sales as committed when deals categorized as "committed" by the Company were not, in fact, committed to by customers. *See* ¶¶49-52, *supra*.  Moreover, according to CW 19, at a January 2020 "sales kickoff"

1    event, Forescout's Vice President of the Americas instructed sales representatives to list deals as

2    "committed" into the Salesforce platform on the basis of a single conversation with a potential

3    customer's C-suite executives or employees in the procurement group.

4         139.    Indeed, on July 20, 2020, the Company, in the Tender Offer Recommendation,

5    reported substantially more realistic revenue forecasts, prepared on July 13, 2020, reflecting

6    estimated revenue of $321 million for 2020, declining to $317 million for FY 2021, and then starting

7    to increase once again in FY 2022 to $358 million and in FY 2023 to $410 million compared to a

8    previous plan utilized by Morgan Stanley projecting $359 million in revenue, increasing steadily by

9    approximately 15% per year to $414 million, $461 million and $549 million for FY 2021, FY 2022

10   and FY 2023.

11        140.    The Proxy Statement also made the following disclosure with respect to Advent's

12   expected financing of the Planned Acquisition:

> Pursuant to a debt commitment letter, as amended and restated (which we refer to as the "debt commitment letter"), the financial institutions party thereto have severally and not jointly committed (1) to provide to Merger Sub on the closing date of the merger senior secured term loans in an aggregate principal amount of $400,000,000; and (2) to make available to Merger Sub (or, after the closing date of the merger, to the surviving corporation) senior secured revolving commitments in an aggregate principal amount of $40,000,000 (a portion of which may be made available to Merger Sub on the closing date of the merger), in each case, on the terms and subject to the conditions set forth in the debt commitment letter.

18        141.    This statement concerning the debt commitment letter was materially misleading

19   because Advent's ability to obtain the financing was dependent upon the projections of Forescout's

20   future operations, the prospects of which had been rapidly deteriorating in a manner which made

21   achieving the prior forecasts unrealistic.  Thus, Advent alleged in the Delaware Litigation that "on

22   March 20, when Forescout gave Buyers a preview to its 1Q2020 results, management reported to

23   Buyers that Forescout expected to [redacted.]  During a subsequent call on the same day, Forescout's

24   Chief Financial Officer, Christopher Harms admitted that he understood Parent's desire for the

25   updated forecasts and that he would have been conducting similar *liquidity planning* in light of

26   Forescout's recent performance and trajectory if the merger were not planned."   Answer and

27   Counterclaim ¶27 (emphasis added).

28

SECOND CONSOLIDATED AMENDED             -52-
COMPLAINT
Case No.: 20-CV-00076-SI

1          **10.     The April 23, 2020 Extraordinary Shareholders' Meeting**

2          142.    On April 23, 2020, at the extraordinary shareholders meeting, Daniel J. Milliken, the

3   Company's general counsel, stated that: "We currently expect the merger to be consummated on or

4   about May 18, 2020, after buyer's remarketing period ends."   The remarketing period referred to

5   Advent obtaining the necessary debt necessary to complete the funding of the Planned Acquisition.

6          143.    The April 23, 2020, statement was materially false or misleading because it omitted

7   material facts that conflict with what a reasonable investor would take from the statement itself.

8   Defendants failed to disclose that Advent had expressed reservations whether the conditions to the

9   closing of the Original Merger Agreement would be met.   Forescout admitted this fact in July 20,

10  2020 the Tender Offer Recommendation on which stated that:

> On April 20, 2020, Forescout received a letter from Parent in which Parent expressed
> concern about deteriorations in the performance and prospects of Forescout's
> business.   The letter also stated that Parent was reviewing Forescout's business,
> operations, future prospects and financial condition in order to assess whether the
> conditions to closing provided in the ... Merger Agreement would be met.

14         144.    Defendants knew of this letter because:

15              A.     it was sent to Forescout and, as explained in the filings in the Delaware

16  Litigation, DeCesare and Harms communicated with Advent on behalf of Forescout.  *See* Answer

17  and Counterclaim ¶38; Counterclaim Answer ¶38 (admitting that DeCesare explained to Parent on

18  April 20, 2020, that Forescout continued to operate under its Board-approved plan);

19              B.     DeCesare and Harms were intimately involved in the ongoing discussion with

20  Advent following the signing of the Original Merger Agreement (*see* Delaware Complaint ¶¶1, 75,

21  78, 89; Answer and Counterclaim ¶¶27, 35, 38, 63); and,

22              C.     after April 20, 2020, the Strategic Committee began considering the possible

23  effect of Advent refusing to proceed with the Planned Acquisition as negotiated in the Original

24  Merger Agreement.  *See* Tender Offer Recommendation at 32.

25         145.    The statements made at the April 23, 2020, extraordinary shareholders meeting were

26  transcribed by Thomson Reuters and are available at https://east.virtualshareholdermeeting.com/

27  vsm/web?pvskey=FSCT2020.   The transcription and recording demonstrate that the statements

28

SECOND CONSOLIDATED AMENDED          -53-
COMPLAINT
CASE NO.: 20-CV-00076-SI

Defendants made on April 23, 2020, were not identified as forward-looking statements and that no meaningful risk factors were identified at the time they were made.

**11.    The April 23, 2020 Press Release**

146.    On April 23, 2020, Forescout also issued a press release which was attached as an exhibit to a Form 8-K filed the next day, stating in relevant part that:

> Forescout continues to expect the transaction to close in the second calendar quarter of 2020 following the completion of a customary debt "marketing period" by Advent. Upon completion of the transaction, Forescout common stock will no longer be listed on any public market.

147.    Forescout's April 23, 2020, press release was materially false and misleading, and Defendants knew Forescout's April 23, 2020, press release was materially false and misleading for the same reasons the statement made at Forescout's April 23, 2020, shareholders' meeting was materially false and misleading, and for the same reasons they knew that statement was materially false and misleading.

148.    Despite Advent having already expressed concerns about closing the Planned Acquisition and Forescout working on contingency plans, Forescout's press release contained only generic warnings about risks and uncertainties regarding the Planned Acquisition, including "the risk that the conditions to the closing of the transaction are not satisfied; potential litigation relating to the transaction; uncertainties as to the timing of the consummation of the transaction and the ability of each party to consummate the transaction; … and the risks described in the filings that Forescout makes with the Securities and Exchange Commission from time to time, including the risks described under the headings "Risk Factors" and "Management Discussion and Analysis of Financial Condition and Results of Operations" in Forescout's Annual Report on Form 10-K, which was filed with the Securities and Exchange Commission on February 28, 2020, and which should be read in conjunction with Forescout's financial results and forward-looking statements…."

**12.    The Form 10-K/A Filed April 29, 2020**

149.    On April 29, 2020, the Company filed the Form 10K/A with the SEC which, incorporated the 2019 Form 10-K by reference and also stating that:

> Forescout expected to hold its 2020 Annual Meeting of Stockholders ("2020 Annual Meeting") in late May 2020; however, Forescout expects the proposed acquisition of Forescout by entities affiliated with Advent ... to close in the second quarter of 2020

and, as such, our Board of Directors has decided not to hold the 2020 Annual Meeting at this time.

150.     The Form 10K/A was materially false or misleading because, by that very time, Defendants knew that Advent had expressed significant concerns about closing the transaction. *See* ¶77, *supra*.  In addition, the Form 10K/A was materially false or misleading for all the same reasons as the 2019 Form 10-K.

151.     Defendants knew the Form 10K/A was materially false and misleading for the same reasons they knew Forescout's April 23, 2020, statements were materially false and misleading.

152.     The false and misleading statements Defendants made on April 29, 2020, were not protected statements of opinion protected by meaningful cautionary language because like Forescout's April 23, 2020, statements they were made at a time when Defendants knew that Advent had expressed reservations about its ability to close on the Original Merger Agreement.

**13.     The May 11, 2020 Press Release**

153.     Despite Advent having already expressed concerns about closing the Planned Acquisition and Forescout working on contingency plans, Forescout's press release contained only generic warnings about risks and uncertainties regarding the Planned Acquisition, including "the risk that the conditions to the closing of the transaction are not satisfied; potential litigation relating to the transaction; uncertainties as to the timing of the consummation of the transaction and the ability of each party to consummate the transaction; … and the risks described in the filings that Forescout makes with the Securities and Exchange Commission from time to time, including the risks described under the headings "Risk Factors" and "Management Discussion and Analysis of Financial Condition and Results of Operations" in Forescout's Annual Report on Form 10-K, which was filed with the Securities and Exchange Commission on February 28, 2020, and which should be read in conjunction with Forescout's financial results and forward-looking statements…."

154.     On May 11, 2020, Forescout disclosed that its Q1 2020 results were $57 million, or $5 million less than the Illustrative Guidance disclosed just eight days before the end of that quarter. Forescout also disclosed that during Q1 2020 it had deeply discounted two large hardware deals resulting in a negative gross margin of 8% for hardware sales for the fiscal quarter.  Forescout,

however, blunted a further decline in its stock price by quoting DeCesare in its May 11, 2020, press release as stating that "we look forward to completing our pending transaction with Advent."

155.     The statement made in the May 11, 2020 press release was materially false or misleading because it failed to disclose that on May 8, 2020, "**Advent Signal[ed] its Intention to Renege on the Merger Agreement.**"  Delaware Complaint at p. 38.  Specifically, "[o]n May 8, 2020, a representative of Advent contacted Forescout's Chief Executive Officer and said that Advent was considering not closing.  Advent's representative said that they could not *'make the numbers work*[.]'" (emphasis added).  Delaware Complaint ¶8.  *See also* Counterclaim Answer ¶63 (Forescout "admits that on May 8, 2020, a representative of Advent contacted Forescout's CEO and told him, among other things, that Advent was considering not closing the Merger.").  The May 8, 2020, conversations were not the first time Advent expressed serious concerns that the proposed transaction could not close.  *See* Answer and Counterclaim ¶63 (on May 8, 2020, "Parent also *reiterated* its *bona fide* belief that consummation of the Transaction would render Forescout insolvent, effectively preventing Parent from closing the financing.") (emphasis added).

156.     Advent's action did not surprise Defendants, because as the Tender Offer Recommendation-9 later filed with the SEC on July 20, 2020 disclosed, from April 23, 2020 through the first half of May, Advent and Forescout had "discussions regarding Forescout's business and financial condition, as well as the information requests in Parent's letter of April 20, 2020.  In addition, the *Strategic Committee and the Forescout Board met regularly to discuss*, among other things, (1) Forescout's business; (2) the information requests from Parent; and (3) *Forescout's options should Parent not proceed with consummating the acquisition of Forescout pursuant to the terms of the Original Merger Agreement*." (emphasis added).

157.     The Termination Letter itself also references earlier discussions by stating "*[a]s we have discussed*, while Parent continues to satisfy its obligations under the Merger Agreement, we have been actively reviewing the Company's business, operations, future prospects, and financial condition, in keeping with Parent's obligations to its investors."  (emphasis added).

1

**LEAD PLAINTIFFS' CLASS ACTION ALLEGATIONS**

2       158.    Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil

3   Procedure 23(b)(3) on behalf of all persons or entities that purchased or otherwise acquired

4   Forescout common stock during the period from February 7, 2019 through May 15, 2020 (the "Class

5   Period"), both dates inclusive.  Excluded from the Class are Defendants, officers and directors of

6   Forescout, any entity in which the Defendants have or had a controlling interest; and affiliates,

7   family members, legal representatives, heirs, successors or assigns of any of the above.

8       159.    The Class is so numerous that joinder of all members is impracticable.  Throughout

9   the Class Period, Forescout common stock was actively traded on the NASDAQ Global Select

10  Market under the ticker symbol "FSCT."   Lead Plaintiffs believe that there are thousands of

11  members in the proposed Class, with the overwhelming majority of Class members having held

12  shares in a street name.  Potential Class members may be identified from records maintained by

13  Forescout, its transfer agents, and brokers and banks that hold shares beneficially for investors in a

14  street name and may be notified of the pendency of this action by mail, using the form of notice

15  similar to that customarily used in securities class actions.

16      160.    Lead Plaintiffs' claims are typical of the claims of those of the Class, as all Class

17  members were similarly affected by Defendants' wrongful conduct in violation of federal law

18  complained of herein.

19      161.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the

20  Class and have retained counsel competent and experienced in class action and securities litigation.

21      162.    Common questions of law and fact exist as to all Class members and predominate

22  over any questions solely affecting individual Class members.  Among the questions of law and fact

23  common to the Class are:

24          A.      whether Forescout and the Individual Defendants made false statements or

25  failed to disclose material information that rendered their Class Period statements as misleading;

26          B.      whether the Individual Defendants are control persons of Forescout for

27  purposes of Section 20(a) of the Exchange Act;

28

1    C.    whether Forescout and the Individual Defendants made the

2    misrepresentations or omissions with scienter;

3    D.    whether the federal securities laws were violated by Defendants' acts as

4    alleged herein;

5    E.    whether the prices of Forescout's securities during the Class Period were

6    artificially inflated because of the Defendants' misconduct complained of herein; and,

7    F.    whether the Class has sustained damages with respect to its Exchange Act

8    claims and, if so, what is the proper measure of damages.

9    163.    A class action is superior to all other available methods for the fair and efficient

10   adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the

11   damages suffered by individual Class members may be relatively small, the expense and burden of

12   individual litigation make it impossible for Class members to individually redress the wrongs done

13   to them.  There will be no difficulty in the management of this action as a class action.

14   164.    With respect to the Exchange Act claims, Lead Plaintiffs will rely, in part, upon the

15   presumption of reliance established by the fraud-on-the-market doctrine in that:

16   A.    Defendants made public misrepresentations or failed to disclose material

17   facts during the Class Period;

18   B.    the omissions and misrepresentations were material;

19   C.    Forescout's common stock traded in an efficient market;

20   D.    the Company's common stock was liquid and traded with moderate to heavy

21   volume during the Class Period;

22   E.    the Company traded on the NASDAQ Global Select Market, and was covered

23   by multiple analysts;

24   F.    the misrepresentations and omissions alleged would tend to induce a

25   reasonable investor to misjudge the value of the Company's common stock; and,

26   G.    Lead Plaintiffs and other Class members purchased or otherwise acquired

27   Forescout common stock between the time that the Defendants failed to disclose or misrepresented

28

material facts, and the time that the true facts were disclosed or materialized, without knowledge of the omitted or misrepresented facts.

165.    Based upon the foregoing, Lead Plaintiffs and other Class members are entitled to a presumption of reliance upon the integrity of the market if they did not actually rely on Defendants' materially false or misleading statements.

166.    Alternatively, Lead Plaintiffs and the Class members are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in violation of a duty to disclose such information, as detailed above.

## COUNT I:

### (Against Defendants Forescout, DeCesare and Harms for

### Violations of Section 10(b) and Rule 10b-5)

167.    Lead Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 to 166 above as if fully set forth herein.

168.    This Count is asserted against Forescout and each of the Individual Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

169.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon the Lead Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including the Lead Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Forescout common stock; and (iii) cause Lead Plaintiffs and other members of the Class to purchase or otherwise acquire Forescout common stock at artificially inflated prices.

170.    Specifically, Forescout and the Individual Defendants made material misrepresentations and omitted to disclose material information that rendered their statements misleading as particularized in Paragraphs 80 through 157.

171.    The Individual Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive the Lead Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Forescout and the Individual Defendants.  In addition to the facts alleged herein demonstrating a strong inference of scienter, certain information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within these Defendants' knowledge and control.  As the senior managers of Forescout, the Individual Defendants had knowledge of the details of Forescout's internal affairs that were inconsistent with their public statements.

172.    As officers and directors of a publicly held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information regarding Forescout's business, operations, and finances.  As a result of the dissemination of the aforementioned false and misleading statements, the market price of Forescout common stock was artificially inflated throughout the Class Period.  Additionally, as sellers of Forescout common stock during the Class Period, the Individual Defendants had a duty to disclose or refrain from trading on Forescout's artificially inflated stock price.

173.    In ignorance of the adverse facts concerning Forescout's business, operations and finances, which were concealed by the misrepresentations and omissions alleged herein, Lead Plaintiffs and the other members of the Class purchased or otherwise acquired Forescout common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock or upon statements disseminated by Defendants and were damaged thereby.

174.    During the Class Period, Forescout's common stock was traded on an active and efficient market.  Lead Plaintiffs and the other members of the Class, directly relying on the

materially false and misleading statements described herein, or relying upon the integrity of the market, purchased or otherwise acquired shares of Forescout at prices artificially inflated by Defendants' wrongful conduct.  Had Lead Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock or would not have purchased or otherwise acquired it at the inflated prices that were paid.  At the time of the purchases or acquisitions by Lead Plaintiffs and the Class, the true value of Forescout's common stock was substantially lower than the prices paid by Lead Plaintiffs and the other members of the Class.  The market price of Forescout's common stock declined sharply upon public disclosure of the facts or materialization of the risks alleged herein to the injury of Lead Plaintiffs and other Class members.

175.    By reason of the conduct alleged herein, Forescout and the Individual Defendants knowingly or recklessly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

176.    As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and the other Class members suffered damages in connection with their respective purchases of the Company's common stock during the Class Period when the risk of Defendants' wrongdoing materialized or upon the disclosure thereof, causing the price of Forescout common stock to decline.  Forescout and the Individual Defendants are liable for damages in connection with these losses under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

### COUNT II:

### (Against Defendants DeCesare and Harms for

### Violations of Section 20(a) of the Exchange Act)

177.    Lead Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 to 176 above, as if fully set forth herein.

178.    During the Class Period, DeCesare and Harms participated in the operation and management of Forescout, and conducted and participated, directly and indirectly, in the conduct of Forescout's business affairs.  Because of their senior positions, they knew the adverse non-public information that rendered Forescout's public statements false and misleading.

179.     As officers and directors of a publicly owned company, DeCesare and Harms had a duty to disseminate accurate and truthful information with respect to Forescout's financial information and results of operations, and to correct promptly any public statements issued by Forescout, which had become materially false or misleading.

180.     Because of their positions of control and authority as senior officers, DeCesare and Harms were able to, and did, control the Company's statements, which Forescout disseminated in the marketplace during the Class Period concerning Forescout's financial information and business. Throughout the Class Period, DeCesare and Harms exercised their power and authority to cause Forescout to engage in the wrongful acts complained of herein.  DeCesare and Harms, therefore, were "controlling persons" of Forescout within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Forescout common stock.

181.     DeCesare and Harms, therefore, acted as controlling persons of Forescout.  By reason of their senior management positions and/or being directors of Forescout, DeCesare and Harms had the power to direct the actions of, and exercised the same to cause, Forescout to engage in the unlawful acts and conduct complained of herein.  DeCesare and Harms exercised control over the general operations of Forescout and possessed the power to control the specific activities, which comprise the primary violations about which Lead Plaintiffs, and the other members of the Class, complain.

182.     As control persons, DeCesare, and Harms are liable pursuant to Section 20(a) of the Exchange Act for the primary violations of the Exchange Act committed by Forescout.

## PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiffs demand judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiffs as the Class Representatives;

B.     Requiring Defendants to pay damages sustained by the Lead Plaintiffs and the Class by reason of the acts and transactions alleged herein;

1      C.      Awarding Lead Plaintiffs and the other members of the Class prejudgment and post-

2  judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and,

3      D.      Awarding such other and further relief as this Court may deem just and proper.

4                         **<u>DEMAND FOR TRIAL BY JURY</u>**

5      Lead Plaintiffs hereby demand a trial by jury.

6  Dated:  May 10, 2021                    **POMERANTZ LLP**

7

8                                          By:  _/s/ *Omar Jafri*[2]_____
                                           Patrick V. Dahlstrom
9                                          Omar Jafri
                                           Ten South La Salle Street, Suite 3505
10                                         Chicago, Illinois 60603
                                           Telephone: (312) 377-1101
11                                         Facsimile: (312) 377-1184
                                           E-mail: pdahlstrom@pomlaw.com
12                                                 ojafri@pomlaw.com

13                                                 -and-

14                                         Jennifer Pafiti (SBN 282790)
                                           1100 Glendon Avenue, 15th Floor
15                                         Los Angeles, California 90024
                                           Telephone: (310) 405-7190
16                                         E-mail: jpafiti@pomlaw.com

17                                                 -and-

18                                         Jeremy A. Lieberman
                                           J. Alexander Hood II
19                                         600 Third Avenue, 20th Floor
                                           New York, New York 10016
20                                         Telephone: (212) 661-1100
                                           Facsimile: (212) 661-8665
21                                         E-mail: jalieberman@pomlaw.com
                                                  ahood@pomlaw.com

22

23

24

25

26

27  _____

28  [2] Orly Guy and Eitan Lavie, who are Of Counsel to Pomerantz LLP and admitted to practice in
    Israel, also provide advice to Meitav in connection with this matter.

SECOND CONSOLIDATED AMENDED                -63-
COMPLAINT
CASE NO.: 20-CV-00076-SI

1

2

**ABRAHAM, FRUCHTER
& TWERSKY, LLP**

3

By:  /s/ *Jeffrey S. Abraham*
Jeffrey S. Abraham

4

(admitted *Pro Hac Vice*)
Michael J. Klein

5

(admitted *Pro Hac Vice*)
One Penn Plaza, Suite 2805

6

New York, NY 10119
Telephone: (212) 279-5050

7

Facsimile: (212) 279-3655
E-mail: JAbraham@aftlaw.com

8

MKlein@aftlaw.com

9

-and-

10

Takeo A. Kellar (SBN 234470)
11622 El Camino Real, Suite 100

11

San Diego, CA 92130
Telephone: (858) 764-2580

12

Facsimile: (858) 764-2582
E-mail:  TKellar@aftlaw.com

13

*Co-Lead Counsel*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on May 10, 2021, a copy of the foregoing was filed electronically via the Court's CM/ECF system.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's CM/ECF System.

Dated:  May 10, 2021

**POMERANTZ LLP**

By: _/s/Omar Jafri_
Omar Jafri

*Co-Lead Counsel*