Anne Johnson Palmer (CSB #302235)
ROPES & GRAY LLP
Three Embarcadero Center
San Francisco, CA 94111-4006
Tel: (415) 315-6300
Fax: (415) 315-6350
Anne.JohnsonPalmer@ropesgray.com

Charles D. Zagnoli (admitted *pro hac vice*)
ROPES & GRAY LLP
191 N. Wacker Dr., 32nd Floor
Chicago, IL 60606
Tel: (312) 845-1200
Fax: (312) 845-5522
Charles.Zagnoli@ropesgray.com

Peter L. Welsh (admitted *pro hac vice*)
C. Thomas Brown (admitted *pro hac vice*)
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199-3600
Tel: (617) 951-7000
Fax: (617) 951-7050
Peter.Welsh@ropesgray.com
Thomas.Brown@ropesgray.com

*Attorneys for Defendant
Forescout Technologies, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| CHRISTOPHER L. SAYCE, Individually and on Behalf of All Others Similarly Situated,<br><br>    *Plaintiff*,<br><br>        v.<br><br>FORESCOUT TECHNOLOGIES, INC., MICHAEL DECESARE, and CHRISTOPHER HARMS,<br><br>    *Defendants*. | CASE NO.: 3:20-cv-00076-SI<br><br>CLASS ACTION<br><br>**DEFENDANT FORESCOUT'S NOTICE OF MOTION AND MOTION TO DISMISS SECOND CONSOLIDATED AMENDED COMPLAINT**<br><br>Date:  August 27, 2021<br>Time: 10:00 A.M.<br>Dept.: Courtroom 1, 17th Floor<br><br>Before: Hon. Susan Illston |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **TABLE OF CONTENTS**

Page

NOTICE OF MOTION AND MOTION ............................................................. 1

STATEMENT OF ISSUES TO BE DECIDED (CIVIL L.R. 7-4(a)(3)) ........................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ........................................ 1

FACTUAL AND PROCEDURAL BACKGROUND ............................................ 3

ARGUMENT ....................................................................................... 6

I.     NEARLY ALL CHALLENGED STATEMENTS ARE NONACTIONABLE UNDER
       THE PSLRA AS FORWARD-LOOKING STATEMENTS OR OPINIONS ........................ 7

II.    PLAINTIFFS' OPERATIONS-RELATED THEORIES STILL REST ON VAGUE,
       INSUFFICIENT FALSITY AND SCIENTER ALLEGATIONS .......................................... 11

       A.     The SAC Fails to Adequately Plead Any Statements' Falsity ................................ 12

              1.     The CW Allegations Remain Deficient ............................................. 12

              2.     Sales Pipeline Allegations ............................................................ 15

              3.     Sales Force Tenure Allegations ..................................................... 18

              4.     "Front-Loaded" Revenue Allegations ............................................ 20

       B.     The SAC Fails to Plead a Strong Inference of Scienter ............................................ 22

III.   THE SAC AGAIN FAILS TO SUFFICIENTLY PLEAD A MERGER THEORY ............. 22

IV.    PLAINTIFFS INADEQUATELY PLEAD COGNIZABLE HARM FOR STOCK
       PURCHASES MADE BETWEEN OCTOBER 10, 2019 AND FEBRUARY 6, 2020 ........ 24

V.     CONCLUSION ....................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Accuray, Inc. Sec. Litig.*,
  757 F. Supp. 2d 936 (N.D. Cal. 2010) ..............................................................*passim*

*Alaska Elec. Pension Fund v. Adecco S.A.*,
  434 F. Supp. 2d 815 (S.D. Cal. 2006), *aff'd*, 256 F. App'x 74 (9th Cir. 2007) ........................ 13

*Brodsky v. Yahoo! Inc.*,
  630 F. Supp. 2d 1104 (N.D. Cal. 2009) .................................................... 12, 13, 16, 19

*Carey Camp v. Qualcomm Inc.*,
  No. 18-cv-1208, 2020 WL 1157192 (S.D. Cal. Mar. 10, 2020) ................................. 25

*In re CDnow, Inc. Sec. Litig.*,
  138 F. Supp. 2d 624 (E.D. Pa. 2001) ....................................................... 23

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
  856 F.3d 605 (9th Cir. 2017) ............................................................. 11

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
  880 F. Supp. 2d 1045 (N.D. Cal. 2012) .................................................. 14, 16, 17, 20

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
  No. 5:11–CV–04003, 2013 WL 2156358 (N.D. Cal. May 17, 2013) ........................ 15

*In re Copper Mountain Sec. Litig.*,
  311 F. Supp. 2d 857 (N.D. Cal. 2004) ................................................. 9, 15, 18

*In re Cutera Sec. Litig.*,
  610 F.3d 1103 (9th Cir. 2010) ........................................................ 7, 9, 10

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005)................................................................. 24

*Eisenstadt v. Centel Corp.*,
  113 F.3d 738 (7th Cir. 1997) ........................................................... 23

*In re Fusion-io, Inc. Sec. Litig.*,
  No. 13-CV-05368, 2015 WL 661869 (N.D. Cal. Feb. 12, 2015) ............................ 15

*Harris v. Ivax Corp.*,
  182 F.3d 799 (11th Cir. 1999) .......................................................... 7

*Kelly v. Elec. Arts, Inc.*,
    71 F. Supp. 3d 1061 (N.D. Cal. 2014) .................................................................................. 25

*Mazzaferro v. Aruba Networks Inc.*,
    No. 13-CV-02342, 2014 WL 12680773 (N.D. Cal. Aug. 1, 2014) ........................................ 14

*McCasland v. FormFactor Inc.*,
    No. C 07–5545, 2009 WL 2086168 (N.D. Cal. July 14, 2009) ............................................. 14

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
    540 F.3d 1049 (9th Cir. 2008) ....................................................................................... *passim*

*Monachelli v. Hortonworks, Inc.*,
    225 F. Supp. 3d 1045 (N.D. Cal. 2016) .............................................................................. 13

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015)............................................................................................................. 11

*Or. Pub. Emps.' Ret. Fund v. Apollo Grp. Inc.*,
    774 F.3d 598 (9th Cir. 2014) ......................................................................................... 15, 25

*Pittleman v. Impac Mortg. Holdings, Inc.*,
    No. SACV 07–0970, 2009 WL 648983 (C.D. Cal. Mar. 9, 2009), *aff'd sub nom.*
    *Sharenow v. Impac Mortg. Holdings, Inc.*, 385 F. App'x 714 (9th Cir. 2010).......................... 22

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
    759 F.3d 1051 (9th Cir. 2014) ....................................................................................... *passim*

*In re Quality Sys., Inc. Sec. Litig.*,
    865 F.3d 1130 (9th Cir. 2017) ......................................................................................... 9, 14

*Shurkin v. Golden State Vintners Inc.*,
    471 F. Supp. 2d 998 (N.D. Cal. 2006), *aff'd*, 303 F. App'x 431 (9th Cir. 2008) ............... 17, 18

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
    160 F. Supp. 2d 1059 (N.D. Cal. 2001) ............................................................................ 10, 20

*Steckman v. Hart Brewing, Inc.*,
    143 F.3d 1293 (9th Cir. 1998) ........................................................................................... 20

*In re SunPower Corp. Sec. Litig.*,
    No. 16-cv-04710, 2018 WL 1863055 (N.D. Cal. Apr. 18, 2018)....................................... 7, 22

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)............................................................................................................. 22

*Vitalone v. Logitech Int'l SA*,
    No. C 11-03855, 2012 WL 13041992 (N.D. Cal. July 13, 2012)................................ 15, 18, 20

*Waterford Twp. Police v. Mattel, Inc.*,
    321 F. Supp. 3d 1133 (C.D. Cal. 2018) ................................................................. 10

*In re White Elec. Designs Corp. Sec. Litig.*,
    416 F. Supp. 2d 754 (D. Ariz. 2006) ............................................................... 16, 17

*Wochos v. Tesla, Inc.*,
    985 F.3d 1180 (9th Cir. 2021) ....................................................................*passim*

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ......................................................................*passim*

**Statutes**

15 U.S.C. § 78u–4(b)(1) ................................................................................................ 12

15 U.S.C. § 78u–5(c) ....................................................................................................... 7

15 U.S.C. § 78u–5(c)(1)(A)(i) ........................................................................................ 9

15 U.S.C. § 78u–5(c)(1)(B) .......................................................................................... 10

15 U.S.C. § 78u–5(i)(1) ................................................................................................... 7

**Rules**

Fed. R. Civ. P. 8 ............................................................................................................... 1

Fed. R. Civ. P. 9(b) ............................................................................................... 1, 7, 25

Fed. R. Civ. P. 12(b)(6) ................................................................................................... 1

**Other**

17 C.F.R. § 240.10b-5 ...................................................................................................... 7

**NOTICE OF MOTION AND MOTION**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that, on August 27, 2021, at 10:00 a.m., or as soon thereafter as this motion may be heard before the Honorable Susan Illston of the U.S. District Court for the Northern District of California, 450 Golden Gate Avenue, San Francisco, CA 94102, Defendant Forescout Technologies, Inc. ("Forescout" or the "Company") will and hereby does move for an order dismissing the second consolidated amended complaint, Dkt. 142 (the "SAC" or "¶ _"). Forescout also joins the motion to dismiss filed by Defendants Michael DeCesare and Christopher Harms (the "Individual Defendants," and collectively with Forescout, "Defendants").

Forescout seeks dismissal pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Fed. R. Civ. P. 12(b)(6), 8, and 9(b). This motion is based upon the Notice of Motion and Motion; the Memorandum of Points and Authorities; Defendants' accompanying request for judicial notice; the accompanying Declaration of Charles D. Zagnoli and its exhibits ("Ex. _"); the Individual Defendants' motion to dismiss ("ID MTD") and supporting papers filed concurrently herewith; the pleadings and records; oral argument; and any other matters properly before the Court.

**STATEMENT OF ISSUES TO BE DECIDED (CIVIL L.R. 7-4(a)(3))**

1.  Have Plaintiffs sufficiently alleged an actionable misrepresentation or omission?

2.  Have Plaintiffs alleged the requisite strong inference of scienter?

3.  Have Plaintiffs sufficiently pled loss causation for the period from October 10, 2019 through February 6, 2020?

4.  Should the SAC be dismissed with prejudice?

**MEMORANDUM OF POINTS AND AUTHORITIES**

Plaintiffs are now on their fourth complaint. Despite efforts to reorganize the same material to create the impression that recycled content is new, and the addition of a few more confidential witnesses ("CWs") making allegations largely repetitive of existing CWs, the SAC leaves uncured the fundamental defects identified by the Court when dismissing the last complaint. Plaintiffs ground their claims on the idea that Forescout's senior executives somehow knew their revenue guidance was unachievable when the guidance was disclosed. Of course, Plaintiffs ignore that Forescout met

1   or exceeded its quarterly guidance through the first half of 2019.  And when Forescout anticipated a

2   miss in the third quarter, it disclosed its results a month ahead of its regular reporting schedule,

3   proactively lowered guidance for the fourth quarter, and missed the revised target by a mere 2.4%.

4   Plaintiffs' claim that Forescout's revenue predictions were a fraud from the start cannot stand where

5   reported earnings largely aligned with predictions, which Forescout proactively corrected as needed.

6        Likewise, the attempt to cast statements about Forescout's sales function as false cannot

7   withstand scrutiny.  To start, Plaintiffs do not allege that any specific disclosed figures about sales

8   force size, tenure, or productivity were false.  Instead, Plaintiffs weave together vague allegations

9   from CWs in low- to mid-level sales positions, attempting to create an impression that the sales force

10  faced massive attrition and extreme sales-target misses.  On that basis, Plaintiffs claim that *any*

11  positive statement about the sales force, no matter how vague, was necessarily false or misleading.

12  This is not the particularized pleading required to state a claim under the PSLRA.  Nor does the

13  narrative align with Forescout's undisputed production of over $350 million in revenue during 2019,

14  in line with the guidance Forescout provided and updated quarterly.  To the limited extent the SAC

15  attempts to add specifics to the vague allegations previously rejected by the Court, the new details

16  confirm that the sales force statements were not false when made.

17       The one substantive addition to the SAC comes through a new CW18.  He allegedly stated

18  that Forescout declined to adopt a new pipeline management system because it supposedly revealed

19  that some deals were classified too aggressively.  Beyond the fact that CW18 claims consideration

20  of this new system occurred before the class period, there is no specific factual allegation that

21  Forescout's senior management rejected the new system for any particular reason, much less for the

22  speculative reasons CW18 asserts or for any reason related to revenue guidance.  These allegations

23  suffer the same defects identified by the Court:  As with all other CWs, new and old, no allegations

24  put CW18 anywhere near the Individual Defendants or the preparation of revenue guidance.  All the

25  more, the SAC still offers no allegations on how the supposed problems in classifying potential deals

26  translated into the company-wide guidance—which proved quite accurate on a quarterly basis.

27       Finally, the SAC does nothing to fix the glaring problems with the channel-stuffing and

28  merger-related claims.  Restyling channel-stuffing allegations as "front-loading revenue" ignores the

1  real defect:  the lack of any specific allegation that any reported revenue was not real, or improperly

2  reported in the quarter in which it was recognized.  And nothing in the SAC avoids the basic point

3  that Forescout had no duty to speculate about what its merger counterparty would or would not do

4  as the closing approached.  When Forescout received notice that the counterparty would not close,

5  Forescout disclosed the notice the next business day and successfully closed the deal in later months.

6          For these reasons and others addressed below, the SAC should be dismissed.  Because

7  Plaintiffs have failed to state a claim after three amendments—and having seen two rounds of

8  motions to dismiss and the Court's Order—dismissal should be with prejudice.  *See Metzler Inv.*

9  *GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1072 (9th Cir. 2008) ("[D]istrict court's discretion

10  to deny leave to amend is particularly broad where plaintiff has previously amended the complaint.").

11                              **FACTUAL AND PROCEDURAL BACKGROUND**

12          Forescout provides device visibility and control solutions that protect organizations'

13  computer networks from cyberattacks.  ¶¶ 1, 27; Ex. 3 at 6.  The Company's customers span a wide

14  range of industries—such as financial services, government, healthcare, manufacturing, energy,

15  entertainment, and retail, Ex. 3 at 7—and include organizations such as the U.S. Postal Service, U.S.

16  Army, Sony, NASA, 20th Century Fox, Kimberly-Clark, Siemens, CVS, and AIG.  Ex. 5 at 11.

17          Forescout experienced significant revenue growth after an October 2017 initial public

18  offering.  ¶ 1.  On February 7, 2019, the Company reported revenue of $297.7 million for FY2018,

19  beating prior year results by approximately 33% and exceeding 2018 projections.  Ex. 1; ¶¶ 31, 80.

20  The same press release announcing these results provided revenue guidance projecting $71.9–$74.9

21  million for 1Q2019 and $363.1–$373.1 million for FY2019.  Ex. 1; ¶ 80.  Forescout cautioned that

22  its forward-looking guidance was subject to a number of risks, including risks to its "expectations

23  concerning the productivity of [its] expanding sales force as [its] sales representatives become more

24  seasoned," "fluctuations in [its] quarterly results," and "increasing competition."  Ex. 1.  Forescout

25  warned that if "any of these risks or uncertainties materialize, or if any of [its] assumptions prove

26  incorrect, [its] actual results could differ materially from the results expressed or implied by these

27  forward-looking statements."  *Id.*  The Company's annual Form 10-K filed on March 1, 2019,

28  reiterated these cautionary statements with twenty-eight pages of specific "Risk Factors" tailored to

1   Forescout's business, Ex. 3 at 14–41, including that its "ability to forecast . . . future results . . . is

2   limited and subject to a number of uncertainties" due to "recent changes in [its] market, sales

3   organization and go-to-market strategies" and its "limited operating history," *id.* at 14; that sales'

4   timing is "difficult to predict and may vary substantially from period to period," *id*. at 23; and that

5   "results of operations have varied significantly in the past," *id.* at 18.

6       Forescout's performance again exceeded guidance in 1Q2019, with the Company reporting

7   quarterly revenue of $75.6 million on May 9, 2019.  Ex. 7.  On the heels of this success, Forescout

8   projected 2Q2019 revenue of $75.3–$78.3 million and increased FY2019 guidance to $365.3–$375.3

9   million.  ¶¶ 89, 91.  On an earnings call that day, CEO Michael DeCesare expressed optimism about

10  the Company's future but acknowledged that certain deals Forescout had expected to close in the

11  second quarter "need[ed] a little bit more time in the oven before they're going to be done."  ¶ 105.[1]

12  Echoing earlier disclosures, Mr. DeCesare and CFO Christopher Harms reiterated that the "timing

13  and composition" of large deals "can shift and cause quarter-to-quarter fluctuations."  Ex. 8 at 5, 9.

14      On August 7, 2019, Forescout announced second-quarter revenue of $78.3 million, at the top

15  end of prior guidance.  Ex. 9.  Forescout also projected third-quarter revenue of $98.8–$101.8

16  million, optimistic that its success would continue.  *Id*.; ¶ 110.  On October 10, however, Forescout

17  preannounced that it expected 3Q2019 revenue of $90.6–$91.6 million.  ¶ 117.  In the press release

18  announcing the revised revenue figures, Mr. DeCesare explained that "Q3 results were impacted by

19  extended approval cycles which pushed several deals out of the third quarter," an impact that was

20  "most pronounced in EMEA against the backdrop of a challenging macro-economic environment."

21  Ex. 12.  The revised estimate held:  Forescout reported final 3Q2019 revenue of $91.6 million on

22  November 6, 2019, ¶ 120—a result at the top end of the revised October estimates, and a 7% increase

23  over 3Q2018.  Ex. 13.  Forescout again attributed the drop in 3Q2019 results to "extended sales

24  cycles, with the resulting revenue shortfall most pronounced in EMEA."  *Id.*  The Company projected

25  4Q2019 revenue of $93.5–$96.5 million and FY2019 revenue of $339–$342 million.  *Id.*; ¶ 120.

26      On February 6, 2020, Forescout announced final 4Q2019 revenue of $91.3 million, a modest

27  2.4% short of guidance.  ¶ 124.  Full-year revenue reached $336.8 million, an increase of 13% over

28

---

[1] This Brief omits the SAC's original emphasis, unless otherwise noted.

FY2018 but $2.2 million short of November projections.  Ex. 14; ¶ 124.  Mr. DeCesare observed that Forescout continued "to face macro and execution challenges in EMEA."  Ex. 14.  The same release announced that Forescout had signed an agreement to be acquired by affiliates of Advent International Corporation ("Advent") for $1.9 billion, or $33 per share (the "Merger").  Id.; ¶ 12.  On February 28, 2020, Forescout filed its Form 10-K, offering twenty-nine pages of specific "Risk Factors" related to the Merger, Forescout's business, and other topics.  ¶ 128; Ex. 15 at 15–43.

On March 24, 2020, Forescout filed a proxy statement for the stockholder vote.[2]  ¶ 133; Ex. 16.  The proxy attached the complete merger agreement and summarized key provisions, including the same two closing conditions that Advent would later cite in initially declining to close. Id. at 12–13, 50, 100, Annex A; ¶ 70; SAC Ex. 1 at ¶¶ 12–13, 85–86; SAC Ex. 2 (Countercls. ("CC")) at ¶ 63.  The proxy also referred to "Illustrative Guidance" that Forescout had given to its financial advisor in January 2020, to support the advisor's Merger-related financial analyses.  Ex. 16 at 61. This guidance projected revenues of $62 million for 1Q2020 and $355 million for the year.  ¶ 56; Ex. 16 at 61.  Forescout described the guidance as "preliminary, but not finalized," id., and offered it with robust forward-looking–statement warnings and risk disclosures, id. at 26.  Those disclosures incorporated "the risks detailed in [Forescout's] filings with the SEC, including in [its] most recent filings on Forms 10-K and 10-Q," and disclosed the risk of a possible "inability to complete the merger due to . . . the failure to satisfy the [ ] conditions to the completion of the merger."  Id.

At a special shareholders meeting on April 23, 2020, Forescout's general counsel stated that the Company "currently expect[s] the merger to be consummated on or about May 18, 2020."  ¶ 142; Ex. 28.  An April 24 press release and April 29 Form 10-K amendment similarly reported that Forescout "expect[ed]" the Merger to close in the second quarter.  ¶¶ 146, 149; Ex. 29; Ex. 23 at 4.

On May 11, 2020, Forescout reported 1Q2020 revenue of $57.2 million.  ¶ 154; Ex. 17.  In the press release, Mr. DeCesare noted that "[i]n March, the severity of the COVID-19 pandemic sharply escalated around the world, causing some customers to delay purchasing decisions in order to prioritize employee health and safety and business continuity planning[.]"  Id.  Forescout's Form 10-Q filed that same day added that the "economic uncertainty from the COVID-19 pandemic [had]

---

[2] The proxy was dated March 23, 2020, but as its cover sheet notes, it was filed on March 24.

1  impacted [its] customers and their available budgets to spend on [Forescout's] products and services,

2  which has resulted in an unfavorable impact on [Forescout's] revenue growth[.]"  Ex. 18 at 21.

3       After market close on Friday, May 15, 2020, Advent notified Forescout that Advent would

4  not close the Merger, citing its view that certain closing conditions in the merger agreement could

5  not be met.  ¶ 70; SAC Ex. 2 (CC) at ¶ 63.  On Monday, May 18, Forescout disclosed Advent's

6  intentions and that the parties were in ongoing discussions.  ¶ 70; Ex. 24.  Two days later, Forescout

7  announced that it had filed a suit in the Delaware Court of Chancery seeking to compel Advent to

8  complete the acquisition.  Ex. 19.  On July 15, 2020, Forescout disclosed that the parties had agreed

9  to close the Merger at a revised price of $29 per share, and that they would dismiss the litigation.

10  Ex. 25; ¶ 17.  On August 17, 2020, the parties announced that the acquisition had closed.  Ex. 26.

11       Plaintiffs filed this suit on January 2, 2020—before Forescout announced FY2019 results and

12  the Merger—alleging violations of Sections 10(b) and 20(a) of the Exchange Act based on statements

13  about Forescout's sales pipeline.  Dkt. 1, ¶ 4.  The lead plaintiff amended the complaint on May 22,

14  2020 to extend the putative class period and to add allegations about Forescout's sales force, the

15  pandemic, and the Merger.  Dkt. 31.  Defendants moved to dismiss on July 6, 2020, Dkt. 44, but on

16  July 22, before Plaintiffs had responded, the Court consolidated this case with *Arbitrage Fund v.*

17  *Forescout Techs., Inc.*, No. 3:20-cv-03819-SI—a dueling securities fraud suit filed on June 10, 2020.

18  Dkt. 55.  The Court reopened the lead-plaintiff process and denied Defendants' motion to dismiss as

19  moot, with leave to refile.  *Id.*  On December 18, 2020, new lead plaintiffs filed a consolidated

20  amended complaint.  Dkt. 116.  Defendants again moved to dismiss on January 29, 2021.  Dkts. 127–

21  130, 134–136.  On March 25, 2021, the Court granted Defendants' motions but gave Plaintiffs leave

22  to amend.  Dkt. 139 (the "Order").  Plaintiffs filed the SAC on May 10, 2021.  Dkt. 142.

23  <u>**ARGUMENT**</u>

24       As in all their prior complaints, Plaintiffs continue to challenge numerous statements that are

25  plainly forward looking and puffery—both nonactionable under the securities laws.  Even beyond

26  those dispositive dismissal grounds, the SAC still fails to plead with particularity that any of

27  Defendants' statements were false or misleading, fails to raise a strong (or really any) inference of

28  scienter, and fails to plead loss causation as to a four-month time period.  To state a claim under

1    Section 10(b) and Rule 10b–5, Plaintiffs must plead (1) a material misrepresentation or omission;

2    (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss;

3    and (6) loss causation.[3]  *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1057

4    (9th Cir. 2014).   Plaintiffs must also meet Rule 9(b)'s heightened standards and the "exacting"

5    pleading requirements of the PSLRA.  *Id.* at 1057–58.  The SAC fails to satisfy these elements.  At

6    bottom, Plaintiffs' case remains an inadequate attempt to transform missed projections and allegedly

7    shifting market trends into fraud.  *See In re SunPower Corp. Sec. Litig.*, No. 16-cv-04710, 2018 WL

8    1863055, at *3 (N.D. Cal. Apr. 18, 2018) (no fraud when company merely "got it wrong").

9    **I.     NEARLY ALL CHALLENGED STATEMENTS ARE NONACTIONABLE UNDER**
10   **        THE PSLRA AS FORWARD-LOOKING STATEMENTS OR OPINIONS**

11           As the Order recognized, the safe harbor immunizes forward-looking statements that are

12   (a) identified as forward looking and accompanied by meaningful cautionary language; *or* (b) made

13   without actual knowledge of falsity.  15 U.S.C. § 78u–5(c); *see* Order at 4–5; *Harris v. Ivax Corp.*,

14   182 F.3d 799, 806-07 (11th Cir. 1999) (construing safe harbor broadly).   Nevertheless, like its

15   predecessors, the SAC challenges numerous forward-looking statements with cautionary language.

16   These statements are protected regardless of the speaker's state of mind.  *In re Cutera Sec. Litig.*,

17   610 F.3d 1103, 1112 (9th Cir. 2010); *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1190 (9th Cir. 2021).

18   But the safe harbor would apply even if the statements had been unaccompanied by cautionary

19   language:  the SAC still fails to plead that any statement's speaker actually knew the statement was

20   false.  And even if treated as opinions, the SAC alleges no grounds to believe the opinions are false.

21           Most statements that the SAC challenges fit perfectly into the PSLRA's definition of forward

22   looking—that is, they are (A) "a projection of revenues . . . or other financial items"; (B) "a statement

23   of the plans and objectives of management for future operations"; (C) "a statement of future

24   economic performance"; or (D) "any statement of the assumptions underlying or relating to" the

25   foregoing.  15 U.S.C. § 78u–5(i)(1).  Forescout's "growth and revenue projections" are "forward-

26

27   [3] Though it is unclear under which subsection of Rule 10b-5 Plaintiffs assert their claims, *see* 17
28   C.F.R. § 240.10b-5(a)–(c), the SAC does make clear that the claims rest solely on alleged "material
     misrepresentations" and omissions.  ¶ 170.  The defects raised in this Motion thus defeat Plaintiffs'
     claims regardless of the Rule 10b-5 subsection relied on by Plaintiffs.

looking on their face." *Police Ret.*, 759 F.3d at 1058; *accord* Order at 5; *see, e.g.*, ¶¶ 80, 89, 91, 110, 117, 120, 136. So too are statements of Defendants' "plans and objectives": for example, statements of "Our Growth Strategy" to "[e]xpand our presence in the market by leveraging our ecosystem of channel partners" and to "continue to broaden and invest in our value added and system integrator channel partner relationships," ¶ 128; and statements that Forescout "expect[ed]" the Merger to close or "look[ed] forward to completing" it, ¶¶ 142, 146, 149, 154. *Wochos*, 985 F.3d at 1192 (goal to meet specific targets and "statements that [Tesla] was 'on track' to achieve this goal and that 'there are no issues' that 'would prevent' Tesla from achieving the goal" are plans or objectives).

Other challenged statements discussed assumptions underlying revenue projections and future plans. For instance, Defendants explained that the guidance assumed certain deals would close in the second half of 2019, as planned. *E.g.*, ¶¶ 97 ("high degree of confidence [deals] close for the year"); 108 ("high degree of confidence" and "feel good" that deals will close "in the second half of the year"); 113 (business indicators are "pointed in the right direction"); 115 (raised yearly guidance based on "confidence we have about how deals were taking shape" and Q3 looking "very solid"). "[S]uch projected timelines are forward-looking statements." *Wochos*, 985 F.3d at 1192. Defendants similarly disclosed risks that Forescout "might confront"—statements again protected as assumptions. *Id.* at 1195–96 (risk disclosures were assumptions protected by safe harbor); *see, e.g.*, ¶¶ 129, 133, 136, 153. Given the safe harbor's plain applicability, and the Order's clarity on this point, it is unclear why Plaintiffs persist in challenging such plainly forward-looking statements.

The SAC also challenges statements "regarding Forescout's sales productivity, pipeline, and deals" that the Order analyzed as "concrete factual assertions about Forescout's operations" in the past or present—for example, comments that some customers had awarded Forescout a "tech win." Order at 5–6. These concrete statements—which are inadequately alleged to be false, *see infra* Part II.A—contrast with Defendants' vague, subjective assumptions that the "pipeline is large enough" (or metrics tracking well enough) that Forescout could meet its guidance.[4] Such vague statements

---

[4] *E.g.*, ¶¶ 101 ("plenty of pipeline" to meet guidance), 108 ("I feel our pipeline is large enough" to permit Forescout to achieve guidance "without those deals closing in the second quarter"), 110 ("rate of closing deals 'remain[s] very strong' and 'very healthy'"; "very comfortable in our pipeline"; "we think we've kind of measured [expected government headwinds and tailwinds] appropriately in our

about operations "tracking very well" against plans or goals or expressing "confidence" that a timeline or metric will trend as planned match statements that *Wochos* deemed forward looking: for example, "preparations . . . are on track" and "progressing," "it's coming in as expected . . . it's getting pretty close to the bull's-eye," "[w]e've got I think a much better supply chain in place," "we're not really seeing any significant change that needs to occur," "[b]ased on our preparedness at this time, we are confident," and "'there are no issues' that 'would prevent' Tesla from achieving the goal." 985 F.3d at 1190–96.  The statements lack the concreteness and specificity of those held actionable by the Ninth Circuit: for example, that "more than 75% of the midsize practice market is still fair game for new system sales," or that "pipeline has grown every quarter since . . . February of 2009." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143 (9th Cir. 2017).  The safe harbor thus protects the statements here under Ninth Circuit precedent.[5]

Nearly all of the forward-looking statements are protected by the safe harbor's cautionary-language prong, regardless of whether the speakers knew the statements to be true or false.  15 U.S.C. § 78u–5(c)(1)(A)(i); *Cutera*, 610 F.3d at 1112; *Wochos*, 985 F.3d at 1190.  These statements were identified as forward looking[6] and accompanied by meaningful cautionary language.  Indeed, the Company repeatedly warned investors that its future performance and ability to achieve its guidance could be adversely affected by a variety of factors—including the very factors that Plaintiffs now allege caused Forescout to miss guidance.  For example, Forescout's 2018 Form 10-K warned that:

> (i)     its "ability to forecast . . . future results . . . is limited and subject to a number of uncertainties," due to "recent changes in [its] market, sales organization and go-to-market strategies" and "limited operating history," Ex. 3 at 14;
>
> (ii)    its growth strategy depended on sales to large organizations and government

---

guidance"), 113 (percentage of tenured sales reps is "tracking very well for us"), 115 (raised yearly guidance based on "confidence we have about how deals were taking shape"; Q3 looks "very solid").

[5] *Wochos* held that statements of *concrete, specific* reasons why goals are achievable can also be "potentially actionable," but the court's illustrations are far more concrete and specific than the statements here:  "because production of relevant units actually rose 75% over the last quarter or because the company has actually hit certain intermediate benchmarks." 985 F.3d at 1192; *see* Order at 5.  *Wochos* deemed nonactionable the sort of vague assessments of a company's ability to achieve goals that are at issue here. 985 F.3d at 1190–96.

[6] *See, e.g.*, Ex. 1; Ex. 4 at 4; Ex. 5 at 3; Ex. 7; Ex. 8 at 4; Ex. 9; Ex. 10 at 4; Ex. 12; Ex. 13; Ex. 14; Ex. 15 at 4–5; Ex. 16 at 26–27; Ex. 17; Ex. 18 at 3–5; Ex. 29; *see also* Ex. 23 at 4 (referring to 2019 Form 10-K); *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 880–81 (N.D. Cal. 2004).

entities that are subject to additional risks, such as "longer sales cycles," *id.* at 15;

(iii)   its future success turned on its ability to "respond to emerging technological trends" in a market that is "rapidly evolving and difficult to predict," *id.* at 22–23;

(iv)   "the timing of . . . sales [is] difficult to predict and may vary substantially from period to period," and "large individual sales have, in some cases, occurred in quarters subsequent to those we anticipated or have not occurred at all," *id.* at 23;

(v)   Forescout historically generated "a substantial portion of revenue during the last few weeks of each fiscal quarter," and if "delayed for any reason," that quarter's revenue could "fall below [Company] expectations," *id.* at 17; and

(vi)   Forescout faces "significant competition" for qualified salespeople and may be unable to hire or retain "a sufficient number of qualified personnel," *id.* at 17.

Other SEC filings reiterated these risks. *E.g.*, Ex. 1 (noting risks to "our expectations concerning the productivity of our expanding sales force as our sales representatives become more seasoned," "fluctuations in our quarterly results," "increasing competition"); Ex. 9 (referencing risks listed in 2018 10-K). As the Merger approached, Forescout continued to disclose deal-related risks, including that the closing's timing was uncertain; that closing conditions might impact the deal's course; that Merger-related litigation might ensue; or that partners might "terminate . . . their relationship with [Forescout] as a result of the Merger." Ex. 14; Ex. 15 at 15–16; Ex. 16 at 12–13 (listing closing conditions), 26–27; Ex. 17; Ex. 29; *see* Ex. 16, Annex A (merger agreement). The Ninth Circuit has held that even less specific disclosures trigger the safe harbor. *See Cutera*, 610 F.3d at 1112 (deeming sufficient a disclosure that the "ability to compete and perform in the industry depended on the ability of [ ] sales force to sell products to new customers"); *Police Ret.*, 759 F.3d at 1059.

The safe harbor also protects the only two forward-looking statements unaccompanied by cautionary language, *see* ¶¶ 115, 142; Exs. 11, 28, and it would protect the other forward-looking statements even if (contrary to fact) they had been unaccompanied by meaningful risk disclosures: Plaintiffs fail to plead that the ***speakers*** actually knew their statements were false, as explained in ID MTD at Part III and *infra* Part II. 15 U.S.C. § 78u–5(c)(1)(B) (statements must be made or approved by someone "with actual knowledge ***by that person***" of statement's falsity) (emphasis added); *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1069 (N.D. Cal. 2001) (same); *Waterford Twp. Police v. Mattel, Inc.*, 321 F. Supp. 3d 1133, 1151 (C.D. Cal. 2018) (plaintiff who failed to plead scienter also failed to plead actual knowledge for safe harbor purposes).

1      At the very least, Defendants' many subjective assessments reflect opinions, and Plaintiffs

2   plead no facts to suggest that Defendants did not actually hold the opinions, or to otherwise overcome

3   the law's protections for such statements.  *See* Order at 8 (statements that deal-closing rate "remain[s]

4   strong" and business is "pointed in the right direction" "are defendants' subjective assessments");

5   *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 183–86, 188–

6   90 (2015); *Wochos*, 985 F.3d at 1188–89, 1196 (saying "'great progress' was being made . . . would

7   potentially be an actionable false statement only if . . . Tesla had been 'making no progress at all'");

8   *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 613,

9   616–17 (9th Cir. 2017) (opinion was not false absent allegation that defendants did not believe it);

10  *infra* at 15, 23–24 (citing statements); ¶¶ 93 ("we feel like we are tracking very well against our sales

11  productivity"), 97 ("high degree of confidence [slipped deals] close for the year"), 117 & Ex. 12

12  (business fundamentals "remain strong").[7]  Plaintiffs have no claim as to these subjective statements.

13
14  ## II.   PLAINTIFFS' OPERATIONS-RELATED THEORIES STILL REST ON VAGUE, INSUFFICIENT FALSITY AND SCIENTER ALLEGATIONS

15     Even beyond the fact that nearly all challenged statements are nonactionable on their face,

16  the SAC fails to plead falsity or scienter.  The SAC largely recycles the same content that the Court

17  found deficient in the last complaint.   Allegations based on the first 15 CWs—already held

18  insufficient to plead falsity—are effectively unchanged.  Plaintiffs amplify the idea that a "market

19  shift" somehow made sales challenging, without alleging specifically how this shift suggests fraud,

20  much less alleging any misleading statements about the supposed shift.  The SAC's substantive

21  changes, however, are few.  Plaintiffs add allegations from five new CWs, largely consisting of

22  versions of the same anecdotes, rumors, personal opinions, and vague, imprecise conclusions offered

23  by the existing CWs and deemed insufficient by the Court.  The single CW alleging anything

24  substantively new—CW18, who claims Forescout considered and rejected a new pipeline

25  management system prior to the class period—likewise provides no facts, much less any specific

26  facts, suggesting that any particular statement was false or misleading when made.  And neither the

27
---
28  [7] Plaintiffs misleadingly allege that Mr. DeCesare said in the October 10, 2019, press release that "the fundamentals of the business had not changed." ¶ 117.  In fact, he said the fundamentals "remain strong"—a plainly subjective assessment that does not suggest the absence of any changes. Ex. 12.

1  new nor the recycled allegations cure Plaintiffs' failure to plead scienter with particularity.

2      **A.**    **The SAC Fails to Adequately Plead Any Statements' Falsity**

3      Like its predecessors, the SAC is devoid of particularized facts indicating how any specific

4  statement about Forescout's revenue guidance or operations was false or misleading when made.[8]

5  Plaintiffs must "specify each statement alleged to have been misleading" and "the reason or reasons

6  why the statement is misleading . . . ." 15 U.S.C. § 78u–4(b)(1).  These standards are "exacting" and

7  require that Plaintiffs plead falsity with particularity.  *Zucco Partners, LLC v. Digimarc Corp.*, 552

8  F.3d. 981, 990–91 (9th Cir. 2009); *Metzler*, 540 F.3d at 1054–55, 1070.  Plaintiffs still fail to do so.

9      **1.**    **The CW Allegations Remain Deficient**

10      Both the old and new CWs are still disconnected from any challenged statement, and none

11  allege a basis to believe they have personal knowledge of revenue-projection processes or corporate-

12  level pipeline or hiring sufficient to plead falsity (or scienter).  Plaintiffs must describe with

13  particularity the CWs' roles and facts suggesting the CWs' statements are reliable and based on

14  personal knowledge.  Order at 6–7, *citing Zucco*, 552 F.3d. at 996.  The "new" CW material does

15  nothing to correct these prior defects.  The SAC offers allegations about the sales force and pipeline

16  tracking from two new CWs:  CW18, allegedly a former "Global Talent and Enablement Manager";

17  and CW19, allegedly a former "Strategic Enterprise Account Executive."  ¶¶ 40(C), 40(G).  These

18  CWs vaguely allege that Forescout "included sales designated as 'committed' in creating

19  projections," ¶ 49, and CW18 alleges some aggregate sales headcounts for all of 2019 and early

20  2020, ¶ 40(G).  But not only do the CWs still fail to explain ***how*** committed deals were incorporated

21  in projections or to align the timing of alleged work force trends with any public statement, *see* Parts

22  II.A.2–3; the SAC also alleges no basis for the CWs' purported knowledge.  *Zucco*, 552 F.3d at 995;

23  *Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1114, 1115 (N.D. Cal. 2009) (rejecting allegations

24  that did not describe with particularity CW's personal knowledge of or role in relevant decisions).

25      Rather, the only facts alleged about their roles suggest that the CWs know little about public

26

27  ─────────────────────
[8] Plaintiffs irrelevantly claim that Forescout's year-over-year "growth rates" for certain quarters
28  dropped compared to the prior year's rates. *See, e.g.*, ¶ 46.  But Plaintiffs do not challenge statements about growth rates; they challenge Forescout's public revenue guidance.  That a company continued to grow year-over-year but at a slightly lower rate is not evidence of fraud.

1   guidance or company-wide performance. *Alaska Elec. Pension Fund v. Adecco S.A.*, 434 F. Supp.

2   2d 815, 825 (S.D. Cal. 2006) (rejecting CW testimony without "allegations indicating how [CWs]

3   would be privy to [information about] worldwide financial statements"), *aff'd*, 256 F. App'x 74 (9th

4   Cir. 2007).   CW19 alleges nothing at all about his or her responsibilities, while CW18 allegedly

5   "trained and supervised NAMs and other sales representatives"—a role with no alleged (or apparent)

6   ties to public forecasting or company-wide performance monitoring.   ¶¶ 40(C), 40(G).   Plaintiffs'

7   characterization of CW18 as a "senior executive" is dubious, ¶ 40(G), given that other CWs with

8   "Manager" titles reported to Directors and were multiple levels below the C-suite, *e.g.*, ¶¶ 36 &

9   45(C), 45(H).   While CW18 baldly claims that he helped, in some unspecified way, to develop a new

10   pipeline tracking system, ¶ 82, he does not claim to know anything about public guidance.   CW18

11   says Mr. DeCesare was "involved in managing larger clients," but this vague allegation seems to be

12   based on "common knowledge at the Company"—that is, hearsay.   ¶ 45(F); *Zucco*, 552 F.3d at 996.

13          Even though the briefing and Order on the last motions to dismiss identified the existing CW

14   allegations' fundamental weaknesses, the SAC—remarkably—makes little attempt to address those

15   weaknesses.   The CWs, new and old, ***uniformly*** fail to allege any facts suggesting that they have

16   personal knowledge of company-wide pipeline or hiring trends. *Brodsky*, 630 F. Supp. 2d at 1115.

17   None claims to know anything about Forescout's methods for preparing public guidance, or connects

18   any anecdote about deals, sales quotas, or employee departures with the preparation or analysis of

19   company-wide guidance. *E.g.*, ¶¶ 36, 36(A) & (E), 45(K), 52(A)–(D), 86, 99(C)–(D) & (F), 112;

20   *Monachelli v. Hortonworks, Inc.*, 225 F. Supp. 3d 1045, 1057–58 (N.D. Cal. 2016) (no CW was "in

21   a position" to say projections "were unreasonable when made," since none worked in finance or "had

22   any role in preparing . . . projections").   Many still base their allegations on hearsay, personal

23   opinion, or hindsight. *E.g.*, ¶¶ 3, 8, 45(H), 50, 52(E) & (F), 83, 88(A) & (E)(iii), 99(D) & (E), 112,

24   122(C); *Zucco*, 552 F.3d at 996; *In re Accuray, Inc. Sec. Litig.*, 757 F. Supp. 2d 936, 944–45 (N.D.

25   Cal. 2010) (rejecting falsity claims based on vague CW statements, "[h]indsight and the former

26   opinions of former employees").   This result is unsurprising when most held low-level roles confined

27   to one division or department and thus were not positioned to have insight into company-wide trends.

28   *E.g.*, ¶¶ 36, 40(B), 52(D) & (F); *Alaska Elec.*, 434 F. Supp. 2d at 825–828 (rejecting claims by low-

1  level employees who alleged no facts "indicating how [they] would be privy to [information on]

2  worldwide financial statements" and did not quantify issues' impact on global results); *City of Royal*

3  *Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1065 (N.D. Cal. 2012) (rejecting CW

4  statement that lacked facts showing impact of one group's performance on total revenue).

5       Likewise, no CW alleges meaningful direct contact with Mr. DeCesare or Mr. Harms.  *See*

6  *Accuray*, 757 F. Supp. 2d at 944–45, 949 (discounting CW allegations that did not describe specific

7  discussions with defendants); *Police Ret.*, 759 F.3d at 1063 (CW statements "lack foundation" when

8  CWs "lack first hand knowledge regarding what the individual defendants knew or did not know").

9  Some new CWs vaguely allude to "all-hands" calls on which Mr. DeCesare discussed general topics,

10  claim to generally know of calls between Mr. DeCesare and other employees, or vaguely allege that

11  Mr. DeCesare participated in unspecified customer pitches, micromanaged, or had access to reports

12  or databases.  *E.g.*, ¶¶ 40(G), 45(C), (F), (H), (K).  But no CW alleges any particularized facts about

13  statements Mr. DeCesare made in (or any facts he learned from) those calls or reports that contradict

14  a public statement.  *See McCasland v. FormFactor Inc.*, No. C 07–5545, 2009 WL 2086168, at *5

15  (N.D. Cal. July 14, 2009) (dismissing similar claims); *cf.* Order at 14 ("plaintiffs fail to adequately

16  allege how the CWs' reports contradict defendants' statements"); *Quality Sys.*, 865 F.3d at 1144

17  (CEO's public statement was false when CW had heard CEO say the opposite on internal calls).

18       Plaintiffs try to explain alleged sales challenges and supposed pipeline issues by claiming the

19  market for Forescout's products shifted as customers deployed cloud systems.  ¶¶ 32–38.  But this

20  explanation's relevance is unclear:  Plaintiffs allege no statements (let alone misstatements) about

21  the nature of Forescout's market, and Defendants disclosed the market shifts at the class period's

22  start.  ¶ 117; Ex. 2 ("acknowledg[ing]" on February 7, 2019 that large customers are not "very

23  interested in deploying" Forescout products "up in the cloud" and that this "part of the market . . . is

24  a little bit more difficult for us to sell into today"); Ex. 3 (disclosing risks from "rapidly evolving"

25  market, including "market acceptance of products based on new or alternative technologies"); *see*

26  *Mazzaferro v. Aruba Networks Inc.*, No. 13-CV-02342, 2014 WL 12680773, at *1 (N.D. Cal. Aug.

27  1, 2014) (allegations about "serious competitor" failed to plead falsity, especially when company

28  "disclosed it was facing competition").  Plaintiffs also offer no particularized facts showing the

1   market shift or its effect on Forescout's business.  They simply cite a purported expert's general

2   opinions. ¶¶ 32–35.  But such "opinions cannot substitute for facts under the PSLRA." *City of Royal*

3   *Oak Ret. Sys. v. Juniper Networks, Inc.*, No. 5:11–CV–04003, 2013 WL 2156358, at *7 (N.D. Cal.

4   May 17, 2013).  Market or demand shifts are a business challenge—not evidence of fraud.

5        The Individual Defendants' brief, which Forescout joins and incorporates by reference,

6   includes a detailed discussion of each new CW.  ID MTD at Part III.A.1.  The CW allegations are

7   insufficient to plead falsity for the same reasons they fail to raise a strong inference of scienter.

8                    **2.      Sales Pipeline Allegations**

9        The SAC does not provide the missing particularized allegations showing that any specific

10  statement about the pipeline was false or misleading.  *E.g.*, ¶¶ 87, 97, 101, 105, 108, 110, 113, 115,

11  117.  As the Court already recognized, most challenged pipeline statements are puffery, reflecting

12  merely Defendants' "subjective assessments" that "do not guarantee the closure of every deal on the

13  pipeline"; indeed, "defendants disclosed that deals on the pipeline could change."[9]  Order at 7–8,

14  *citing* Ex. 8; *see Or. Pub. Emps.' Ret. Fund v. Apollo Grp. Inc*., 774 F.3d 598, 606 (9th Cir. 2014)

15  ("inherently subjective" puffing is nonactionable); *Police Ret.*, 759 F.3d at 1060; *In re Fusion-io,*

16  *Inc. Sec. Litig*., No. 13-CV-05368, 2015 WL 661869, at *15 (N.D. Cal. Feb. 12, 2015) (statements

17  about momentum and "healthy pipeline" are nonactionable); *Vitalone v. Logitech Int'l SA*, No. C 11-

18  03855, 2012 WL 13041992, at *6 (N.D. Cal. July 13, 2012) (words like "'strong' and 'healthy'" are

19  nonactionable); *Copper*, 311 F. Supp. 2d at 868–69 ("business remained 'strong'" is nonactionable).

20       The SAC also still "fails to adequately plead how defendants' statements about Forescout's

21  deals and pipeline are false" or misleading, or "how the inclusion of [allegedly miscategorized] deals

22  [in Salesforce] would render Forescout's forecasts false."  Order at 8, 10.  Even now, no CW alleges

23  that any specific "illusory" deal was included in any particular forecast, or facts to suggest how

24  purported challenges "necessarily precluded [Forescout] from reaching its projected growth targets."

25

---

26  [9] *See, e.g.*, ¶¶ 97 ("fairly high degree of confidence" that deals will close in back half of year); 101
27  ("plenty of pipeline"); 105 ("high degree of confidence"); 108 ("very large pipeline"); 110 ("rate of
    closing deals 'remain[s] very strong' and 'very healthy'"; "very comfortable in our pipeline";
28  "pipeline is absolutely taking shape very effectively"); 113 ("quite happy" with pipeline; "pointed in
    the right direction"); 115 ("great visibility"; "confidence we have about how deals were taking
    shape"); 117 ("pipeline 'continued to grow'"); *supra* at n.7 (business fundamentals "remain strong").

1   *Royal Oak*, 880 F. Supp. 2d at 1064–68.  CW18 and CW19 offer a new, conclusory allegation that

2   "[t]he Company included sales designated as 'committed' in creating projections," ¶ 49, but the CWs

3   miss the point:  the SAC pleads no particularized facts indicating "***how*** the inclusion of such deals

4   would render Forescout's forecasts false—the [S]AC lacks details of how defendants develop their

5   revenue projections."  Order at 10 (emphasis added); *see also In re White Elec. Designs Corp. Sec.*

6   *Litig.*, 416 F. Supp. 2d 754, 772–73 (D. Ariz. 2006) (rejecting CW allegations that did not claim

7   company publicly reported allegedly inflated internal sales goals as bookings and backlog); *Accuray*,

8   757 F. Supp. 2d at 949.  For all Plaintiffs allege, the guidance accounted for alleged pipeline issues

9   by discounting or ignoring "committed" deals based on Defendants' assessment of the deals' actual

10  likelihood of closing.  The SAC generically claims that Defendants monitored large deals' progress

11  and certain pipeline reports, ¶¶ 43, 45(A)–(L), but no allegations suggest Defendants deliberately

12  ignored that alleged insight when forecasting.  If they kept tabs on deals in the pipeline, then they

13  also could reach informed forecasting judgments no matter how the deals were categorized.

14  Plaintiffs plead no particularized allegation to the contrary.[10]

15       Indeed, the SAC now alleges that supposed pipeline categorization issues began as early as

16  2018 and that Defendants knew these issues led in some unexplained way to "inflated" revenue

17  projections.  ¶ 49.  Plaintiffs claim that in June 2018, Forescout consulted an advisory firm pitching

18  a new "Customer Engagement Process" ("CEP") for categorizing pipeline deals.  *Id.*  CW18

19  supposedly could recognize through CEP that Forescout "would miss its sales targets for the next

20

21  ---
[10] No particularized facts in the SAC suggest the Illustrative Guidance was knowingly unachievable.
22  *See* ¶ 137; ID MTD at Part III.C.  Plaintiffs claim customers or partners terminated relationships with
    Forescout due to the Merger, ¶¶ 130–131, 137, but the SAC pleads no reason to think the guidance
23  had not accounted for that possibility; Defendants were aware of the risk and disclosed it shortly
    after the Merger's announcement. Ex 15 at 15-16; *see* Ex. 16 at 26.  Similarly, the SAC never alleges
24  ***when*** the partners terminated—and thus fails to plead with particularity that they did so before the
    guidance was made or disclosed.  *Brodsky*, 630 F. Supp. 2d at 1114 (CW allegations deficient when
25  court could not "determine the temporal relationship between [CW's] statements and [defendant's]
    statements"); *cf.* Order at 9 (CW statement not specifying "when the deals ultimately did not close"
26  was vague).  The SAC claims that a pleading in the Delaware Merger litigation placed some
    terminations in late February 2020, but the pleading cited by the SAC says no such thing.  ¶ 131,
27  *citing* SAC Ex. 3 at ¶ 26.  Similarly, Advent's characterization of financial reports in hotly contested
    litigation says nothing about ***Defendants'*** views of the business.  ¶ 137, *citing* SAC Ex. 2 (CC) at
28  ¶¶ 28–29.  Indeed, Defendants denied Advent's allegations.  SAC Ex. 3 at ¶¶ 28–29.

1    three or four quarters consecutively."  ¶ 83.  These new allegations say nothing about how CEP

2    would have made any difference to revenue guidance or management's view of the Company's

3    ability to meet that guidance; CW18 cannot even offer one fact to support his conclusory prediction

4    of missed sales targets.  And the SAC alleges no particularized facts suggesting that Defendants or

5    other senior executives shared the consultant's (or any CW's) alleged opinions about the pipeline or

6    sales outlook.  *Wochos*, 985 F.3d at 1194 (employee pessimism insufficient to establish requisite

7    defendant knowledge); *Shurkin v. Golden State Vintners Inc.*, 471 F. Supp. 2d 998, 1015–16, 1017

8    (N.D. Cal. 2006), *aff'd*, 303 F. App'x 431, 433 (9th Cir. 2008) (falsity insufficiently pled when based

9    only on CWs' disagreement with executives' business judgments).

10        But most critically, these allegations suggest missed guidance was not the inevitable result of

11   the missed sales targets and miscategorized deals alleged by CWs:  Forescout met or exceeded its

12   ***unrevised*** guidance in every quarter from 2018 through 2Q2019,[11] ¶¶ 31, 46; Ex. 2 at 5—despite

13   Plaintiffs' conclusory claim that Defendants "knew" the guidance was "inflated" in 2018 and

14   CW18's unsupported prediction that Forescout would miss those quarters' sales targets, ¶¶ 49, 83.

15        Otherwise, the CWs' pipeline allegations still amount to nothing more than anecdotes about

16   pitches to certain customers within certain Company divisions, *e.g.*, ¶¶ 45, 52, or vague allegations

17   of pressure to categorize deals as "committed."  ¶¶ 52(A)–(G).  The Court has already found these

18   allegations vague and unreliable for reasons the SAC fails to cure.  *Compare, e.g.*, Order at 8–9

19   (finding CW13 and CW14's conflicting testimony unreliable), *with* ¶ 52(F)–(G) (repeating same

20   allegations); *White*, 416 F. Supp. 2d at 772 (falsity not pled when CW allegations that management

21   exerted "intense pressure on sales personnel" and told them to raise quotas did not suggest company

22   reported quotas as "actual bookings and backlog"); *Royal Oak*, 880 F. Supp. 2d at 1065 (rejecting

23   CW allegations that did not quantify anecdotes' impact on company revenues "as a whole").

24        Plaintiffs still plead no particularized facts to suggest that Defendants could not have believed

25   the pipeline was "large," "healthy," or trending positively, even assuming (as a few CWs opine) that

26

---

27   [11] Plaintiffs wrongly claim that on May 9, 2019, Forescout "preannounced a lowered guidance range"
     or "poor results" for 2Q2019.  ¶¶ 4, 97, 105.  In fact, the May 9 release contained neither lowered
28   guidance nor results; it offered the ***first*** 2Q2019 ***projection*** Forescout had disclosed. ¶¶ 80–81; Ex. 1.
     Forescout ultimately met that 2Q2019 projection.  ¶ 89; Ex. 9.

1   some deals were unlikely to close in certain quarters or "illusory," *e.g.*, ¶¶ 8, 52(A)–(G), 57.

2   Defendants disclosed that the pipeline was several times larger than Forescout's internal bookings

3   plan—figures the SAC does not allege are false.  ¶ 87, *quoting* Ex. 4 at 7; Ex. 5 at 13.  And nothing

4   in the SAC suggests any executive shared CWs' alleged assessments of deals' estimated closing

5   timelines or overall chances.  The CWs bare disagreements with executives' business judgments do

6   not plead falsity.  *Shurkin*, 471 F. Supp. 2d at 1015–16, 1017; *Wochos*, 985 F.3d at 1194, 1196.

7        Finally, Plaintiffs continue to challenge statements that certain slipped deals were "tech

8   wins," where Forescout had already won the business, but Plaintiffs fail to add new support for this

9   already rejected claim.  Order at 9; *e.g.*, ¶¶ 88, 97, 99.  The SAC still cannot muster a single fact

10  suggesting that when they discussed "tech wins," the Individual Defendants were referring to any

11  specific deal alleged by a CW to be improperly categorized as "committed."  Such pleading does not

12  meet the "exacting" standards required under the PSLRA.  *Zucco*, 552 F.3d at 990–91.

13           **3.       Sales Force Tenure Allegations**

14       The SAC again challenges sales force statements that the Court has held are "vague and non-

15  actionable puffery," itself a sufficient reason to dismiss the claims.[12]   Order at 7; *supra* at 15

16  (collecting cases); *Vitalone*, 2012 WL 13041992, at *6 ("[W]ords such as 'strong' and 'healthy'" are

17  "far too vague to be actionable.") (citation omitted); *Copper*, 311 F. Supp. 2d at 868–69 ("business

18  remained 'strong'").  The SAC also fails to meaningfully address the Order's holding that the CWs'

19  sales force allegations are deficiently vague.  Order at 6–7; *e.g.*, ¶¶ 38–41, 80, 87, 91, 93, 105, 108,

20  110, 113, 117, 120, 136.  Plaintiffs still support their sales force theory mainly with anecdotes,

21  rumors, and vague, unsubstantiated impressions recounted by a few CWs assigned to certain corners

22  of a multinational company.  *Id.* (CW allegations "are too vague to establish falsity"); *Accuray*, 757

23  F. Supp. 2d at 944–45 (rejecting falsity claims based on vague CW allegations).  For instance, CWs

24  still generally allege layoffs in certain groups or divisions at unspecified times during 2019, *e.g.*,

25  ¶¶ 38(A), 40(B)–(D), or vaguely claim that a "significant number" of salespeople left, *e.g.*, ¶¶ 40(B),

26
27  [12] *See, e.g.*, ¶¶ 87 ("hiring like crazy"; "we get kind of better visibility"); 93 ("we feel like we are tracking very well against our sales productivity"); 105 ("high degree of confidence" based on "maturation of our reps"); 113 ("tracking very well"; "pointed in the right direction"); *supra* at n.7 ("fundamentals of our business remain strong").
28

40(D); *see also* ¶ 38(B).  These allegations fail to show how any specific statement was false or misleading when made, much less how alleged sales force turnover left any projection necessarily unachievable.[13]  Order at 6–7; *Zucco*, 552 F.3d. at 990–91 (must plead falsity with particularity).

Indeed, even the few newly alleged facts fail to suggest any statements were false or misleading when made.  The challenged statements about the salesforce were largely made in the first few months of 2019.  *See* ¶¶ 87, 93, 105, 108; *see also* ¶ 113.  But the CWs allege that departures began in earnest in the "summer," or more specifically in September—only *after* the challenged sales force statements.[14]  *See, e.g.*, ¶¶ 40(A); 40(C); 40(D); 40(E); 40(F); 40(G); 40(H).  Only a few CWs vaguely allege departures earlier in 2019, and to the very limited extent these CWs provide any particularized details, those sparse details suggest the cuts involved a relatively small number of employees.  *See, e.g.*, ¶¶ 38(A); 38(B); 40(B); 40(F); *Accuray*, 757 F. Supp. 2d at 944–45.  One CW (CW18) who alleges more concrete headcount numbers makes clear that the numbers cover all of 2019 and part of 2020—making it impossible to say whether or to what extent any of the changes alleged by CW18 were present when the sales force statements were made in early 2019.  ¶ 40(G); *Brodsky*, 630 F. Supp. 2d at 1114 (CW allegations lacked particularity when court could not "determine the temporal relationship between [CW's] statements and [defendant's] statements").  The other CWs do not suggest how alleged departures affected sales employees with *two years' tenure*—the population relevant to Plaintiffs' falsity theory.  And the SAC ignores that some sales personnel would have passed their two-year anniversary over the course of 2019.

Only one sales force statement was made even in the second half of 2019:  the August 7, 2019 statement that the percentage of tenured sales personnel "was 50% at the end of 2018 up from 35% a year prior, and although it's tracking very well for us, we're going to hold-off on disclosing what the percentage is until we finish 2019." ¶ 113.  Plaintiffs have not sufficiently pled that this statement was false or misleading.  Defendants plainly described the 50% figure as a point-in-time snapshot

---

[13] Plaintiffs again wrongly assert that sales "productivity" dropped from 50% to 38% between 2018 and 2019.  ¶¶ 5, 94, 122(B).  Those percentages represented the proportion of salespeople who had "been with Forescout . . . and [in] the territory for more than two years"—not productivity.  ¶ 113.

[14] CW16 and CW17 vaguely allege that "on or about" May 9, 2019, "Forescout planned to initiate another round of cuts in the summer of 2019." ¶ 95(B).  But the CWs offer no details for the alleged plans—and no facts suggesting these line employees personally knew the plans. *See supra* at 12–15.

1    from the end of 2018.  Plaintiffs do not claim the figure was false as of that date.  Plaintiffs fault

2    Defendants for supposedly failing to disclose that the percentage dropped over 2019, but Defendants

3    expressly declined to provide interim percentages before the year's end.  ¶ 113.  In the meantime,

4    Forescout disclosed that it faced stiff competition for qualified salespeople and might struggle to

5    retain or hire "a sufficient number of productive sales personnel[.]"  Ex. 3 at 17.  No particularized

6    facts suggest Defendants could not have thought the percentage was "tracking very well" in August

7    2019; even this August statement was made before the SAC claims that layoffs began in earnest.

8        Finally, no allegations suggest that purported sales force turnover would have so dramatically

9    impacted sales productivity that the revenue guidance was plainly unachievable when made.  *Royal*

10   *Oak*, 880 F. Supp. 2d at 1064–65 (dismissing complaint that did not allege how problems

11   "necessarily precluded [company] from reaching its projected growth targets").  Forescout issued its

12   FY2019 guidance on February 7, 2019—before Plaintiffs claim that sales force turnover began in

13   earnest.  As the year progressed, the Company proactively lowered projections to account for actual

14   business trends it observed and preannounced disappointing results early.  ¶ 124; Exs. 13 & 14.  This

15   history suggests, not fraud, but that Forescout believed it could meet its forecasts when they were

16   made and promptly revised them based on a realistic view of performance as time passed.

17        **4.    "Front-Loaded" Revenue Allegations**

18        Plaintiffs repackage their failed channel-stuffing allegations, studiously avoiding the label

19   while asserting the same claim:  that Forescout's 4Q2019 financial results were false or misleading

20   because the Company allegedly manipulated bookings to pull forward revenue.  ¶¶ 124–26; Order at

21   10–11 ("Plaintiffs fail to establish a channel-stuffing claim.").  By any name, "[c]hannel stuffing

22   claims are viewed with skepticism in the Ninth Circuit because there are often genuine reasons to

23   strive for earlier sales."  *Vitalone*, 2012 WL 13041992, at *4.  "[S]uch claims are only probative of

24   falsity if plaintiffs can (1) demonstrate defendants engaged in channel stuffing *in order to* artificially

25   inflate sales . . . and (2) make a showing of specific transactions . . . ."  *Id.* (quotations omitted); *see*

26   *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1298 (9th Cir. 1998); *Splash Tech.*, 160 F. Supp. 2d

27   at 1076.  Plaintiffs plead none of the facts required for such a claim.

28        Regardless of their label, Plaintiffs' bare allegations fall far short of even the PSLRA's

1   general, "exacting" falsity standard.  *Zucco*, 552 F.3d. at 990–91; *Metzler*, 540 F.3d at 1054–55.

2   Plaintiffs plead no particularized facts suggesting that Forescout in fact pulled revenue into 4Q2019

3   from later quarters—let alone did so improperly or in a way that would have rendered 4Q2019 results

4   misleading.  The Court has already held Plaintiffs' recycled factual allegations insufficient:  namely,

5   the unsubstantiated, anonymous whistleblower accusation; Advent's follow-up discovery request in

6   contentious litigation (unaccompanied by any channel-stuffing claims); and a bare allegation that a

7   single reseller deal fell through for unspecified reasons.  ¶¶ 11, 13, 67, 126(A); Order at 10.  That

8   Forescout's revenue declined in 1Q2020, at the onset of the worst global pandemic in a century,

9   shows no impropriety.   ¶ 58; Order at 10 ("Plaintiffs also fail to demonstrate how declines in

10  Forescout's earnings or financial performance were not caused by the COVID-19 pandemic.").

11          Plaintiffs parrot Advent's claim from the contentious Merger litigation that certain customer

12  discounts were "unnatural" attempts to pull sales into ***1Q2020*** at the expense of later quarters.

13  ¶ 126(D).  Of course, these accusations do nothing to support Plaintiffs' theory of revenue pulled

14  forward into ***4Q2019***.  *See* ¶¶ 11, 13.  But in any event, neither Plaintiffs nor Advent plead any

15  particularized facts to support the bare allegation.  Plaintiffs assert that the Company "routinely

16  provided end of quarter discounts in order to promote sales," ¶ 126(F), and recognize that Forescout

17  achieved significant sales in 2Q2020, ¶ 126(C).  That Forescout's revenues bounced back ***the very***

18  ***next quarter***, after the pandemic's initial economic effects had begun to pass, suggests that the first-

19  quarter dip was driven by those pandemic effects, not by routine sales or accounting practices.

20          Plaintiffs still fail to allege a single fact about Forescout's actual revenue recognition

21  practices, let alone facts suggesting that Forescout improperly recognized revenue in a particular

22  quarter.  Plaintiffs irrelevantly note that auditors found it "challenging" to determine the proper

23  revenue recognition approach for Forescout's business.  ¶¶ 78(A), 126(E), *quoting* Ex. 15 at 73.  Yet

24  the same auditors concluded that Forescout's financial statements "present fairly, in all material

25  respects, the financial position of the Company at December 31, 2019 . . . and the results of its

26  operations . . . in conformity with" GAAP. Ex. 15 at 73.  The auditors reached that opinion after

27  they had "evaluated the design and tested the operating effectiveness of the Company's process and

28  controls to determine . . . the timing of revenue recognition," and after they had "evaluated the

1 accuracy of the Company's accounting conclusions, specifically related to . . . the timing of revenue

2 recognition." *Id.* at 74.  Plaintiffs' bare allegations are insufficient under every pleading standard.

### 3       **B.**      **The SAC Fails to Plead a Strong Inference of Scienter**

4       The SAC should be dismissed for the independent reason that Plaintiffs still do not raise the

5 requisite strong inference of scienter.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308,

6 314 (2007); *Zucco*, 552 F.3d at 991.  The Individual Defendants' brief, which Forescout joins and

7 incorporates by reference, explains why the SAC fails to raise a strong inference that Mr. DeCesare

8 or Mr. Harms (or any other Forescout executive) knew Defendants' public statements were false.  ID

9 MTD at Part III.  "Because Plaintiff[s] fail[ ] to plead scienter on the part of [the Individual

10 Defendants], Plaintiff[s] cannot successfully plead scienter on the part of" Forescout.  *Pittleman v.*

11 *Impac Mortg. Holdings, Inc.*, No. SACV 07–0970, 2009 WL 648983, at *3 (C.D. Cal. Mar. 9, 2009),

12 *aff'd sub nom. Sharenow v. Impac Mortg. Holdings, Inc.*, 385 F. App'x 714 (9th Cir. 2010).

13       The SAC suggests a far more likely and compelling innocent inference, *see Tellabs*, 551 U.S.

14 at 314 (defining strong inference):  Defendants failed to perfectly predict their business's future.

15 Defendants took an optimistic view of that future based on several quarters of sustained success,

16 while disclosing the risks that Plaintiffs now claim arose, *see* Part I.A.  When the risks started to

17 occur, Defendants preannounced quarterly results a month early, lowered guidance, and disclosed

18 slipped deals and other challenges.  *E.g.*, Ex. 8 & ¶ 123; Ex. 12 & ¶ 135; Ex. 13 & ¶ 138; Ex. 14 &

19 ¶ 141.  Defendants repeatedly cautioned that the challenges might reoccur or continue.  *E.g.*, Ex. 7

20 (listing risks); Ex. 12 (same); Ex. 13 (same); Ex. 14 (same).  Despite Plaintiffs' narrative that the

21 sales function collapsed in 2019, *e.g.*, ¶¶ 8, 39–41, Forescout earned over $350 million in FY2019

22 revenue and largely met guidance, ¶ 124; Exs. 13 & 14.  The SAC suggests Defendants' predictions

23 "got it wrong," but hindsight critiques do not show fraud.  *SunPower*, 2018 WL 1863055, at *3.

### 24 **III.**    **THE SAC AGAIN FAILS TO SUFFICIENTLY PLEAD A MERGER THEORY**

25       "Plaintiffs [again] fail to explain how Forescout's expectation of completing the Advent

26 acquisition was false," especially when "Advent ultimately completed an acquisition."  Order at 9;

27 *see* ¶ 76 (admitting Merger closed in August 2020); Ex. 25.  Indeed, the SAC's Merger allegations

28 are notable more for what they remove than what they add:  Plaintiffs no longer seriously challenge

Forescout's disclosures of Merger risks and deal terms—disclosures that began months before Advent expressed concern about closing conditions and that specifically cautioned that the closing's timing faced "uncertainties," that closing conditions might impact the deal's course, and that litigation might ensue.[15]  Ex. 14; Ex. 15 at 15–16; Ex. 16 at 12–13, 26–27, Annex A; Ex. 17; Ex. 18 at 21.  Instead, Plaintiffs substitute a new Merger statement that says the same thing as previously challenged statements, and they repeat their rejected guilt-by-hindsight theory without alleging any new facts in support:  because Advent *eventually* refused to close, Plaintiffs claim Defendants should have predicted that result and told the public.  Forescout had no duty to guess at Advent's future actions.  *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 746 (7th Cir. 1997) (no duty to disclose difficulties in corporate auction, including that potential bidders had bowed out); *In re CDnow, Inc. Sec. Litig.*, 138 F. Supp. 2d 624, 632 (E.D. Pa. 2001) ("[D]efendants had no duty to disclose that the merger would fail . . . before it was certain that these events would occur.").

In any event, the SAC pleads no facts suggesting that Forescout's subjective assessments of the deal's future were baseless or misleading.  According to the SAC, when Forescout said in April 2020 that it "expect[ed]" the Merger to close, Advent had not even indicated that it *might* walk away from the deal.  ¶¶ 142, 146, 149.  Its April 20 letter merely stated, in the midst of the worst pandemic in a century, that Advent "*was reviewing* Forescout's business, operations, future prospects and financial condition in order to *assess whether* the conditions to closing . . . would be met."  ¶ 77(A) (emphasis added).  Even when Forescout said on May 11, 2020, that "we look forward to completing our pending transaction," Advent had merely said on May 8 that it was "*considering* not closing."

---

[15] The SAC suggests some Merger-related risk disclosures and future goals were misleading because partners allegedly terminated relationships with Forescout due to the Merger.  ¶¶ 128–29, 133, 136.  But the disclosures made no explicit or implicit representation that Forescout had not already experienced such issues.  *Wochos*, 985 F.3d at 1196 (such risk disclosures not false); *e.g.*, Ex. 15 at 15–16 (disclosing risks in February 2020); Ex. 16 at 26.  And that partners allegedly terminated in the past does not render misleading Forescout's plans for future growth initiatives.  ¶¶ 128, 130.  The SAC also does not allege precisely *when* these partners terminated—and thus fails to plead with particularity that they had already done so when the disclosures were made.  *Supra* n.10.

Plaintiffs also fail to identify a misstatement in the March 2020 proxy's discussion of the Merger's debt financing.  *See* ¶¶ 140–41.  In particular, Plaintiffs allege no facts to support the mistaken notion that Advent's ability to obtain financing depended on Forescout's forecasts.  The SAC's exhibits indicate otherwise.  *Cf.* SAC Ex. 1 at ¶ 10, 43–47; SAC Ex. 2 (CC) at ¶ 8.

¶¶ 154–55 (emphasis added).  Nothing about Advent's statements indicated that it would definitively refuse to close or suggests Forescout's subjective expectations were baseless or insincere.  Indeed, "throughout the remainder of April 2020 and into the first half of May 2020, Forescout and Advent continued to work toward closing the" Merger.[16]  Ex. 30 at 32; *see also* SAC Ex. 1 at ¶ 77; *id.*, ¶ 9 ("At first, it seemed Advent was testing Forescout's appetite to reprice the deal.").  Only on May 15 did Advent announce that it would not close as scheduled, and Forescout disclosed Advent's decision the next business day, publicly disagreed with Advent's assessment of the closing conditions, and sued to enforce the Merger's performance—ultimately closing the Merger in August.  ¶ 70; SAC Ex. 1 at ¶ 2; Ex. 24.  Nothing about this timeline suggests fraud.[17]

As to scienter, Forescout joins and incorporates by reference the ID MTD at Part III.

## IV.   PLAINTIFFS INADEQUATELY PLEAD COGNIZABLE HARM FOR STOCK PURCHASES MADE BETWEEN OCTOBER 10, 2019 AND FEBRUARY 6, 2020

Plaintiffs also fail to plead loss causation as to shares bought after the October 10, 2019 earnings call and before the February 6, 2020 announcement of the Merger (and the Merger price).[18] *Metzler*, 540 F.3d at 1061–62 (alteration omitted), *citing Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005).  Plaintiffs must "set forth allegations that if assumed true, are sufficient to provide the defendant with some indication that the drop in defendant's stock price was causally related to

---

[16] Defendants had good reason to expect a closed deal, even beyond the parties' ongoing cooperation. The closing conditions offered only narrow grounds to terminate:  the "Material Adverse Effect" condition on which Advent relied excluded pandemics as a basis to terminate, subject to narrow exceptions. Ex. 16 at 97, A-4; ¶ 70; SAC Ex. 1 at ¶¶ 1–2, 81; SAC Ex. 2 (CC) at ¶ 3.  And the closing conditions likewise carved out any failure to meet projections.  Ex. 16, Annex A at A-3–5, A-72–73. That the Board met to discuss "options should Parent not proceed with" closing the Merger is not inconsistent with Forescout's expectations.  ¶ 156, *quoting* Ex. 30 at 32.  The meetings merely reflect careful contingency planning during economic upheaval that threatened all pending transactions.

[17] Plaintiffs suggest that Forescout knew Advent would not close simply because, in mid-April 2020, the parties exchanged forecasts of the pandemic's impact on the business.  ¶ 77(D), *citing* SAC Ex. 1 at ¶ 70, *and id.*, Ex. 2 at ¶ 37.  These forecasts (and the parties' views of them) were hotly contested in the Delaware case.  *See supra* n.10; ID MTD at Part III.C.  Regardless, that the parties evaluated the pandemic's impact and closing conditions did not reveal that Advent would try to terminate.

[18] Forescout raised this argument in its prior motion, with an independent argument that Plaintiffs had failed to plead loss causation generally.  Dkt. 127 at 24–25.  The Order acknowledged this argument about the four-month gap in Plaintiffs' loss causation theory, but the Order appeared to rule only on the general adequacy of Plaintiffs' allegations.  *See* Order at 11–12.  Defendants thus respectfully re-assert this narrower argument for the Court's consideration.

---

1   the defendant's financial misstatements." *Metzler*, 540 F.3d at 1062 (quotation omitted); *see Apollo*,

2   774 F.3d at 605 (allegations must satisfy Rule 9(b)).  But the only post-October 10 price drops alleged

3   in the SAC were not caused by any alleged misstatement for which such shareholders have a claim.

4   Shareholders who bought their stock during this period can only assert claims for statements

5   made before their purchases; the shareholders have no claim based on later statements, which "could

6   not have affected [the] decision to purchase stock." *Kelly v. Elec. Arts, Inc.*, 71 F. Supp. 3d 1061,

7   1069 (N.D. Cal. 2014); *see Carey Camp v. Qualcomm Inc.*, No. 18-cv-1208, 2020 WL 1157192, at

8   *4 (S.D. Cal. Mar. 10, 2020).  But such shareholders cannot trace any pre-February 6 misstatements

9   alleged in the SAC to the only two price drops that these shareholders allegedly experienced.  Those

10  drops—on May 11 and 18, 2020, ¶¶ 69, 71—resulted from the disclosure of Forescout's pandemic-

11  impacted 1Q2020 results and Advent's attempt to terminate the Merger, respectively.  *See* ¶¶ 69,

12  71.  But the SAC alleges no misstatements about 1Q2020 performance or the Merger that predate

13  February 6.  Alleged pre-February 6 statements all relate to Forescout's 2019 performance, and the

14  stock price ***rose*** on February 6 when Forescout disclosed FY2019 financial results, the percentage

15  of tenured salespeople, and the Merger.  ¶¶ 12, 124.  These shareholders thus suffered no losses

16  traceable to any alleged fraud that affected their stock purchases.  *Carey Camp*, 2020 WL 1157192,

17  at *7 (no loss causation for price drops not caused by alleged misrepresentation).  This gap in the

18  allegations makes sense:  the first complaint's putative class period ended on October 9, 2019, Dkt.

19  1, ¶ 1, and the class period in the now-consolidated *Arbitrage Fund* complaint began on February 6,

20  2020, No.3:20-cv-03819, Dkt. 1 at 1.  Plaintiffs blindly combined these class periods without alleging

21  loss causation for purchases made in between.  The claims thus fail as to this four-month period.

22  **V.     CONCLUSION**

23         For the above reasons, the SAC should be dismissed with prejudice.

24   Date:  June 24, 2021                          Respectfully submitted,

25

26                                                **ROPES & GRAY LLP**

27                                                 */s/ Anne Johnson Palmer*
                                                  Anne Johnson Palmer (CSB #302235)

28
                                                 *Attorneys for Defendant Forescout Technologies, Inc.*