IGNACIO E. SALCEDA, State Bar No. 164017
DIANE M. WALTERS, State Bar No. 148136
REBECCA L. EPSTEIN, State Bar No. 168226
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: (650) 493-9300
Facsimile: (650) 565-5100
Email: isalceda@wsgr.com
         dwalters@wsgr.com
         bepstein@wsgr.com

Attorneys for Defendants
Michael DeCesare and Christopher Harms

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| CHRISTOPHER L. SAYCE, Individually and on Behalf of All Others Similarly Situated,<br><br>        Plaintiff,<br><br>        v.<br><br>FORESCOUT TECHNOLOGIES, INC., MICHAEL DECESARE, and CHRISTOPHER HARMS,<br><br>        Defendants. | CASE NO.: 3:20-cv-00076-SI<br><br>CLASS ACTION<br><br>**INDIVIDUAL DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS SECOND AMENDED COMPLAINT**<br><br>Date:  August 27, 2021<br>Time:  10:00 a.m.<br>Dept:  Courtroom 1, 17th Floor<br><br>Before:  Hon. Susan Illston |

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ....................................................................................1

STATEMENT OF ISSUES TO BE DECIDED (CIVIL L.R. 7-4(a)(3))......................................1

MEMORANDUM OF POINTS AND AUTHORITIES ...............................................................1

INTRODUCTION.....................................................................................................................1

BACKGROUND.......................................................................................................................2

I.      APPLICABLE LEGAL STANDARDS.................................................................2

II.     PLAINTIFFS FAIL TO PLEAD FALSITY .........................................................4

III.    THE SAC FAILS TO PLEAD A STRONG INFERENCE OF SCIENTER..........4

        A.      Plaintiffs Fail to Plead Any Direct Evidence of Scienter...........................4

                1.      The CW Allegations Do Not Provide the Missing Inference
                        of Scienter. ....................................................................................5

                2.      Plaintiffs' "Admission" Allegations Fail. ....................................16

        B.      The SAC Lacks Any Compelling Motive Allegations...............................17

                1.      The Stock Sale Allegations Are Woefully Deficient. ...................17

                2.      The Merger Motive Allegations Fail to Plead Scienter................19

        C.      The Merger and Delaware Litigation Allegations Do Not Plead
                Scienter...................................................................................................20

        D.      Plaintiffs' Allegations Fail Both Individually and Holistically ...............23

IV.     PLAINTIFFS' LOSS CAUSATION ARGUMENTS ARE FLAWED ................25

V.      THE SECTION 20(a) CLAIM ALSO FAILS .....................................................25

CONCLUSION ......................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alaska Elec. Pension Fund v. Adecco S.A.*,
434 F. Supp. 2d 815 (S.D. Cal. 2006),
*aff'd*, 256 F. App'x 74 (9th Cir. 2007) ........................................................................... 16

*Brodsky v. Yahoo! Inc.*,
630 F. Supp. 2d 1104 (N.D. Cal. 2009) ............................................................................ 8

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
880 F. Supp. 2d 1045 (N.D. Cal. 2012) ............................................................. 6, 15, 18

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
No. 5:11-CV-04003-LHK, 2013 WL 2156358
(N.D. Cal. May 17, 2013) ................................................................................................ 8

*ECA & Local 134 IBEW Joint Pension Trust of Chicago v.*
*JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009) .......................................................................................... 19

*Glazer Capital Mgmt., LP v. Magistri*,
549 F.3d 736 (9th Cir. 2008) ......................................................................................... 19

*In re Accuray, Inc. Sec. Litig.*,
757 F. Supp. 2d 936 (N.D. Cal. 2010) ...................................................................... 5, 11

*In re CDnow, Inc. Sec. Litig.*,
138 F. Supp. 2d 624 (E.D. Pa. 2001) ............................................................................ 21

*In re Cerner Corp. Sec. Litig.*,
425 F.3d 1079 (8th Cir. 2005) ....................................................................................... 13

*In re NVIDIA Corp. Sec. Litig.*,
768 F.3d 1046 (9th Cir. 2014) ......................................................................................... 4

*In re Rackable Sys., Inc. Sec. Litig.*,
No. C 09-0222 CW, 2010 WL 3447857
(N.D. Cal. Aug. 27, 2010) ............................................................................................. 24

*In re SunPower Corp. Sec. Litig.*,
No. 16-cv-04710-RS, 2018 WL 1863055
(N.D. Cal. Apr. 18, 2018) .............................................................................................. 24

*Iron Workers Local 580 Joint Funds v. NVIDIA Corp.*,
--- F. Supp. 3d ----, 2021 WL 796336 (N.D. Cal. Mar. 2, 2021),
*appeal docketed*, No. 21-15604 (9th Cir. Apr. 5, 2021) ................................................ 9

*Lau v. Opera Ltd.*,
--- F. Supp. 3d ----, 2021 WL 964642 (S.D.N.Y. Mar. 13, 2021) ................................ 21

*Lipton v. PathoGenesis Corp.*,
    284 F.3d 1027 (9th Cir. 2002) ........................................................................... 17

*Mazzaferro v. Aruba Networks, Inc.*,
    No. 13-CV-02342-VC, 2014 WL 12680773
    (N.D. Cal. Aug. 1, 2014) ................................................................................... 10

*McCasland v. FormFactor Inc.*,
    No. C 07-5545 SI, 2009 WL 2086168
    (N.D. Cal. Jul. 14, 2009) ............................................................................... 7, 16

*McGovney v. Aerohive Networks, Inc.*,
    No. 18-CV-00435-LHK, 2019 WL 8137143
    (N.D. Cal. Aug. 7, 2019) ............................................................................... 6, 13

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
    540 F.3d 1049 (9th Cir. 2008) ............................................................ 3, 4, 18, 19

*Monachelli v. Hortonworks, Inc.*,
    225 F. Supp. 3d 1045 (N.D. Cal. 2016) ............................................................. 5

*Paciga v. Invuity Inc.*,
    No. C 17-01005 JSW, 2018 WL 7286503
    (N.D. Cal. Sept. 26, 2018) ............................................................................... 16

*Police Ret. Sys. v. Intuitive Surgical, Inc.*,
    759 F.3d 1051 (9th Cir. 2014) .................................................................. *passim*

*Police Ret. Sys. v. Intuitive Surgical, Inc.*,
    No. 10-CV-03451-LHK, 2012 WL 1868874
    (N.D. Cal. May 22, 2012),
    *aff'd*, 759 F.3d 1051 (9th Cir. 2014) .............................................................. 8, 9

*Robb v. Fitbit Inc.*,
    216 F. Supp. 3d 1017 (N.D. Cal. 2016) ............................................................. 9

*Roberts v. Zuora, Inc.*,
    No. 19-cv-03422-SI, 2020 WL 2042244
    (N.D. Cal. Apr. 28, 2020) ................................................................................ 16

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001) ............................................................ 12, 14, 18, 19

*Scandlon v. Blue Coat Sys., Inc.*,
    No. C 11-4293 RS, 2013 WL 5313168
    (N.D. Cal. Sept. 23, 2013) ............................................................................... 24

*ScripsAmerica, Inc. v. Ironridge Global LLC*,
    119 F. Supp. 3d 1213 (C.D. Cal. 2015) ............................................................ 21

*S. Ferry LP, No. 2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) ........................................................................... 24

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) .............................................................................. 3, 4, 24

*Waterford Township Police v. Mattel, Inc.*,
    321 F. Supp. 3d 1133 (C.D. Cal. 2018),
    *aff'd sub nom. Castro v. Mattel, Inc.*,
    794 F. App'x 669 (9th Cir. 2020) ........................................................................ 9

*Wochos v. Tesla, Inc.*,
    985 F.3d 1180 (9th Cir. 2021) .......................................................................... 12

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ........................................................... 3, 5, 12, 23

## STATUTES

15 U.S.C. § 78u-4(b)(1)(B) ............................................................................................ 3

15 U.S.C. § 78u-4(b)(2) .................................................................................................. 3

Civil L.R. 7-4(a)(3) .......................................................................................................... 1

## RULES

Fed. R. Civ. P. 8 ............................................................................................................... 1

Fed. R. Civ. P. 9(b) .................................................................................................... 1, 3

Fed. R. Civ. P. 12(b)(6) .................................................................................................. 1

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on August 27, 2021 at 10:00 a.m., or as soon thereafter as the matter may be heard, before the Honorable Susan Illston of the U.S. District Court for the Northern District of California, 450 Golden Gate Avenue, San Francisco, CA, defendants Michael DeCesare and Christopher Harms (the "Individual Defendants") will and hereby do move for an order dismissing the second amended complaint ("SAC" or "¶_"). The Individual Defendants also join in the motion to dismiss filed by defendant Forescout Technologies, Inc. ("Forescout," and collectively with the Individual Defendants, "Defendants").

The Individual Defendants seek dismissal of the SAC pursuant to the Private Securities Litigation Reform Act of 1995 ("Reform Act" or "PSLRA") and Federal Rules of Civil Procedure 12(b)(6), 8, and 9(b). The Individual Defendants' motion to dismiss is based upon this Notice of Motion and Motion; the Memorandum of Points and Authorities herein; the Forescout motion to dismiss and supporting papers ("Forescout Motion to Dismiss" or "Forescout MTD"); Defendants' Notice of Incorporation by Reference and Request for Judicial Notice; the pleadings and records; oral argument; and any other matters properly before the Court.

**STATEMENT OF ISSUES TO BE DECIDED (Civil L.R. 7-4(a)(3))**

1. Have plaintiffs sufficiently alleged an actionable misrepresentation or omission?

2. Have plaintiffs sufficiently alleged the requisite strong inference of scienter?

3. Have plaintiffs sufficiently alleged loss causation for the period between October 10, 2019 and February 6, 2020?

4. Have plaintiffs pleaded a cause of action for control person liability?

5. Should dismissal be granted with prejudice?

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

In amending their allegations, plaintiffs largely repackaged the same hodgepodge of claims the Court deemed deficient in its March 25, 2021 Order dismissing the consolidated amended complaint (the "CAC"). Plaintiffs have now had four opportunities to attempt to satisfy the Reform Act's rigorous pleading requirements and have failed to do so. The SAC should thus be

1    dismissed with prejudice.

2              The SAC's deficient scienter allegations – alone – warrant dismissal.  Although plaintiffs

3    have added allegations purportedly attributable to five additional former Forescout employees

4    ("CWs"), all of the CW allegations (both old and new) suffer from the same critical defects:

5    (i) none of the CWs claims to have personal knowledge about the challenged public statements;

6    and (ii) none of the CWs claims to have personal knowledge regarding the mental states of

7    Messrs. DeCesare and Harms at the time any challenged statement was made.

8              Not only have plaintiffs failed to plead any new particularized facts giving rise to a strong

9    inference of scienter, they have also jettisoned other allegations, leaving any purported motive

10   allegations even weaker than in the CAC.  For example, the CAC included several paragraphs and

11   charts listing the Individual Defendants' stock sales in a section entitled "Defendants Financial

12   Motivations Further Support a Strong Inference of Scienter."  With the exception of two cursory

13   sentences in the "Parties" section of the SAC, the stock sale allegations have all but disappeared.

14   Indeed, the SAC, like the CAC, fails to offer any compelling explanation why the Individual

15   Defendants purportedly would have engaged in a scheme to defraud investors.

16             Moreover, competing and compelling inferences of non-fraudulent conduct outweigh

17   plaintiffs' unsupported fraud allegations.  In addition to the absence of any coherent theory of

18   fraud, Plaintiffs ignore Defendants' transparent and detailed risk disclosures throughout the class

19   period, which undermine plaintiffs' claims of fraudulent concealment.

20             In sum, the SAC fails to plead – as it must – particularized facts giving rise to a strong

21   inference of scienter, and the SAC should be dismissed with prejudice.

22                                              **BACKGROUND**

23             To avoid burdening the Court with duplicative background information, the Individual

24   Defendants incorporate by reference the Factual and Procedural Background section of

25   Forescout's Motion to Dismiss.  *See* Forescout MTD at 3-6.

26   **I.    APPLICABLE LEGAL STANDARDS**

27             To state a claim for securities fraud, a plaintiff must plead, among other things, a material

28   misrepresentation or omission, scienter, and loss causation.  *See Police Ret. Sys. v. Intuitive*

*Surgical, Inc.*, 759 F.3d 1051, 1057 (9th Cir. 2014).[1]  Plaintiffs must also satisfy the heightened pleading requirements of Rule 9(b) and the Reform Act.  *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1054-55 (9th Cir. 2008).  As the Ninth Circuit has made clear, "[d]ue in large part to the enactment of the [Reform Act], . . . plaintiffs in private securities fraud class actions face formidable pleading requirements to properly state a claim and avoid dismissal[.]"  *Id.*

To satisfy these rigorous requirements, a complaint must:  (i) "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief . . . state with particularity all facts on which that belief is formed," 15 U.S.C. § 78u-4(b)(1)(B); and (ii) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," or scienter, *id.* § 78u-4(b)(2).  These heightened pleading requirements serve as a "check" against "abusive" shareholder litigation.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007).

The "strong inference" standard "unequivocally raise[d] the bar for pleading scienter," requiring plaintiffs to plead particularized facts "that give rise to a 'strong' – *i.e.*, a powerful or cogent – inference."  *Id.* at 321-23.  Courts must conduct a comparative inquiry and "compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and ***only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference***."  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009) (emphasis added).

Where, as here, plaintiffs rely on statements from confidential witnesses in an attempt to satisfy these rigorous requirements, plaintiffs "must pass two hurdles":  (1) the CWs must be described with sufficient particularity "to establish their reliability and personal knowledge"; and (2) "those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter."  *Id*. at 995.

---

[1] Although it is not clear from the SAC if plaintiffs are asserting claims under each subsection of Rule 10b-5(a)-(c), scienter is an essential element of each subsection, and the Individual Defendants thus move to dismiss plaintiffs' claims under Section 10(b) and each subsection of Rule 10b-5(a)-(c) for failure to plead scienter.

1    **II.      PLAINTIFFS FAIL TO PLEAD FALSITY**

2              To satisfy the Reform Act's "exacting requirements for pleading 'falsity,'" plaintiffs must

3    plead specific, contemporaneous facts indicating why each statement was false when made.

4    *Metzler*, 540 F.3d at 1070.  As set forth in Forescout's Motion to Dismiss, in which the Individual

5    Defendants also join, the SAC remains devoid of such facts.  *See* Forescout MTD, Sections I-III.

6    The SAC should thus be dismissed in its entirety for failing to plead falsity.  *Id.*

7    **III.     THE SAC FAILS TO PLEAD A STRONG INFERENCE OF SCIENTER**

8              To state a claim for securities fraud, plaintiffs must plead particularized facts giving rise

9    to a strong inference that Mr. DeCesare or Mr. Harms made false or misleading statements with

10   scienter, *i.e.*, "a mental state embracing intent to deceive, manipulate, or defraud." *Intuitive*

11   *Surgical*, 759 F.3d at 1061 (citation omitted).  To qualify as "strong," the inference "must be

12   more than merely plausible or reasonable—it must be cogent and at least as compelling as an

13   opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.

14             The Ninth Circuit has instructed courts to conduct a "dual inquiry" by first determining

15   whether any of the allegations "standing alone, is sufficient to create a strong inference of

16   scienter," and then, "[i]f none is sufficient alone . . . consider[ing] the allegations holistically[.]"

17   *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1056 (9th Cir. 2014).  Whether viewed

18   individually or holistically, the allegations in the SAC – like the CAC – fail to give rise to any

19   inference of scienter.  Moreover, compelling and competing inferences of non-fraudulent

20   conduct further undermine an inference of scienter here.

21             **A.       Plaintiffs Fail to Plead Any Direct Evidence of Scienter**

22             To plead scienter as to each defendant, plaintiff must allege "'***specific contemporaneous***

23   ***statements or conditions*** that demonstrate the intentional or the deliberately reckless false or

24   misleading nature of the statements when made.'" *Metzler*, 540 F.3d at 1066 (emphasis added)

25   (citation omitted).  Like the CAC, the SAC lacks any facts, much less particularized facts,

26   showing the mental states of Messrs. DeCesare or Harms at the time each of the statements

27   attributed to them was made.  In the absence of such facts, plaintiffs fail to plead a strong

28   inference of an "intent to deceive, manipulate, or defraud." *Intuitive Surgical*, 759 F.3d at 1061;

*In re Accuray, Inc. Sec. Litig.*, 757 F. Supp. 2d 936, 949 (N.D. Cal. 2010) ("Plaintiffs fail to plead facts identifying what each Defendant purportedly knew . . . .").

### 1.    The CW Allegations Do Not Provide the Missing Inference of Scienter.

Like the CAC, the SAC fails to identify a single, contemporaneous internal email, report, or document demonstrating that any public statement was false or misleading when made, much less demonstrating that any statement was made with an intent to deceive or defraud or with deliberate recklessness.  Instead, plaintiffs again ask the Court to infer scienter based on the opinions, hearsay, and speculation of former Forescout employees.  *E.g.*, ¶¶3, 6-8, 36, 38, 40, 45, 49-52, 57, 82-86, 88, 95-96, 98-100, 106, 112, 122, 123.

Although the SAC adds allegations attributed to five new CWs (CW16-CW20), the CW allegations – both old and new – continue to suffer from the same fatal deficiencies:  none of the CWs claims to have personal knowledge regarding any of the challenged statements or the mental states of Messrs. DeCesare or Harms at the time any allegedly false or misleading statement was made.  As the Court held in rejecting the prior CW allegations, "plaintiffs failed to adequately allege how the CWs' reports contradict defendants' statements."  March 25, 2021 Order ("March 25 Order") at 14.  The same failure permeates the SAC.

Notably, none of the CWs states that any public statement was false or misleading, and no CW is alleged to have had any involvement in corporate decision-making or public reporting. *See, e.g.*, *Monachelli v. Hortonworks, Inc.*, 225 F. Supp. 3d 1045, 1057-58 (N.D. Cal. 2016) (noting that none of the CWs were "in a position" to state that the public "predictions . . . were unreasonable when made,'" given that "none of them worked in finance, and none of them had any role in preparing . . . projections'").  The CW allegations thus fail to show how any public statement was false or misleading when made, much less that any statement was made with scienter.  *See Zucco*, 552 F.3d at 998 ("generalized claims about corporate knowledge are not sufficient to create a strong inference of scienter, since they fail to establish that the witness reporting them has reliable personal knowledge of the defendants' mental state").

The CW allegations regarding Mr. DeCesare consist largely of general allegations regarding access to data and attendance at periodic meetings that lack the particularized details

1    necessary to plead a strong inference of scienter.  *See Intuitive Surgical*, 759 F.3d at 1063 ("Mere

2    access to reports containing undisclosed sales data is insufficient to establish a strong inference of

3    scienter."); *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1064-65

4    (N.D. Cal. 2012) (CW allegations regarding review of executive reports at weekly meetings

5    insufficient to show that executives believed company could not meet its long-term goals).

6         Nor do the CW allegations raise any inference of scienter as to Mr. Harms.  Indeed, ***Mr.***

7    ***Harms is not even mentioned by name in the CW allegations***.

8         **CWs 1-15**.  Other than repackaging and reorganizing them, the allegations attributed to the

9    15 original CWs remain largely unchanged from the CAC, and no new particularized facts have

10   been added in the SAC.  *See, e.g.*, ¶¶ 36, 38, 40, 45, 52, 86, 88, 95, 99, 100, 106, 112, 122, 126.

11   The allegations purportedly attributable to CWs 1-15 thus remain deficient and fail to support

12   plaintiffs' securities fraud claims.  March 25 Order at 13 ("[I]ndividually and collectively, the

13   CWs' statements lack detail to establish either the reliability of CWs' statements or that the

14   statements themselves are indicative of scienter.").

15        **New CWs 16-20**.  As set forth below, new CWs 16-20 do not salvage plaintiffs' claims.

16        **CW16**.  CW16 is described as "a Channel Account Manager ('CAM') at Forescout from

17   December 2015 to February 2020, who provided support for sales efforts in New England, New

18   York City and Canada."  ¶40.E.  The SAC does not allege that CW16 was involved in the

19   preparation of corporate guidance or public reporting, nor does the SAC allege that CW16 had any

20   personal communications with Mr. DeCesare or Mr. Harms.  Indeed, the allegations attributed to

21   CW16 do not mention ***any*** of the Defendants' public statements.[2]  As such, the CW16 allegations

22   contribute little to the scienter analysis.  *See, e.g.*, *McGovney v. Aerohive Networks, Inc.*, No. 18-

23   CV-00435-LHK, 2019 WL 8137143, at *19 (N.D. Cal. Aug. 7, 2019) (finding that allegations

24   attributed to CWs who were not alleged to have "reported to or had direct personal contact" with

25   the defendants "provide little reliable basis to support an inference of the Defendants' scienter

26

27        [2] As detailed herein, merely interspersing deficient CW allegations after the challenged
     statements does not provide the particularized, contemporaneous facts necessary to plead a
28   strong inference of scienter as to each individual.

1   because the CWs do not have personal knowledge as to what the Defendants knew").

2          CW16 alleges that there were hiring freezes and layoffs in the summer of 2019 and

3   speculates that the layoffs were "an attempt to 'get leaner' in anticipation of a planned sale of the

4   Company." ¶40.E.  CW16's unquantified allegations regarding layoffs at an unspecified time in

5   the "summer of 2019" and speculation about Forescout lack essential details and thus fail to show

6   that any challenged statement was false or misleading when made, much less knowingly or

7   deliberately so.  *See, e.g.*, *McCasland v. FormFactor Inc.*, No. C 07-5545 SI, 2009 WL 2086168,

8   at *5 (N.D. Cal. Jul. 14, 2009) (no allegations that CWs "provided any ***specific*** information to

9   defendants that contradict[ed] any public statement made," "that any defendant received such

10  [specific] information in an email" or internal report or "that any CW heard or read any specific

11  private statement by a defendant that contradicted a public statement.").

12         Similarly, CW16's allegations that Mr. DeCesare held quarterly business calls during

13  which he allegedly provided updates on the sales pipeline and "tech wins" also lack essential

14  details, such as dates and specific content discussed.  ¶45.D.  Indeed, CW16 does not even identify

15  what Mr. DeCesare purportedly said about "tech wins" during such calls, much less suggest that

16  those purported comments were inconsistent with any public statements.  The vague "quarterly

17  call" allegations thus fail to show that Mr. DeCesare's public statements about "tech wins" (or any

18  other statements) were false when made, much less knowingly so.

19         Indeed, CW16, who allegedly was in a lower-level regional sales position, does not claim

20  to have had any direct communications with Mr. DeCesare regarding any topic, nor does CW16

21  claim to have knowledge regarding Mr. DeCesare's (or Mr. Harms') mental state.  *See Intuitive*

22  *Surgical*, 759 F.3d at 1063 (witness allegations insufficient to defeat competing inference where

23  the witnesses lacked "first hand knowledge regarding what the individual defendants knew or did

24  not know about [the company's] financial health").

25         **CW17**.  CW17 is described as "a Strategic Account Manager ('SAM') at Forescout from

26  April 2019 to February 2021, who sold Forescout's products to large enterprises in Houston,

27  Austin and San Antonio."  ¶36.E.  CW17, a lower-level regional salesperson, is not alleged to

28  have been involved in the preparation of corporate guidance or public reporting or to have had any

personal communications with either Mr. DeCesare or Mr. Harms.  *See, e.g.*, *Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1114 (N.D. Cal. 2009) ("For the complaint to survive . . . , Plaintiffs must describe with particularity these CWs' roles in [the] revenue recognition process and that they had personal knowledge of Defendants' accounting decisions.") (citation omitted).  Thus, like the CW16 allegations, the CW17 allegations contribute little to the scienter analysis.

CW17 alleges that there were "five rounds of layoffs between April 2019 and February 2021 and that major cuts in the sales force took place in the summer of 2019."  ¶40.F.  Like CW16, however, CW17 does not address any of the challenged public statements, much less claim that any statement was false.  Nor does CW17 claim to have any knowledge regarding the Defendants' mental states at the time any challenged statements were made.

CW17 further speculates that "Forescout's most senior executives, including DeCesare and Redman, used Clari to monitor sales deals and the Company's forecasts."  ¶45.E.  Clari is described in the SAC as "a Salesforce revenue operations platform add-on," ¶43, that "provides information about the status of sales representatives, the sales pipeline, and forecasts with real-time accuracy to monitor deals and sales representatives."  ¶7.  The SAC, however, fails to allege any facts to explain how a lower-level regional sales representative would have personal knowledge regarding the use of Clari by Mr. DeCesare, much less knowledge how any unspecified information purportedly accessed by Mr. DeCesare related to the public guidance.  *See, e.g.*, *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, No. 5:11-CV-04003-LHK, 2013 WL 2156358, at *9 (N.D. Cal. May 17, 2013) ("The SAC does not allege that CW6 had any contact with the individual defendants; thus, CW6 offers 'little, if any, reliable basis from which to infer scienter.'") (citation omitted).

Moreover, the CW17 allegations regarding Clari lack critical details:  what specific information did Mr. DeCesare review, on which date did he review it, and most importantly, how did it render any of the challenged public statements knowingly false or misleading when made?  As courts have recognized, the "'particularity' requirement of the PSLRA cannot be satisfied by a mere conclusory assertion that Defendants had 'access to, and use of the information' collected by the [c]ompany's tracking software."  *Police Ret. Sys. v. Intuitive Surgical, Inc.*, No. 10-CV-03451-

LHK, 2012 WL 1868874, at *19 (N.D. Cal. May 22, 2012) (citation omitted), *aff'd*, 759 F.3d 1051 (9th Cir. 2014).  "Rather, particularity requires pleading the who, what, where, when, and how regarding each Defendant's access to the relevant information that belies fraudulent intent." *Id.*  Because plaintiffs "***do not adequately tie the specific contents of any of these data sources to particular statements***," the CW17 allegations fail to show that each defendant who made each statement "spoke falsely."  *Iron Workers Local 580 Joint Funds v. NVIDIA Corp.*, --- F. Supp. 3d ----, 2021 WL 796336, at *9 (N.D. Cal. Mar. 2, 2021) (emphasis added), *appeal docketed*, No. 21-15604 (9th Cir. Apr. 5, 2021); *cf. Robb v. Fitbit Inc.*, 216 F. Supp. 3d 1017, 1032 (N.D. Cal. 2016) (data scientist hired to analyze Fitbit's fitness devices personally provided monthly reports directly to the COO regarding device technology failures that allegedly rendered defendants' public statements about the devices' accuracy misleading).

The CW17 allegations further contend that "Forescout lost every single customer in CW17's territory in southern Texas by April 2019," but no details concerning these customers are pleaded in the SAC.  ¶99.C.  For example, CW17 does not identify the customers or the dollar amounts attributed to such deals.  Indeed, the CW17 allegations lack facts regarding the potential impact, if any, of the unidentified deals on Forescout's global revenue guidance or future sales performance.  Nor does CW17 claim to have any knowledge regarding what Messrs. DeCesare and Harms did or did not know concerning the deals in southern Texas.  The allegations thus fail to raise any inference of scienter as to either individual.  *See, e.g.*, *Waterford Twp. Police v. Mattel, Inc.*, 321 F. Supp. 3d 1133, 1154 (C.D. Cal. 2018) (CW allegations insufficient to raise a strong inference of scienter where CW did not have personal knowledge regarding global retail inventory levels), *aff'd sub nom. Castro v. Mattel, Inc.*, 794 F. App'x 669 (9th Cir. 2020).  Moreover, plaintiffs disregard that Forescout reported revenue at the top end of its guidance for the April-June 2019 quarter.  *See* Forescout MTD at 4.

CW17 also contends that Forescout allegedly lost millions of dollars in potential business in Texas from AMD by May 2019, but, as with the other allegations, the AMD allegations lack critical details.  In particular, the CW17 allegations fail to allege whether the AMD deal was included in the public guidance; what effect (if any) the deal's loss would have had on the global,

company-wide revenue projections, pipeline or sales outlook; and what Messrs. DeCesare and Harms did or did not know concerning the AMD potential business.  ¶99.C; *see, e.g.*, *Mazzaferro v. Aruba Networks, Inc.*, No. 13-CV-02342-VC, 2014 WL 12680773, at *1 (N.D. Cal. Aug. 1, 2014) ("the loss of one client is not equivalent to a decrease in . . . revenue.").  Thus, CW17 fails to provide the requisite details showing what each Individual Defendant knew, when they knew it, and other details, including "the ratio of clients lost to clients added, how many projects were or were not in the pipeline, or whether the company was actually losing revenue or market share." *Mazzaferro*, 2014 WL 12680773, at *1.[3]

**CW18**.  CW18 is described as "Global Talent and Enablement Manager ('GTEM')" from June 2018 to December 2020.  ¶40.G.  Like the other CWs, CW18:  (i) does not contend that any challenged statement was false, much less deliberately so; (ii) is not alleged to have had any role in the preparation of Forescout's public guidance or other public statements; and (iii) does not claim to have had any personal communications with either Individual Defendant during the putative class period.  *Supra* at 6-9.  The CW18 allegations thus fail to raise any inference of scienter as to any challenged statement.  *Id.*

**The "CEP" Model**.  CW18 alleges that Forescout retained a consultant, Force Management, in June 2018 to develop a new forecasting model referred to in the SAC as the "Customer Engagement Process" or "CEP."  ¶¶49-50.  According to the CW18 allegations, Force allegedly told "senior executives" at Forescout *in 2018 – i.e.*, before the start of the class period – that a "majority" of the deals that had been identified internally as "committed" would not be considered "committed" under the CEP model.  ¶88.D.  CW18 further alleges that CEP was "never implemented" at Forescout because it purportedly "would have forced the Company to recognize that a large

---

[3] Although the SAC alleges that "CW17 also corroborate[s] that Forescout's declining revenue in 2019 was directly caused by pricing pressure and superior cloud delivered solutions offered by competitors" (¶99.A), the CW17 allegations do not say anything about "pricing pressure and superior cloud delivered solutions offered by competitors," much less that they "directly caused" Forescout's 2019 revenue to decline.  *Id.*  Rather, CW17 offers his personal opinion that Forescout's products were "outdated," which purportedly made sales to new customers more difficult *for him personally*.  ¶36.E.  Nor does any other CW offer any particularized facts to support the contention that Defendants purportedly knew that they could not meet revenue guidance because of a shift toward cloud computing.  ¶48.

1  proportion of deals identified as 'committed' would, in fact, not close." ¶83.  CW18's allegations

2  regarding CEP fail to plead a strong inference of scienter on multiple grounds.

3      *First*, although the CW18 allegations discuss internal sales forecasting at Forescout, CW18

4  alleges no facts regarding the preparation of Forescout's public revenue guidance.  Whether or not a

5  deal was considered "committed" for purposes of internal sales qualification does not say anything

6  about how Forescout prepared its public guidance, much less show that the guidance was somehow

7  fraudulent.  *See, e.g.*, *Accuray*, 757 F. Supp. 2d at 949 ("Plaintiffs do not allege . . . whether the

8  sales targets were incorporated into the forecast.").

9      *Second*, the CEP allegations are internally inconsistent and contradictory.  For example,

10  CW18 alleges that a "majority" of the deals that had been identified internally as "committed" were

11  "miscategorized."  ¶88.D.  Yet, CW18 later "estimates" that "1 out of 5 deals in the global sales

12  pipeline was miscategorized as 'committed'" – *i.e.*, 20%, not more than 50% – and "1 out of every 3

13  seven or eight figure deals was miscategorized as 'committed,'" or 33%.  ¶99.D.

14      *Third*, CW18's contention that he was able to use the CEP model to determine that

15  Forescout "would miss its sales targets for the next three or four quarters consecutively" (¶83) is

16  belied by Forescout's results in the four quarters following June 2018.  *See, e.g.*, ¶46 (3Q2018

17  revenue increased 23% year-over-year); Exhibit ("Ex.") 1 to the Declaration of Charles D. Zagnoli[4]

18  (4Q2018 revenue increased 35% year-over-year); Ex. 7 (1Q2019 revenue increased 27% year-over-

19  year); Ex. 9 (2Q2019 revenue increased 16% year-over-year).

20      *Fourth*, a number of the CEP allegations appear to be based on speculation, hearsay, and

21  CW18's personal opinions.  For example, although CW18 alleges that Mr. DeCesare purportedly

22  knew that Forescout "had considered implementing the CEP model," CW18 does not allege that he

23  ever spoke directly with Mr. DeCesare about the CEP model or any other subject.  ¶88.E.iii.  Nor

24  does CW18 offer any facts to support the assertion that "***Defendants*** knew, as of February 7, 2019,

25  that most deals in Forescout's pipeline barely had a 50% chance of success" based on the CEP

26

27      [4] Except as otherwise noted herein, the exhibit cites herein refer to the Declaration of Charles
     D. Zagnoli Supporting Defendants' Motions to Dismiss Second Consolidated Amended
28  Complaint.

model, a model that "Defendants then refused to fully implement." ¶82.  Indeed, the SAC does not plead any facts, much less particularized facts, showing what Messrs. DeCesare and Harms did or did not know regarding CEP.  CW18 also offers no support for his assessments of particular deals' chances of closing or Forescout's ability to meet sales targets; and he alleges no facts at all to suggest Mr. DeCesare or Mr. Harms shared CW18's opinions.  *See, e.g.*, *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1194 (9th Cir. 2021) (rejecting employees' view that goal was "impossible" when nothing suggested defendant agreed).  Allegations that salespeople thought some deals were misclassified or some targets were unachievable, *e.g.*, ¶¶ 36, 52, suggest "only that there was some disagreement within the corporation over its [sales] processes, and not that . . . management was deliberately reckless." *Zucco*, 552 F.3d at 998.

Regardless, as explained *supra* at 11, CW18 does not allege how any internal sales forecasts correlated to Forescout's public guidance.  Indeed, Forescout's uncontested financial results undermine CW18's claims of poor internal forecasting:  if the internal forecasting was in fact as bad as CW18 claims, Forescout would not have reported above-guidance 1Q2019 revenue on May 9, 2019, or reported 2Q2019 revenue on August 7, 2019 that was at the top end of the guidance provided in May 2019 – but Forescout achieved both results.

In any event, "[c]alling executives . . . bad forecasters, does not plead fraud, except where it can be shown that they knew or were deliberately reckless in disregarding the misleading nature of their forecasts." *Ronconi v. Larkin*, 253 F.3d 423, 437 (9th Cir. 2001).  No such facts are pleaded in the SAC.

***Slipped Deals***.  Although CW18 alleges that an "$80 million potential deal with Booz Hamilton repeatedly slipped in 2019," ¶99.D, CW18 does not allege whether and/or when the Booz Hamilton deal was included in Forescout's public guidance.  For example, plaintiffs do not allege that the Booz Hamilton deal negatively impacted Forescout's ability to meet it public guidance in the first half of 2019 – a period in which Forescout met or exceeded its revenue guidance – nor do plaintiffs allege that Forescout missed its 3Q2019 or 4Q2019 guidance by ***$80 million***.  The Booz Hamilton allegations thus lack the contemporaneous facts necessary to show that any of Defendants' guidance or other statements were deliberately false when made.  *Supra* at 9-10; *cf. also In re*

*Cerner Corp. Sec. Litig.*, 425 F.3d 1079, 1084 (8th Cir. 2005) ("A company could conceivably lose a material number of deals it had pursued, and yet continue to see a strong demand for its products.").  Moreover, CW18 does not allege that he had any communications with the Individual Defendants regarding the Booz Hamilton deal.

Nor does the mere allegation that a deal slipped into a later quarter refute the accuracy of any challenged statement.  To the contrary, it was consistent with Defendants' public statements cautioning about lengthy sales cycles and deal delays.  *See* Forescout MTD at 10; March 25 Order at 8 (defendants did "not guarantee the closure of every deal on the pipeline" and "disclosed that deals on the pipeline could change").

***Hands-on Management Style***.  CW18's allegations that Mr. DeCesare was a "micromanager" and "acted as the sale [*sic*] representative himself for the larger deals, meeting clients face-to-face and participating in conference calls" similarly fail.  ¶100.B.  Courts have found allegations concerning a "hands-on" management style to be "insufficient in the absence of other allegations about the defendants' involvement" in the alleged fraud.  *See McGovney*, 2019 WL 8137143, at *21 (citing cases).  Moreover, the CW18 allegations do not identify any specific client meetings or client calls in which Mr. DeCesare participated, the dates of any such meetings, or the content discussed at any of the unidentified meetings.  The CW18 allegations thus fail to show that any challenged public statement was somehow rendered false when made as a result of unidentified client meetings, much less deliberately so.

***Sales Force Layoffs and Turnover***.  CW18 alleges that the size of Forescout's sales organization declined from 400 employees in June 2018 to 300 in the beginning of 2020 due to both voluntary and involuntary terminations.  ¶40.G.  Yet, CW18 also acknowledges that, during this same period, Forescout hired 100 new sales representatives.  *Id.*  CW18 nevertheless disparages the new hires, offering his conclusory assessment that all 100 were "inexperienced" and "unable to close deals given the lengthy sales cycle."  *Id.*  CW18 further alleges that the loss of experienced NAMs resulted in Forescout "losing tens of millions of dollars in potential business."  ¶95.C.

As with the other CW allegations, the CW18 sales force layoff and other allegations fail to provide particularized, contemporaneous details.  For example, CW18 does not identify any specific

1   deals that potentially were lost due to sales force turnover, when the unidentified deals potentially

2   were lost, the dollar values associated with the unidentified deals, and more importantly, how any of

3   the unidentified lost deals rendered any challenged public statement knowingly false when made.

4   *Supra* at 9-10.  Similarly, CW18's hindsight allegation that Mr. DeCesare allegedly acknowledged

5   internally *in 2020* – months after the challenged sales force statements were made – that sales force

6   reductions had been made in *2019* and that additional reductions would be needed in *2020* (¶123.A)

7   does not show that any earlier (or later) public statement was knowingly false when made.  "[F]raud

8   by hindsight is not actionable."  *Ronconi*, 253 F.3d at 430 n.12 (citation omitted).[5]

9       **CW19**.  CW19 is described as a "former Strategic Enterprise Account Executive

10  ('SEAE')" from September 2019 to June 2020.  ¶40.C.  CW19, who was only employed at

11  Forescout for eight months, is not alleged to have been involved in the preparation of corporate

12  guidance or public reporting or to have had any personal communications with either Individual

13  Defendant.  *Supra* at 5.

14      Although CW19 alleges that the "SLED section of the Public Sector division was

15  eliminated in September 2019," the CW19 allegations fail to explain how the elimination of one

16  section within one division purportedly rendered any of the Defendants' challenged statements

17  about global, company-wide guidance or performance knowingly false.  ¶40.C.  CW19's

18  allegations that additional layoffs in unspecified numbers were made in September 2019 and June

19  2020 (after the end of the class period and after the start of a pandemic) similarly fail to show that

20  any challenged statement was fraudulent when made.  *Id.*

21      CW19's allegations regarding a single internal meeting in January 2020 – *i.e.*, late in the

22  class period – also fails to show that any class period statement was deliberately false when made.

23  CW19 alleges that, during a January 2020 sales meeting breakout session with unidentified

24  attendees, the VP of the Americas purportedly "instructed sales representatives to list deals as

25  ─────────────

26      [5] CW18 also alleges that Mr. DeCesare used Clari "to track sales, [and] monitor sales representatives, deals and forecasts," but CW18 offers no facts regarding Mr. DeCesare's alleged

27  use of Clari.  ¶100.C.  Indeed, the SAC does not plead any facts to show how CW18 purportedly would know what Mr. DeCesare did or did not review.  In any event, as with the other Clari allegations, these allegations are missing critical details, *e.g.*, what did Mr. DeCesare review,

28  when did he review it, and how did it render any statement fraudulent when made?

'committed' into the Salesforce platform based only on a single conversation with a senior executive of the customer in the negotiation stage . . . ." ¶99.F.  CW19 does not, however, identify any such deals that purportedly were entered into Salesforce, nor does the CW allege that any such deals were included in public guidance.  *See, e.g.*, *Royal Oak*, 880 F. Supp. 2d at 1065 ("Plaintiffs fail to allege facts explaining how the performance of either CW5's group or the Verizon sales impacted the revenues of Juniper as a whole").  Moreover, CW19 does not allege that Messrs. DeCesare and Harms were aware of any such purported instructions.  ¶57.[6]

**CW20**.  CW20 is described as "a Senior Deal Desk Manager" from August 2018 to April 2020, who allegedly worked "with sales representatives on the East Coast to structure deals and make proposals to customers."  ¶45.H.  Like the other CWs, CW20 is not alleged to have been involved in the preparation of corporate guidance or public reporting or to have had any personal communications with either Individual Defendant.  By plaintiffs' own admission, CW20 was four levels removed from the senior executives (*id.*:  CW20 reported to Roberts, who reported to Martin, who reported to DeCesare).  Moreover, the CW20 allegations consist of little more than general allegations about access to data and multiple levels of hearsay.

CW20 alleges that s/he prepared spreadsheet updates regarding deals valued at more than $500,000 that allegedly were discussed in meetings with Mr. DeCesare and Mr. Martin.  *Id.* Although the CW20 allegations do not identify any specific deals, the updates presumably were limited to deals on the "East Coast" of the U.S. only, based on the description of CW20's responsibilities.  *Id.*  CW20 does not (and cannot) allege what was discussed at any of the meetings with Mr. DeCesare – let alone that any such discussions contradicted a public statement – since CW20 does not allege that s/he personally attended the meetings.  The CW20 "spreadsheet update" allegations thus contribute little to the scienter analysis.  Likewise, the factually unsupported CW20 allegation that Mr. DeCesare purportedly used Clari amounts to little more than a general "access to information" allegation and lacks the particularized facts necessary to satisfy the Reform Act's

---

[6] Nor does this hearsay allegation regarding one conversation support plaintiffs' allegations of a companywide "pressure campaign."  ¶6.  Other allegations offered in support of the alleged "pressure campaign" are the same CW allegations already found to be deficient.  *Supra* at 6.

1  rigorous pleading requirements. *See, e.g.*, *Paciga v. Invuity Inc.*, No. C 17-01005 JSW, 2018 WL

2  7286503, at *6 (N.D. Cal. Sept. 26, 2018) (complaint did not "address what specific negative

3  information officers knew about its sales data or core operations that was sufficiently troubling

4  that the officers must have known that . . . guidance would not be met"); *cf.*, *Roberts v. Zuora,*

5  *Inc.*, No. 19-cv-03422-SI, 2020 WL 2042244, at *11 (N.D. Cal. Apr. 28, 2020) (CW allegations

6  sufficient where allegations included personal knowledge about specific emails and meetings,

7  including meetings with founders during which a major customer's termination was discussed).

8         CW20 further alleges that "despite the length of Forescout's sales cycle, deals were

9  forecasted to close within weeks of a quarter, and inevitably slipped into the next quarter as a result."

10  ¶99.E.  The CW20 allegations, however, do not identify specific deals, customers, dollar amounts,

11  reports, or any other contemporaneous information that would have rendered any challenged

12  statement false or misleading when made.  *See, e.g.*, *Alaska Elec. Pension Fund v. Adecco S.A.*,

13  434 F. Supp. 2d 815, 828 (S.D. Cal. 2006) (CW allegations failed to quantify impact of alleged

14  improprieties on revenues or year-end results), *aff'd*, 256 F. App'x 74 (9th Cir. 2007).  Nor do

15  these allegations say anything about Forescout's public guidance.

16         Finally, CW20 generally alleges that s/he attended "'all hands' conference calls" during

17  which Mr. DeCesare allegedly discussed "revenue forecasts, current bookings, 'tech wins,' and

18  the Company's inability to generate new business in 2019."  ¶100.E.  This vague allegation,

19  however, lacks specific facts, such as the dates of any such call – much less any particularized

20  facts suggesting that Mr. DeCesare said or learned something on these calls that contradicted any

21  public statement.  *McCasland*, 2009 WL 2086168, at *5.  Moreover, CW20's sweeping claim that

22  Forescout purportedly was unable "to generate new business in 2019" is belied by Forescout's

23  reported financial results.  *See* Forescout MTD at 3-6.

24         **2.**    **Plaintiffs' "Admission" Allegations Fail.**

25         Plaintiffs allege that the Individual Defendants' "admitted" having knowledge of the

26  purportedly deteriorating sales pipeline and the status of all deals based on general statements that

27  Messrs. DeCesare and Harms made regarding overseeing the business and working to improve

28  sales productivity.  *See, e.g.*, ¶44 (alleged statements regarding "spend[ing] a lot of time" on sales

1   execution and productivity and spending time in the field); *see also, e.g.*, ¶¶88.E.i, 96, 100.H, 104,

2   115.  As this Court found in the March 25 Order, however, "without additional corroboration

3   showing defendants' statements about the pipeline or big deals were false, defendants' admissions

4   to monitoring the pipeline and big deals are insufficient to plead a strong inference of scienter."

5   March 25 Order at 14.  No such additional facts are pleaded in the SAC.  Moreover, plaintiffs do

6   not identify any information that the Individual Defendants learned during their review of the

7   business that rendered any statement false when made.  *See, e.g.*, *Lipton v. PathoGenesis Corp.*,

8   284 F.3d 1027, 1036 (9th Cir. 2002) (report allegations did not establish scienter when,

9   "[a]lthough plaintiffs refer to the existence of [certain data]" and generally assert "what they think

10   the data shows, plaintiffs do not allege with particularity any specific information showing that

11   [the] data informed defendants that patient demand . . . was flat").[7]

12        **B.**     **The SAC Lacks Any Compelling Motive Allegations**

13        In its March 25 Order, the Court held that the CAC's stock sale and other financial

14   motive allegations were insufficient to establish a strong inference of scienter.  *Id.* at 14-15.  The

15   stock sale and other financial motive allegations in the SAC are even weaker than in the CAC.

16        **1.**     **The Stock Sale Allegations Are Woefully Deficient.**

17        Apparently recognizing that the CAC's allegations regarding the Individual Defendants'

18   stock sales undermined – rather than supported – plaintiffs' scienter allegations, plaintiffs have

19   jettisoned the paragraphs in the CAC that addressed the stock sales, including charts reflecting

20   the date and amount of each stock sale during the class period, as well as earlier sales.  CAC

21   ¶¶167-168.  The only allegations in the SAC regarding the Individual Defendants' stock sales are

22   a single sentence in each of the paragraphs identifying Messrs. DeCesare and Harms in the

23   "Parties" section of the SAC.  ¶¶24, 25.  Because the Court already held that the more lengthy

24   stock sale allegations in the CAC failed to plead scienter, the two sentences of cursory

---

26       [7] Nor do plaintiffs' former channel stuffing allegations – now recast as "front-loaded
revenue" allegations – suffice to plead a strong inference of scienter.  *E.g.*, ¶¶124-126.  In

27   addition to the failure to plead facts supporting the "front-loading" allegations (*see* Forescout
MTD at 20-22), plaintiffs fail to plead any facts suggesting that the Individual Defendants were

28   aware of any purported "front-loading" scheme.

allegations in the SAC also fail to plead any inference of scienter.  March 25 Order at 14.

In analyzing stock sale allegations, courts examine:  (i) the amounts and percentage of shares sold; (ii) timing; and (iii) whether the sales were consistent with prior trading history.  *See Ronconi*, 253 F.3d at 435.  Plaintiffs' removal of facts undermining any suggestion that the stock sales were somehow suspicious is unavailing.  As the now deleted CAC stock sales charts reflected, the sales were made with regularity over the course of the lengthy Class Period.  CAC ¶¶167-168.  For example, Mr. Harms' stock sales reflect predetermined amounts sold near the middle of every month.  *Id.* ¶167 (*e.g.*, exactly 9,815 shares sold five months in a row).  Likewise, Mr. DeCesare sold shares in every month of 2019, excluding June and October.  *Id.* ¶¶167-168.  Thus, this is not a situation where the defendants unexpectedly dumped a large portion of their shares just days before a "bad news" announcement.

Moreover, plaintiffs disregard that all of the stock sales were pursuant to predetermined, non-discretionary Rule 10b5-1 trading plans disclosed on the SEC filings for each sale.  *See* Ex. 20; Ex. 21.  Courts have found that such trading plans provide "innocent, alternative explanation for the stock sales," thus "negat[ing] an inference of scienter."  *Royal Oak*, 880 F. Supp. 2d at 1069; *see also Metzler*, 540 F.3d at 1067 n.11 (sales pursuant to "pre-determined plans may 'rebut[] an inference of scienter.'") (alteration in original) (citation omitted).

Ignoring all of this, plaintiffs appear to suggest the stock sales were suspicious simply because the total amount sold during the Class Period was higher than the total amount sold before the Class Period.  ¶¶24, 25.  Once again, however, plaintiffs ignore several critical facts.  As an initial matter, because Forescout only went public in October 2017 (¶1), there is not a lengthy trading history from which to assess comparable periods and patterns.  Following the IPO and a March 2018 secondary offering, the Individual Defendants were subject to lockups that precluded them from selling any shares for several months following the offerings.  Ex. 22 at 120; *see, e.g.*, *Ronconi*, 253 F.3d at 436 ("*In re Silicon Graphics* suggests that restrictions on an insider's ability to trade are important in determining whether the trading pattern is suspicious.").  Thus, it is hardly surprising that the Individual Defendants sold fewer shares during plaintiffs' comparison period than during the Class Period.

Nor are the percentages sold during the Class Period unusually high, particularly in light of the lengthy period over which they occurred.  Mr. DeCesare sold approximately 22% of his holdings, and Mr. Harms sold approximately 47.5%.[8]  The Ninth Circuit has found significantly higher percentages to be insufficient to plead scienter.  *See Metzler*, 540 F.3d at 1067 (CEO stock sales of 37% of holdings and CFO sales of 100% of holdings); *Ronconi*, 253 F.3d at 435-36 (sales by seven insiders in excess of 69% insufficient where timing of sales was not suspicious).

### 2.   The Merger Motive Allegations Fail to Plead Scienter.

Plaintiffs allege that the desire to sell Forescout at a premium purportedly motivated Defendants to portray the company inaccurately to both investors and potential acquirors.  *See, e.g.*, ¶54 ("Key to Defendants' effort to obtain a premium price for the Company was to portray Forescout as still being a growth company with a steadily increasing revenue flow that had been sidelined by a series of one-offs during 2019.").  The SAC further implies that the merger provided Messrs. DeCesare and Harms with a motive to commit fraud because:  (i) as is common in a merger transaction, they stood to receive "golden parachutes" significantly larger than their annual salaries (¶¶24-25, 61); and (ii) had the merger not closed, their stock would have traded at a lower value and their jobs purportedly were being threatened by an "activist investor."  ¶61; *see also* ¶127.D.

As this Court held in its March 25 Order, however, "financial motives arising from the potential acquisition are insufficient to establish a strong inference" of scienter.  March 25 Order at 15 (citing *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 748 (9th Cir. 2008)).  In *Glazer*, the Ninth Circuit noted that it was "join[ing]" its "sister circuits" in holding "that evidence of a personal profit motive on the part of officers and directors contemplating a merger is insufficient to raise a strong inference of scienter."  549 F.3d at 748; *see also ECA & Local 134 IBEW Joint*

---

[8] Because the Class Period spans two fiscal years, the number of shares and exercisable options varied over the period.  The 2019 proxy statement discloses beneficial share ownership as of April 1, 2019, including options and RSUs vesting within 60 days of April 1, 2019.  The proxy reflects 1,026,130 shares for Mr. DeCesare and 220,763 for Mr. Harms.  Ex. 6 at 47.  The percentages were calculated by dividing the total shares sold during the Class Period by the sum of:  (i) the total shares in the proxy, and (ii) shares sold before April 1, 2019, but after the start of the Class Period (a total of 1,049,098 for Mr. DeCesare and 231,127 for Mr. Harms).  *Id.*; CAC ¶167.

*Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 201 (2d Cir. 2009) ("Such generalized desires fail to establish the requisite scienter because 'the desire to achieve the most lucrative acquisition proposal can be attributed to virtually every company seeking to be acquired[.]'") (citation omitted).

Nor are there any pleaded facts to support the suggestion that the Individual Defendants purportedly had an incentive to make false statements in order to hide alleged performance issues from Advent. Rather, as with any merger, Advent conducted due diligence regarding Forescout, *see, e.g.*, Ex. 16 at 41-43, and there are no facts pleaded in the SAC to suggest that Advent was not fully aware of Forescout's financial performance and the state of its pipeline and salesforce. Indeed, the notion that Messrs. DeCesare and Harms could somehow dupe a sophisticated private equity buyer who conducted extensive due diligence of Forescout defies credulity.

Finally, plaintiffs fail to explain how an event that had not yet occurred could have provided a motive for securities fraud during the first eight months of the putative class period, *i.e.*, the period before October 2019 when plaintiffs allege Forescout "put itself up for sale." ¶53.

### C.    The Merger and Delaware Litigation Allegations Do Not Plead Scienter

To the extent that the SAC relies on allegations from the Delaware Litigation,[9] not only do such allegations fail to give rise to a strong inference of scienter, but also, the Delaware Litigation raises competing inferences of nonfraudulent conduct. Plaintiffs allege that Defendants' statements in April and May 2020 regarding the anticipated completion of the Advent acquisition were misleading because Defendants purportedly knew as early as April that the transaction would not close. *E.g.*, ¶¶14, 143, 147, 150, 152, 155. Plaintiffs do not dispute, however, that Forescout did not receive Advent's Termination Letter until May 15, 2020. ¶15. Advent's true intentions before that date were not known. SAC Ex. 1 at ¶9 ("A first, it seemed Advent was testing Forescout's appetite to reprice the deal."); *id.* at ¶10 ("Advent's true intentions" not revealed prior to the Termination Letter); SAC Ex. 2 at ¶77 (Advent admitted that despite cancelling one meeting on May 13, 2020, "other planning meetings between Advent and Forescout continued.").

_____

[9] *See, e.g.*, ¶¶14, 58, 60-72, 77, 126-127, 130-132, 134, 137-138, 141, 143, 147-148, 150, 152, 153, 155.

1   Plaintiffs' unsupported allegations that Defendants knew that Advent would terminate the merger

2   should not be credited.  *In re CDnow, Inc. Sec. Litig.*, 138 F. Supp. 2d 624, 632-33 (E.D. Pa.

3   2001).

4          Confident that it had a binding agreement with Advent, Forescout filed a complaint in the

5   Delaware Court of Chancery seeking specific performance of the merger agreement (the

6   "Delaware Litigation").  ¶16.  The Delaware Litigation subsequently settled, and the parties

7   entered into a revised merger agreement, pursuant to which Advent would commence a tender

8   offer for Forescout's shares at $29 per share.  ¶17.  In August 2020, the acquisition closed.  ¶76.

9   Defendants' confidence in the transaction closing is borne out by the fact that Forescout filed suit

10  for specific performance, and that the transaction did, in fact, ultimately close, further

11  undermining the SAC's unsupported assertions that Defendants intentionally made false or

12  misleading statements about the deal.

13         As shown in Forescout's Motion to Dismiss, the allegations in the short-lived Delaware

14  Litigation fail to plead the falsity of any challenged statement and thus also fail to plead scienter.

15  *See* Forescout MTD at 22-24.  Indeed, given that the allegations were "unproved and contested,"

16  they do not constitute particularized facts sufficient to plead a strong inference of scienter.  *See,*

17  *e.g., ScripsAmerica, Inc. v. Ironridge Global LLC*, 119 F. Supp. 3d 1213, 1262 (C.D. Cal. 2015)

18  ("allegations from other complaints or documents, which are unproved and are contested, may not

19  be used to establish facts to demonstrate scienter") (citation omitted); *see also Lau v. Opera Ltd.*, -

20  -- F. Supp. 3d ----, 2021 WL 964642, at *11 (S.D.N.Y. Mar. 13, 2021) ("unproven allegations in

21  another case provide no support for an inference of scienter in this case").

22         Moreover, the Delaware Litigation did not concern Forescout's business during 2019 but

23  rather whether Advent could claim in May 2020 that a "Material Adverse Effect" ("MAE") had

24  occurred ***after the signing of the merger agreement in early February 2020*** due to the growing

25  COVID-19 pandemic.  SAC Ex. 1 at ¶1.  The Advent-prepared 2020 forecasts relied on in the

26  SAC (¶77.D) were sharply disputed in the Delaware Litigation and concerned the potential impact

27  from the pandemic.  As alleged by Forescout, Advent's forecasts were based on unrealistic

28  assumptions, were "overly pessimistic," and prepared without the input of Forescout management.

INDIVIDUAL DEFENDANTS' MOTION TO DISMISS          -21-
CASE NO. 3:20-CV-00076-SI

1   SAC Ex. 1 at ¶¶6, 9, 70, 79.  The issue in the Delaware Litigation was not whether Forescout had

2   provided past projections inconsistent with the Illustrative Guidance (SAC ¶13), but rather

3   whether despite a global pandemic, Forescout's revenues for 1Q2020, which were "only

4   $5 million lower than the $62 million 'Illustrative Guidance'" constituted an "MAE on a $1.9

5   billion transaction."  SAC Ex. 1 at ¶84.  The unproven Delaware Litigation allegations thus do not

6   serve as an admission that Defendants knew as of March 24, 2020 that the Illustrative Guidance

7   could not be achieved.  *Compare* SAC ¶137, *citing* SAC Ex. 2 at ¶¶28-29, *with* SAC Ex. 3 at

8   ¶¶28-29 (denying Advent's allegations, including that the analysis was of "low quality").[10]

9        The Delaware Litigation allegations also do not demonstrate that the Individual

10   Defendants made misleading statements due to purported "routine" end-of-quarter discounting.

11   ¶77.E.  The Delaware Complaint merely stated that Advent and Forescout participated in forecast

12   calls where deals "including discounts" were discussed and that "[a]ny discounts Forescout gave

13   were consistent with the way Forescout had operated in the past."  SAC Ex. 1 at ¶94.  Forescout

14

---

15        [10] Nor do the Preliminary Proxy Statement and Proxy Statement ("Proxy Statements") plead
16   scienter.  The SAC alleges that Defendants supposedly knew by January 2020 (but purportedly
concealed) that there had been a "fundamental shift" in the business (¶56) and no longer believed
17   in the "veracity" of earlier preliminary projections for FY2020.  ¶62.  A review of the Proxy
Statements, however, reveals that plaintiffs have mischaracterized the passages referenced in the
18   SAC.  Ex. 27 at 40-44; Ex. 16 at 40-44.  As the Proxy Statements reflect, Forescout prepared two
sets of preliminary, "tops-down" operating plans in *November 2019* for *FY2020*, *i.e.*, before the
19   results for the quarter ending December 31, 2019 (4Q2019) were known.  *Id.*  *Two months later*,
*i.e.*, after the end of 4Q2019, members of Forescout management informed the Forescout board's
20   Strategic Committee that, although they believed that the "2020 financial results contemplated"
by the November 2019 plan "were still achievable," it "was likely that Forescout's 2020
21   financial results would be below the estimates" in the earlier plans.  *Id.*  In January 2020,
Forescout prepared a bottoms-up operating plan, referred to as the Alternate Plan.  *Id.*  In late
22   January 2020, Forescout prepared preliminary, but not finalized revenue guidance that was
referred to as the Illustrative Guidance.  *Id.*  Although plaintiffs attempt to make much of
23   differences in these financial models, plaintiffs ignore that all of them were, in fact, publicly
disclosed in the March 2020 Proxy Statements, and there are no facts pleaded showing that
24   Forescout "no longer believed in the veracity" of its projections.

25        Similarly, the SAC also mischaracterizes the Proxy Statements to suggest that there had been
an undisclosed "fundamental shift" in the business.  The reference to "shift" in the proxy,
26   however, referred to "a greater than expected shift away from perpetual licenses and toward
term-based licenses" in 4Q2019.  Ex. 27 at 42.  Plaintiffs ignore that the introduction and impact
27   of term-based licenses in 2019, including 4Q2019, were publicly disclosed.  *See, e.g.*, Ex. 9
(discussing "recently released term-based licensing options"); Ex. 10, at 4-5, 7-9 (discussing
28   term-based licensing revenue); Ex. 13; Ex. 14 (discussing 4Q2019 term-based license contracts
revenue).  Likewise, the amount of licensing revenue was publicly disclosed.  ¶127.C.

had also denied Advent's allegations regarding the purported materiality of discounts in 1Q2020

(SAC Ex. 3 at ¶¶7, 8, 41, 58), and the SAC omits to mention that the two discounts in 1Q2020

were described as the "result of one off negotiations" and which were clearly disclosed by

Forescout.  Ex. 18 at 26.  Accordingly, plaintiffs also fail to plead an inference of scienter based

on the discounts.[11]

The allegations in the Delaware Litigation regarding Forescout's purported future

insolvency and the statement supposedly "admitted" by Mr. Harms regarding liquidity planning

are not facts, but rather, additional disputed, unproven allegations.  *Compare* ¶¶140-141, *with*

SAC Ex. 3 at ¶27 (denying Mr. Harms made the statement attributed to him); SAC Ex. 1 at ¶6

(alleging "Advent's scenarios were prepared to create an imagined insolvency of Forescout post-

closing of the Merger").  In any event, Forescout publicly disclosed in its Form 10-Q for the

quarter ended March 31, 2020 that "the economic uncertainty from the COVID-19 pandemic"

had impacted Forescout's customers' ability to spend on Forescout products, which "ha[d]

resulted in an unfavorable impact on [Forescout's] revenue growth and gross margin in the first

quarter of 2020 and which may also delay the timing of future sales."  Ex. 18 at 21.  As a result,

Forescout prudently "borrowed $16.0 million under [its] revolving credit facility *as a*

***precautionary measure*** to provide additional liquidity in light of global economic uncertainty

and financial market conditions caused by COVID-19."  *Id.* (emphasis added).  That Forescout

took "precautionary measure[s]" with respect to additional liquidity in light of the uncertainty

created by a global pandemic does not mean that Forescout was teetering on the verge of

bankruptcy as the SAC erroneously implies.  The July Case prepared ***months after a pandemic***

***had commenced***, (SAC ¶¶77.F-H), also fails to establish knowledge that any prior forecasts were

intentionally false or misleading.

### D.     Plaintiffs' Allegations Fail Both Individually and Holistically

"When conducting [a] holistic review," courts "must also 'take into account plausible

opposing inferences' that could weigh against a finding of scienter."  *Zucco*, 552 F.3d at 1006

---

[11] The SAC's allegations regarding terminated relationships due to the Merger also fail to
establish scienter.  *E.g.*, ¶¶77.C, 130, 134, 137.  Indeed, the risk of merger-related lost business
was disclosed in connection with the transaction.  Ex. 15 at 15-16; Forescout MTD at 16 n.10.

(quoting *Tellabs*, 551 U.S. at 323).  As explained *supra* at 5-23, the SAC is devoid of any facts giving rise to a strong inference that the Individual Defendants intentionally deceived investors.

To the contrary, Defendants repeatedly cautioned investors regarding the specific risks that Forescout faced, including, among other things, Forescout's dependence on large deals, the unpredictable nature of the lengthy sales cycles, and the fact that some deals occurred in later quarters than originally anticipated.  *See* Forescout MTD at 3-6, 9-10.  For example, during the May 9, 2019 conference call, Mr. DeCesare candidly disclosed that, although he remained optimistic regarding the longer term, certain deals that Forescout had hoped would close in the second quarter "now appear[ed] to be more naturally on track for the back half of the year" (Ex. 8 at 11) and reiterated that the "timing and composition" of large deals "can shift and cause quarter-to-quarter fluctuations."  *Id.* at 5.  The transparency of Defendants' public disclosures further undermines any suggestion that Defendants deliberately concealed information from investors.

Here, an "equally plausible inference is that to the extent any statements were unduly positive, that was merely another aspect of management's failure to understand and respond well to business conditions."  *Scandlon v. Blue Coat Sys., Inc.*, No. C 11-4293 RS, 2013 WL 5313168, at *3 (N.D. Cal. Sept. 23, 2013).  As courts have recognized, "problems and difficulties are the daily work of business people[;] [t]hat they exist does not make a lie out of any alleged false statement."  *In re Rackable Sys., Inc. Sec. Litig.*, No. C 09-0222 CW, 2010 WL 3447857, at *5 (N.D. Cal. Aug. 27, 2010) (citation omitted).  At most, the allegations "suggest that defendants 'got it wrong'—that the results they hoped for did not come to pass, but not that they knew the projections were groundless when made."  *In re SunPower Corp. Sec. Litig.*, No. 16-cv-04710-RS, 2018 WL 1863055, at *3 (N.D. Cal. Apr. 18, 2018).[12]

---

[12]  Nor does the rare – and unalleged – core operations inference have any application here. *See S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785-86 (9th Cir. 2008).  The SAC's allegations fail to give rise to any inference of fraudulent conduct, and the SAC lacks facts establishing the narrow conditions under which a core operations inference may be invoked.  In particular, plaintiffs fail to plead facts demonstrating *each* Individual Defendant's "actual" exposure to contradictory information at the time the statements were made, and the allegations fall far short of describing circumstances so "rare" that it would be "absurd" not to impute scienter.  *Id.*

1   **IV.   PLAINTIFFS' LOSS CAUSATION ARGUMENTS ARE FLAWED**

2          As set forth in Forescout's Motion to Dismiss, in which the Individual Defendants also

3   join, the SAC also fails to allege loss causation for the period between October 10, 2019 and

4   February 6, 2020.  *See* Forescout MTD, Section IV.

5   **V.   THE SECTION 20(A) CLAIM ALSO FAILS**

6          Because the Section 10(b) claim fails, the Section 20(a) claim also should be dismissed.

7   *See Intuitive Surgical*, 759 F.3d at 1064 n.6.

8                                  **CONCLUSION**

9          The Individual Defendants respectfully request that the SAC be dismissed with prejudice.

10  Dated:  June 24, 2021                    WILSON SONSINI GOODRICH & ROSATI
                                            Professional Corporation
11
                                            By: /s/    *Ignacio E. Salceda*
12                                               Ignacio E. Salceda

13                                          Attorneys for Defendants Michael DeCesare and
                                            Christopher Harms
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28