**ABRAHAM, FRUCHTER**
**& TWERSKY, LLP**
Takeo A. Kellar (SBN 234470)
11622 El Camino Real, Suite 100
San Diego, CA 92130
Telephone: (858) 764-2580
Email: TKellar@aftlaw.com

**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
Email: jpafiti@pomlaw.com

*Lead Counsel for Plaintiffs*

*[Additional Counsel on Signature Page]*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| CHRISTOPHER L. SAYCE, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> FORESCOUT TECHNOLOGIES, INC., MICHAEL DECESARE, and CHRISTOPHER HARMS, <br><br> Defendants. | CASE NO.: 3:20-cv-00076-SI <br><br> <u>CLASS ACTION</u> <br><br> **LEAD PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS** <br><br> Date:  September 17, 2021 <br> Time:  10:00 a.m. <br> Dept.:  Courtroom 1, 17th Floor <br><br> Before:  Hon. Susan Illston |

# TABLE OF CONTENTS

Page

I.      INTRODUCTION .............................................................................................1

II.     SUMMARY OF RELEVANT FACTS .............................................................2

        A.      Alleged Misstatements About Deals and the Sales Pipeline ..................2

        B.      Alleged Misstatements About Revenue Projections................................3

        C.      Alleged Misstatements About Sales Productivity and Hiring ................4

        D.      Defendants Engineer a Sale of the Company Aided by Their False
                Narrative and Inflated Q4 2019 Results.................................................4

        E.      Advent Balks at Closing the Planned Acquisition with Defendants Failing
                to Disclose That Material Fact and Instead Making Optimistic Statements
                About the Planned Acquisition ...............................................................6

        F.      Forescout Seeks to Enforce the Original Merger Agreement but Agrees to
                a Material Discount on the Merger Price.................................................7

        G.      Plaintiffs Are Damaged While the Individual Defendants Profit ...........7

III.    ARGUMENT....................................................................................................8

        A.      PLAINTIFFS PROPERLY ALLEGE THAT DEFENDANTS MADE
                MATERIALLY FALSE OR MISLEADING STATEMENTS.............8

                1.      Forescout's Revenue Guidance Figures Lacked a Reasonable Basis..........9

                2.      Defendants Failed to Disclose that the Company's Sales
                        Productivity Was Declining During the Class Period...............................13

                3.      Defendants Misled Investors About the Deterioration in the
                        Company's Sales Pipeline.........................................................................16

                4.      Plaintiffs Allege Facts Demonstrating That Forescout's Q4 2019
                        Results Were Distorted by Channel Stuffing............................................20

                5.      Plaintiffs Allege Facts Demonstrating That Statements Relating to
                        the Company's Channel Partners Driving Growth Were Materially
                        False or Misleading...................................................................................23

                6.      Plaintiffs Allege Facts Demonstrating That Statements Relating to
                        the Illustrative Guidance in the Proxy Were Materially False or
                        Misleading.................................................................................................25

                7.      Plaintiffs Properly Allege That the Statements with Respect to the
                        Expected Closing of the Planned Acquisition Were Materially
                        False or Misleading...................................................................................27

        B.      THE COMPLAINT ALLEGES FACTS RAISING A STRONG
                INFERENCE OF SCIENTER ...............................................................30

1. DeCesare's Access to Clari and Smartsheet Fortifies the Scienter Allegations ..................................................................................30

2. Additional CW Allegations Support an Inference of Scienter...................33

3. Forescout Cannot Now Disown the Factual Statements It Made in the Delaware Litigation and the Tender Offer Recommendation Which Demonstrate a Strong Inference of Scienter ................................38

4. DeCesare Being a Micromanager Further Supports Scienter with Respect to the Channel Stuffing Allegations ..............................................41

5. The Materiality of the Facts Relating to the Planned Acquisition Also Supports a Strong Inference of Scienter............................................42

6. Plaintiffs Have Alleged a Plausible Theory of Fraud Further Supporting a Strong Inference of Scienter..................................................42

C. THE COMPLAINT SUFFICIENTLY ALLEGES LOSS CAUSATION.............46

D. THE COMPLAINT ADEQUATELY ALLEGES SECTION 20(a) CLAIMS .........................................................................................................47

IV. CONCLUSION...........................................................................................................47

**TABLE OF AUTHORITIES**

<u>Cases</u>                                                                                          <u>Page</u>

*Akorn, Inc. v. Fresenius Kabi AG*,
        No. CV 2018-0300-JTL, 2018 WL 4719347 (Del. Ch. Oct. 1, 2018), *aff'd*, 198
        A.3d 724 (Del. 2018) ........................................................................................ 40

*Ap-Fonden v. Goldman Sachs Grp., Inc.*,
        No. 18-CV-12084 (VSB), 2021 WL 2659797 (S.D.N.Y. June 28, 2021) ....................... 33

*Azar v. Yelp, Inc.*,
        No. 18-CV-00400-EMC, 2018 WL 6182756 (N.D. Cal. Nov. 27, 2018) ............ 18, 43, 44

*Basic Inc. v. Levinson*,
        485 U.S. 224 (1988)............................................................................................ 42

*Bielousov v. GoPro, Inc.*,
        No. 16-cv-06654-CW, 2017 WL 3168522 (N.D. Cal. July 26, 2017)............................. 31

*Bos. Ret. Sys. v. Uber Techs., Inc.*,
        No. 19-CV-06361-RS, 2020 WL 4569846 (N.D. Cal. Aug. 7, 2020) .................. 15, 19, 28

*Buttonwood Tree Value Partners, LP v. Sweeney*,
        No. SACV1000537CJCMLGX, 2012 WL 13026910 (C.D. Cal. Dec. 10, 2012)............ 23

*Camp v. Qualcomm, Inc.*,
        Case No. 18-cv-1208, 2020 WL 1157192 (S.D. Cal. Mar. 10, 2020) .............................. 47

*City of Ann Arbor Employees' Ret. Sys. v. Sonoco Prod. Co.*,
        827 F. Supp. 2d 559, 579 (D.S.C. 2011).......................................................................... 24

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
        No. 18-CV-04844-BLF, 2021 WL 1091891 (N.D. Cal. Mar. 22, 2021).............. 13, 28, 42

*Eminence Capital, LLC v. Aspeon, Inc.*,
        316 F.3d 1048 (9th Cir. 2003) .......................................................................................... 47

*ESG Capital Partners, Ltd. P'ship v. Stratos*,
        828 F.3d 1023 (9th Cir. 2016) ................................................................................... 18, 25

*Esso Expl. & Prod. Chad, Inc. v. Taylors Int'l Servs.*,
        No. 09-0467, 2010 WL 2520996 (W.D. La. June 9, 2010) ......................................... 38, 46

*FTC v. John Beck Amazing Profits, LLC*,
        865 F. Supp. 2d 1052 (C.D. Cal. 2012) ........................................................................... 35

*Garcia v. Doe White Trucking Co.*,
        No. 20-CV-00134-SI, 2020 WL 3061784 (N.D. Cal. June 9, 2020).......................... 21, 25

*Glazer Capital Mgmt., L.P. v. Magistri*,
        549 F.3d 376 (9th Cir. 2008) ........................................................................................... 45

*Hatamian v. Advanced Micro Devices, Inc.*,
        87 F. Supp. 3d 1149 (N.D. Cal. 2015) ........................................................................ 9, 32

*Howard v. Everex Sys., Inc.*,
228 F.3d 1057 (9th Cir. 2000) .................................................................................... 47

In re Allied Nev. Gold Corp.,
743 F. App'x 887 (9th Cir. 2018) ............................................................................. 37

*In re Allied Nev. Gold Corp., Sec. Litig.*,
No. 3:14-cv-00175-LRH-WGC, 2016 WL 4191017 (D. Nev. Aug. 8, 2016)................. 37

*In re Alphabet, Inc. Sec. Litig.*,
___ F.4th ___, 2021 WL 2448223 (9th Cir. June 16, 2021)...................................... *passim*

*In re Century Aluminum Co. Sec. Litig.*,
No. C 09-1001 SI, 2011 WL 830174 (N.D. Cal. Mar. 3, 2011) ...................................... 47

*In re Connetics Corp. Sec. Litig.*,
No. C 07-02940 SI, 2008 WL 3842938 (N.D. Cal. Aug. 14, 2008)........................... 22, 41

*In re Countrywide Fin. Corp. Sec. Litig.*,
588 F. Supp. 2d 1132 (C.D. Cal. 2008) ....................................................................... 24, 33

*In re CV Therapeutics, Inc. Sec. Litig.*,
No. C 03-03709 SI, 2004 WL 1753251 (N.D. Cal. Aug. 5, 2004) ................................... 11

*In re Diamond Foods, Inc., Sec. Litig.*,
No. C 11-05386 WHA, 2012 WL 6000923 (N.D. Cal. Nov. 30, 2012) .......................... 20

*In re Dura Pharm., Inc. Sec. Litig.*,
452 F. Supp. 2d 1005 (S.D. Cal. 2006).......................................................................... 19

*In re Gilead Scis. Sec. Litig.*,
No. C 03-4999 MJJ, 2005 WL 2649200 (N.D. Cal. Oct. 11, 2005) ............................... 18

*In re Gilead Scis. Sec. Litig.*,
No. C 03-4999 SI, 2009 WL 3320492 (N.D. Cal. Oct. 13, 2009) ................................... 12

*In re Illumina, Inc.*,
No. 3:16-cv-3044-L-KSC, 2018 WL 500990 (S.D. Cal. Jan. 22, 2018) ......................... 12

*In re InterMune, Inc. Sec. Litig.*,
No. C 03-2954 SI, 2004 WL 1737264 (N.D. Cal. July 30, 2004) ................................... 10

*In re Juno Therapeutics, Inc.*,
2:16-cv-01069-RSM, ECF No. 55 (W.D. Wash. Feb. 2, 2017)...................................... 44

*In re Juno Therapeutics, Inc.*,
No. C16-1069RSM, 2017 WL 2574009 (W.D. Wash. June 14, 2017) ........................... 44

*In re LDK Solar Sec. Litig.*,
584 F. Supp. 2d 1230 (N.D. Cal. 2008) ......................................................................... 23

*In re Merit Med. Sys.*,
No. 81902326DOCADSX, 2021 WL 1192133 (C. D. Cal. Mar. 29, 2021).............. 14, 17

*In re Mylan N.V. Sec. Litig.*,
379 F. Supp. 3d 198 (S.D.N.Y. 2019)............................................................................. 40

*In re Myriad Genetics, Inc.*,
  No. 2:19-cv-00707-DBB-DBP, 2021 WL 977770 (D. Utah Mar. 16, 2021) .................. 33

*In re New Century*,
  588 F. Supp. 2d 1206 (C.D. Cal. 2008) ............................................................... 19

*In re Novatel Wireless Sec. Litig.*,
  830 F. Supp. 2d 996 (S.D. Cal. 2011) ................................................................ 22

*In re NPS Pharm., Inc.*,
  Nos. 2:06-cv-00570, 2007 WL 1976589 (D. Utah July 3, 2007) ..................................... 12

*In re OSG Sec. Litig.*,
  12 F. Supp. 3d 619 (S.D.N.Y. 2014) ................................................................. 41

*In re Quality Sys. Sec. Litig.*,
  13-cv-01818-CJC-JPR, ECF No. 26 (C.D. Cal. Apr. 7, 2014) ........................................ 18

*In re Quality Sys.*,
  865 F.3d 1130 (9th Cir. 2017) ................................................................. *passim*

*In re Silicon Storage Tech., Inc. Sec. Litig.*,
  C-015-0295-PJH, 2007 WL 760535 (N.D. Cal. Mar. 9, 2007) ................................. 40, 41

*In re SLM Corp. Sec. Litig.*,
  740 F. Supp. 2d 542 (S.D.N.Y. 2010) ................................................................ 45

*In re Sprint Corp. Sec. Litig.*,
  232 F. Supp. 2d 1193 (D. Kan. 2002) ................................................................ 29

*In re Synergen, Inc. Sec. Litig.*,
  863 F. Supp. 1409 (D. Colo. 1994) ................................................................... 35

*In re TFT-Lcd Antitrust Litig.*,
  No. C 10-4945 SI, 2011 WL 3738985 (N.D. Cal. Aug. 24, 2011) ................................. 17

*In re Time Warner Inc. Secs. Litig.*,
  9 F.3d 259 (2d Cir.1993) .............................................................................. 45

*In re UTStarcom, Inc. Sec. Litig.*,
  617 F. Supp. 2d 964 (N.D. Cal. 2009) ........................................................... 12, 19

*In re WageWorks, Inc., Sec. Litig.*,
  No. 18-cv-01523-JSW, 2020 WL 2896547 (N.D. Cal. June 1, 2020) .............................. 35

*Institutional Investors Group v. Avaya*,
  564 F.3d 242 (3d Cir. 2009) ......................................................................... 36

*Jackson v. Microchip Tech., Inc.*,
  No. CV-18-02914-PHX-JJT, 2020 WL 1170843 (D. Ariz. Mar. 11, 2020) ..................... 37

*Junge v. Geron Corp.*,
  No. C 20-00547 WHA, 2021 WL 1375960 (N.D. Cal. Apr. 12, 2021) ........................... 43

*Kalnit v. Eichler*,
  264 F.3d 131 (2d Cir. 2001) ......................................................................... 45

*Karinski v. Stamps.com, Inc.*,
    Case No. CV 19-1828, 2020 WL 281716 (C.D. Cal. Jan. 17, 2020)................................ 38

*Kelly v. Elec. Arts., Inc.*,
    71 F. Supp. 3d 1061 (N.D. Cal. 2014) ...................................................................... 46

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018) .................................................................................... 8

*Lau v. Opera Ltd.*,
    ___ F. Supp. 3d ____, 2021 WL 964642 (S.D.N.Y. Mar. 13, 2021)................................ 41

*Lawrence v. Zilog, Inc.*,
    242 F.3d 382, 2000 WL 1545053 (9th Cir. 2000) .......................................................... 29

*Loritz v. Exide Techs.*, No.
    2:13-cv-2607-SVW-Ex, 2014 WL 4058752 (C.D. Cal. Aug. 7, 2014) ............................ 11

*Lormand v. U.S. Unwired Inc.*,
    565 F.3d 228 (5th Cir. 2009) ...................................................................................... 18

*Markette v. XOMA Corp.*,
    5-cv-03425-HSG, 2017 WL 4310759 (N.D. Cal. Sept. 28, 2017) .................................... 27

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011)..................................................................................................... 8

*McGovney v. Aerohive Networks, Inc.*,
    No. 18-CV-00435-LHK, 2019 WL 8137143 (N.D. Cal. Aug. 7, 2019).......................... 31

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
    540 F.3d 1049 (9th Cir. 2008) .................................................................................. 43

*Milman v. Box Hill Sys. Corp.*,
    72 F. Supp. 2d 220 (S.D.N.Y. 1999).......................................................................... 24

*Mulderrig v. Amyris, Inc.*,
    Case No. 19-CV-1765 YGR, 2020 WL 5903844 (N.D. Cal. Oct. 5, 2020) ..................... 13

*Mulligan v. Impax Labs., Inc.*,
    36 F. Supp. 3d 942 (N.D. Cal. 2014) ........................................................................ 14

*Murphy v. Precision Castparts Corp.*,
    No. 3:16-cv-00521-SB, 2020 WL 4040827 (D. Or. July 3, 2020) ................................. 19

*N.Y. Hotel Trades Council v. Impax Labs., Inc.*,
    No. 19-16744, 2021 WL 81719 (9th Cir. Jan. 11, 2021)................................................ 11

*Nathanson v. Polycom, Inc.*,
    87 F. Supp. 3d 966 (N.D. Cal. 2015) ........................................................................ 47

*Nguyen v. New Link Genetics Corp.*,
    297 F. Supp. 3d 472 (S.D.N.Y. 2018)........................................................................ 12

*No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003) .............................................................................. 43, 44

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
  380 F.3d 1226 (9th Cir. 2004) .................................................................................. 31, 34, 36

*Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*,
  780 F. App'x 480 (9th Cir. 2019) ....................................................................................... 37

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015) ..................................................................................................... 28, 29

*Pirani v. Slack Techs., Inc.*,
  445 F. Supp. 3d 367 (N.D. Cal. 2020) ........................................................................... 9, 47

*Plymouth Cty. Ret. Ass'n v. Advisory Bd. Co.*,
  370 F. Supp. 3d 60 (D.D.C. 2019) ..................................................................................... 13

*Ravens v. Republic New York Corp.*,
  No. CIV.A.99-4981, 2002 WL 1969651 (E.D. Pa. Apr. 24, 2002) ................................... 29

*Robb v. Fitbit, Inc.*,
  Case No. 16-cv-00151-SI, 2017 WL 219673 (N.D. Cal. Jan. 19, 2017) ........................... 37

*Roberts v. Zuora, Inc.*,
  No. 19-CV-03422-SI, 2020 WL 2042244 (N.D. Cal. Apr. 28, 2020) ............................... 30

*Rodriguez v. Gigamon Inc.*,
  325 F. Supp. 3d 1041 (N.D. Cal. 2018) ............................................................................. 19

*Rubin v. Trimble*,
  No. C-95-4353 MMC, 1997 WL 227956 (N.D. Cal. Apr. 28, 1997) ............................... 19

*S. Ferry LP #2 v. Killinger*,
  687 F. Supp. 2d 1248 (W.D. Wash. 2009) ......................................................................... 36

*S.E.C. v. Todd*,
  642 F.3d 1207 (9th Cir. 2011) ............................................................................................. 9

*Schueneman v. Arena Pharm., Inc.*,
  840 F.3d 698 (9th Cir. 2016) ......................................................................................... 9, 20

*ScripsAmerica, Inc. v. Ironridge Global LLC*,
  119 F. Supp. 3d 1213 (C.D. Cal. 2015) ............................................................................. 41

*SEC v. Goldfield Deep Mines Co.*,
  758 F.2d 459 (9th Cir. Cal. 1985) ...................................................................................... 23

*Sheehan v. Little Switzerland, Inc.*,
  136 F. Supp. 2d 301 (D. Del. 2001) ................................................................................... 29

*Shenwick v. Twitter, Inc.*,
  282 F. Supp. 3d 1115 (N.D. Cal. 2017) ............................................................................. 16

*Shenwick v. Twitter, Inc.*,
  No. 16-cv-05314-JST, 2021 WL 1232451 (N.D. Cal. Mar. 31, 2021) .............................. 35

*Shreiber v. Synacor, Inc*,
  832 F. App'x 54 (2d Cir. 2020) .......................................................................................... 27

*Siracusano v. Matrixx Initiatives, Inc.,*
 585 F.3d 1167 (9th Cir. 2009) ................................................................................................. 23

*Soto v. Am. Honda Motor Co.,*
 No. C 12-01377 SI, 2012 WL 5877476 (N.D. Cal. Nov. 20, 2012) ................................. 26

*Spitzberg v. Houston Am. Energy Corp.,*
 758 F.3d 676 (5th Cir. 2014) ................................................................................................. 38

*Starr v. Baca,*
 652 F.3d 1202 (9th Cir. 2011) ............................................................................................... 26

Steckman v. Hart Brewing, Inc.,
 143 F.3d 1293 (9th Cir. 1998) ............................................................................................... 20

*Tellabs Inc. v. Makor Issues & Rights, Ltd.,*
 551 U.S. 308 (2007) ......................................................................................................... 30, 46

*Usher v. City of Los Angeles,*
 828 F.2d 556 (9th Cir. 1987) ................................................................................................... 8

*Webb v. Solarcity Corp.,*
 884 F.3d 844 (9th Cir. 2018) ................................................................................................. 42

*Whole Foods Mkt. Grp., Inc. v. Wical Ltd. P'ship,*
 No. 1:17-CV-01079-RCL, 2019 WL 6910168 (D.D.C. Oct. 22, 2019) .......................... 38

*Wochos v. Tesla, Inc.,*
 985 F.3d 1180 (9th Cir. 2021) ......................................................................................... 23, 29

*Yaron v. Intersect ENT, Inc.,*
 No. 19-cv-02647-JSW, 2020 WL 6750568 (N.D. Cal. June 19, 2020) ...................... 21, 22

*Zelman v. JDS Uniphase Corp.,*
 376 F. Supp. 2d 956 (N.D. Cal. 2005) .................................................................................. 37

*Zucco Partners, LLC v. Digimarc Corp.,*
 552 F.3d 981 (9th Cir. 2009) ................................................................................................. 37

<u>Statutes</u>

15 U.S.C. § 78u-4(b)(1) .............................................................................................................. 9

15 U.S.C. §78u-5 ....................................................................................................................... 25

17 C.F.R. §240.10b-5 ...................................................................................................... 8, 23, 29

Fed. R. Civ. P. 12(b)(6) ...................................................................................................... *passim*

Fed. R. Evid. 410 ....................................................................................................................... 41

Fed. R. Evid. 801(d)(2) ............................................................................................................. 38

Lead Plaintiffs Glazer Capital Management, L.P., Glazer Enhanced Fund L.P., Glazer Enhanced Offshore Fund, Ltd., Glazer Offshore Fund, Ltd. and Highmark Limited, in respect of its Segregated Account Highmark Multi-Strategy 2 (collectively, the "Glazer Funds") and Meitav Tachlit Mutual Funds Ltd. ("Meitav," and together with the Glazer Funds, "Lead Plaintiffs" or "Plaintiffs") respectfully submit this Opposition to the Motions to Dismiss filed by Defendants Forescout Technologies, Inc. ("Forescout" or the "Company"), ECF No. 143 ("FSCT Mot.") and Michael DeCesare ("DeCesare") and Christopher Harms ("Harms") (the "Individual Defendants," and together with Forescout, "Defendants"), ECF No. 145 ("ID. Mot.").[1]

## STATEMENT OF ISSUES TO BE DECIDED (Civil L.R. 7-4(a)(3))

(1) Whether Plaintiffs allege actionable misrepresentations or omissions;

(2) Whether Plaintiffs allege a strong inference of scienter;

(3) Whether Plaintiffs properly allege loss causation;

(4) Whether Plaintiffs pleaded a claim for control person liability; and

(5) Whether, if Defendants' motions to dismiss are granted in whole or in part, Plaintiffs should be granted leave to amend?

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Plaintiffs' SAC adds numerous facts beyond those originally alleged including: allegations based on the accounts 5 additional Confidential Witnesses ("CW") that bolster inferences of both falsity and scienter; specific facts from the litigation in Delaware (the "Delaware Litigation") between subsidiaries of Advent International, Inc. ("Advent") and Forescout that relate to the Merger Agreement dated February 6, 2020 (the "Original Merger Agreement"); and specific facts from a July 2020 Tender Offer Recommendation filed by the Company with the Securities and Exchange Commission ("SEC").

One case in point is that ***Forescout's own factual statements*** in the Delaware Litigation and the Tender Offer Recommendation demonstrate that a material development occurred on April

---

[1] Citation to "¶_" and "¶¶_" refer to the Second Amended Complaint ("SAC").

20, 2020, when Defendants were told by Advent that it was assessing whether the conditions to closing the Original Merger Agreement would be met given Forescout's deterioration in performance and prospects. Yet, without disclosing that material fact, and at the same time the Board was making contingency plans, Defendants opined in public statements that they expected the Original Merger Agreement to close on or about May 18, 2020, an event Defendants continued to look forward to in a May 11, 2020 press release despite on May 8, 2020, Advent having signaled its intention to renege on the Original Merger Agreement.

Defendants, unsurprisingly, devote enormous effort to argue that Plaintiffs have not alleged all the facts that could support their claims, including evidentiary details that the law does not require at the pleading stage, or a motive which independently alleges a strong inference of scienter. These are strawmen arguments, however, as Plaintiffs' allegations of both falsity and scienter are premised primarily on the Company's factual admissions as well as the factual statements of numerous CWs, including CW16, CW17, CW18, CW19, CW20 as well as Advent, whose accounts and allegations respectively easily meet the relevant standards of liability.

## II.    SUMMARY OF RELEVANT FACTS

The SAC supplies the requisite specificity pursuant to the Private Securities Litigation Reform Act ("PSLRA") by pleading new facts for each of the topics addressed in the Court's March 25, 2021 Order (hereafter the "Order").

### A.    Alleged Misstatements About Deals and the Sales Pipeline[2]

Starting, at least, as early as April 2019, Forescout, and specifically DeCesare, used a sales tool called Clari to track the Company's sales representatives, deals, the pipeline and forecasts in real time. This fact is confirmed by the accounts of CW17, who joined the Company in April 2019, and corroborated by CW18 and CW20. ¶¶36.E, 43-44, 45.E, 45.G, 45.L. The SAC also shows that Defendants knew that the sales pipeline contained unreliable deals. CW20 provided DeCesare with granular reports on the status of all deals over $500,000, including the steps

---

[2]    Order at 8.

remaining to close the transaction, so DeCesare knew that certain deals were illusory before he made misleading statements about "tech wins" and the pipeline.  ¶¶45.H-J.

The SAC also clarifies that DeCesare pressured employees at SecurityMatters, a different company acquired by Forescout, and Redman pressured employees at Forescout, and hence there is no inconsistency between the CWs on this issue.  ¶¶52.A-G.  The SAC also addresses the Court's concern regarding "when the deals did not close," Order at 9, because it shows that numerous CWs were, in fact, pressured to identify illusory deals worth millions of dollars as "committed" before certain false statements about the sales pipeline were made.  *See, e.g.*, ¶86 (CW9 pressured in February 2019 before most of the false statements were made); ¶122.C (alleging that CW7, CW10, CW11 and CW14 were already pressured before specific false statements about the sales pipeline were made in October 2019).  The SAC also contains a new account from CW19, which confirms the widespread nature of the pressure campaign because CW19 heard the Vice President of Americas at Forescout tell sales representatives to identify illusory deals as "committed" in the Salesforce platform.  ¶99.D.  CW18 and CW19 also confirm that deals identified as "committed" were, in fact, included in the Company's projections and forecasts.  ¶¶49, 99.E.  The SAC also cures any concerns about vagueness in Plaintiffs' prior pleading (Order at 9) as CW18, a senior executive who trained and supervised sales representatives, including the other CWs, affirmatively states that 1 out of every 3 large deals in the Company's global pipeline was illusory in FY 2019, and 1 out of all 5 deals in the global pipeline was illusory in FY 2019.  ¶99.D.

**B.    Alleged Misstatements About Revenue Projections[3]**

In FY 2018, Forescout retained Force Management LLC ("Force Management") to analyze and develop Forescout's sales program to, among other things, assure the credibility of the Company's sales pipeline and guidance.  ¶¶3, 49-50.  This sales program was known as the Customer Engagement Process ("CEP").  ¶49.  The development of CEP was overseen by Steven Redman ("Redman"), Forescout's Chief Revenue Officer ("CRO") and Brian Gumbel ("Gumbel"), the Company's head of worldwide sales.  ¶82.  CEP demonstrated that deals

---

[3]    Order at 9.

considered "committed" by the Company only had a 50% chance of success. ¶50. CEP's step-by-step process categorized deals as "committed" only after an authorized person from a prospective purchaser signed off on a deal. ¶¶49-51, 83. Despite knowing that CEP showed only 50% of the deals had any likelihood of closing, Defendants provided guidance to the market in February 2019 for full year revenues that was based solely on their subjective opinions, and not conditioned on a person authorized by a prospective purchaser to commit to a deal. ¶¶80-86.

C.    **Alleged Misstatements About Sales Productivity and Hiring[4]**

The SAC alleges new facts based on the testimony of CW18, who served as Forescout's Global Talent and Enablement Manager from June 2018 through December 2020. ¶40.G. In this capacity, CW18 trained and supervised Named Account Managers ("NAM") and others in the Company's sales force. *Id.* As such, CW18 knew about Forescout's global salesforce headcount, as well as the total number of salespersons hired and fired during the Class Period. ¶¶40.G., 122.B. In addition, CW18 knew all of the issues surrounding Forescout's salesforce during the relevant period, including, but not limited to, the sales cycle, the amount of time required to close deals, and the total number of productive sales representatives lost in 2019, which caused the Company to lose tens of millions in potential business during the Class Period. *Id.*

D.    **Defendants Engineer a Sale of the Company Aided by Their False Narrative and Inflated Q4 2019 Results**

In October 2019, as Defendants recognized that they could no longer maintain a façade of continued rapid growth, the Company put itself up for sale. Key to Defendants' effort to obtain a premium price was portraying Forescout as still having a decent level of growth left in its operations that had been sidelined by a series of one-offs in FY 2019. ¶¶9, 53-54. To do so, the Company needed to avoid reporting a further decline in revenue growth for Q4 2019 and project a resumption of growth more in line with Forescout's historical results going forward. ¶¶10, 54.

The façade began cracking on October 10, 2019, when the Company preliminarily reported that Q3 2019's revenue would be, at most, $91.6 million which was $7.2 million below guidance (¶117) representing only a 7% growth in revenue from Q3 2018. ¶¶8, 46, 120. Defendants publicly

---

[4]    Order at 6-7.

attributed the dramatically lower growth rate to an "extended approval cycles which pushed several deals out of the third quarter." ¶117; *see also* ¶120. However, that purportedly extended sales cycle never materialized as the Company's Q4 reported revenue only increased by 8% (¶124) while Q1 2020 year-over-year revenue – even with the help of some highly questionable sales – *decreased* by 7.7% and Q2 2020 revenue only increasing by 2% from that of Q2 2019. ¶¶126.C-D. Indeed, the last forecast made publicly available by Forescout reflected expected 2020 revenue of $321 million, a *decrease* from 2019 reported revenue of $336.8 million, which itself was lower than the lowest range of the original 2019 guidance of $363.1 million. ¶¶77.G, 139

On February 6, 2020, Forescout issued a press release disclosing that it had entered into the Original Merger Agreement to be acquired by an indirect wholly-subsidiary Advent, a private equity investor, for $33.00 per share. ¶¶12, 60. The press release also reported disappointing Q4 2019 results with the saving grace being that the Company's revenues, and especially its licensing revenues, were reported to be growing from the prior year results in line with the Q3 2019 reported results. ¶¶125-26.

However, Forescout's Q4 2019 results had been distorted through the frontloading of sales which a CW stated was made to Merlin International, one of the Company's distributors. ¶¶125-26. Although the precise terms of that and other channel stuffing "sales" are not yet known, Forescout acknowledged engaging in conduct which Advent described as channel stuffing with the most obvious channel stuffing taking place in Q1 2020 when the Company quite transparently jammed through two sales totaling $4,787,000 in hardware *at a loss*. ¶¶126.C-D, 126.F.

Forescout's problems were compounded when two multinational professional services companies that were substantial business partners of Forescout terminated their relationship with the Company and a third major partner stated that it could no longer be a go-to-market partner for Forescout. ¶130. The disruptions in those relationships, according to the Company, "caused tens of millions of dollars of Forescout's pipeline to be deregistered." *Id.* (quoting Delaware Complaint ¶93). Nonetheless, the Company's 2019 Form 10-K, and subsequent SEC filings incorporating statements made in the 2019 Form 10-K, refused to disclose those material adverse facts

notwithstanding their detrimental impact on Forescout's ability to achieve the projections which lay at the heart of Advent's ability to finance the Planned Acquisition. *E.g.*, ¶¶134, 148, 151, 153.

On March 3, 2020, the Company filed a preliminary proxy with the SEC, which was substantially similar in form to a March 24, 2020, proxy statement (the "Proxy") that Forescout later filed with the SEC. ¶62. The preliminary proxy statement and the Proxy revealed an interesting and disturbing fact relating to Advent's planned acquisition (the "Planned Acquisition") of Forescout – that Forescout had provided Advent with Q1 2020 and FY 2020 revenue projections which were materially higher than those generated internally in January 2020 and referred to as the "Illustrative Guidance." ¶13.

**E.    Advent Balks at Closing the Planned Acquisition with Defendants Failing to Disclose That Material Fact and Instead Making Optimistic Statements About the Planned Acquisition**

Advent became extremely concerned by the Company's rapidly declining fortunes and, on April 14, 2020, delivered its own forecasts of the Company's results for 2020 and 2021 to Defendants. ¶77.D; *see also* Delaware Complaint ¶70. On April 20, 2020, Advent followed through by sending a letter warning Defendants that it was reviewing the Company's operations and prospects "in order to assess whether the conditions to closing provided in the Original Merger Agreement would be met." ¶77.A. Defendants reacted by causing the Board's Strategic Committee to begin considering the possible effect of Advent refusing to proceed with the Planned Acquisition as negotiated in the Original Merger Agreement. ¶144.C (citing Tender Offer Recommendation (Defs.' Ex. 30) at 32).

Nonetheless, starting on April 23, 2020, Defendants continued to represent that they expected the Planned Acquisition to close in May 2020. ¶¶142, 146, 149 and 154. Those statements of opinion continued through May 11, 2020, even though by no later than May 8, 2020, "**Advent Signal[ed] its Intention to Renege on the [Original] Merger Agreement**." ¶77.B; *see also* ¶¶154-155 (Forescout admits that on May 8, 2020, Advent's representative told DeCesare that Advent ***could not "make the numbers work***[.]" (emphasis added)). In reaction to the disastrous Q1 2020 results, investors drove down the price of Forescout's stock from $32.09 to $30.50 (¶68) but did not yet know that Advent did not intend to proceed with the Original Merger

Agreement – Defendants, however, knew otherwise and, in response to the May 8 conversation, DeCesare sent May 14, 2020, correspondence that Advent characterized as a "made-for-litigation email to Advent[.]" Counterclaim ¶44.[5]  When Advent's refusal to close the Planned Acquisition was disclosed on May 18, 2020, Forescout's stock plummeted by nearly 24% in a single day to $22.57, followed by a drop to $20.93 on May 19, 2020 and $19.84 on May 20, 2020.  ¶71.

**F.    Forescout Seeks to Enforce the Original Merger Agreement but Agrees to a Material Discount on the Merger Price**

On May 19, 2020, after initially seeking to compromise the dispute, Forescout sued Advent in the Delaware Court of Chancery to obtain specific enforcement of the Original Merger Agreement.  ¶16.  Advent answered and filed its own counterclaim which Forescout then answered.  ¶33; Jafri Decl. (ECF No. 142-1) Exs. 1-3.  On July 15, 2020, Advent and Forescout settled the Delaware Litigation through a new revised merger agreement providing for the Company to be acquired through a tender offer at $29.00 per share, representing an approximately $300 million discount from the terms of the Original Merger Agreement.  ¶74.

On July 20, 2020, the Company filed a Tender Offer Recommendation recommending that Forescout shareholders accept the $29.00 per share offer with the acquisition then completed on August 14, 2020.  ¶¶75-76.  The Tender Offer Recommendation contained a new forecast supporting the reasonableness of the $29.00 per share price which, among other things, reflected 2020 revenues of $321 million, which was materially lower than the FY 2020 projection of $355 million in revenue contained in the Illustrative Guidance.  ¶77.G; *see also* Defs.' Ex. 30 at 45.

**G.    Plaintiffs Are Damaged While the Individual Defendants Profit**

Plaintiffs and other public investors suffered substantial damages from purchasing Forescout stock in reliance on the truth of Defendants' statements.  ¶176.  The Individual Defendants, in contrast, managed to sell $12 million of stock in the open market.  ¶¶24-25. DeCesare and Harms, respectively, stood to receive another $44.3 million and $14.1 million from

---

[5]    The SAC cites Advent's "Answer and Counterclaim" but, because the Answer and Counterclaim repeat paragraph numbers, citations herein are to "Answer ¶_" and "Counterclaim ¶_."

the sale of their restricted stock units, performance-based restricted stock units and golden parachute payments from the Planned Acquisition. *Id.*

In addition, Defendants' deception facilitated the sale of over $29 million in stock by a key Forescout investor whose representative served as Vice Chairman of the Board of Directors. ¶81(d). In addition, the Planned Acquisition offered that investor a clear pathway out of its investment in Forescout stock which would have imploded in value if not for the Planned Acquisition. ¶61.

III. **ARGUMENT**

On a 12(b)(6) motion, "the court must assume that the plaintiff's allegations are true and must draw all reasonable inferences in the plaintiff's favor." Order at 3 (citing *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987)). The Court's analysis is confined to the complaint and any materials that are the proper subject of judicial notice or incorporation by reference except that judicial notice does not extend to the truth of disputed facts asserted in those documents. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018).

Section 10(b) of the Exchange Act makes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011) (quoting 17 C.F.R. §240.10b-5(b)). The elements of a §10(b) claim are: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. Order at 4 (citation omitted). Defendants contend that Plaintiffs have failed to adequately plead the existence of materially false or misleading statements, a strong inference of scienter and, with respect to a portion of the claims, loss causation. As demonstrated below, Plaintiffs have, in fact, properly alleged each one of those elements of a Section 10(b) claim.

A.    **PLAINTIFFS PROPERLY ALLEGE THAT DEFENDANTS MADE MATERIALLY FALSE OR MISLEADING STATEMENTS**

To allege falsity, a Section 10(b) complaint "must state with particularity each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and all

facts on which that belief is formed." Order at 6 (citing 15 U.S.C. § 78u-4(b)(1)). A statement is materially misleading if it "create[s] an impression of a state of affairs that differs in a material way from the one that actually exists." Order at 6 (citation omitted). This includes "disclosing adverse information that cuts against the positive information." *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016). Since it involves an issue of what facts are material, "[g]enerally, whether a public statement is misleading, or whether adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact." *Pirani v. Slack Techs., Inc.*, 445 F. Supp. 3d 367, 385 (N.D. Cal. 2020) (internal quotation marks and citations omitted). "Accordingly, resolving an issue as a matter of law is only appropriate when the adequacy of the disclosure is so obvious that reasonable minds [could] not differ." *S.E.C. v. Todd*, 642 F.3d 1207, 1220 (9th Cir. 2011).

### 1.    Forescout's Revenue Guidance Figures Lacked a Reasonable Basis

On February 7, 2019, Forescout provided a revenue guidance for FY 2019 within the range of $363.1 to $373.1 million, representing year-over-year growth of 24% at the midpoint. ¶80. Before this false revenue guidance was issued, Defendants knew that a dramatic shift towards cloud computing had already taken place in FY 2018, and Forescout faced stiff competition from competitors who provided superior cloud-based products that Forescout could not provide. ¶¶32-36. This allegation in the SAC is now bolstered by the account of an internationally recognized expert on cloud computing and is corroborated with numerous CW accounts. *Id.*; *see Hatamian v. Advanced Micro Devices, Inc.*, 87 F. Supp. 3d 1149, 1159-60 (N.D. Cal. 2015) (considering allegations based on an expert to find that the defendants would have known certain pertinent facts before the misrepresentations were made). Plaintiffs' expert confirms, based upon examining the Company's products, that Forescout provided legacy technology between 2018 and 2020 that was uncompetitive with the offerings of its peers. ¶¶33-34. As one of many examples, CW8 confirms that the rate of closing deals began to decline dramatically in FY 2019 because competitors offered a better product than Forescout at a lower price. ¶36. Other CWs, including CW1, similarly confirm that sales representatives faced difficulty in meeting quotas in the beginning of 2019

because of intense competition and a lack of customer interest in Forescout's offerings. ¶¶36.A-E.

The SAC also contains the account of a senior executive, CW18, who states that Force Management told Forescout in FY 2018 that, without implementing Force Management's CEP and its rigorous steps, a majority of deals in the Company's sales pipeline would not be considered "committed" deals. ¶¶50, 81-83. Defendants, however, chose not to implement CEP in the beginning of 2019 as planned, and instead released the FY 2019 revenue guidance even though they knew that the underlying basis for the guidance rested on faulty assumptions about the Company's sales pipeline, which comprised of a very high number of deals that were, in fact, not "committed." *Id.* CW18 further states that Forescout's failure to implement CEP in the beginning of 2019 meant that the Company would miss its sales targets for the next three to four quarters, and CW18 was right given that Defendants missed the lower end of the range of the FY 2019 revenue guidance by tens of millions of dollars, repeatedly pre-announced poor results or lowered guidance for the next quarter and missed revenue guidance in Q3 2019. ¶83.

Defendants' knowledge of these facts also helps place into context evidence of Defendants' company-wide pressure campaign beginning as early as February 2019 when CW9 was forced to identify a seven-figure deal as "committed" even though there was no commitment from a buyer. ¶86. This was not a harmless campaign to merely encourage the quick completion of transactions to meet revenue targets. Numerous CWs confirm that "committed" deals worth millions of dollars were illusory, ¶¶52.A-G, and CW18 and CW19 now confirm that "committed" deals were included in the Company's projections, ¶49, and forecasts, ¶99.E.

Defendants contend that the FY 2019 guidance is not actionable because it is a forward-looking statement protected by the PSLRA's safe harbor. However, Defendants fail to meet their burden to show that the guidance was accompanied by "meaningful" cautionary statements that provided a high degree of specificity. *See, e.g.*, *In re InterMune, Inc. Sec. Litig.*, No. C 03-2954 SI, 2004 WL 1737264, at *4-5 (N.D. Cal. July 30, 2004) (concluding that forward looking statements that are not based on the most accurate information available to defendants are not protected by the safe harbor). Here, the guidance issued was only accompanied by generic

statements about "increasing competition" and "fluctuations in our quarterly results." FSCT Mot. at 10 (citing Defs.' Ex. 1). Such vague generalized risks, however, are not sufficient to invoke the safe harbor. *See, e.g.*, *In re CV Therapeutics, Inc. Sec. Litig.*, No. C 03-03709 SI, 2004 WL 1753251, at *11 (N.D. Cal. Aug. 5, 2004) (rejecting claim that cautionary statements immunized defendants from liability when defendants failed to disclose pertinent risks that had already transpired before the statement was made). The safe harbor also does not apply because the guidance was provided with actual knowledge of a high risk that it would not be met, and Defendants omitted to disclose that high risk to investors. *See, e.g.*, *N.Y. Hotel Trades Council v. Impax Labs., Inc.*, No. 19-16744, 2021 WL 81719, at *2 (9th Cir. Jan. 11, 2021) (reversing dismissal because revenue guidance figures were given with actual knowledge of facts that rendered the figures false); *see also* Section III.B(2).

Defendants question CW18's credibility, and dispute whether CW18 was a senior executive since other lower level CWs also had the word "manager" in their titles. FSCT Mot. at 13. However, in doing so, Defendants ignore that CW18's title includes the word "Global" which demonstrates that CW18 was, in fact, a senior executive. *See Loritz v. Exide Techs.*, No. 2:13-cv-2607-SVW-Ex, 2014 WL 4058752, at *10 (C.D. Cal. Aug. 7, 2014) (referring to the Vice President of Global EHS as a senior executive and crediting the witness's account to sustain the complaint). Defendants also misconstrue the SAC to gin up an alleged inconsistency in another attempt to attack CW18's credibility. FSCT. Mot. at 17; ID. Mot. at 10. Force Management, not CW18, told Forescout, in FY 2018, that only 50% of the deals could succeed if Forescout implemented CEP. ¶50. CW18's estimate that one out of every three large deals was illusory is CW18's own assessment about the sales pipeline in FY 2019. ¶99.D. The SAC further shows that CW18's statements about missed sales target refer to FY 2019, not FY 2018, because the Company failed to implement CEP in early 2019. ¶51. Defendants misread the SAC when they assume CW18's statements about missed sales targets referred to FY 2018 and must be false because the Company allegedly met its targets in FY 2018. FSCT. Mot. at 17; ID. Mot. at 10.

Similarly infirm is Defendants' attempt to repeatedly question the credibility of the CWs by focusing on minutiae that the CWs allegedly fail to provide. FSCT. Mot. at 13-14, 17, 19; ID.

Mot. at 6-16.  Those arguments have long been recognized as being inappropriate at the pleading stage.  *See, e.g., Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 484-85 (S.D.N.Y. 2018) (ruling that the strength of a CW's knowledge and credibility are issues to be left for discovery); *In re Gilead Scis. Sec. Litig.*, No. C 03-4999 SI, 2009 WL 3320492, at *2 (N.D. Cal. Oct. 13, 2009) (declining to engage "in a more searching assessment of CW2's credibility" at the pleading stage); *In re NPS Pharm., Inc.*, Nos. 2:06-cv-00570, 2007 WL 1976589, at *5 (D. Utah July 3, 2007) (ruling that an attack on a CW's credibility is an improper invitation to weigh evidence at the pleading stage).

Defendants also seek to discredit the testimony of CW18 and other CWs by arguing that they fail to explain how Forescout created forecasts or how committed deals were incorporated into projections or which specific, illusory deals were included in the forecasts. FSCT Mot. at 2, 15-16.  However, Defendants err in their evidentiary demands on a motion to dismiss – in contrast to a summary judgment motion – as Plaintiffs are only required to plead facts that suggest that the basis for the guidance given was not reasonable.  *See In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 970-73 (N.D. Cal. 2009) (denying motion to dismiss because complaint adequately pled that defendants' optimistic financial projections lacked a reasonable basis); *In re Illumina, Inc.*, No. 3:16-cv-3044-L-KSC, 2018 WL 500990, at *5 (S.D. Cal. Jan. 22, 2018) (denying motion to dismiss when complaint alleged that sales were declining, and defendants' guidance assumed that sales would increase).

Here, Plaintiffs have satisfied that pleading standard by alleging that it was unreasonable to provide the FY 2019 revenue guidance when Defendants were put on notice that half the deals in the sales pipeline were unreliable and when they simultaneously launched a pressure campaign to force NAMs to identify deals as "committed" when there was no commitment from buyers, and illusory deals were, in fact, included in the Company's forecasts as CW19 confirms.  ¶¶86, 99.E. At this stage, Plaintiffs do not need to prove that every deal identified by Force Management as unreliable was included in the Company's forecasts.  Indeed, even assuming that a quarter of the unreliable deals identified by Force Management were included in the Company's revenue guidance, Defendants would be liable because such a miss would be material to investors.  *See*

*Plymouth Cty. Ret. Ass'n v. Advisory Bd. Co.*, 370 F. Supp. 3d 60, 91 (D.D.C. 2019) (ruling that the failure to disclose that the departure of certain executives would render the guidance unachievable was actionable even if the actual impact on sales was between only 0.9% and 2.2%).

Defendants also err to the extent that they are asserting that the FY 2019 revenue guidance was not materially misleading because Forescout met its guidance through the first half of 2019. FSCT Mot. at 1-2, ID. Mot. at 12. That argument, however, ignores that Forescout *missed* its full year 2019 revenue guidance by $36.3 million on the high end of range and $26.3 million on the low end of the range while only growing revenues at 13% rather than the 24% originally projected. ¶80, Defs.' Ex. 14 at 7.

Forescout's claim that Plaintiffs do not challenge growth rates, FSCT Mot. at 12 n.8, is false. *See, e.g.*, ¶¶80 and 91 (pleading both that the guidance figure and the 24% growth rate was false). In a conclusory footnote, Forescout also claims that the massive decline in Forescout's year-over-year growth rates is "irrelevant," but it is axiomatic that a company's expected rate of growth has a direct impact on its stock price. *See, e.g.*, *City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, No. 18-CV-04844-BLF, 2021 WL 1091891, at *2 (N.D. Cal. Mar. 22, 2021) (sustaining claims when the company's significant decline in revenue growth led to a stock price decline of 10%). Indeed, that is precisely what happened here when Defendants failed to achieve their previous growth guidance. *See, e.g.*, ¶90 (16% decline in stock price), ¶118 (38% decline in stock price).

### 2. Defendants Failed to Disclose that the Company's Sales Productivity Was Declining During the Class Period

At an investor day held on March 4, 2019, DeCesare told investors that the Company was "hiring like crazy," and the past and current maturation of sales representatives provided "increased visibility" into the sales pipeline. ¶87. This statement is actionable and unprotected by the safe harbor because it "contain[ed] concrete factual assertions about Forescout's operations." Order at 5; *see also Mulderrig v. Amyris, Inc.*, Case No. 19-CV-1765 YGR, 2020 WL 5903844, at *12-15 (N.D. Cal. Oct. 5, 2020) (ruling that false statements of current fact used as a basis to suggest that there was "good visibility on continuing at this rate" were actionable).

Before this statement was made, according to CW7, Forescout fired a significant number of employees in the Commercial division, and, according to CW1, 25 to 30 Business Development Representatives ("BDR") and Sales Development Representatives ("SDR") were terminated or left the Company in the first few months of 2019 – a significant reduction given that, according to CW18, the entire team of BDRs and SDRs at the end of 2019 consisted of only 60 individuals. ¶88.A.  According to CW18, at this time, Forescout also began to eliminate or otherwise lose "ramped up" NAMs, and ultimately replaced 25 to 30 NAMs in FY 2019 with inexperienced employees, losing tens of millions in potential business.  ¶88.B.  DeCesare also did not disclose the deficiencies in the Company's sales pipeline that Force Management uncovered in FY 2018 when he stated that the maturation of sales representatives provided "increased visibility" into the sales pipeline.  ¶¶49-51.

On May 9, 2019, DeCesare responded to an analyst question about sales capacity and hiring by falsely stating that "nothing ha[d] changed" about sales productivity.  ¶93.  This statement was materially false and misleading when made because DeCesare omitted to disclose the decline in productivity that had already occurred according to CW1, CW7 and CW18, and further omitted to disclose that on or about when this false statement was made, according to CW16 and CW17, Forescout planned to initiate another round of cuts to become leaner in anticipation of the merger.  ¶95.B.  *See, e.g.*, *In re Merit Med. Sys.*, No. 81902326DOCADSX, 2021 WL 1192133, at *8 (C. D. Cal. Mar. 29, 2021) (concluding that statements such as "nothing had changed regarding 2019 revenues" were plausibly false when defendants omitted to disclose declining orders for a product line).  There is no basis for Defendants to contend that the false statements made on March 4, 2019 are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance" because DeCesare was pointedly asked by an analyst about hiring and the capacity of the sales force, and he affirmatively stated that "nothing ha[d] changed" ¶93, when that was untrue.  *See Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 966-67 (N.D. Cal. 2014) (internal quotation marks and citations omitted). Even if the Court considered any statement as one of corporate optimism, Defendants are liable because they were aware of facts that undermined the misleading statements.  *See Bos. Ret. Sys.*

*v. Uber Techs., Inc.*, No. 19-CV-06361-RS, 2020 WL 4569846, at *7-8 (N.D. Cal. Aug. 7, 2020) (ruling that optimistic statements were actionable when defendants knew facts that undermined the statements yet still allowed the statements to be made).

On May 9, 2019, DeCesare also touted the rise in productivity of the Company's sales force, as reflected by the number of "ramped" sales representatives increasing from 35% in FY 2017 to 50% in FY 2018, without disclosing that metric was declining in FY 2019, and again claimed that "the percentage of our sales reps that have been hired" in certain regions showed that the Company's business was "pointed in the right direction." ¶113. On August 12, 2019, Harms affirmatively told investors that the Company raised its revenue guidance in May 2019 because it "still had great visibility into the rest of the year." ¶115. At these events, Defendants again failed to disclose that the productivity of sales representatives was declining at this point for the reasons discussed above, and hence "visibility into the rest of the year" was diminishing.

Defendants, in a footnote, continue to deny that the percentage of employees who serve at Forescout for more than two years refers to productivity. FSCT Mot. at 19 n.13. However, in doing so, they disregard DeCesare's own statement that connected the rise in "productivity" to an increase in the number of sales representatives who had served at Forescout for more than two years. *See* Defs.' Ex. 2 at ECF No. 144-2 at 6 (touting the rise of representatives with two or more years of experience, and stating that "from a ***productivity perspective***, our 2018, 2017 and 2016 cohorts are producing at or better than we expected…") (emphasis added). Defendants' claim that it is difficult to determine whether CW18's statements about headcount relate to 2019 or 2020 is false. FSCT Mot. at 19. CW18 explicitly states that Forescout fired or otherwise lost 25 to 30 NAMs in FY 2019 alone, losing tens of millions in potential business. ¶¶40.G, 95.C. This fact is corroborated by Defendants' own disclosure later in an Annual Report for 2019 filed with the SEC on Form 10-K, in which ***Defendants admitted*** that the number of sales representatives with two or more years of experience declined from a high of 50% in FY 2018 to 38% in FY 2019, erasing all the productivity gains from previous years that the Defendants touted throughout the Class Period. ¶¶41-42, 78.B. The Court should also reject Defendants' invitation to draw a pleading inference in their favor based on DeCesare's refusal to provide interim percentages of the number

of "ramped" sales representatives because DeCesare's refusal to provide specific data "strongly impl[ies] that he had access to the disputed information," *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1147 (N.D. Cal. 2017), but failed to disclose it because the data would severely undermine his misleading statements. *See also* ¶113 ("we're going to hold-off on disclosing what that percentage is until we finish 2019.").

### 3. Defendants Misled Investors About the Deterioration in the Company's Sales Pipeline

The Court has already ruled that most of the statements made on the May 9, 2019 conference call regarding Forescout's sales pipeline and alleged "tech wins" are "concrete factual assertions about Forescout's operations." Order at 5. The Defendants thus cannot invoke the safe harbor for any of these false statements. *See In re Quality Sys.*, 865 F.3d 1130, 1148-49 (9th Cir. 2017) (holding that the safe harbor is inapplicable to false statements of current fact even when they are mixed with forward-looking statements). These statements were materially false and misleading when made for the same reasons identified in Sections III.A(1) through III(A)(2), and because (a) Forescout had already lost significant business in Texas according CW17, (b) according to CW18, 1 out of every 5 deals in the global sales pipeline was miscategorized as "committed" and 1 out of every 3 seven- or eight-figure deals in the global sales pipeline was miscategorized as "committed" in FY 2019, (c) multiple CWs, including CW7, CW9, C10, CW11 and CW14 state that each one of them and other sales representatives were pressured by senior executives at Forescout to identify numerous seven figure deals as "committed" even though buyers had no interest, (d) according to CW13, DeCesare pressured the salesforce at SecurityMatters to "fudge the numbers," (e) CW18 and CW19 confirm that "committed" deals were included in Forescout's projections, and CW19 confirms that "committed" deals were included in the Company's forecasts, (f) CW20 confirms that "committed" deals were forecasted to close within weeks of a quarter, and inevitably slipped into the next quarter as a result, and (g) the pressure campaign was widespread given Matt Hartley's (Forescout's Vice President of the Americas) instruction to CW19 and other sales representatives that deals should be identified as "committed" in the Salesforce platform even when there was no credible commitment from customers. ¶99.

On August 7, 2019, DeCesare again misled investors when he claimed that the rate of closing deals "remain[s] very strong," blamed poor performance in the second quarter to "pent up demand," and continued to make similar misrepresentations about the current state of the Company's sales pipeline. ¶¶110, 113. Similarly, Harms justified that Forescout revised its full year guidance in FY 2019 upwards in the second quarter of 2019 because the Company still had "great visibility" into the rest of the year. ¶115.

In the October 10, 2019 press release, Defendants falsely stated that the sales pipeline "continued to grow." ¶117. In a footnote ignoring that the Ninth Circuit has held that the statement "our pipeline keeps growing" was a false statement of current fact (*In re Quality Sys.*, 865 F.3d at 1143), Forescout claims that this statement was "puffery." FSCT Mot. at 15 n.9. However, DeCesare also misleadingly suggested that nothing had changed about Forescout's business when he claimed that the fundamentals "remain strong." Defs.' Ex. 12. On October 10, 2019 and November 6, 2019, the Defendants falsely told investors that Forescout would miss, and did miss, its revenue guidance by tens of millions of dollars because of "extended approval cycles" due to deteriorating macroeconomic conditions in the EMEA region. ¶¶117, 120. Forescout fails to challenge the falsity of this specific statement and has waived the right to do so as a result. *See In re TFT-Lcd Antitrust Litig.*, No. C 10-4945 SI, 2011 WL 3738985, at *3 (N.D. Cal. Aug. 24, 2011).

Defendants fail to address why the failure to disclose material facts about Forescout's sales pipeline did not render their responses to pointed analyst questions false but, instead, principally hinge their arguments – repeatedly – on the revenue guidance figures and whether the SAC pleads that any specific illusory deal identified by a CW was included in the guidance or how the inclusion of such deals would render the guidance false or how the guidance was created. FSCT Mot. at 15-16. However, in *In re Quality Sys.* the Ninth Circuit assumed, without deciding, that the ***false guidance figures*** were accompanied by meaningful cautionary language and thus inactionable, but nonetheless reversed the dismissal because the complaint sufficiently pled false statements of current fact about the company's sales pipeline. 865 F.3d at 1148-49; *see also In re Merit Med. Sys.*, 2021 WL 1192133, at *10 (refusing to dismiss the complaint on materiality grounds because "Plaintiffs challenged statements alleged in the CAC are much broader than simply statements

about 2019 revenue guidance."); *Azar v. Yelp, Inc.*, No. 18-CV-00400-EMC, 2018 WL 6182756, at *7-16 (N.D. Cal. Nov. 27, 2018) (ruling that false guidance figures were protected by the safe harbor, but sustaining numerous non-forward looking, false statements of current fact).

Nor are Defendants correct in their contention that unless a plaintiff finds a CW who admits to preparing a false forecast and provides documentary evidence that a defendant knew the forecast was false, the complaint must be dismissed. FSCT Mot. at 9-20; ID. Mot. at 6-16. Even the much-hyped director in *In re Quality Sys.* said nothing about how that company's forecasts were prepared, who prepared them or which specific deals in the sales pipeline were included in that company's forecasts. *See In re Quality Sys. Sec. Litig.*, 13-cv-01818-CJC-JPR, ECF No. 26 at ¶¶1, 44-47, 63, 120 (C.D. Cal. Apr. 7, 2014). He only provided general allegations about declining bookings, a deterioration in the sales pipeline and defendants' easy access to real-time information, which twenty CWs quoted in in the SAC similarly provide here. *Id.*

The Court should also reject Defendants' *ipse dixit* that "the guidance accounted for alleged pipeline issues by discounting or ignoring 'committed' deals based on Defendants' assessment of the deals' actual likelihood of closing." FSCT Mot. at 16. The PSLRA does not provide courts a license to resolve disputed issues of fact even assuming this baseless claim had any good faith basis to be made. *See In re Gilead Scis. Sec. Litig.*, No. C 03-4999 MJJ, 2005 WL 2649200, at *6 n.4 (N.D. Cal. Oct. 11, 2005) (refusing to wade into factual disputes at the pleading stage). Nor can the Court credit such unsubstantiated assertions made in briefs that purport to address the element of falsity. *See, e.g.*, *Lormand v. U.S. Unwired Inc.*, 565 F.3d 228, 267 (5th Cir. 2009) (emphasizing that the PSLRA and *Tellabs* do not alter the pleading standard for any element of a securities fraud claim except for scienter).

Nor are Plaintiffs required to "muster" any facts to suggest that when Defendants discussed "tech wins," they must be referring to the specific deals alleged by the CWs to be illusory. FSCT Mot. at 18. The PSLRA does not require Plaintiffs to "prove [their] case at the outset." *ESG Capital Partners, Ltd. P'ship v. Stratos*, 828 F.3d 1023, 1035 (9th Cir. 2016). In any event, CW19's new account of Hartley's open and brazen instructions to identify illusory deals as

"committed" in the Salesforce platform provides strong evidence that the illusory deals identified by the CWs are merely the tip of the iceberg. ¶¶84-85, 99.F, 122.C.

Forescout also buries certain, self-selected phrases from Defendants' false statements about the sales pipeline in footnotes to argue that they are inactionable puffery. FSCT Mot. at 8 n.4, n.9. Not so. Virtually identical statements have been deemed actionable when defendants omit material facts like they did here. *See In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d at 970-73 (concluding that misleading statements about "strong demand" were actionable); *Murphy v. Precision Castparts Corp.*, No. 3:16-cv-00521-SB, 2020 WL 4040827, at *10-12 (D. Or. July 3, 2020) (noting that pursuant to *Quality Sys.*, statements that "sales are still going strong" are actionable, mixed statements unprotected by the safe harbor); *In re New Century*, 588 F. Supp. 2d 1206, 1226 (C.D. Cal. 2008) (concluding that claims about strong credit quality "cannot be chalked up to 'mere puffery.'"); *In re Dura Pharm., Inc. Sec. Litig.*, 452 F. Supp. 2d 1005, 1033 (S.D. Cal. 2006) (finding that virtually identical statements were actionable); *see also Rodriguez v. Gigamon Inc.*, 325 F. Supp. 3d 1041, 1050-51 (N.D. Cal. 2018) (applying *Quality Sys.* to conclude that touting a "large deferred service," "***healthy product backlog***," and "consistent quarterly linearity" as metrics that provided "***visibility***" into the fourth quarter revenue guidance were false statements of present business conditions) (emphasis added).

Nor are DeCesare's reference to unspecified, large deals shifting and causing quarter-to-quarter fluctuations or Harms' false statement that some deals are now expected to close in the back half of the year meaningful disclosures. FSCT Mot. at 15 (citing Order at 8). Defendants ignore DeCesare's explicit misrepresentation, made in the May 2019 conference call, that Forescout's sales pipeline was so large and robust that the Company would achieve its 2019 objectives even "without those deals closing in the second quarter." ¶108. The bespeaks caution doctrine is a very heavy burden for a defendant to meet and requires a "stringent showing." *Uber Techs., Inc.*, 2020 WL 4569846, at *8. Critically, the doctrine does not apply to misleading statements of existing fact. *See, e.g.*, *Rubin v. Trimble*, No. C-95-4353 MMC, 1997 WL 227956, at *7-8 (N.D. Cal. Apr. 28, 1997). In fact, the conflicting messages DeCesare sent to investors on May 9, 2019 are themselves sufficient to create liability. *See, e.g.*, *In re Diamond Foods, Inc.*,

*Sec. Litig.*, No. C 11-05386 WHA, 2012 WL 6000923, at *8 (N.D. Cal. Nov. 30, 2012) (ruling that inconsistent and ambiguous statements created an inference of both falsity and scienter).[6]

### 4.    Plaintiffs Allege Facts Demonstrating That Forescout's Q4 2019 Results Were Distorted by Channel Stuffing

This Court previously held that Plaintiffs' channel stuffing allegations failed to pass muster because: (i) Defendants did not admit to artificially listing deals as closed; and (ii) Plaintiffs' allegations relied on vague accusations and an anonymous whistleblower. Order at 10.[7] The SAC cures both those prior deficiencies by alleging both Defendants' admission to channel stuffing and enough specifics concerning Defendants' underlying practices.

Forescout admitting to having engaged in channel stuffing came in response to Advent's assertion in the Termination Letter that the Company engaged in "non-standard discounts" to a "significant number of customers" which were causing a material adverse effect on the "near- and long term business prospects for the Company," *i.e.,* channel stuffing. ¶70.B. After being confronted with these facts in the Termination Letter, the Company "acknowledged" or, put

---

[6]    The Court should reject Defendants' claim that the statements made after August 2019 do not relate to sales productivity, and hence cannot be false. FSCT Mot. at 18-19. Defendants disregard that DeCesare repeatedly told investors that *both* the rise in sales productivity and the large, robust nature of the sales pipeline together provided great "visibility" into whether the Company would meet its financial objectives and touted *both* as strong indicators of the current state of the Company's business. ¶¶87, 105, 113. Before Defendants' false statements were made in October and November 2019, additional sales force cuts had already been made across divisions, including cuts in the healthcare and financial services division in August 2019 as confirmed by CW8, the entire SLED section was on course to be eliminated in September 2019 as confirmed by CW17 and CW19, and a serious hiring freeze was instituted in September 2019 to increase cashflow and blunt the impact of poor financial results according to CW6. ¶122.A. Indeed, CW18 now confirms that the entire team of BDRs and SDRs was terminated or otherwise lost in FY 2019, and the Company lost 100 "ramped up" sales representatives in FY 2019, which caused a loss of tens of millions in business. ¶122.B. That Defendants did not make specific misrepresentations about the salesforce after August 2019 when they continued to claim that there was great "visibility" and made misleading statements about the sales pipeline is of no moment. The omission of even more deterioration in the salesforce is still actionable. *See Schueneman*, 840 F.3d at 706 (holding that once a defendant touts positive information to investors, he is bound to disclose adverse facts that cut against that information).

[7]    Channel stuffing is generally defined as "the oversupply of distributors in one quarter to artificially inflate sales, which will then drop in the next quarter as the distributors no longer make orders while they deplete their excess supply." Order at 10 (quoting *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1298 (9th Cir. 1998)).

---

another way, *admitted* that the channel stuffing which took place in Q1 2020 by asserting those discounts were "consistent with the way Forescout has operated in the past." ¶126.F (quoting Delaware Complaint ¶94).

Defendants seek to disclaim their admission by contending that the discounts in Q1 2020 were the "result of one-off negotiations" which were fully disclosed in the Q1 2020 10-Q. ID Mot. at 23 (quoting Ex. 18 at 26). However, the "one-off" nature of the negotiations reflects the scope of the discounts given rather than the number of discounted sales because, as the Q1 2020 10-Q makes clear, it happened with "*two* large deals." Ex. 18 at 26 (emphasis added). More importantly, Defendants ignore that the Company's admission of channel stuffing came in response to Advent's assertion in the Termination Letter to a "*significant number of customers*" (Delaware Complaint ¶94 (emphasis added)) clearly referring to more than just two isolated transactions. To the extent any doubt remains as to what "significant number" means, elsewhere, Advent made clear that it was more than the "two such deals" (Counterclaim ¶41) and, on a Rule 12(b)(6) motion to dismiss, any ambiguity with respect to the facts must be interpreted in Plaintiffs' favor. *See, e.g.*, *Garcia v. Doe White Trucking Co.*, No. 20-CV-00134-SI, 2020 WL 3061784, at *2 (N.D. Cal. June 9, 2020).

The existence of channel stuffing is further supported by the complete collapse in the Company's reported licensing revenue by 60% from $37,680,000 in Q1 2019 to $14,799,000 in Q1 2020 – which would have been substantially worse had Forescout not front-loaded at least $4.787 million in hardware sales *at a loss* into Q1 2020. ¶126.C. Defendants' contention that this revenue implosion was caused by the COVID pandemic rather than prior channel stuffing (FSCT Mot. at 21) fails to explain why Q2 2020 revenues then reverted to being flat with those of Q2 2019 despite the pandemic continuing in full force during that fiscal quarter. ¶126.C (citing Q2 2020 Form 10-Q at 14). Similarly, Defendants fail to explain why Forescout's peers did not suffer a similar revenue decline. ¶126.C (citing Counterclaim ¶33).

*Yaron v. Intersect ENT, Inc.*, No. 19-cv-02647-JSW, 2020 WL 6750568 (N.D. Cal. June 19, 2020), is on point as holding that channel stuffing has been properly alleged where, as here, Defendants admit to the conduct even though Plaintiffs "fail[] to allege 'specific transactions,

specific shipments, specific customers, specific[] times, or specific dollar amounts[.]'" *Id.* at *7. Nonetheless, Plaintiffs have identified "non-standard discounts" similar in form to the Q1 2020 sales of $4.787 million of hardware *at a loss* as the means through which the Company plausibly engaged in channel stuffing in Q1 2020 as well as Merlin booking sales to end-customers who could not close on transactions before the end of Q4 2019. ¶¶126.A-B; ¶126.D (citing Counterclaim ¶32).[8] Those allegations, especially when combined with Defendants' admission of channel stuffing, more than adequately identify the relevant transactions forming the basis of Plaintiffs' claim. *See, e.g., In re Connetics Corp. Sec. Litig.*, No. C 07-02940 SI, 2008 WL 3842938, at *10 (N.D. Cal. Aug. 14, 2008) (finding channel stuffing allegations sufficient where the plaintiffs failed to plead "nuts and bolts" of the transactions but provided other allegations with particularity).[9]

Defendants also too easily dismiss the "Critical Audit Matter" questioning the Company's revenue recognition. ¶126.E. Forescout's auditors only opined that the Company's reported results for FY 2019 "present fairly in *all material respects* ... the results of operations" in conformity with GAAP. *Id.* (quoting Ex. 15 at 73) (emphasis added). The auditors, however, did not opine with respect to Q4 2019 results which were at issue in this action and there are many scenarios under which a transaction material to Q4 results would not be material to the results of an entire fiscal year. *See, e.g., In re Novatel Wireless Sec. Litig.*, 830 F. Supp. 2d 996, 1015 (S.D. Cal. 2011) (recognizing that 5% is the standard measure of materiality). In any event, Defendants' argument that a clean auditors' opinion negates the existence of channel stuffing fails because, as was the case in *Yaron*, the improper channel stuffing can relate to "discounted bulk sales" rather than sales being improperly recorded as sales for revenue recognition purposes. 2020 WL 6750568, at *7; *see also Buttonwood Tree Value Partners, LP v. Sweeney*, No.

---

[8] Hardware sales were included in the Company's reported licensing revenues. *See, e.g.*, Q1 2020 Form 10-Q at 25.

[9] *City of Dearborn Heights Act 345 Police & Fire Retire. Sys. V. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017), upon which this Court previously relied (Order at 10-11), Plaintiffs respectfully submit, is not on point because, there, the plaintiffs failed to link the channel stuffing allegations to the goodwill calculations which they alleged were materially false or misleading.

SACV1000537CJCMLGX, 2012 WL 13026910, at *2 (C.D. Cal. Dec. 10, 2012) ("that an auditor issued a 'clean opinion' does not negate allegations that the Individual Defendants acted with fraudulent intent.") (citing *SEC v. Goldfield Deep Mines Co.*, 758 F.2d 459, 467 (9th Cir. Cal. 1985) ("the willingness of an accountant to give an unqualified opinion with respect to [financial statements] does not negate the existence of the requisite intent or establish good faith reliance.")); *In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1254-55 (N.D. Cal. 2008) (finding there is no exculpatory inference from a clean audit opinion when a complaint otherwise pleads falsity).

### 5.    Plaintiffs Allege Facts Demonstrating That Statements Relating to the Company's Channel Partners Driving Growth Were Materially False or Misleading

Defendants do not dispute that Forescout's February 28, 2020, statement in its 2019 Form 10-K that the Company's growth strategy included leveraging its "ecosystem of channel partners" with Forescout being focused on "educating existing partners and investing in sales enablement to expand our market reach" (¶128) was one of historical fact.  Instead, Defendants contend that the 2019 Form 10-K's other statement that the Merger "***could*** adversely affect our business" (¶129 (emphasis added)) is not actionable.  FSCT Mot. at 8.  However, Defendants are mistaken as the use of the term "could" is a statement of risk which is actionable where, as here, "the risk had already come to fruition."  *In re Alphabet, Inc. Sec. Litig.*, ___ F.4th ___, 2021 WL 2448223, at *11 (9th Cir. June 16, 2021) (citing *Siracusano v. Matrixx Initiatives, Inc.,* 585 F.3d 1167, 1181 (9th Cir. 2009); *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 986 (9th Cir. 2008)).

Defendants also contend in a footnote that the statements are not actionable because "the disclosures made no explicit or implicit representation that Forescout had not already experienced such issues." FSCT Mot. at 23 n.15.  However, that argument ignores that a statement is actionable under Rule 10b-5 when it "omit[s] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. §240.10b-5(b); *see also In re Alphabet, Inc. Sec. Litig.*, 2021 WL 2448223, at *8 (citing cases).

*Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1196 (9th Cir. 2021), upon which Defendants rely, is not on point because, there, the relevant statement "affirmatively acknowledges that Tesla *has* 'experienced to date' the sort of 'challenges'" which were addressed by the risk factor disclosure.

Here, in contrast, the relevant statements in the 2019 Form 10-K fail to acknowledge or disclose that the Company had already lost at least three major partners because of the planned acquisition, causing tens of millions of dollars of Forescout's pipeline to be deregistered (¶130), and that other customers were no longer willing to work with Forescout.  ¶131.

Equally meritless is Defendants' contention that simply because "partners terminated in the past does not render misleading Forescout's plans for future growth initiatives." FSCT Mot. at 23 n.15.  Instead, the loss of key business partners has long been recognized as being a material fact.  *See, e.g.*, *City of Ann Arbor Employees' Ret. Sys. v. Sonoco Prod. Co.*, 827 F. Supp. 2d 559, 579 (D.S.C. 2011) ("The market could consider the information regarding price concessions and the loss of an allegedly significant customer material for reasons beyond their impact on the company's ability to meet its earnings guidance."); *Milman v. Box Hill Sys. Corp.*, 72 F. Supp. 2d 220, 231 (S.D.N.Y. 1999) ("hypothetical warnings will not eliminate liability based on the failure to disclose present knowledge" of the loss of several key customers).  Here, that is especially appropriate because the 2019 Form 10-K represented that the Company's growth strategy was dependent upon "existing partners" (¶128) and Forescout itself, in the Delaware Litigation, acknowledged that the loss of those partners "caused tens of millions of dollars of [its] pipeline to be deregistered." Delaware Complaint ¶93; *see also* ¶77.C.

Finally, Defendants contend that Plaintiffs have not adequately alleged falsity because they "do not allege precisely *when* these partners terminated**.**" FSCT Mot. at 16 n.10 and 23 n.15.  That is not correct because Plaintiffs are not required to plead their claims with the level of specificity Defendants suggest.  *See*, *e.g.*, *In re Amgen Inc. Sec. Litig.*, No. CV 07-2536 PSG (PLAx), 2014 WL 12585809, at *11 (C.D. Cal. Aug. 4, 2014) (explaining that while some corroborating details should be pled, Circuit precedent makes it clear that the absence of other allegations is not fatal and the complaint must be read as a whole); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1186 (C.D. Cal. 2008) (applying *Tellabs* to rule that the failure to provide dates and specify each fact is not fatal).  Forescout fixed the time for Advent's claim that the Company's business had "cratered" as having been Advent's allegation was based upon information derived "from Forescout's sales pipeline predictor tool *during the last week of February 2020* regarding

booking targets." Counterclaim Answer ¶26 (emphasis added). However, even without those facts, Defendants' argument fails as a matter of law because, on a motion to dismiss, all reasonable inferences are made in Plaintiffs' favor. *See, e.g.*, *Garcia,* 2020 WL 3061784, at *2; *see also ESG Capital Partners, Ltd. P'ship, supra*.

However, even assuming, *arguendo*, that those partner terminations occurred later in time – and there is no basis for reaching such a conclusion on a Rule 12(b)(6) motion to dismiss – those statements from the 2019 Form 10-K were specifically incorporated by reference into the March 24, 2020 Proxy. ¶135. In addition, the relevant risk factor from the 2019 Form 10-K was incorporated by reference into press releases made on April 23, 2020, and May 11, 2020. ¶¶148, 153. Defendants do not even bother to argue that the underlying events of partner terminations had not yet taken place by those times.

### 6.    Plaintiffs Allege Facts Demonstrating That Statements Relating to the Illustrative Guidance in the Proxy Were Materially False or Misleading

Defendants contend that the Illustrative Guidance contained in the Proxy is not actionable as a matter of law because it is a forward-looking statement protected by the PSLRA's safe harbor provision. FSCT Mot. at 7-8. However, Defendants ignore Plaintiffs' allegation that the risk factor itself was materially misleading because the underlying events had already occurred. ¶137. The Ninth Circuit very recently reiterated that risk factors themselves can be materially misleading where they warn that a risk *might* occur when the event has already come to pass. *See, e.g.*, *In re Alphabet, Inc. Sec. Litig.*, 2021 WL 2448223, at *10 (citing *Berson*, 527 F.3d at 985-87).

Defendants also ignore that: (i) the PSLRA's safe harbor is limited to forward-looking statements "accompanied by *meaningful* cautionary statements" (15 U.S.C. §78u-5(c) (emphasis added)) and that (ii) Plaintiffs specifically allege that the risk factors contained in the Proxy were not meaningful because of their generic nature and because of their failure to identify existing adverse facts affecting the Company's ability to achieve those forecasts, including the loss of key business partners. ¶¶137; ¶77.C. Defendants, once again, offer no substantive response to Plaintiff's allegation and, therefore, effectively acknowledge that the relevant risk factors were not meaningful. *See, e.g.*, *Soto v. Am. Honda Motor Co.*, No. C 12-01377 SI, 2012 WL 5877476, at

*4 (N.D. Cal. Nov. 20, 2012) (holding that an argument raised for the first time on a reply brief had been waived).

In making that argument, however, Defendants ignore Forescout's loss of key customers having taken place prior to March 24th. *See* p. 24, *supra* (citing Counterclaim Answer ¶26). Defendants ignore that whatever the failings of Clari as a long-term predictor of future sales, it still generated information which Defendant DeCesare characterized as "provid[ing] new visibility into the sales execution process that is unparalleled." *See* Jafri Decl. Ex. 4 at p.2.

Similarly, Defendants' claim that they lacked such knowledge is fundamentally inconsistent with their other contention that the COVID pandemic caused a shortfall in revenues. FSCT Mot. at 5-6, 21. If the COVID shortfall contention is credited as being true, it is axiomatic that Defendants knew of such facts before March 24, 2020 when they disseminated the Proxy because the pandemic had started in Asia in January 2020 and the World Health Organization, on March 11, 2020, declared COVID to be a pandemic. *See* WHO Timeline – COVID-19, World Health Organization, April 27, 2020, https://www.who.int/news-room/detail/27-04-2020-who-timeline---covid-19 (cited in Delaware Complaint ¶34 n.9). Indeed, Defendants may not now disclaim that factual contention because although alternative pleading may be allowed in answering a complaint, it cannot serve as the basis for dismissing Plaintiffs' claims on a Rule 12(b)(6) motion. *See, e.g.*, *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) ("If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss").[10]

---

[10] Defendants, in an argument confined to a footnote, contend that "Plaintiffs allege no facts to support the notion that Advent's ability to obtain financing depended on Forescout's forecasts." FSCT Mot. at 23 n.15. That is not correct as even a cursory review of Defendants' argument shows that it relies on denying Advent's factual allegations of a specific phone call with Defendant Harms discussing these very issues. ¶141 (quoting Counterclaim ¶27). However, even Forescout's denial admits that Harms had a phone call on March 20, 2020, in which "Forescout engaged in scenario planning…." Counterclaim Answer ¶27(cited in ID. Mot. at 23). Scenario planning sounds a lot like projections of future operations and Defendants do not explain the purpose of any such scenario planning making the purpose alleged by Advent of liquidity planning more than plausible given the context of such planning.

### 7. Plaintiffs Properly Allege That the Statements with Respect to the Expected Closing of the Planned Acquisition Were Materially False or Misleading

Defendants, on three separate occasions, stated that Forescout expected the Original Merger Agreement to close on or about May 18, 2020: at an April 23, 2020, shareholder meeting (¶142); in an April 23, 2020, press release following the shareholder meeting (¶146); and in an April 29, 2020 Form 10-K/A filed with the SEC. ¶149. On a final occasion, on May 11, 2020, Forescout stated that "we look forward" to closing the Merger. ¶154.

Defendants, with respect to the first three of those statements, contend that they were made at a time when "Advent had not even indicated that it *might* walk away from the deal." FSCT Mot. at 23. Defendants' factual contention, however, cannot be reconciled with the Company's later statement in the Tender Offer Recommendation that, on April 20, 2020, Forescout received a letter from Advent stating that it was "assess[ing] whether the conditions to closing provided in the Original Merger Agreement would be met." ¶143. Defendants' understanding that Advent, indeed, might walk away from the deal is confirmed by the fact that the Strategic Committee began considering the effect of Advent refusing to proceed with the Planned Acquisition as negotiated in the Original Merger Agreement. ¶144.C (citing Tender Offer Recommendation at 32).

Defendants also contend that the statements themselves are forward-looking statements protected by the PSLRA's safe harbor provision. *See* FSCT Mot. at 8 (identifying ¶¶142, 146, 149 and 154 as being subject to the PSLRA safe harbor). Once again, Defendants are mistaken because the word "expect" (¶¶146, 149) or the phrase "look forward to" (¶154) are plainly statements of opinion rather than forward looking statements subject to the PSLRA safe harbor provision. *See, e.g., Shreiber v. Synacor, Inc*, 832 F. App'x 54, 57 (2d Cir. 2020) (statements "phrased in terms of … expectations and projections" are "quintessential opinion statements"); *Markette v. XOMA Corp.*, 5-cv-03425-HSG, 2017 WL 4310759, at *5 (N.D. Cal. Sept. 28, 2017) ("There is no reasonable basis to read a statement of hopefulness, encouragement, or expectation as anything other than an opinion").[11]

---

[11] In addition, the PSLRA safe harbor unquestionably does not apply with respect to the statement made at the April 23, 2020, shareholder meeting because, as Defendants concede, it was

Plaintiffs may establish the falsity of an opinion in three ways: "if (1) the statement is not actually believed, (2) there is no reasonable basis for the belief, or (3) the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy." *City of Sunrise Firefighters' Pension Fund*, 2021 WL 1091891, at *11 (quoting *Dearborn*, 856 F.3d at 616). Defendants focus their arguments on the first two prongs of the test claiming that they believed the Planned Acquisition would go forward which was a reasonable belief based upon the contractual terms of the Original Merger Agreement. FSCT Mot. at 7. However, Defendants' argument ignores that statements of opinion give rise to liability even if "the issuer believes the opinion (however irrationally)" if the opinion is disclosed without "information in the issuer's possession at the time" which is "material to a reasonable investor." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 188-89 (2015): *Uber Techs., Inc.*, 2020 WL 4569846, at *8 (ruling that purported opinion statements were actionable where defendants were aware of facts that contradicted or undermined the statements of belief).

*Omnicare* provides a framework for analyzing the materiality of omitted facts through the example of the statement that: "We believe our conduct is lawful." *Id.* at 189. The Supreme Court held that making that statement "in the face of its [senior] lawyers' contrary advice, or with knowledge that the Federal Government was taking the opposite view" constituted a material omission of fact. *Id.* Here, Advent taking a contrary view with respect to the expected closing of the Merger is analogous to the Federal Government's opposite view in the example contained in *Omnicare*. Advent's contrary view being a material fact is confirmed by the Tender Offer Recommendation later identifying the April 20, 2020, letter sent by Advent questioning whether

---

"unaccompanied by cautionary language." FSCT Mot. at 10. Instead, Defendants contend that Plaintiffs fail to allege that Daniel J. Milliken, the Company's Secretary and General Counsel who made the April 20th statement had actual knowledge of the material undisclosed information. *Id.*

Defendants are in error because the record facts in this action demonstrate that Advent's recalcitrance at proceeding with the Original Merger Agreement was well-known at high levels within the Company and was a matter inevitably addressed to Milliken in his capacity as the Company's Secretary requiring him to attend each Board meeting. *See* Jafri Decl. Ex. 5 at §5.13. In addition, Milliken, as General Counsel, almost certainly became aware of Advent's concerns because one of the key issues was whether Advent continued to be bound by the terms of the Original Merger Agreement. *See* Tender Offer Recommendation at 21-22 (the strategic committee's continued meetings concerning Advent's expressed doubts about proceeding with the Planned Acquisition were made with management and counsel attending).

---

the conditions to closing on the Original Merger Agreement had been met as having been a material event causing the Company to internally discuss its options should Advent refuse to close on the Original Merger Agreement. ¶¶65, 77.A, 144.C.

Cases decided prior to *Omnicare,* relying on the same legal principles, reached the same decision in the context of the failure to disclose known facts which could adversely affect the ability of a proposed merger to close. *In re Sprint Corp. Sec. Litig.*, 232 F. Supp. 2d 1193, 1219-20 (D. Kan. 2002), is on point in finding that claims relying on "multiple statements of 'optimism' or 'expectation' regarding regulatory approval" of a planned merger were actionable under § 10(b) and Rule 10b-5 where they failed to disclose non-public information that "significantly elevated the risk from threatened opposition of the merger to preliminary blockage" by regulators. *See also Ravens v. Republic New York Corp.*, No. CIV.A.99-4981, 2002 WL 1969651, at *8 (E.D. Pa. Apr. 24, 2002) (misrepresentations and omissions were actionable where they "could have affected a reasonable shareholder's assessment of the probability that the Merger would be consummated."); *Sheehan v. Little Switzerland, Inc.*, 136 F. Supp. 2d 301, 310 (D. Del. 2001) (the defendants' merger announcement was actionable where because of omitted information "shareholders may have believed that ... the merger was more likely to occur"); *Lawrence v. Zilog, Inc.*, 242 F.3d 382 (table), 2000 WL 1545053, at *1 (9th Cir. 2000) (announcement merger would proceed at $25 per share was "in effect, a prediction that a particular form of merger would go forward without any future financial troubles requiring the parties to renegotiate its terms.").

*Wochos*, upon which Defendants again rely, is not on point and, instead, held a statement of opinion was not actionable "because the disclosure also acknowledged that the company had already experienced 'the sort of 'challenges' that it would have to overcome in order to achieve its stated objective[.]'" *In re Alphabet, Inc. Sec. Litig.*, 2021 WL 2448223, at *11. Here, in contrast, the statements at issue are opinions that contain no acknowledgment or disclosure whatsoever about problems brewing with Advent with respect to closing on the Original Merger Agreement. *See* ¶142; *see also* ¶¶146 ("Forescout continues to expect the transaction to close in the second calendar quarter"); 149 (same), 154 ("we look forward to completing our pending transaction with Advent."). Instead, Defendants' statements "affirmatively create[d] an impression of a state of

affairs that differ[ed] in a material way from the one that actually exist[ed]" by repeatedly stating that the Planned Acquisition was expected to close on or about May 18, 2020, while Defendants were exchanging contentious correspondence and making contingency plans *because* Advent was clearly an unwilling partner. *E.g.*, ¶¶64-65, 156.

### B. THE COMPLAINT ALLEGES FACTS RAISING A STRONG INFERENCE OF SCIENTER

Deliberate recklessness is sufficient to plead scienter. *Roberts v. Zuora, Inc.*, No. 19-CV-03422-SI, 2020 WL 2042244, at *10 (N.D. Cal. Apr. 28, 2020). The inference of scienter "need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences." *Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). In evaluating scienter, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Id.* at 326; *see also In re Quality Sys.,* 865 F.3d at 1144 (holding that courts must assess the allegations of scienter collectively).

### 1. DeCesare's Access to Clari and Smartsheet Fortifies the Scienter Allegations

The Individual Defendants contend that the SAC's allegations related to Clari are "little more than a general 'access to information' allegations" and lack particularity. ID. Mot. at 15. Defendants do not dispute that Clari provided granular data about the sales force and the sales pipeline in real time. ¶43. Three CWs, including CW17, who joined Forescout in April 2019, ¶36.E, confirm that Defendants used Clari to monitor sales representatives, deals and the Company's forecasts. ¶¶43.E, 43.G, 43.L. These interlocking accounts from the CWs demonstrate that Defendants monitored real-time information on Clari concerning the Company's sales pipeline, sales representatives and forecasts as early as April 2019 and yet still made misleading statements about "tech wins" and the pipeline starting in May 2019. *Id.* Defendants complain that the CWs do not say when exactly DeCesare accessed Clari or what specific information DeCesare viewed on Clari, ID. Mot. at 8, 14 n.5, 15, but DeCesare himself is quoted in an advertising

brochure, in which he claimed that "Clari provides new visibility into the sales execution process that is unparalleled." *See* Jafri Decl. Ex. 4 at p.2.[12]

Moreover, Plaintiffs' allegations are not based on mere access to Clari. DeCesare admitted that he and Harms spent a lot of time on "sales ramping and productivity," and Harms admitted that both Defendants "probed" the sales pipeline. ¶44. In addition, CW20, a senior deal desk manager at Forescout, states that CW20 prepared updates for *all* deals valued at $500,000 or more by utilizing Smartsheet, a software program that gathered all pertinent information from Salesforce. ¶45.H. CW20 inputted granular data in Smartsheet about the status of negotiations with customers, the steps needed to be taken to close deals, and the expected dollar amount for each deal. ¶45.I. According to CW20, these updates were prepared for the Senior Vice President of Revenue Operations, Aaron Martin ("Martin"), so that Martin could report the status of *all* deals valued at $500,000 or more directly to DeCesare. CW20 was told by CW20's immediate boss, the Director of the Global Deal Desk, that Martin presented the information collected on Smartsheet to DeCesare in weekly meetings. ¶45.H.

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226 (9th Cir. 2004), is on point as holding that these kinds of allegations are more than sufficient to allege a strong inference of scienter. Specifically, in *Oracle*, the Ninth Circuit held that Defendants' access to a similarly comprehensive database in combination with their admission to accessing that database gave rise to an inference that defendants must have accessed information that undermined their misleading statements. *Id.* at 1231. Similarly, in *Bielousov v. GoPro, Inc.*, the defendants argued that the complaint failed to provide specifics about the company's internal reporting system or which defendant actually accessed the system, but another court in this District ruled that allegations of access to software with real-time reporting capabilities in combination with defendants' boasting about tracking inventory was enough to plead a strong inference of scienter. No. 16-cv-06654-CW, 2017 WL 3168522, at *6-7 (N.D. Cal. July 26, 2017). Here, the allegations

[12] The Court may take judicial notice of the fact that this document is in the public realm, and that DeCesare made this statement. *See, e.g.*, *McGovney v. Aerohive Networks, Inc.*, No. 18-CV-00435-LHK, 2019 WL 8137143, at *7 (N.D. Cal. Aug. 7, 2019) (taking judicial notice of statements made by defendants during the class period, but not for the truth of the matter asserted).

are even stronger because CW20 prepared reports provided to DeCesare that contained granular details about the status of all deals over $500,000, including the remaining steps required to complete the transaction.  Because DeCesare was actually provided with such granular reports, it is inconceivable that DeCesare did not know about the Company-wide pressure campaign where numerous NAMs were forced to report illusory deals as "committed" even though buyers had no interest and there was no commitment, ¶52, or that "committed" deals were included in the Company's forecasts as CW19 affirmatively asserts.  ¶99.E.  The SAC contains well-pled allegations from multiple CWs, all of whom were pressured to report illusory deals over $1 million as "committed" during the Class Period, ¶¶52.A-G, and the Court should not ignore common sense and presume that DeCesare did not know about the illusory deals.  *See Hatamian*, 87 F. Supp. 3d at 1161 ("When assessing allegations holistically, the Court views circumstances that are probative of scienter with a practical and common-sense perspective.").

Defendants contend that the updates Martin provided to DeCesare must be limited to the East Coast because CW20 worked with sales representatives in that region to structure deals and make proposals to customers. ID. Mot. at 15.  However, Defendants ignore that that was a different part of CW20's job duties, and CW20 also inputted granular details about deals on Smartsheet for Martin to provide to DeCesare in weekly meetings.  ¶45.H.

Indeed, this Court previously accepted allegations that Defendants admitted "to monitoring the pipeline and big deals," but found that the Plaintiffs' allegations only suffered from needing "additional corroboration showing defendants' statements about the pipeline were false."  Order at 14.  Now, as demonstrated above, the SAC describes in detail pertinent facts known to Defendants before each false statement was made regarding the deterioration in the Company's sales pipeline and the precipitous decline in productivity that began early in the Class Period.  *See, e.g.*, ¶¶82-86, 88, 95-96, 98-99.  Moreover, the SAC does not rely on only admissions or "mere access" to sales information, but now includes additional information from CW20 that DeCesare, in fact, had access to all relevant information that rendered his Class Period statements materially misleading when made.  ¶¶45.H-J.

Defendants' contention that the CWs do not provide dollar amounts, dates, identify specific customers and specific deals, or recall specific details about specific conversations, ID. Mot. at 6-10, disregards the actual state of the law in a post-*Tellabs* regime. *See In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, at *11; *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d at 1186; *Ap-Fonden v. Goldman Sachs Grp., Inc.*, No. 18-CV-12084 (VSB), 2021 WL 2659797, at *12 (S.D.N.Y. June 28, 2021) (rejecting similar arguments and emphasizing that the PSLRA and Rule 9(b) do not require plaintiffs to plead details such as dates, times and places, so long as the complaint gives fair notice of the claims and grounds upon which they are based).

The Individual Defendants object that the CWs do not mention Harms by name, ID. Mot. at 6, but Harms himself told investors that he analyzed and "probed" the sales pipeline. ¶104. Indeed, it is irrational to assume that Harms would be ignorant while DeCesare knew or recklessly disregarded all the necessary details. *See In re Alphabet, Inc. Sec. Litig.*, 2021 WL 2448223, at *13 (holding that information contained in an important memorandum that was reviewed by one senior executive must have been shared with another senior executive as well); *In re Myriad Genetics, Inc.*, No. 2:19-cv-00707-DBB-DBP, 2021 WL 977770, at *17-18 (D. Utah Mar. 16, 2021) (considering all the allegations about what other senior executives knew to determine whether the complaint sufficiently pled scienter against the defendants).

### 2.     Additional CW Allegations Support an Inference of Scienter

According to CW18, very senior executives at Forescout, including Gumbel and Redman, were involved in evaluating CEP. ¶¶51, 82. Defendants' suggestion that DeCesare and Harms would not plausibly know about Force Management's conclusions or the decision to circumvent CEP when CW18, Redman and Gumbel were charged with implementing it defies common sense. *See In re Alphabet, Inc. Sec. Litig.*, 2021 WL 2448223, at *13 (rejecting similar arguments, and holding that information contained in a memorandum reviewed by one senior executive would also have been known to another senior executive given the reporting structure at the company and the fact that both senior executives learned other relevant facts later in the class period). It particularly defies common sense given the information DeCesare received from Martin, and the fact that Redman and Gumbel directly provided DeCesare with updates on the status of deals and

the sales pipeline. ¶100.F.  Despite these known facts, Defendants provided a revenue guidance in February 2019 that lacked a reasonable basis. ¶¶80-86.

Before the FY 2019 guidance was given, there was also a dramatic shift towards the cloud that left Forescout behind and created intense pricing pressure that put the guidance and growth rates at risk.  This allegation is bolstered both by the accounts of numerous CWs, ¶36A.-E, and the assessment of a renowned cloud computing expert, who examined Forescout's suite of products and concluded that the Company offered legacy technology that was outcompeted by its peers, ¶¶32-35.  *See Oracle Corp.*, 380 F.3d at 1233 (considering expert's analysis of improper revenue adjustments to conclude that the complaint raised a strong inference of scienter).

There is still more evidence of scienter with respect to listing deals as "committed" when, in fact, there were several additional steps required to close the transaction.  Both DeCesare and Redman instigated the pressure campaign to identify illusory deals as "committed." ¶52.F-G.  In conclusory fashion, Defendants insist that the CWs are unreliable and inconsistent on this issue. FSCT Mot. at 17.  However, in making that argument, Defendants ignore that the SAC clarifies that, according to CW7 and CW14, Redman instigated the pressure campaign internally at Forescout.  ¶52.G; *see also In re Lucent Techs., Inc. Sec. Litig.*, 217 F. Supp. 2d 529, 554 (D.N.J. 2002) (considering facts known to non-defendant, senior executives at the company to conclude that the complaint sufficiently pled scienter against corporation and the named defendants). In addition, consistent with the testimony of CWs 7 and 14, according to CW13, DeCesare pressured sales employees at **SecurityMatters**, a new acquisition thousands of miles away from Company headquarters. ¶52.F.  The direct participation of DeCesare in a pressure campaign at another company makes perfect sense, and supports his knowledge of a similar pressure campaign existing at Forescout's legacy business because a CEO is more likely to apply direct pressure to "fudge the numbers," as CW13 alleged, on a newly acquired company with a different culture and a different salesforce. *Id.*

The widespread nature of this pressure campaign is confirmed by CW19, who heard the Vice President of the Americas, Matt Hartley, instruct sales representatives to list deals as "committed" in the Salesforce platform only on the basis of a single conversation with a potential

customer's C-Suite executives or employees in the procurement group. ¶57. Hartley's statement is admissible against Defendants at trial. *See FTC v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052, 1061 n.30 (C.D. Cal. 2012) (admitting statements of telemarketers as party admissions made by agents or employees acting within the scope of their employment).

The SAC pleads additional facts regarding Defendants' knowledge or recklessness with respect to their false statements about sales productivity. In addition to the fact that DeCesare admitted to monitoring the Company's sales productivity, ¶44, the SAC now contains a direct account from CW18, who heard DeCesare state in early 2020 that the salesforce was reduced in FY 2019 because the Company had failed to grow revenues in FY 2019, demonstrating DeCesare's knowledge about the terminations and the reasons why they occurred. ¶40.G. Defendants contend that this allegation pleads "fraud-by-hindsight," ID. Mot. at 14, but a defendant's conduct after a false statement is made can support an inference of scienter. *See Shenwick v. Twitter, Inc.*, No. 16-cv-05314-JST, 2021 WL 1232451, at *10-11 (N.D. Cal. Mar. 31, 2021) (deferring ruling on motion in limine, but emphasizing that post-class period documents are relevant to whether a defendant acted with scienter); *In re Synergen, Inc. Sec. Litig.*, 863 F. Supp. 1409, 1420 (D. Colo. 1994) (denying motion for summary judgment because a presentation created after the class period raised a strong inference of scienter).

The Company also admitted in its Annual Report for FY 2019 that its ramped salesforce dramatically declined from a high of 50% in FY 2018 to 38% in FY 2019. ¶78.B. That, in turn, was a process that CW1 and CW7 confirm began in February 2019, ¶88.A, intensified as the year progressed, ¶40, and ultimately resulted in the implosion of the Company's salesforce no later than December 31, 2019. ¶¶40.G, 41, 42. *See In re WageWorks, Inc., Sec. Litig.*, No. 18-cv-01523-JSW, 2020 WL 2896547, at *7 (N.D. Cal. June 1, 2020) (sustaining scienter allegations and refusing to "'close [its] eye'" to defendants' "post-mortem diagnosis of the problems that led to false financial statements.").

Hence, the facts pled through the accounts of numerous CWs demonstrate that the decline in sales productivity did not suddenly happen overnight, ¶¶40.A-H, and Defendants' contention that DeCesare would not know about this gradual decline rings hollow particularly since he

repeatedly spoke about this very specific subject in direct response to pointed analyst questions. In *S. Ferry LP #2 v. Killinger*, 687 F. Supp. 2d 1248, 1258-60 (W.D. Wash. 2009), the district court applied the Third Circuit's reasoning in *Institutional Investors Group v. Avaya*, 564 F.3d 242, 269-70 (3d Cir. 2009) to sustain scienter allegations where a defendant similarly held himself out as an expert on the subject at issue. In *Avaya*, the Third Circuit held that a defendant's highly specific responses to direct questions from an analyst showed that the defendant held himself out as knowledgeable about the subject, and reversed the district court's decision to dismiss the complaint. 564 F.3d at 269-70. That reasoning applies with equal force here. Defendants repeatedly talked about the sales productivity metrics, including the percentage of ramped employees throughout the Class Period, and particularly in response to pointed analyst questions in May 2019 about the reasons why Forescout would achieve its financial objectives for the year. ¶¶87, 93, 105, 113. In fact, DeCesare even suggested that he had access to information about the number of ramped employees during the Class Period in an August 2019 conference call, but told investors that he would withhold this information until the end of the year. ¶113. These facts are sufficient to plead scienter because Defendants held themselves out as knowledgeable about sales productivity and the number of ramped employees throughout the Class Period.

In light of all these facts that support a strong inference of scienter, the Court should not disregard credible allegations from multiple CWs that: DeCesare was an extreme micromanager, ¶45.C, who acted as the chief sales representative himself for large deals, ¶45.F, that he attended meetings where the lack of interest from new customers was discussed, ¶45.K, that he held conference calls to discuss the status of "tech wins," *id.*, that business dried up in different regions, ¶99.C, and that very large deals repeatedly "slipped" in FY 2019, ¶99.D, even if these allegations would be insufficient on their own. *See Oracle Corp.*, 380 F.3d at 1234 (reversing dismissal because allegations of defendants' hands-on style combined with their admissions and other facts strongly supported an inference of scienter even if micromanagement was not sufficient to plead the claim on its own).

Defendants' suggestion that facts known before the Class Period cannot support scienter, ID. Mot. at 10, is based on a misunderstanding of the law because pleading facts known before a

false statement is made is classic evidence of scienter; scienter needs to be contemporaneous, facts do not.  See *Zelman v. JDS Uniphase Corp.*, 376 F. Supp. 2d 956, 971-72 (N.D. Cal. 2005) ("Facts relevant to scienter will ordinarily date from before any alleged misrepresentations.").  Similarly, Defendants' repeated assertion that CW18's and other CWs' accounts are based on "anecdotes, rumors, hearsay, speculation or opinions" is not enough to dismiss the SAC.  In *In re Allied Nev. Gold Corp., Sec. Litig.*, No. 3:14-cv-00175-LRH-WGC, 2016 WL 4191017, at *11 (D. Nev. Aug. 8, 2016), the district court dismissed credible CW accounts as "hearsay, rumor, [opinions] or speculation."  The Ninth Circuit reversed because the CW statements undermined defendants' false statements, and the Circuit did not consider it important to rule on defendants' improper evidentiary objections at the pleading stage.  743 F. App'x 887, 888 (9th Cir. 2018).

Defendants also continue to mischaracterize the Ninth Circuit's decision in *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 997 n.4 (9th Cir. 2009), which, in fact, stated that hearsay ***does not*** automatically disqualify a CW's statement.  *See also Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 484 n.5 (9th Cir. 2019) (rejecting the same mischaracterization of *Zucco* and then crediting plausible hearsay account to reverse dismissal).  Defendants also continue to emphasize that some CWs did not talk to or hear from the Individual Defendants, but Defendants still disregard that the Ninth Circuit and this Court routinely credit CWs' accounts even when the CWs did not interact with a defendant.  *See Quality Sys.*, 865 F.3d at 1144 (crediting accounts of numerous CWs who had no direct contact with defendants); *Robb v. Fitbit, Inc.*, Case No. 16-cv-00151-SI, 2017 WL 219673, at *6 (N.D. Cal. Jan. 19, 2017) (sustaining complaint based on reports provided by CW who did not interact with the individual defendants); *see also Jackson v. Microchip Tech., Inc.*, No. CV-18-02914-PHX-JJT, 2020 WL 1170843, at *11 (D. Ariz. Mar. 11, 2020) (sustaining a complaint and rejecting an argument that witness accounts should be disregarded because witnesses did not talk to or hear from the defendants).

Furthermore, the Court should reject Defendants' speculation about a presumed disagreement with the CWs when Defendants offer no evidence of an actual disagreement and the CWs spoke in factual terms.  *See Karinski v. Stamps.com, Inc.*, Case No. CV 19-1828, 2020 WL

281716, at *18 (C.D. Cal. Jan. 17, 2020) (rejecting a similarly conclusory claim that CWs merely disagreed with higher management as an improper factual attack at the pleading stage); *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676 (5th Cir. 2014) (overruling conclusion that CW accounts were a mere disagreement with management because the CWs spoke in factual terms). DeCesare and Harms have not yet been deposed. Unsubstantiated assertions of fact made in briefs about Defendants' alleged "opinions" are not even enough to prevail on summary judgment, let alone a motion to dismiss. *See, e.g.*, *Esso Expl. & Prod. Chad, Inc. v. Taylors Int'l Servs.*, No. 09-0467, 2010 WL 2520996, at *10 (W.D. La. June 9, 2010) (ruling that unsworn facts asserted only by counsel in a brief are insufficient to prevail on summary judgment).

3.    **Forescout Cannot Now Disown the Factual Statements It Made in the Delaware Litigation and the Tender Offer Recommendation Which Demonstrate a Strong Inference of Scienter**

The issue confronting Forescout on May 18, 2020, and June 5, 2020, when the Company filed its Complaint and then its Answer to Advent's Counterclaim, was that it was trying to enforce the Original Merger Agreement. In July 2020, the issue confronting the Company in filing the Tender Offer Recommendation was explaining why it had agreed to lower the merger price from $33.00 to $29.00 per share. Those statements are a sufficiently reliable indicator of the facts as they existed at the times relevant to this action and, indeed, would even be admissible into evidence as the admission of a party opponent. *See* Fed. R. Evid. 801(d)(2); *see also Whole Foods Mkt. Grp., Inc. v. Wical Ltd. P'ship*, No. 1:17-CV-01079-RCL, 2019 WL 6910168, at *2 (D.D.C. Oct. 22, 2019) ("The reliability-guarantee behind Fed. R. Evid 801(d)(2)(B) is that if a party previously manifested its belief in a statement, it is more likely that the statement is true. It also prevents a party from conveniently changing its beliefs to suit its current litigation needs.").

Thus, Forescout's own statements demonstrate that the representations regarding the Company's growth strategy (¶¶128-129, 135, 148, 151), were materially false or misleading when made because the Company had lost three major channel partners. ¶77.C (citing Delaware Complaint ¶93). Similarly, it is Forescout's own statements which fix the impact of those events as having been evident from a sales pipeline report made available to Advent during the last week

of February 2020 – *i.e.*, before the relevant statement on February 28, 2020 was made – reflecting expected decreased future sales. ¶132 (citing Counterclaim Answer ¶26).

Defendants also cannot now disclaim that they knew by no later than April 20, 2020 – which was before their publicly stated opinions with respect to the closing of the Original Merger Agreement (¶¶140, 142, 146, 149, 153-54) – that Advent was assessing whether the conditions to the closing of the Original Merger Agreement would be met because the Company later admitted to that fact in the Tender Offer Recommendation (¶143) with the letter referenced in the Delaware Litigation. *See* Delaware Complaint ¶71. In any event, Defendants do not deny knowing of the events of April 20, 2020, but instead attempt to spin the facts by claiming that they just perceived Advent's April 20, 2020 letter as "testing Forescout's appetite to reprice the deal." Forescout MTD at 24. However, Defendants' version of the facts cannot be seriously credited on this Rule 12(b)(6) motion to dismiss especially given the Tender Offer Recommendation's statement that the Company, through its Strategic Committee, considered this development material as it began more seriously considering the possible effect of Advent refusing to proceed with the Original Merger Agreement. ¶144.C.

Similarly, Plaintiffs' allegation that at the time the Proxy disclosed the Illustrative Guidance, the Q1 2020 portion of the Illustrative Guidance was inconsistent with a March 20, 2020 preview the Company gave to Advent regarding Q1 2020 earnings is supported by the Company characterizing that purported preview as "scenario planning." Counterclaim and Answer to Counterclaim ¶27. Advent states that the preview reflected a "sudden and sharp decline in performance" with Forescout answering that allegation by stating that it "lack[ed] knowledge or information sufficient to form a belief about the truth of the allegation." *Id.* ¶28. Although technically a denial, it is an extremely weak one particularly given there being only one week left to the end of Q1 2020 and the actual results having been a 7.7% miss from the Q1 2020 Illustrative Guidance – which would have been far worse, *i.e.,* a more than 15% miss had the Company not sold $4.787 million of hardware at a loss. ¶126.D.

Finally, the Delaware Litigation reveals that Advent told DeCesare it "could not make the numbers work" on May 8, 2019, and on May 14, 2019, Defendants responded with what Advent

characterized as a "made-for-litigation" email. *See supra* p.26. Advent thus told Defendants on May 8, 2020, that the transaction would not be closing. *Cf. Akorn, Inc. v. Fresenius Kabi AG*, No. CV 2018-0300-JTL, 2018 WL 4719347, at *23 (Del. Ch. Oct. 1, 2018), *aff'd*, 198 A.3d 724 (Del. 2018) ("the contemporaneous evidence shows that Fresenius continued to assess how it could close the Merger and make the numbers work."). Nevertheless, on May 11, DeCesare misleadingly implied the transaction was scheduled to close on May 18, 2020 before sending an undisclosed made-for-litigation email to Advent. *See* Counterclaim ¶¶43-44.

Nor does Defendants' contention that revenue "bounced back" in Q2 2020 (FSCT Mot. at 21) withstand serious factual scrutiny. Instead, those results which represented only a 2% increase in sales from Q2 2019 (¶59) were part of the disappointing results causing the Company in the Tender Offer Recommendation to reference new guidance lowering FY 2020 expected revenues from $386 million to $320 million or by more than 17%. ¶77.G.

Similarly, although certain of these facts originate with statements made by Advent, they are sufficiently reliable to serve as the basis for pleading scienter. Advent had knowledge of the relevant facts because it was the counterparty to the Original Merger Agreement. *See, e.g.*, *In re Silicon Storage Tech., Inc. Sec. Litig.*, C-015-0295-PJH, 2007 WL 760535, at *30 (N.D. Cal. Mar. 9, 2007) (explaining that all witness statements are evaluated based upon their reliability and personal knowledge of the relevant facts) (citing cases). This is especially true where, as here, Advent had no reason to lie about the relevant facts: fixing March 20, 2020, as the day the Company knew that it had experienced a "sudden and sharp decline in performance" was not relevant to its defense to not proceeding with the Original Merger Agreement because of liquidity issues. *See, e.g.,* Answer ¶9; *see also In re Mylan N.V. Sec. Litig.*, 379 F. Supp. 3d 198, 215 (S.D.N.Y. 2019) ("treat[ing] allegations borrowed from [a complaint filed by a group of 47 state attorneys general] as a proper basis for the pleadings" where that complaint was (1) the result of a government investigation and (2) verified by plaintiffs' counsel).[13]

---

[13] There exists no ironclad rule against relying on pleadings from another action in alleging a claim. As Judge Scheindlin ably explained, cases deciding otherwise arise from misconstruing a prior Second Circuit decision precluding a party from alleging facts from consent decrees or *nolo*

*ScripsAmerica, Inc. v. Ironridge Global LLC*, 119 F. Supp. 3d 1213, 1262 (C.D. Cal. 2015), upon which Defendants rely, is not on point because there the SEC's allegations were that the defendant had acted as "an unregistered broker or dealer" which did not amount to a claim of fraud. *ScripsAmerica*, in another part of the decision, however, recognizes that "reliability and personal knowledge" are the essential elements with respect to whether the Court may rely on the statement of any witness. *Id.* at 1261; *see also In re Silicon Storage Tech.,* 2007 WL 760535, at *30 (explaining that all witness statements are evaluated based upon their reliability and personal knowledge of the relevant facts) (citing cases).[14]

### 4. DeCesare Being a Micromanager Further Supports Scienter with Respect to the Channel Stuffing Allegations

Although Defendants – incorrectly – dispute whether Q4 2019 results were materially false or misleading because of channel stuffing, they cannot reasonably deny that Plaintiffs have properly alleged that Defendants would have known about any such conduct having occurred. DeCesare is a micromanager who tracks all potential sales of $500,000 or more on a weekly basis. ¶100.D.  In addition, DeCesare and Harms have access to the Clari system which reports on the sales pipeline and have otherwise acknowledged that they monitor that system.  ¶100.C; *see also* Jafri Decl. Ex. 4 at p.2.  These facts when combined with Plaintiffs' other factual allegations corroborating that Forescout engaged in channel stuffing in Q4 2019 (*see* Section II.C, *supra*) sufficiently allege a strong inference of scienter.  *See* Order at 14 (citing *In re Quality Sys.*, 865 F.3d at 1145-1146).

---

*contendre* pleas which are inadmissible under Fed. R. Evid. 410.  *In re OSG Sec. Litig.*, 12 F.Supp.3d 619, 620-21 (S.D.N.Y. 2014).  Here, however, Defendants do not contend that any such blanket rule of inadmissibility applies to the facts from the Delaware Litigation upon which Plaintiffs rely in the Complaint.  Nor would it make sense to do so since this Court considered factual allegations from another action sufficiently reliable where "other sources corroborate[d] some, though not all, of the allegations from the SEC complaint." *In re Connetics Corp. Sec. Litig.*, No. C 07-02940 SI, 2008 WL 3842938, at *4 (N.D. Cal. Aug. 14, 2008).

[14]    *Lau v. Opera Ltd.*, ___ F. Supp. 3d ____, 2021 WL 964642, at *11 (S.D.N.Y. Mar. 13, 2021), is also not on point because, there, the plaintiffs relied upon the mere existence of other litigation against an unaffiliated company with a shared director as suggestive of scienter.

---

### 5. The Materiality of the Facts Relating to the Planned Acquisition Also Supports a Strong Inference of Scienter

The Ninth Circuit recognizes that certain facts are sufficiently material to a company that the CEO or CFO such as DeCesare and Harms would know about because they involve "core operations." *See Webb v. Solarcity Corp.*, 884 F.3d 844 (9th Cir. 2018) (recognizing that the "'core operations' doctrine … allows us to infer that facts critical to a business's 'core operations' or an important transaction are known to a company's key officers.") (internal quotation marks omitted). The Ninth Circuit has recently clarified that the presumption of knowledge applies wherever the facts at issue are sufficiently material to a company's operations. *In re Alphabet, Inc. Sec. Litig.*, 2021 WL 2448223, at *13.

The Planned Acquisition is precisely such a fact because a merger has long been regarded by its very nature as a highly material fact in a company's history or operations. *See, e.g., Basic Inc. v. Levinson,* 485 U.S. 224, 238 (1988) (recognizing that "a merger in which it is bought out is the most important event that can occur in a small corporation's life"). In addition, the record from the Delaware Litigation is suffuse with references to the direct involvement of both DeCesare and Harms in all relevant discussions. *See*, *e.g.*, Counterclaim ¶¶27, 35, 38, 44. Indeed, Advent sought to compel the testimony of both DeCesare and Harms at trial – prior to the action being settled – as necessary factual witnesses. *See* Jafri Decl. Ex. 6.

Similarly material was the information relating to the three channel partners either canceling or downgrading their relationships with Forescout because of the Planned Merger being announced. ¶130. Those events caused the de-registration of tens of millions of dollars of expected future sales (Delaware Complaint ¶89) which was a material event for Forescout.[15]

### 6. Plaintiffs Have Alleged a Plausible Theory of Fraud Further Supporting a Strong Inference of Scienter

"The Ninth Circuit recently highlighted the importance of holistically considering the plausibility of fraud theories." *City of Sunrise Firefighters' Pension Fund*, 2021 WL 1091891,

---

[15] Indeed, even absent Defendants' knowledge based on materiality, these are facts which would have appeared in the Company's sales pipeline predictor tool. *See, e.g.,* Counterclaim Answer ¶26. That sales pipeline predictor tool can reasonably be assumed to be the Clari system employed by Forescout which DeCesare regularly utilized. *See* Section III.B.1, *supra*.

*22 (citation omitted).  Specifically, in *Oracle*, Judge Freeman found a fraud theory plausible where it was meant to buy time to improve flagging sales.  *Id.*

Plaintiffs' fraud theory more than plausibly explains each of the materially false or misleading statements made by Defendants.  Plaintiffs have alleged a plausible theory of fraud starting with the sale of over $29 million of the Company's stock by the Vice Chairman of the Company's Board shortly after the February 7, 2019 revenue guidance.  ¶81.  Such insider sales even by corporate insiders who are not named as defendants "support an inference of scienter."  *See Junge v. Geron Corp.*, No. C 20-00547 WHA, 2021 WL 1375960, at *7 (N.D. Cal. Apr. 12, 2021).

Similarly supporting a strong inference of fraud is the fact that DeCesare and Harms collectively sold $12 million of the Company's common stock during the Class Period compared to only $3.393 million before the Class Period.  ¶¶24-25.  It is uncontested that ***both*** the number of shares sold, and the dollar amount obtained during the Class Period are dramatically out of line with the Individual Defendants' prior trading history.  ID. Mot. at 18 (conceding that the amount sold during the Class Period was higher than pre-Class Period sales).  *See Azar*, 2018 WL 6182756, at *19-20 (concluding that stock sales that were disproportionate in proceeds and the number of shares sold during the Class Period contributed to an inference of scienter even though the total percentage sold was lower than the total percentage sold here).

The timing of the stock sales during the Class Period is also suspicious.  DeCesare dumped $1.75 million on ***one*** day during the Class Period within days after false statements were made.  CAC at ¶¶167-68.  No similarly suspicious sale was made before the Class Period.  *Id.*; s*ee also No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 939 (9th Cir. 2003) (absence of insider sales for four months after the class period raised an inference of scienter).  The average price per share sold during the Class Period was also far higher than the price per share sold before the Class Period.  CAC at ¶¶167-68.

The Court should reject Defendants' mischaracterization of *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1061 n.5 (9th Cir. 2008), which never held that the mere existence of a trading plan immunizes a defendant from liability when Defendants continue to hide

when the plan was adopted or amended.  In *Azar*, another court in this District rejected the same mischaracterization of *Metzler* when the court could not determine when the plan was adopted or if it was amended for the purpose of trading on inside information.  2018 WL 6182756, at \*18-19.  Here too, Defendants' decision to hide the trading plan is particularly troubling because none of the SEC filings attached to their Motion show when the plan was adopted or if it was amended shortly before or during the Class Period when Form 4s filed with the SEC typically do contain that kind of information.  *Id.*; ECF No. 144-20, 144-21.

Nor does Defendants' attempt to manipulate the prior trading history based on references to Forescout's IPO or Defendants' restrictions on trading, ID. Mot. at 18, defeat an inference of scienter.  A 15-month Class Period is alleged, and the Court's analysis to assess patterns is restricted to only 15 months before the Class Period or to November 2017 – after Forescout's IPO.  *See Am. W. Holding Corp.*, 320 F.3d at 941 (holding that if the class period consists of ten months, the court's review is limited to only ten months before the class period).  Similar arguments concerning "lockup" periods have also failed.  *Compare In re Juno Therapeutics, Inc.*, 2:16-cv-01069-RSM, ECF No. 55 at 32, (W.D. Wash. Feb. 2, 2017) (arguing that lockup period cuts against scienter) *with In re Juno Therapeutics, Inc.*, No. C16-1069-RSM, 2017 WL 2574009, at \*6 (W.D. Wash. June 14, 2017) (concluding that allegations of "insider sales" were "compelling.").  The lockup period expired in April 2018, **ten months** before the Class Period began, but DeCesare's sales before February 2019 on any given day never came close to the $1.75 million he sold on a single day during the Class Period.  CAC at ¶¶167-68.

The fraud theory shifts somewhat but still focuses on the personal financial motives of the Individual Defendants with Forescout's Q4 2019 reported results being key to Forescout being able to negotiate the Original Merger Agreement price of $33.00 per share.  *See* Section II.C, *supra*.  The desire to keep Forescout's stock price high through an acquisition demonstrates motive, especially given Defendants' large holdings of Forescout stock and the other substantial golden parachute payments the Individual Defendants were entitled to receive upon the closing of the Original Merger Agreement totaling approximately $58.5 million with the alternative being

potentially losing their jobs based upon the demands of shareholder activists who had acquired a 14.5% stake in the Company.  ¶61.

After that, the Original Merger Agreement was the only thing preventing the complete implosion of Forescout's stock price based upon the Company's rapidly deteriorating results of operations and future business prospects.  ¶61.  Indeed, once investors learned of the Q1 2020 results, they started driving down the price of Forescout's stock even without knowing that Advent was unwilling (or unable because of financing concerns) to close on the Original Merger Agreement.  ¶69.  Defendants' opining that the Planned Acquisition would soon close was intended to create a momentum towards closing by publicly contending that Advent was bound by the terms of the Original Merger Agreement and as part of an overall strategy in advance of litigation to enforce the terms of that agreement.  Defendants ignore that Advent levelled that very same accusation at the Company.  *See* Counterclaim ¶¶43-44 (referring to "a made-for-litigation email to Advent" that DeCesare sent on May 14, 2020).

*In re Time Warner Inc. Secs. Litig.*, 9 F.3d 259, 264 (2d Cir.1993), is on point in in holding that a motive creating a strong inference of scienter is properly alleged where concealing adverse information long enough enabled completion of a major corporate transaction.  In *Time Warner,* the corporate transaction at issue was a rights offering but the same rationale applies with equal, if not greater, force to a merger.  *See, e.g., In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 558 (S.D.N.Y. 2010) (actions taken "to keep the merger prospects viable" when defendant would receive a "concrete and personal benefit" from a merger are indicative of scienter); *see also Kalnit v. Eichler,* 264 F.3d 131, 139 (2d Cir. 2001) (a motive exists wherever, there are "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged.").

*Glazer Capital Mgmt., L.P. v. Magistri*, 549 F.3d 376, 748 (9th Cir. 2008), upon which Defendants rely, does not preclude looking to financial incentives even from the consummation of a merger as part of a holistic analysis of whether Plaintiffs have properly alleged fraud.  Instead, *Glazer* limited its holding to "[s]uch allegations *alone*." *Id.* at 748 (emphasis added).  Indeed, any other interpretation of *Glazer* would cause the holding to conflict with the Supreme Court's

---

holding that "personal financial gain may weigh heavily in favor of a scienter inference[.]" *Tellabs*, 551 U.S. at 325.

Here, Plaintiffs' allegations regarding the Individual Defendants' very substantial personal financial motives (¶¶24, 25, 61 and 127.D) do not stand "alone" but, instead, as part of an array of other facts, supporting Defendants' knowledge of the underlying materially false or misleading statements, which they failed to disclose to Plaintiffs and other investors (*e.g.*, ¶¶132, 138-141, 144, 148, 151, 156) and, Plaintiffs respectfully submit, should be viewed as helping allege a strong inference of scienter.

## C.    THE COMPLAINT SUFFICIENTLY ALLEGES LOSS CAUSATION

Defendants contend that the Court did not specifically address their "narrower argument" for alleging loss causation. FSCT. Mot. at 24. However, in fact, the Court acknowledged that very argument in the first sentence that appears under the Order's discussion of loss causation. Order at 16. Regardless, this "narrow argument" continues to lack merit because it fails to recognize that many shareholders who bought the Company's stock between October 2019 and February 2020 also purchased shares before October 2019 *and* retained their shares through the corrective disclosures in February 2020. Indeed, Meitav, which is a Lead Plaintiff, bought Forescout shares throughout the Class Period and *did not* sell out its shares after the February 6, 2020 announcement. ECF No. 86-1 (loss chart for Meitav). Hence, one of the Lead Plaintiffs in this Action itself relied on every single statement alleged to be false and suffered a loss with the revelation of the truth after each and every partial disclosure. Speculation without production of evidence in an attempt to knock out hypothetical shareholders not named in the SAC is insufficient to prevail even on summary judgment. *Taylors Int'l Servs.*, 2010 WL 2520996, at *10 (disregarding unsworn facts asserted in a brief to deny motion for summary judgment).

Defendants continue to confuse issues of whether a lead plaintiff has standing with loss causation, but Lead Plaintiffs here have standing to assert claims for all the statements. *See Kelly v. Elec. Arts., Inc.*, 71 F. Supp. 3d 1061, 1069 (N.D. Cal. 2014) (ruling that appointed lead plaintiff did not have standing to pursue claims for post-purchase statements).

---

Defendants' continued reliance on *Camp v. Qualcomm, Inc.*, Case No. 18-cv-1208, 2020 WL 1157192, at *7 (S.D. Cal. Mar. 10, 2020), remains grossly inappropriate because their purported "intervening events" regarding the pandemic contradict the well-pled allegations of the SAC. FSCT Mot. at 25. Defendants ignore that all the declines in stock price revealed concealed risks about the massive deterioration in Forescout's business that began in early 2019, including serious problems with its sales pipeline and sales productivity, both of which relate to the pre-merger and post-merger periods, but their position is not sufficient to prevail on a motion to dismiss. *See Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 966, 984 (N.D. Cal. 2015) (noting that whether there are alternative causes for the decline in price is not an appropriate consideration at the pleading stage).

### D.     THE COMPLAINT ADEQUATELY ALLEGES SECTION 20(a) CLAIMS

Having sufficiently plead a primary violation of Section 10(b), and because Defendants do not dispute "control," Plaintiffs' Section 20(a) control person claims should also be sustained. *See Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000).

## IV.     CONCLUSION

Therefore, for all the reasons stated above, Defendants' Motions to Dismiss should be denied in their entirety. Should the Court again find the Complaint wanting in any respect, Plaintiffs respectfully request leave to amend the pleadings in order to cure any such deficiencies. *See Eminence Capital, LLC v. Aspeon, Inc.,* 316 F.3d 1048, 1051-52 (9th Cir. 2003) (leave to amend should be granted "with extreme liberality," especially in securities fraud cases); *see also Slack Techs, Inc.*, 445 F. Supp. 3d at 367 (noting that leave to amend should be granted even without a formal request if there is any possibility to cure a pleading defect); *cf. In re Century Aluminum Co. Sec. Litig.*, No. C 09-1001 SI, 2011 WL 830174, at *10 (N.D. Cal. Mar. 3, 2011) (dismissing claim only after multiple rounds of motion practice).

Dated:  August 2, 2021

Respectfully submitted,

**POMERANTZ LLP**

By:  /s/ *Omar Jafri*
Patrick V. Dahlstrom
Omar Jafri
Ten South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
E-mail: pdahlstrom@pomlaw.com
       ojafri@pomlaw.com

-and-

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
E-mail: jpafiti@pomlaw.com

-and-

Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
E-mail: jalieberman@pomlaw.com
       ahood@pomlaw.com

**ABRAHAM, FRUCHTER
  & TWERSKY, LLP**

By:  /s/ *Jeffrey S. Abraham*
Jeffrey S. Abraham
(admitted *Pro Hac Vice*)
Michael J. Klein
(admitted *Pro Hac Vice*)
One Penn Plaza, Suite 2805
New York, NY 10119
Telephone: (212) 279-5050
Facsimile: (212) 279-3655
E-mail: JAbraham@aftlaw.com
       MKlein@aftlaw.com

-and-

Takeo A. Kellar (SBN 234470)
11622 El Camino Real, Suite 100
San Diego, CA 92130
Telephone: (858) 764-2580
Facsimile: (858) 764-2582
E-mail: TKellar@aftlaw.com

*Co-Lead Counsel*