Anne Johnson Palmer (CSB #302235)
ROPES & GRAY LLP
Three Embarcadero Center
San Francisco, CA 94111-4006
Tel: (415) 315-6300
Fax: (415) 315-6350
Anne.JohnsonPalmer@ropesgray.com

Charles D. Zagnoli (admitted *pro hac vice*)
ROPES & GRAY LLP
191 N. Wacker Dr., 32nd Floor
Chicago, IL 60606
Tel: (312) 845-1200
Fax: (312) 845-5522
Charles.Zagnoli@ropesgray.com

Peter L. Welsh (admitted *pro hac vice*)
C. Thomas Brown (admitted *pro hac vice*)
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199-3600
Tel: (617) 951-7000
Fax: (617) 951-7050
Peter.Welsh@ropesgray.com
Thomas.Brown@ropesgray.com

*Attorneys for Defendant*
*Forescout Technologies, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| CHRISTOPHER L. SAYCE, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> FORESCOUT TECHNOLOGIES, INC., MICHAEL DECESARE, and CHRISTOPHER HARMS, <br><br> Defendants. | CASE NO.: 3:20-cv-00076-SI <br><br> <u>CLASS ACTION</u> <br><br> **DEFENDANT FORESCOUT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS SECOND CONSOLIDATED AMENDED COMPLAINT** <br><br> Date:  September 17, 2021 <br> Time: 10:00 A.M. <br> Dept.: Courtroom 1, 17th Floor <br><br> Before: Hon. Susan Illston |

## **TABLE OF CONTENTS**

I.    PLAINTIFFS' OPPOSITION DOES LITTLE TO ADDRESS THE SAC'S
      FUNDAMENTAL FLAWS AS IDENTIFIED IN THE MOTION TO DISMISS ............... 1

II.   PLAINTIFFS HAVE NO REAL RESPONSE TO THE FACT THAT MOST
      CHALLENGED STATEMENTS FALL UNDER THE PSLRA'S SAFE HARBOR ........... 3

III.  PLAINTIFFS FAIL TO ESTABLISH ANY MISSTATEMENT ........................................ 5

      A.    Plaintiffs' Vague, Anecdotal Pipeline Allegations
            Say Nothing About Forescout's Ability to Meet Guidance
            or Make Genuine, Optimistic Pipeline Assessments ................................................... 5

      B.    Plaintiffs Have Not Alleged Any Misstatements About the Sales Force ................... 8

      C.    Plaintiffs' Ever-Shifting Channel-Stuffing Theory Falls Short ............................... 10

      D.    Plaintiffs' Channel-Partner Claim Rests on Wild, Unsupported Speculation .......... 11

      E.    Plaintiffs Fail to Plead Particularized Facts to Suggest That the Illustrative
            Guidance or the Risk Factor in the Proxy Statement Were Misleading ................... 12

      F.    The Merger Statements Are Nonactionable ............................................................. 13

IV.   THE OPPOSITION IDENTIFIES NO COGNIZABLE HARM FOR STOCK
      PURCHASES MADE IN THE FOUR-MONTH GAP IN THE SAC'S CLAIMS.............. 15

V.    CONCLUSION........................................................................................................... 15

DEFENDANT FORESCOUT'S REPLY
ISO ITS MOTION TO DISMISS                                    CASE NO. 3:20-CV-00076-SI

## TABLE OF AUTHORITIES

Page(s)

### CASES

*In re Alphabet Sec. Litig.*,
　　1 F.4th 687 (9th Cir. 2021) ....................................................................................... 14

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
　　856 F.3d 605 (9th Cir. 2017) ..................................................................................... 14

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
　　880 F. Supp. 2d 1045 (N.D. Cal. 2012) ..................................................................... 10

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
　　No. 5:11-CV-04003, 2013 WL 2156358 (N.D. Cal. May 17, 2013).......................... 13

*In re Copper Mountain Sec. Litig.*,
　　311 F. Supp. 2d 857 (N.D. Cal. 2004) ......................................................................... 7

*In re Cutera Sec. Litig.*,
　　610 F.3d 1103 (9th Cir. 2010) ..................................................................................... 4

*In re Cutera Sec. Litig.*,
　　No C 07-2128, 2008 WL 11395505 (N.D. Cal. Sept. 30, 2008),
　　*aff'd*, 610 F.3d 1103 (9th Cir. 2010)........................................................................... 4

*In re CV Therapeutics, Inc. Sec. Litig.*,
　　No. C 03-03709, 2004 WL 1753251 (N.D. Cal. Aug. 5, 2004)................................... 4

*In re Dura Pharms., Inc. Sec. Litig.*,
　　452 F. Supp. 2d 1005 (S.D. Cal. 2006)......................................................................... 6

*Frenzel v. AliphCom*,
　　76 F. Supp. 3d 999 (N.D. Cal. 2014) ........................................................................... 5

*Golub v. Gigamon Inc.*,
　　847 F. App'x 368 (9th Cir. 2021) ................................................................................. 3

*Golub v. Gigamon Inc.*,
　　No. 17-cv-06653, 2019 WL 4168948 (N.D. Cal. Sept. 3, 2019),
　　*aff'd*, 847 F. App'x 368 (9th Cir. 2021)........................................................................ 4

*Kwok Kong v. Fluidigm Corp.*,
　　No. 20-cv-06617-PJH, 2021 WL 3409258 (N.D. Cal. Aug. 4, 2021) ......................... 1

*McGovney v. Aerohive Networks, Inc.*,
　　367 F. Supp. 3d 1038 (N.D. Cal. 2019) ........................................................................ 7

-ii-

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
540 F.3d 1049 (9th Cir. 2008) ............................................................................... 12

*In re New Century*,
588 F. Supp. 2d 1206 (C.D. Cal. 2008) ................................................................... 6

*Omnicare Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015)............................................................................................... 14

*In re Pivotal Sec. Litig.*,
No. 3:19-cv-03589, 2020 WL 4193384 (N.D. Cal. July 21, 2020) ...................... 15

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
759 F.3d 1051 (9th Cir. 2014) ................................................................. 2, 3, 6, 12

*In re Quality Sys., Inc. Sec. Litig.*,
865 F. 3d 1130 (9th Cir. 2017) ............................................................................ 2, 6

*In re Sprint Corp. Sec. Litig.*,
232 F. Supp. 2d 1193 (D. Kan. 2002)..................................................................... 14

*UTStarcom, Inc. Sec. Litig.*,
617 F. Supp. 2d 964 (N.D. Cal. 2009) ..................................................................... 6

*Wochos v. Tesla, Inc.*,
985 F.3d 1180 (9th Cir. 2021) .......................................................................*passim*

*Yaron v. Intersect ENT, Inc.*,
No. 19-cv-02647-JSW, 2020 WL 6750568 (N.D. Cal. June 19, 2020)........................ 10, 11

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) ............................................................................ 2, 12

DEFENDANT FORESCOUT'S REPLY
ISO ITS MOTION TO DISMISS                                    CASE NO. 3:20-CV-00076-SI

## SUMMARY OF ARGUMENT

Plaintiffs' opposition, Dkt. 153 ("Opposition" or "Opp."), fails to explain how any new allegations in the SAC[1] cure the defects in its predecessor. Most fundamentally, the SAC's narrative of a collapsing sales force and deteriorating pipeline—which relies on nonactionable predictions and subjective beliefs, and on CWs not alleged to have had any contact with the persons making the challenged statements—simply does not square with Forescout's actual revenue results during the class period. The Opposition makes plain that, even on their fourth complaint, Plaintiffs cannot meet the PSLRA's high pleading bar. For these reasons, and others set forth below and in the Individual Defendants' reply ("ID Reply"), which Forescout joins, the SAC should be dismissed with prejudice.

## ARGUMENT

### I.   PLAINTIFFS' OPPOSITION DOES LITTLE TO ADDRESS THE SAC'S FUNDAMENTAL FLAWS AS IDENTIFIED IN THE MOTION TO DISMISS

The Opposition tellingly makes little effort to address three basic flaws in the SAC's claims.

***First***, Plaintiffs cannot reconcile their story of an "unreliable" pipeline and collapsing sales force with actual results: Forescout met its unrevised guidance in the first two quarters of 2019, announced a 3Q2019 miss ***early***, proactively lowered 4Q2019 guidance, and then missed the new fourth quarter guidance by only 2.4%. "These results, largely on point to projections, cut sharply against plaintiff's charge that defendants' statements were misleading." *Kwok Kong v. Fluidigm Corp.*, No. 20-cv-06617-PJH, 2021 WL 3409258, at *8 (N.D. Cal. Aug. 4, 2021) (dismissing complaint when, "in stark contrast" to claims of "poor performance," company beat guidance in two quarters and missed by "a mere two percent" in the last). These results are fatal to a case resting on claims that Forescout knowingly gave false projections and hid its sales force's supposed collapse.

***Second***, the Opposition fails to explain how a few new CW allegations, differing little from the earlier allegations, cure the problems identified in the Order dismissing the prior complaint. Like the old CWs, the new CWs mainly offer vague, anecdotal claims and rumors from low-level staff who had little to no personal contact with senior executives, and no claimed knowledge about forecasts' preparation, company-wide trends, or challenged statements. O.B. at 12–15; *see* Order

---

[1] Capitalized terms have the meanings given to them in Forescout's Motion, Dkt. 143 ("O.B.").

at 6 (CW allegations "too vague to establish falsity"), 10 ("CAC lacks details of how defendants develop their revenue projections"). The Opposition argues that CW18 was a senior executive because his title allegedly included the word "Global," Opp. at 11, but Plaintiffs neglect to allege his supposed seniority level compared to other personnel, ¶ 40(G). CW18 was a "manager," and other CWs in "manager" roles clearly did not qualify as senior executives. *E.g.*, ¶¶ 36, 38. This is but one of many examples of how the CWs uniformly fail to allege the necessary basis for their claimed knowledge and reliability and particularized facts supporting their conclusory claims. O.B. at 12; Order at 6–7; *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990–91, 996 (9th Cir. 2009).[2] Plaintiffs cannot dodge this basic pleading requirement by labeling it "minutiae." Opp. at 11–12.

*Third*, the Opposition underscores that Plaintiffs' falsity theory rests solely on CWs' subjective assessments of deals' prospects and the business's strength, rather than on specific facts contradicting any public statements. Plaintiffs even admit that CW18's allegation about the number of deals prematurely classified as "committed" reflects "CW18's *own assessment* about the sales pipeline." Opp. at 11 (emphasis added). But Plaintiffs still plead no facts to suggest that Defendants shared any CW's views of the pipeline or sales force, or to adequately challenge Defendants' "subjective assessments" of the business. Order at 8; *see* O.B. at 11, 17–18; *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1194 (9th Cir. 2021) (rejecting employees' self-declared view that goal was "impossible"); *Zucco*, 552 F.3d at 998; *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1063 (9th Cir. 2014). Also, Plaintiffs cannot explain how allegations about internal assessments of the pipeline (and internal classifications of particular deals) relate to, much less show the falsity of, company-wide revenue guidance—which Forescout consistently met.

In now pointing to the "shift towards cloud computing," Opp. at 9, Plaintiffs ignore that

---

[2] Plaintiffs' comparison to the director's allegations in *Quality Systems* highlights the deficiency of the SAC's CW allegations. Opp. at 18. No CW here was a director or had anywhere near a director's level of seniority and information access. Also, unlike any CW here, the *Quality Systems* director alleged specific facts about company projections and their preparation process, directly connected allegations of business issues to specific statements, and alleged a basis for the director's forecasting knowledge. *In re Quality Sys., Inc. Sec. Litig.*, 865 F. 3d 1130, 1138 (9th Cir. 2017); Am. Compl., *In re Quality Sys., Inc. Sec. Litig.*, No. 13-cv-01818, Dkt. 26 (C.D. Cal. Apr. 7, 2014), ¶ 1 (director alleged revenues were decreasing "contrary to [statements] promising revenue growth of 20–24%"), ¶ 120 (director discussed projections with executives), ¶ 147 (facts about forecasting process).

DEFENDANT FORESCOUT'S REPLY
ISO ITS MOTION TO DISMISS                                    CASE NO. 3:20-CV-00076-SI

Forescout disclosed the challenges posed by cloud systems at the class period's start. O.B. at 14. Regardless, competitive pressure from emerging technology and an alleged expert's hindsight opinion do not establish fraud. O.B. at 14–15, *citing City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, No. 5:11-CV-04003, 2013 WL 2156358, at \*7 (N.D. Cal. May 17, 2013).

## II.    PLAINTIFFS HAVE NO REAL RESPONSE TO THE FACT THAT MOST CHALLENGED STATEMENTS FALL UNDER THE PSLRA'S SAFE HARBOR

The Opposition also fails to address the hurdle Plaintiffs face because of the PSLRA's safe harbor, instead making conclusory arguments unsupported by any analysis. Four key points underscore that the vast majority of the challenged statements are nonactionable as a matter of law.

*First*, Plaintiffs concede (as they must) that most statements are plainly forward-looking under the safe harbor, instead disputing only whether a few scattered statements are. O.B. at 7–11 (explaining why, *e.g.*, ¶¶ 89, 91, 97, 108, 110, 113, 115, 117, 120, and 133 are forward looking); Opp. at 10–11, 13, 16, 25–27 (ignoring these arguments). And the few times they do engage on this point, their arguments are unconvincing. Plaintiffs mistakenly assume that opinions about the Merger's prospects cannot also be forward-looking. Opp. at 27. In fact, the safe harbor protects forward-looking opinions. *Golub v. Gigamon Inc.*, 847 F. App'x 368, 373 (9th Cir. 2021) (applying safe harbor to forward-looking opinions). Here, statements that Forescout "expected" or "looked forward" to the Merger's closing disclosed Defendants' objectives and predictions for the Merger's future course. O.B. at 7–8. The mere use of "expect" or "look forward to" does not make a statement non-forward-looking. *See Wochos*, 985 F.3d at 1195–96 ("[w]e expect that we will continue to experience challenges" fell "squarely within the statute's definition" of forward looking); *Police Ret.*, 759 F.3d at 1058 ("we continue to expect" ongoing growth was "plainly" forward-looking projection). Also, Plaintiffs are flatly wrong when they say, "Defendants do not dispute that Forescout's February 28, 2020, statement" about channel partner–related growth strategies "was one of historical fact." Opp. at 23. Defendants expressly explained why that statement was forward-looking. O.B. at 8. Plaintiffs apparently have no response. Plaintiffs note in passing the Court's holding that three statements from the May 9, 2019, conference call made non-forward-looking, concrete assertions about sales productivity and pipeline, Order at 5–6, but Plaintiffs ignore the other

-3-

statements from the May 9 call.  Opp. at 16; *e.g.*, ¶¶ 97, 108.  Forescout explained in detail why these statements (and others) were forward-looking.  O.B. at 7–11.  Plaintiffs again offer no response.

*Second*, Plaintiffs nakedly claim that some cautionary language was too generic to be meaningful, but they make no effort to reconcile their bare conclusion with the language itself.  Opp. at 10–11.  In fact, Forescout adequately disclosed the very risks Plaintiffs claim occurred.  O.B. at 9–10; *see In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112 (9th Cir. 2010) (sufficient to warn of risks in "ability to continue increasing sales performance" and "failure to attract and retain sales and marketing personnel"); *In re Cutera Sec. Litig.*, No C 07-2128, 2008 WL 11395505, at *9 (N.D. Cal. Sept. 30, 2008), *aff'd*, 610 F.3d 1103 (9th Cir. 2010).  Plaintiffs wrongly claim that Defendants' cautionary statements were inadequate because they described risks as possibilities when the risks had supposedly started to occur.  Opp. at 10–11, 23–24, 25–26.  The SAC alleges insufficient facts to support this argument.  *Infra* at Part III.D–F.  Defendants specifically disclosed—on the class period's first day—that Forescout was *already* experiencing market shifts and competitive pressures, O.B. at 14, and that Forescout faced the risks Plaintiffs claim later affected 3Q and 4Q2019 revenue, *e.g.*, Ex. 1; *see also* O.B. at 9–10, 19; ¶ 31, 40(A)–(H), 46 (alleged sales force and revenue-generation issues began later in class period).[3]  Defendants also cautioned investors about the Merger risks in the press release announcing the deal, O.B. at 10; Ex. 14—weeks before Advent first allegedly expressed concern, ¶ 65, and before partners could have terminated because of the deal.  *Cf. In re CV Therapeutics, Inc. Sec. Litig.*, No. C 03-03709, 2004 WL 1753251, at *11 (N.D. Cal. Aug. 5, 2004) (cited by Opp. at 11) (unlike Forescout, issuer *already knew* risks had materialized when it issued risk factors).  The safe harbor's cautionary-language prong thus protects forward-looking statements here, regardless of the speaker's state of mind or actual knowledge.  O.B. at 7.

*Third*, Plaintiffs make little effort to address the safe harbor's actual knowledge prong, which independently protects any forward-looking statements not accompanied by meaningful cautionary language.  O.B. at 7, 10, Parts II–III; ID-MTD at Part III; ID Reply at Part II; *Wochos*, 985 F.3d at

---

[3] Forescout indeed rebutted Plaintiffs' claims that the risk factors accompanying the Illustrative Guidance were too generic and failed to disclose lost business partners.  *Contra* Opp. at 25; *see* O.B. at 9–10 & n.6, 16 n.10, *citing* Ex. 16; *infra* Part III.D.  Cautionary language is adequate when (like the Illustrative Guidance's) it refers to other filings' risk factors.  *Golub v. Gigamon Inc.*, No. 17-cv-06653, 2019 WL 4168948, at *9 (N.D. Cal. Sept. 3, 2019), *aff'd*, 847 F. App'x 368 (9th Cir. 2021).

-4-

1190. For the April 23, 2020, Merger statement, in particular, Plaintiffs attempt to use their brief to add an unpled basis for Mr. Milliken's knowledge, Opp. at 27–28 n.11; ¶¶ 142–45, but "[i]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." *Frenzel v. AliphCom*, 76 F. Supp. 3d 999, 1009 (N.D. Cal. 2014) (quotation omitted). In any event, nothing in the SAC or Opposition suggests Mr. Milliken knew on April 23, 2020 that the Merger would not close. O.B. at 22–24; *infra* at Part III.F.

*Fourth*, with the exception of a few nonactionable Merger-related opinions, *infra* Part III.F, Plaintiffs make no effort to explain how (even if the safe harbor had not applied) Defendants' many opinions would be actionable despite the law's protections for such statements. O.B. at 11.

## III.    PLAINTIFFS FAIL TO ESTABLISH ANY MISSTATEMENT

Against the background of Plaintiffs' disjointed case theories and their failed attempt to elude the PSLRA safe harbor, the Opposition also fails to rescue the seven categories of inadequately pled misstatements addressed in Plaintiffs' brief.

### A.    Plaintiffs' Vague, Anecdotal Pipeline Allegations Say Nothing About Forescout's Ability to Meet Guidance or Make Genuine, Optimistic Pipeline Assessments

The Opposition makes no effort to show how Forescout's positive statements about its ability to achieve guidance, let alone general assessments of its pipeline, were knowingly false or misleading when made.[4] Plaintiffs simply repeat their narrative of a collapsing sales function, ignoring that Forescout met its guidance in the first two quarters of 2019 and only missed operative guidance by single-digit percentages in the final two. The notion that the guidance or optimistic assessments were knowingly false is not credible against this backdrop—especially given the lack of any factual allegation suggesting that senior executives doubted their own statements or had information, at the time they spoke, indicating that Forescout would miss guidance (which it in fact consistently met).

Contrary to the Opposition's strawman, Forescout did not claim that Plaintiffs must "find[ ] a CW who admits to preparing a false forecast and provides documentary evidence that a defendant knew the forecast was false." Opp. at 18. Rather, Defendants noted that the SAC fails to plead a

---

[4] Plaintiffs misread the Motions to challenge only the SAC's claims about revenue guidance. Opp. at 17. Defendants have consistently and explicitly explained why Plaintiffs' allegations fail to show that *any* pipeline statement was false or misleading when made. *E.g.*, O.B. at 11, 15, 17–18.

-5-

DEFENDANT FORESCOUT'S REPLY
ISO ITS MOTION TO DISMISS                                          CASE NO. 3:20-CV-00076-SI

single fact to show how pipeline classifications affect guidance, much less how any specific fact about pipeline categories rendered guidance false when issued. O.B. at 15–16. Plaintiffs point to allegations that some CWs felt pressure to categorize deals as "committed" before the deals were (in the CWs' view) definitively committed, that either 20% or "half" of pipeline deals were "unreliable," and that unspecified "committed" deals were included in forecasts. Opp. at 10, 12. But these allegations say nothing about how supposedly misclassified sales prospects would affect forecasts' preparation. Plaintiffs (and their CWs) cannot even allege that Defendants ignored the risk that some deals forecast for a given quarter might slip or fall through. O.B. at 15–18. These allegations do not suggest that the public projections were knowingly false when made. Order at 8, 10.

The Opposition also cannot explain how optimistic statements about Forescout's ability to meet guidance based on its pipeline were somehow false or misleading. The Opposition barely notes Forescout's puffery argument, making no effort to identify any particular positive statement that described objectively verifiable, specific pipeline facts. Nearly all statements were the sort of vague, subjective assessments routinely deemed puffery.[5] O.B. at 15; Order at 7–8. Plaintiffs also conflate the PSLRA's safe harbor with puffery—a distinct doctrine that specifically applies to vague, subjective statements of corporate optimism. *See* Opp. at 17–18, 19 (citing safe harbor cases); *Police Ret.*, 759 F.3d at 1058 (ruling on safe harbor and puffery as distinct, alternative dismissal grounds).

The CWs' attacks on the pipeline's strength lack the specificity required to convert general and optimistic descriptions of the pipeline into fraudulent misstatements. *E.g.*, ¶¶ 36, 52. For example, the Opposition points to CW18's unsupported assessment that 1 in 5 deals were prematurely classified as "committed." ¶ 99(D). Of course, CW18's assessment says nothing about the views of the executives actually making public statements about revenue and the pipeline. The

[5] Plaintiffs' cases are inapposite. Opp. at 19. *UTStarcom, Inc. Sec. Litig.* did not address puffery. 617 F. Supp. 2d 964, 971 (N.D. Cal. 2009). *In re Dura Pharms., Inc. Sec. Litig.* held that "generalized" statements about "strong" sales *were* puffery; the statements were actionable because well-pled allegations suggested the speakers could not have reasonably believed the statements (a scenario absent here). 452 F. Supp. 2d 1005, 1033 (S.D. Cal. 2006); *see* O.B. at 11. *In re New Century* held that statements about credit quality and underwriting could be objectively verified against industry standards, unlike the subjective assessments here. 588 F. Supp. 2d 1206, 1125–26 (C.D. Cal. 2008). The *Quality Systems* statement made far more verifiable, specific representations than a mere statement that "pipeline 'continued to grow,'" ¶ 117. *Quality Sys.*, 865 F.3d at 1143.

-6-

DEFENDANT FORESCOUT'S REPLY
ISO ITS MOTION TO DISMISS                          CASE NO. 3:20-CV-00076-SI

variation in CWs' claims about the alleged classification "error rate" highlights the subjective nature of their assessments:  CW18 claims that Force Management thought half the pipeline deals were miscategorized, ¶ 50, but Plaintiffs now say CW18 disagreed with that assessment, Opp. at 11.  In any event, no specific allegations explain how supposed uncertainty in 20% of the deals would make it false or misleading to describe the pipeline as "strong," "healthy," or adequate to meet guidance. Notably, Defendants disclosed to the market (in statements Plaintiffs do not challenge) that the pipeline was several times larger than the internal bookings plan.  O.B. at 17–18.  This missing context "makes it difficult to understand the severity of the problem or whether that actually had an impact on" the Company's ability to meet guidance or on the pipeline's overall strength.  *McGovney v. Aerohive Networks, Inc.*, 367 F. Supp. 3d 1038, 1056–57 (N.D. Cal. 2019); *see In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 867–68 (N.D. Cal. 2004).  That some deals were allegedly classified as "committed" prematurely does not indicate that those deals would never close, much less that the pipeline was so precarious that vague, positive assessments were fraudulent.

Contrary to Plaintiffs' claim, Defendants did not "assume CW18's statements about missed sales targets referred to FY 2018."  Opp. at 11; *see* O.B. at 17.  CW18's fatally vague statements merely predicted missed sales targets "for the next three or four quarters," without identifying (even implicitly) the quarters to which CW18 was referring.  ¶ 83.  But whether that prediction referred to late 2018 and early 2019, or only to 2019, makes no difference to Defendants' point:  Forescout met its unrevised guidance ***through 2Q2019***, despite Plaintiffs' claim that Defendants somehow knew in 2018 that guidance was inflated and CW18's prediction that Forescout would miss those quarters' sales targets.  However CW18's allegations are construed, they show missed guidance was ***not*** the inevitable result of the miscategorized deals alleged by CWs—underscoring the major gap between the SAC's pipeline allegations and its theory of false guidance or untenable confidence.  O.B. at 17.

Finally, Plaintiffs all but concede that they failed to address the Court's prior holding dismissing the "tech win" claims. *See* Order at 9; O.B. at 18.  Plaintiffs point only to an allegation that a sales manager allegedly instructed personnel to mark deals as "committed" once negotiations started. *See* Opp. at 18–19, *citing* ¶¶ 84–85, 99(F), 122(C).  This allegation still offers no basis to infer that the deals the Individual Defendants described as "tech wins" were the same deals CWs say

DEFENDANT FORESCOUT'S REPLY
ISO ITS MOTION TO DISMISS                                    CASE NO. 3:20-CV-00076-SI

were not "committed"—much less that the "tech win" deals were not situations where customers had generally decided to use Forescout technology but continued to consider specific deal terms.  O.B. at 18.  Plaintiffs may not have to "prove" their claims at the pleading stage, Opp. at 18, but they do have to allege enough facts to meet the PSLRA's exacting standard.  The SAC again fails to do so.[6]

### B.      Plaintiffs Have Not Alleged Any Misstatements About the Sales Force

The Opposition effectively concedes that the SAC alleges no actionable statements about the sales force.  The Opposition makes no real effort to explain how the SAC has addressed the Order's holding that the CWs' sales force allegations are "too vague to establish falsity."  Order at 6; O.B. at 18.  Nor do Plaintiffs seriously dispute that the vague, non-numerical sales force statements identified in Forescout's Motion are immaterial puffery.  Opp. at 14–15; Order at 7; O.B. at 18 & n.12.  Plaintiffs summarily conclude that March 4, 2019, statements that Forescout was "hiring like crazy" and had "increased visibility" would be material to investors (and thus allegedly not puffery) because of a different statement, made months later on May 9, that "nothing has changed at those levels."  Opp. at 14–15.  Plaintiffs neglect to explain the supposed connection between these statements, let alone why Defendants' statements were sufficiently specific and verifiable to be actionable.  O.B. at 18 & n.12.  Plaintiffs passingly argue that Defendants knew facts contradicting their optimism, Opp. at 14–15, but the Opposition points to no such allegations, and the SAC makes none.  O.B. at 19.

Plaintiffs imply that Mr. DeCesare misled investors when he said that Forescout was "hiring like crazy" and had visibility into its pipeline because of its percentage of tenured sales reps, without disclosing some vaguely alleged employee departures.[7]  Opp. at 13–14.  But no allegations suggest

[6] Contrary to Plaintiffs' suggestion, Opp. at 17, the SAC does not claim that statements about "extended approval cycles" or EMEA economic conditions were false.  *See* ¶¶ 119 (challenging statements about business fundamentals and pipeline growth as false or misleading), 121–123 (challenging revenue results and guidance based on allegations about sales force and business performance).  And Forescout did explain why the SAC failed to plead that those statements were misleading.  O.B. at 11, 14–15, 18.  Even if Plaintiffs could now improperly use their brief to add an unpled falsity claim for these statements, the SAC would still plead no facts to suggest that extended approval cycles and EMEA conditions did *not* cause the guidance misses.  Order at 9–10.

[7] Plaintiffs again conflate the percentage of tenured salespeople with sales productivity.  *E.g.*, Opp. at 15 (drop in tenure percentage allegedly "eras[ed] all the productivity gains from previous years," an apparent reference to past tenure percentages); *id.* (characterizing discussion of tenure percentage as "tout[ing] the rise in productivity").  The SAC pleads no particularized facts about productivity

-8-

that Forescout was *not* "hiring like crazy" or that alleged departures had impaired Forescout's pipeline visibility as of March 2019.  The SAC alleges nothing about Forescout's hiring practices at all, and it alleges no particularized facts about the visibility Forescout gained from tenured salespeople.  Nor do the alleged departures make the statements misleading.  Mr. DeCesare also explicitly stated that "not everybody works out," and he cautioned investors that he did not "ever expect this [percentage of tenured salespeople] to get to 100%."  ¶ 87.

Plaintiffs identify no facts suggesting that sales departures had meaningfully begun *before* Defendants made their statements, such that the statements could have been false or misleading when made. O.B. at 19.  Plaintiffs concede that they do not challenge any sales force statement made after August 2019. Opp. at 20 n.6.  But no particularized facts suggest that any significant sales departures had begun before that date.  O.B. at 19.  Plaintiffs point to vague allegations about unquantified departures from a single group or type of role at loosely defined or unspecified times, or about Forescout supposedly having unspecified "plans" to terminate sales jobs at some undefined future point.  Opp. at 14; ¶¶ 38(A), 40(B), 88(A); *see* O.B. at 18–19.  But these allegations fail to suggest that the alleged departures so affected the sales function that Defendants could not have reasonably expressed confidence in the sales force at the time they spoke.  Similarly, Plaintiffs repeat CW18's allegations about the total number of employees in certain roles at the *end* of 2019 or about trends that allegedly played out across the entire year.  Opp. at 14, 15; ¶¶ 40(G), 88(A)–(B), 95(C).  But nothing in these allegations bears particularly on the sales force's status in the beginning or middle of 2019, when the executives spoke.  O.B. at 19.  The SAC lacks particularized facts to suggest any challenged statements were false or misleading when made—let alone that Defendants knew the sales function was performing poorly when they offered vague, optimistic assessments of it.

Plaintiffs claim that Defendants implicitly referred to the sales force every time they said they had "visibility" into the guidance and pipeline, but this claim finds no support in the statements or logic.  Opp. at 20 n.6; *see also id.* at 15.  Defendants attributed their visibility to numerous sources,

---

*declines* in 2019.  Contrary to Plaintiffs' suggestion, Opp. at 15, Mr. DeCesare did not suggest the tenure percentage tied to productivity when he merely commented on expectations for various cohorts' productivity levels.  Ex. 2 at 5.  Similarly, read in context, the statement that "nothing has changed at those levels" refers—not to productivity—but to the "investment levels" Forescout planned to achieve to reach positive operating margins.  ¶ 93; Ex. 8 at 11-12; Opp. at 14.

-9-

including executives' observations in the field and conversations with employees and customers. ¶¶ 44, 100(H), 104, 115; Exs. 8, 10, 11. Indeed, Plaintiffs' scienter theory rests on allegations that Mr. DeCesare spent significant time in the field talking with customers, "micromanaging" the sales team, reviewing sales databases or reports, and monitoring big deals. Opp. at III(B)(4); ¶¶ 45(C); 100(B); 127(B). Nothing in the SAC suggests executives did *not* have visibility into the pipeline at any point, and Plaintiffs have utterly failed to explain why investors would understand bare references to visibility as references to sales force tenure specifically. *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1060–61 (N.D. Cal. 2012) (whether statements are misleading evaluated from reasonable investor's perspective).

### C.       Plaintiffs' Ever-Shifting Channel-Stuffing Theory Falls Short

The Opposition defends Plaintiffs' channel-stuffing theory by distorting their allegations. Plaintiffs accept the Order's definition of channel stuffing as the "oversupply of distributors in one quarter to artificially inflate sales, which will then drop in the next quarter as the distributors no longer make orders while they deplete their excess supply." Opp. at 20 n.7, *quoting* Order at 10. Plaintiffs allege no facts that indicate such practices, much less with the particularity that the Ninth Circuit requires for channel-stuffing claims. O.B. at 20–22; Order at 10–11. Plaintiffs note Advent's allegation that Forescout gave non-standard discounts directly to *customers* in *1Q2020*, Opp. at 20–21, but Plaintiffs fail to explain how this allegation shows that Forescout committed channel stuffing through a *reseller* in *4Q2019*. ¶ 125; O.B. at 20–22. Indeed, the Opposition repeatedly claims that Forescout committed some sort of channel stuffing in 1Q2020, Opp. at 20–21, but the SAC only alleges that channel stuffing occurred in *4Q2019* and supposedly rendered *4Q2019* revenue results false or misleading, ¶¶ 124–25—as even the Opposition's section heading recognizes, Opp. at 20. The unpled discount theory the Opposition now asserts for the first time does not fit Plaintiffs' own channel-stuffing definition. Nor do the facts: Plaintiffs claim channel stuffing decreases revenue in later quarters, *id.* at 20 n.7, 21, but they admit Forescout's revenues *rebounded* in 2Q2020, *id.* at 21. Plaintiffs' endlessly shifting channel-stuffing theories reveal how baseless the claim is.

In any event, giving discounts (or selling hardware at a loss) does not render actual revenue results false or misleading. *Yaron v. Intersect ENT, Inc.*, No. 19-cv-02647, 2020 WL 6750568, at *7

-10-

(N.D. Cal. June 19, 2020) (cited by Opp. at 21–22) (dismissing claim that revenue results and guidance were false or misleading simply because company gave discounts to boost sales).  As in *Yaron*, the SAC offers no particularized allegations that reported 4Q2019 results were false—that is, "that customers did not order the products they bought or that [Forescout] had misrepresented the revenue for [the] quarter." *Id.*  Nor does the SAC allege facts suggesting that Forescout used channel-stuffing to hide poor performance while it touted the opposite; to the contrary, Forescout ***pre-announced*** expected 4Q2019 revenue declines in October 2019 by lowering its guidance.  Forescout even disclosed that it may face "increased pressure for pricing discounts."  Ex. 3 at 15; *id.* at 30, 35.

Plaintiffs curiously explain away ***their own allegations*** that the auditor opinions somehow suggest channel stuffing; Plaintiffs now argue that the opinions are irrelevant to the novel channel-stuffing theory first asserted in their Opposition.  Opp. at 22–23; O.B. at 21–22.  Plaintiffs strain credulity by speculating that auditors might have found material channel stuffing in 4Q2019, ignored it because it made an immaterial difference to full-year results, and still declared the financial statements accurate and consistent with GAAP.  Opp. at 22; O.B. at 21.  Having pled no details about specific transactions, or even circumstantial evidence of channel stuffing, Plaintiffs' claim fails.

### D. Plaintiffs' Channel-Partner Claim Rests on Wild, Unsupported Speculation

Plaintiffs claim that statements about Forescout's "growth strategy" of investing in channel partner relationships, and certain risk disclosures about the Merger's effect on Forescout's business, were false or misleading because the Company had allegedly "already lost" three business partners due to the Merger when the statements were made.  Opp. at 23–25; *e.g.*, ¶¶ 129, 133, 136.  Plaintiffs fail to explain why three partners' alleged terminations due to the Merger would prevent Forescout from executing a go-forward strategy of investing in channel partner relationships—or why that statement of future intent would otherwise be false or misleading simply because some business partners had terminated in the past.  O.B. at 23 n.15.  Plaintiffs also have not (and cannot) allege ***when*** the partners allegedly terminated—a key fact on which their falsity theory hinges.  O.B. at 16 n.10, 23 n.15.  The Opposition's only response is to point to Advent's unrelated allegation in the Merger litigation that Forescout's business supposedly "cratered" in late February 2020.  Opp. at 24–25, 38–39.  But the Delaware pleadings include nothing suggesting that lost business partners caused

-11-

or even contributed to this alleged decline. Neither Advent nor Forescout attributed the alleged decline to lost business partners; indeed, Forescout denied that the business had "cratered" at all.[8] SAC Ex. 3, ¶ 26. Plaintiffs claim that the PSLRA's heightened pleading standards allow them to simply speculate, without any alleged factual basis, as to the date that partners terminated. Opp. at 24–25. The PSLRA requires more. *Zucco*, 552 F.3d at 990–91. That is especially true when Plaintiffs' entire theory as to these statements hinges on whether the business partners terminated before or after the statements were made. O.B. at 23 n.15, *citing Wochos*, 985 F.3d at 1196. Plaintiffs cannot assume a critical, central fact without actually pleading any particularized basis for it.[9]

### E.    Plaintiffs Fail to Plead Particularized Facts to Suggest That the Illustrative Guidance or the Risk Factor in the Proxy Statement Were Misleading

Plaintiffs make no serious effort to defend their claim that the Illustrative Guidance was false or misleading because channel partners had allegedly terminated and Forescout's revenue had supposedly declined in 1Q2020. Opp. at 25–26. The SAC does not even explain why investors would have been misled into viewing the Illustrative Guidance as an operative forecast when it was published in March 2020. Forescout had disclosed on February 6, 2020, that it was "suspending financial guidance for the first quarter and full year 2020 as a result of the pending" merger. Ex. 14. The Proxy explicitly described the Illustrative Guidance as "preliminary, but not finalized, revenue guidance that Forescout management shared with the Strategic Committee" of the Board and a financial advisor months earlier to support the advisor's merger-related financial analyses. Ex. 16 at 61. Reasonable investors would not view months-old, preliminary, "illustrative" guidance as an

---

[8] Plaintiffs wrongly claim that Forescout "fix[ed] the impact" of the terminations "as having been evident" in the last week of February 2020: Forescout only admitted that Advent purported to characterize sales data from late February, denied Advent's characterization of the data, and (like Advent) said nothing at all about partner terminations. Opp. at 38–39, *citing* SAC Ex. 3, ¶ 26.

[9] Plaintiffs irrelevantly note that Defendants did not argue the partners terminated after later Merger-related filings, whose risk factors (Plaintiffs claim) incorporated the challenged partner statements. Opp. at 25. But the SAC does not attack the later press releases' risk factors as false or misleading; it attacks only their statements about the Merger's expected closing. ¶¶ 146–48, 153–57 (alleging only that risk factors were "generic"); Opp. at 29. Regardless, Plaintiffs (not Defendants) bear the burden of pleading when the terminations occurred. *Police Ret.*, 759 F.3d at 1057–58 (listing elements "complaint must allege"). Plaintiffs cannot plead that critical fact with the required particularity. *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008); *Zucco*, 552 F.3d. at 990.

-12-

indication of Forescout's current projections, especially after Forescout disclaimed any intention to publicly forecast revenues. *Royal Oak*, 880 F. Supp. 2d at 1060–61 (whether statements are misleading evaluated from reasonable investor's perspective).

Plaintiffs also do not meaningfully address their failure to plead any particularized facts suggesting that the Illustrative Guidance was knowingly unachievable or that any accompanying risk factors were misleading. *See* O.B. at 16 n.10; *supra* at Part III.D; Opp. at 25–26.  Instead, Plaintiffs claim that if the pandemic caused Forescout's 1Q2020 revenue decline, then Defendants must have known about the revenue shortfalls before they issued the Proxy on March 24, 2020, since the pandemic was declared on March 11.  Opp. at 26.  But the fact that the entire market knew of the pandemic's *existence* does not establish that Defendants actually knew—two weeks after the pandemic began—that the pandemic would prevent Forescout from meeting the Illustrative Guidance.  1Q2020 results missed the Illustrative Guidance by only $5 million, ¶ 13, even though that guidance was prepared in January 2020, well before the pandemic arose.  Ex. 16 at 61 (Forescout gave Morgan Stanley the Illustrative Guidance "[i]n late January 2020").  Indeed, the Illustrative Guidance was first disclosed on March 3, 2020, before the WHO's pandemic declaration.  Ex. 27.

### F.      The Merger Statements Are Nonactionable

Plaintiffs do not dispute that Defendants had no freestanding, affirmative duty to guess at Advent's future actions before Advent definitively announced its intentions.  O.B. at 22–23.  And yet Plaintiffs continue to insist that Defendants should have guessed at and then disclosed Advent's putative intentions before Advent even did.  Defendants simply had no such duty.  *Id.*

Statements that Forescout "expect[ed]" or "look[ed] forward" to the Merger's closing, ¶¶ 146, 149, 154, are protected by the PSLRA's safe harbor.  *See supra* at Part II.  But even if analyzed as opinions, as the Opposition mistakenly proposes, Opp. at 27–30, the statements remain nonactionable.  *See Wochos*, 985 F.3d at 1188–89 ("[T]here are substantial limits in applying [falsity] theories to a pure statement of honest *opinion*.").  Plaintiffs concede that the speakers believed the Merger would close and that their belief had a reasonable basis.  *See* Opp. at 28.  Plaintiffs argue only that Defendants knew undisclosed facts that supposedly "seriously [] undermine[d]" the opinions' accuracy.  *Id.*  But "pleading [opinions'] falsity under an omissions theory [is] 'no small

-13-

task for an investor.'" *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615 (9th Cir. 2017), *quoting Omnicare Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 194 (2015). "[L]iability is not necessarily established by demonstrating that an issuer knows, but fails to disclose, some fact cutting the other way, because reasonable investors understand that opinions sometimes rest on a weighing of competing facts." *Id.* (quotation omitted). "Instead, an investor must call into question the issuer's basis for offering the opinion by identifying particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the [issuer] did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id.* (quotation omitted). The SAC falls well short of this high standard.

As of April 23, 2020, Advent had said it was "assess[ing] whether" the closing conditions would be met, in the midst of the worst pandemic in a century; even by May 11, Advent had said only that it was "considering" not closing. O.B. at 23–24. Neither comment resembled the Supreme Court's hypothetical in *Omnicare*, contrary to Plaintiffs' inapt comparison, Opp. at 28–29. In that scenario, the company issued its opinion without disclosing that an authority on the subject had reached a ***directly opposite*** opinion. *Omnicare*, 575 U.S. at 188–89 & n.6; *Wochos*, 985 F.3d at 1196 ("Given that a 'pure statement of opinion' is generally not actionable, Tesla's remark . . . that 'great progress' was being made . . . would potentially be an actionable false statement only if . . . Tesla had been making no progress at all.") (citation omitted), *quoting Omnicare*, 575 U.S. at 187.[10] Here, Advent gave no equally definitive indication that it would not close until it sent the May 15, 2020, termination letter—which Forescout disclosed the next business day.[11]  O.B. at 24.  Reasonable

---

[10] Plaintiffs confuse legal doctrines while trying to distinguish this *Wochos* holding. Opp. at 29; O.B. at 11. Plaintiffs rely on a passage from *In re Alphabet Securities Litigation* that discussed falsity standards for risk disclosures. 1 F.4th 687, 703–04 (9th Cir. 2021). But the SAC challenges Defendants' opinions about the Merger, not their Merger-related risk factors. *See supra* n.9. In the *Wochos* passage quoted above, *Wochos* applied *Omnicare*'s distinct opinion standards, 985 F.3d at 1196, which *Alphabet* did not address.

[11] Plaintiffs misplace their reliance on *In re Sprint Corp. Securities Litigation*, 232 F. Supp. 2d 1193 (D. Kan. 2002). There, "DOJ authorities indicated . . . the DOJ was very unlikely to approve the merger under any circumstances." *Id.* at 1219 n.6. Such definitive regulator statements are a far cry from Advent's equivocal statements here. Even *Sprint* dismissed claims based on opinions disclosed before defendants had ***definitive*** indications that the merger was unlikely to proceed. *Id.* at 1220.

-14-

investors reading Defendants' statements in the context of international economic upheaval caused by a global pandemic would expect Advent and Forescout's Board to assess closing conditions and plan for hypothetical contingencies. *See Dearborn*, 856 F.3d at 615; O.B. at 23–24. Defendants had already told investors that the closing's timing was uncertain, that closing conditions might go unmet, and that deal litigation might ensue. O.B. at 10. Before Advent sent its termination letter, Defendants had no duty to disclose every development that might "cut[ ] the other way" from their expectation of a closed Merger. *Dearborn*, 856 F.3d at 616; *see In re Pivotal Sec. Litig.*, No. 3:19-cv-03589, 2020 WL 4193384, at *10–14 (N.D. Cal. July 21, 2020) (opinions about anticipated performance not misleading despite failure to disclose "lengthening sales cycles and diminished growth").

## IV.    THE OPPOSITION IDENTIFIES NO COGNIZABLE HARM FOR STOCK PURCHASES MADE IN THE FOUR-MONTH GAP IN THE SAC'S CLAIMS

Plaintiffs still miss the point regarding stock purchases made by putative class members between October 10, 2019, and February 6, 2020. The problem is not that the named Plaintiffs lack standing or did not purchase their shares at the right times. Opp. at 46. Rather, the named Plaintiffs purport to assert claims for a class that would include members who bought shares during that window—and yet the SAC has failed to allege any viable loss causation theory as to those purchases. O.B. at 24–25. Plaintiffs put the cart before the horse when they call this pleading defect "speculation without production of evidence" or suggest the issue raises fact disputes. Opp. at 46–47. Plaintiffs cannot proceed to discovery on claims that are defectively pled on their face.

## V.    CONCLUSION

The SAC should be dismissed with prejudice. "[T]he district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint," as Plaintiffs have done three times. *Metzler*, 540 F.3d at 1072 (citation omitted).

Date:  August 24, 2021                      Respectfully submitted,

                                            **ROPES & GRAY LLP**
                                            */s/ Anne Johnson Palmer*
                                            Anne Johnson Palmer (CSB #302235)

                                            *Attorneys for Defendant Forescout Technologies, Inc.*

-15-