**Pages 1 - 38**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Susan Illston, Judge

CHRISTOPHER L. SAYCE,             )
Individually and On Behalf of  )
All Others Similarly Situated, )
                                  )
          Plaintiff,              )
                                  )
  VS.                             )  **NO. C 20-00076 SI**
                                  )
FORESCOUT TECHNOLOGIES, INC.,  )
MICHAEL DECESARE, and          )
CHRISTOPHER HARMS,             )
                                  )
          Defendants.            )
_____)

San Francisco, California
Friday, September 17, 2021

**TRANSCRIPT OF REMOTE ZOOM VIDEO CONFERENCE PROCEEDINGS**

**APPEARANCES VIA ZOOM:**

For Plaintiff:
                    POMERANTZ LLP
                    10 South LaSalle Street, Suite 3505
                    Chicago, Illinois  60603
               BY:  **OMAR JAFRI, ATTORNEY AT LAW**
                    **PATRICK V. DAHLSTROM, ATTORNEY AT LAW**

                    ABRAHAM, FRUCHTER & TWERSKY LLP
                    11622 El Camino Real, Suite 100
                    San Diego, California 92130
               BY:  **JEFFREY S. ABRAHAM, ATTORNEY AT LAW**
                    **MICHAEL J. KLEIN, ATTORNEY AT LAW**

        **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED REMOTELY BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
                    CSR No. 7445, Official Court Reporter

**APPEARANCES VIA ZOOM:**   (CONTINUED)

For Defendant Forescout Technologies, Inc.:
                          ROPES & GRAY LLP
                          800 Boylston Street
                          Boston, Massachusetts 02199
                 BY:  **C. THOMAS BROWN, ATTORNEY AT LAW**

                          ROPES & GRAY LLP
                          191 North Wacker Drive, 32nd Floor
                          Chicago, Illinois 60606
                 BY:  **CHARLES D. ZAGNOLI, ATTORNEY AT LAW**


For Defendants Michael DeCesare and Christopher Harms:
                          WILSON, SONSINI, GOODRICH & ROSATI
                          650 Page Mill Road
                          Palo Alto, California 94304
                 BY:  **DIANE M. WALTERS, ATTORNEY AT LAW**
                          **IGNACIO SALCEDA, ATTORNEY AT LAW**

**Friday - September 17, 2021**                                    **10:04 a.m.**

                          P R O C E E D I N G S

                               ---o0o---

THE CLERK:  This is Civil Matter 20-76, Sayce versus Forescout Technologies, Inc., et al.

Counsel, starting with plaintiff, would you please state your appearance.

MR. JAFRI:  Good morning, Your Honor.  This is Omar Jafri from Pomerantz for the plaintiff.

THE COURT:  Good morning.

MR. ABRAHAM:  Your Honor --

MR. DAHLSTROM:  Patrick Dahlstrom from Pomerantz on behalf of the plaintiffs.

MR. ABRAHAM:  Your Honor, Jeffrey Abraham from Abraham, Fruchter & Twersky for plaintiffs as well, and with me is Michael Klein in my conference room.

THE COURT:  Good morning.

MR. KLEIN:  Good morning, Your Honor.

MR. BROWN:  Good morning, Your Honor.  C. Thomas Brown of Ropes & Gray on behalf of defendant Forescout Technologies, and with me is my colleague Charles Zagnoli.

THE COURT:  Good morning.

THE CLERK:  You're on mute.

MS. WALTERS:  I apologize.

Good morning, Your Honor.  Diane Walters with Wilson

Sonsini Goodrich & Rosati on behalf of the individual defendants.

THE COURT:  Good morning.

MR. SALCEDA:  And good morning, Your Honor.  Ignacio Salceda, also of Wilson Sonsini, on behalf of the individual defendants.

THE COURT:  Good morning.

Is that everybody?

THE CLERK:  That's everybody.

THE COURT:  I think it is.

All right.  Well, welcome.  This is defendants' motions to dismiss the second amended complaint, which includes a lot more confidential witnesses than the previous one and includes more about the Advent merger than the previous one.

I'm still not persuaded that there's enough information in here to make out the requirements that the plaintiffs have for stating claims under the standards of the PSLRA.

But, first, let me ask.  The complaint now has exhibits attached from the Delaware litigation that have redactions in them.  Do the plaintiffs have access to unredacted documents of those?

MR. ABRAHAM:  No, Your Honor.

THE COURT:  Okay.  The defendants do, presumably; but the plaintiffs don't?

MR. BROWN:  We would, Your Honor.  The documents would

have been filed and subject to the confidentiality orders in the Delaware Court of Chancery where those claims were first filed.

**THE COURT:**  Right.  Okay.  All right.  Well, anyway, I would be happy to hear from the plaintiffs.

**MR. JAFRI:**  Good morning, Your Honor.  This is Omar Jafri.

**THE COURT:**  Yes.

**MR. JAFRI:**  I will address the statements that were made before the merger, or before the announcement of the merger on February 26, 2020; and then I will hand it over to Mr. Abraham to focus on the merger-related statements from February 26, 2020, onwards --

**THE COURT:**  All right.

**MR. JAFRI:**  -- with respect to his arbitrage clients.

I presume that you may already have an order in mind.  So I will focus on what I think are the most important statements that also were really not addressed in the motions.  Those were the ones that were made in May of 2019, in August of 2019, in October and November of 2019.

Many of these statements involved misrepresentations about technology wins, and they involved concrete misrepresentations where misleading statements were made about the nature of the pipeline and how many technology wins had already been garnered.  There really wasn't much of an attempt to focus on the statements that we emphasize in bold, about those

statements.

But you have already, I think, found in your previous order that at least many of the ones in May of 2019 were concrete representations of fact.  But initially, you had said that you were not convinced that there was enough there to show that they were false or made with scienter.  But based on the Court's previous order, many of those statements have already been deemed to not be forward-looking, and the safe harbor does not apply to them.

There is new information from new confidential witnesses that shows why those specific statements were misleading, if not false.

And the standard here is, it doesn't have to be a literally false statement.  The standard is whether it's a misleading statement or not.

They made concrete misrepresentations at that point, saying that "We already have all these deals in the oven; that there are technology wins," which means that --

**THE COURT:**  Which paragraphs are you thinking of now, Mr. Jafri?

**MR. JAFRI:**  Your Honor, these are the ones that begin on -- these are the ones that begin on page -- they start with page 97.

**THE COURT:**  Page 97?

**MR. JAFRI:**  I'm sorry.  Paragraph 97, which is page 35 of

the second amended complaint.

**THE COURT:**  Okay.

**MR. JAFRI:**  And so, you know, the ones that are bolded here, you know, these are statements like (reading):

". . . every one of those deals is still in the pipeline."

This is on 97.

You know, (reading):

". . . we had . . . very large account . . . . We've already been awarded the business."

And then you go on with similar statements where, again, on paragraph 101 on page 39 they again say (reading):

"Those deals are ones where we've already got the technology win."

". . . and land is getting larger, we feel like there is plenty of pipeline to deliver upon the guidance," for the rest of the year.

Then on paragraph 105, he makes a specific misrepresentation where he says that (reading):

"[Look] we [already] have [these] technology [sic] wins [sic] in these [sic] accounts, meaning that they've chosen us.  So it's very -- it's not common for a customer to award a technology win to a vendor and then not buy their product for an extended period of time."

This is what he said.

If you compare the reply brief to this statement, in the reply brief, the new justification for why these statements are not misleading is that:  Look, we may have had the technology wins; but, you know, we needed additional time to get the money and the specific deals done.

So either what Mr. DeCesare said here was misleading or the speculation in the reply brief is inaccurate.

And the reason why these statements that have already been deemed as concrete misrepresentations of fact were, in fact, misleading is because Mr. DeCesare, according to Confidential Witness 17 and Confidential Witness 18 and Confidential Witness 20, viewed data on Clari, which is an electronic platform that provided him with realtime information about the status of deals at every juncture.

There is an advertising brochure that we requested judicial notice of.  We are not requesting judicial notice of the website.  We are requesting judicial notice of the statement that Mr. DeCesare made.  And that's something that defendants regularly will request courts to take judicial notice of.  But at the moment, they don't want you to consider that statement.

In that statement, he said that Clari provides unparalleled visibility into the sales pipeline, and he admitted that he used it.  That platform provided realtime

information about all the nitty-gritty that you would need to know about the status of each and every single deal.

There is criticism in the papers that we didn't say what was provided by this platform and when it was provided and what Mr. DeCesare specifically saw.  But on paragraph 45 -- 43 -- sorry -- we explained from --

**THE COURT:**  43, you said?

**MR. JAFRI:**  43, Your Honor.

On 43, there are quotes describing what Clari does.  These are taken specifically from Clari's own website where it describes its own software.

It says that you will always know what's going on with your reps, your deals, your pipeline and forecast in purpose-built application; and that your forecast is always up to the minute and accurate, whether you have five sales representatives or 5,000; and that you will know when you are short on the pipeline, see which deals are at risk, predict outcomes early in the quarter, spot churn risk before it's too late, track sales and buyer activities.

So that's the "what."  That's what it provided.

We know Mr. DeCesare has said publicly -- he's publicly said that he used the software and that it provided unparalleled access -- I'm sorry -- it provided unparalleled visibility into the sales pipeline.  That admission is there.

There's nothing preventing the Court from taking judicial

notice of the fact that he made the statement.  No one is saying you should -- you should accept it for the truth of the matter asserted.  It's for the -- it's for the fact that he made the statement, and there's no running away from it.

We also have three confidential witnesses that say that he, in fact, used this when he monitored the sales pipeline in the class period.

Separately, we have Confidential Witness 20 who says that Confidential Witness 20 prepared reports for all deals that were valued at over $500,000, and the details of that were provided directly to Mr. DeCesare in weekly meetings about all deals that were over $500,000, including the steps that were required to close the deal, including whether a customer had given final sign-off, whether economic buyers from that customer had agreed to the deal on not.  This was provided to him regularly in weekly meetings.

**THE COURT:**  Provided to whom?

**MR. JAFRI:**  To Mr. DeCesare.

**THE COURT:**  And who provided him that information?

**MR. JAFRI:**  Confidential Witness 20 prepared reports, and those reports were provided to Mr. DeCesare in meetings with Mr. Aaron Martin, who was the senior revenue operations officer.

And these reports were specifically provided so that Mr. Martin could then provide Mr. DeCesare with all details

about what the status of each deal was and, specifically, what was required to close the deal.

Now, if you look at this in conjunction with all the other -- the CWs that we had initially alleged -- and I know you initially said:  Well, that's not enough to assure that these statements may have been misleading because, you know, these may have been one-off transactions and things of that sort.

Well, the fact is that there were numerous confidential witnesses who said that they were either pressured to count deals worth $1 million or more as committed or ran them through as committed deals and that, in fact, there was no commitment and the deals never worked out.

Now we know that he had weekly information provided to him about all deals that were $500,000.  So he knew what the status of those -- all those other deals was.

With respect to the pressure campaign, I believe that the -- Your Honor, the only thing that the initial order had said about why, you know, you didn't think that there was enough pled is, I think you said there may have been an inconsistency about who created the pressure.

And we clarified in our second amended complaint that Mr. DeCesare was pressuring SecurityMatters, which was a separate entity that was recently purchased with Forescout. Confidential Witness 13 said that the pressure came directly

from Mr. DeCesare and that Mr. Redmond was instigating the pressure campaign internally at Forescout.  So there's no inconsistency there, either literally or as a matter of interpretation.

Now, if you go back to the other statements which were misleading with respect to the fact that they knew that there was deterioration in the pipeline, that there were a lot of these deals that were, in fact, not committed, we now have two new confidential witnesses who provide more direct testimony and say that not only were these deals just committed and just, you know, hanging out there in the netherworld, but they were included in the company's forecasts and projections.  I believe Confidential Witness 18 said that and Confidential Witness 19 also said that.

And so if you -- if we now consider the fact that we have all this additional information and we look at the context in which these statements were being made, the only responses that the defendants have come up with are twofold.

First, they say you haven't pled that, when these confidential witnesses were talking about these deals which were unreliable or for which they were pressured or the deals with respect to the Clari reports or the Confidential Witness 20 reports that were provided, that those specific deals are the ones that he was talking about.

Well, that's just another way of saying:  Provide proof

specifically, provide the smoking gun or your case should be dismissed.

But the Supreme Court and the Ninth Circuit do not require us to plead a smoking gun.  We are only required to plead enough facts to show that there is an equally cogent and compelling inference of fraud.  And ties break in our favor.  And so with respect to that point, we are not required to plead that kind of evidence.

With respect to the second thing that now they are saying, which is "Well, there could have been tech wins but there was just a delay in the process," the statement that I pointed to you is contradictory to that.  Mr. DeCesare said, "They don't take that long.  That's why we're sure this is going to work out."  And then it didn't work out.

In the third quarter, the company had a poor financial performance; and it blamed, at that point, deterioration in Europe, Middle East, and Africa, which is only 15 percent of its business.

We said that was a misleading statement in light of what we've pled in the Americas.  The defendants never challenged the falsity.

THE COURT:  What quarter -- what year is this quarter now that you're talking about?

MR. JAFRI:  Your Honor, they started announcing that they would have poor quarterly results in the third quarter of 2019.

They preannounced these several weeks before. And they said it was because "We've had some" -- "We've had some macroeconomic problems in the Europe, Middle East, and Africa region," when that was barely 15 percent of the business.

And that was a misleading statement because they didn't disclose all the problems that were occurring in the United States or the fact that they were relying on unreliable deals and, yet, creating this impression that everything was in the oven.

Now, in terms of these tech wins, these are not amorphous statements about unspecified deals or unspecified tech wins.

He was repeatedly questioned pointedly by analysts: Well, why is it that you think this is all going to work out at the end when you're now coming and telling us that these deals will slip?

And he said: Look, even if these slip -- deals slip again, our pipeline is so large and we have so many tech wins in it that we will still meet all our objectives.

That was a misleading statement. It was false because, in fact, it turned out not to be true. If there was so many tech wins in the pipeline and it was so large and robust, why did they preannounce poor quarterly results in the third quarter? And then why did they miss the guidance in the fourth quarter? And why did the business crater and implode in the beginning of 2020?

You have to ask yourself this.  And there is no explanation for it.  There is no non-culpable inference of fraud in light of the actual facts.

Their story about this is to effectively disregard the inconvenient facts and only focus on selected facts to paint this narrative that nothing went wrong here with the company's performance.

Now, when we look at this idea that they've painted where, you know:  We kept preannouncing poor results; so we never missed our guidance.  That's the theme here.  So dismiss the case because nothing happened.

Let's go back to May of 2019 when these concrete misrepresentations started to be made.  At that point they preannounced for second quarter and said:  We'll only have 14 percent growth compared to the double-digit growths that we were encountering before.  Right?  They come and say this.  And the story is:  All these deals are in the oven.  It's large. It's robust.  Everything is going to be fine based on the current information that we have.  It'll all work out at the end of the year.

What happens?  The stock price reacts negatively.  There's a 16 percent decline.  Tens of millions are lost in terms of investments because of that.  So the market is negatively reacting.  It's a material event.  That's what happens when they preannounce poor quarterly results.

Then the spin is everything's going to work out.  So you have to assume that must have been true, when it turned out that it wasn't, because they, again, go back in the third quarter and preannounce and say:  We're going to not do as well as we should.  Then the story becomes:  It's because of these one-offs and macroeconomic problems in Europe and the Middle East.

They've never challenged that statement in their motion to dismiss.  They claim that we didn't allege it as a misleading or a false statement, but it's there.  In paragraph 117 and 120, we allege those as misleading statements.  It's there.  It's left unchallenged.  The Court is not obligated to dismiss statements that the defendants never challenge.

And so -- and I've explained to you why that's misleading, because they didn't disclose the full truth about the deterioration in the pipeline, which was known to them through Clari and through Confidential Witness 20's granular reports about the status of all deals over 500,000 that were provided on a weekly basis to Mr. DeCesare.

THE COURT:  What does "granular" mean?

MR. JAFRI:  So, Your Honor, if you look at what Confidential Witness 20 said about those reports -- this is on page -- I'm sorry -- 45(H) through (J).  And in paragraph 45(H), it says that during these weekly calls where these reports were provided, the pipeline, sales pipeline was

extensively discussed, "including deals that were expected to close or not expected to close, and whether any other steps were required to help facilitate closing such as legal review of customer contracts."

Now, take this in conjunction with the other CWs who say the deals were not committed, even though they were being counted into projections and forecasts, because they didn't have sign-off from the buyers and they didn't have the final legal contract or purchase orders.

So they were having these discussions, which means he knew about those deals; and yet, he went there and he made these misleading statements.  He misrepresented the nature of the sales pipeline.

All they have tried to do is to recast all of this as this case is about projections and guidance.  Well, we cited the actual case law, for which there is radio silence in the reply.

Forget the guidance.  Forget the projections for a moment. In *Quality Systems*, the Ninth Circuit said that the guidance was subject to dismissal because the cautionary statements were adequate, but it sustained all the other current facts.  So if you look at it from that vantage point, I'm only talking about the current misrepresentations of fact, which you've already found were current misrepresentations.

Well, you know, here, they made similar misrepresentations.  And they don't have to be related to the

guidance; and even if they are, they are independently actionable.  And we have pled actual knowledge of facts that undermine those statements and render them misleading, and the facts bore this out.

I mean, you really have to ask yourself:  When he went out there and he said, "Look, these buyers don't take that long to finish deals; you know, the money comes in; it's unusual for them to just keep waiting and for us to work out these specific deal terms," even though now they've come out in their reply and said, "No, no.  Actually, that could have been possible," okay, well, what's true?  Is what is in the reply true, or is what Mr. DeCesare said true?  You really have to question yourself.

And then, second, if it was true what he said, then why did they keep having poor financial results where investors, in fact, negatively react to the news?  16 percent stock drop when they start disclosing that things are not turning out well. And in the third quarter when the initial story also falls apart -- which is these slipped deals will work out later in the year -- there's nearly a 40 percent decline in the company's stock price in October of 2019 because the market understood that what they had been saying in May was false and it reacted negatively.

Your Honor, at this point, unless you have any other questions, I would like to turn it over to Mr. Abraham so he

can focus on the February 2020 statements.

**THE COURT:**  Okay.  And before you do that, since we -- I would like to hear from both sides.  We have until 11:00.

Do the defendants want to respond to Mr. Jafri?

**MR. BROWN:**  Your Honor, I can respond very briefly on a couple of points, reserving -- I think we probably want to hear Mr. Abraham before doing so completely.

But --

**THE COURT:**  Okay.

**MR. BROWN:**  -- I do think that just one key issue to raise in the context of what Mr. Jafri said is I think it really highlights the point we've made consistently throughout our brief about the need for specificity.

The tech wins point goes right to this in the PSLRA standard.  We're accused of all sorts of misstatements regarding tech wins.  I don't even know what deals we're talking about, much less I haven't heard of a single confidential witness who said:  I talked to Mr. DeCesare.  I talked to Mr. Harms.  Or I saw an e-mail from Mr. DeCesare or Mr. Harms who said, "The tech win in Deal ABC, that wasn't true.  They hadn't agreed to accept our technology and ultimately buy it."

There's also a conflation here, in this conversation about the sales pipeline, between what's going on in the making of publicly stated revenue guidance and how the company internally

accounts for what, as it says repeatedly, is a much larger sales pipeline; i.e., a lot of potential deals which may or may not come through.

We never actually hear an answer to the fundamental point that this company, for the first two quarters of the class period, made its guidance as then -- for that quarter as then pending.  The next quarter when it didn't make it, it preannounced; and then it made, ultimately, in the high range of the number that was announced.  And then, in the final quarter, the miss was 2 percent.

These are not numbers that suggest not only, sort of, unknowing, you know, or willful misstatement of revenue guidance.  They also show that generalized statements about the sales pipeline being in good shape and "We're confident of our ability to make returns on that pipeline" being false.

If the story, the narrative that's coming through -- which, by the way, and again to repeat, never gets connected back to any specific statement or anything that Mr. DeCesare or Mr. Harms knew -- then we would see by the story that's being told much worse results than are actually reported.  And the numbers themselves were never disputed.

So we're left with people who are totally removed from the people making statements saying that:  Well, actually, some version of "I kind of disagree with that," which is not enough under the Reform Act, of course, to make a statement; but I

would say even under *Iqbal* here, given the actual results, it's just not plausible to say that Mr. DeCesare and Mr. Harms didn't generally believe, when they were making statements that were positive about the sales pipeline or the sales force, what they were saying. And there's nothing, again, that specifically goes to that.

**THE COURT:** Okay. Thank you.

All right. Mr. Abraham?

**MR. ABRAHAM:** All right. Yes. I just wanted to make sure I'm not on mute, Your Honor.

**THE COURT:** No, you're not muted.

**MR. ABRAHAM:** Thank you.

Anyway, I'm going to start with the channel parties driving growth. And the first time that statement is made is on February 28th, 2020, in the company's Form 10-K filed with the SEC. And there are two statements. One is a statement of existing or historical fact.

And we quoted at paragraph 128 of the complaint that we want to "Expand our presence in the market by leveraging our ecosystem of channel partners."

And in the next paragraph of the complaint, basically we allege that same thing was -- that same representation was made, with the caveat of "could."

But the allegation is, is that the risk had come to fruition by February 28th.

Defendants basically raise two arguments with respect to that, to our understanding.

One is that this wasn't a material misrepresentation, to which our response would be that, future growth being dependent on channel partners -- they took the time to say this -- and then losing the partners was clearly a material fact impacting the company's growth plans.

And with re- -- and the second argument is that we haven't adequately alleged the timing of this event.  Now, we believe that this event, we've adequately alleged, based upon the applicable pleading standards, that it took place before February 28th.

The complaint that the defendant Forescout filed in the Delaware litigation when it was plaintiff, in paragraph 93 says, quote:  Any loss in contracts can, in large part, also be attributed to the announcement of the deal with Advent.

The announcement of the deal took place on February 6th.

And Forescout's answer to Advent's counterclaim, in the counterclaim answer, paragraph 26, also refers to information derived from the pipeline in the last week of February 2020.

So we think there's a sufficient basis on a motion to dismiss to more than reasonably infer -- to strongly infer that those loss of channel partners took place before February 28th, making the statement in the February 28th Form 10-K materially false and misleading.

But even if it had not taken place at that time, even if the loss of the channel partners had not taken place, we allege in paragraphs 133 and 134, with respect to the proxy statement issued on March 24th, that the same statement was made. And March 24th postdates a scenario planning which took place on March 20, 2020, and is referenced in the counterclaim and the counterclaim answer at paragraph 27. And for ease of reference, I'll identify that as Exhibit 3 to the Jafri declaration at page 17.

So from our perspective, it's abundantly clear that by March 24 they knew these facts, which were material facts, about the loss of the channel partners. We also think we've adequately alleged it on February 28th.

Now, as we argued in our brief, these statements made in the 10-K are also incorporated by reference into later statements made by defendants. The 10-K is incorporated by reference into the April 23, 2020, disclosure, and that's at paragraph 148. The -- it's also incorporated by reference, for example, into the May 11th, 2020, disclosure at paragraph 153. The entire 10-K is incorporated into those disclosures, including those statements.

Now, defendants in response argue that we didn't specifically allege it at least with respect to April 23 and May 11th, though we did allege that the entire 10-K was incorporated by reference and, therefore, materially false and

misleading.

But, Your Honor, I hate to be in this position, but that's a relatively easy fix in an amendment, to allege that that statement was repeated in April 23rd, I believe in April 29th, and in May 11th, though we do not retreat from our position that we've adequately alleged falsity on March 24th and February 28th as well.

Defendants also argue that this may not have been that material a fact.  I respectfully disagree, obviously, because they refer to a cratering of the business and they make a big deal of it.  Forescout makes a big deal of this fact itself in its complaint filed in Delaware in paragraph 93 with the language I previously referenced.

And the actual results reflect a dramatic decline.  You have Quarter 1, 2020 decline in revenue that's pretty dramatic. Quarter 2, 2020, you have flat revenue.

And then you get the Schedule 14D-9, which is the tender offer recommendation made in August, with a July case that reflects much lower projections in 2020, 2021, and going forward.  Something caused it.

At this stage of the proceeding, it's fair to infer, more than reasonable, I would say strongly, that it was a loss of channel partners, at least in part, and that's what caused it. And it wasn't disclosed.  And it was a material misrepresentation made in the 10-K, repeated in the proxy, with

all those documents incorporated by reference all over, those statements incorporated by reference, again, April 23, April 29, and May 11.

Now, moving on, again, to the proxy of March 24, which I already mentioned, paragraph 133 has a specific representation about the effect of the pendency of the merger on our business relationships, which I discussed in connection with the channel partners.

There's also illustrative guidance which -- look, illustrative guidance is a forward-looking statement.  I'm not going to deny that.  But in order to be exempt under the PSLRA, you have to have meaningful cautionary language.  And as we argue in our brief and as we allege in our complaint, the cautionary language is, in fact, not meaningful.

The risk factors identified are general economic conditions, the accuracy of accounting assumptions, changes in actual or projected cash flows, competitive pressures, changes in tax law.  That is not the relevant risk factor that's meaningful.

Instead, you have a March 2020 preview of a sudden and sharp decline in operations that's referenced in the counterclaim at paragraph 27, 28, and we refer to in paragraph 137 of our complaint, which defendants, I believe, ignore in their reply brief.

You also have the loss of key channel partners, which

should inform the fact that the illustrative guidance is unachievable.

And even if you take defendants' word on it, which I am skept- -- Your Honor should be skeptical about, as I am, that it's COVID, COVID was already pretty much in full force by March 24th.  We were already in lockdown, at least in New York, and I think the same was true in California.  And this was one week before the end of the fiscal quarter.

So the illustrative guidance itself lacked meaningful cautionary language.  There was actual facts that had happened at that time which caused it to be materially misleading.

And then you get to the issue of the expected closing of the acquisition.  The first statement with respect to that is made April 23rd at a shareholder meeting.  And it's not identified as forward-looking, and no meaningful risk factors were identified at that time.  We allege that in paragraph 145 of the complaint.

Defendants argue that the person making the statement, who was Daniel [sic] Milliken apparently, the company's secretary and then general counsel, that we haven't adequately alleged actual knowledge.  Now, we address this argument in a footnote in our brief, Footnote 11, but I think the facts are pertinent.

Mr. Milliken is required to attend each board meeting as a secretary of the company, if not as general counsel.  At that time, there was no issue more important to Forescout than

whether Advent would continue and proceed with the original merger agreement. They had set up a strategic committee at that time. And it's almost inconceivable that the general counsel wouldn't know about something which at its core was a legal issue.

So I think that if we haven't actually alleged his actual knowledge, I think we're in a position to do so, if we had to, on an amended complaint.

And then the question becomes whether these are forward-looking statements. Plaintiffs believe that these are statements of opinion rather than forward-looking statements. At their core, they relate to Advent's opinion of whether -- excuse me -- Forescout's opinion as to whether Advent would, in fact, consummate the merger.

And the key material fact that they neglected to disclose on April 23rd and April 29th is that they got this April 20th letter from Advent. Now, it's a little bit hard for defendants to say that this letter is not material. It caused them to form a strategic committee. It's specifically referenced in the later 14D-9 tender offer recommendation. It certainly meets all the qualifications as being a material statement, certainly on a pleading motion.

And when you get to May 11th, it's almost mind-boggling that defendants could look forward to closing the deal with Advent when they get a May 8th letter which in their complaint

in Delaware they say Advent signals its intention to renege on the merger agreement.  It's Exhibit 1 to the Jafri affidavit at page 38.  They say by May 8th they had no doubts that they were going to back out.

So, Your Honor, for those reasons, we believe that we've alleged actionable misstatements that -- and -- we've alleged actionable misstatements with respect to all those matters alleged.

I don't know if Your Honor has any questions for me.

THE COURT:  No.  That's fine.

So now, Mr. Brown, or anyone else, do you want to respond?

MR. BROWN:  Yes, Your Honor.  I'll make a few points, and then I need to let Ms. Walters have some time as well.

THE COURT:  Okay.

MR. BROWN:  So on the -- on the channel partners point, I'm still having trouble, again, applying the specificity standard, understanding what channel partner termination supposedly actually occurred, much less that Mr. Harms or Mr. DeCesare knew about.

And if you look at paragraph 128 where they quote the statement, the risk factor is actually about the channel partner strategy.  It's not a statement about any given channel partner saying that they will always be a channel partner forever and ever, hallelujah, amen.

So we don't actually get a single allegation that suggests

that there was anything like the level of cancellation -- even accepting that some confidential witness totally disconnected from the C suite would know anything about this -- that there was somehow an undermining of the ability of the company to execute on a channel strategy, particularly in such a way that a general statement about that strategy would somehow be false or misleading when made.  And, again, that's even before you get to the temporal problem.  Like, we don't see where the timing is.

The illustrative guidance we cover in great detail in our brief.  I think the key point there is, it was disclosed and always stated to be just that:  a set of, at the time of the deal being signed, views about where the numbers might go.  It was never offered as public guidance or a public view and never made as a statement of any sort.

And so I don't really -- I'm having a hard time understanding, like, what's -- what's misleading about saying:  At the time we signed the deal, we provided a set of illustrative guidance to our bankers, saying:  This is where we kind of think numbers will look like for purposes of generating a fairness opinion.

Finally, again, there is not a single allegation that anyone inside of Forescout had knowledge that Advent would not, in fact, close the deal.  They claim that the statements that are false or misleading are ones that say:  We look forward to

closing the deal.  The deal, in fact, closed.

So there is inherent in the argument here that there was some kind of promise there that everybody knew or that we were required to make affirmative speculation about what the timing would be, whether Advent would have some challenge in the course of what was obviously a very difficult time for everyone, as COVID was coming in, to figuring out where the business was going to go.

And so when it comes right down to it, what plaintiffs are asking for on the misstatement argument is simply that there was somehow an obligation, based on speculation inside of Forescout, to make affirmative public disclosure, again, about what Advent's intentions were, which they didn't know.

And to close that out, when they heard that Advent -- when Advent sent them a notice that they weren't closing on May 18th, they disclosed that before the market opened the next time from when they received that notice.

And, secondly, the statements were, in fact, not false because the deal did close.

Unless Your Honor has any specific questions on the misstatement points, I would cede the floor to Ms. Walters on the Sanger points.

**THE COURT:**  All right.  Ms. Walters?

**MS. WALTERS:**  Your Honor, I will just touch upon a few points with respect to plaintiff's comments and, in particular,

with respect to the confidential witnesses.

**THE COURT:**  Can you just speak a little bit louder?

**MS. WALTERS:**  Yes.

**THE COURT:**  Thank you

**MS. WALTERS:**  I apologize.  I want to just touch upon a few points, including, in particular, the confidential witnesses.

So as a general matter, the CW witnesses, both old and new, suffer from several fundamental defects.  None of these CWs claims to have knowledge about any of the challenge statements.  And, in fact, none of them allege that any challenge statement was false or misleading when made.  Also, none of the CWs claim -- claim to have any knowledge about the mental state of either Mr. DeCesare or Mr. Harms at the time any challenge statement was made.

Mr. Jafri mentioned repeatedly access to Clari data and Smartsheet reports, but -- and referred to the availability of granular data.  What he didn't refer to is what that granular data purportedly showed at any given point in time during the class period, much less at the time a challenge statement was made.

Missing are the critical details of who, what, when, and where.  Courts uniformly reject mere access to data allegations as sufficient to plead a strong inference of scienter.  What did that granular data show?  How did it specifically render

any challenge statement false or misleading when made?

I would also add that CW 20, who he repeatedly referred to, was not present in any of the meetings he described and does not allege that he had any personal interaction with Mr. DeCesare or Mr. Harms and as did none of the other CWs alleged to have personal interaction with any of the individual defendants, much less about the challenge statements.

I also would add --

**THE COURT:**  Let me ask you this:  In the abstract, if a CW says, "It was my job to report to my boss, and it was my boss's job to report what I did to a defendant," that's not ever enough?

**MS. WALTERS:**  I would say merely alleging that it was his responsibilities to report is not sufficient because, what was he reporting?  He doesn't have first knowledge -- firsthand knowledge of what was discussed in the meeting.  He wasn't at the meeting.  What did that -- what did that information show?  What did those reports show?

First, what were the reports?  What's the date of the report?  What contradictory information was in that report that rendered any challenge statement false or misleading when made?  The critical -- again, just a critical who, what, when, and where is missing.

So then also, just generally, in a broader sense, another -- the fundamental defect with respect to scienter is

the complaint lacks any particularized facts identifying specific contemporaneous internal documents or statements demonstrating that any of the challenge statements were false or misleading when made, much less deliberately or intentionally, and much less deliberately or intentionally so. And that failure alone warrants dismissal of the complaint.

**THE COURT:** Well, what about all this Clari stuff?

**MS. WALTERS:** The Clari data?

**THE COURT:** Clari, yes.

**MS. WALTERS:** Yes. So the -- at most, what Mr. Jafri is referring to is access to it. So this, again, goes to the point of particularized facts are required.

What did the Clari data show? How did the Clari data render any challenge statement misleading? What is the contradictory Clari data contemporaneous with a challenge statement that rendered it false and misleading when made, much less knowingly or intentionally so?

**THE COURT:** All right.

**MS. WALTERS:** And, Your Honor, if I may, I would just note that this is plaintiff's fourth attempt to state a claim, and we would respectfully submit that dismissal should be with prejudice.

**THE COURT:** All right. Thank you.

Mr. Jafri or Mr. Abraham?

**MR. JAFRI:** Yes, Your Honor.

Very briefly, I wanted to touch on a few points, which I think there's a -- there's a common theme here in both Forescout's arguments and Ms. Walter's arguments on behalf of the individual defendants.

I think what they're really trying to say is that the complaint doesn't say that any of the CWs who were pressured with respect to a specific deal, like the University of Wisconsin deal, that that deal was mentioned in the report provided to Mr. DeCesare.  And that specifically was there; and yet, he went and out and made this false statement.  And when he talked about the tech win, he was really talking about the University of Wisconsin, Madison deal.  Right?

Now, that's another way of saying:  Provide a smoking gun. We reference multiple cases, including from here in the Circuit:  the *Amgen* case, the *Countrywide* case, as well as a recent case involving the looting of the sovereign wealth fund in Malaysia involving the 1IMD scandal where the court sustained the complaint against the senior executives of Goldman Sachs and explained this in detail -- and it's consistent with other cases in the Ninth Circuit -- saying (reading):

> "The Private Securities Litigation Reform Act or Rule 9(b) do not require specificity about dates, times, and places, so long as fair notice of the claims is alleged."

Anything more is untenable.

And all they've done is criticize and get finicky about how, you know, you didn't provide a date for this report and you didn't provide the dollar amount and you didn't provide the smoking gun, so your case should be dismissed.

That is not required.

Now, going back to the idea about the Clari data and Confidential Witness 20's report, without repeating what I've already said, which, you know, I went through specifics in the complaint about what Clari showed, what Confidential Witness 20's information provided to Mr. DeCesare showed.  I gave you paragraph numbers.  So that addresses the "what."

I explained the "why" because clearly he knew about the pressure campaign and those other deals since he was provided with all the information about all the deals over 500,000 or more.

And inferences of scienter have to be from a commonsense perspective.  The Court shouldn't leave its common sense at the doorstep and say:  You haven't provided smoking gun evidence.

And the case law is consistent on this point.  There were two cases that we mention in opposition to the motions to dismiss.  One of them is the *Oracle* case from the Ninth Circuit.  The other one is the *Roku* case.  In both these cases, you had information in databases and you had information provided -- you had general allegations, much more general than

what I think our complaint alleges.  But you had that in combination with defendants saying that they monitored the database, for instance, which Mr. DeCesare has admitted publicly and said that it provides unparalleled visibility.

And that combination of facts alone is sufficient for both the Ninth Circuit and other courts in the Northern District of California.  Both of them have said you don't have to plead all this specificity.  I mean, if that's the -- if that's what we were required to do, then let's just eliminate discovery and trial.  But at least the Supreme Court hasn't said that's what we need to do yet.

So, Your Honor, for those reasons, I think it's much -- it's more than sufficient.  And to the extent that there is even a plausible tie, it breaks in our favor.

Thank you.

**THE COURT:**  All right.  Thank you.

Mr. Abraham, anything?

**MR. ABRAHAM:**  Yes.  I'd like to note that our allegations with respect to the channel partners are not in any way dependent upon confidential witnesses.  They're dependent upon Forescout's own statement in the complaint it voluntarily filed in Delaware state court in which, I will point out, on page 50 of that complaint, paragraph 93, it refers to all those partners as "major partners" in the fifth line of that allegation.  That is a material fact, and it is reasonably tied

to the shortfall in future revenues by Forescout's own words in its own complaint which is an admission.

The other thing relates -- another point relates to the original merger agreement.  My adversary said the merger agreement closed.  That's not correct.  The original merger agreement did not close.  It was litigated.  They came up with a new merger agreement.  So it never closed.

And it's not speculation to say that my partner to the merger agreement has raised issues with respect to whether they will consummate the deal.  That was known internally when they set up the strategic committee after the April 20th letter. It's identified as a material fact in a subsequent SEC filing, in the tender offer recommendation.  It is a material fact that was known internally, and it was the risk that, in connection with the statement of opinion, they were required to disclose under the Supreme Court's decision in *Omnicare*.

And on a final note -- it's not my favorite note -- this is only Glazer's second attempt at pleading a claim.  And if there's any reason -- and I've mentioned certain facts that we fell short.  We are requesting leave to amend.

**THE COURT:**  All right.  Thank you all very much.  Well, I appreciate these arguments.  They have been helpful.  And the matter will be submitted.  You'll hear from me shortly.

Thank you.

**MR. ABRAHAM:**  Thank you, Your Honor.

**MS. WALTERS:**  Thank you, Your Honor.

**MR. BROWN:**  Thank you, Your Honor.

**THE CLERK:**  That concludes the hearing for today. Thank you.

(Proceedings adjourned at 10:55 a.m.)

---oOo---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:  Monday, October 18, 2021

*Ana Dub*
_____

Ana Dub, CSR No. 7445, RDR, RMR, CRR, CCRR, CRG, CCG
Official United States Reporter