Pages 1 -  44

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Susan Illston, Judge

CHRISTOPHER L. SAYCE,               )
Individually and On Behalf of  )
All Others Similarly Situated, )
                                    )
            Plaintiff,              )
                                    )
  VS.                               )  NO. C 20-00076 SI
                                    )
FORESCOUT TECHNOLOGIES, INC.,   )
MICHAEL DECESARE, and           )
CHRISTOPHER HARMS,              )
                                    )
            Defendants.             )
_____)

                        San Francisco, California
                        Friday, March 19, 2021

    TRANSCRIPT OF REMOTE ZOOM VIDEO CONFERENCE PROCEEDINGS

APPEARANCES VIA ZOOM:

For Plaintiff:
                        POMERANTZ LLP
                        10 South LaSalle Street, Suite 3505
                        Chicago, Illinois  60603
                    BY:  **OMAR JAFRI, ATTORNEY AT LAW**
                        **PATRICK V. DAHLSTROM, ATTORNEY AT LAW**

                        ABRAHAM, FRUCHTER & TWERSKY LLP
                        11622 El Camino Real, Suite 100
                        San Diego, California 92130
                    BY:  **JEFFREY S. ABRAHAM, ATTORNEY AT LAW**

        (APPEARANCES CONTINUED ON FOLLOWING PAGE)

Reported Remotely By:  Ruth Levine Ekhaus, RMR, RDR, FCRR
                        CSR No. 12219, Official Court Reporter

APPEARANCES VIA ZOOM:  (CONTINUED)

For Defendant Forescout Technologies, Inc.:
                          ROPES & GRAY LLP
                          800 Boylston Street
                          Boston, Massachusetts 02199
                     BY:  **C. THOMAS BROWN, ATTORNEY AT LAW**

                          ROPES & GRAY LLP
                          191 North Wacker Drive, 32nd Floor
                          Chicago, Illinois 60606
                     BY:  **CHARLES D. ZAGNOLI, ATTORNEY AT LAW**

                          ROPES & GRAY LLP
                          Three Embarcadero Center
                          San Francisco, California 94111.
                     BY:  **ANNE JOHNSON PALMER, ATTORNEY AT LAW**


For the Defendants
DeCesare and Harms:
                          WILSON, SONSINI, GOODRICH & ROSATI
                          650 Page Mill Road
                          Palo Alto, California 94304
                     BY:  **DIANE M. WALTERS, ATTORNEY AT LAW**
                          **IGNACIO SALCEDA, ATTORNEY AT LAW**

Friday - March 19, 2021                              10:07 a.m.

P R O C E E D I N G S

---o0o---

THE CLERK:  Good morning, Judge.

Now calling Case Number 20-cv-76, Sayce versus Forescout Technologies, Incorporated, et al.

Counsel, please state your appearances for the record, starting with the plaintiff.

MR. ABRAHAM:  Your Honor, Jeffrey Abraham for plaintiff.

THE COURT:  Good morning.

MR. DAHLSTROM:  Good morning, Your Honor.  Patrick Dahlstrom from Pomerantz on behalf of Meitav Tachlit Mutual Fund, and the plaintiffs.

THE COURT:  Good morning.

MR. JAFRI:  Good morning, Your Honor.  This is Omar Jafri for the lead plaintiffs.

THE COURT:  Good morning.

MR. BROWN:  Good morning, Your Honor.  C. Thomas Brown of Ropes & Gray on behalf of defendant Forescout Technologies, Incorporated.

THE COURT:  Good morning.

MS. PALMER:  Good morning, Your Honor.  Anne Johnson Palmer also with Ropes & Gray on behalf of Forescout.

THE COURT:  Good morning.

MR. ZAGNOLI:  Good morning, Your Honor.  This is Charlie Zagnoli of Ropes & Gray for defendant Forescout.

THE COURT:  Good morning.

MR. SALCEDA:  Good morning, Your Honor.  This is Ignacio Salceda on behalf of defendants Michael DeCesare and Christopher Harms.

THE COURT:  Good morning.

MS. WALTERS:  Good morning Your Honor Diane Walters of Wilson, Sonsini, Goodrich & Rosati also counsel for the individual defendants.

THE COURT:  Good morning.

Is that everybody?  Looks like it.

Well, good morning to you all.  So far, so good this day because I was able to log on to this Zoom with no trouble.  And I hope all the rest of you had that same small feeling of success as we get going.

This is defendants' motion to dismiss the amended consolidated complaint.  Defendants argue that there's -- there aren't sufficiently pled actionable misstatements; that loss causation is not adequately pled; and that scienter is not adequately pled.

I'll be happy to hear from all of you to add to whatever you have already provided in your papers.

I'll tell you, my preliminary view is to grant the motion. I'm not as convinced that there is inadequate loss causation

alleged, but I am persuaded right now that the -- that falsity has not been adequately alleged.  I think the confidential informants have sort of vague -- vague information.  There are a lot of them, but the information doesn't directly bear, I think, on the falsity of the statements you've alleged; and I think scienter isn't there at this point either.

So that's where I'm starting, but I'll be happy to hear from you.  Perhaps the plaintiffs want to go first, since I'm starting that way.

MR. JAFRI:  Sure, Your Honor.  Good morning.

The first thing that I wanted to mention is, as you mentioned in SlackDeck, the standard for falsity is that the motion should be granted if no reasonable person would find the statement misleading.

Here, you at least have plenty of present statements of current or past fact, including, for instance, that we are hiring like crazy, which was in paragraph 107 of our complaint. The sales force is ramping and maturing.  This statement was, in fact, found actionable in *Schiller versus Newgenics*.

The defendants, in their motions, refer to this as puffery, but they no longer claim that to be the case in their reply brief.

In another earnings conference call, the defendants said that every one of those deals is still in the pipeline.  This is on paragraph 117 of the complaint.

They also repeatedly claim that they had already been awarded the business.  And I believe Mr. DeCesare said, quote, With respect to the customers, they have chosen us.  It is not common for a customer to award a technology win to a vendor and not buy their product.

They also said that they had already built a very large pipeline over many years and had hundreds of sales reps to deliver on the guidance.

All of these statements were made in the context of claiming that these metrics, the sales force, as well as the number of deals that they had already accumulated, provided great, quote/unquote, visibility into the pipeline.

There are two cases in the Northern District.  One of them is *Mulderrig*.  The other one is *Gigamon*.  Both of these cases were cited in our opposition in which similar factual representations were made by the defendants to tie them to, quote/unquote, visibility into how the business would perform, whether it was in terms of guidance or how the business was expected to perform later in the year.

Both Judges Rogers and Davila said that, based on *Quality Systems*, these were present misrepresentations of fact.  They said the safe harbor did not apply; and for those reasons, they sustained the complaint.

All these statements that I mentioned to you are not identified in the defendants' reply brief.  None of them --

some of them are just clearly ignored.  And to the extent that any are discussed, they don't explain why they are not false.

As Judge Koh noted in *Nguyen versus Nissan North American Insurance Company* -- I give you the citation.  It is 2020 Westlaw 5517261 -- the failure to address a party's arguments in the opposition brief at all or even meaningfully amounts to abandonment.

Given that the defendants do not challenge that these statements are statements of present or current fact or that they are false, they cannot now claim that the complaint does not sufficiently plead falsity.

If you -- if you consider the other statements later in the class period, the defendants had said that the earnings misses were caused by poor performance issues in Europe, Middle East, and Africa, and then they blame COVID in the first quarter of 2020.

These statements were false because we believe the CWs and other facts suggest that that is not the real reason, or at least they did not disclose that there was massive deterioration in the sales pipeline, and that an enormous number of people had either left the company or been fired. And for that reason, the statement was at least misleading, if not knowingly false.

On February 6th, they announced financial results.  Our claim is that the revenues were effectively inflated by channel

stuffing schemes, so the actual numbers were false.  There's nothing forward-looking about that.

In terms of the statements of April 29th, 2020, they announced that they were canceling an annual shareholders meeting because of the merger, suggesting that the merger was going to go through and there was no problem at all with the merger.  That, again, has a current representation of fact.  There is nothing forward-looking about that statement.

On May 11, 2020, Mr. DeCesare said that:  We look forward to completing our agreement with Advent.

That is a statement of Mr. DeCesare's state of mind or belief.  At the maximum, it's an optimistic statement.

In *GoPro*, another court in the Northern District said that if you say something like "We believe that we will deliver upon the guidance," even if the guidance may be forward-looking, the fact that you are saying that this is your belief means that it is an opinion and it's not protected by the PSLRA safe harbor.

The defendants do not address this case.  They do not explain why this statement that Mr. DeCesare made on May 11th is a statement of current fact.  They just, in conclusory fashion, state that it was forward-looking without any legal support.

In terms of the basis of falsity, the defendants have elevated the pleading standards.  As Judge Tigar noted in *Twitter*, there is a difference in terms of how you credit the

CWs for the purposes of falsity and scienter.  Scienter, obviously, is a higher standard.

Keeping that in mind, the CWs here say that there was massive attrition in the beginning of 2019 with an entire inside sales team eliminated, an entire department in the public sector division eliminated, and widespread layoffs across multiple divisions as well as multiple departments.

The claim that's made in the motions is that these are just anecdotes, and that they are not reflective of a global sales force headcount.  But that, Your Honor, is categorically wrong.

In the 2020 10-K, the company admitted that sales force productivity had declined from 50 percent at the end of 2018 to 38 percent in 2019.  That figure was a global headcount for all sales representatives.  That backs up the CW allegations.

And the reason why this is so important is if you consider the statements that have been made initially, which are touting sales productivity, and stating that because of the matured and ramped-up nature of the sales representatives -- meaning they have been here for more than two years -- for this reason, we know that we will deliver on the guidance, and everything is hunky dory, and everything is going fine, what they were doing is they were touting the metrics from before.

So -- and by that I mean the figures where they went up from 38 percent in 2017 to 50 percent in 2020.  And then there

was a subsequent decline in 2019 to 38 percent.  So they effectively ended up back to where they were.

They cannot have it both ways.  They cannot tell investors repeatedly that there has been an enormous level of increase in productivity and for this reason we believe that we will deliver on the guidance, or that our sales force is in great shape, yet at the same time, ignore their own admissions in the 10-K which stated that the sales force productivity had, in fact, gone back to what it was.  There is no question that this is about a global sales force.

Now, in terms of the sales pipeline, they repeatedly stated that there were tech wins, which I explain to you that they suggested that we already have the business, and we -- you know, people will not retain us if they didn't want to pay us the money, and so on and so forth.

Here you have multiple confidential witnesses that claimed that they were -- there was a pressure campaign, that they were counting committed deals that were expected to close in a certain quarter as committed, when there was no commitment from buyers.

There are multiple confidential witnesses from different divisions -- such as the pet care division, I believe, another one was in the public sector division, and on and on -- who say that some of these were worth millions of dollars, there was no commitment.  And in one case, the customer had directly said

that "We don't want to buy your product at this point," but there were senior managers who pressured the CWs to count the deals as committed in the pipeline.

Those senior managers were Mr. Jensen and Mr. Redman. Mr. Redman was the chief revenue office of Forescout responsible for all global revenues and sales.  Mr. Jensen was the head of sales for the Americas.  These two individuals were the instigators of the pressure campaign, and they also knew about the illusory nature of the deals and participated in conference calls with customers.

It is not rational to claim that such high level executives would be involved if this was just a back-office operation, and that it didn't matter.  Mr. Redman's involvement in this shows that this was substantial and that it mattered to the company and that it, in fact, did indicate that there was a global problem.

In fact, one CW said that the committed deals where the ones that were expected to close in a quarter.  So, clearly, the company expected to derive revenue from it.  And if that's the case, then certainly it would also mean that they were counted in its forecast, which were then thereby misleading.

Now, I also wanted to talk a little bit about the merger statements because I'm not sure, Your Honor, if you were also talking about those initially when you suggested that you may be inclined to grant the motions.

But on February 6th, 2020, the company announced its actual financial results and stated that there was going to be a merger that was going to go through. This statement was false because the revenue figures were not true. They were subject to a channel stuffing scheme. There's a whistleblower that was identified in Advent's complaint who claims that there was a channel stuffing scheme. That whistleblower worked at Forescout.

In addition, I would note that the Court in In Re: Kinetics said that if you have other strong circumstantial evidence, you don't need to pled specific transactions, times, or dollar amounts.

And while we do not have those, we have plenty of other facts, including the fact that there were heightened discounts that the company admitted giving in the first quarter of 2020. And our complaint explains why those heightened discounts are a telltale sign of channel stuffing. You will not find any response in the reply brief to this claim and therefore it is, again, abandoned. Given that this is a telltale sign, it is additional evidence of a channel stuffing scheme.

Second, the confidential witness who's identified as Confidential Witness 15 said, Merlin, the company that the whistleblower had said was engaged in the channel stuffing scheme, quote, he claimed -- the confidential witness claimed, Merlin agreed to resell products for high value deals even

though Merlin could not close the deal before the quarter.

This is in paragraph 83 of the complaint.  This is twisted in the reply as somehow we made some kind of misrepresentation when we said that this was a regular practice.  It's -- our interpretation of this is that it was a regular practice, because the confidential witness did not identify one deal, the confidential witness identified multiple deals; including another deal that the confidential witness said involved a hospital and that ultimately never closed, but was offloaded to Merlin.

Another fact that is troubling is the fact that the auditors in the 2010 case said that, quote/unquote, revenue recognition was challenging.  They did not give a clean check to the company.

Another fact is that Advent itself stated in its complaint, quote, that there were non-standard discounts and payment terms that had a substantially inverse short- and long-term effect on the company.

So we don't just rely upon the whistleblower.  There are plenty of facts out there to suggest that there was a channel stuffing scheme.

The April 29th, 2020 statement was -- gave a -- suggested that the merger would go through.  But if you look at the complaints that Forescout and Advent filed -- and before I get into this, Your Honor, I wanted to mention one thing which I

think is really critical for the Court to take account of.

In the individual defendants' brief, they cited a Southern District case to claim that allegations from another complaint are never considered.  That's actually not true.  I'm going to give you a citation to the *Mylan Securities* case.  This is at -- this is at 379 F.sup.3d 198.

In this the Court did an extensive analysis on whether you can consider other allegations that come from other complaints.  And contrary to the impression that's been given to the Court in the defendants' papers, it says:  Neither circuit precedent, nor the weight of authority, nor logic dictate that other complaints should be disregarded either in a falsity or scienter analysis.

In that case, the district court sustained an allegation found in the state attorney general's complaint which quoted the CEO as saying that he agreed to fix the prices or allocate market share.

The defendants had similarly said, these are just somebody else's allegations, you know, this doesn't matter.

The Court said the weight of authority is to the contrary.  And it explained in a very sensible fashion why that's the case by saying, this is no different from a news report where you find a fact and then you put it in your complaint.  Obviously, this depends on who filed the complaint, who that party is, and whether the complaint is particularized and substantiated.

Here, the complaint was filed by Forescout and Advent. Advent is the company that bought Forescout and had inside access to its sales pipeline, its sales data, and granular information that even we don't have.  The allegations that we took come straight from there.

Now, let's talk about those allegations.  Forescout, for instance, in its own verified complaint, signed by the same lawyers who now represent the individual defendants, said that there was a massive deterioration in the company's business in the first quarter of 2020.

Second, in Forescout's verified complaint, it says that Mr. DeCesare was told on May 8, 2020, that Advent was considering not going through with the deal, and that Advent's technology had told Mr. DeCesare, personally, this information.

These are not just allegations from a third party.  These are Forescout's allegations.  They are admissions.

In terms of Advent, based on the *Mylan* case that I mentioned to you, the Court can very easily consider these allegations and should credit them.

Here is what happened:  On April 29th, they suggested that the deal would go through.

Now, let's look at the timeline.  On March 20, 2020, Mr. Harms told Advent that the company would face a liquidity crisis without the merger.

On March 25th, Advent said that it was alarmed by the

sales data shared with it.

On March 27th, 2020, Advent stated that the company's business fell off a cliff, quote/unquote, compared to its peers, indicating that the COVID-related excuse was false.

On April 7th, 2020 -- this is a direct quote from Mr. DeCesare, where he admitted, quote/unquote, that the company's projections were unrealistic.

That is the focal point of our complaint, and there is an admission from the defendant that it's true.

On April 14th, 2020, Advent told Forescout that it could not meet the guidance given in the March 20th -- March 2020 proxy statement, which we stated was false.

Subsequent to that -- now about the April 14, 2020 statement, one comment that I wanted to make was this was described as a scrivener's error in the reply brief when, in fact, it appears in the complaint, I believe on paragraph 151, as the basis for falsity.  The defendants do not get --

THE COURT:  Paragraph what?

MR. JAFRI:  151, Your Honor.

THE COURT:  Thank you.

MR. JAFRI:  In 151, it's stated as a basis for falsity.  The defendants do not get to dictate how we write our complaint.  The facts are in there.

Now, too, in between this time period, Advent was being provided with outdated figures that it believed were false and

it was haranguing the defendants to come clean and provide new data, which the defendants didn't do; and Advent described this strategy as implausible.

This was taken from a complaint signed by the same lawyers who signed Forescout's motion to dismiss in this case.

Now, moving on to the May 11th, 2020 statement. As I mentioned to you, Forescout, in its verified complaint stated that Mr. DeCesare was told on May 8th that the company was concerned that it would not go through with the merger.

On May 11th, 2020, Mr. DeCesare went out and said: We look forward to completing our transaction with Advent.

As I explained earlier, the *GoPro* case, as well as *Puma Biotechnology*, two district court decisions from the Ninth Circuit, say statements like this are not protected by the safe harbor because they are really statements of opinions or beliefs.

This was a false statement based on facts that Mr. DeCesare was personally aware of and told about, and therefore this statement was undercut by those other facts. Even if he had some irrational belief that the merger would go through, the fact -- and this is based on the Supreme Court's decision in *Omnicare* that clearly says that even if the belief is irrational, if you are aware of facts that undermine that belief, you need to disclose that information if you make a statement.

Mr. DeCesare had two options at this point.  One, he could have said nothing; or he could have told the truth and said there is a risk that the merger would fail.

The *Qualcomm* case in the Southern District of California, where there are similar facts, where there was a risk that the regulator would say no to the merger, and then they went out and made optimistic statements, the Court said that the fact that there was a risk and you didn't disclose it is false, and it rejected all the cautionary statements that were provided because they weren't sufficient to tell anybody that this risk had heightened or that it had already occurred.

Now, moving on to the safe harbor, I wanted to mention the *Quality Systems* Ninth Circuit balance actual holding because this is what it held.  And *Quality Systems* is either ignored or minimized in the defendants' briefs.  It's circuit precedent. It controls.  It cannot be overruled in the absence of over -- intervening Supreme Court authority or en banc review.

And it said -- this is on 865 F.3d 1130.  (reading):

"We hold, a defendant may not transform non-forward-looking statements into forward-looking statements that are protected by the safe harbor provisions of the PSLRA by combining non-forward-looking statements about a past or current facts with forward-looking statements about projected revenues and earnings."

There is exactly what has happened in this case.

And under this holding, as I mentioned, they made nearly a dozen statements of current fact or representations about what had happened before that were false.

And the Court said in *Quality Systems* that, if you have a situation where you've done that, you need to admit that you've made false statements, otherwise no cautionary statement is sufficient.

There was no admission here that they made false statements about productivity or the sales pipeline.  And so, therefore, no cautionary statement could provide them with any protection.

Even if the safe harbor did apply, there was there were no specific indications of whether the risk had heightened or whether it had already occurred.  And as in *CV Therapeutics*, you said that simply stating that something may happen or could happen, when it either has already happened or there is an increased risk of it happening does not provide you with protection.

Also in *InterMune*, I believe, which is a 2004 decision of the Court, the Court had noted that this language has to be reflective of ongoing business operations.  And that makes sense, otherwise the defendant can say something years before when the facts, obviously, have changed several years later and say, ha-ha, we actually warned you then.

But -- and this is exactly what's happening.  They are quoting language from the 2018 10-K, which reflects results and statements from 2018 outside the class period to say:  We warned you.

It has nothing to do with what's happening in 2019.  They didn't warn that the merging party was alarmed, or had thought that the business had fallen off a cliff, or was thinking of canceling the agreement.  They didn't say that they were counting deals that weren't committed as tech wins.  They didn't disclose that sales productivity was deteriorating as they spoke about how it was great throughout 2019.

The only revenue figures that would be protected by the safe harbor and the complaint are the actual guidance figures, and by that I mean the quantitated figures, those are the forward-looking statements, clearly.  But those two are not protected given all the facts that I just discussed.

And there is a case recently from the Ninth Circuit from 2019, where the Court reversed a dismissal because the defendants were on notice of facts that made the guidance figures false.

The same is true in the Northern District's cases in *Stockholm* and *Illumina*, both of which said that these are factual questions if there are enough facts out there to suggest that the guidance figures may not be true.  So for this reason, even if the safe harbor applied to the actual

figures -- which, again, I note are only a handful of statements amongst dozens of other current statements that are false, those two are not protected because the cautionary statements are not adequate for the same reason that I mentioned, and they were made with scienter, which I will get to in a few minutes.

There has been an overreliance on the Ninth Circuit's recent position in *Tesla*, again, acting as if the prior precedent doesn't control. But that case is very different, Your Honor. Most of the statements there were on-track statements. In fact, the Court went on and on saying that these are just statements about whether they are on track or not.

And even if you view that case in a light most favorable to the defendants, that might mean that if a defendant says something is on track, that's no longer actionable, given that there is a spirit of authority in the circuit before this decision came out on whether an on-track statement can be false.

Let's say you decide that, based on this, the on-track statements are no longer false. There is only one statement in our complaint that's an on-track statement from May 2019. In that same earnings conference call, there were plenty of other false statements that were made, the ones that I already discussed. And so even if you take that away, nothing changes

about the case.

Second, *Tesla* is not about a sales pipeline like *Quality Systems* was, or sales productivity.

Another thing that makes it extremely distinguishable is that there, the defendants repeatedly said that they had no experience producing the economy version of the car. This is known to anybody who knows anything about the company or about cars in general. It's a true statement. They repeatedly said: We have no experience producing this. We cannot predict.

And that was true.

They also had cautionary statements that were far more specific. So, for instance, about the batteries, they said: We've had problems producing them before, and we expect to continue experiencing these challenges in producing these batteries.

They made similar representations about not being able to meet the production goals.

So in *Tesla*, they disclosed that there were problems before and there were problems going forward. You will not find that anywhere in the cautionary statements that are already outdated in the defendants' opposition papers, whether it's the motion itself or whether it is the reply.

Moving on to scienter, one of the most glaring deficiencies in the defendants' motion -- and I had identified this when we had written our opposition -- was the fact that

you will not find the names Jensen and Redman anywhere, in either the opposition or the reply brief.

As I mentioned to you earlier, Mr. Jensen, who was head of sales for the Americas, and Mr. Redman, the chief revenue officer responsible for the global supply chain and global revenues, were the chief instigators of the pressure campaign and knew about the illusory deals.

Mr. Jensen was aware of confidential witnesses' factual representation that the University of Wisconsin, Madison had said, "We're not going to complete this deal before September of 2020," and yet he instructed the Confidential Witness 7, as well as Confidential Witness 7's boss, cited in the complaint, who corroborates his allegations, otherwise known as Confidential Witness 14, that you should go and report this and say it was platformed as a committed deal.

Both these individuals who were at the center of this fraud knew about this, and they were high-level executives. And so, therefore, it is inconceivable that Mr. DeCesare and Mr. Harms would not know.

This is consistent with the Court's decision in *FitBit* where a non-defendant chief operating officer knew that there were problems with the company's product, and the Court said that that was sufficient to impute knowledge onto the individual defendants.

There is no discussion of these facts anywhere, in either

the motion to dismiss or the reply.

There is a weak attempt to distinguish *FitBit* by saying that *FitBit* is just about reports, and it was about a core product.  But given that the Court decided this issue twice, the fact remains that the Court's core wording was:  If such a senior executive knew, it's implausible that the individual defendants one step above that person would not know.

And that is further buttressed by the *Alibaba* case, *Christine Asia Company versus Yun Ma*, which we cited in our brief which had nothing about to do with reports and was certainly not about one product.  Alibaba, as you know, does not have one product.  It's sort of like the Chinese version of Amazon.  It was more of a regulatory -- the underlying basis was a regulatory complaint, I believe.

And the Court said the same thing that the Court here had said in *FitBit*, which is:  Senior level executives knew and it's inconceivable that they would not relay this information to the defendants.

This is more than sufficient to plead scienter.  But there are even more additional facts.  Confidential Witness 13 stated that the pressure campaign came directly from DeCesare.  Confidential Witness -- this is in paragraph 73 of the complaint.

Confidential Witness 10 said that regular sales force reports were provided to Mr. Redman, the chief instigator of

pressure campaign.  This is on paragraph 160.

Confidential Witness 10 said that the head of worldwide sales received automatic alerts for all deals over a million dollars.  His hame was Brian Gumbel.  He's mentioned in paragraph 161 of the complaint.

In *Quality Systems*, the Ninth Circuit said someone -- a senior person receiving automatic alerts, that's sufficient for the individual defendants to be aware of the facts.

There are also admissions here.  Mr. DeCesare said himself, quote, sales ramping and productivity is something that me and Harms spend a lot the time on, and that they probe the sales pipeline and spend a lot of time asking questions in the field about deals.  But defendants would now have this Court rule that they didn't know about the level of attrition, or that the sales pipeline was drying up.

In terms of the channel stuffing allegations, I already mentioned all the facts that I also think support scienter as well, given than they came from both Forescout's own complaint, as well as Advent's complaint.  And I have explained to you that the weight of authority is those allegations should be credited, especially given who is making them.

Now, another thing about this which I wanted to mention -- because I thought about this once I read the reply -- and I had to mention this given that it does not represent the current state of the law accurately, is that as I told you in *Mylan* the

judge had said that there is no difference between this and finding something in a news report that -- that would, you know, show some fact where -- that would suggest there is an inference of scienter.

There is another case, it's called *In Re: Under Armor Securities Litigation* -- this is 2020 Westlaw 363411 -- where the Court vacated the dismissal and said that scienter allegations based on reports in a news report convinced it that its prior ruling was incorrect, and scienter was pled.

As I mentioned to you, in *Mylan* the court said there is no difference between credible allegations coming from somebody else that are well particularized in a news report.

So if they are sufficient to vacate dismissal under Rule 60(b), they certainly are sufficient to plead scienter under the pleadings standards.  And I would urge the Court to credit these very serious allegations, including admissions that Forescout made in its own complaint.  And now it turns around and runs into another courthouse and says:  Please, you know, those are just our allegations.  Now, you know, we should minimize them.  And please believe us now.  We didn't really mean what when said.

Your Honor, the Court should not do that.  There was a specific conversation as I mentioned between Mr. DeCesare and Mr. Brian -- I believe, Mr. Brian, I think was his name -- from Advent.  This is mentioned in Forescout's verified complaint

where he told him on May 8th, that, look, the deal may not go through.

As I mentioned to you, he went out there -- he had no obligation to make any statements, but yet he still went and he made a misleading statement that was extremely reckless.  And there is a temporal proximity between these two statements.

As you know, the corrective disclosure, the massive plunge in the stock price happened on May 18th.  The disclosure was on May 11th.  This is a seven-day gap.  In *Twitter*, Judge Tigar found a five-month gap between falsity and the corrective disclosure to say that the temporal proximity supported an inference of scienter.

I thought that was close.  But this is barely a week.  I don't think I have seen any other case where it was so close, and I have made this argument in many cases and I have never seen temporal proximity this close.

In terms of the insider trading, you will not find any attempt to address whether these trading plans were made in good faith.  The SEC regulations require the defendants to construct these plans in good faith.  They cannot be used as vehicles for trading on inside information.  They have not met their burden.  They have not produced the trading plan. Without seeing the trading plan, the Court cannot assume they were made in good faith.

We also mentioned in our opposition that the trading

activity was inconsistent with the trading plan.  And by that I mean Mr. DeCesare sold $1.75 million during the course of the fraud, when earlier in the period he had not sold more than $300,000.  That's inconsistent with the trading plan that requires you to sell equal amounts on the same day and so on.  And there is case law in our opposition brief, which I'm sure the Court has probably seen already.

He had 10 months to sell, you know, as much as he wanted.  But he never sold anything compared to what he was selling in close proximity to his false statements.

The defendants throw out that some hypothetical executive, you know, sometimes sells stock in conjunction with an earnings announcement.  But there is no evidence here that that happened.  They haven't presented any facts.  They haven't shown the trading plan.  They have never hesitated to reach outside the pleadings when they want the Court to consider some fact that they find is helpful, but they don't want to show the trading plan.  Why not?

And obviously without seeing the trading plan, and given all these facts, the Court should not credit that argument at all.

Now with the trading plan set aside, the defendant sold $12 million or nearly $4 million -- four times the amount over collectively than what they sold before.

And they claim that we never mentioned salaries in our

complaint. This claim is incorrect. We mentioned in paragraph 172 that Mr. DeCesare was paid $500,000 annually and Mr. Harms was paid 435 -- $453,000 annually. This is clearly disproportionate to the amount that they profited. The Ninth Circuit did do a comparison between salaries and sales and said that that was sufficient to show scienter, and the Court should do the same.

Same goes for Mr. Kalish, who made $29 million.

In *Stamps*, a case that we cited in our brief, Judge Fitzgerald said that this was not irrelevant, and to the extent that it is irrelevant, it's a factual question that should be for discovery or trial. I would urge the Court to do the same.

Now, in terms of the other allegations, the RSUs, the bonuses, the merger motive, the restricted stocks units, and the bonuses, which are all tied to sales productivity and obviously this massive windfall of $42 million, we're not saying that this is independently sufficient. We're saying that this has to be viewed collectively. And the Supreme Court teaches in *Tellabs* that you don't scrutinize all this on an individual basis. You have to view this collectively, holistically. And given all the things that I said, the Court cannot overlook the fact that they would profit so greatly from this merger.

And another thing about that that I wanted to mention,

finally, is, Your Honor, it's true that the market did not know before October 2019 that the merger was happening.  But still, at least there was a motive beyond that point to make false representations.  And we allege that there were false representations.  But it's much more nuanced than that.

In October, the market was made aware that they had hired a financial adviser.  That didn't happen overnight.  They clearly thought about it before that; perhaps months before that.

And the timing shows this because the most brazen misrepresentations about the sales pipeline and so on were made in October 2019 -- I'm sorry -- in May 2019.  That's when they are constantly having this back-and-forth with analysts, where they are repeatedly making misleading statements about the sales productivity and sales pipeline, giving rise to a powerful inference that at that point, they had decided to back this ship, this sinking ship, and sell it off and profit from it, despite the massive deterioration in the business, the lackluster sales, the inability to peddle this product that, unlike *Tesla*, for instance, they had been pedaling for 10 years and that nobody wanted to buy.

My understanding, Your Honor, from the last causation argument is that you've already rejected it, so I won't go, you know, too much into detail except to say that it's completely meritless.

As you know, in the *First Solar* decision from 2018, the Ninth Circuit clearly said that you can rely on an earnings miss to plead loss causation, even if it doesn't reveal fraud. That's exactly what we did.

I don't know where this claim is coming from that our theory isn't pled.  If you look at the complaint, at -- on each partial disclosure, on each earnings miss, also when the determination letter came out, we alleged the actual stock drops, we said what the stock drops were, we said that this was a partial disclosure, as well as the materialization of the risk.

This, clearly, is more than sufficient to meet the notice pleadings standards which, as you know, in *BofI* the Ninth Circuit has effectively said, you know, sure, we have some cases that say 9(b) applies, but it's really Rule 8.

And then, obviously, the hypothetical investors, you know, who may have purchased or may not have purchased is really not relevant to that case at all and has nothing to do with loss causation.

Thank you.

THE COURT:  Thank you.

So who is going for the defense?

MR. BROWN:  Your Honor, Thomas Brown of Ropes & Gray on behalf of Forescout.  I'll also have some time for Mr. Salceda as well --

THE COURT:  All right.

MR. BROWN:  -- on behalf of individuals.

So let me -- so it was a lot there.  Let me just start with a couple of points.

First, I know Your Honor can see in our briefs, both opening and reply, the addressing of all of the particular claims that we've made here, I would like to use my time here in response to Mr. Jafri's argument to make a few specific points.

And first to come at the high level, this is a -- as has been said repeatedly, this is a missed earnings case.  And the allegations about the sales force and sales pipeline are designed to demonstrate one or both of that either the senior executives knew that their forecasts were wrong and therefore wouldn't be protected by the safe harbor; or, two, designed to mislead the investing public into believing that the company could make them when, at the time they were made, supposedly they were impossible.

I think, you know, this is problematic on a couple of levels.  I mean, first, on the safe harbor itself, I think the argument that we've just heard misses a key part of thinking about how you think about the application of *Quality Systems* and the *Tesla* case to this framework; and that is:  Okay.  What in those cases were the allegations that were made by the confidential witnesses and other sources that led to the view

that statements like "We are on track," or "We are pleased with where we are," were or were not protected.

In the *Quality Systems* case, you had directors and senior executives sitting in meetings with the people making the statements saying exactly the opposite in those meetings as to what they were saying publicly.  In that case, it was:  Do we have a bunch of greenfield opportunities for our sales force, or do we have a matured and played out market?

Whereas in the *Tesla* case, the on-track statements were about an ability to achieve a goal, which is exactly what's going on here.  In fact, every time you see sales force statements in connection with statements about how the company is proceeding against its guidance, Forescout is proceeding against its guidance, there is only one actual -- to borrow the phrase used in both *Quality Systems* and *Tesla* -- kind of concrete numerical claim, and that is this one about the seniority or the tenure of the sales force, which Mr. DeCesare, when he makes those disclosures, says very clearly:  I give these as an annual number.

The last time that that number even comes up is in October.  And we never hear that at the time that any of those statements are made that those numbers -- pardon me -- in August of 2019 -- that any of those numbers were wrong, much less that there is any information in front of him that said that anything that he was saying about the sales force at the

time was knowingly false.

In fact, this actually goes to the issue with the confidential witnesses, which is they provide kind of two different types of information which are kind of almost at war with each other.  On the one hand, there are allegations from a number of confidential witnesses to the event that -- things like entire sales divisions were being shut down, that's 1 and 7.; there is a hiring freeze, that's 6.; the system is in complete collapse; sales representatives are only able to make 35 percent of their targets, that's Confidential Witness 1 and 7; 1 and 2 say that only 50 percent.  And yet in the opposition brief at page 21, admits that when they actually get down to specifics, they can only identify $7 million worth of deals that they claim were somehow illusory.  And by the way, this is in a revenue pipeline that is about $350 million by the end of 2019.

So they are at war with themselves, the confidential witnesses, I mean, in this sense, that they don't provide you with any basis for understanding:  Okay.  How was it that these alleged claims about pressure campaigns or -- or representatives unable to make their quotas, then build up into some understanding by the executive, you know, what they were saying at the time about the guidance was somehow wrong?

In fact, you don't hear anything about that.

And I think this really comes clear if you stop and walk

through each of the points at which the company makes disclosures regarding how it's performing throughout the quarter.  So the class period here begins on 2/7/2019, and at that time, according to the public release that's referenced in the complaint at paragraph 103, the projections for the first quarter earnings, $71.9 million to $79.4.

The next disclosure that's alleged of earnings results, happens on 5/9/2019.  That's the first quarter earnings call.  At that point the results for that -- for the first quarter, $76.5 million.  That exceeds the first quarter guidance that was given through months before; so no miss.

Next earnings call, this is for the second quarter of 2019.  It occurs at the beginning of August.  You see, the company does its earnings calls a little more than a month after the close of the quarter.

On that date, the company disclosed $78.3 million in revenue for Q2 2019.  That's as against projections of $75.3 to $78.3; i.e., yet again, the company, when it disclosed, is meeting the target that it set or the guidance that it gave, I should say, the quarter prior.

Now, the one time that we see an actual miss or a change, the company actually steps in early.  In October of 2019, 10/10/2019, this is at our Exhibit 12, or in the complaint at paragraph 135.  There is a reduction of the then-controlling guidance for the third quarter.

Now, just for the time reference, Your Honor, this is a month prior to when the company would normally disclose.  And they say:  Wait a second.  We're not trending so well.  We're putting our guidance down.

A month later, when they make their actual end-of-quarter final earnings call, that's on November 6th, 2019, they disclose $91.6 million of revenue.  That's spot in the range that they had reset in October.

So I think that if you walk through this -- now I'm at the premerger period.  There is actually a lot of confusion in the way plaintiffs try to argue this case between what's going on before the merger is announced, and then what's going on after the merger is announced.

So prior to the merger being announced, we have one miss of guidance, and that is announced in advance, a month earlier than usual.  So not only, I think, this demonstrates sort of two parts of this issue.  One, as to the falsity allegations, how the claims about the sales function completely collapsing don't really add up to a few million dollars of miss in pipelines that, over the course of a year, generate almost $350 million worth of revenue.

And also, as to scienter, the idea that there is a massive effort to fraudulently cover up the ability of the sales force to produce is not really borne out by the idea that the company would step in a month earlier than usual and say "Hey, we're

having some trouble with our sales function this month.  We're bringing down the guidance," and then actually meeting the revised guidance.

Once you get to the point of the merger coming along, I think there's a lot of confusion about the way that -- the claims in the Delaware case and what the plaintiffs are alleging here work together.

The plaintiffs have alleged that the sales function was effectively not working in 2019 and led to false guidance. Well, as we've seen, the guidance misses actually aren't really all that big, and the guidance was changed.

But the Advent claims -- and this is laid out in our brief and you can see it also in the definitions in the merger agreement -- involve all forward-looking issues.  The basis on which Advent claimed it had the right not to proceed with the merger was on -- because of the occurrence of a supposed material adverse event.  That is, by definition -- as laid out in our brief and as you can read in the merger agreement -- a forward-looking event.

And so it's not a claim about what was going on in 2019. So the idea that Advent saying that once the pandemic came along, that the company didn't adapt, and on a forward-looking basis it had suffered an MAE, because that's how the definition works, says nothing about views of what was going on in 2019 because it's quite clear, not only as plaintiffs have said,

that Advent did extensive diligence, but also all of the things prior to the signing of the merger are excluded as a basis for being unable to proceed with the merger.

So what we're really left with is a claim here, which I think is entirely contrary to the law that somehow expressions of concern a few days before a formal notice somehow triggered an affirmative obligation to disclose.  There's actually -- there is reason that the law doesn't require guessing or claims because then you get -- you open up a Pandora's box here saying:  Okay.  Well, what if they said, "Well, we're looking at the numbers."

Someone could argue, "Well that might have led Mr. DeCesare and Mr. Harms to think there might be some possibility.  Does that trigger an obligation?"

No.  Until they were -- when they were told by Advent "We're not proceeding with the merger," they immediately, before the opening of the market on next business day -- which was a Monday, they were told on a Friday -- they made a disclosure:  Advent isn't proceeding.

Finally, as to the channel stuffing scheme, Your Honor, channel stuffing is about ill-timed recognition of revenue.  We don't have allegations of a single deal, a single amount of revenue, much less any wrong timing on those sorts of things.

So those, I think, Your Honor, cover the kind of key points I would like to made.  And before yielding the floor to

Mr. Salceda, I would just like to see if Your Honor had anything in particular --

THE COURT:  Yeah.  What about Mr. Redman and Mr. Jansen?

MR. BROWN:  Mr. Redman is -- so Mr. Redman is, as Mr. Jafri said, the chief revenue officer.  First, the -- I think this really goes to this claim that, one, as I said, the allegations of this pressure campaign are either, you know, A, completely vague, someone says:  Oh, there is a pressure campaign; or, B, they relate to specific deals that add up to no more than a few million dollars, which don't really add up.

So I mean, the numbers don't work.

And, secondly, as it clear, I think, from walking through the different disclosures and how they did against the quarterly guidance, you can see that the claim that somehow supposed pressure campaigns led to great errors by the senior executives -- who are, by the way, never alleged to have had any discussions with Mr. Redman about either specific deals or about how they were going to build what their guidance was.  So I don't see how exactly those connect to false statements particularly when you ground yourself back into the question of:  Okay.  At each quarter, how did the company do?  As against prior to the announcement of the merger, how did it do against the guidance for that quarter that was then in control?

The only time there was a miss is when the company

actually steps in early and says:  We need to bring our guidance down here because deals are slipping.

There are longer sales cycles and a MAE, are the reasons that are described.  And other than a naked assertion that these were somehow untrue, we actually don't get any allegations in the complaint related to either Mr. Redman or anybody else about why those weren't, in fact, real issues that the company was experiencing.

THE COURT:  Okay.  Thank you.

Mr. Salceda, did you want to speak?  We have, I'll tell you, less than 10 minutes left, so --

MR. SALCEDA:  Thank you, Your Honor.

THE COURT:  -- be succinct.

MR. SALCEDA:  I will be succinct, as I am the caboose on this train.  And Mr. Brown ably discussed why the complaint fails to state a claim.

And Your Honor started the hearing this morning by noting that Your Honor didn't believe that the plaintiffs showed that there was a false statement.  And, of course, if there is no false statement, there is no scienter.

I think it's important to take a step back and remember that this is a securities class action based on the Reform Act. It is governed by the pleadings standard under the Reform Act. And, as the Supreme Court in *Tellabs* made clear, in order to plead a strong inference of fraudulent scienter, there needs to

be compelling allegations.  It's not just enough to say that the defendants could have done a better job or were somehow negligent.

But there is also a key aspect that the plaintiffs, despite the volume of the argument in the complaint, fail to point out.  They don't point to a single internal forecast that differs from the company's guidance which, as Mr. Brown noted, the company exceeded guidance in Q1, hit the top end of guidance in Q2, and then did have a shortfall and disclosed that early in Q3.  There is not a single internal document cited.

There were a number of salespeople, lower-level salespeople, but they don't seem to be involved at all -- there is no allegation that they are involved -- in company-wide guidance.  And so while for a salesperson thinking, "I might not make a $2 million sale," might be the most important thing in his or her life, this is a company that has quarterly sales of almost $100 million, and a pipeline that -- if that encompasses all deals or rather potential deals -- would obviously be quite vast.

And there is not a single communication between any of the CWs and Mr. DeCesare or Mr. Harms, not one.  And that is a significant difference that, for example, with *Quality Systems*, where the allegations are that members of the board of directors are the CWs.  A president, you know, a CEO -- I think

a COO of the company is a CW, and saying:  I was in the room with the individuals and this is what happened.

These people had no contact with Mr. Harms or Mr. DeCesare, and so they are quite removed.  And while they may have concerns and opinions, it's just their opinions.  They have no -- there is no tie to any of the allegations and Mr. DeCesare and Mr. Harms's knowledge; let alone that those allegations undermine the company's public statements.

And so as Mr. Brown noted, the company met Q2 -- met Q1 and Q2; came shy in Q3, and explained the reasons why.  And although, as plaintiffs said, that's all -- you know, that's made up.  There is no basis to think that.  So I think that the CWs don't work.

The core operations inference, again, fails.  And here I think that that's what they are trying to do when talking about Mr. Jensen and Mr. Redman.  Their job as sales managers is to push on their salespeople.  So this notion of a pressure campaign -- I presume every company has pressure to make -- every salesperson has pressure to make their quota, every region has pressure to make their quota; that's their business to try to achieve sales.  And so in a competitive landscape, this is -- there are challenges.

And here, the company was very forthright, not only about the risks it faced, but also what it was trying to do.  And so I think that the company's statements are -- not only not

supportive of scienter, but they undermine plaintiffs' theory of scienter.  And *Tellabs* requires the Court to consider those competing inferences.

And finally the mode of allegations, salaries and bonuses, those have been rejected so many times by the Ninth Circuit and this district that I won't rehash that.

And the spot sales allegations, although the plaintiffs would like to make those trading plans go away, those -- the SEC filings for each of the sales, every single one mentions that they're pursuant to a trading plan.  And courts in this district have repeatedly held that those trading plans undermine an inference of scienter, and so did the Ninth Circuit in the *Metzler* case.

So I know that Your Honor has another calendar and so I won't overstay my welcome, and I'll just add a couple of quick things about the Delaware case.

The company had a binding agreement and it believed that the deal was ironclad when, on the 15th of May, was the first time that Advent had said "We will not close."  The company promptly proceeded to exercise its rights under the agreement and sought specific performance and, of course, ultimately that deal closed.

And so, as Mr. Brown said, there is no requirement to speculate and to do what-ifs, but, of course, if you look at the disclosures, the company did warn about the risks on the

deal and the possibility that closing conditions could not be satisfied.

Here, I think the facts alleged don't show falsity, and they certainly don't raise the required strong inference of scienter.

Unless Your Honor has any questions for me --

THE COURT:  No.  Thank you.

MR. SALCEDA:  Thank you.

THE COURT:  All right.  Well, I appreciate all of your arguments.  I'm going to have to tell you that the matter is submitted at this point, and you will hear from me shortly.

Thank you.

MR. SALCEDA:  Thank you, Your Honor.

THE CLERK:  That concludes our civil law and motion calendar for today.

(Proceedings adjourned at 10:59 a.m.)

---o0o---

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:    Tuesday, October 19, 2021




_____
Ruth Levine Ekhaus, RMR, RDR, FCRR, CSR No. 12219
Official Reporter, U.S. District Court