**ROPES & GRAY LLP**
Amy Jane Longo (CSB #198304)
10250 Constellation Boulevard
Los Angeles, CA 90067
Tel: (310) 975-3300
Fax: (310) 975-3400
Amy.Longo@ropesgray.com

*Attorneys for Defendant*
*Forescout Technologies, Inc.*

*[Additional Counsel on Signature Page]*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| CHRISTOPHER L. SAYCE, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>FORESCOUT TECHNOLOGIES, INC., MICHAEL DECESARE, and CHRISTOPHER HARMS,<br><br>Defendants. | CASE NO.: 3:20-cv-00076-SI<br><br><u>CLASS ACTION</u><br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL**<br><br>Hearing Date: February 2, 2024<br>Time: 10:00 a.m.<br>Judge: Hon. Susan Illston |

---

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No. 3:20-cv-00076-SI

**TABLE OF CONTENTS**

INTRODUCTION ......................................................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND.............................................................4

    A.    Factual Background .....................................................................................4

    B.    Procedural History ......................................................................................6

ARGUMENT ..........................................................................................................................8

I.    PLAINTIFFS HAVE NOT PRESENTED A VIABLE METHOD FOR DETERMINING DAMAGES ON A CLASS-WIDE BASIS AND THUS CANNOT SATISFY RULE 23(b)(3)...............................................................................................9

    A.    Plaintiffs' Damages Methodology Fails To Account for Structural Changes to Forescout's Stock Price During the Proposed Class Period ......................10

    B.    Plaintiffs' Damages Model Does Not Articulate a Method for Disaggregating the Harm Allegedly Resulting from Plaintiffs' Two Theories of Liability ...14

II.    PLAINTIFFS BOTH FAIL TO SATISFY RULE 23(a)'S TYPICALITY AND ADEQUACY REQUIREMENTS .................................................................................16

    A.    Glazer Satisfies Neither the Adequacy nor the Typicality Requirements with Respect to the Entire Class Period ..................................................................18

        i.    Glazer is Atypical and Inadequate, at a Minimum, as to the Period Before May 11, 2020 ..........................................................................18

        ii.    Glazer is Generally Atypical and Inadequate ...................................20

    B.    Plaintiffs Cannot Adequately Represent the Class Due to the Conflict Between Them ............................................................................................22

CONCLUSION......................................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A&J Deutscher Family Fund v. Bullard*,
No. 85-1850, 1986 WL 14903 (C.D. Cal. Sept. 22, 1986) ...................................................... 17

*Am. Timber & Trading Co. v. First Nat. Bank of Oregon*,
690 F.2d 781 (9th Cir. 1982) .................................................................................................. 13

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)..................................................................................................... 9, 17, 20

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)........................................................................................................ 19, 21

*Berman v. Freedom Fin. Network, LLC*,
400 F. Supp. 3d 964 (N.D. Cal. 2019) ................................................................................... 23

*In re BP P.L.C. Sec. Litig.*,
No. 4:10-md-2185, 2013 WL 6388408 (S.D. Tex. Dec. 6, 2013) ........................ 13, 15, 16, 24

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)....................................................................................................... 9, 13, 15

*Doyle v. Chrysler Grp., LLC*,
663 F. App'x 576 (9th Cir. 2016) ...................................................................................... 9, 15

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011) .................................................................................................. 17

*Gordon v. Sonar Cap. Mgmt.*,
92 F. Supp. 3d 193 (S.D.N.Y. 2015)....................................................................................... 22

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014).......................................................................................................... 8, 14

*Hanon v. Dataproducts Corp.*,
976 F.2d 497 (9th Cir. 1992) ............................................................................................ 17, 22

*Hayes v. MagnaChip Semiconductor Corp.*,
No. 14-cv-01160, 2016 WL 7406418 (N.D. Cal. Dec. 22, 2016)............................................ 14

*Jaroslawicz v. M&T Bank Corp.*,
No. 15-00897, 2023 WL 5528723 (D. Del. Aug. 28, 2023).............................................. 19, 20

*Kaufman v. Lawrence*,
   No. 74 Civ. 5081, 1977 U.S. Dist. LEXIS 13206 (S.D.N.Y. Oct. 31, 1977) ......................... 20

*Landry v. Price Waterhouse Chartered Accts.*,
   123 F.R.D. 474 (S.D.N.Y. 1989) ................................................................................ 22

*Leyva v. Medline Indus., Inc.*,
   716 F.3d 510 (9th Cir. 2013) ..................................................................................... 15

*Loritz v. Exide Techs.*,
   NO. 2:13-cv-02607, 2015 WL 6790247 (C.D. Cal. July 21, 2015)...................................... 16

*May v. Gladstone*,
   562 F. Supp. 3d 709 (C.D. Cal. 2021) ......................................................................... 23, 24

*Mulderrig v. Amyris, Inc.*,
   340 F.R.D. 575 (N.D. Cal. 2021)................................................................................. 21

*Rolex v. Emps.' Ret. Trust  v. Mentor Graphics Corp.*,
   136 F.R.D. 658 (D. Or. 1991) ..................................................................................... 21

*In re Signet Jewelers Ltd. Sec. Litig.*,
   No. 14-cv-01160, 2019 WL 3001084 (S.D.N.Y. July 10, 2019)............................................ 14

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011)..................................................................................................... 8

**Other Authorities**

Fed. R. Civ. P. 23 ..................................................................................... *passim*

Pursuant to Federal Rule of Civil Procedure 23, Defendants Forescout Technologies, Inc. ("Forescout" or "the Company"), Michael DeCesare, and Christopher Harms (together, "Defendants") respectfully submit this Opposition to Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel (the "Motion" or "Br.") filed by Lead Plaintiffs Meitav Mutual Funds Ltd. (f/k/a Meitav Tachlit Mutual Funds Ltd.) ("Meitav") and Glazer Capital Management, L.P., Glazer Enhanced Fund, L.P., Glazer Enhanced Offshore Fund, Ltd., Glazer Offshore Fund, Ltd., and Highmark Limited, in respect of its Segregated Account Highmark Multi-Strategy 2 ("Glazer," and together with Meitav, "Plaintiffs").  *See* Dkt. 193.

## STATEMENT OF ISSUES TO BE DECIDED (Civil L.R. 7-4(a)(3))

(1)  Whether Plaintiffs have failed to establish that damages in this matter can be measured on a class-wide basis and are therefore unable to satisfy Rule 23(b)(3)'s predominance requirement; and

(2)  Whether Plaintiffs have failed to establish that they are typical and/or adequate class representatives under Rule 23(a).

## INTRODUCTION

Plaintiffs' Motion, and the expert report of Dr. Zachary Nye upon which it relies, fail to establish that a common methodology can be used to measure damages on a class-wide basis—a necessary showing to satisfy Rule 23's predominance requirement.  This failure stems, at base, from the fact that Plaintiffs advance two completely separate theories of liability, originally pled in separate complaints filed by different plaintiffs represented by different counsel.  The first of these theories involves statements between May and November 2019 regarding the strength of Forescout's sales pipeline, "slipped" deals, "tech wins," and economic conditions in EMEA.  The second theory relates to the lone May 11, 2020 statement that Forescout "look[ed] forward to completing [the] pending transaction with Advent."  Plaintiffs attempt to collapse these two distinct theories under a single damages model in order to increase their potential recovery.  The generic methodology Plaintiffs propose, however, cannot bridge the factual and logical gap between them.

To assess Dr. Nye's methodology and conclusions, Defendants engaged Prof. Wei Jiang, Professor of Finance at Emory University's Goizueta Business School and a leading expert in the

area of mergers and acquisitions and, in particular, merger arbitrage. Prof. Jiang opines in her report, filed simultaneously herewith, that Dr. Nye's report suffers from significant oversights and methodological flaws that entirely undermine its conclusions. These shortcomings result in disconnects between Plaintiffs' damages model and their competing theories of liability. Plaintiffs thus fail to establish predominance for two reasons.

First, Dr. Nye's rote approach in attempting to define a class-wide damages methodology does not account for the fundamental shift in Forescout's stock price after the February 6, 2020 announcement of the proposed transaction with Advent International Corporation at $33 per share (the "Merger" with "Advent"). After that announcement, Forescout's stock price no longer reflected the market's view of the Company's fundamentals including, among other things, the past performance and future prospects of the Company's sales pipeline. Instead, as Dr. Nye acknowledges, Forescout's stock price from that point forward was "structurally different" and "determined largely by the market's assessment of the likelihood of success of the takeover bid." Expert Report of Zachary Nye, Ph.D., Dkt. 194-1 ("Nye Report") ¶ 67; Nye Dep., Ex.2[1] at 63:21-24. As Prof. Jiang explains, Forescout's stock price after the February 6, 2020 Merger announcement was driven primarily by the Merger price and the likelihood of the Merger closing, rather than by expectations regarding Forescout's future earnings. In other words, to the extent Forescout's stock price was ever inflated by the alleged 2019 sales pipeline misstatements (it was not), that ceased to be true, at the absolute latest, after the February 6, 2020 Merger announcement.

Ultimately, Defendants will show on the merits that Defendants' statements were true, that there was never any such inflation and that, regardless, the market was aware of challenges to Forescout's 2019 sales pipeline by the time the Company pre-announced its 3Q2019 results on October 10, 2019. Even setting aside those arguments at the class certification stage, however, it is clear that Plaintiffs' methodology cannot reliably calculate purported damages on a class-wide basis. Plaintiffs' proposal to apply consistent back-casting across the entire class period would award post-February 6, 2020 purchasers with damages that are untethered to Plaintiffs' theory of liability.

---

[1] Citations to "Ex." refer to the exhibits attached to the Declaration of Amy Jane Longo.

Specifically, Plaintiffs' methodology would award damages to those who purchased after February 6, 2020 (when, at the absolute latest, any purported inflation from the alleged 2019 sales pipeline misstatements no longer existed) and before May 11, 2020 (when the only alleged Merger-related misstatement occurred). As a result, at a minimum, the proposed class naturally divides into two distinct time periods that require different methods of assessing damages: (1) from May 10, 2019 to, at the latest, February 6, 2020, premised on the claim that Forescout's stock allegedly was inflated due to the 2019 pipeline statements[2]; and (2) from May 12, 2020 to May 15, 2020, premised on the claim that Forescout's stock allegedly was inflated due to the May 11, 2020 statement about the Merger.

Second, even if Plaintiffs could show (counterfactually), that the "truth" about Forescout's 2019 statements did not fully emerge until May 18, 2020, Plaintiffs' motion should still fail. To satisfy Rule 23(b), Plaintiffs would still need to advance a damages model that could disaggregate what portion of the May 18 price decline was attributable to "correction" of the May 11, 2020 Merger-related statement, what portion was attributable to "correction" of the 2019 sales pipeline statements, and what portion was attributable to numerous other confounding variables in the midst of a global pandemic. Plaintiffs have not done so—nor could they because, as Prof. Jiang's report explains, she is aware of no commonly accepted method for accomplishing that disaggregation. Instead, members of the proposed class will be in conflict with one another: post-May 11 purchasers would want to apply a damages model that allocates a larger share of the decline to the Merger-related statement, while earlier purchasers would want to apply a damages model with a heavier weighting towards correction of the 2019 pipeline-related statements. Plaintiffs have thus failed to demonstrate that there is a viable method to measure damages on a class-wide basis even under this counterfactual scenario (which they do not even clearly allege).

In addition, Plaintiffs also fail to satisfy Rule 23(a), which provides an independent basis for

---

[2] As outlined further in Section I.A below, Plaintiffs have also failed to explain how any purported inflation attributable to alleged misstatements about the Company's 2019 sales pipeline could have persisted beyond October 10 or November 6, 2019, when Forescout pre-announced, and then formally released its 3Q2019 earnings. Defendants will show on the merits that Plaintiffs are not entitled to any damages for this period (or any other).

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No. 3:20-cv-00076-SI

3

denying the Motion. First, as a merger arbitrageur that only invested in Forescout after the Merger announcement and that clearly did not invest based on any alleged pipeline misstatements, Glazer is atypical of the class it seeks to represent and inadequate to serve as a class representative as to the period before May 11, 2020. Glazer is likewise atypical and inadequate as to the post-May 11 period due to individual questions surrounding its reliance on Forescout's alleged Merger misstatement. Second, due to the conflict between the Plaintiffs regarding allocation of damages from the May 18 stock price drop, as identified above and described in further detail below, the two Plaintiffs collectively cannot adequately represent the proposed class. The Court should therefore deny the Motion and decline to certify the proposed class.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background

While the Court is familiar with the factual allegations underlying this case, certain facts that are particularly relevant to Plaintiffs' Motion are worth reiterating. On May 9, 2019, Forescout reported its 1Q2019 revenue, projected 2Q2019 revenue of $75.3–$78.3 million, and increased FY2019 guidance to $365.3–$375.3 million. SAC ¶¶ 89, 91. On an earnings call that day, which occurred after market close, CEO Michael DeCesare remarked that certain deals had "slipped a little bit" from 2Q2019. SAC ¶¶ 97, 101.

On August 7, 2019, Forescout announced 2Q2019 revenue of $78.3 million—at the top end of prior guidance—and projected 3Q2019 revenue of $98.8–$101.8 million. SAC ¶ 110; Ex. 5. On October 10, 2019, however, Forescout preannounced that it expected 3Q2019 revenue of $90.6–$91.6 million, lower than previously projected. SAC ¶ 117. In the press release announcing the revised revenue figures, Mr. DeCesare explained that "Q3 results were impacted by extended approval cycles which pushed several deals out of the third quarter," an impact that was "most pronounced in EMEA against the backdrop of a challenging macro-economic environment." Ex. 6; SAC ¶ 117. Plaintiffs allege that "[o]n this partial disclosure or the materialization of the risks thereof, the price of Forescout's common stock declined by over 37% from its closing price of $39.20 on the previous day, to close at $24.565 per share on October 10, 2019[.]" SAC ¶ 118.

On November 6, 2019, Forescout reported 3Q2019 revenue of $91.6 million, a result at the

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No. 3:20-cv-00076-SI

top end of the October estimate.  SAC ¶ 120.  Forescout attributed the drop in 3Q2019 results to "extended sales cycles, with the resulting revenue shortfall most pronounced in EMEA." Ex. 7; SAC ¶ 120.  The Company projected 4Q2019 revenue of $93.5–$96.5 million and FY2019 revenue of $339–$342 million.  Ex. 7; SAC ¶ 120.

On February 6, 2020, Forescout announced final 4Q2019 revenue of $91.3 million and FY2019 revenue of $336.8 million, both of which fell short of previous guidance.  SAC ¶¶ 91, 124. That same press release also announced that Forescout had signed the Merger agreement with Advent.  SAC ¶ 12.  That day, Forescout's stock price closed at $33.28, increasing by $5.30 compared to the prior day's close of $27.98, despite the quarterly and full-year revenue misses.  *See* Nye Report Ex. 3B at 4.

On May 11, 2020, after market close, Forescout reported 1Q2020 revenue of $57.2 million, which was less than the "Illustrative Guidance" of $62 million that Forescout had given to its financial advisor in January 2020 and that Forescout referred to in its March 24, 2020 proxy statement.  SAC ¶¶ 63, 72, 154.  In the May 11, 2020 press release, Mr. DeCesare noted that "[i]n March, the severity of the COVID-19 pandemic sharply escalated around the world, causing some customers to delay purchasing decisions in order to prioritize employee health and safety and business continuity planning[.]" *Id*.  Forescout's Form 10-Q filed that same day added that the "economic uncertainty from the COVID-19 pandemic [had] impacted [its] customers and their available budgets to spend on [Forescout's] products and services, which has resulted in an unfavorable impact on [Forescout's] revenue growth[.]" Ex. 9 at 21.  The press release also noted that: "we look forward to completing our pending transaction with Advent." SAC ¶ 154.  On May 12, 2020, Forescout's stock closed at $1.59 lower than the previous day's close.  SAC ¶ 69; *see* Nye Report Ex. 3B at 5.  Plaintiffs claim in their Motion that the May 11, 2020 "additional partial disclosure" revealed the falsity of statements related to deals and the sales pipeline.  Br. at 4-5.

After market close on Friday, May 15, 2020, Advent notified Forescout that Advent would not close the Merger.  ¶ 70; SAC Ex. 2 (CC) at ¶ 63.  On Monday, May 18, 2020, Forescout disclosed that Advent had provided notice to Forescout that it would not be proceeding with the acquisition as scheduled.  SAC ¶ 70.  Forescout's stock price closed on May 18, 2020 at $22.57, compared to its

closing price of $29.52 the previous trading day. SAC ¶ 71. Forescout filed suit seeking to compel Advent to complete the Merger. Ex. 8. In July 2020, Forescout disclosed that the parties had agreed to close the Merger at a revised price of $29 per share. SAC ¶ 17. The acquisition closed in August 2020. Ex. 10.

**B.    Procedural History**

Plaintiff Christopher Sayce, individually and on behalf of others similarly situated, originally filed this suit on January 2, 2020—before Forescout had even announced FY2019 results and its forthcoming Merger with Advent—alleging violations of Sections 10(b) and 20(a) of the Exchange Act based on a series of 2019 statements about Forescout's revenue guidance and sales pipeline. Dkt. 1 ¶ 4. The purported class period at that time was February 7, 2019 through October 9, 2019, with the relevant corrective disclosures alleged to have been made in 2019. Dkt. 1 ¶¶ 1, 39-45. On March 23, 2020, the Court appointed Meitav as Lead Plaintiff. Dkt. 27 ¶ 1. On May 22, 2020, Meitav amended the complaint to extend the putative class period through May 15, 2020 and to add alleged misstatements about Forescout's sales force. Dkt. 31.

On June 10, 2020, Plaintiff the Arbitrage Fund, individually and on behalf of others similarly situated, filed a separate suit alleging violations of Sections 10(b) and 20(a) of the Exchange Act based on Forescout's 2020 statements leading up to the Merger, including the May 11, 2020 statement that Forescout "look[ed] forward to completing [its] pending transaction with Advent." *Arbitrage Fund v. Forescout Techs., Inc.*, No. 3:20-cv-03819-SI. The purported class period for that suit ran from February 6, 2020, through May 15, 2020, with the relevant corrective disclosure alleged to have been made on May 18, 2020.

Defendants moved to dismiss the first suit on July 6, 2020, Dkt. 44, but on July 22, before Plaintiffs had responded, the Court consolidated the two matters described above. Dkt. 55. The Court then reopened the lead-plaintiff process and, on November 19, 2020, appointed Meitav and Glazer as co-lead plaintiffs. Dkt. 115. On December 18, 2020, the Plaintiffs filed a consolidated amended complaint alleging misstatements related to revenue guidance, the pipeline, the sales force, channel-stuffing, and the Merger. Dkt. 116. On March 25, 2021, the Court granted Defendants' motion to dismiss but granted Plaintiffs leave to amend. Dkt. 139.

Plaintiffs filed a second consolidated amended complaint (the "Complaint") on May 10, 2021, alleging misstatements related to revenue guidance, the pipeline, the sales force, "front-loaded" revenue, channel partners, and the Merger. Dkt. 142. On October 6, 2021, the Court granted Defendants' motion to dismiss and denied Plaintiffs leave to amend. Dkt. 158. Plaintiffs appealed, but they did not challenge the dismissal of claims related to revenue guidance or "front-loaded" revenue. *Glazer Cap. Mgmt. L.P. v. Forescout Techs., Inc.*, 21-16876, Dkt. 16 at 5 n.1.

On March 16, 2023, the Ninth Circuit affirmed this Court's dismissal order in part, reversed in part, and remanded the case for further proceedings. The Ninth Circuit reversed in part and remanded, specifically with respect to two categories of alleged misrepresentations, affirming dismissal with respect to all of the other challenged statements. *Glazer Cap. Mgmt. L.P. v. Forescout Techs., Inc.*, 21-16876, Dkt. 55-1 at 58-59. Accordingly the only statements that now remain are:

> (1) statements made on May 9, 2019, August 7, 2019, August 12, 2019, October 10, 2019, and November 6, 2019, asserting that (i) the disappointing second quarter performance was due to "slipped" deals, (ii) the "slipped" deals were "tech wins," (iii) the sales pipeline was large, healthy, and continuing to grow, and (iv) the third quarter revenue miss was due to delays in closing caused by economic conditions in the EMEA area; and (2) the May 11, 2020, press release stating that Forescout "look[ed] forward to completing [the] pending transaction with Advent."

*Id.* at 59. Plaintiffs allege that statements about the pipeline in 2019 were false or misleading because Forescout did not in fact have "tech wins," it was losing customers, deals would continue to "slip," and it was mis-categorizing deals as "committed." *See* SAC ¶¶ 99, 100. Plaintiffs further allege that the May 11, 2020 statement was false or misleading because it failed to disclose a May 8, 2020 conversation with Advent during which Advent stated that it was considering not closing the Merger. SAC ¶¶ 154-55. No statements made between November 6, 2019 and May 11, 2020 remain in this case.

Plaintiffs' proposed class period runs from May 9, 2019 through May 15, 2020 (the "Class Period"). Br. at 1. According to Plaintiffs, statements made on October 10, 2019 about 3Q2019 preliminary results, on May 11, 2020 about 1Q2020 results, and on May 18, 2020 about Advent not

proceeding with the Merger revealed the purported falsity of Defendants' statements.  SAC ¶¶ 70-72, 117-18, 154; Br. at 5.

Plaintiffs propose two class representatives, Meitav and Glazer, who took fundamentally different approaches to their trading in Forescout stock.  Meitav claims it purchased and sold Forescout securities regularly throughout the Class Period pursuant to an indexing strategy that roughly tracked an underlying cybersecurity index.  Shemesh (Meitav) Dep., Ex. 3 at 36:1-10; Dkt. 86, Ex. A at 2-7.  Meitav testified that it was unfamiliar with Defendant Forescout, had only heard of Forescout recently, and, contrary to its verified interrogatory responses, did nothing to monitor public news regarding Forescout during the putative Class Period.  Shemesh (Meitav) Dep. 67:17 – 69:26; 94:6 – 96:21; 104:25-105:17.  ███████████████████████████████████████████ ███████████████████████████████████  Dkt. 66, Ex. C, Schedule A; *see also* Ort (Glazer) Dep., Ex. 4 at 73:3-9.  As described in further detail below, Glazer invested in Forescout not based on its fundamentals, but pursuant to a "merger arbitrage" strategy through which it sought to profit from the "arbitrage spread"—in this case, the difference between Forescout's stock price and the acquisition price offered by Advent.

### ARGUMENT

In assessing Plaintiffs' Motion, the Court must conduct a "rigorous analysis" to determine whether Plaintiffs have established each element of Federal Rule of Civil Procedure 23(a) and (b)(3) by a preponderance of the evidence.  *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011).  If Plaintiffs fail to satisfy any element of Rule 23, class certification must be denied.  *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014).  As described in detail below, Plaintiffs have failed to meet their burden under both Rule 23(b)(3) and 23(a).  *First,* Plaintiffs have failed to identify a common methodology that will reliably measure damages on a class-wide basis in light of the structural changes in Forescout's stock price following the Merger announcement.  For this reason, at a minimum the class must be divided into sub-classes that are consistent with the two separate theories advanced in this matter.  *Second,* Glazer is both atypical and inadequate to serve as class representative because of its merger-arbitrage strategy and the unique defenses that strategy raises.  *Third,* both Glazer and Meitav are inadequate due to the conflict between them based on their

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No. 3:20-cv-00076-SI
8

differing trading histories and their separate theories of liability.

I.   **PLAINTIFFS HAVE NOT PRESENTED A VIABLE METHOD FOR DETERMINING DAMAGES ON A CLASS-WIDE BASIS AND THUS CANNOT SATISFY RULE 23(b)(3)**

Plaintiffs do not proffer a method to reliably compute damages on a class-wide basis that is consistent with their two distinct theories of liability.  They therefore fail under Rule 23(b)(3) to demonstrate that common issues predominate.  To certify a class under Rule 23(b)(3), the Court must find that "common questions . . . 'predominate over any question affecting only individual members'" and that class resolution is "superior to other available methods for the fair and efficient adjudication of the controversy."  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997) (citing Fed. R. Civ. P. 23(b)(3)).  The Rule 23(b)(3) inquiry looks to whether the proposed class is "sufficiently cohesive to warrant adjudication by representation."  *Id.* at 623.  A plaintiff's failure to "establish[] that damages are capable of measurement on a class-wide basis" will violate the predominance requirement of Rule 23(b)(3).  *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013); *see also Doyle v. Chrysler Grp., LLC*, 663 F. App'x 576, 579 (9th Cir. 2016) ("A methodology for calculation of damages that [can]not produce a class-wide result [i]s not sufficient to support certification.") (citing *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1167 (9th Cir. 2014)).  A model supporting a plaintiff's damages case "must be consistent with its liability case."  *Comcast*, 569 U.S. at 35 (internal quotation marks and citation omitted).

Plaintiffs' proffered expert, Dr. Nye, asserts that a simple, uniform back-casting methodology will suffice to calculate damages on a class-wide basis.  Specifically, he proposes to measure inflation in Forescout's stock price that is attributable to the alleged misstatements by identifying changes in the stock price following each of the alleged corrective disclosures.  Nye Report ¶ 67.  Next, he asserts that this inflation can be "back-cast" in order to identify the price inflation due to the alleged fraud for each day in the proposed Class Period on a class-wide basis.  Nye Report ¶ 67.  From there, he proposes that damages for each individual class member can be mechanically calculated based on the dates of their purchases and sales of Forescout stock.  Nye Report ¶ 62.

Plaintiffs' proposed damages methodology is far too simple to reliably apply on a class-wide basis for two reasons.  ***First***, Forescout's stock price after the Merger announcement was structurally

different than prior to the announcement in that it was driven by the merger price rather than fundamentals about Forescout's stand-alone prospects. Plaintiffs' proposal to back-cast alleged sales pipeline inflation over the entire Class Period would award damages untethered to their theory of liability to those who purchased after February 6, 2020. **Second**, even if Plaintiffs could somehow show that Forescout's stock price remained inflated by the alleged pipeline misstatements after February 6, 2020 (which they do not even clearly *allege*), they would still need to disaggregate and allocate the May 18, 2020 stock price drop across their two theories of liability, while accounting for any other confounding variables. They have not identified a class-wide damages model that can do so; indeed, as Defendants' expert, Prof. Jiang has opined, no commonly accepted method exists. Accordingly, Plaintiffs cannot show that common issues predominate, and certification should be denied. At a minimum, any class should be sub-divided into two distinct time periods corresponding to the two theories of liability at issue.

A.    **Plaintiffs' Damages Methodology Fails To Account for Structural Changes to Forescout's Stock Price During the Proposed Class Period**

Plaintiffs do not—and cannot—articulate a method for measuring class-wide damages on a consistent basis across the proposed Class Period in light of the effects of the February 6, 2020 Merger announcement. To be clear, Defendants intend to prove on the merits that, to the extent any 2019 pipeline-related statements were false or misleading (they were not), any misimpression was fully corrected by disclosures on October 10, 2019 (when Forescout announced preliminary financial results for Q32019 that were below prior guidance), or by February 6, 2020 at the latest (when Forescout announced Q42019 and FY2019 results that were below prior guidance). Plaintiffs allege that October 10, 2019 was a partial corrective disclosure with respect to the 2019 statements. SAC ¶ 118. Nowhere in the Complaint, however, do they make clear when fulsome disclosure of the pipeline statements supposedly occurred, and nothing in the Complaint suggests that any misimpression could have remained in the market after October 10, 2019. At the absolute most, and even setting aside the fatal absence of such allegations in the Complaint, the remaining statements about the sales pipeline—all of which were made in 2019—could not have had any effect on the stock price after FY2019 results—which fell short of projections—were announced on February 6, 2020. Even disregarding those arguments at the class certification stage, however, the structural

impact of the February 6, 2020 Merger announcement was to render Forescout's fundamentals (including the status of its sales pipeline) irrelevant to the Company's stock price.

Both parties' experts acknowledge that the Merger announcement effected this structural change. As Dr. Nye puts it, following the announcement, Forescout's stock price was "determined largely by the market's assessment of the likelihood of success of [Advent's] takeover bid." Nye Report ¶ 67. Dr. Nye goes on to explain that Forescout experienced "substantial revaluation" after the Merger announcement, and its stock price was then "determined by three factors: the offer price, the probability of the bid's success, and the expected post-takeover price if it fails." Nye Report ¶ 68 n.117; *see also* Nye Dep. 64:10 – 65:12; *see* Expert Report of Professor Wei Jiang ("Jiang Report") ¶ 45 (after the Merger announcement, Forescout's stock no longer traded on "the company's fundamentals"). He further testified that there is a "structurally different asset price and dynamics that [one] would expect after a company is expected to go private or even merge with another company." Nye Dep. 63:22-24. Critically, the post-February 6, 2020 pricing dynamics Dr. Nye identifies were not present prior to the Merger announcement, when the stock price instead was determined by the fundamentals of Forescout's business.[3]

Despite Dr. Nye's acknowledgement that Forescout's stock price was fundamentally different following the Merger announcement, and although he uses two distinct "Control Periods" for purposes of his *Cammer* factor 5 event study as a result of this difference, he fails to articulate how he would account for the impact of the Merger announcement in Plaintiffs' proposed damages model. In particular, he does not explain how he (or anyone) would calculate the alleged price inflation following the Merger announcement. Doing so would require, at a minimum, an estimation of the bid's success probability and Forescout's expected post-takeover price if the bid failed (to say nothing of the other relevant factors he fails to address including, among other things, the effect of the

---

[3] As Prof. Jiang's report explains, even the last of Dr. Nye's three factors—"the expected post-takeover price if it fails"—is distinct from the standalone price of the company pre-Merger announcement because, *e.g.*, the share price may need to account for the probability of a different buyer stepping in. Jiang Report ¶ 46; *compare* Nye Dep. 73:1-6 (testifying that elements that would go into the expected post-takeover price if the Merger bid were to fail amounted only to "Forescout as the public company.").

COVID-19 pandemic). Dr. Nye has not described any method for accounting for these factors in his report after February 6, 2020. Indeed, Prof. Jiang has opined that she is aware of no reliable methodology to make such a determination. Jiang Report ¶ 15. Defendants do not dispute that the need for individual damages calculations alone does not defeat class certification. *See* Br. at 19 (citing *Vaquero v. Ashley Furniture Indus.*, 824 F.3d 1150, 1155 (9th Cir. 2016)). But here, where Plaintiffs cannot articulate a consistent method for calculating damages across the Class Period and the proposed class did not suffer damages traceable to the same alleged course of conduct, individualized questions overwhelm common ones, precluding class certification.

The proposed class thus divides cleanly into two distinct time periods that require two distinct methods of assessing damages: the first from May 10, 2019[4] to, at the latest, February 6, 2020, premised on the claim that Forescout's stock was purportedly inflated due to the pipeline statements; and the second from May 12, 2020 to May 15, 2020, premised on the claim that Forescout's stock was purportedly inflated due to the May 11, 2020 statement about the Merger (issued after market close). During the gap between these two time periods (from February 6, 2020 through May 11, 2020), as Prof. Jiang explains in her report, there could not have been any pipeline-related inflation, as the stock price did not trade on fundamentals after the Merger announcement. Jiang Report ¶ 45.[5] Nor was there any inflation due to the alleged Merger misstatement during this time period, as the statement had not been made yet. *Id.* ¶ 54. Dr. Nye fails to acknowledge these additional contours in his proposed damages methodology. *Id.* ¶ 48.

Plaintiffs cannot avoid these fatal flaws by arguing, as they seem to suggest in their Complaint, SAC ¶ 60, that Advent's decision to enter into the Merger agreement was premised upon

---

[4] As noted above, *supra* p. 4, the first alleged misstatement occurred after the market closed on May 9, 2019. Plaintiffs' Motion offers no explanation of how those who purchased Forescout stock on May 9, 2019 were purportedly harmed under their theory when the first alleged misstatement occurred after the market closed that day.

[5] This conclusion is consistent with the academic literature, which finds that, once it is known that a company is a "target" for acquisition, its stock price is "largely driven by the expected deal completion, not [the company's] fundamentals." Jiang Report ¶ 39. It also finds support in contemporaneous analyst commentary, which shows that many analysts commented that Forescout's stock price was no longer driven by fundamentals following the Merger announcement. *Id.* ¶ 48.

the allegedly misleading 2019 pipeline statements, such that pipeline inflation was somehow baked into Advent's offer price. *See also* Nye Dep. 73:7-12 (testifying that Defendants "allegedly misled the market with respect to the company's true revenue prospects," and that this "wasn't fully appreciated under [P]laintiff[s'] theory of liability . . . until the end of the class period.") As an initial matter, Advent is a highly sophisticated private equity firm that engaged in extensive due diligence, including a thorough review of non-public information regarding Forescout's sales pipeline, its 2019 earnings, and its 2020 projections. Plaintiffs have no grounds to make an entirely speculative claim on Advent's behalf that Forescout misled Advent during the course of the Merger negotiations through its public statements about the 2019 pipeline or otherwise. Moreover, and fatally for Plaintiffs' theory, Advent did not proceed with the transaction as planned in May 2020 because of the Company's *2020* financial performance in the context of the intervening global pandemic, which Advent alleged constituted a material adverse effect under the transaction agreement. *See, e.g.*, SAC ¶ 70(A). Advent never alleged that any of the statements about Forescout's 2019 sales pipeline had an impact on its decision not to proceed with closing. And nothing in Forescout's announcement on May 18, 2020 referenced or related to the Company's 2019 sales performance, which had been fully disclosed months earlier. There is therefore no basis for any counterfactual speculation that any alleged pipeline-related inflation remained in Forescout's stock price following the Merger announcement, if indeed that is what Plaintiffs intend to argue (it is far from clear).

At a minimum, the differences in Plaintiffs' theories and the structural changes in Forescout's stock price after February 6, 2020 necessitate dividing the Class Period into sub-classes. Failure to divide the class in this manner would result in a damages model that is not "consistent with [Plaintiffs'] liability case," *Comcast*, 569 U.S. at 35, by awarding class members who purchased after February 6 with damages for purported pipeline inflation that did not exist at the time of their investment. A district court has broad power to facilitate management of class actions, including by creating such sub-classes as appropriate. *Am. Timber & Trading Co. v. First Nat. Bank of Oregon*, 690 F.2d 781, 786-87 (9th Cir. 1982); *see In re BP P.L.C. Sec. Litig.*, No. 4:10-md-2185, 2013 WL 6388408, at *17 (S.D. Tex. Dec. 6, 2013) (when evaluating Rule 23's adequacy requirement, holding that sub-classes were appropriate in light of the two "self-contained" time periods at issue). Because

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No. 3:20-cv-00076-SI

a securities class period cannot extend past the date of reasonable reliance on a defendants' allegedly false statements, the class should at a minimum be divided into two groups consisting of: (1) purchasers of Forescout stock from May 10, 2019 through February 6, 2020, at the latest; and (2) purchasers of Forescout stock from May 12, 2020 to May 15, 2020. *See Halliburton*, 573 U.S. at 278 (2014) (holding that investors are eligible for presumption of reliance—and, thus, for class membership—only if they "traded the stock between when the misrepresentations were made and when the truth was revealed"); *Hayes v. MagnaChip Semiconductor Corp.*, No. 14-cv-01160, 2016 WL 7406418, at *7-9 (N.D. Cal. Dec. 22, 2016) (ending class period at date of corrective disclosure because "subsequent disclosure made continued reliance on those financial reports unreasonable"); *In re Signet Jewelers Ltd. Sec. Litig*., No. 14-cv-01160, 2019 WL 3001084, at *18 (S.D.N.Y. July 10, 2019) ("In a securities fraud class action, courts are required to cut off the class period on the date of a statement or event that cures the market.").

**B.      Plaintiffs' Damages Model Does Not Articulate a Method for Disaggregating the Harm Allegedly Resulting from Plaintiffs' Two Theories of Liability**

As noted above, it is entirely unclear whether and to what extent Plaintiffs allege that inflation related to the 2019 pipeline statements remained impounded in Forescout's stock price by the time of the May 18, 2020 disclosure. Even if Plaintiffs could somehow show that the May 18 disclosure to some extent corrected both the pipeline-related statements and the Merger statement (they cannot), Plaintiffs' damages model does not—and could not—parse out the damages attributable to each of the two distinct theories of liability. In other words, Plaintiffs' damages model does not articulate a method for separating out (i) any alleged inflation from May 11, 2020 through May 15, 2020 that purportedly was due to the alleged pipeline misstatements from (ii) any alleged inflation during this time period that purportedly was due to the alleged Merger misstatement. This disaggregation is necessary if Plaintiffs are to argue that pipeline inflation continued until May 18 given that, even under Plaintiffs' theory of the case, not every member of the class suffered damages from both the alleged pipeline misstatements and the alleged Merger misstatement. Jiang Report ¶ 48. Moreover, as described in Section II.B below, the need to parse out the two causes of the alleged inflation creates a conflict between the class representatives that precludes certification under Rule 23(a)(4).

Dr. Nye's analysis disregards Plaintiffs' two distinct theories of liability and, in the process, he makes no effort to disaggregate any alleged inflation caused by the two different types of alleged misstatements. As Dr. Nye testified, he did not "disentangle[] the various company-specific pieces of information and their effects on the market price" throughout the Class Period, and while he proffered some methods that he said could potentially be used to do so, he identified no such method that would be appropriate and viable here based on Plaintiffs' specific theories of liability. Nye Dep. 74:25 – 76:6; *see also id.* 66:5-17 (when asked whether there was an economic method for "distinguishing between what the merger price does to the value of the stock versus how much of that residual price inflation might be in it," testifying that that is something he "would need to consider carefully" that was "outside the scope" of his report). Dr. Nye's analysis likewise fails to explain how he would disaggregate additional confounding variables affecting Forescout's stock price movement in May 2020, including the onset of a global pandemic that drastically impacted the tech sector. *See* Nye Report at 31 (recognizing that factors influencing price movement "can include changes in market and industry conditions or the dissemination of material, non-fraud-related, Company-specific information").

In light of *Comcast*, Dr. Nye's failure to propose a methodology that tracks Plaintiffs' two theories of liability is fatal to certification. Under *Comcast*, plaintiffs must provide "the specifics of their proposed [damages] methodology." *BP*, 2013 WL 6388408, at *17. A court is then required to "rigorously examine" and take a "hard look" at the proposed methodology "for disconnects between damages and liability." *Id.; see also Leyva v. Medline Indus., Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) ("[P]laintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability."); *Doyle*, 663 F. App'x at 579 (predominance not satisfied where plaintiff failed to offer a damages model to measure damages solely attributable to plaintiff's theory of liability).

Here, without a more complete explanation of how Plaintiffs propose to use an event study to calculate class members' damages—including how that event study will incorporate Plaintiffs' two distinct theories of liability and disaggregate inflation according to the two types of alleged misrepresentations—Plaintiffs cannot meet the requirements of Rule 23(b)(3). *See BP*, 2013 WL

6388408, at *16-17 (denying class certification where plaintiffs' damages methodology "[did] not disaggregate inflation according to the type of misrepresentation corrected or risk disclosed"). Plaintiffs cannot obscure the details of their damages methodology at the class certification stage and hope to clarify later. *See BP*, 2013 WL 6388408, at *17 (rejecting plaintiffs' argument that their event study would provide "options to the jury to disaggregate inflation by the type of misrepresentation, should the jury agree with [d]efendants that the misrepresentations were not part of a single, cohesive fraudulent scheme."). Nor are Plaintiffs saved by Dr. Nye's conclusory statement that "[a]fter isolating the price impact of the alleged misstatements and omissions, one can estimate the price inflation due to the alleged fraud for each day during the Class Period" given that he fails even to acknowledge Plaintiffs' two different theories of liability or articulate how he would parse out the inflation allegedly connected to these two theories. Nye Report ¶ 31.

The absence of a detailed explanation in Dr. Nye's report is not surprising, as Prof. Jiang is aware of no commonly accepted method to disaggregate the May 18, 2020 price drop into the alleged pipeline inflation and alleged Merger inflation. Jiang Report ¶ 15. While Dr. Nye testified as to certain methods that he *could* apply to disentangle company-specific pieces of information and their effects on the market price during the Class Period, *see* Nye Dep. 74:16 – 76:23, even if Dr. Nye had described these tools in his report and attempted to tie them to the facts of the case—which to be clear, he did not—none are viable here. Jiang Report ¶ 15; *Loritz v. Exide Techs.*, No. 2:13-cv-02607, 2015 WL 6790247, *22 (C.D. Cal. July 21, 2015) (denying class certification in part where plaintiffs' expert failed to "tie [his] theories [regarding techniques to compute damages in light of issues raised by defendants] to the facts of [the] case or to each other" and "fail[e]d to propose one model explaining how he would used these techniques in concert to calculate damages in this case."). Plaintiffs' proposed damages model is thus insufficient to support class certification.

## II.     PLAINTIFFS BOTH FAIL TO SATISFY RULE 23(a)'S TYPICALITY AND ADEQUACY REQUIREMENTS

Regardless of the Court's determination under Rule 23(b), to certify a class it must also conclude that the action meets all four requirements under Rule 23(a): numerosity, commonality, typicality, and adequacy. *See* Fed. R. Civ. P. 23(a)(1)-(4). "The United States Supreme Court requires district courts to engage in a 'rigorous analysis' of each Rule 23(a) factor when determining

whether plaintiffs seeking class certification have met the requirements of Rule 23." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 980 (9th Cir. 2011) (citing *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)). Plaintiffs are unable to satisfy the typicality and adequacy standards in particular, and class certification should therefore be denied. In the alternative, the Court should define two distinct sub-classes to account for the distinct theories advanced by different categories of Forescout investors.

Under Rule 23(a)(3), Plaintiffs must establish that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). This involves a determination as to whether "plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Amchem*, 521 U.S. at 626 n.20. The Ninth Circuit has held that "class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).

Rule 23(a)(4) requires that any class representative "fairly and adequately protect the interests of the class." Adequate representation depends upon, among other things, "an absence of antagonism between representatives and absentees, and a sharing of interest between representatives and absentees." *Ellis*, 657 F.3d at 985. Although adequacy is a distinct standard from typicality, the two are significantly interrelated. *See, e.g.*, *A&J Deutscher Family Fund v. Bullard*, No. 85-1850, 1986 WL 14903, at *7 (C.D. Cal. Sept. 22, 1986) (recognizing "considerable overlap between the typical[it]y prerequisite of Rule 23(a)(3) and the adequate representation requirement of Rule 23(a)(4)").

Both proposed class representatives fail under a Rule 23(a) analysis. Glazer is neither adequate nor typical of the class for the period before May 11, 2020 because it is a merger arbitrageur that followed a trading strategy divorced from the fundamentals of Forescout securities. Glazer only purchased Forescout securities during the final months of the Class Period, after a series of disclosures directly addressing the allegedly misleading information regarding Forescout's sales pipeline that Plaintiffs claim had been concealed. Glazer is likewise atypical and inadequate as to the period following May 11, 2020 given that ███████████████████████████████

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No. 3:20-cv-00076-SI

███████████████████████████████████████████████████

████████████████████████████████ Ort (Glazer) Dep. 157:5-11 ████████

████████████████████████████ Moreover, neither named Plaintiff is adequate given the intrinsic conflict between the two with respect to their damages claims, as discussed above.  Plaintiffs therefore fail to satisfy Rule 23(a).

**A.    Glazer Satisfies Neither the Adequacy nor the Typicality Requirements with Respect to the Entire Class Period**

Glazer is atypical and inadequate as to the entire Class Period because its trading strategy drastically differed from other Forescout investors, and there remain significant questions about its actual reliance on the alleged misstatements in this case—including the one alleged misstatement made after it began trading in Forescout.  Specifically, Glazer is atypical and inadequate as to, at a minimum, the period before the May 11, 2020 Merger-related statement because, unlike most of the class it seeks to represent, its investment in Forescout was premised not on the fundamentals of Forescout's business, but rather on speculation as to whether Forescout's Merger with Advent would ultimately be consummated and at what price.  Indeed, Glazer held no Forescout securities for the vast majority of the alleged Class Period and did not even begin to trade in Forescout until the day that Forescout announced the Merger, at which point all but one alleged misstatement had been made.  Once Glazer started trading in Forescout, it is clear even from the current incomplete discovery record that it did not rely upon any alleged misstatements, meaning Glazer is subject to unique defenses and atypical and inadequate to serve as a class representative.

**i.    *Glazer is Atypical and Inadequate, at a Minimum, as to the Period Before May 11, 2020***

Glazer's history of trading in Forescout precludes a claim that it was harmed by any misstatements allegedly made by the Company prior to May 11, 2020.  ████████████

███████████████████████████████████████████████████

████████████████████████ Ort (Glazer) Dep.  73:10 – 74:10.[6]  ████████

---

[6] As Prof. Jiang explains, when a merger or acquisition is announced, the stock of the target company typically trades at a discount to the announced transaction price offered by the acquirer.  The discount between the transaction price and the trading price is known as the "arbitrage spread."  In its simplest form, the goal of an investor pursuing a merger arbitrage strategy is to capture the arbitrage spread

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████ Ort (Glazer) Dep.  80:25 – 81:17; 161:21-25. In other words, Glazer's only involvement in this case relates to the period following February 6, 2020, during which time only one misstatement was allegedly made, and no misstatements about the pipeline were allegedly made.[7]

Though the record regarding Glazer's investment decisions remains incomplete due to its intransigence in responding to Defendants' document requests, it is clear Glazer at a minimum did not rely on any of the alleged pipeline misstatements, all of which significantly predated Glazer's first purchase. ████████████████████████████████████████████████████ ████████████████████████████ *see* Ort (Glazer) Dep. 55:13 – 56:16, 68:2-10, ████████ ████████████████████████████████ *See* Ex. 11. ████████████████ ████████████████████████████████ *Id.*; Ort. (Glazer) Dep. 130:2-8.  *See Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ("Any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance.").  Given that (unlike other investors) Glazer pursued a strategy untethered from Forescout's fundamentals and did not rely on the alleged pipeline misstatements, it is differently situated from other class members and ill-suited as a class representative, at a minimum, for the period before the alleged Merger misstatement on May 11, 2020.

In a recent, very similar matter involving claims under Section 14(a), the District of Delaware excluded all merger arbitrageurs from the class at the certification stage on both typicality and adequacy grounds.  *See Jaroslawicz v. M&T Bank Corp.*, No. 15-00897, 2023 WL 5528723, at *29, 34 (D. Del. Aug. 28, 2023).  In analyzing typicality, the court observed that the "investment activities [and] objectives [of merger arbitrageurs] may not be typical of the broader class of traditional

---

by purchasing the target's stock at a price below where the arbitrageur anticipates the transaction will ultimately close, and then selling those shares for a profit when the merger closes.

[7] Moreover, as Prof. Jiang opines, there was no inflation in Forescout's stock price related to the alleged pipeline misstatements between February 6, 2020 and May 11, 2020.

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No. 3:20-cv-00076-SI
19

shareholders." *Id.* at \*28.  As Defendants' expert here, Prof. Jiang, explained in *M&T Bank*, "merger arbitrageurs [were] positioned differently than traditional investors with respect to the materiality" of the alleged omissions and "the nature of the damages they could have experienced from merger delays and share price fluctuations." *Id*. at \*28.  Specifically, the merger arbitrageurs could not have been harmed by any purported omissions in the issuer's proxy statement because their investment strategy was dependent on the merger-arbitrage spread and deal closure, rather than the issuer's stock performance. *Id.* at \*27.  The court ultimately excluded all merger arbitrageurs from the class, finding that the interests of traditional shareholders "[were] not aligned with those of merger arbitrageurs." *Id.* at \*34; *see also Kaufman v. Lawrence*, No. 74 Civ. 5081, 1977 U.S. Dist. LEXIS 13206 at \*3-4 (S.D.N.Y. Oct. 31, 1977) (noting that excluded institutional arbitrageurs "do not stand in the position of the public, unprofessional investor and, accordingly, the distinction between them and the public shareholder is rational, justified, and fair"); *Amchem*, 521 U.S. at 594-95 ("Representatives must be part of the class and possess the same interest and suffer the same injury as the class members.").

The same rationale applies here with respect to statements made before May 11.  As discussed above in detail and in the Jiang Report, the market for Forescout's stock following the Merger announcement became uncorrelated with the Company's fundamentals and instead was almost entirely influenced by, among other things, the Advent offer price. Jiang Report ¶ 45.  Glazer entered into this post-Merger announcement environment with a specific plan: to place a bet as to whether the Merger would close.  As Prof. Jiang has opined, this is a fundamentally different investment objective and approach to risk than non-merger arbitrageur investors, who principally looked to Forescout's fundamentals and, therefore, may have potentially considered the alleged pipeline misstatements. *Id.* ¶ 43.  Glazer's posture is therefore entirely different from other investors with respect to both the materiality of Defendants' alleged misstatements and the nature of damages allegedly suffered before May 11. *See Jaroslawicz*, 2023 WL 5528723, at \*28.

### ii.    Glazer is Generally Atypical and Inadequate

Moreover, Glazer is inadequate and atypical as to the entirety of the class period, including following May 11, 2020, because discovery to date suggests that Glazer's approach to investing may expose it to unique defenses.  As described above, Glazer unquestionably did not rely upon the

alleged pipeline misstatements, which were made in 2019. ████████████████████

████████████████████████████████████████████████████████████████

Ort (Glazer) Dep. 157:5-11 ████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████ *See Basic*, 485 U.S.

at 248.  For this reason, Glazer's claims are not typical of the class, and it is therefore not suited to

serve as a class representative in this matter. *See e.g.*, *Mulderrig v. Amyris, Inc.*, 340 F.R.D. 575, 582

(N.D. Cal. 2021) (lead plaintiff atypical because he was "in a uniquely different situation than the

other class members," in part because he made a series of tweets that demonstrated that he in fact

understood the very statements that he later asserted through the lawsuit were misleading); *Rolex v.*

*Emps. Ret. Trust v. Mentor Graphics Corp.*, 136 F.R.D. 658, 664 (D. Or. 1991) (lead plaintiff atypical

because "there are questions concerning the materiality to [plaintiff] of the integrity of the market

and the alleged misrepresentations of the defendants in making his decision to trade in the stock").

What Glazer *did* rely on in making its investments is less clear, underscoring the unique

defenses available in this case. ████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████ Ex.  11 ████████████████████████

████████ ; Ort (Glazer) Dep. 139:19 – 140:4. ████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████ Ex. 11 ████████████████████████ Ort (Glazer) Dep. 132:24 –

139:3, 213:14 – 214:5. ████████████████████████

████████████████████████████████████████ Ort (Glazer) Dep. 132:24 –

138:7.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████ ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████

The very fact that further discovery is necessary to assess the particular bases for Glazer's individual investment decisions weighs against certification. Courts have specifically found that plaintiffs were atypical based on the mere existence of bona fide factual questions about whether the non-public information they had access to was relevant to their decisions to purchase stock. *See Landry v. Price Waterhouse Chartered Accts.*, 123 F.R.D. 474, 476 (S.D.N.Y. 1989) (holding that certain plaintiffs were atypical because of unique defenses related to certain non-public information they had access to, but noting: "However, whether these defenses will be successful is of no matter. The fact that plaintiffs will be subject to such defenses renders their claims atypical of other class members."). For this reason, class certification as to Glazer should be denied. *See Hanon*, 976 F.2d at 508; *Gordon v. Sonar Cap. Mgmt.*, 92 F. Supp. 3d 193, 201, 205 (S.D.N.Y. 2015) (certification motion denied where plaintiff was "likely to focus on [a unique defense] to the detriment of the class").

**B.    Plaintiffs Cannot Adequately Represent the Class Due to the Conflict Between Them**

Both Plaintiffs are likewise inadequate to serve as lead class representatives for the independent reason that there is an unavoidable conflict between them with respect to the damages

---

[8] The Parties submitted a Joint Statement regarding a discovery dispute related to the review and production of Glazer's emails on December 13, 2023. The production of emails that were exchanged during the time when Glazer was purchasing and selling Forescout stock would provide the contemporaneous details of Glazer's trading strategy ████████████████████ *See, e.g.*, Ort (Glazer) Dep. 148:4-17 ████████████

████████████████████

they claim, as addressed in Section I, *supra*.  As a result, at a minimum, the Court should decline to certify the continuous Class Period alleged in the Complaint.

Rule 23(a)(4)'s adequacy component hinges on two questions: "(1) whether the representative plaintiffs and their counsel have any conflicts of interest with other class members, and (2) whether the representative plaintiffs and their counsel will prosecute the action vigorously on behalf of the class."  *May v. Gladstone*, 562 F. Supp. 3d 709, 712 (C.D. Cal. 2021); *see also Berman v. Freedom Fin. Network, LLC*, 400 F. Supp. 3d 964, 985 (N.D. Cal. 2019) (adequacy means that "the representative does not have any conflicts of interest with other class members and will prosecute the action vigorously on behalf of the class.").  "[U]ncovering conflicts of interest between the named parties and the class they seek to represent is a critical purpose of the adequacy inquiry." *May*, 562 F. Supp. at 712 (citing *Rodriguez v. West Publ'g. Corp.*, 563 F.3d 948, 959 (9th Cir. 2009)).

Here, as addressed in Section I, *supra*, the named Plaintiffs' theories of the case are plainly at odds with one another due to the timing of their trades and the nature of their investment approaches.  This conflict would impact how Plaintiffs pursue and prioritize discovery from Defendants and lead to insurmountable tension with respect to calculation of damages.  ███████ ████████████████████████████████████████████  *See* Ort (Glazer) Dep. 73:3-9; Dkt. 66, Ex. C, Schedule A.  Because Forescout's stock price was dictated by the Merger price prospects during that period, Glazer can only reasonably claim damages related to the lone remaining Merger statement, and not in connection with the sales pipeline statements.  *See supra* Section I.A.  Meitav, in contrast, claims damages throughout the proposed Class Period, and it bought all but 60 of its shares in Forescout prior to the Merger statement.  *See* Dkt. 86, Ex. A at 2-7; Jiang Report ¶ 96 (noting that by February 6, 2020, Meitav had purchased 26,089 shares).

Even if Plaintiffs could somehow demonstrate that Forescout's stock price remained inflated due to the alleged sales pipeline misstatements until May 18, 2020, constructing a class-wide damages model in that context would create irreconcilable conflict between Meitav and Glazer. Meitav and Glazer will be forced to argue directly competing positions regarding the portion of the May 18, 2020 stock price drop that is attributable to alleged misstatements regarding the sales

pipeline versus the Merger.[9]  Specifically, Meitav will be incentivized to argue that the majority of the May 18, 2020 stock drop was due to the removal of alleged inflation due to purported pipeline misrepresentations (as opposed to the removal of alleged inflation due to the purported Merger misrepresentation).  The larger the portion attributed to the removal of inflation due to pipeline misrepresentations, the greater the damages awarded to Meitav.  It would be in Glazer's best interest, however, to argue the opposite—that a larger portion of the May 18, 2020 stock drop was due to the removal of inflation due to the Merger misstatement.  *See* Jiang Report ¶¶ 97, 100.  For this reason, the Court should deny the Motion or, at most, establish sub-classes with respect to the different theories at issue.  *See, e.g.*, *BP*, 2013 WL 6388408, at \*10-11 (declining to certify full class period due to apparent conflict between class members based on distinctions in the timing of their trades).

## CONCLUSION

For the foregoing reasons, Plaintiffs' Class Certification Motion should be denied in its entirety.  Alternatively, Defendants request that the Court certify only the following sub-classes: (1) May 10, 2019 to, at the latest, February 6, 2020; and (2) May 12, 2020 to May 15, 2020.

---

[9] As described above, *supra* Section I, Prof. Jiang is aware of no commonly accepted method for parsing out the two different types of alleged inflation.  While Plaintiffs could try multiple methods and attempt to establish a range of estimates for the two types of alleged inflation, doing so would create the conflict discussed herein, precluding class certification.  *See* Jiang Report ¶ 16.

Dated:  December 22, 2023

**ROPES & GRAY LLP**                          **WILSON SONSINI GOODRICH &**
                                              **ROSATI, Professional Corporation**


 */s/ Amy Jane Longo*                          */s/ Diane M. Walters*
Amy Jane Longo                                Ignacio E. Salceda
Mark S. Gaioni                                Diane M. Walters
10250 Constellation Boulevard                 Rebecca L. Epstein
Los Angeles, CA 90067                         650 Page Mill Road
Tel: (310) 975-3300                           Palo Alto, CA 94304
amy.longo@ropesgray.com                       Tel: (650) 493-9300
mark.gaioni@ropesgray.com                     isaceda@wsgr.com
                                              dwalters@wsgr.com
Anne Johnson Palmer                           bepstein@wsgr.com
Three Embarcadero Center
San Francisco, CA 94111                       *Attorneys for Defendants Michael DeCesare*
Tel: (415) 315-6300                           *and Christopher Harms*
anne.johnsonpalmer@ropesgray.com

Peter L. Welsh (admitted *pro hac vice*)
C. Thomas Brown (admitted *pro hac vice*)
Prudential Tower
800 Boylston Street
Boston, MA 02199
Tel: (617) 951-7000
peter.welsh@ropesgray.com
thomas.brown@ropesgray.com

Charles D. Zagnoli (admitted *pro hac vice*)
191 North Wacker Drive, 32nd Floor
Chicago, IL 60606
Tel: (312) 845-1200
charles.zagnoli@ropesgray.com

*Attorneys for Defendant Forescout*
*Technologies, Inc.*

**<u>ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)</u>**

I, Amy Jane Longo, am the ECF User whose identification and password are being used to file this document.  In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that all signatories have concurred in this filing.

Dated: December 22, 2023                                    */s/ Amy Jane Longo*
                                                                        Amy Jane Longo

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
Case No. 3:20-cv-00076-SI
26