# EXHIBIT 1 FILED UNDER SEAL

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

|  |  |
|---|---|
| CHRISTOPHER L. SAYCE, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>FORESCOUT TECHNOLOGIES, INC., et. al.<br><br>Defendants. | CASE NO.: 20-CV-00076-SI |

**EXPERT REPORT OF PROFESSOR WEI JIANG**

**December 22, 2023**

**TABLE OF CONTENTS**

I.   INTRODUCTION ............................................................................................................. 1

     A.  Qualifications ...................................................................................................... 1

     B.  Assignment and Compensation ........................................................................... 3

     C.  Materials Relied Upon ........................................................................................ 4

     D.  Summary of Opinions .......................................................................................... 4

II.  SUMMARY OF PLAINTIFFS' ALLEGATIONS AND DR. NYE'S OPINION
     REGARDING DAMAGES METHODOLOGY ................................................................. 5

     A.  The Alleged Misstatements ................................................................................. 5

         1)  The Alleged 2019 Sales Pipeline Misstatements ..................................... 5

         2)  The Alleged Merger Misstatement ........................................................... 7

     B.  The Alleged Corrective Disclosures ................................................................... 7

     C.  Summary of Dr. Nye's Purported "Class-Wide Damages" Methodology ..................... 9

III. THE NYE METHODOLOGY FAILS TO CONSIDER THE ABSENCE OF ANY
     ALLEGED INFLATION IN FORESCOUT'S STOCK PRICE FROM FEBRUARY 6 TO
     MAY 11, 2020 ......................................................................................................... 11

     A.  Forescout's Price Change Following Its February 6, 2020 Announcements ................. 11

     B.  Forescout's Stock Price Reaction Following the Company's February 6, 2020
         Announcements Is Consistent with Academic Literature ............................................. 12

     C.  Equity Analyst Commentary on Forescout's Stock Price Reaction Following the
         February 6, 2020 Announcements ..................................................................... 15

     D.  Forescout's Stock Price Could Not Have Been Inflated Between February 6 and May
         11, 2020 Even Under the Continuing Sales Pipeline Inflation Theory ......................... 16

IV.  THE NYE METHODOLOGY FAILS TO EXPLAIN HOW THE ALLEGED MERGER
     INFLATION CAN BE SEPARATED FROM FORESCOUT STOCK'S ABNORMAL
     RETURN ON MAY 18, 2020 ...................................................................................... 21

     A.  Forescout's Stock Price Reaction Following the May 18, 2020 Announcement .......... 21

     B.  Equity Analyst Commentary on Forescout's Stock Price Reaction Following the May
         18, 2020 Announcement ..................................................................................... 22

     C.  In Addition to Deal Risk Readjustment, Forescout's May 18, 2020 Price Drop also
         Reflected the Market's Reassessment of Its Standalone Value ................................... 25

V.   NO COMMONLY ACCEPTED METHOD EXISTS TO SEPARATE THE ALLEGED
     MERGER INFLATION FROM FORESCOUT'S ABNORMAL RETURN ON MAY 18,
     2020 ....................................................................................................................... 27

     A.  Discounted Cash Flow ("DCF") Modeling Is Not a Reliable Method for Disentangling
         the Impacts of "Competing Information" ............................................................. 28

B.   Academic Findings on Average Price Impact of Corporate Events Is Not a Reliable Method for Disentangling the Impacts of "Competing Information" ............................. 29

C.   Content Analysis of Analyst Commentary Is Not a Reliable Method for Disentangling the Impact of "Competing Information" ........................................................................... 30

D.   Options Analysis Is Not a Reliable Method for Disentangling the Impacts of "Competing Information" .................................................................................................. 30

VI.  DISENTANGLING THE TWO ALLEGED INFLATION COMPONENTS UNDER THE CONTINUING SALES PIPELINE INFLATION THEORY ALSO CREATES A CONFLICT AMONG DIFFERENT COHORTS OF THE PROPOSED CLASS ................ 34

A.   Under the Continuing Sales Pipeline Inflation Theory, It Is also Necessary to Disentangle the Alleged Sales Pipeline Inflation and the Alleged Merger Inflation in Forescout's Abnormal Return on May 18, 2020 ............................................................. 34

B.   Conflict between the Two Lead Plaintiffs, Meitav and Glazer ...................................... 36

1)   Meitav ...................................................................................................................... 36

2)   Glazer ...................................................................................................................... 37

C.   Conflict between the Cohorts of the Proposed Class Similarly Situated as the Lead Plaintiffs Under the Continuing Sales Pipeline Inflation Theory ................................... 38

## I.    INTRODUCTION

### A.    Qualifications

1.    I am currently the Asa Griggs Candler Professor of Finance and Vice Dean of Faculty and Research at Emory University Goizueta Business School.  Prior to joining the faculty at Emory in July 2022, I was the Arthur F. Burns Professor of Free and Competitive Enterprise at Columbia University Graduate School of Business, where I also served in various administrative roles, including the Vice Dean of Curriculum and Instruction from July 2016 to August 2019, and prior to that, the Chair of the Finance Division and the Director of the Chazen Institute for Global Business.  I am a Research Associate of the National Bureau of Economic Research (NBER) in two departments: Law and Economics, and Corporate Finance.  I am also a Senior Fellow at the Program on Corporate Governance at Harvard Law School.  I was a visiting professor and Scholar-in-Residence at Columbia Law School in 2009 and 2014.

2.    I received a Ph.D. in economics from the Department of Economics at the University of Chicago.  I received my undergraduate training in economics at Fudan University in Shanghai, China.

3.    My research and teaching have focused on the fields of corporate finance, corporate governance, and institutional investors.  I have authored or coauthored over 35 research papers that have been published in peer-reviewed journals, many of which have been featured in the top journals in economics, finance, accounting, and law.  My academic work has been recognized by numerous honors bestowed by academic and professional organizations, including annual best paper prizes from the top three finance journals (*Journal of Finance, Review of Financial Studies*, and *Journal of Financial Economics*) and research awards from industry organizations such as the Q Group and Chicago Quantitative Alliance. I have authored extensive works on corporate finance and governance issues related to control changes.  I have also published extensively on topics specifically pertaining to mergers and acquisitions ("M&A").  For example, in my paper published in *Journal of Finance* in 2012, my coauthors and I estimated how stocks' market prices adjust to incorporate the prospect of a takeover.  In a more recent *Journal of Finance* publication in

1

2018, my coauthors and I studied how revisions to premia in deal offer prices impact target shareholders and merger arbitrageurs. A companion paper (published in *Finance Research Letters*) demonstrates that the involvement of activist merger arbitrageurs in deals may also benefit acquiror shareholders. In addition, I am an author on the first comprehensive empirical study in a peer-reviewed journal (*Journal of Law and Economics*) on the returns and risk from appraisals following M&As.

4.    I was an Editor of *Review of Financial Studies* from January 2017 to December 2019. I served on the Board of the American Finance Association ("AFA," the premier academic finance organization) from 2017 to 2020. Recently, I was elected the Vice President of the AFA and will serve as the AFA's President-Elect in 2025 and President in 2026. I was also nominated and appointed a Fellow of the Financial Management Association ("FMA") in 2018. Established in 2000, the FMA Fellows Program recognizes individuals who have made significant contributions to the profession. Currently I serve as the President of the Society of Financial Studies, the academic finance association that sponsors *Review of Financial Studies*. My research has been featured in major media outlets, including the *Wall Street Journal*, *New York Times*, *Financial Times*, *Economist*, *Businessweek*, and *Institutional Investors*. I have published "op-ed" pieces, including in *Reuters* and the *Financial Times*. I have frequently been invited to give seminars and keynote speeches at academic and practitioner conferences.

5.    I have 22 years of experience teaching Corporate Finance in the undergraduate, MBA, EMBA, Masters, and Ph.D. programs at Emory University, Columbia University, and the Wharton School of the University of Pennsylvania, covering topics including financial performance, firm valuation, corporate governance, and empirical methods. I have also taught courses in Financial Econometrics at the University of Chicago in undergraduate and masters programs. I am a seven-time winner of teaching excellence awards at Columbia Business School.

6.    A detailed list of my experience and research publications is included in my *curriculum vitae*, which is attached as **Appendix A** to this report. A list of cases in which I have provided expert testimony in the preceding four years is attached as **Appendix B** to this report.

2

## B.    Assignment and Compensation

7.    This is a proposed securities class action brought by Glazer Capital Management, L.P. and certain of its affiliates ("Glazer") and Meitav Tachlit Mutual Funds Ltd. ("Meitav") (collectively "Plaintiffs"), individually and on behalf of all others purportedly similarly situated, against Forescout Technologies, Inc., ("Forescout") and two of Forescout's former officers, Michael DeCesare and Christopher Harms (collectively, "Defendants").[1] Plaintiffs allege that they suffered damages due to Defendants' purported misstatements and seek certification of a class (the "Proposed Class") consisting of all those "who purchased or otherwise acquired the common stock of Forescout between May 9, 2019 and May 15, 2020, both dates inclusive" (the "Proposed Class Period").[2] In support of Plaintiffs' Class Certification Motion, Plaintiffs filed an expert report by Dr. Zachary Nye ("Dr. Nye") dated October 27, 2023 (the "Nye Report").[3]

8.    Counsel for the Defendants, Ropes & Gray and Wilson Sonsini Goodrich & Rosati ("Counsel"), have asked me to review the Nye Report and to respond to Section VII titled, "Damages Can Be Measured on a Class-Wide Basis and in a Manner Consistent with Lead Plaintiffs' Theory of Liability."

9.    I bill on a time and materials basis for my work in connection with this assignment. My hourly rate is $975. I have been supported in my work by staff at Analysis Group, working under my direction. None of my compensation, nor that of the Analysis Group staff supporting me, depends in any way on the opinions I express or the outcome of this matter.

---

[1] Christopher L. Sayce, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Forescout Technologies, Inc., Michael DeCesare, and Christopher Harms, Defendants, United States District Court, Northern District of California, San Francisco Division. Case No.: 20-CV-00076-SI, Second Consolidated Amended Complaint, May 10, 2021 ("SCAC").

[2] Christopher L. Sayce, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Forescout Technologies, Inc., Michael DeCesare, and Christopher Harms, Defendants, United States District Court, Northern District of California, San Francisco Division. Case No.: 3:20-cv-00076-SI, Plaintiffs' Notice of Motion and Motion for Class Certification, and Appointment of Class Representatives and Class Counsel, October 27, 2023 ("Plaintiffs' Class Certification Motion"), p. i. I note that the first alleged misstatement was made after the market closed on May 9, 2019. As such, those who bought Forescout's stock during market hours on May 9, 2019 were not affected by the alleged misstatement. However, for the purposes of this report, I adopt Plaintiffs' Proposed Class Period definition.

[3] Expert Report of Zachary Nye, Ph.D., dated October 27, 2023, attached as Exhibit A to the Declaration of Omar Jafri, filed in support of the Plaintiffs' Class Certification Motion.

C. **Materials Relied Upon**

10. I have prepared this report based on the documents and other evidence available to me to date. A list of the materials I have relied upon is included in **Appendix C.** I have also drawn on my extensive experience as a financial economist.

D. **Summary of Opinions**

11. As I discuss in detail in the remainder of this report, I have formed the following opinions:[4]

12. Contrary to Dr. Nye's assertion, the "general economic framework" described in the Nye Report is not a reliable class-wide common method for assessing damages purportedly suffered by each member of the Proposed Class in a "manner consistent with Lead Plaintiffs' theory of liability," for the following reasons.

13. First, the Nye Methodology would mechanically calculate an alleged price inflation present in Forescout's stock price from February 6, 2020 to May 11, 2020, even though neither the Alleged Sales Pipeline Inflation nor the Alleged Merger Inflation was then present in Forescout's stock price.

14. Second, to the extent that the Nye Methodology attributes Forescout's entire abnormal return on May 18, 2020 to the removal of the Alleged Merger Inflation, it is inappropriate, because Forescout's May 18, 2020 abnormal return also reflected the effects of confounding information unrelated to any alleged misstatements.

15. Third, Dr. Nye has not explained how the generic Nye Methodology could separate the removal of the Alleged Merger Inflation and/or the Alleged Sales Pipeline Inflation from Forescout's abnormal return on May 18, 2020. I am aware of no well-accepted reliable method to do so.

16. Fourth, any attempt to disentangle the removal of the Alleged Merger Inflation and the Alleged Sales Pipeline Inflation from Forescout's abnormal return on May 18, 2020 would create a conflict between the two Lead Plaintiffs, Glazer and Meitav. This conflict highlights a broader conflict that exists between different cohorts of the Proposed Class similarly

---

[4] Unless already defined, capitalized terms in this subsection are defined in the main body of this report.

4

situated as the Lead Plaintiffs.  The generic Nye Methodology is incapable of resolving such conflict.  In addition, Lead Plaintiff Glazer is a merger arbitrageur and is differently situated compared to investors who bought Forescout stock before February 6, 2020 who may claim Alleged Sales Pipeline Damages.  The Nye Methodology has not considered this difference.

## II.    SUMMARY OF PLAINTIFFS' ALLEGATIONS AND DR. NYE'S OPINION REGARDING DAMAGES METHODOLOGY

### A.    The Alleged Misstatements

17.  I understand that based on the opinion by the Ninth Circuit Court of Appeals dated March 16, 2023, only two types of alleged misstatements remain in this case.[5]  The first type includes alleged misstatements made on five different days in 2019, related to Forescout's sales pipeline (the "Alleged 2019 Sales Pipeline Misstatements"), whereas the second type includes one alleged misstatement on May 11, 2020 (the "Alleged Merger Misstatement"), related to the pending acquisition by Advent International ("Advent") at a price of $33 per share of Forescout stock, originally announced on February 6, 2020.[6]  I briefly describe each alleged misstatement below.  Each of these alleged misstatements is also marked on **Exhibit 1**, which is a chart showing Forescout's stock price from April 1, 2019 to August 17, 2020 (when Advent completed its tender offer to acquire all outstanding shares of Forescout stock at $29 per share).[7]

1)  The Alleged 2019 Sales Pipeline Misstatements

18.  After the market close on May 9, 2019, Forescout issued a press release announcing its Q1 2019 financial results and the guidance for Q2 2019 revenues.[8]  Plaintiffs allege that

---

[5] Glazer Capital Management, L.P.; Glazer Enhanced Fund L.P.; Glazer Enhanced Offshore Fund, Ltd.; Glazer Offshore Fund, Ltd.; Highmark Limited; Meitav Tachlit Mutual Funds Ltd., Plaintiffs-Appellants, v. Forescout Technologies, Inc.; Michael DeCesare; Christopher Harms, Defendants-Appellees, No. 21-16876,  D.C. No. 3:20-cv-00076-SI, Opinion, United States Court of Appeals For The Ninth Circuit Ninth Circuit Court of Appeals Opinion filed March 16, 2023 ("Court of Appeals Opinion"),  pp. 2, 59.
[6] Court of Appeals Opinion, pp. 22, 59.
[7] "Advent International Completes Tender Offer for Shares of Forescout Technologies," *Advent*, August 17, 2020, available at https://www.adventinternational.com/advent-international-completes-tender-offer-for-shares-of-forescout-technologies/.
[8] "Forescout Technologies Reports First Quarter 2019 Financial Results," *GlobeNewswire*, May 9, 2019, available at https://www.globenewswire.com/en/news-release/2019/05/09/1821356/0/en/Forescout-Technologies-Reports-First-

Defendants made misstatements during an earnings conference call on that day, when discussing "slipped" deals, *i.e.,* deals that Forescout had expected to close within the second quarter but now were expected to close in the latter part of the year.[9]

19. <u>After the market close on August 7, 2019</u>, Forescout released its Q2 2019 financial results and held an earnings conference call.[10]  Plaintiffs allege that on this call, Defendant Michael DeCesare "falsely claimed that Forescout's rate of closing deals 'remain[s] very strong' and 'very healthy,' misleadingly blamed a poor performance in the second quarter to 'pent-up demand,' and said the Company was 'very comfortable in our pipeline, rolling in both the third and the fourth quarter, but we think we've kind of measured those two things appropriately in our guidance.'"[11]

20. <u>On August 12, 2019</u>, in the KeyBanc Capital Markets Technology Leadership Forum, Defendant Christopher Harms indicated that Forescout still had "confidence" about how certain "deals were taking shape."[12]  Plaintiffs allege this to be a misstatement.[13]

21. <u>On October 10, 2019</u>, Forescout issued a press release announcing that it expected its Q3 2019 revenues to be lower than the projections announced in August 2019.[14] Plaintiffs claim that Defendants made a misstatement when stating that the Q3 results were "impacted by extended approval cycles which pushed several deals out of the third quarter" and that the impact was "most pronounced in" the Europe, Middle East, and Africa ("EMEA") region "against the backdrop of a challenging macro-economic environment" and that "the fundamentals of [the] business remain strong" and the sales pipeline "continued to grow."[15]

---

Quarter-2019-Financial-Results.html. Henceforth, I refer to Forescout's four fiscal quarters as "Q1", Q2," "Q3," and "Q4," respectively.

[9] SCAC, ¶ 97.

[10] "Forescout Technologies Reports Second Quarter 2019 Financial Results," *GlobeNewswire*, August 7, 2019, available at https://www.globenewswire.com/en/news-release/2019/08/07/1898692/0/en/Forescout-Technologies-Reports-Second-Quarter-2019-Financial-Results.html.

[11] SCAC, ¶ 110.

[12] SCAC, ¶ 115.

[13] SCAC, ¶ 116.

[14] "Forescout Technologies Announces Preliminary Third Quarter 2019 Financial Results," *GlobeNewswire*, October 10, 2019, available at https://www.globenewswire.com/news-release/2019/10/10/1928027/0/en/Forescout-Technologies-Announces-Preliminary-Third-Quarter-2019-Financial-Results html.

[15] SCAC, ¶ 117; "Forescout Technologies Announces Preliminary Third Quarter 2019 Financial Results," *GlobeNewswire*, October 10, 2019, available at https://www.globenewswire.com/news-release/2019/10/10/1928027/0/en/Forescout-Technologies-Announces-Preliminary-Third-Quarter-2019-Financial-Results.html.

22.  <u>After the market close on November 6, 2019</u>, Forescout stated that Q3 2019 results "were impacted by extended sales cycles, with the resulting revenue shortfall most pronounced in EMEA," which Plaintiffs allege is a misstatement.[16]

      2)  The Alleged Merger Misstatement

23.  On February 6, 2020, Forescout announced that Advent had agreed to acquire Forescout for $33 per share in cash (the "Acquisition Announcement").[17]  I understand that the only Alleged Merger Misstatement currently remaining in the case is from a Forescout press release issued after the market close on May 11, 2020, stating that "[w]e look forward to completing our pending transaction with Advent."[18]  Plaintiffs allege that this statement is misleading because the press release failed to mention that on May 8, 2020, an Advent representative informed Forescout's CEO that it was "considering not closing" the merger.[19]

**B.    The Alleged Corrective Disclosures**

24.  I understand that in a complaint filed on January 2, 2020 (the "First Complaint"),[20] plaintiff Christopher Sayce alleged that the corrective disclosure with respect to the alleged 2019 sales pipeline misstatements occurred during pre-market hours on October 10, 2019, when Forescout issued a press release announcing its preliminary Q3 2019 financial results that "lowered 3Q19 revenue guidance to $90.6 million to $91.6 million, compared to prior revenue guidance of $98.8 million to $101.8 million, and market consensus of $100.52 million."[21]

---

[16] SCAC, ¶ 120; "Forescout Technologies Reports Third Quarter 2019 Financial Results," *GlobeNewswire*, November 6, 2019, available at https://www.globenewswire.com/en/news-release/2019/11/06/1942616/0/en/Forescout-Technologies-Reports-Third-Quarter-2019-Financial-Results html.

[17] "Forescout to be Acquired by Advent International in $1.9 Billion Transaction," *GlobeNewswire*, February 6, 2020, available at https://www.globenewswire.com/news-release/2020/02/06/1981052/0/en/Forescout-to-be-Acquired-by-Advent-International-in-1-9-Billion-Transaction.html.

[18] Court of Appeals Opinion, pp. 22, 59.

[19] SCAC, ¶ 155.

[20] Christopher L. Sayce, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Forescout Technologies, Inc., Michael DeCesare, and Christopher Harms, Defendants, United States District Court, Northern District of California, San Francisco Division. Case No.: 3:20-cv-00076, Complaint for Violation of the Federal Securities Laws, January 2, 2020.

[21] First Complaint ¶ 39.  *See also* "Forescout Technologies Announces Preliminary Third Quarter 2019 Financial Results," *GlobeNewswire*, October 10, 2019, available at https://www.globenewswire.com/news-release/2019/10/10/1928027/0/en/Forescout-Technologies-Announces-Preliminary-Third-Quarter-2019-Financial-Results.html.

25. The First Complaint also alleged two "Post-Class Period Disclosures," on (i) October 16, 2019 (when a UBS analyst cut Forescout's target price from $50 to $33, noting that "'[e]xecution credibility has been undermined' and has created 'a likely frustrating valuation overhang,' which will require several quarters to 'rebuild investor confidence'"[22]) and (ii) November 6, 2019 (when "Forescout reported its 3Q19 financial results and … downgraded FY19 financial guidance significantly."[23])

26. Thus, under the initial theory of liability, the alleged 2019 sales pipeline misstatements were fully corrected by either October 10, 2019 or November 6, 2019, and consequently, any purported inflation introduced by those misstatements (the "Alleged Sales Pipeline Inflation") was no longer present in Forescout's stock price after either October 10, 2019 or November 6, 2019. I hereafter refer to this theory as the "2019 Sales Pipeline Inflation Theory."

27. I understand that an amended complaint filed by lead plaintiff Meitav on May 22, 2020 (the "Amended Complaint") alleged that the last corrective disclosure occurred on May 18, 2020, when Forescout disclosed that Advent notified Forescout on May 15, 2020 that it would not proceed with the acquisition as scheduled (the "Termination Letter").[24] I understand that the Amended Complaint did not allege any Merger Misstatement, and it treated the May 18, 2020 final corrective disclosure as correcting the Alleged 2019 Sales Pipeline Misstatements. Thus, under that amended theory of liability, the Alleged Sales Pipeline Inflation continued to be present in Forescout's stock price until May 18, 2020. I understand that, at least to an extent, this theory of liability is also articulated in Plaintiffs' Second Consolidated Amended Complaint, filed on May 10, 2021 (the "SCAC"). The SCAC alleges that some of the alleged pipeline inflation may have been removed by a disclosure on October 10, 2019[25] (though

---

[22] First Complaint ¶ 42.

[23] First Complaint ¶ 43. *See also* "Forescout Technologies Reports Third Quarter 2019 Financial Results," *GlobeNewswire*, November 6, 2019, available at https://www.globenewswire.com/en/news-release/2019/11/06/1942616/0/en/Forescout-Technologies-Reports-Third-Quarter-2019-Financial-Results html.

[24] Christopher L. Sayce, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Forescout Technologies, Inc., Michael DeCesare, and Christopher Harms, Defendants, United States District Court, Northern District of California, San Francisco Division. Case No.: 20-CV-00076-SI, Amended Complaint for Violation of the Securities Law, May 22, 2020 ("Amended Complaint"), ¶ 25. *See also* "Forescout Provides Update Regarding Pending Acquisition by Advent International: Forescout and Advent In Ongoing Discussion," *GlobeNewswire*, May 18, 2020, available at https://www.globenewswire.com/news-release/2020/05/18/2034910/0/en/Forescout-Provides-Update-Regarding-Pending-Acquisition-by-Advent-International html.

[25] SCAC, ¶ 118.

neither the SCAC nor Dr. Nye's report makes clear to what degree).  In any event, the SCAC appears to assert that at least some of the Alleged Sales Pipeline Inflation persisted.  I hereafter refer to this theory as the "Continuing Sales Pipeline Inflation Theory."

28.  I further understand that the above-mentioned complaints in this case that include allegations related to the Merger Misstatement claim May 18, 2020 as the only corrective disclosure date with respect to the Alleged Merger Misstatement.[26]  Under this theory of liability, the inflation introduced by the Alleged Merger Misstatement (the "Alleged Merger Inflation") was dissipated on May 18, 2020.  I hereafter refer to this theory as the "Merger Inflation Theory."  In the table below, I summarize these theories of liability.

**Table 1: Summary of Theories of Liability[27]**

| Theory of Liability | Type of Alleged Misstatement | Alleged Last Corrective Disclosure Date | Alleged Damages Period |
|---|---|---|---|
| 2019 Sales Pipeline Inflation Theory | Alleged Sales Pipeline Misstatements Made in 2019 | 10/10/2019 or 11/6/2019 | 5/9/2019 to 10/9/2019 or 11/6/2019 |
| Continuing Sales Pipeline Inflation Theory | Alleged Sales Pipeline Misstatements Made in 2019 | 5/18/2020 | 5/9/2019 to 5/15/2020 |
| Merger Inflation Theory | Alleged Merger Misstatement Made on 5/11/2020 | 5/18/2020 | 5/12/2020 to 5/15/2020 |

### C.    Summary of Dr. Nye's Purported "Class-Wide Damages" Methodology

29.  In Section VII of his Report titled "Damages Can Be Measured on a Class-Wide Basis and in a Manner Consistent with Lead Plaintiffs' Theory of Liability," Dr. Nye describes a purported "general economic framework for quantifying per-security damages on a Class-wide basis, which reflects methodologies [that he] would propose to use if asked to calculate damages in this matter" (the "Nye Methodology").[28]  Even though Plaintiffs have multiple (and sometimes competing) theories of liability as I described above, Dr. Nye only presents

---

[26] *See* SCAC ¶ 70.
[27] Because the alleged corrective disclosures on October 10, 2019 and May 18, 2020 both occurred before the market open, the corresponding last day of the alleged damages period is the prior trading day on October 9, 2019 and May 15, 2020, respectively.  Because the alleged corrective disclosure on November 6, 2019 occurred after the market close, the corresponding last day of the alleged damages period is the same trading day.
[28] Nye Report, ¶ 58.

one generic "economic framework,"[29] without describing how he would tailor his damages method to the specifics of each theory. The Nye Methodology employs the following four steps.

30. First, one would calculate the inflation per share removed from the stock's price "by analyzing the change in a security's price caused by a corrective disclosure and/or the materialization of a concealed risk."[30] Dr. Nye proposes to conduct such a calculation using an "event study," which "isolate[s] Company-specific price movement caused by the revelation of true facts related to the alleged fraud from price movement caused by other factors."[31] In the remainder of this report, I refer to "Company-specific price movement" isolated using an event study as "abnormal return."

31. Second, under the Nye Methodology, one would calculate the price inflation present daily during the Proposed Class Period as the sum of Forescout's abnormal returns following all subsequent alleged corrective disclosures.[32]

32. Third, one would calculate damages for each member of the Proposed Class, which according to Dr. Nye can be carried out "mechanically" based on the estimated daily inflation per share over the Proposed Class Period and each member's "actual trading activity in the security."[33]

33. Fourth, one would incorporate the so-called "90-day lookback" provision of the Private Securities Litigation Reform Act of 1995.[34]

34. I understand that for the purposes of seeking certification of the Proposed Class in this case, Plaintiffs must, through Dr. Nye, present a common method to calculate damages that can

---

[29] Nye Report, ¶ 58.
[30] Nye Report, ¶ 60.
[31] Nye Report, ¶ 60.
[32] Nye Report, fn. 103.
[33] Nye Report, ¶ 62.
[34] Nye Report, ¶ 63. ("This provision applies such that losses on securities purchased during the Class Period and held as of the close of the 90-day period subsequent to the Class Period (the '90-Day Lookback Period') cannot exceed the difference between the purchase price paid for the security and the average price of the security during the 90-Day Lookback Period. Losses on securities purchased during the Class Period and sold during the 90-Day Lookback Period cannot exceed the difference between the purchase price paid for the security and the rolling average price of the security during the portion of the 90-Day Lookback Period elapsed as of the date of sale. Section 10(b) damages incurred by purchasers of Forescout stock during the Class Period can be calculated on a Class-wide basis in this manner.")

be applied reliably to all members of the Proposed Class.

### III. THE NYE METHODOLOGY FAILS TO CONSIDER THE ABSENCE OF ANY ALLEGED INFLATION IN FORESCOUT'S STOCK PRICE FROM FEBRUARY 6 TO MAY 11, 2020

35. Under the 2019 Sales Pipeline Inflation Theory, the Alleged Sales Pipeline Inflation was removed from Forescout's stock price by November 5, 2019 at the latest.  Thus, under this theory, Forescout's stock price was not inflated from November 6, 2019 onwards, let alone from February 6 to May 11, 2020.  In this section, I explain that even under the Continuing Sales Pipeline Inflation Theory, because of the fundamental structural change to Forescout's stock price following the February 6, 2020 Acquisition Announcement, it was not inflated from February 6 to May 11, 2020.

#### A. Forescout's Price Change Following Its February 6, 2020 Announcements

36. The Acquisition Announcement was made on February 6, 2020.[35]  A few minutes after that announcement (also before the stock market opened), Forescout reported its Q4 and full-year 2019 revenue and earnings per share ("EPS"),[36] which were below management guidance and equity analysts' consensus estimates.[37]  Forescout also announced that it had suspended guidance on financial results for future periods as a result of the pending acquisition.[38]

37. Despite reporting quarterly financial results that missed analysts' consensus estimates and management's prior guidance, Forescout's stock price increased by $5.30 (or 18.9 percent),

---

[35] "Forescout to be Acquired by Advent International in $1.9 Billion Transaction," *GlobeNewswire*, February 6, 2020, available at https://www.globenewswire.com/news-release/2020/02/06/1981052/0/en/Forescout-to-be-Acquired-by-Advent-International-in-1-9-Billion-Transaction.html.

[36] "Forescout Technologies Reports Fourth Quarter and Full Year 2019 Financial Results," *GlobeNewswire,* February 6, 2020, available at https://www.globenewswire.com/en/news-release/2020/02/06/1981056/0/en/Forescout-Technologies-Reports-Fourth-Quarter-and-Full-Year-2019-Financial-Results.html.

[37] The Q4 2019 and FY 2019 revenue and EPS results were below the guidance for both these metrics provided on November 6, 2019 when Forescout announced its Q3 2019 results. ("Forescout Technologies Reports Third Quarter 2019 Financial Results," *GlobeNewswire*, November 6, 2019, available at https://www.globenewswire.com/en/news-release/2019/11/06/1942616/0/en/Forescout-Technologies-Reports-Third-Quarter-2019-Financial-Results.html). The Q4 2019 and FY 2019 revenue and EPS were also below analysts' most recent consensus estimates for these metrics prior to Forescout's announcement, available through Capital IQ.

[38] "Forescout to be Acquired by Advent International in $1.9 Billion Transaction," *GlobeNewswire*, February 6, 2020, available at https://www.globenewswire.com/news-release/2020/02/06/1981052/0/en/Forescout-to-be-Acquired-by-Advent-International-in-1-9-Billion-Transaction.html.

from $27.98 on February 5, 2020 to $33.28 on February 6, 2020,[39] which exceeded the $33 price offered by Advent.

### B. Forescout's Stock Price Reaction Following the Company's February 6, 2020 Announcements Is Consistent with Academic Literature

38.    The price of a company's stock reflects, among other things, investors' expectations about the present value of the stock's expected future cash flows, discounted for both the time value of money and the risk associated with such expected future cash flows.[40]   When there is no expectation that a company may be subject to a change of control, the projection of the stock's expected future cash flows generally reflect investors' expectations about the company "fundamentals" as a going concern (*i.e.*, factors that affect the company's long-run revenue, earnings, growth, *etc.*).   The present value of such expected future cash flows is also called the stock's "standalone" value.  However, according to a large body of academic literature, once it is known that a company is a "target," (*i.e.,* maybe acquired through a takeover or merger as Forescout would be in this case if its deal with Advent was completed), then its stock price is largely driven by the offer price and expectation of deal completion, not its fundamentals.[41]  As a result, as Jindra and Walkling (2004) note: "Invariably, the market price of a target firm adjusts upward following the announcement of an acquisition bid. … [T]he adjustment of [the target stock's] market prices toward or even above the offered bid price contains important information about the market's interpretation of the offer in light of bidder, target, and bid characteristics."[42]

39.    Thus, following an M&A announcement, a simplified formula for the determinants of the stock price of a target company, assuming there are only two possible outcomes going forward, can be written as follows:[43]

---

[39] Stock price data is obtained from Bloomberg, L.P.  According to Dr. Nye, Forescout's abnormal return on February 6, 2020 was 18.25 percent, which was statistically significant.  *See* Nye Report, Exhibit 11B.

[40] For a discussion of the concept of "present value," *see* Brealey, Richard, Stewart Myers, and Franklin Allen, *Principles of Corporate Finance*, 12th Ed., McGraw-Hill Education, 2017, p. 24.

[41] *See* Samuelson, William and Leonard Rosenthal, 1986, "Price Movements as Indicators of Tender Offer Success," *The Journal of Finance*, Vol. 41, No. 2 (June), pp. 481-499 ("Samuelson and Rosenthal (1986)"), p. 482.

[42] Jindra, Jan, and Ralph A. Walkling, 2004, "Speculation Spreads and the Market Pricing of Proposed Acquisitions," *Journal of Corporate Finance*, Vol. 10, No. 4, pp. 495-526 ("Jindra and Walkling (2004)"), p. 496.

[43] This equation is equivalent to equation (1) of Samuelson and Rosenthal (1986).  *See* p. 483.

$$P_T = P_D \times Prob_D + P_{ND} \times (1 - Prob_D) \tag{i}$$

In equation (i), the market price of the target's stock $P_T$ no longer reflects only the stock's standalone value. Instead, $P_T$ may be expressed as a probability-weighted average of the two expected outcomes: (1) deal completion, with a probability of $Prob_D$, in which scenario holders of the target stock receive the present value of the announced deal price $P_D$ for each target share, and (2) deal failure, with a probability of $(1 - Prob_D)$, in which scenario holders of the target stock receive the "fallback price" $P_{ND}$, which equals the target stock's standalone value (plus the reverse termination fees, if applicable[44]) when the deal fails, discounted to the present. Equation (i) can be extended to account for additional scenarios, such as the deal being completed at a different price than the announced deal price, $P_D$.[45]

40. In a semi-efficient stock market, a company's stock price impounds all public information available to investors about the company (whether related to the company's fundamentals or the prospect of a takeover) quickly. In the case of a target firm's stock, if investors perceive the pending deal's probability of success to be high, then even though public information about the stock's standalone value is still incorporated in the stock price, the market assigns little weight to such information. In other words, the target's stock price in that scenario is predominantly driven by the present value of the expected deal price. This explains why, despite Forescout releasing financial results on February 6, 2020 that missed earlier guidance, its stock price increased sharply in response to the Acquisition Announcement.

41. One indicator of the probability of deal success is the merger arbitrage spread (also known as the "risk arbitrage spread" or "speculation spread"), which can be calculated daily as the deal price less the target stock's market price, expressed as a percentage of the target's market price.[46] Holding all else equal, a smaller merger arbitrage spread implies a higher probability

---

[44] A proposed M&A agreement may require the bidder to pay the target a reverse termination fee if it fails to consummate the deal. In that case, the expected value of such reverse termination fees would be impounded in the fallback price. However, the expected reverse termination fees are not part of the target's standalone value absent the deal.

[45] For example, equation (i) can be extended to:
$$P_T = P_D \times Prob_D + P_{RD} \times (Prob_{RD}) + P_{ND} \times (1 - Prob_D - Prob_{RD})$$
where the two new variables $P_{RD}$ and $Prob_{RD}$ denote the revised deal price and the probability of deal completion at the revised price, which can be higher than the original deal price (when the current bidder sweetens the offer or the target receives a competing higher bid) or lower (when the current deal is re-priced lower).

[46] See Jindra and Walkling (2004), p. 496.

13

of deal completion.[47]    The merger arbitrage spread typically narrows over time, reflecting diminishing time value of the offer price and increasing certainty of deal closure.  The merger arbitrage spread is ultimately virtually zero shortly before a deal is completed.

42.    Investors pursuing a merger arbitrage strategy are known as merger arbitrageurs.  They buy the target company's stock and take on "event risk" (*i.e.*, the risk that the deal may eventually not be completed or be completed only at less favorable terms) in exchange for a relatively modest return (*i.e.*, the merger arbitrage spread).[48]

43.    Merger arbitrageurs' trading strategy is fundamentally different from those pursued by non-arbitrageur investors who took long positions in a target's stock before the deal's announcement.  A long investment is a directional bet on a target's equity.  That strategy's return increases if the target's value and stock price increase, which depends on the target's ability to generate profits in the long run, as well as industry and market-wide factors.  In contrast, merger arbitrageurs follow an event-driven strategy and bet on an announced deal's completion.  The strategy's returns do not depend on a target's value as a going concern if the deal is completed.  Arbitrageurs who bet on deal completion are thus not speculating on a target's value as a standalone going concern.

44.    Citing to academic literature, the Nye Report also acknowledges that after Forescout's Acquisition Announcement on February 6, 2020, its stock price was "determined largely by the market's assessment of the likelihood of success of the takeover bid."[49]  Because of this consideration, the estimation period used in Dr. Nye's event study for events prior to

---

[47] This relationship between the probability of deal completion (or event risk) and the merger arbitrage spread can be understood by reviewing equation (i).  In that equation, holding all other factors constant, when the probability of deal completion $Prob_D$ increases, the gap between the present value of the announced deal price $P_D$ and the target's market price $P_T$ narrows, *i.e.,* the merger arbitrage spread declines.  For example, if the probability of deal completion is 100 percent and the time value of money is zero, then the target's market price should equal the announced deal price, resulting in a merger arbitrage spread of zero.

[48] Mitchell, Mark, and Todd Pulvino, (2001), "Characteristics Of Risk and Return In Risk Arbitrage," *Journal of Finance*, Vol. 56, No. 6, pp. 2135– 2175 ("Mitchell and Pulvino (2001)"), p. 2135; Baker, Malcolm, and Serkan Savasoglu, 2002, "Limited Arbitrage in Mergers and Acquisitions," *Journal of Financial Economics*, Vol. 64, No. 1, pp. 91-115, pp. 91-92; Kirchner, Thomas, 2016, *Merger Arbitrage*, 2nd Ed., Wiley, p. 146.

[49] Dr. Nye cited Hutson, Elaine, and Colm Kearney, 2001, "Volatility In Stocks Subject To Takeover Bids: Australian Evidence Using Daily Data," *Journal of Empirical Finance,* Vol. 8, pp. 273–296 at 294. (Nye Report, ¶ 67).

February 6, 2020 is different from the estimation period for events after February 6, 2020.[50] Dr. Nye also testified in his deposition that he used two different estimation periods because after the Acquisition Announcement, Forescout's stock returns had a "structurally different asset price and dynamics that you would expect after a company is expected to go private or even merge with another company."[51]

## C.    Equity Analyst Commentary on Forescout's Stock Price Reaction Following the February 6, 2020 Announcements

45.    My review of 13 equity analyst reports published within two weeks following the February 6, 2020 announcements[52] indicates that after the Acquisition Announcement, many analysts commented that Forescout's stock price was no longer driven by the company's fundamentals, but instead driven by the prospect of the pending acquisition being completed at the announced deal price of $33.  For example, a Bank of America Merrill Lynch report dated February 7, 2020 stated that Forescout's "stock is no longer trading on fundamentals."[53] This report further noted that "[i]nvestors should no longer rely on our previous opinion or price objective."[54] Analysts from Summit Insights Group opined that "if the company was not acquired, the stock would have lost 25-30% of its value from yesterday's closing price."[55]

46.    Some analysts observed that following the Acquisition Announcement, Forescout's stock price had exceeded the $33 offer price, which signaled that some market participants were expecting a higher deal price.  For example, a Needham report published on February 6, 2020 stated that "[w]e believe acquisition is likely a done deal.  The acquisition agreement includes

---

[50] For events prior to February 6, 2020, Dr. Nye uses the calendar year immediately preceding the impact date as the estimation period; for events after February 6, 2020, Dr. Nye uses the period between February 7, 2020 and May 15, 2020 as the estimation period.  *See* Nye Report, ¶ 67.

[51] *See* Deposition of Zachary Nye, November 20, 2023 ("Nye Deposition"), p. 63:20-24.

[52] For my review of analyst reports, I included all reports available from the Capital IQ ("CapIQ") and the Refinitiv databases that covered Forescout.  I excluded reports classified as "quantitative" by CapIQ or Refinitiv, which generally do not offer qualitative insights or commentary.  For the two-week period from February 6 to February 20, 2020, after excluding four "quantitative" reports, I identified a total of 13 analyst reports published by 11 unique contributors that form the basis of my review.

[53] Bank of America Merrill Lynch, "Forescout Technologies, Inc, Moving to No Rating," February 7, 2020, p. 1.

[54] Bank of America Merrill Lynch, "Forescout Technologies, Inc, Moving to No Rating," February 7, 2020, p. 1.

[55] Summit Insights Group, "More than a 50% chance an alternative buyer could emerge; As expected, activist investors likely forced the company to sell itself ahead of negative results," February 6, 2020.

a 30-day Go- Shop, but we think its [*sic*] unlikely we see anyone up-bid the deal at this point. However, with the stock now trading above the takeout price, clearly there is some potential for a second bid."[56]  A February 6, 2020 report by Summit Insights Group stated that "Forescout stock is trading at around $33.45, indicating that some investors believe that a new potential bidder might move forward with a higher price."[57]

47.  Based on his review of analysts' commentary following Forescout's February 6, 2020 announcements, Dr. Nye provided the below characterization:[58]

   a.  Given that: (i) the Company reported "weak 4Q results" as both revenue and EPS were short of consensus; (ii) the Company's "stock [wa]s no longer trading on fundamentals"; (iii) "the offer price represent[ed] a fair value for ForeScout's business"; and (iv) most analysts set their price targets for the Company to $33 "based on [the] proposed transaction price," the statistically significant Company-specific stock price increase on February 6, 2020 is consistent with that expected in an efficient market.

   **D.    Forescout's Stock Price Could Not Have Been Inflated Between February 6 and May 11, 2020 Even Under the Continuing Sales Pipeline Inflation Theory**

48.  According to the Continuing Sales Pipeline Inflation Theory, Forescout's stock price continued to reflect at least some amount of Alleged Sales Pipeline Inflation after November 6, 2019 (though Plaintiffs nowhere make clear how much).  However, after February 6, 2020, Forescout's stock price changes were no longer driven primarily by changes in investors' expectations about the company's fundamentals.  Thus, information about Forescout's fundamentals, such as the alleged prior misstatements that purportedly introduced the

---

[56] Needham, "Forescout Technologies, Inc., FSCT: Announces Agreement to Be Acquired at $33," February 6, 2020. (Original capitalization of all words in the first sentence of this excerpt removed).

[57] Summit Insights Group, "More than a 50% chance an alternative buyer could emerge; As expected, activist investors likely forced the company to sell itself ahead of negative results," February 6, 2020. ███████ ████████████████████████████████████████ Deposition of Mark Ort, November 30, 2023 ("Ort Deposition"), p. 125:22-126:9.

[58] Nye Report, Exhibit 12, p. 71. Citations omitted.  Dr. Nye also finds that following Forescout's February 6, 2020 announcements, four equity research firms revised their target price for Forescout, all to $33, which was the announced deal price (with another two research firms already having the price targets at $33 even before the Acquisition Announcement and two additional firms not updating their price targets that were above $33).  *See* Nye Report Exhibit 5C.  I note that reports by one of these four equity research firms, Baird, are not available from the two databases that I used (*i.e.*, CapIQ and Refinitiv).

Alleged Sales Pipeline Inflation into Forescout's stock price, or any alleged corrections of those misstatements, had little or virtually no relevance in determining Forescout's stock price after the Acquisition Announcement. The Nye Methodology fails to consider this implication of the Acquisition Announcement, which renders it unreliable and unfit for assessing damages for every member of the Proposed Class.

49. The merger arbitrage spread implied by Forescout stock's daily closing price was negative on February 6, 2020, and remained so on most of the following trading days till February 20, 2020.[59] This suggests that the market viewed the probability of closing the Advent acquisition at the announced $33 price to be high, and that some investors may have expected that the final deal could occur at a price even greater than $33. From February 21, 2020 to March 5, 2020, Forescout's merger arbitrage spread remained low (ranging between 0.09 percent and 1.66 percent), suggesting that the market may have viewed the Advent deal as having a high probability of success.[60]

50. Between early March and mid-April 2020, Forescout's merger arbitrage spread spiked temporarily. However, an analysis of this temporary spike suggests that even in this period, Forescout's stock price was not driven by the company-specific fundamentals. Rather, starting in March 2020, like many companies, Forescout's stock price was severely impacted by COVID-19,[61] as the outbreak of the pandemic caused significant and widespread dislocations in equity and debt capital markets. In well-functioning capital markets, arbitrage ensures that "substantially similar assets trade at substantially similar prices."[62] But

---

[59] Throughout this report, unless otherwise noted, the merger arbitrage spread is calculated using the stock price at the market close.

[60] For example, Jetley, Gaurav and Xinyu Ji, 2010, "The Shrinking Merger Arbitrage Spread: Reasons and Implications," *Financial Analysts Journal,* Vol. 66, No. 2, pp. 54-68 ("Jetley and Ji (2010)") show that the median merger arbitrage spreads over the first 90 trading days after an M&A announcement was in the one to two percent range for successful deals (*See* Jetley and Ji (2010) Figure 1, Panels A and B, respectively). Even for deals with a near certainty for success perceived by the market, the merger arbitrage spread may still be one to two percent because of the time value of money if the anticipated deal closure date is still many days away.

[61] In this report, I do not offer a comprehensive analysis of COVID-19's impact on Forescout, as that analysis is outside the scope of my assignment.

[62] Mitchell, Mark and Todd Pulvino, 2012, "Arbitrage crashes and the speed of capital," *Journal of Financial Economics*, Vol. 104, No. 3, pp. 469–490 ("Mitchell and Pulvino (2012)"), p. 469. ("When prices of related assets diverge, arbitrageurs sell short the expensive asset and simultaneously purchase the cheap asset. When the prices of the two assets converge, arbitrageurs unwind their trades and generate risk-free profits." "If arbitrageurs lose access to debt capital, and if they are unable to replace the lost debt capital with new equity capital, they could be unable to force prices of similar assets to the same level.")

17

arbitrageurs need capital.  During severe credit crunches, the sudden lack of debt capital (an important source of arbitrageurs' capital) restricts arbitrage and causes severe price dislocations and widening of merger arbitrage spreads.[63]  In the spring of 2020, liquidity evaporated, creating "massive market disruptions" until interventions from the Federal Reserve improved liquidity.[64]

51.  As several studies on the impact of the unprecedented COVID-19 crisis on capital markets noted, the S&P 500 Index reached its peak on February 19, 2020, and then "experienced its steepest descent in living memory, losing 34% of its value in the 5-week period between February 19 and March 23, 2020, before bouncing back by over 30% by the end of April."[65] Forescout's stock price was similarly impacted by the pandemic.  In **Exhibit 2**, I plot Forescout's stock price and the S&P 500 Index[66] from February 24, 2020 to the end of the Proposed Class Period (May 15, 2020).  I choose February 24, 2020 as the starting date of this analysis because several studies on the impact of the COVID-19 focus on the period from February 24 (considered to be "the start of a series of large stock market declines"[67]) to March 20, 2020 ("the day before the $2.2 trillion fiscal stimulus gained traction").[68]  As **Exhibit 2** shows, both Forescout's stock price and the S&P 500 Index declined sharply following news of the global spread of COVID-19 over the February 24 through March 20, 2020 period (shaded in grey on **Exhibit 2**)  before rebounding, suggesting that Forescout's stock price decline in March 2020 was predominantly driven by market-wide concerns about the COVID-19 pandemic, rather than specific information about Forescout's fundamentals.

52.  **Exhibit 3** shows that over this period, other M&A targets' merger arbitrage spreads, like Forescout's, also increased.  Specifically, I identified all friendly M&A deals publicly announced over the four-month period ending on February 23, 2020 (*i.e.*, the day before the

---

[63] Mitchell and Pulvino (2012), p. 469.

[64] Pastor, Lubos and M. Blair Vorsatz, 2020, "Mutual Fund Performance And Flows During The COVID-19 Crisis," *The Review of Asset Pricing Studies*, Vol. 10, No. 4, pp. 791–833 ("Pastor and Vorsatz (2020)"), p. 792.

[65] *See* Pastor and Vorsatz (2020), p. 792; Simon H. Kwan and Thomas M. Mertens, "Market Assessment of COVID-19," FRBSF Economic Letter, Research from Federal Reserve Bank of San Francisco 2020-14, May 28, 2020, ("Kwan and Mertens (2020)"), p. 2.

[66] On Exhibit 2, the S&P 500 Index level is pegged at Forescout's closing price on February 24, 2020.

[67] Kwan and Mertens (2020), p. 2.  I am aware of other studies that use different starting dates around February 24, 2020.  My analysis here is not sensitive to the starting date choice.

[68] Kwan and Mertens (2020), p. 2; *see also*, Ramelli, Stefano, Alexander F Wagner, 2020, "Feverish Stock Price Reactions to COVID-19," *The Review of Corporate Finance Studies*, Vol. 9, No. 3, pp. 622–655.

"the start of a series of large stock market declines") that were still pending as of February 23, 2020.[69] To ensure comparability with the Advent/Forescout deal, I further limited my analysis to deals (1) with all-cash consideration; (2) involving a U.S. public target company; (3) with a deal value between $1 billion and $10 billion, and (4) with the bidder acquiring 100 percent of the target company.[70] Applying these criteria, using the Refinitiv dataset, I identified the Advent/Forescout deal and the targets in five other transactions ("Target Firm Peers").[71] Eventually, all six deals were completed. **Exhibit 3** shows that Forescout's and all five of the Target Firm Peers' merger arbitrage spreads spiked in March 2020. Forescout's merger arbitrage spread (using daily closing price) first exceeded three percent on March 6, 2020 and remained above three percent until April 14, 2020. The merger arbitrage spreads of some of the Target Firm Peers spiked before Forescout's did and remained well above Forescout's even after Forescout's merger arbitrage spread had returned to the one to three percent range. I calculated the daily average, median, and interquartile range of the Target Firm Peers' merger arbitrage spreads over this 30-trading day period (March 6 to April 14, 2020), and found that Forescout's merger arbitrage spread was below: (a) the Target Firm Peers' daily average merger arbitrage spread on all but three days; and (b) the Target Firm Peers' daily median merger arbitrage spread on all but five days, but within the Target Firm Peers' interquartile range on three of those five days.

53.  This analysis demonstrates that the temporary widening of Forescout's merger arbitrage spread reflected the market-wide impact of the COVID-19 pandemic, which caused severe liquidity crunch and market dislocations.[72] COVID-19 related concerns also lowered investors' assessment of a deal's probability of completion and in turn, a target's stock

---

[69] I used the following criteria: (1) Deal Attitude: Friendly, (2) Date Announced: October 23, 2019 to February 23, 2020, and (3) Date Effective or Date Withdrawn: after February 23, 2020.

[70] I used the following criteria: (1) Consideration Structure: Cash Only and Percentage of Cash: 100, (2) Target Company Listed: on a U.S. Stock Exchange and Target Nation: United States, (3) Deal Value: $1 billion to $10 billion and (4) Percentage of Shares Acquired in Transaction: 100.

[71] The other five transactions are: (1) the Google/Fitbit merger announced on November 1, 2019; (2) Yageo's acquisition of KEMET announced on November 11, 2019; (3) Apollo Global Management's acquisition of Tech Data announced on November 13, 2019; (4) Francisco Partners Management and Evergreen Coast Capital's acquisition of LogMeIn announced on December 27, 2019; (5) Simon Property Group's acquisition of Taubman Centers announced on February 10, 2010.

[72] An analysis conducted by J.P. Morgan Asset Management similarly found that merger arbitrage spreads spiked in March 2020 to over 25 percent, which "nearly reached financial crisis wides [*sic*]." *See* "Themes from the quarterly Quantitative Beta Research Summit," J.P. Morgan Asset Management, 2Q 2020, p. 2, Exhibit 4.

price.[73]  For instance, some M&A agreements include materially adverse event ("MAE") or materially adverse change ("MAC") clauses which permit the bidder to walk away from a deal, or tactically employ such a clause to re-negotiate a lower deal price.

54. I understand that following the Court of Appeals' decision, the only Alleged Merger Misstatement remaining in this case is the one made on May 11, 2020.[74]  Therefore, any Alleged Merger Inflation could not have been present in Forescout's stock price before May 11, 2020.

55. Forescout's stock price also could not have been inflated by any Alleged 2019 Sales Pipeline Misstatements from February 6, 2020 to May 11, 2020, because after the Acquisition Announcement, the stock price was predominantly driven by: (i) expectations regarding the Advent acquisition; and (ii) market-wide effects caused by COVID-19's catastrophic shock. That is, the primary driving forces for Forescout's stock price over this period were "events" decoupled from Forescout's fundamentals, *i.e.,* the Advent acquisition and COVID-19.

56. In sum, from February 6 to May 11, 2020, Forescout's stock price contained neither the Alleged Merger Inflation nor the Alleged Sales Pipeline Inflation.  Thus, there is no reason to believe that those who purchased Forescout's stock over this period suffered any damages even under the Continuing Sales Pipeline Inflation Theory.  However, the Nye Methodology would inappropriately attribute a positive amount of inflation to Forescout's stock price during this period given its "backcast" approach, which starts by calculating the "Company-specific price movement caused by the revelation of true facts" and treating it as the price inflation that was present on all prior days in the Proposed Class Period.  In other words, the Nye Methodology would incorrectly assume that all or some portion of Forescout's abnormal returns following any alleged corrective disclosure (*e.g.,* May 18, 2020) reflects price inflation that was previously present in Forescout's stock price from the start of the Proposed Class Period, including the February 6 through May 11, 2020 sub-period.  Such a damages methodology, which disregards the factors of this case discussed above, is unsuitable for

---

[73] "Themes from the quarterly Quantitative Beta Research Summit," J.P. Morgan Asset Management, 2Q 2020, p. 3 ("Merger arbitrage spreads began to widen in February as the rise in economic and market volatility called into question the likelihood that deals would close on previously proposed terms. Toward the middle of March, however, merger arbitrage exposures began to collapse—with spreads growing nearly as wide as they had in the financial crisis as hedge funds de-risked and sought liquidity wherever they could").

[74] Court of Appeals Opinion, p. 59.

calculating damages for each member of the Proposed Class.

**IV.    THE NYE METHODOLOGY FAILS TO EXPLAIN HOW THE ALLEGED MERGER INFLATION CAN BE SEPARATED FROM FORESCOUT STOCK'S ABNORMAL RETURN ON MAY 18, 2020**

**A.    Forescout's Stock Price Reaction Following the May 18, 2020 Announcement**

57.    According to the Merger Inflation Theory, Forescout's May 18, 2020 announcement of Advent's Termination Letter corrected the Alleged Merger Misstatement made on May 11, 2020.  Following this disclosure, Forescout's stock price fell by $6.95 (or 23.54 percent) from $29.52 on Friday May 15, 2020, to $22.57 on May 18, 2020,[75] and adjusting for contemporaneous changes in market and industry factors, the abnormal price decline was $7.06 per share according to Dr. Nye's event study.[76]  I expect that under the Nye Methodology, this $7.06 "Company-specific" price decline (or a comparable measure that Dr. Nye may calculate using a different event study model for damage calculation purposes) would be used to quantify the Alleged Merger Inflation previously present in Forescout's stock price.

58.    However, it is inappropriate to treat Forescout's entire abnormal return following the Termination Letter disclosure as the removal of the Alleged Merger Inflation.  Consequently, it is necessary to separate out the Alleged Merger Inflation from Forescout's abnormal return on May 18, 2020.  As discussed below, commentary from some analysts suggests that Forescout's price decline on May 18, 2020 was the result of investors' assessment of several factors, including:

- A revised (lower) probability of the Advent deal being completed at the originally announced deal price of $33;

- A revised (higher) probability of the deal being completed at a lower deal price;

- A revised probability of the deal not being completed and Advent paying Forescout a reverse termination fee;

---

[75] Stock price data is obtained from Bloomberg, L.P.
[76] "Company-specific return" on May 18, 2020 (negative 23.9 percent) multiplied by Forescout's closing price on May 15, 2020 ($29.52) equals -$7.06.  *See* Nye Report, Exhibit 11B.

- A revised probability of the deal not being completed and Advent not paying Forescout a reverse termination fee;

- An assessment of the decline in Forescout's standalone value since February 6, 2020 due to confounding factors not attributable to a correction of any alleged misstatements,[77] which include, among other things, COVID-19's impact on Forescout's customers and business prospects.

59. The Nye Methodology fails to recognize that Forescout's price decline on May 18, 2020 reflected these different factors, and provides no reliable method of separating the price impact of any purported correction of the Alleged Merger Misstatement from other confounding factors, which renders the Nye Methodology unreliable for calculating damages purportedly suffered by each member of the Proposed Class.

### B.    Equity Analyst Commentary on Forescout's Stock Price Reaction Following the May 18, 2020 Announcement

60. I identified 10 analyst reports covering Forescout released by seven unique contributors within two weeks following the Termination Letter disclosure on May 18, 2020.[78] In discussing the sharp decline in Forescout's stock price on May 18, 2020, several analysts mentioned both the announcement of the Termination Letter as well as Forescout's financial results announcements (including the most recent release seven days earlier on May 11, when Forescout announced its Q1 2020 results[79]). For example, a Macquarie report dated May 18,

---

[77] Under the Continuing Sales Pipeline Inflation Theory, a portion of the decline in Forescout's standalone value would also reflect the removal of the Alleged Sales Pipeline Inflation, which needs to be excluded when estimating the price inflation for calculating damages purportedly caused by the Alleged Merger Misstatement.

[78] In my review of analyst reports, I included all reports available from the CapIQ and the Refinitiv databases that covered Forescout. I excluded reports classified as "quantitative" by CapIQ or Refinitiv, which generally do not offer qualitative insights or commentary. For the two-week period from May 18 to June 1, 2020, after excluding two "quantitative" reports and one additional report by Marktfeld which provided analyses of Forescout stock's ownership only and no commentary on the stock performance, I identified a total of 10 analyst reports published by seven unique contributors that form the basis of my review.

[79] Forescout reported "total revenue of $57.2 million and non-GAAP EPS loss of -$0.67," whereas consensus estimates from Cap IQ were total revenue of $78.9 million and non-GAAP EPS loss of -$0.37. I note that Forescout stopped providing official financial guidance on February 6, 2020. "Forescout Technologies Reports First Quarter 2020 Financial Results," *GlobeNewswire*, May 11, 2020, available at https://www.globenewswire.com/news-release/2020/05/11/2031444/0/en/Forescout-Technologies-Reports-First-Quarter-2020-Financial-Results html; S&P Capital IQ; "Forescout Technologies Reports Fourth Quarter and Full Year 2019 Financial Results," *GlobeNewswire*, February 6, 2020, available at https://www.globenewswire.com/news-

2020 stated that "we think the stock is reflecting the large miss and possibility of the deal not closing."[80]

61.    Several analysts stated that they remained on the sidelines given the uncertainty around the acquisition and the COVID-19 pandemic.[81]  Among those who attempted to assess Forescout stock's standalone value, there was a wide range of value estimates.  For instance, Citi analysts' range was $13 to $19.[82]  UBS analysts assumed Forescout's fallback price to be $17.[83]  Needham analysts' estimate of Forescout's stock price ranged from $17 to $21 if there was no deal, but these analysts did not provide a price target and noted that given the "scant detail or contextual information" available regarding Forescout's financial results and projections, it is "difficult to forecast the progression of numbers."[84]  Macquarie and Piper Sandler analysts lowered their price targets for Forescout based on its fundamentals, to $25

---

release/2020/02/06/1981056/0/en/Forescout-Technologies-Reports-Fourth-Quarter-and-Full-Year-2019-Financial-Results.html.

[80] Macquarie Research, "Forescout Technologies (FSCT US): Advent Delays Acquisition – Talks Ongoing," May 18, 2020, p. 1.  A Piper Sandler report dated May 18, 2020 also commented that Forescout had "provided an update today regarding the pending acquisition with Advent, announcing that the transaction would not be proceeding as scheduled" and "released its 1Q'20 results on May 11, 2020 with revenue declining ~24% driven by decline in product revenue related to sales of its perpetual licenses."  Piper Sandler, "Forescout Technologies, Inc. (FSCT) Neutral Back to the Drawing Board - Lowering target to $26", May 18, 2020, p. 1.  Commenting on Forescout's closing stock price of $22.57 on May 18, 2020, a Berenberg analyst report noted that the price had baked in the likelihood of a deal being completed at a lower price, and if no deal transpired then the stock price could fall further, noting that Forescout's Q1 2020 results were "underwhelm[ing]."  Berenberg, "Forescout Technologies Inc. (FSCT US): Standalone valuation implies additional downside," May 18, 2020.

[81] Citi, "Alert: Advent close delay; where do we go from here?" May 18, 2020, p. 1 ("Deal timing remains uncertain, and we don't have a view on whether Advent 'walks' or a competing buyer steps in. The original deal was at $33/share. We do know that there was an extensive "go shop" before the shareholder vote, and no competing bids surfaced at that time. Since then, the business has weakened, with steep license declines in Q1, suggesting to us that there isn't likely to be incremental interest, except at a meaningfully lower price"); Macquarie Research, "ForeScout Technologies (FSCT US): Advent Delays Acquisition – Talks Ongoing," May 18, 2020, p. 1 ("A re-pricing is likely. […] We believe a deal price lowering is more probable, especially as Advent is likely to take a long-term view, and the current crisis should not materially affect their long-term thesis"); Piper Sandler, "'The Days of Our Lives' - FSCT Commences Litigation Against Advent," May 20, 2020, p. 1 ("As this drama continues to unfold, we believe the sidelines is the best place to watch it");  Berenberg, "Forescout Technologies Inc. (FSCT US): Standalone valuation implies additional downside," May 18, 2020, p. 1 ("[w]e believe the market is currently pricing in the likelihood that that Advent and Forescout will renegotiate terms for a lower price which better reflects the company's revenue potential during the pandemic," and "uncertainty surrounding the acquisition and the negative impact to its business from the ongoing pandemic").  JP Morgan analysts published a report on May 20, 2020, simply providing their updated financial estimates for Forescout with no commentary on the acquisition. *See* J.P. Morgan, "Model Update," May 20, 2020.

[82] Citi, "Alert: Advent close delay; where do we go from here?" May 18, 2020, p. 1.

[83] UBS, "Forescout Technologies Inc: Execution Distractions Likely as Legal Action with Advent Now Underway," May 28, 2020, p. 1.

[84] Needham, "Forescout Technologies Inc. (FSCT): FSCT: Looking Increasingly Oversold--Thoughts on Advent Deal and Model," May 21, 2020, p. 1.

and $26, respectively.[85]

62.    Moreover, while several analysts commented that Forescout might still be acquired at a lower price, most of them did not provide estimates for such a revised deal price or its likelihood. A UBS report issued on May 28, 2020 simplistically assumed "a binary … outcome" that the deal would either be completed at the original deal price of $33 or there would be no deal, and assigned 50 percent probability to each scenario.[86]    Analysts at Needham considered four scenarios without providing any probability estimates for these scenarios.[87]

63.    I understand that Lead Plaintiff Glazer produced a spreadsheet ███████████████
████████████████████████████████████████████████████████████
██████████████████████████████"[88]  ███████████████████████  a Needham report (the only one among the analyst reports I identified to provide a revised deal price estimate), estimated a lower revised deal price in the  $23 to $26 range.[89] ███████████
████████████████████████████████████████████████████████████
████████████████████



64.    To summarize, analysts' commentary suggests that following the May 18, 2020 announcement of the Termination Letter, the market began to reduce the weight assigned to the original $33 deal as a factor in determining Forescout's stock price and increase the weights to other scenarios, *e.g.*, no deal and/or Forescout being acquired at a price lower than $33.  However, most analysts did not provide any estimate for the probabilities of different scenarios.    Analysts' estimates for Forescout stock's standalone value also varied considerably.

---

[85] Piper Sandler, "Back to the Drawing Board - Lowering target to $26", May 18, 2020, p. 1; Macquarie Research, "ForeScout Technologies (FSCT US): ForeScout Files Complaint Against Advent," May 21, 2020, p. 1.
[86] UBS, "Forescout Technologies Inc: Execution Distractions Likely as Legal Action with Advent Now Underway," May 28, 2020, p. 1.
[87] Needham, "Forescout Technologies Inc. (FSCT): FSCT: Looking Increasingly Oversold--Thoughts on Advent Deal and Model," May 21, 2020, p. 1.  The four scenarios considered were: "Deal Gets Done as Originally Agreed Upon, Deal Gets Done at a Hair Cut to the Original Deal Price, Deal Breaks with Full Break-Up Fee, Deal Breaks and No Break- Up Fee.  Three of these outcomes imply a price higher than the valuation of $17-$21.  The original deal was at $33, a 20%-30% haircut yields $23-$26, and a break-up with break-up fee yields $19.00-$23.50.")
[88] GlazerCapital_00001,███████████████
[89] Needham, "Forescout Technologies Inc. (FSCT): FSCT: Looking Increasingly Oversold--Thoughts on Advent Deal and Model," May 21, 2020, p. 1.

**C.    In Addition to Deal Risk Readjustment, Forescout's May 18, 2020 Price Drop also Reflected the Market's Reassessment of Its Standalone Value**

65.    After the February 6, 2020 Acquisition Announcement, and through the end of the Proposed Class Period, Forescout announced financial results on two occasions: February 6 and May 11, 2020.  On February 6, 2020, Forescout released its Q4 2019 and FY 2019 financial results, which were below analysts' consensus estimates and prior management guidance.[90] These results conveyed information about Forescout's standalone value, and were well known to the bidders.  For example, before Forescout's Q4 2019 results were publicly released on February 6, 2020, the preliminary results were provided to the bidders.[91]  After receiving such results in late January 2020, a financial bidder who had been competing against Advent to acquire Forescout indicated that it "was not going to make a revised acquisition proposal because its updated view of valuation for Forescout would likely be below $30.00 per share."[92]  Yet, after Forescout announced its final Q4 2019 and FY 2019 results on February 6, 2020 that missed prior guidance, its stock price increased above the announced $33 deal price.[93]

66.    On May 11, 2020, Forescout reported Q1 2020 financial results, which again missed analysts' consensus estimates.[94]  On the same day, Forescout made the Alleged Merger Misstatement.[95]  Following these announcements, Forescout's abnormal return was only modestly negative and not statistically significant at the 95 percent confidence level according to Dr. Nye's event study.[96]  Based on his review of analyst reports, Dr. Nye opines

---

[90] "Forescout Technologies Reports Fourth Quarter and Full Year 2019 Financial Results," *GlobeNewswire,* February 6, 2020, available at https://www.globenewswire.com/en/news-release/2020/02/06/1981056/0/en/Forescout-Technologies-Reports-Fourth-Quarter-and-Full-Year-2019-Financial-Results.html.  The Q4 2019 and FY 2019 revenue and EPS were below analysts' most recent consensus estimates for these metrics prior to Forescout's announcement, available through Capital IQ.

[91] Forescout Preliminary Proxy Statement, filed with the SEC on March 3, 2020, pp. 44-45.

[92] Forescout Preliminary Proxy Statement, filed with the SEC on March 3, 2020, p. 43.

[93] Forescout's stock price at close on February 6, 2020 was $33.28. Stock price data is obtained from Bloomberg, L.P.

[94] Forescout reported "total revenue of $57.2 million and non-GAAP EPS loss of -$0.67," whereas consensus estimates of quarterly revenue and non-GAAP EPS were $79.8 million and -$0.33, respectively. *See* S&P Capital IQ; "Forescout Technologies Reports First Quarter 2020 Financial Results," *GlobeNewswire*, May 11, 2020, available at https://www.globenewswire.com/news-release/2020/05/11/2031444/0/en/Forescout-Technologies-Reports-First-Quarter-2020-Financial-Results.html.

[95] Court of Appeals Opinion, p. 8.

[96] Nye Report, Exhibit 11B.

that "the Advent deal was 'helping support shares.'"[97]  In other words, Dr. Nye believes that between May 11, 2020 and May 18, 2020 (the disclosure of the Termination Letter), Forescout's stock price continued to be driven predominantly by the prospect of the Advent deal completion, rather than information about fundamentals, such as Forescout's Q1 2020 financial results.[98]

67.  After Forescout's May 18, 2020 announcement, several analysts noted that Forescout's standalone value had declined since February 6, 2020, and at least a portion of the decline was caused by the COVID-19 pandemic's effect on Forescout's business.  For example, a Needham analyst report on May 21, 2020 noted that Forescout typically earned half of it license revenue "in the last several weeks of the quarter, exactly when Covid lockdown hit the US," and Forescout's license revenues in Q1 2020 had "plummeted 60% y-o-y."[99] Macquarie analysts commented that Forescout's business model was "heavily dependent on hospitals and governments," which were "simply frozen by the COVID-19 pandemic."[100]  A Piper Sandler report dated May 18, 2020 stated that "[t]he COVID-19 pandemic has clearly taken a toll on business and near-term trends, depressing new license business for FSCT."[101]

68.  In short, the decline in Forescout's stock price following the disclosure of the Termination Letter was attributable to a variety of factors, including, among others, market participants assigning: (i) a lower probability on the Advent deal's completion at the original price of $33 (*i.e.,* a readjustment in the market's perception of the deal risk); (ii) a higher probability of a deal's completion at a lower price; (iii) a higher probability of deal failure; (iv) a lower standalone value due to COVID-19's impact on Forescout's business;[102] and (v) incremental negative information about the target typically conveyed in bidder-initiated deal

---

[97] Nye Report, Exhibit 12, p. 75.

[98] I note, however, that Forescout's merger arbitrage spread increased every day from May 12 to May 15, 2020 (8.2 percent on May 12, 9.4 percent on May 13, 10.4 percent on May 14, and 11.8 percent on May 15).  This increase could reflect the market's reassessment of the deal risk and/or the company's standalone value.  However, the generic Nye Methodology cannot be used to disentangle the portion due to the market's reassessment of the deal risk versus that driven by the market's reassessment of Forescout's standalone value since the release of the Q1 results.

[99] Needham, "ForeScout Technologies, Inc. (FSCT): FSCT: Looking Increasingly Oversold--Thoughts on Advent Deal and Model," May 21, 2020, p. 1.

[100] Macquarie Research, "Forescout Files Complaint Against Advent," May 21, 2020, p. 3.

[101] Piper Sandler, "Back to the Drawing Board - Lowering target to $26," May 18, 2020, p. 1.

[102] Under the Continuing Sales Pipeline Inflation Theory, a portion of the decline in Forescout's standalone value would also reflect the removal of the Alleged Sales Pipeline Inflation, which needs to be excluded when estimating the price inflation for calculating damages purportedly caused by the Alleged Merger Misstatement.

cancellations, beyond any public information about the target's fundamentals.[103]

69.   According to the Merger Inflation Theory, only the portion of Forescout's abnormal return attributable to the readjustment of the perceived probability of the Advent acquisition can be considered the removal of the Alleged Merger Inflation. Therefore, the effects of the remaining factors (including, among others, any downward reassessment of Forescout's standalone value due to COVID-19 and acquirer-initiated deal cancellation) would have to be separated from Forescout's May 18, 2020 abnormal return in order to estimate the Alleged Merger Inflation. However, Dr. Nye has not explained how to accomplish this with the generic Nye Methodology.

V.    **NO COMMONLY ACCEPTED METHOD EXISTS TO SEPARATE THE ALLEGED MERGER INFLATION FROM FORESCOUT'S ABNORMAL RETURN ON MAY 18, 2020**

70.   Despite the necessity to separate out the Alleged Merger Inflation from Forescout's abnormal return on May 18, 2020, Dr. Nye acknowledged in his deposition that he has not "disentangled the various company-specific pieces of information and their effects on the market price on every day during class period."[104] However, he claimed that the "event study methodology includes additional analyses of that company-specific return that can be utilized to distinguish between competing information, company-specific information and its effect."[105]

71.   The "event study methodology" that Dr. Nye refers to is a well-defined, basic methodology in finance,[106] involving the calculation of a stock's abnormal return on any given trading day, after accounting for the broad stock market's and/or industry peers' movements on that day. Based on my teaching and research in finance over more than two decades, I am not aware of any well-accepted extensions of the event study methodology that would permit one to

---

[103] Davidson, Wallace N., Dipa Dutia, and Louis Cheng, 1989, "A Re-Examination of the Market Reaction to Failed Mergers," *Journal of Finance*, Vol. 44, No. 4, pp. 1070–1083 at p. 1081; Wang, Wenyu, "Bid anticipation, information revelation, and merger gains," *Journal of Financial Economics*, Vol. 128, No. 2, May 2018, pp. 320-343.

[104] Nye Deposition, p. 75: 3-6.

[105] Nye Deposition, p. 75: 9-13.

[106] For a description of the event study methodology and its general use, *see* Chapter 4 of *The Econometrics of Financial Markets*, by John Campbell et al., Princeton University Press, 1997 and "Federal Securities Acts and Areas of Expert Analysis," by Nicholas Gold et al., Chapter 27 of the *Litigation Services Handbook: The Role of the Financial Expert*, 6th ed., edited by Roman Weil et al., John Wiley & Sons, Inc., 2017.

27

reliably allocate a single price drop to the impact of "competing information" (*e.g.,* removal of the Alleged Merger Inflation versus changes in Forescout's standalone value). However, in his deposition, Dr. Nye claimed there were four methods of doing so:

- "[D]iscounted cash flow modeling."[107]

- "Looking at the academic findings with respect to certain corporate events and their conditional average effect on a stock price."[108]

- Content analysis, *i.e.*, review of analyst reports that "can be helpful in disentangling company-specific information in the sense that some analysts will model different components to an informational disclosure and describe how it influences their understanding of the price";[109] and

- "[O]ption pricing theory" that "can be applied because there is an element of probabilities and under uncertainty that is part of the option pricing framework that can be teased out."[110]

72. None of the above four "disentangling" methods are suitable for reliably separating out the Alleged Merger Inflation from Forescout's abnormal return on May 18, 2020.

### A.   Discounted Cash Flow ("DCF") Modeling Is Not a Reliable Method for Disentangling the Impacts of "Competing Information"

73. A DCF is a valuation method that can be applied to a stock to estimate the value of the stock as the sum of the values of all its expected future cash flows, discounted to the present to account for the time value of money and the risks associated with the future cash flows. To employ the DCF method, it is necessary to have reliable projections of the future cash flows. Market participants' (including equity analysts') projections for a company are typically informed by, among other things, the guidance provided by the company's management. However, Forescout management stopped providing guidance about its future prospects after

---

[107] Nye Deposition, 75: 14-15.
[108] Nye Deposition, 75: 15-17.
[109] Nye Deposition, 75: 18-23.
[110] Nye Deposition, 75: 24 – 76: 2.

the Acquisition Announcement,[111] which made it difficult to reliably carry out any DCF-based valuation of Forescout's stock as of May 18, 2020.

74. Of the analyst reports available to me published by seven equity research firms during the two weeks following the May 18, 2020 announcement, only one firm, Macquarie, used a DCF model to assess Forescout's standalone value. Notably, the Macquarie report published on May 18, 2020 noted that the authors were "awaiting updates from both parties before revisiting [their] valuation.[112] Three days later, Macquarie analysts published a report containing a DCF analysis, based on "new data in the complaint filed 5/20/2020 as management cited a strong and encouraging 2Q forecast with a likely large 8-fiure transaction."[113] Thus, I am aware of no analysts who adopted a DCF model to estimate Forescout's standalone value based only on information that was publicly available as of May 18, 2020.

75. In sum, it is unclear how a DCF method can accomplish the task of separating out the Alleged Merger Inflation from Forescout's abnormal return on May 18, 2020, and Dr. Nye has offered no explanation. Thus, Dr. Nye's claim that DCF modeling "can be utilized to distinguish between competing information, company-specific information and its effect"[114] is speculative and without any basis.

### B. Academic Findings on Average Price Impact of Corporate Events Is Not a Reliable Method for Disentangling the Impacts of "Competing Information"

76. Dr. Nye testified in his deposition that Forescout stock's abnormal return can also be parsed out into portions attributable to "competing information" by "looking at the academic findings with respect to certain corporate events and their conditional average effect on a

---

[111] Forescout disclosed in its preliminary proxy statement filed with the SEC on March 3, 2020 the "illustrative guidance" that it had previously provided to the Strategic Committee of the company Board and financial advisor Morgan Stanley in late January 2020. However, according to the proxy statement, this Illustrative Guidance "represented preliminary, but not finalized, revenue guidance." Forescout Preliminary Proxy Statement, filed with the SEC on March 3, 2020, p. 60.

[112] Macquarie Research, "Forescout Technologies (FSCT US): Advent Delays Acquisition - Talks Ongoing," May 18, 2020, p. 1.

[113] Macquarie Research, "Forescout Technologies (FSCT US): Forescout Files Complaint Against Advent," May 21, 2020, p. 3.

[114] Nye Deposition, 75: 9-13.

stock price."[115]  However, Dr. Nye has not identified a single "academic finding" or defined a single "corporate event" that could reasonably form the basis of such an analysis.

77.    Moreover, any "average" effect of a particular type of corporate events observed from a sample of other companies' stock prices would not account for the unique facts of this case, and thus not be a reliable method to separately measure the Alleged Merger Inflation removed from Forescout's stock price on May 18, 2020.

### C.    Content Analysis of Analyst Commentary Is Not a Reliable Method for Disentangling the Impact of "Competing Information"

78.    Dr. Nye also testified in his deposition that Forescout's abnormal return can be parsed out into portions attributable to "competing information" by reviewing the content of analyst reports that may "model different components to an informational disclosure and describe how it influences their understanding of the price."[116]  Like his claims regarding the other methods, Dr. Nye's claim with respect to the analyst report review is vague.  I am unaware of any reliable way to separate out the dissipation of the Alleged Merger Inflation from Forescout's abnormal return on May 18, 2020 based on analysts' commentary, and Dr. Nye has offered no explanation of how that can be done either.

79.    Another practical challenge (which Dr. Nye has not addressed) to attempting to separate out the dissipation of the Alleged Merger Inflation from Forescout's abnormal return on May 18, 2020 based on analysts' commentary is that there was no consensus among analysts about the inputs that should be used to determine Forescout's stock price, including: the probability of deal completion at a deal price of $33; the probability of deal completion at a lower deal price;  the estimate of that lower deal price; and the stock's standalone value and the reverse termination fee, if any, which would determine the stock price if the deal were to fail.

### D.    Options Analysis Is Not a Reliable Method for Disentangling the Impacts of "Competing Information"

80.    Lastly, Dr. Nye testified in his deposition that Forescout's abnormal return can be parsed out into portions attributable to "competing information" by using "option pricing theory …

---

[115] Nye Deposition, 75:15-17.
[116] Nye Deposition, 75: 18-23.

because there is an element of probabilities and under uncertainty that is part of the option pricing framework that can be teased out."[117]  While Dr. Nye's claim is vague, I assume that by "probabilities," he refers to the following potential scenarios relevant for Forescout's stock price determination as of May 18, 2020:[118]

- The probability of Advent closing the acquisition at the original $33 price ("Scenario 1");

- The probability of closing an acquisition at an unknown price lower than $33 ("Scenario 2");

- The probability of no deal, a scenario that itself had two potential outcomes:

  o The probability of Advent paying Forescout a reverse breakup fee,[119] in which case Forescout stock's unobserved fallback price would equal its unobserved standalone value plus the present value of the reverse breakup fee ("Scenario 3");

  o The probability of Advent not paying Forescout any reverse breakup fee, in which case Forescout stock's unobserved fallback price would equal its unobserved standalone value ("Scenario 4").

81.    I am familiar with the academic literature that estimates the probability of a deal's success based on the target's stock and option prices.  For example, a paper by Bester *et al.* published earlier this year considers a binary outcome (*i.e.,* a deal is completed at the original deal price or no deal is completed) to estimate the probability of deal completion, but this study does not analyze the scenario of a deal being completed at a lower price.[120]  In contrast, following Forescout's May 18, 2020 announcement, several analysts opined on the possibility that Forescout could complete a deal at a lower price.

---

[117] Nye Deposition, 75: 24 – 76: 2.
[118] *See*, for example, Needham, "ForeScout Technologies Inc. (FSCT): FSCT: Looking Increasingly Oversold-- Thoughts on Advent Deal and Model," May 21, 2020.
[119] I understand that according to the agreement between Advent and Forescout, if the acquisition was not completed and certain criteria were met, Advent would be required to pay Forescout a reverse breakup fee in the amount of $111,664,539, or $2.31 per share (based on 48,404,973 Forescout shares outstanding as of May 2020).  Forescout Form 8-K, February 7, 2020; Forescout 2019 10-K, p. 2.
[120] Bester, Alan, Victor H. Martinez, and Ioanid Rosu, 2023, "Option Prices and the Probability of Success of Cash Mergers," *Journal of Financial Econometrics*, Vol. 21, No. 1 (Winter) 2023, pp. 145–186 ("Bester et al. (2023)").

82. Dr. Nye seems to suggest that using the prices of exchange-traded options on Forescout's stock, one could (i) estimate the probabilities of Scenarios 1 and 2; (ii) in turn, calculate the combined probability of Scenarios 3 and 4; (iii) then make some assumptions to differentiate between Scenarios 3 and 4; and (iv) finally "backout" the standalone value portion of Forescout's stock price. However, such an attempt would not be reliable for a host of reasons.

83. First, such an approach would require reliable estimates of the revised deal price and reverse termination fee.[121] Dr. Nye has not proposed any method of deriving reliable estimates for these critical inputs, and I am not aware of any options-based analysis to obtain such estimates. With respect to estimating the revised deal price and the probability of the deal's completion at that lower price, given the economic relationship between stock and option prices, it is not feasible to reliably estimate these two metrics simultaneously using Forescout's stock and option prices on May 18, 2020.

84. Second, such an approach is overly simplistic to the extent that it considers only one scenario of a revised deal (i.e., one "Scenario 2"). As I discussed above, however, analyst commentary following Forescout's May 18, 2020 disclosure of the Termination Letter makes clear that there was considerable disagreement among market participants about a revised deal price or the likelihood of a deal's completion at a revised price.

85. Third, in the approach above, it is necessary to estimate the probability that Advent would pay Forescout a reverse termination fee (i.e., the separate probabilities of Scenario 3 or Scenario 4 occurring). Again, Dr. Nye has not proposed any method of deriving these probabilities, and I am not aware of any options-based analysis to obtain such estimates.

86. Finally, as of May 18, 2020, there were various option contracts on Forescout's stock with different strike prices and maturities.[122] There is no definitive rule for which option price

---

[121] Even though the agreement between Advent and Forescout specified the reverse termination fee amount, it is possible that market participants would assume that Advent would end up paying less than the contractually specified amount.

[122] Options data from Cboe DataShop. A call (put) option is a financial derivative that provides a payoff to the option holder if the underlying stock's price is above (below) a contractually specified threshold (also called a strike price or an exercise) by a certain contractually specified date (also known as a maturity date). See Brealey, Richard, Stewart Myers, and Franklin Allen, *Principles of Corporate Finance*, 12th Ed., McGraw-Hill Education, 2017, pp. 526-528.

should be used in the options analysis that Dr. Nye seems to suggest. The use of different options (with different strike prices or maturities) to conduct the above analysis would result in varying conclusions about the probability of deal completion. To illustrate this point, consider the following simplified hypothetical example.[123]

87.   Consider a call option on Forescout's stock with a strike price of $30.[124]  If Advent agreed to acquire Forescout for the original deal price of $33 before the option expired, then Forescout's stock's price would rise to $33 (making a simplified assumption that the merger arbitrage spread was zero) and the option's payoff at expiration would be $3 (calculated as the stock price, $33, less the strike price, $30). If Advent refused to complete the merger at the deal price of $33 before the option expired and assuming the fallback price or any revised deal price would be below $30, then the option would expire worthless, and the option payoff at expiration would be $0. On May 18, 2020, the closing price of the Forescout call option with a strike price of $30 expiring on June 19, 2020 was $0.23.   Under the above assumptions, this option price of $0.23 is the probability-weighted average of two payoffs, either $3 or $0, *i.e.*,

$$\$0.23 = Prob_{Deal} \times \$3 + (1 - Prob_{Deal}) \times \$0 = Prob_{Deal} \times \$3.$$

Thus, the probability that Advent would agree to close the deal at $33 implied by this option price is $0.23 divided by $3, or eight percent.

88.   But the same approach could also be applied using the May 18, 2020 closing price of the Forescout call option (with the same strike price of $30) expiring on August 21, 2020, which was $0.49. Based on this option's price, the probability that Advent would agree to close the deal at $33 would be $0.49 divided by $3, or 16 percent, which is double the first estimate. This difference is due to the difference in the option prices used in the analysis, which, in this case, reflects the difference in the two options' maturities (June 19, 2020 *versus* August 21, 2020).   In the options approach outlined above, one would like to match the option

---

[123] For simplicity, I assume that the risk-free interest rate (which is an input to the option analysis) is zero given the short time horizon.
[124] A call option holder has the right but not the obligation to exercise the option. The holder would exercise a call option only when the stock price exceeds the strike price by the maturity date and therefore the payoff is positive. Otherwise, the holder would simply forego exercising the call option, in which case, the option holder would receive nothing.

maturity with the expected time horizon by when a resolution to the Advent/Forescout deal dispute would be reached.  However, as of May 18, 2020, there was no basis to reliably determine whether the dispute would be resolved in one month (*i.e.,* by June 19, 2020) or three months (*i.e.,* by August 21, 2020) or even later.  Option pricing is sensitive to the length of maturity, especially when the underlying stock is volatile.  When it is not clear what option maturity date or strike price should be used, any inferred probability of deal completion from an option price is inherently speculative and unreliable

89. In sum, options analysis to separate out the dissipation of the Alleged Merger Inflation from Forescout's abnormal return on May 18, 2020 requires many arbitrary assumptions, including, among other things, which option contracts to select for the analysis.  Each set of assumptions will lead to a different result, and given the wide range of possible results, the method is inherently unreliable and speculative.

## VI.    DISENTANGLING THE TWO ALLEGED INFLATION COMPONENTS UNDER THE CONTINUING SALES PIPELINE INFLATION THEORY ALSO CREATES A CONFLICT AMONG DIFFERENT COHORTS OF THE PROPOSED CLASS

### A.    Under the Continuing Sales Pipeline Inflation Theory, It Is also Necessary to Disentangle the Alleged Sales Pipeline Inflation and the Alleged Merger Inflation in Forescout's Abnormal Return on May 18, 2020

90. Regardless of whether any Alleged Sales Pipeline Inflation was present in Forescout's stock price beyond November 6, 2019, Forescout stock's abnormal return on May 18, 2020 reflected, among other things, the changes in the market's assessment of Forescout's standalone value and the readjustment in the market's perception of the deal risk.  Therefore, to reliably assess damages due to the Alleged Merger Misstatement ("Alleged Merger Damages"), one must disentangle, among other things, the removal of Alleged Merger Inflation and the standalone value change reflected in Forescout's May 18, 2020 abnormal return, which the Nye Methodology is unable to accomplish.

91. Under the Continuing Sales Pipeline Inflation Theory, I understand that Plaintiffs allege that both the Alleged Merger Inflation and the Alleged Sales Pipeline Inflation were removed from Forescout's stock price on May 18, 2020 (though it is unclear to what extent they are asserting that some portion of the Alleged Sales Pipeline Inflation was also removed

previously). Dr. Nye claims that according to Plaintiffs' theory, a portion of Forescout's May 18, 2020 price drop reflected the effect of information about Forescout's fundamentals, such as revealing its "true revenue prospects" about which the market purportedly had previously been misled. He testified:[125]

> [T]he defendants allegedly misled the market with respect to the company's true revenue prospects. But that wasn't fully appreciated under plaintiff's theory of liability, is my understanding, until the end of the class period.

92. That is, Dr. Nye acknowledges that under the Continuing Sales Pipeline Inflation Theory, the price impact of any purported corrective disclosures since February 6, 2020 about the Alleged 2019 Sales Pipeline Misstatements (*e.g.,* through the company's February 6 or May 11, 2020 financial results announcements) did not manifest until May 18, 2020, *i.e.,* some portion of Forescout's price drop on May 18, 2020 was attributable to the purported removal of the Alleged Sales Pipeline Inflation.

93. Thus, to reliably assess damages due to the Alleged 2019 Sales Pipeline Misstatements ("Alleged Sales Pipeline Damages"), one must also separately measure, among other factors, the portion of Forescout's abnormal return attributable to (i) the removal of the Alleged Merger Inflation; (ii) the removal of the Alleged Sales Pipeline Inflation; and (iii) remaining standalone value change unrelated to any allegations in this case, including, among other things, events or factors (*e.g.*, the global COVID-19 pandemic) that were unrelated to any Alleged 2019 Sales Pipeline Misstatements.

94. Neither the generic Nye Methodology nor any purported extensions of the event study method that he mentioned in his deposition can be used to disentangle the purported removal of the Alleged Merger Inflation and the purported removal of at least some of the Alleged Sales Pipeline Inflation reflected in Forescout's abnormal return on May 18, 2020 under the Continuing Sales Pipeline Inflation Theory. Furthermore, even if one were to assume that these two types of alleged price inflation could be reliably disentangled, each type of alleged inflation is only relevant for a particular cohort of the Proposed Class. Specifically, the Alleged Merger Inflation is only relevant for assessing damages purportedly suffered by

---

[125] Nye Deposition, p. 73:8-12.

those who bought Forescout stock from May 12 to 15, 2020, whereas the Alleged Sales Pipeline Inflation is only relevant for assessing damages purportedly suffered by those who bought Forescout stock before February 6, 2020.  This would create a conflict between these two cohorts of the Proposed Class.

## B.    Conflict between the Two Lead Plaintiffs, Meitav and Glazer

95.    My review of the trading records submitted by the two Lead Plaintiffs, Meitav and Glazer, confirms that, under Plaintiffs' theory of liability, they do not belong to the same cohort by economic reasoning, and any attempt to disentangle the Alleged Sales Pipeline Inflation from the Alleged Merger Inflation would create a conflict between them.

### 1)  Meitav

96.    Lead Plaintiff Meitav first purchased Forescout stock during the Proposed Class Period on May 13, 2019.  During the Proposed Class Period, Meitav's purchases are as follows:

- Between May 13, 2019 and February 5, 2020, Meitav bought 26,089 shares.[126] Under the Continuing Sales Pipeline Inflation Theory, Meitav could only claim purported Alleged Sales Pipeline Damages for these purchases.

- Between February 6 and May 11, 2020, Meitav bought 3,892 shares.[127]  As I explained above, Forescout's stock price was not inflated in this period.

- After the Alleged Merger Misstatement on May 11, 2020 and through the end of the Proposed Class Period, Meitav bought only 60 shares.[128]  Under the Merger Inflation Theory, Meitav could only claim purported Alleged Merger Damages for these purchases.

97.    The majority of Meitav's purchases of Forescout shares during the Proposed Class Period were prior to February 6, 2020, for which Meitav could only claim Alleged Sales Pipeline Damages.  Under the Continuing Sales Pipeline Inflation Theory, a portion of the inflation

---

[126] Declaration of Jennifer Pafiti in Support of Motion of Meitav Tachlit Mutual Funds Ltd. for Appointment as Lead Plaintiff and Approval of Lead Counsel, November 6, 2020, No. 3:20-cv-00076-SI ("Pafiti Declaration"), Exhibit A.
[127] Pafiti Declaration, Exhibit A.
[128] Meitav bought 19 Forescout shares on May 12 and 41 shares on May 13, 2020.  Pafiti Declaration, Exhibit A.

present in Forescout's stock price prior to February 6, 2020 was not removed until May 18, 2020. However, the generic Nye Methodology is incapable of identifying the portion of Forescout's abnormal return on May 18, 2020 attributable to the removal of the Alleged Sales Pipeline Inflation from Forescout's stock price. Moreover, Meitav's damages estimate would *increase* if the portion of Forescout's May 18, 2020 abnormal return attributable to the removal of the Alleged Sales Pipeline Inflation is larger.

2)  Glazer

98.  Glazer is a New York-based fund manager that undertakes various "event-driven" strategies including "merger arbitrage." [129] ███████████████████████████████ ███████████████████████████████ [130] As expected of a merger arbitrageur, Glazer first bought Forescout stock after the Advent acquisition was announced on February 6, 2020. [131] During the Proposed Class Period, Glazer's purchases are as follows:

- Between February 6 and May 11, 2020, Glazer bought 538,997 shares. [132] Forescout's stock price was not inflated in this period.

- After May 11, 2020 through the end of the Proposed Class Period, Glazer purchased 104,700 shares. [133]

---

[129] "Glazer Capital is a New York-based merger arbitrage strategy hedge fund manager that was founded by Paul Glazer in 1998." (Preqin, "Glazer Capital," available at https://www.preqin.com/data/profile/fund-manager/glazer-capital/11675). Glazer describes itself as an investment firm that undertakes "multiple event-driven strategies." *See* "Strategy: A Disciplined and Differentiated Approach," *Glazer Capital*, available at https://www.glazercapital.com/strategy/. Event-driven strategies are "equity oriented strategies involving investments, long or short, in the securities of corporations undergoing significant change such as spin-offs, mergers, liquidations, bankruptcies and other corporate events." Johnston, Teun, "Event-Driven Strategies: A Favourable Environment," *The Hedge Fund Journal*, May 2007, available at https://thehedgefundjournal.com/event-driven-strategies/.

[130] Ort Deposition, p. 74:5-10.

[131] Glazer's first purchase of Forescout shares on February 6, 2020 was at a price of $33.23 per share, above the announced deal price of $33. *See* Declaration of Ian D. Berg in Support of the Motion of the Glazer Funds for Appointment as Lead Plaintiff and Approval of Selection of Lead Counsel, October 30, 2020, No. 3:20-cv-00076-SI ("Berg Declaration"), Schedule A.

[132] Glazer also sold 93,997 shares between February 6 and May 11, 2020. Thus, over this period, Glazer net bought 445,000 shares. *See* Berg Declaration, Schedule A.

[133] Glazer's additional purchases of a target firm's shares is consistent with academic research that defines institutional merger arbitrageurs as institutions that "regularly increase their holdings of firms targeted for acquisition." Hsieh, Jim and Ralph A. Walkling, 2005, "Determinants and implications of arbitrage holdings in acquisitions," *Journal of Financial Economics*, Vol. 77, No. 3, pp. 605-648, p. 606.

99. For those 104,700 shares bought between May 12 through 15, 2020, Glazer could only claim Alleged Merger Damages, but not Alleged Sales Pipeline Damages even under the Continuing Sales Pipeline Inflation Theory, because Glazer, as a merger arbitrageur, is differently situated compared to typical pre-February 6, 2020 non-arbitrageur investors pursuing the Alleged Sales Pipeline Damages claim. As explained above, the return of a long investment held by a non-arbitrageur investor in Forescout stock depends on, among other things, Forescout's ability to generate profits in the long run (which, in turn, depends on factors such as the health and strength of Forescout's sales pipelines). In contrast, a merger arbitrageur's return does not primarily depend on Forescout's value as a going concern (including the health and strength of its sales pipelines), but on the likelihood of the Advent acquisition's successful completion. Dr. Nye has not explained whether and how he would tailor his generic damages method to the specific situations and circumstances of merger arbitrageurs such as Glazer. Moreover, under the Continuing Sales Pipeline Inflation Theory, to the extent that the Alleged 2019 Sales Pipeline Misstatements were corrected by Forescout's various quarterly earnings releases in 2019 and 2020, then by May 11, 2020, all those misstatements had been cured. As such, those who bought Forescout shares after May 11, 2020 could not have been misled by the Alleged 2019 Sales Pipeline Misstatements. In sum, Glazer could only claim Alleged Merger Damages for shares purchased after May 11, 2020.

100. Furthermore, in direct contrast to Meitav, all else being equal, Glazer's damages estimate would *decrease* if the portion of Forescout's May 18, 2020 abnormal return attributable to the Alleged Sales Pipeline Inflation is larger.

   C.   **Conflict between the Cohorts of the Proposed Class Similarly Situated as the Lead Plaintiffs Under the Continuing Sales Pipeline Inflation Theory**

101. The conflict between Glazer's and Meitav's damages claims illustrates the broader dispute that is likely to arise between members of the Proposed Class who, like Meitav, mostly purchased Forescout shares between May 9, 2019 and February 5, 2020 ("Cohort 1") and those who, like Glazer, primarily purchased Forescout stock between May 12 and 15, 2020 ("Cohort 2"). If the portion of the May 18, 2020 abnormal return attributable to the removal of the Alleged Sales Pipeline Inflation increases, Cohort 1 would be better off, while Cohort

38

2 would be worse off.  Conversely, if the portion of the May 18, 2020 abnormal return attributable to the removal of the Alleged Merger Inflation increases, Cohort 1 would be worse off, while Cohort 2 would be better off.  The generic Nye Methodology is unable to resolve this conflict.

Signed on the twenty second day of December 2023

_____

Wei Jiang

39

**Appendix A**

**Updated in December 2023**

**Wei Jiang**

Emory University Goizueta Business School

1300 Clifton Road, room 537
Atlanta, GA 30322
E-mail:  wei.jiang@emory.edu

---

## CURRENT EMPLOYMENT & APPOINTMENTS

**Goizueta Business School, Emory University**

Asa Griggs Candler Professor of Finance, July 2022 – present.

Vice Dean of Faculty and Research, July 2023 - present

**Other**

Vice President, American Finance Association (AFA), 2024; President-Elect, 2025; President, 2026.

President, the Society of Financial Studies, July 2022 – June 2024.

Research Associate, NBER (Law and Economics), May 2016 – present.

Research Associate, NBER (Corporate Finance), April 2022 – present

Senior Fellow, Harvard Law School Corporate Governance Program, July 2014 – present.

Senior Fellow, Asian Bureau of Finance and Economic Research (ABFER), October 2022 – present.

Member, the Committee on Capital Markets Regulation, January 2017 – present.

Director of board, International Institute of Law and Finance, May 2022 – present

## EDUCATION

**University of Chicago**

Ph.D. in Economics, 2001.

Concentration:  Financial Economics, Econometrics.

**Fudan University, China**

MS & BA in Economics.

## PAST EMPLOYMENT AND WORK EXPERIENCE

**Columbia Business School**

Academic appointments

Arthur F. Burns Professor of Free and Competitive Enterprise, July 2013 – June 2022.

Professor of Finance and Economics, July 2011 – June 2013.

Associate Professor of Finance and Economics, with tenure, July 2009 – June 2011.

Sidney Taurel Associate Professor of Finance and Economics, July 2006 – June 2009.

Associate Professor of Finance and Economics, July 2005 – June 2006.

Assistant Professor of Finance and Economics, July 2001 – June 2005.

Administrative appointments

Member, Provost's Faculty Advisory Committee, July 2020 – June 2022.

1

**Appendix A**

Vice Dean (for Curriculum, Instruction, and Programs), January 2019 – August 2019.

Vice Dean (for Curriculum and Instruction), July 2016 – December 2018

Director, Jerome A. Chazen Institute for Global Business, July 2014 – June 2016.

Chair, Finance Group, July 2011 – June 2014.

Inaugural Academic Director, Master in Financial Economics Program, July 2010 – June 2011.

**Editorial & Professional Services**

Editor-in-chief, ECGI blog, January 2022 – June 2023.

Director of board, The European Corporate Governance Institute (ECGI), September 2022 – June 2023

Director of the American Finance Association, January 2017 – January 2020.

Board member, AFFECT (Academic Female Finance Committee), April 2020 – June 2022.

Editor, *Review of Financial Studies,* January 2017 – December 2020.

Associate Editor, *Journal of Finance,* December 2010 – July 2016.

Finance Area Editor, *Management Science*, January 2012 – June 2014.

Associate Editor, *Management Science*, December 2009 – December 2011.

Associate Editor, *Review of Financial Studies,* July 2012 – June 2015.

**Columbia Law School**

Scholar in Residence, September 2009 – June 2010, September – December 2014.

Senior Fellow, Center for Law and Economics Studies, September 2009-June 2010.

**The Wharton School of the University of Pennsylvania**

Visiting Associate Professor of Finance, July 2006-June 2007.

**University of Chicago**

**Department of Economics**

Lecturer, September 1998-June 2000.

**Financial Mathematics Master Program, Department of Mathematics**

Lecturer, March 2000-June 2001.

**Prudential Securities (New York Office)**

Consultant, October 1997-June 1998.

**Prudential Securities (Shanghai Office)**

Analyst & Associate, December 1994-August 1996.

**GRANTS, AWARDS & RECOGNITION**

**Research Awards**

2023 GSU FinTech Conference, Best Discussant Prize.

2022 Cavalcade AP Best Paper in Asset Pricing, "Form Man vs. Machine to Man + Machine."

2022 Global AI Finance Research Conference Best Paper Prize, sponsored by SKKU, National University of Singapore, and Korean Finance Association, "Form Man vs. Machine to Man + Machine."

2

**Appendix A**

American Association of Individual Investors (AAII) Best Paper Prize in Investments and Asset Pricing at the 2022 Midwest Finance Association Conference. "Form Man vs. Machine to Man + Machine."

Best Paper Award of the 2022 China Finance Research Conference (CFRC) at Tsinghua University. "Form Man vs. Machine to Man + Machine."

Best Paper Award of the 2022 Annual Conference in Digital Economics, "Form Man vs. Machine to Man + Machine."

The Xi Yue Best Paper Prize at the annual China International Conference in Finance (CICF), 2021, "Mapping U.S.-China Technology Decoupling."

The Dimensional Fund Advisors (DFA) Distinguished Paper Prize, *Journal of Finance,* 2020, "Trading against random expiration of private information: A natural experiment."

The Aberdeen Standard Investments Best Paper Prize by European Corporate Governance Initiative (ECGI)*, 2020,* "Picking friends before picking (proxy) fights."

Jensen Prize for Corporate Finance and Organizations, *Journal of Financial Economics* best paper contest, First Prize, 2018, "How does hedge fund activism reshape corporate innovation."

Fellow, Financial Management Association, elected in 2018.  (Established in 2000, the FMA Fellows Program recognizes individuals who have made significant contributions to the profession such as distinguished scholarship.)

The Best Paper Award of *Review of Corporate Finance Studies,* 2018. "Have instrumental variables brought us closer to truth?"

The Michael J. Brennan Best Paper Award, *Review of Financial Studies*, 2015, "The real effects of hedge fund activism."

One of the "Top 10 Corporate and Securities Articles of 2015" (out of all articles indexed in legal journals during 2015) by Thomson Reuters *Corporate Practice Commentator*, "The Long-term Effects of Hedge Fund Activism."

The Best Paper Award from John L. Weinberg Center for Corporate Governance at the University of Delaware, 2016. "How Does Hedge Fund Reshape Corporate Innovation."

Outstanding Paper Award in Financial Institutions, Midwest Finance Association, 2016, "Mutual Fund Holdings of Credit Default Swaps:  Liquidity Management and Risk Taking."

One of the two Best Paper Prizes in the 2015 FMA Consortium on Activist Investors, Corporate Governance and Hedge Funds, "Dancing with the Activists."

One of the two Best Paper Prizes in the 2015 FMA Consortium on Activist Investors, Corporate Governance and Hedge Funds, "Influencing Control: Jawboning in Risk Arbitrage."

The IRRC Institute Research Award, Honorable Mention, 2015.  "How Does Hedge Fund Reshape Corporate Innovation."

The Best Paper Prize in Corporate Finance, The Chinese Finance Association (TCFA), 2014. "Reputational Concerns of Independent Directors."

*Review of Financial Studies* Distinguished Referee Award, 2014.

The 7th Annual Academic Conference on Corporate Governance Best Paper Award, 2014. "Out-of-the-Money CEOs."

3

**Appendix A**

Chicago Quantitative Alliance (CQA) Annual Academic Competition Best Paper Award, 3rd Place, co-recipient with Vikas Agarwal, Yuehua Tang, and Baozhong Yang, 2010. "Uncovering Hedge Fund Skill from the Portfolio Holdings They Hide."

The Western Finance Association Annual Meeting Analysis Group Award for the Best Paper on Financial Institutions and Markets, with Ashlyn Nelson and Edward Vytlacil, 2010. "Liar's Loan? – Effects of Origination channel and Information Falsification on Mortgage Loan Delinquency."

The Terker Family Prize in Investment research, the Wharton School Rodney L. White Center for Financial Research, "Takeover Activity and Target Valuations: Feedback Loops in Financial Markets," with Alex Edmans and Itay Goldstein, 2009.

*Journal of Finance* Brattle Award, finalist ("Hedge Fund Activism, Corporate Governance, and Firm Performance"), co-recipient with Alon Brav, Frank Partnoy, and Randall Thomas, 2008.

The Roger F. Murray Best Paper Award by the Q Group, 2nd Place, co-recipient with Alon Brav, 2007.

The Institute for Quantitative Investment Research (INQUIRE UK) Annual Best Paper Prize, co-recipient with Alon Brav, 2007.

Chicago Quantitative Alliance (CQA) Annual Academic Competition Best Paper Award, 2nd Place, co-recipient with Alon Brav, 2007.

*Journal of Finance* Smith-Breeden Distinguished Paper Prize ("Offering versus Choice in 401(k) Plans: Equity Exposure and Number of Funds"), co-recipient with Gur Huberman, 2006.

Whitebox Scholar, Yale International Center of Finance, summer 2005.

**External Research Grants**

Center for Global Enterprise (CGE) research project "Management Practices in an Age of Engaged Investors," $400,000, Principal Investigator. 2017.

BNP Paribas Hedge Fund Center at SMU Research Grant, $10,000, Co-Investigator with Vikas Agarwal and Vyacheslav Fos, 2010. "Inferring Reporting Biases in Hedge Fund Databases from Hedge Fund Equity Holdings"

The Q-Group Research Grant, "Do Institutional Investors Have an Ace Up Their Sleeves? Evidence from Confidential Filings of Portfolio Holdings," $10,000, Co-Investigator with Vikas Agarwal, Yuehua Tang, and Baozhong Yang, 2009.

National Science Foundation (NSF) Grant, "A Micro View of the Mortgage Crisis: Evidence from Loan-Level Data from a Large Bank," $760,000, Principal Investigator, with Ashlyn Nelson and Edward Vytlacil, 2009-2012.

Federal Deposit Insurance Corporation (FDIC) Financial Research Grant, "Simultaneous Holding of Debt and Equity by Institutional Investors," $10,000, Co-Investigator with Kai Li and Pei Shao, 2008-2009.

"Shareholders and Corporate Governance Research Agenda and Conference" grant, the Millstein Center for Corporate Governance and Performance, Yale School of Management, $10,000, Co-Investigator with Alon Brav, 2007.

The Q-Group Research Grant, "Hedge Fund Activism," $10,000, Co-Investigator with Alon Brav, 2006-2007.

4

**Appendix A**

Federal Deposit Insurance Corporation (FDIC) Financial Research Grant, $10,000, "Hedge Fund Activism," Co-Investigator with Alon Brav, 2006-2007.

TIAA-CREF Institute Research Grant, $50,000, "Director Ownership of Mutual Funds," Co-Investigator with Qi Chen, 2004-2005.

PER Seed Grant for economics, $5,000, 2004.

INQUIRE grant on quantitative investment research, $10,000, "Market Timing by Mutual Funds," 2004.

Francis Yuen Dissertation Scholarship, September 2000-June 2001.

Francis Yuen Fellowship, September 1997-June 2000.

University of Chicago Graduate Scholarship, September 1996-June 1997.

**Teaching**

Executive MBA Award for Commitment to Excellence, Class of 2020.

(Selected by all graduating Executive MBA students and awarded to a full-time faculty member of official who exemplifies commitment to excellence.)

Executive MBA Award for Commitment to Excellence, Class of 2019.

Singhvi Prize for Scholarship, 2013.

(Selected by all graduating MBA students and awarded to a full-time faculty member who exemplifies excellence in the classroom, based on his or her dedication to teaching and the ability to communicate knowledge and encourage students.)

Executive MBA Award for Commitment to Excellence, 2009.

Executive MBA Award for Commitment to Excellence, 2007.

Dean's Award for Teaching Excellence in a Core Course, 2006.

Executive MBA Award for Commitment to Excellence, 2005.

Best Instructor, voted by the class, Financial Mathematics Master Program, University of Chicago, 2000.


**PUBLISHED AND ACCEPTED PAPERS**

- Reviewed publications in academic journals:

[41] "Shareholder Monitoring Through Voting:  New Evidence from Proxy Contest" (subsuming "Picking Friends before Picking (Proxy) Fights:  How Mutual Fund Voting Shapes Proxy Contests") with Alon Brav, Tao Li, and James Pennington.  *Review of Financial Studies,* forthcoming.

[40] "Mapping US-China Technology Decoupling, Innovation, and Firm Performance," with Pengfei Han and Danqing Mei. *Management Science,* forthcoming.

[39] "How to Talk When a Machine is Listening:  Corporate Disclosure in the Age of AI," with Sean Cao, Baozhong Yang, and Alan Zhang.  *Review of Financial Studies,* 2023. 36(9), 3603-2642.

[38] "Diversity Through Turnover: How to Overcome the Glacial Pace Toward Board Diversity?" *Journal of Law, Finance, and Accounting,* 2023 (7), 1-26, Lead article.

[37] "Dissemination, Publication, and Impact of Finance Research:  When Novelty Meets Conventionality," with Rui Dai, Lawrence Donohue, and Freda Drechsler. *Review of Finance*, February 2023, 23(1), 79-141.

**Appendix A**

[36] "What Explains Differences in Finance Research Productivity During the Pandemic? (with Brad M. Barber, Adair Morse, Manju Puri, Heather Tookes, and Ingrid Werner), *Journal of Finance,* August 2021, vol 76(4), 1655-1697.

[35] "Mutual Fund Holdings of Credit Default Swaps: Liquidity, Yield, and Risk Taking," with Jitao Ou and Zhongyan Zhu.  *Journal of Finance,* April 2021, vol 76(2), 537-586.

[34] "The Long Rise and Quick Fall of Appraisal Arbitrage," with Tao Li and Randall Thomas, *Boston University Law Review,* December 2020, vol 100(6).

[33] "CoCo Issuance and Bank Fragility," with Stefan Avdjiev, Patrick Bolton, Anastasia Kartasheva, and Bilyana Bogdanova.  *Journal of Financial Economics,* 2020, vol 138(3), 593-613, lead article.

[32] "Dancing with the Activists," with Lucian Bebchuk, Alon Brav, and Thomas Keusch. *Journal of Financial Economics,* 2020, vol 137, 1-41. Lead article.

[31] "Trading Against the Random Expiration of Private Information: A Natural Experiment," with Mohammadreza Bolandnazar, Robert J. Jackson, Jr. and Joshua Mitts.  *Journal of Finance*, Lead article, 2020, vol. 75, 5-44.

[30] "Will Tenure Voting Give Corporate Managers Lifetime Tenure?" with Paul H. Edelman and Randall Thomas, *Texas Law Review,* 2019, vol. 97, 991-1029.

[29] "Influencing Control:  Jawboning in Risk Arbitrage." With Tao Li and Danqing Mei, *Journal of Finance,* 2018, Vol 73(6), 2635-2675.

[28] "How Does Hedge Fund Activism Reshape Corporate Innovation?" with Alon Brav, Song Ma, and Xuan Tian, *Journal of Financial Economics,* 2018, Vol 130 (2), 237-264

[27] "Have Instrumental Variables Brought Us Closer to Truth?" *Review of Corporate Finance Studies,* 2017, vol. 6 (2), 127-140.

[26] "Appraisal:  Shareholder Remedy or Litigation Arbitrage?" with Tao Li, Danqing Mei, and Randall Thomas, *Journal of Law and Economics*, 2016, vol. 59, 697-729.

[25] "Reputation Concerns of Independent Directors:  Evidence from Individual Director Voting," with Hualin Wan and Shan Zhao, *Review of Financial Studies,* 2016, vol. 29(3), 655-696.

[24] "Out-of-the-Money CEOs:  Inferring Private Control Premium from CEO Option Exercises," with Vyacheslav Fos, *Review of Financial Studies,* 2016, vol. 29(6), 1549-1585.

[23] "Feedback Effects, Asymmetric Trading, and the Limits to Arbitrage," with Alex Edmans and Itay Goldstein, *American Economic Review*, 2015, 105(12): 3766-3797.

[22] "Career-risk concerns, information effort, and optimal pay-for-performance sensitivity, with Qi Chen, and Shane S. Dikolli, *Journal of Management Accounting Research*, 2015, vol. 27, 165-195.

[21] "The Real Effects of Hedge Fund Activism:  Productivity, Asset Allocation, and Labor Outcomes" with Alon Brav and Hyunseob Kim, *Review of Financial Studies,* October 2015, vol. 28, 2723-2769.  Lead article.

[20] "The Long-Term Effects of Hedge Fund Activism," with Lucian Bebchuk and Alon Brav, *Columbia Law Review,* June 2015, vol. 115, 1085-1156.

[19] "Securitization and Loan Performance: Ex Ante and Ex Post Relations in the Mortgage Market," with Ashlyn Nelson and Edward Vytlacil, *Review of Financial Studies,* 2014, vol. 27(2), 454-483.

6

**Appendix A**

[18] "Liar's loan?—Effects of Origination Channel and Information Falsification on Mortgage Delinquency," with Ashlyn Nelson and Edward Vytlacil, *Review of Economics and Statistics,* 2014, vol. 96(1), 1-18. Lead article.

[17] "Pre-Disclosure Accumulations by Activist Investors:  Evidence and Policy," with Lucian Bebchuk, Alon Brav, and Robert Jackson, *Journal of Corporation Law,* 39, Fall 2013.

[16] "Inferring Reporting-Related Biases in Hedge Fund Databases from Hedge Fund Equity Holdings," with Vikas Agarwal and Vyacheslav Fos.  *Management Science,* 2013, vol. 59(6), 1271-1289.

[15] "Uncovering Hedge Fund Skills from the Portfolio Holdings They Hide," with Vikas Agarwal, Yuehua Tang, and Baozhong Yang. *Journal of Finance*, 2013, vol. 68(2), 739-783.

[14] "The Real Effects of Financial Markets: The Impact of Prices on Takeovers," with Alex Edmans and Itay Goldstein, *Journal of Finance*, 2012, vol. 67(3), 933-972.

[13] "Hedge Funds and Chapter 11," with Kai Li, and Wei Wang, *Journal of Finance*, 2012, vol. 67(2), 513-560.

[12] "When Creditors are Shareholders:  Effects of Simultaneous Holding of Debt and Equity by Noncommercial-Banking Institutions," with Kai Li, and Pei Shao, *Review of Financial Studies*, 2010, vol. 23(10), 3595-3637.

[11] "Payoff Complementarities and Financial Fragility: Evidence from Mutual Fund Outflows," with Qi Chen and Itay Goldstein, *Journal of Financial Economics*, 2010, vol. 97, 239-262.

[10] "Activist Arbitrage:  A Study of Open-Ending Attempts of Closed-End Funds" with Michael Bradley, Alon Brav, and Itay Goldstein, *Journal of Financial Economics*, 2010, vol. 95 (1), 1-19. Lead article.

[9] "Directors' Ownership in the U.S. Mutual Fund Industry," with Qi Chen and Itay Goldstein, *Journal of Finance*, 2008, vol 63(5), 2629-2677.

[8] "Hedge Fund Activism, Corporate Governance, and Firm Performance," with Alon Brav, Frank Partnoy, and Randall Thomas, *Journal of Finance*, 2008, vol. 63 (4), 1729-1775, finalist for the Brattle Award, and ranked among the "Top 10 most-cited articles from *Journal of Finance*" by Scientific Direct in 2009.

[7] "Defined Contribution Pension Plans:  Determinants of Participation and Contribution Rates," with Gur Huberman and Sheena Iyengar, *Journal of Financial Services Research*, 2007, vol. 31(1), 1-32.  Lead article.

[6] "Price Informativeness and Investment Sensitivity to Stock Prices," with Qi Chen and Itay Goldstein, *Review of Financial Studies*, 2007, vol. 20 (3), 619-650.

[5] "Offering vs. Choices in 401(k) Plans:  Equity Exposure and Number of Funds," with Gur Huberman, *Journal of Finance*, 2006, vol. XLI(2), 763-801*,* winner of the Smith-Breeden Distinguished Paper Prize.

[4] "Analysts' Weighting of Private and Public Information," with Qi Chen, *Review of Financial Studies,* 2006, vol. 19(1), 319-355.

[3] "A Nonparametric Approach to Measuring and Testing Curvature," with Jason Abrevaya, *Journal of Business and Economic Statistics*, 2005, vol. 23(1), 1-19. Lead article.

7

**Appendix A**

[2] "Investor Learning about Analyst Ability," with Qi Chen and Jennifer Francis, *Journal of Accounting and Economics*, 2005, vol. 39(1), 3-24.  Lead article.

[1] "A Nonparametric Test of Market Timing," *Journal of Empirical Finance*, 2003, vol. 10(4), pp 399 – 425.  Lead article.

- Other Publications (lightly reviewed, book chapters, reviews, and practitioner/policy papers):

[16] "The Credit Suisse CoCo Wipeout:  Facts, Misperceptions, and Lessons from Financial Regulation," with Patrick Bolton and Anastasia V. Kartasheva, *Journal of Applied Corporate Finance*, 2023, 35(2), 66-74.

[15] "The Disappeared Outperformance of Post-Reorg Equity," with Wei Wang and Yan Yang, *Journal of Alternative Investments* 25 (3), 118-137, 2023.

[14] "Governance by persuasion:  Hedge Fund Activism and the Market for Corporate Influence." In Oxford Research Encyclopedia of Economics and Finance.  Published by Oxford University Press, 2022.

[13] "The Impact of Private Equity Buyouts on Productivity and Jobs," a white paper for the Committee of Capital Market Regulation, 2020.

[12] "To FinTech and beyond," with Itay Goldstein and G. Andrew Karolyi, *Review of Financial Studies,* Editorial, 2019, Vol 32 (5), 1647-1661.

[11] "Who are the short-termists?" *Journal of Applied Corporate Finance,* lead article, 2018, vol. 30 (4), 1-8.

[10] "Recent advances in research on hedge fund activism: Value creation and identification," *Annual Review of Financial Economics,* 2015 (December) issue.

[9] "Delinquency Model Predictive Power among Low-Documentation Loans, with Ashlyn Nelson and Edward Vytlacil, *Economic Letters*, 2013, vol. 120, 171-173.

[8] "Re: 'Petition for Rulemaking Under Section 13 of the Securities Exchange Act of 1934' filed by Wachtell, Lipton, Rosen & Katz on March 7, 2011," with J. B. Heaton and Alon Brav, http://www.sec.gov/comments/4-624/4624-2.pdf.

[7] "Hedge Fund Activism," with Alon Brav and Hyunseob Kim, chapter in *Research Handbook on Hedge Funds, Private Equity and Alternative Investments*, Edward Elgar Publishing Ltd, 2010.

[6] "Hedge Fund Activism:  A Review," with Alon Brav and Hyunseob Kim, *Foundations and Trends in Finance,* 2010, vol. 4(3), 1-66.

[5] "Returns to Hedge Fund Activism," with Alon Brav, Frank Partnoy, and Randall Thomas, *Financial Analyst Journal*, 2008, vol 64, 45-61.

[4] "How Much Choice Is Too Much?:  Contributions to 401(k) Retirement Plans," with Gur Huberman and Sheena Iyengar, chapter in *Pension Design and Structure:  New Lessons from Behavioral Finance*, edited by Olivia Mitchell and Stephen Utkus, Oxford University Press, 2004, pp 83-96.

[3] "Positive Hurdle Rates without Asymmetric Information," with Qi Chen, *Financial Research Letters,* March 2004, 1(2), 106-112.

[2] "How Do Analysts Weight Private Information and Why?"  with Qi Chen, in *Corporate Governance:  Implications for Financial Services Firms*, Proceedings of the 39th Chicago Federal Reserve Bank of Chicago Conference on Bank Structure and Competition, 2004, pp 336-353.

[1] "Commodity Futures Market in China," with David Wall, *The Futures and Derivatives Law Review,* Volume 2 Issue 1, Cavendish Publishing Limited, London, January 1995, pp 13-42.

8

**Appendix A**

Reprinted in *Financing China Trade and Investment*, ed. Kui-Wai Li, Praeger, Westport & London, 1997, pp183 – 214.

## WORKING PAPERS

[1] "A Race to Lead:  How Chinese Government Intervention Shapes the U.S.–China Production Competition," with Xiao Cen and Vyacheslav Fos.

[2] "Surviving the Fintech Disruption," with Yuehua Tang, Jiqiu Xiao, and Vincent Yao.

[3] "From Man vs. Machine to Man + Machine:  The Art and AI of Stock Analyses," with Sean Vao, Junbo Wang, and Baozhong Yang.

[4] "Trading Ahead of Barbarians' Arrival at the Gate:  Insider Trading on Non-Insider Information," with Georgy Chabakauri and Vyacheslav Fos.

[5] "How Do Firms Withstand Global Economics Shocks," with Xiao Cen and Vyacheslav Fos.

[6] "The Real Effect of Social-Political Racial Animus:  Mutual Fund Manager Performance During the AAPI Hate," with Vikas Agarwal, Yuchen Luo, and Hon Zou.

## COURSES TAUGHT

- MBA/EMBA:
    - Corporate Finance (core); Advanced Corporate Finance; Corporate Governance; Global Immersion—China; Activist Investing.
- Ph.D.:
    - Empirical Corporate Finance; Empirical Methods in Corporate Finance; Financial Econometrics—Panel Data.
- Master:
    - Financial Econometrics; Empirical Methods; Advanced Corporate Finance.
- BBA:
    - Advanced Corporate Finance

## DOCTORAL STUDENT PLACEMENTS

- Jose Martinez, sponsor, 2006.  Oxford University Said School of Business.  First placement:  Swedish Institute for Financial Research (SIFR).
- George Murillo, sponsor, *graduate with distinction*, 2008. First placement:  Goldman Sachs & Co.
- Linying Zhao (Department of Economics), sponsor, 2009.  First placement:  Shanghai University of Finance and Economics.
- Huidan Lin (Department of Economics), committee member, 2009.  First placement:  IMF.
- Xiaozheng Wang, committee member, 2009.  First placement:  Criterion Economics Consulting.
- Yael Eisenthal, sponsor, *graduate with distinction*, 2009.  First placement:  Goldman Sachs Asset Management.
- Vyacheslav Fos, sponsor, *graduate with distinction*, 2011.  First placement: University of Illinois Urbana Champaign.  Current:  Boston College.
- Ravindra Sastry, committee chair, 2012.  First placement:  Southern Methodist University.
- Yang Chen, sponsor, 2013.  First placement:  Bank of America/Merrill Lynch.

**Appendix A**

- Andres Liberman, sponsor, 2013.  First placement:  NYU Stern School of Business.
- Yuehua Tang (Georgia State University), (external) committee member, 2013.  First placement:  Singapore Management University.  Current:  University of Florida
- Tao Li (Department of Economics), committee member, 2013.  First placement:  Warwick Business School.  Current:  University of Florida.
- Jun Kyung Auh, committee chair, 2014.  First placement:  Georgetown University McDonough School of Business.
- Jaehyun Cho, committee member, 2015.  First placement:  SEC.
- Colleen Honigsberg (Department of Accounting and Columbia Law School), committee member, 2016. First placement:  Stanford Law School.
- Guojun Chen, committee chair, 2016. First placement: Nanyang Technology University.
- Arput Gupta, committee chair, 2016.  First placement:  NYU Stern.
- Joshua Mitts, sponsor, 2017.  First placement:  Columbia Law School.
- Kunal Sachdeva, sponsor, 2018.  First placement:  Rice University Jones Graduate School of Business.
- Zoi Melina Papoutsi, committee chair, 2018.  First placement:  European Central Bank.
- Nan Li, committee member. 2019.  First placement:  University of Minnesota.
- Minchen Zheng, sponsor, 2019.  First placement:  Man Group.
- Honglin Ren (Georgia State University), committee member, 2019.  First placement:  Renmin University.
- Xiao Cen, sponsor, 2020.  First placement:  Texas A&M.
- Danqing Mei, sponsor, 2020.  First placement:  CKGSB.
- Rebecca DeSimone, 2020. Committee member.  First placement:  LBS
- Maxime Couvert (Swiss Finance Institute), 2020. Committee member.  First placement: Hong Kong University.
- Kerry Siani, 2022.  Committee chair.  First placement:  MIT Sloan.
- Adrien Alvero, 2022.  Committee member.  First placement:  TRG Management.
- Vrinda Mittal, 2023.  Committee member.  First placement:  UNC Chapel Hill

10

**Appendix B**

WEI JIANG

Testimony as an Expert Witness 2019 – 2023

*David Jaroslawicz, individually and on behalf of all others similarly situated, v. M&T Bank Corporation, et al.,* United States District Court District Of Delaware, Civ. No. 1:15-cv-00897-EJW.  Provided expert opinion in 2022.

## Appendix C
## Materials Relied Upon

**Legal Documents**

Christopher L. Sayce, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Forescout Technologies, Inc., Michael Decesare, and Christopher Harms, Defendants, United States District Court, Northern District of California, San Francisco Division. Case No.: 20-CV-00076-SI, Amended Complaint for Violation of the Securities Law, May 22, 2020.

Christopher L. Sayce, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Forescout Technologies, Inc., Michael Decesare, and Christopher Harms, Defendants, United States District Court, Northern District of California, San Francisco Division. Case No.: 3:20-cv-00076-SI, Plaintiffs' Notice of Motion and Motion for Class Certification, and Appointment of Class Representatives and Class Counsel, October 27, 2023.

Christopher L. Sayce, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Forescout Technologies, Inc., Michael Decesare, and Christopher Harms, Defendants, United States District Court, Northern District of California, San Francisco Division. Case No.: 20-CV-00076, Complaint for Violations of the Federal Securities Laws, January 2, 2020.

Christopher L. Sayce, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Forescout Technologies, Inc., Michael Decesare, and Christopher Harms, Defendants. United States District Court, Northern District of California, San Francisco Division. Case No.: 20-CV-00076-SI, Second Consolidated Amended Complaint, May 10, 2021.

Declaration of Ian D. Berg in Support of the Motion of the Glazer Funds for Appointment as Lead Plaintiff and Approval of Selection of Lead Counsel, October 30, 2020, No. 3:20-cv-00076-SI.

Declaration of Jennifer Pafiti in Support of Motion of Meitav Tachlit Mutual Funds Ltd. for Appointment as Lead Plaintiff and Approval of Lead Counsel, November 6, 2020, No. 3:20-cv-00076-SI.

Glazer Capital Management, L.P.; Glazer Enhanced Fund L.P.; Glazer Enhanced Offshore Fund, Ltd.; Glazer Offshore Fund, Ltd.; Highmark Limited; Meitav Tachlit Mutual Funds Ltd., Plaintiffs-Appellants, v. Forescout Technologies, Inc.; Michael Decesare; Christopher Harms, Defendants-Appellees, No. 21-16876, D.C. No. 3:20-cv-00076-SI, Opinion, United States Court of Appeals For The Ninth Circuit Ninth Circuit Court of Appeals Opinion filed March 16, 2023.

**Deposition Transcripts**

Deposition of Mark Ort, November 30, 2023.

Deposition of Zachary Nye, November 20, 2023.

**Expert Report**

Expert Report of Zachary Nye, Ph.D., dated October 27, 2023, attached as Exhibit A to the Declaration of Omar Jafri, filed in support of the Plaintiffs' Class Certification Motion.

**Bates-Stamped Documents**

GlazerCapital_00001.

**Academic Literature**

"Federal Securities Acts and Areas of Expert Analysis," by Nicholas Gold et al., Chapter 27 of the *Litigation Services Handbook: The Role of the Financial Expert,* 6th ed., edited by Roman Weil et al., John Wiley & Sons, Inc., 2017.

Baker, Malcolm, and Serkan Savasoglu, 2002, "Limited Arbitrage in Mergers and Acquisitions," *Journal of Financial Economics,* Vol. 64, No. 1, pp. 91-115.

Bester, Alan, Victor H. Martinez, and Ioanid Rosu, 2023, "Option Prices and the Probability of Success of Cash Mergers," *Journal of Financial Econometrics,* Vol. 21, No. 1 (Winter) 2023, pp. 145–186.

Brealey, Richard, Stewart Myers, and Franklin Allen, *Principles of Corporate Finance,* 12th Ed., McGraw-Hill Education, 2017.

Chapter 4 of *The Econometrics of Financial Markets,* by John Campbell et al., Princeton University Press, 1997.

Davidson, Wallace N., Dipa Dutia, and Louis Cheng, 1989, "A Re-Examination of the Market Reaction to Failed Mergers," *Journal of Finance,* Vol. 44, No. 4, pp. 1070–1083.

Hsieh, Jim and Ralph A. Walkling, 2005, "Determinants and implications of arbitrage holdings in acquisitions," Journal of Financial Economics, Vol. 77, No. 3, pp. 605-648.

**Appendix C**
**Materials Relied Upon**

**Academic Literature**

Jetley, Gaurav and Xinyu Ji, 2010, "The Shrinking Merger Arbitrage Spread: Reasons and Implications," *Financial Analysts Journal,* Vol. 66, No. 2, pp. 54-68.

Jindra, Jan, and Ralph A. Walkling, 2004, "Speculation Spreads and the Market Pricing of Proposed Acquisitions," *Journal of Corporate Finance,* Vol. 10, No. 4, pp. 495-526.

Kirchner, Thomas, 2016, *Merger Arbitrage,* 2nd Ed., Wiley.

Mitchell, Mark and Todd Pulvino, 2012, "Arbitrage crashes and the speed of capital," *Journal of Financial Economics,* Vol. 104, No. 3, pp. 469–490.

Mitchell, Mark, and Todd Pulvino, 2001, "Characteristics Of Risk and Return In Risk Arbitrage," *Journal of Finance,* Vol. 56, No. 6, pp. 2135– 2175.

Pastor, Lubos and M. Blair Vorsatz, 2020, "Mutual Fund Performance And Flows During The COVID-19 Crisis," *The Review of Asset Pricing Studies,* Vol. 10, No. 4, pp. 791–833.

Ramelli, Stefano, Alexander F Wagner, 2020, "Feverish Stock Price Reactions to COVID-19," *The Review of Corporate Finance Studies,* Vol. 9, No. 3, pp. 622–655.

Samuelson, William and Leonard Rosenthal, 1986, "Price Movements as Indicators of Tender Offer Success," *The Journal of Finance,* Vol. 41, No. 2 (June), pp. 481-499.

Simon H. Kwan and Thomas M. Mertens, "Market Assessment of COVID-19," FRBSF Economic Letter, Research from Federal Reserve Bank of San Francisco 2020-14, May 28, 2020.

Wang, Wenyu, "Bid anticipation, information revelation, and merger gains," *Journal of Financial Economics,* Vol. 128, No. 2, May 2018, pp. 320-343.

**SEC Filings**

Forescout 2019 10-K.

Forescout Form 8-K, February 7, 2020.

Forescout Preliminary Proxy Statement, filed with the SEC on March 3, 2020.

Taubman Centers, Inc. Form 8-K, February 11, 2020.

Taubman Centers, Inc. Form 8-K, November 16, 2020.

Tech Data Corporation Form 8-K, November 29, 2019.

**Equity Analyst Reports**

Bank of America Merrill Lynch, "Forescout Technologies, Inc, Moving to No Rating," February 7, 2020.

Berenberg, "Forescout Technologies Inc. (FSCT US): Standalone valuation implies additional downside," May 18, 2020.

Citi, "Alert: Advent close delay; where do we go from here?" May 18, 2020.

J.P. Morgan, "Model Update," May 20, 2020.

Macquarie Research, "Forescout Technologies (FSCT US): Advent Delays Acquisition – Talks Ongoing," May 18, 2020.

Macquarie Research, "Forescout Technologies (FSCT US): ForeScout Files Complaint Against Advent," May 21, 2020.

Needham, "Forescout Technologies Inc. (FSCT): FSCT: Looking Increasingly Oversold--Thoughts on Advent Deal and Model," May 21, 2020.

Needham, "Forescout Technologies, Inc., FSCT: Announces Agreement to Be Acquired at $33," February 6, 2020.

Piper Sandler, "'The Days of Our Lives' - FSCT Commences Litigation Against Advent," May 20, 2020.

Piper Sandler, "Back to the Drawing Board - Lowering target to $26", May 18, 2020.

Summit Insights Group, "More than a 50% chance an alternative buyer could emerge; As expected, activist investors likely forced the company to sell itself ahead of negative results," February 6, 2020.

UBS, "Forescout Technologies Inc: Execution Distractions Likely as Legal Action with Advent Now Underway," May 28, 2020.

2

## Appendix C
## Materials Relied Upon

**Publicly Available Sources**

"Advent International Completes Tender Offer for Shares of Forescout Technologies," *Advent,* August 17, 2020, available at https://www.adventinternational.com/advent-international-completes-tender-offer-for-shares-of-forescout-technologies/.

"Forescout and Advent International Reach Amended Merger Agreement," *GlobeNewswire,* July 15, 2020, available at https://www.globenewswire.com/news-release/2020/07/15/2062619/0/en/Forescout-and-Advent-International-Reach-Amended-Merger-Agreement html.

"Forescout Provides Update Regarding Pending Acquisition by Advent International: Forescout and Advent In Ongoing Discussion," *GlobeNewswire,* May 18, 2020, available at https://www.globenewswire.com/news-release/2020/05/18/2034910/0/en/Forescout-Provides-Update-Regarding-Pending-Acquisition-by-Advent-International.html.

"Forescout Technologies Announces Preliminary Third Quarter 2019 Financial Results," *GlobeNewswire,* October 10, 2019, available at https://www.globenewswire.com/news-release/2019/10/10/1928027/0/en/Forescout-Technologies-Announces-Preliminary-Third-Quarter-2019-Financial-Results.html.

"Forescout Technologies Reports First Quarter 2019 Financial Results," *GlobeNewswire,* May 9, 2019, available at https://www.globenewswire.com/en/news-release/2019/05/09/1821356/0/en/Forescout-Technologies-Reports-First-Quarter-2019-Financial-Results.html.

"Forescout Technologies Reports First Quarter 2020 Financial Results," *GlobeNewswire,* May 11, 2020, available at https://www.globenewswire.com/news-release/2020/05/11/2031444/0/en/Forescout-Technologies-Reports-First-Quarter-2020-Financial-Results html.

"Forescout Technologies Reports Fourth Quarter and Full Year 2019 Financial Results," *GlobeNewswire,* February 6, 2020, available at https://www.globenewswire.com/en/news-release/2020/02/06/1981056/0/en/Forescout-Technologies-Reports-Fourth-Quarter-and-Full-Year-2019-Financial-Results html.

"Forescout Technologies Reports Second Quarter 2019 Financial Results," *GlobeNewswire,* August 7, 2019, available at https://www.globenewswire.com/en/news-release/2019/08/07/1898692/0/en/Forescout-Technologies-Reports-Second-Quarter-2019-Financial-Results.html.

"Forescout Technologies Reports Third Quarter 2019 Financial Results," *GlobeNewswire,* November 6, 2019, available at https://www.globenewswire.com/en/news-release/2019/11/06/1942616/0/en/Forescout-Technologies-Reports-Third-Quarter-2019-Financial-Results.html.

"Forescout to be Acquired by Advent International in $1.9 Billion Transaction," *GlobeNewswire,* February 6, 2020, available at https://www.globenewswire.com/news-release/2020/02/06/1981052/0/en/Forescout-to-be-Acquired-by-Advent-International-in-1-9-Billion-Transaction html.

"Strategy: A Disciplined and Differentiated Approach," *Glazer Capital,* available at https://www.glazercapital.com/strategy/.

"Themes from the quarterly Quantitative Beta Research Summit," J.P. Morgan Asset Management, 2Q 2020.

Johnston, Teun, "Event-Driven Strategies: A Favourable Environment," *The Hedge Fund Journal,* May 2007, available at https://thehedgefundjournal.com/event-driven-strategies/.

Preqin, "Glazer Capital," available at https://www.preqin.com/data/profile/fund-manager/glazer-capital/11675.


**Data**

Bloomberg, L.P.

Cboe DataShop.

Refinitiv.

S&P Capital IQ.



**Exhibit 1: Forescout Stock Price and News Events**

*April 1, 2019 - August 17, 2020*

**Note:**

[1] On July 15, 2020, Advent approved of a revised agreement to acquire Forescout at $29/share.

**Sources:**

Bloomberg, L.P.; Plaintiffs' Class Certification Motion, p. i; "Forescout Technologies Reports First Quarter 2019 Financial Results," *GlobeNewswire*, May 9, 2019; SCAC, ¶97; "Forescout Technologies Reports Second Quarter 2019 Financial Results," *Forescout*, August 7, 2019; SCAC, ¶110; SCAC ¶115; "Forescout Technologies Announces Preliminary Third Quarter 2019 Financial Results," *GlobeNewswire*, October 10, 2019; SCAC ¶117; "Forescout Technologies Reports Third Quarter 2019 Financial Results," *GlobeNewswire*, November 6, 2019; SCAC ¶120; "Forescout to be Acquired by Advent International in $1.9 Billion Transaction," *GlobeNewswire*, February 6, 2020; S&P Capital IQ; Court of Appeals Opinion, p. 22; "Forescout Provides Update Regarding Pending Acquisition by Advent International: Forescout and Advent In Ongoing Discussion," *GlobeNewswire*, May 18, 2020; "Forescout and Advent International Reach Amended Merger Agreement," *GlobeNewswire*, July 15, 2020.

### Exhibit 2: Forescout Stock Price vs. S&P 500 Market Index
*February 24, 2020 - May 15, 2020*



**Notes:**
[1] The value of "Market Index: S&P 500" as of February 24, 2020 is scaled to Forescout's stock price as of February 24, 2020.
[2] Several studies on the market-wide catastrophic impact of the COVID-19 focus on the period from February 24, 2020 (considered to be "the start of a series of large stock market declines") to March 20, 2020 ("the day before the $2.2 trillion fiscal stimulus gained traction").
**Sources:**
Bloomberg, L.P.; Nye Report, Exhibit 11B; Kwan, Simon H. and Thomas M. Mertens, "Market Assessment of COVID-19," FRBSF Economic Letter, Research from Federal Reserve Bank of San Francisco 2020-14, May 28, 2020; Ramelli, Stefano and Alexander F. Wagner, 2020, "Feverish Stock Price Reactions to COVID-19," *The Review of Corporate Finance Studies*, 9(3), pp. 622–655.

**Exhibit 3: Merger Arbitrage Spreads of Forescout and Target Firm Peers**
*February 24, 2020 - May 15, 2020*



**Notes:**

[1] Merger arbitrage spread on a given day is calculated as (offer price at the time - target firm's closing price on that day)/ target firm's closing price on that day.

[2] The following criteria are used to identify Target Firm Peers: (1) Deal Attitude: Friendly, (2) Date Announced: October 23, 2019 to February 23, 2020, and (3) Date Effective or Date Withdrawn: after February 23, 2020, (4) Consideration Structure: Cash Only, (5) Percentage of Cash: 100, (6) Target Company Listed: in U.S. Stock Exchange, (7) Deal Value: $1 billion to $10 billion, (8) Target Nation: United States and (9) Percentage of Shares Acquired in Transaction: 100.

**Sources**:

Refinitiv; Tech Data Corporation Form 8-K, November 29, 2019; "Forescout to be Acquired by Advent International in $1.9 Billion Transaction," *GlobeNewswire,* February 6, 2020, available at https://www.globenewswire.com/news-release/2020/02/06/1981052/0/en/Forescout-to-be-Acquired-by-Advent-International-in-1-9-Billion-Transaction.html; "Forescout and Advent International Reach Amended Merger Agreement," *GlobeNewswire,* July 15, 2020, available at https://www.globenewswire.com/news-release/2020/07/15/2062619/0/en/Forescout-and-Advent-International-Reach-Amended-Merger-Agreement.html; Taubman Centers, Inc. Form 8-K, February 11, 2020; Taubman Centers, Inc. Form 8-K, November 16, 2020.