# Exhibit A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CHRISTOPHER L. SAYCE, Individually and on Behalf of All Others Similarly Situated, | ) ) ) |
| | ) Case No. |
| Plaintiffs, | ) 3:20-cv-00076-SI |
| | ) |
| v. | ) Class Action |
| | ) |
| FORESCOUT TECHNOLOGIES, INC., MICHAEL DECESARE, and CHRISTOPHER HARMS, | ) ) ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

Videotaped Deposition of WEI JIANG

(Given Remotely)

Tuesday, January 16, 2024

10:33 a.m. Eastern

Reported by:  Karen Kidwell, RMR, CRR

HUDSON COURT REPORTING & VIDEO      (800) 310-1769

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

15

Q.    You've never submitted a report or testified on loss causation?

A.    That is correct.

Q.    Have you ever done a loss causation analysis in a securities case?

A.    No, I have not.

Q.    Have you ever provided an estimate for price inflation of a security?

A.    You have to define for what purpose. Obviously, in academic research, we do that all the time.

Q.    Right.  What I meant is, in a securities case, whether it was a report or testimony, have you ever done -- you know, have you ever done any kind of price inflation analysis?

A.    No, I have not.

Q.    Have you ever done any price inflation analysis, you know, even if it wasn't in a securities case, in your consulting work, when it came to, for instance, a Section 10 action under the Exchange Act?

A.    Let me see whether any cases was under the Section 10.  I don't think so.

Q.    Do you know what the merit stage of a case is?

A.    I think comes after the class

certification.

Q.   Correct.  Yes, that's right.

Have you ever submitted a report or testified on damages at the merit stage of a case?

A.   No, I have not.

Q.   Have you ever calculated damages in a securities case?

A.   Again, it's -- you're talking about in class action cases, not in general?

Q.   Correct.

A.   No, I have not.

Q.   Do you know how to calculate damages for claims raised under Section 10 of the Exchange Act?

A.   I have a broad knowledge about that.

Q.   Right.  But my question is, can you calculate the damages?

A.   If you gave me all the key dates or the data, I believe I'm capable of doing that.

Q.   But you've never done it before, right?

A.   I have not done before; just being the legal cases.

Q.   Right.  So, so far, no court has ever accepted any method that you've proposed for measuring damages?

A.   You are correct.

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

A.   I did not dispute that the stock was efficient.

Q.   Your report also does not dispute that Defendants' statements impacted the price of Forescout securities?

A.   Could you repeat that question again?

Q.   Your report does not dispute that Defendants' statements impacted the price of Forescout securities?

A.   I did not dispute that.  I treat them as allegations.

Q.   Earlier on, you had mentioned an event study.  I'm just going to assume that you understand what that is.  Did you conduct an event study in this case?

A.   I was not asked to conduct event study in this case.

Q.   So the answer is, no, you never conducted an event study?

A.   For this case, no.

Q.   Okay.  So, Professor Jiang, I -- if you could just turn your attention to AgileLaw, I have some questions about your report.  I'm going to reveal this and mark this as Exhibit 1.  So this is Plaintiffs' Exhibit 1.

26

explain to me what you mean by you didn't work directly on it?

A.    Because I read the lawsuit that you just mentioned.  Basically, Forescout tried to force Advent to go through the merger instead of walking away.  So this is part of the background information and part of the development evolution of this merger and acquisition case.  That is what I'm aware of.

Now, my report does not have direct relevance to that.  But it's a fact.  It's good to know, since I'm working on this case that is based on a merger and acquisition deal.

Q.    I see.  So you mentioned something about reading about the lawsuit between Advent and Forescout.  Can you explain to me where you read about it?

A.    So there are formal legal documents about that the Forescout tried to force the Advent to go through the deal.  I also read about it just in broad news, because this is public information, and this case is in many of the news media that we would come across on a day-to-day basis.

Q.    Have you read the complaint that Forescout filed in Delaware against Advent?

A.    I reviewed it very briefly.  I did not

read in close detail.

Q.   What do you mean by you "reviewed it very briefly"?

A.   I go from beginning, from beginning, the first page to the last page, tried to know what was going on.  That was what I meant by -- yeah.

Q.   Okay.  So you didn't carefully read every single page in the complaint?

A.   In the particular complaint, I did not read -- I did not read every sentence carefully.

Q.   Did you review Advent's answer and counterclaims against Forescout in the Delaware litigation?

A.   I don't recall I read it.

Q.   So you don't remember reading that?

A.   I had impression it was among the materials I read, but I do not have a clear recollection.

Q.   Did you ever talk to anyone at Advent about the merger in preparation for your report here?

A.   No, I did not.

Q.   Did you ever talk to anyone at Forescout who may have knowledge about the merger to prepare your report?

A.   No, I did not.

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Q.   Did you ever rely on any nonpublic documents that, you know, belong to Advent to form your opinions here?

A.   I believe I relied on one Bates-stamped document provided by Glazer, in a spreadsheet, which I -- sorry.

Q.   Go ahead.

MR. BROWN:  Let her finish.

Go ahead.

THE WITNESS:  I believe that was not public.

BY MR. JAFRI:

Q.   Right.  But that wasn't my question.  My question is, did you review any nonpublic documents that belong to Advent?  Not Glazer.  Advent.

A.   Let me just recall.  I don't think so, no.

Q.   Did you review any nonpublic documents that may belong to Forescout to form any of your opinions in your report?

A.   No.

Q.   So, you know, I have a hypothetical question.  Suppose that I told you that some of these documents that, you know, may be found, for instance, in, you know, e-mails shared between Advent and Forescout showed that the merger was terminated in

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

part because of Advent's negative views about Forescout's ability to close deals.  Let's just assume that's a true fact.  Would that affect any of your opinions in this case?

MR. BROWN:  Objection for the hypothetical.

If you can answer, go ahead.

THE WITNESS:  It would not.

BY MR. JAFRI:

Q.   Why is that?

A.   I -- so the reason why Advent -- so those -- those communications, hypothetically, just as you mentioned, would not affect my decision, which is whether there is a common method applicable to all members of the class that is consistent with the Plaintiffs' theory of liability.

Q.   But why is that the case?

A.   I think the answer will be very long to answer.  If possible, could you ask question more specifically so I can address more pointedly.

Q.   Well, I'm just trying to understand why that fact wouldn't be relevant to your analysis, the fact here being that, you know, Advent decided that it wasn't going to proceed with the merger because it had concerns about Forescout's ability to close

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

deals.

A.    So, now --

MR. BROWN:  Objection.

THE WITNESS:  -- Advent is not a named party in the case that I'm asked to work on. And I listed four reasons why there's no common method that consistent with plaintiff liability theory in my report.  And none of these reasons would be contradicted by the hypothetical fact that you just mentioned.

BY MR. JAFRI:

Q.    I see.  So you're saying that if I told you to assume that the merger was terminated because of Forescout's, you know, ability to close deals, Advent's -- sorry, let me rephrase that question.

If I told you that the merger was terminated in part because Advent was concerned about Forescout's ability to close deals, that would not change your opinion on the price inflation that you have discussed in your report?

A.    That is correct.

MR. BROWN:  Objection.

BY MR. JAFRI:

Q.    And it wouldn't change your opinion about whether there are any confounding events?

MR. BROWN:  Objection.

Go ahead, Wei.  You can answer.

THE WITNESS:  There are confounding events, regardless whether what you hypothesize is true or not.

BY MR. JAFRI:

Q.   I understand.  But what I'm saying is, you have certain opinions about confounding events in your report, correct?

A.   That is correct.

Q.   And you're telling me that if I told you to assume that the fact that we discussed is true, that wouldn't impact your opinion at all?

A.   It would not impact any of the opinions I stated in my report.

Q.   Did you ever form an understanding of the reasons why Advent decided not to proceed with the merger?

MR. BROWN:  Objection.

THE WITNESS:  So I was not asked to evaluate or hypothesize why Advent was hesitant about executing the merger.

BY MR. JAFRI:

Q.   So does that mean that you don't have a full understanding of why Advent decided not to

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

proceed with the merger?

MR. BROWN:  Object to form.

Go ahead, Wei.

THE WITNESS:  I -- you know, you just asked me, you know, whether I have access to any propriety information, and my answer is no.

So I read public information in some of the legal documents, in public news, just like any other market participant.  We know something about the evolution of the merger, how it had a hiccup, how eventually it went through, and the revised deal.  And that is my information set. But I would not know everything, because I was not given all information related to this deal.

BY MR. JAFRI:

Q.  Correct.  Right.

So is it fair to say that you cannot be certain about why Advent decided not to proceed with the merger, because you don't have all the facts?

A.  That is fair.  I agree with you.

Q.  Right.  And then you mentioned something about, you know, internal documents, and how you don't have access to those.  And I presume, and please correct me if I'm wrong, that if you had access to those documents, that might change your

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

view, right?

MR. BROWN:  Object to form.  Misstates prior testimony.

THE WITNESS:  So, you know, if I have -- this is a hypothetical question, right?

So if you give me different information on this, on that, and this and that, you know, there is a possibility my opinion would be changed, because we all could change our opinion if we were given different set of information.

Based on the current information, this is my opinion.  And, also, if I were given additional information, as you just hypothesized, that I get to know more about the forces, why the deal was initially suspended, then it would not change the current opinions I stated in my report.

BY MR. JAFRI:

Q.   Okay.  So, you know, going back to Appendix C on AgileLaw, same page.  Actually, if we could go to page 56, I believe.  I see that you identified -- are you with me, Professor Jiang?

A.   I'm looking at the page number.  So could you tell me, it's appendix page -- the document page 56, "Academic Literature," that page?

complaint.  I reviewed more, but these are the three complaints that I relied on my work -- relied my work on.

Q.   Did someone tell you to review all three complaints to perform your analysis?

A.   No.  I requested all complaints related to this case, and I was given all complaints.

Q.   I'm going to show you the first complaint, which will be marked as Plaintiffs' Exhibit 2 for the purposes of this deposition.

(Exhibit 2 was marked for identification.)

BY MR. JAFRI:

Q.   Do you see this complaint, where it says "Document 1" at the top?

A.   Yes, I do.  Let me know which page I should go to.

Q.   So I -- we'll get to that.  But I just wanted to make sure that we were talking about the same document.  That's why -- and that you had access to it.

Do you know who filed this complaint?

A.   It was the person who -- whose name printed on this page.  And, also, it was Meitav.

Q.   So you believe that Meitav filed this complaint?

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

MR. BROWN:  Object to form.

THE WITNESS:  You mean filing person?  Is Christopher Sayce.

BY MR. JAFRI:

Q.  Right.  But you just said that it wasn't just Christopher Sayce; it was also Meitav that filed this complaint, right?

A.  You know, my recollection could be wrong.

Q.  Okay.  So you're not sure who filed the complaint?

MR. BROWN:  Objection.

THE WITNESS:  What I understand is investors in Forescout stock who bought the stocks before the merger, in the early period.  That is -- that is irrelevant for my work.  Now, who the names are really does not matter for my opinion or my work.

BY MR. JAFRI:

Q.  So you have no idea who Mr. Sayce is over here, the person identified as the plaintiff who filed the complaint?

A.  I actually asked about who Mr. Sayce is.  And the information I got is that the name of who this person exactly is is not relevant for my work.

Q.  Who told you that?

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

48

results.  And November 6th is such a date.

BY MR. JAFRI:

Q.   Are you aware of whether there was a struck -- whether there was a drop in Forescout's stock price following this announcement?

A.   Did you mean November 6th?

Q.   Yes.

A.   Every day, stock price moves.  That day, there was no significant stock price movement, based on my look at the data, and also based on Dr. Nye's table.

Q.   I see.  So there was no -- there was no stock drop following the announcement of the financial results on November 6, 2019, correct?

MR. BROWN:  Object to form.  Misstates prior testimony.

THE WITNESS:  There is no significant price movement, as far as I know, on November 6th.

BY MR. JAFRI:

Q.   So, Professor Jiang, can you explain to me, based on your reading of this complaint, what is it about November 6, 2019, that makes it fully corrective?

A.   Make fully corrective is that if there

49

were alleged misstatements before, then in October, the firm offered guidance of the sales and pipeline, et cetera.  And on November 6th, it fully officially announced the financial results.  So if the investors were misled due to the previously alleged misstatements, by now, by November 6th, they should have been informed about the truthful financial situation of the firm.

Q.   That's because the financial results were announced that day?

MR. BROWN:  Objection.

THE WITNESS:  The financial results were announced on that day, yes.

BY MR. JAFRI:

Q.   So that's the reason.  Okay.

Did you rely on any analyst reports, whether or not mentioned in this complaint, to determine whether the complaint contained any corrective disclosures?

A.   No, analyst reports do not -- all the analyst reports I reviewed do not have any commentary about corrective disclosures.

Q.   Do you recall mentioning in your report an analyst report from November of 2019 that discussed, you know, execution problems at Forescout?

56

of the document, but 25 -- sorry.  What I meant is it's on page 28 when you look at AgileLaw, but it's complaint page 25.

A.    Okay.

Q.    Okay.  Now, can you please turn your attention to paragraph 69.  So over here, it says -- and I'll read this to you.  It says:  "On May 11, 2020, Forescout disclosed its results for quarter 1 2020.  In reaction to this disclosure, the price of Forescout's common stock declined by nearly 5 percent from its closing price of $32.09 on the previous day, to close at $30.50 per share on May 12, 2020, on heavy trading volume."

Do you recall reading this?

A.    Yes.

Q.    Now, you did not analyze this earnings miss as a corrective disclosure in your report, correct?

MR. BROWN:  Objection.

Go ahead.

THE WITNESS:  I do not -- I do not analyze -- so -- could you repeat your question again?  Do I analyze?  What do you mean do I analyze?

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

57

BY MR. JAFRI:

Q.   Did you assume that this was a corrective disclosure in your report?

A.   I did not assume this is a corrective disclosure, but I allowed the possibility that this could be purported as a corrective disclosure by the Plaintiffs.

Q.   And you allowed this possibility in your report?

A.   The opinion I formed would allow this possibility, yes.

Q.   So where does that -- where does it say that in your report?  Can you go back to your report?

A.   It doesn't -- it's not stated in this report, meaning whether this is considered alleged to be a corrective disclosure or not would not change my conclusion.  Meaning I thought about this possibility.  I thought about what if yes, what if no, would I change my opinion in the end?  Whether this is yes, whether it is no, how this is alleged, it would not change my opinion.

Q.   Yeah, but that's not my question.  My question is, did you discuss this as a corrective disclosure in your report?

A.   I did not discuss this as a corrective

58

disclosure in my report.

Q.    Now, from what I recall -- I will represent to you that I know everything that you've said about this event in your report, and I, you know, agree that you never really discussed it as a corrective disclosure.  But if we could go back to the report on -- this is back to Exhibit 1.  And --

A.    Which -- which document?  001 document, which paragraph?

Q.    So I think we -- this is going to be on pages -- so it's on page 25 and 26 of your report, which, in AgileLaw, should be page 30.  Page 29 and 30.  So in paragraph 66, if you read paragraph 66, Professor Jiang, maybe that will be easier, and then we can discuss it.

MR. BROWN:  Are you asking her to read it to herself?

MR. JAFRI:  Right.  I mean, if she wants to.  Unless she remembers what she said here.

THE WITNESS:  So you want me to read paragraph 66?

BY MR. JAFRI:

Q.    Correct.

A.    Yes.

Q.    Is it fair to say that, over here, you're

59

representing what your understanding of Dr. Nye's views are?

MR. BROWN:  Objection.

Go ahead.

THE WITNESS:  This is my interpretation of Dr. Nye's view about the price reaction on May 11th.  Actually May 12th, meaning after the May 11th announcement.

BY MR. JAFRI:

Q.   Right.  So you assumed that Dr. Nye believed that the stock price of Forescout was not -- was not moving, based on the fundamentals, right?

MR. BROWN:  Object to form.

THE WITNESS:  My interpretation of Dr. Nye's report is that he believes that the stock price during this period was due -- predominantly driven by the deal completion, rather than the stand-alone value.

BY MR. JAFRI:

Q.   And is that because of the fact that he said that the announcement of the deal was helping to support shares on that date?

A.   This is one factor that contributed to my inference.

Q.   What other factors contributed to your

inference about Dr. Nye's opinion?

A.    When Dr. Nye wrote -- I recall, when Dr. Nye wrote this -- this sentence around this section, he also cited a few analyst reports.  And he quoted -- he quoted as analysts were very firm on the merger prospect, and they're not changing their price targets for Forescout stock, despite the earnings announcement.  And, further, Dr. Nye also, based on his analysis, indicated that the stock drop on May 12th was not statistically significant.  So it's not a significant stock-drop day that Dr. Nye highlighted, to my understanding.

Q.    Does a stock drop have to be statistically significant in order for the news to be a corrective disclosure?

A.    The news can be a corrective disclosure even if the stock price is not significant.  But if the stock price is not significant, then we cannot reliably conclude that the stock price actually dropped on that day.  I think that was your question.

Q.    I'm sorry.  You said that we cannot conclude -- we cannot conclude that the stock price dropped on that date, if it's not statistically significant?

A.    If it's not statistically significant, we

New York
212-273-9911
Hudson Court Reporting & Video
1-800-310-1769
New Jersey
732-906-2078

61

cannot conclude that, reliably, that the stock price dropped on that day. I believe that's -- that is what statistic significance is.

Q. So it's measuring the drop in a company's stock price only?

A. It's -- it's a general rule of statistical analysis, because things change. We have to say, you know, at what point the change is considered to be significant. And I believe Dr. Nye is applying the standard statistical significance rule. And he concluded in his report that, this day, drop was not significant.

Q. Right. But my question is different.

Does a plaintiff need to show that a corrective disclosure is statistically significant for that disclosure to be corrective?

A. I think that is a legal opinion.

Q. So you don't know?

A. I don't know.

Q. Okay. So if you don't know, why did you -- why did you discuss that as a factor in terms of your, you know, opinions about what Dr. Nye believes?

MR. BROWN: Objection.

Go ahead.

62

THE WITNESS:  Because I'm asked to provide economic analysis of this situation.  And I think it's meaningful thing to discuss when we think about whether the stock price increased or decreased.  And statistical significance is a very commonly used metric to assess whether we believe the stock price actually dropped or increased.  Just a common method.

BY MR. JAFRI:

Q.    So, you know, the reason why I brought this up, Professor Jiang, is because I noticed that you said something about what Dr. Nye's views were about the May 11, 2020, announcement of financial results, but I didn't see anything, you know, about your own opinions about this event.  Can you show me anywhere in this report where you discuss what your beliefs are about this disclosure?

MR. BROWN:  Objection.

THE WITNESS:  My view of the significance of this disclosure is that I accept that this is a appeal-court-remanded date of alleged misstatement of the merger.  This is the working premise of my report.

BY MR. JAFRI:

Q.    I'm sorry.  I don't think I followed.

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

And, you know, just -- just so you know, I'm not able to look at the realtime. I don't know what happened.

But, anyways, can you please explain that again? I'm sorry. I apologize. I didn't understand what you said.

A. I think your question is about what opinion I have on the date of May 11th. Is that your question?

Q. Yeah, so my question was, what I noticed is that you said something about what Dr. Nye believes about the May 11, 2020, announcement of the financial results, but I didn't see anything in the report about what your own beliefs are. So my question was, can you show me where you discussed your views about the May 11, 2020, financial results, in your report?

MR. BROWN: Objection.

Go ahead and answer, if you can.

THE WITNESS: Yeah, I really think your question is really not clear. I don't know what you want me to -- really want me to show.

BY MR. JAFRI:

Q. So my question is, where does it say that, you know, "I, Professor Jiang, think this about the events from May 11, 2020," in your report?

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

64

MR. BROWN:  Objection.

THE WITNESS:  So on this one, I think I previously answered.  So in my report, I treat May 11th as the date of alleged merger misstatement.

BY MR. JAFRI:

Q.    Yeah, but we're not talking about the merger misstatement.  We're talking about the financial results that were announced on May 11, 2020, right?

A.    Currently, we are.

Q.    Right.  So that's what my question is about.  What I'm saying is, where in your report do you express any views about what you think about the impact of those financial results?

MR. BROWN:  Objection.

THE WITNESS:  I think I expressed my view in the report, that after the merger was announced in February, all the way up to just before the merger was announced to be terminated, the stock prices are primarily driven by the merger deal, and not by the stand-alone value of the firm.  And May 11 is a date within that range.  That was my opinion.

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

BY MR. JAFRI:

Q. No, I understand. But what I'm -- I'm talking about something very specific here. My question is about the financial results of May 11, 2020. So, again, can you tell me where in this report you express any view about the financial results that were released on May 11, 2020?

MR. BROWN: Objection.

THE WITNESS: I think I really, you know, answered your question, because May 11 is within the period I just said that the price was not driven by the fundamental value of the firm. Hence, whatever happened about financial announcement on that date carries virtually no weight in the stock price.

BY MR. JAFRI:

Q. Okay. Now, you did do one thing, which is you discussed analyst commentary about the financial results of May 11, 2020, in your report, right?

A. Yes.

Q. And you agree that the results that were announced on that day were below consensus estimates for revenue and earnings, right?

A. Yes.

Q. And you reviewed certain analyst reports

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

from, you know, May 18, 2020, onwards, when the merger was terminated, right?

A.   I reviewed those reports after the merger was terminated, yes.

Q.   So these analyst reports discuss the earnings release from the week before, on May 11, 2020, the one we've been talking about, right?

A.   Yes.

Q.   Do you recall a report by Macquarie on May 18, 2020?

A.   You have to, you know -- I don't really remember the name of those reports.  But if you refer to me, then I can try to recall.

Q.   Sure.  I'll show it to you.  So I'm going to show you the Macquarie analyst report we just discussed, and I'm going to mark it as Plaintiffs' Exhibit 4.

Do you see it now?

(Exhibit 4 was marked for identification.)

THE WITNESS:  Yes.

BY MR. JAFRI:

Q.   Do you recall seeing this document before?

A.   Yes.

Q.   You discussed this analyst report in your report, correct?

A.   Yes.   In one of the footnotes, yes.

Q.   Now, these analysts from Macquarie were one of the ones that revised the company's price target, based on its fundamentals, right?

MR. BROWN:   Objection.

THE WITNESS:   Yes.

BY MR. JAFRI:

Q.   In fact, the analysts from Macquarie stated that investors grew concerned after Forescout released poor financial results on May 11, 2020, right?

A.   Could you tell me where about the May 11th?  Because I cited this report for its commentary after the cancellation.  So please tell me when it's referred to the May 11th.

Q.   Sure.  So if you look at the second bullet point.  And I've highlighted this.  I'm going to represent for the record that the highlight is mine.

A.   Yes.

Q.   So the second bullet point says -- and I'll read it to you.

A.   Okay.  Yeah, now I see it.

Q.   It says:  "Investors grew concerned after the company released disappointing results on May 11th, fearing a rerating of the transaction price

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

or cancellation of the agreement."  That's what it says, right?

A.    Yes.

Q.    Okay.  Now, these analysts also said that the stock drop on May 18, 2020, reflected both the miss on May 11, 2020, as well as Advent's decision not to close the merger, right?

MR. BROWN:  Objection.  Where are you pointing to?

MR. JAFRI:  Well, I'm summarizing what it says.  I don't know if she recalls.  But we can read it.

BY MR. JAFRI:

Q.    Would it be easier, Professor Jiang, if I just read it to you?

A.    You can just tell me which -- which paragraph.

Q.    So it's -- it's right underneath "Action and recommendation."  It's the sentence that I highlighted.

A.    Yes, I see the highlighted sentence on last one.

Q.    So I'm going to repeat my question again.

The analysts from Macquarie said that the stock drop on May 18, 2020, reflected both the large

69

miss on May 11, 2020, as well as Advent's decision not to close the merger?

MR. BROWN:  Objection.

If you follow what's being asked, you can answer.

THE WITNESS:  Yes, the process, the report analysts believed the stock's reflecting both the large miss and the possibility that you are not closing.

BY MR. JAFRI:

Q.   Right.  And you are aware, Professor Jiang, that other analysts similarly discuss not only the failure of the deal with Advent, but also the financial results from May 11, 2020, in the reports that you reviewed?

MR. BROWN:  Objection.

THE WITNESS:  Yes, there's some -- some of analyst report mentioned to that effect.

BY MR. JAFRI:

Q.   Do you recall that a Piper Sandler report from this time called the results of May 11, 2020, underwhelming?

A.   You know, I think you have to quote it out, because I cannot claim I remember exactly that sentence.

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Q.   So if we go to --

MR. BROWN:  Omar, sorry.  Just very quickly, just to make sure the record is clear. On Exhibit 4, the two points where there's highlighting, those were both added by you. That's not from the original.  Just so the record is clear.  Is that -- am I correct?

MR. JAFRI:  That's right.  I thought I said that, Tom, already.  I mean --

MR. BROWN:  Yeah, I wasn't -- make clear that it came out in both places.  I just want to make sure we were on that.  Okay, thank you.

MR. JAFRI:  Yeah, that's correct.

MR. BROWN:  Okay.

BY MR. JAFRI:

Q.   So, Professor Jiang, let's go back to Exhibit 1.

A.   Exhibit 1, okay.

Q.   And so this will be on page 27 in AgileLaw, and page 23 of your report.

A.   In AgileLaw, which was the page number?

Q.   27.

A.   Okay.

Q.   So do you remember now -- does this jog your memory when we discussed the analyst reports,

when you look at footnote 80 and 81?

MR. BROWN:  Objection.

THE WITNESS:  Yes, I remember reading those reports, yes.

BY MR. JAFRI:

Q.   Right.  And isn't the Piper Sandler report described by you in footnote 80?

A.   I see that.

Q.   So you see -- if you go into footnote 80, footnote 80, which is, you know, the first footnote here, and you go six lines down from where it says, "Commenting on Forescout."  You see that?

A.   Yes.

Q.   Right.  So you wrote over here: "Commenting on Forescout's closing stock price of $22.57 on May 18, 2020, a Berenberg analyst reported" -- sorry -- "a Berenberg analyst report noted that the price had baked in the likelihood of a deal being completed at a lower price, and if no deal transpired then the stock price could fall further, noting that Forescout's quarter 1 2020 results were, quote/unquote, 'underwhelming.'"

That's what you wrote, right?

A.   Yes, I read that.

Q.   Okay.  Now, for the record, I just wanted

New York
212-273-9911
Hudson Court Reporting & Video
1-800-310-1769
New Jersey
732-906-2078

to correct one thing. I reported this as the Piper Sandler report. It isn't. It's the Berenberg. You read that. Just to be clear.

Now, you say a lot about, you know, analyst reports in your own report, right? You discuss it a lot?

MR. BROWN: Objection.

THE WITNESS: I don't know what it is "a lot." But I discuss multiple reports.

BY MR. JAFRI:

Q. Right. And you agree that analyst reports are important towards forming expert opinions about, for instance, you know, whether there is price inflation or not?

MR. BROWN: Objection.

THE WITNESS: I do not think the analysts are commenting on whether stock price contains inflation, as we define it here. I don't think so.

BY MR. JAFRI:

Q. No, but that wasn't my question. My question is -- my question was, would you consider analyst reports if you were to do a price inflation analysis?

MR. BROWN: Objection.

73

THE WITNESS:  Yes, I would consider analyst reports.

BY MR. JAFRI:

Q.   Right.  Yeah.

And, in fact, here, when you discussed whether or not there was price inflation between February 2020 and May 2020, you discussed analyst reports, right?

MR. BROWN:  Objection.

THE WITNESS:  Yes, I did.

MR. JAFRI:  Okay.  All right.  So, Tom, I think it's like 10:58.  If you want to stop now, we can.  And then we can come back, you know, in 30 minutes, if that's okay with everybody.

MR. BROWN:  Okay.  So just to be precise, let's say 12:30, 11:30 Central.

MR. JAFRI:  Sure.

MR. BROWN:  Okay.

MR. JAFRI:  Does that work for you, Professor Jiang?

THE WITNESS:  Yeah, that works.

MR. JAFRI:  Thank you.

MR. BROWN:  Okay.  See you in half an hour.

VIDEOGRAPHER:  Off the record at

74

11:58 a.m.

(A luncheon recess transpired

from 11:58 a.m. until 12:34 p.m.)

VIDEOGRAPHER:  Please stand by.

Back on the record at 12:34 p.m.

BY MR. JAFRI:

Q.    Professor Jiang, before we took a break, we were discussing the May 18, 2020, disclosure and the analyst reports related to that, right?  I wanted to know, what, in your view, were the factors that caused the stock price to drop on that date and following that date?

MR. BROWN:  Objection.

Go ahead.

THE WITNESS:  Could you specify the date?

BY MR. JAFRI:

Q.    So on May 15, 2020, Forescout announced that Advent had refused to close the merger, right?

A.    Refused to close the deal as originally, on original term, yes.

Q.    Right.  And the stock price dropped for the next few days, next few trading days?

A.    So you are asking about the stock price following the announcement on the 18th.  Is that correct?

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Q.   I believe the announcement was on the 15th.

A.   Yeah, but that's -- you know, we're talking about the impact -- impact date is the 18th. Is that what you're talking about?

Q.   Right, right, right.

A.   Yeah.

Q.   So for that impact date, the stock price dropped, right?

A.   Yes.

Q.   So what, in your view, were the factors that caused that stock price to drop?

MR. BROWN:  I am going to object.  Not nearly within the scope of any opinions she's offering here.

But you can answer, if you like.

THE WITNESS:  So, indeed, I was not asked to analyze what caused the stock price drop on the 18th, but if you ask me, I think the price drop reflects multiple factors.  There's revised, market-revised, assessed probability that the deal would still go through on original term.  That increased the probability that deal -- a different deal might go through at a different term, and increased the probability

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

76

that there might be no deal at all.  And, also, a change in the stand-alone value since the merger announcement.  Such change has been masked, because the price has primary follow the deal.

And, additionally, when an acquirer initiated a deal cancellation, the market may infer additional information and assess the price accordingly.  And, finally, stock prices goes up and down every minute, every second.  There's market-wide component, industry-wide component, and regular noise.  So that would be what I've used, the composition of the stock return.

BY MR. JAFRI:

Q.    You mentioned that one of the factors would involve the Forescout stand-alone value.  Is that the same thing as the fundamentals of the business?

A.    The stand-alone value is the same as the fundamental value, but in the merger context, I also want to adjust any -- no breakup fees, this and that.

Q.    Right.  But in that formula, the stand-alone value is also present when -- when the breakup fee is discussed, right?

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

77

A.    The stand-alone value is -- yeah, the breakup fee is additional adjustment.  So stand-alone value would be the fundamental value of the firm at the time.

Q.    Okay.  So you agree that, at least in part, the fundamentals of the business were a factor only impacted when the stock price dropped?

MR. BROWN:  Objection.

Go ahead.

THE WITNESS:  So, again, I have not -- I was not asked and I have not conducted analysis of the disaggregation of the return.  But based on economic factors, this is a factor.

BY MR. JAFRI:

Q.    When you say "this," you mean the fundamentals?

A.    The fundamental, what you just mentioned, yes.

Q.    Okay.  And then, you know, as we have discussed, we had discussed the analyst reports that came out once this disclosure occurred, before we took a break, right?

A.    Yes, we are looking at analyst reports responding to the May 18th disclosure.

Q.    Right.  And those analyst reports also

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

discussed the May 11, 2020, financial results, right?

A.   Yes.

Q.   Right.  And so those analyst reports were discussing in part why the stock price dropped, right?

MR. BROWN:  Objection.

You can answer.

THE WITNESS:  Yeah, I can't -- I don't object to your interpretation of analyst report.

This is analyst report.  It's not my opinion.

BY MR. JAFRI:

Q.   Right, no, but I wasn't -- my question isn't about your opinion.  My question is about what the analysts' is.

My question is -- and I'll repeat it -- the analyst reports that we discussed, the context in which that discussion was taking place was about the stock price drop that followed the termination of the deal, right?

A.   Yes.

Q.   Okay.  All right.  So I wanted to talk a little bit about, you know, the multiple theories that, you know, the Defendants have and that you've discussed as well in your report.  You stated in your report that the Plaintiffs have multiple and

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

97

the fundamental value of Forescout carries virtually no weight in Forescout's stock price after announcement and before they announced the termination.

Q.   So when you say "virtually no weight," are you saying that there is -- that there is a possibility that -- at least there's a possibility that the fundamentals could be considered?

A.   I'm not referring to the possibility of fundamental could be considered.  I'm referring to the magnitude of the weight that the fundamentals would command in the price.

Q.   Okay.  So are you saying that no weight should be given to the fundamentals at all?

A.   I said virtually no weight should be given to the fundamentals.

Q.   Okay.  So what does that mean?  What do you mean by "virtually no weight"?

A.   So how much detail would you like to have, or -- if I elaborate?

Q.   I just want to know whether you have a certain opinion about any weight, whether any weight should be given at all.  And you said, well, virtually no weight.  And I'm just saying, okay, well, what does that mean?  That's my question.

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

A.    Sure.  Because, first, you asked me whether I think no weight should be given.  I refute that.  I think the -- in that circumstance, there is possible the price carries some weight.

What I -- my opinion were that, in this case, during the period that we talk about, the fundamental value carries virtually no weight.  The reason is that after the merger announcement, the stock price is a probability weighted sum of the deal price and the stand-alone value.  And because the investors expect the deal to be completed, there's very high probability that stand-alone value would carry virtually no weight.

Q.    Did you talk to any investor when you -- any investor in Forescout securities when you wrote this report of yours?

A.    No, I did not.

Q.    Okay.  So I think this is a good place for us to talk about the equation, you know, the equation that you have in your report.  And I would direct your attention back to Exhibit 1, and this would be page 13.

A.    Page 13?

Q.    Yes.  So on page 13, I believe, at the top of the -- sorry, this is page 17 on AgileLaw, and

it's page 13 of your report.

A.    Yes.

Q.    So on page 17 on AgileLaw.

A.    Yes.

Q.    I believe you have the equation over here at the top of the page, right?

A.    Yes.

Q.    And this is an equation for calculating Forescout stock price following the announcement of the merger, right?

A.    It is a approximation of the stock price following the merger.

Q.    When you did an analysis of this equation, did you consider whether any of these factors were affected by fraud?

MR. BROWN:  Objection.

THE WITNESS:  This is a statement about how the stock price is formed.  And for each element, numerous economic factors could feed into this.  But that's not the point of this equation.

BY MR. JAFRI:

Q.    So you didn't consider whether fraud would impact anything in this equation?

MR. BROWN:  Objection.

THE WITNESS:  This -- this is an equation. So you see the equation doesn't have the word "fraud."  But if you think -- if you think fraud could impact any item, then they would -- if this is true, they would impact the item that you assume to impact.

BY MR. JAFRI:

Q.    Okay.  So let's be more specific.  So you think it's possible for fraud to impact the deal price in this equation?

MR. BROWN:  Objection.

THE WITNESS:  In your hypothetic case, if you assume -- if you assume that fraud could impact the probability of the deal, then it will impact the probability of the deal.

BY MR. JAFRI:

Q.    Including this price, right?

A.    If it impacts probability, then it would impact the price under that hypothetic setup.

Q.    And you would agree with me that if the deal price was lower, then the Forescout stock price would also be lower in 2020, right?

MR. BROWN:  Objection.

THE WITNESS:  Yes.  Other things equal, if the deal price is lower, if all other numbers

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

remain the same, the stock price would be lower.

BY MR. JAFRI:

Q.    And is that opinion also true for the probability of deal completion?

MR. BROWN:  Objection.

THE WITNESS:  If the deal probability is lower, everything else equal, the stock price would be lower.

BY MR. JAFRI

Q.    One of the variables in the formula is the probability of deal completion, right?

A.    It is -- yes, it is.

Q.    Right.  And is that where -- is that, like, probability, where it says "Prob," and then there's a capital D underneath?  Is that what it is?

A.    Yes.  It is the -- to be more accurate, it's the probability of the deal completion as of that moment.

Q.    Okay.  When you wrote your report, did you assume that the probability of deal completion was 100 percent?

MR. BROWN:  Objection.

THE WITNESS:  No, I did not.

BY MR. JAFRI:

Q.    So what -- what percentage would you say

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

102

was the probability of deal completion?

MR. BROWN:  Objection.

THE WITNESS:  This exact number is not possible to get.  I do not have an exact number.

BY MR. JAFRI:

Q.  So are you saying that you cannot say what the probability of the deal completion would be with certainty?

MR. BROWN:  Objection.

THE WITNESS:  I cannot say what the deal probability would be in exact number.

BY MR. JAFRI:

Q.  Did you have a number in mind when you worked on this report on what the probability of the deal completion was between Advent and Forescout?

MR. BROWN:  Objection.

THE WITNESS:  Based on the information I have during -- on this case, at announcement, the market-assessed deal probability is very close to 100 percent.

BY MR. JAFRI:

Q.  When you say "the market," what do you mean?

A.  Because the stock price reflects the aggregate market perception about the value of the

103

firm.  So every -- the element that feed in, the market probability is not my assessed probability or your assessed probability, but the market-assessed probability at the time.

Q.   Right.  No, I understand that.  But what do you mean exactly?  Are you talking about analysts?  Are you talking about investors?  Who are you talking about?

A.   To be accurate, it is determined by the marginal traders in the stock market.

Q.   Did you discuss the marginal traders in your report?

A.   No, because you asked me a academic question, and that was my answer.

Q.   I'm not sure I follow.  My question was about the probabilities of deal completion.  And I believe that you said quite a bit about that in the report, so -- anyways.

So here's another question I have.  Did you consider whether there was a range of probabilities about the deal completion between Forescout and Advent?

A.   There is a range of probabilities on people's minds and in people's opinion, yes.

Q.   So what was that range?

New York
212-273-9911
Hudson Court Reporting & Video
1-800-310-1769
New Jersey
732-906-2078

MR. BROWN:  Objection.

THE WITNESS:  Again, I do not know what people think.  And nobody knows.  What I know is the aggregate market-assessed probability, as demonstrated in the stock price.

BY MR. JAFRI:

Q.  So in this formula, the fallback price for the target, should the deal fail, is equal to the stand-alone value plus the reverse termination fee, right?  I think we talked about this a little bit before.

A.  Yes.

Q.  Right.  So if the probability of deal completion, you know, is not 100 percent, let's assume, then the stand-alone value in this equation would be a factor that would determine Forescout's stock price, right?

A.  Yes.  Anytime -- oh, I think someone's -- someone's is echoing.  I'm hearing echoing.

Yes, the probability of deal failure would impact the stock price, yes.

Q.  Okay.  So if the probability of deal completion is not 100 percent, or you're not certain that it's 100 percent, then why are you saying that Forescout's stand-alone value had no effect on its

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

stock price?

MR. BROWN:  Objection.

THE WITNESS:  I said the stock price was primary driven by the merger price.

BY MR. JAFRI:

Q.    But that doesn't address my question.  My question is -- and, again I repeat it.  What I'm saying is, from your testimony, what I'm gathering is that you're not certain whether the deal completion was 100 percent or not, right?

MR. BROWN:  Objection.

THE WITNESS:  The deal price, based on the stock price, I infer that the market anticipate the deal to go through at announcement at a probability very close to 100 percent.

BY MR. JAFRI:

Q.    Okay.  So it's not -- it's not -- so you're saying it's very close to 100 percent.  And does that mean, like, over 90 percent?  What do you have in mind?

MR. BROWN:  Objection.

BY MR. JAFRI:

Q.    Do you have a range, a percentage range, in mind?

A.    I do not have an exact percentage range in

New York
212-273-9911
Hudson Court Reporting & Video
1-800-310-1769
New Jersey
732-906-2078

mind.

Q.   Do you have an understanding of how the probability of deal completion was reflected in the stock price?

A.   Yes.

Q.   What is that?

A.   It's reflected in the merger spread.

Q.   Okay.  So it's based on the arbitrage spread that you mentioned?

A.   Yes.

Q.   Right.  And didn't that widen in this period at some point?

A.   It widened during the COVID period, yes.

Q.   Right, yeah.  And in that period, you -- you never did any analysis of whether COVID impacted Forescout's stock price, right?

MR. BROWN:  Objection.

THE WITNESS:  No, I did not conduct -- oh, sorry, the microphone is echo.

BY MR. JAFRI:

Q.   Go ahead, Professor Jiang.  I think you said, "I did not conduct," and then you stopped.

A.   I did not conduct a full analysis of how COVID impacted Forescout stock price.

Q.   So you cannot say with certainty that the

107

arbitrage spread was widening because of the market's concerns about COVID?

MR. BROWN:  Objection.

THE WITNESS:  I cannot conclude for certainty that that's the only thing that the market thought about was the impact of COVID.

BY MR. JAFRI:

Q.    Professor Jiang, I wanted to discuss -- I wanted to discuss some things that you wrote in your report about the issue that we have discussed, just for clarification.

So can you please -- are you still on your report?  This would be Exhibit 1.  And I think you just have to go one page up.  On page 16.  Sorry, yeah, on page 16 of AgileLaw, or page 12 of your report.

Okay.  So over here in paragraph 38, if you go -- if you go seven line -- eight lines down, where the sentence begins with "However."

A.    Yeah.

Q.    Right.  So over here, you wrote -- are you with me here?

A.    Yes, I am with you.

Q.    Okay.  So over here you wrote:  "However, according to a large body of academic literature,

testimony.

THE WITNESS:  I never said all investors should have this expectation.

BY MR. JAFRI:

Q.  Well, didn't you say that the probability of deal completion was almost 100 percent?

A.  Yes.  This is the market aggregate assessment of the probability.

Q.  Right.  And some of that is based on what the investors expect, right?

A.  Yes.  The market aggregate, yes.  It doesn't mean every investor thinks exactly the same.

Q.  No, no, I understand.  But what I'm saying is, if the probability of deal completion is 100 percent, why won't almost all investors have this expectation?

MR. BROWN:  Objection.

THE WITNESS:  I didn't say that the probability is close to 100 percent.  I said the market -- based on the market data, the market aggregate assessed, the probability is very close to 100 percent.  And that is what's relevant for the stock price.

BY MR. JAFRI:

Q.  I see.  But as we discussed, that's only

New York
212-273-9911
Hudson Court Reporting & Video
1-800-310-1769
New Jersey
732-906-2078

114

based on the merger arbitrage spread, and nothing else, right?

A.    In this case, yes.

Q.    And you never did any comprehensive analysis of COVID-19?

MR. BROWN:  Objection.

THE WITNESS:  For this case.  Not beyond what I plotted in my report.

BY MR. JAFRI:

Q.    Professor Jiang, I wanted to move on to another topic, which relates to variations in inflation.

MR. BROWN:  Omar, I don't know how long you are going to be on this topic, but I was going to ask for a quick bathroom break at the hour.  And I know we're just slightly under an hour yet, but --

MR. JAFRI:  Yes, sure, we can take a break now, if you need.

MR. BROWN:  -- if we're at a natural point, and we could take five, I would appreciate that.

MR. JAFRI:  That's totally fine with me. Should we take a ten-minute break?

MR. BROWN:  Just a five-minute bathroom

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

is -- just so I want -- I find out whether we're on the same page, you agree that all the investors, you know, including Glazer and Meitav and others, who bought shares following February 6, 2020, would have purchased based upon the merger being completed, right?

MR. BROWN:  Objection.

THE WITNESS:  When they purchased between February 6th to right before the termination of the merger.  That is merger related, yes.

BY MR. JAFRI:

Q.  Okay.  Now, you know, as we discussed before, you did not fully analyze whether the financial results that were announced on May 11, 2020, were corrective disclosure, right?

A.  I don't know what is "analyze."  I don't know what -- what do you mean by "analyze"?  Did I mention it?  Did I -- do I have opinion on it?  Like, what -- what do you mean "analyze"?

Q.  What I mean is what we discussed earlier, which is your report doesn't say one way or the other whether the financial results on May 11, 2020, was a corrective disclosure.

MR. BROWN:  Objection.

THE WITNESS:  No, I do not -- I do not say

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

this is a corrective disclosure.

BY MR. JAFRI:

Q.    Now, you know, earlier on, I think we had reached an agreement on the fact that Dr. Nye did not give any opinion in this case on the inflation in Forescout's stock price during particular periods, right?

A.    He did not mention periods by periods. But his method indicate it will be applied on each of the trading dates, based on the trading records of individual investors.

Q.    Dr. Nye has not calculated any damages in this case, right?

A.    He did not calculate it.  But he proposed a method to calculate.

Q.    And he also did not address whether any confounding factors need to be disaggregated at this stage, right?

A.    He did not address the disaggregation of confounding factors.

Q.    As I understand your opinion on conflicts, you believe that there is a conflict here because the Plaintiffs must separately measure sales by applying related inflation and then separately measure merger-related inflation, right?