# Exhibit B

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

------------------------------------------------x

CHRISTOPHER L. SAYCE,

Individually and on Behalf of

All Others Similarly Situated,

        Plaintiffs,

vs.                      Case No.

FORESCOUT TECHNOLOGIES, INC.,   3:20-cv-00076-SI

MICHAEL DECESARE, and

CHRISTOPHER HARMS,

        Defendants.

------------------------------------------------x


REMOTE VIDEOTAPED DEPOSITION BY VIRTUAL ZOOM OF

ZACHARY NYE

Monday, November 20, 2023




Stenographically Reported By:

Lynne Ledanois, License No. 6811

Job No. 6309800


PAGES 1 - 96

Page 1

So those company-specific returns reflect    11:28AM
the information that the company discloses on those
days is I think the takeaway from the regression
model.

BY MR. BROWN:                                  11:28AM

Q    Just to make sure I'm being clear here, we
were talking about various elements that might be
factored into that price, the likelihood of the
deal, fundamentals, you know, if the deal doesn't
happen.                                        11:28AM

But the regression just deals with all of
those in toto, it doesn't break them out into those
particular elements; is that fair to say?

A    I don't know how to answer that question.  I
don't fully understand the question, sorry.    11:29AM

Q    If you say that you have a statistically
significant movement of price on Forescout on a
particular day after the merger has been announced,
does the event study, the regression and the event
study permit you to piece out -- P-I-E-C-E for our    11:29AM
California friends -- piece out how much of that is
due to changes and views about the likelihood of the
merger versus changes in views about the
fundamentals of Forescout's business?

A    Well, the event study is more than just a    11:29AM

Page 74

regression model.  So for the purposes of this class 11:29AM certification report where I'm assessing market efficiency, no, I have not disentangled the various company-specific pieces of information and their effects on the market price on every day during the 11:30AM class period.

I've estimated those company-specific reactions in total.

However, the event study methodology includes additional analyses of that 11:30AM company-specific return that can be utilized to distinguish between competing information, company-specific information and its effect.

And those analyses include discounted cash flow modeling, looking at the academic findings with 11:30AM respect to certain corporate events and their conditional average effect on a stock price.

Analyst can be helpful in disentangling company-specific information in the sense that some analysts will model different components to an 11:30AM informational disclosure and describe how it influences their understanding of the price.  I think it's called content analysis.

There's also option pricing theory can be applied because there is an element of probabilities 11:31AM

Page 75

and under uncertainty that is part of the option    11:31AM

pricing framework that can be teased out.

There's other tools of financial economics

that can be applied that are all within the

construct of the event study, it's just that they    11:31AM

are in addition to the regression model.

Q    So that's helpful.  And tell me it's fair

to say that that's pointing to the -- those

particular tools in this particular event study are

not ones that you've pursued at this stage?    11:31AM

A    I'm sorry.  What was the question?

Q    The question is:  You just described a

number of tools to piece out the various elements of

where a particular price movement on a day has

happened.    11:32AM

But my question was simply that

understanding those tools are available, you have

not, for purposes of the analysis as it presently

stands in this opinion, carried out any of that

work; is that fair to say?    11:32AM

MR. JAFRI:  Objection, form.

THE WITNESS:  That's fair to say with

respect to my opinion on market efficiency.

With respect to my opinion on the event

study or out-of-pocket damages estimation    11:32AM

Page 76

methodology being applicable here, I think that is    11:32AM

relevant to describe I think a full event study

framework.

BY MR. BROWN:

Q    So let me just skip ahead since the topic    11:32AM

is there because I was going to ask a few questions

about that later.

But my understanding is that your opinion

about the availability -- your opinion at this stage

is simply about the availability of a methodology    11:32AM

for conducting those things is -- it is not itself

an analysis on any given day of what the price

effect was of any particular information?

MR. JAFRI:  Objection, form.

THE WITNESS:  That's correct, I have not    11:33AM

analyzed damages or assessed loss causation.  I

haven't been asked to.

My understanding is that's improper at the

class certification stage to do so.

BY MR. BROWN:    11:33AM

Q    Whether it's improper or not isn't really

an issue.  For me I just wanted to know whether or

not you had done it or not, but I take it you have.

Fair enough.

Let me ask you just a couple more    11:33AM

Page  77

methodology of estimating damages that is consistent    11:44AM

with their theory of liability.

Q    How -- in forming your opinions about the

availability of such a method here, what is your

understanding of what the theory of -- lead    11:44AM

plaintiffs' theory of liability is in this case?

A    My understanding, which -- is that this

theory of liability is also informed by the Ninth

Circuit's decision regarding that case in that the

defendants allegedly gave statements regarding their    11:44AM

revenue projections, in particular booking or

forecasting sales that were allegedly illusory and not

committed, I suppose you'd say.

They made false statements regarding their

revenue projections that artificially inflated the    11:45AM

price of Forescout and that the price -- or the

truth was revealed gradually over time as the

company reported quarterly misses with respect to

their revenues in that their revenues were lower

than what the market had been led to believe.    11:45AM

Thereby, causing stock price declines and

causing the prior inflation from those misstatements

to dissipate.

The company, however, continued to make

misstatements and omissions regarding their revenue    11:46AM

Page 85

prospects and projections and basically implying    11:46AM

that these slipped deals would still come in and

they would still receive those revenues, but at

later dates.

And it kind of kept getting pushed out    11:46AM

even towards the later part of the class period.  I

think it gets pushed out into 2020.

And as of February, as we talked about,

the company announced a go-private transaction with

Advent.  I think plaintiffs are alleging that the    11:46AM

false statements regarding their revenues

projections contributed to Advent acquiring or

making an offer.

And that as it's explained in the

complaint, Advent gradually internally understood    11:47AM

the truth and became frustrated and, indeed, took

the -- conveyed to defendants that they were not --

Advent was not going to go through with a go-private

transaction.

And by I think May 11th, 2020, at least    11:47AM

the Ninth Circuit describes that date as the date

when defendants allegedly were aware that Advent was

not going to go through with it.  Nonetheless, the

defendants informed the market that they were

looking forward to closing the deal at $33 per    11:47AM

Page 86