# Exhibit C

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| CHRISTOPHER L. SAYCE, *et al.*<br><br>Plaintiffs,<br><br>v.<br><br>FORESCOUT TECHNOLOGIES, INC., *et al.*,<br><br>Defendants. | Case No. 20-CV-00076-SI |

EXPERT REPLY REPORT OF ZACHARY NYE, PH.D.

March 11, 2024

**Table of Contents**

I.    Background and Qualifications..........................................................................................1

II.   Scope of Engagement .....................................................................................................1

III.  Bases for Opinions..........................................................................................................2

IV.   Dr. Jiang Has Adopted Defendants' Incorrect and Overly Narrow View of Lead
      Plaintiffs' Theory of Liability, Thereby Rendering Her Opinions on Class-Wide
      Damages Unreliable .........................................................................................................3

V.    Damages Can Be Measured on a Class-Wide Basis in a Manner Consistent With
      Lead Plaintiffs' Theory of Liability ...............................................................................10

      a.   *Dr. Jiang's Criticisms of My Damages Methodology Are Meritless, Have
           Been Rejected by Courts, and Wrongly Require Analysis of Loss Causation at
           the Class Certification Stage* .................................................................................13

      b.   *Dr. Jiang Fails to Provide a Reliable Basis for Her Conclusion That There
           Was No Price Inflation Present in Forescout's Stock Price From February 6
           to May 11, 2020; Nevertheless, the Issues She Raises Are Common to the
           Class*.........................................................................................................................24

      c.   *May 18, 2020: Dr. Jiang's Criticism of the Event Study Methodology Is
           Meritless; An Event Study Can Control for Confounding Information* ......................35

      d.   *Defendants Incorrectly Claim That Damages Must Be Allocated Between
           Theories of Liability at the Class Certification Stage*.................................................40

VI.   There Is No Economic Basis for Defendants' and Dr. Jiang's Contention That a
      Conflict Exists Between the Lead Plaintiffs, and "Different Cohorts" of the Class,
      Due to the Timing of Their Transactions.......................................................................42

VII.  Conclusion ....................................................................................................................46

## I.    Background and Qualifications

1.    Previously in this matter, I submitted the Expert Report of Zachary Nye, Ph.D., dated

October 27, 2023 (the "Nye Report"), in which I opined that:

i.    The common stock of Forescout Technologies, Inc. ("Forescout" or the "Company") traded in an efficient market during the period May 9, 2019 through May 15, 2020, inclusive (the "Class Period");[1] and

ii.    Damages under §10(b) ("Section 10(b)") of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 promulgated thereunder by the SEC, can be calculated using a method that is common to each Class member and in a manner consistent with Lead Plaintiffs' theory of liability, for investors who purchased or otherwise acquired Forescout stock during the Class Period.[2, 3]

2.    On November 20, 2023, I provided expert testimony at a deposition regarding my

opinions contained in the Nye Report (the "Nye Deposition").

3.    My qualifications are contained in ¶1 of the Nye Report.  My curriculum vitae, which

includes my academic research, publications in the past ten years, and prior expert testimony in

the past four years, is attached hereto as Exhibit 1.

## II.    Scope of Engagement

4.    I now have been asked by Counsel for Lead Plaintiffs to reply to the Expert Report of

Professor Wei Jiang, dated December 22, 2023 (the "Jiang Report").[4, 5]  I have also been asked to

---

[1] Nye Report, §VI.

[2] Nye Report, §VII.

[3] The claims in this action are set forth in the Second Consolidated Amended Complaint for Violations of the Securities Laws, dated May 10, 2021, Dkt. 142 (the "Complaint").  *See also* the Order Granting Defendants' Motion to Dismiss, dated October 6, 2021, Dkt. 158; and the Opinion of the United States Court of Appeals for the Ninth Circuit, dated March 16, 2023.

[4] Dr. Jiang was deposed in this matter on January 16, 2024 (the "Jiang Deposition").

[5] Dr. Jiang was asked "to review the Nye Report and to respond to Section VII titled, 'Damages Can Be Measured on a Class-Wide Basis and in a Manner Consistent with Lead

- 1 -

respond to certain portions of Defendants' Opposition to Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel, dated December 22, 2023 ("Opposition to Class Certification"), to the extent they are relevant to my opinions in the Nye Report.

**III.    Bases for Opinions**

5.      My opinions are based upon my professional knowledge and experience, my review of documents and information relevant to this matter, and the analyses described in this Report, as well as in the Nye Report and its Exhibits.  Documents, data, and other information that I have relied upon as the bases for my opinions are cited in this Report and the Nye Report.  Such documents and information are typically relied upon by financial experts in securities class actions and by financial economists in their research.

6.      Counsel for Lead Plaintiffs has informed me that the record in this matter continues to be developed and that fact discovery is ongoing.  To the extent they are relevant, I would expect to review additional information that may become available through discovery as well as the reports and depositions of other expert witnesses.  The opinions offered in this Report are subject to refinement or revision based on continuing analysis of the documents and information listed above, as well as new or additional information that may be provided to or obtained by me in the course of this matter.

---

Plaintiffs' Theory of Liability.'" (*See* Jiang Report, ¶8.)  To my knowledge, neither Dr. Jiang nor Defendants challenge my opinion that Forescout stock traded in an efficient market during the Class Period.  Nor do they proffer any opinions with respect to price impact of the alleged misrepresentations and omissions in this matter. (*See* Jiang Deposition, 21:23–22:11.)

**IV.    Dr. Jiang Has Adopted Defendants' Incorrect and Overly Narrow View of Lead Plaintiffs' Theory of Liability, Thereby Rendering Her Opinions on Class-Wide Damages Unreliable**

7.    The bulk of Dr. Jiang's report is based upon her adoption of Defendants' view of the scope of the alleged misrepresentations at issue in the case, which I understand to be an incorrect and overly narrow interpretation of Lead Plaintiffs' theory of liability. Specifically, Defendants assert that "Plaintiffs advance two completely separate theories of liability."[6] According to Defendants, "[t]he first of these theories involves statements between May and November 2019 regarding the strength of Forescout's sales pipeline, 'slipped' deals, 'tech wins,' and economic conditions in EMEA. The second theory relates to the lone May 11, 2020 statement that Forescout 'look[ed] forward to completing [the] pending transaction with Advent.'"[7] Dr. Jiang likewise states that there are "two types of alleged misstatements" in this matter, which she refers to as the "Alleged 2019 Sales Pipeline Misstatements" and the "Alleged Merger Misstatement."[8] However, she claims that Lead Plaintiffs have **three** different "theories of liability," as follows:

(i)  the "2019 Sales Pipeline Inflation Theory," which begins on May 9, 2019, and was "fully corrected by either October 10, 2019 or November 6, 2019";[9]

(ii) the "Continuing Sales Pipeline Inflation Theory," which begins on May 9, 2019, and was fully corrected by May 18, 2020;[10, 11] and

---

[6] Opposition to Class Certification, p. 1.

[7] Opposition to Class Certification, p. 1.

[8] Jiang Report, ¶17 ("The first type includes alleged misstatements made on five different days in 2019, related to Forescout's sales pipeline (the 'Alleged 2019 Sales Pipeline Misstatements'), whereas the second type includes one alleged misstatement on May 11, 2020 (the 'Alleged Merger Misstatement'), related to the pending acquisition by Advent International ('Advent') at a price of $33 per share of Forescout stock, originally announced on February 6, 2020.").

[9] Jiang Report, ¶26, Table 1.

[10] Jiang Report, ¶27, Table 1.

[11] Dr. Jiang cites to the complaint filed on January 2, 2020 in this matter, as a basis for her assertion that there are two different theories of liability tied to the "Alleged 2019 Sales Pipeline

> (iii) the "Merger Inflation Theory," which begins on May 12, 2020, and was fully corrected by May 18, 2020.[12]

8.      Based on this portrayal of Lead Plaintiffs' allegations, Defendants and/or Dr. Jiang conclude that: (i) "[t]he generic [damages] methodology Plaintiffs propose … cannot bridge the factual and logical gap between" these "distinct theories";[13] (ii) Plaintiffs must "disentangle the removal of the Alleged Merger Inflation and the Alleged Sales Pipeline Inflation from Forescout's abnormal return on May 18, 2020";[14] (iii) there is "a conflict between the two Lead Plaintiffs" and "different cohorts" of the Class based on the timing of their purchases;[15] and (iv) "neither the Alleged Sales Pipeline Inflation nor the Alleged Merger Inflation was … present in Forescout's stock price" during the period from February 6, 2020 through May 11, 2020.[16]

9.      On the contrary, it is my understanding that Lead Plaintiffs allege a **single** theory of liability in which Defendants materially misrepresented the financial prospects of the Company.

---

Misstatements," each with different corrective disclosure dates.  (*See* Jiang Report, ¶24, citing Christopher L. Sayce, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Forescout Technologies, Inc., Michael DeCesare, and Christopher Harms, Defendants, United States District Court, Northern District of California, San Francisco Division, Case No.: 3:20-cv-00076, Complaint for Violation of the Federal Securities Laws, dated January 2, 2020.) However, it is my understanding that the operative Complaint in this matter is the Second Consolidated Amended Complaint for Violations of the Securities Laws, dated May 10, 2021, which reflects the full set of alleged corrective events under Lead Plaintiffs' theory of liability as reinstated by the Ninth Circuit's opinion on appeal, including May 9, 2019, October 10, 2019, May 11, 2020, and May 18, 2020.  (*See* Complaint, ¶¶69–72, 89, 90, 117–119.)

[12] Jiang Report, ¶28, Table 1.

[13] Opposition to Class Certification, p. 1.

[14] Jiang Report, ¶16.  *See also* Opposition to Class Certification, §I.B. ("Plaintiffs' Damages Model Does Not Articulate a Method for Disaggregating the Harm Allegedly Resulting from Plaintiffs' Two Theories of Liability").

[15] Jiang Report, ¶16, §VI.  *See also* Opposition to Class Certification, pp. 2–3, 23–24.

[16] Jiang Report, ¶13.  *See also* Opposition to Class Certification, §I.A ("Plaintiffs' Damages Methodology Fails To Account for Structural Changes to Forescout's Stock Price During the Proposed Class Period").

Under this theory, the so-called "Alleged 2019 Sales Pipeline Misstatements" and "Alleged Merger Misstatement" are simply two categories of materially misleading statements, which omitted the same substantial negative information.  Indeed, at their core, all of these misstatements are alleged to be false and misleading because they concealed Forescout's adverse demand trends and the impact such trends were having on the Company's financial prospects, including the Company's ability to successfully close the pending Advent transaction.

10.    More specifically, Lead Plaintiffs allege that, prior to the Class Period, Forescout "began to fall behind its competitors that provided superior cybersecurity solutions designed for the emerging cloud computing marketplace."[17]  Yet, from the start of the Class Period, Defendants "assured investors that the Company would meet its revenue target for 2019 because it had a large, healthy pipeline, and deals expected to close in the second quarter had merely slipped into later quarters and because Forescout had already been awarded the business."[18]  Such assurances were allegedly false, however, as they contradicted statements by Confidential Witnesses, who "described a persistent, companywide pressure campaign to identify illusory deals as 'committed,' … significant customer losses in certain regions during the Class Period, … a material amount of deals in the pipeline miscategorized as 'committed,' deals that lingered in the forecast file with no prospect of closing, and deals forecasted to close within weeks of a quarter that inevitably slipped into the next quarter."[19]  Then, on October 10, 2019, when the Company released its third-quarter 2019 financial results, "the market began to understand that

---

[17] Plaintiffs' Corrected Notice of Motion and Motion for Class Certification, and Appointment of Class Representatives and Class Counsel, October 31, 2023 ("Motion for Class Certification"), p. 3.

[18] Motion for Class Certification, p. 4.

[19] Motion for Class Certification, p. 4 (internal citation to Complaint omitted).

Defendants' earlier representations about 'slipped' deals were false."[20]  However, "instead of coming clean with investors, Defendants repeatedly shifted blame from the U.S. market to alleged approval cycles and deteriorating macroeconomic conditions abroad where Forescout conducted a small amount of its business."[21]

11.     With respect to the Advent deal, Lead Plaintiffs allege that, "[a]s Forescout's business began to decline in 2019, the Company put itself up for sale no later than October 2019. … Key to Defendants' effort to obtain a premium price was [falsely] portraying the Company as poised for revenue growth, and Defendants prepared [baseless] forecasts for potential acquirers anticipating even higher revenue growth in 2020."[22]  After entering the merger agreement in February 2020, "Advent became alarmed at Forescout's declining financial performance," and "began to review the Company's business and prospects."[23]  On May 8, 2020, Advent allegedly "reiterate[d]" to Forescout that it "could not 'make the numbers work' for the planned acquisition and expressed concerns regarding whether the conditions for closing could be met."[24] "Despite knowing this nonpublic, adverse information, on May 11, 2020, [Defendant] DeCesare told investors that 'we look forward to completing our pending transaction with Advent.'"[25, 26] Ultimately, on May 18, 2020, the alleged concealed risks associated with the Company's

---

[20] Motion for Class Certification, p. 5.

[21] Motion for Class Certification, p. 5.

[22] Motion for Class Certification, p. 5 (internal citation to Complaint omitted).  *See also* Complaint, ¶¶10–11, 53–59.

[23] Motion for Class Certification, p. 5.

[24] Motion for Class Certification, p. 5.

[25] Motion for Class Certification, p. 5.

[26] An additional alleged partial corrective disclosure occurred on May 11, 2020, when "the Company failed to meet its own lackluster revenue target for the first quarter of 2020."  (*See* Motion for Class Certification, p. 5.)

deteriorating sales pipeline and adverse demand trends materialized, when "Forescout shocked investors by disclosing that Advent was refusing to proceed with the Planned Acquisition of the Company for $33.00 per share."[27]

12.     According to Lead Plaintiffs, Advent's reasons for backing out of the deal, included, *inter alia*: (i) "'the Company's actual recent financial performance,'" and "'expected future financial performance for the fiscal year 2020 and beyond'"; (ii) that Forescout was "'continuing to provide non-standard discounts and payment terms on its products to a significant number of customers [which were] material and substantially adversely affect[ed] the near- and long-term prospects of the Company'"; and (iii) "[i]f the Acquisition were to be consummated, 'the Company would not be solvent … under any relevant test of solvency' because, among other things, 'the Company's debts [would] likely exceed its estimated enterprise value.'"[28]  These are precisely the same factors Lead Plaintiffs allege had been concealed throughout the Class Period via Defendants' "Alleged 2019 Sales Pipeline Misstatements," which were made in an "effort to obtain a premium price … [from] potential acquirers."[29]  Thus, under Lead Plaintiffs' **single** theory of liability, the "Alleged Merger Misstatement" on May 11, 2020 served to maintain the remaining price inflation created by the "Alleged 2019 Sales Pipeline Misstatements" by preventing the relevant truth from becoming public—namely, that Forescout's deteriorating sales pipeline and adverse demand trends had put the planned acquisition in serious jeopardy.

13.     At my deposition, I testified about my understanding that the alleged "false statements regarding [Forescout's] revenues projections contributed to Advent acquiring or making an

---

[27] Complaint, ¶70.

[28] Complaint, ¶70, citing Advent's Termination Letter to Forescout, May 15, 2020.

[29] Motion for Class Certification, p. 5.  *See also* Complaint, ¶¶10, 11.

offer," and, as "explained in the complaint, Advent gradually internally understood the truth and became frustrated and, indeed, … conveyed to defendants that [it] w[as] not … going to go through with a go-private transaction."[30]  I also testified that:

> by … May 11th, 2020, at least the Ninth Circuit describes that date as the date when defendants allegedly were aware that Advent was not going to go through with it.  Nonetheless, the defendants informed the market that they were looking forward to closing the deal at $33 per share, which is alleged to be another false statement that contributed to price inflation in Advent's stock from that point on in the class period.
>
> And that ultimately the deal fell through and the stock price declined significantly under plaintiffs' theory and it contributed to actual losses and damages to class period purchasers in the stock.[31]

Thus, while Defendants' statements on May 11, 2020 regarding the status of the Advent deal are alleged to be materially misleading in their own right, the so-called "Alleged 2019 Sales Pipeline Misstatements" are necessarily a part of and relevant to the so-called "Alleged Merger Misstatement."[32]

14.    Dr. Jiang ignores all of this in her report, and adopts Defendants' erroneous position that Lead Plaintiffs' allegations regarding Forescout's sales pipeline are "completely separate" from their allegations regarding Advent's refusal to proceed with the merger.[33]  In fact, she testified that: (i) she "was not asked to evaluate or hypothesize why Advent was hesitant about executing the merger";[34] (ii) she cannot be certain about why Advent decided not to proceed with the

---

[30] Nye Deposition, 86:10–86:19.

[31] Nye Deposition, 86:20–87:9.

[32] Dr. Jiang testified that she "do[es] not have a clear view about why the merger [allegedly] failed." (*See* Jiang Deposition, 89:2–20.)  She also conceded that there can be multiple categories of alleged misstatements related to a single theory of liability. (*See* Jiang Deposition, 80:2–81:4.)

[33] Opposition to Class Certification, p. 1.

[34] Jiang Deposition, 31:20–22.

merger, because she does not have all the facts;[35] (iii) she does not have an understanding of what Lead Plaintiffs allege are the reasons why the merger failed;[36] and (iv) the reasons why Advent terminated the pending offer "would not impact any of the opinions" in her report.[37]

15.     However, by sidestepping any consideration of how the "Alleged 2019 Sales Pipeline Misstatements" affected the market's understanding of the probability of the deal closing as scheduled, Dr. Jiang falsely portrays any revelation concerning product demand and future revenue growth as "confounding" information on May 18, 2020, which in her mind must be "disentangled."  It likewise enables her opinion that there was no inflation in Forescout's stock price during the February 6–May 11, 2020 period,[38] which is entirely premised on the notion that

---

[35] Jiang Deposition, 32:13–20:

> A. … I would not know everything, because I was not given all information related to this deal.
>
> BY MR. JAFRI:
>
> Q. Correct.  Right.  So is it fair to say that you cannot be certain about why Advent decided not to proceed with the merger, because you don't have all the facts?
>
> A. That is fair.  I agree with you.

*See also* Jiang Deposition, 85:9–86:11.

[36] Jiang Deposition, 89:2–12:

> Q. Do you have an understanding of what the Plaintiffs allege are the reasons why the merger failed?
>
> MR. BROWN: Objection.
>
> THE WITNESS: Do you mean what are the reasons that the Plaintiffs alleged that the merger failed?
>
> BY MR. JAFRI:
>
> Q. Right.
>
> A. No, I -- I do not have a clear view about why the merger failed.

[37] Jiang Deposition, 31:11–15.

[38] Jiang Report, §III.  *See also* Opposition to Class Certification, §I.A.

"the prospect of the pending acquisition being completed at the announced deal price of $33" was unaffected by Forescout's deteriorating sales pipeline and adverse demand trends.[39]  On the contrary, under Lead Plaintiffs' **single** theory of liability, the "Alleged 2019 Sales Pipeline Misstatements" are what lured Advent to the negotiating table in the first place and Advent's discovery of the relevant truth (from its continuing due diligence into Forescout's business) is what caused the Planned Acquisition to be terminated at a deal price of $33.  In sum, Defendants' and Dr. Jiang's failure to consider Lead Plaintiffs' actual theory of liability renders their opinions on Class-wide damages unreliable and irrelevant at best.

V.      **Damages Can Be Measured on a Class-Wide Basis in a Manner Consistent With Lead Plaintiffs' Theory of Liability**

16.     The analyses set forth in the Nye Report establish a foundation for estimating damages on a Class-wide basis and in a manner consistent with Lead Plaintiffs' theory of liability.[40] Specifically, by controlling for changes in market and industry factors, an event study can isolate the price change of the stock due to the release of Company-specific information on every day of the Class Period, including the alleged corrective event dates.  Thus, as the decline in a security's price in response to corrective disclosures and/or the materialization of a concealed risk reflects the dissipation of price inflation created or maintained by earlier misstatements and/or omissions, such Company-specific price changes are the natural starting point from which to measure—on a Class-wide basis—the level of price inflation present during the Class Period.  Indeed, this "out-of-pocket, or event study, method is the standard measurement of damages in Section 10(b)

---

[39] Jiang Report, ¶45.  *See also* Opposition to Class Certification, pp. 10, 11.

[40] Nye Report, §VII.

- 10 -

securities cases."[41]  Dr. Jiang testified that she would also use the event study methodology to calculate class-wide damages under Section 10(b).[42]

17.    At this early stage of the litigation, I have not conducted an analysis of loss causation or calculated Class-wide damages.  Nonetheless, as described in the Nye Report, a damages methodology that can be commonly applied to all Class members involves measuring the Company-specific returns (*i.e.*, abnormal or residual returns net of market and industry effects) in response to the alleged corrective disclosures and/or risk materialization events, adjusting for any confounding news, and then calculating the amount of inflation in Forescout stock throughout the Class Period.[43]  "Once the daily levels of price inflation have been calculated throughout the Class Period, a Class member's actual trading activity in the security can be used

---

[41] *City of Miami Gen. Empls. Ret. Trust v. RH, Inc.*, No. 17-CV-00554-YGR, 2018 WL 4931543, at *3 (N.D. Cal. Oct. 11, 2018).  *See also, e.g.*, *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 155 (1972) (out-of-pocket method is "the correct measure of damages" in Exchange Act case); *Hatamian v. Advanced Micro Devices, Inc.*, No. 14-CV-00226-YGR, 2016 WL 1042502, at *8 (N.D. Cal. Mar. 16, 2016); *In re SanDisk LLC Sec. Litig.*, No. 15-CV-01455-VC, 2018 WL 4293336, at *2 (N.D. Cal. Sept. 4, 2018) ("The out-of-pocket method is widely considered an accepted method for the evaluation of materiality damages to a class of stockholders in a defendant corporation."); *In re Pfizer, Inc. Sec. Litig.*, 819 F.3d 642, 649 (2d Cir. 2016).

[42] Jiang Deposition, 17:1–18:

> Q. Let's just say that you want to calculate damages under Section 10 of the Exchange Act.  How would you do it?
>
> A. First, I would identify the date that is called the corrective disclosure, which is the revelation of some alleged truth, such as a previous omitted fact or a previous alleged misstatement.  I would take the stock price reaction on that day and conduct what we called an event study to isolate that the price impact that would be attributed to that revealed of alleged truth.  And that could be used as an indicator of the potential price inflation on the date -- on the dates before this corrective disclosure.  And then on the typical -- on a given day before this corrective disclosure or multiple corrective disclosures, then the presumed alleged price inflation would be the sum of all these abnormal terms on the subsequent disclosure.

[43] Nye Report, ¶60, citing *In re Pfizer, Inc. Sec. Litig.*, 819 F.3d 642, 649 (2d Cir. 2016).

to mechanically calculate damages on an individual basis."[44]  This is precisely the same damages methodology that I put forth at the class certification phase in *Waggoner v. Barclays PLC*, which was endorsed by the Second Circuit.[45]

18.    With respect to Plaintiffs' theory of liability in the present matter, my understanding is that: (i) "Defendants [allegedly] engaged in a plan, scheme, conspiracy and course of conduct" to "deceive the investing public";[46] (ii) "[a]s a result of the dissemination of the [alleged] false and misleading statements, the market price of Forescout common stock was artificially inflated throughout the Class Period;"[47] and (iii) "Class members suffered damages in connection with their respective purchases of the Company's common stock during the Class Period when the risk of Defendants' wrongdoing materialized or upon the disclosure thereof, causing the price of Forescout common stock to decline."[48]  Furthermore, as described in Section IV above, Plaintiffs

---

[44] Nye Report, ¶62.

[45] *Waggoner v. Barclays PLC*, 875 F.3d 79, 105 (2d Cir. 2017).  *See also* the following cases in which the court accepted my damages methodology at class certification: *Halman Aldubi Provident & Pension Funds Ltd. v. Teva Pharms. Indus.*, No. 20-4660-KSM, 2023 U.S. Dist. LEXIS 197573, at *72-74 (E.D. Pa. Nov. 3, 2023); *Ferris v. Wynn Resorts Limited*, No. 18-cv-00479-APG-DJA, 2023 U.S. Dist. LEXIS 35374, at *38 (D. Nev. Mar. 1, 2023); *Karinski v. Stamps.com, Inc.*, No. CV-19-1828-MWF (SKx), 2020 WL 6572660, at *8 (C.D. Cal Nov. 9, 2020); *Cooper v. Thoratec Corp.*, No. 14-CV-0360 CW, 2018 WL 2117337, at *7 (N.D. Cal. May 8, 2018); *In re Banc of California Sec. Litig.*, 326 F.R.D. 640, 651 (C.D. Cal. 2018); *In re Allergan PLC Sec. Litig.*, No. 18-CIV-12089 (CM)(GWG), 2021 WL 4077942, at *14-15 (S.D.N.Y. Sep. 8, 2021); *Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 47-48 (S.D.N.Y. 2018); *Roofer's Pension Fund, et al. v. Papa, et al.*, 333 F.R.D. 66, 87-88 (D.N.J. 2019); *Hayes v. MagnaChip Semiconductor Corp.*, No. 14-CV-01160-JST, 2016 WL 7406418, at *9 (N.D. Cal. Dec. 22, 2016); *Thorpe v. Walter Investment Management Corp., et al.*, No. 1:14-cv-20880-UU, 2016 WL 4006661, *15-16 (S.D. Fla. Mar. 16, 2016); *In re Zillow Group, Inc. Securities Litigation*, No. C17-1387-JCC, 2020 WL 6318692, at *8 (W.D. Wash. Oct. 28, 2020); *In re Snap Inc. Securities Litigation*, 334 F.R.D. 209, 216-18 (C.D. Cal. 2019).

[46] Complaint, ¶169.

[47] Complaint, ¶172.

[48] Complaint, ¶176.

- 12 -

have clearly advanced a single theory of liability that alleges a causal connection between the alleged misrepresentations and the actual losses suffered by Class members upon the revelation of the relevant truth on the corrective event dates. Thus, given that an "event study shows how much money the fraud caused shareholders to lose," by "[i]dentifying residual returns on days when allegedly concealed information reached the market," and calculates "what the price of [the defendant company's] security would have been had the alleged wrongful conduct not occurred, by estimating the amount of artificial inflation in the company's stock price over time,"[49] it is clear that "this is a case in which the Plaintiffs' 'proposed measure for damages is … directly linked with their underlying theory of classwide liability … and is therefore in accord with the Supreme Court's … decision in *Comcast*.' *U.S. Foodservice*, 729 F.3d at 123 n.8."[50]

### a. Dr. Jiang's Criticisms of My Damages Methodology Are Meritless, Have Been Rejected by Courts, and Wrongly Require Analysis of Loss Causation at the Class Certification Stage

19. Dr. Jiang contends that "the general economic framework described in the Nye Report is not a reliable class-wide common method for assessing damages purportedly suffered by each member of the Proposed Class in a manner consistent with Lead Plaintiffs' theory of liability,"[51] for the following reasons:

    i.   "First, the Nye Methodology would mechanically calculate an alleged price inflation present in Forescout's stock price from February 6, 2020 to May 11, 2020, even though neither the Alleged Sales Pipeline Inflation nor the Alleged Merger Inflation was then present in Forescout's stock price."[52]

---

[49] *In re Pfizer, Inc. Sec. Litig.*, 819 F.3d 642, 649 (2d Cir. 2016) (internal quotation marks omitted).

[50] *Waggoner v. Barclays PLC*, 875 F.3d 79, 106 (2d Cir. 2017). *See also Roofer's Pension Fund, et al. v. Papa, et al.*, 333 F.R.D. 66, 88 (D.N.J. 2019) (citing *Neale v. Volvo Cars of North Am., LLC*, 794 F.3d 353, 374 (3d Cir. 2015).

[51] Jiang Report, ¶12 (internal quotation marks omitted).

[52] Jiang Report, ¶13.

ii. "Second, to the extent that the Nye Methodology attributes Forescout's entire abnormal return on May 18, 2020 to the removal of the Alleged Merger Inflation, it is inappropriate, because Forescout's May 18, 2020 abnormal return also reflected the effects of confounding information unrelated to any alleged misstatements."[53]

iii. "Third, Dr. Nye has not explained how the generic Nye Methodology could separate the removal of the Alleged Merger Inflation and/or the Alleged Sales Pipeline Inflation from Forescout's abnormal return on May 18, 2020.  I am aware of no well-accepted reliable method to do so."[54, 55]

20.     However, Dr. Jiang fails to acknowledge that a determination of whether and to what extent there was inflation present in Forescout's stock price during the Class Period, necessarily requires an assessment of "loss causation—a causal connection between the defendants' alleged misrepresentations and the plaintiffs' economic losses,"[56] which I understand is not required at this stage of the litigation.[57]  The same is true of Dr. Jiang and Defendants' purported requirement that Plaintiffs specify how to separate out the "effects of confounding information unrelated to any alleged misstatements."[58]  These are all quintessential loss causation issues, which require the weighing of discovery evidence regarding Defendants' liability in this matter, and which I understand is not the role of a financial economist, but rather the trier of fact.  Again,

---

[53] Jiang Report, ¶14.  Other than on May 18, 2020, Dr. Jiang does not contend that confounding information was disclosed on any of the alleged corrective event dates.

[54] Jiang Report, ¶15.  In §VI of this Report, I address Dr. Jiang's fourth criticism of the proposed damages methodology regarding whether there is a "conflict" between the Lead Plaintiffs and "different cohorts of the Proposed Class."  (*See* Jiang Report, ¶16.)

[55] To be clear, Dr. Jiang does not contest that damages can be calculated on a Class-wide basis for the period before February 6, 2020.  (*See* Jiang Deposition, 118:19–24.)

[56] *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2406 (2014) ("*Halliburton II*") (internal quotations omitted).

[57] *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804 (2011).

[58] Jiang Report, ¶14.  *See also* Jiang Report, ¶58; Opposition to Class Certification, p. 3.

- 14 -

Dr. Jiang and Defendants fail to appreciate that the resolution of such issues is not required, nor

proper, at this stage of the litigation.[59, 60]

---

[59] *Erica P. John Fund, Inc. v. Halliburton Co.,* 563 U.S. 804 (2011).

[60] *See also, e.g.*, the following cases in which defense experts proffered strikingly similar arguments regarding the estimation of damages at the class certification phase, which were rejected by the court:

*Ferris v. Wynn Resorts Limited*, No. 18-cv-00479-APG-DJA, 2023 U.S. Dist. LEXIS 35374, at *37–38 (D. Nev. Mar. 1, 2023):

> Nye's methodology of determining damages is consistent with the plaintiffs' theory that the class's losses come from the inflated stock price caused by the defendants' misstatements and later price drop when the truth was revealed. The defendants' argument that Nye should take into consideration other confounding events that may explain some or all of the back-end price drop is a loss-causation argument that I do not address at the class certification stage. Moreover, Nye states in his report attached to the plaintiffs' reply that he has not actually performed a loss causation analysis, but confounding information can be addressed by his methodology when that analysis is performed. *See* ECF No. 270-2 at 58-65. Finally, the defendants' argument that Nye's method fails to account for the possibility that inflation is not necessarily constant over the entire class period is premature at this stage. *See Waggoner, 875 F.3d at 106* (rejecting the argument that class certification was improper where "the [p]laintiffs' damages model failed to account for variations in inflation over time" because damage calculations need not be "so precise" at the class certification stage). The plaintiffs therefore have established a methodology for determining damages on a class-wide basis such that common issues predominate.

*In re Apple Inc. Securities Litigation*, No. 19-CV-2033-YGR, 2022 WL 354785, at *12 (N.D. Cal. Feb. 4, 2022):

> The Ninth Circuit has stated that *Comcast* demands only that plaintiffs "be able to show that their damages stemmed from the defendant's actions that created the legal liability." *Leyva*, 716 F.3d at 514. There is only one theory of liability here, namely, that defendants' misrepresentation inflated the stock price and corrective disclosures removed such inflation. Plaintiff has proposed a standard method of calculating damages that is consistent with this theory of liability and can be applied classwide. At the class certification, plaintiff is not required to do more.
>
> Next, defendants fault Dr. Feinstein for failing to consider numerous purported facts, namely:
>
>> the fact[s] that (i) there is a subject-matter 'mismatch' between the contents of the [c]hallenged [s]tatement and the November 2018 purportedly corrective disclosures, and thus a 'corrective' price

- 15 -

decline cannot be assumed, (ii) the qualitative fact of Apple slowing business in China was well known to the market at the time the [c]hallenged [s]tatement was made, and thus the quantitative "corrective" statements could not affect Apple's stock price, (iii) the "new information" disclosed on January 2, 2019 regarding the 'magnitude and severity' of the quarter-end drop in Apple's iPhone business in China could not have been known at the time the [c]hallenged [s]tatement was made two months earlier; and (iv) there was non-fraud related information released on January 2, 2019 that caused the [c]ompany's stock price to drop.

(Opp. at 24.)  However, these "attack[s on] the 'fit' between an alleged corrective disclosure and a prior alleged fraudulent statement … [are] nothing more than [ ] attack[s] on loss causation," which plaintiff need not show as a condition of class certification.  *Hatamian*, 2016 WL 1042502, at *9 (citing *Halliburton I*, 563 U.S. at 813).  "Defendants' arguments are therefore misplaced."  *Id*.

*Hatamian v. Advanced Micro Devices, Inc*., No. 14-CV-00226-YGR, 2016 WL 1042502, at *9 (N.D. Cal. Mar. 16, 2016):

Defendants argue that Plaintiffs' simplistic damages model is insufficient because it reflects a misalignment between certain misrepresentations and later corrective disclosures.  In other words, Defendants attack the "fit" between an alleged corrective disclosure and a prior alleged fraudulent statement.  This is nothing more than an attack on loss causation, or Plaintiffs' ability to "show that a misrepresentation that affected the integrity of the market price *also* caused a subsequent economic loss."  *Halliburton I*, 131 S.Ct. at 2186 (emphasis in original).  So too is Defendants' argument that Professor Coffman's methodology would not be able to "disaggregate the price inflation" attributable to particular theories of liability.  (Oppo. at 24:16-21.)  As explained by Professor Coffman, this inquiry is appropriately understood as a loss causation analysis.  (Coffman Rebuttal ¶ 56.)  *See, e.g. In re SLM Corp. Sec. Litig.*, 2012 WL 209095, at *5 (S.D.N.Y. Jan. 24, 2012) ('evaluating potentially confounding information on the disclosure dates, and determining whether it was material, is tantamount to a loss causation analysis').  These sorts of inquiries into loss causation are properly addressed by a fact-finder on the merits; Plaintiffs need not show loss causation as a condition of class certification.  *See Halliburton I,* 131 S. Ct. at 2186.  Defendants' arguments are therefore misplaced.

*Hayes v. MagnaChip Semiconductor Corp.*, No. 14-CV-01160-JST, 2016 WL 7406418, at *9 (N.D. Cal. Dec. 22, 2016):

Avenue Capital attacks the methodology of Nye's event study on several grounds similar to those raised by the defendant in Hatamanian [*sic*].  The critiques fall into two main categories.  First, Avenue Capital attacks the "fit" of Nye's damages methodology, arguing that the study fails to take into account price inflation over time, the impact of the 2014 corrective disclosures, and the impact

- 16 -

of confounding news.  ECF No. 249 at 26-29.  Like the defendant in <u>Hatamanian</u> [*sic*], Avenue Capital points to a Southern District of Texas case as an example of a court rejecting an event study under <u>Comcast</u> as insufficient tailored.  <u>In re BP p.l.c. Sec. Litig.</u>, No. 10-MD-2185, 2013 WL 6388408 (S.D. Tex. Dec. 6, 2013).  But as the <u>Hatamanian</u> [*sic*] court recognized, <u>In re BP</u> is distinguishable because in that case the problem was the event study's failure to "take into account two differing theories of fraud liability plaintiffs were pursuing." 2016 U.S. Dist. LEXIS 34150, at *26, 2016 WL 1042502.  Plaintiffs have only one theory here.  The flaws that Avenue Capital identifies in Nye's study, like in <u>Hatamanian</u> [*sic*], are "are ultimately immaterial to class certification" because they relate to loss causation, an issue "properly addressed by a fact-finder on the merits." <u>Id</u>.

*City of Miami Gen. Employees' & Sanitation Employees' Ret. Trust v. RH, Inc.*, No. 17-CV-00554-YGR, 2018 WL 4931543, at *3-4 n.3 (N.D. Cal. Oct. 11, 2018):

> Defendants aver that plaintiffs' "failure to describe a specific method is fatal to certification because there is no way for the Court to determine whether the proposed methodologies will measure damages that are solely attributable to plaintiffs' theory of liability."  (Opp. at 10 (citing *Doyle*, 663 F. App'x at 579) (internal quotations omitted).)  However, in *Doyle*, the Ninth Circuit faulted plaintiffs' method for calculating damages for failed [*sic*] to "measure only the damages that are attributable to the theory of liability."  Here, plaintiffs assert a fraud-on-the-market theory of liability, accordingly, the method proposed by plaintiffs—which is based on an economic valuation analyzing the extent to which the disclosure(s), correcting the alleged misrepresentations and omissions, caused the price of RH stock to fall—will limit damages to those that are attributable to that theory of liability.  *See Nursing Home Pension Fund v. Oracle Corp.*, 2006 WL 8071391, at *11 n. 4 (N.D. Cal. Dec. 20, 2006) (finding that the out-of-pocket method, which "consist[]]s of an event study and analysis of price movement attributable to company specific events," is "[t]he methodology used to calculate damages in fraud-on-the-market cases [and] is well-established.")  Moreover, unlike in *Doyle*, there are no individualized issues regarding liability.
>
> ***
>
> The Court is unpersuaded by defendants' argument at the October 1, 2018 hearing that this case is much more complicated than those cases in which courts have approved use of a out-of-pocket or event theory method of damages calculation.
>
> ***
>
> In support of their second agreement, that plaintiffs' proposed method does not contain anything that "addresses any of the specific [*sic*] of this litigation," defendants aver that "Dr. Feinstein could replace the two referenced to 'RH' with the name of another company and come to the conclusion that this same general methodology would apply in any other set of circumstances involving securities litigation." (Opp. at 5.)  However, this assertion seems to reflect the fact that

securities fraud cases fit Rule 23 "like a glove," rather than suggest that class treatment is inappropriate. …

Finally, defendants' argument that the plaintiffs' proposed method fails "to demonstrate how one would measure inflation using any 'standard tools of valuation' if it cannot be measured using an event study" is essentially an assertion that plaintiffs' method will result in incorrect calculations. However, this criticism prematurely addresses the quantification and allocation of damages, which courts consistently find are not appropriately raised at the class certification stage. *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010) ("damage calculations alone cannot defeat certification"). Additionally, the Ninth Circuit has held that plaintiffs are not required to prove their damages with "exact proof" at the certification stage. *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 970 (9th Cir. 2013).

*Karinski v. Stamps.com, Inc.*, No. CV-19-1828-MWF (SKx), 2020 WL 6572660, at *8 (C.D. Cal Nov. 9, 2020):

Finally, Defendants argue that Plaintiff has not provided a class-wide damages model as required by *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013). However, courts in the Ninth Circuit read *Comcast* "to demand only that plaintiffs 'be able to show that their damages stemmed from the defendant's actions that created the legal liability.'" *Hatamian*, 2016 WL 1042502, at *8 (quoting *Levya*, 716 F.3d at 514). Here, Lead Plaintiff has demonstrated that damages can be calculated using a common, widely-accepted methodology for all Class members. (*See* Nye Rpt. ¶¶ 60-63). Dr. Nye's damages methodology has been routinely accepted by courts examining these same issues at class certification. *See Cooper v. Thoratec Corp.*, No. 14-CV-0360 CW, 2018 WL 2117337, at *7 (N.D. Cal. May 8, 2018) (approving Dr. Nye's event study method for calculating per-share damages); *In re Banc of California Sec. Litig.*, 326 F.R.D. 640, 651 (C.D. Cal. 2018) (same); *Todd*, 2017 WL 821662, at *11 ("'[t]he event study method is an accepted method for the evaluation of materiality damages to a class of stockholders in a defendant corporation'") (citation omitted).

*SEB Inv. Mgmt. AB v. Symantec Corp.*, No. C 18-02902 WHA, 335 F.R.D. 276, 288 (N.D. Cal. 2020):

Defendants argue that an event study cannot work here because there is allegedly no evidence of price increases following the alleged misrepresentations and no evidence of price declines following any disclosure of the alleged truth concerning what defendant contends are plaintiff's liability theories. Defendants' arguments are not, as defendants would have it, an attack on Dr. Hartzmark's damages model. Rather, defendants assert that plaintiff will be unable to disaggregate the artificial inflation from confounding events. This is an inquiry into loss causation and loss causation need not be analyzed at the class certification stage. *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 813, 131 S.Ct. 2179, 180 L.Ed.2d 24 (2011).

- 18 -

*Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 47-48 (S.D.N.Y. 2018):

> Defendants contend that Dr. Nye's damages model (1) fails to account for the possibility of variation in inflation over time; (2) "rests on flawed assumptions, such as that FCA could have disclosed the 'truth' of its alleged misstatements at the beginning of the class period in a manner equivalent to supposed 'corrective disclosures'"; and (3) does not control for confounding information. (Dfs.' Opp'n 22). The Second Circuit has held, however, that *Comcast* does not require Plaintiffs to account for variations in inflation throughout the class period at the class certification stage. *See Waggoner*, 875 F.3d at 106 ….
>
> \*\*\*
>
> Similarly, Defendants' second and third challenges go to the question of loss causation (that is, whether Plaintiffs' damages were caused by the alleged fraud alone or by other market factors), and the Supreme Court has held "that loss causation … [is a] common question[] that need not be adjudicated before a class is certified." *Amgen*, 568 U.S. at 475 (citing *Halliburton I*, 563 U.S. at 809); *In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 105 (S.D.N.Y. 2016) ("[P]laintiffs are not required to establish loss causation … on class certification."). Accordingly, Comcast provides no basis to deny Plaintiffs' motion for class certification.

*Roofer's Pension Fund, et al. v. Papa, et al.*, 333 F.R.D. 66, 87-88 (D.N.J. 2019):

> Third, Defendants' criticisms about Dr. Nye's methodologies are largely focused on Dr. Nye's failure to make precise damage calculations, which are not required for class certification. See Comcast, 569 U.S. at 35 (stating that "[c]alculations need not be exact"); Reyes, 802 F.3d at 485, 489 (noting that "an inability to calculate damages on a classwide basis will not, on its own, bar certification"); Neale, 794 F.3d at 374-75; City of Sterling Heights, 2015 WL 5097883, at *13 (explaining that Comcast "did not stand for the general proposition that in all class actions, a plaintiff must prove that damages are calculable on a class-wide basis before certification can be granted"); Waggoner v. Barclays PLC, 875 F.3d 79, 106 (2d Cir. 2017) (finding that the lead plaintiff's failure to "account for variations in inflation over time" is inconsequential at the class certification stage). Nor is it dispositive that individualized issues may affect damages calculations so long as common issues determining liability predominate. See Neale, 794 F.3d at 374-75; In re Wilmington Tr. Sec. Litig., 310 F.R.D. 243, 246 (D. Del. 2015) ("[C]lass certification is not defeated when there are individual issues with respect to the calculation of damages."); West Palm Beach Police Pension Fund, 2016 WL 4138613, at *14-15.
>
> For those reasons, that Dr. Nye did not address certain hypotheticals offered by Defendants, see Defs. Br. at 21-23, and did not actually calculate the amount of damages for each class is inconsequential at this juncture. The Court is not required to "assess the validity of Plaintiff's damages model[s]" to determine whether class certification is warranted. See City of Sterling Heights, 2015 WL 5097883, at *13. It is enough for Lead Plaintiff to show that each of Dr. Nye's

- 19 -

> proposed methodologies can be used to prove damages on a class-wide basis, which it has done.  The Court thus finds that the predominance requirement is met with respect to measuring damages for each proposed class.

*In re Allergan PLC Sec. Litig.*, No. 18-CIV-12089 (CM)(GWG), 2021 WL 4077942, at *14-15 (S.D.N.Y. Sep. 8, 2021):

> Allergan insists that the damages model Nye offers does not correspond with its only remaining theory of liability, but would rather calculate generalized damages, which would conflate several different theories of liability (some of which were dismissed in the Court's prior order discussing Allergan's motion to dismiss).

> But Allergan's damages model is consistent with its liability case.

> \*\*\*

> Additionally, Nye's opinions about class-wide damages are no different from those he offered in a different case, where the Second Circuit upheld his methodology as complying with *Comcast*.  In *Waggoner v. Barclays PLC*, Nye offered an opinion on a damages model that "complie[d] with *Comcast*" because it "directly measured" the harm associated with earlier misrepresentations by observing "the drop in price" of a corrective disclosure.  875 F.3d at 106.  This Court does not see any noticeable difference between Nye's event study damages model in *Waggoner* and the event study damages model that he offers in this case.  And insofar as Allergan is insisting that an event study damages model is unable to isolate the price drop attributable to any specific misrepresentation or corrective disclosure, this Court has in the past "reject[ed] the suggestion that an event study is incapable of disaggregating the effects of confounding information.  Were it otherwise, nearly every securities fraud class action would fail." *Signet*, 2019 WL 3001084, at *20.  As this Court has previously noted, there is "no reason why an event study – the generally accepted method for measuring damages in a securities fraud class action – cannot work in this case." *Ibid*.  That same principle applies, here.

> There is no reason to conclude that the event study model offered in this case is flawed.  Of course, DeKalb will ultimately need to disaggregate any legitimate confounding factors to *prove* economic loss, but it need not do so at this juncture to establish that common issues relating to damages predominate for purposes of class certification.  *See Waggoner*, 875 F.3d at 106.  Courts have long held that "Plaintiffs are not required at [the class certification] stage to demonstrate that any price impact was due to the prior misrepresentation alone." *Pirnik v. Fiat Chrysler Automobiles, N.V.*, 327 F.R.D. 38, 46 (S.D.N.Y. 2018); *see also Haliburton I*, 563 U.S. at 807.  Rather, a plaintiff's burden at this stage is simply to propose a methodology for calculating damages that corresponds to its theory of liability.  The methodology that Nye describes, which applies on a class-wide basis, is capable of measuring the out-of-pocket losses suffered by the class members.

- 20 -

21.    Defendants are also wrong to assert that the general economic framework for quantifying per-share damages on a Class-wide basis described in the Nye Report fails to satisfy *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013).[61]  Indeed, it is my understanding that "*Comcast* does not suggest that damage calculations must be so precise at this juncture.  To the contrary, *Comcast* explicitly states that '[c]alculations need not be exact.' 569 U.S. at 35."[62]  Moreover, Dr. Jiang provides absolutely no basis (academic, legal, or otherwise) for her understanding of what constitutes "a reliable class-wide common method for assessing damages purportedly suffered by each member of the Proposed Class."[63]  Thus, her assertions about what the proposed damages methodology must specify at this stage of the litigation, and that the "'backcast' approach" is inappropriate in this matter, amount to pure *ipse dixit*.[64]

22.    On the contrary, the use of an event study, like mine, "to determine whether, and the extent to which, [a defendant's] stock price was artificially high (*i.e.*, inflated) during the Class Period due to the market's misapprehension of … risk," is "standard operating procedure in federal securities litigation."[65]  MacKinlay (1997), a widely cited academic primer on event study analysis, similarly notes that "in legal liability cases event studies are used to assess damages."[66]  Moreover, as noted in the Nye Report, the Second Circuit's decision in *Pfizer*

---

[61] Opposition to Class Certification, pp. 9, 13, 15.

[62] *Waggoner v. Barclays PLC*, 875 F.3d 79, 106 (2d Cir. 2017).

[63] Jiang Report, ¶12.

[64] Jiang Report, ¶56.

[65] *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 253 (2d Cir. 2016), quoting *United States v. Gushlak*, 728 F.3d 184, 201 (2d Cir. 2013); *See also, e.g.*, *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1313 n.31 (11th Cir. 2011) ("The methodology of event studies has been sustained by many circuits.").

[66] MacKinlay, A. Craig, 1997, "Event Studies in Economics and Finance," *Journal of Economic Literature*, Vol. 35, pp. 13–39, ("MacKinlay (1997)"), at p. 13, citing Mitchell, Mark L. and

clearly states that price inflation is appropriately measured based on the "residual return" (*i.e.*, the Company-specific return) "on a day when the market discovers allegedly concealed information."[67]  Similarly, the Seventh Circuit's decision in *Glickenhaus* states that "[t]he best way to determine the impact of a false statement is to observe what happens when the truth is finally disclosed and use that to work backward, on the assumption that the lie's positive effect on the share price is equal to the additive inverse of the truth's negative effect."[68]  Indeed, as noted by the Supreme Court in *Dura*, "the Restatement of Torts, in setting forth the judicial consensus, says that a person who 'misrepresents the financial condition of a corporation in order to sell its stock' becomes liable to a relying purchaser 'for the loss' the purchaser sustains 'when the facts … become generally known' and 'as a result' share value 'depreciate[s].'"[69]

---

Jeffry M. Netter, 1994, "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," *The Business Lawyer*, Vol. 49, pp. 557, 558.  According to Google Scholar, MacKinlay (1997) has been cited by at least 8,430 other academic publications.

[67] Nye Report, ¶62, quoting *In re Pfizer, Inc. Sec. Litig.*, 819 F.3d 642, 649 (2d Cir. 2016) (internal citations omitted, emphasis in original):

> Just as the existence of a residual return on a day when the market discovers allegedly concealed information shows that the company's stock price was artificially inflated, the *size* of the residual return on such a day provides evidence of the *amount* by which concealing that particular information inflated the defendant company's stock.  As a result, if concealed information reached the market through multiple corrective disclosures, the sum of the residual returns associated with those disclosures provides evidence about the amount of artificial inflation in the company's stock after the fraud but before those corrections.  Thus, an expert using an event study can estimate the amount of artificial inflation in the defendant company's stock price when shareholders purchased their shares, which is equivalent to estimating the difference between what those investors should have paid for the shares but-for the alleged fraud, and what they actually paid.

[68] *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 415 (7th Cir. 2015).

[69] *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 344 (2005).

23.    Accordingly, it is my understanding that the measure of price inflation, and thus per-share damages, is premised on the actual losses suffered by investors when "the truth makes its way into the marketplace."[70]  Indeed, event studies, like mine, establish whether there is the necessary "causal connection" between an alleged misrepresentation and subsequent economic loss, which "in turn, allows an expert to make inferences about the degree to which the company's stock price may have been artificially inflated on the basis of the market's misconception as to the truth prior to the release of that information."[71]  Notably, Dr. Jiang provides no event study of her own to support her bold claims that there are no damages during a significant portion of the Class Period, and that Lead Plaintiffs' proposed damages methodology is incapable of disaggregating potential confounding information.

---

[70] *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342–43 (2005).  Specifically, the *Dura* court stated that:

> [A]s a matter of pure logic, at the moment the transaction takes place, the plaintiff has suffered no loss; the inflated purchase payment is offset by ownership of a share that *at that instant* possesses equivalent value.  Moreover, the logical link between the inflated share purchase price and any later economic loss is not invariably strong.  Shares are normally purchased with an eye toward a later sale. But if, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss.  If the purchaser sells later after the truth makes its way into the marketplace, an initially inflated purchase price *might* mean a later loss.  But that is far from inevitably so.  When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price.  (The same is true in respect to a claim that a share's higher price is lower than it would otherwise have been—a claim we do not consider here.)  Other things being equal, the longer the time between purchase and sale, the more likely that this is so, *i.e.*, the more likely that other factors caused the loss.  (Emphasis in original.)

[71] *In re Vivendi S.A. Sec. Litig.*, 838 F.3d 223, 253 (2d Cir. 2016).

      **b. Dr. Jiang Fails to Provide a Reliable Basis for Her Conclusion That There Was No Price Inflation Present in Forescout's Stock Price From February 6 to May 11, 2020; Nevertheless, the Issues She Raises Are Common to the Class**

24.     Dr. Jiang asserts that "the Nye Methodology would mechanically calculate an alleged price inflation present in Forescout's stock price from February 6, 2020 to May 11, 2020, even though neither the Alleged Sales Pipeline Inflation nor the Alleged Merger Inflation was then present in Forescout's stock price" during this period.[72] She opines that there could not have been **any** inflation in Forescout's stock price during this period, "because of the fundamental structural change to Forescout's stock price following the February 6, 2020 Acquisition Announcement."[73] Specifically, Dr. Jiang states:

> [A]fter February 6, 2020, Forescout's stock price changes were no longer driven primarily by changes in investors' expectations about the company's fundamentals. Thus, information about Forescout's fundamentals, such as the alleged prior misstatements that purportedly introduced the Alleged Sales Pipeline Inflation into Forescout's stock price, or any alleged corrections of those misstatements, had little or virtually no relevance in determining Forescout's stock price after the Acquisition Announcement.[74]

According to Dr. Jiang, following the February 6, 2020 announcement, Forescout's stock price was "instead driven by the prospect of the pending acquisition being completed at the announced deal price of $33."[75]

25.     As an initial matter, Dr. Jiang draws premature conclusions about the level of inflation my damages methodology would estimate in Forescout's stock price during the period February 6–May 11, 2020. She assumes that I would "start[] by calculating the 'Company-specific price

---

[72] Jiang Report, ¶13. *See also* Jiang Report, §III ("The Nye Methodology Fails to Consider the Absence of Any Alleged Inflation in Forescout's Stock Price From February 6 To May 11, 2020").

[73] Jiang Report, ¶35. *See also* Opposition to Class Certification, pp. 11–12.

[74] Jiang Report, ¶48.

[75] Jiang Report, ¶45.

movement caused by the revelation of true facts' and treating it as the price inflation that was present on all prior days in the Proposed Class Period."[76]  However, as stated in the Nye Report, "I have not, as of yet, been asked to provide an opinion on loss causation or to calculate Class-wide damages in this matter."[77]  Thus, to date, I have not presented any estimate of price inflation for any days during the Class Period.

26.     Nevertheless, as I testified at deposition, "the out-of-pocket or event study damages estimation methodology can be fashioned to account for changes in price inflation due to evolving and different misstatements over the course of time,"[78] including the impact of the Company's February 6, 2020 announcement of the Advent deal:

> A. … [T]hat's the point of having a damages methodology that's consistent with plaintiffs' theory of liability.  If it implies varying inflation over time, the methodology can incorporate that and provide consistent estimates of damages.
>
> Q. Is the methodology that would be used for a purchaser prior to the takeover announcement date common with the methodology of the purchaser from after the takeover announcement date?
>
> A. Yes.
>
> Q. Why would that be the case?
>
> A. Because, again, the methodology is going to estimate the level of price inflation present in the stock as a result of the misstatements throughout the class period.  And so that measure of per-share damages will be the same for all investors, again, you just would plug in different buy and sell dates to calculate those individual damages.
>
> Q. That would also involve, would it not, taking into account the movement in price that was caused by the announcement of a takeover at a particular price amount here of $33?

---

[76] Jiang Report, ¶56.

[77] Nye Report, ¶58.  *See also* Nye Deposition, 91:9–11 ("I have not estimated price inflation at any point during the class period there.  But I think that [the event study or out-of-pocket] methodology can be used to do so.")

[78] Nye Deposition, 87:19–23.

A. **It may be that upon employing the methodology, that that would be a factor that could influence the price inflation**. But again, I have not conducted that to date.[79]

27.     Indeed, it is Dr. Jiang who is proffering affirmative opinions about the amount of inflation present in Forescout stock price without conducting the requisite analysis.  For example: (i) she has not conducted an event study;[80] (ii) she has not reviewed all of the news or analyst reports during the Class Period;[81] (iii) she has not analyzed all of the alleged corrective events;[82] (iv) she has not conducted a loss causation analysis;[83] and (v) she has not reviewed any discovery evidence.[84]  Instead, Dr. Jiang's opinions on the drivers of Forescout's stock price from February 6 to May 11, 2020, and how they purportedly imply a lack of price inflation, are

---

[79] Nye Deposition, 89:8–90:10 (emphasis added).

[80] Jiang Deposition, 22:12–20.

[81] According to Dr. Jiang, the only analyst reports she relied on are those published: (i) "within two weeks following the February 6, 2020 announcements"; and (ii) "within two weeks following the Termination Letter disclosure on May 18, 2020."  (*See* Jiang Report, ¶¶45, 60.) *See also* Jiang Report, Appendix C, and Jiang Deposition, 34:1–10:

> Q. … So if you go towards the end of this page, you identified certain analyst reports here, right?
>
> A. Yes, that's correct.
>
> Q. Now, I don't see any analyst reports here from any point in time before February of 2020.
>
> A. Yes.
>
> Q. So you never reviewed any analyst reports from before February 2020, correct?
>
> A. That's correct.

[82] Jiang Deposition, 19:5–9; 45:22–46:7; 56:16–58:1; 93:7–20; 143:12–144:1.

[83] Jiang Deposition, 90:5–9.

[84] Jiang Deposition, 28:13–20; 32:4–14.

premised **solely** on the merger arbitrage spread during this period.[85, 86]  However, as discussed

further below, her opinions are unreliable for at least two additional reasons: (i) the merger

arbitrage spread widened considerably after the Advent deal was announced (a factor Dr. Jiang

acknowledges and admits she has not accounted for); and (ii) she erroneously assumes that the

"prospect of the pending acquisition being completed at the announced deal price of $33" was

unaffected by the alleged fraud and completely independent of the Company's fundamentals.[87]

28.     Specifically, for the first two weeks following the announcement of the Advent deal (*i.e.*,

February 6 through February 20, 2020), Dr. Jiang opines that the merger arbitrage spread on

"**most**" of the trading days "**suggests** that the market viewed the probability of closing the

Advent acquisition at the announced $33 price to be high."[88]  She continues that "[f]rom

February 21, 2020 to March 5, 2020, Forescout's merger arbitrage spread remained low (ranging

between 0.09 percent and 1.66 percent), **suggesting** that the market **may** have viewed the Advent

deal as having a high probability of success."[89]  Then, "[b]etween early March and mid-April

---

[85] Jiang Deposition, 109:15–110:6; and 113:20–114:3:

> A. … [B]ased on the market data, the market aggregate assessed, the probability [of deal completion] is very close to 100 percent.  And that is what's relevant for the stock price.
>
> BY MR. JAFRI:
>
> Q. I see.  But as we discussed, that's only based on the merger arbitrage spread, and nothing else, right?
>
> A. In this case, yes.

[86] According to Dr. Jiang, "One indicator of the probability of deal success is the merger arbitrage spread (also known as the 'risk arbitrage spread' or 'speculation spread'), which can be calculated daily as the deal price less the target stock's market price, expressed as a percentage of the target's market price.  Holding all else equal, a smaller merger arbitrage spread implies a higher probability of deal completion."  (*See* Jiang Report, ¶41 (internal quotations omitted).)

[87] Jiang Report, ¶45.

[88] Jiang Report, ¶49 (emphasis added).

[89] Jiang Report, ¶49 (emphasis added).

2020," Dr. Jiang concedes that "Forescout's merger arbitrage spread spiked temporarily" to well above 2%.[90]  Indeed, as shown in the following chart, Forescout's merger arbitrage spread exceeded 2% on **most** of the trading days from February 6 through May 11, 2020.  Thus, based on Dr. Jiang's own logic, it appears that the closing of the deal was not viewed as "near certainty" for **most** of this period.[91]



---

[90] Jiang Report, ¶50.

[91] According to Dr. Jiang, "[e]ven for deals with a near certainty for success perceived by the market, the merger arbitrage spread may still be one to two percent because of the time value of money if the anticipated deal closure date is still many days away."  (*See* Jiang Report, footnote 60.)

- 28 -

29.    The only factor Dr. Jiang cites as a potential cause for this observed "spike" in Forescout's merger arbitrage spread is COVID-19.[92]  However, she "do[es] not offer a comprehensive analysis of COVID-19's impact on Forescout as that analysis is outside the scope of [her] assignment,"[93] and, as a result, she "cannot conclude [with] certainty that [] the only thing that the market thought about was the impact of COVID":

> Q. Do you have an understanding of how the probability of deal completion was reflected in the stock price?
>
> A. Yes.
>
> Q. What is that?
>
> A. It's reflected in the merger spread.
>
> Q. Okay.  So it's based on the arbitrage spread that you mentioned?
>
> A. Yes.
>
> Q. Right.  And didn't that widen in this period at some point?
>
> A. It widened during the COVID period, yes.
>
> Q. Right, yeah.  And in that period, you -- you never did any analysis of whether COVID impacted Forescout's stock price, right?
>
> MR. BROWN: Objection.
>
> ...
>
> A. **I did not conduct a full analysis of how COVID impacted Forescout stock price**.
>
> Q. So you cannot say with certainty that the arbitrage spread was widening because of the market's concerns about COVID?
>
> MR. BROWN: Objection.

---

[92] *See, e.g.*, Jiang Report, ¶50.

[93] Jiang Report, footnote 61.

THE WITNESS: **I cannot conclude for certainty that that's the only thing that the market thought about was the impact of COVID**.[94]

30.     Consistent with her admittedly incomplete analysis, Dr. Jiang's conclusions about the "drivers" of Forescout's stock price during this period are far from definitive. For example, she states that "an analysis of this temporary spike **suggests** that even in this period, Forescout's stock price was not driven by the company-specific fundamentals."[95] Similarly, Dr. Jiang asserts that "both Forescout's stock price and the S&P 500 Index declined sharply following news of the global spread of COVID-19 over the February 24 through March 20, 2020 period … before rebounding, **suggesting** that Forescout's stock price decline in March 2020 was **predominantly driven** by market-wide concerns about the COVID-19 pandemic, rather than specific information about Forescout's fundamentals."[96]

31.     Nonetheless, Dr. Jiang admits that, during this period, "COVID-19 related concerns [] lowered investors' assessment of a deal's probability of completion and in turn, a target's stock price."[97] Yet, Dr. Jiang ignores the fact that, as the deal's probability of completion declined in the eyes of investors, Forescout's fundamentals became increasingly important to the Company's stock price. Indeed, she notes that "[i]n the case of a target firm's stock, if investors perceive the pending deal's probability of success to be high, then even though public information about the stock's standalone value is still incorporated in the stock price, the market assigns little weight to such information."[98] However, if investors perceive a lower probability of deal success, then it

---

[94] Jiang Deposition, 106:2–107:6 (emphasis added).

[95] Jiang Report, ¶50 (emphasis added).

[96] Jiang Report, ¶51 (emphasis added). *See also* Jiang Report, ¶55.

[97] Jiang Report, ¶53.

[98] Jiang Report, ¶40.

follows that the market would assign a greater "weight" to publicly available information concerning Forescout's fundamentals and standalone value. Accordingly, the notion that "Forescout's stock price over this period [was driven by] 'events' decoupled from Forescout's fundamentals" is simply false.[99]

32.    More importantly, by limiting her analysis to whether the market assigned any weight to the Company's fundamentals and standalone value during the February 6–May 11, 2020 period, Dr. Jiang erroneously assumes that the alleged fraud had no impact on the pricing of the Advent deal or the probability of it closing. On the contrary, as discussed above, it is my understanding that the alleged misstatements and omissions regarding Forescout's sales pipeline and revenue projections directly contributed to Advent's take-private offer at $33 per share, and that Advent's discovery of the relevant truth (from its due diligence into Forescout's business) is what caused the Planned Acquisition to be terminated at a deal price of $33.[100] Thus, even assuming, *arguendo*, that Forescout's stock price was entirely "driven by the prospect of the pending acquisition being completed at the announced deal price of $33,"[101] it would still, by definition, be inflated by the alleged misstatements and omissions, under Lead Plaintiffs' theory of liability.

33.    To see this more concretely, consider Dr. Jiang's "simplified formula for the determinants of the stock price of a target company" following an "M&A announcement":[102]

$$P_T = P_D \times Prob_D + P_{ND} \times (1 - Prob_D),$$

where:

$P_T$ is "the market price of the target's stock";

$P_D$ is "the announced deal price";

---

[99] Jiang Report, ¶55.

[100] *See supra* ¶¶9–15.

[101] Jiang Report, ¶45.

[102] Jiang Report, ¶39.

$Prob_D$ is the probability of "deal completion"; and

$P_{ND}$ is "the target stock's standalone value (plus the reverse termination fees, if applicable)."[103]

34.     Basic algebra dictates that if the $33 deal price ($P_D$) and/or the probability of deal completion ($Prob_D$) were artificially inflated as a result of Defendants' material misrepresentations concerning Forescout's financial prospects, then the market price of the Company's stock ($P_T$) would, in turn, have been artificially inflated as well.  Indeed, at her deposition, Dr. Jiang confirmed that the Forescout's stock price would have been lower in 2020 had the market understood the deal price and/or the probability of deal completion to be lower.[104] Yet, Dr. Jiang fails to consider that, under Lead Plaintiffs' single theory of liability, had the relevant truth about Forescout's deteriorating sales pipeline and adverse demand trends been known to investors (including Advent), then the probability of the deal closing at $33 per share would have been virtually nil, thereby precluding Forescout's stock price from approaching anywhere near $33 during the February 6–May 11, 2020 period.  Accordingly, Dr. Jiang's opinion of no inflation during this period is meritless.

---

[103] Jiang Report, ¶39 (internal quotations omitted).

[104] Jiang Deposition, 100:20–101:8:

Q. And you would agree with me that if the deal price was lower, then the Forescout stock price would also be lower in 2020, right?

MR. BROWN: Objection.

THE WITNESS: Yes.  Other things equal, if the deal price is lower, if all other numbers remain the same, the stock price would be lower.

BY MR. JAFRI:

Q. And is that opinion also true for the probability of deal completion?

MR. BROWN: Objection.

THE WITNESS: If the deal probability is lower, everything else equal, the stock price would be lower.

35.    Dr. Jiang also ignores the inherent relationship between "the prospect of the pending acquisition being completed,"[105] and Forescout's fundamentals.  It is widely recognized in the academic literature that the success of a pending takeover bid depends, in large part, on the target company's fundamentals.  For example, Malmendier, Opp, and Saidi (2016) discuss possible reasons for failed takeover bids, including: (i) "failed deals associated with (typically bad) public news about the target"; and (ii) "failed deals in which the acquirer discovered (bad) information in the due diligence process."[106, 107]  Analysts following Forescout also understood that "Advent may decide to end the proposed transaction given concerns around COVID-19 **or a revaluation of the company**."[108]  In fact, when the Company "reported disappointing 1Q20 results on May 11th," it "caus[ed] investors to grow concerned about the deal price and timing."[109]  Dr. Jiang acknowledges that "bidder-initiated deal cancellations" typically convey "incremental negative

---

[105] Jiang Report, ¶45.

[106] Malmendier, Ulrike, Marcus M. Opp, Farzad Saidi, 2016, "Target revaluation after failed takeover attempts: Cash versus stock," *Journal of Financial Economics*, Vol. 199, pp. 92–106 ("Malmendier, Opp, and Saidi (2016)"), at 96.  As an example, the authors cite "the uncovering of accounting fraud in the due diligence process" as a reason for a failed takeover.  (*Id.*, p. 93.)

[107] *See also* Neuhauser, K. L., Davidson, W. N., Glascock, J. L., 2011, "An Analysis of Failed Takeover Attempts and Merger Cancellations," *International Journal of Managerial Finance*, Vol. 7, No. 4, 347–376, at 352:

> It seems useful to consider the set of alternative factors that may provide explanations for the voluntary withdrawal of the takeover bid.  First, a takeover withdrawal may occur because the bidder recognizes that the initial takeover bid was in error (i.e., the bidder comes to realize that target firm value is less than the value initially assessed by the bidder). …  The recognition of the valuation error may also occur because the bidder gains additional information about the target after making the initial bid.

[108] Macquarie, "ForeScout Technologies, FQ1'20: Bad miss, but Advent acquisition stabilizing shares," May 12, 2020, 5:46 PM (emphasis added).

[109] Macquarie, "ForeScout Technologies, ForeScout Files Complaint Against Advent," May 21, 2020, 8:01 PM.

information … beyond any public information **about the target's fundamentals**."[110]  Given this undisputed link between a target company's fundamentals and the likelihood of a successful takeover deal, it is illogical for Dr. Jiang to conclude that: (i) the allegedly fraudulent fundamentals provided to Advent had no impact on "the prospect of the pending acquisition being completed";[111] and (ii) "there is no reason to believe that those who purchased Forescout's stock over [the February 6–May 11, 2020] period suffered any damages."[112]

36.     Notwithstanding Dr. Jiang's faulty reasoning, regardless of the extent to which price inflation varies over the course of the Class Period, the out-of-pocket damages methodology is common to the Class.  Furthermore, it is my understanding that the Second Circuit's decision in "*Waggoner* explicitly rejected the notion that *Comcast* requires 'that damage calculations [ ] be so precise' as to account for 'variations in inflation over time.'"[113, 114]

---

[110] Jiang Report, ¶68 (emphasis added).

[111] Jiang Report, ¶45.

[112] Jiang Report, ¶56.

[113] *In re Signet Jewelers Ltd. Secs. Litig.,* No. 16-CIV-6728 (CM) (RWL), 2019 WL 3001084, at *20 (S.D.N.Y. July 10, 2019), quoting *Waggoner v. Barclays PLC*, 875 F.3d 79, 106 (2d Cir. 2017).  *See also, e.g.*, *Hayes v. MagnaChip Semiconductor Corp.*, No. 14-CV-01160-JST, 2016 WL 7406418, at *9 (N.D. Cal. Dec. 22, 2016); and *Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 47-48 (S.D.N.Y. 2018).

[114] *See also, e.g.*, *Vrakas v. United States Steel Corp.*, No. 17-579, 2019 WL 7372041, at *10 (W.D. Pa. Dec. 31, 2019):

> Plaintiffs also provide additional information in their Reply to address Defendants' concern that Plaintiffs have not provided guidance on accounting for "variations in alleged price inflation."  Pl. Class Cert. Reply at 7.  First, Plaintiffs highlight that the inflation ribbon will be applied the same way for all proposed Class members—and also note that Defendants' expert, Dr. Zurek agrees that inflation would be the same for all class members.  *Id.*  They then maintain that this argument is premature for the class certification stage because it has no bearing on whether the damages methodology itself applies to all Class members, citing examples of other courts that have held that this argument more appropriately applies to the "quantification and allocation of damages" rather than

### c.   May 18, 2020: Dr. Jiang's Criticism of the Event Study Methodology Is Meritless; An Event Study Can Control for Confounding Information

37.    Dr. Jiang asserts that, "under the Nye Methodology, [the entire] 'Company-specific' price decline" on May 18, 2020 "would be used to quantify the Alleged Merger Inflation previously present in Forescout's stock price."[115]  She states that "it is inappropriate to treat Forescout's entire abnormal return following the Termination Letter disclosure as the removal of the Alleged Merger Inflation.  Consequently, it is necessary to separate out the Alleged Merger Inflation from Forescout's abnormal return on May 18, 2020."[116]

38.    However, Dr. Jiang once again has no basis to assume that the entire Company-specific price decline on May 18, 2020 "would be used to quantify the Alleged Merger Inflation previously present in Forescout's stock price."  At this early stage of the litigation, I have not conducted an analysis of loss causation or calculated Class-wide damages.  Moreover, Dr. Jiang's critique simply boils down to her own personal requirement that Lead Plaintiffs' proposed damages methodology must establish, at the class certification stage, the precise mechanisms by which "the price impact of any purported correction of the Alleged Merger Misstatement [can be separated] from other confounding factors" that may have influenced "Forescout's price decline on May 18, 2020."[117]  However, it is my understanding that no such requirement exists.  Rather, Lead Plaintiffs' Counsel has informed me that "Courts have long

---

whether common issues of law and fact predominate.  *RH*, 2018 WL 4931543, at *4 (noting that "courts consistently find [these criticisms] are not appropriately raised at the class certification stage").  The Court agrees.

[115] Jiang Report, ¶57.

[116] Jiang Report, ¶58.  Dr. Jiang defines the "Termination Letter" as when "Advent notified Forescout on May 15, 2020 that it would not proceed with the acquisition as scheduled."  (*See* Jiang Report, ¶27.)

[117] Jiang Report, ¶59.

held that 'Plaintiffs are not required at [the class certification] stage to demonstrate that any price impact was due to the prior misrepresentation alone.' *Pirnik v. Fiat Chrysler Automobiles, N.V.*, 327 F.R.D. 38, 46 (S.D.N.Y. 2018); see also *Haliburton I*, 563 U.S. at 807."[118]

39.    Nevertheless, to the extent that any truly confounding information was disclosed on the corrective event dates, it is widely recognized that an event study can be fashioned so as to isolate the effects of confounding events.  Indeed, MacKinlay (1997), a widely cited academic primer on event study analysis, states that:

> Over the decades from the early 1930s until the late 1960s the level of sophistication of event studies increased.  John H. Myers and Archie Bakay (1948), C. Austin Barker (1956, 1957, 1958), and John Ashley (1962) are examples of studies during this time period.  The improvements included removing general stock market price movements and separating out confounding events.
>
> ***
>
> Ideally the empirical results will lead to insights relating to understanding the sources and causes of the effects (or lack of effects) of the event under study.  Additional analysis may be included to distinguish between competing explanations.[119]

I further understand that courts have "reject[ed] the suggestion that an event study is incapable of disaggregating the effects of confounding information.  Were it otherwise, nearly every securities fraud class action would fail."[120]

---

[118] *In re Allergan PLC Sec. Litig.*, No. 18-CIV-12089 (CM)(GWG), 2021 WL 4077942, at *15 (S.D.N.Y. Sep. 8, 2021).

[119] MacKinlay (1997), pp. 14, 15–16.  According to Google Scholar, MacKinlay (1997) has been cited by at least 7,323 other academic publications.

[120] *In re Allergan PLC Sec. Litig.*, No. 1-CIV-12089 (CM)(GWG), 2021 WL 4077942, at *15 (S.D.N.Y. Sep. 8, 2021), quoting *In re Signet Jewelers Ltd. Secs. Litig.*, No. 16-CIV-6728 (CM) (RWL), 2019 WL 3001084, at *20 (S.D.N.Y. July 10, 2019).

40.    At deposition, I discussed at length the fact that "the event study is more than just a regression model," and there are "tools of financial economics" that can be used to disentangle the effects of various company-specific pieces of information on a stock price:

A. Well, the event study is more than just a regression model.  So for the purposes of this class certification report where I'm assessing market efficiency, no, I have not disentangled the various company-specific pieces of information and their effects on the market price on every day during the class period.  I've estimated those company-specific reactions in total.  However, the event study methodology includes additional analyses of that company-specific return that can be utilized to distinguish between competing information, company-specific information and its effect.  And those analyses include discounted cash flow modeling, looking at the academic findings with respect to certain corporate events and their conditional average effect on a stock price.  Analyst can be helpful in disentangling company-specific information in the sense that some analysts will model different components to an informational disclosure and describe how it influences their understanding of the price.  I think it's called content analysis.  There's also option pricing theory can be applied because there is an element of probabilities and under uncertainty that is part of the option pricing framework that can be teased out.  There's other tools of financial economics that can be applied that are all within the construct of the event study, it's just that they are in addition to the regression model. …

Q. … your opinion at this stage is simply about the availability of a methodology for conducting those things is -- it is not itself an analysis on any given day of what the price effect was of any particular information?

MR. JAFRI: Objection, form.

THE WITNESS: That's correct, I have not analyzed damages or assessed loss causation.  I haven't been asked to.  My understanding is that's improper at the class certification stage to do so.[121]

41.    In rebuttal, Dr. Jiang asserts that she is "not aware of any well-accepted extensions of the event study methodology that would permit one to reliably allocate a single price drop to the impact of 'competing information' (*e.g.*, removal of the Alleged Merger Inflation versus changes in Forescout's standalone value)."[122]  She also claims that none of the "'disentangling' methods"

---

[121] Nye Deposition, 74:25–77:19.

[122] Jiang Report, ¶71. *See also* Opposition to Class Certification, pp. 15–16.

I discussed at my deposition "are suitable for reliably separating out the Alleged Merger Inflation from Forescout's abnormal return on May 18, 2020."[123]  Yet, Dr. Jiang never defines what could be considered a "[r]eliable [m]ethod for [d]isentangling the [i]mpacts of '[c]ompeting [i]nformation.'"[124]  Instead, all of her criticisms merely demand that I provide the underlying assumptions and inputs to the disentanglement methodology at this early stage of the litigation.[125]  As discussed above, it is my understanding that there is no requirement that "damage calculations must be so precise at this juncture,"[126] given that these are quintessential loss causation issues that require the weighing of discovery evidence regarding Defendants' liability in this matter.[127]

42.      Regardless, Dr. Jiang fails to identify any truly confounding information that cannot be reliably disentangled from the negative effects of the alleged corrective information disclosed on May 18, 2020.  Specifically, she points to "commentary from some analysts **suggest[ing]** that Forescout's price decline on May 18, 2020 was the result of investors' assessment of several

---

[123] Jiang Report, ¶72.

[124] Jiang Report, §§V.A, V.B, V.C.

[125] For example, Dr. Jiang states that: (i) I must have "reliable projections of the future cash flows" in order to use a discounted cash flow model (*see* Jiang Report, ¶73); (ii) I must identify the academic findings and corporate events "that could reasonably form the basis of such an analysis" (*see* Jiang Report, ¶76); and (iii) my "claim with respect to the analyst report review is vague" (*see* Jiang Report, ¶¶78–79).  With respect to options analysis, Dr. Jiang concedes that "academic literature [] estimates the probability of a deal's success based on the target's stock and option prices," and that option prices can be used to "'backout' the standalone value portion of Forescout's stock price."  However, she argues that the analysis would be based on "arbitrary assumptions."  (*See* Jiang Report, ¶¶81, 82, 89.)

[126] *Waggoner v. Barclays PLC*, 875 F.3d 79, 106 (2d Cir. 2017).

[127] *See supra* ¶¶20, 21.

factors."[128, 129]  However, the first four of the five factors she identifies are directly related to the alleged corrective "disclosure of Advent's refusal to proceed with the Acquisition,"[130] which caused the market to reassess the "probability of the Advent deal being completed at the originally announced deal price of $33," versus other outcomes.[131]

43.     The fifth factor identified by Dr. Jiang is "[a]n assessment of the decline in Forescout's standalone value since February 6, 2020 due to confounding factors not attributable to a correction of any alleged misstatements, which include, among other things, COVID-19's impact on Forescout's customers and business prospects."[132]  However, Dr. Jiang fails to mention that, in the related Delaware action, Forescout denied that COVID-19 had a "materially disproportionate adverse effect" on its business compared to its peer companies.[133]  Thus, when

---

[128] Jiang Report, ¶58 (emphasis added).

[129] Tellingly, Dr. Jiang has no opinion on what caused Forescout's stock price to drop on May 18, 2020.  *See* Jiang Deposition, 75:11–19:

> Q. So what, in your view, were the factors that caused that stock price to drop?
>
> MR. BROWN: I am going to object.  Not nearly within the scope of any opinions she's offering here.  But you can answer, if you like.
>
> THE WITNESS: So, indeed, I was not asked to analyze what caused the stock price drop on the 18th …

[130] Complaint, ¶71.

[131] Jiang Report, ¶58. The first four factors listed by Dr. Jiang are: (i) "A revised (lower) probability of the Advent deal being completed at the originally announced deal price of $33"; (ii) "A revised (higher) probability of the deal being completed at a lower deal price"; (iii) "A revised probability of the deal not being completed and Advent paying Forescout a reverse termination fee"; and (iv) "A revised probability of the deal not being completed and Advent not paying Forescout a reverse termination fee."  (*See id*.)

[132] Jiang Report, ¶58 (internal quotations omitted).

[133] *See, e.g., Forescout Technologies, Inc. v. Ferrari Group Holdings, L.P. & Ferrari Merger Sub, Inc.*, C.A. No. 2020-0385-SG, Verified Complaint, May 19, 2020, ¶84:

> There has been no disproportionate impact of COVID-19 on Forescout that could support Advent's invocation of an MAE. …

appropriate, at the merits stage of this litigation, the effect of COVID-19 on Forescout's

customers and business prospects, and in turn the Company's stock price, can readily be

controlled for by analyzing the stock price performance of Forescout's peer group during this

time period.  For example, the Nye Report identifies the companies in Forescout's industry,[134]

and contains regression analyses that "measure the relationship between Forescout stock returns

and 1) changes in market-wide factors that would be expected to impact all stocks; and 2)

changes in industry-wide factors that would be expected to impact stocks in the 'Infrastructure

Software' industry."[135]  The standard event study framework discussed in the Nye Report is

more than capable of disentangling the price impact of COVID-19 and any other confounding

market- and/or industry-wide effects Dr. Jiang has in mind.

### d.  Defendants Incorrectly Claim That Damages Must Be Allocated Between Theories of Liability at the Class Certification Stage

44.     Defendants contend that "Plaintiffs' damages model does not—and could not—parse out

the damages attributable to each of the two distinct theories of liability."[136]  More specifically,

they contend that the damages model must "articulate a method for separating out (i) any alleged

inflation from May 11, 2020 through May 15, 2020 that purportedly was due to the alleged

---

Although many companies, including customers of Forescout, have told employees to shelter in place, Forescout has continued to pursue business opportunities, including the large eight-figure deal it expects to close in the second quarter of 2020.  In addition, despite the challenges created by COVID-19 and the announcement of the Merger, Forescout's subscription business was up 11 percent in Q1 2020.  Q1 2020 can hardly be seen as indicative of Forescout's (or any company's) long-term financial performance, given the recent COVID-19 outbreak in the United States.  There is no evidence of any sustained long-term impact on Forescout's prospects.

[134] Nye Report, ¶69, Exhibit 11C.

[135] Nye Report, ¶66.

[136] Opposition to Class Certification, p. 14.

pipeline misstatements from (ii) any alleged inflation during this time period that purportedly was due to the alleged Merger misstatement."[137]

45.    However, it is my understanding that no such disaggregation is required at this time.[138] As stated above, it is my understanding that: (i) Lead Plaintiffs have advanced a single theory of liability, in which the "alleged pipeline misstatements" and "the alleged Merger misstatement"[139] both stem from the same substantial negative information concerning demand for Forescout's products and the Company's ability to generate revenue; and (ii) Lead Plaintiffs allege a causal connection between the alleged misrepresentations and the actual losses suffered by Class members upon the revelation of the relevant truth on the corrective event dates.  Accordingly, there is no need to "disaggregate any alleged inflation caused by the two different types of alleged misstatements,"[140] and it is clear that "this is a case in which the Plaintiff's 'proposed measure for damages is … directly linked with their underlying theory of classwide liability … and is therefore in accord with the Supreme Court's … decision in *Comcast*.' *U.S. Foodservice,* 729 F.3d at 123 n.8."[141]

---

[137] Opposition to Class Certification, p. 14.  *See also* Jiang Report, ¶16.

[138] *See supra* note 60, quoting, *e.g.*, *Ferris v. Wynn Resorts Limited*, No. 18-cv-00479-APG-DJA, 2023 U.S. Dist. LEXIS 35374, at *37–38 (D. Nev. Mar. 1, 2023); *In re Apple Inc. Securities Litigation*, No. 19-CV-2033-YGR, 2022 WL 354785, at *12 (N.D. Cal. Feb. 4, 2022); *Hatamian v. Advanced Micro Devices, Inc*., No. 14-CV-00226-YGR, 2016 WL 1042502, at *9 (N.D. Cal. Mar. 16, 2016); *Hayes v. MagnaChip Semiconductor Corp.*, No. 14-CV-01160-JST, 2016 WL 7406418, at *9 (N.D. Cal. Dec. 22, 2016); *City of Miami Gen. Employees' & Sanitation Employees' Ret. Trust v. RH, Inc.*, No. 17-CV-00554-YGR, 2018 WL 4931543, at *3-4 n.3 (N.D. Cal. Oct. 11, 2018); and *SEB Inv. Mgmt. AB v. Symantec Corp.*, No. C 18-02902 WHA, 335 F.R.D. 276, 288 (N.D. Cal. 2020).

[139] Opposition to Class Certification, p. 14.

[140] Opposition to Class Certification, p. 15.

[141] *Waggoner* v. *Barclays PLC*, 875 F.3d 79, 106 (2d Cir. 2017).

46.     In any event, as discussed in more detail in §V.c, Defendants' and Dr. Jiang's assertion that an event study is incapable of disaggregating the effects of confounding information is meritless.[142]   To the extent certain alleged corrective event dates also contain material disclosures wholly unrelated to allegations which survive to trial, my proposed methodology can be adapted to the operative set of alleged misstatements at that time.

**VI.     There Is No Economic Basis for Defendants' and Dr. Jiang's Contention That a Conflict Exists Between the Lead Plaintiffs, and "Different Cohorts" of the Class, Due to the Timing of Their Transactions**

47.     According to Dr. Jiang, "[u]nder the Continuing Sales Pipeline Inflation Theory, … both the Alleged Merger Inflation and the Alleged Sales Pipeline Inflation were removed from Forescout's stock price on May 18, 2020."[143]   Nonetheless, Dr. Jiang bleakly opines that:

> even if one were to assume that these two types of alleged price inflation could be reliably disentangled, each type of alleged inflation is only relevant for a particular cohort of the Proposed Class.  Specifically, the Alleged Merger Inflation is only relevant for assessing damages purportedly suffered by those who bought Forescout stock from May 12 to 15, 2020, whereas the Alleged Sales Pipeline Inflation is only relevant for assessing damages purportedly suffered by those who bought Forescout stock before February 6, 2020.  This would create a conflict between these two cohorts of the Proposed Class.[144]

48.     Similarly, Dr. Jiang opines that Lead Plaintiffs Glazer and Meitav "do not belong to the same cohort by economic reasoning, and any attempt to disentangle the Alleged Sales Pipeline

---

[142] *See also supra* note 60, quoting *In re Allergan PLC Sec. Litig.*, No. 18-CIV-12089 (CM)(GWG), 2021 WL 4077942, at *15 (S.D.N.Y. Sep. 8, 2021), quoting *In re Signet Jewelers Ltd. Secs. Litig.*, No. 16-CIV-6728 (CM) (RWL), 2019 WL 3001084, at *20 (S.D.N.Y. July 10, 2019).

[143] Jiang Report, ¶91.

[144] Jiang Report, ¶94.

- 42 -

Inflation from the Alleged Merger Inflation would create a conflict between them."[145, 146]

Apparently, this is because "Glazer, as a merger arbitrageur, is differently situated compared to typical pre-February 6, 2020 non-arbitrageur investors pursuing the Alleged Sales Pipeline Damages claim," since "a merger arbitrageur's return does not primarily depend on Forescout's value as a going concern (including the health and strength of its sales pipelines), but on the likelihood of the Advent acquisition's successful completion."[147]  Dr. Jiang further states that "[t]he conflict between Glazer's and Meitav's damages claims illustrates the broader dispute that is likely to arise between members of the Proposed Class who, like Meitav, mostly purchased Forescout shares between May 9, 2019 and February 5, 2020 ('Cohort 1') and those who, like Glazer, primarily purchased Forescout stock between May 12 and 15, 2020 ('Cohort 2')."[148]

49.      However, Dr. Jiang's opinion that there is a conflict between pre- and post-February 6, 2020 purchasers is entirely based on her incorrect assumption that the "Sales Pipeline Inflation Theory" is separate and distinct from the "Merger Inflation Theory."  On the contrary, as discussed above, under Lead Plaintiffs' **single** theory of liability, Defendants concealed Forescout's adverse demand trends and the impact such trends were having on the Company's financial prospects, including the Company's ability to successfully close the pending Advent acquisition.  Advent allegedly backed out of the deal due to the revelation of the truth regarding "[Forescout's] actual recent financial performance," as well as "information received from

---

[145] Jiang Report, ¶95.  *See also* Opposition to Class Certification, §II.B.

[146] Herein, "Glazer" refers collectively to Glazer Capital Management, L.P., Glazer Enhanced Fund L.P., Glazer Enhanced Offshore Fund, Ltd., Glazer Offshore Fund, Ltd. and Highmark Limited, in respect of its Segregated Account Highmark Multi-Strategy.  "Meitav" refers to Meitav Tachlit Mutual Funds Ltd.

[147] Jiang Report, ¶99.

[148] Jiang Report, ¶101.

[Forescout] regarding the Company's expected future financial performance for the fiscal year 2020 and beyond,"[149] which Lead Plaintiffs allege had been concealed throughout the Class Period (via Defendants' "Alleged 2019 Sales Pipeline Misstatements") in an "effort to obtain a premium price … [from] potential acquirers anticipating even higher revenue growth in 2020."[150]  Under Lead Plaintiffs' **single** theory of liability, the "Alleged Merger Misstatement" on May 11, 2020, therefore, served to maintain the remaining price inflation initially created by the "Alleged 2019 Sales Pipeline Misstatements" by preventing the relevant truth from becoming public—namely, that Advent "could not 'make the numbers work' for the planned acquisition and expressed concerns regarding whether the conditions for closing could be met."[151]

50.     Dr. Jiang never explains why all investors, who were misled about Forescout's demand trends and the impact such trends were having on the Company's financial prospects, including the Company's ability to successfully close the pending Advent transaction, would not be equally enthusiastic about recouping their collective economic losses incurred on May 18, 2020, regardless of when they purchased Forescout stock.  Indeed, Lead Plaintiffs' **single** theory of liability directly implies that all Class Period purchasers who held Forescout stock through May 18, 2020 incurred the same economic loss as a result of the revelation of the relevant truth concealed by **all** of Defendants' prior misstatements and omissions.  Accordingly, when each Class member acquired Forescout stock during the Class Period is irrelevant, and there is no conflict across the Class with respect to the calculation of damages.  As described in the Nye Report, "[a]lthough damages, if any, for each individual Class member may vary, the

---

[149] Complaint, ¶70.

[150] Motion for Class Certification, p. 5.  *See also* Complaint, ¶¶10, 11.

[151] Motion for Class Certification, p. 5.

methodologies for calculating damages … would be commonly applicable to each Class member in this matter."[152]

51.    Furthermore, it is my understanding that Lead Plaintiffs have asserted the "fraud on the market" presumption of reliance,[153] which is based "on the fairly modest premise that 'market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices.'"[154]  Under this theory, I understand that "investors' reliance on any public material misrepresentations and/or omissions may be presumed for purposes of a Rule 10b-5 action since the effects of those misrepresentations and/or omissions will already be impounded in the market price."[155, 156]  As such, individual differences in the investment decisions with respect to Forescout stock are irrelevant to the Class-wide damages model.  Under Lead Plaintiffs' fraud-on-the-market theory, the alleged misstatements and omissions impacted all Class members equally since those misrepresentations were reflected in the efficient market price of Forescout stock, which was artificially inflated by the alleged fraud throughout the Class Period.[157]  In fact, as described in the Nye Report, "[a]rbitrage activity is a

---

[152] Nye Report, ¶60.  *See also* Nye Deposition, 88:6–89:2.

[153] *See* Nye Report, ¶11.

[154] *See* Nye Report, ¶12, quoting *Halliburton II*, 134 S. Ct. at 2403 (quoting *Basic*, 485 U.S. at 246, n. 24).

[155] Nye Report, ¶15, citing *Basic*, 485 U.S. at 241–42, 244, quoting *Peil v. Speiser*, 806 F.2d 1154, 1160–61 (3d Cir. 1986).  *See also Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804 (2011).

[156] *See also* Nye Report, §VI demonstrating the efficiency of the market for Forescout stock during the Class Period.

[157] Notably, Dr. Jiang does not dispute that the market for Forescout stock was efficient throughout the Class Period.  (*See* Jiang Deposition, 21:23–22:2.)

critical element of modern, efficient security markets," and "[a]rbitrageurs ensure that market prices reflect public information."[158]

## VII.    Conclusion

52.    In sum, all of Defendants' and Dr. Jiang's criticisms of the damages methodology described in the Nye Report involve loss causation and damages issues that are necessarily common among all Class members.  The event study analysis applies to all Class members, regardless of the extent to which the stock price movement is due to a corrective disclosure and/or the materialization of a concealed risk.  If the Court requires at trial the types of disentanglement Defendants and Dr. Jiang urge, the analysis will focus on events applicable to **all** market participants transacting in Forescout shares at a given time, not the specific circumstances of individual investors.  Thus, the currently premature loss causation analyses Defendants and Dr. Jiang advance could be established with common proof.  Similarly, if at the time loss causation and damages are analyzed, it is determined that price inflation did vary with certain fraud-related misrepresentations or non-fraud-related factors, those variations would be reflected in the inflation band used to calculate damages for the entire Class.  Nothing in the Jiang Report or the Opposition to Class Certification changes my opinion that damages under Section 10(b), for investors who purchased or otherwise acquired Forescout stock during the Class Period, can be calculated using a methodology that is common to the Class and in a manner that is consistent with Lead Plaintiffs' theory of liability.

---

[158] Nye Report, ¶35, footnote 57, quoting Sharpe, William F., *et al.*, *Investments*, Prentice Hall, 6th ed., 1999, p. 284.

- 47 -

53.     My work in this matter is ongoing.  My opinions in this Report are subject to refinement or revision based on analysis of new information which may be provided to me, including the opinions of other experts, receipt of additional documents and data, and based on further analysis of the data and materials described herein.  I understand that discovery is ongoing.  Should additional relevant information be provided to me, my opinions may be supplemented at a later date.

Executed on March 11, 2024, at Redwood City, California.

Zachary Nye, Ph.D.

**Exhibit 1**



702 MARSHALL STREET, SUITE 200
REDWOOD CITY, CA 94063
650.298.0200
WWW.SCGINC.COM

## Zachary R. Nye
*Email:* zach@scginc.com

---

### Education

**Ph.D. – University of California, Irvine**                                     2009
Finance                                                                Irvine, California

- Dissertation: Macro-Augmented Volatility Forecasting.

- Research Interests: Market efficiency of underlying and derivative securities, volatility forecasting, risk management, financial econometrics, valuation and corporate finance.

- Teaching Experience: Corporate Finance, Investments, and Risk Management.

**M.Sc. – London Business School**                                          2004
Finance                                                                London, England

- Earned distinction for Masters Thesis on the informational efficiency of credit-linked notes.

**A.B. – Princeton University**                                              2001
Economics                                                          Princeton, New Jersey

---

### Employment History

**Vice President**                                              Summer 2015 – present
Stanford Consulting Group, Inc.                            Redwood City, California

The Stanford Consulting Group, Inc. provides economic research and expert testimony for business litigation, as well as regulatory and legislative proceedings.

Responsibilities include:

- quantifying economic damages (*e.g.*, present value of expected future earnings, price inflation, lost profits, unjust enrichment, reasonable royalties);

- enterprise, project, equity, debt, derivative-security and intellectual-property valuation;

- assessing the informational efficiency of financial securities;

- analyzing fairness opinions related to corporate mergers and acquisitions;

- econometric modeling and analysis;

- marginal cost analysis;

- preparing expert reports and declarations;

- providing deposition and trial testimony; and

- supporting counsel in preparation for cross examination of opposing experts.

**Senior Consultant**                                      Summer 2009 – Summer 2015
Stanford Consulting Group, Inc.                            Redwood City, California

# Exhibit 1

**Associate**                                                                    Summer 2004 – Summer 2005
Stanford Consulting Group, Inc.                                          Redwood City, California

**Mortgage Consultant**                                                        Fall 2002 – Summer 2003
Woolwich PLC                                                                           Oxford, UK

**Trading Desk Specialist**                                                    Fall 2001 – Summer 2002
Merrill Lynch, Defined Asset Funds                                    Plainsboro, New Jersey

---

### Academic Research

Nye, Zachary and Mark Washburn, 2013, "Macro-Augmented Volatility Forecasting," *Western Decision Sciences Institute Proceedings*. Paper presented at the WDSI Annual Meeting, Long Beach, California, March 27, 2013. Winner of the 2013 Best Theoretical/Empirical Research Paper Awards.

Nye, Zachary and Philippe Jorion, 2009, "Macro-Augmented Volatility Forecasting," Working Paper, University of California at Irvine.

Nye, Zachary and Timothy C. Johnson, 2005, "Market Efficiency's Hidden Teeth: An Unambiguous Test for Derivative Securities," Working Paper, London Business School.

---

### Testimony

Charles Larry Crews, Jr., et al. v. Rivian Automotive, Inc., et al., United States District Court, Central District of California, Case No. 2:22-cv-01524-JLS-E
            Deposition                         January 12, 2024

In re Talis Biomedical Securities Litigation, United States District Court, Northern District of California, Case No. 3:22-cv-00105-SI
            Deposition                         December 8, 2023

In re Apache Corp. Securities Litigation, United States District Court, Southern District of Texas, Houston Division, Case No. 4:21-cv-00575
            Deposition                         November 8, 2023
            Evidentiary Hearing           December 6, 2023

Altimeo Asset Management, et al. v. Qihoo 360 Technology Co. Ltd., et al., United States District Court, Southern District of New York, Case No. 1:19-cv-10067-PAE
            Deposition                         November 30, 2023

Christopher L. Sayce, et al. v. Forescout Technologies, Inc., et al., United States District Court, Northern District of California, San Francisco Division, Case No. 3:20-cv-00076-SI
            Deposition                         November 20, 2023

In re Alta Mesa Resources, Inc. Securities Litigation, United States District Court, Southern District of Texas, Houston Division, Case No. 4:19-cv-00957
            Deposition                         November 14, 2023

Miriam Edwards, et al. v. McDermott International, Inc., et al., United States District Court, Southern District of Texas, Houston Division, Case No. 4:18-cv-04330
            Deposition                         April 26, 2023
            Evidentiary Hearing           September 27, 2023

# Exhibit 1

Halman Aldubi Provident and Pension Funds Ltd., et al. v. Teva Pharmaceuticals Industries Limited, et al., United States District Court, Eastern District of Pennsylvania, Case No. 2:20-cv-04660-KSM

| | |
|---|---|
| Deposition | November 4, 2022 |
| Evidentiary Hearing | September 21, 2023 |

John V. Ferris, et al. v. Wynn Resorts Limited, et al., United States District Court, District of Nevada, Case No. 2:18-cv-00479-GMN-DJA

| | |
|---|---|
| Deposition | August 26, 2022 |
| Deposition | January 31, 2023 |

In re Jernigan Capital, Inc. Securities Litigation, United States District Court, Southern District of New York, Case No. 1:20-cv-09575-JLR

| | |
|---|---|
| Deposition | January 27, 2023 |

Ali Karimi, et al. v. Deutsche Bank AG, et al., United States District Court, Southern District of New York, Case No. 1:22-cv-02854-JSR

| | |
|---|---|
| Deposition | August 12, 2022 |

Teresa Doskocz, et al. v. ALS Lien Services, et al., Superior Court of California, County of Contra Costa, Case No. C17-01486

| | |
|---|---|
| Deposition | April 23, 2018 |
| Deposition | March 8, 2022 |
| Deposition | April 14, 2022 |
| Trial | April 29, 2022 |

Paul Hayden, et al. v. Portola Pharmaceuticals, Inc., et al., United States District Court, Northern District of California, Case No. 3:20-cv-00367-VC

| | |
|---|---|
| Deposition | March 30, 2022 |

United States of America ex rel. Lori Morsell, et al. v. Symantec Corporation, United States District Court for the District of Columbia, Civil Action No. 12-cv-0800 (RC)

| | |
|---|---|
| Deposition | March 13, 2019 |
| Trial | March 22, 2022 |

United States of America ex rel. Tiffany Montcrieff, et al. v. Peripheral Vascular Associates, P.A., United States District Court for the Western District of Texas, San Antonio Division, Civil Action No. SA-17-CV-00317-XR

| | |
|---|---|
| Deposition | July 31, 2020 |
| Trial | February 14, 2022 |

In re Advance Auto Parts, Inc. Securities Litigation, United States District Court, District of Delaware, Case No. 1:18-CV-00212-RGA

| | |
|---|---|
| Deposition | July 14, 2020 |
| Deposition | September 30, 2021 |

In re Allergan PLC Securities Litigation, United States District Court, Southern District of New York, Civil Action No. 18-CV-12089-CM

| | |
|---|---|
| Deposition | May 19, 2020 |
| Deposition | September 27, 2021 |

Gabby Klein, et al. v. Altria Group, Inc., et al., United States District Court, Eastern District of Virginia, Richmond Division, Case No. 3:20-cv-00075-DJN

| | |
|---|---|
| Deposition | August 31, 2021 |

In re Tahoe Resources, Inc. Securities Litigation, United States District Court, District of Nevada, Case No. 2:17-cv-01868-RFB-NJK

| | |
|---|---|
| Deposition | August 4, 2021 |

# Exhibit 1

Hawaii Structural Ironworkers Pension Trust Fund, et al. v. AMC Entertainment Holdings, Inc., et al., United States District Court, Southern District of New York, Case 1:18-cv-00299-AJN-SLC

| | |
|---|---|
| Deposition | July 9, 2020 |
| Deposition | July 28, 2021 |

In re Mylan N.V. Securities Litigation, United States District Court, Southern District of New York, Case No. 1:16-CV-07926 (JPO)

| | |
|---|---|
| Deposition | November 22, 2019 |
| Deposition | July 20, 2021 |

Oregon Laborers Employers Pension Trust Fund, et al. v. Maxar Technologies Inc., et al., United States District Court, District of Colorado, Case No. 1:19-cv-00124-WJM-SKC

| | |
|---|---|
| Deposition | May 28, 2021 |

Roei Azar, et al. v. Yelp, Inc., et al., United States District Court, Northern District of California, Case No. 3:18-cv-00400-EMC

| | |
|---|---|
| Deposition | March 2, 2021 |

Roofers' Pension Fund, et al. v. Joseph C. Papa, et al., United States District Court, District of New Jersey, Civil Action No. 2:16-cv-02805-MCA-LDW

| | |
|---|---|
| Deposition | April 2, 2019 |
| Deposition | January 14, 2021 |

Utah Retirement Systems, et al. v. Healthcare Services Group, Inc., et al., United States District Court, Eastern District of Pennsylvania, Case No. 2:19-cv-01227-ER

| | |
|---|---|
| Deposition | December 10, 2020 |

Matt Karinski, et al. v. Stamps.com, Inc., et al., United States District Court, Central District of California, Case No. 2:19-cv-01828-MWF-SK

| | |
|---|---|
| Deposition | August 14, 2020 |

Alexandre Pelletier, et al. v. Endo International PLC, et al., United States District Court, Eastern District of New Pennsylvania, Civil Action No. 2:17-cv-05114-MMB

| | |
|---|---|
| Deposition | July 27, 2020 |

In re Zillow Group, Inc. Securities Litigation, United States District Court, Western District of Washington at Seattle, Case No. 2:17-cv-01387-JCC

| | |
|---|---|
| Deposition | March 10, 2020 |

Joseph Prause, et al. v. TechnipFMC plc, et al., United States District Court, Southern District of Texas, Houston Division, Case No. 4:17-cv-02368

| | |
|---|---|
| Deposition | February 5, 2020 |
| Deposition | March 9, 2020 |

In re Quorum Health Securities Litigation, United States District Court, Middle District of Tennessee, Case No. 3:16-cv-02475

| | |
|---|---|
| Deposition | August 17, 2018 |
| Deposition | January 14, 2020 |

In re Snap Inc. Securities Litigation, United States District Court, Central District of California, Western Division, Case No. 2:17-cv-03679-SVW-AGR

| | |
|---|---|
| Deposition | December 13, 2019 |

Jet Capital Master Fund, L.P., et al. v. American Realty Capital Properties, Inc., et al., United States District Court, Southern District of New York, Case No. 1:15-cv-00307-AKH

| | |
|---|---|
| Deposition | July 26, 2019 |

# Exhibit 1

City of Pontiac General Employees' Retirement System, et al. v. Dell Inc., et al., United States District Court, Western District of Texas, Austin Division, Case No. 1:15-cv-00374-LY
          Deposition          April 19, 2017
          Deposition          November 6, 2018

Pirnik v. Fiat Chrysler Automobiles N.V., et al., United States District Court, Southern District of New York, Case No. 1:15-CV-07199-JMF
          Deposition          February 2, 2018
          Deposition          September 13, 2018

Bradley Cooper, et al. v. Thoratec Corporation, et al., United States District Court, Northern District of California, Oakland Division, Case No. 4:14-cv-00360-CW
          Deposition          March 6, 2018

L-3 Communications Corporation, et al. v. Serco, Inc., United States District Court for the Eastern District of Virginia, Case No. 1:15-cv-701-GBL-JFA
          Deposition          October 22, 2015
          Deposition          October 18, 2017

In re Juno Therapeutics, Inc., United States District Court of Western District of Washington at Seattle, Case No. C16-1069RSM
          Deposition          October 4, 2017

Brad Mauss, et al. v. NuVasive, Inc., et al., United States District Court, Southern District of California, Case No.: 13-cv-02005-JM
          Deposition          December 20, 2016
          Deposition          August 28, 2017

In re Akorn, Inc. Securities Litigation, United States District Court, Northern District of Illinois, Eastern Division, Case No. 15-CV-01944
          Deposition          June 21, 2017

In re Ocwen Financial Corporation Securities Litigation, United States District Court, Southern District of Florida, Case 14-81057-CIV-WPD
          Deposition          September 23, 2016
          Deposition          March 28, 2017

Stephen Calfo, et al. v. John P. Messina, Sr., et al., United States District Court, Southern District of New York, Civil Action No. 15 Civ. 04010 (LGS)
          Deposition          January 5, 2017

In re EZCORP, Inc. Securities Litigation, United States District Court, Southern District of New York, Case No. 14-cv-6834 (ALC)
          Deposition          October 14, 2016

Arthur Menaldi, et al. v. Och-Ziff Capital Management Group LLC, et al., United States District Court, Southern District of New York, No. 14-CV-03251-JPO
          Deposition          October 3, 2016

Keith Thomas, et al. v. MagnaChip Semiconductor Corp., et al., United States District Court, Northern District of California, Case No. 3:14-cv-01160-JST
          Deposition          September 16, 2016

In re Rocket Fuel, Inc. Securities Litigation, United States District Court, Northern District of California, Oakland Division, Case No. 4:14-cv-03998-PJH
          Deposition          September 14, 2016

# Exhibit 1

Barbara Strougo, Individually and on Behalf of All Others Similarly Situated v. Barclays PLC, et al., United States District Court, Southern District of New York, Case No. 14-cv-5797 (SAS)

| | |
|---|---|
| Deposition | August 11, 2015 |
| Evidentiary Hearing | November 5, 2015 |
| Deposition | June 16, 2016 |

In re Merck & Co., Inc. Securities, Derivative & "ERISA" Litigation, United States District Court, District of New Jersey, Case Numbers: 05-cv-5060; 07-cv-4021; 07-cv-4022; 07-cv-4023; 07-cv-4024; 07-cv-4546; 11-cv-6259; and 15-cv-518

| | |
|---|---|
| Deposition | December 6, 2013 |
| Deposition | October 1, 2015 |

Richard Thorpe and Darrel Weisheit, Individually and on Behalf of All Others Similarly Situated v. Walter Investment Management Corp., et al., United States District Court, Southern District of Florida, Case No. 1:14-cv-20880-UU

| | |
|---|---|
| Deposition | September 16, 2015 |

City of Austin Police Retirement System, *Individually and on Behalf of All Others Similarly Situated* v. Kinross Gold Corporation, et al., United States District Court, Southern District of New York, Civil Action No. 1:12-cv-01203-VEC-KNF

| | |
|---|---|
| Deposition | November 19, 2014 |

In re El Paso Partners, L.P. Derivative Litigation, Court of Chancery of the State of Delaware, C.A. No. 7141-CS

| | |
|---|---|
| Deposition | September 24, 2013 |
| Trial | November 12 and 13, 2014 |

L-3 Communications Corporation, et al. v. Jaxon Engineering & Maintenance, Inc., et al., United States District Court for the District of Colorado, Civil Action No. 10-cv-02868-MSK-KMT

| | |
|---|---|
| Deposition | August 7, 2014 |

Axa Corporate Solutions Assurance, et al. v. Honeywell International, Inc., et al., Superior Court of the State of Arizona in and for the County of Maricopa, No. CV2011-019334

| | |
|---|---|
| Deposition | February 24, 2014 |

In re Heckmann Corporation Securities Litigation, United States District Court for the District of Delaware, Case No. 1:10-cv-00378-LPS-MPT

| | |
|---|---|
| Deposition | November 9, 2012 |