# EXHIBIT 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

CASE NO.: 3:20-cv-00076-SI

------------------------------------x

CHRISTOPHER L. SAYCE, Individually

and on Behalf of All Others Similarly

Situated,

       Plaintiffs,

   - against -

FORESCOUT TECHNOLOGIES, INC.,

MICHAEL DECESARE, and CHRISTOPHER HARMS,

     Defendants.

------------------------------------x

      March 11, 2024

      11:07 a.m.

   Continued Videotaped Deposition of

MARK ORT, taken by Defendants, pursuant to

30(b)(6) Notice, held via Zoom

videoconference, before Todd DeSimone, a

Registered Professional Reporter and Notary

Public of the State of New York.

Page 225

MR. STEELE:  35.

MR. GAIONI:  Which is 35.  Go to page 3.

Q.    A little bit later Mr. Davidowitz writes back to you "Mark, lawyer felt the non-reliance representation section of the DMA" -- you understand that to be the definitive merger agreement?

A.    Could you zoom in a little bit?

MR. STEELE:  Yeah.

A.    I see that.

Q.    That section covers this "and pretty much absolves the seller from having a problem here.  Section 4.14 Part B."  You respond "I agree."  Then you say "I'm telling you I have seen this and Advent ain't stupid.  They know that projections af" -- could you scroll down a little bit further, Andrew, please -- "they know that projections af lipstick on a pig."

Do you see that?

A.    Yeah.

Q.    What do you understand Mr. Davidowitz to be saying in his message from 4:09 p.m. eastern time?

01:02:03PM

01:02:15PM

01:02:41PM

01:02:53PM

01:03:05PM

Page 307

A.    Looking at this today and trying to reconstruct it, my understanding was he was suggesting that if Forescout provided projections to Advent that were more positive than perhaps other     01:03:35PM illustrative guidance that they had internally which had not been shared, that Mr. Davidowitz's attorney was suggesting that Forescout indemnify themselves by the section in the merger agreement which     01:04:04PM represents that Advent is not relying on such projections from Forescout.

Q.    Your response, "Advent ain't stupid.  They know that projections af lipstick on a pig."     01:04:24PM

A.    I would imagine "af" probably should have said "are," a-r-e.

Q.    What did you mean by those comments?

A.    I believe that what I meant was     01:04:36PM that Advent is fully capable of conducting due diligence on their own and that they need to treat any projections they receive from Forescout or the management of a target company as an optimistic case     01:04:53PM

Page 308

projection.

MR. GAIONI:  Could you go to tab 12.

(Glazer Exhibit 36 marked for identification.)                        01:05:17PM

MR. STEELE:  It should be in the folder, and here it is.

Q.    Mr. Ort, I'm showing you what's been marked as Exhibit 36.  This is an e-mail from Anthony Baumann dated 4-17-20,   01:06:02PM Bates number GlazerCapital_74856.  Can you see this document?

A.    Yes.

Q.    This e-mail copies you and is directed to charms@forescout.  It is       01:06:28PM addressed "Hi Chris."  Do you have an understanding that this is Chris Harms, the then CFO of Forescout?

A.    It seems plausible.

Q.    And it is a two e-mail chain.   01:06:42PM If I direct your attention to the first e-mail in the chain, Mr. Baumann writes "I am an analyst at an investment firm in New York."  He goes on to say "We are reaching out to as many of our management teams as    01:07:00PM

Page 309

apologized for getting caught in Forescout?

A.    Because we lost money, and I apologize when something goes wrong under my watch.

Q.    You were taking responsibility   03:28:48PM for it?

A.    Yes.  When I say taking responsibility, it wasn't that somehow I knew something or didn't know something, it was simply the fact that as a leader, it is   03:28:59PM my responsibility to recognize that the buck stops with me, and the stock had been trading very poorly the last few days, Spruce Point was out, it wasn't -- it wasn't like -- it wasn't -- it wasn't, how   03:29:13PM should I say, in retrospect, clearly the tell-tale signs were there purely from the public domain that somebody knew something, and I was taking responsibility for not being more cautious and I guess heeding   03:29:34PM that warning.

Q.    You make a reference to a buyer check here.  What do you mean by that?

A.    Buyer check is a term of art in the merger and arb world and it means an   03:29:47PM

Page 378

indication that the buyer is committed to a transaction.  It could be a press release from a buyer, it could be an earnings call in the case where a buyer is a public company, something that indicates that the   03:30:03PM buyer is committed to a transaction.

Q.     Did you engage in a buyer check with respect to this transaction?

A.     I don't believe so, because I don't think that I had any way of legally   03:30:19PM getting information out of Advent.

Q.     You say "I should have heeded my own words (during our December 31, 2019 toast)."

What's that a reference to?   03:30:35PM

A.     At the end of 2019, when we were looking back over the year, I believe that all of us were prompted to come up with either something that we would implement in a year, something that we   03:30:56PM would work on, something professionally that we would work on, and I believe that what I said was have the courage to sell losing positions, and that's a reference to the fact that oftentimes when an investment   03:31:09PM

Page 379

causes a loss, a mark to market loss, that
it is difficult emotionally to be
circumspect and skeptical and it is hard to
then sell the position and crystallize that
loss.                                              03:31:32PM

Q.    With respect to Glazer's
Forescout investment, you say "should have
had the courage to sell when I had the
chance to."

Are you saying that you            03:31:46PM
considered selling earlier but didn't?

A.    I think -- we consider buying
and selling every day.  We review our
portfolio even during calm and easy times,
and so much more so during a period of time  03:32:04PM
when, as you saw from all of the documents
that we produced, that we really had no
idea why Forescout was trading down.

We didn't know if Spruce Point
was accurate or not, and that was a          03:32:22PM
reference to the fact that the company,
that situation, the Forescout situation,
clearly had appeared to have more risk
purely based on what was out in the public
domain and the price activity in the         03:32:33PM

Page 380

shares, and I was lamenting the fact that I had not heeded the warning that those factors had introduced, that I continued to hold a position or perhaps even purchased more shares during the days -- during the early days of May.    03:32:55PM

Q.    At what point did you think, looking back on May 18th, that you should have sold?

MR. ABRAHAM:  Objection as to form.    03:33:16PM

A.    That's a -- I think that's a -- that's a Monday morning quarterback type question and it's really not fair to answer it because in hindsight everything is 20/20, but at the time that we went through it we did our very best, we gathered the information that we could from public and legal sources, and in particular we listened to management put out a press release that said we look forward to closing the transaction, and at the time the information that we had, we made the decision to invest -- to remain and continue investing in Forescout.    03:33:26PM    03:33:42PM    03:33:54PM

Page 381

So I don't think it's -- I don't think it's right to look back and say what should we have done.

Q.    Well, isn't that exactly what you are doing here, looking back and saying 03:34:04PM I should have sold earlier?

A.    I am taking responsibility after the fact when something occurred or having made a mistake.  I think in general what really makes -- what really 03:34:20PM differentiates people is that they are able to take responsibility for mistakes, even if at that time they were not grossly negligent.

Q.    You would agree you made a 03:34:35PM mistake in not selling the Forescout -- Glazer's Forescout stake earlier on the basis of the information you had at that time?

MR. ABRAHAM:  Objection as to 03:34:44PM form.

A.    I cannot say yes to that statement.

Q.    What mistake did you make?

MR. ABRAHAM:  Objection as to 03:34:54PM

Page 382

form.

A.    By definition, losing money is a mistake, unless lightning strikes.

Q.    There is no response here from Mr. Glazer in the Bloomberg messages.  Did    03:35:07PM you ever discuss the message with him?

A.    This specific message, did I discuss it with Mr. Glazer?  That's your question?  Or did I discuss the loss with him?    03:35:21PM

Q.    Let's start with this specific message.

A.    I don't recall.

Q.    Did you discuss the loss with Mr. Glazer?    03:35:27PM

A.    I would imagine that I did, but I don't recall specifics.

Q.    What did you talk about?

MR. ABRAHAM:  Objection as to form.    03:35:36PM

A.    I just answered it.  I said I don't recall specifics.

Q.    You have no recollection of any conversation you had with Mr. Glazer regarding Glazer's loss in Forescout    03:35:44PM

Page 383

investment?

MR. ABRAHAM:  Objection as to form.

A.    One more time, I answered that question.  And to put that in context, that was four years ago and there was a lot going on back then.                                          03:35:51PM

Q.    Did you ever discuss Glazer's loss on its Forescout investment with anyone else at Glazer?                                   03:36:10PM

A.    I may have at the time, and once again, I just don't recall.

Q.    Do you recall the content of any such conversation with anyone at Glazer regarding the loss in the Forescout          03:36:27PM investment?

MR. ABRAHAM:  Objection as to form.

A.    I do not.  Once again, to put it in context, we invest in many different      03:36:42PM companies over the years and sometimes things don't work out, but it's hard to recall what I would have discussed four years ago.

Q.    It is Glazer's contention in          03:37:00PM

Page 384

this litigation that it was misled by Forescout's public statements; is that right?

A.    Yes.

Q.    There is no reference to being   03:37:06PM misled by Forescout public statements in this Bloomberg message, is there?

A.    I do not see one.

MR. GAIONI:  I have nothing further.                                        03:37:22PM

THE WITNESS:  Pardon, what was that?

MR. ABRAHAM:  He says he has nothing further.  Can we go off the record for a couple of minutes, please? 03:37:29PM

THE VIDEOGRAPHER:  Off the record -- I'm sorry, Counselor, did you say go off the record?

MR. ABRAHAM:  Yes, please.

THE VIDEOGRAPHER:  We are now   03:37:36PM off the record.  The time is 3:37 p.m.

(Recess taken.)

THE VIDEOGRAPHER:  We are now on the record.  The time is 3:41 p.m.

MR. ABRAHAM:  I guess the       03:41:52PM

Page 385

deposition is concluded.  Thank you.

THE VIDEOGRAPHER:  Let me just take us off the record.  We are off the record at 3:42 p.m. eastern daylight time and this concludes today's                03:42:05PM testimony given by Mark Ort.  The total number of media units used was four and will be retained by Veritext San Francisco.

[TIME NOTED:  3:42 p.m.]

_____

MARK ORT

_____

Subscribed and sworn to

before me this _____

day of _____, 2024.

_____

Notary Public

Page 386

CERTIFICATION

I, TODD DeSIMONE, a Notary Public for and within the State of New York, do hereby certify:

That the witness whose testimony as herein set forth, was duly sworn by me; and that the within transcript is a true record of the testimony given by said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 11th day of March, 2024.

TODD DESIMONE

*       *       *

Page 389

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127