**Pages 1 - 20**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Susan Illston, Judge

CHRISTOPHER L. SAYCE,           )
individually and on behalf of   )
all others similarly situated,  )
                                )
          Plaintiffs,           )
                                )
  VS.                           )     **NO. C 20-00076 SI**
                                )
FORESCOUT TECHNOLOGIES, INC.,   )
et al.,                         )
                                )
          Defendants.           )
_____  )

                         San Francisco, California
                         Friday, May 17, 2024

          **TRANSCRIPT OF VIDEOCONFERENCE PROCEEDINGS**

**APPEARANCES**:  (via videoconference)

For Plaintiffs:
                    ABRAHAM, FRUCHTER & TWERSKY LLP
                    450 Seventh Avenue - 38th Floor
                    New York, New York  10123
               **BY:  JEFFREY S. ABRAHAM, ATTORNEY AT LAW
                    MICHAEL J. KLEIN, ATTORNEY AT LAW**

                    POMERANTZ LLP
                    Ten South LaSalle Street - Suite 3505
                    Chicago, Illinois  60603
               **BY:  OMAR JAFRI, ATTORNEY AT LAW
                    GENC ARIFI, ATTORNEY AT LAW**


          **(APPEARANCES CONTINUED ON THE FOLLOWING PAGE)**


Remotely Reported:  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
                    U.S. District Court - Official Reporter

**APPEARANCES:**  (via videoconference, continued)

For Defendants:

ROPES & GRAY LLP
800 Boylston Street
Boston, Massachusetts  02199
BY:  **C. THOMAS BROWN, ATTORNEY AT LAW**

ROPES & GRAY LLP
10250 Constellation Boulevard
Los Angeles, California  90067
BY:  **MARK S. GAIONI, ATTORNEY AT LAW**

WILSON SONSINI GOODRICH & ROSATI
650 Page Mill Road
Palo Alto, California  94304
BY:  **DIANE M. WALTERS, ATTORNEY AT LAW**
**IGNACIO E. SALCEDA, ATTORNEY AT LAW**

**Friday - May 17, 2024**                                    **9:59 a.m.**

                          **P R O C E E D I N G S**

                             ---oOo---

THE CLERK:  Now calling civil matter 20-CV-76, Sayce versus Forescout Technologies, Incorporated, et al.

Counsel, please state your appearances for the record starting with Plaintiff.

MR. ABRAHAM:  Good morning, Your Honor, Jeffrey Abraham with Abraham Fruchter and Twersky for Plaintiffs.  With me in my office is Michael Klein of my office though not on camera.

THE COURT:  Good morning.

MR. ABRAHAM:  Good morning.

MR. JAFRI:  Good morning, Your Honor, this is Omar Jafri from Pomerantz, also for the Plaintiffs.

THE COURT:  Good morning.

MR. ARIFI:  Good morning, Your Honor, this is Genc Arifi, also for the Plaintiffs.

THE COURT:  Good morning.

MR. BROWN:  Good morning, Your Honor, C. Thomas Brown of Ropes & Gray on behalf of Defendant Forescout Technologies.

THE COURT:  Good morning.

MR. GAIONI:  Good morning, Mark Gaioni, also of Ropes & Gray on behalf of Defendant Forescout Technologies.

THE COURT:  Good morning.

**MS. WALTERS:**  Good morning, Your Honor, Diane Walters with Wilson Sonsini Goodrich & Rosati appearing on behalf of the individual Defendants.

**THE COURT:**  Good morning.

**MR. SALCEDA:**  Good morning, Your Honor, Ignacio Salceda also Wilson Sonsini on behalf of the individual Defendants.

**THE COURT:**  Good morning.  So, is that everybody?

(No response.)

**THE COURT:**  This is Defendant's -- Plaintiffs' motion for class certification.  The Defendants oppose.  It has been well and truly briefed.  I will be happy to hear what people want to add today.

I will tell you the -- my preliminary view is that the class should be certified.  I think that the Defendants' objections and arguments primarily would require drawing factual conclusions that we are not prepared to do at this stage of the proceedings.

I have a couple of little questions for you, and then I will be happy to hear -- I think I will let Defendants go first since it's their issue.

But I do want to ask the Plaintiffs first whether the class period should start May 9th or May 10th.  Is this a big issue?

**MR. ABRAHAM:**  It's not a big issue, and I think we

could probably resolve that with Defendants.

THE COURT:  All right.  Well, I would recommend that you do that.  That would be great.

MR. ABRAHAM:  Thank you, Your Honor.

THE COURT:  I am concerned to hear -- and so when you -- when you talk to me, I would like to hear about the -- Glazer as an appropriate Plaintiff, similar situation to other investors.  I would like to hear your thoughts on that, both Plaintiffs and Defense; but with that, I will just ask the -- who is going to go for the Defendants?

MR. BROWN:  I am, Your Honor.

THE COURT:  Okay, Mr. Brown.

MR. BROWN:  Yes, thank you, Your Honor.

I think, being respectful of what Your Honor had to say on a preliminary matter, I would like to address the point about whether or not the position that we have taken actually requires inappropriate factual conclusions.

And as Your Honor is aware, obviously our argument turns on the fulcrum of the point that there was a merger announcement in the middle of the proposed class period; and it is our view, based on the opinion of our expert who -- Dr. Wei Jiang, who is a professor of finance, that at that point the fundamental market dynamics of the trading and Forescout's stock changed and were driven not by fundamentals of information in the market but rather as a bet effectively on

whether the deal would close.

And that point -- although some of the implications of it are disputed, the basic point that the fundamental market dynamics changed is also conceded by Plaintiffs' expert, Dr. Nye.

So our view is -- and we believe that because of this fundamental change, that there is an inherent methodological problem that Plaintiffs are faced with in proving damages; and that is, how is it that you account for this move away from trading based on fundamentals; i.e., based on the market's analysis of information that has been publicly disclosed versus views about the merger and then later on an alleged misstatement that relates to the merger possibly closing or not versus the fundamentals.

And our view, Your Honor, is -- actually, first the burden on Plaintiffs here is not simply one of pleading.  The standard is quite clear that they have a preponderance of the evidence standard and that Your Honor is permitted, in fact, to consider merits like issues in determining whether they have met that burden.

And we believe that in particular with respect to that methodological problem, how is it that you deal with the merger that they haven't actually carried that burden, and that because it is their burden, saying more than we think these are problems that we can resolve later on facts is, in fact, not

sufficient at this stage.

And I will make, you know, clear, Your Honor, it's not our position that as proposed the two different classes that we -- periods that we say are appropriately met, that they wouldn't otherwise meet the standards on those.

It is simply the fact that there is this gap period -- let's call it -- from the date of the merger announcement until the point of, let's call it, the, quote/unquote, alleged merger misstatement was made where we say -- and that there is no fundamentally contested point that the market dynamics have changed.

Therefore, the ability of the -- that any kind of alleged inflation had disappeared, and that Plaintiffs' attempts to sort of tie this into Advent's decision to purchase really don't work, one, because Advent fundamentally was working on different information.  It was a purchaser with a lot of internal proprietary and non-public information that it was operating on.

And, secondly, the theory effectively becomes that it is not a fraud on the market anymore but a fraud on Advent, and Advent never once said or alleged in any of its later claims, which are integrated into Plaintiffs' complaint, that it wasn't proceeding because it thought it had been misled.

In fact, if it had been, it more naturally would have brought a claim for fraud on the reps that were made as of the

time of the deal.

So, for those reasons, Your Honor, we respectfully believe that there is not actually too much factual determination that has to go into this.  It is a methodological one, and it tops up the period.  It doesn't entirely eliminate the classes.  It makes for two different ones, each of which stand differently and each of which are dealing with fundamentally different kinds of market dynamics.

And that actually goes along with the history of how this case came to be.  It was two different cases that were filed by two different firms at two different times and then were brought together for administrative convenience.

Unless Your Honor has specific questions that go to your concerns --

**THE COURT:**  Okay, that -- then why doesn't Plaintiff -- whoever is speaking for Plaintiff respond to what Mr. Brown just said.

**MR. ABRAHAM:**  Sure.  Heading backwards, when Your Honor consolidated the cases, the same argument was raised; and the basis for consolidation that was the single theory throughout the class period with the final disclosure on May 15th/May 18th would be the truth about Forescout's operational business including the sales pipeline.

But more fundamentally, on the -- on the -- on the causation, both Professor Jiang and -- which is Defendants'

expert and Professor Nye, Plaintiffs' expert, have identified the standalone value of the target company, which in this case is Forescout, as one of the three factors influencing the stock trading price even after the merger.

In other words, there is a -- the probability that the -- that the merger goes through, and there is a probability that the merger doesn't go through; and the part where the probability that the merger doesn't go through, the standalone value of Forescout is an important factor in valuing the company.  That's in paragraph 39 of Professor Jiang's report and paragraph 33 of Professor Nye's expert report.

So it remains an issue.  It remains a material non-disclosure especially as it relates to November 6th, non -- materially false and misleading statement and the events study that Professor Nye says -- Professor Nye points to can identify the amount of inflation during that period.  The amount of inflation doesn't have to be constant.  It can change during the class period.

**THE COURT:**  All right.  Thank you.

**MR. BROWN:**  If I can respond briefly to that.

**THE COURT:**  Of course, yeah.

**MR. BROWN:**  I think that Mr. Abraham is missing part of the point that Professor Jiang makes, which is while you could identify methodologies which might be applicable, she says in her opinion none of them actually work; and Dr. Nye

says -- you know, names what they are but doesn't actually show how they would work, which we say is part of the burden here.

The Plaintiffs affirmatively need to show how would the mechanics work, and, indeed, do so in a way that could be critiqued and examined.

So I don't believe that they have actually carried the burden with respect to how -- even if you were to accept against Professor Jiang's view that there was some way to do this and that you wouldn't be hampered by making assumptions that are arbitrary, that that actually hasn't been done here.

We haven't had a methodology that we can fairly critique, and it is Plaintiffs' burden at this stage to actually do that.

They knew what Professor Jiang's criticism was at the time of her initial report, and the -- the answer back wasn't, Here is the methodology and here is how it works; but rather, Here's a few things that I think she is wrong about -- and some version of these words aren't used -- but effectively, you know, she doesn't know what she is talking about.

I think they both seem to have reasonable familiarity with their methodologies, so she does know what she is talking about but --

MR. ABRAHAM:  Your Honor, may I reply?

THE COURT:  Sure.

MR. ABRAHAM:  Professor Nye identifies the event study as being able to untangle the different elements of causation.

Based upon the Ninth Circuit's recent decision in *Nutramax*, I think that confirms a long line of case authority that he doesn't actually have to do the event study at that stage.

And as my colleague mentioned, we disagree and Professor Nye pointed out errors in Professor Jiang's analysis of the facts.

**MR. BROWN:**  And I think this has been a constant mischaracterization of our argument all along.  We've never said they actually have to do the calculation.  They do have to provide a methodology for doing it, and that's what we are saying is missing.  The calculation itself, I agree, they don't have to do that calculation now.

**THE COURT:**  One expert says his methodology won't work and the other expert says my methodology will work; right?

**MR. BROWN:**  But he doesn't -- well, in the first instance, yes, he says, I think she is wrong when she says they don't work.

First off, I would submit that a -- a -- someone who is credentialed in actually analyzing pricing around mergers is -- has the credibility that can't be naysayed by someone who is -- while he clearly has a skill in applying the method -- the -- building the models for the damages calculations is not a credentialed expert in mergers and merger arbitrage.

But more fundamentally, the point is that he can't just

say at this stage it's more than their -- the burden requires more than just saying, Well, I think there might be some way I can do that in the future.

It's I have to show how I can do it and we have to be able to critique what that is.  That is not saying he has to run the numbers for all the Plaintiffs or what the number would look like, but it is saying there has to be a clearly articulated methodology.  And in our view that -- that level of requirement is not met here.

**MR. ABRAHAM:**  I would be repeating myself, Your Honor, but the methodology is the event study, and Professor Nye has identified multiple cases -- including, I think, five or six within this district -- in which the Court accepted an event study as being a reliable method for class certification.

And the fact that there was a merger announcement is just another fact affecting the stock price for which an event study pulls out the relevant inflation.

**THE COURT:**  Okay.  Thank you, both.

And what about -- what about Glazer?  Mr. Abraham, why don't you start.

**MR. ABRAHAM:**  All right.  The Glazer funds are arbitragers, and Defendants are correct that they are event driven investors; but that doesn't mean that they don't rely on other information in the marketplace.

In fact, if Your Honor looks at the record, within the

deal sheet that Glazer produced, it shows that they actually reviewed the November 6th, 2019, press release which serves as one of the bases for this claim.

They are not hedged -- and I think this is an error in Professor Jiang's analysis. They aren't hedged in their investment in Forescout. They buy it. They have a long position. There is a minor hedging before February 16th based upon the stock trading above the deal price at around $35 a share; but from February 16th going forward, they are perfectly long without respect to any call options.

They -- the problem identified is more specifically where there is a merger stock for stock and the arbitrager buys one and sells short the others so as to achieve a neutrality -- kind of a neutral position regardless whether the deal goes through. But that's not present here in this case.

And Professor Jiang's definition of arbitrager, basically as event driven professor, includes almost anybody who bought after February 6 because it was an event and everybody bought based upon an event.

So, it basically says you couldn't have a class during that period of time, which I think is wrong for the reasons we just discussed.

So, Glazer being an arbitrager is a non-issue because they still rely on -- on these statements relating to the sales pipeline and operational issues.

The fact that they are an arbitrager doesn't make a differential with respect to their ability to bring a securities fraud claim.

There are a lot of other attacks on Glazer, and I can address those too.  I don't know if that's what Your Honor was intending.

**THE COURT:**  Whatever you want to say.

**MR. ABRAHAM:**  Okay.  I believe Defendants in their brief say that Glazer does not believe that Advent -- the problem with Glazer is that they did not believe that Advent relied on Forescout's illustrative guidance.

The illustrative guidance is not one of the actionable statements in this case, but all that Glazer's testimony says -- if you read it -- is they don't think that any problems with the illustrative guidance could serve as a basis for Advent ditching the merger because the merger agreement contains a provision stating that Advent was not relying on that illustrative guidance.  So it is just stating what the merger agreement says.

Glazer does not know all the facts that Advent took into account in agreeing to pay $33 per share when they are discussing this internally.  They are guessing.  The fact -- the factual record will bear that out.

And there's a major difference between not relying on a particular set of management projections and being misled by

the state of Forescout's business and not knowing of the particular pipeline or operational issues, which were in part publicly disclosed along with the Q1 earnings on May 11th, 2020, and then according to our -- Plaintiffs' allegations, in part led to the merger's termination on May 15th, 2020.

The Defendants also fixate on Mr. Ort, who is the portfolio manager at Glazer, suggesting that he should have realized that the merger was in trouble.

That was made the day after the fund suffered a multimillion dollar loss on May 18th.

And in his deposition Mr. Ort was asked a question. (As read:) "You would agree that you made a mistake in not selling Glazer to Forescout stake earlier on the basis of the information you had at that time."

And he answered by saying, "I cannot say yes to that." And that's at his transcript, which is attached to Ms. Longo's reply declaration, at page 382, lines 15 through 23.

The record also reflects facts which Defendants neglect to mention in their brief. Mr. Ort testified that he relied or took into account Defendants' May 11th, 2020, statement about Forescout looking forward to closing the merger, which is the very statement that the Court held is actionable in this case. And that's at Ort transcript, page 380, lines 17 through 21.

So, there is actually testimony that Glazer relied on the actionable statement on May 11th in both deciding to hold,

which I understand is not an issue, but in purchasing an additional more than 100,000 shares of Forescout's stock during that period of time.

Glazer looked at a risk -- there was also record evidence that Glazer knew there was some -- thought that the risk was that the merger would be delayed, not that it would be terminated.

Within the Ninth Circuit there is authority including the case of *Moyle versus Liberty Mutual Benefit -- Retirement Benefit Plan*, that where the Defendant's representations were allegedly made on a uniform basis and classwide basis individual issues reliance do not preclude class certifications.

And any issue with Glazer's contemporaneous views were colored by the Glazer funds, like the rest of the class having been defrauded at that time -- including by the November 6th statement I mentioned previously -- which they relied on either through the efficient market hypothesis or through their -- as their worksheet demonstrates by actually reviewing that statement.  I don't know if Your Honor has any questions.

**THE COURT:**  Nope.  That's fine.  That's fine.  Did you -- just remind me, there is one other question I want to ask to the Defense.  But, Mr. Brown, did you want to respond about Glazer?

**MR. BROWN:**  Yes, Your Honor.  First, as an initial

matter, the fact that it took Mr. Abraham so much work to explain away the testimony related to Glazer's understanding that Advent was a smart well-informed investor with a lot of non-public information, itself demonstrates that there is a whole lot of unique defenses with respect to Glazer in particular.

And secondarily, assuming that there is a class period that covers the entire time without the gap in it that we argue for, then necessarily an arbitrager who is playing admittedly on a different theory than fundamental investors in the market is, again, atypical of what most of the class is going to look like.

I think those are very simple responses, and they don't take long to make because -- the fact that it took a long time to make that argument shows that there is a lot of problems that that particular refuted representative has.

**MR. ABRAHAM:**  Your Honor, may I?

**THE COURT:**  Sure.

**MR. ABRAHAM:**  Yeah, I mean, Advent is sophisticated. Everybody knows that, and almost everybody who bought after February 6th -- I shouldn't say "almost everybody," but the class consists largely of arbitragers and investors of that nature.

And the fundamentals -- the fundamental value of Forescout was part of Glazer's analysis.  They always wanted to know what

would happen if the deal didn't go through, how much the stock would trade at.  That was always part of their analysis and their worksheet reflects that, Your Honor.

MR. BROWN:  Although as an arbitrager, they have an interest in more value being assigned to the merger inflation as opposed to the pipeline inflation.  And, again, there is an obvious conflict there, Your Honor.

MR. ABRAHAM:  I don't think there is an obvious conflict.  I think that -- like I said, everybody who bought after February 6th bought based upon the event.

And any -- any of those issues can be ferreted out throughout the event and the event study.  There is nothing unusual about Glazer.  They are an investor.  The only thing is that they are more forthright about buying based upon events such as a merger.

THE COURT:  Okay.  Thank you.  So, Mr. Brown, one other question I have for you.  In the sur-reply Defendants submitted the form 14A SEC filing for Forescout, which is really, really long.  You referred to just a couple of pages of it in the -- in the paper, and I'm just wondering what was the purpose of attaching this?  And help me understand the significance you attribute to it.

MR. BROWN:  Your Honor, if I might ask you where particularly in the papers you are referring to so I can make sure I answer --

**THE COURT:** Docket number 218, Exhibit 2.

(Pause in proceedings.)

**MR. BROWN:** I just want to make sure I see the right spot, so I'm looking at it in the paper. Ah, here we are. Right, this -- this is because we referenced the timing of various disclosures of what is known as illustrative guidance.

**THE COURT:** Yeah.

**MR. BROWN:** In other words, guidance that was put out by the company in order to provide disclosures related to its solicitation of proxy votes, and the timing of that versus what Advent is doing, which we argue is a -- its own separate process of building its own set of forward-looking forecasts.

In other words, Advent is not relying on what's going on with the company's own forecasting. It is doing its own work; and in order to support the timing of that, we needed to point to the particular disclosure where this would reveal, by the company. That's the point.

**THE COURT:** Okay. So it's for timing. All right. Well, thank you. That's all the questions I had. Is there anything else anybody wants to add?

(No response.)

**MR. ABRAHAM:** No, Your Honor.

**MR. BROWN:** Only if Your Honor has further questions.

**THE COURT:** No, I don't. Thank you. Well, the matter will be submitted. You will hear from us shortly.

**MR. ABRAHAM:**  Thank you, Your Honor.

**MR. BROWN:**  Thank you, Your Honor.

(Proceedings adjourned at 10:24 a.m.)

---oOo---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:    May 18, 2024

_Marla Knox_

Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
United States District Court - Official Reporter