UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER L. SAYCE, et al., | Case No. 20-cv-00076-SI |
| Plaintiffs, | |
| v. | **ORDER GRANTING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTING CLASS REPRESENTATIVES AND CLASS COUNSEL** |
| FORESCOUT TECHNOLOGIES, INC., et al., | |
| Defendants. | Re: Dkt. No. 196 |

Before the Court is plaintiffs' motion for class certification and appointment of class representatives and class counsel. Dkt. No. 196. Defendants oppose on the grounds that plaintiffs have failed to identify a common methodology that will reliably measure damages on a class-wide basis and thus cannot satisfy Federal Rule of Civil Procedure 23(b)(3), and that plaintiffs fail to satisfy Rule 23(a)'s typicality and adequacy requirements. Dkt. No. 202. The Court heard oral argument on this motion on May 17, 2024. For the reasons set forth below, the Court GRANTS plaintiffs' motion.

**BACKGROUND**

**I.    Procedural History**

On January 1, 2020 plaintiff Christopher Sayce, individually and on behalf of others similarly situated, filed a securities class action lawsuit against defendants Forescout Technologies, Inc., Michael Decesare, and Christopher Harms. Dkt. No. 1. Plaintiff Sayce alleged violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934 based on a series of statements made in 2019 about Forescout's sales pipeline and revenue guidance. *Id.* ¶¶ 1, 4-6. The proposed class period was February 7, 2019 through October 9, 2019, with the relevant corrective disclosures alleged to have been made in October or November of 2019. *Id.* ¶¶ 1, 39-43. On March 23, 2020, the Court appointed plaintiff Meitav Tachlit Mutual Funds Ltd. ("Meitav") as lead plaintiff. Dkt. No. 27 ¶ 1. On May 31, 2020, Meitav filed an amended complaint to extend the class period through

United States District Court
Northern District of California

May 15, 2020 and add additional alleged misstatements about Forescout's sales force.  Dkt. No. 31 ¶¶ 1, 3-25.

One June 10, 2020, plaintiffs the Arbitrage Fund et al., individually and on behalf of others similarly situated, filed a separate suit against the same defendants alleging violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934 based on Forescout's statements in 2020 leading up to the announced merger with Advent International Corp. ("Advent").  *Arbitrage Fund v. Forescout Techs., Inc.*, No. 20-cv-03819-SI, Dkt. No. 1 ¶¶ 73-87.  The proposed class period ran from February 6, 2020 through May 15, 2020, with the relevant corrective disclosure alleged to have been made on May 18, 2020.  *Id.* ¶ 1, 3, 12.

Meitav filed a motion to consolidate these two cases on June 15, 2020.  Dkt. No. 35. Defendants moved to dismiss the first suit on July 6, 2020.  Dkt. No. 44.  Before that motion was heard, the court consolidated the two cases on July 22, 2020.  Dkt. No. 55.  The Court then re-opened the lead plaintiff process and appointed Meitav and Glazer Funds ("Glazer") as co-lead plaintiffs.  Dkt. No. 115.  On December 18, 2020, Meitav and Glazer filed a consolidated amended complaint alleging misstatements related to the sales pipeline, sales force, revenue guidance, channel-stuffing, and the acquisition by Advent.  Dkt. No. 116 ¶¶ 3-30.  The proposed class period was February 7, 2019 through May 15, 2020.  *Id.* ¶ 1.

Defendants filed a motion to dismiss the consolidated amended complaint, and on March 25, 2021 the Court granted defendants' motion to dismiss with leave to amend.  Dkt. No. 139. Plaintiffs filed a second consolidated amended complaint on May 10, 2021 alleging misstatements relating to the same topics.  Dkt. No. 142.  Defendants filed another motion to dismiss, and on October 6, 2021 the Court granted defendants' motion to dismiss with prejudice and denied leave to amend.  Dkt. No. 158.  Plaintiffs appealed but did not challenge the dismissal of claims related to statements made between February 7, 2019 and March 4, 2019.  *Glazer Capital Mgmt., L.P., v. Forescout Techs., Inc.*, 63 F.4th 747, 755 n.1 (9th Cir. 2023).

On March 16, 2023, the Ninth Circuit affirmed in part, reversed in part, and remanded for further proceedings.  The court reversed and remanded with respect to claims regarding the following challenged statements:

(1) the statements made on May 9, 2019, August 7, 2019, August 12, 2019, October 10, 2019, and November 6, 2019, asserting that (i) the disappointing second quarter performance was due to "slipped" deals, (ii) the "slipped" deals were "tech wins," (iii) the sales pipeline was large, healthy, and continuing to grow, and (iv) the third quarter revenue miss was due to delays in closing caused by economic conditions in the EMEA area; and (2) the May 11, 2020, press release stating that Forescout "look[ed] forward to completing [the] pending transaction with Advent." *Id.* at 781-82.

Defendants answered the second consolidated amended complaint on June 16, 2023. Dkt. No. 178.

## II.    Factual Background

The following allegations are drawn from the second consolidated amended complaint ("SCAC"). Dkt. No. 142. Allegations discussed below focus on the allegedly materially false or misleading statements remaining at issue after the Ninth Circuit decision in *Glazer Capital Management*.

Defendant Forescout ("the Company") provides cybersecurity services for large computer networks. *Id.* ¶¶ 1, 27-28. The Company became publicly traded through an initial public offering ("IPO") in October 2017. *Id.* Individual defendant Michael DeCesare was Forescout's President, CEO, and a member of the Company's Board of Directors. *Id.* ¶ 24. Individual defendant Christopher Harms was Forescout's CFO. *Id.* ¶ 25.

The Company experienced strong revenue growth from fiscal year ("FY") 2014 through 2018. *Id.* ¶ 31. However, between 2018 and 2020, "the market increasingly sought cloud-based cybersecurity products that Forescout could not provide" and Forescout continued to offer "legacy technology . . . that was not competitive with the offerings of its peers." *Id.* ¶¶ 34-35. "[S]ales began to substantially decrease in 2019, and the rate of closed deals dramatically shrunk because customers believed that Forescout's competitors offered a better product . . . at a lower price." *Id.* ¶ 36. Several former Forescout employees identified that the Company's product offerings were "substantially less effective for use in cloud computing or remote working situations" and thus became difficult to sell. *Id.* According to former employees, "deals previously identified as 'committed' in the sales pipeline began evaporating in 2019." *Id.* ¶ 38. This caused "many experienced sales personnel to leave the Company voluntarily." *Id.* The Company also laid off

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

many sales representatives. *Id.* ¶¶ 39-40.

Defendants provided revenue guidance to investors of 24% annual growth in revenue for FY 2019, the first public guidance issued by Forescout since its IPO. *Id.* ¶¶ 2-3. The Company's reported quarterly results during 2019 "were consistently and materially below the full year revenue guidance." *Id.* ¶ 46. Defendants "publicly attributed this decline in sales growth to a series of non-recurring delays . . . such as bureaucratic delays in customers finalizing orders, a shift to a subscription revenue model and . . . deteriorating macroeconomic conditions in the EMEA region." *Id.* ¶ 47. Analysis by a former Forescout employee in early 2019 of information received from a consulting firm Forescout had hired indicated that "a majority of Forescout's deals in the sales pipeline had only a 50% chance of closing yet Forescout identified the deals as 'committed' in its sales pipeline." *Id.* ¶¶ 3, 50. Additionally, a new system for projecting future revenue "reflected that a very large number of sales recorded as 'committed' by sales representatives were, in fact, highly unlikely to be made." *Id.* ¶ 51. Beginning in February 2019, senior Forescout executives "pressured sales representative[s] to categorize deals a 'committed' even though buyers had, in fact, not yet made any such commitment to make a purchase" so the Company could project continued rapid sales increases. *Id.* ¶¶ 6, 52. This amounted to a "widespread pressure campaign." *Id.* ¶ 6; *see also* ¶¶ 52, 99.

On May 9, 2019, defendants preannounced a lowered guidance range for the second quarter of FY 2019. *Id.* ¶ 4. "On this partial disclosure of the materialization of the risks thereof," the price of Forescout's common stock declined by just over 16%. *Id.* ¶ 90. Defendants claimed the company would still meet its revenue guidance for FY 2019 "because the Company had already been awarded business despite some deals simply having 'slipped' to close later in the year." *Id.* ¶ 4. Analysts repeatedly questioned defendants about the basis for increasing the guidance despite the "slipped" deals, "and Defendants repeatedly made concrete and material misrepresentations in response to analysts' inquiries by stating that Forescout had 'tech wins' with firm commitments from customers" and that the Company's sales pipeline was large and robust. *Id.* ¶¶ 4, 97, 100, 105, 108. In fact, according to plaintiffs, the company did not have "tech wins" and ultimately the company admitted in a Form 10-K Annual Report that sales productivity declined from 50% to 38% in 2019.

*Id.* ¶ 5.

On August 7, 2019, Forescout announced the Company's financial results for its second quarter of FY 2019. *Id.* ¶ 110. It also held a conference call, in which DeCesare "falsely claimed that Forescout's rate of closing details 'remain[s] very strong' and 'very healthy' and made materially false or misleading statements regarding the strength of the Company's sales pipeline. *Id.* ¶¶ 110, 113. On August 12, 2019 defendant Harms made the allegedly false or misleading statements that Forescout raised its full year guidance for revenues in the second quarter of 2019 because "we still had great visibility into the rest of the year and still the confidence we have about how deals were taking shape" [sic] and that third quarter "was still very solid." *Id.* ¶ 115.

On October 10, 2019, Forescout announced preliminary financial results for the third quarter of 2019 that missed the low end of the revenue guidance by over $7 million. *Id.* ¶¶ 8, 117. "On this partial disclosure of the materialization of the risks thereof," the price of Forescout common stock declined by over 37%. *Id.* ¶ 118. Defendants again "falsely claimed that the sales pipeline 'continued to grow,' and deals had merely slipped again because of extended approval cycles due to poor economic conditions outside the United States. *Id.* ¶¶ 8, 117.

On November 6, 2019, Forescout announced financial results for the third quarter of 2019, missing guidance by at least $7.2 million on the low end. *Id.* ¶ 120. DeCesare "again shifted blame from the U.S. market to 'extended sales cycles' in the EMEA region for the revenue miss." *Id.* The announcement also gave materially false or misleading revenue guidance for the fourth quarter of 2019. *Id.* ¶¶ 120-121.

In October 2019, the Company put itself up for sale. *Id.* ¶¶ 9, 53. "However, there were certain revenue goals the Company needed to meet to make it an attractive acquisition candidate." *Id.* ¶ 10; *see also* ¶ 54. "The Company produced these by showing moderately lower growth in revenue from prior year results for the fourth fiscal quarter . . . of FY 2019 and providing projections to potential acquirers reflecting 14% growth in revenue for FY 2020 with steady annual revenue growth of approximately 15%" thereafter. *Id.* However, Forescout had "in fact front-loaded millions of dollars of sales" in fourth quarter results and the FY 2020 revenue projections "lacked any reasonable basis and were materially higher than internal guidance." *Id.* ¶ 11. First quarter FY

2020 reported revenue represented a 24% decline from first quarter FY 2019 revenues, "and that decline was only achieved through a multi-million-dollar discounted sale of hardware at a loss." *Id.* ¶ 58.

On February 6, 2020, Forescout also announced its fourth quarter FY 2019 results. *Id.* ¶ 124.   On February 6, 2020, Forescout also announced that Advent had entered into a merger agreement to acquire Forescout for $33 per share. *Id.* ¶¶ 12, 60.  The planned acquisition would substantially enrich DeCesare and Harms, the individual defendants. *Id.* ¶ 61.  However, Advent soon learned that the FY 2020 projections it had been provided with "were inconsistent and materially higher" than guidance and that "the Company had been laying off and otherwise losing experienced sales representatives necessary to drive Forescout's revenue growth." *Id.* ¶ 13; *see also id.* ¶ 62.  The Company then failed to meet "even the lower revenue projection" for the first quarter of FY 2020, reporting revenue representing a 24% decline from first quarter of FY 2019 revenue. *Id.* ¶ 13. Advent also "learned from a corporate whistleblower that the Company had front-loaded millions of dollars in sales in Q4 2019 . . . with the whistleblower's version of events confirmed by other unusual facts reported by the Company." *Id.* ¶¶ 13, 67.

On April 20, 2020, "Advent informed Defendants that it was unsure whether it could proceed with the terms of the Original Merger Agreement." *Id.* ¶ 65.[1]  After April 20, 2020, a strategic committee of the Board of Directors met regularly to discuss Forescout's options should Advent not proceed with the acquisition. *Id.* ¶¶ 14, 65, 144, 156.  On May 8, 2020, an Advent representative told DeCesare that Advent could not "make the numbers work" for the planned acquisition and expressed concerns about whether conditions precedent to the acquisition would be met. *Id.* ¶ 68.

On May 11, 2020, Forescout disclosed its first quarter FY 2020 results, which were $5 million less than guidance disclosed "just eight days before the end of that quarter," and the price of Forescout's common stock declined by nearly 5%. *Id.* ¶¶ 69, 72, 154.  Forescout "blunted a further decline in its stock price by quoting DeCesare in its May 11, 2020 press release as stating

---

[1] Specifically, Advent sent a letter stating that it was "was reviewing Forescout's business, operations, future prospects and financial condition in order to assess whether the conditions to closing provided in the Original Merger Agreement would be met." *Id.* ¶¶ 77, 143.

United States District Court
Northern District of California

that 'we look forward to completing our pending transaction with Advent.'" *Id.* ¶ 154.  On May 15, 2020, Advent sent a termination letter explaining why it was refusing to proceed with the acquisition.  *Id.* ¶¶ 15, 70.  On May 18, 2020, Forescout disclosed that Advent was refusing to proceed with the planned acquisition and Forescout's stock price "plummeted by nearly 24%."  *Id.* ¶¶ 70-71.

On May 19, 2020, Forescout filed a complaint in the Delaware Court of Chancery against Advent seeking specific performance of Advent's agreement to proceed with the acquisition ("Delaware Litigation").  *Id.* ¶ 16, 73.  On July 15, 2020, Forescout and Advent settled the Delaware Litigation with Advent acquiring Forescout at an approximately $300 million discount from the original acquisition agreement.  *Id.* at ¶¶ 17, 74.  On August 14, 2020, the tender offer closed and Advent completed its acquisition of Forescout for $29 per share.  *Id.* ¶ 76.

In sum, plaintiffs allege that defendants "engaged in a plan, scheme, conspiracy and course of conduct" that was intended to, and throughout the class period, did "deceive the investing public." *Id.* ¶ 169.  "As a result of the dissemination of the [] false and misleading statements, the market price of Forescout stock was artificially inflated throughout the Class Period."  *Id.* ¶ 172.  "Class members suffered damages in connection with their respective purchases of the Company's common stock during the Class Period when the risk of Defendants' wrongdoing materialized or upon the disclosure thereof, causing the price of Forescout common stock to decline."  *Id.* ¶ 176.

## LEGAL STANDARD

Class actions are governed by Rule 23 of the Federal Rules of Civil Procedure.  Plaintiffs bear the burden of showing that they have met each of the four requirements of Rule 23(a) and at least one subsection of Rule 23(b).  *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1067 (9th Cir. 2014) (citations omitted).  A plaintiff "must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23, including (if applicable) the predominance requirement of Rule 23(b)(3)."  *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014) ("Halliburton II") (citations omitted).

The Court's "class certification analysis must be rigorous and may entail some overlap with

United States District Court
Northern District of California

the merits of the plaintiff's underlying claim." *Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, 568 U.S. 455, 465-66 (2013) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011) (internal quotation marks omitted)).  The same analytical principles govern both Rule 23(a) and 23(b).  *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013).  However, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen*, 568 U.S. at 466.  "Merits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether Rule 23 prerequisites for class certification are satisfied." *Id.*

## DISCUSSION

Lead plaintiffs seek certification of a class consisting of "all persons and entities who purchased or otherwise acquired [Forescout] common stock between May 9, 2019 and May 15, 2020, both dates inclusive."  Dkt. No. 196 at i.[2]

"As a threshold matter . . . the party seeking class certification must demonstrate that an identifiable and ascertainable class exists." *Mazur v. eBay, Inc.*, 257 F.R.D. 563, 567 (N.D. Cal. 2009).  A class is sufficiently ascertainable if it is "administratively feasible for the court to determine whether a particular individual is a member." *O'Connor v. Boeing N. Am., Inc.*, 184 F.R.D. 311, 319 (C.D. Cal. 1998).  Here, the proposed class is ascertainable because plaintiffs clearly identify who the class members are: any person or entity that purchased Forescout common stock during the proposed class period.  Moreover, defendants do not challenge the ascertainability of the class.  Accordingly, the class is ascertainable, and the proposed class members identifiable.

Defendants contest class certification on the grounds that plaintiffs have failed to identify a common methodology that will reliably measure damages on a class-wide basis and thus cannot satisfy Rule 23(b)(3) and that plaintiffs fail to satisfy Rule 23(a)'s typicality and adequacy requirements.  Dkt. No. 202 at 8.  As a result, defendants urge that class certification be denied, or in the alternative, that the Court define two sub-classes: (1) from May 10, 2019 to February 6, 2020

---

[2] Excluded from the class are "Defendants, officers and directors of Forescout, any entity in which the Defendants have or had a controlling interest; and affiliates, family members, legal representatives, heirs, successors or assigns of any of the above."  Dkt. No. 196 at 1 n.2.

(at the latest), premised on the claim that Forescout's stock was inflated due to the 2019 pipeline statements, and (2) from May 12, 2020 to May 15, 2020, premised on the claim that Forescout's stock was inflated due to the May 11, 2020 merger statement. *Id.* at 3, 12, 14, 17. Plaintiffs respond that defendants seek to introduce merits issues about loss causation that are premature at the class certification stage. Dkt. No. 214 at 1-2. Both parties submit expert reports in support of their arguments.

## I.      Rule 23(b)

Along with the requirements of Rule 23(a) (discussed in Part II below), plaintiffs must establish that one or more of the grounds for maintaining the suit under Rule 23(b) are met: (1) that there is a risk of substantial prejudice from separate actions; (2) that declaratory or injunctive relief benefitting the class as a whole would be appropriate; or (3) that common questions of law or fact predominate and the class action is superior to other available methods of adjudication. *See* Fed. R. Civ. P. 23(b). Plaintiffs seek certification under Rule 26(b)(3).

### A.      Predominance

Rule 23(b)(3) requires that "the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. Proc. 23(b)(3). The predominance analysis "focuses on the relationship between the common and individual issues in the case and tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Wang v. Chinese Daily News*, 737 F.3d 538, 545 (9th Cir. 2013) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998) (internal quotation marks omitted)). To meet the predominance requirement under Rule 23(b)(3), "plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability" under the proposed damages model. *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) (citing *Comcast*, 569 U.S. at 38). "Calculations need not be exact," but "any model supporting a plaintiff's damages case must be consistent with its liability case" and courts must conduct a "rigorous analysis" to determine whether this is so. *Comcast*, 569 U.S. at 35 (citations and internal quotation marks

United States District Court
Northern District of California

omitted).  However, "damage calculations alone cannot defeat certification." *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010).

Defendants contend that plaintiffs advance two "separate theories of liability" originally pled in separate complaints: one involving statements made between May and November 2019 and the other relating to the May 11, 2020 statement that Forescout "look[ed] forward to completing [the] pending transaction with Advent." Dkt. No. 202 at 1.  Defendants contend that plaintiffs' "proposal to back-cast alleged sales pipeline inflation over the entire Class Period would award damages untethered to their theory of liability to those who purchased after February 6, 2020." *Id.* at 10. According to defendants, to the extent Forescout's stock price was inflated by the alleged 2019 misstatements (which defendants deny), the February 6, 2020 merger announcement rendered Forescout's fundamentals, including the status of its sales pipeline, irrelevant to its stock price. *Id.* at 2, 11.  Defendants contend that at a minimum the proposed class should be divided into two distinct time periods that require two distinct methods of assessing damages. *Id.* at 3, 12, 14.

Defendants separately contend that even if plaintiffs could somehow show that the May 18, 2020 disclosure to some extent corrected both the 2019 pipeline-related statements and the merger statement, plaintiffs would need to disaggregate the portion of the May 18, 2020 price decline attributable to "correction" of the May 11, 2020 statement and the portion attributable to "correction" of the 2019 sales pipeline statements.  Dkt. No. 202 at 3, 14.  Defendants assert that plaintiffs' expert "fails to explain how he would disaggregate additional confounding variables affecting Forescout's stock price movement in May 2020, including the onset of a global pandemic that drastically impacted the tech sector." *Id.* at 15.

### 1.    Plaintiffs Are Entitled to the Fraud-on-the-Market Presumption of Reliance

As an initial matter, plaintiffs argue that they are entitled to the fraud-on-the-market presumption of reliance because Forescout's shares traded in an efficient market during the class period.  Dkt. No. 196 at 11.  Investors are eligible for the presumption of reliance under the fraud-on-the-market theory if the plaintiff traded the stock between when the misrepresentations were

United States District Court
Northern District of California

made and when the truth was revealed. *Halliburton II*, 573 U.S. at 278. Defendants do not contest this, and the Court agrees that plaintiffs are entitled to the rebuttable fraud-on-the-market presumption of reliance. *See Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988) ("An investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price. Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b–5 action.").[3] "[T]o invoke the *Basic* presumption, a plaintiff must prove that: (1) the alleged misrepresentations were publicly known, (2) they were material, (3) the stock traded in an efficient market, and (4) the plaintiff traded the stock between when the misrepresentations were made and when the truth was revealed." *Halliburton II*, 573 U.S. at 278. The Court further finds that plaintiffs have adequately shown that Forescout's stock traded on an efficient market during the class period such that the fraud-on-the-market presumption can be applied, a point defendants also do not contest. *See* Dkt. No. 194, Ex. A ("Nye Report") ¶¶ 14-19, 22-57 (analyzing the *Cammer* factors and other factors applied by courts in evaluating market efficiency to conclude that the market for Forescout was informationally efficient throughout the class period and explaining that throughout the class period Forescout shares were listed and traded on the NASDAQ as well as other national

---

[3] In their sur-reply, defendants argue that "the alleged misrepresentations here . . . hinge on purportedly misleading non-public projections provided to Advent in the context of confidential diligence provided to a private acquiror." Dkt. No. 217 at 9. Thus, plaintiffs' "theory is not fraud-on-the-market, but 'fraud-on-Advent.'" *Id.* This pertains to defendants' arguments about plaintiffs' theory of liability, discussed below. The Court does not construe this to be an attack on the conclusion that plaintiffs are entitled to the fraud-on-the-market presumption of reliance because Forescout's shares traded in an efficient market during the class period.

Defendants cite two cases in relation to this argument. Both discuss whether a plaintiff has adequately pled reliance. In one, *ScripsAmerica, Inc. v Ironridge Global LLC*, 119 F. Supp. 3d 1213, 1251 (C.D. Cal. 2015), the plaintiff's alleged misrepresentations were part of an arm's length transaction and the court had previously ruled that the plaintiff did not plausibly allege that the market incorporated the alleged misrepresentations. *Id.* at 1251. Additionally, the allegations in the complaint "clearly" established that the plaintiff did not rely on publicly available information concerning its stock price or business in general. *Id.* In the other, *In re American Intern. Group, Inc. Sec. Litig.*, 265 F.R.D. 157, 175 (S.D.N.Y.2010), the complaint nowhere alleged that the defendants made a public misstatement, nor did plaintiffs provide evidence of any public misstatement in their motion for class certification submissions. The court found that because plaintiffs had "not established or even pled" that the defendants made any public misstatement or omission, the fraud-on-the-market presumption did not apply. *Id.* Here, plaintiffs allege a series of allegedly misleading public statements in the SCAC so neither of these cases is instructive.

securities markets); *Todd v. STARR Surgical Co.*, CV-14-05263-MWF-RZ, 2017 U.S. Dist. LEXIS 1919, at *17 (C.D. Cal. Jan. 5, 2017) ("federal courts are unanimous in their agreement that a listing on the NASDAQ or a similar national market is a good indicator of efficiency").

### 2. Whether Damages Can Be Calculated on a Class-Wide Basis Consistent with Plaintiffs' Theory of Liability

Plaintiffs point to the "out-of-pocket measure of damages" model proposed by their expert, Dr. Zachary Nye, to quantify per-security damages on a class-wide basis.  Nye Report ¶¶ 58, 59 n.100.  According to Dr. Nye, this framework reflects methodologies commonly applicable to each class member that he would propose to use if asked to calculate damages.  *Id.* ¶ 58.  Specifically, an "event study" can be used to isolate company-specific security price movement caused by the revelation of true facts related to the alleged fraud from price movement caused by other factors, such as changes in market and industry conditions.  *Id.* ¶ 60.  "After isolating the price impact of the alleged misstatements and omissions, one can estimate the price inflation due to the alleged fraud for each day during the class period."  *Id.*  Once "daily levels of price inflation have been calculated throughout the Class Period, a Class member's actual trading activity in the security can be used to mechanically calculate damages on an individual basis."  *Id.* ¶ 62.

For purposes of examining market efficiency under the fifth *Cammer* factor, Dr. Nye conducted an event study "to determine whether new, material, Company-specific information promptly caused a measurable stock price reaction after accounting for contemporaneous market and industry effects."  *Id.* ¶¶ 66, 48.  For purposes of this event study, Dr. Nye used two "Control Periods": prior to and including February 6, 2020, and February 7, 2020 through May 15, 2020, both dates inclusive.  *Id.* ¶ 67.  Two Control Periods were used "given that, following a takeover announcement, a target company's 'share price is determined largely by the market's assessment of the likelihood of success of the takeover bid.'"  *Id.* (citation omitted).  In his deposition, Dr. Nye explained that he adjusted his control period at the Advent transaction "to account for the structurally different asset price and dynamics that you would expect after a company is expected to go private or even merge with another company."  Dkt. No. 203, Ex. 2 ("Nye Dep.") at 63:17-24.

Defendants submit an expert report by Prof. Wei Jiang ("Dr. Jiang"), who opines that Dr. Nye's methodology fails to adequately consider the implication of the acquisition announcement. Dkt. No. 203, Ex. 1 ("Jiang Report") ¶ 48.  Per Dr. Jiang, "according to a large body of academic literature," once it is known that a company may be acquired through a takeover or merger, "its stock price is largely driven by the offer price and expectation of deal completion, not its fundamentals."  *Id.* ¶ 38.  "This explains why, despite Forescout releasing financial results on February 6, 2020 that missed earlier guidance, its stock price increased sharply" in response to the acquisition announcement.  *Id.* ¶ 40.  Dr. Jiang reviewed "13 equity analyst reports published within two weeks following the February 6, 2020 announcements" and notes that "after the [a]cquisition [a]nnouncement, many analysts commented that Forescout's stock price was no longer driven by the company's fundamentals, but instead driven by the prospect of the pending acquisition being completed at the announced deal price of $33."  *Id.* ¶ 45.

Dr. Nye also reviewed analyst commentary following the February 6, 2020 announcements, concluding: "Given that: (i) the Company reported 'weak 4Q results' as both revenue and EPS were short of consensus; (ii) the Company's "stock [wa]s no longer trading on fundamentals"; (iii) "the offer price represent[ed] a fair value for ForeScout's business"; and (iv) most analysts set their price targets for the Company to $33 "based on [the] proposed transaction price," the statistically significant Company-specific stock price increase on February 6, 2020 is consistent with that expected in an efficient market.  Nye Report, Ex. 12 at 71.

According to Dr. Jiang, Forescout's stock price could not have been inflated by any alleged 2019 sales pipeline misstatements from February 6, 2020 to May 11, 2020 because after the merger announcement, "the stock price was predominantly driven by: (i) expectations regarding the Advent acquisition; and (ii) market-wide effects caused by COVID-19's catastrophic shock."  *Id.* ¶ 55, *see also* ¶ 48.  Additionally, merger inflation could not have been present in Forescout's stock price before May 11, 2020 because the only alleged merger misstatement remaining in the case is the one made on that date.  *Id.* ¶ 54.  Dr. Jiang notes that Forescout's merger arbitrage spread spiked temporarily in March and mid-April 2020, however her analysis of this temporary spike suggests that the stock price was severely impacted by COVID-19 rather than being driven by company-

specific fundamentals.  *See id.* ¶¶ 50-53.[4]  In sum, "there is no reason to believe that those who purchased Forescout's stock over [the February 6, 2020 to May 11, 2020] period suffered any damages," even under the continuing sales pipeline inflation theory.  *Id.* ¶ 56.  However, the Nye methodology "would incorrectly assume that all or some portion of Forescout's abnormal returns following any alleged corrective disclosure (e.g., May 18, 2020) reflects price inflation that was previously present in Forescout's stock price from the start of the [p]roposed [c]lass [p]eriod, including the February 6 through May 11, 2020 sub-period."  *Id.* ¶ 56.[5]

Dr. Jiang separately opines that Dr. Nye "provides no reliable method" for separating out the price impact of any purported correction of the May 11, 2020 merger misstatement from Forescout's abnormal return on May 18, 2020.  *Id.* ¶¶ 58-59.  Based on a review of 10 analyst reports following the May 18, 2020 disclosure, Dr. Jiang concludes that "the decline in Forescout's stock price following the disclosure of the Termination Letter was attributable to a variety of factors, including, among others, market participants assigning: (i) a lower probability on the Advent deal's completion at the original price of $33 (*i.e.*, a readjustment in the market's perception of the deal risk); (ii) a higher probability of a deal's completion at a lower price; (iii) a higher probability of deal failure; (iv) a lower standalone value due to COVID-19's impact on Forescout's business; and (v) incremental negative information about the target typically conveyed in bidder-initiated deal cancellations, beyond any public information about the target's fundamentals."  *Id.* ¶ 68.

Dr. Nye testified at his deposition that for purposes of his class certification report where he was assessing market efficiency, he didn't disentangle the various company-specific pieces of information and their effects on the market price, but the event study methodology "includes additional analyses of that company-specific return that can be utilized to distinguish between competing information, company-specific information and its effect."  Nye Dep. at 75:1-13.  Dr.

---

[4] The merger arbitrage spread is one indicator of the probability of deal success.  Jiang Report ¶ 41.  A smaller merger arbitrage spread generally implies a higher probability of deal completion. *Id.*  The merger arbitrage spread is ultimately zero shortly before a deal is completed.  *Id.*

[5] According to Prof. Jiang, this is because the Nye methodology's "backcast" approach starts by calculating the "Company specific price movement caused by the revelation of true facts" and treats it as the price inflation present on all prior days in the class period.  Jiang Report ¶ 56

United States District Court
Northern District of California

Nye then testified to various methods he could use to disentangle company-specific pieces of information.  *See id.* at 75:14-76:6.  Dr. Jiang asserts that based on her "teaching and research in finance over more than two decades" she is "not aware of any well-accepted extensions of the event study methodology that would permit one to reliably allocate a single price drop to the impact of 'competing information' (*e.g.*, removal of the Alleged Merger Inflation versus changes in Forescout's standalone value)."  Jiang Report ¶ 71.  Dr. Jiang then proceeds to explain why none of the four "disentangling" methods for doing so that Mr. Nye mentioned in his deposition—"discounted case flow modeling," "looking at the academic findings with respect to certain corporate events and their conditional average on a stock price," "content analysis," *i.e.*, review of analyst reports, and "option pricing theory"—are suitable for reliably separating out the alleged merger inflation from Forescout's abnormal return on May 18, 2020.  *See id.* ¶¶ 71-89.

In his Reply Expert Report, Dr. Nye opines that the bulk of Dr. Jiang's report is based on her adoption of an "overly narrow interpretation of Lead Plaintiffs' theory of liability."  Dkt. No. 215, Ex. C ("Nye Reply Report") ¶ 7.  Dr. Nye also asserts that a "determination of whether and to what extent there was inflation present in Forescout's stock price during the Class Period" requires an assessment of loss causation, as does the purported requirement that plaintiffs specify how to separate out the effects of confounding information.  *Id.* ¶ 20.  According to Dr. Nye, Dr. Jiang draws premature conclusions about the level of inflation his damages methodology would estimate in stock price from February 6, 2020 to May 11, 2020 and proffers opinions about the amount of inflation present during this period without conducting the requisite analysis.  *See id.* ¶¶ 25, 27.  Dr. Nye also describes additional reasons that Dr. Jiang's conclusion that there was no price inflation in Forescout stock from February 6, 2020 to May 11, 2020 is unreliable.  *See id.* ¶¶ 27-31.  Dr. Nye opines that given his understanding that the alleged misstatements and omissions about Forescout's sales pipeline and revenue projections directly contributed to Advent's take-private offer, even assuming that Forescout's stock price was entirely driven by the prospect of the pending acquisition, it would still be inflated by the other alleged misstatements under plaintiffs' theory of liability.  *Id.* ¶¶ 32-34.  Dr. Nye further opines that Dr. Jiang ignores the inherent relationship between the prospect of the Advent merger being completed and Forescout's fundamentals.  *Id.* ¶ 35.  Per Dr.

Nye, "[i]t is widely recognized in the academic literature that the success of a pending takeover bid depends, in large part, on the target company's fundamentals." *Id.*

Dr. Nye separately opines that "to the extent that any truly confounding information was disclosed on the corrective event dates, it is widely recognized that an event study can be fashioned so as to isolate the effects of confounding events." *Id.* ¶ 39. He points out that Dr. Jiang never defines what could be considered a reliable method for disentangling the impacts of competing information and opines that "all her criticisms demand that he provide the underlying assumptions and inputs to the disentanglement methodology at this early stage of the litigation." *Id.* ¶ 41. Regardless, he asserts, Dr. Jiang fails to identify any confounding information that could not be reliably disentangled from the May 18, 2020 alleged corrective disclosures. *Id.* ¶ 42. For example, in the related Delaware action, Forescout denied that COVID-19 had a "materially disproportionate adverse effect" on its business compared to its peer companies, so at the merits stage, the effect of COVID-19 on Forescout's stock price "can readily be controlled for by analyzing the stock price performance of Forescout's peer group during this time period." *Id.* ¶ 43.

\*\*\*

In their reply, plaintiffs for the first time clearly articulate their theory of liability. As stated by Dr. Nye, plaintiffs allege a theory of liability in which Forescout made materially misleading statements about the sales pipeline and merger that all stemmed from the "same substantial negative information concerning demand for Forescout's products and the Company's ability to generate revenue." Nye Reply Report ¶ 54, *see also* ¶ 49 (noting that under lead plaintiffs' theory of liability, defendants "concealed Forescout's adverse demand trends and the impact such trends were having on the Company's financial prospects, including the Company's ability to successfully close the pending Advent acquisition"). Under this theory of liability, the May 11, 2020 misstatement served to maintain the remaining price inflation created by the 2019 sales pipeline misstatements by preventing the truth that Forescout's "deteriorating sales pipeline and adverse demand trends had put the planned acquisition in serious jeopardy" from becoming public. *Id.* ¶¶ 12, 49. Furthermore, the 2019 misstatements are what "lured Advent to the negotiating table in the first place." *Id.* ¶ 15. Additionally, Advent's reasons for backing out of the deal are "precisely the same factors" plaintiffs

allege were concealed throughout the class period.  *Id.* ¶ 12.

Defendants contend in their sur-reply that Glazer's supplemental document production and deposition testimony contradict this purported unitary theory of liability.  Dkt. No. 217 at 6. Specifically, defendants contend that Glazer's supplemental production and the supplemental deposition testimony of its corporate designee Mark Ort "expressly reject the idea that Advent—a sophisticated private equity fund that had access to voluminous non-public information regarding Forescout's operations through the transaction diligence process—would have been misled by any projections Forescout provided."  *Id.*  Defendants contend that plaintiffs' claim that Advent was "induced to make an inflated offer by the alleged Sales Pipeline misstatements and by internal projections provided during the course of negotiations is contradicted by Glazer's supplemental discovery" and inconsistent with plaintiffs' proposed class-wide damages methodology.  *Id.* at 7.

In support of these arguments, defendants point to a March 27, 2020 Bloomberg message exchange between J. Davidowitz of Seaport Global Holdings and Mr. Ort, where Mr. Davidowitz messaged that "someone had pointed out an oddity in the background section" regarding the Advent merger deal.  Dkt. No. 218, Ex. 3 at GlazerCapital_00060612.  Mr. Davidowitz and Mr. Ort appear to have held a call.  *See id.* at GlazerCapital_00060612-613.  Mr. Davidowitz then messaged: "Mark, lawyer felt the non-reliance representation section of the DMA covers this and pretty much absolves the seller from having a problem here."  *Id.* at GlazerCapital_00060613.  Mr. Ort then messaged: "I agree. I'm telling you I have seen this.  And Advent aint stupid.  They know that projections [are] lipstick on a pig."  *Id.*  When asked at his deposition what he understood Mr. Davidowitz to be saying in this message, Mr. Ort responded: "[M]y understanding was he was suggesting that if Forescout provided projections to Advent that were more positive than perhaps other illustrative guidance that they had internally which had not been shared, that Mr. Davidowitz's attorney was suggesting that Forescout indemnify themselves by the section in the merger agreement which represents that Advent is not relying on such projections from Forescout."  Dkt. No. 218, Ex. 1 ("Glazer Supp. Dep.") at 307:23-308:12.  When asked specifically about his statement that "Advent ain't stupid. They know that projections [are] lipstick on a pig[,]" Mr. Ort testified: "I believe that what I meant was that Advent is fully capable of conducting due diligence on their own and that

they need to treat any projections they receive from Forescout or the management of a target company as an optimistic case projection." *Id.* at 308:20-309:1.

Defendants also point to an April 30, 2020 Bloomberg message exchange where an analyst at Capstone Investment asked Glazer investment professional Vik Mittal what he made of Spuce Point "forensic" work "based on earnings releases and previous forecasts that the proxy clearly states [] were given to Advent during the dd process." Dkt. No. 218, Ex. 4 GlazerCapital_00091564. Mr. Mittal responded: "[I don't know] irrelevant [in my opinion]." *Id.* Defendants then point to evidence that the Spruce Point report was "widely derided." *See id.* Ex. 5 at GlazerCapital_00092222 (analysts characterizing Spruce Point as an "#arbitroll" after noting that "Spruce Point did not provide an argument of what mechanism Advent would use to exit the deal, though Bloomberg suggests a disclosure issue around internal forecasts"); Ex. 6 at GlazerCapital_00091983 (analyst stating "[t]he guys at [S]pruce [P]oint are the definition of clowns" in relation to the Advent deal); Ex. 7 at GlazerCapital_00091721 (Bloomberg message from Churchill Capital noting, "obviously we don't see eye-to-eye with the Spruce Point short report . . . We thought the spread was already attractive and today's report has not changed our view"). This is relevant because Spruce Point allegedly conjectured that Advent was misled by the projections Forescout shared in diligence. Dkt. No. 217 at 8-9.

According to defendants, considering this evidence, there is "no basis to conclude that Advent's offer somehow perpetuated the alleged 2019 Sales Pipeline inflation beyond February 6, 2020." *Id.* at 9. In other words, the supplemental discovery confirms what was outlined in defendants' opposition and the Jiang Report: that after the February 6, 2020 merger announcement, "Forescout's share price was driven by the market's assessment of the likelihood that the Merger would close at the announced share price, and there was no Sales Pipeline inflation, at the absolute minimum, for the February 6, 2020 to May 11, 2020 time period." *Id.* at 9-10.

***

Based on the evidence and competing expert reports presented, the Court cannot conclude as a factual matter that all inflation from the alleged 2019 sales pipeline misstatements dissipated after the February 6, 2020 merger announcement. The parties have provided competing expert

opinions and defendants' supplemental evidence submitted in their sur-reply does not clearly indicate that no sales pipeline inflation could have been present after February 6, 2020.  Courts should not "engage in free-ranging merits inquiries" at the class certification stage.  *Amgen*, 568 U.S. at 466.  Plaintiffs' SCAC alleges that a materially false or misleading statement was made on November 6, 2019 about fourth quarter FY 2019 revenue guidance.  SCAC ¶¶ 120-121.  On May 11, 2020, Forescout disclosed its below guidance first quarter 2020 results, which the Court understands to be a partial corrective disclosure.  *See* ¶¶ SCAC 69, 72, 154.  Analysts attributed the May 18, 2020 stock price decline to both the earnings miss of May 11, 2020 as well as Advent's decision not to close the merger.  *See* Dkt. No. 215, Ex. A ("Jiang Dep.") at 65:17-69:18.  Advent's termination letter identified Forescout's recent financial performance as a reason for the merger termination.  SCAC ¶ 70; *see also* Nye Reply Report ¶ 35 (noting that it is "widely recognized in the academic literature that the success of a pending takeover bid depends, in large part, on the target company's fundamentals").  "Arguments regarding the impact or lack of impact of different disclosures on the market are generally reserved for the merits stage."  *In re Snap Inc. Sec. Litig.*, 334 F.R.D. 209, 225 (C.D. Cal. 2019) (noting that the cases relied on by the defendant "stand only for the proposition that when a securities class action defendant has *unequivocally* disclaimed the prior assertion, certification of a class that extends beyond that period is improper").

Additionally, the Court sees one theory of liability here:  that defendants' alleged misrepresentations (about the sales pipeline and the May 11, 2020 merger statement) inflated Forescout stock price, and corrective disclosures and/or the materialization of concealed risks removed this inflation.  *See* SCAC ¶¶ 69, 71, 90, 118, 174, 176; *In re Apple Sec. Litig.*, No. 4:19-cv-2033-YGR, 2022 U.S. Dist. LEXIS 23771, at *33-34 (N.D. Cal. Feb. 4, 2022).  Courts shorten class periods when defendants explicitly disclose to investors that they should not rely on defendants' public statements.  *See Hayes v. MagnaChip Semiconductor Corp.*, No. 14-cv-01160, 2016 WL 7406418, at *7-8 (N.D. Cal. Dec. 22, 2016) (declining to extend the class period where the defendant disclosed that its prior financial statements "should not be relied upon" and noting that a number of district courts have declined to extend the class period when similar unequivocal statements were made).  There are no such unequivocal disclosures at issue here.

The Court further finds that plaintiffs have adequately disclosed a class-wide damages model under *Comcast*. Dr. Nye opines that a class-wide "out of pocket" damages model can be commonly applied to all class members. *See* Nye Report ¶ 60; Nye Reply Report ¶ 17. Dr. Nye provides details on how such a model could be constructed, including by using an event study, and explains that this methodology can disentangle the effects of confounding information and events. *See* Nye Report ¶¶ 59-62; Nye Reply Report ¶¶ 39-40. The Court finds these disclosures to be sufficient to satisfy Rule 23(b)(3). Numerous courts in the District agree regarding the sufficiency of damages disclosures like Dr. Nye's. *See City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, No. 18-cv-04844-BLF, 2022 U.S. Dist. LEXIS 83836, at *26-27 (N.D. Cal. May 9, 2022) (collecting cases). "Courts regularly reaffirm that the out-of-pocket, or event study, method matches plaintiffs' theory of liability under Section 10(b) of the Securities Exchange Act, making it the standard method for calculating damages in virtually every Section 10(b) class action." *City of Miami Gen. Empls. Ret. Trust v. RH, Inc.*, No. 17-CV-00554-YGR, 2018 WL 4931543, at *3 (N.D. Cal. Oct. 11, 2018). Plaintiffs assert a fraud-on-the-market theory of liability. Accordingly, the method proposed by plaintiffs, which is based on an economic valuation analyzing the extent to which disclosure(s) correcting the alleged misrepresentations caused the price of Forescout stock to fall, will limit damages to those that are attributable to that theory of liability. *See id.*; *In re Qualcomm Inc. Sec. Litig.*, No. 17cv121-JO-MSB, 2023 U.S. Dist. LEXIS 47016, at *53 (S.D. Cal. Mar. 20, 2023) (holding that the plaintiffs' proposed event study method damages methodology "is sufficient under *Comcast* because the methodology can isolate different categories of misrepresentations and measure the damages stemming from each"). The Ninth Circuit reads *Comcast* to demand that plaintiffs "be able to show that their damages stemmed from the defendant's actions that created the legal liability." *Leyva*, 716 F.3d at 514 (citing *Comcast*, 569 U.S. at 38). Plaintiffs have done so here. Dr. Nye's methodology of determining damages is consistent with plaintiffs' theory that losses resulted from the inflated stock price caused by defendants' series of alleged misleading statements and later price drops when the truth was revealed.

The Court further finds that the challenges defendants raise to Dr. Nye's damages methodology pertain to loss causation, which requires plaintiffs "to show that a misrepresentation

that affected the integrity of the market price also caused a subsequent economic loss." *Erica P. John Fund, Inc., v. Halliburton Co.*, 563 U.S. 804, 812 (2011) ("*Halliburton I*") (emphasis removed), *see also Police Ret. Sys. of St. Louis v. Granite Constr. Inc.*, No. C 19-04744 WHA, 2021 U.S. Dist. LEXIS 12458, at *7 (N.D. Cal. Jan. 21, 2021) ("Calculating the actual inputs into the out-of-pocket method by parsing and scaling the abnormal returns requires an analysis of 'loss causation'").  The Supreme Court has said that plaintiffs do not need to prove loss causation at the class certification stage, even when "intervening causes" beyond the alleged misrepresentation "such as 'changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events' . . . were responsible for the loss or part of it." *Halliburton I*, 563 U.S. at 812-13.  Numerous courts in this District have similarly held that inquiries into loss causation are inappropriate at the class certification stage.  *See, e.g.*, *Sheet Metal Workers Nat'l Pension Fund v. Aktiengesellschaft*, No. 20-cv-04737-RS, 2023 U.S. Dist. LEXIS 88178, at *23-24 (N.D. Cal. May 19, 2023) (finding the defendants' attacks on the plaintiffs' damages methodology premature where the plaintiffs had shown that investor uncertainty about risk, investors' beliefs about a merger, and the impact of alleged corrective disclosures could be factored into the out-of-pocket damages model); *Hatamian v. Adv. Micro Devices, Inc.*, No. 14-cv-00226 YGR, 2016 WL 1042502, at *9 (N.D. Cal. Mar. 16, 2016) (finding the defendants' argument that the plaintiffs' damages model was insufficient because it reflects a misalignment between certain misrepresentations and later corrective disclosures and because the expert's methodology would not be able to disaggregate price inflation are attacks on loss causation properly addressed by a fact-finder on the merits); *SEB Inv. Mgmt. AB v. Symantec Corp.*, 335 F.R.D. 276, 288 (N.D. Cal. 2020) (holding that the defendants' assertion that the plaintiff would be unable to disaggregate artificial inflation from confounding events is "an inquiry into loss causation and loss causation need not be analyzed at the class certification stage"); *Luna v. Marvell Tech. Grp., Ltd.*, No. C 15-05447 WHA, 2017 U.S. Dist. LEXIS 178674, at *17 (N.D. Cal. Oct. 27, 2017) (holding that the defendants' argument that the plaintiff's expert "has not shown how he will disaggregate price inflation attributable to confounding events" is an inquiry into loss causation which need not be analyzed at the class certification stage).

Defendants cite little case law to support their contention that their criticisms of plaintiffs' proposed damages model require the class at a minimum be subdivided into two sub-classes. They rely primarily on *In re BP P.L.C. Sec. Litig.*, No. 4:10-md-2185, 2013 WL 6388408, at *17 (S.D. Tex. Dec. 6, 2013) ("*BP I*"), where a Texas court held that "[s]imply invoking the event study methodology . . . [does] not assuage the Court that the class-wide damages methodology proposed will track Plaintiffs' theories of liability," as required by *Comcast*. However, this statement must be examined in light of the circumstances of that case. *BP I* "addressed certification for two putative investor classes: one for shares held after the infamous British Petroleum oil spill and one for a pre-spill class." *Junge v. Geron Corp.*, No. C 20-00547-WHA, 2022 U.S. Dist. LEXIS 61962, at *24 (N.D. Cal. Apr. 2, 2022). Upon a renewed motion for class certification, the district court found the plaintiffs' proposed methodology was only appropriate to use with respect to a post-explosion subclass. *In re BP P.L.C. Sec. Litig.*, No. 10-md-2185, 2014 WL 2112823, at *12 (S.D. Tex. May 20, 2014) ("*BP II*"). The plaintiffs' pre-explosion theory of liability concerned the court because it "antithetical to the 'fraud-on-the-market' theory." *Id.* at *4, *12. The court concluded that the plaintiffs' proposed damages model with respect to the pre-spill subclass would involve an examination of every class member's "subjective motivations," injecting "individualized inquiries into what is supposed to be a classwide model of recovery." *Id.* at *11-12. Not so here, where plaintiffs' theory of liability rests upon a fraud-on-the-market theory of reliance.

Defendants also cite *Loritz v. Exide Techs.*, No. 2:13-cv-02607, 2015 WL 6790247, at *22 (C.D. Cal. July 21, 2015). There, in relevant part, the court found that the plaintiffs "failed to set forth any model of damages (let alone one tied to their theory of liability) in their opening brief." *Id.* Plaintiffs' expert addressed damages for the first time in the rebuttal report only "discussing general techniques for computing damages in securities fraud cases." *Id.* However, "[plaintiffs' expert] fail[ed] to tie these theories to the facts of this case or to each other—in other words, he fail[ed] to propose one model explaining how he would use the techniques in concert to calculate damages in this case." *Id.* Not so here, where Dr. Nye set forth the out-of-pocket model of damages in his opening expert report, tied the model to the facts of this case, and identified techniques that could be used to disaggregate the effects of different misrepresentations and confounding

information.[6]

Because plaintiffs are entitled to a presumption of reliance under *Basic* and they have adequately tied their damages model to their theory of recovery, the Court finds that plaintiffs have demonstrated that "questions of law or fact [including reliance and damages] common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). The purpose of analyzing plaintiffs' damages model at the class certification stage "is to determine whether individualized damages questions predominate over other common issues" and does not permit defendants "a preemptive strike on the merits." *In re Bofi Holding, Inc. Sec. Litig.*, No. 3:15-cv-02324-GPC-KSC, 2021 U.S. Dist. LEXIS 159675, at *30 (S.D. Cal. Aug. 23, 2021). Plaintiffs "may face substantial hurdles in actually proving loss causation and out-of-pocket damages." *Sheet Metal Workers Nat'l Pension Fund*, 2023 U.S. Dist. LEXIS 88178, at *23 (citation omitted). "Yet the fact that calculating damages is a complex undertaking does not undermine the use of the out-of-pocket model, nor does it militate against certifying the class." *Id.* at *23-24.

### B. Superiority

"Rule 23(b) also requires that class resolution must be 'superior to other available methods for the fair and efficient adjudication of the controversy.'" *Hanlon*, 150 F.3d at 1023 (quoting Fed. R. Civ. P. 23(b)(3)). The Court must determine "whether the objectives of the particular class action procedure will be achieved in the particular case." *Id.* (citation omitted). The four factors for the Court's examination are: (1) the interest of each class member in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against the class; (3) the desirability of concentrating the litigation of the claims in the particular forum; and (4) the difficulties likely to be encountered in the management of a class action. *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1190-92 (9th Cir. 2001).

Defendants do not challenge superiority and the Court finds that a class action is the superior

---

[6] The same court that decided *Loritz* distinguished it in a subsequent case involving an expert report by Dr. Nye. *See In re Snap Securities Litigation*, 334 F.R.D. at 216-217.

method of adjudication in this case.  The alternative methods of resolution are individual claims by geographically dispersed individual plaintiffs.  Class treatment will increase the class members' access to redress by unifying what otherwise may be multiple small claims.  Further, to the Court's knowledge, there is no other pending litigation involving these claims. *See id.* at 1191. Each class member will not have to litigate "numerous and substantial separate issues to establish his or her right to recover individually."  *Id.* at 1192.  The complexities of class action treatment do not outweigh the benefits of considering common issues in one trial; thus, class action treatment is the superior method of adjudication.  *See id.*

## II.     Rule 23(a) Requirements

Under Rule 23(a), the class may be certified only if: (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.  *See* Fed. R. Civ. P. 23(a).  These elements are often referred to as "numerosity," "commonality," "typicality," and "adequacy."  *United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO v. ConocoPhillips Co.*, 593 F.3d 802, 806 (9th Cir. 2010).  The Court examines each in turn.

### A.     Numerosity

The class must be so numerous that joinder of all members is "impracticable."  *See* Fed. R. Civ. P. 23(a)(1).  There is no fixed numerical threshold, but generally courts have found the requirement satisfied when the class contains forty or more members.  *See City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, No. 18-cv-04844-BLF, 2022 WL 1459567, at *3 (N.D. Cal. May 9, 2022) (citations omitted).  "In cases involving securities traded on national stock exchanges, numerosity is practically a given."  *In re VeriSign, Inc. Sec. Litig.*, No. C 02-02270 JW, 2005 WL 7877645, at *4 (N.D. Cal. Jan. 13, 2005).

The Court finds that this requirement is met.  Forescout common stock traded regularly and

actively throughout the proposed class period on a national securities exchange, with an average weekly trading volume of $185,251,406. Nye Report ¶ 24. Further, defendants do not oppose class certification on numerosity grounds.

### B. Commonality

Defendants likewise do not challenge certification based on Rule 23(a)'s commonality requirement. Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Fed. R. Civ. Proc. 23(a)(2). Commonality exists where "the circumstances of each particular class member vary but retain a common core of factual or legal issues with the rest of the class." *Parra v. Bashas', Inc.*, 536 F.3d 975, 978-79 (9th Cir. 2008).

The Court concludes that this requirement is satisfied. Common questions include:

> (i) whether Forescout and the Individual Defendants made materially false and misleading statements and omitted to disclose material information that rendered their statements misleading; (ii) whether the underlying misrepresentations and omissions were made with scienter; (iii) whether the Individual Defendants are control persons of Forescout for purposes of the Exchange Act; (iv) whether the price of Forescout's securities during the Class Period was artificially inflated because of the Defendants' misconduct; (v) to what extent the members of the Class have sustained damages; and (vi) the proper measure of damages.

Dkt. No. 196 at 8. The Ninth Circuit has explained that "[t]he overwhelming weight of authority holds that repeated misrepresentations . . . satisfy the 'common question' requirement. Confronted with a class of purchasers allegedly defrauded over a period of time by similar misrepresentations, courts have taken the common sense approach that the class is united by a common interest in determining whether a defendant's course of conduct is in its broad outlines actionable, which is not defeated by slight differences in class members' positions." *Blackie v. Barrack*, 524 F.2d 891, 902 (9th Cir. 1975).

### C. Typicality and Adequacy

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. Proc. 23(a)(3). Rule 23(a)(4) permits the

certification of a class only if the "representative parties will fairly and adequately protect the interests of the class." "The adequacy-of-representation requirement 'tend[s] to merge' with the commonality and typicality criteria of Rule 23(a), which 'serve as guideposts for determining whether . . . maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'" *Amchem Prods. v. Windsor*, 521 U.S. 591, 626 n.20 (1997) (quoting *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 157, n.13 (1982)).

Representation is adequate if: (1) the class representatives and counsel do not have any conflicts of interest with other class members; and (2) the representative plaintiffs and counsel will prosecute the action vigorously on behalf of the class. *Staton v. Boeing, Co.*, 327 F.3d 938, 957 (9th Cir. 2003) (citations omitted). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon* 150 F.3d at 1020. Class certification is inappropriate, however, if a putative class representative is subject to "unique defenses which threaten to become the focus of the litigation." *Hanon*, 976 F.2d at 508 (citations omitted).

Defendants contest the typicality and adequacy of lead plaintiffs for three separate reasons, each addressed in turn.[7]

### 1.    Whether Glazer is Atypical and Inadequate Due to Lack of Reliance on the Alleged Misstatements

Defendants contend that Glazer is atypical and inadequate as the entirety of the class period

---

[7] Defendants do not challenge adequacy of class counsel and the Court finds the proposed class counsel adequate.

United States District Court
Northern District of California

because discovery "suggests that Glazer did not trade in Forescout securities in reliance on either" the alleged 2019 sales pipeline misstatements or the alleged May 11, 2020 merger misstatement. Dkt. No. 217 at 6, 10.

Defendants specifically contend that supplemental discovery confirms that Glazer did not believe that Advent was misled by the alleged 2019 sales pipeline misstatements. *Id.* at 10. Specifically, "Glazer's contemporaneous communications reveal that it did not believe Advent—a sophisticated party with access to extensive non-public diligence—had been misled by any projections provided to it by Forescout in the context of negotiations." *Id.* The Court notes that this is not the same as asserting that Glazer itself was not misled by the alleged misstatements. Defendants also contend that "the record makes clear that Glazer, as a merger arbitrageur, did not invest in Forescout based on any assessment of its fundamentals, but rather based on its views about the likelihood that the Merger would close at the announced price of $33.00 per share." *Id.* Lastly, defendants contend that "Glazer's supplemental discovery also strongly suggests that Glazer did not rely on the alleged May 11, 2020 misstatement." *Id.* at 11.

Defendants point to the following evidence in support of these arguments. On May 18, 2020, Mr. Ort wrote to Paul Glazer, the firm's founder and principal: "Paul, I apologize for getting caught in [Forescout]. I should have had the sense to recognize that without a buyer check we can't be in these. And I should have heeded my own words (during our Dec 31 2019 toast) to 'have the courage to sell' when I had the chance to. Another painful lesson learned." Dkt. No. 218, Ex. 8 at GlazerCapital_00115677; *see also* Ex. 9 at GlazerCapital_00115606 (May 18, 2020 Bloomberg chat from Mr. Ort to Mr. Mittal conveying the same message). At his supplemental deposition, Mr. Ort testified that he apologized "[b]ecause we lost money, and I apologize when something goes wrong under my watch." Ort. Supp. Dep. 378:1-4. He also testified: "When I say taking responsibility it wasn't that somehow I knew something or didn't know something, it was simply the fact that as a leader, it is my responsibility to recognize that the buck stops with me, and the stock had been trading very poorly the last few days . . . in retrospect, clearly the tell-tale signs were there purely from the public domain that somebody knew something, and I was taking responsibility for not being more cautious and I guess heeding that warning." Ort. Supp. Dep. 378:7-378:21. Mr. Ort

27

further testified that "I should have heeded my own words" was a reference to: "At the end of 2019, when we were looking back over the year, I believe that all of us were prompted to come up with [] something that we would implement in a year [or] something professionally that we would work on, and I believe that what I said was have the courage to sell losing positions, and that's a reference to the fact that oftentimes when an investment causes a loss . . . that it is difficult emotionally to be circumspect and skeptical and it is hard to then sell the position and crystallize that loss." *Id.* at 379:12-380:5.   Defendants interpret this to mean that "Mr. Ort admitted that Glazer did not understand the alleged Merger misstatement to mean that there was no risk to the Merger closing; instead, Glazer viewed the public information in the market as raising doubts prior to May 18." Dkt. No. 217 at 11.   Defendants contend that "the mere fact that Glazer believed that those signs existed subjects it to the unique defense that, as a sophisticated merger arbitrageur that conducted extensive research, discussing the Merger and Forescout's business with former insiders and a range of analysts, it did not in fact rely on the alleged May 11 Merger misstatement." *Id.* at 12.

In his initial deposition, Mr. Ort of Glazer Funds indicated that he was unable to recall exactly how the May 11, 2020 statement impacted Glazer's trading decisions.  Glazer Dep. at 157:2-11.[8]  He was also unable to recall what decisions and inputs went into the purchases and sales of Forescout stock.  *Id.* at 148:11-17.  In making its investments, Glazer tracked publicly available sources and conducted private conversations with third parties in Spring 2020 about the company's performance and about the prospects that the merger would close as expected, including a former CEO of Forescout and a solicitation firm.  *Id.* at 132:24 –139:3, 213:14 – 214:5.  Mr. Ort testified that to his knowledge, Forescout's former CEO didn't share any nonpublic information with him at the time of their conversation.  *Id.* at 137:21-24.[9]

---

[8] Plaintiffs and defendants each submit different excerpts of the Glazer deposition by and through Mark Ort.  The Court refers to both sets of excerpts as the Glazer Dep. throughout.

[9] Defendants also contend that Glazer's "work file" does not reference any of the alleged pipeline misstatements.  Dkt. No. 202 at 19.  As plaintiffs point out this is incorrect; the work file summarizes defendants' November 6, 2019 pipeline statements.  *See* Dkt. No. 203, Ex. 11 at ECF 29.

United States District Court
Northern District of California

Plaintiffs argue in their reply that defendants' contention that the Glazer Funds did not rely upon Forescout's fundamentals because they were driven solely by the likelihood that the merger would close "lacks merit because any investor including Glazer Funds needed to consider what value Forescout's stock would have if the merger did not close." Dkt. No. 214 at 12. Dr. Jiang opined that Forescout's stock price following the merger announcement represented a probability-weighted average of deal completion and deal failure, in which case stockholders receive the target stock's standalone value. Jiang Report ¶ 39. Mr. Ort testified that he thinks Glazer developed a general idea of Forescout stock's fair value absent the merger. Glazer Dep. at 188:24-189:5. He further testified that he doesn't see as separate factors how much of the May 18, 2020 stock price decline he would attribute to the re-rating of Forescout's stock price absent the merger and the fact that Glazer could no longer rely on the May 11, 2020 statement about the transaction closing. *Id.* at 187:8-188:22. Dr. Nye opines that the sales pipeline inflation affected the market's understanding of the probability of the merger closing as scheduled and that there is an inherent relationship between a company's fundamentals and the prospect of an acquisition being completed. Nye Reply Report ¶¶ 31-35.

Defendants cite several cases in their opposition that the Court finds do not support their arguments. First, defendants cite *Mulderrig v. Amyris, Inc.*, where the court found the first proposed lead plaintiff atypical and inadequate in part because he made a series of tweets that demonstrated that he understood that the statements at issue in the lawsuit were misleading such that the issue of his own reliance on the alleged fraud "threaten[s] to become the focus of the litigation." 340 F.R.D. 575, 581-82 (N.D. Cal. 2021) (citing *Hanon*, 976 F.2d at 508). No such evidence has been presented here. The court found the second proposed named plaintiff adequate and typical. The defendants argued that this lead plaintiff was atypical and inadequate in part because he had largely been uninvolved in the litigation. *Id.* at 582-83. The court disagreed, noting that the "Supreme Court expressly disapproved of attacks on the adequacy of a class representative based on the representative's ignorance, noting that in complex securities litigation . . . the named plaintiff need not have specific knowledge of the material facts in support of his claim." *Id.* 583 (citing *Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 370–76 (1966)). The court concluded that although this lead

plaintiff could not remember the dates alleged misstatements were made, when he read them, whether they impacted his trade decision, and which specific court filings he reviewed, he expressed a general understanding of the litigation and was not inadequate for his lack of recall. *Id.* at 584. Importantly, he also demonstrated his commitment to his role as a class representative. *Id.* He appeared for a deposition, testified that he reviewed documents pertaining to the case, asked for case updates, and provided requested documents in discovery. Here, Glazer similarly has been actively involved in this litigation, appeared for its deposition, is willing to serve as a representative party on behalf of the class, and understands its duties as class representative. *See* Dkt. No. 66-3.[10]

Defendants also cite *Landry v. Price Waterhouse Chartered Accts.*, 123 F.R.D. 474, 476 (S.D.N.Y. 1989). There, the court found the plaintiffs atypical because of unique defenses related to non-public information they had access to. *Id.* at 476. The court found that the testimony of the plaintiffs made clear that they would be faced with unique defenses and would be "required to devote considerable time to rebut the claim that their purchases were based not on the integrity of the market, but on non-public information that they received." *Id.*

Here, there is no indication that Glazer had access to any material non-public information ("MNPI"). Mr. Ort declares that Glazer Capital LLC, as investment adviser to the Glazer Funds, "maintains an internal commitment to avoid the use of MNPI and, to the end, employs strict protocols and procedures designed to avoid and prevent use of any MNPI." Dkt. No. 215, Ex. E ("Ort. Decl.") ¶ 5. He also declares that the Glazer Funds "did not seek to obtain, and in fact did not possess, any MNPI relating to" Forescout or whether its proposed acquisition by Advent would proceed as announced. *Id.* ¶ 4. He further declares that "any such assertion is illogical because, had

---

[10] Related to this argument, defendants also point to *Rolex v. Emps. Ret. Trust v. Mentor Graphics Corp.*, 136 F.R.D. 658 (D. Or. 1991). There the court found that the fact that the plaintiff continued to trade in the stock "after he learned of the alleged misrepresentations of defendants rebuts the presumption that the plaintiff relied on the misrepresentations in making his purchases." *Id.* at 664. Here, defendants have not shown that Glazer continued to trade in Forescout stock after learning the alleged misrepresentations were misrepresentations. Additionally, this Court has declined to follow *Rolex* after concluding that "the weight of authority appears to favor the position that the purchase of stock after a partial disclosure is not a per-se bar to satisfying the typicality requirement." *In re Connetics Corp. Sec. Litig.*, 257 F.R.D. 572, 577 (N.D. Cal. 2009).

United States District Court
Northern District of California

the Glazer Funds known that Advent was attempting to avoid closing on the acquisition, the Glazer Funds would have refrained from purchasing any additional Forescout stock and, thereby, would have avoided a material amount of the damages they have suffered." *Id.* Defendants have not offered any proof to the contrary. *See In re Turquoise Hill Res. Ltd. Sec. Litig.*, No. 20-cv-08585 (LJL), 2021 U.S. Dist. LEXIS 8840, at *29-30 (S.D.N.Y. Jan. 15, 2021) (crediting a declaration from a lead plaintiff asserting that no MNPI had been received and noting that the opposing movants failed to offer any proof that would elevate their contention above the speculative).[11]

In their sur-reply, defendants point to *Basic*, which held that "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance." 485 U.S. at 248. Defendants reference the *Basic* example that plaintiffs cannot reasonably rely on "allegedly fraudulent attempt[s] to manipulate market price [if] news of the merger discussions credibly entered the market and dissipated the effects of the misstatements" since then those who traded shares after the corrective statements would have no connection to the fraud. *Id.* The evidence defendants point to suggests that Mr. Ort realized in retrospect that he made a mistake but does not suggest that Glazer traded in Forescout stock after the effects of the alleged misstatements dissipated, nor does the Court find that defendants' evidence severs the link between the misrepresentations alleged in the SCAC and the price paid by Glazer Funds at the time it made the transactions. In their sur-reply, defendants also point to *Hayes*, 2016 WL 7406418, at *7-8, where the court found that the defendants had rebutted the presumption of reliance where the defendant company made disclosures that its prior financial statements "should not be relied upon" such that no investor could reasonably have relied on the alleged misstatements. *Hayes* is not analogous because defendants here have not pointed to any disclosure by Forescout that made reliance on the alleged misstatements unreasonable.[12]

---

[11] Plaintiffs also submit an email in which Forescout's former CEO indicated he didn't possess any non-public information in response to a compliance question indicating Glazer did not wish to receive any MNPI and seeking affirmation that none would be provided. Dkt. No. 215, Ex. G.

[12] The Court also notes that the discussed portions of these cases relate to rebutting the

United States District Court
Northern District of California

United States District Court
Northern District of California

In sum, the Court cannot conclude based on the evidence presently before it that defenses unique to Glazer "threaten to become the focus of the litigation." *Hanon*, 976 F.2d at 508. To what extent Glazer relied on the alleged misstatements is best left for the fact finder to resolve on the merits.

### 2.    Whether Glazer is Atypical and Inadequate as to the Pre-May 11, 2020 Period Due to its Trading History

In their opposition, defendants contend that Glazer's history of trading in Forescout precludes a claim that it was harmed by any misstatements made by the Company prior to May 11, 2020. Dkt. No. 202 at 18. Given its "fundamentally different investment objective" as a merger arbitrageur and approach to risk, defendants contend that its posture was "entirely different from other investors with respect to both the materiality of Defendants' alleged misstatements and the nature of damages allegedly suffered before May 11." *Id.* at 20. Dr. Jiang defines merger arbitrageurs as those who "buy the target company's stock and take on 'event risk' (*i.e.*, the risk that the deal may eventually not be completed or be completed only at less favorable terms) in exchange for a relatively modest return (*i.e.*, the merger arbitrage spread)." Jiang Report ¶ 42.

Glazer invested in Forescout common stock pursuant to its merger arbitrage strategy. Glazer Dep. at 73:10-74:10. It only began purchasing shares of Forescout common stock following the February 6, 2020 merger announcement. Dkt. 66, Ex. C, Schedule A; *see also* Glazer Dep. at 80:25 – 81:23. Mr. Ort testified at the Glazer deposition that his best understanding of why specific purchases were made is that "we probably established a price at which we were willing to buy and price at which we were willing to sell." Glazer Dep. 131:20-132:7. The announcement by Forescout on May 18, 2020 that Advent did not intend to close on the acquisition prompted Glazer to "sell the shares." Glazer Dep. 161:21-25; *see also* Dkt. 66, Ex. C, Schedule A.

Dr. Jiang opines that Glazer is differently situated as a merger arbitrageur compared to

---

presumption of reliance for purposes of the fraud-on-the-market theory of reliance, which as discussed in Part I, defendants do not clearly contest.

investors who bought Forescout stock before February 6, 2020.  Jiang Report ¶ 16.  According to Dr. Jiang, "[m]erger arbitrageurs' trading strategy is fundamentally different from those pursued by non-arbitrageur investors who took long positions in a target's stock before the deal's announcement" because they follow an event-driven strategy and bet on an announced deal's completion rather than a directional bet on a target's equity, which depends on the company's ability to generate profits in the long run as well as industry and market-wide factors."  *Id.* ¶ 43.

Defendants rely on *Jaroslawicz v. M&T Bank Corp.*, No. 15-00897, 2023 WL 5528723  (D. Del. Aug. 28, 2023), a case involving Section 14(a) claims where the court excluded merger arbitrageurs from the class on typicality and adequacy grounds.  The court considered whether merger arbitrageurs "should be treated differently than traditional shareholders in securities class actions, as their investment activities objectives may not be typical of the broader class of traditional shareholders and may cause them to experience injury under 14(a) differently."  *Id.* at *28.  The court distinguished cases supporting the proposition that arbitrageurs are routinely included in class actions on the basis that those cases discuss whether "arbitrageurs can be subject to the same presumption of reliance on market prices under a fraud-on-the-market theory of reliance in the context of a 10(b) claim."  *Id.*  The court found these cases inapposite because "liability in 14(a) claims does not require establishing fraud, and reliance on the proxy statements is established for 14(a) claims through the transaction causation element."  *Id.*  The court went on to explain that an expert report by Dr. Jiang provided "significant evidence why merger arbitrageurs are positioned differently than traditional investors with respect to the materiality of the Joint Proxy Statement omissions and the nature of the damages they could have experienced from merger delays and share price fluctuations."  *Id.* at *28.  The court expressed concern about the class representatives' ability "to fairly and adequately represent the interests of merger arbitrageurs" in their absence, especially given that on rebuttal plaintiffs' expert suggested additional theories of harm for merger arbitrageurs that the plaintiffs had not asserted as damages theories in the case.  *Id.* at *29.  The court found that the plaintiffs had asserted damages theories tailored to the factual circumstances of traditional investors like themselves, but that failed to represent some of the key types of theories or damages a merger arbitrageur would raise.  *Id.* at *34.  The court also explicitly found that the class

representatives' representation of merger arbitrageurs had been adequate thus far. *Id.* Ultimately, the court concluded that though it was "convinced that *some* merger arbitrageurs must be excluded from the class, this poses the challenge of crafting a precise definition of merger arbitrageurs to use in the class definition to exclude merger arbitrageurs from the class." *Id.* at *38 (emphasis in original). The Court does not find this case instructive given that the court's reasoning was specific to Section 14(a) claims and due to the factual differences between the cases.[13]

*Kaufman v. Lawrence*, No. 74 Civ. 5081 (RLC), 1977 U.S. Dist. LEXIS 13206 (S.D.N.Y. Oct. 31, 1977), the other case defendants rely on, is also inapposite. This decision concerned whether to approve a securities class action settlement. The court excluded institutional arbitrageurs from the settlement because the facts showed they had opposed the plaintiff's effort to enjoin the exchange offer and had purchased shares after the exchange offer had been made public and therefore could not rely on the misrepresentation. *Id.* at *13. The plaintiff had instituted the class action to enjoin consummation of the exchange offer. *Id.* at *2.

Plaintiffs contend that Dr. Jiang's definition of merger arbitrageurs encompasses all investors who purchased Forescout stock after the merger announcement on February 6, 2020 and if all investors employed the same investment strategy, it is "axiomatic that the Glazer Funds' strategy is typical of other investors." Dkt. No. 214 at 10. Dr. Nye explains in his Reply Report that under lead plaintiffs' theory of liability, all purchasers of Forescout stock during the class period "incurred the same economic loss as a result of the revelation of the relevant truth concealed by all of Defendants' prior misstatements and omissions." Nye Reply Report ¶ 50.

The Court is not persuaded that Glazer is atypical and inadequate because of its position as a merger arbitrageur. It appears Glazer is similarly situated to other investors who purchased Forescout stock after the February 6, 2020 merger announcement, and the Court has not found a basis for concluding that Glazer is atypical as a matter of law. *See Greenfield v. Flying Diamond Oil Corp.*, 1981 U.S. Dist. LEXIS 11924, at *16-17 (S.D.N.Y. Mar. 30, 1981) (surveying relevant

---

[13] The court in *Jaroslawicz* recently vacated the cited opinion and issued a superseding order deciding the class certification motion on other grounds. *Jaroslawicz v. M&T Bank Corp.*, No. 15-00897, 2024 WL 474846 (D. Del. Feb. 7, 2024).

United States District Court
Northern District of California

caselaw and concluding that courts have held that the claims of arbitrageurs and nonarbitraguers were atypical as a matter of fact, but the court had not located cases holding that "the claims of these two groups are atypical or antagonistic as a matter of law").

### 3.   Whether Lead Plaintiffs Glazer and Meitav are Inadequate Due to an Alleged Conflict Between Them

Lastly, defendants contend that both Glazer and Meitav are inadequate to serve as lead class representatives because "there is an unavoidable conflict between them with respect to the damages they claim" due to "the timing of their trades and the nature of their investment approaches." Dkt. No. 202 at 22-23.  Defendants contend that even if plaintiffs could demonstrate that Forescout's stock price remained inflated due to the alleged sales pipeline misstatements until May 18, 2020, Meitav and Glazer would be forced to argue competing positions regarding the portion of the May 18, 2020 stock price drop attributable to the alleged sales pipeline misstatements versus the merger. *Id.* at 23-24.  Specifically, post-May 11, 2020 purchasers would want to apply a damages model that allocates a larger share of the decline to the merger-related statement, while earlier purchasers would want to apply a damages model that allocates a larger share towards correction of the 2019 pipeline-related statements.  *Id.* at 3.

Glazer first purchased Forescout stock following the February 6, 2020 merger announcement.  Glazer Dep. at 81:11-17; Dkt. 66, Ex. C, Schedule A.  Glazer suffered a loss upon the earnings miss announced on May 11, 2020.  *See* Dkt. No. 66-3.  Meitav purchased Forescout securities throughout the class period pursuant to an indexing strategy that roughly tracked an underlying cybersecurity index.  Meitav Dep. at 36:1-23, 69:1-5; Dkt. 86, Ex. A at 2-7.  Meitav bought the vast majority of its shares in Forescout prior to the February 6, 2020 merger statement. *See* Dkt. 86, Ex. A at 2-7.

Dr. Jiang opines that any attempt to disentangle the removal of the alleged merger inflation and the alleged sales pipeline inflation would create a conflict between Glazer and Meitav and those similarly situated.  Jiang Report ¶ 16.  Dr. Jiang indicates that she understands that plaintiffs allege that both the alleged merger inflation and alleged sales pipeline inflation were removed from

United States District Court
Northern District of California

United States District Court
Northern District of California

Forescout's stock price on May 18, 2020, although it is unclear to what extent plaintiffs allege that some portion of the alleged sales pipeline inflation was also removed previously. *Id.* ¶ 91. Dr. Jiang contends that "to reliably assess damages due to the Alleged 2019 Sales Pipeline Misstatements . . . one must also separately measure, among other factors, the portion of Forescout's abnormal return attributable to (i) the removal of the Alleged Merger Inflation; (ii) the removal of the Alleged Sales Pipeline Inflation; and (iii) remaining standalone value change unrelated to any allegations in this case," including, among other things, the global COVID-19 pandemic. *Id.* ¶¶ 90, 93.

Dr. Jiang further opines that "even if one were to assume that the two types of price inflation could be reliably disentangled," the alleged merger inflation is only relevant for assessing damages suffered by those who bought Forescout stock from May 12, 2020 to May 15, 2020, while the alleged sales pipeline inflation is only relevant for assessing damages by those who bought Forescout stock before February 6, 2020. *Id.* ¶ 94. According to Dr. Jiang, this would create a conflict between these two cohorts of the proposed class because Meitav's damages estimate would increase, while Glazer's damages estimate would decrease, if the portion of Forescout's abnormal return attributable to the removal of the alleged sales pipeline inflation was larger. *Id.* ¶¶ 94, 97, 100.

Plaintiffs respond that Meitav "bought shares both before and after the merger announcement and the misrepresentation made on May 11, 2020" and the Glazer funds "purchased Forescout stock both before and after the earnings miss announced on May 11, 2020," and there can be no plausible conflict under these facts. Dkt. No. 214 at 14-15. Dr. Nye opines that there is no economic basis for the alleged conflict because the alleged sales pipeline misstatements and merger misstatement are interrelated and under plaintiffs' theory of liability, all class period purchasers who held stock through May 18, 2020 "incurred the same economic loss as a result of the revelation of the relevant truth" concealed by all of defendants' prior misstatements. Nye Reply Report ¶¶ 49-50.

In *Blackie v. Barrack*, 524 F.2d 891, 908 (9th Cir. 1975), the defendants similarly contended that the interests of class members in proving damages from price inflation irreconcilably conflicted because some class members would desire to maximize the inflation existing on a given date while others would desire to minimize it. The court agreed that class members might at some point during

the litigation have differing interests but disagreed that such potential conflicts provided a valid reason to refuse to certify the class. *Id. Blackie* involved a case with interim corrective disclosures where the major portion of the alleged inflation was attributed to causes that allegedly persisted throughout the class period. *See id.* at 909-10. The court reasoned that it would be in the interest of each class member to maximize the inflation from those causes at every point in the class period and that because the major portion of the inflation was attributed to causes persisting throughout the period, interim corrective disclosures did not necessarily bring pre-disclosure and post-disclosure purchasers into conflict. *Id.* at 910. The court noted that courts "faced with the same situation have repeatedly . . . rejected defendants' position, for the potential conflict is present in most prolonged classes involving a series of misrepresentations." *Id.* The court specifically found that the conflict, if any, was substantially outweighed by the class members' "overriding common interest in establishing the existence and materiality of misrepresentations." *Id.* at 909.

Although the Court agrees with defendants that it is unclear to what extent the alleged sales pipeline related inflation was dissipated by partial disclosures prior to May 18, 2020, the Court also finds it credible that that May 18, 2020 disclosure dissipated both merger and sales pipeline related inflation. Both Meitav and Glazer share an interest in maximizing overall inflation from both the merger related misstatement and the sales pipeline-related misstatements. Any potential conflict is too speculative to decline to certify the class at the outset. *See id.* at 909 (noting that "courts have generally declined to consider conflicts, particularly as they regard damages, sufficient to defeat class action status at the outset unless the conflict is apparent, imminent, and on an issue at the very heart of the suite"); *In re JPMorgan Chase & Co. Sec. Litig.*, 2015 U.S. Dist. LEXIS 132181, at *13 (S.D.N.Y. 2015) (noting that the court is not aware of any case "holding that a lead plaintiff seeking class certification in a securities fraud suit fails to establish adequacy or typicality where that plaintiff made securities purchases after an alleged partial corrective disclosure but before the final corrective disclosure"); *In re LDK Solar Sec. Litig.*, 255 F.R.D. 519, 530 (N.D. Cal. 2009) (finding that although class members might favor different interpretations regarding the extent to which a report disclosed the fraud or a press-released re-inflated the stock price, "all class members are unified by an interest in proving the same common course of conduct regarding the defendant's

1   allegedly fraudulent [] representations").

2

3                                  **CONCLUSION**

4        The Court certifies the following class: all persons and entities who purchased or otherwise

5   acquired Forescout common stock between May 9 or 10, 2019[14] and May 15, 2020, both dates

6   inclusive.  Lead plaintiffs the Glazer Funds[15] and Meitav Mutual Funds Ltd. are appointed as Class

7   Representatives.  Pomerantz LLP and Abraham, Fruchter & Twersky LLP are appointed as Co-

8   Class Counsel.

9

10                **ASSOCIATED ADMINISTRATIVE SEALING MOTIONS**

11       Defendants submitted an administrative motion to consider whether another party's material

12  should be sealed concurrently with their opposition.  Dkt. No. 201.  Plaintiff Glazer Funds filed a

13  statement in response with significantly narrowed redactions.  Dkt. No. 206.  The Court has

14  reviewed the proposed narrowed redactions and finds that the "compelling reasons" standard for

15  sealing the documents is met.  Plaintiff Glazer Funds' proposed order at Dkt. No. 206-7 is hereby

16  GRANTED.

17

18

19

20

21

22  ///

23  ///

24

25       [14] The parties appear in their briefing to dispute whether the class period should start on May
    9, 2019 or May 10, 2019.  At the May 17, 2024 hearing, the parties indicated they could resolve this
26  dispute on their own.

27       [15] The Glazer Funds refers to Glazer Capital Management, L.P., Glazer Enhanced Fund,
    L.P., Glazer Enhanced Offshore Fund, Ltd., Glazer Offshore Fund, Ltd., and Highmark Limited, in
28  respect of its Segregated Account Highmark Multi-Strategy 2.  *See* Dkt. No. 196-1.

United States District Court
Northern District of California

Defendants also submitted an administrative motion to consider whether another party's material should be sealed concurrently with their sur-reply.  Dkt. No. 216.  Plaintiff Glazer Funds submitted a response indicating that they do not require any of the items identified in Dkt. No. 216 to be maintained under seal.  This motion is therefore DENIED.

**IT IS SO ORDERED**.

Dated:  May 28, 2024

SUSAN ILLSTON
United States District Judge

United States District Court
Northern District of California